## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Kohchise Jackson,

   Plaintiff,

v.

Corizon Health, Inc., et al.

   Defendants.

Case No: 2:19-cv-13382
District Judge: Terrence G. Berg
Magistrate Judge: Patricia T. Morris

---

MARGOLIS, GALLAGHER & CROSS
Lawrence H. Margolis (P69635)
Ian T. Cross (P83367)
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Defendants Corizon Health, Inc.
and Keith Papendick, M.D.
1441 West Long Lake Road, Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
dscarber@chapmanlawgroup.com

CORBET, SHAW, ESSAD, & BONASSO, PLLC
Daniel R. Corbet (P37306)
Kenneth A. Willis (P55045)
Attorneys for Prime Healthcare Services,
Colleen M. Spencer, and David A. Krause
30500 Van Dyke Ave., Suite 500
Warren, MI 48093
(313) 964-6300
daniel.corbet@cseb-law.com
kenneth.willis@cseb-law.com

---

## DEFENDANTS CORIZON HEALTH INC., AND KEITH PAPENDICK M.D.'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants CORIZON HEALTH, INC., and KEITH PAPENDICK, M.D., (hereinafter the "Corizon Defendants") by and through their counsel, CHAPMAN LAW GROUP, and for their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, state as follows:

1. On January 3, 2020, Plaintiff Kohchise Jackson filed his Amended Complaint in this matter against Defendants Prime Healthcare Services, Colleen Marie Spencer, Keith Papendick, M.D., and Corizon Health, Inc. (**Dkt. No. 12, PageID.183**).[1]

2. As it pertains to the Corizon Defendants, Plaintiff alleges that these Defendants, *between April 18, 2017, and April 27, 2017*, refused to approve his request for a colostomy reversal surgery. (**Id., PageID.193, 198, 200, 201**; **¶¶50, 74, 80**).

3. Specifically, Plaintiff alleges:

   **(a)** Defendant Dr. Papendick was "an official with final *decision-making authority* with respect to whether 407 requests…are approved or ATP'd" (**Id., PageID.191**, ¶37); and

   **(b)** Defendant Corizon Health, Inc., acting through its *final decisionmaker*, Dr. Papendick, unlawfully determined that the reversal was not "medically necessary," thereby not only violating MDOC Policy, but

---

[1] Plaintiff's Amended Complaint also named Dr. David Krause, D.O., a physician at the St. Clair County Jail who was dismissed by this Court on June 30, 2020 (ECF No. 32, PageID.629).

further violating the United States Constitution for purposes of deliberate indifference. (**PageID.193, ¶48**).

**(c)** Defendant Corizon, Inc., through Dr. Papendick, unlawfully determined that the reversal surgery was not medically necessary in order to avoid paying for the procedure and making a larger profit. (**PageID.200, ¶83**).

4. Discovery has now taken place in this case, including depositions of Plaintiff, his surgeon Dr. Erina Kansakar, his retained expert Dr. Ralph Silverman, M.D., and defendants. Based upon the evidence, including the admissions of Plaintiff's own witnesses, summary judgment is proper, as **there is no genuine dispute as to the following facts**:

**(a)** It was Plaintiff's *own treating surgeon*, Dr. Kansakar, who determined that the colostomy reversal was not medically necessary and who, upon being contacted by Defendants when Plaintiff arrived to prison, specifically advised Defendants that there were "no urgent medical issues," "the colostomy is functional," and there was "*no MEDICAL NECESSITY*." (**Exhibit A, pp. 63-64, 72**); (**Exhibit B**);

**(b)** Plaintiff's own treating surgeon, Dr. Kansakar, testified that the colostomy reversal was "*not medically necessary*." (**Exhibit C, p. 32**);

**(c)** Plaintiff's treating surgeon, Dr. Kansakar, testified that, with respect to colostomy reversals, "there can be *differences of opinion*, amongst

doctors, regarding colostomy reversal, whether we do it, [and] the timing of when it can be done." (**Exhibit C, p. 57**). She further testified that, as to colostomy reversals for Hartmann's Procedures (i.e., Plaintiff's original colostomy procedure), it is "within a particular medical provider's ***medical judgment*** as to what they are going to do or what they think is appropriate for a particular patient." (**Exhibit C, pp. 58-59**);

**(d)**  Plaintiff's treating surgeon, Dr. Kansakar, testified that there are ***"real" and "significant" risks with colostomy reversal surgeries***, including "death, infection, the potential need for reoperation and the potential for a leak or potential for damage to surrounding structures including the ureter and genitourinary system." (**Exhibit C**, **pp. 52-53**). She further testified that these risks "are real things that can occur" and that they can occur with every patient, including a patient such as Mr. Jackson. (**Exhibit C, pp. 53, 67**).

**(e)**  Dr. Papendick testified that he ***exercised his medical judgment*** in determining that an alternative treatment plan was appropriate, and the reversal was not medically necessary (**Exhibit D, p. 105**). He testified that he "made the right call" because:

> "there is a baseline question about whether its [the surgery's] risk is worse than its benefits. ***His risk*** was more than his benefit for a…colostomy reversal. ***He was*** having absolutely no complaints,

except that he wanted his reversal. ***He was*** having no medical problems whatsoever, according to the provider who saw him on a regular basis." (**Exhibit D**, **pp. 73-74**).

Dr. Papendick testified that, in his medical judgment, the surgery was not medically necessary **and** there was also an MDOC policy directive[2] that Dr. Papendick was required to follow which categorized this surgery as "reconstructive" and "cosmetic" surgery and mandated that the MDOC's chief medical officer (CMO) was the ultimate authority and final decision-maker as to Plaintiff's colostomy reversal being approved. (**Exhibit D, p. 85**).

**(f)**   Plaintiff's retained expert, Dr. Silverman, testified that, in his opinion, Dr. Papendick ***failed to exercise proper medical judgment*** in determining whether there was medical necessity for the reversal surgery, that Dr. Papendick's actions in failing to exercise proper medical judgment constituted a breach of the standard of care, and that ***he disagrees with Dr. Papendick's medical judgment*** that the risks of the colostomy reversal outweighed the benefits of the surgery.[3] The law is clear that "differences in judgment between an inmate and prison medical

---

[2] The MDOC policy in question is Policy 03.04.100-Corrective and Reconstructive Services, AA. And BB.

