# EXHIBIT

# E

**Jeffrey Bomber, D.O.**
**05/28/2021**

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4

5

6    KOHCHISE JACKSON,              Case No.:

7                                   2:19-cv-13382

8         Plaintiff,               Honorable

9         vs.                      Terrence G. Berg

10   CORIZON HEALTH, Inc.,          Magistrate:

11   et al.,                        Patricia T. Morris

12

13        Defendants.

14   - - - - - - - - - - - - -  /

15   Pages 1-102

16

17        The Virtual, Videotaped Deposition of

18   Jeffrey Bomber, D.O., taken pursuant to Notice in

19   the above-entitled cause, via Zoom, on May 28, 2021,

20   at 11:00 a.m., before Carol Marie Hicks, CSR-3345,

21   Notary Public in and for the County of Livingston.

22

23

24

25



**Jeffrey Bomber, D.O.**
**05/28/2021**                                                    **Pages 2..5**

Page 2

```
 1  APPEARANCES:
 2          IAN T. CROSS (P83367)
 3          MARGOLIS, GALLAGHER & CROSS
 4          214 S. Main Street, Suite 200
 5          Ann Arbor, Michigan 48104
 6          734.994.9590
 7          larry@lawinannarbor.com
 8
 9              Appearing on behalf of the Plaintiff.
10
11          KENNETH A. WILLIS (P55045)
12          CORBET, SHAW, ESSAD & BONASSO, PLLC
13          30500 Van Dyke Avenue, Suite 500
14          Warren, Michigan 48093
15          313.964.6300
16          kenneth.willis@cseb-law.com
17
18              Appearing on behalf of the Defendant
19              Prime Healthcare Services and
20              Colleen Spencer.
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES - (cont'd.)
 2
 3          DEVLIN SCARBER (P64532)
 4          CHAPMAN LAW GROUP
 5          1441 West Long Lake Road, Suite 310
 6          Troy, Michigan 48098
 7          248.644.6326
 8          dscarber@chapmanlawgroup.com
 9
10              Appearing on behalf of Defendants
11              Corizon Health, Inc., and
12              Keith Papendick, M.D.
13
14  ALSO PRESENT:  STEVE ALFONSI, VIDEOGRAPHER
15
16  (All parties appeared via Zoom.)
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX TO EXAMINATIONS
 2  Witness                                    Page
 3  JEFFREY BOMBER, D.O.
 4      EXAMINATION BY MR. CROSS        6, 92, 97
 5      EXAMINATION BY MR SCARBER       92, 96, 99
 6
 7                  EXHIBITS
 8  Deposition Exhibit                         Page
 9      BOMBER EXHIBIT 1   LARA Corporations Online   35
10                         Filing System for Quality
11                         Correctional Care of
12                         Michigan
13      BOMBER EXHIBIT 2   Corizon Practitioner        12
14                         Clinical Onboarding form
15      BOMBER EXHIBIT 3   Resume of Bethany Chester   18
16      BOMBER EXHIBIT 4   InGauge screenshots         22
17      BOMBER EXHIBIT 5   Resume of Lori Mignon Ernst 29
18      BOMBER EXHIBIT 6   Corizon Utilization         33
19                         Management Manual 2017
20      BOMBER EXHIBIT 7   (Not marked)
21      BOMBER EXHIBIT 8   Corizon Performance Review  51
22                         for Dr. Papendick
23      BOMBER EXHIBIT 9   (Not marked)
24
25
```

