# EXHIBIT J

Ralph Silverman, M.D.
July 23, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KOHCHISE JACKSON,                 )
      Plaintiff,                  )
      vs                          ) Case No. 2:19-CV-13382
CORIZON HEALTH, INC.,             )
et al.,                           )
      Defendants.                 )

DEPOSITION OF RALPH SILVERMAN, M.D.

APPEARING REMOTELY FROM

CLAYTON, MISSOURI

JULY 23, 2021

1:00 P.M.

REPORTED BY:

ROBIN HEJNAR, CSR, RPR

CSR No. 084-004689

APPEARING REMOTELY FROM DUPAGE COUNTY, ILLINOIS

Ralph Silverman, M.D.
July 23, 2021

Page 2

```
 1   APPEARANCES:
 2
 3          MARGOLIS, GALLAGHER & CROSS, by
            LAWRENCE MARGOLIS & IAN CROSS
 4          214 South Main Street, Suite 200
            Ann Arbor, Michigan 48104
 5          (734) 994-9590
            larry@lawinannarbor.com
 6               Representing the Plaintiff;
 7
 8
 9          CORBET, SHAW, ESSAD & BONASSO, by
            DANIEL CORBET
10          30500 Van Dyke Avenue, Suite 500
            Warren, Michigan 48093
11          (312) 964-6300
            daniel.corbet@cseb-law.com
12               Representing Prime Healthcare Services,
                 Colleen Spencer, and David Krause;
13
14
15
            CHAPMAN LAW GROUP, by
16          DEVLIN SCARBER
            1441 West Long Lake Road, Suite 310
17          Troy, Michigan 48098
            (248) 644-6326
18          dscarber@chapmanlawgroup.com
                 Representing Corizon Health, Inc., and
19               Keith Papendick, M.D.
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2   WITNESS                      EXAMINATION
 3   RALPH SILVERMAN, M.D.
 4     By Mr. Scarber               05, 71, 91
 5     By Mr. Corbet                42, 80, 90
 6     By Mr. Cross                 59, 89
 7
 8
 9
10
11
12
13
14
15               E X H I B I T S
16   NUMBER                      MARKED FOR ID
17   Exhibit A                      12
18   Exhibit B                      12
19
20
21
22
23
24
25
```

Page 4

```
 1               THE REPORTER:  The attorneys participating
 2   in this deposition acknowledge that I am not physically
 3   present in the deposition room and that I will be
 4   reporting this remotely.  They further acknowledge that,
 5   in lieu of an oath administered in person, the witness
 6   will verbally declare his/her testimony in this matter
 7   is under penalty of perjury.  The parties and their
 8   counsel consent to this arrangement and waive any
 9   objections to this manner of reporting.
10               Please indicate your agreement by stating
11   your name and your agreement on the record.
12               MR. CORBET:  Dan Corbet, I'm fine with that.
13               MR. CROSS:  Ian Cross, I consent.
14               MR. SCARBER:  Devlin Scarber, I agree.
15               THE REPORTER:  Can I have a stipulation to
16   the doctor's identity, foregoing the ID?
17               MR. CORBET:  Dan Corbet, yes.
18               MR. CROSS:  Ian Cross, yes.
19               MR. SCARBER:  Devlin Scarber, yes.
20               What I would ask is, that he provide some
21   kind of ID after the deposition, maybe to Mr. Cross;
22   Mr. Cross, if you can get it to us?
23               MR. CROSS:  Sure.  I don't have a problem
24   with that.
25
```

Page 5

```
 1               (Whereupon, Ralph Silverman, M.D., is
 2               duly sworn.)
 3               DIRECT-EXAMINATION
 4   BY MR. SCARBER:
 5     Q.  Let the record reflect that this is the
 6   deposition of Dr. Ralph Silverman, that's being taken
 7   pursuant to notice, all purposes allowed under Michigan
 8   and Federal Court Rules and Rules of Evidence.
 9         Dr. Silverman, we've had an opportunity to meet
10   earlier today, before your deposition.  My name is
11   Devlin Scarber.  I'm representing the Corizon defendants
12   in this case.  I'm here, today, to ask you some
13   questions about your involvement in this, in terms of
14   your review and opinions in this particular case.  Do
15   you understand that?
16     A.  Yes.
17     Q.  And you've given a deposition before, correct?
18     A.  Yes.
19     Q.  And I used to say this is an unusual format, but
20   it's becoming very typical now.  We've got two other
21   attorneys who are appearing remotely.  If you got any
22   issues understanding any questions; if there's any
23   technical difficulties at all, make sure you let us
24   know; and we'll try to correct whatever problems that
25   there are.  Fair enough?
```

Ralph Silverman, M.D.
July 23, 2021

Page 6

1  A.  Yes.
2  Q.  If you don't understand a question that I might
3  ask you, just let me know; and I will repeat or rephrase
4  the question, and try to make the question better, so
5  that you can understand.
6  A.  Yes.
7  Q.  You've indicated that you've given a deposition
8  before.  About how many times have you given a
9  deposition before?
10  A.  85 to 100 times since 2004.
11  Q.  And when did you become a licensed medical
12  doctor?
13  A.  1998.
14  Q.  And where do you currently practice?
15  A.  Is the question, where is my current practice?
16  Q.  Yeah, where do you currently practice?
17  A.  Are you asking me where my address is?
18  Q.  Where do you currently practice medicine?
19  A.  St. Louis.
20  Q.  Out of any clinic or hospital?
21  A.  I have an office, and hospitals that I go to.
22  Q.  Where's your office located?
23  A.  In St. Louis.
24  Q.  What hospitals are you affiliated with, or have
25  privileges at, that you might see patients?

Page 7

1  A.  Mercy Hospital, St. Clair Hospital, and Missouri
2  Baptist Hospital.  That's a parent hospital.
3  Q.  And can you tell us if you brought any materials
4  with you today for your deposition?
5  A.  I did.
6  Q.  And what did you bring?
7  A.  I brought my record with me, including -- in no
8  particular order -- an expert report from Dr. McKenna, a
9  filed amended complaint, an expert report from
10  Dr. McQuiston, the Michigan Department of Correction
11  records, a deposition of Dr. Papendick, a record of
12  replacement surgery at Jackson, a second Corizon expert
13  report, a Notice of Deposition, and a third Corizon
14  expert report.  I can open any of these.
15  Q.  Okay.  What was the material you reviewed?  You
16  said something about "request for services," or
17  something like that.  I might have misunderstood you,
18  but it was before you started talking about the expert
19  reports that you got.
20  A.  I don't understand the question.
21  Q.  What was the thing that you mentioned that you
22  reviewed prior to mentioning -- I think it was
23  Dr. McKenna's expert report.
24  A.  The amended complaint.
25  Q.  What was after that?

Page 8

1  A.  The request for expert report.
2  Q.  And then after that?
3  A.  Michigan Department of Correction records.
4  Q.  You -- I thought you said there was some kind of
5  request for a surgery record or something like that.
6  Maybe I misheard you.
7  A.  This was -- some Lake Huron records.  I'm looking
8  at the actual file that I have, that's labeled on there;
9  and these are progress reports; notes, if you will, of
10  Lake Huron Medical Center.
11  Q.  And when were you retained in this particular
12  case, to serve as an expert witness?
13  A.  My recollection is November of 2020.
14  Q.  And were you provided all the records that you
15  just mentioned, in November 2020?
16  A.  I don't recall, but I believe it came in
17  different points, if you will.
18  Q.  Do you know what materials you actually had when
19  you wrote your report, your expert report in this case?
20  A.  No.
21  Q.  And what is your area of practice?
22  A.  I practice both general surgery and colorectal
23  surgery.
24  Q.  Do you agree, Doctor, that medical professionals
25  are taught to exercise medical judgment based upon their

Page 9

1  training and knowledge of medicine, and to make
2  decisions regarding treatment?
3  A.  Yes.
4  Q.  And, in fact, you use your medical judgment every
5  day to make decisions regarding what treatment options
6  to use regarding the healthcare of your patients,
7  correct?
8  A.  True.
9  Q.  And you would agree that medical professionals
10  use medical judgment in making healthcare decisions
11  regarding patients?
12  A.  Yes.
13  Q.  You agree, Doctor, that doctors/physicians could
14  arrive at different treatment decisions using reasonable
15  medical judgment?
16  A.  It's possible.
17  Q.  Your opinion in this case is that, Dr. Papendick,
18  one of the defendants in this case, failed to exercise
19  proper medical judgment in treating Mr. Jackson,
20  correct?
21  A.  I was wondering if my final report was available.
22  Q.  Do you have that?
23  A.  No.
24  Q.  Okay.
25  MR. CORBET:  Hey, Devlin, he said "final."

Ralph Silverman, M.D.
July 23, 2021

Page 10

1 Does that mean there's more than one?
2        THE WITNESS: I don't have any belief that
3 there's more than one.
4        MR. CORBET: Okay.
5        THE WITNESS: What was the question again?
6 Does anybody have my report available, or not? And if
7 the answer's no, then I can't answer that question,
8 because I'd like to look at my report.
9 BY MR. SCARBER:
10     Q. Well, I may have a copy of your report that is
11 written up, where I got comments on it. I don't know if
12 I have an unredacted copy of your report. I thought you
13 would have a copy of it for your deposition today.
14        (Discussion off the record.)
15 BY MR. SCARBER:
16     Q. Dr. Silverman, your opinion in this case is that
17 Dr. Papendick failed to exercise proper medical judgment
18 in treating Mr. Jackson, correct?
19     A. Yes.
20     Q. And based upon the failure to exercise proper
21 medical judgment, you believe that Dr. Papendick
22 breached the standard of care?
23     A. Yes.
24     Q. And you believe that, as a result of the
25 decisions that he made based upon his medical judgment,

Page 11

1 resulting in a breach of the standard of care, as you
2 say, that Mr. Jackson was injured, correct?
3        MR. CORBET: Misstates testimony.
4 BY MR. SCARBER:
5     Q. Is that what you believe?
6     A. Yes.
7     Q. And are those opinions that you're prepared to
8 discuss today?
9     A. Yes.
10     Q. Doctor, I do have -- you don't have your CV with
11 you, right?
12     A. I do.
13     Q. You do have it?
14     A. I do.
15     Q. Okay. Take a look at this hardcopy of that, and
16 tell me if that's what you got; and that's probably --
17 I'm going to tell you, we probably got that back in
18 November of 2020, sometime around then.
19        THE REPORTER: I can't hear you.
20        THE WITNESS: I'm just saying, that's not
21 mine, that's not mine. There's extra papers delivered
22 to me.
23        It's up-to-date.
24        MR. SCARBER: Robin, what we're going to do
25 is, we're going to mark his CV as exhibit -- the

Page 12

1 doctor's Exhibit A to his deposition. This will be
2 marked out of order. I don't care.
3 BY MR. SCARBER:
4     Q. Did you get a copy of this deposition notice?
5     A. Yes.
6     Q. You got a copy of that?
7     A. Yes.
8        MR. SCARBER: And, Robin, what we'll do is
9 we'll mark this deposition notice -- this is the
10 deposition notice that we sent. We'll mark that as
11 Exhibit B.
12 BY MR. SCARBER:
13     Q. Did you have an opportunity to review the
14 deposition of the actual surgeon who performed
15 Mr. Jackson's colostomy in this case?
16     A. Everything I told you was all I reviewed. So the
17 answer to that would be no.
18     Q. So you didn't review Dr. Cansicar's testimony,
19 where she testified that, when she referenced a standard
20 of practice, what she was talking about was her standard
21 of practice, and not what everybody else does?
22     A. Same answer, I haven't reviewed it.
23     Q. And that's because, Doctor, that every doctor has
24 a certain standard that they might follow as a part of
25 their practice, right?

Page 13

1     A. I haven't reviewed her testimony.
2     Q. You can answer that question though; every doctor
3 has a standard of a particular practice that they might
4 do in their practice, and other doctors might have a
5 different standard that they follow, right?
6     A. Well, typically, there's an actual standard of
7 care; and if you're talking about the art of medicine,
8 some things are done differently to arrive at a similar
9 endpoint.
10     Q. But that's because every doctor's medical
11 judgment is not the same, right?
12     A. Medical judgment can be different.
13     Q. And in your practice, Doctor, you've had patients
14 who have gotten a second opinion about something you may
15 have told them, or wanted to do with respect to their
16 care, correct?
17     A. It's possible. If you're asking me if I have a
18 recollection of that, the answer would be no.
19     Q. Do you have a recollection, Doctor, that maybe
20 you, yourself, at some point, was sought out for maybe a
21 second or third opinion from a patient that might have
22 seen some other doctors prior to coming to you?
23     A. I'm sure I've given second or third opinions. I
24 don't have independent recollections of it.
25     Q. But you should have over the course of your

Ralph Silverman, M.D.
July 23, 2021

Page 14

1  practice --
2      A. I just answered that.
3      Q. Well, let me finish my question.
4          You believe that that has occurred over the
5  course of your practice, since about 1998 or so?
6      A. Since 2004, which is when I started seeing
7  patients on my own, yes.
8      Q. And you reviewed Dr. Papendick's testimony in
9  this case it sounds like?
10     A. Yes.
11     Q. And you reviewed his testimony, where he
12 testified about risk versus benefits of a colostomy
13 reversal for Mr. Jackson?
14     A. Yes.
15     Q. And basically, you disagree with the medical
16 judgment that he used in terms of risk or benefits for
17 Mr. Jackson?
18     A. True.
19     Q. That's true?  You disagree with it?
20     A. That is true.
21     Q. Dr. Cansicar, in this case, testified that there
22 can be differences of opinion amongst doctors regarding
23 colostomy reversals, concerning whether to do them.  Do
24 you agree with that?
25     A. I didn't read the deposition.

Page 15

1      Q. Do you agree that there can be differences of
2  opinions regarding doctors, concerning whether to do
3  colostomy reversals?
4      A. Doctors can review a patient's chart, a clinical
5  history, and make a decision about when the colostomy
6  should be reversed.
7      Q. And they can reach different conclusions based
8  upon what they review, right?
9      A. It's possible.
10     Q. Did you review her testimony, where she testified
11 that there could be differences of opinion regarding
12 colostomy reversals as to when they should be done, in
13 terms of the timing?
14     A. I didn't review her testimony.
15     Q. But do you agree that --
16     A. My question is, why do you keep asking if I
17 reviewed the testimony, when I've told you I haven't
18 reviewed the testimony?  If you want to ask a question
19 about the testimony, that's different, but my answer's
20 going to be the same.  I haven't reviewed her testimony.
21     Q. Let me stop you right there.  As the attorney,
22 I'm going to be the one asking the questions.  You're
23 the one here to answer the questions.  You don't have to
24 question me, with all due respect, as to why I might be
25 asking a question in a certain way.  If you can't answer

Page 16

1  the question, you can just tell me you can't answer it.
2  If I ask you the same question, or it seems like it's a
3  redundant question, you can answer the question, but you
4  can't tell me how to ask the question.
5      A. But I said to you that I haven't reviewed her
6  testimony, yet you keep asking, "Have I reviewed her
7  testimony?"
8      Q. Are you here to answer questions?
9      A. I'm certainly here to answer questions.
10     Q. I would appreciate it if you do that.  If you've
11 got a problem with the way I'm asking questions --
12     A. I've already said that.
13     Q. You have an attorney here who is representing
14 you, who can object.  Just like you've gone to medical
15 school, he's gone to law school.  Just like you've
16 passed boards, he's passed the bar exam, and he can say
17 whatever, and tell an objection that he wants to make
18 relative to the way I'm asking questions, okay?
19     A. That's fine.
20     Q. Okay.  So you would agree, Doctor, then, that
21 there can be differences of opinion amongst doctors as
22 with respect to the timing of when to do a colostomy
23 reversal?
24     A. It's possible.
25     Q. It's possible that there could be differences of

Page 17

1  medical judgment, differences of opinion?
2      A. That's what I said.
3      Q. The surgeon in this case, Dr. Silverman, who is
4  Dr. Cansicar, testified to -- after looking at various
5  articles and language from articles, she came to those
6  conclusions that we just talked about.
7      A. Which conclusions were those?
8      Q. The conclusions that there could be differences
9  among whether to do a reversal and the timing of when to
10 do a reversal, if a doctor decides he wants to do one.
11     A. Okay.
12     Q. Would you agree, Doctor, that there would be, not
13 only medical testimony to support that from physicians
14 that will say that, but there would be articles that
15 would acknowledge that fact as well?
16     A. I don't need articles to tell me that.
17 Physicians can look at patients' charts, patients'
18 records, physical exams, and come to conclusions about
19 when a colostomy can be reversed.
20     Q. And they can come to conclusions as to whether or
21 not it should be reversed at all, correct?
22     A. True.
23     Q. You, in particular, Dr. Silverman, you had no
24 involvement in the medical decisions and medical
25 judgments that were made concerning this particular

Ralph Silverman, M.D.
July 23, 2021

Page 18

1  case, correct?
2    A.  Yes.
3    Q.  And you were retained by the plaintiff, correct?
4    A.  Yes.
5    Q.  And you were retained by the plaintiff to give an
6  opinion to the plaintiff, right?
7    A.  I was retained by the plaintiff to review the
8  medical records and come to a conclusion about the care
9  delivered in the case, correct.
10   Q.  And the conclusions that you came to were
11  supporting the plaintiff's position, correct?
12   A.  That is true.
13   Q.  And you were also paid by the plaintiff to review
14  records and come to the conclusions that you would come
15  to, correct?
16   A.  I was paid by the hour to review the records and
17  come to a conclusion.
18   Q.  Dr. Silverman, do you ever call another doctor's
19  office or medical facility, so that you can get
20  information for further understanding about a particular
21  patient that you might be treating?
22   A.  I don't understand the question.  Can you
23  rephrase?
24   Q.  Yes.
25       As a doctor, if you know that a patient may have

Page 19

1  seen another doctor, or go to another hospital, or
2  treated at another facility, would you ever call that
3  particular hospital or doctor's office maybe to get some
4  information about the particular patient, or some
5  further information to help your understanding about a
6  particular patient?
7    A.  If the record didn't accurately or fully answer
8  the questions that I had in mind on this particular
9  patient, if there wasn't enough information, then I
10  would, in fact, call the physician.
11   Q.  Okay.  And you would do that out of concern for
12  the patient's care, correct?
13   A.  I would do that to make sure that the information
14  that I had was complete before I delivered care to the
15  patient.
16   Q.  And you feel like that is something that is a
17  safe practice to do concerning a patient, right?
18   A.  I think it's a reasonable practice to do, and
19  it's safe if you need information that is not present.
20   Q.  Information that you might obtain, the facts that
21  you might obtain might assist you in the medical
22  decisions and judgments that you are going to be making
23  about that particular patient, correct?
24   A.  It may or it may not assist you.
25   Q.  Dr. Silverman, are you aware that the medical

Page 20

1  records in this case document that, on at least two
2  occasions, the healthcare providers in the Michigan
3  Department of Corrections contacted the surgeon's office
4  about Mr. Jackson's colostomy, and a potential reversal;
5  and that, on both occasions, the surgeon's office stated
6  that there were no urgent medical issues, and the
7  colostomy is functional, and that there is no medical
8  necessity?
9    A.  I am aware that those calls were made.
10   Q.  And you reviewed Dr. Papendick's testimony, where
11  he discussed that, in his medical judgment, the risk for
12  doing surgery for Mr. Jackson outweighed the benefit of
13  doing the surgery, correct?
14   A.  I did read that testimony, in fact.
15   Q.  You disagree with that, right?
16   A.  I wholly disagree with that.
17   Q.  And Dr. Papendick testified that, in his medical
18  judgment, based upon information he was provided,
19  Mr. Jackson was having no medical problems back in
20  April 2017/March of 2017.  Are you aware of that?
21   A.  Yes.
22   Q.  And do you disagree with that?
23   A.  Yes.
24   Q.  From the records that you saw, would you please
25  tell me what physical medical problem that you saw, that

Page 21

1  Mr. Jackson had back in March or April of 2017, with
2  respect to his colostomy?
3    A.  The records will reflect that Mr. Jackson, in
4  fact, developed not only anxiety, psychological issues
5  and stress about having a colostomy that was perfectly
6  able to be reversed, but also that he was -- tried to,
7  in fact, hide the smell of his colostomy, and the fact
8  that he was assaulted, and punched in the colostomy
9  because of his issues, causing, at least on paper,
10  issues regarding his psychology.
11   Q.  Are you a psychologist, Dr. Silverman?
12   A.  No, but --
13   Q.  I just want you to answer my question.
14   A.  I'm not done answering my question.
15   Q.  Are you a psychologist?
16   A.  I'm not done --
17   Q.  Go ahead.
18   A.  -- answering my question.
19   Q.  If your answer is you are not a psychologist, yes
20  or no, go ahead.
21   A.  We can stop this right now.  If you're not going
22  to let me answer my question, we can finish this now.
23  What's it going to be, Counselor?
24   Q.  Listen, you're here to testify.
25   A.  I am speaking.

