# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**KOHCHISE JACKSON**,
 Plaintiff,

v.

**CORIZON HEALTH, Inc.,**, et al,
Defendants.

Case No.: 2:19-cv-13382
Hon.: Terrence G. Berg
Mag.: Patricia T. Morris

Laurence H. Margolis (P69635)
Ian T. Cross (P83367)
*Margolis, Gallagher & Cross*
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: larry@lawinannarbor.com
Email: ian@lawinannarbor.com

Daniel R. Corbet (P37306)
Kenneth A. Willis (P55045)
*Corbet, Shaw, Essad & Bonasso, Pllc*
Attorneys for Defendant Prime Healthcare
Services and Colleen Spencer
30500 Van Dyke Ave., Suite 500
Warren, MI 48093
Phone: (313) 964-6300
Email: daniel.corbet@cseb-law.com
Email: kenneth.willis@cseb-law.com

Ronald W. Chapman Sr., (P37603)
Delvin Scarber (P64532)
*Chapman Law Group*
Attorneys for Defendants Corizon Health, Inc.
and Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: rchapman@chapmanlawgroup.com
Email: dscarber@chapmanlawgroup.com

## PLAINTIFF'S RESPONSE TO DEFENDANTS PRIME HEALTHCARE SERVICES - PORT HURON LLC AND COLLEEN SPENCER'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**SECTION NO.**                                                          **PAGE**

---

**Table of Contents**………..…………………………...………… ii.

**Index of Exhibits** ………..……………………………………… iii.

**Statement of Issues Presented**………..…………………………. v.

**Table of Authorities**…………………………………………… v.

**Controlling or Most Appropriate Authorities**……………………. vii.

## ARGUMENT

**I) Introduction**……………………………………………….... 1

**II) *Monell* Liability Can Be Established On the Basis of a Single Act**…………………………………………………. 3

**III) Participation in the Decision to Deny Care is Sufficient to Confer Liability**...………………..……………………………. 7

**IV) Every Eighth Amendment Deprivation-of-Adequate Medical-Treatment Claim is Also Cognizable as Medical Malpractice**………..…………………………..……………..…. 11

**V) Conclusion**……………………….……………………….. 17

## INDEX OF EXHIBITS

EXHIBIT A          Deposition of Dr. Kansakar, Mar. 3, 2017

EXHIBIT B          Dr. Kansakar Letter, Jan. 1, 2017

EXHIBIT C          Treatment Plan Note, Dec. 27, 2016

EXHIBIT D          Spencer Kite Responses, Feb. 1, Feb. 7, and Feb. 15, 2017

EXHIBIT E          Deposition of Kohchise Jackson, Mar. 22, 2017

EXHIBIT F          Inmate Notes, Jan. 22, 2017

EXHIBIT G          Inmate-Detainee Lockdown Review, Jan. 22, 2017

EXHIBIT H          Prime-St. Clair Contract Extender, Nov. 28, 2016

EXHIBIT I          Deposition of Tracy DeCaussin, Mar. 19, 2017

EXHIBIT J          Prime-St. Clair Contract

EXHIBIT K          Deposition of Richard Olejnik, Mar. 19, 2017

EXHIBIT L          Affidavit of Colleen Spencer, Aug. 8, 2021

EXHIBIT M          Defendant Prime's Response to Plaintiff's Interrogatory

EXHIBIT N          Email to Defense Counsel, Dec. 10, 2020

## **Statement of Issues Presented**

I. DID THE PRIME DEFENDANTS INTERFERE WITH PLAINTIFF'S PRE-SCRIBED PLAN OF TREATMENT FOR A NON-MEDICAL REASON?

Plaintiff Answers: **Yes.**

Prime Defendants May Answer: **No.**


II. CAN PLAINTIFF ESTABLISH *MONELL* LIABILITY ON THE BASIS OF A SINGLE ACTION TAKEN BY PRIME'S AUTHORIZED DECISONMAKER?

Plaintiff Answers: **Yes.**

Prime Defendants May Answer: **No.**

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

1) *Lemarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001)

2) *Darrah v. Krishner,* 865 F.3d 361, 372-73 (6th Cir. 2017)