[3] Dr. Silverman was recently deposed on July 23, 2021, and his transcript is unavailable at this time.  Defendants may supplement as necessary.

personnel regarding appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim." *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976).

**(g)** Dr. Papendick and Dr. Bomber (Corizon's State Medical Director at the time in question) testified that neither Dr. Papenick ***nor Corizon*** is the final decision-maker with respect to whether a 407 request for a colostomy reversal is approved, and that it was the MDOC, according to the MDOC's Policy, that made the final determination denying Plaintiff's medical request. (**Exhibit D, pp. 94-96**) (**Exhibit E, p. 92**). The law is clear that a policy, practice, or custom can be established only if "a plaintiff can identify…actions taken by officials with final decision-making authority." *Winkler v. Madison Cty.*, 893 F.3d 877, 901 (6th Cir. 2018) (quoting *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)). By all accounts Dr. Papendick did not have final decision-making authority regarding the reversal surgery.

**(h)** Plaintiff's treating surgeon, Dr. Kansakar, testified that the colostomy reversal sought by Plaintiff fits squarely into the definition of the MDOC's policy regarding Corrective and Reconstructive Surgery (**Exhibit C, p. 59**), meaning that it "shall be authorized for a prisoner ***only*** if determined medically necessary **and only if approved by the**

**CMO**.” (*See* **Exhibit F, MDOC policy 03.04.100.AA.BB**.). Dr. Bomber testified that the CMO refers to the chief medical officer for the MDOC (**Exhibit E, p. 77**). The MDOC considers colostomy reversals to be cosmetic surgeries (**Exhibit E, pp. 74-76**).

(i)   Plaintiff testified at his deposition that it was the ***MDOC's officials and its policies*** that denied his colostomy reversal, admitting that "MDOC told me they wouldn't do the surgery because it was cosmetic, and they said I was more worried about my appearance." (**Exhibit G, p. 136**); Jackson admitted the MDOC Ombudsman told him that the MDOC policy is "they don't do reconstructive and cosmetic surgery." (**Exhibit G, p. 177**), which is consistent with Dr. Papendick's and Dr. Bomber's testimony regarding the MDOC policy.

(j)   Lastly, Plaintiff admitted that the MDOC specifically advised him, when denying his surgery, that "reversal for a functional colostomy is considered non-essential. POLICY IS NO REVERSALS UNLESS there is a MEDICAL REASON." (**Exhibit G, pp. 143-144**); (see also **Exhibit H**, **MDOC's Step II Grievance Appeal Response, signed by MDOC officials**) (emphasis as in original).

The law if very clear that in order to satisfy a *Monell* claim, the Plaintiff must prove that there is a policy, practice, or custom of Corizon that is unconstitutional

<u>and</u> must "identify the policy, connect the policy to the [defendant] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)), cert. denied, 114 S. Ct. 1219, 127 L.Ed.2d 565 (1994). As the evidence demonstrates, and as testified to by all of the parties, including Plaintiff, it was the MDOC Policy Directive that was the "'moving force' behind the [alleged] violation of the plaintiff's constitutional rights." *Maxwell v. Corr. Med. Servs., Inc.*, 538 F. App'x 682, 691 (6th Cir. 2013) (quoting *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)). Furthermore, "[i]f no constitutional violation by the individual defendants is established, the [entity] defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

5.     For the reasons set forth in the Brief accompanying this motion, there is no genuine issue of material fact regarding Plaintiff's claims against the Corizon Defendants, and summary judgment is proper.

6.     The undersigned attorney contacted Plaintiff's counsel via email on August 9, 2021. Plaintiff will oppose this motion.

WHEREFORE, based upon the foregoing reasons, Corizon Defendants respectfully requests that this Honorable Court GRANT the Corizon Defendants'

Motion for Summary Judgment and provide any and all further relief that this Court

deems just and equitable.

                              Respectfully submitted,

                              CHAPMAN LAW GROUP

Dated: August 9, 2021         /s/Devlin K. Scarber
                              Ronald W. Chapman Sr., M.P.A.,
                              LL.M. (P37603)
                              Devlin Scarber (P64532)
                              Attorneys for Corizon Defendants
                              1441 West Long Lake Rd., Suite 310
                              Troy, MI 48098
                              (248) 644-6326
                              rchapman@chapmanlawgroup.com
                              dscarber@chapmanlawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Kohchise Jackson,

      Plaintiff,

v.

Corizon Health, Inc., et al.

      Defendants.

Case No: 2:19-cv-13382
District Judge: Terrence G. Berg
Magistrate Judge: Patricia T. Morris

---

MARGOLIS, GALLAGHER & CROSS
Lawrence H. Margolis (P69635)
Ian T. Cross (P83367)
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Defendants Corizon Health, Inc.
and Keith Papendick, M.D.
1441 West Long Lake Road, Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
dscarber@chapmanlawgroup.com

CORBET, SHAW, ESSAD, & BONASSO, PLLC
Daniel R. Corbet (P37306)
Kenneth A. Willis (P55045)
Attorneys for Prime Healthcare Services,
Colleen M. Spencer, and David A. Krause
30500 Van Dyke Ave., Suite 500
Warren, MI 48093
(313) 964-6300
daniel.corbet@cseb-law.com
kenneth.willis@cseb-law.com

---

## BRIEF IN SUPPORT OF DEFENDANTS CORIZON HEALTH, INC., AND KEITH PAPENDICK M.D.'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES...................................................................... iii

STATEMENT OF ISSUES PRESENTED................................................ vi

CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT....... vii

I.   STATEMENT OF FACTS .............................................................1

II.   STANDARD OF REVIEW............................................................7

III.   LEGAL ARGUMENT .................................................................8

  A.   There is no genuine dispute that there was no medical necessity for Plaintiff's requested colostomy reversal...............................................9

  B.   There is no genuine dispute that Plaintiff's claim against the Corizon Defendants amounts to a disagreement over medical judgment. ........................15

  C.   There is no genuine dispute that Plaintiff cannot support a deliberate indifference claim regarding receiving inadequate supplies. ..............................20

  D.   There is no genuine dispute that Dr. Papendick is not the final decision-making authority and that Plaintiff has failed to demonstrate a Monell claim. ...20

IV.   CONCLUSION AND REQUESTED RELIEF............................................25

## INDEX OF AUTHORITIES

**CASES**                                                                                      **PAGE**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)................................................ vi, 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................ vi, 7