Page 5

```
 1              EXHIBITS - (cont'd.)
 2  Deposition Exhibit                         Page
 3      BOMBER EXHIBIT 10  Declaration of Erin         85
 4                         Orlebecke, M.D.,
 5                         November 10, 2014
 6      BOMBER EXHIBIT 11  Declaration of Harriet      86
 7                         Squier, M.D.,
 8                         November 18, 2014
 9
10  (Attached.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Jeffrey Bomber, D.O.
05/28/2021                                    Pages 6..9

Page 6

1  May 28, 2021
2  At or about 11:00 a.m.
3          JEFFREY BOMBER, D.O.,
4  having first been duly sworn, was examined and testified
5  on his oath as follows:
6          THE VIDEOGRAPHER:  We're now on the
7      record.  This is the video-recorded deposition of
8      Dr. Jeffrey Bomber, being taken virtually.  Today is
9      May 28, 2021, and the time is 11 a.m.  Would the
10     attorneys please identify themselves and the court
11     reporter please swear in the witness.
12          MR. CROSS:  Good morning.  Ian Cross
13     on behalf of the plaintiff Kohchise Jackson.
14          MR. WILLIS:  Good morning.  Kenneth
15     Willis on behalf of defendant Prime Healthcare
16     Services and Colleen Spencer.
17          MR. SCARBER:  Good morning.  Devlin
18     Scarber appearing on behalf of the Corizon
19     defendants in this case, Corizon and Dr. Papendick.
20          JEFFREY BOMBER, D.O.,
21  having first been duly sworn, was examined and testified
22  on his oath as follows:
23          EXAMINATION
24  BY MR. CROSS:
25  Q   Good morning, Dr. Bomber.  Have you ever had your

Page 7

1      deposition taken before?
2  A   Yes, I have.
3  Q   So I'm just going to go over some ground rules, even
4      though you probably already know.  I need verbal
5      responses, no head nod, head shaking, so that the
6      court reporter can get something on the record.
7      It's not an endurance test.  If you need a break, if
8      you need to use the bathroom, just let me know, and
9      we'll take a break.  I'd just ask that you answer
10     the last question that I pose before the break,
11     okay?
12  A   Yes.
13  Q   And if you don't understand any of my questions, I
14     don't want you to guess, I want you to ask me to
15     clarify, all right?
16  A   Yes.
17  Q   All right.  When was the last time you were deposed?
18  A   Last time I was deposed; approximately one year ago.
19  Q   Do you remember what case it was?
20  A   I believe it was -- there were a couple of cases in
21     a row, so I'd have to look back at the record.
22  Q   Okay.  So, there was one involving a gentleman by
23     the name of Kensu; is that correct?
24  A   I appeared in court for a Kensu case, and did one
25     deposition, as well, for a Kensu case.

Page 8

1  Q   Okay.  And there was a Spiller?
2  A   Yes, I recall a Spiller.
3  Q   And there was an Estate of Franklin?
4  A   I recall a Franklin.
5  Q   And there was an estate of Warren?
6  A   Warren, yes.
7  Q   Are there any that I'm missing?
8  A   Those are the ones that come to mind right now.
9  Q   But it's possible there's another?
10  A   It's possible.
11  Q   Okay.  Can you give me a run down of your employment
12     history since 2009.
13  A   In 2009 I served as the site medical provider at the
14     Newberry Correctional Facility, and also worked at
15     Helen Newberry Joy as a staff physician.  Subsequent
16     to that, I became the northern regional medical
17     director for PHS, which is now Corizon Health.
18  Q   Okay.  How long did you do that?
19  A   I was a northern regional medical director for six
20     years.
21  Q   What were your duties as a northern regional medical
22     director?
23  A   My duties were to supervise the medical providers in
24     the region.
25  Q   What did you do after you were the northern regional

Page 9

1      medical director?
2  A   After I was the northern regional medical director I
3      became the state medical director for Corizon
4      Health.
5  Q   And when did that -- was that a promotion?
6  A   Yes.
7  Q   When did you get that promotion?
8  A   I served as state medical director for four years,
9      so that would be from 2015 through August of 2019.
10  Q   And you are no longer the state medical director?
11  A   I am not.  I concluded that in August of 2019.
12  Q   So what have you done for a living between
13     August 2019 and the present?
14  A   I am a staff physician at Schoolcraft Memorial
15     Hospital in Manistique, Michigan, and I'm the
16     medical director for the Naubinway Rural Health
17     Clinic, and I also consult with Corizon Health.  I'm
18     a contract employee, still, for Corizon Health.
19  Q   So why did you cease to be the state medical
20     director?
21  A   I was the medical director for four years, and it
22     required living in Lansing for a significant amount
23     of time, and my main home is in Naubinway, and I was
24     ready to be back home.
25  Q   I see.  And what are your duties now as a contractor



Jeffrey Bomber, D.O.
05/28/2021                                              Pages 10..13

Page 10

1    for Corizon Health?
2  A    As a contract employee I help to supervise the
3       providers at seven sites in the northern region.
4  Q    So how is that different from when you were the
5       northern regional medical director?
6  A    Well, I only have seven sites at this time.  When I
7       was the northern director, I had 21 sites.
8  Q    Oh, okay.  So is there another individual who's now
9       the northern regional medical director?
10 A    The sites have been redistributed.
11 Q    Was there ever a time when you worked in utilization
12      management, perhaps temporarily, due to a vacancy?
13 A    Yes, when I was the northern regional medical
14      director we were without a utilization management
15      physician for a couple of months and so all of us
16      pitched in for that time period.  The state medical
17      director at the time was Dr. Orlebeck and I was one
18      of her regional medical directors and we assisted
19      with the process.
20 Q    Can you describe what you did, what those temporary
21      duties consisted of.
22 A    Yes.  So, there's a form, a No. 407, which is an
23      MDOC form, that a provider completes in order to
24      request a specialty service of some type, and that
25      request is reviewed by the utilization management

Page 11

1       physician.
2  Q    Okay.  And what does the utilization management
3       physician do when reviewing that request?
4  A    They review it for medical necessary; and, if
5       medical necessity is demonstrated, the procedure or
6       the referral is approved or an alternative treatment
7       plan is offered.
8  Q    All right.  In your current position as a
9       contractor, are you able to hire medical providers?
10 A    I am involved in the hiring process, I'm part of the
11      interview team.
12 Q    Were you able to hire medical providers when you
13      were the regional medical director for the northern
14      region?
15 A    Yes; again, I was part of a team, it was a team
16      evaluation.
17 Q    I see.  Do you train the providers?
18 A    I trained the providers up until the time I became
19      state medical director.
20 Q    And have you trained new providers since you became
21      a contractor?
22 A    I have not trained them in the formal sense --
23      formal sense being when we met with them and went
24      over the training materials -- I don't do that
25      anymore.  I do follow up with them, do phone

Page 12

1    meetings and chart reviews in order to make sure
2    that they're acclimating and doing well.
3  Q    Okay.  Tell me about the onboarding process for a
4       new provider; what training materials do they
5       receive, if any?
6  A    So, they -- before COVID -- they would have two days
7       of training in the Lansing office, in person, with
8       an RMD and review the Corizon provider training
9       manual; they would also have training in IT for the
10      electronic medical record; and there were also
11      modules required by the Michigan Department of
12      Corrections.
13 Q    So, in the course of the onboarding process, did the
14      new provider ever watch a video?
15 A    I do not recall any videos.
16 Q    Are there any quizzes that they have to take?
17 A    There was a questionnaire, I believe it was based on
18      the clinical modules; I think there was a module on
19      diabetes, prostate cancer, a couple others.  So
20      there were some questions, medical questions.
21          (Bomber Deposition Exhibit No. 2 was
22          marked for identification.)
23 Q    Okay.  I'm going to show you an exhibit.  We'll call
24      this Plaintiff's Exhibit 2.  Can you see the
25      document?

Page 13

1  A   Yes, I can.
2  Q    You recognize it?
3  A    That looks like, yeah, the "Practitioner Clinical
4       Onboarding Checklist."
5  Q    Okay.  Did you provide any of the training in this
6       checklist to new providers?
7  A    I did provide some of the training, yes.
8  Q    Was there another person who provided other portions
9       of the training?
10 A    Yes, there are other people.
11 Q    Who are they?
12 A    The office manager, the IT director, and the
13      regional operations manager.
14 Q    And are those Corizon employees?
15 A    Yes.
16 Q    And regional operations manager is what you said?
17 A    Yes.  Oh, and some of the siting -- some of the
18      training was done on-site with the MDOC health unit
19      manager.
20 Q    Okay.  So HUM did some of it.
21 A    Correct.
22 Q    So this is Corizon's training; is there a separate
23      set of modules that are MDOC training that they also
24      received?
25 A    Yes, there are modules.  Most of those deal with



**Jeffrey Bomber, D.O.**
05/28/2021                                             Pages 14..17

1   safety in the correctional environment.
2   Q   So, can you point out which portion of this
3       onboarding you were responsible for providing the
4       training for.
5   A   Sure.  I would review the "Corizon Culture of
6       Patient Safety" in our patient safety program; I
7       would review --
8   Q   Where is that?  Culture of patient, okay.
9   A   Yeah, I would review that portion.  I would review
10      some of it in "The Correctional Environment"; of
11      course, some of that is done with the MDOC and
12      on-site.  We would review the "Behavioral Health"
13      section; we would review the "Correctional
14      Healthcare Policies and Procedures," I believe all
15      of those were reviewed; I would review the
16      "Documentation and Medical Records"; and the
17      "Utilization Management portion; and "Pharmacy."
18  Q   How about in Phase II --
19  A   And that's down on that page.
20  Q   -- were you involved in any of these trainings?
21  A   The "Correctional Environment" would be done on-site
22      with the HUM.
23  Q   Um-hum.
24  A   The "Medical Management Model:  Decision Support
25      System," that would be done by me or the regional

1   medical director; the pharmacy training, a lot of
2   that had to do with the IT and how to put in orders
3   so IT would do part of that and we would do part of
4   the pharmacy training; the "Quality Improvement
5   Program," yes, we would do that; and the "Behavioral
6   Health," we would do that; under "Legal and Risk
7   Management," I recall some training on forensics and
8   patient safety reporting; "Correctional Healthcare
9   Policies and Procedures," we also reviewed, we
10  reviewed those as well.
11  Q   Okay.  And this first part, "Accountable Care in the
12      Patient Centered Medical Home Environment," who was
13      responsible for this section?
14  A   I was responsible for the "Corizon Culture of
15      Patient Safety."  I'm not sure, I would think the
16      regional managers did the "Accountable Care
17      Organization" sections.  The "Contract Overview,"
18      the "Full Risk, Shared Risk, Pass Through," I'm not
19      familiar with what all those mean.  So that would be
20      something that operations and office manager would
21      train on.
22  Q   Who is the regional operations manager?
23  A   The head, VP of operations, Mason Gill; and he has
24      had several people over the last ten years report to
25      him, generally, there are two; I believe, currently,

1   it's Sara Goff.
2   Q   Sara Goff.  So she would be the one to do the first
3       section, like the "Contract Overview, Full Risk
4       Shared Risk, Pass Through"?
5   A   Right, that wasn't a medical part.  We focused on
6       the medical parts.  Anything that deal with
7       operations, they would have to do.
8   Q   So, you said you did this "Quality Improvement
9       Program" section?
10  A   Yes.
11  Q   I want to direct your attention to the second to
12      last bullet point, "Key performance indicators,
13      slash, Process Indicators and Quality Indicators."
14      What is that?
15  A   I didn't calculate or have anything to do with those
16      KPIs.  We did report quality data to the MDOC, as
17      required in the contract.
18  Q   Well, I'm asking you what you trained the new
19      providers about with respect to that issue.
20  A   We trained the providers on what quality indicators
21      the Michigan Department of Correction tracked.
22  Q   What about key performance indicators?  What did you
23      teach them about key performance indicators?
24  A   Nothing.
25  Q   Nothing?

1   A   Nothing.
2   Q   Does Corizon have any key performance indicators,
3       that you're aware of?
4               MR. SCARBER:  I'll just make an
5       objection to form; broad, overbroad base.  But if
6       the witness can go, go ahead.
7   A   I do not have anything to do with key performance
8       indicators or calculations.  I'm familiar with the
9       term, and I do believe that the corporate office
10      does have KPIs.
11  BY MR. CROSS:
12  Q   So what's a KPI?
13  A   As I -- and, again, we don't use the term -- we
14      don't use the term when discussing the quality
15      indicators with the Michigan Department of
16      Corrections.  But I believe healthcare organizations
17      use KPIs to track emergency room runs,
18      hospitalization days, all-around utilization.
19  Q   All-around utilization; what do you mean by that?
20  A   So, if I have a patient go to the ER and utilize the
21      ER, that's a utilization.
22  Q   So ER runs would be a KPI?
23  A   Again, I don't calculate them.  I don't look at the
24      data.  I can't tell I exactly what Corizon's KPIs
25      are.



**Jeffrey Bomber, D.O.**
05/28/2021                           Pages 18..21

Page 18

1  Q   Okay. I'm going to show you another document.
2        THE COURT REPORTER:  And are you
3   marking these as exhibits, Mr. Cross?
4        MR. CROSS:  Yes, the previous one was
5   Exhibit 2.
6        (Bomber Deposition Exhibit No. 3 was
7        marked for identification.)
8  BY MR. CROSS:
9  Q   I'm sorry, can you see the document?
10 **A   Yes.**
11 Q   Have you ever interacted with this Bethany Chester
12     person in a professional capacity?
13 **A   Yes.**
14 Q   She work for Corizon?
15 **A   Yes.**
16 Q   I want to direct your attention to the second
17     dash -- well, what is this document, first of all?
18     What does it appear to be?
19 **A   It looks like a job description.**
20       MR. SCARBER:  Is that a resume?  I'm
21   sorry, Ian.
22       MR. CROSS:  I think it's a resume.
23       MR. SCARBER:  Okay.  I mean, I see --
24 **A   I don't know.**
25       MR. SCARBER:  He's looking at

Page 19

1   segments of it 'cause the way it was being scrolled
2   down.
3  **A   Yeah, now I see the name.  So, I guess, it looks**
4  **like a resume.**
5  BY MR. CROSS:
6  Q   Okay.  I want to go to the second dash in her
7      "Professional Experience"; it says, "Creating,
8      maintaining, managing emergency room, inpatient,
9      hospice and palliative care, utilization management
10     and COVID-19 data for monthly reporting to state
11     medical director and Michigan Department of
12     Corrections."  You were the state medical director
13     after October of 2017; is that correct?
14 **A   Correct.**
15 Q   Did you receive monthly reports containing emergency
16     room, inpatient, hospice and palliative care,
17     utilization management, et cetera, data from this
18     Bethany Chester person?
19 **A   Yes.  If you look at the MDOC contract, those**
20 **numbers are required, that we are required to report**
21 **those numbers to the Michigan Department of**
22 **Corrections on a monthly basis.**
23 Q   And she didn't just report those numbers to the
24     Michigan Department of Corrections, she also
25     reported them to you, right?

Page 20

1  **A   Well, to me, but the numbers were shared as part of**
2  **the monthly report with the Department.**
3  Q   So did you -- you received the report, Exhibit 1?
4  **A   Yes.**
5  Q   What did you do with that data?
6  **A   It was given to the MDOC in a monthly report.**
7  Q   So the only reason it came to you was for to you
8      give it to the MDOC?
9  **A   No, several people help write that report, including**
10 **myself.**
11 Q   Okay.  So you participate in creating a report for
12     the MDOC --
13 **A   Yes.**
14 Q   -- containing all of this data.
15 **A   Yes, there's a whole list of the required numbers in**
16 **the contract.**
17 Q   And is the only reason that Corizon tracks that data
18     to comply with the contractual requirement to report
19     it to the MDOC?
20 **A   I can't tell you all the reasons Corizon would track**
21 **that data.**
22 Q   Can you tell me any of the reasons?
23       MR. SCARBER:  I'll just place an
24   objection; calls for speculation.
25 **A   My role was to provide the numbers per the**

Page 21

1   contractual agreement.
2  BY MR. CROSS:
3  Q   So you can't tell me any of the reasons?
4        MR. SCARBER:  Just going to place
5   another objection; asked and answered.
6  **A   I can't tell you the reasons Corizon would want to**
7  **see the data.  I can tell you that I needed to see**
8  **the data because it was required that I report that**
9  **to the Michigan Department of Corrections.**
10 BY MR. CROSS:
11 Q   Okay.  So, does Corizon track any performance
12     measures or indicators for the MDOC contract?
13       MR. SCARBER:  Just going to place an
14   objection; that seems like that was asked and
15   answered and it's been discussed over the last
16   several minutes of your questions.  But to the
17   extent it's a different question or you have a
18   different answer.
19 **A   I do not have a different answer.  My requirement**
20 **was to provide the data to the Department of**
21 **Corrections.**
22 BY MR. CROSS:
23 Q   I'm not asking if you provided data to the
24     Department of Corrections.  I'm asking if Corizon
25     tracks any performance measures or indicators for



Page 22

1    the MDOC contract, to your knowledge?
2            MR. SCARBER:  Objection; asked and
3    answered.
4  A    I believe that they looked at the monthly reports
5       that we provided to the DOC; beyond that, I don't
6       know.
7  BY MR. CROSS:
8  Q    All right.  I'm going to show you another document.
9       We'll mark this Plaintiff's Exhibit 4.
10           (Bomber Deposition Exhibit No. 4 was
11       marked for identification.)
12 Q    Have you ever used a computer program that looks
13      like that, sir?
14 A    I have not used it.  I know that Corizon has
15      something called InGauge that they used to use for
16      their utilization management.  We didn't use the
17      data.
18 Q    So, who uses InGauge?
19 A    I believe corporate, it's used at the corporate
20      level.
21 Q    So that would be, what, C Suite executives?
22           MR. SCARBER:  I'm going to place an
23      objection; calls for speculation; if you know, any
24      more than you said.
25 A    I know Corizon leadership looks at InGauge.

Page 23

1  BY MR. CROSS:
2  Q    So you've never used this.
3  A    I've not used their data, no.  We generated our data
4       for the DOC from the electronic medical record, as
5       well as the inpatient team and the on-site
6       utilization management clerks and RNs.
7  Q    Do you know if this program is still in use?
8  A    I, frankly, don't.  Like I said, I don't use it.
9  Q    Okay.  If I wanted to talk to someone who uses it,
10      who would that be?
11 A    That would be somebody at the corporate level for
12      Corizon.
13 Q    What's the corporate level?  What does that mean?
14 A    That would mean those at the Corizon headquarters
15      Nashville, Tennessee.
16 Q    Okay.  So no one in Michigan uses this.
17 A    We don't use it.
18 Q    What is utilization management?
19 A    Utilization management is monitoring the amount of
20      utilization in a medical contract.
21 Q    What's the purpose of utilization management?
22 A    From my point of view, providing numbers to the
23      Michigan Department of Corrections, as contractually
24      obligated to; also, to monitor, like, if there's
25      been an intervention.  For example, when we started

Page 24

1       to utilize the Impact Pro, we wanted to ensure that
2       quality measures were being met and that inmates
3       were -- we were ensuring that inmates were getting
4       their medical needs met.  So we would monitor the
5       number of referrals, for example, to make sure that
6       they were getting adequate care.
7  Q    So the purpose of utilization management is to
8       report data to the MDOC?
9  A    No, and also monitor the quality of care.
10 Q    Monitor the quality of care.  So, when you were
11      acting as a utilization review physician, in a
12      temporary capacity, you were monitoring the quality
13      of care?
14 A    As a utilization management physician, I was
15      monitoring the off-site referral request, ensuring
16      medical necessity, and approving or giving an ATP.
17 Q    I see.  Does the utilization management physician
18      reviewer consider costs when making his or her
19      decisions?
20 A    No, cost is never an issue in anything we do as
21      medical providers.
22 Q    So utilization management never considers cost.
23 A    Not from my perspective; in fact, we're instructed
24      by operations to practice medicine based on medical
25      necessity, not cost.

Page 25

1  Q    Not cost.  Okay.  Well, that's -- let me show you
2       another document.  Hold on, this is -- got this
3       clock in the way so I can't click on it.  Here we
4       go.  Can you see the document, sir?
5  A    Yes.
6  Q    All right.  For the record, this is a 30(b)(6)
7       deposition you gave in Estate of Franklin.  And I
8       would like you to read out loud, for the record,
9       lines 10 through 12 on this page.
10           MR. SCARBER:  Let me have an
11      opportunity to review the document, counsel.  What
12      lines do you want him to review?
13           MR. CROSS:  10 through 12.
14           MR. SCARBER:  Okay.
15           MR. CROSS:  We'll call this
16      exhibit -- what are we on, 6?
17           MR. SCARBER:  I thought the last one
18      you said was 3.
19           MR. CROSS:  All right, 4, then.
20           MR. SCARBER:  I don't know.  You
21      better ask Carol.
22           THE COURT REPORTER:  I don't know
23      because I'm not marking them, I don't know.
24           MR. SCARBER:  Okay.  Maybe ken got
25      another one, I was right and you could have said

Jeffrey Bomber, D.O.
05/28/2021
Pages 26..29

1  another one, I'm not sure.  Hang on.
2          MR. WILLIS:  I only heard 3 or for
3  the last one, I think, but I could be wrong.
4  BY MR. CROSS:
5  Q   This InGauge screenshot, we'll call this Exhibit 4,
6  and then I haven't shown you another one since this,
7  before the deposition transcript, so we'll call the
8  deposition transcript -- you know, we'll call it 7,
9  'cause I've already saved a couple as 5 and 6.
10         So could you read lines 10 through 12
11  of this transcript for the record?
12  A   Sure.
13         "And that the utilization management
14  component of the review process takes into
15  consideration cost, correct"?
16         "Yes."
17         Did you say line 13, too?
18  Q   Nope.
19  A   Okay.
20  Q   So it sounds like your testimony, in this case, was
21  that the utilization management component of the
22  review process -- well, this review process, I want
23  you to look at lines 3 through 8, so we know what
24  review process we're talking about here.
25         MR. SCARBER:  Well, hang on, I'm

1  going to object to form, 'cause it sounds like you
2  were asking him a question and now you're asking him
3  to review something again.
4          MR. CROSS:  Okay.
5          MR. SCARBER:  So what do you want him
6  to look at now?
7          MR. CROSS:  Lines 3 through 8, or 3
8  through 9.
9          MR. SCARBER:  Okay.  Hang on.  Take a
10  look at that.  Okay.  Go ahead.
11  BY MR. CROSS:
12  Q   Okay.  So would it be fair to say that your
13  testimony, in this case, was that the utilization
14  management component of the 407 review process takes
15  into consideration cost?
16         MR. SCARBER:  I'm going to place an
17  objection that it looks like it's taken out of
18  context, so I object to form and mischaracterization
19  of the document.  But go ahead.
20  A   So the context is as a provider, as a utilization
21  management reviewer, as a state medical director, I
22  do not consider costs, it's always medical
23  necessity.
24         Yes, I'm sure that at the -- probably
25  the DOC and at the corporate level they do review

1  costs.  But, yes, they do consider costs.  On a
2  daily basis, I don't think about cost.
3  Q   So what were you talking about here in this
4  testimony when you said it "takes into consideration
5  costs"?  "Yes."
6          MR. SCARBER:  Let me place another
7  objection.  I mean, to give him two lines out of a,
8  it looks like this is page 232 of a deposition, and
9  ask him what he was talking about, I think, is an
10  unfair question.  So I object that the -- I'll
11  object to form and taking the document out of
12  context.
13         MR. CROSS:  I'll object to your
14  speaking objection.
15         MR. SCARBER:  Can you tell him what
16  you were talking about in just one page of a
17  200-page deposition?
18         THE WITNESS:  I'm speculating.
19         MR. SCARBER:  Okay.
20         MR. CROSS:  Devlin, you're coaching
21  the witness.
22         MR. SCARBER:  You just asked the
23  witness, with all due respect, counsel, to tell him
24  what he was talking about after reading 12 lines of
25  a deposition.

1          MR. CROSS:  If you'd like to read
2  more of it, he can.
3          MR. SCARBER:  He's not going to sit
4  here and read -- the question has to be a question
5  he can answer without reading 100 pages or 200 pages
6  of a deposition.  I mean, if you want to put it in
7  some kind of context, that's fine.  But my objection
8  is to form, and I'm not trying to coach the witness
9  on this, but I think it's -- I think it's an unfair
10  question that requires a very detailed objection.
11         (Bomber Deposition Exhibit No. 5 was
12         marked for identification.)
13  BY MR. CROSS:
14  Q   Okay.  Let's move on.  I'm going to show you what's
15  been marked Plaintiff's Exhibit 5.  Have you ever
16  interacted with this Lori Mignon Ernst individual in
17  a professional capacity?
18  A   Yes.
19  Q   Okay.  You know who she is?
20  A   Yes.
21  Q   And what is this document, for the record?
22  A   It looks like another resume.
23  Q   Okay.  I want to direct your attention to the one,
24  two, three, four, fifth dash here, under "Director
25  of Utilization Management:  Set up UM processes

Jeffrey Bomber, D.O.
05/28/2021                                    Pages 30..33

Page 30

1  within each region with CCO/COO to ensure maximum
2  effectiveness" -- oh, I'm sorry, the next one --
3  strike that.  "Work with CCO/RMD within regions to
4  identify barriers and to find solutions for problems
5  and align the contract in meeting with UM targets."
6  A   Yes, I see it.
7  Q   Did Ms. Ernst ever work with you to align the
8  Michigan contract in meeting with UM targets?
9  A   No.
10 Q   Is it fair to say that UM stands for utilization
11 management?
12 A   Yes.
13 Q   Okay.  Did anyone work with you to align the
14 Michigan contract in meeting with utilization
15 management targets?
16 A   I'm not even sure how targets is defined.
17 Q   Well, how would you define it?
18 A   I have no idea how they define it, it's not given
19 here.
20             MR. SCARBER:  And let me just place
21 an objection as to foundation.  This isn't his
22 resume, he didn't draft this, he has no idea what
23 this stuff means.
24 BY MR. CROSS:
25 Q   So you testified that you have interacted with

Page 31

1  Ms. Ernst in a professional capacity, correct?
2  A   Correct.
3  Q   And between 2013 and 2015, you were the regional
4  medical director, that was your title, correct?
5  A   Yes.
6  Q   So, if Ms. Ernst is saying that she worked with RMD,
7  does RMD stand for regional medical director?
8  A   Yes.
9  Q   So what did you -- strike that.  When you worked
10 with Ms. Ernst, what did you do?
11 A   So, my main interaction with Ms. Ernst was when we
12 went to a centralized model for utilization
13 management, our portion, our participation for
14 Michigan.
15 Q   Are there utilization management targets for the
16 Michigan contract?
17 A   No.
18 Q   Were there ever utilization management targets for
19 the Michigan contract?
20 A   Not for me, sir, never.
21 Q   Not for you, sir?  What do you mean by that?
22 A   Not for the medical providers, not for the regional
23 medical directors, we were never given targets.
24 Q   So who are the targets for?
25 A   I don't even know how they're defined.  I would just

Page 32

1  be guessing.
2  Q   All right.  The next one in this resume, "Daily
3  review of Pipes/QNXT"; do you know what that is?
4  A   I do not.
5  Q   "Reports including inpatient tracking and outpatient
6  referrals of all contacts to monitor and ensure
7  compliance with targeted budget."
8             Is there a targeted budget for the
9  MDOC contracts for Corizon?
10 A   I'm not sure what targeted budget is.  We did have a
11 budget from the DOC contract.  I have no idea what a
12 targeted budget is.
13 Q   How is the budget set?
14 A   Well, there were a certain number of dollars over a
15 five-year period that were allotted for medical
16 management.
17 Q   By Corizon.
18 A   No, actually, by the DOC; that was in the DOC
19 contract.
20 Q   So there's a contract with the DOC that states how
21 much the DOC is paying Corizon for medical
22 management, correct --
23 A   Yes.
24 Q   -- more or less?  And then does Corizon internally
25 have a budget for how much it wants to spend on

Page 33

1  medical management in Michigan?
2  A   I would -- I think.  I don't know.
3  Q   You don't know anything about that.
4  A   I don't have anything to do with preparing those
5  budgets, if they exist.
6  Q   And you don't know how reviewing inpatient tracking
7  and outpatient referrals could help ensure
8  compliance with the targeted budget?
9  A   I would be speculating.  I have no part in that.
10 Q   Okay.  So you testified that your interactions with
11 Ms. Ernst were primarily related to a move to
12 centralize utilization management?
13 A   Yes.
14             (Bomber Deposition Exhibit No. 6 was
15             marked for identification.)
16 Q   All right.  Let's look at what we will call
17 Plaintiff's Exhibit 6.  And this resume was 5, in
18 case I forgot to note it.  And this is Bates 103,
19 the "Utilization Management Manual," produced by
20 Corizon.  So, see here it says the "Utilization
21 Management Core Process will launch in January of
22 2017"?
23 A   Yes, I see that.
24 Q   What is the Utilization Management Core Process?
25 A   I believe that was when we went to the centralized



Jeffrey Bomber, D.O.
05/28/2021                                    Pages 34..37

**Page 34**

1   UM process.
2   Q   And how is that different from the previous
3       practice?
4   A   In the previous practice, there was just one
5       utilization management physician.  But in the new
6       practice now, Dr. Papendick, who's currently the
7       UMMD for the Michigan contract, is now supported by
8       two other utilization management physicians; he has
9       back up and support, you know, if he needs vacation
10      or whatever.  So those physicians are now all
11      Corizon employees.
12  Q   So Dr. Papendick is a Corizon employee?
13  A   I don't know what -- if he's Quality Correction or
14      Corizon now.  I haven't been the state medical
15      director for going on two years, so I'm not sure
16      what his current designation is.
17  Q   When you were the state medical director, were you a
18      Corizon employee?
19  A   No, I was employed by Quality Correctional Care of
20      Michigan.
21  Q   What is Quality Correctional Care of Michigan?
22  A   Quality Correctional Care of Michigan is a
23      professional corporation, a PC.
24  Q   In, say, 2017, who was the president of Quality
25      Correctional Care of Michigan?

**Page 35**

1   A   I was.
2   Q   And this is a corporation, correct?
3   A   A professional corporation.
4   Q   Who were the shareholders of Quality Correctional
5       Care of Michigan, PC?
6   A   I believe there was myself and Dr. Sylvia McQueen.
7   Q   Dr. Sylvia McQueen; is she licensed to practice
8       medicine in Michigan?
9   A   I don't know.
10          (Bomber Deposition Exhibit No. 1 was
11      marked for identification.)
12  Q   All right.  I'm going to show you what's been marked
13      Plaintiff's Exhibit 1; and this is from the LARA
14      Corporations Online Filing System; and it says the
15      names and addresses of all shareholders, and we just
16      have one shareholder here, and that would be you,
17      correct?
18  A   It looks like it.
19  Q   So you were the sole shareholder of this
20      corporation.
21          MR. SCARBER:  I'm just going to place
22      an objection only to a time -- a point in time, like
23      when is it dated or when is this from?
24          MR. CROSS:  This was filed in 2018.
25          MR. SCARBER:  Okay.

**Page 36**

1   BY MR. CROSS:
2   Q   So, did Quality Correctional -- what is this --
3       Quality Correctional Care of Michigan, PC, make a
4       profit that year?
5   A   No, there's no profit, none.
6   Q   Did it lose money?
7   A   You'd have to ask the operations director because I
8       believe there may have been a loss year.  But that
9       would be information you'd have to obtain from
10      operations.  It was, essentially, a nonprofit.
11  Q   It was a nonprofit.
12  A   Essentially, it was a way -- in Michigan you can
13      only practice medicine under, I think it's four
14      different entities, and a PC is one of them.  So
15      Corizon would contract with Quality Correctional
16      Care to provide the medical care to provide the
17      providers.
18  Q   Did Quality Correctional Care of Michigan have any
19      other clients other than Corizon?
20  A   No.
21  Q   Does Quality Correctional Care of Michigan have any
22      plans for mass layoffs in the near future?
23          MR. SCARBER:  Let me just place an
24      objection to relevance, and, you know, asking about
25      the business decisions, which are probably

**Page 37**

1       proprietary or confidential concerning a defendant
2       that's not even in the case or party that's not even
3       in the case.  But go ahead, if you can answer.
4   A   I'm not a part of the leadership with Quality
5       Correctional Care, so I don't know.
6   BY MR. CROSS:
7   Q   Okay.  Is it fair to say that Quality Correctional
8       Care passes through its expenses to Corizon?
9   A   Yes.
10  Q   Okay.  So let's go back to what we were talking
11      about before.  This is Exhibit 6, the "Utilization
12      Management Core Process."
13          I want to direct your attention to
14      this section about how the success of the program
15      will be measured.  It says, "We will focus
16      specifically on outpatient referrals per thousand,
17      claims per thousand, referrals per UMMD, claims
18      without a referral, ATPs and percent ATPs
19      overturned."
20          What's the difference between
21      outpatient referrals per thousand and claims per
22      thousand?
23  A   I'm not sure.  It's nothing that we tracked or
24      presented.  I would speculate that the outpatient
25      referrals are the pure number of patients referred;

Jeffrey Bomber, D.O.
05/28/2021                                                  Pages 38..41

Page 38

1  and, claims, that would, to me, infer that there was
2  some sort of cost claim made or charge associated
3  with that.
4  Q  Like a dollar amount.
5  A  Yeah, like if you go to the emergency room there's,
6  you know, a cost associated with that; or if you see
7  a specialist, there's an office fee; if they do a
8  surgery, there'd be a surgery fee.  That's generally
9  what I understand to be a claim.  So that specialist
10  would file a claim or a charge.
11  Q  All right.  And see this, like, first clear, or not
12  filled-in, bullet point here that says, "30/60/90
13  day review RMDs and UMMDs"?
14  A  I see it.
15  Q  Were you involved in those 30-, 60- or 90-day
16  reviews of the success of this program?
17  A  No.
18  Q  Okay.  Do you know how a metric like outpatient
19  referrals per thousand would indicate success versus
20  failure of this program?
21  A  I wasn't part of the development of that program nor
22  was I part of the ongoing meetings with that
23  program; it wasn't part of my job description, my
24  duties.
25  Q  Okay.  So, let's go to this section about how RMDs

Page 39

1  will monitor and remain knowledgeable of referral
2  and ATP activity.  "RMDs will review:  Detailed
3  daily reports of all ATPs."  Did you do that?
4  A  Yeah, as you can see in the monthly report to the
5  DOC, we did report the percentage of ATPs.
6  Q  And was the only reason you did that to report it to
7  the DOC?
8  A  Well, I certainly wouldn't want the number of ATPs
9  to start going up.  So I would look at it to make
10  sure that we were, you know, at or around our
11  average, because we want to make sure that the
12  inmates are getting the care that they need.  So we
13  would look at it from a quality point of view.
14  Q  So is there a goal or target for the percentage of
15  ATPs that are -- I mean -- or, I'm sorry, the
16  percentage of requests that are approved versus
17  ATP'd?
18  A  There's no goal or requirement, that I'm aware of.
19  We did track it to make sure that, if there was a
20  trend, we'd want to explain why.
21  Q  Okay.  Is that something you track at the individual
22  provider level?
23  A  We would look at that in the beginning with a new
24  provider.  Often, when you first get into the system
25  and you're learning how to use Uptodate and learning

Page 40

1  the referral system, a new provider might have a
2  higher number of ATPs, and so we would help them be
3  able to write more detailed and more medically
4  necessary type referrals.
5         As far as tracking it provider by
6  provider, there were times where we did that.  It
7  wasn't anything that we did regularly.
8  Q  So when would you do that?
9  A  There were a couple of times where the Michigan
10  Department of Corrections requested that, so we did
11  provide that data.
12  Q  I'm going to take you down a page, this is still the
13  same exhibit.  This chart here, does that accurately
14  represent the workflow of the Utilization Management
15  Core Process, as you understand it?
16  A  It's very small and I would need a few minutes to
17  look at it.
18  Q  All right.
19  A  Actually, I have to take my glasses off to do -- oh,
20  we have a copy right here.  Okay.  Yeah, this looks
21  to be the process that's being used now.
22  Q  Okay.  Let's go through it.  So it starts with the
23  outpatient referral request; that's done by a
24  medical provider at the site, correct?
25  A  Yes.

Page 41

1  Q  And if that request is missing information or it's
2  not detailed enough, there's this UM nurse review,
3  and it looks like there's an arrow that goes back to
4  the provider.  So would the UM nurse determine if
5  there wasn't enough information in the request and
6  then ask the provider to resubmit it, if that the
7  case?
8  A  Not resubmit.  If there was a missing section, a
9  blank part of the form, the provider would give that
10  information to the UM nurse and they would complete
11  the same 407.  So they wouldn't have to file a new
12  one.
13  Q  Okay.  So the UM nurse makes sure that the request
14  is complete.
15  A  Correct.
16  Q  And it has all the information that the physician
17  reviewer would need to make a decision.
18  A  From a clerical point of view, not a medical
19  decision-making point of view.
20  Q  Okay.  But she's not making the medical decision,
21  but she's making sure that there's enough
22  information for a physician to make a medical
23  decision.
24  A  Correct.
25  Q  Okay.  So then the next box we have is called pass



**Page 42**

1     through list.  What's that?

2 **A**   **That would be like a pacemaker check; automatic**

3     **approvals.**

4 **Q**   All right.  So there's a list of things that are

5     automatically approved.

6 **A**   **Correct.**

7 **Q**   And if it's on the pass through list, then we get a

8     yes, and we go directly to referral authorized,

9     right?

10 **A**   **Correct.**

11 **Q**   And does the physician reviewer determine if the

12     procedure is on the pass through list?

13 **A**   **That list was developed by physicians.**

14 **Q**   Okay.  But the person who compares the request to

15     the list, is that a physician?

16 **A**   **No, they review the pass through list, and, if it's**

17     **appropriate for that, it's automatically given an**

18     **authorization.**

19 **Q**   Okay.  And that's the nurse reviewer who does that?

20 **A**   **Correct.**

21 **Q**   Okay.  Now, if it's not on the pass through list,

22     then it goes to the utilization management medical

23     director, right?

24 **A**   **Yes.**

25 **Q**   And it goes to him via, what, an email?

**Page 43**

1 **A**   **Yes, it's -- well, now it's all electronic now.**

2 **Q**   Okay.

3 **A**   **Yes.**

4 **Q**   If I say the word "407 group," do you know what that

5     is?

6 **A**   **That's the email group that the 407 request is sent**

7     **out to.**

8 **Q**   And who's in the email group?

9 **A**   **That would be the provider, the UMMD nurse and**

10     **provider, and then whoever on-site helps to manage**

11     **the 407 process, usually the HUM, as well as the**

12     **health information manager.**

13 **Q**   And are those sent to the Michigan.gov emails for

14     these individuals or are they sent to Corizon health

15     emails?

16 **A**   **That would all be through the EMR now.  So, back**

17     **then, it would be through the DOC email process.**

18 **Q**   So the email is within the EMR?

19 **A**   **Yeah, now there are messages within the EMR**

20     **regarding the 407s.  I believe they still have the**

21     **email groups, though, too.**

22 **Q**   So if I were to order a prisoner's medical records,

23     they would include those messages or would they not?

24          MR. SCARBER:  Just going to place an

25     objection to foundation, as to whether he could know

**Page 44**

1     that.  But go ahead.

2 **A**   **I'm not sure.**

3          MR. SCARBER:  And my objection, Ian,

4     is, more or less, he doesn't know what the MDOC

5     would give you or be able to produce for you because

6     I think your question asked 'if you ordered records,

7     what would you get'?

8          MR. CROSS:  Okay.

9          MR. SCARBER:  That's the basis of my

10     objection.

11 **A**   **I don't know.**

12 BY MR. CROSS:

13 **Q**   And you believe it would be the Michigan.gov emails

14     for those people would receive --

15 **A**   **Yes.**

16 **Q**   -- those messages?  Okay.  So, where were we?  On

17     UMMD review.  Now, if the UMMD approves the request,

18     it goes to the UM nurse, who adds detail attributes.

19     What does that mean?

20 **A**   **Well, there has to be an authorization number**

21     **attached now to the 407 so that whoever the**

22     **specialist or whatever the provider is has an**

23     **authorization number.**

24 **Q**   So the UM nurse adds an authorization number and

25     then the referral is authorized?

**Page 45**

1 **A**   **Correct.**

2 **Q**   So once the UMMD approves, there's no one else who

3     has to approve the referral, it's done?

4 **A**   **Correct.**

5 **Q**   All right.  Now, if the UMMD does not approve, are

6     they required to issue an alternative treatment

7     plan?

8 **A**   **Yes.**

9 **Q**   The UMMD cannot deny without issuing an alternative

10     treatment plan, correct?

11 **A**   **There is no such thing as deny.**

12 **Q**   Okay.

13 **A**   **It's either approved or given an alternative**

14     **treatment plan.**

15 **Q**   And is the alternative treatment plan typically

16     something that can be done on-site at the prison?

17 **A**   **Not always.  It could be that the UMMD physician**

18     **thought that an ultrasound may be more appropriate**

19     **than a CT scan.  So it may be an alteration in the**

20     **request or given an ATP, such as self -- a home**

21     **exercise program, which can be done on-site.  So it**

22     **could be either.**

23 **Q**   Could be either.  Does the UMMD physician have

24     access to any information that the site physicians

25     don't have access to, in terms of what is medically



Jeffrey Bomber, D.O.
05/28/2021                                                    Pages 46..49

Page 46

1   indicated for a given problem?
2 A   Site providers have access to whatever they need;
3     they're provided a subscription to Uptodate;
4     They're -- I don't know if it's the same. I can
5     tell you that they both have adequate resources.
6 Q   So the site provider has Uptodate and the UMMD also
7     have Uptodate.
8 A   Correct.
9 Q   And the UMMD uses Uptodate to make his
10    determinations?
11            MR. SCARBER: I'm just going to place
12    an objection to foundation. Are you asking what he
13    does or what somebody else might do or what they're
14    supposed to do? I guess that's my question; form.
15 BY MR. CROSS:
16 Q   Okay. So what did you do when you were doing this?
17 A   As a site provider?
18 Q   No, as a UMMD, as a reviewer.
19 A   Oh, for the two months when I did that? Yes, I
20    would utilize Uptodate, at the time, was my main
21    resource; also, the National Cancer website
22    information, sometimes. Mostly Uptodate.
23 Q   Okay. So if you -- if an alternative treatment plan
24    is issued, then the ATP goes to the site provider
25    for review, correct?

Page 47

1 A   Correct.
2 Q   And the site provider has two options: They can
3     either accept the ATP or they cannot accept the ATP.
4 A   That's correct.
5 Q   And this not accepting the ATP, that's referred to
6     as an appeal?
7 A   Yes, then they have the right to appeal.
8 Q   How common are appeals?
9 A   I can't quantify it for you. Generally, I
10    understand, currently, there are one or two a week.
11 Q   Has that volume changed at all in your time with
12    Corizon?
13 A   No, it seems to be somewhat steady.
14 Q   Okay. Do you know about how many alternative
15    treatment plans there are a week?
16 A   I do not know that, no.
17 Q   So, if the site provider does not accept the ATP,
18    then it goes to the regional medical director,
19    which, at one point, was you, correct?
20 A   Correct.
21 Q   And do these appeals go to you now in your current
22    role?
23 A   Yes.
24 Q   All right. And are you able to unilaterally
25    overturn the ATP?

Page 48

1 A   No, not as a regional director.
2 Q   Not as a regional director. So you have two
3     options: You can uphold the ATP, right?
4 A   Correct.
5 Q   And then you would discuss that with the site
6     provider, and that would be the end of the process.
7 A   No.
8 Q   No? I mean -- so here I see the arrow goes to
9     uphold ATP, nurse acknowledges, site provider
10    accepts ATP.
11 A   No, that is not our process in Michigan.
12 Q   So beside upholding, you have another option, you
13    can appeal the ATP, right?
14 A   Correct.
15 Q   So it comes to you, you can't say, 'I overturn,' but
16    you can uphold or you can appeal again to the CMO.
17    Who's the CMO?
18 A   So this doesn't delineate the entire process in
19    Michigan. But the pathway that you just asked me a
20    question on: If the provider comes to me and
21    appeals it, then I send that appeal to the CMO or
22    SMD, state medical director, RMD, council, which
23    meets three times a week, and we discuss the appeal.
24 Q   So the appeals -- you're saying, in Michigan,
25    appeals don't go to the Corizon CMO.

Page 49

1 A   No, no, not -- no. Go ahead.
2 Q   This is not an accurate description of the process.
3 A   No, no. There are some components not included in
4     this document.
5 Q   All right. So the RMD gets it; the RMD appeals it
6     to the state medical director; you used to be the
7     state medical director; then what happens?
8 A   It's the state medical director -- there's a council
9     that meets, it includes the state medical director,
10    the regional medical director, and they then decide
11    whether or not to overturn the ATP or uphold the
12    ATP.
13 Q   So that's kind of like this appeals committee review
14    up here.
15 A   I have to look closer. No, it's not exactly like
16    that, because ultimately the chief medical officer
17    of the state of Michigan has the ultimate authority.
18    So, can I walk you through the actual process?
19 Q   Yeah, yeah, go ahead.
20 A   Okay. So, we're at the appeal level. So the RMD
21    appeals to the state medical director RMD council;
22    and if they uphold the ATP, the provider still has
23    another option and that is to appeal to the chief
24    medical officer of the state of Michigan that has
25    ultimate authority, they can do that there; and

**Jeffrey Bomber, D.O.**
05/28/2021                                                        Pages 50..53

1 then, also, if I uphold the ATP, the provider always
2 has the option to go to the chief medical officer
3 for the state of Michigan.  There's several levels
4 of appeal.
5                  MR. SCARBER:  When you say "state of
6 Michigan," are you talking about, what, what --
7 Corizon or another entity?
8                  MR. CROSS:  I'm asking the questions
9 here.
10                  MR. SCARBER:  I understand, but I
11 need to be clear.
12                  THE WITNESS:  So it's just between
13 Corizon and DOC.  At this point, there's no one from
14 Corizon corporate involved in the process.
15 BY MR. CROSS:
16 Q    All right.  Can the prisoner initiate the appeal
17     process?
18 A    They have a system of grievances.
19 Q    I understand they can file a grievance, and that's
20     handled by the MDOC, right?
21 A    Correct.
22 Q    But can they initiate the Corizon appeal process
23     that you just described?
24 A    No, I don't believe so.
25 Q    Okay.  Does Corizon review the performance of

1 site-level medical providers?
2 A    There's an annual review process, yes.
3 Q    Have you ever done any kind of performance review of
4     a provider as an RMD or state medical director?
5 A    Yes.
6                  (Bomber Deposition Exhibit No. 8 was
7                  marked for identification.)
8 Q    All right.  I'm going to show you what we will call
9     Exhibit 8.  Do you recognize this document?  I mean
10     not what's filled out in it, but just the form
11     itself?
12 A    It's not -- it looks like a document that's similar
13     to what we review.  We used to review providers in
14     Michigan, but it's not exactly the same, this is a
15     little different.
16 Q    How is it different?
17 A    Well, the form is a little different, the
18     organization is different; some of the questions are
19     similar, though.
20 Q    Okay.  Tell me how the form is different; what are
21     the differences, what are the different questions?
22 A    Well, I'd have to have the other form in front of
23     me.  It's just the way it's organized, the lines,
24     the boxes, they're all a little different.
25 Q    Interesting.  And you know who this person Keith

1 Papendick is, right?
2 A    Yes.
3 Q    And what's his job?
4 A    He is a utilization management physician.
5 Q    And do you know who this person, James Powell, is?
6 A    That would be Dr. Powell, who used to be the chief
7     medical officer of Corizon.
8 Q    Okay.  So I'm noticing on this form -- like, let me
9     direct your attention to No. 5, "Demonstrates
10     compassion in patient encounters, NA"; that would
11     stand for not applicable, right?  Is that a fair
12     assumption?
13 A    That question, seems to me, would be directed
14     towards someone who's seeing patients eye to eye,
15     face to face.
16 Q    Exactly.  And does Dr. Papendick, in his current
17     role, see patients eye to eye, face to face?
18 A    No.
19 Q    So, this form probably isn't specific to utilization
20     management medical directors, is it?
21                  MR. SCARBER:  Just going to place an
22     objection to speculation and foundation.  But go
23     ahead.
24 A    I can't answer that question 'cause I didn't develop
25     this form nor do I use this exact form.

1 BY MR. CROSS:
2 Q    Okay.  Do you have access to the form that you do
3     use?
4 A    Not immediately, no.
5 Q    So, I want to direct your attention to the Medical/
6     Clinical Judgment Section."  On the form that you
7     use, is there something similar to No. 3,
8     "Prescribes pharmaceutical therapy within the
9     guidelines of Corizon Health or contracted
10     formulary"?
11 A    There is a question around pharmacy and
12     pharmaceutical use.  Can't tell you exactly if it
13     reads the same, there is a question.
14 Q    There's a question like that?
15 A    Yes.
16 Q    And what would be the answer that would reflect
17     better on the site provider, yes or no?
18 A    Yes.
19 Q    Yes.  What's a formulary?
20 A    A formulary is a list of medications provided by any
21     healthcare organization.  The MDOC has a formulary