Ralph Silverman, M.D.
July 23, 2021

Page 22

1   Q.  If I ask a yes or no question --
2   A.  You're not letting me answer my question.
3   Q.  Go ahead.  I would ask you to direct --
4           MR. CORBET:  Answer the question.  We'll
5   discuss it on cross when he's done asking his questions,
6   okay?
7           THE WITNESS:  To answer the question, that
8   I'm not a psychologist.  I have dealt with numerous
9   patients over the last 17 years --
10  BY MR. SCARBER:
11  Q.  Okay.  You've answered my question.  Thank you.
12      So the yes or no answer to my question,
13  Dr. Silverman, is you're not a psychologist, correct?
14  Yes or no?
15  A.  I'm not going to answer that.
16  Q.  Have you gone to school for psychology?
17  A.  No.
18  Q.  Do you have a psychological degree?
19  A.  I don't think there's such things as
20  psychological degrees.
21  Q.  Do you have a Ph.D. in psychology?
22  A.  No.
23  Q.  Do you have a medical degree in psychiatry?
24  A.  No.
25  Q.  Do you prescribe medications for depression or

Page 23

1   anxiety as a result of a psychiatric condition?
2   A.  No.
3   Q.  Is it fair to say, Doctor, that you are not a
4   licensed psychologist or psychiatrist?
5   A.  Yes.  You can lower your voice too.
6   Q.  Thank you.  Now I'm going to go back to my
7   original question.
8       Aside from psychological problems that you've
9   identified, and anxiety problems that you've identified,
10  can you tell me an actual physical medicine condition
11  that Mr. Jackson had with respect to his colostomy back
12  in April or March of 2017?
13  A.  He was punched and it had blood in it.
14  Q.  That happened in March of 2017.  So I'm going to
15  ask the question again.
16      Other than -- with respect to him having an
17  actual physical condition that can be diagnosed by a
18  medical doctor, a physical problem with his colostomy
19  that he had by Dr. Kansakar back in December
20  of 2016, did you find in the records a specific medical
21  related injury, a physical medicine injury that
22  Mr. Jackson was experiencing in March of 2017 or April
23  of 2017?
24  A.  Not other than what I've already said.
25  Q.  Well, you mention psychological and anxiety

Page 24

1   problems.  Other than psychological and anxiety
2   problems, are you aware of any other medical problems,
3   physical conditions that we're talking about, that
4   Mr. Jackson would have had in March or April of 2017?
5   A.  No.
6   Q.  Dr. Papendick testified that the patient was
7   having absolutely no complaints, no medical problems,
8   but was just saying he wanted a reversal back in March
9   or April of 2017.  Did you read that in his deposition?
10  A.  Yes.
11  Q.  Did you read in any record, in March or April
12  of 2017, when this was reviewed by Dr. Papendick, where
13  the patient was making any medical complaints, talking
14  about pain, or that his colostomy wasn't functioning
15  properly?
16  A.  No.
17  Q.  In fact, there's nothing in the records that say
18  anything like that, is there?
19  A.  True.
20  Q.  And did you review Mr. Jackson's testimony in
21  this case?
22  A.  Yes.
23  Q.  And when did you review that?
24  A.  I think that was more recently.
25  Q.  Was it, like, within the last month?

Page 25

1   A.  Yes.
2   Q.  Was it within the last week?
3   A.  I don't recall.  Possibly.
4   Q.  Did you review his testimony, that as soon as he
5   got to prison from the St. Clair County Jail, he was
6   planning to file a lawsuit against the jail because he
7   hadn't gotten a reversal in jail?
8   A.  Yes.  I think he also threatened that in the
9   records as well, the medical records.
10  Q.  And did you review where he testified that he
11  essentially came to prison, saying he would sue the
12  prison too, even though he had no physical complaints
13  about the colostomy?
14  A.  I do recall that.
15  Q.  And Dr. Papendick testified about Mr. Jackson
16  having concerns -- strike the question.  I'll restate
17  it.
18      Dr. Papendick testified that he was actually
19  having concerns, that the surgery could actually harm
20  Mr. Jackson, didn't he?
21  A.  Yes.
22  Q.  And Dr. Kansakar testified that there are
23  significant risks to Mr. Jackson for things like a
24  potential need for a re-operation, for leaking after the
25  reversal surgery, for damage to the surrounding

Ralph Silverman, M.D.
July 23, 2021

Page 26

1  structure, including the ureter and genitourinary
2  system, infection, heart attack, stroke, death?  You
3  agree that those risks can occur, correct, Doctor?
4      A.  Those are the general risks of abdominal surgery.
5      Q.  And those are the same risks that you actually
6  have to tell your patients when you're getting ready to
7  perform a procedure like this on them?
8      A.  Not only are they the same risks, but they are
9  the same risks that exist whether you're in prison or
10  whether you're out of prison.
11      Q.  I'm going to ask my question again.
12      A.  All right.  You ask your question all you want,
13  Counsel.
14      Q.  But I'm going to ask my question until I get an
15  answer.
16      A.  Ask it again.
17      Q.  My question is, these are the same risks that you
18  provide to your patients before you get ready to perform
19  a procedure on them, correct?
20      A.  Correct.
21      Q.  Thank you.
22          And even the records of the surgeon who performed
23  the colostomy reversal on Mr. Jackson in June of 2019
24  recognized the same risks.  Did you see that in the
25  records, or did you not review those records?

Page 27

1      A.  Which records?
2      Q.  The records where he gets his colostomy reversal.
3      A.  I did review those records.
4      Q.  You received the DMC records?
5      A.  I believe I reviewed a -- maybe just the
6  operative report.  Maybe not the entire record.
7      Q.  To speed this up, is that something that you
8  might have looked at?
9      A.  Yes.
10      Q.  It's front and back.
11          Does that look like something that you would have
12  reviewed, Doctor?
13      A.  Yes.
14      Q.  All right.  Let me see that back for a second.  I
15  appreciate it.
16          Can you read this last sentence, here, for the
17  record, Doctor?  Just read the last sentence of that
18  paragraph.
19      A.  "After patient was made aware of all the risks
20  and benefits of the procedure, including, but not
21  limited to the risk of heart attack, stroke, death,
22  infection, the potential need for re-operation, and the
23  potential for a leak, or potential for damage to
24  surrounding structures, including the ureter and
25  genitourinary system, the patient signed informed

Page 28

1  consent after lengthy discussion."
2      Q.  Thank you.
3          This is the surgical report of June 19th, 2019,
4  by Dr. Weber.  It is page 574 of 579 of the DMC medical
5  records.  I won't mark it.
6          Dr. Silverman, colostomy reversals are elective
7  surgeries, right?
8      A.  Yes, they're not emergencies.  They're not
9  emergent procedures, right.
10      Q.  They can be performed, or oftentimes not
11  performed, correct?
12      A.  They can be performed, and if there are
13  contraindications, they can be not performed.
14      Q.  And many patients elect to have a colostomy
15  reversal, and many don't elect to have it, correct?
16      A.  The overwhelming majority of patients elect to
17  have it reversed, and rarely someone will not elect to
18  have it reversed.
19      Q.  But you have seen that there are patients who get
20  it and patients who don't get it, right?
21      A.  I have, as I just testified to.
22      Q.  And there's nothing mandating that the reversal
23  be done, correct, unless there is some kind of
24  serious -- serious damage occurring to the patient,
25  making it an emergent situation, right?

Page 29

1      A.  I don't understand the question.
2      Q.  There's nothing that is mandated for the patient,
3  that he actually has to have a colostomy reversal,
4  correct?
5          MR. CORBET:  Objection, vague.
6          THE WITNESS:  Mandated to have a colostomy
7  reversal?
8  BY MR. SCARBER:
9      Q.  I'll rephrase the question.
10          Is it mandating for a patient, that he must
11  undergo a colostomy reversal?
12      A.  If a patient does not want to undergo a colostomy
13  reversal, the patient does not have to undergo a
14  colostomy reversal.
15      Q.  And you're not aware of any particular mandate
16  that says, after you have a colostomy, you must
17  100 percent, absolutely have to have a colostomy
18  reversal?
19      A.  Correct.
20      Q.  In fact, Doctor, in both of Mr. Jackson's visits
21  with Dr. Kansakar in December of 2016 and January
22  of 2017, are you aware that she testified that he had no
23  complaints regarding his colostomy?
24      A.  I didn't review her testimony.
25      Q.  Are you aware from looking at the records?  You

Ralph Silverman, M.D.
July 23, 2021

Page 30

1  said you reviewed the records.  Did you review the
2  records?
3      A.  Yes.
4      Q.  Are you aware from reviewing the records, that
5  when she saw him in the follow-up visits, he was in good
6  condition, productive, functioning properly, and had no
7  pain issues?
8      A.  I'm aware of that.
9      Q.  You have no reason to disagree with her
10 examination in her records, do you?
11     A.  I have no reason to disagree with her.
12     Q.  Doctor, you mentioned in your report, that the
13 longer a reversal is delayed, the more likely the chance
14 of developing fibrosis in the pelvis, where the rectal
15 stump sits, and it can cause a difficult reconnection
16 procedure, and poor functional results of incontinence
17 and stricture formation.  Do you recall that?
18     A.  Yes.
19     Q.  None of these problems existed with Mr. Jackson,
20 did they?
21     A.  Nope.
22     Q.  In fact, he's functioning just fine after his
23 reversal that occurred in June 2019, right?
24     A.  Yes.
25     Q.  So regardless of whether he got it in two months,

Page 31

1  one year, two years, two-and-a-half years, Mr. Jackson
2  did not suffer any adverse injury or medical condition
3  as a result of not getting the reversal back in 2017,
4  correct?
5      A.  He didn't suffer a physical complication from his
6  reversal surgery.
7      Q.  Thank you.
8          Are you aware, Dr. Silverman, that Mr. Jackson is
9  not even alleging claims in this lawsuit for any
10 physical damage for not having the colostomy reversal
11 sooner?
12     A.  I don't understand the question.
13     Q.  Are you aware that Mr. Jackson is not even
14 alleging in this lawsuit that he sustained any physical
15 damage for not having his colostomy reversal sooner?
16     A.  I'm not --
17         THE REPORTER:  I'm sorry, wait.
18         THE WITNESS:  I'm not disputing that either.
19         THE REPORTER:  One second.  There was an
20 objection.  I didn't hear it.
21         MR. CORBET:  I said objection, foundation.
22         THE REPORTER:  And, Doctor, if you could
23 repeat your answer.
24         MR. SCARBER:  You didn't hear his answer?
25         THE REPORTER:  No.  I got the last

Page 32

1  statement.  There were two statements.
2          THE WITNESS:  I don't remember what I said.
3  BY MR. SCARBER:
4      Q.  My question was, are you aware that Mr. Jackson
5  is not even alleging claims in this particular lawsuit
6  for any physical damage that occurred to him as a result
7  of not having his colostomy reversal performed any
8  sooner?
9      A.  And I think I said I'm not aware of that, but I'm
10 not disputing it either.
11     Q.  Okay.  I believe you did.
12         He's not claiming, Dr. Silverman, that he had --
13 that his reconnection procedure was difficult?
14     A.  I don't think so.
15     Q.  He's not claiming that he's got any kind of poor
16 functioning, correct?
17     A.  Correct.
18     Q.  In fact, Dr. Silverman, after Mr. Jackson went
19 for his colostomy reversal in 2019, he hasn't seen any
20 doctor in two years almost, for any complaints regarding
21 his colostomy or any of the organs that are involved
22 with his colostomy.  Are you aware of that?
23     A.  I don't know those facts.  I'm not disputing them
24 either.
25     Q.  And in all sincerity, Dr. Silverman, since

Page 33

1  Mr. Jackson's release from prison in May 2019,
2  Mr. Jackson has been shot twice, been involved in a car
3  accident, but after his reversal was completed, he has
4  never been to any doctor for any problems, specifically,
5  because his reversal did not occur at any point any
6  sooner.  Are you aware of that?
7      A.  No.
8      Q.  Do you dispute that?
9      A.  No.
10     Q.  You weren't shown any records disputing that,
11 correct?
12     A.  I wasn't shown any records at all like that.
13     Q.  And you testified earlier, and I think I showed
14 you while you were testifying, the operative report from
15 his colostomy reversal.
16         Are you aware that, when he got the colostomy
17 reversal done, Dr. Weber's report indicates that he
18 wasn't having any issues just before he did his
19 reversal?
20     A.  I don't recall that.  I'm not disputing that.
21     Q.  I'll just show it to you, and I'll reference page
22 575 of that operative report.  Can you read that right
23 there?  Just the language in the first paragraph.
24     A.  "He has no issues."
25     Q.  Dr. Silverman, is it true, or are you aware that

Ralph Silverman, M.D.
July 23, 2021

Page 34

1  several courts have found that your testimony and
2  opinions lack credibility?
3      A.  Am I aware that courts have found my testimony to
4  be -- lack of credibility, is that the question?
5      Q.  Yes.
6      A.  No.
7      Q.  You've never heard of a court, basically, saying
8  that your testimony lacked credibility, or you were
9  testifying to things that you weren't even qualified to
10 testify to?
11     A.  There are two instances that I will put on the
12 record, where I was not allowed to testify.
13         The first instance was a case in Tennessee; and
14 if you are familiar with Tennessee Caselaw, you have to
15 be living in the state one year before the incident, and
16 that state must be touching a border of Tennessee.  I
17 had moved back to Texas from St. Louis more than one
18 year before the event, and Texas does not touch the
19 border of Tennessee, and, therefore, I wasn't allowed to
20 testify.
21         There was another instance in, I believe,
22 Michigan, in fact, where there was a case against a
23 general surgeon, and I was specializing in colorectal
24 surgery, and was not allowed to give testimony because
25 the overwhelming majority of my work was in colorectal

Page 35

1  surgery and not general surgery.  If there's something
2  I'm missing, please tell me.
3      Q.  So let's talk about the Michigan case.  Thank you
4  for mentioning that Tennessee case.  Let's talk about
5  the Michigan case first.
6         It was a case called Wilson versus Dean, a Court
7  of Appeals decision in January 9th of 2018; and in that
8  particular case, you indicated that you were trying to
9  testify about a general surgery standard of practice,
10 and the court found that you were not even sufficiently
11 practicing general surgery in order to testify about it,
12 correct?
13     A.  I stated that for the record, yes.
14     Q.  So the court in Wilson, in Michigan, the state
15 that we're -- that this case involves, the court in
16 Wilson found that you were trying to give opinions that
17 you weren't even qualified to give, right?
18     A.  I'm qualified.  I am a practicing general
19 surgeon.  The rules in Michigan, from my
20 understanding -- I'm not a lawyer -- is I wasn't doing
21 enough general surgery in order to be an expert in
22 general surgery, because the overwhelming majority of my
23 work was colorectal surgery, even though I'm a full
24 functioning general surgeon.
25     Q.  And just for the record, the cite for the Wilson

Page 36

1  versus Dean case; that is, D-e-a-n.  It is 2018
2  Mich.App.Lexus 57.  That's docket No. 334243.
3         You ran into a problem in Ohio as well, where
4  your credibility and opinions were found to lack -- be
5  lacking in credibility when you tried to give expert
6  testimony there?
7      A.  I don't recall that.
8      Q.  The records of the case of Gysegem versus Ohio
9  State University, Wexner Medical Center, G-y-s-e-g-e-m;
10 Wexner is W-e-x-n-e-r.  This is a Court of Claims of
11 Ohio, September 8th, 2020.  Case ID number for that is
12 2018-00113JD.  The cite for that is going to be 2020
13 Ohio Misc, M-i-s-c, period, Lexus 152.
14         Does any of that ring a bell for you?
15     A.  No.
16         MR. CROSS:  Devlin, can you spell the first
17 name of that case in Ohio again, please.
18         MR. SCARBER:  Yes, it's G-y-s-e-g-e-m.
19         MR. CORBET:  Thank you.
20 BY MR. SCARBER:
21     Q.  In that particular case, Dr. Silverman, the court
22 found that your opinions were biased and less credible
23 than the other witnesses.
24     A.  I don't know anything about it.
25     Q.  Why don't I let you look at it, and then I'll ask

Page 37

1  you some questions about it.
2      A.  Okay.
3      Q.  All right.  So the court in that case, from which
4  you just read, stated, "Dr. Silverman has demonstrated a
5  willingness to testify outside his area of expertise,"
6  correct?  End quote.
7      A.  That's what it says.
8      Q.  It says, quote -- this is the courts findings --
9  "20 to 25 percent of Dr. Silverman's income is generated
10 from Dr. Silverman's case reviews and testimony, with
11 about 95 percent of the reviews being performed on
12 behalf of plaintiffs," end quote.  Is that true?
13     A.  Yes.
14     Q.  It also said in that case, that you actually
15 claim to have performed hundreds of surgical procedures,
16 but that the overwhelming majority were earlier in your
17 career, right?
18     A.  Are you talking about a specific surgery?
19     Q.  I'm talking about the court's findings about your
20 credibility in this Ohio case.  Did you see that?
21     A.  You're going to have to put it in context for
22 the --
23     Q.  Do you want me to read it?
24     A.  Yeah.
25     Q.  "Dr. Silverman -- quote, "While Dr. Silverman

Ralph Silverman, M.D.
July 23, 2021

Page 38

1  asserts that he has performed hundreds of appendectomies
2  and colococostomies in his career, Dr. Silverman admits
3  that he performed the overwhelming majority of
4  colococostomies early in his career, when he was engaged
5  in more general surgery."
6       A.  That's true.  Absolutely true.  I've always
7  testified that I've skewed toward colorectal surgery in
8  my career and general surgery.  Absolutely true, and I
9  testified to the truth.
10      Q.  Well, the court indicates here that you were
11 actually misrepresenting that you had some kind of
12 expertise in an area that you didn't have expertise in.
13      A.  The court is saying that I did most of my general
14 surgery in appendectomies and colococostomies earlier in
15 my career, which I testified to truthfully.
16      Q.  In also says here, quote, "With no evidence,
17 Dr. Silverman suggested that a doctor, Dr. Eiferman,
18 exhibited a lack of care for his patients," end quote.
19           The court's saying here, Doctor, that, with no
20 evidence, you made a suggestion about another doctor
21 doing something wrong.  Why would you do that?
22      A.  I'd have to review the case, and you presenting
23 me this in the last two or three minutes, doesn't nearly
24 prepare myself for these kind of questions.  Like this
25 case and other cases, I reviewed the records, and I came

Page 39

1  to an opinion about it.
2       Q.  The court says -- it goes on to say, quote, "Such
3  a suggestion demonstrates bias and affects
4  Dr. Silverman's overall credibility," end quote.
5           Are you aware, Doctor, that there's not many
6  courts that go on the record and say that an expert
7  witness lacks credibility and is biassed?
8       A.  I'm not aware.
9       Q.  Have you heard about the courts saying that about
10 a lot of other medical experts?
11      A.  I'm not aware.
12      Q.  And yet, in this case we're here for today, all
13 of this business that you're talking about, about
14 Mr. Jackson having these potential problems from not
15 getting a colostomy reversal sooner, you have absolutely
16 no evidence to suggest, from the records, that any of
17 those problems ever occurred with Mr. Jackson that you
18 were talking about, or these complications about him not
19 getting a reversal sooner, right?
20      A.  I didn't testify that he didn't have any
21 complications.
22      Q.  You put in your report, Doctor, that if he
23 doesn't get the reversal sooner, he would have all of
24 these problems and complications, didn't you?
25      A.  I said it was a risk, such as Dr. Papendick put a

Page 40

1  risk that the risk of dying from anesthesia is three
2  percent.  That didn't happen either, Counselor.
3       Q.  So you recognize that there are risks, right?
4       A.  Asked and answered.  I've testified to that.
5       Q.  Thanks for your objection.  I appreciate it, but
6  my question is more directed to the fact that, if you
7  write your report in November of 2020, and we know from
8  the medical records, at least from 2019 forward, that
9  Mr. Jackson hasn't had any complications at all, no
10 problems reconnecting anything, no problems with
11 incontinence, why would you even suggest anything like
12 that is possible in your report, when you have no
13 evidence for it?
14      A.  I will answer that question with a question.  Why
15 would Dr. Papendick suggest that all of these risks and
16 all these complications from anesthesia; and, in fact,
17 Dr. Kansakar, the risk of having surgery, none of that
18 happened either, Counselor, which leads me to believe
19 that this thing could have been done earlier.
20      Q.  Let me ask you a question -- and I'm just going
21 to stop you and move to strike for being nonresponsive.
22           Dr. Papendick was an expert in this case.
23 Dr. Papendick hasn't been driven -- gone through the
24 courts and been called biassed and not credible.
25           My question to you is, you wrote a report almost

Page 41

1  a year-and-a-half later, talking about some things that
2  could have happened to this guy after surgery that never
3  happened, and I want to know why.  Why would you say
4  something like that?
5       A.  Because it's the truth.
6       Q.  Okay.
7       A.  The longer you wait to reverse a colostomy, the
8  more intraabdominal scarring, and the other things that
9  I mentioned can happen.  It doesn't mean it's going to.
10 Nothing is a hundred percent, Counselor, but it doesn't
11 mean that it can't happen.
12      Q.  Let me ask you this question then.  So it sounds
13 like, Dr. Silverman, what you're saying is that, because
14 these things could happen, it was worth you considering
15 these types of things when you were issuing your expert
16 report, correct?
17      A.  Absolutely.  Absolutely.
18      Q.  It was worth you mentioning that these things
19 could happen, that these are risks that could happen,
20 when you were trying to consider, with your medical
21 judgment, what the standard should be, right?
22      A.  That's right.
23      Q.  Thank you.
24           When was the last time you performed a colostomy
25 reversal?