3) *Titlow v. Corr. Med. Servs.*, 2008 U.S. Dist. LEXIS 125272 (E.D. Mich. 2008)

## Introduction and Factual Background

Plaintiff Kohchise Jackson was a pretrial detainee in the St. Clair County Jail from May 17, 2016 to March 23, 2017. During his detention he developed a colovesical fistula, which is a hole connecting his bladder to his large intestine. (Ex. A–Kansakar Dep. 10:1-10:10, Mar. 5, 2021). December of 2016, Mr. Jackson underwent an emergency surgery to address this problem. (Ex. A, 10:16-12:23). The surgery involved the temporary diversion of Mr. Jackson's fecal stream, meaning that stool exited his body via an opening the surgeon created in his abdomen. (Ex. A, 12:5-12:10). Mr. Jackson's surgeon planned to perform a second surgery two months after the initial procedure to reconnect Mr. Jackson's colon to his rectal stump and close the opening in his abdomen. (Ex. A, 14:1-17:7; Ex. B–Kansakar Letter, Jan. 1, 2017; Ex. C–Treatment Plan Note, Dec. 26, 2017). His surgeon, Dr. Erina Kansakar, testified, "I would say it is medically necessary to have the colostomy reversed," (Ex. A, 31:11-31:13) that she believed that performing this procedure approximately eight weeks after the initial surgery represented the standard of care, (Ex. A, 14:25-15:8; Ex. 4) that and that the colostomy "was meant to be temporary . . . and the original plan was to kind of hook him back up. So that was the plan to do a colostomy reversal." (Ex. A, 16:17-16:21). Dr. Kansakar further testified, "it's a lifestyle-altering procedure for the patient, and it's – it would be very normal for the patient to have a natural route established. I would recommend colostomy reversal." (Ex. A, 28:4-28:8).

1

Mr. Jackson did not receive the colostomy reversal surgery while detained in the St. Clair County Jail. Dr. Kansakar testified that she "was told that his surgery was not approved. So I was not able to perform the second surgery for the patient." (Ex. A, 16:24-17:2). Someone made a decision to "postpone" the surgery "due to the fact that it is not emergent or life-threatening." (Ex. D–Spencer Kite Response, 02/01/17). As a result, Mr. Jackson did not receive the colostomy reversal until the Summer of 2019, about a month after he was released from prison. In the intervening years, he suffered. He grew "tired of that bag falling off and getting feces on my clothes." (Ex. E–Jackson Dep. 122:22-122:23, Mar. 22, 2021). The bag "was constantly leaking." (Ex. E, 42:18). While in the county jail, Mr. Jackson was placed on administrative lockdown, i.e. solitary confinement, "because of continuous complaints of his smell" from other detainees. (Ex. F–Inmate Notes, Jan. 22, 2017). "After numerous complaints and many movements throughout the building," no alternative housing placement could be found. (Ex. G–Inmate-Detainee Lockdown Review). At that time, "they would clear the whole rock – everybody out for me to clean my bag when I when I would go to the bathroom. I would have problems with people in the bathroom when I be cleaning my bag in the stall because of the smell of it – it did not smell like feces. It smelled like the insides of me. It was like, terrible. Would make me nauseous. And I'm sure other people, too." (Ex. E, 124:7-124:14).[1]

_____

1 The Court has determined that the suffering associated with being forced to use a colostomy bag despite the viability of a reversal procedure, as alleged in Plaintiff's Amended Complaint, "is sufficient to satisfy the objective element of the Eighth

2

Defendant Prime Healthcare Services – Port Huron LLC (hereafter "Prime"), assumed a contract to provide medical services at the St. Clair County Jail when it purchased a hospital in Port Huron. (Ex. H–Prime-St. Clair Contract Extender, Nov. 28, 2016; Ex. I–DeCaussin Dep. 6:5-6:21, Mar. 19, 2021). Defendant Colleen Spencer, f.k.a. Colleen Dewan, was the "RN Coordinator" for the St. Clair County Jail healthcare program. (Ex. I, 9:4-9:12). She worked at the jail, but was an employee of Prime. Prime's contract with St. Clair County provided for payment of a fixed annual fee of $490,962 to provide medical services at the jail. (Ex. J–Prime-St. Clair Contract, 1). Additional offsite services provided to detainees at Prime's hospital facility were billed to the County "at agreed upon discounted rates," which in this case were "53% of [Prime's] charges." (Ex. J, 23). No evidence has been introduced to demonstrate whether or not providing services at the discounted 53% reimbursement rate was profitable for Prime.