*Ayala v. Terhune,* 195 Fed. App'x. 87 (3rd Cir. 2006) ...........................................13

*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) ....................................................21

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004) .............................9, 19

*Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001) ............................................. vi

*Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146 (6th Cir. 1995)....................8

*Duchon v. Cajon Co.*, 791 F.2d 43 (6th Cir. 1986) ...................................................7

*Estelle v. Gamble*, 429 U.S. 97 (1976) ...................................................... vi, 8, 9, 19

*Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009)...........................................................8

*Farmer v. Brennan*, 511 U.S. 825 (1994) ...................................................... vi, 9, 19

*Ferrari v. Ford Motor Co.*,826 F.3d 885 (6th Cir. 2016)...........................................8

*Hoffer v Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020) ...............................23

*Johnson v Karnes*, 398 F.3d 868 (6th Cir. 2005)............................................... 18, 20

*Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010) ......................................20

*Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985)......................................... vi, 7

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990)....................................8

*Miller v Calhoun.*, 408 F.3d. 803 (6th Cir. 2005)....................................................21

*Miller v. Sanilac County*, 606 F.3d 240 (6th Cir.2010)......................................... vii

*Pembaur v. City of Cincinnati*, 106 S. Ct. 1292 (1986)..........................................21

*Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018)........................................ 9, 10, 18

*Scott v. Harris*, 550 U.S. 372 (2007) ................................................................ vi, 7

*Shofner v. Comacho*, 2000 U.S. App. LEXIS 23493 (6th Cir. Sept 14, 2000) ........18

*Street v. JC Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ...................................8

*Swarbrick v. Frantz*, 2012 U.S. Dist. LEXIS 33461 (D Colo, Feb. 21, 2012). 13, 14

*Taylor v. Hughes*, 920 F.3d 729 (11th Cir. 2019)....................................................23

*Waters v. City of Morristown, Tenn.*, 242 F.3d 353 (6th Cir. 2001) ..................... vii

*Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001)........................ 21, 24

*West v. Atkins*, 487 U.S. 42 (1988) ......................................................... vii

*Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976) ...............................................18

*Williams v. Mehra*, 186 F.3rd 685 (6th Cir. 1999) ................................................. vi

*Wilson v. Seiter*, 501 U.S. 294 (1991) ....................................................... vi

*Winkler v. Madison Cty.*, 893 F.3d 877 (6th Cir. 2018) .........................................22

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ...........................................................17

## STATUTES

42 U.S.C. § 1983 ............................................................................... vi, vii

## RULES

Fed. R. Civ. P. 56 ................................................................................ vi, 7

## <u>INDEX OF EXHIBITS</u>

**Exhibit A:**  MDOC Medical Records

**Exhibit B:**  Affidavit of Ronald E. Drinker, N.P.

**Exhibit C:**  Deposition of Erina Kansakar, M.D.

**Exhibit D:**  Deposition of Keith Papendick, M.D.

**Exhibit E:**  Deposition of Jeffrey Bomber, D.O.

**Exhibit F:**  MDOC Policy Directive 03.04.100.AA.BB

**Exhibit G:**  Deposition of Plaintiff, Kohchise Jackson

**Exhibit H:**  MDOC's Step II and Step III Grievance Appeal Response, signed by MDOC officials

**Exhibit I:**  Affidavit of James H. McQuiston, D.O., FACOS, FACS (general surgery expert)

**Exhibit J:**  Deposition of Ralph Silverman, M.D. (Plaintiff's retained general surgery expert)

**Exhibit K:**  *Swarbrick v. Frantz*, 2012 U.S. Dist. LEXIS 33461 (D Colo, Feb. 21, 2012)

**Exhibit L:**   *Shofner v. Comacho*, 2000 U.S. App. LEXIS 23493, *5 (6th Cir. Sept 14, 2000)

## <u>STATEMENT OF ISSUES PRESENTED</u>

I. SHOULD THE COURT GRANT THE CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BECAUSE THERE ARE NO GENUINE ISSUES OF ANY MATERIAL FACT?

**Defendant Answers:**          **YES.**
**Plaintiff Answers:**          **NO.**

## <u>CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

Summary judgment is appropriate if the moving party shows that there is no genuine issue as to any material fact, such that a reasonable jury could find only for the moving party – even when viewing the evidence in a light most favorable to the non-moving party. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); see also *Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). Plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts because allegations alone are not sufficient to avoid summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248. To state a 42 U.S.C. § 1983 claim for a violation of a prisoner's Eighth Amendment right to adequate medical care, a plaintiff must allege facts evidencing deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). To succeed on a claim of deliberate indifference, a plaintiff must demonstrate that, objectively, there was a "sufficiently serious" medical need, and must also show that each defendant was subjectively aware of that serious medical need, and consciously disregarded it. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001); *Williams v. Mehra*, 186 F.3rd 685, 691 (6th Cir. 1999).

A private entity employed by the state to provide medical services to its prison inmates may be sued under 42 U.S.C. § 1983 for constitutional violations. *West v. Atkins*, 487 U.S. 42, 54 (1988). To survive a summary judgment motion, Plaintiff must demonstrate that (1) his constitutional rights were violated, and (2) a policy or custom of CCS was the "moving force" behind the deprivation of his rights. *Miller v. Sanilac County*, 606 F.3d 240, 254–55 (6th Cir.2010); *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 362 (6th Cir. 2001).

## I.   <u>STATEMENT OF FACTS</u>

Plaintiff Kohchise Jackson was an inmate in the Michigan Department of Corrections prison from March 23, 2017, through May 16, 2019. Prior to his arrival at MDOC, from May 17, 2016 to March 23, 2017, Plaintiff was a pre-trial detainee at the St. Clair County Jail. During his incarceration at the St. Clair County Jail, Plaintiff was diagnosed with a colovesical fistula, for which he underwent a Hartmann's procedure on December 10, 2016, with Dr. Erina Kansakar, M.D. The Hartmann's "procedure involves removing a portion of the colon and creates a colostomy and the lower portion of the colon is disconnected. His bladder was repaired. He tolerated the procedure well and had an uneventful post-operative course." (**Exhibit I**).