22     and we're -- that's preferred that we use a drug on
23     the formulary.  It's not the only drugs we can use,
24     but those are the preferred medications.
25 Q    What's the purpose of having a drug formulary?



Jeffrey Bomber, D.O.
05/28/2021                                    Pages 54..57

Page 54

1  A    A drug, what, I'm sorry?
2  Q    What is the purpose of having a drug formulary?
3  A    **Purpose of having a drug formulary is to make sure**
4       **that you provide medications in every category**
5       **needed for the patients.**
6  Q    Well, wouldn't you be able to provide medications in
7       every category needed for the patients without a
8       drug formulary?
9              MR. SCARBER: Just going to place an
10      objection to relevance. Go ahead.
11 A    **I know there are other reasons for having a**
12      **formulary; health entities, hospitals, for example,**
13      **clinics, are provided better cost in volume buying**
14      **participating in a formulary.**
15 BY MR. CROSS:
16 Q    So is part of the reason that a health care
17      organization would use a drug formulary to control
18      costs?
19             MR. SCARBER: Place an objection as
20      speculation and mischaracterizes his testimony. But
21      go ahead.
22 A    **They use it to provide better pricing and help with**
23      **cost, yes.**
24 BY MR. CROSS:
25 Q    Okay. And so below this question you have a --

Page 55

1       strike that. See where it says, "Percentage of
2       non-formulary medication on-site"?
3  A    **Yeah, I can tell you we don't track that for the**
4       **providers.**
5  Q    You don't?
6  A    **No.**
7  Q    All right. Do you track the number of UM requests
8       during the last year for the providers?
9  A    **We do not, and there's a question on that, we just**
10      **don't have the data available. So, no, we don't**
11      **discuss that in our reviews.**
12 Q    Do you track the percentage of requests that are
13      approved?
14 A    **We track the overall -- now we track the overall**
15      **percent of ATPs, yes.**
16 Q    But do you track the percentage of an individual
17      providers' 407 requests that are approved?
18 A    **Previously, I was asked that question, and I did**
19      **answer that question before, and, yes,**
20      **intermittently that number has been tracked and**
21      **provided to the DOC.**
22 Q    Do you use that number at all in evaluating the
23      performance of the individual provider?
24 A    **I don't, no.**
25 Q    Did Corizon ever use that number in evaluating the

Page 56

1       performance of the individual provider?
2  A    **Not actively.**
3  Q    What do you mean by "not actively"?
4  A    **That number may have been provided intermittently to**
5       **us and the providers. But it was not a part of**
6       **their annual assessment, it wasn't a factor in**
7       **evaluating them.**
8  Q    If a provider has something like a 50 percent ATP
9       approval rate, would they receive any kind of
10      coaching or performance improvement plan?
11 A    **Intermittently, like I said earlier, typically that**
12      **would be a new provider who just needs some coaching**
13      **to help learn the system better. Most of our**
14      **providers are overall seasoned. We have many**
15      **providers that have been with us for many years, and**
16      **they don't have many ATPs.**
17 Q    They don't have many ATPs at all or they don't have
18      many ATPs as a percentage of their requests?
19 A    **There are some providers who have virtually hundred**
20      **percent of their 407s approved, and, you know,**
21      **others 90, 85 percent. Occasionally, like I say, we**
22      **get somebody who has a lower approval rate and we**
23      **want to make sure that they have the tools required**
24      **to be successful.**
25 Q    So if someone has a -- if a provider has a lower

Page 57

1       approval rate, what changes do they need to make to
2       be more successful?
3  A    **Generally, their 407s don't include enough**
4       **information or they haven't demonstrated medical**
5       **necessity.**
6  Q    So if it doesn't include enough information -- we
7       were talking before about this nurse reviewer --
8       hold on -- this nurse review portion of the
9       "Utilization Management Core Process Workflow" --
10 A    **Right.**
11 Q    -- where the nurse should help them correct that
12      before it even gets to the physician reviewer,
13      right?
14 A    **Usually, yes.**
15 Q    So if they're not including enough information,
16      shouldn't that not really affect their ATP
17      percentage because it gets fixed before it gets to
18      the doctor?
19 A    **Yeah, we've improved that part. So, you're correct,**
20      **that would be a very, very small percentage of them**
21      **now.**
22 Q    Okay. So, usually, if their percentage is -- their
23      approval rate is low, it's because they're
24      requesting things that aren't medically necessary?
25 A    **Yes.**



**Jeffrey Bomber, D.O.**
05/28/2021                                      Pages 58..61

1 Q  So how does Corizon define medially necessary?
2 A  Well, the MDOC has policies, and we also use
3     Uptodate, sometimes available other medical
4     literature, whatever is required.
5 Q  So you're telling me that there are some MDOC
6     policies that indicate what's medically necessary
7     and what's medically necessary?
8 A  Yes, there are some policies.  They also use
9     InterQual.
10 Q  Does the MDOC have a definition of medical
11     necessity?
12 A  I don't think so, per se.
13 Q  Has the standard of what meets medical necessity
14     changed at all over the course of your time working
15     in the Michigan prison system?
16 A  Only in the sense that Uptodate changes every day.
17 Q  All right.  So what's the definition of medical
18     necessity that you apply?
19 A  So, medical necessity is based on the medical
20     literature and the standard of care.  So any
21     procedure, intervention, is based on the medical
22     evidence whether or not it's necessary.
23 Q  What do you mean by "necessary"?
24 A  So, you know, in medicine we have a saying, 'Do no
25     harm,' and if we order a test we want to make sure

1     that that test will be the appropriate test and also
2     be thinking that it may lead to other procedures, so
3     want to make sure that it's the right type of
4     imaging, for example.  We want to make sure that
5     the -- there are -- you know, everything in medicine
6     we weigh the risk versus benefit.  So the benefit of
7     a treatment or a procedure should outweigh any risk,
8     based on the medical evidence.
9 Q  So if the benefit outweighs the risk is the
10     procedure then medically necessary?
11 A  No, that's only part of my answer.
12 Q  That's only part of it?  What else -- so you have to
13     have benefit outweighing risk; what else do you
14     need?
15         MR. SCARBER:  I'm just going to place
16     an objection; asked and answered in his last answer.
17     He mentioned a number of things that go into it.
18 BY MR. CROSS:
19 Q  You may answer.
20 A  So, yeah, there are numerous research studies and
21     FDA approvals, et cetera, to lead to the
22     determination of medical necessity and benefit
23     versus risk.
24 Q  All right.  So you're talking about efficacy and
25     evidence-based medicine; is that right?

1 A  Correct.
2 Q  So if there is research that indicates that the
3     requested service, whatever it is, is effective for
4     the condition, whatever it is, and the benefit of
5     the service or procedure outweighs the risk, it is
6     then medically necessary?
7 A  You have to take it by -- patient by patient, you
8     have to individualize this.  You can't just make a
9     blanket -- there are some generalizations, but you
10     just can't just make a blanket statement.
11 Q  Did you review any documents in preparation for
12     today's deposition?
13 A  Yes.
14 Q  What documents did you review?
15 A  I only reviewed documents provided by my attorney.
16 Q  Did you review any medical records?
17 A  I reviewed portions of medical records I was
18     provided by my attorney.
19 Q  Did you review medical records for an individual by
20     the name of Kohchise Jackson?
21 A  Yes.
22 Q  What medical records did you review?
23 A  There were excerpts from his chart, I believe; there
24     was a 407 request.
25 Q  What else?

1 A  I would have to have my attorney provide those
2     documents again.
3         MR. SCARBER:  Ian, we gave him the
4     MDOC chart, he looked through that.  I can't say he
5     looked at every page, but he had that to skim
6     through.
7 BY MR. CROSS:
8 Q  All right.  Did you receive any records about
9     Mr. Jackson's treatment after he left the MDOC or
10     before he entered the MDOC?
11 A  I believe there was a document related to his time
12     in a jail.
13 Q  Okay.  How about afterwards?
14 A  I did not see any medical records afterwards, that I
15     recall.
16 Q  Have you ever met Mr. Jackson?
17 A  No, with the caveat being that I do visit a lot of
18     sites and do meet patients intermittently, but I
19     can't say for sure.
20 Q  Okay.  But fair to say you've never evaluated him as
21     a medical provider.
22 A  No, I have not evaluated him.
23 Q  Did you form any opinions about whether any
24     procedures were medically necessary on the basis of
25     your review of medical records for Mr. Jackson?



Page 62

1  A   Yes, there was a request for revision of a
2      colostomy.
3  Q   And you formed an opinion about whether reversing
4      that colostomy was medically necessary; is that
5      correct?
6  A   Yes.
7  Q   Based on your review of those medical records.
8  A   Medical records and MDOC policy, yes.
9  Q   Okay.  So MDOC policy determines what's medically
10     necessary?
11 A   No.
12 Q   So, then, how did MDOC policy factor into your
13     clinical judgment about whether a colostomy reversal
14     was medically necessary?
15 A   MDOC has policies based on medical necessity.  They
16     don't do the research that determines medical
17     necessity, but their policies are based on medical
18     necessity.
19 Q   Okay.  But is it fair to say that you were able to
20     form an opinion about whether a colostomy reversal
21     was medically necessary or not based on reviewing
22     medical records?
23 A   No, I would review Uptodate and see what the current
24     recommendation is, whether it's medically necessary.
25 Q   So you looked at Uptodate and you looked at medical

Page 63

1      records?
2  A   I have looked at Uptodate on a daily basis.  I can't
3      say that I looked at colostomy reversal in the last
4      month, but I have reviewed that before.
5  Q   Okay.  But you were able to form an opinion on the
6      basis of the medical records you reviewed in
7      preparation for today's deposition and your
8      experience and what you previously read on Uptodate?
9  A   Yes.
10 Q   Okay.  So if I were to show you some medical records
11     for Mr. Jackson from a time period after he was
12     released from the Michigan Department of
13     Corrections, would you be able to form a medical
14     opinion about whether or not colostomy reversal was
15     appropriate or medically necessary at that time?
16 A   I can't say, I'd have to review the information.
17 Q   And --
18          MR. SCARBER:  Let me just place an
19     objection to this line of questioning.  This witness
20     isn't a named defendant in this particular case.
21     There is no allegations about whether this witness'
22     medical judgment was involved in making the
23     decisions in this particular case; and, you know,
24     he's not really a part of the claim that's being
25     made here.

Page 64

1          MR. CROSS:  Is he going to testify
2  about whether or not colostomy reversal is medically
3  necessary?
4          MR. SCARBER:  Are you talking about
5  at the time that the request was made or are you
6  talking about two-and-a-half years later?
7          MR. CROSS:  I'm talking about at
8  either time.
9          MR. SCARBER:  If you're going to ask
10 him the question, I suppose he could answer the
11 question as to what was necessary at that particular
12 time.  But this is way outside the scope of what
13 your claim is.  And I don't want to go any further,
14 you know, making any speaking objections, but my
15 objection is that that's not what this witness is
16 here for.  He's not here to establish any standard
17 of care testimony for your guy or your standard of
18 care testimony with respect to what happened
19 later in the case with Dr. Weber or anything of that
20 nature, if that's where you're going with it.
21          If you're going to ask him about the
22 407 process, what was presented based upon what he's
23 seen from the 407 process at that particular time in
24 April of 2017 or that summer, based upon whatever
25 was submitted or whatever the appeal or the

Page 65

1  grievance was, I mean, obviously, I think that's
2  pertinent.
3          MR. CROSS:  But you don't think it's
4  pertinent to ask him about -- well --
5          MR. SCARBER:  It doesn't matter if I
6  think it's pertinent.  I guess what I'm saying is
7  that's my objection.
8          MR. CROSS:  Okay.
9          MR. SCARBER:  And I'll reserve it.  I
10 mean, you can ask him -- you certainly can -- if you
11 got a question to ask, I'll make my objection as you
12 ask it.  I was just laying the foundation so that I
13 didn't have to keep objecting to a whole bunch of
14 questions that you might ask.  But go ahead.
15 BY MR. CROSS:
16 Q   Okay.  So did you apply the same definition of
17     medical necessity you just discussed when you were
18     doing utilization review?
19 A   Yes, the literature and the MDOC policy on
20     revisions, I think, is very clear.
21 Q   So who trained you to do utilization review?
22 A   That would be my predecessor as state medical
23     director, was Dr. Orlebeck.
24 Q   And she taught you what constitutes medical
25     necessity?



Jeffrey Bomber, D.O.
05/28/2021                                     Pages 66..69

1  A  No.
2  Q  No?  Who taught you that?
3  A  **We use Uptodate, InterQual and other relevant**
4     **medical literature to determine medical necessity.**
5  Q  So you look at the literature and if the literature
6     indicates that a given treatment is, well, effective
7     and the benefit outweighs the risk, is it then
8     medically necessary or is there something else that
9     you need?
10 A  **I would ask what is the consensus opinion, what does**
11    **Uptodate say.**
12 Q  All right.  Let me give you an example:  Say a
13    patient has cataracts, dense cataracts in both eyes;
14    is it medically necessary to remove both cataracts
15    or is it just good enough to remove one?
16 A  **I'd really have to know about the particular inmate**
17    **and his symptoms.  I'd have to have more details**
18    **than that.**
19 Q  What details would you need?
20        MR. SCARBER:  Just going to place an
21    objection to asked and answered.
22 A  **I'd want to know more about the inmate, what's his**
23    **vision, does he meet the medically necessary**
24    **criteria.**
25

1  BY MR. CROSS:
2  Q  So that's what I'm getting at here.  What is the
3     necessary medical criteria?
4        MR. SCARBER:  Objection; asked and
5     answered now quite a few times.
6  A  **About cataract removal, I would have to look it up.**
7  BY MR. CROSS:
8  Q  So there's a specific policy somewhere about
9     cataract removal and when it's medically necessary
10    to remove a cataract?
11 A  **No, consensus opinion and Uptodate, for example, is**
12    **where I would look.**
13 Q  So you would look at Uptodate and see if Uptodate
14    says do it, then you do it?
15        MR. SCARBER:  Objection;
16    mischaracterizes his testimony about -- I won't make
17    a speaking objection.  But he's already given you
18    indications as to what might help his decision as to
19    medical necessity.
20 A  **There are other guidelines.  Medicare, I believe,**
21    **has guidelines for cataract removal.**
22 BY MR. CROSS:
23 Q  So if something meets Medicare's guidelines, is
24    it -- of medical necessity, is it then medically
25    necessary, according to Corizon?

1  A  **It's multifactorial.  I'm just trying to explain**
2     **that there's not just one thing that we look at, but**
3     **Uptodate is our core resource.**
4  Q  All right.  Is it possible that Corizon's definition
5     of medical necessity is more restrictive than
6     Medicare's?
7  A  **Wow.  I couldn't really answer that.  You're talking**
8     **about a lot of information.  I just really couldn't**
9     **answer that.**
10 Q  Well, are there some procedures that Medicare would
11    consider medically necessary and pay for that
12    Corizon would not do for a prisoner?
13 A  **I can't answer that, there's just too many**
14    **variables.**
15        MR. CROSS:  Why don't we take a break
16    now.
17        THE VIDEOGRAPHER:  Going off the
18    record, the time is 12:33 p.m.
19        (Break was taken.)
20        THE VIDEOGRAPHER:  We're back on the
21    record.  The time is 12:52 p.m.
22 BY MR. CROSS:
23 Q  Okay.  I'm going to take you back to Exhibit 6, this
24    Utilization Management Manual, the portion about the
25    UM core process.  See where it says here, at the

1     bottom, that some training will be provided to
2     support a successful launch?
3  A  **Yes.**
4  Q  Did you receive any training in connection with the
5     launch of the UM core process?
6  A  **Yes, we received training and we did review the**
7     **process.**
8  Q  All right.  How was the training provided?
9  A  **I believe there was some live training, as well as**
10    **some virtual training.**
11 Q  Virtual training, interesting.  How did you do the
12    virtual training?
13 A  **With -- actually, I think, Mignon, at one time, did**
14    **some training.**
15        THE COURT REPORTER:  Excuse me, what
16    was that?
17 A  **Yes, I did receive training, yes.**
18 Q  Okay.  Did you -- were there any materials provided
19    to you during that training?
20 A  **I can't recall precisely what was provided, there**
21    **were some materials.**
22 Q  What kind of materials?
23 A  **I think there was an algorithm similar to the one**
24    **you showed me about -- it was focusing on the**
25    **process and procedure that is what happens to the**



Page 70

1    407 once it's generated, who it goes to, and the
2    appeal process.  That's what the focus of that
3    training was.
4  Q   So was it this manual?  Is that what you were shown?
5  A   No, we weren't trained in this manual.  There are
6    parts of it, perhaps, but I didn't see this
7    particular manual that you're showing me.
8  Q   Okay.  Did you go through a training module called
9    RMD Utilization Management 101?
10 A   I don't think so, no.
11 Q   So the online training, was it live or was it
12    recorded?
13 A   There were --
14         MR. SCARBER:  Just going to place an
15    objection; I don't know if he said "online" or if he
16    said "virtual."  But go ahead.
17 A   Yeah, no, it was live, either telephone or virtual.
18 BY MR. CROSS:
19 Q   Do you know if that session was recorded?
20 A   I do not.
21 Q   Okay.  And the in-person training, where did that
22    take place?
23 A   There was training at our annual state-wide meeting.
24 Q   Who provided that training?
25 A   I believe it was actually one of the VPs of

Page 71

1    operation and Mignon Ernst.
2  Q   Did they give you any handouts or did they put up a
3    PowerPoint slide, any kind of the materials, or did
4    they just talk?
5  A   There were materials.  I don't have them.
6  Q   Do you remember what they were?
7  A   There were some -- there was a PowerPoint
8    presentation at the state-wide meeting.
9  Q   Okay.
10 A   And then there were subsequent calls, group calls.
11 Q   Do you know what a 30(b)(6) witness is?
12 A   I believe that is where you testify on behalf of a
13    corporation.
14 Q   And you get specific subjects you're going to
15    testify about, correct?
16 A   Correct.
17 Q   And you have to become reasonably knowledgeable
18    about those subjects before you testify, correct?
19 A   Correct.
20 Q   Have you ever been a 30(b)(6) witness for Corizon?
21 A   Yes, but, I'm sorry, sometimes the numbers or the
22    designations are confusing.
23 Q   Were you ever designated to testify about Corizon's
24    document retention policies?
25 A   I may have been asked a question about them.  But I

Page 72

1    don't have anything to do with their document
2    retention.
3  Q   So you're not familiar with their document retention
4    policies at all.
5  A   No, I'm not a part of what happens at the corporate
6    level.
7  Q   Okay.  Do you have a computer at work?
8  A   Yes.
9  Q   Do you need to retain documents that you create on
10    your computer, pursuant to a policy?
11 A   Pursuant to a policy.  I had -- at one time, I had
12    the MDOC policies and procedures and a copy of the
13    contract.  I do -- the Corizon forms, I do have the
14    annual review form for providers on my computer.
15    But I don't retain any documents for the company.
16 Q   All right.  Is there like a provider handbook or a
17    manual that's provided to Corizon providers in
18    Michigan?
19 A   Yes.
20 Q   Do you have access to that document?
21 A   Yes, there are hard copies in the Lansing office.
22 Q   And what's the title of it?
23 A   Corizon Provider Training Manual?
24 Q   Corizon Provider Training Manual?  Okay.  Is there a
25    virtual version that providers can access online?

Page 73

1  A   Not that I'm aware of.  I have not.
2  Q   Okay.  I'm going to go back to this deposition you
3    gave in Franklin.  So here, at 15 through 16, you
4    said, "The resources are now part of the onboarding
5    manual which is available via the web to the
6    providers."  Do you have any idea what resources you
7    were talking about there?
8  A   I don't believe that ever materialized.  That's what
9    we were told was going to happen to it.  But during
10    my tenure, it actually did not.
11 Q   And then at line 23 to 24, you were asked, "So it's
12    an online manual now"?  And you said, "Yes."
13 A   Yes.
14 Q   But, in fact, it was not actually an online manual?
15 A   That was my understanding, that it was going to be
16    online and was online, but it did not materialize.
17 Q   Okay.  So, in your opinion, is it medically
18    necessary to reverse a functional colostomy, ever?
19         MR. SCARBER:  Just going to place an
20    objection to relevance, foundation.  But go ahead.
21 A   My opinion is based on medical necessity as per
22    Uptodate and following MDOC policy.  I'm not an
23    expert in colostomies.
24 BY MR. CROSS:
25 Q   Okay.  What MDOC policy are you referring to, sir?



Page 74

1  A  There is a policy that discusses cosmetic surgeries;
2     and under their policy, colostomy reversal is
3     considered more of a cosmetic procedure, and that is
4     not approved.
5  Q  So you're saying there's an MDOC policy that
6     prohibits cosmetic surgeries; is that correct?
7  A  Yes.
8  Q  And under that policy a colostomy reversal is
9     considered cosmetic.
10 A  They refer to it as being part of a cosmetic group,
11    yes.
12 Q  What differentiates a cosmetic from a non-cosmetic
13    surgical procedure?
14 A  You'd have to ask the MDOC how they define that.
15    But a cosmetic procedure is meant to reverse the way
16    something looks.
17 Q  Okay.  So this policy that you're talking about,
18    does it specifically say that colostomy reversals
19    are cosmetic?
20 A  I did see the policy prior to this deposition today,
21    and it is present.  Is it okay to refer to that
22    policy?
23 Q  Sure.  Yeah.
24 A  Do you want to bring it up or you want me to just
25    to --

Page 75

1  Q  I'll need a second to grab it.  But I think I can
2     bring it up here.  Let me find that policy.  And you
3     have a copy in front of you?
4  A  I do.
5         MR. SCARBER:  We have one, Ian.
6  BY MR. CROSS:
7  Q  Okay, let me just find it myself.  What's the policy
8     number?
9  A  It's Policy Directive No. 03.04.100.
10 Q  All right, 03.04.100, and what version of the policy
11    are you referring to?
12 A  The effective date is 2-1-2015, but this was
13    filed -- oh, no, that's an evidence number, right?
14    So, yeah, 2-1-2015.
15 Q  All right.  So we're looking at the same policy
16    right now.
17 A  Okay.
18 Q  What portion of the policy indicates that a
19    colostomy reversal is cosmetic?
20 A  So they state under Section AA and BB, "Corrective
21    surgery is a surgical procedure to alter or adjust
22    body parts or the body's structure.  Reconstructive
23    surgery is a surgical procedure to reform body
24    structure or correct defects.  For purposes of this
25    policy, corrective and reconstructive surgery does

Page 76

1     not include procedures which can be done under local
2     anesthesia.  Corrective and reconstructive surgeries
3     shall be authorized by a prisoner only if determined
4     medically necessary and only if approved by the CMO.
5     It shall not be approved if the sole purpose is to
6     improve appearance."
7  Q  Okay.  So I don't see anything in that policy
8     specifically about colostomy reversals.  Can you
9     explain how you believe that policy prohibits
10    colostomy reversals.
11 A  That's what we were told by the MDOC, that they
12    consider colostomy reversals to be under this
13    particular policy.
14 Q  So is a colostomy reversal a reconstructive surgery
15    or a corrective surgery?
16 A  I -- again, I'm not an expert in interpreting that.
17    It looks like the MDOC considers it a
18    reconstructive-type surgery.
19 Q  Okay.  And does this policy say that corrective and
20    reconstructive surgeries are not permitted for
21    prisoners?
22         MR. SCARBER:  Just going to place an
23    objection; the policy speaks for itself, he didn't
24    write the policy; and object to speculation as to
25    what's meant by it, other than what the MDOC has

Page 77

1     already told the inmate.  Go ahead, if you can
2     answer.
3  A  It does state only if determined medically necessary
4     and only if approved by the chief medical officer,
5     which would be the chief medical officer of the
6     MDOC.
7  BY MR. CROSS:
8  Q  In your time as a provider for the MDOC, are you
9     aware of any prisoners who received a surgery to
10    reform body structure or correct defects?
11 A  Well, correcting defects can be interpreted much
12    more broadly in the face of an orthopedic injury,
13    for example, that affects function, which may be
14    medically necessary.  So, in that context,
15    certainly.
16 Q  Are you aware of any inmates who received a surgical
17    procedure to alter or adjust body parts during your
18    time as a provider?
19 A  Not for cosmetic purposes, no.
20 Q  Okay.  So cosmetic purposes means what?  The sole
21    purpose is to improve appearance?
22         MR. SCARBER:  Just going to object to
23    form, and asked and answered already.
24 A  That's what the policy says.
25



Page 78

1  BY MR. CROSS:
2  Q   Do you think the sole purpose of reversing a
3     colostomy is to improve appearance?
4  A   **I can tell you it's not considered medically**
5     **necessary with -- according to Uptodate; and if it's**
6     **not medically necessary, no, we don't approve them.**
7  Q   So do you think it was medically necessary in June
8     of 2019 after Mr. Jackson got out of MDOC custody?
9  A   **I couldn't say.  I don't have that information.**
10 Q   What information would you need?
11 A   **What was the patient presenting with, what was the**
12    **opinion of the surgeon, what was the reasoning of**
13    **it.**
14 Q   All right.  I want to you assume, for the purposes
15    of this question, that the patient's presentation at
16    the time he received the surgery was the same in all
17    material respects to his presentation when the
18    surgical request was ATP'd while he was in the MDOC.
19 A   **So I don't understand what that presentation has to**
20    **do with the policy that we were instructed to follow**
21    **at the time.**
22 Q   It's not about the policy, sir, it's about what is
23    medically necessary.  So you're saying that the
24    reversal surgery wasn't medically necessary because
25    of the policy or because of the state of medical

Page 79

1     practice?
2  A   **That was not only the policy, that's, I believe,**
3     **what even the patient's own surgeon said at the**
4     **time.**
5  Q   Was it not medically necessary because of this
6     policy or was it not medically necessary because of
7     the state of medical practice?
8          MR. SCARBER:  Just going to place an
9     objection, asked and answered.
10 A   **Right, there's no evidence I'm aware of that says**
11    **that it's medically necessary.**
12 BY MR. CROSS:
13 Q   So why isn't it medically necessary?
14         MR. SCARBER:  Just place an objection
15    to asked and answered, now quite a few times, again.
16 A   **Well, we'd had have to go and look at all the**
17    **literature that resulted in that consensus opinion.**
18    **So it would be a number of reasons it's considered**
19    **not necessary.**
20 BY MR. CROSS:
21 Q   Are you aware that the colostomy was eventually
22    reversed?
23 A   **Yes.**
24 Q   So do you think that -- hold on.  Strike that.  Are
25    you aware that the Michigan Medicaid program was

Page 80

1     billed for the cost of the reversal surgery?
2  A   **No.**
3  Q   All right.  Well, I want to you just assume that
4     it's true.  Are you aware that medical necessity is
5     a condition of payment under both the Medicare and
6     the Michigan Medicaid programs?
7  A   **I've not seen the language.**
8  Q   Are you aware that a physician who directly or
9     indirectly seeks reimbursement from Michigan
10    Medicaid for a service that is not medically
11    necessary is committing healthcare fraud, a ten-year
12    felony?
13 A   **As you say.**
14 Q   So do you think Dr. Weber, the doctor who reversed
15    Mr. Jackson's colostomy shortly after he was
16    released from prison, committed healthcare fraud?
17 A   **I cannot speak to the specifics of that case.**
18 Q   So, the way I see it, there are three possibilities
19    here:  Either, one, his condition changed between
20    the time he was in prison and the time that he was
21    released such that, while it wasn't medically
22    necessary when he was in prison, it became medically
23    necessary when he was released; or Dr. Weber
24    committed healthcare fraud by performing a procedure
25    and billing for a procedure that's not medically

Page 81

1     necessary; or Corizon's definition or the MDOC's
2     definition of medical necessity is different from
3     the definition used by the Michigan Medicaid
4     program.  Can you think of another possibility?
5          MR. SCARBER:  I'm just going to place
6     an objection to the form of the question and to
7     speculation all over the question.  Your question
8     started out even with speculation on your behalf.
9     So object to form, speculation.  He can't answer
10    that kind of question.  But go ahead, if you can.
11 A   **I can't, there's too many variables.  There's always**
12    **a difference of opinion among medical providers.**
13    **But I can't speak to the legalities of whether they**
14    **committed a crime or fraud.**
15 BY MR. CROSS:
16 Q   Well, do you think it was medically necessary to
17    reverse the colostomy after he got out if we assume
18    that his condition was the same?
19         MR. SCARBER:  Objection; asked and
20    answered, calls for speculation, foundation.
21 A   **Again, you're asking me to speculate.  I don't know.**
22 BY MR. CROSS:
23 Q   Well, what kind of information would you need to
24    know?
25 A   **I'd want to see the surgeon's note prior to the**



Jeffrey Bomber, D.O.
05/28/2021          Pages 82..85

Page 82

1    procedure, the nature of the procedure, what
2    procedure was done; and even then, I mean, you're
3    going to find difference of opinion among different
4    surgeons.  His previous surgeon, I understand, said
5    it wasn't medically necessary.
6 Q  Well, would it help you if I showed you the
7    surgeon's note prior to the procedure?  Would you be
8    able to form an opinion then?
9 A  Again, you're asking me to speculate?
10 Q  Well --
11 A  I can't do that.
12 Q  -- didn't you testify earlier that you formed an
13    opinion about whether a colostomy reversal was
14    medically necessary for Mr. Jackson based on your
15    review of some medical records in preparation for
16    today's deposition?
17         MR. SCARBER:  I'm going to place an
18    objection; that mischaracterizes his testimony.  And
19    I don't want to make a speaking objection, but a lot
20    more went into that answer.
21 A  I believe I answered as to medical necessity and how
22    that MDOC policy dictated what they would approve
23    and what they would not.
24 BY MR. CROSS:
25 Q  So you didn't have an opinion as to whether the

Page 83

1    reversal surgery was medically necessary in April of
2    2017.
3         MR. SCARBER:  You mean did he
4    formulate an opinion in April of 2017?
5         MR. CROSS:  No, I'm asking him does
6    he have an opinion today that he was able to
7    formulate, based on reviewing medical records from
8    Mr. Jackson's time in the MDOC, about whether or not
9    a colostomy reversal was medically necessary for
10    Mr. Jackson.
11         MR. SCARBER:  And I'm going to
12    object, again, that it's been asked and answered
13    repeatedly about what he thinks about that
14    particular procedure, whether it should have been
15    done or whether it was medically necessary or what
16    the basis of his opinion already was concerning
17    that.  But I think the record will speak for itself
18    that he's been asked that a number of times and
19    given reasons as to his opinion.  But go ahead.
20 A  No, it did not meet the criteria for medical
21    necessity.
22 BY MR. CROSS:
23 Q  So why couldn't you determine, based on medical
24    records from June of 2019, whether it met criteria
25    for medical necessity at that time?

Page 84

1         MR. SCARBER:  I'm just going to place
2    app objection, also, to, at this point, what
3    difference does it make for this doctor, at this
4    point, to be talking about something that happened
5    well after this time period.  But go ahead.  He
6    didn't make any decisions -- but go ahead.
7 A  Yes, the decision would be the same based on the
8    policy.
9 BY MR. CROSS:
10 Q  The decision would be the same based on the policy,
11    meaning, in June of '19, the decision would be the
12    same?
13 A  Unless this policy has been changed, yes.
14 Q  Okay.  So the determination of whether it's
15    medically necessary or not is based on a policy of
16    the MDOC.
17         MR. SCARBER:  Objection; asked and
18    answered, many times, and taken out of context of
19    what his prior testimony was.
20 A  So, again, my answer is the same, the MDOC base
21    their policy on medical necessity.
22 BY MR. CROSS:
23 Q  Is it possible that medical necessity in the MDOC
24    context is different from medical necessity in the
25    Michigan Medicaid program context?

Page 85

1         MR. SCARBER:  I'm going to place an
2    objection; calls for speculation.  The question
3    itself asked him is it possible; anything is
4    possible.  But if you can answer.
5 A  It's possible, but I don't have those Medicaid
6    policies in my hands for review.
7         (Bomber Deposition Exhibit No. 10 was
8    marked for identification.)
9 BY MR. CROSS:
10 Q  Okay.  Let me show you a document.  We'll call this
11    Exhibit 10.  This is a declaration of Dr. Erin
12    Orlebecke, and I believe you testified earlier that
13    Dr. Erin Orlebecke trained you how to do utilization
14    management activities; is that correct, sir?
15 A  Yes.
16 Q  And she was the state medical director before you
17    were the state medical director; is that correct?
18 A  Yes.
19 Q  Okay.  Now, down here on page six of the
20    declaration, if we look at the bottom of No. 13, it
21    says, "If a patient can hear out of one ear without
22    a hearing aid, then no hearing aid is necessary for
23    the other ear."  Do you agree with that?
24         MR. SCARBER:  I'll just place an
25    objection, before the witness answers, as to we

Page 86

1    don't know anything about this particular case at
2    this point, what this is referring to, what the
3    facts are, and what this doctor was actually
4    responding to. But if you can answer, go ahead.
5  A   I believe that the MDOC did have policies on hearing
6      aid and replacement and what the criteria were for
7      approval of hearing aids; that has changed
8      throughout the years. So, at the time -- and Dr.
9      Orlebecke didn't train me, per se, on this
10     particular patient, but there was a policy at the
11     time that we would follow.
12 BY MR. CROSS:
13 Q   Do you know a Dr. Harriet Squier?
14 A   Yes.
15          (Bomber Deposition Exhibit No. 11 was
16          marked for identification.)
17 Q   Okay. I'm going to show you what's been marked
18     Plaintiff's Exhibit 11. This is a declaration of
19     Dr. Harriet Squier, and here, at page six, she says,
20     "Mr. Coates's examination suggested that he had very
21     good hearing in the right ear; therefore, a hearing
22     aid in the other ear would not add much benefit and
23     there was no medical necessity for Mr. Coates to
24     have a hearing aid."
25          Do you agree that there's no medical

Page 87

1    necessity to have a hearing aid in one ear if you
2    can hear out of the other ear?
3          MR. SCARBER: Same objection as
4    before, but go ahead, with respect to the affidavit
5    by -- or declaration by Dr. Orlebecke. But go
6    ahead, so I don't have to repeat it, go ahead.
7  A   I would have to know what Uptodate said at the time,
8      as well as the MDOC policy.
9  BY MR. CROSS:
10 Q   Okay. Do you know what Dr. Squier's job was when
11     she worked in the MDOC?
12 A   Yes, she worked for PHS, which became Corizon, as a
13     utilization management physician.
14 Q   And you started doing utilization management at the
15     point that she retired; is that correct?
16 A   Yes, I believe that was around the time I left.
17 Q   And then who took over from you?
18 A   Dr. Papendick replaced Dr. Squier.
19 Q   Okay. So, fair to say, at some point in, you know,
20     2012 to 2014, it was not considered medically
21     necessary for a prisoner to hear out of both ears?
22          MR. SCARBER: I'm going to place an
23     objection. He has already said he would have to
24     review a policy -- objection; calls for speculation,
25     foundation. Go ahead.

Page 88

1  A   Yeah, I'm sure that, at the time, Uptodate and MDOC
2      policy spelled out what type of hearing loss
3      required corrective aids, but I don't remember the
4      details.
5  BY MR. CROSS:
6  Q   Is there a risk of death associated with getting a
7      hearing aid?
8  A   Not that I'm aware.
9  Q   Okay. Are there some benefits to being able to hear
10     out of both of your ears?
11          MR. SCARBER: Just going to place an
12     objection to relevance as well. Go ahead. It has
13     nothing to do with the medical issue we're talking
14     about here. But go ahead.
15 A   Yes, it's better if you have hearing from both of
16     your ears.
17 BY MR. CROSS:
18 Q   Okay. So, from the patient's perspective, is it
19     possible that the benefits of a hearing aid outweigh
20     the risks?
21 A   It's possible.
22 Q   Okay. So, do you think the utilization management
23     department is considering something else besides the
24     risks versus the benefits to a patient of a
25     particular procedure?

Page 89

1          MR. SCARBER: Calls for speculation.
2    He wasn't involved in any of those cases. But go
3    ahead.
4  A   No, I wasn't involved in determining that policy.
5      But I know that it was a joint process between
6      Corizon and the DOC.
7  BY MR. CROSS:
8  Q   Can you answer the question that I asked you, sir?
9  A   Can you repeat the question.
10          MR. CROSS: Ms. Hicks, can you repeat
11     that question.
12          (Page 88, lines 22-25 were read
13          back.)
14 A   Can you tell me what "something else" means?
15 Q   Well, I'm asking you that, sir. Are they
16     considering something besides a risk-to-benefit
17     analysis?
18 A   Well, they're considering what the MDOC thinks about
19     the issue, as well, and what their policy is.
20 Q   Okay. You talked before about Uptodate and the need
21     to establish that the treatment -- that there's
22     evidence to support the treatment, right? That's
23     part of medical necessity?
24 A   Correct.
25 Q   Do you know if there's evidence that hearing aids



Jeffrey Bomber, D.O.
05/28/2021                                                      Pages 90..93

1    help with hearing loss?
2           MR. SCARBER:  I'll place another
3    objection to relevance, particularly with respect to
4    this issue.  It has nothing to do with the Monell
5    claim that we're talking about here or possible
6    Monell claim.  Go ahead.
7  A   **I would have to read up on the benefits of hearing**
8     **aids.  Sorry, I don't know off the top of my head.**
9  BY MR. CROSS:
10  Q   So I'm just -- it seems to me like there's something
11    else being considered besides a risk/benefit
12    analysis and whether the procedure is supported by
13    evidence, at least in this case with the hearing
14    aide.  Do you agree with that?
15  A   **Not that I'm aware of, no.**
16  Q   So those are the only things that are being
17    considered, is whether it's A1 evidence that the
18    procedure helps the problem and the risks to the
19    patient and the potential benefits to the patient?
20           MR. SCARBER:  Just going to place an
21    objection, asked and answered.  Go ahead.
22  A   **That's how I practice medicine, yes.**
23  BY MR. CROSS:
24  Q   You practice outside of a prison as well, correct?
25  A   **Yes.**

1    and current.
2           MR. CROSS:  All right.  I don't have
3    further questions.  Thank you for your time, sir.
4           MR. WILLIS:  I don't have anything.
5           EXAMINATION
6  BY MR. SCARBER:
7  Q   Doctor, I have one question for you.  Specifically,
8    when you were talking about the appeals procedure
9    with respect to a final determination as to whether
10    or not Mr. Jackson would have a colostomy reversal
11    or not, who has the -- who makes the final
12    determination as to whether or not that procedure
13    would be done?
14  A   **The final determination is made by the chief medical**
15    **officer of the Michigan Department of Corrections.**
16  Q   Corizon is not the final decision-maker with respect
17    to that procedure?
18  A   **That's correct, Corizon is not.**
19           MR. SCARBER:  I don't have anything
20    further.
21           MR. CROSS:  I have some follow-up.
22           EXAMINATION
23  BY MR. CROSS:
24  Q   Does Corizon have any policies about what is
25    medically necessary?

1  Q   Do you look at MDOC policies when determining
2    whether a given test or procedure is medically
3    necessary for your non-prisoner patients?
4           MR. SCARBER:  I'm just going to place
5    an objection to relevance.  We're not talking about
6    what this particular doctor does outside of what's
7    involved in the treatment of Mr. Jackson, who, at
8    the time of his lawsuit, was an inmate in the county
9    jail, as well as a prisoner in the Michigan
10    Department of Corrections.  So we're not -- it's
11    irrelevant to the issue in this case.  Go ahead.
12  A   **I do not use MDOC policy outside of the MDOC.**
13  BY MR. CROSS:
14  Q   So are there things that might be medically
15    necessary outside of the MDOC that wouldn't be
16    medically necessary inside the MDOC?
17  A   **It just so happens that what I use out in the world**
18    **is Uptodate, it's very similar.**
19  Q   But Uptodate is not the only thing you use inside
20    the MDOC, right?
21           MR. SCARBER:  Asked and answered.
22    But go ahead.
23  A   **No, they also use InterQual, National Cancer**
24    **Coalition data, and then sometimes a literature**
25    **search is done, too, to see if there's anything new**

1  A   **No, because we're told -- we're instructed to use**
2    **Uptodate.  They have clinical modules -- I mentioned**
3    **that earlier -- for diabetes, hypertension, prostate**
4    **cancer.  But they're just modules based on the**
5    **evidence, and, on a day-to-day basis, we're**
6    **instructed to use Uptodate.  Corizon pays for that**
7    **for all of its providers.**
8  Q   Well, does Corizon instruct its providers at all
9    about what's medically necessary and what's not
10    medically necessary?
11  A   **Yeah, based on what's in Uptodate and what the**
12    **policies of the MDOC are.  But there's no Corizon**
13    **policy saying, 'Hey, you need to approve this for**
14    **this and not this.'  There's nothing like that.**
15  Q   Let's go back to the exhibit we talked about before,
16    "Practitioner Clinical Onboarding"; and one of the
17    modules here under "Utilization Management" is
18    called "Determining Medical Necessity"; and did you
19    testify that you provide that training?
20           MR. SCARBER:  Hey, Ian, you've got
21    the wrong exhibit up, I'm sorry.
22           MR. CROSS:  What do I have up?
23           MR. SCARBER:  You got a declaration
24    up.  Just maybe go back a few.
25           MR. CROSS:  Hold on.

Page 94

1        MR. SCARBER: While you're getting
2  it, I'm just going to note this is -- I thought this
3  wasn't, but now it's clear that this is outside the
4  scope of what I had asked the witness in my one
5  question. So it's outside the scope of my direct of
6  the witness. But go ahead.
7  BY MR. CROSS:
8  Q   You train people about that, determining medical
9     necessity?
10       MR. SCARBER: Place an objection,
11    asked and answered, about maybe an hour-and-a-half
12    or so ago. But go ahead.
13       MR. CROSS: Yeah, I don't remember
14    what he said.
15       MR. SCARBER: Okay.
16 A   Sure. The answer is that yes, we direct them to
17    Uptodate and the other resources available for
18    medical decision-making.
19 BY MR. CROSS:
20 Q   And so all you tell them to do to determine medical
21    necessity is look at Uptodate?
22 A   Uptodate, National Cancer.
23 Q   Cancer.
24 A   The same. There's no Corizon policy like that.
25    We're using Uptodate 'cause it's current

Page 95

1     information, it's dynamic.
2  Q   Okay.
3        MR. SCARBER: And let me just place
4     another objection to all -- he's already answered
5     all of the various things that go into determining
6     medical necessity for a particular patient in his
7     testimony over the last couple of hours. But go
8     ahead.
9  BY MR. CROSS:
10 Q   Your testimony is that there's no Corizon definition
11    of medical necessity anywhere that's given to the
12    providers?
13 A   Not -- when I train my providers, I show them
14    Uptodate, we review it, there are -- there's no,
15    something similar to Uptodate, that Corizon has that
16    I'm aware of.
17       In the training manual, there are a
18    couple statements about medical necessity. But
19    there's no, like, algorithm or rules for making a
20    decision inside Corizon outside of that. So, no,
21    I'm not sure what, you know --
22 Q   But there's something in the training manual about
23    determining medical necessity.
24 A   Yeah, there are some guidelines.
25       MR. CROSS: Okay. Thanks. That's

Page 96

1  all I have.
2              EXAMINATION
3  BY MR. SCARBER:
4  Q   With respect to whether there are guidelines in the
5     training manual determining medical necessity or
6     not, is there any specific direction or order that
7     Corizon gives to its medical providers or reviewers
8     limiting their ability at all -- and I'm not talking
9     about MDOC policy, but I'm talking about something
10    from Corizon -- limiting their ability to be able to
11    factor in the things that they feel are important
12    for medical necessity?
13 A   No, quite the contrary; in fact, we tell them if you
14    find something outside of Uptodate in the medical
15    literature -- for example, sometimes new things came
16    out in "The New England Journal" or "The Journal of
17    American Medicine" that Uptodate was a little behind
18    on -- and we considered that information as well.
19    So, no, they're never limited.
20 Q   And is the patient's presenting condition and
21    symptoms something that is also very important in
22    determining whether something is medically necessary
23    for that particular patient?
24 A   Yes.
25 Q   And if the patient, in this particular situation,

Page 97

1  has a functional colostomy and no complaints of
2  physical issues or pain or any type of suffering
3  related to that particular colostomy, would that be
4  something that would be considered in determining
5  whether it was medically necessary?
6  A   Yes.
7  Q   In addition to all of the other factors that you
8     already spent time discussing here.
9  A   Correct.
10 Q   Again, these are factors; is that correct?
11 A   Yes, sir.
12       MR. SCARBER: I have nothing further.
13              EXAMINATION
14 BY MR. CROSS:
15 Q   Doctor, do you have an understanding of what
16    prisoners are entitled to under the Eighth Amendment
17    in terms of health care?
18       MR. SCARBER: All right, I'm going to
19    place an objection; that's way outside of the scope
20    of my redirect at this point. So what do you want
21    to do?
22       MR. CROSS: Are you going to instruct
23    him not to answer?
24       MR. SCARBER: I'm going to place a
25    very, very strong limit on what we discuss after



Jeffrey Bomber, D.O.
05/28/2021                                          Pages 98..101

Page 98

1    this point, if you got one question or something
2    like that, but now this is going in a whole other
3    direction.  This is not follow-up.  This is stuff
4    that could have been covered on your direct or
5    cross.  Go ahead.
6  A   It's been some time since I've read the Eighth
7      Amendment.  But the bottom line is inmates are
8      entitled to the same standard of care as that as
9      available in the community.  So I'd have to go back
10     and look at the Eighth Amendment.
11            MR. SCARBER:  And I'm going to place
12     an objection that it calls for a legal conclusion.
13 BY MR. CROSS:
14 Q   Okay.  Now, Devlin, your attorney just asked you
15     some questions about the factors that Corizon
16     providers consider when they are determining whether
17     a colostomy reversal is medically necessary, like is
18     the patient in pain or having issues with the
19     colostomy.  Are those the same things that a
20     provider would consider in the community when
21     determining whether a colostomy reversal is
22     medically necessary?
23            MR. SCARBER:  Place an objection to
24     foundation.  But go ahead.
25 A   Yes.

Page 99

1  BY MR. CROSS:
2  Q   So if you were at a community hospital and someone
3      came in with a functional colostomy, you would say,
4      'I'm not going to refer you to a surgeon because you
5      don't need this to be reversed'?
6  A   I definitely would explain the medical necessity and
7      the risks versus benefits of any procedure.
8  Q   But would you refer them to a general surgeon or no?
9  A   Yeah, if a patient came to me requesting -- any
10     procedure, really -- and if they were adamant that
11     they wanted to see a specialist, absolutely I would
12     facilitate that.
13            MR. CROSS:  Okay.  I don't have any
14     further questions.  Thank you, sir.
15            MR. SCARBER:  I have a follow-up
16     question.
17            EXAMINATION
18 BY MR. SCARBER:
19 Q   Is it true that Mr. Jackson was incarcerated at the
20     time of this particular event that he's talking
21     about, his colostomy reversal request?
22 A   Yes.
23 Q   Mr. Jackson was not on the -- in the outside
24     community, was he?
25 A   Not at that time.

Page 100

1  Q   Were there any specific -- and I think you've
2      already testified -- but there was not an MDOC
3      policy involved in that particular determination as
4      to when he was on the outside of the medical
5      community?
6  A   I don't believe so.
7  Q   I'm sorry, on the outside of the Department of
8      Corrections.
9  A   No.
10 Q   And you testified earlier about your understanding
11     of the Eighth Amendment.  Were you speculating about
12     the Eighth Amendment and what the legal requirements
13     were?
14 A   It's been a long day and I'm just drawing a blank
15     there.
16 Q   All right.  Do you have an understanding that under
17     the Eighth Amendment Mr. Jackson would have to
18     demonstrate a serious medical need for a particular
19     procedure?
20 A   Thank you for reminding me; yes.
21 Q   Would it also be your understanding that he would
22     have to have a serious medical need that was
23     willfully ignored or disregarded by a healthcare
24     professional that caused him some kind of harm,
25     substantial harm, with respect to whether or not a

Page 101

1      procedure was done?
2  A   Yes, thank you, that's what I recall now.
3  Q   Are you aware, from any records that you've
4      reviewed, of seeing a serious medical need for a
5      colostomy reversal demonstrated, by Mr. Jackson in
6      this particular case, during the time of his
7      incarceration in the MDOC?
8  A   I am not.
9  Q   Have you been advised of any serious physical harm
10     or pain or suffering in any physical manner that was
11     experienced by Mr. Jackson as a result of not
12     getting a colostomy reversal in the MDOC?
13 A   I am not.
14            MR. SCARBER:  I have nothing further.
15            MR. CROSS:  All right.  I don't have
16     anything further.
17            MR. WILLIS:  Nothing for me.  Thank
18     you.
19            THE VIDEOGRAPHER:  This concludes the
20     deposition.  The time is 1:40 p.m.
21            (The virtual, videotaped deposition
22            concluded at 1:40 p.m.)
23
24
25

**Jeffrey Bomber, D.O.**
**05/28/2021**