Ralph Silverman, M.D.
July 23, 2021

Page 42

1    A.  Last week.  I usually do one or two a week.
2    Q.  When's the last time you performed a colostomy?
3    A.  A colostomy?  Last week.
4    Q.  Doctor, what I'm going to do is rest at this
5  particular time, because I want to see if I can pop-up
6  some of the stuff we got; and we've got another attorney
7  here, a Mr. Corbet, who is probably going to have some
8  questions for you as well.  So why don't I do that.
9  Thank you for your time.  I appreciate it.
10              CROSS-EXAMINATION
11  BY MR. CORBET:
12    Q.  Hi, Doctor.  Can you hear me okay?
13    A.  Yes.
14    Q.  My name's Dan Corbet.  I represent the medical
15  providers at St. Clair County Jail, okay?
16    A.  Who do you represent?
17    Q.  The -- it's actually the nurse and -- at the
18  saint -- and the company that employed her, or that she
19  was working with at the St. Clair County Jail.  Do you
20  follow me or no?
21          MR. SCARBER:  So he was in jail first, and
22  then he goes to prison after he was in jail.
23          THE WITNESS:  Right.
24          MR. SCARBER:  So he's alleging -- there's
25  allegations that the jail didn't do something and that

Page 43

1  the prison didn't do something afterwards.
2          THE WITNESS:  Thank you.
3          MR. SCARBER:  He's the first guy.
4          MR. CORBET:  Thank you, Devlin.  I
5  appreciate that.
6  BY MR. CORBET:
7    Q.  So do you follow along with that, Doctor?
8    A.  Yes.
9    Q.  Okay.  Let me go back a few things, and your -- I
10  guess I can start with your medical school.  Where did
11  you go to medical school?
12    A.  University of Missouri, Kansas City.
13    Q.  And where did you do a residency at?
14    A.  St. Louis University.
15    Q.  Did you do a fellowship in colorectal?
16    A.  Yes.
17    Q.  Where was that at?
18    A.  William Beaumont.
19    Q.  And you're board certified in?
20    A.  General surgery and colorectal surgery.
21    Q.  And what years were you board certified in those
22  disciplines?
23    A.  2003-ish.
24    Q.  Both of them were around the same time?
25    A.  Around the same time, one after the other.

Page 44

1    Q.  Has your license ever been revoked or suspended?
2    A.  No.
3    Q.  Have you ever had any disciplinary action with
4  respect to staff privileges anywhere?
5    A.  No.
6    Q.  Has anybody filed a complaint against your
7  license as far as you know?
8    A.  Not as far as I know.
9    Q.  Did anybody -- Are you a member of any medical
10  societies?
11    A.  The American Society of Colorectal Surgeons and
12  the American College of Surgeons.
13    Q.  Has anybody filed a complaint against you with
14  respect to those societies?
15    A.  Not that I know of.
16    Q.  And you have done -- How many cases in Michigan
17  have you reviewed?
18    A.  This year you said?
19    Q.  No, just in general.
20    A.  Is the question, how many cases total have I ever
21  reviewed?
22    Q.  In Michigan.
23    A.  In Michigan, excuse me.
24        I don't know.  Maybe four or five.
25    Q.  Is there one particular state that you do most of

Page 45

1  your reviews out of?
2    A.  I tend to be a preponderance in Tennessee.
3    Q.  Any idea why?
4    A.  Because of what I just discussed about experts in
5  Tennessee, in terms of the Tennessee Laws have to be
6  touching a continuous state.
7    Q.  Where you practice now is -- you connect with
8  Tennessee?
9    A.  That is correct.
10    Q.  Is that why you moved from Texas to Tennessee?
11    A.  I've never moved to Tennessee.
12    Q.  Oh, I'm sorry.  To St. Louis, my bad.
13    A.  I'm from St. Louis.  That's not the reason I
14  moved.
15    Q.  Sorry to be redundant, but you've read the
16  deposition of Dr. Kansakar, Mr. Jackson, and
17  Dr. Papendick; is that right?
18    A.  I did not read the deposition of -- the first
19  deposition you mentioned.
20    Q.  I'm sorry.  All right.  My bad again.
21        You read the depositions of Mr. Jackson and
22  Dr. Papendick, correct?
23    A.  Yes.
24    Q.  And you said -- I think you said you might have
25  read Mr. Jackson's in the last week or so maybe; is that

Ralph Silverman, M.D.
July 23, 2021

Page 46

1  fair?
2      A.  Something like that.
3      Q.  And Dr. Papendick's, when did you read that one
4  do you think?
5      A.  In the last couple of weeks, two, three weeks.  I
6  can't recall.
7      Q.  And have you asked to read the deposition of
8  Dr. Kansakar?
9      A.  I can't recall.
10     Q.  But you've known about Dr. Kansakar -- Strike
11  that.
12         So earlier in the deposition you said something
13  about a final report, and I'm looking at your report
14  from December of 2020, and what threw me off is it's
15  labeled, "Preliminary Expert Report."
16         So my question is, is there one report, or are
17  there two, a preliminary and final?
18     A.  I don't know.  I'm assuming that my preliminary
19  is my final.
20     Q.  Okay.  Are you aware that the nurse at the
21  jail -- her first name is Colleen; that she contacted
22  Dr. Kansakar's office on at least one or two occasions
23  to discuss the colostomy reversal with that office?
24     A.  Yes, I think we've already visited this line of
25  questioning.

Page 47

1      Q.  Okay.  So you're aware that she contacted the
2  office.  I'm specifically talking about the nurse.
3      A.  Yes.
4      Q.  I'm not sure you went through that specifically
5  before.
6         And what was she told by Dr. Kansakar's office or
7  office manager?
8      A.  Something along the lines of, it's not an
9  emergency to reverse the ostomy.
10     Q.  Was she also told it's based on the personal
11  comfort of the patient?
12     A.  I don't recall.
13     Q.  Can you tell us how many times Mr. Jackson was
14  taken out of the St. Clair County Jail to some sort of a
15  medical appointment?
16     A.  I don't know offhand how many times he was taken.
17     Q.  Well, it was more than one, because he had
18  surgery, right?
19     A.  Right.
20     Q.  Do you think it was more than five or less than
21  five?
22     A.  Don't know.
23     Q.  Do you know who paid for the out-of-jail
24  appointment/medical care?
25     A.  I'm sorry?  I didn't hear you.

Page 48

1      Q.  I'm sorry.
2          MR. CORBET:  Can you hear me okay, Robin?
3          THE REPORTER:  Yes.
4              (Wherein, question is read back
5              upon request.)
6          THE WITNESS:  Who pays for it?  Was that the
7  question?
8  BY MR. CORBET:
9      Q.  Yes.
10     A.  No, I don't know who pays for it.
11     Q.  Do you know if nurse Colleen had the authority to
12  grant or deny out-of-jail appointments?
13     A.  I don't know that.
14     Q.  Do you know if Mr. Jackson had a history of
15  violence?
16     A.  While I was making my report, I think that I read
17  where he was in jail for possibly armed robbery; and
18  then, of course, counselor over here mentioned some
19  stuff that happened, perhaps -- I forget what he said,
20  after he got out of or before he got out of, an assault
21  or something like that.  That's what I know of.
22     Q.  So at least, as of the time when his colostomy --
23  where he had the colostomy while in the county jail, he
24  had a history of violence; at least, as far as you know,
25  armed robbery.  Fair enough?

Page 49

1      A.  Yes.
2      Q.  Let me go back to my notes here.
3          Have we heard all of your opinions that you're
4  going to give in this case?
5      A.  Yes.
6      Q.  Have you ever reviewed any other cases for
7  Mr. Cross's or Mr. Margolis's firm?
8      A.  Not to my knowledge.
9      Q.  Do you know how they got ahold of your name?
10     A.  I don't recall.
11     Q.  Is your curriculum vitae up-to-date?
12     A.  Yes.
13     Q.  Do you have an academic appointment?
14     A.  I have an unpaid academic appointment as a
15  clinical assistant, professor of surgery for St. Louis
16  University.
17     Q.  So what's the hierarchy of those positions?  Can
18  you run through them for me?
19     A.  I, myself, don't know the hierarchy.  I've had
20  that particular appointment since 2012-ish, and that's
21  what they appointed me, to teach medical students, so
22  that's all I know.
23     Q.  So what was it you were called, an assistant --
24     A.  Assistant professor of surgery is what they --
25     Q.  Assistant.

Ralph Silverman, M.D.
July 23, 2021

Page 50

1    For which hospital?
2    A.  St. Louis University.
3    Q.  Now, I know there's steps to go up to get to full
4  professor, right?
5    A.  There are.
6    Q.  Is there anything above full professor that you
7  know of at St. Louis University?
8    A.  I don't know.
9    Q.  How many steps below that are you right now?
10   A.  I'm not even on that track.  I have no idea.
11   Q.  So I always thought it started out with, like,
12 clinical assistant professor of surgery, then you moved
13 up the ladder.  You're not even -- that doesn't even
14 apply to you?
15   A.  Correct, it doesn't apply to me.
16   Q.  Is there a hierarchy or a ladder that -- which
17 would pertain to you?
18   A.  No.
19   Q.  So it's just clinical assistant professor of
20 surgery, and it begins there and stops there?
21   A.  What was the last thing you said?
22   Q.  It begins there and stops there.  It's not like
23 you can move up the ladder at all?
24   A.  Right, it's an unpaid position.  It's a volunteer
25 position.

Page 51

1    Q.  But there's not anything on your track that's
2  above that?  Like, for instance, after two years, you
3  apply for -- I don't know -- whatever's above clinical
4  assistant professor of surgery?
5    A.  I have no idea.  I don't think so.  I have no
6  idea.
7    Q.  How long have you been on staff at St. Louis
8  University?
9    A.  2012.
10   Q.  Oh, sorry.  You told me that.  I apologize.
11     Have you done any research for your opinions in
12 this case?
13   A.  No.
14   Q.  You're a colorectal surgeon.  Is there any
15 sub-interest/specialty that you're more interested in?
16   A.  I am boarded in colorectal surgery.
17   Q.  I mean, is there a subset of that?  Like, you're
18 the subspecialist for oncology cases, or something like
19 that?
20   A.  No.
21   Q.  You spend most -- do you spend most of your time
22 doing -- what?  De -- What procedure do you spend most
23 of your time doing?
24   A.  I spend most of my time seeing patients and
25 performing surgery, in coloscopies.

Page 52

1    Q.  So most of the procedures you do are coloscopies?
2    A.  If you're going by volume as a unit, by itself,
3  the answer would be yes.
4    Q.  Would there be another way to do it, other than
5  by volume of the number of procedures?
6    A.  You can do it by time, Counselor.
7    Q.  Let's do it by time.  What procedure do you spend
8  the most time doing?
9    A.  Colostomies, colon surgery.
10   Q.  How many of those do you do a week on average?
11   A.  Anywhere between four and six.
12   Q.  How many colonoscopies do you do per week on
13 average?
14   A.  Probably 10 to 15.
15   Q.  Oh, have you -- and I know there's an objection
16 to relevance on this, but for discovery, have you ever
17 been sued for malpractice?
18   A.  Twice.
19   Q.  In what states?
20   A.  Missouri.
21   Q.  Have you received any -- Do you have Notice of
22 Intent in Missouri?
23   A.  I'm sorry?
24   Q.  Have you ever heard of a Notice of Intent?
25   A.  No, I don't know what that is.

Page 53

1    Q.  In Michigan, we have something called "Notice of
2  Intent to Sue."  You've never received one of those in
3  Missouri?
4    A.  I don't think so.
5    Q.  Okay.  And the two times you were sued in
6  Missouri, they're not ongoing cases right now, are they?
7    A.  No.
8    Q.  I'm sorry, you said, no?
9    A.  No.
10   Q.  Okay.  So then let me ask you.  Did they go to
11 trial at all?
12   A.  No.
13   Q.  Were -- don't tell me any number if they were
14 settled, but were they settled?
15   A.  I think they were dropped.  My name was dropped.
16   Q.  Do you know -- sometimes you can drop someone's
17 name, but there was still a settlement.  Do you know if
18 there were settlements?
19   A.  I don't know.  I have no idea.
20   Q.  Did you give depositions in those cases?
21   A.  At least one of them I did.
22   Q.  Can you just briefly tell me what the case
23 involved?
24   A.  It involved sepsis and vertical banded
25 gastroplasty.  It happened when I was in residency.

Ralph Silverman, M.D.
July 23, 2021

Page 54

1   Q.  You were a resident at St. Louis at the time?
2   A.  Yes.
3   Q.  How about the other one?  Was it recent?
4   A.  That was -- no, that was not recent either.  It
5  was a surgeon who did two colon resections of the same
6  patient for different pathologies.  I was a covering
7  physician.
8   Q.  Now, in those cases, you weren't the target at
9  all of the lawsuit, either one of them, were you?
10   A.  I was named in them, so I guess I was the target.
11   Q.  Did they claim that you violated the standard of
12  care?
13   A.  I don't recall that particular -- I don't know.
14   Q.  What are you charging for your deposition today?
15   A.  I block out four hours for all depositions.  It's
16  a $2,000 fee.
17   Q.  And does that include your prep time?
18   A.  No.
19   Q.  How much time do you think it took to prepare for
20  your deposition today?
21   A.  Oh, maybe four, maybe five hours.
22   Q.  And what's your hourly rate for that?
23   A.  $500.
24   Q.  And how much time do you think you've put in this
25  case so far?

Page 55

1   A.  I don't know, but they're on the invoices, which
2  we filed with counsel.
3   Q.  Maybe we did.
4       MR. SCARBER:  Just for the record, Dan and
5  Ian, I don't see anything about his payment in here, any
6  invoices, or anything like that.
7       MR. CROSS:  On the retainer letter, there's
8  a check and a statement about payment.  There's a
9  document that says, "Retainer Letter."  It's in there.
10       MR. SCARBER:  Okay.  Thank you.  Sorry about
11  that.  Go ahead.
12       MR. CORBET:  No problem.
13  BY MR. CORBET:
14   Q.  So the case that was from Ohio, I think -- in one
15  of the cases, they quoted you about the amount of your
16  income that comes from the expert work that was
17  somewhere around 25 percent.  Do you remember that?
18   A.  Yep, that's accurate.
19   Q.  So I was going to say, is that still accurate
20  today?
21   A.  Yes.
22   Q.  And the number of reviews you do annually, on
23  average, is what?
24   A.  What was the question?
25   Q.  The number of medical case reviews that you do on

Page 56

1  average for a year is what?
2   A.  I'm probably sent maybe two cases a month to look
3  at.
4   Q.  And how many depositions do you, typically, do a
5  month?
6   A.  Oh, maybe -- I think, maybe one, maybe one every
7  other month or so.
8   Q.  Have you done a trial in the last -- well,
9  probably nobody's done a trial for a year, but before
10  that, how many trials do you think you've appeared in,
11  on average, a year?
12   A.  Over the last 17 years, I've probably been
13  involved in six or seven trials maybe.  That's a guess.
14   Q.  Are you listed on any expert services that you
15  know of?
16   A.  Not to my knowledge.  I don't advertise.
17   Q.  That was my next question.  The number of
18  states -- or the names of the states that you testified
19  in -- so I'm going to guess Tennessee, Ohio and
20  Michigan.  Can you think of any others?
21   A.  I've testified in a lot of states.  I've probably
22  testified in probably close to 35 different states or
23  so.  I can't tell you every single name of them, but,
24  yes, around 35 states or so.
25   Q.  In Michigan, you're aware that -- at least for

Page 57

1  purposes of standard of care testimony, you have to be
2  practicing a majority of your professional time in the
3  specialty to which the defendant that you're testifying
4  about is practicing.  You're aware of that, right?
5   A.  I am aware of that.
6   Q.  So the majority of your professional time, I'm
7  going to guess, is colorectal surgery?
8   A.  Yep, about 70 to 80 percent.  It's a fluctuation,
9  but 70 to 80 percent colorectal surgery, 20 to
10  30 percent general surgery, in that range.
11   Q.  Do you know what specialty Dr. Papendick is?
12   A.  I'm assuming he's some kind of medicine doctor,
13  maybe family medicine, or internal medicine.  I don't
14  know for sure though.
15   Q.  And how about Dr. Krause, do you know what
16  specialty he is?
17   A.  No.
18   Q.  I should say, do you know what specialty he
19  practices?
20   A.  Same answer.
21   Q.  Oh, you said you read the amended complaint in
22  this case?
23   A.  Yes.
24   Q.  You read -- when did you first receive it do you
25  think?

Ralph Silverman, M.D.
July 23, 2021

Page 58

1    A.  I have no idea.
2    Q.  I mean, it's not been in the last couple of weeks
3  though, has it?
4    A.  Probably not.
5    Q.  Did you have it when you wrote your report, your
6  preliminary report in -- sorry.  You don't recall?
7    A.  No.
8    Q.  You did say you saw the deposition notice for
9  yourself?
10   A.  Yes.
11   Q.  You brought all the records -- you've supplied us
12  with all the records you've reviewed in relation to this
13  case?
14   A.  Yes.
15   Q.  Including notes, sticky notes, highlighted notes,
16  dog-ear pages; is that right?
17   A.  I don't have any of those.
18   Q.  Okay.  Everything you have is probably on the
19  computer, I imagine.
20   A.  What's that?
21   Q.  Everything that you reviewed is on the computer?
22   A.  Yes.
23   Q.  Did you review any hardcopies of anything?
24   A.  No.
25   Q.  What a word when we dont review anything --

Page 59

1  hardcopies.  Everything's on the computer, huh?
2        Have you written any articles on this area?
3    A.  Have I read any articles?
4    Q.  No, written any.
5    A.  No.
6    Q.  Did you write any notes in relation to this case?
7    A.  No.
8    Q.  I'm just about done.
9        Thank you, Doctor, for your time.  I appreciate
10  it.
11   A.  No problem.
12       MR. CROSS:  All right.  Did you have
13  anything else, Devlin, or am I good to go?
14       MR. SCARBER:  I guess, if you're going to
15  ask questions, Ian, I'll go after you.
16       MR. CROSS:  Okay.
17             CROSS-EXAMINATION
18  BY MR. CROSS:
19   Q.  So, Dr. Silverman, you testified, the last time
20  you performed a colostomy takedown was last week?
21   A.  Yes.
22   Q.  About how many colostomy takedowns do you perform
23  in a typical month?
24   A.  Well, like I said, it's usually one or maybe two
25  a week.