## I.  *Monell* Liability Can Be Established On the Basis of a Single Act

Prime and Colleen Spencer (hereafter "Prime Defendants") argue that because the County of St. Clair paid Prime on a fee-for-service basis for medical services performed in the Prime Defendants' hospital, Plaintiff's claim against them fails. (ECF No. 85, PageID.974).  According to the Prime Defendants, testimony indicating that the hospital

---

Amendment inquiry at the motion to dismiss stage." (ECF No. 32, PageID.625).

3

was paid on a fee-for-service basis proves that the Prime Defendants did not have a policy of "denying out of jail medical appointments to save money," and because Plaintiff cannot prove the existence of such a policy, the Prime Defendants are entitled to summary judgment. *Id*.

The problem with this line of reasoning lies in the final step. The existence of any policy is irrelevant to the claim against Ms. Spencer, and proving such a policy is only one of several ways to establish Prime's liability. Proof of a "policy" is relevant to § 1983 claims in the context of municipal, as opposed to individual, liability for a civil rights violation. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).[2] "The requirement that a municipality's wrongful actions be a "policy" is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials." *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994). Rather, "[i]t is meant to distinguish those injuries for which 'the government as an entity is responsible under § 1983,' *Monell*, 436 U.S. at 694, from those injuries for which the government should not be held accountable." *Id*. There are four ways a plaintiff can establish municipal (or corporate) liability under § 1983:

> the plaintiff may prove (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

---

2 Private corporations providing healthcare to prisoners are treated as if they were a municipality for purposes of § 1983. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014).

4

*Wright v. City of Euclid,* 962 F.3d 852, 880 (6th Cir. 2020).

Plaintiff can show an "official policy" via the first method by presenting evidence of "formal rules or understandings -- often but not always committed to writing -- that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). A Plaintiff can also show municipal responsibility via the second method, where the municipality has made a conscious decision to pursue "a course of action tailored to a particular situation and not intended to control decisions in later situations." *Pembaur*, 475 U.S. at 481. The municipality is responsible for these individual decisions when "the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers." *Pembaur* at 481; *See also, Cady v. Arenac County,* 574 F.3d 334, 345 (6th Cir. 2009).

In this case, there is sufficient evidence for a jury to find that the decision to cancel the surgery scheduled for February 9, 2017 was made by Prime's authorized decisionmakers. In a 30(b)(6) deposition, the County of St. Clair testified that it had delegated authority to make healthcare decisions for its jail inmates to "our contracted medical provider." (Ex. K–Olejnik Dep. 6:5-6:8, Mar. 19, 2021). The County did not, itself, employ any medical staff at the jail. (Ex. K, 7:21-8:3). No County employees ever overruled decisions made by the contractor's medical staff, (Ex. K, 8:19-8:24), and the decision to postpone Mr. Jackson's surgery was not made by any St. Clair County

5

employee. (Ex. K, 11:16-11:19). The County testified that "[a]ll of the medical appointments were scheduled through medical staff," (Ex. K, 10:18-10:19), and that "**[w]e did not make medical decisions. I'm not sure who decided the actual decision, but it was not up to us at the jail.**" ( Ex. K, 12:21-12:24). The County further testified that pursuant to its contract with Prime, Prime's RN Coordinator, "Colleen," and Prime's Physician/Physician extender were responsible for determining whether jail detainees would receive surgical procedures. (Ex. I–DeCaussin Dep. 9:4-9:12, 13:1-13:7).