Dr. Kansakar testified at her deposition that, during her pos-op visits with Mr. Jackson, **he never made any complaints to her about his colostomy**, and that her follow-up exams on December 27, 2016, and January 10, 2017, both demonstrated that his <u>colostomy was in good condition, productive, functioning properly, and he had no pain issues</u>. (**Exhibit C, pp. 41-43, 53**). Also, she never documented anything about him complaining about needing a reversal or that he absolutely had to have a reversal, nor it affecting him psychologically (**Exhibit C, p. 44**).

Plaintiff's Complaint alleges that he was supposed to have a reversal of his colostomy with Dr. Kansakar on February 9, 2017, while he was in the St. Clair

1

County Jail. (**Dkt. No. 12, PageID.197, ¶69**). However, Plaintiff alleges that the Co-Defendant Prime Healthcare jail medical staff refused to allow the surgery in order to "pass the cost of surgery onto the MDOC and/or its healthcare contractors." (**Dkt. No. 12, PageID.189, ¶26**). Dr. Kansakar testified that she <u>never</u> discussed any dates with Corizon providers at the prison on which she planned to perform a colostomy reversal on Plaintiff, stating, "if he wasn't in the prison [in February 2017]…I wouldn't have discussed that." (**Exhibit C, p. 48**).

Once Plaintiff arrived to prison on March 23, 2017, he was assessed by MDOC and Corizon medical staff. On March 24, 2017, Corizon health provider Ronald Drinkert, N.P., performed a history and physical exam on Plaintiff (**Exhibit B**). On March 24, 2017, N.P. Drinkert issued medical detail orders for Mr. Jackson, which included medical equipment and supplies for his colostomy, including a stomahesive skin barrier, paste, colostomy bags, and wipes. Also, on March 24, 2017, N.P. Drinkert counseled Plaintiff on how to use the colostomy supplies appropriately and properly care for his colostomy. Additionally, N.P. Drinkert affirms that:

> "On or about March 29, 2017, and April 7, 2017, in following up and obtaining further information regarding Mr. Jackson's care, I contacted his colostomy surgeon Dr. Kansakar's office and discussed the patient's care. During these conversations, I was advised by Dr. Kansakar's office that there were no urgent medical issues, the colostomy was functional, and there was no medical necessity for a colostomy reversal. I documented these

conversations in the patient's Michigan Department of Corrections medical chart."[4] (**Exhibit B, ¶5**).

On April 12, 2017, Plaintiff was transferred from the MDOC RGC facility to the JCS (Cooper Street) facility. Upon being assessed by the nurse, he advised that he was "supposed to have surgery for reversal." (**Exhibit A, p. 51**). The nurse also stated that the "patient does not have current symptoms of psychosis, depression, anxiety." (**Id.**). On April 18, 2017, Plaintiff was evaluated by Corizon health provider, Dr. Alsalman. On exam, Dr. Alsalman's findings included: "currently doing well," "having functional colostomy," "denies abdominal pain or UTIs," "Colostomy in place that's functioning well," "normal abdominal muscles," abdomen "soft, nontender, no organomegaly," "no hepatic enlargement," negative for palpable masses." (**Id., pp. 43-45**). On April 18, 2017, per Plaintiff's request, Dr. Alsalman submitted a 407 request[5] for a general surgery consult for a colostomy reversal. Dr. Alsalman's request emphasized that "he's currently doing well, having functional colostomy, denies abdominal pain or UTI's," and Plaintiff's statement that "he's ready for colostomy reversal." (**Id., p. 41**). Dr. Papendick reviewed the

---

[5] A 407 request is a term used by the MDOC that refers to a request for a particular medical test or procedure. "Could be anything from a test to a procedure to a change in food, it's myriad." (**Exhibit D, pp. 11-12**).

matter, and, on April 19, 2021, concluded that "[m]edical necessity not demonstrated at this time. Continue to follow in on site clinic by MSP." (**Id., pp. 36-38**).

Dr. Papendick testified that his decision was governed by there being no medical necessity and the MDOC policy which categorized this surgery as "reconstructive" and "cosmetic" surgery requiring approval of the MDOC's chief medical officer (CMO). (**Exhibit D, pp. 85, 115**). The MDOC has a specific policy directive governing this matter, which states:

> AA. Corrective surgery is a surgical procedure to alter or adjust body parts or the body structure. Reconstructive surgery is a surgical procedure to reform body structure or correct defects. For purposes of this policy, corrective and reconstructive surgery does not include procedures which can be done under local anesthesia.
>
> BB. Corrective and reconstructive surgery shall be authorized for a prisoner only if determined medically necessary and only if approved by the CMO. It shall not be approved if the sole purpose is to improve appearance. (MDOC Policy Directive 03.04.100, **Dkt. No. 17-2**).

According to Dr. Kansakar, Plaintiff's colostomy reversal fit precisely into the MDOC's policy definition for corrective or reconstructive surgery:

> Q. When you're going to do a reversal, essentially <u>what you're trying to do is alter or adjust the patient's body or their body structure</u>, right, back to what it was, correct?
> A. Yes, sir.
> Q. I mean, you're trying to put a patient back in some kind of original way, correct?
> A. Correct. The goal is to establish the natural continuity.
> Q. <u>And it's reconstructive in the sense that you're to reform the body structure back to how it was previously</u> in terms

> of what you indicated in terms of how to have their waste
> excreted in the original way, correct?
> A. Yes, sir. (**Exhibit C, p. 59**).

Therefore, any approval for Plaintiff's colostomy reversal surgery would be governed by MDOC Policy Directive 03.04.100.

Dr. Papendick also testified that not only does the MDOC have the final authority regarding approvals for reversal surgery, but that there is a multi-step appeal process whereby Corizon could overturn his initial decision on medical necessity (**Exhibit D, p. 93**). Dr. Papendick is only the first or second step in a multi-step process, further demonstrating that he is not a final decisionmaker (**Id., p. 92**). Dr. Bomber provided similar testimony regarding the appeals process (**Id., pp. 49-50**). Here, neither Plaintiff nor any of his providers ever pursued any appeals within Corizon's appeal process, and Plaintiff has sued no other providers. The only involvement that Dr. Papendick had in Mr. Jackson's quest for a colostomy reversal was in April 2017 when Plaintiff was first admitted to the MDOC (**Id., p. 104**).