```
 1                 CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN     )
 3                          ) SS
 4    COUNTY OF LIVINGSTON  )
 5        I, Carol Marie Hicks, Certified Shorthand Reporter,
 6    a Notary Public in and for the above county and state, do
 7    hereby certify that the above deposition was taken before
 8    me at the time and place hereinbefore set forth; that the
 9    witness was by me first duly sworn to testify to the
10    truth, and nothing but the truth, that the foregoing
11    questions and answers made by the witness were duly
12    recorded by me stenographically and reduced to computer
13    transcription; that this is a true, full and correct
14    transcript of my stenographic notes so taken; and that I
15    am not related to, nor of counsel to either party nor
16    interested in the event of this cause.
17
18
19                    _____
20                    Carol Marie Hicks
21                    CSR 3345 Notary Public,
22                    Livingston County, Michigan
23    My Commission expires:  September 4, 2021
24
25
```

**Jeffrey Bomber, D.O.**
**05/28/2021**

1

---

**0**

---

**03.04.100** 75:9,10

---

**1**

---

**1** 20:3 35:10,13

**10** 25:9,13 26:10 85:7,11

**100** 29:5

**101** 70:9

**103** 33:18

**11** 6:9 86:15,18

**11:00** 6:2

**12** 25:9,13 26:10 28:24

**12:33** 68:18

**12:52** 68:21

**13** 26:17 85:20

**15** 73:3

**16** 73:3

**19** 84:11

**1:40** 101:20,22

---

**2**

---

**2** 12:21,24 18:5

**2-1-2015** 75:12,14

**200** 29:5

**200-page** 28:17

**2009** 8:12,13

**2012** 87:20

**2013** 31:3

**2014** 87:20

**2015** 9:9 31:3

**2017** 19:13 33:22 34:24 64:24 83:2,4

**2018** 35:24

**2019** 9:9,11,13 78:8 83:24

**2021** 6:1,9

**21** 10:7

**22-25** 89:12

**23** 73:11

**232** 28:8

**24** 73:11

**28** 6:1,9

---

**3**

---

**3** 18:6 25:18 26:2,23 27:7 53:7

**30(b)(6)** 25:6 71:11,20

**30-** 38:15

**30/60/90** 38:12

---

**4**

---

**4** 22:9,10 25:19 26:5

**407** 10:22 27:14 41:11 43:4,6,11 44:21 55:17 60:24 64:22,23 70:1

**407s** 43:20 56:20 57:3

---

**5**

---

**5** 26:9 29:11,15 33:17 52:9

**50** 56:8

---

**6**

---

**6** 25:16 26:9 33:14,17 37:11 68:23

**60-** 38:15

---

**7**

---

**7** 26:8

---

**8**

---

**8** 26:23 27:7 51:6,9

**85** 56:21

**88** 89:12

---

**9**

---

**9** 27:8

**90** 56:21

**90-day** 38:15

---

**A**

---

**a.m.** 6:2,9

**A1** 90:17

**AA** 75:20

**ability** 96:8,10

**absolutely** 99:11

**accept** 47:3,17

**accepting** 47:5

**accepts** 48:10

**access** 45:24,25 46:2 53:2 72:20, 25

**acclimating** 12:2

**Accountable** 15:11,16

**accurate** 49:2

**accurately** 40:13

**acknowledges** 48:9

**acting** 24:11

**actively** 56:2,3

**activities** 85:14

**activity** 39:2

**actual** 49:18

**adamant** 99:10

**add** 86:22

**addition** 97:7

**addresses** 35:15

**adds** 44:18,24



**Jeffrey Bomber, D.O.**
**05/28/2021**

**adequate** 24:6 46:5

**adjust** 75:21 77:17

**advised** 101:9

**affect** 57:16

**affects** 77:13

**affidavit** 87:4

**agree** 85:23 86:25 90:14

**agreement** 21:1

**ahead** 17:6 27:10,19 37:3 44:1
49:1,19 52:23 54:10,21 65:14
70:16 73:20 77:1 81:10 83:19
84:5,6 86:4 87:4,6,25 88:12,14
89:3 90:6,21 91:11,22 94:6,12
95:8 98:5,24

**aid** 85:22 86:6,22,24 87:1 88:7,19

**aide** 90:14

**aids** 86:7 88:3 89:25 90:8

**algorithm** 69:23 95:19

**align** 30:5,7,13

**all-around** 17:18,19

**allegations** 63:21

**allotted** 32:15

**alter** 75:21 77:17

**alteration** 45:19

**alternative** 11:6 45:6,9,13,15
46:23 47:14

**Amendment** 97:16 98:7,10
100:11,12,17

**American** 96:17

**amount** 9:22 23:19 38:4

**analysis** 89:17 90:12

**anesthesia** 76:2

**annual** 51:2 56:6 70:23 72:14

**answers** 85:25

**anymore** 11:25

**app** 84:2

**appeal** 47:6,7 48:13,16,21,23
49:20,23 50:4,16,22 64:25 70:2

**appeals** 47:8,21 48:21,24,25
49:5,13,21 92:8

**appearance** 76:6 77:21 78:3

**appeared** 7:24

**appearing** 6:18

**applicable** 52:11

**apply** 58:18 65:16

**approval** 56:9,22 57:1,23 86:7

**approvals** 42:3 59:21

**approve** 45:3,5 78:6 82:22 93:13

**approved** 11:6 39:16 42:5 45:13
55:13,17 56:20 74:4 76:4,5 77:4

**approves** 44:17 45:2

**approving** 24:16

**approximately** 7:18

**April** 64:24 83:1,4

**arrow** 41:3 48:8

**assessment** 56:6

**assisted** 10:18

**assume** 78:14 80:3 81:17

**assumption** 52:12

**ATP** 24:16 39:2 45:20 46:24 47:3,
5,17,25 48:3,9,10,13 49:11,12,
22 50:1 56:8 57:16

**ATP'D** 39:17 78:18

**ATPS** 37:18 39:3,5,8,15 40:2
55:15 56:16,17,18

**attached** 44:21

**attention** 16:11 18:16 29:23
37:13 52:9 53:5

**attorney** 60:15,18 61:1 98:14

**attorneys** 6:10

**attributes** 44:18

**August** 9:9,11,13

**authority** 49:17,25

**authorization** 42:18 44:20,23,24

**authorized** 42:8 44:25 76:3

**automatic** 42:2

**automatically** 42:5,17

**average** 39:11

**aware** 17:3 39:18 73:1 77:9,16
79:10,21,25 80:4,8 88:8 90:15
95:16 101:3

---

**B**

---

**back** 7:21 9:24 34:9 37:10 41:3
43:16 68:20,23 73:2 89:13
93:15,24 98:9

**barriers** 30:4

**base** 17:5 84:20

**based** 12:17 24:24 58:19,21 59:8
62:7,15,17,21 64:22,24 73:21
82:14 83:7,23 84:7,10,15 93:4,
11

**basis** 19:22 28:2 44:9 61:24 63:2,
6 83:16 93:5

**Bates** 33:18

**bathroom** 7:8

**BB** 75:20

**beginning** 39:23

**behalf** 6:13,15,18 71:12 81:8

**Behavioral** 14:12 15:5

**benefit** 59:6,9,13,22 60:4 66:7
86:22

**benefits** 88:9,19,24 90:7,19 99:7

**Bethany** 18:11 19:18

**billed** 80:1

**billing** 80:25

**blank** 41:9 100:14

**blanket** 60:9,10

**body** 75:22,23 77:10,17



body's 75:22

bomber 6:3,8,20,25 12:21 18:6
22:10 29:11 33:14 35:10 51:6
85:7 86:15

bottom 69:1 85:20 98:7

box 41:25

boxes 51:24

break 7:7,9,10 68:15,19

bring 74:24 75:2

broad 17:5

broadly 77:12

budget 32:7,8,10,11,12,13,25
33:8

budgets 33:5

bullet 16:12 38:12

bunch 65:13

business 36:25

buying 54:13

---

**C**

---

calculate 16:15 17:23

calculations 17:8

call 12:23 25:15 26:5,7,8 33:16
51:8 85:10

called 22:15 41:25 70:8 93:18

calls 20:24 22:23 71:10 81:20
85:2 87:24 89:1 98:12

cancer 12:19 46:21 91:23 93:4
94:22,23

capacity 18:12 24:12 29:17 31:1

care 15:11,16 19:9,16 24:6,9,10,
13 34:19,21,22,25 35:5 36:3,16,
18,21 37:5,8 39:12 54:16 58:20
64:17,18 97:17 98:8

Carol 25:21

case 6:19 7:19,24,25 26:20 27:13
33:18 37:2,3 41:7 63:20,23
64:19 80:17 86:1 90:13 91:11

101:6

cases 7:20 89:2

cataract 67:6,9,10,21

cataracts 66:13,14

category 54:4,7

caused 100:24

caveat 61:17

CCO/COO 30:1

CCO/RMD 30:3

cease 9:19

Centered 15:12

centralize 33:12

centralized 31:12 33:25

cetera 19:17 59:21

changed 47:11 58:14 80:19
84:13 86:7

charge 38:2,10

chart 12:1 40:13 60:23 61:4

check 42:2

checklist 13:4,6

Chester 18:11 19:18

chief 49:16,23 50:2 52:6 77:4,5
92:14

claim 38:2,9,10 63:24 64:13 90:5,
6

claims 37:17,21 38:1

clarify 7:15

clear 38:11 50:11 65:20 94:3

clerical 41:18

clerks 23:6

click 25:3

clients 36:19

Clinic 9:17

clinical 12:18 13:3 53:6 62:13
93:2,16

clinics 54:13

clock 25:3

closer 49:15

CMO 48:16,17,21,25 76:4

coach 29:8

coaching 28:20 56:10,12

Coalition 91:24

Coates 86:23

Coates's 86:20

Colleen 6:16

colostomies 73:23

colostomy 62:2,4,13,20 63:3,14
64:2 73:18 74:2,8,18 75:19 76:8,
10,12,14 78:3 79:21 80:15 81:17
82:13 83:9 92:10 97:1,3 98:17,
19,21 99:3,21 101:5,12

committed 80:16,24 81:14

committee 49:13

committing 80:11

common 47:8

community 98:9,20 99:2,24
100:5

company 72:15

compares 42:14

compassion 52:10

complaints 97:1

complete 41:10,14

completes 10:23

compliance 32:7 33:8

comply 20:18

component 26:14,21 27:14

components 49:3

computer 22:12 72:7,10,14

concluded 9:11 101:22

concludes 101:19

conclusion 98:12

Jeffrey Bomber, D.O.
05/28/2021

**4**

condition 60:4 80:5,19 81:18 96:20

confidential 37:1

confusing 71:22

connection 69:4

consensus 66:10 67:11 79:17

consideration 26:15 27:15 28:4

considered 74:3,9 78:4 79:18 87:20 90:11,17 96:18 97:4

considers 24:22 76:17

consisted 10:21

constitutes 65:24

consult 9:17

contacts 32:6

context 27:18,20 28:12 29:7 77:14 84:18,24,25

contract 9:18 10:2 15:17 16:3,17 19:19 20:16 21:12 22:1 23:20 30:5,8,14 31:16,19 32:11,19,20 34:7 36:15 72:13

contracted 53:9

contractor 9:25 11:9,21

contracts 32:9

contractual 20:18 21:1

contractually 23:23

contrary 96:13

control 54:17

copies 72:21

copy 40:20 72:12 75:3

core 33:21,24 37:12 40:15 57:9 68:3,25 69:5

Corizon 6:18,19 8:17 9:3,17,18 10:1 12:8 13:14 14:5 15:14 17:2 18:14 20:17,20 21:6,11,24 22:14,25 23:12,14 32:9,17,21,24 33:20 34:11,12,14,18 36:15,19 37:8 43:14 47:12 48:25 50:7,13, 14,22,25 52:7 53:9 55:25 58:1 67:25 68:12 71:20 72:13,17,23,

24 87:12 89:6 92:16,18,24 93:6, 8,12 94:24 95:10,15,20 96:7,10 98:15

Corizon's 13:22 17:24 68:4 71:23 81:1

corporate 17:9 22:19 23:11,13 27:25 50:14 72:5

corporation 34:23 35:2,3,20 71:13

Corporations 35:14

correct 7:23 13:21 19:13,14 26:15 31:1,2,4 32:22 35:2,17 40:24 41:15,24 42:6,10,20 45:1, 4,10 46:8,25 47:1,4,19,20 48:4, 14 50:21 57:11,19 60:1 62:5 71:15,16,18,19 74:6 75:24 77:10 85:14,17 87:15 89:24 90:24 92:18 97:9,10

correcting 77:11

Correction 16:21 34:13

correctional 8:14 14:1,10,13,21 15:8 34:19,21,22,25 35:4 36:2,3, 15,18,21 37:5,7

Corrections 12:12 17:16 19:12, 22,24 21:9,21,24 23:23 40:10 63:13 91:10 92:15 100:8

corrective 75:20,25 76:2,15,19 88:3

cosmetic 74:1,3,6,9,10,12,15,19 75:19 77:19,20

cost 24:20,22,25 25:1 26:15 27:15 28:2 38:2,6 54:13,23 80:1

costs 24:18 27:22 28:1,5 54:18

council 48:22 49:8,21

counsel 25:11 28:23

county 91:8

couple 7:20 10:15 12:19 26:9 40:9 95:7,18

court 6:10 7:6,24 18:2 25:22 69:15

covered 98:4

COVID 12:6

COVID-19 19:10

create 72:9

creating 19:7 20:11

crime 81:14

criteria 66:24 67:3 83:20,24 86:6

cross 6:12,24 17:11 18:3,4,8,22 19:5 21:2,10,22 22:7 23:1 25:13, 15,19 26:4 27:4,7,11 28:13,20 29:1,13 30:24 35:24 36:1 37:6 44:8,12 46:15 50:8,15 53:1 54:15,24 59:18 61:7 64:1,7 65:3, 8,15 67:1,7,22 68:15,22 70:18 73:24 75:6 77:7 78:1 79:12,20 81:15,22 82:24 83:5,22 84:9,22 85:9 86:12 87:9 88:5,17 89:7,10 90:9,23 91:13 92:2,21,23 93:22, 25 94:7,13,19 95:9,25 97:14,22 98:5,13 99:1,13 101:15

CT 45:19

Culture 14:5,8 15:14

current 11:8 34:16 47:21 52:16 62:23 92:1 94:25

custody 78:8

**D**

D.O. 6:3,20

daily 28:2 32:2 39:3 63:2

dash 18:17 19:6 29:24

data 16:16 17:24 19:10,17 20:5, 14,17,21 21:7,8,20,23 22:17 23:3 24:8 40:11 55:10 91:24

date 75:12

dated 35:23

day 38:13 58:16 100:14

day-to-day 93:5

days 12:6 17:18

deal 13:25 16:6

death 88:6



decide 49:10

decision 14:24 41:17,20,23 67:18 84:7,10,11 95:20

decision-maker 92:16

decision-making 41:19 94:18

decisions 24:19 36:25 63:23 84:6

declaration 85:11,20 86:18 87:5 93:23

defects 75:24 77:10,11

defendant 6:15 37:1 63:20

defendants 6:19

define 30:17,18 58:1 74:14

defined 30:16 31:25

definition 58:10,17 65:16 68:4 81:1,2,3 95:10

delineate 48:18

demonstrate 100:18

demonstrated 11:5 57:4 101:5

Demonstrates 52:9

dense 66:13

deny 45:9,11

department 12:11 16:21 17:15 19:11,21,24 20:2 21:9,20,24 23:23 40:10 63:12 88:23 91:10 92:15 100:7

deposed 7:17,18

deposition 6:7 7:1,25 12:21 18:6 22:10 25:7 26:7,8 28:8,17,25 29:6,11 33:14 35:10 51:6 60:12 63:7 73:2 74:20 82:16 85:7 86:15 101:20,21

describe 10:20

description 18:19 38:23 49:2

designated 71:23

designation 34:16

designations 71:22

detail 44:18

detailed 29:10 39:2 40:3 41:2

details 66:17,19 88:4

determination 59:22 84:14 92:9, 12,14 100:3

determinations 46:10

determine 41:4 42:11 66:4 83:23 94:20

determined 76:3 77:3

determines 62:9,16

determining 89:4 91:1 93:18 94:8 95:5,23 96:5,22 97:4 98:16, 21

develop 52:24

developed 42:13

development 38:21

Devlin 6:17 28:20 98:14

diabetes 12:19 93:3

dictated 82:22

difference 37:20 81:12 82:3 84:3

differences 51:21

differentiates 74:12

direct 16:11 18:16 29:23 37:13 52:9 53:5 94:5,16 98:4

directed 52:13

direction 96:6 98:3

Directive 75:9

directly 42:8 80:8

director 8:17,19,22 9:1,2,3,8,10, 16,20,21 10:5,7,9,14,17 11:13, 19 13:12 15:1 19:11,12 27:21 29:24 31:4,7 34:15,17 36:7 42:23 47:18 48:1,2,22 49:6,7,8, 9,10,21 51:4 65:23 85:16,17

directors 10:18 31:23 52:20

discuss 48:5,23 55:11 97:25

discussed 21:15 65:17

discusses 74:1

discussing 17:14 97:8

disregarded 100:23

DOC 22:5 23:4 27:25 32:11,18, 20,21 39:5,7 43:17 50:13 55:21 89:6

doctor 57:18 80:14 84:3 86:3 91:6 92:7 97:15

document 12:25 18:1,9,17 22:8 25:2,4,11 27:19 28:11 29:21 49:4 51:9,12 61:11 71:24 72:1,3, 20 85:10

Documentation 14:16

documents 60:11,14,15 61:2 72:9,15

dollar 38:4

dollars 32:14

draft 30:22

drawing 100:14

drug 53:22,25 54:1,2,3,8,17

drugs 53:23

due 10:12 28:23

duly 6:4,21

duties 8:21,23 9:25 10:21 38:24

dynamic 95:1

E

ear 85:21,23 86:21,22 87:1,2

earlier 56:11 82:12 85:12 93:3 100:10

ears 87:21 88:10,16

effective 60:3 66:6 75:12

effectiveness 30:2

efficacy 59:24

Eighth 97:16 98:6,10 100:11,12, 17

electronic 12:10 23:4 43:1



Jeffrey Bomber, D.O.
05/28/2021
6

**email**  42:25 43:6,8,17,18,21

**emails**  43:13,15 44:13

**emergency**  17:17 19:8,15 38:5

**employed**  34:19

**employee**  9:18 10:2 34:12,18

**employees**  13:14 34:11

**employment**  8:11

**EMR**  43:16,18,19

**encounters**  52:10

**end**  48:6

**endurance**  7:7

**England**  96:16

**ensure**  24:1 30:1 32:6 33:7

**ensuring**  24:3,15

**entered**  61:10

**entire**  48:18

**entities**  36:14 54:12

**entitled**  97:16 98:8

**entity**  50:7

**environment**  14:1,10,21 15:12

**ER**  17:20,21,22

**Erin**  85:11,13

**Ernst**  29:16 30:7 31:1,6,10,11
  33:11 71:1

**essentially**  36:10,12

**establish**  64:16 89:21

**estate**  8:3,5 25:7

**evaluated**  61:20,22

**evaluating**  55:22,25 56:7

**evaluation**  11:16

**event**  99:20

**eventually**  79:21

**evidence**  58:22 59:8 75:13 79:10
  89:22,25 90:13,17 93:5

**evidence-based**  59:25

**exact**  52:25

**examination**  6:23 86:20 92:5,22
  96:2 97:13 99:17

**examined**  6:4,21

**excerpts**  60:23

**Excuse**  69:15

**executives**  22:21

**exercise**  45:21

**exhibit**  12:21,23,24 18:5,6 20:3
  22:9,10 25:16 26:5 29:11,15