Page 60

1    Q.  So, perhaps, six per month --
2    A.  Yes.
3    Q.  -- approximately?
4        So that would be almost 70, about, per year?
5    A.  That sounds reasonable.
6    Q.  This year, has anyone who you performed a
7  colostomy takedown on died as a result of the procedure?
8    A.  No.
9    Q.  Did anyone die last year?
10   A.  Not to my recollection.  I don't think I've ever
11  had someone die from a colostomy closure.
12   Q.  How many colostomy closures do you think you've
13  performed over the course of your career?
14   A.  I don't know, but 17 years would be hundreds,
15  obviously.
16   Q.  Are you aware of the risk of death associated
17  with general anesthesia?
18   A.  Yes.
19   Q.  What is the risk of death associated with general
20  anesthesia for an otherwise healthy middle-aged male?
21   A.  It's far less than one percent.  Of course, as
22  you alluded to, that number could rise if you have
23  comorbidities, such as diabetes, or morbid obesity, or
24  something like that, but an otherwise healthy male with
25  no significant medical issues, less than one percent die

Page 61

1  from anesthesia.
2    Q.  And is that -- How do you know that?
3    A.  Training and experience.
4    Q.  Is that something most physicians would know?
5    A.  Yes.
6        MR. SCARBER:  I'm going to place an
7  objection to foundation.
8        MR. CORBET:  Join.
9  BY MR. CROSS:
10   Q.  So I noticed in your report, you mentioned
11  fibrosis of the rectal stump.  Can you explain what that
12  is?
13       MR. SCARBER:  I'm going to place an
14  objection to relevancy.  He's already testified that he
15  didn't have it, but go ahead.
16       MR. CORBET:  Join.
17  BY MR. CROSS:
18   Q.  Go ahead.
19   A.  Basically, when you have abdominal surgery, and
20  you disconnect the rectum, you can have fibrosis and
21  scarring in the abdominal cavity, as well as the pelvis
22  and the rectum.
23   Q.  What is fibrosis?
24   A.  Basically scarring, or tissues turning into
25  thicker -- tissues that are much more difficult to work

Ralph Silverman, M.D.
July 23, 2021

Page 62

1 with --
2     Q.  I'm sorry, I cut you off.  What did you say?
3     A.  -- and don't function as well.
4     Q.  So does scarring, abdominal scarring, make a
5 reversal surgery more difficult in your --
6     A.  It has the potential -- abdominal scarring has
7 the potential for making surgery more difficult, yes.
8     Q.  What are some other factors that might make a
9 colostomy takedown more difficult?
10    A.  Other factors would be -- for example, someone
11 that's morbidly obese, somebody that has had multiple
12 abdominal surgeries in the past, prior to the actual
13 formation of the colostomy, people that are
14 immunocompromised.  I mean, I can go on and on, but all
15 of these things can make colostomy takedown more
16 difficult.
17    Q.  Okay.  So would you agree, that the risks of a
18 colostomy takedown vary from patient to patient?
19    A.  Of course.
20    Q.  You had an opportunity to review some of
21 Mr. Jackson's medical records from after he was released
22 from prison, that's correct?
23    A.  Yes.
24    Q.  Did you notice any difference in his medical
25 condition between the time he was released and the time

Page 63

1 that he was in prison, that would make a colostomy
2 reversal, say, more urgent after he was released?
3         MR. SCARBER:  Let me place an objection,
4 Ian, because I'm going to place an objection to
5 foundation, No. 1, because he's testified that all he
6 saw was the operative report.  I asked him about DMC
7 records.  He didn't say anything about DMC records.
8 He's also testified that he has no evidence suggesting
9 that Mr. Jackson's colostomy reversal was difficult or
10 that he had any issues with it.
11        So I'm going to place an objection to
12 foundation, as well as relevance at this point, and
13 mischaracterizes the witness's testimony.
14 BY MR. CROSS:
15    Q.  You may answer.
16    A.  So I saw no difference in the medical condition.
17    Q.  Did you see any changes in his medical condition
18 over the course of his incarceration that would make it
19 more necessary to perform a reversal at the end of the
20 incarceration than at the beginning?
21        MR. SCARBER:  I'm going to place another
22 objection, to foundation and relevance.
23        MR. CORBET:  Join.
24        MR. SCARBER:  Primarily, because we're only
25 talking about one instance where he tried to have a

Page 64

1 reversal.  He didn't try to get a reversal at the end of
2 his incarceration.  He only tried the first couple of
3 months he was there.  Go ahead.
4         THE WITNESS:  I saw no change in that
5 condition.
6 BY MR. CROSS:
7     Q.  Are you aware of any medical reason for delaying
8 the reversal surgery by two-and-a-half years?
9     A.  No, there was absolutely no reason to delay
10 Mr. Jackson's colostomy reversal.  I would also say,
11 that Dr. Papendick's testimony --
12        MR. SCARBER:  I'm going to place an
13 objection, outside the scope of your question at this
14 point.  It's nonresponsive.  You asked him a question.
15 He's answered it.
16        MR. CORBET:  And this is Corbet, form,
17 foundation.  Sorry, go ahead.
18 BY MR. CROSS:
19    Q.  What was your impression of Dr. Papendick's
20 testimony?
21        MR. SCARBER:  I'm going to place an
22 objection.  That's outside the scope of this witness's
23 role.  He can't have an impression of a witness's
24 testimony.  It's the jury's job.  And the other thing is
25 foundation, and to form.

Page 65

1         MR. CORBET:  Join.
2 BY MR. CROSS:
3     Q.  Doctor, do you remember being asked some
4 questions by Mr. Scarber about your review of
5 Dr. Papendick's testimony?
6     A.  Yes.
7     Q.  Okay.  What were your impressions of
8 Dr. Papendick's testimony?
9         MR. SCARBER:  Same objection.  I asked
10 specific questions about --
11        MR. MARGOLIS:  You've heard the objection,
12 Devlin.  You can put it on the record.  You can let him
13 answer the question.
14        MR. SCARBER:  Foundation.
15        Listen, I've got one attorney there, Larry.
16 I mean, I know I got Dan on my team, but still.  I mean,
17 we still represent different people.
18        MR. CORBET:  Form and foundation.
19 Objection.  This is Dan.
20        MR. SCARBER:  Thanks, Dan.
21 BY MR. CROSS:
22    Q.  Go ahead.
23    A.  I need the question repeated.
24            (Wherein, question is read back
25             upon request.)

Ralph Silverman, M.D.
July 23, 2021

Page 66

1          MR. SCARBER:  Same objection.
2          THE WITNESS:  I saw that Dr. Papendick was,
3  basically, wrong in regards to describing the reasons
4  for why Mr. Jackson couldn't have his colostomy
5  reversed.  I felt there was -- after reading
6  Dr. Papendick's deposition, I saw no evidence in his
7  deposition that he presented, that would cause him
8  reason to not, in fact, let Mr. Jackson have his
9  colostomy reversed, that was any different than when
10  Mr. Jackson left jail/prison.  I don't remember the
11  difference between the two.
12          MR. SCARBER:  Foundation.
13  BY MR. CROSS:
14     Q.  Do you remember Mr. Scarber asking you some
15  questions about whether there is a mandate requiring
16  colostomies to be reversed?
17     A.  Yes, I do recall that line of questioning.
18     Q.  What is your understanding of what a mandate is
19  in the context of those questions?
20     A.  I took that to mean that there's something, in
21  some chapter, that meant that every single colostomy
22  must be reversed no matter what.  That's how I
23  interpreted "a mandate."
24     Q.  What do you mean by a chapter?  A chapter of
25  what?

Page 67

1     A.  Like in some medical textbook, or some resource
2  like that.
3     Q.  If a patient doesn't want to undergo a surgical
4  procedure, regardless of what that surgical procedure
5  is, is there ever a time when they have to undergo the
6  surgical procedure?
7     A.  If they're of sound mind, and can make their own
8  decisions, there's never a time where they have to do
9  that.
10     Q.  Do you write -- you were asked about some notes
11  that Dr. Kansakar or Dr. Weber made following their
12  visits with the plaintiff in this case.  Do you remember
13  that?
14     A.  Yes.
15     Q.  Do you typically write notes when you see a
16  patient in their medical chart?
17     A.  Yes.
18     Q.  And when you write, "No other complaints," what
19  does that mean exactly?
20          MR. SCARBER:  I'm just going to place an
21  objection to foundation.
22  BY MR. CROSS:
23     Q.  I'm sorry, do you ever write, "No other
24  complaints," in your notes?
25     A.  Yes.

Page 68

1     Q.  What do you mean when you say a patient has no
2  other complaints?
3          MR. SCARBER:  Foundation, relevance.
4          MR. CORBET:  And form.
5          THE WITNESS:  Typically, when I say, "no
6  other complaints," me, personally, I will say -- like,
7  for example, "no other complaints," I'm referring to,
8  like, no chest pain, or no shortness of breath, or no
9  leg pain, or claudication.  Typically, as a surgeon, I'm
10  writing that, "no other complaints," because I'm giving
11  a reason why the patient could, in fact, have surgery.
12  BY MR. CROSS:
13     Q.  I see.  So "no other complaints" sort of means,
14  no other symptoms that the patient has communicated to
15  you?
16          MR. SCARBER:  Foundation.
17          THE WITNESS:  Correct.
18          MR. SCARBER:  Relevance.  His personal
19  practice is --
20          THE REPORTER:  I'm sorry?
21          MR. SCARBER:  I said, his answer's outside
22  the scope of the question, but go ahead.
23  BY MR. CROSS:
24     Q.  If you had a stoma, would you seek a reversal
25  surgery?

Page 69

1          MR. SCARBER:  I'm just going to place an
2  objection.
3          THE WITNESS:  Are you talking about
4  personally?
5  BY MR. CROSS:
6     Q.  Yes.
7          MR. SCARBER:  Let me make my objection.
8  Object to foundation and relevance.  Go ahead.
9          MR. CORBET:  And form.
10          THE WITNESS:  I, personally, would like my
11  stoma reversed.  In my experience, I will tell you that,
12  the overwhelming majority, I'd venture to say,
13  99 percent of people who have had stomas would like them
14  reversed.
15  BY MR. CROSS:
16     Q.  Why would -- or let me ask it this way.  Why do
17  the overwhelming majority of your patients want to have
18  their stoma reversed?
19          MR. SCARBER:  Foundation.  Go ahead.
20          MR. CORBET:  Form and foundation, and
21  relevance.
22          THE WITNESS:  Because people want their
23  stomas reversed because they can be difficult to manage,
24  they require a lot of upkeep, they require having a
25  constant supply of -- supplies to change the stoma.

Ralph Silverman, M.D.
July 23, 2021

Page 70

1 They can leak, they can be embarrassing, they can smell,
2 and cause social anxiety and psychological issues; and
3 we have teams of people, clinics that we send patients,
4 just for these particular issues.
5 BY MR. CROSS:
6    Q. So would you agree that having a colostomy
7 involves suffering?
8           MR. SCARBER: I'm just going to place an
9 objection to form and foundation.
10          MR. CORBET: Join.
11          THE WITNESS: That question is based on my
12 experience over the last 17 years, dealing with patients
13 with colostomies; that, in fact, there is a significant
14 amount of suffering that goes with them, and social
15 disability.
16 BY MR. CROSS:
17    Q. And you testified that you refer patients with
18 colostomies to special treatment providers to deal
19 specifically with those social and personal issues
20 associated with having a bag?
21    A. Yes. So people we send them to not only help
22 them with the appliances, and what is the most secure
23 appliance, and things that they can live with, and they
24 also help them socially, and what things you can and
25 can't do, and things like that.

Page 71

1    Q. Okay.
2           MR. CORBET: Form and foundation by the way,
3 sorry.
4           MR. CROSS: I don't think I have any further
5 questions. I may have some follow-up if there is
6 recross.
7              REDIRECT-EXAMINATION
8 BY MR. SCARBER:
9    Q. Doctor, are you aware that Mr. Jackson was
10 actually offered some kind of social counseling, and
11 counseling to help him cope with having the colostomy,
12 and he did not want it when he was in the Michigan
13 Department of Corrections?
14    A. I do recall reading something along those lines.
15    Q. And the patients that you refer to these
16 psychological programs or coping programs, these people
17 that you are referring, these are people that want to
18 get the help, so that they can learn how to cope with
19 this stuff, right, with having this colostomy?
20    A. You mischaracterized when I said, "these people."
21 There are stoma clinics. They help them with the stomas
22 and the pouches and the supplies, but they also help
23 them psychologically and socially with the stomas; and
24 the answer is, yes, the overwhelming majority would want
25 to go to those particular programs.

Page 72

1    Q. Because if you're having some kind of emotional
2 problem, or psychological problem, or a problem coping;
3 if you're really having an issue, you want to get help
4 with that, as a patient?
5    A. Some people want to, some people don't. I send
6 -- patients a lot of times will want to go to these
7 places initially for help with the actual pouch, we call
8 pouching, but then they provide another service on top
9 of that. Whenever we have a colostomy --
10    Q. Doctor, my question is very simple.
11    A. I find that rude that you would cut off my
12 answer.
13    Q. Well, welcome to --
14    A. I'm just trying to elaborate --
15    Q. I didn't ask you to elaborate. I asked you a
16 question; and when I ask questions, I try to get an
17 answer to the question. I don't want to be rude, but
18 you started going off on something else that I didn't
19 ask you.
20       My question is -- you may have answered it.
21 That's why I stopped you, because --
22    A. Go ahead.
23    Q. -- I lose your answer when you keep going on and
24 on.
25       My question is, people that you typically refer

Page 73

1 to these particular coping programs, who help them with
2 the stoma, who --
3    A. You're mischaracterizing it again. So I will
4 answer this question when you characterize it the right
5 way.
6    Q. The people that you refer out to get assistance
7 with their stoma, and who, on top of that service, also
8 help them with dealing with the stoma, the patients you
9 send to these places, these are patients that want to
10 get that kind of assistance, correct?
11    A. I was trying to answer that question.
12    Q. Yes or no?
13    A. No.
14    Q. They don't want that assistance?
15    A. I will elaborate if you want me to.
16    Q. Yes or no, do the people you send these people --
17 you send your patients to, who provide this --
18    A. I send all of my colostomy patients, ileostomy
19 patients to these people for helping with the pouching
20 system. All of them go. On top of that, they will
21 offer some psychosocial things on top of that. Most of
22 the people, overwhelming majority of the people, want to
23 go when I offer that assistance.
24    Q. Thank you.
25       Another question --

Ralph Silverman, M.D.
July 23, 2021

Page 74

1    A.  That's the elaboration that you wouldn't let me
2  do.
3    Q.  Another question for you.  In the Gysegem
4  opinion, the court also indicated --
5          MR. CROSS:  Objection.  This is outside of
6  cross.
7  BY MR. SCARBER:
8    Q.  -- quote, "Dr. Silverman lacks the credentials of
9  opposing experts.  Dr. Silverman does not currently
10  teach any surgery or any general surgery residents, and
11  Dr. Silverman has never taught fellows in any
12  specialty."  This is actually in response to
13  Mr. Corbet's question.
14       Is that true, Doctor, that you have never -- you
15  don't currently teach any general surgery residents, and
16  have never taught any fellows?
17    A.  That's absolutely true.  The only people I've
18  taught, which I've testified truthfully to, is medical
19  students.  Absolutely true.
20    Q.  Do you treat any individuals in the Department of
21  Corrections?
22    A.  No.
23    Q.  No?  I didn't hear you, I'm sorry.
24    A.  Oh, I said no, and I'm thinking about it, but
25  I've never had a prisoner -- I may have had one or two

Page 75

1  consults in the hospital over the last 17 years of a
2  prisoner, but I have no independent recollection of it.
3    Q.  In any event then, Doctor, it's not something
4  that -- that's not a particular practice that you have a
5  whole lot of experience, or maybe any experience doing,
6  correct?
7    A.  Right.
8    Q.  Are you aware of the circumstances that prisoners
9  have to undergo when they're in the prison system, in
10  terms of being exposed to a greater degree of infection,
11  being exposed to a greater degree of injury, things like
12  that?
13    A.  If the question is, Do I have objective knowledge
14  of that, I don't.  I have perceptions, but not objective
15  knowledge.
16    Q.  What is your perception of that?  Do you perceive
17  or --
18    A.  I perceive that prisons can be potentially
19  dangerous places.  That's all --
20    Q.  So my question --
21    A.  But it's a perception.  It's not based in
22  reality.  I've never been in prison.  I don't have an
23  inner understanding of prisons and jails, and things
24  like that.
25    Q.  And prisons can be more dangerous places than for

Page 76

1  a patient who has a surgery, gets to go home for three
2  weeks and recover, and go on with his life, right?
3  Correct?
4    A.  I don't know.  I have no idea.
5    Q.  Someone who you perform a surgery on is going to
6  get to go home, be taken care of by their family maybe,
7  and --
8    A.  So the perception I have would be maybe that --
9  and, again, I don't know.  Maybe you have surgery, and
10  you recover for a few days in the hospital, maybe go --
11  I don't know where you go after that.
12    Q.  Okay.  But you would agree that their perception
13  would be that it's going to be a little bit different
14  for a prisoner who undergoes a surgery and has to return
15  to prison versus the average patient you would have, or
16  a routine patient that you would have, that you would
17  perform the surgery and they would just go home?
18    A.  I would not expect a prisoner to go home after
19  surgery, that is correct.
20    Q.  You would expect that prisoner to go back to --
21  probably what would be a more populated area, and a more
22  dangerous area, right, after having a surgery?
23    A.  I have no idea where they go.  I don't know if
24  they go to a step-down, they go to a hospital infirm.  I
25  don't know.  I have no idea.