Defendant Colleen Spencer claims that she did not have authority to grant or deny out-of-jail medical appointments for jail detainees. (Ex. L–Spencer Aff. ¶ 11, Aug. 8, 2021). She claims that the decision was made by the Physician or Physician extender, i.e., the Prime Healthcare official who *did* have final authority. (Ex. L, ¶ 8). Her allegations that County officials made the decision (Ex. L, ¶¶ 8, 10) are contradicted by the County's testimony. Her claim that the surgery was postponed because Mr. Jackson "knew the date of the out of jail medical appointment," (Ex. L, ¶ 5), and that as a result, custody staff would not allow him to be transported, is contradicted by her prior contemporaneous statement: "the Inmate's surgery is postponed at this time due to the fact that it is not emergent or life-threatening."[3] (Ex. D, Spencer Kite Response, 02/01/17). This is sufficient for a jury to find that the decision to cancel Mr. Jackson's surgery was made by Prime's authorized decisionmakers. Prime also cannot escape

---

3   This is the reason for the denial alleged in Plaintiff's Amended Complaint. (ECF No. 12, PageID.188, ¶ 25).

liability by belatedly claiming[4] that some higher-up official who did not review the decision was its actual final decisionmaker, since "[a] municipality may not escape Monell liability . . . by simply delegating decisionmaking authority to a subordinate official and thereafter studiously refusing to review his unconstitutional action on the merits." *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994).

## IiI. Participation in the Decision to Deny Care is Sufficient to Confer Liability

A defendant may be held liable under § 1983 "insofar as she participates in a violation of the constitution or federal law." *Fizer v. City of Warren*, 2021 U.S. Dist. LEXIS 160522 at *28 (E.D. Mich. 2021). *See also, Parsons v. United States DOJ*, 801 F.3d 701, 714 (6th Cir. 2015) ("the fact that a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation.") Prison medical personnel can be held responsible for an Eighth Amendment violation when they "encouraged the specific incident of misconduct" or "at least implicitly authorized, approved, or knowingly acquiesced in the denial of medical care." *Kensu v. Borgerding*, 2019 U.S. Dist. LEXIS 170218 at *14 (E.D. Mich. 2019). This is true even when the defendant did not have supervisory authority over the individual empowered to deny treatment. *See Sildack v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 121801 at *14-*17 (E.D. Mich. 2014)

---

4  Prime should have disclosed the identity of this person during the discovery period. Plaintiff served a single interrogatory on Prime requesting the identity of the person(s) who made this decision, (Ex. M–Prime's Response to Plaintiff's Interrogatory), and asked Prime to supplement its essentially non-responsive answer (Ex. N–Email to Defense Counsel, December 10, 2020). Prime never did.

(denying summary judgment to complicit MDOC official, where non-party Corizon Utilization Managment physician was "the sole person who made the decision not to approve the request" for surgery).

Ms. Spencer, the R.N. Coordinator, was "the head nurse at the jail," (Ex. E–Jackson Dep. 38:3-38:4), and was the primary person responsible for the detainee healthcare program in the facility. Ms. Spencer was responsible for "24/7 program oversight" and acted as "a case manager for coordination of all medical services for inmates." (Ex. J–Prime-St. Clair Contract, 14). Ms. Spencer was responsible for "recruiting, orienting and scheduling" all other medical personnel at the jail, (Ex. J, 21) and for coordinating "all appointments and transportation" for offsite specialty care services. (Ex. J, 15).   While the physician/physician extender was present on site only twice a week, for two hours at a time to see patients, Ms. Spencer worked at the jail forty hours per week. (Ex. J, 14).

Here, the evidence suggests that Ms. Spencer was at the very least complicit in canceling Mr. Jackson's surgery.  Dr. Kansakar's office faxed a letter to "Colleen" on January 24, 2017 to inform her that, "[m]y recommendation and standard of care for this patient is to have a Barium Enema x-ray via the distal rectal stump and a colostomy reversal. Please see attached office note." Dr. Kansakar believes she "wrote this letter to make a case for surgery and asked [her office manager] to fax it over to the insurance company." (Ex. A–Kansakar Dep. 18:10-19:21; Ex. B–Kansakar Letter). Someone in the

8

jail (likely Ms. Spencer) then circled "standard of care" and "colostomy reversal" on the letter, drew an arrow, and wrote, "When?"