Plaintiff filed a grievance with the MDOC regarding his reversal surgery, going through the 3-step MDOC grievance process, with denials occurring on 5/15/2017, 6/8/2017, and 10/19/2017. The MDOC provided detailed reasons for which it determined that there was no medical necessity for a reversal, citing various records stating: "**colostomy in good status**," "**able to complete self-care**," "**has a greater degree of body image issue than other concerns**," "**no urgent medical

**issues were reported from the surgeon's office and the colostomy is functional**," "**no medical necessity per outside documentation or from conversation with surgeon's (Dr. Kansakar's) office**," "**radiologic studies on 4/7/2017 which showed no issues with the colostomy**." (see **Dkt. No. 12-9; PageID268**; also **Exhibit H**).

It was the MDOC that denied Plaintiff's request for reversal surgery, stating:

> "Per documentation, you are doing fine with current condition, the reversal is a <u>major surgery with potential complications up to death</u> and the Department will not okay <u>a dangerous unnecessary elective procedure</u>, a reversal for a functional colostomy is <u>considered non-essential</u>. <u>POLICY IS NO REVERSAL UNLESS there is a MEDICAL REASON</u>. (See **Exhibit H**)(emphasis as in original).

On or about October 25, 2017, the MDOC issued its Step III Grievance Response, again denying Plaintiff's request for surgery to reverse his colostomy. The MDOC's denial stated in pertinent part, "all relevant information within the electronic record has be reviewed…a disagreement with the plan of care does not support a denial of care or inadequate medical treatment." (**Exhibit H**).

Mr. Jackson was paroled on May 16, 2019. He filed his lawsuit in this matter on November 18, 2019 (**Dkt. No. 2, PageID.42**), alleging that Dr. Papendick and Corizon Health, Inc., somehow violated his Constitutional Eighth Amendment rights against cruel and unusual punishment. (**Dkt. No. 12, PageId.198**).

## II.   <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).

In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986). However, a party opposing a motion for summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*. (quotations and citation omitted). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial…" *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). Conclusory statements without demonstrated evidentiary support will not defeat a motion for summary judgment. *Ferrari v. Ford Motor Co.*,826 F.3d 885,897-898 (6th Cir. 2016) (quoting *Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454,458 (6th Cir. 2013)). Moreover, a plaintiff cannot simply "replace conclusory allegations of the complaint... with conclusory allegations of an affidavit. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). As the Sixth Circuit stated, a party responding to a summary judgment motion must "put up" supporting evidence or "shut up" regarding his claim. *Street v. JC Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989); *Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995).

## III.    LEGAL ARGUMENT

The United States Supreme Court holds that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, an action under the Eighth Amendment does not transform medical malpractice claims into constitutional violations "merely because the victim is a prisoner." *Id*. at 106. Rather, "[i]n order to state a cognizable claim, a prisoner

8

must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id*. To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 895 (6th Cir. 2004).

**A. There is no genuine dispute that there was no medical necessity for Plaintiff's requested colostomy reversal.**

Based upon the evidence in this case, Plaintiff cannot demonstrate the Eighth Amendment's objective component's requirement of a serious medical need for him to receive a colostomy reversal. See *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) holding that, in claims alleging that the medical treatment was "inadequate," there "must be **medical proof** that the provided treatment was not adequate medical treatment of the [inmate's] condition." *Id.* (citing *Santiago v Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). *Rhinehart* holds that where "an inmate ha[s] a medical need 'diagnosed by a physician as **mandating** treatment,' the plaintiff can establish the objective component by showing that the prison failed to provide treatment." (citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)). Additionally, "a deliberate-indifference claim based on a 'desire for additional or different

treatment' will typically require evidence, likely expert medical testimony, 'showing the **medical necessity** for such a treatment.'" *Id.* at 746 (citing *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017).

In this case, there is no dispute that there is no physician or literature mandating that Plaintiff was to receive a colostomy reversal, nor that there was "medical necessity" for a reversal. Plaintiff admitted that he received various medical treatments for his colostomy, but simply wished for a different treatment that he feels would have been more adequate:

> Q. Do you disagree with Dr. Papendick's medical judgment that you did not require a colostomy reversal?
> A Yeah.
>
> \* \* \*
>
> Q. …So you believe that -- is it fair to say that <u>you believe that instead of treating you the way they did when you were in the MDOC in terms of giving you medical assessments, supplies, referring you to the ER, determining what type of supplies you might need, performing labs and X-rays, you believe that they should have also been doing a colostomy reversal as well; right</u>?
> A I believe they should have did (sic) the colostomy reversal.
> Q <u>Instead of all the other stuff they were doing</u>?
> A Yes. (**Exhibit G, pp. 173-174**).

Here, discovery has revealed that it was Plaintiff's own treating surgeon, Dr. Kansakar, who determined that the colostomy reversal was not medically necessary and who, upon being contacted by Corizon healthcare provider when Plaintiff arrived to prison, specifically advised the Corizon healthcare provider that there

were "no urgent medical issues," "the colostomy is functional," and there was "no MEDICAL NECESSITY." (**Exhibit A, pp. 63-64, 72**); (**Exhibit B**). At her deposition, Dr. Kansakar testified that the colostomy reversal was "not medically necessary." (**Exhibit C, p. 32**). Additionally, Plaintiff's retained expert, Dr. Silverman testified:

> Q. And you're not aware of any particular **mandate** that says, after you have a colostomy, you must 100 percent, absolutely have to have a colostomy reversal?
> A. Correct. (**Exhibit J, p. 29**).

Not only did Dr. Kansakar testify that there was no medical necessity for Plaintiff's reversal, but she further testified that, with respect to colostomy reversals, there can be ***differences of opinion***, and amongst doctors, and it is within a particular medical provider's ***medical judgment***:

> Q. Well, let me just ask you this to save some time here. <u>What this basically says, these different studies that it's talking about, is basically saying that there can be differences of opinion, differences of opinions amongst doctors regarding colostomy reversal, right, whether we do it, the timing of when it can be done, things like that, correct</u>?
> A. Yes, sir.
> Q. And you don't disagree with that, right?
> A. <u>No, I do not disagree with that</u>.  (**Exhibit C, p. 57**).
>
> \* \* \*
>
> Q. Doctor, just to follow up with you regarding what we were talking about when we last left off, here are some of those articles that were filed or that were referenced in a court filing. Are you able to see my screen?
> A. Yes, sir.