  33:14,17 35:10,13 37:11 40:13
  51:6,9 68:23 85:7,11 86:15,18
  93:15,21

**exhibits**  18:3

**exist**  33:5

**expenses**  37:8

**experience**  19:7 63:8

**experienced**  101:11

**expert**  73:23 76:16

**explain**  39:20 68:1 76:9 99:6

**extent**  21:17

**eye**  52:14,17

**eyes**  66:13

---

**F**

**face**  52:15,17 77:12

**facilitate**  99:12

**Facility**  8:14

**fact**  24:23 73:14 96:13

**factor**  56:6 62:12 96:11

**factors**  97:7,10 98:15

**facts**  86:3

**failure**  38:20

**fair**  27:12 30:10 37:7 52:11 61:20
  62:19 87:19

**familiar**  15:19 17:8 72:3

**FDA**  59:21

**fee**  38:7,8

**feel**  96:11

**felony**  80:12

**file**  38:10 41:11 50:19

**filed**  35:24 75:13

**Filing**  35:14

**filled**  51:10

**filled-in**  38:12

**final**  92:9,11,14,16

**find**  30:4 75:2,7 82:3 96:14

**fine**  29:7

**five-year**  32:15

**fixed**  57:17

**focus**  37:15 70:2

**focused**  16:5

**focusing**  69:24

**follow**  11:25 78:20 86:11

**follow-up**  92:21 98:3 99:15

**forensics**  15:7

**forgot**  33:18

**form**  10:22,23 17:5 27:1,18 28:11
  29:8 41:9 46:14 51:10,17,20,22
  52:8,19,25 53:2,6 61:23 62:20
  63:5,13 72:14 77:23 81:6,9 82:8

**formal**  11:22,23

**formed**  62:3 82:12

**forms**  72:13

**formulary**  53:10,19,20,21,23,25
  54:2,3,8,12,14,17

**formulate**  83:4,7

**foundation**  30:21 43:25 46:12
  52:22 65:12 73:20 81:20 87:25
  98:24

**Franklin**  8:3,4 25:7 73:3

**frankly**  23:8



Jeffrey Bomber, D.O.
05/28/2021

7

**fraud** 80:11,16,24 81:14

**front** 51:22 75:3

**Full** 15:18 16:3

**function** 77:13

**functional** 73:18 97:1 99:3

**future** 36:22

---

### G

**gave** 25:7 61:3 73:3

**general** 99:8

**generalizations** 60:9

**generally** 15:25 38:8 47:9 57:3

**generated** 23:3 70:1

**gentleman** 7:22

**get'** 44:7

**Gill** 15:23

**give** 8:11 20:8 28:7 41:9 44:5
66:12 71:2

**giving** 24:16

**glasses** 40:19

**goal** 39:14,18

**Goff** 16:1,2

**good** 6:12,14,17,25 66:15 86:21

**grab** 75:1

**grievance** 50:19 65:1

**grievances** 50:18

**ground** 7:3

**group** 43:4,6,8 71:10 74:10

**groups** 43:21

**guess** 7:14 19:3 46:14 65:6

**guessing** 32:1

**guidelines** 53:9 67:20,21,23
95:24 96:4

**guy** 64:17

---

### H

**handbook** 72:16

**handled** 50:20

**handouts** 71:2

**hands** 85:6

**hang** 26:1,25 27:9

**happen** 73:9

**happened** 64:18 84:4

**hard** 72:21

**harm** 100:24,25 101:9

**harm,'** 58:25

**Harriet** 86:13,19

**head** 7:5 15:23 90:8

**headquarters** 23:14

**health** 8:17 9:4,16,17,18 10:1
13:18 14:12 15:6 43:12,14 53:9
54:12,16 97:17

**healthcare** 6:15 14:14 15:8 17:16
53:21 80:11,16,24 100:23

**hear** 85:21 87:2,21 88:9

**heard** 26:2

**hearing** 85:22 86:5,7,21,24 87:1
88:2,7,15,19 89:25 90:1,7,13

**Helen** 8:15

**helps** 43:10 90:18

**Hey** 93:13,20

**Hicks** 89:10

**higher** 40:2

**hire** 11:9,12

**hiring** 11:10

**history** 8:12

**hold** 25:2 57:8 79:24 93:25

**home** 9:23,24 15:12 45:20

**hospice** 19:9,16

---

**hospital** 9:15 99:2

**hospitalization** 17:18

**hospitals** 54:12

**hour-and-a-half** 94:11

**hours** 95:7

**hundred** 56:19

**hypertension** 93:3

---

### I

**Ian** 6:12 18:21 44:3 61:3 75:5
93:20

**idea** 30:18,22 32:11 73:6

**identification** 12:22 18:7 22:11
29:12 33:15 35:11 51:7 85:8
86:16

**identify** 6:10 30:4

**II** 14:18

**imaging** 59:4

**immediately** 53:4

**Impact** 24:1

**important** 96:11,21

**improve** 76:6 77:21 78:3

**improved** 57:19

**improvement** 15:4 16:8 56:10

**in-person** 70:21

**incarcerated** 99:19

**incarceration** 101:7

**include** 43:23 57:3,6 76:1

**included** 49:3

**includes** 49:9

**including** 20:9 32:5 57:15

**indications** 67:18

**indicators** 16:12,13,20,22,23
17:2,8,15 21:12,25

**indirectly** 80:9



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
05/28/2021

8

**individual**  10:8 29:16 39:21
55:16,23 56:1 60:19

**individualize**  60:8

**individuals**  43:14

**infer**  38:1

**information**  36:9 41:1,5,10,16,22
43:12 45:24 46:22 57:4,6,15
63:16 68:8 78:9,10 81:23 95:1
96:18

**Ingauge**  22:15,18,25 26:5

**initiate**  50:16,22

**injury**  77:12

**inmate**  66:16,22 77:1 91:8

**inmates**  24:2,3 39:12 77:16 98:7

**inpatient**  19:8,16 23:5 32:5 33:6

**inside**  91:16,19 95:20

**instruct**  93:8 97:22

**instructed**  24:23 78:20 93:1,6

**interacted**  18:11 29:16 30:25

**interaction**  31:11

**interactions**  33:10

**interesting**  51:25 69:11

**intermittently**  55:20 56:4,11
61:18

**internally**  32:24

**interpreted**  77:11

**interpreting**  76:16

**Interqual**  58:9 66:3 91:23

**intervention**  23:25 58:21

**interview**  11:11

**involved**  11:10 14:20 38:15
50:14 63:22 89:2,4 91:7 100:3

**involving**  7:22

**irrelevant**  91:11

**issue**  16:19 24:20 45:6 88:13
89:19 90:4 91:11

**issued**  46:24

**issues**  97:2 98:18

**issuing**  45:9

---

## J

**Jackson**  6:13 60:20 61:16,25
63:11 78:8 82:14 83:10 91:7
92:10 99:19,23 100:17 101:5,11

**Jackson's**  61:9 80:15 83:8

**jail**  61:12 91:9

**James**  52:5

**January**  33:21

**Jeffrey**  6:3,8,20

**job**  18:19 38:23 52:3 87:10

**joint**  89:5

**Journal**  96:16

**Joy**  8:15

**judgment**  53:6 62:13 63:22

**June**  78:7 83:24 84:11

---

## K

**Keith**  51:25

**ken**  25:24

**Kenneth**  6:14

**Kensu**  7:23,24,25

**key**  16:12,22,23 17:2,7

**kind**  29:7 49:13 51:3 56:9 69:22
71:3 81:10,23 100:24

**knowledge**  22:1

**knowledgeable**  39:1 71:17

**Kohchise**  6:13 60:20

**KPI**  17:12,22

**KPIS**  16:16 17:10,17,24

---

## L

**language**  80:7

**Lansing**  9:22 12:7 72:21

**LARA**  35:13

**launch**  33:21 69:2,5

**lawsuit**  91:8

**laying**  65:12

**layoffs**  36:22

**lead**  59:2,21

**leadership**  22:25 37:4

**learn**  56:13

**learning**  39:25

**left**  61:9 87:16

**legal**  15:6 98:12 100:12

**legalities**  81:13

**level**  22:20 23:11,13 27:25 39:22
49:20 72:6

**levels**  50:3

**licensed**  35:7

**limit**  97:25

**limited**  96:19

**limiting**  96:8,10

**lines**  25:9,12 26:10,23 27:7 28:7,
24 51:23 89:12

**list**  20:15 42:1,4,7,12,13,15,16,21
53:20

**literature**  58:4,20 65:19 66:4,5
79:17 91:24 96:15

**live**  69:9 70:11,17

**living**  9:12,22

**local**  76:1

**long**  8:18 100:14

**longer**  9:10

**looked**  22:4 61:4,5 62:25 63:2,3

**Lori** 29:16

**lose** 36:6

**loss** 36:8 88:2 90:1

**lot** 15:1 61:17 68:8 82:19

**loud** 25:8

**low** 57:23

**lower** 56:22,25

---

**M**

**made** 38:2 63:25 64:5 92:14

**main** 9:23 31:11 46:20

**maintaining** 19:8

**make** 12:1 17:4 24:5 36:3 39:9,
11,19 41:17,22 46:9 54:3 56:23
57:1 58:25 59:3,4 60:8,10 65:11
67:16 82:19 84:3,6

**makes** 41:13 92:11

**making** 24:18 41:20,21 63:22
64:14 95:19

**manage** 43:10

**management** 10:12,14,25 11:2
14:17,24 15:7 19:9,17 22:16
23:6,18,19,21 24:7,14,17,22
26:13,21 27:14,21 29:25 30:11,
15 31:13,15,18 32:16,22 33:1,
12,19,21,24 34:5,8 37:12 40:14
42:22 52:4,20 57:9 68:24 70:9
85:14 87:13,14 88:22 93:17

**manager** 13:12,13,16,19 15:20,
22 43:12

**managers** 15:16

**managing** 19:8

**Manistique** 9:15

**manner** 101:10

**manual** 12:9 33:19 68:24 70:4,5,
7 72:17,23,24 73:5,12,14 95:17,
22 96:5

**mark** 22:9

**marked** 12:22 18:7 22:11 29:12,
15 33:15 35:11,12 51:7 85:8
86:16,17

**marking** 18:3 25:23

**Mason** 15:23

**mass** 36:22

**material** 78:17

**materialize** 73:16

**materialized** 73:8

**materials** 11:24 12:4 69:18,21,22
71:3,5

**matter** 65:5

**maximum** 30:1

**Mcqueen** 35:6,7

**MDOC** 10:23 13:18,23 14:11
16:16 19:19 20:6,8,12,19 21:12
22:1 24:8 32:9 44:4 50:20 53:21
58:2,5,10 61:4,9,10 62:8,9,12,15
65:19 72:12 73:22,25 74:5,14
76:11,17,25 77:6,8 78:8,18
82:22 83:8 84:16,20,23 86:5
87:8,11 88:1 89:18 91:1,12,15,
16,20 93:12 96:9 100:2 101:7,12

**MDOC's** 81:1

**meaning** 84:11

**means** 30:23 77:20 89:14

**meant** 74:15 76:25

**measured** 37:15

**measures** 21:12,25 24:2

**medially** 58:1

**Medicaid** 79:25 80:6,10 81:3
84:25 85:5

**medical** 8:13,16,19,21,23 9:1,2,
3,8,10,16,19,21 10:5,9,13,16,18
11:4,5,9,12,13,19 12:10,20
14:16,24 15:1,12 16:5,6 19:11,
12 23:4,20 24:4,16,21,24 27:21,
22 31:4,7,22,23 32:15,21 33:1
34:14,17 36:16 40:24 41:18,20,
22 42:22 43:22 47:18 48:22
49:6,7,8,9,10,16,21,24 50:2

51:1,4 52:7,20 53:5 57:4 58:3,
10,13,17,19,21 59:8,22 60:16,
17,19,22 61:14,21,25 62:7,8,15,
16,17,22,25 63:6,10,13,22
65:17,22,24 66:4 67:3,19,24
68:5 73:21 77:4,5 78:25 79:7
80:4 81:2,12 82:15,21 83:7,20,
23,25 84:21,23,24 85:16,17
86:23,25 88:13 89:23 92:14
93:18 94:8,18,20 95:6,11,18,23
96:5,7,12,14 99:6 100:4,18,22
101:4

**medically** 40:3 45:25 57:24 58:6,
7 59:10 60:6 61:24 62:4,9,14,21,
24 63:15 64:2 66:8,14,23 67:9,
24 68:11 73:17 76:4 77:3,14
78:4,6,7,23,24 79:5,6,11,13
80:10,21,22,25 81:16 82:5,14
83:1,9,15 84:15 87:20 91:2,14,
16 92:25 93:9,10 96:22 97:5
98:17,22

**Medicare** 67:20 68:10 80:5

**Medicare's** 67:23 68:6

**medication** 55:2

**medications** 53:20,24 54:4,6

**medicine** 24:24 35:8 36:13 58:24
59:5,25 90:22 96:17

**meet** 61:18 66:23 83:20

**meeting** 30:5,8,14 70:23 71:8

**meetings** 12:1 38:22

**meets** 48:23 49:9 58:13 67:23

**Memorial** 9:14

**mentioned** 59:17 93:2

**messages** 43:19,23 44:16

**met** 11:23 24:2,4 61:16 83:24

**metric** 38:18

**Michigan** 9:15 12:11 16:21 17:15
19:11,21,24 21:9 23:16,23 30:8,
14 31:14,16,19 33:1 34:7,20,21,
22,25 35:5,8 36:3,12,18,21 40:9
48:11,19,24 49:17,24 50:3,6
51:14 58:15 63:12 72:18 79:25
80:6,9 81:3 84:25 91:9 92:15



**Michigan.gov** 43:13 44:13

**Mignon** 29:16 69:13 71:1

**mind** 8:8

**minutes** 21:16 40:16

**mischaracterization** 27:18

**mischaracterizes** 54:20 67:16 82:18

**missing** 8:7 41:1,8

**model** 14:24 31:12

**module** 12:18 70:8

**modules** 12:11,18 13:23,25 93:2, 4,17

**Monell** 90:4,6

**money** 36:6

**monitor** 23:24 24:4,9,10 32:6 39:1

**monitoring** 23:19 24:12,15

**month** 63:4

**monthly** 19:10,15,22 20:2,6 22:4 39:4

**months** 10:15 46:19

**morning** 6:12,14,17,25

**move** 29:14 33:11

**multifactorial** 68:1

**N**

**NA** 52:10

**named** 63:20

**names** 35:15

**Nashville** 23:15

**National** 46:21 91:23 94:22

**nature** 64:20 82:1

**Naubinway** 9:16,23

**necessity** 11:5 24:16,25 27:23 57:5 58:11,13,18,19 59:22 62:15,17,18 65:17,25 66:4

67:19,24 68:5 73:21 80:4 81:2 82:21 83:21,25 84:21,23,24 86:23 87:1 89:23 93:18 94:9,21 95:6,11,18,23 96:5,12 99:6

**needed** 21:7 54:5,7

**Newberry** 8:14,15

**nod** 7:5

**non-cosmetic** 74:12

**non-formulary** 55:2

**non-prisoner** 91:3

**nonprofit** 36:10,11

**northern** 8:16,19,21,25 9:2 10:3, 5,7,9,13 11:13

**note** 33:18 81:25 82:7 94:2

**noticing** 52:8

**number** 24:5 32:14 37:25 39:8 40:2 44:20,23,24 55:7,20,22,25 56:4 59:17 75:8,13 79:18 83:18

**numbers** 19:20,21,23 20:1,15,25 23:22 71:21

**numerous** 59:20

**nurse** 41:2,4,10,13 42:19 43:9 44:18,24 48:9 57:7,8,11

**O**

**oath** 6:5,22

**object** 27:1,18 28:10,11,13 76:24 77:22 81:9 83:12

**objecting** 65:13

**objection** 17:5 20:24 21:5,14 22:2,23 27:17 28:7,14 29:7,10 30:21 35:22 36:24 43:25 44:3,10 46:12 52:22 54:10,19 59:16 63:19 64:15 65:7,11 66:21 67:4, 15,17 70:15 73:20 76:23 79:9,14 81:6,19 82:18,19 84:2,17 85:2, 25 87:3,23,24 88:12 90:3,21 91:5 94:10 95:4 97:19 98:12,23

**objections** 64:14

**obligated** 23:24

**obtain** 36:9

**Occasionally** 56:21

**October** 19:13

**off-site** 24:15

**offered** 11:7

**office** 12:7 13:12 15:20 17:9 38:7 72:21

**officer** 49:16,24 50:2 52:7 77:4,5 92:15

**on-site** 13:18 14:12,21 23:5 43:10 45:16,21 55:2

**onboarding** 12:3,13 13:4 14:3 73:4 93:16

**ongoing** 38:22

**online** 35:14 70:11,15 72:25 73:12,14,16

**operation** 71:1

**operations** 13:13,16 15:20,22,23 16:7 24:24 36:7,10

**opinion** 62:3,20 63:5,14 66:10 67:11 73:17,21 78:12 79:17 81:12 82:3,8,13,25 83:4,6,16,19

**opinions** 61:23

**opportunity** 25:11

**option** 48:12 49:23 50:2

**options** 47:2 48:3

**order** 10:23 12:1 43:22 58:25 96:6

**ordered** 44:6

**orders** 15:2

**organization** 15:17 51:18 53:21 54:17

**organizations** 17:16

**organized** 51:23

**Orlebeck** 10:17 65:23

**Orlebecke** 85:12,13 86:9 87:5


hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
05/28/2021

11

**orthopedic** 77:12

**outpatient** 32:5 33:7 37:16,21,24 38:18 40:23

**outweigh** 59:7 88:19

**outweighing** 59:13

**outweighs** 59:9 60:5 66:7

**overbroad** 17:5

**overturn** 47:25 48:15 49:11

**overturned** 37:19

**Overview** 15:17 16:3

---

**P**

**p.m.** 68:18,21 101:20,22

**pacemaker** 42:2

**pages** 29:5

**pain** 97:2 98:18 101:10

**palliative** 19:9,16

**Papendick** 6:19 34:6,12 52:1,16 87:18

**part** 11:10,15 15:3,11 16:5 20:1 33:9 37:4 38:21,22,23 41:9 54:16 56:5 57:19 59:11,12 63:24 72:5 73:4 74:10 89:23

**participate** 20:11

**participating** 54:14

**participation** 31:13

**parts** 16:6 70:6 75:22 77:17

**party** 37:2

**pass** 15:18 16:4 41:25 42:7,12, 16,21

**passes** 37:8

**pathway** 48:19

**patient** 14:6,8 15:8,12,15 17:20 52:10 60:7 66:13 78:11 85:21 86:10 88:24 90:19 95:6 96:23,25 98:18 99:9

**patient's** 78:15 79:3 88:18 96:20

**patients** 37:25 52:14,17 54:5,7 61:18 91:3

**pay** 68:11

**paying** 32:21

**payment** 80:5

**pays** 93:6

**PC** 34:23 35:5 36:3,14

**people** 13:10 15:24 20:9 44:14 94:8

**percent** 37:18 55:15 56:8,20,21

**percentage** 39:5,14,16 55:1,12, 16 56:18 57:17,20,22

**performance** 16:12,22,23 17:2,7 21:11,25 50:25 51:3 55:23 56:1, 10

**performing** 80:24

**period** 10:16 32:15 63:11 84:5

**permitted** 76:20

**person** 12:7 13:8 18:12 19:18 42:14 51:25 52:5

**perspective** 24:23 88:18

**pertinent** 65:2,4,6

**pharmaceutical** 53:8,12

**pharmacy** 14:17 15:1,4 53:11

**Phase** 14:18

**phone** 11:25

**PHS** 8:17 87:12

**physical** 97:2 101:9,10

**physician** 8:15 9:14 10:15 11:1,3 24:11,14,17 34:5 41:16,22 42:11,15 45:17,23 52:4 57:12 80:8 87:13

**physicians** 34:8,10 42:13 45:24

**Pipes/qnxt** 32:3

**pitched** 10:16

**place** 20:23 21:4,13 22:22 27:16 28:6 30:20 35:21 36:23 43:24 46:11 52:21 54:9,19 59:15 63:18

66:20 70:14,22 73:19 76:22 79:8,14 81:5 82:17 84:1 85:1,24 87:22 88:11 90:2,20 91:4 94:10 95:3 97:19,24 98:11,23