Page 77

1    Q.  Okay.  So you really -- I guess what you're
2  saying, you really have no idea --
3    A.  I think I've answered that pretty clearly.  I
4  have no idea.
5    Q.  You have no idea what's happening in these
6  prisons, correct?
7    A.  I have never been there.  I don't know what's
8  happening in prisons.
9    Q.  Okay.  You indicated something about, if
10  Dr. Papendick determined -- and you might have
11  indirectly said this, but I just want to be clear.  I
12  think you indicated that, if Dr. Papendick had made some
13  kind of different decision, that the patient would have
14  gotten a reversal surgery.  Did you suggest that, or did
15  I hear that wrong?
16    A.  I don't recall.  I don't recall that line of
17  questioning.
18    Q.  Are you aware, Dr. Silverman, that the MDOC
19  itself, the Illinois Department of Corrections, has
20  their own policies about which particular types of
21  procedures they will approve, and the procedures for how
22  those particular surgeries get approved, and they go
23  beyond Dr. Papendick?
24    A.  I am not holding myself out to understand the
25  inner workings of the Department of Corrections, and

Ralph Silverman, M.D.
July 23, 2021

Page 78

1  their policies, and the things you just mentioned.
2      Q.  So nothing you were testifying to was implying
3  something about there being some type of policies on
4  behalf of the healthcare company that has to work within
5  the prison, or the Michigan Department of Corrections'
6  policies themselves, correct?
7      A.  I have not given any opinions on the Michigan
8  Department of Correction policies.
9      Q.  Okay.  And no written policies, or anything like
10 that on behalf of the healthcare providers who provide
11 any kind of care within the prison, correct?
12     A.  I have not opined on any policies.
13     Q.  Thank you.
14         I just want to -- you're not aware of Mr. Jackson
15 having any issues with constipation, polyps, bleeding,
16 open sores, bloody sores, stoma issues, while he was in
17 the Michigan Department of Corrections or the jail, are
18 you?
19     A.  No, just the bleeding from the assault, nothing
20 else on that list.
21     Q.  And this bleeding that we're talking about from
22 the assault, you're aware that he was sent to the
23 emergency room by the healthcare providers in the prison
24 the same day, and he had no issues following that with
25 respect to any injuries or damages to his colostomy

Page 79

1  area?
2      A.  I'm aware of that.
3      Q.  You would also agree with me that he had no
4  profuse bleeding from his stoma?
5      A.  Right.
6      Q.  You would agree with me that he had nothing
7  saying that his colostomy bag was always, or was ever
8  full of any blood that you saw from a medical record,
9  right?
10     A.  I don't recall.
11     Q.  You would agree that he didn't develop any
12 complications at his stoma site, right?
13     A.  Yes.
14     Q.  I looked through the document that Mr. Cross
15 referenced, called the "Retainer Letter," and I did not
16 see anything in this letter, other than a letter dated
17 November 20th, 2020, when you were originally sent the
18 case, it sounds like, and a check for $2,500.
19         Do you have any subsequent billing in this case,
20 or invoices in this case with respect to your review or
21 anything like that?  I know we paid you to be here.
22     A.  I don't think so.
23     Q.  Okay.  You haven't -- How much are you charging
24 for the preparation time that you have put in thus far?
25     A.  We talked about that.  It was about five or six

Page 80

1  hours.
2      Q.  And that's what you think your rate is going to
3  end up being?
4      A.  Yes.
5      Q.  Nothing further.  Thank you, Doctor.
6         MR. CORBET:  Can you hear me, Doctor?  I
7  have some follow-up.  This is Dan Corbet.
8         THE WITNESS:  Yes, Dan.
9              RECROSS-EXAMINATION
10 BY MR. CORBET:
11     Q.  Would you agree that there is no consensus
12 regarding the timing of reversal of Hartmann's
13 procedure, as of 2015 anyways?
14     A.  I would think that the consensus, if there's no
15 contraindications, depending on the disease process,
16 would be to reverse in around two months.
17     Q.  You would agree -- so you disagree with that
18 statement that I just made, correct?
19     A.  Correct.  And I would also elaborate to say, that
20 it's safest to wait at least two months to reverse them.
21     Q.  Okay.  Many studies reported a median time to the
22 reversal procedure of nine months; is that right?
23     A.  Are you talking about averages, or are you
24 talking about when it's safest to?
25     Q.  A median time.  So it's neither.  It's median.

Page 81

1  Median means halfway point, right?
2      A.  Yeah.  So if you're asking, When does the average
3  stoma get -- a median stoma -- I guess that's what
4  you're quoting there.  I don't know that.
5      Q.  This patient --
6      A.  I would also go on to say, Counselor, that all of
7  the different reasons for why colostomies may be formed
8  are inside of that data, not just one particular disease
9  process.
10     Q.  I'm sorry, did I ask you that question?  Can you
11 hear me, Doctor?
12     A.  Yes.
13     Q.  Did I ask you that question?
14     A.  You're asking me about data, so I have to be able
15 to interpret the data that you're quoting from.  So I
16 have to make sense of the data that I have not had a
17 chance to read, that you get to read off of that.
18     Q.  So my question was, do you agree with that
19 statement, and then you elaborated on something that I
20 didn't ask, and now I understand Mr. Scarber's
21 objections to you --
22     A.  Counselor --
23     Q.  -- elaborate.
24     A.  Because I haven't seen the document.
25     Q.  Okay.  So that's why I'm not asking you about a

Ralph Silverman, M.D.
July 23, 2021

Page 82

1   particular document.  I'm just asking you if you agree
2   that many studies -- First of all, this patient had a
3   Hartmann procedure, correct?
4       A.  Yes.
5       Q.  And so, as a result of the Hartmann procedure,
6   part of that is, a colostomy was formed, correct?
7       A.  That's the definition of a Hartmann.
8       Q.  Okay.  Thank you.
9           So you disagree with the statement that there is
10  no consensus regarding the timing or reversal of
11  Hartmann's procedure, correct?  You disagree that?
12      A.  Yes.
13      Q.  And you didn't come here today with any
14  literature to support your opinion, did you?
15      A.  No.
16      Q.  Even though I think the deposition notice asked
17  you to bring whatever documents you have.  You know
18  what, I don't want to -- let me see what it actually
19  says for sure.
20          I'll leave that one alone.  I'm reading the dep
21  notice right now.  I'm not sure it's that specific, so
22  let me go back to my question; and my question is, you
23  would disagree that many studies reported a median time
24  to the reversal procedure of nine months.  Do you agree
25  with that or you don't agree with that?

Page 83

1       A.  I can't comment on that without reading what
2   you're reading.
3       Q.  Do you agree that delayed reversal has been
4   advocated in several studies?
5       A.  No context.  I can't comment on that.
6       Q.  So I'm talking about the reversal -- it's talking
7   about reversal of a colostomy in somebody who's had a
8   Hartmann procedure.  You can't comment on whether or not
9   there is some -- several studies have advocated delayed
10  reversal.  You don't know that one way or another,
11  correct?
12      A.  I would need context; and, specifically, what are
13  the reasons the colostomy was made, and what
14  comorbidities we're looking at.  There's a lot of
15  context that you're not giving me.
16      Q.  How about if I added, the reasons included less
17  dense adhesions, and more time to optimize the clinical
18  and nutritional status of the patient?  Does that give
19  you enough context to answer, that delayed reversal has
20  been advocated in several studies?
21      A.  There's no context in there at all, actually,
22  Counselor.
23      Q.  Okay.  So you can't say you are aware or you're
24  not aware that delayed reversal has been advocated in
25  several studies regarding the Hartmann procedure?

Page 84

1       A.  That is correct.  I cannot say that.
2       Q.  But you can't say you haven't seen studies like
3   that?
4       A.  I'm not seeing the studies that you're
5   particularly talking about, nor the disease processes
6   for why the Hartmann's procedures were performed in the
7   first place; and by the way, the variables that you're
8   talking about, that you're asking me to opine about; for
9   example, nutritional status, intraabdominal scarring,
10  has nothing to do with the case that we're talking
11  about.
12      Q.  And it says, "In our patients, time until
13  reversal was shorter for diverticulitis compared with
14  cancer, 6 months versus 12 months."
15          You can't agree with that, can you?
16      A.  I can agree with that, because you've given me
17  context as what the disease process [sic].  Surely
18  reversals for Hartmann's, secondary to diverticulitis,
19  is far less than those that have rectal or colon cancer,
20  who, more likely than not, are receiving chemotherapy or
21  radiation because they had a Hartmann's in the first
22  place, which meant it was either obstructing, or
23  something along those lines, which is advanced cancer.
24      Q.  Okay.  But this says 6 months versus 12 months.
25  You disagree with that, correct?

Page 85

1       A.  Six months for diverticulitis?
2       Q.  And 12 months for cancer.
3       A.  All I'm going to agree to is that, you would wait
4   longer for colon cancer or rectal cancer, then you would
5   have to individualize the patient for each of those
6   disease processes.  Again, the overwhelming majority of
7   colostomies are reversed within two or three months of
8   formation for diverticulitis.
9       Q.  So if it's a patient who's got diverticulitis,
10  the reason advocated in several studies for waiting
11  longer -- I guess it doesn't say what delayed reversal
12  is, but delayed reversal in diverticulitis patients has
13  been advocated in several studies.  One of the reasons
14  is less dense adhesions.  Do you understand that
15  context?
16      A.  Yes.
17      Q.  So if there is an article out there that says
18  that, you would disagree with it, correct?
19      A.  I don't understand what exactly you're reading,
20  Counselor.  I will tell you that the overwhelming
21  majority of patients with Hartmann procedures from
22  diverticulitis can be safely reversed around eight
23  weeks.
24      Q.  Why would somebody write that it would be -- a
25  median time to the reversal procedure would be nine

Ralph Silverman, M.D.
July 23, 2021

Page 86

1  months?
2           MR. CROSS:  Objection, calls for
3  speculation.
4           MR. CORBET:  I heard a lot of speculative
5  answers today.
6           THE WITNESS:  And I would need to look at
7  the studies that you're referring to; and it looks like
8  what you are citing is a meta-analysis, which means it's
9  a paper that's looking at multiple studies.  In order to
10  answer the question appropriately, you would want to see
11  what each study is actually saying.
12  BY MR. CORBET:
13     Q.  Did you bring any studies with you today?
14     A.  No, and you're not supplying me with any either,
15  just asking me to comment on them without looking at
16  them.
17     Q.  And you are retained by the plaintiff to be an
18  expert in this case, correct?
19     A.  Yeah, we've already covered that, Counselor.
20     Q.  I'm just putting it in context at this point in
21  time.
22           So you would want to do the reversal, if you're
23  going to do it, if there were less dense adhesions,
24  correct?
25     A.  You would want -- based on the patient, you want

Page 87

1  to wait until they're recovered from their colostomy
2  procedure, and you want to wait until the intraabdominal
3  inflammation, which is probably the adhesion, is at its
4  lowest, and that's usually at least around eight weeks
5  or so, which is when Dr. Kansakar was going to reverse
6  Mr. Jackson in the first place, at least temporarily.
7  Tentatively scheduled I should say.
8     Q.  Did I ask that question?
9     A.  That's part of my answer.
10     Q.  Move to strike, beyond the scope of the question.
11           Did I hear that one of the courts found that you
12  were biassed and not credible?  Do you remember that
13  part of your deposition, Doctor?
14     A.  Yep.
15     Q.  Did you ever hear that from the attorney that
16  retained you in the case?
17     A.  No.
18     Q.  Today is the first day that you've ever heard
19  anybody ask you about that decision?
20     A.  Correct.
21     Q.  Do you know when you testified in that case, how
22  many years ago it was?
23     A.  I believe counselor mentioned around 2018.
24     Q.  How many depositions have you done in the last
25  three years do you think?

Page 88

1     A.  I usually do one or two maybe a month.  It hasn't
2  changed in the last three years.
3     Q.  So you're not aware of any -- you're not aware of
4  any studies out there that would suggest it would be
5  better to wait more than three months to reverse a
6  Hartmann's procedure in a patient who had
7  diverticulitis?
8     A.  Correct.
9     Q.  Would that be a breach to the standard of care if
10  a surgeon was to wait more than three months to reverse
11  a Hartmann's procedure in a patient who had
12  diverticulitis?
13     A.  It depends on the patient's individual factors
14  and whatnot.  I can't answer that.  Lots of -- I can
15  tell you that lots of patients with diverticulitis, who
16  have had Hartmann's procedures for one reason or
17  another, do not need to wait longer than three months.
18     Q.  Why is that?
19     A.  Maybe it's individual factors, maybe they're
20  immunocompromised, maybe they're morbidly obese and
21  asked to lose weight, maybe they have uncontrolled
22  diabetes, and diabetes should be better controlled
23  before they actually undergo the colostomy reversal.
24  There's a host of reasons why you could wait.
25     Q.  Thank you.  I'm done.  I appreciate your time,

Page 89

1  Doctor.
2           MR. CROSS:  I just have some brief cross.
3              RECROSS-EXAMINATION
4  BY MR. CROSS:
5     Q.  You testified that, by the time -- the
6  appropriate amount of time to wait before reversing a
7  stoma is dependent on the reasons that the stoma was
8  placed, correct?
9     A.  Yes, that is one of many reasons, one of many
10  things you would look at.
11     Q.  What other things would you look at?
12     A.  I don't understand the question.
13     Q.  Okay.  You said that the reason that you placed
14  the stoma is one thing that you would look at in
15  determining the appropriate amount of time to wait
16  before performing a reversal surgery?
17     A.  Correct.
18     Q.  What are some other factors that you would look
19  at besides that one?
20     A.  You would look at their overall health, their
21  comorbidities; for example, diabetes, hypertension,
22  asthma, emphysema, COPD, those kinds of things.  You
23  would want to make sure their medical issues were
24  well-managed and controlled.  You would want to make
25  sure that they are of appropriate weight so you can

Ralph Silverman, M.D.
July 23, 2021

Page 90

1  decrease your incidence of wound infections and hernias.
2  You would want to make sure that they have had proper
3  nutritional support, if, in fact, they require that at
4  all.  Usually, that's for our very sick patients at the
5  extremes of age.  So those are some of the things that
6  you would look at before making a decision to reverse a
7  colostomy, or ileostomy, or a stoma, if you will.
8      Q.  And in looking at Mr. Jackson's records that you
9  reviewed in this case, did you see any medical reason to
10 delay the reversal?
11         MR. SCARBER:  I just want to place an
12 objection, asked and answered, but go ahead, Doctor.
13         MR. CORBET:  And form and foundation.
14         THE WITNESS:  I see no evidence in the chart
15 why there was a contraindication for reversing
16 Mr. Jackson's colostomy.
17         MR. CROSS:  Okay.  I don't have any further
18 questions.  Thank you.
19         MR. SCARBER:  Nothing from me.  Thanks a
20 lot, Doctor.
21         MR. CORBET:  Just a little bit of follow-up
22 on that.
23             RECROSS-EXAMINATION
24 BY MR. CORBET:
25     Q.  I see that we were sent some of the DMC records.

Page 91

1  Were you sent those DMC records too?
2      A.  I don't recall.
3      Q.  The only thing I think you said you saw from the
4  DMC records was the operative report; is that true?
5      A.  I did say that.
6      Q.  Did you see that today for the first time, or
7  have you seen that in the past?
8      A.  I think I've seen it in the past.
9      Q.  And what set of records?  Because we're looking
10 at your records that were emailed to us.
11     A.  I don't recall.
12     Q.  Is it possible, you saw it today for the first
13 time when Mr. Scarber showed it to you?
14     A.  I think it's possible, but I think I saw it
15 before.  I answered truthfully.
16     Q.  What set of records do you think you saw it in?
17     A.  Asked and answered.  I don't recall.
18     Q.  Okay.  I'm sorry, Doctor.  Thank you very much
19 for your time.
20             REDIRECT-EXAMINATION
21 BY MR. SCARBER:
22     Q.  Let me ask you a question, Doctor.  Did you write
23 the report, or did Mr. Cross, or someone in plaintiff's
24 office write it for you?
25     A.  I wrote the entire report and signed it.

Page 92

1      Q.  For you to have written the report, assuming that
2  you wrote the report, right, that means that you would
3  have had to have the records in front of you, that you
4  would have needed in order to be able to say the things
5  you said in this report?
6      A.  I'm assuming so.
7      Q.  I got nothing further.
8          MR. SCARBER:  E-tran.
9          THE REPORTER:  Copies?
10         MR. CROSS:  Yes.
11         MR. CORBET:  I would like a copy, please
12 e-tran, four per page.
13             (FURTHER DEPONENT SAITH NOT.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1  STATE OF ILLINOIS      )
                          ) SS:
2  COUNTY OF DUPAGE       )
3
4      I, ROBIN HEJNAR, a Certified Shorthand Reporter
5  and Registered Professional Reporter do hereby certify:
6      That prior to being examined, the witness in
7  the foregoing proceeding was by me duly sworn to testify
8  to the truth, the whole truth, and nothing but the
9  truth;
10     That said proceedings were taken remotely
11 before me at the time and places therein set forth and
12 were taken down by me in shorthand and thereafter
13 transcribed into typewriting under my direction and
14 supervision;
15     I further certify that I am neither counsel
16 for, nor related to, any party to said proceedings, not
17 in anywise interested in the outcome thereof.
18     In witness whereof, I have hereunto subscribed
19 my name.
20 Dated:  August 6, 2021
21
22  Robin Hejnar
23  _____
    ROBIN HEJNAR, RPR
24  CSR No. 084-004689
25

Ralph Silverman, M.D.
July 23, 2021

**Exhibits**

EX A Ralph Si
lverman, M.D.
072321
3:17 12:1
EX B Ralph Si
lverman, M.D.
072321
3:18 12:11

**$**

$2,000
54:16
$2,500
79:18
$500
54:23

**1**

1
63:5
10
52:14
100
6:10 29:17
12
84:14,24
85:2
15
52:14
152
36:13
17
22:9 56:12
60:14 70:12
75:1
1998
6:13 14:5
19th
28:3

**2**

20
37:9 57:9
2003-ish
43:23
2004
6:10 14:6
2012
51:9
2012-ish
49:20
2015
80:13
2016
23:20 29:21
2017
20:20 21:1
23:12,14,22,
23 24:4,9,12
29:22 31:3
2017/march
20:20
2018
35:7 36:1
87:23
2018-00113JD
36:12
2019
26:23 28:3
30:23 32:19
33:1 40:8
2020
8:13,15
11:18 36:11,
12 40:7
46:14 79:17
20th
79:17
25
37:9 55:17

**3**

30

57:10
334243
36:2
35
56:22,24

**5**

57
36:2
574
28:4
575
33:22
579
28:4

**6**

6
84:14,24

**7**

70
57:8,9 60:4

**8**

80
57:8,9
85
6:10
8th
36:11

**9**

95
37:11
99
69:13
9th
35:7

**A**

abdominal
26:4 61:19,
21 62:4,6,12
able
21:6 81:14
92:4
above
50:6 51:2,3
absolutely
24:7 29:17
38:6,8 39:15
41:17 64:9
74:17,19
academic
49:13,14
accident
33:3
accurate
55:18,19
accurately
19:7
acknowledge
17:15
action
44:3
actual
8:8 12:14
13:6 23:10,
17 62:12
72:7
added
83:16
address
6:17
adhesion
87:3
adhesions
83:17 85:14
86:23
admits
38:2
advanced
84:23

Ralph Silverman, M.D.
July 23, 2021

adverse
31:2
advertise
56:16
advocated
83:4,9,20,24
85:10,13
affects
39:3
affiliated
6:24
afterwards
43:1
age
90:5
ago
87:22
agree
8:24 9:9,13
14:24 15:1,
15 16:20
17:12 26:3
62:17 70:6
76:12 79:3,
6,11 80:11,
17 81:18
82:1,24,25
83:3 84:15,
16 85:3
ahead
21:17,20
22:3 55:11
61:15,18
64:3,17
65:22 68:22
69:8,19
72:22 90:12
ahold
49:9
allegations
42:25
alleging
31:9,14 32:5
42:24
allowed
5:7 34:12,
19,24

alluded
60:22
amended
7:9,24 57:21
American
44:11,12
amount
55:15 70:14
89:6,15
anesthesia
40:1,16
60:17,20
61:1
annually
55:22
answer
10:7 12:17,
22 13:2,18
15:23,25
16:1,3,8,9
19:7 21:13,
19,22 22:2,
4,7,12,15
26:15 31:23,
24 40:14
52:3 57:20
63:15 65:13
71:24 72:12,
17,23 73:4,
11 83:19
86:10 87:9
88:14
answer's
10:7 15:19
68:21
answered
14:2 22:11
40:4 64:15
72:20 77:3
90:12 91:15,
17
answering
21:14,18
answers
86:5
anxiety
21:4 23:1,9,

25 24:1 70:2
anybody
10:6 44:6,9,
13 87:19
anyone
60:6,9
apologize
51:10
Appeals
35:7
appeared
56:10
appearing
5:21
appendectomie
s
38:1,14
appliance
70:23
appliances
70:22
apply
50:14,15
51:3
appointed
49:21
appointment
47:15 49:13,
14,20
appointment/
medical
47:24
appointments
48:12
appreciate
16:10 27:15
40:5 42:9
43:5 59:9
88:25
appropriate
89:6,15,25
appropriately
86:10
approve
77:21
approved
77:22

approximately
60:3
April
20:20 21:1
23:12,22
24:4,9,11
area
8:21 37:5
38:12 59:2
76:21,22
79:1
armed
48:17,25
around
11:18 43:24,
25 55:17
56:24 80:16
85:22 87:4,
23
arrive
9:14 13:8
art
13:7
article
85:17
articles
17:5,14,16
59:2,3
asked
40:4 46:7
63:6 64:14
65:3,9 67:10
72:15 82:16
88:21 90:12
91:17
asking
6:17 13:17
15:16,22,25
16:6,11,18
22:5 66:14
81:2,14,25
82:1 84:8
86:15
assault
48:20 78:19,
22