In responses Ms. Spencer wrote to Mr. Jackson's electronic messages asking about the surgery, Ms. Spencer indicated that Dr. Kansakar's office had been contacted multiple times and that "all medical recommendations have been provided to SCCIC staff." Although Dr. Kansakar clearly recommended colostomy reversal and prescribed a plan of treatment including colostomy reversal, (Ex. C–Treatment Plan Note), a determination was made that Dr. Kansakar's prescribed course of treatment "is not emergent and does not need to be done immediately."  (Ex. D–Spencer Kite Responses). Where, 1) the surgeon's request for approval of the procedure was sent specifically to Ms. Spencer, 2) Ms. Spencer was the official primarily responsible for coordinating detainee healthcare at the St. Clair County Jail, and 3) Ms. Spencer's responses to Mr. Jackson's kites suggest that Ms. Spencer was aware of and supported the decision to postpone the surgery, a jury could find that she participated in the decision to deny treatment.

The case cited by Defendant on this point, *Roberson v. Tenn. Dep't Corr.*, 2013 U.S. Dist. LEXIS 1006 (M.D. Tenn. 2013) is inapposite. *Roberson*, like the present matter, involved a prison system (the Tennessee DOC) that outsourced its healthcare services to a private contractor, Corizon. The inmate plaintiff sued his treating physician, who worked for Corizon, and a number of TDOC officials. The TDOC officials had no

9

control over the private contractor, and "were not personally involved in any decision regarding Plaintiff's medical care or hip replacement surgery." *Roberson* at *15. The TDOC officials in *Roberson* are analogous to St. Clair County's employees in the present matter, who similarly had no involvement in the medical care provided by their contractor. (Ex. K–Olejnik Dep. 6:5-11:19). The other defendant granted summary judgment in *Roberson,* Dr. Alexander, treated the plaintiff and submitted requests for the plaintiff to receive surgery which others within Corizon had the power to approve or deny. *Roberson* at *16. Dr. Alexander was in an analogous position to Dr. Kansakar or Dr. Alsalman in this case: he was a treating physician recommending that the plaintiff receive surgery. Ms. Spencer was not similarly-situated to any of the defendants in *Roberson.* She was neither an uninvolved public employee or a treating physician *submitting* requests for surgery. Rather, she was the *recipient* of the physician's request for surgery and a participant in the decision to deny it. Her involvement is more analogous to that of Dr. Stieve, Dr. McQueen, and Dr. Edelman in *Sildack*, who were all involved and complicit in the decision to deny the plaintiff surgery, and were not granted summary judgment even though the final decisionmaker in that case was non-party Dr. Harriet Squier. *See Sildack v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 121801 at *25-*28 (E.D. Mich. 2014).

10

## IV. Every Eighth Amendment[5] Deprivation-of-Adequate-Medical-Treatment Claim is Also Cognizable as Medical Malpractice

The Prime Defendants argue that their denial of a colostomy reversal surgery in this case "might support a claim for medical malpractice under state law, but it does not support a claim of deliberate indifference under federal law." (ECF No. 58, PageID.977). They appear to argue that the evidence demonstrates, at best, a medical-malpractice claim because 1) colostomy bags were provided to Plaintiff, and 2) because "it is possible for different doctors could [sic] arrive at different treatment decisions using medical judgment." *Id*. Defendants' argument betrays a misunderstanding of the distinction between medical-malpractice and Eighth Amendment deliberate-indifference.

The primary difference between a malpractice claim and a deliberate-indifference claim is that deliberate-indifference claims contain a heightened mens rea requirement. The elements of a medical-malpractice claim in Michigan are:

(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care.

*Plescia v. United States*, 2015 U.S. Dist. LEXIS 175305 at *12 (E.D. Mich. 2015). Eighth-Amendment deliberate-indifference claims, on the other hand, are said to involve proof of two components: 1) "that the deprivation alleged be of a sufficiently serious need," and 2) "that the defendants must have 'a sufficiently culpable state of mind."

---

5  The Court has determined that Plaintiff's Fourteenth Amendment claims will be analyzed under the Eighth Amendment framework. (ECF No. 32, PageID.629).