11

> Q. Okay. One of the articles being "What Proportion of Patients with an Ostomy for Diverticulitis Get Reversed", another one being "Restoration of Bowel Continuity After Surgery for Acute Perforated Diverticulitis: Should Hartmann's Procedure be Considered a One-Stage Procedure, Feasibility and Morbidity of Reversal of Hartmann's, so Avoiding or Reversing Hartmann's Procedures." <u>So there's a number of articles that would seem to indicate that it's certainly within a particular medical provider's medical judgment as to what they are going to do or what they think is appropriate for a particular patient, correct</u>?
> A. <u>Correct, sir</u>.
> Q. And you don't disagree with that, right?
> A. <u>I do not disagree with that</u>. (**Exhibit C, p. 58**).

Similarly, Defendant's expert general surgeon, Dr. McQuiston affirms that "there is no specific time frame or standard for whether or when a reversal surgery must occur. Mr. Jackson had no medical necessity that required him to have a reversal surgery done before he completed his incarceration." (**Exhibit I, ¶5**). Dr. McQuiston further opined that "there is nothing in Mr. Jackson's records that indicates he was having issues or complications with his colostomy that necessitated a reversal. Mr. Jackson was not put at any risk nor suffered any damages or injuries by not having his colostomy reversal during his incarceration. When he had his reversal surgery done in 2019, he had a very uneventful recovery." (**Id., ¶7**). Plaintiff's retained expert surgeon, Dr. Silverman, further confirmed that Plaintiff suffered no medical injuries by not having his colostomy reversed in the MDOC.

> Q. Doctor, you mentioned in your report, that the longer a reversal is delayed, the more likely the chance of

developing fibrosis in the pelvis, where the rectal stump
sits, and it can cause a difficult reconnection procedure,
and poor functional results of incontinence and stricture
formation. Do you recall that?

A.  Yes.

Q.  <u>None of these problems existed with Mr. Jackson, did
they</u>?

A.  **Nope.** (**Exhibit J, p. 30**).

* * *

Q.  Did you notice any difference in his medical condition
between the time he was released and the time that he was
in prison, that would make a colostomy reversal, say, more
urgent after he was released?

A.  So **I saw no difference in the medical condition**. (**Id.,
pp. 62-63**).

In *Ayala v. Terhune,* 195 Fed. Appx. 87 (3rd Cir. 2006), the plaintiff prisoner

suffered from ulcerative colitis before being committed to state prison. He believed

that prison doctors and nurses should have approved the colostomy reversal surgery

as suggested by his prior physician. The Third Circuit refused to uphold a deliberate

indifference claim simply because another doctor suggested a colostomy reversal

and the correctional health personnel made the decision to not follow the suggestion,

reasoning that such decisions fall squarely into the well-established rule that refusal

to provide a particular course of treatment preferred by the plaintiff does not

constitute deliberate indifference.

Similarly, in *Swarbrick v. Frantz*, 2012 U.S. Dist. LEXIS 33461 (D Colo, Feb.

21, 2012) (**Exhibit K**) despite plaintiff-inmate filing multiple grievances demanding

a colostomy reversal surgery, the inmate was denied the procedure. The nursing staff

in *Swarbrick* (similar to this case) documented that the colostomy bag was in place on the colostomy and that there appeared to be no problems with the colostomy. The court ultimately denied the plaintiffs preliminary injunction and denied his Eighth Amendment claims. In deciding whether there was an imminent irreparable injury sufficient to sustain a preliminary injunction under the Eighth Amendment, the court emphasized the non-emergency nature of a colostomy reversal. It found that the inmate's colostomy was medically supervised, and staff documented that the risk of problems with the ostomy site is extremely small.

Here, Mr. Jackson's records clearly indicated that "no urgent medical issues were reported from the surgeon's office and the colostomy is functional." In fact, just as in Jackson's case, the doctors in *Swarbrick* demonstrated that a colostomy reversal is not a particularly time sensitive procedure:

> There is a minimal amount of time that must pass before reversal can be considered, but there is no maximum amount of time. I even reviewed a number of ostomy blogs looking for evidence to support the offender's claim that it is medically necessary to reverse his colostomy. The blogs all made it very clear that it is individual choice to pursue reversal, and that reversal can occur years after placement. In addition, not only did the blogs contain patient stories of successful reversal, they also contained many stories of unsuccessful reversals. *Id.* at *12.

Plaintiff's own surgeon's office advised the Corizon medical staff that the reversal was not medically necessary, and she later testified that it was not medically necessary. The evidence is clear that no doctor or authority mandates that a reversal

be done nor the timing of when it must be done.  As such, Plaintiff cannot satisfy the objective component that a colostomy reversal was sufficiently serious.

**B.    There is no genuine dispute that Plaintiff's claim against the Corizon Defendants amounts to a disagreement over medical judgment.**

In addition to Plaintiff's surgeon's admission that whether and when to do a colostomy reversal is based upon medical judgment and can vary from provider to provider, Plaintiff's expert Dr. Silverman also agreed that this case amounts to a disagreement over medical judgment:

> Q. Dr. Silverman, <u>your opinion in this case is that Dr. Papendick failed to exercise proper medical judgment in treating Mr. Jackson, correct</u>?
> A. **Yes**. (**Exhibit J, p. 10**).
>                         * * *
> Q. And <u>you reviewed Dr. Papendick's testimony, where he discussed that, in his medical judgment, the risk for doing surgery for Mr. Jackson outweighed the benefit of doing the surgery, correct</u>?
> A. I did read that testimony, in fact.
> Q. You disagree with that, right?
> A. **I wholly disagree with that**. (**Id., p. 19**).

Dr. Papendick testified that he *exercised his medical judgment* in determining that an alternative treatment plan was appropriate, and the reversal was not medically necessary (**Exhibit D, p. 105**). He testified that he "made the right call" because "*His risk* was more than his benefit for a…colostomy reversal. *He was* having absolutely no complaints, except that he wanted his reversal. *He was* having no medical problems whatsoever, according to the provider who saw him on a regular

basis." (**Exhibit D, pp. 73-74**). Dr. Papendick testified that, in his medical judgment, the surgery was not medically necessary **and** there was also an MDOC policy directive[6] that Dr. Papendick was required to follow which categorized this surgery as "reconstructive" and "cosmetic" surgery and mandated that the MDOC's chief medical officer (CMO) was the ultimate authority and final decision-maker as to Plaintiff's colostomy reversal being approved. (**Id., p. 85**).