**plaintiff** 6:13

**Plaintiff's** 12:24 22:9 29:15 33:17 35:13 86:18

**plan** 11:7 45:7,10,14,15 46:23 56:10

**plans** 36:22 47:15

**point** 14:2 16:12 23:22 35:22 38:12 39:13 41:18,19 47:19 50:13 84:2,4 86:2 87:15,19 97:20 98:1

**policies** 14:14 15:9 58:2,6,8 62:15,17 71:24 72:4,12 85:6 86:5 91:1 92:24 93:12

**policy** 62:8,9,12 65:19 67:8 72:10,11 73:22,25 74:1,2,5,8,17, 20,22 75:2,7,9,10,15,18,25 76:7, 9,13,19,23,24 77:24 78:20,22,25 79:2,6 82:22 84:8,10,13,15,21 86:10 87:8,24 88:2 89:4,19 91:12 93:13 94:24 96:9 100:3

**portion** 14:2,9,17 31:13 57:8 68:24 75:18

**portions** 13:8 60:17

**pose** 7:10

**position** 11:8

**possibilities** 80:18

**possibility** 81:4

**potential** 90:19

**Powell** 52:5,6

**Powerpoint** 71:3,7

**practice** 24:24 34:3,4,6 35:7 36:13 79:1,7 90:22,24

**Practitioner** 13:3 93:16

**precisely** 69:20

**predecessor** 65:22

**preferred** 53:22,24



preparation  60:11 63:7 82:15

preparing  33:4

Prescribes  53:8

present  9:13 74:21

presentation  71:8 78:15,17,19

presented  37:24 64:22

presenting  78:11 96:20

president  34:24

previous  18:4 34:2,4 82:4

previously  55:18 63:8

pricing  54:22

primarily  33:11

Prime  6:15

prior  74:20 81:25 82:7 84:19

prison  45:16 58:15 80:16,20,22
  90:24

prisoner  50:16 68:12 76:3 87:21
  91:9

prisoner's  43:22

prisoners  76:21 77:9 97:16

Pro  24:1

problem  46:1 90:18

problems  30:4

procedure  11:5 42:12 58:21
  59:7,10 60:5 69:25 74:3,13,15
  75:21,23 77:17 80:24,25 82:1,2,
  7 83:14 88:25 90:12,18 91:2
  92:8,12,17 99:7,10 100:19 101:1

procedures  14:14 15:9 59:2
  61:24 68:10 72:12 76:1

process  10:19 11:10 12:3,13
  16:13 26:14,22,24 27:14 33:21,
  24 34:1 37:12 40:15,21 43:11,17
  48:6,11,18 49:2,18 50:14,17,22
  51:2 57:9 64:22,23 68:25 69:5,7,
  25 70:2 89:5

processes  29:25

produce  44:5

produced  33:19

professional  18:12 19:7 29:17
  31:1 34:23 35:3 100:24

profit  36:4,5

program  14:6 15:5 16:9 22:12
  23:7 37:14 38:16,20,21,23 45:21
  79:25 81:4 84:25

programs  80:6

prohibits  74:6 76:9

promotion  9:5,7

proprietary  37:1

prostate  12:19 93:3

provide  13:5,7 20:25 21:20 36:16
  40:11 54:4,6,22 61:1 93:19

provided  13:8 21:23 22:5 46:3
  53:20 54:13 55:21 56:4 60:15,18
  69:1,8,18,20 70:24 72:17

provider  8:13 10:23 12:4,8,14
  27:20 39:22,24 40:1,5,6,24 41:4,
  6,9 43:9,10 44:22 46:6,17,24
  47:2,17 48:6,9,20 49:22 50:1
  51:4 53:17 55:23 56:1,8,12,25
  61:21 72:16,23,24 77:8,18 98:20

providers  8:23 10:3 11:9,12,17,
  18,20 13:6 16:19,20 24:21 31:22
  36:17 46:2 51:1,13 55:4,8 56:5,
  14,15,19 72:14,17,25 73:6 81:12
  93:7,8 95:12,13 96:7 98:16

providers'  55:17

providing  14:3 23:22

pure  37:25

purpose  23:21 24:7 53:25 54:2,3
  76:5 77:21 78:2

purposes  75:24 77:19,20 78:14

pursuant  72:10,11

put  15:2 29:6 71:2

Q

quality  15:4 16:8,13,16,20 17:14
  24:2,9,10,12 34:13,19,21,22,24

35:4 36:2,3,15,18,21 37:4,7
  39:13

quantify  47:9

question  7:10 21:17 27:2 28:10
  29:4,10 44:6 46:14 48:20 52:13,
  24 53:11,13,14 54:25 55:9,18,19
  64:10,11 65:11 71:25 78:15
  81:6,7,10 85:2 89:8,9,11 92:7
  94:5 98:1 99:16

questioning  63:19

questionnaire  12:17

questions  7:13 12:20 21:16 50:8
  51:18,21 65:14 92:3 98:15 99:14

quizzes  12:16

R

rate  56:9,22 57:1,23

read  25:8 26:10 29:1,4 63:8
  89:12 90:7 98:6

reading  28:24 29:5

reads  53:13

ready  9:24

reason  20:7,17 39:6 54:16

reasoning  78:12

reasons  20:20,22 21:3,6 54:11
  79:18 83:19

recall  8:2,4 12:15 15:7 61:15
  69:20 101:2

receive  12:5 19:15 44:14 56:9
  61:8 69:4,17

received  13:24 20:3 69:6 77:9,16
  78:16

recognize  13:2 51:9

recommendation  62:24

reconstructive  75:22,25 76:2,14,
  20

reconstructive-type  76:18

record  6:7 7:6,21 12:10 23:4
  25:6,8 26:11 29:21 68:18,21



Jeffrey Bomber, D.O.
05/28/2021

13

83:17

recorded 70:12,19

records 14:16 43:22 44:6 60:16,
17,19,22 61:8,14,25 62:7,8,22
63:1,6,10 82:15 83:7,24 101:3

redirect 97:20

redistributed 10:10

refer 74:10,21 99:4,8

referral 11:6 24:15 37:18 39:1
40:1,23 42:8 44:25 45:3

referrals 24:5 32:6 33:7 37:16,
17,21,25 38:19 40:4

referred 37:25 47:5

referring 73:25 75:11 86:2

reflect 53:16

reform 75:23 77:10

region 8:24 10:3 11:14 30:1

regional 8:16,19,21,25 9:2 10:5,
9,13,18 11:13 13:13,16 14:25
15:16,22 31:3,7,22 47:18 48:1,2
49:10

regions 30:3

regularly 40:7

reimbursement 80:9

related 33:11 61:11 97:3

released 63:12 80:16,21,23

relevance 36:24 54:10 73:20
88:12 90:3 91:5

relevant 66:3

remain 39:1

remember 7:19 71:6 88:3 94:13

reminding 100:20

removal 67:6,9,21

remove 66:14,15 67:10

repeat 87:6 89:9,10

repeatedly 83:13

replaced 87:18

replacement 86:6

report 15:24 16:16 19:20,23
20:2,3,6,9,11,18 21:8 24:8 39:4,
5,6

reported 19:25

reporter 6:11 7:6 18:2 25:22
69:15

reporting 15:8 19:10

reports 19:15 22:4 32:5 39:3

represent 40:14

request 10:24,25 11:3 24:15
40:23 41:1,5,13 42:14 43:6
44:17 45:20 60:24 62:1 64:5
78:18 99:21

requested 40:10 60:3

requesting 57:24 99:9

requests 39:16 55:7,12,17 56:18

required 9:22 12:11 16:17 19:20
20:15 21:8 45:6 56:23 58:4 88:3

requirement 20:18 21:19 39:18

requirements 100:12

requires 29:10

research 59:20 60:2 62:16

reserve 65:9

resource 46:21 68:3

resources 46:5 73:4,6 94:17

respect 16:19 28:23 64:18 87:4
90:3 92:9,16 96:4 100:25

respects 78:17

responding 86:4

responses 7:5

responsible 14:3 15:13,14

restrictive 68:5

resubmit 41:6,8

result 101:11

resulted 79:17

resume 18:20,22 19:4 29:22
30:22 32:2 33:17

retain 72:9,15

retention 71:24 72:2,3

retired 87:15

reversal 62:13,20 63:3,14 64:2
74:2,8 75:19 76:14 78:24 80:1
82:13 83:1,9 92:10 98:17,21
99:21 101:5,12

reversals 74:18 76:8,10,12

reverse 73:18 74:15 81:17

reversed 79:22 80:14

reversed' 99:5

reversing 62:3 78:2

review 11:4 12:8 14:5,7,9,12,13,
15 24:11 25:11,12 26:14,22,24
27:3,14,25 32:3 38:13 39:2 41:2
42:16 44:17 46:25 49:13 50:25
51:2,3,13 57:8 60:11,14,16,19,
22 61:25 62:7,23 63:16 65:18,21
69:6 72:14 82:15 85:6 87:24
95:14

reviewed 10:25 14:15 15:9,10
60:15,17 63:4,6 101:4

reviewer 24:18 27:21 41:17
42:11,19 46:18 57:7,12

reviewers 96:7

reviewing 11:3 33:6 62:21 83:7

reviews 12:1 38:16 55:11

revision 62:1

revisions 65:20

risk 15:6,18 16:3,4 59:6,7,9,13,
23 60:5 66:7 88:6

risk-to-benefit 89:16

risk/benefit 90:11

risks 88:20,24 90:18 99:7

RMD 12:8 31:6,7 48:22 49:5,20,
21 51:4 70:9

Jeffrey Bomber, D.O.
05/28/2021

14

**RMDS** 38:13,25 39:2

**RNS** 23:6

**role** 20:25 47:22 52:17

**room** 17:17 19:8,16 38:5

**row** 7:21

**rules** 7:3 95:19

**run** 8:11

**runs** 17:17,22

**Rural** 9:16

---

**S**

**safety** 14:1,6 15:8,15

**Sara** 16:1,2

**saved** 26:9

**scan** 45:19

**Scarber** 6:17,18 17:4 18:20,23,
25 20:23 21:4,13 22:2,22 25:10,
14,17,20,24 26:25 27:5,9,16
28:6,15,19,22 29:3 30:20 35:21,
25 36:23 43:24 44:3,9 46:11
50:5,10 52:21 54:9,19 59:15
61:3 63:18 64:4,9 65:5,9 66:20
67:4,15 70:14 73:19 75:5 76:22
77:22 79:8,14 81:5,19 82:17
83:3,11 84:1,17 85:1,24 87:3,22
88:11 89:1 90:2,20 91:4,21 92:6,
19 93:20,23 94:1,10,15 95:3
96:3 97:12,18,24 98:11,23
99:15,18 101:14

**Schoolcraft** 9:14

**scope** 64:12 94:4,5 97:19

**screenshot** 26:5

**scrolled** 19:1

**search** 91:25

**seasoned** 56:14

**section** 14:13 15:13 16:3,9 37:14
38:25 41:8 53:6 75:20

**sections** 15:17

**seeks** 80:9

**segments** 19:1

**send** 48:21

**sense** 11:22,23 58:16

**separate** 13:22

**served** 8:13 9:8

**service** 10:24 60:3,5 80:10

**Services** 6:16

**session** 70:19

**set** 13:23 29:25 32:13

**shaking** 7:5

**shared** 15:18 16:4 20:1

**shareholder** 35:16,19

**shareholders** 35:4,15

**shortly** 80:15

**show** 12:23 18:1 22:8 25:1 29:14
35:12 51:8 63:10 85:10 86:17
95:13

**showed** 69:24 82:6

**showing** 70:7

**shown** 26:6 70:4

**significant** 9:22

**similar** 51:12,19 53:7 69:23
91:18 95:15

**sir** 22:13 25:4 31:20,21 73:25
78:22 85:14 89:8,15 92:3 97:11
99:14

**sit** 29:3

**site** 8:13 40:24 45:24 46:2,6,17,
24 47:2,17 48:5,9 53:17

**site-level** 51:1

**sites** 10:3,6,7,10 61:18

**siting** 13:17

**situation** 96:25

**skim** 61:5

**slash** 16:13

**slide** 71:3

**small** 40:16 57:20

**SMD** 48:22

**sole** 35:19 76:5 77:20 78:2

**solutions** 30:4

**sort** 38:2

**sounds** 26:20 27:1

**speak** 80:17 81:13 83:17

**speaking** 28:14 64:14 67:17
82:19

**speaks** 76:23

**specialist** 38:7,9 44:22 99:11

**specialty** 10:24

**specific** 52:19 67:8 71:14 96:6
100:1

**specifically** 37:16 74:18 76:8
92:7

**specifics** 80:17

**speculate** 37:24 81:21 82:9

**speculating** 28:18 33:9 100:11

**speculation** 20:24 22:23 52:22
54:20 76:24 81:7,8,9,20 85:2
87:24 89:1

**spelled** 88:2

**Spencer** 6:16

**spend** 32:25

**spent** 97:8

**Spiller** 8:1,2

**Squier** 86:13,19 87:18

**Squier's** 87:10

**staff** 8:15 9:14

**stand** 31:7 52:11

**standard** 58:13,20 64:16,17 98:8

**stands** 30:10

**start** 39:9

**started** 23:25 81:8 87:14



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**05/28/2021**

15

starts 40:22

state 9:3,8,10,19 10:16 11:19
  19:10,12 27:21 34:14,17 48:22
  49:6,7,8,9,17,21,24 50:3,5 51:4
  65:22 75:20 77:3 78:25 79:7
  85:16,17

state-wide 70:23 71:8

statement 60:10

statements 95:18

states 32:20

steady 47:13

strike 30:3 31:9 55:1 79:24

strong 97:25

structure 75:22,24 77:10

studies 59:20

stuff 30:23 98:3

subjects 71:14,18

submitted 64:25

subscription 46:3

subsequent 8:15 71:10

substantial 100:25

success 37:14 38:16,19

successful 56:24 57:2 69:2

suffering 97:2 101:10

suggested 86:20

Suite 22:21

summer 64:24

supervise 8:23 10:2

support 14:24 34:9 69:2 89:22

supported 34:7 90:12

suppose 64:10

supposed 46:14

surgeon 78:12 79:3 82:4 99:4,8

surgeon's 81:25 82:7

surgeons 82:4

surgeries 74:1,6 76:2,20

surgery 38:8 75:21,23,25 76:14,
  15,18 77:9 78:16,24 80:1 83:1

surgical 74:13 75:21,23 77:16
  78:18

swear 6:11

sworn 6:4,21

Sylvia 35:6,7

symptoms 66:17 96:21

system 14:25 35:14 39:24 40:1
  50:18 56:13 58:15

—————————————

                  T

takes 26:14 27:14 28:4

taking 28:11

talk 23:9 71:4

talked 89:20 93:15

talking 26:24 28:3,9,16,24 37:10
  50:6 57:7 59:24 64:4,6,7 68:7
  73:7 74:17 84:4 88:13 90:5 91:5
  92:8 96:8,9 99:20

target 39:14

targeted 32:7,8,10,12 33:8

targets 30:5,8,15,16 31:15,18,23,
  24

taught 65:24 66:2

teach 16:23

team 11:11,15 23:5

telephone 70:17

telling 58:5

temporarily 10:12

temporary 10:20 24:12

ten 15:24

ten-year 80:11

Tennessee 23:15

tenure 73:10

term 17:9,13,14

terms 45:25 97:17

test 7:7 58:25 59:1 91:2

testified 6:4,21 30:25 33:10
  85:12 100:2,10

testify 64:1 71:12,15,18,23 82:12
  93:19

testimony 26:20 27:13 28:4
  54:20 64:17,18 67:16 82:18
  84:19 95:7,10

therapy 53:8

there'd 38:8

thing 45:11 68:2 91:19

things 42:4 57:24 59:17 90:16
  91:14 95:5 96:11,15 98:19

thinking 59:2

thinks 83:13 89:18

this.' 93:14

thought 25:17 45:18 94:2

thousand 37:16,17,21,22 38:19

time 6:9 7:17,18 9:23 10:6,11,16,
  17 11:18 35:22 46:20 47:11
  58:14 61:11 63:11,15 64:5,8,12,
  23 68:18,21 69:13 72:11 77:8,18
  78:16,21 79:4 80:20 83:8,25
  84:5 86:8,11 87:7,16 88:1 91:8
  92:3 97:8 98:6 99:20,25 101:6,
  20

times 40:6,9 48:23 67:5 79:15
  83:18 84:18

title 31:4 72:22

today 6:8 74:20 83:6

today's 60:12 63:7 82:16

told 73:9 76:11 77:1 93:1

tools 56:23

top 90:8

track 17:17 20:20 21:11 39:19,21
  55:3,7,12,14,16



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**05/28/2021**

16

**tracked**  16:21 37:23 55:20

**tracking**  32:5 33:6 40:5

**tracks**  20:17 21:25

**train**  11:17 15:21 86:9 94:8 95:13

**trained**  11:18,20,22 16:18,20 65:21 70:5 85:13

**training**  11:24 12:4,7,8,9 13:5,7, 9,18,22,23 14:4 15:1,4,7 69:1,4, 6,8,9,10,11,12,14,17,19 70:3,8, 11,21,23,24 72:23,24 93:19 95:17,22 96:5

**trainings**  14:20

**transcript**  26:7,8,11

**treatment**  11:6 45:6,10,14,15 46:23 47:15 59:7 61:9 66:6 89:21,22 91:7

**trend**  39:20

**true**  80:4 99:19

**two-and-a-half**  64:6

**type**  10:24 40:4 59:3 88:2 97:2

**typically**  45:15 56:11

---

**U**

**ultimate**  49:17,25

**ultimately**  49:16

**ultrasound**  45:18

**Um-hum**  14:23

**UMMD**  34:7 37:17 43:9 44:17 45:2,5,9,17,23 46:6,9,18

**UMMDS**  38:13

**understand**  7:13 38:9 40:15 47:10 50:10,19 78:19 82:4

**understanding**  73:15 97:15 100:10,16,21

**unfair**  28:10 29:9

**unilaterally**  47:24

**unit**  13:18

**uphold**  48:3,9,16 49:11,22 50:1

**upholding**  48:12

**Uptodate**  39:25 46:3,6,7,9,20,22 58:3,16 62:23,25 63:2,8 66:3,11 67:11,13 68:3 73:22 78:5 87:7 88:1 89:20 91:18,19 93:2,6,11 94:17,21,22,25 95:14,15 96:14, 17

**utilization**  10:11,14,25 11:2 14:17 17:18,19,21 19:9,17 22:16 23:6,18,19,20,21 24:7,11,14,17, 22 26:13,21 27:13,20 29:25 30:10,14 31:12,15,18 33:12,19, 20,24 34:5,8 37:11 40:14 42:22 52:4,19 57:9 65:18,21 68:24 70:9 85:13 87:13,14 88:22 93:17

**utilize**  17:20 24:1 46:20

---

**V**

**vacancy**  10:12

**vacation**  34:9

**variables**  68:14 81:11

**verbal**  7:4

**version**  72:25 75:10

**versus**  38:19 39:16 59:6,23 88:24 99:7

**video**  12:14

**video-recorded**  6:7

**videos**  12:15

**view**  23:22 39:13 41:18,19

**virtual**  69:10,11,12 70:16,17 72:25 101:21

**virtually**  6:8 56:19

**vision**  66:23

**visit**  61:17

**volume**  47:11 54:13

**VP**  15:23

**VPS**  70:25

---

**W**

**walk**  49:18

**wanted**  23:9 24:1 99:11

**Warren**  8:5,6

**watch**  12:14

**web**  73:5

**Weber**  64:19 80:14,23

**website**  46:21

**week**  47:10,15 48:23

**weigh**  59:6

**willfully**  100:23

**Willis**  6:14,15 26:2 92:4 101:17

**witness'**  63:21

**word**  43:4

**work**  18:14 30:3,7,13 72:7

**worked**  8:14 10:11 31:6,9 87:11, 12

**workflow**  40:14 57:9

**working**  58:14

**world**  91:17

**Wow**  68:7

**write**  20:9 40:3 76:24

**wrong**  26:3 93:21

---

**Y**

**year**  7:18 36:4,8 55:8

**years**  8:20 9:8,21 15:24 34:15 56:15 64:6 86:8