Ralph Silverman, M.D.
July 23, 2021

assaulted
21:8
asserts
38:1
assist
19:21,24
assistance
73:6,10,14,
23
assistant
49:15,23,24,
25 50:12,19
51:4
associated
60:16,19
70:20
assuming
46:18 57:12
92:1,6
asthma
89:22
attack
26:2 27:21
attorney
15:21 16:13
42:6 65:15
87:15
attorneys
5:21
authority
48:11
available
9:21 10:6
average
52:10,13
55:23 56:1,
11 76:15
81:2
averages
80:23
aware
19:25 20:9,
20 24:2
27:19 29:15,
22,25 30:4,8
31:8,13
32:4,9,22

33:6,16,25
34:3 39:5,8,
11 46:20
47:1 56:25
57:4,5 60:16
64:7 71:9
75:8 77:18
78:14,22
79:2 83:23,
24 88:3

## B

back
11:17 20:19
21:1 23:6,
11,19 24:8
27:10,14
31:3 34:17
43:9 48:4
49:2 65:24
76:20 82:22
bad
45:12,20
bag
70:20 79:7
banded
53:24
Baptist
7:2
bar
16:16
based
8:25 10:20,
25 15:7
20:18 47:10
70:11 75:21
86:25
basically
14:15 34:7
61:19,24
66:3
Beaumont
43:18
beginning
63:20

begins
50:20,22
behalf
37:12 78:4,
10
belief
10:2
believe
8:16 10:21,
24 11:5 14:4
27:5 32:11
34:21 40:18
87:23
bell
36:14
below
50:9
benefit
20:12
benefits
14:12,16
27:20
besides
89:19
better
6:4 88:5,22
bias
39:3
biased
36:22
biassed
39:7 40:24
87:12
billing
79:19
bit
76:13 90:21
bleeding
78:15,19,21
79:4
block
54:15
blood
23:13 79:8
bloody
78:16

board
43:19,21
boarded
51:16
boards
16:16
border
34:16,19
breach
11:1 88:9
breached
10:22
breath
68:8
brief
89:2
briefly
53:22
bring
7:6 82:17
86:13
brought
7:3,7 58:11
business
39:13

## C

call
18:18 19:2,
10 72:7
called
35:6 40:24
49:23 53:1
79:15
calls
20:9 86:2
cancer
84:14,19,23
85:2,4
Cansicar
14:21 17:4
Cansicar's
12:18
car
33:2

Ralph Silverman, M.D.
July 23, 2021

care
  10:22 11:1
  12:2 13:7,16
  18:8 19:12,
  14 38:18
  47:24 54:12
  57:1 76:6
  78:11 88:9
career
  37:17 38:2,
  4,8,15 60:13
case
  5:12,14
  8:12,19
  9:17,18
  10:16 12:15
  14:9,21 17:3
  18:1,9 20:1
  24:21 34:13,
  22 35:3,4,5,
  6,8,15 36:1,
  8,11,17,21
  37:3,10,14,
  20 38:22,25
  39:12 40:22
  49:4 51:12
  53:22 54:25
  55:14,25
  57:22 58:13
  59:6 67:12
  79:18,19,20
  84:10 86:18
  87:16,21
  90:9
Caselaw
  34:14
cases
  38:25 44:16,
  20 49:6
  51:18 53:6,
  20 54:8
  55:15 56:2
causing
  21:9
cavity
  61:21
Center
  8:10 36:9

certain
  12:24 15:25
certainly
  16:9
certified
  43:19,21
chance
  30:13 81:17
change
  64:4 69:25
changed
  88:2
changes
  63:17
chapter
  66:21,24
characterize
  73:4
charging
  54:14 79:23
chart
  15:4 67:16
  90:14
charts
  17:17
check
  55:8 79:18
chemotherapy
  84:20
chest
  68:8
circumstances
  75:8
cite
  35:25 36:12
citing
  86:8
City
  43:12
claim
  37:15 54:11
claiming
  32:12,15
claims
  31:9 32:5
  36:10

Clair
  7:1 25:5
  42:15,19
  47:14
claudication
  68:9
clear
  77:11
clearly
  77:3
clinic
  6:20
clinical
  15:4 49:15
  50:12,19
  51:3 83:17
clinics
  70:3 71:21
close
  56:22
closure
  60:11
closures
  60:12
Colleen
  46:21 48:11
College
  44:12
colocecostomi
es
  38:2,4,14
colon
  52:9 54:5
  84:19 85:4
colonoscopies
  52:12
colorectal
  8:22 34:23,
  25 35:23
  38:7 43:15,
  20 44:11
  51:14,16
  57:7,9
coloscopies
  51:25 52:1
colostomies
  52:9 66:16

70:13,18
  81:7 85:7
colostomy
  12:15 14:12,
  23 15:3,5,12
  16:22 17:19
  20:4,7 21:2,
  5,7,8 23:11,
  18 24:14
  25:13 26:23
  27:2 28:6,14
  29:3,6,11,
  12,14,16,17,
  23 31:10,15
  32:7,19,21,
  22 33:15,16
  39:15 41:7,
  24 42:2,3
  46:23 48:22,
  23 59:20,22
  60:7,11,12
  62:9,13,15,
  18 63:1,9
  64:10 66:4,
  9,21 70:6
  71:11,19
  72:9 73:18
  78:25 79:7
  82:6 83:7,13
  87:1 88:23
  90:7,16
come
  17:18,20
  18:8,14,17
  82:13
comes
  55:16
comfort
  47:11
comment
  83:1,5,8
  86:15
comments
  10:11
communicated
  68:14
comorbidities
  60:23 83:14

Ralph Silverman, M.D.
July 23, 2021

89:21

**company**
42:18 78:4

**compared**
84:13

**complaint**
7:9,24 44:6,
13 57:21

**complaints**
24:7,13
25:12 29:23
32:20 67:18,
24 68:2,6,7,
10,13

**complete**
19:14

**completed**
33:3

**complication**
31:5

**complications**
39:18,21,24
40:9,16
79:12

**computer**
58:19,21
59:1

**concern**
19:11

**concerns**
25:16,19

**conclusion**
18:8,17

**conclusions**
15:7 17:6,7,
8,18,20
18:10,14

**condition**
23:1,10,17
30:6 31:2
62:25 63:16,
17 64:5

**conditions**
24:3

**connect**
45:7

**consensus**
80:11,14
82:10

**consent**
28:1

**consider**
41:20

**considering**
41:14

**constant**
69:25

**constipation**
78:15

**consults**
75:1

**contacted**
20:3 46:21
47:1

**context**
37:21 66:19
83:5,12,15,
19,21 84:17
85:15 86:20

**continuous**
45:6

**contraindication**
90:15

**contraindications**
28:13 80:15

**controlled**
88:22 89:24

**COPD**
89:22

**cope**
71:11,18

**Copies**
92:9

**coping**
71:16 72:2
73:1

**copy**
10:10,12,13
12:4,6 92:11

**Corbet**
9:25 10:4

11:3 22:4
29:5 31:21
36:19 42:7,
11,14 43:4,6
48:2,8
55:12,13
61:8,16
63:23 64:16
65:1,18 68:4
69:9,20
70:10 71:2
80:6,7,10
86:4,12
90:13,21,24
92:11

**Corbet's**
74:13

**Corizon**
5:11 7:12,13

**correct**
5:17,24 9:7,
20 10:18
11:2 13:16
17:21 18:1,
3,9,11,15
19:12,23
20:13 22:13
26:3,19,20
28:11,15,23
29:4,19 31:4
32:16,17
33:11 35:12
37:6 41:16
45:9,22
50:15 62:22
68:17 73:10
75:6 76:3,19
77:6 78:6,11
80:18,19
82:3,6,11
83:11 84:1,
25 85:18
86:18,24
87:20 88:8
89:8,17

**Correction**
7:10 8:3
78:8

**Corrections**
20:3 71:13
74:21 77:19,
25 78:17

**Corrections'**
78:5

**counsel**
26:13 55:2

**counseling**
71:10,11

**counselor**
21:23 40:2,
18 41:10
48:18 52:6
81:6,22
83:22 85:20
86:19 87:23

**county**
25:5 42:15,
19 47:14
48:23

**couple**
46:5 58:2
64:2

**course**
13:25 14:5
48:18 60:13,
21 62:19
63:18

**court**
5:8 34:7
35:6,10,14,
15 36:10,21
37:3 38:10,
13 39:2 74:4

**court's**
37:19 38:19

**courts**
34:1,3 37:8
39:6,9 40:24
87:11

**covered**
86:19

**covering**
54:6

**credentials**
74:8

Ralph Silverman, M.D.
July 23, 2021

credibility
34:2,4,8
36:4,5 37:20
39:4,7
credible
36:22 40:24
87:12
cross
22:5 36:16
55:7 59:12,
16,18 61:9,
17 63:14
64:6,18
65:2,21
66:13 67:22
68:12,23
69:5,15
70:5,16 71:4
74:5,6 79:14
86:2 89:2,4
90:17 91:23
92:10
Cross's
49:7
CROSS-
EXAMINATION
42:10 59:17
current
6:15
curriculum
49:11
cut
62:2 72:11
CV
11:10,25

D

D-E-A-N
36:1
damage
25:25 27:23
28:24 31:10,
15 32:6
damages
78:25

Dan
42:14 55:4
65:16,19,20
80:7,8
dangerous
75:19,25
76:22
data
81:8,14,15,
16
dated
79:16
day
9:5 78:24
87:18
days
76:10
De
51:22
deal
70:18
dealing
70:12 73:8
dealt
22:8
Dean
35:6 36:1
death
26:2 27:21
60:16,19
December
23:19 29:21
46:14
decides
17:10
decision
15:5 35:7
77:13 87:19
90:6
decisions
9:2,5,10,14
10:25 17:24
19:22 67:8
decrease
90:1
defendant
57:3

defendants
5:11 9:18
definition
82:7
degree
22:18,23
75:10,11
degrees
22:20
delay
64:9 90:10
delayed
30:13 83:3,
9,19,24
85:11,12
delaying
64:7
delivered
11:21 18:9
19:14
demonstrated
37:4
demonstrates
39:3
dense
83:17 85:14
86:23
deny
48:12
dep
82:20
Department
7:10 8:3
20:3 71:13
74:20 77:19,
25 78:5,8,17
dependent
89:7
depending
80:15
depends
88:13
DEPONENT
92:13
deposition
5:6,10,17
6:7,9 7:4,

11,13 10:13
12:1,4,9,10,
14 14:25
24:9 45:16,
18,19 46:7,
12 54:14,20
58:8 66:6,7
82:16 87:13
depositions
45:21 53:20
54:15 56:4
87:24
depression
22:25
describing
66:3
determined
77:10
determining
89:15
develop
79:11
developed
21:4
developing
30:14
Devlin
5:11 9:25
36:16 43:4
59:13 65:12
diabetes
60:23 88:22
89:21
diagnosed
23:17
die
60:9,11,25
died
60:7
difference
62:24 63:16
66:11
differences
14:22 15:1,
11 16:21,25
17:1,8

Ralph Silverman, M.D.
July 23, 2021

**different**
8:17 9:14
13:5,12
15:7,19 54:6
56:22 65:17
66:9 76:13
77:13 81:7
**differently**
13:8
**difficult**
30:15 32:13
61:25 62:5,
7,9,16 63:9
69:23
**difficulties**
5:23
**direct**
22:3
**DIRECT-
EXAMINATION**
5:3
**directed**
40:6
**disability**
70:15
**disagree**
14:15,19
20:15,16,22
30:9,11
80:17 82:9,
11,23 84:25
85:18
**disciplinary**
44:3
**disciplines**
43:22
**disconnect**
61:20
**discovery**
52:16
**discuss**
11:8 22:5
46:23
**discussed**
20:11 45:4
**discussion**
10:14 28:1

**disease**
80:15 81:8
84:5,17 85:6
**dispute**
33:8
**disputing**
31:18 32:10,
23 33:10,20
**diverticuliti
s**
84:13,18
85:1,8,9,12,
22 88:7,12,
15
**DMC**
27:4 28:4
63:6,7 90:25
91:1,4
**docket**
36:2
**doctor**
6:12 8:24
9:13 11:10
12:23 13:2,
13,19 16:20
17:10,12
18:25 19:1
23:3,18 26:3
27:12,17
29:20 30:12
31:22 32:20
33:4 38:17,
19,20 39:5,
22 42:4,12
43:7 57:12
59:9 65:3
71:9 72:10
74:14 75:3
80:5,6 81:11
87:13 89:1
90:12,20
91:18,22
**doctor's**
12:1 13:10
18:18 19:3
**doctors**
13:4,22
14:22 15:2,4

16:21
**doctors/
physicians**
9:13
**document**
20:1 55:9
79:14 81:24
82:1
**documents**
82:17
**dog-ear**
58:16
**doing**
20:12,13
35:20 38:21
51:22,23
52:8 75:5
**dont**
58:25
**driven**
40:23
**drop**
53:16
**dropped**
53:15
**due**
15:24
**duly**
5:2
**dying**
40:1

**E**

**e-tran**
92:8,12
**earlier**
5:10 33:13
37:16 38:14
40:19 46:12
**early**
38:4
**Eiferman**
38:17
**eight**
85:22 87:4

**either**
31:18 32:10,
24 40:2,18
54:4,9 84:22
86:14
**elaborate**
72:14,15
73:15 80:19
81:23
**elaborated**
81:19
**elaboration**
74:1
**elect**
28:14,15,16,
17
**elective**
28:6
**emailed**
91:10
**embarrassing**
70:1
**emergencies**
28:8
**emergency**
47:9 78:23
**emergent**
28:9,25
**emotional**
72:1
**emphysema**
89:22
**employed**
42:18
**end**
37:6,12
38:18 39:4
63:19 64:1
80:3
**endpoint**
13:9
**engaged**
38:4
**entire**
27:6 91:25
**essentially**
25:11

Ralph Silverman, M.D.
July 23, 2021

event
  34:18 75:3
everybody
  12:21
Everything's
  59:1
evidence
  5:8 38:16,20
  39:16 40:13
  63:8 66:6
  90:14
exactly
  67:19 85:19
exam
  16:16
examination
  30:10
exams
  17:18
excuse
  44:23
exercise
  8:25 9:18
  10:17,20
exhibit
  11:25 12:1,
  11
exhibited
  38:18
exist
  26:9
existed
  30:19
expect
  76:18,20
experience
  61:3 69:11
  70:12 75:5
experiencing
  23:22
expert
  7:8,9,12,14,
  18,23 8:1,
  12,19 35:21
  36:5 39:6
  40:22 41:15
  46:15 55:16

  56:14 86:18
expertise
  37:5 38:12
experts
  39:10 45:4
  74:9
explain
  61:11
exposed
  75:10,11
extra
  11:21
extremes
  90:5

_____

F

facility
  18:19 19:2
fact
  9:4 17:15
  19:10 20:14
  21:4,7 24:17
  29:20 30:22
  32:18 34:22
  40:6,16 66:8
  68:11 70:13
  90:3
factors
  62:8,10
  88:13,19
  89:18
facts
  19:20 32:23
failed
  9:18 10:17
failure
  10:20
fair
  5:25 23:3
  46:1 48:25
familiar
  34:14
family
  57:13 76:6
far
  44:7,8 48:24

  54:25 60:21
  79:24 84:19
Federal
  5:8
fee
  54:16
feel
  19:16
fellows
  74:11,16
fellowship
  43:15
felt
  66:5
fibrosis
  30:14 61:11,
  20,23
file
  8:8 25:6
filed
  7:9 44:6,13
  55:2
final
  9:21,25
  46:13,17,19
find
  23:20 72:11
findings
  37:8,19
fine
  16:19 30:22
finish
  14:3 21:22
firm
  49:7
first
  33:23 34:13
  35:5 36:16
  42:21 43:3
  45:18 46:21
  57:24 64:2
  82:2 84:7,21
  87:6,18
  91:6,12
five
  44:24 47:20,
  21 54:21

  79:25
fluctuation
  57:8
follow
  12:24 13:5
  42:20 43:7
follow-up
  30:5 71:5
  80:7 90:21
following
  67:11 78:24
forget
  48:19
form
  64:16,25
  65:18 68:4
  69:9,20 70:9
  71:2 90:13
format
  5:19
formation
  30:17 62:13
  85:8
formed
  81:7 82:6
forward
  40:8
found
  34:1,3
  35:10,16
  36:4,22
  87:11
foundation
  31:21 61:7
  63:5,12,22
  64:17,25
  65:14,18
  66:12 67:21
  68:3,16
  69:8,19,20
  70:9 71:2
  90:13
four
  44:24 52:11
  54:15,21
  92:12

Ralph Silverman, M.D.
July 23, 2021

front
  27:10 92:3
full
  35:23 50:3,6
  79:8
fully
  19:7
function
  62:3
functional
  20:7 30:16
functioning
  24:14 30:6,
  22 32:16
  35:24

**G**

G-Y-S-E-G-E-M
  36:9,18
gastroplasty
  53:25
general
  8:22 26:4
  34:23 35:1,
  9,11,18,21,
  22,24 38:5,
  8,13 43:20
  44:19 57:10
  60:17,19
  74:10,15
generated
  37:9
genitourinary
  26:1 27:25
getting
  26:6 31:3
  39:15,19
give
  18:5 34:24
  35:16,17
  36:5 49:4
  53:20 83:18
given
  5:17 6:7,8
  13:23 78:7
  84:16

giving
  68:10 83:15
goes
  39:2 42:22
  70:14
going
  11:17,24,25
  15:20,22
  19:22 21:21,
  23 22:15
  23:6,14
  26:11,14
  36:12 37:21
  40:20 41:9
  42:4,7 49:4
  52:2 55:19
  56:19 57:7
  59:14 61:6,
  13 63:4,11,
  21 64:12,21
  67:20 69:1
  70:8 72:18,
  23 76:5,13
  80:2 85:3
  86:23 87:5
good
  30:5 59:13
grant
  48:12
greater
  75:10,11
guess
  43:10 54:10
  56:13,19
  57:7 59:14
  77:1 81:3
  85:11
guy
  41:2 43:3
Gysegem
  36:8 74:3

**H**

halfway
  81:1

happen
  40:2 41:9,
  11,14,19
happened
  23:14 40:18
  41:2,3 48:19
  53:25
happening
  77:5,8
hardcopies
  58:23 59:1
hardcopy
  11:15
harm
  25:19
Hartmann
  82:3,5,7
  83:8,25
  85:21
Hartmann's
  80:12 82:11
  84:6,18,21
  88:6,11,16
health
  89:20
healthcare
  9:6,10 20:2
  78:4,10,23
healthy
  60:20,24
hear
  11:19 31:20,
  24 42:12
  47:25 48:2
  74:23 77:15
  80:6 81:11
  87:11,15
heard
  34:7 39:9
  49:3 52:24
  65:11 86:4
  87:18
heart
  26:2 27:21
help
  19:5 70:21,
  24 71:11,18,

  21,22 72:3,7
  73:1,8
helping
  73:19
hernias
  90:1
Hey
  9:25
hide
  21:7
hierarchy
  49:17,19
  50:16
highlighted
  58:15
history
  15:5 48:14,
  24
holding
  77:24
home
  76:1,6,17,18
hospital
  6:20 7:1,2
  19:1,3 50:1
  75:1 76:10,
  24
hospitals
  6:21,24
host
  88:24
hour
  18:16
hourly
  54:22
hours
  54:15,21
  80:1
hundred
  41:10
hundreds
  37:15 38:1
  60:14
Huron
  8:7,10
hypertension
  89:21

Ralph Silverman, M.D.
July 23, 2021

**I**

Ian
  55:5 59:15
  63:4
ID
  36:11
idea
  45:3 50:10
  51:5,6 53:19
  58:1 76:4,
  23,25 77:2,
  4,5
identified
  23:9
ileostomy
  73:18 90:7
Illinois
  77:19
imagine
  58:19
immunocomprom
ised
  62:14 88:20
implying
  78:2
impression
  64:19,23
impressions
  65:7
incarceration
  63:18,20
  64:2
incidence
  90:1
incident
  34:15
include
  54:17
included
  83:16
including
  7:7 26:1
  27:20,24
  58:15

income
  37:9 55:16
incontinence
  30:16 40:11
independent
  13:24 75:2
indicated
  6:7 35:8
  74:4 77:9,12
indicates
  33:17 38:10
indirectly
  77:11
individual
  88:13,19
individualize
  85:5
individuals
  74:20
infection
  26:2 27:22
  75:10
infections
  90:1
infirm
  76:24
inflammation
  87:3
information
  18:20 19:4,
  5,9,13,19,20
  20:18
informed
  27:25
initially
  72:7
injured
  11:2
injuries
  78:25
injury
  23:21 31:2
  75:11
inside
  81:8
instance
  34:13,21