*Darrah v. Krisher*, 865 F.3d 361, 367-68 (6th Cir. 2017) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Implicit within the test is a requirement that the plaintiff actually be *deprived* of his "right to adequate medical care during pretrial confinement." *Johnson v. Karnes,* 398 F.3d 868, 873 (6th Cir. 2005). Otherwise, there can be no constitutional violation. For example, cancer is "an objectively serious medical need," *Dittmer v. Corizon Health, Inc.,* 2021 U.S. Dist. LEXIS 13068 at *23 (E.D. Mich. 2021), and can cause a prisoner to experience "torture or a lingering death," harms which the Eighth Amendment clearly prohibits. *See Brown v. Plata,* 563 U.S. 493, 510 (2011). But a prisoner who dies a slow and painful death from cancer despite having received competent, error-free medical treatment has no Eighth Amendment claim: he has not been deprived of "the constitutional right to adequate medical care." *See Johnson v. Karnes,* 398 F.3d at 873. It is impossible to establish a violation of this right when the treatment provided to the prisoner comported with the standard of care.

To make the threshold showing that the care provided was inadequate, Eighth Amendment plaintiffs are required to proffer "verifying medical evidence" in many circumstances, just as expert testimony is typically required in state-law medical-malpractice claims. Expert testimony is required to make out a state-law medical malpractice claim in most circumstances because "the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice

12

in the community." *Plescia v. United States,* 2015 U.S. Dist. LEXIS 175305 at *13 (E.D. Mich. 2015) (quoting *Lince v. Monson*, 363 Mich. 135, 108 (1961)). However, "Michigan courts also agree that '[w]here the absence of professional care is so manifest that within the common knowledge and experience of an ordinary layman it can be said that the defendant was careless,'" expert testimony is not required. *Id.* (quoting *Law Offices of Laurence Stockler, P.C. v. Rose*, 174 Mich.App. 14, 48 (1989)). The same obvious/non-obvious distinction is applied in the Eighth-Amendment context. When the claim involves a medical problem that "was so obvious that a layperson would recognize the need for medical treatment," the plaintiff does not need to submit "verifying medical evidence" to support her claim. *Colson v. City of Alcoa*, 2021 U.S. App. LEXIS 26532 at *14 (6th Cir. 2021). A need for colostomy reversal likely falls on the "obvious" side of the line. *See Morris v. Corr. Med. Servs.*, 2012 U.S. Dist. LEXIS 165424 at *8 (E.D. Mich. 2012) (holding that need for cataract removal in one eye was obvious to a layperson). But verifying medical evidence *is* required in Eighth Amendment claims involving "minor maladies or non-obvious complaints." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004). It is easy to see why: a jury faced with only a prisoner's allegation that he needed more or different treatment, where his needs were non-obvious to a layperson and no medical evidence is presented, would not be able to determine if the treatment provided was inadequate.

13

While a threshold showing of a breach of the standard of care is *necessary* to prove a violation of the right to adequate medical care in custody, it is not *sufficient:* "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).  That is because "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions,' it outlaws cruel and unusual 'punishments.'" *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The defendant must therefore act with some mental element of punitive intent for his conduct to constitute 'punishment.' *Wilson v. Seiter*, 501 U.S. 294, 300 (1991). The minimum mens rea element sufficient to satisfy this requirement is "deliberate indifference," which lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other;" deliberate indifference is approximately equivalent to recklessness. *Farmer*, 511 U.S. at 836. This requirement that the defendant act recklessly or intentionally in depriving the plaintiff of adequate medical care, i.e. possess "a sufficiently culpable state of mind," is known as the "subjective component" of an Eighth Amendment claim. *Brooks v. Celeste*, 39 F.3d 125, 127-28 (6th Cir. 1994).