Although Dr. Silverman disagrees with Dr. Papendick's medical judgment, he agreed with Dr. Papendick's conclusion that Plaintiff was having no medical problems, and merely wanted a reversal:

> Q. Dr. Papendick testified that the patient was having absolutely no complaints, no medical problems, but was just saying he wanted a reversal back in March or April of 2017. Did you read that in his deposition?
> A. Yes.
> Q. Did you read in any record, in March or April of 2017, when this was reviewed by Dr. Papendick, where the patient was making any medical complaints, talking about pain, or that his colostomy wasn't functioning properly?
> A. No.
> Q. In fact, there's nothing in the records that say anything like that, is there?
> A.  True. (**Exhibit J, p. 24**).

---

[6] The MDOC policy in question is Policy 03.04.100-Corrective and Reconstructive Services, AA. And BB.

Dr. Silverman also reviewed Plaintiff's testimony where he was essentially demanding a reversal and threatening a lawsuit the moment Plaintiff left the county jail and arrived to the MDOC, <u>even without</u> having any physical complaints:

> Q. Did you review his testimony, that as soon as he got to prison from the St. Clair County Jail, he was planning to file a lawsuit against the jail because he hadn't gotten a reversal in jail?
> A. Yes. I think he also threatened that in the records as well, the medical records.
> Q. And did you review where he testified that he essentially came to prison, saying he would sue the prison too, even though he had no physical complaints about the colostomy?
> A. I do recall that. (**Id., p. 25**).

Dr. Silverman also agreed that, as part of a physician's medical judgment, physicians, including himself, should always consider the possibility that risks may occur to a patient even where those risks may ultimately not happen. (**Id., p. 41**).

> Q. It was worth you mentioning that these things could happen, that these are risks that could happen, when you were trying to consider, with your medical judgment, what the standard should be, right?
> A. That's right. (**Id., p. 41**).

Federal Courts typically do not intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d

857, n.5 (6th Cir. 1976). See *Rhinehart, supra,* at 752, holding: "Neither negligence alone, nor a disagreement over the wisdom or correctness of a medical judgment is sufficient for the purpose of a deliberate indifference claim." Nor does an alleged "**misdiagnosis** of an ailment" constitute deliberate indifference. *Johnson v Karnes*, 398 F.3d 868, 875 (6th Cir. 2005). See also *Shofner v. Comacho*, 2000 U.S. App. LEXIS 23493, *5 (6th Cir. Sept 14, 2000) (**Exhibit L**):

> Rather, <u>Shofner feels that the Defendants should provide him the treatment Dr. Bloss recommended</u>. But <u>a difference of opinion regarding medical treatment</u> or Shofner's need for back surgery <u>is insufficient to state a claim under the Eighth Amendment</u>. See *Estelle* (citations omitted). Accordingly, Shofner's Eighth Amendment claim was <u>properly dismissed for failure to state a claim</u> upon which relief may be granted.

Furthermore, this Honorable Court has previously recognized that if discovery commenced and it was "demonstrated that the decision to deny the colostomy reversal surgery was based on a medical professional's judgment of the medical risks and benefits associated with the surgery – not mere economic considerations," dismissal would be consistent with the law and the actions of other courts that have decided this issue. (See **Dkt. No. 32, PageId.623**). Based upon the testimony and admissions of Plaintiff's own witnesses, as well as Dr. Papendick, his decision was based upon his medical judgment concerning the risks and benefits of the procedure. (**Exhibit D, p. 74**). Here, Dr. Silverman specifically testified that he "reviewed Dr. Papendick's testimony, where he discussed that, in his medical judgment, the risk for

doing surgery for Mr. Jackson outweighed the benefit of doing the surgery," and the disagrees with Dr. Papendick (**Exibit J, p. 19**).

For the above reasons, even if Plaintiff was able to establish a serious medical need, he could not meet the subjective element of the deliberate indifference test. Jackson must prove facts supporting an inference that Defendants knew about and disregarded a substantial risk of harm associated with not providing him with the colostomy reversal. Given the evidence, in no way could Papendick's conduct demonstrate a "sufficiently culpable state of mind in denying medical care" nor "wanton infliction of pain" when treating Plaintiff. See *Estelle v. Gamble*, 429 U.S. 97,104 (1976); *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 895 (6th Cir. 2004). The law expressly holds that a prison physician's "<u>failure to alleviate a significant risk that he should have perceived</u> but did not, while no cause for commendation, <u>cannot under our cases be condemned as the infliction of punishment</u>." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (emphasis added).

Here, the overwhelming evidence demonstrating that (a) there is no mandate that a colostomy reversal must be done, (b) there was no medical necessity in Mr. Jackson's particular medical situation for a reversal, (c) the agreement by all of the medical physicians that the colostomy reversal decision is left to a provider's medical judgment, and (d) the fact that Plaintiff did not suffer sufficiently serious

medical injuries by not receiving his reversal would all defeat deliberate indifference.

**C. There is no genuine dispute that Plaintiff cannot support a deliberate indifference claim regarding receiving inadequate supplies.**

Plaintiff admitted that his claim about not receiving adequate colostomy supplies occurred occasionally, was usually promptly corrected, and not intentional. He testified that the correct supplies were usually provided within a week or two, that this did not happen all the time, and he is not alleging that this was done "purposefully." (**Exhibit G, pp. 109,112, 118-120**). He further testified that it was the MDOC nurse who handled getting him the supplies. This would not amount to deliberate indifference and, further, Plaintiff did not sue the MDOC.

**D. There is no genuine dispute that Dr. Papendick is not the final decision-making authority and that Plaintiff has failed to demonstrate a Monell claim.**

"Liability may be imposed on a[n] [entity carrying out a traditional state function like providing medical services at a jail, see *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) only when [that] [entity's] 'policy' or 'custom' caused the plaintiff's injury and a 'direct causal link' existed between the policy and the purported denial of the right to adequate medical care." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (internal citations omitted). A "policy or custom" can be based upon: "(1) the [entity's]... official policies; (2) ***actions taken by***

*officials with final decision-making authority*; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). However, "[i]f no constitutional violation by the individual defendants is established, the [entity] defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

Here, the ultimate basis of Plaintiff's claim against Dr. Papendick, and the sole basis for his *Monell* claim is that Dr. Papendick was a final decisionmaker regarding the colostomy reversal. The evidence clearly demonstrates that Dr. Papendick is not the final decisionmaker with respect to Plaintiff's requested colostomy reversal.