  51:2 63:25
instances
  34:11
Intent
  52:22,24
  53:2
interested
  51:15
internal
  57:13
interpret
  81:15
interpreted
  66:23
intraabdomina
l
  41:8 84:9
  87:2
invoices
  55:1,6 79:20
involved
  32:21 33:2
  53:23,24
  56:13
involvement
  5:13 17:24
involves
  35:15 70:7
issue
  72:3
issues
  5:22 20:6
  21:4,9,10
  30:7 33:18,
  24 60:25
  63:10 70:2,
  4,19 78:15,
  16,24 89:23
issuing
  41:15

**J**

Jackson
  7:12 9:19
  10:18 11:2
  14:13,17

  20:12,19
  21:1,3
  23:11,22
  24:4 25:15,
  20,23 26:23
  30:19 31:1,
  8,13 32:4,18
  33:2 39:14,
  17 40:9
  45:16,21
  47:13 48:14
  66:4,8,10
  71:9 78:14
  87:6
Jackson's
  12:15 20:4
  24:20 29:20
  33:1 45:25
  62:21 63:9
  64:10 90:8,
  16
jail
  25:5,6,7
  42:15,19,21,
  22,25 46:21
  47:14 48:17,
  23 78:17
jail/prison
  66:10
jails
  75:23
January
  29:21 35:7
job
  64:24
Join
  61:8,16
  63:23 65:1
  70:10
judgment
  8:25 9:4,10,
  15,19 10:17,
  21,25 13:11,
  12 14:16
  17:1 20:11,
  18 41:21
judgments
  17:25 19:22

Ralph Silverman, M.D.
July 23, 2021

**June**
26:23 28:3
30:23
**jury's**
64:24

---

**K**

**Kansakar**
23:19 25:22
29:21 40:17
45:16 46:8,
10 67:11
87:5
**Kansakar's**
46:22 47:6
**Kansas**
43:12
**keep**
15:16 16:6
72:23
**kind**
8:4 28:23
32:15 38:11,
24 57:12
71:10 72:1
73:10 77:13
78:11
**kinds**
89:22
**know**
5:24 6:3
8:18 10:11
18:25 32:23
36:24 40:7
41:3 44:7,8,
15,24 46:18
47:16,22,23
48:10,11,13,
14,21,24
49:9,19,22
50:3,7,8
51:3 52:15,
25 53:16,17,
19 54:13
55:1 56:15
57:11,14,15,

18 60:14
61:2,4 65:16
76:4,9,11,
23,25 77:7
79:21 81:4
82:17 83:10
87:21
**knowledge**
9:1 49:8
56:16 75:13,
15
**known**
46:10
**Krause**
57:15

---

**L**

**labeled**
8:8 46:15
**lack**
34:2,4 36:4
38:18
**lacked**
34:8
**lacking**
36:5
**lacks**
39:7 74:8
**ladder**
50:13,16,23
**Lake**
8:7,10
**language**
17:5 33:23
**Larry**
65:15
**law**
16:15
**Laws**
45:5
**lawsuit**
25:6 31:9,14
32:5 54:9
**lawyer**
35:20

**leads**
40:18
**leak**
27:23 70:1
**leaking**
25:24
**learn**
71:18
**leave**
82:20
**left**
66:10
**leg**
68:9
**lengthy**
28:1
**letter**
55:7,9
79:15,16
**letting**
22:2
**Lexus**
36:13
**license**
44:1,7
**licensed**
6:11 23:4
**life**
76:2
**limited**
27:21
**line**
46:24 66:17
77:16
**lines**
47:8 71:14
84:23
**list**
78:20
**listed**
56:14
**Listen**
21:24 65:15
**literature**
82:14
**little**

76:13 90:21
**live**
70:23
**living**
34:15
**located**
6:22
**long**
51:7
**longer**
30:13 41:7
85:4,11
88:17
**look**
10:8 11:15
17:17 27:11
36:25 56:2
86:6 89:10,
11,14,18,20
90:6
**looked**
27:8 79:14
**looking**
8:7 17:4
29:25 46:13
83:14 86:9,
15 90:8 91:9
**looks**
86:7
**lose**
72:23 88:21
**lot**
39:10 56:21
69:24 72:6
75:5 83:14
86:4 90:20
**lots**
88:14,15
**Louis**
6:19,23
34:17 43:14
45:12,13
49:15 50:2,7
51:7 54:1
**lower**
23:5

Ralph Silverman, M.D.
July 23, 2021

lowest
  87:4

_____

M

_____

M-I-S-C
  36:13
M.D.
  5:1
made
  10:25 17:25
  20:9 27:19
  38:20 67:11
  77:12 80:18
  83:13
majority
  28:16 34:25
  35:22 37:16
  38:3 57:2,6
  69:12,17
  71:24 73:22
  85:6,21
make
  5:23 6:4
  9:1,5 15:5
  16:17 19:13
  62:4,8,15
  63:1,18 67:7
  69:7 81:16
  89:23,24
  90:2
making
  9:10 19:22
  24:13 28:25
  48:16 62:7
  90:6
male
  60:20,24
malpractice
  52:17
manage
  69:23
manager
  47:7
mandate
  29:15 66:15,
  18,23

mandated
  29:2,6
mandating
  28:22 29:10
March
  21:1 23:12,
  14,22 24:4,
  8,11
MARGOLIS
  65:11
Margolis's
  49:7
mark
  11:25 12:9,
  10 28:5
marked
  12:2
material
  7:15
materials
  7:3 8:18
matter
  66:22
Mckenna
  7:8
Mckenna's
  7:23
Mcquiston
  7:10
MDOC
  77:18
mean
  10:1 41:9,11
  51:17 58:2
  62:14 65:16
  66:20,24
  67:19 68:1
means
  68:13 81:1
  86:8 92:2
meant
  66:21 84:22
median
  80:21,25
  81:1,3 82:23
  85:25

medical
  6:11 8:10,
  24,25 9:4,9,
  10,15,19
  10:17,21,25
  13:10,12
  14:15 16:14
  17:1,13,24
  18:8,19
  19:21,25
  20:6,7,11,
  17,19,25
  22:23 23:18,
  20 24:2,7,13
  25:9 28:4
  31:2 36:9
  39:10 40:8
  41:20 42:14
  43:10,11
  44:9 47:15
  49:21 55:25
  60:25 62:21,
  24 63:16,17
  64:7 67:1,16
  74:18 79:8
  89:23 90:9
medications
  22:25
medicine
  6:18 9:1
  13:7 23:10,
  21 57:12,13
meet
  5:9
member
  44:9
mention
  23:25
mentioned
  7:21 8:15
  30:12 41:9
  45:19 48:18
  61:10 78:1
  87:23
mentioning
  7:22 35:4
  41:18

Mercy
  7:1
meta-analysis
  86:8
Mich.app.
lexus
  36:2
Michigan
  5:7 7:10 8:3
  20:2 34:22
  35:3,5,14,19
  44:16,22,23
  53:1 56:20,
  25 71:12
  78:5,7,17
middle-aged
  60:20
mind
  19:8 67:7
mine
  11:21
minutes
  38:23
Misc
  36:13
mischaracteri
zed
  71:20
mischaracteri
zes
  63:13
mischaracteri
zing
  73:3
misheard
  8:6
misrepresenti
ng
  38:11
missing
  35:2
Missouri
  7:1 43:12
  52:20,22
  53:3,6
Misstates
  11:3

Ralph Silverman, M.D.
July 23, 2021

misunderstood
  7:17
month
  24:25 56:2,
  5,7 59:23
  60:1 88:1
months
  30:25 64:3
  80:16,20,22
  82:24 84:14,
  24 85:1,2,7
  86:1 88:5,
  10,17
morbid
  60:23
morbidly
  62:11 88:20
move
  40:21 50:23
  87:10
moved
  34:17 45:10,
  11,14 50:12
multiple
  62:11 86:9

―――――――――

      N

name
  5:10 36:17
  46:21 49:9
  53:15,17
  56:23
name's
  42:14
named
  54:10
names
  56:18
necessary
  63:19
necessity
  20:8
need
  17:16 19:19
  25:24 27:22
  65:23 83:12

86:6 88:17
needed
  92:4
never
  33:4 34:7
  41:2 45:11
  53:2 67:8
  74:11,14,16,
  25 75:22
  77:7
nine
  80:22 82:24
  85:25
nobody's
  56:9
nonresponsive
  40:21 64:14
notes
  8:9 49:2
  58:15 59:6
  67:10,15,24
notice
  5:7 7:13
  12:4,9,10
  52:21,24
  53:1 58:8
  62:24 82:16,
  21
noticed
  61:10
November
  8:13,15
  11:18 40:7
  79:17
number
  36:11 52:5
  53:13 55:22,
  25 56:17
  60:22
numerous
  22:8
nurse
  42:17 46:20
  47:2 48:11
nutritional
  83:18 84:9
  90:3

―――――――――

      O

obese
  62:11 88:20
obesity
  60:23
object
  16:14 69:8
objection
  16:17 29:5
  31:20,21
  40:5 52:15
  61:7,14
  63:3,4,11,22
  64:13,22
  65:9,11,19
  66:1 67:21
  69:2,7 70:9
  74:5 86:2
  90:12
objections
  81:21
objective
  75:13,14
obstructing
  84:22
obtain
  19:20,21
obviously
  60:15
occasions
  20:2,5 46:22
occur
  26:3 33:5
occurred
  14:4 30:23
  32:6 39:17
occurring
  28:24
offer
  73:21,23
offered
  71:10
offhand
  47:16

office
  6:21,22
  18:19 19:3
  20:3,5
  46:22,23
  47:2,6,7
  91:24
oftentimes
  28:10
Ohio
  36:3,8,11,
  13,17 37:20
  55:14 56:19
okay
  7:15 9:24
  10:4 11:15
  16:18,20
  17:11 19:11
  22:6,11
  32:11 37:2
  41:6 42:12,
  15 43:9
  46:20 47:1
  48:2 53:5,10
  55:10 58:18
  59:16 62:17
  65:7 71:1
  76:12 77:1,9
  78:9 79:23
  80:21 81:25
  82:8 83:23
  84:24 89:13
  90:17 91:18
oncology
  51:18
one
  9:18 10:1,3
  15:22,23
  17:10 31:1,
  19 34:15,17
  42:1 43:25
  44:25 46:3,
  16,22 47:17
  53:2,21
  54:3,9 55:14
  56:6 59:24
  60:21,25
  63:25 65:15

Ralph Silverman, M.D.
July 23, 2021

74:25 81:8
82:20 83:10
85:13 87:11
88:1,16
89:9,14,19
**ongoing**
53:6
**open**
7:14 78:16
**operative**
27:6 33:14,
22 63:6 91:4
**opine**
84:8
**opined**
78:12
**opinion**
9:17 10:16
13:14,21
14:22 15:11
16:21 17:1
18:6 39:1
74:4 82:14
**opinions**
5:14 11:7
13:23 15:2
34:2 35:16
36:4,22 49:3
51:11 78:7
**opportunity**
5:9 12:13
62:20
**opposing**
74:9
**optimize**
83:17
**options**
9:5
**order**
7:8 12:2
35:11,21
86:9 92:4
**organs**
32:21
**original**
23:7

**originally**
79:17
**ostomy**
47:9
**out-of-jail**
47:23 48:12
**outside**
37:5 64:13,
22 68:21
74:5
**outweighed**
20:12
**overwhelming**
28:16 34:25
35:22 37:16
38:3 69:12,
17 71:24
73:22 85:6,
20

---

**P**

---

**page**
28:4 33:21
92:12
**pages**
58:16
**paid**
18:13,16
47:23 79:21
**pain**
24:14 30:7
68:8,9
**Papendick**
7:11 9:17
10:17,21
20:17 24:6,
12 25:15,18
39:25 40:15,
22,23 45:17,
22 57:11
66:2 77:10,
12,23
**Papendick's**
14:8 20:10
46:3 64:11,
19 65:5,8

66:6
**paper**
21:9 86:9
**papers**
11:21
**paragraph**
27:18 33:23
**parent**
7:2
**part**
12:24 82:6
87:9,13
**particular**
5:14 7:8
8:11 13:3
17:23,25
18:20 19:3,
4,6,8,23
29:15 32:5
35:8 36:21
42:5 44:25
49:20 54:13
70:4 71:25
73:1 75:4
77:20,22
81:8 82:1
**passed**
16:16
**past**
62:12 91:7,8
**pathologies**
54:6
**patient**
13:21 18:21,
25 19:4,6,9,
15,17,23
24:6,13
27:19,25
28:24 29:2,
10,12,13
47:11 54:6
62:18 67:3,
16 68:1,11,
14 72:4
76:1,15,16
77:13 81:5
82:2 83:18
85:5,9 86:25

88:6,11
**patient's**
15:4 19:12
88:13
**patients**
6:25 9:6,11
13:13 14:7
22:9 26:6,18
28:14,16,19,
20 38:18
51:24 69:17
70:3,12,17
71:15 72:6
73:8,9,17,
18,19 84:12
85:12,21
88:15 90:4
**patients'**
17:17
**payment**
55:5,8
**pays**
48:6,10
**pelvis**
30:14 61:21
**people**
62:13 65:17
69:13,22
70:3,21
71:16,17,20
72:5,25
73:6,16,19,
22 74:17
**perceive**
75:16,18
**percent**
29:17 37:9,
11 40:2
41:10 55:17
57:8,9,10
60:21,25
69:13
**perception**
75:16,21
76:8,12
**perceptions**
75:14

Ralph Silverman, M.D.
July 23, 2021

perfectly
  21:5
perform
  26:7,18
  59:22 63:19
  76:5,17
performed
  12:14 26:22
  28:10,11,12,
  13 32:7
  37:11,15
  38:1,3 41:24
  42:2 59:20
  60:6,13 84:6
performing
  51:25 89:16
period
  36:13
personal
  47:10 68:18
  70:19
personally
  68:6 69:4,10
pertain
  50:17
Ph.d.
  22:21
physical
  17:18 20:25
  23:10,17,18,
  21 24:3
  25:12 31:5,
  10,14 32:6
physician
  19:10 54:7
physicians
  17:13,17
  61:4
place
  61:6,13
  63:3,4,11,21
  64:12,21
  67:20 69:1
  70:8 84:7,22
  87:6 90:11
places
  72:7 73:9

75:19,25
plaintiff
  18:3,5,6,7,
  13 67:12
  86:17
plaintiff's
  18:11 91:23
plaintiffs
  37:12
planning
  25:6
please
  20:24 35:2
  36:17 92:11
point
  13:20 33:5
  63:12 64:14
  81:1 86:20
points
  8:17
policies
  77:20 78:1,
  3,6,8,9,12
polyps
  78:15
poor
  30:16 32:15
pop-up
  42:5
populated
  76:21
position
  18:11 50:24,
  25
positions
  49:17
possible
  9:16 13:17
  15:9 16:24,
  25 40:12
  91:12,14
possibly
  25:3 48:17
potential
  20:4 25:24
  27:22,23
  39:14 62:6,7

potentially
  75:18
pouch
  72:7
pouches
  71:22
pouching
  72:8 73:19
practice
  6:14,15,16,
  18 8:21,22
  12:20,21,25
  13:3,4,13
  14:1,5
  19:17,18
  35:9 45:7
  68:19 75:4
practices
  57:19
practicing
  35:11,18
  57:2,4
preliminary
  46:15,17,18
  58:6
prep
  54:17
preparation
  79:24
prepare
  38:24 54:19
prepared
  11:7
preponderance
  45:2
prescribe
  22:25
present
  19:19
presented
  66:7
presenting
  38:22
pretty
  77:3
Primarily
  63:24

prior
  7:22 13:22
  62:12
prison
  25:5,11,12
  26:9,10 33:1
  42:22 43:1
  62:22 63:1
  75:9,22
  76:15 78:5,
  11,23
prisoner
  74:25 75:2
  76:14,18,20
prisoners
  75:8
prisons
  75:18,23,25
  77:6,8
privileges
  6:25 44:4
probably
  11:16,17
  42:7 52:14
  56:2,9,12,
  21,22 58:4,
  18 76:21
  87:3
problem
  16:11 20:25
  23:18 36:3
  55:12 59:11
  72:2
problems
  5:24 20:19
  23:8,9 24:1,
  2,7 30:19
  33:4 39:14,
  17,24 40:10
procedure
  26:7,19
  27:20 30:16
  32:13 51:22
  52:7 60:7
  67:4,6
  80:13,22
  82:3,5,11,24
  83:8,25

Ralph Silverman, M.D.
July 23, 2021

85:25 87:2
88:6,11
procedures
 28:9 37:15
 52:1,5 77:21
 84:6 85:21
 88:16
process
 80:15 81:9
 84:17
processes
 84:5 85:6
productive
 30:6
professional
 57:2,6
professionals
 8:24 9:9
professor
 49:15,24
 50:4,6,12,19
 51:4
profuse
 79:4
programs
 71:16,25
 73:1
progress
 8:9
proper
 9:19 10:17,
 20 90:2
properly
 24:15 30:6
provide
 26:18 72:8
 73:17 78:10
provided
 8:14 20:18
providers
 20:2 42:15
 70:18 78:10,
 23
psychiatric
 23:1
psychiatrist
 23:4

psychiatry
 22:23
psychological
 21:4 22:18,
 20 23:8,25
 24:1 70:2
 71:16 72:2
psychological
ly
 71:23
psychologist
 21:11,15,19
 22:8,13 23:4
psychology
 21:10 22:16,
 21
psychosocial
 73:21
punched
 21:8 23:13
purposes
 5:7 57:1
pursuant
 5:7
put
 34:11 37:21
 39:22,25
 54:24 65:12
 79:24
putting
 86:20

————————

Q

qualified
 34:9 35:17,
 18
question
 6:2,4,15
 7:20 10:5,7
 13:2 14:3
 15:16,18,24,
 25 16:1,2,3,
 4 18:22
 21:13,14,18,
 22 22:1,2,4,
 7,11,12

23:7,15
 25:16 26:11,
 12,14,17
 29:1,9 31:12
 32:4 34:4
 40:6,14,20,
 25 41:12
 44:20 46:16
 48:4,7 55:24
 56:17 64:13,
 14 65:13,23,
 24 68:22
 70:11 72:10,
 16,17,20,25
 73:4,11,25
 74:3,13
 75:13,20
 81:10,13,18
 82:22 86:10
 87:8,10
 89:12 91:22
questioning
 46:25 66:17
 77:17
questions
 5:13,22
 15:22,23
 16:8,9,11,18
 19:8 22:5
 37:1 38:24
 42:8 59:15
 65:4,10
 66:15,19
 71:5 72:16
 90:18
quote
 37:6,8,12,25
 38:16,18
 39:2,4 74:8
quoted
 55:15
quoting
 81:4,15

————————

R

radiation
 84:21

Ralph
 5:1,6
ran
 36:3
range
 57:10
rarely
 28:17
rate
 54:22 80:2
re-operation
 25:24 27:22
reach
 15:7
read
 14:25 20:14
 24:9,11
 27:16,17
 33:22 37:4,
 23 45:15,18,
 21,25 46:3,7
 48:4,16
 57:21,24
 59:3 65:24
 81:17
reading
 66:5 71:14
 82:20 83:1,2
 85:19
ready
 26:6,18
reality
 75:22
reason
 30:9,11
 45:13 64:7,9
 66:8 68:11
 85:10 88:16
 89:13 90:9
reasonable
 9:14 19:18
 60:5
reasons
 66:3 81:7
 83:13,16
 85:13 88:24
 89:7,9