It is this distinction between *negligent* conduct and *reckless or intentional* conduct that separates state-law malpractice claims from federal-law deliberate-indifference claims. *See Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). The relevant distinction is not, as the Prime Defendants suggest, between providing some treatment and

14

providing no treatment to the prisoner. *See Lemarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) ("a prisoner is not required to show that he was literally ignored by the staff to prove an Eighth Amendment violation"). While totally disregarding a prisoner's pleas for medical attention will generally suffice to establish the subjective component, *See, e.g. Hill v. Winn*, 2020 U.S. Dist. LEXIS 205086 at *8 (E.D. Mich. 2020), it is not the only way to do so. A plaintiff can satisfy the subjective component by showing that the prison doctor *intentionally* breached the standard of care while providing treatment, for example by "choosing the 'easier and less efficacious treatment' of throwing away the prisoner's ear and stitching the stump" rather than reattaching the ear, *Estelle v. Gamble*, 429 U.S. 97, 104 n.10 (1976), by concluding a surgical procedure without addressing an obvious bile leak, *Lemarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001), or by prescribing a medication known to be less effective merely because it is cheaper. *Darrah v. Krishner*, 865 F.3d 361, 372-73 (6th Cir. 2017).

Particularly relevant to this case, "knowing interference with [a] prescribed plan of treatment" constitutes deliberate indifference. *Darrah v. Krishner*, 865 F.3d at 368 (6th Cir. 2017); *See also, Imelmann v. Corizon Inc.*, 2016 U.S. Dist. LEXIS 133107 at *18-*20 (E.D. Mich. 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). Where the decision to deny the care recommended by the patient's treating physician is made by "non-treating, non-examining supervisors," such persons cannot escape liability for their interference by claiming that their decision to deny care represents a

15

mere "difference of opinion regarding medical treatment." *Sildack v. Corizon Health, Inc.,* 2014 U.S. Dist. LEXIS 121801 at *18-*19 (E.D. Mich. 2014); *See also, Strayhorn v. Caruso,* 2015 U.S. Dist. LEXIS 114980 at *30-*31 (E.D. Mich. 2015) (denying summary judgment to non-treating physician who "made an armchair assessment" that offsite services requested by plaintiff's treaters were unnecessary); *Titlow v. Corr. Med. Servs.,* 2008 U.S. Dist. LEXIS 125272 at *18-*19 (E.D. Mich. 2008) (finding that decisions to deny surgery by non-treating supervisory physicians were not medical treatment decisions: "[t]hese denials by health administrators who did not treat plaintiff, at least when viewed in the light most favorable to plaintiff, reflect an administrative decision divorced from the specific circumstances of plaintiff's condition, rather than a medical treatment decision with which plaintiff simply disagrees.")

In this case, the Plaintiff's treating physician, Dr. Erina Kansakar, prescribed a plan of treatment that included a barium enema and X-ray to check for leaks in his rectal stump, followed by a colostomy reversal surgery in February of 2017. (Ex. A–Kansakar Dep. 13:23-15:10, Ex. C–Treatment Plan Note). The Prime Defendants knew that these were Dr. Kansakar's treatment recommendations. (Ex. B–Kansakar Letter). The Prime Defendants then decided not to provide the treatment recommended by Dr. Kansakar, "due to the fact that it is not emergent or life-threatening." (Ex. D–Spencer Kite Responses, Feb. 7, 2017). These are not valid excuses for refusing to provide a surgical procedure recommended by a prisoner's treating physician. *See Titlow v. Corr. Med.*

16

*Servs.*, 2008 U.S. Dist. LEXIS 125272 at \*17 (E.D. Mich. 2008) ("Defendants cite no authority for the proposition that a condition must be "life threatening" or need "emergency" treatment to constitute a serious medical need, most likely because there is no such authority. . . . This is so regardless of whether defendants determined that the treatment sought by plaintiff was merely cosmetic.")

The decision not to provide surgery to Mr. Jackson was not an accident. The Prime Defendants "correctly perceived all the relevant facts, understood the consequences of such facts, and disregarded those consequences" when they made a considered, deliberate choice to cancel Mr. Jackson's surgery. *See Lemarbe v. Wisneski*, 266 F.3d 429, 440 (2001). The surgery was cancelled not because it was not medically indicated, but rather because it was not emergent or life-threatening. A reasonable jury could find that on these facts, the Prime Defendants "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed" in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

## IV. Conclusion

For all the foregoing reasons, the Prime Defendants' Motion for Summary Judgment should be denied.

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff

17