Corizon could only be liable when the alleged official (alleged by Plaintiff to be Dr. Papendick) has the "final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 106 S. Ct. 1292, 1299 (1986). The well-settled legal rule is that "final decision authority is unreviewable and not constrained by the official policies of superior officials." *Miller v Calhoun*, 408 F.3d. 803, 816 (6th Cir. 2005).

By all accounts Dr. Papendick did not have final decision-making authority regarding the reversal surgery. Dr. Papendick and Dr. Bomber (Corizon's State Medical Director at the time in question) testified that neither Dr. Papenick *nor*

***Corizon*** is the final decision-maker with respect to whether a 407 request for a colostomy reversal is approved, and that it was the MDOC, according to the MDOC's Policy, that made the final determination denying Plaintiff's medical request. (**Exhibit D, pp. 94-96**) (**Exhibit E, p. 92**). The law is clear that a policy, practice, or custom can be established only if "a plaintiff can identify…actions taken by officials with final decision-making authority." *Winkler v. Madison Cty.*, 893 F.3d 877, 901 (6th Cir. 2018) (quoting *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)).

Plaintiff's treating surgeon, Dr. Kansakar, testified that the colostomy reversal sought by Plaintiff fits squarely into the definition of the MDOC's policy regarding Corrective and Reconstructive Surgery (**Exhibit C, p. 59**), meaning that it "shall be authorized for a prisoner ***only*** if determined medically necessary **and only if approved by the CMO**." (See **Exhibit F**). Dr. Bomber testified that the CMO refers to the chief medical officer for the MDOC (**Exhibit E, p. 77**). The MDOC considers colostomy reversals to be cosmetic surgeries (**Id., pp. 74-76**).

Moreover, Plaintiff admitted at his deposition that it was the ***MDOC's officials and its policies*** that denied his colostomy reversal, admitting that "MDOC told me they wouldn't do the surgery because it was cosmetic, and they said I was more worried about my appearance." (**Exhibit G, p. 136**); Jackson admitted the MDOC Ombudsman told him that the MDOC policy is "they don't do reconstructive

22

and cosmetic surgery." (**Id., p. 177**), which is consistent with Dr. Papendick's and Dr. Bomber's testimony regarding the MDOC policy. Furthermore, Plaintiff admitted that the MDOC specifically advised him that the denial of the colostomy reversal was based upon their policy (**Id., pp. 143-144**).

Another fatal flaw with Plaintiff's *Monell* claim is that since the evidence and admissions by Plaintiff's own witnesses demonstrates that Dr. Papendick's decision was also based upon his medical judgment regarding medical necessity and his judgment that Plaintiff's risks outweighed the benefits of the surgery, and Plaintiff's fundamental claim is a mere disagreement with the medical judgment and a desire for a different form of treatment, Dr. Papendick did not commit any Constitutional violations. See also *Hoffer v Fla. Dep't of Corr.*, 973 F.3d 1263, 1272 (11th Cir. 2020), holding that:

> To be clear, "some medical attention" <u>doesn't necessarily demand curative care</u>. Rather, medical intervention exists along a spectrum. At one end is ignoring medical needs entirely, which our decisions have rightly and repeatedly condemned: "'Choosing to deliberately disregard' an inmate's complaints of pain 'without any investigation or inquiry,'" we have held, constitutes deliberate indifference. *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (quoting *Goebert*, 510 F.3d at 1328). The plaintiffs here, understandably, demand care at the other end of the spectrum—a prompt and an effective, albeit expensive, cure. There is, though, a range of responsible treatment options between the two poles that will satisfy the Eighth Amendment.

"The long and short of it is that diagnosing, monitoring, and managing conditions—even where a complete cure may be available—will often meet the "minimally adequate medical care" standard that the Eighth Amendment imposes." *Id*. "If no constitutional violation by the individual defendants is established, the [entity] defendants cannot be held liable under § 1983." *Watkins, supra* at 687.

Plaintiff attempts to sidestep the objective and subjective components of deliberate indifference, by arguing that the Defendant Corizon Health, Inc., through Dr. Papendick, "unlawfully" determined that the reversal surgery was not medically necessary in order to avoid paying for the procedure and making a larger profit. For the reasons state above, there is no merit to any argument that Dr. Papendick nor Corizon unlawfully determined no medical necessity. Furthermore, the Corizon Defendants have made it very clear that costs were not a factor in Mr. Jackson's request. In fact, Dr. Bomber testified that "we're instructed by operations to practice medicine based on medical necessity, not costs." (**Exhibit E, p. 24**).

> Q.  Does the utilization management physician reviewer consider costs when making his or her decisions?
> A.  No, cost is never an issue in anything we do as medical providers. (**Id., p. 24**).

Dr. Papendick testified:

> Q.  Did you ever issue ATPs rather than approvals based on a cost consideration?
> A.  Absolutely not.  (**Exhibit D, p. 30**).

Be that as it may, this Honorable Court has previously recognized that if discovery "demonstrated that the decision to deny the colostomy reversal surgery was based on a medical professional's judgment of the medical risks and benefits associated with he surgery – not mere economic considerations," dismissal would be consistent with the law and the actions of other courts that have decided this issue. (See **Dkt. No. 32, PageId.623**).

## IV.   <u>CONCLUSION AND REQUESTED RELIEF</u>

WHEREFORE, Corizon Defendants respectfully request that this Honorable Court Deny Plaintiff's Motion to Compel in its entirety and provide any and all such relief as is deemed just and equitable, including that this Honorable Court limit Plaintiff's discovery requests to the pertinent issues in this case.

Respectfully submitted,

CHAPMAN LAW GROUP

Dated: August 9, 2021

/s/Devlin Scarber
Ronald W. Chapman Sr., M.P.A., LL.M. (P37603)
Devlin Scarber (P64532)
Attorneys for Corizon Defendants
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
dscarber@chapmanlawgroup.com

**PROOF OF SERVICE**

I hereby certify that on August 9, 2021, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved nonparticipants.

/s/ Devlin Scarber
Devlin Scarber (P64532)
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

26