Ralph Silverman, M.D.
July 23, 2021

**recall**
8:16 25:3,14
30:17 33:20
36:7 46:6,9
47:12 49:10
54:13 58:6
66:17 71:14
77:16 79:10
91:2,11,17
**receive**
57:24
**received**
27:4 52:21
53:2
**receiving**
84:20
**recent**
54:3,4
**recently**
24:24
**recognize**
40:3
**recognized**
26:24
**recollection**
8:13 13:18,
19 60:10
75:2
**recollections**
13:24
**reconnecting**
40:10
**reconnection**
30:15 32:13
**record**
5:5 7:7,11
8:5 10:14
19:7 24:11
27:6,17
34:12 35:13,
25 39:6 55:4
65:12 79:8
**records**
7:11 8:3,7,
14 17:18
18:8,14,16
20:1,24 21:3

23:20 24:17
25:9 26:22,
25 27:1,2,3,
4 28:5 29:25
30:1,2,4,10
33:10,12
36:8 38:25
39:16 40:8
58:11,12
62:21 63:7
90:8,25
91:1,4,9,10,
16 92:3
**recover**
76:2,10
**recovered**
87:1
**recross**
71:6
**RECROSS-
EXAMINATION**
80:9 89:3
90:23
**rectal**
30:14 61:11
84:19 85:4
**rectum**
61:20,22
**REDIRECT-
EXAMINATION**
71:7 91:20
**redundant**
16:3 45:15
**refer**
70:17 71:15
72:25 73:6
**reference**
33:21
**referenced**
12:19 79:15
**referring**
68:7 71:17
86:7
**reflect**
5:5 21:3
**regarding**
9:2,5,6,11

14:22 15:2,
11 21:10
29:23 32:20
80:12 82:10
83:25
**related**
23:21
**relation**
58:12 59:6
**relative**
16:18
**release**
33:1
**released**
62:21,25
63:2
**relevance**
52:16 63:12,
22 68:3,18
69:8,21
**relevancy**
61:14
**remember**
32:2 55:17
65:3 66:10,
14 67:12
87:12
**remotely**
5:21
**repeat**
6:3 31:23
**repeated**
65:23
**rephrase**
6:3 18:23
29:9
**replacement**
7:12
**report**
7:8,9,13,14,
23 8:1,19
9:21 10:6,8,
10,12 27:6
28:3 30:12
33:14,17,22
39:22 40:7,
12,25 41:16

46:13,15,16
48:16 58:5,6
61:10 63:6
91:4,23,25
92:1,2,5
**reported**
80:21 82:23
**REPORTER**
11:19 31:17,
19,22,25
48:3 68:20
92:9
**reports**
7:19 8:9
**represent**
42:14,16
65:17
**representing**
5:11 16:13
**request**
7:16 8:1,5
48:5 65:25
**require**
69:24 90:3
**requiring**
66:15
**research**
51:11
**resections**
54:5
**residency**
43:13 53:25
**resident**
54:1
**residents**
74:10,15
**resource**
67:1
**respect**
13:15 15:24
16:22 21:2
23:11,16
44:4,14
78:25 79:20
**response**
74:12

**rest**
42:4
**restate**
25:16
**result**
10:24 23:1
31:3 32:6
60:7 82:5
**resulting**
11:1
**results**
30:16
**retained**
8:11 18:3,5,
7 86:17
87:16
**retainer**
55:7,9 79:15
**return**
76:14
**reversal**
14:13 16:23
17:9,10 20:4
24:8 25:7,25
26:23 27:2
28:15,22
29:3,7,11,
13,14,18
30:13,23
31:3,6,10,15
32:7,19
33:3,5,15,
17,19 39:15,
19,23 41:25
46:23 62:5
63:2,9,19
64:1,8,10
68:24 77:14
80:12,22
82:10,24
83:3,6,7,10,
19,24 84:13
85:11,12,25
86:22 88:23
89:16 90:10
**reversals**
14:23 15:3,
12 28:6

84:18
**reverse**
41:7 47:9
80:16,20
87:5 88:5,10
90:6
**reversed**
15:6 17:19,
21 21:6
28:17,18
66:5,9,16,22
69:11,14,18,
23 85:7,22
**reversing**
89:6 90:15
**review**
5:14 12:13,
18 15:4,8,
10,14 18:7,
13,16 24:20,
23 25:4,10
26:25 27:3
29:24 30:1
38:22 58:23,
25 62:20
65:4 79:20
**reviewed**
7:15,22
12:16,22
13:1 14:8,11
15:17,18,20
16:5,6 20:10
24:12 27:5,
12 30:1
38:25 44:17,
21 49:6
58:12,21
90:9
**reviewing**
30:4
**reviews**
37:10,11
45:1 55:22,
25
**revoked**
44:1
**right**
11:11 12:25

13:5,11
15:8,21 18:6
19:17 20:15
21:21 26:12
27:14 28:7,
9,20,25
30:23 33:22
35:17 37:3,
17 39:19
40:3 41:21,
22 42:23
45:17,20
47:18,19
50:4,9,24
53:6 57:4
58:16 59:12
71:19 73:4
75:7 76:2,22
79:5,9,12
80:22 81:1
82:21 92:2
**ring**
36:14
**rise**
60:22
**risk**
14:12,16
20:11 27:21
39:25 40:1,
17 60:16,19
**risks**
25:23 26:3,
4,5,8,9,17,
24 27:19
40:3,15
41:19 62:17
**robbery**
48:17,25
**Robin**
11:24 12:8
48:2
**role**
64:23
**room**
78:23
**routine**
76:16

**rude**
72:11,17
**rules**
5:8 35:19
**run**
49:18

**S**

**safe**
19:17,19
**safely**
85:22
**safest**
80:20,24
**saint**
42:18
**SAITH**
92:13
**saying**
11:20 24:8
25:11 34:7
38:13,19
39:9 41:13
77:2 79:7
86:11
**says**
29:16 37:7,8
38:16 39:2
55:9 82:19
84:12,24
85:17
**Scarber**
5:4,11 10:9,
15 11:4,24
12:3,8,12
22:10 29:8
31:24 32:3
36:18,20
42:21,24
43:3 55:4,10
59:14 61:6,
13 63:3,21,
24 64:12,21
65:4,9,14,20
66:1,12,14
67:20 68:3,

Ralph Silverman, M.D.
July 23, 2021

16,18,21
69:1,7,19
70:8 71:8
74:7 90:11,
19 91:13,21
92:8
**Scarber's**
81:20
**scarring**
41:8 61:21,
24 62:4,6
84:9
**scheduled**
87:7
**school**
16:15 22:16
43:10,11
**scope**
64:13,22
68:22 87:10
**second**
7:12 13:14,
21,23 27:14
31:19
**secondary**
84:18
**secure**
70:22
**see**
6:25 26:24
27:14 37:20
42:5 55:5
63:17 67:15
68:13 79:16
82:18 86:10
90:9,14,25
91:6
**seeing**
14:6 51:24
84:4
**seek**
68:24
**send**
70:3,21 72:5
73:9,16,17,
18

**sense**
81:16
**sentence**
27:16,17
**sepsis**
53:24
**September**
36:11
**serious**
28:24
**serve**
8:12
**service**
72:8 73:7
**services**
7:16 56:14
**set**
91:9,16
**settled**
53:14
**settlement**
53:17
**settlements**
53:18
**seven**
56:13
**several**
34:1 83:4,9,
20,25 85:10,
13
**shorter**
84:13
**shortness**
68:8
**shot**
33:2
**show**
33:21
**showed**
33:13 91:13
**shown**
33:10,12
**sic**
84:17
**sick**
90:4

**signed**
27:25 91:25
**significant**
25:23 60:25
70:13
**Silverman**
5:1,6,9
10:16 17:3,
23 18:18
19:25 21:11
22:13 28:6
31:8 32:12,
18,25 33:25
36:21 37:4,
25 38:2,17
41:13 59:19
74:8,9,11
77:18
**Silverman's**
37:9,10 39:4
**similar**
13:8
**simple**
72:10
**sincerity**
32:25
**single**
56:23 66:21
**site**
79:12
**sits**
30:15
**situation**
28:25
**skewed**
38:7
**smell**
21:7 70:1
**social**
70:2,14,19
71:10
**socially**
70:24 71:23
**societies**
44:10,14
**Society**
44:11

**someone's**
53:16
**sooner**
31:11,15
32:8 33:6
39:15,19,23
**sores**
78:16
**sort**
47:14 68:13
**sought**
13:20
**sound**
67:7
**sounds**
14:9 41:12
60:5 79:18
**speaking**
21:25
**special**
70:18
**specializing**
34:23
**specialty**
57:3,11,16,
18 74:12
**specific**
23:20 37:18
65:10 82:21
**specifically**
33:4 47:2,4
70:19 83:12
**speculation**
86:3
**speculative**
86:4
**speed**
27:7
**spell**
36:16
**spend**
51:21,22,24
52:7
**St**
6:19,23 7:1
25:5 34:17
42:15,19

Ralph Silverman, M.D.
July 23, 2021

43:14 45:12,
13 47:14
49:15 50:2,7
51:7 54:1
**staff**
44:4 51:7
**standard**
10:22 11:1
12:19,20,24
13:3,5,6
35:9 41:21
54:11 57:1
88:9
**start**
43:10
**started**
7:18 14:6
50:11 72:18
**state**
34:15,16
35:14 36:9
44:25 45:6
**stated**
20:5 35:13
37:4
**statement**
32:1 55:8
80:18 81:19
82:9
**statements**
32:1
**states**
52:19 56:18,
21,22,24
**status**
83:18 84:9
**step-down**
76:24
**steps**
50:3,9
**sticky**
58:15
**stoma**
68:24 69:11,
18,25 71:21
73:2,7,8
78:16 79:4,

12 81:3
89:7,14 90:7
**stomas**
69:13,23
71:21,23
**stop**
15:21 21:21
40:21
**stopped**
72:21
**stops**
50:20,22
**stress**
21:5
**stricture**
30:17
**strike**
25:16 40:21
46:10 87:10
**stroke**
26:2 27:21
**structure**
26:1
**structures**
27:24
**students**
49:21 74:19
**studies**
80:21 82:2,
23 83:4,9,
20,25 84:2,4
85:10,13
86:7,9,13
88:4
**study**
86:11
**stuff**
42:6 48:19
71:19
**stump**
30:15 61:11
**sub-interest/
specialty**
51:15
**subsequent**
79:19

**subset**
51:17
**subspecialist**
51:18
**sue**
25:11 53:2
**sued**
52:17 53:5
**suffer**
31:2,5
**suffering**
70:7,14
**sufficiently**
35:10
**suggest**
39:16 40:11,
15 77:14
88:4
**suggested**
38:17
**suggesting**
63:8
**suggestion**
38:20 39:3
**supplied**
58:11
**supplies**
69:25 71:22
**supply**
69:25
**supplying**
86:14
**support**
17:13 82:14
90:3
**supporting**
18:11
**sure**
5:23 13:23
19:13 47:4
57:14 82:19,
21 89:23,25
90:2
**Surely**
84:17
**surgeon**
12:14 17:3

26:22 34:23
35:19,24
51:14 54:5
68:9 88:10
**surgeon's**
20:3,5
**Surgeons**
44:11,12
**surgeries**
28:7 62:12
77:22
**surgery**
7:12 8:5,22,
23 20:12,13
25:19,25
26:4 31:6
34:24 35:1,
9,11,21,22,
23 37:18
38:5,7,8,14
40:17 41:2
43:20 47:18
49:15,24
50:12,20
51:4,16,25
52:9 57:7,9,
10 61:19
62:5,7 64:8
68:11,25
74:10,15
76:1,5,9,14,
17,19,22
77:14 89:16
**surgical**
28:3 37:15
67:3,4,6
**surrounding**
25:25 27:24
**suspended**
44:1
**sustained**
31:14
**sworn**
5:2
**symptoms**
68:14
**system**

Ralph Silverman, M.D.
July 23, 2021

26:2 27:25
73:20 75:9

_____

**T**

_____

**Take**
  11:15
**takedown**
  59:20 60:7
  62:9,15,18
**takedowns**
  59:22
**taken**
  5:6 47:14,16
  76:6
**talk**
  35:3,4
**talked**
  17:6 79:25
**talking**
  7:18 12:20
  13:7 24:3,13
  37:18,19
  39:13,18
  41:1 47:2
  63:25 69:3
  78:21 80:23,
  24 83:6
  84:5,8,10
**target**
  54:8,10
**taught**
  8:25 74:11,
  16,18
**teach**
  49:21 74:10,
  15
**team**
  65:16
**teams**
  70:3
**technical**
  5:23
**tell**
  7:3 11:16,17
  16:1,4,17
  17:16 20:25

23:10 26:6
35:2 47:13
53:13,22
56:23 69:11
85:20 88:15
**temporarily**
  87:6
**tend**
  45:2
**Tennessee**
  34:13,14,16,
  19 35:4
  45:2,5,8,10,
  11 56:19
**Tentatively**
  87:7
**terms**
  5:13 14:16
  15:13 45:5
  75:10
**testified**
  12:19 14:12,
  21 15:10
  17:4 20:17
  24:6 25:10,
  15,18,22
  28:21 29:22
  33:13 38:7,
  9,15 40:4
  56:18,21,22
  59:19 61:14
  63:5,8 70:17
  74:18 87:21
  89:5
**testify**
  21:24 34:10,
  12,20 35:9,
  11 37:5
  39:20
**testifying**
  33:14 34:9
  57:3 78:2
**testimony**
  11:3 12:18
  13:1 14:8,11
  15:10,14,17,
  18,19,20
  16:6,7 17:13

20:10,14
24:20 25:4
29:24 34:1,
3,8,24 36:6
37:10 57:1
63:13 64:11,
20,24 65:5,8
**Texas**
  34:17,18
  45:10
**textbook**
  67:1
**Thank**
  22:11 23:6
  26:21 28:2
  31:7 35:3
  36:19 41:23
  42:9 43:2,4
  55:10 59:9
  73:24 78:13
  80:5 82:8
  88:25 90:18
  91:18
**Thanks**
  40:5 65:20
  90:19
**thicker**
  61:25
**thing**
  7:21 40:19
  50:21 64:24
  89:14 91:3
**things**
  13:8 22:19
  25:23 34:9
  41:1,8,14,
  15,18 43:9
  62:15 70:23,
  24,25 73:21
  75:11,23
  78:1 89:10,
  11,22 90:5
  92:4
**think**
  7:22 19:18
  22:19 24:24
  25:8 32:9,14
  33:13 45:24

46:4,24
47:20 48:16
51:5 53:4,15
54:19,24
55:14 56:6,
10,20 57:25
60:10,12
71:4 77:3,12
79:22 80:2,
14 82:16
87:25 91:3,
8,14,16
**thinking**
  74:24
**third**
  7:13 13:21,
  23
**thought**
  8:4 10:12
  50:11
**threatened**
  25:8
**three**
  38:23 40:1
  46:5 76:1
  85:7 87:25
  88:2,5,10,17
**threw**
  46:14
**time**
  41:24 42:2,
  5,9 43:24,25
  48:22 51:21,
  23,24 52:6,
  7,8 54:1,17,
  19,24 57:2,6
  59:9,19
  62:15 67:5,8
  79:24 80:21,
  25 82:23
  83:17 84:12
  85:25 86:21
  88:25 89:5,
  6,15 91:6,
  13,19
**times**
  6:8,10
  47:13,16

Ralph Silverman, M.D.
July 23, 2021

53:5 72:6

**timing**
15:13 16:22
17:9 80:12
82:10

**tissues**
61:24,25

**today**
5:10,12 7:4
10:13 11:8
39:12 54:14,
20 55:20
82:13 86:5,
13 87:18
91:6,12

**told**
12:16 13:15
15:17 47:6,
10 51:10

**top**
72:8 73:7,
20,21

**total**
44:20

**touch**
34:18

**touching**
34:16 45:6

**track**
50:10 51:1

**training**
9:1 61:3

**treat**
74:20

**treated**
19:2

**treating**
9:19 10:18
18:21

**treatment**
9:2,5,14
70:18

**trial**
53:11 56:8,9

**trials**
56:10,13

**true**
9:8 14:18,
19,20 17:22
18:12 24:19
33:25 37:12
38:6,8
74:14,17,19
91:4

**truth**
38:9 41:5

**truthfully**
38:15 74:18
91:15

**try**
5:24 6:4
64:1 72:16

**trying**
35:8,16
41:20 72:14
73:11

**turning**
61:24

**twice**
33:2 52:18

**two**
5:20 20:1
30:25 31:1
32:1,20
34:11 38:23
42:1 46:5,
17,22 51:2
53:5 54:5
56:2 59:24
66:11 74:25
80:16,20
85:7 88:1

**two-and-a-
half**
31:1 64:8

**type**
78:3

**types**
41:15 77:20

**typical**
5:20 59:23

**typically**
13:6 56:4

67:15 68:5,9
72:25

___

**U**

___

**uncontrolled**
88:21

**undergo**
29:11,12,13
67:3,5 75:9
88:23

**undergoes**
76:14

**understand**
5:15 6:2,5
7:20 18:22
29:1 31:12
77:24 81:20
85:14,19
89:12

**understanding**
5:22 18:20
19:5 35:20
66:18 75:23

**unit**
52:2

**University**
36:9 43:12,
14 49:16
50:2,7 51:8

**unpaid**
49:14 50:24

**unredacted**
10:12

**unusual**
5:19

**up-to-date**
11:23 49:11

**upkeep**
69:24

**ureter**
26:1 27:24

**urgent**
20:6 63:2

___

**V**

___

**vague**
29:5

**variables**
84:7

**various**
17:4

**vary**
62:18

**venture**
69:12

**versus**
14:12 35:6
36:1,8 76:15
84:14,24

**vertical**
53:24

**violated**
54:11

**violence**
48:15,24

**visited**
46:24

**visits**
29:20 30:5
67:12

**vitae**
49:11

**voice**
23:5

**volume**
52:2,5

**volunteer**
50:24

___

**W**

___

**W-E-X-N-E-R**
36:10

**wait**
31:17 41:7
80:20 85:3
87:1,2 88:5,
10,17,24

Ralph Silverman, M.D.
July 23, 2021

89:6,15

**waiting**
85:10

**want**
15:18 21:13
26:12 29:12
37:23 41:3
42:5 67:3
69:17,22
71:12,17,24
72:3,5,6,17
73:9,14,15,
22 77:11
78:14 82:18
86:10,22,25
87:2 89:23,
24 90:2,11

**wanted**
13:15 24:8

**way**
15:25 16:11,
18 52:4
69:16 71:2
73:5 83:10
84:7

**Weber**
28:4 67:11

**Weber's**
33:17

**week**
25:2 42:1,3
45:25 52:10,
12 59:20,25

**weeks**
46:5 58:2
76:2 85:23
87:4

**weight**
88:21 89:25

**well-managed**
89:24

**went**
32:18 47:4

**Wexner**
36:9,10

**whatever's**
51:3

**whatnot**
88:14

**When's**
42:2

**wholly**
20:16

**William**
43:18

**willingness**
37:5

**Wilson**
35:6,14,16,
25

**witness**
8:12 10:2,5
11:20 22:7
29:6 31:18
32:2 39:7
42:23 43:2
48:6 64:4
66:2 68:5,17
69:3,10,22
70:11 80:8
86:6 90:14

**witness's**
63:13 64:22,
23

**witnesses**
36:23

**wondering**
9:21

**word**
58:25

**work**
34:25 35:23
55:16 61:25
78:4

**working**
42:19

**workings**
77:25

**worth**
41:14,18

**wound**
90:1

**write**
40:7 59:6

67:10,15,18,
23 85:24
91:22,24

**writing**
68:10

**written**
10:11 59:2,4
78:9 92:1

**wrong**
38:21 66:3
77:15

**wrote**
8:19 40:25
58:5 91:25
92:2

---

**Y**

**Yeah**
6:16 37:24
81:2 86:19

**year**
31:1 34:15,
18 44:18
56:1,9,11
60:4,6,9

**year-and-a-
half**
41:1

**years**
22:9 31:1
32:20 43:21
51:2 56:12
60:14 64:8
70:12 75:1
87:22,25
88:2