# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**KOHCHISE JACKSON**,
  Plaintiff,

v.

**CORIZON HEALTH, Inc.,**, et al,
Defendants.

Case No.: 2:19-cv-13382
Hon.: Terrence G. Berg
Mag.: Patricia T. Morris

Laurence H. Margolis (P69635)
Ian T. Cross (P83367)
*Margolis, Gallagher & Cross*
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: larry@lawinannarbor.com
Email: ian@lawinannarbor.com

Daniel R. Corbet (P37306)
Kenneth A. Willis (P55045)
*Corbet, Shaw, Essad & Bonasso, Pllc*
Attorneys for Defendant Prime Healthcare
Services and Colleen Spencer
30500 Van Dyke Ave., Suite 500
Warren, MI 48093
Phone: (313) 964-6300
Email: daniel.corbet@cseb-law.com
Email: kenneth.willis@cseb-law.com

Ronald W. Chapman Sr., (P37603)
Delvin Scarber (P64532)
*Chapman Law Group*
Attorneys for Defendants Corizon Health, Inc.
and Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: rchapman@chapmanlawgroup.com
Email: dscarber@chapmanlawgroup.com

## PLAINTIFF'S RESPONSE TO DEFENDANTS CORIZON HEALTH, INC. AND DR. KEITH PAPENDICK'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**SECTION**                                                        **PAGE**
                                    **NO.**

**Table of Contents**………..…………………………...………… **ii.**

**Index of Exhibits** ………...………………………………… **iii.**

**Statement of Issues Presented**………..……………………… **v.**

**Controlling or Most Appropriate Authorities**…………………… **vi.**

## <u>ARGUMENT</u>

**I) Introduction**…………………………………………..... **1**

**II) There is Sufficient Evidence to Find for the Plaintff
on the Objective Prong of the Deliberate Indifference Test..……… **2**

**III) Corizon's Utilization Management Department
<u>Intentionally</u> Blocked Dr. Alsalman's General Surgery
Referral for the Purpose of Reducing Corizon's Costs and
Thereby Increasing its Profit...…………………….…………… **6**

**IV) Defendant's Claim that MDOC Policy Required Them
to Deny Mr. Jackson a Reversal Surgery Is False, and Would
Not be an Excuse if it Were True**…………………………….… **19**

**V) Plaintiff Does Not Need to Prove that Dr. Papendick was a
Final Decisionmaker**…………………….………………….. **23**

**VI) Conclusion**…………………….…………………….… **25**

# INDEX OF EXHIBITS

EXHIBIT 1          Corizon Bid Protest Letter, Mar. 8, 2021
EXHIBIT 2          Corizon-MDOC Service Contract, 2016-2021
EXHIBIT 3          Dr. Erina Kansakar Deposition, Mar. 5, 2021
EXHIBIT 4          Dr. Kansakar Letter to Colleen Spencer, Jan. 24, 2017
EXHIBIT 5          Dr. Kansakar Prescribed Treatment Plan, Dec. 27, 2016
EXHIBIT 6          Dr. Alsalman Request for General Surgery Consult, Apr. 18, 2017
EXHIBIT 7          Dr. Papendick ATP of Request for Surgical Consult, Apr. 19, 2017
EXHIBIT 8          Dr. Papendick Deposition, May 5, 2021
EXHIBIT 9          DMC Medical Records Excerpt
EXHIBIT 10         Deposition of Kohchise Jackson, Mar. 22, 2021
EXHIBIT 11         Dr. Ralph Silverman Deposition, Jul. 23, 2021
EXHIBIT 12         Declaration of Kohchise Jackson, Sep. 14, 2021
EXHIBIT 13         MDOC Records Excerpt,  Jan. 7, 2018
EXHIBIT 14         Deposition of Dr. Lacy (Excerpt), Mar. 14, 2019
EXHIBIT 15         MDOC Physical and Mental Health Care Expenditure Report–3rd Quarter
EXHIBIT 16         MDOC Physical and Mental Health Care Expenditure Report–1st Quarter
EXHIBIT 17         Excerpt from Presentation to House Appropriations, March 3, 2021
EXHIBIT 18         Excerpt from Corizon MDOC Bid Packet for 2020 Contract Renewal
EXHIBIT 19         Corizon UM Stats Report to MDOC, April 2017
EXHIBIT 20         Excerpt from Corizon Proposal for Missouri, Mar. 17, 2021
EXHIBIT 21         Corizon Technical Proposal for Tennessee, 2012
EXHIBIT 22         Florida Health Care Study, Nov. 13, 2019
EXHIBIT 23         Corizon Technical Proposal for Kansas DOC, 2013
EXHIBIT 24         Corizon's Responses to Plaintiff's Requests, Jul. 7, 2021
EXHIBIT 25         Dr. Jeffrey Bomber Deposition, May 28, 2021
EXHIBIT 26         InGauge Screenshots
EXHIBIT 27         2017 Corizon Utilization Management Manual
EXHIBIT 28         Excerpt of Deposition of Dr. Papendick (*Spiller v. Stieve*)
EXHIBIT 29         Excerpt of Deposition of Dr. Papendick (*Lashuay v. Deline*)
EXHIBIT 30         Excerpts of Deposition of Dr. Sharon Oliver (*Lyles v. Papendick*)
EXHIBIT 31         Corizon's Emergency Motion to Disqualify Expert (*Sildack v. Corizon*)
EXHIBIT 32         ATP Request for Hearing Aide
EXHIBIT 33         Declaration of Dr. Harriet Squier
EXHIBIT 34         Declaration of Erin Orlebeke
EXHIBIT 35         Excerpt from Provider Information Program Manual
EXHIBIT 36         Affidavit of Keith Swift
EXHIBIT 37         Affidavit of Larry Cowan
EXHIBIT 38         MDOC Response to FOIA Request
EXHIBIT 39         Photo of Keith Swift's Stoma
EXHIBIT 40         Photo of Larry Cowan's Stoma
EXHIBIT 41         Excerpt from Corizon Health Site Staff Orientation
EXHIBIT 42         Excerpt from Michigan Medicaid Provider Manual
EXHIBIT 43         Declaration of Dr. Ralph Silverman, M.D.
EXHIBIT 44         Excerpt of Deposition of Dr. Jeffrey Bomber (*Estate of Franklin v. Heyns*)

EXHIBIT 45          Papendick Performance Evaluations
EXHIBIT 46          PACER Search Results for Corizon, 2016
EXHIBIT 47          MDOC Policy Directive 03.03.130
EXHIBIT 48          Excerpt of 2017 Vendor Contracts Report to Michigan Legislature
EXHIBIT 49          Letter from Michigan DTMB Chief Procurement Officer to Corizon, May 30, 2019.
EXHIBIT 50          ATP for Gastroenterology Consult

## **Statement of Issues Presented**

I. DID DR. PAPENDICK DENY PLAINTIFF'S COLOSTOMY REVERSAL SURGERY FOR A NON-MEDICAL REASON?

Plaintiff Answers: **Yes.**

Corizon Defendants May Answer: **No.**

II. WAS A CUSTOM OR POLICY OF CORIZON THE 'MOVING FORCE' BE-HIND THE INJURY ALLEGED?

Plaintiff Answers: **Yes.**

Corizon Defendants May Answer: **No.**

III. IS THE NEED FOR A COLOSTOMY REVERSAL SUFFICIENTLY SERI-OUS TO IMPLICATE THE EIGHTH AMENDMENT?

Plaintiff Answers: **Yes.**

Corizon Defendants May Answer: **No.**

# <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

1) *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991)

2) *Brooks v. Celeste*, 39 F.3d 125 (6th Cir. 1994)

3) *Strayhorn v. Caruso*, 2015 U.S. Dist. LEXIS 114980 (E.D. Mich. 2015)

# I. Introduction

Defendant Corizon Health, Inc. (hereafter "Corizon") is a privately-held corporation that describes itself as "the pioneer and foremost provider of correctional health care in the United States." (**Ex. 1**, pg. 3). Plaintiff Kohchise Jackson is an individual who was incarcerated in the Michigan Department of Corrections from March of 2017 to May of 2019. Corizon was responsible for Mr. Jackson's healthcare needs during the term of his incarceration, pursuant to a five-year, $715,733,760.00 contract with the State of Michigan. (**Ex. 2**, pg. 33).

In December of 2016, while detained in a county jail, Mr. Jackson underwent an emergency surgery to repair a colovesical fistula. (**Ex. 3**, pg. 10-13). The surgery involved the temporary diversion of Mr. Jackson's fecal stream, meaning that stool exited his body via an opening the surgeon created in his abdomen. (**Ex. 3**, pg. 12). Mr. Jackson's surgeon planned to perform a second surgery two months after the initial procedure to reconnect Mr. Jackson's colon to his rectal stump and close the opening in his abdomen. (**Ex. 3**, pg. 14-17; **Ex. 4**; **Ex. 5**). His surgeon testified, "I would say it is medically necessary to have the colostomy reversed," (**Ex. 3**, pg. 31) that performing this procedure approximately eight weeks after the initial surgery represented the standard of care, (**Ex. 3**, pg. 14-15; **Ex. 4**) that and that the colostomy "was meant to be temporary . . . and the original plan was to kind of hook him back up. So that was the plan to do a colostomy reversal." (**Ex. 3**, pg. 16). Dr. Kansakar further testified, "it's a

1

lifestyle-altering procedure for the patient, and it's – it would be very normal for the patient to have a natural route established. I would recommend colostomy reversal." (**Ex. 3**, pg. 28). Nevertheless, Mr. Jackson did not receive the second surgery prior to his transfer to MDOC custody.

Mr. Jackson also did not receive the surgery during his two-year stay in prison. Less than a month after his arrival, Plaintiff's prison physician, Dr. Mahir Alsalman, referred Mr. Jackson for a consult with a general surgeon for the reversal procedure. (**Ex. 6**). But Dr. Alsalman's referral to a general surgeon was blocked by Corizon's Utilization Management department. (**Ex. 7**). The employee within Utilization Management who made the decision to disallow the referral was Dr. Keith Papendick, one of Corizon's Utilization Management Medical Directors. (**Ex. 8**, pg. 73). Mr. Jackson finally received the surgery on June 19, 2019, thirty-four days after his release from prison. The procedure was performed at Detroit Medical Center by Dr. John Webber and was paid for by Medicaid. (**Ex. 9**; **Ex. 10**, pg. 219).

## II. There is Sufficient Evidence for a Jury to Find for the Plaintiff on the Objective Prong of the Deliberate Indifference Test

The parties have already litigated the question of whether "a failure to authorize a colostomy reversal – even if motivated by financial rather than medical concerns – can[] constitute deliberate indifference under the Eighth Amendment." (ECF No. 32, PageID.623). This Court rejected Defendant's argument, premised on *Swarbrick v. Franz*, 2012 U.S. Dist. LEXIS 33461 (D. Colo. 2012), that "colostomy reversal surgery

2

is 'not medically necessary' and thus not sufficiently serious to satisfy the objective prong of the deliberate indifference test." *Id*. Rather, relying on *Baker v. Blanchette*, 186 F.Supp. 2d 100,  103 (D. Conn. 2001) this Court recognized that:

> a colostomy "prevent[s] [an individual] from eliminating waste in a normal manner; (2) . . . require[s] him to wear a bag that constantly emit[s] a foul odor; and (3) . . . require[s] significant maintenance by the plaintiff and medical personnel. Though these consequences do not inevitably entail pain, they adequately meet the test of 'suffering' that Gamble recognized is inconsistent with 'contemporary standards of decency."

(ECF No. 32, PageID.625).

Mr. Jackson did not allege in his Amended Complaint that his colostomy was nonfunctional, or that he developed complications at the stoma site. He merely claimed that he was forced to live with an unnecessary colostomy for years, and suffered as a result. Dr. Kansakar and Dr. Silverman both testified that colostomies for diverticulitis should be reversed about eight weeks after placement, (**Ex. 3**, pp. 14-15, 22-23, 28, 39, 45-46; **Ex. 11**, pp. 64, 80, 85-87), and that living with a stoma generally results in significant suffering for patient. (**Ex. 3**, pg. 29-30; **Ex. 11**, pg. 69-70). Mr. Jackson will testify to his suffering as a result of having a colostomy bag for the duration of his prison sentence. (**Ex. 10**, pp. 42-43, 107-110, 122-125; **Ex. 12**). In addition to leaking feces on himself and being unable to control his bowel movements, Mr. Jackson was assaulted multiple times by other inmates who were angry about the smell of his stoma and wanted prison authorities to house him somewhere else. (**Ex. 10**, pg. 123-124, 126; **Ex. 12**). One of these assaults was serious enough to send him to the hospital. (**Ex. 13**).

3

Defendants emphasize that Plaintiff did not suffer a permanent injury. But this is not a required element of an Eighth Amendment claim. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). For example, the "shackling of pregnant detainees in labor" generally satisfies the objective component, "i.e. it poses a substantial risk of serious harm," even though the harms caused by being handcuffed to the bed during childbirth may be primarily to human dignity. *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 574 (6th Cir. 2013).  The Sixth Circuit similarly explained in *Boretti v. Wiscomb*, 930 F.2d 1150, 1155 (6th Cir. 1991), that a prisoner can recover for the "deprivation and degradation" of being "forced to sit in his own feces for several hours,"  although leaving a paraplegic and incontinent prisoner to sit in his own feces does not involve a serious risk of physical injury. *See Boretti* at 1155, quoting and explaining *Parrish v. Johnson,* 800 F.2d 600, 610 (6th Cir. 1986).  This is because "[t]he infliction of such unnecessary suffering is inconsistent with contemporary standards of decency." *Boretti* at 1153.

Thus, the primary issue before the Court at this juncture is *why* Dr. Papendick blocked Dr. Alsalman's general surgery referral.  Was the decision based on his "judgment of the *medical* risks and benefits associated with the surgery[?]" (ECF No. 32, PageID.623). Or did Dr. Papendick do so "for nonmedical reasons" such as a desire "to save money?" (ECF No. 32, PageID.623). This inquiry into Defendants' **subjective** motivations for their actions is necessary because "[t]he Eighth Amendment does not

4

outlaw cruel and unusual 'conditions;' it outlaws cruel and unusual 'punishments.'"
*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A defendant must therefore act with some
element of punitive intent for his conduct to constitute 'punishment.' *Wilson v. Seiter*,
501 U.S. 294, 300 (1991). Thus, "[w]here a prison official's conduct is merely negligent
—i.e. where simply an accident has occurred—there is no viable claim." *Rhodes v.*
*Michigan*, __F.4th__, 2021 FED App. 0192P at *26 (6th Cir. Aug. 24, 2021). The
minimum mens rea element required to render conduct 'punishment' is "deliberate
indifference," which lies "somewhere between the poles of negligence at one end and
purpose or knowledge at the other;" deliberate indifference is approximately equivalent
to recklessness. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

In the context of providing medical treatment to prisoners, the Eighth Amendment
is implicated when a defendant's breach of the standard of care is either reckless or
intentional. *See Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). A "reasonable
mistake in medical judgment," such as an honestly-held but incorrect belief that reversal
surgery was not medically feasible for Mr. Jackson, would not implicate the Eighth
Amendment. *See Lemarbe v. Wisneski*, 266 F.3d 429, 441 (6th Cir. 2001). But where a
defendant "correctly perceived all relevant facts, understood the consequences of those
facts, and disregarded those consequences in the treatment of the patient," the subjective
prong is satisfied. *Id.*

5

### III. Corizon's Utilization Management Department <u>Intentionally</u> Blocked Dr. Alsalman's General Surgery Referral for the Purpose of Reducing Corizon's Costs and Thereby Increasing its Profit

Corizon's business model provides it with strong incentives to limit the amount of healthcare it provides to prisoners. Corizon's contracts with its state and local government clients typically require the client to pay Corizon a fixed amount per prisoner, per month (PPPM). Then, "Corizon employs all medical staff in the facility and covers the cost of medication, off-site referrals, and hospitalizations. (Doc. 74-2, pp. 28-29). Therefore, the less treatment inmates require, the more money Corizon makes." *Davidson v. Corizon, Inc.*, 2015 U.S. Dist. LEXIS 89527 at *20-21 (N.D. Ala. 2015). This is known as a "Full-Risk" contract. *Id*. "Shared-risk" contracts involve arrangements whereby the client reimburses Corizon for less than 100% of the cost of providing certain healthcare services, such that Corizon and the contracting public entity are both exposed to a financial loss each time a healthcare service is provided to an inmate. Corizon's 2016-2021 contract with the MDOC is an example of a "shared-risk" contract. (**Ex. 14**, pg. 50-51; **Ex. 2**, pg. 53-54).

The 2016-2021 Corizon-MDOC contract provided for payments to Corizon of a fixed amount per prisoner, per month ("PPPM"), including a management fee. (**Ex. 2**, pg. 53-54). The fixed PPPM fee included all services except for pharmaceuticals and "specialty care," i.e., off-site visits to specialists for procedures that cannot be performed in the prison. Pharmacy and specialty-care costs were shared between the MDOC and

6

Corizon pursuant to a formula involving a "Risk-Share Base PPPM" and a "Risk-Share Maximum Cap PPPM." *Id*. The MDOC reimbursed Corizon for 50% of the portion of its specialty-care and pharmacy costs that exceeded the "Base PPPM" but were below the "Maximum Cap PPPM" in a given quarter. *Id*. The Maximum Cap PPPM was always set $40 above the Base PPPM, meaning that the MDOC's risk-share exposure was limited to twenty dollars per-prisoner, per-month. Corizon bore sole responsibility for marginal costs above the Risk-Share Maximum Cap PPPM. *Id*.

The practical result of this arrangement is that when the total cost of specialty care and pharmaceuticals for the Michigan prison population exceeded the Risk-Share Base PPPM figure, but was below the Risk-Share Maximum Cap PPPM, each marginal dollar that Corizon was able to save by avoiding an off-site procedure or discontinuing an inmate's prescription medication increased Corizon's profit by fifty cents. When the total cost of specialty care and pharmaceuticals for the prison population exceeded the Risk Share Maximum Cap PPPM, each marginal dollar Corizon could save by denying care increased its profits by one dollar. Total off-site and pharmacy costs were close to the Risk-Share Maximum Cap during the first and second quarters of 2017.[1] (**Ex. 15**; **Ex. 16**; **Ex. 17**; **Ex. 2**, pg. 53-54).

---

[1] The total paid by the State of Michigan to Corizon for the first six months of 2017 was $63,751,904 ($96,150,899 minus $32,398,995, *compare* Ex. 15; Ex. 16). The prison population in early 2017 fluctuated between approximately 41,000 and 40,500, (Ex. 17), meaning the State paid Corizon between $259 and $262 per-prisoner, per-month, averaged over the two quarters. This is well above the 2017 Base PPPM ($246.54) but slightly below the PPPM Cap during 2017 ($266.54).

Corizon responded rationally to these economic incentives via massive cost cutting in the areas of off-site care and pharmaceuticals. For example, "upon transitioning the psychiatry contract from MDOC's previous provider in June of 2016," Corizon "**implemented initiatives that decreased psychotropic medication spend by 60%, averaging $204,362 per month for a total savings of 9.8M since the onset of the contract.**" (**Ex. 18**, pg. 80) (emphasis in original). The reduction in spending on off-site specialty care was even more dramatic. Per an April 2017 report that Corizon submitted to the MDOC concerning the volume of healthcare services utilized in MDOC facilities, newly-compiled claims data:

> "reveals dramatic decreases in utilization since Corizon was awarded the medical contract in 2009. **The cost savings in the area above the curve in the MDOC/Tableau data is in the hundreds of millions of dollars.** This is also shown graphically on page 11 where we compared the Average Quarterly Expenditures in Millions of dollars in Outpatient UM."

**Ex. 19**- Corizon UM Stats Report to MDOC, April 2017, pg. 21. (emphasis added).

The cost reductions that Corizon achieved over its tenure as the MDOC healthcare vendor are, indeed, shockingly large. Quarterly expenditures on off-site specialty care dropped from $23.1 million in Q1 2009, to only $5.6 million by Q2 2016, **a decline of over 75%.** (**Ex. 19**, pg. 11-12). Corizon's cost-cutting was not limited to its Michigan contract: it implemented the same aggressive cost-reduction strategies in other states,

8

such as Missouri (**Ex. 20**, pg. 6), Tennessee (**Ex. 21**, pg. 18), and Florida (**Ex. 22**, pp. 29-30, 60)[2].

Corizon did not achieve these massive reductions in spending on specialist visits by providing the same care for less money: it achieved them by providing less care. Corizon drastically reduced the volume of specialty services provided to prisoners by maintaining "a 'laser' focus" on several "Key Performance Indicators (KPI) . . . across our contracts companywide." (**Ex. 23**, pg. 10-11). These KPIs include:

> "**Inpatient Days per/1000 Offenders:** Measures volume of offsite care with the goal of reducing unnecessary offsite trips;" and

> "**Offender Patient Referrals per/1000 Offenders:** Measures volume of physician specialty visits and other outpatient referrals with the goal of reducing unnecessary offsite trips."

**Ex. 23**- Corizon Technical Proposal for Kansas DOC, pg. 10 (emphasis in original); **Ex. 24**, Requests to Admit, pg. 4-5.

"Corizon leadership," meaning "those at the Corizon headquarters in Nashville, Tennessee" monitored these KPIs using InGauge. (**Ex. 25**, pg. 22-23). InGauge is Corizon's "proprietary, state-of-the-art data mining application system" which "enabl[es] us to minimize offsite care and deliver reduced healthcare and transportation costs." (**Ex. 23**, pg. 249-251). Per Corizon, "InGauge delivers a suite of standard reports that focus on the key drivers of healthcare utilization and cost." (**Ex. 23**, pg. 250). Screenshots of InGauge produced in discovery in this case, as well as screenshots

---

2   This report is admissible under the F.R.E. 803(8)(a)(iii) hearsay exception. *See Jones v. Sandusky Cnty.*, 652 Fed.Appx. 348, 356 (6th Cir. 2016); *Combs v. Wilkenson*, 315 F.3d 548, 555-56 (6th Cir. 2002).

9

included in a bid for a Tennessee DOC contract, show ***targets*** for some of these 'key drivers of healthcare utilization and cost,' in addition to the trending actual values of the monitored metrics at specific correctional facilities. (**Ex. 26**; **Ex. 21**, pg. 430-443).

Corizon's outpatient Utilization Management ("UM") program was a crucial component of its efforts to hit its cost-reduction targets. (**Ex. 21**, pg. 18; **Ex. 26**,  bates 00462). Corizon measures the performance of the outpatient UM program via the "Outpatient Referrals per/1000" KPI. (**Ex. 27**, pg. 104).   The primary function of Corizon's UM department is to review and screen requests by medical providers in the prisons for offsite services. Other than in emergency situations, "no offsite services should be completed until authorization is received" from the UM department. (**Ex. 27**, pg. 8).

The outpatient UM review process begins when a medical provider stationed in a prison "submit[s] [an] outpatient referral request[] to the UM department." (**Ex. 27**, pg. 104). Requests are initially reviewed by a UM nurse. The nurse examines the request to determine if the requested service is on the "Abbreviated Review List," a.k.a. the "pass-through" list. (**Ex. 25**, pg. 41-42; **Ex. 27**, pg. 106). If the service is on the pass-through list, the request is automatically approved, without review by a physician. (**Ex. 25**, pg. 42; **Ex. 28**, pg. 17). If the request seeks a service that is not on the pass-through list, the request is referred to a Utilization Management Medical Director ("UMMD"). (**Ex. 25**, pg. 42).

10

The sole job duty assigned to UMMDs is reviewing requests for offsite services and "approving or deferring those requests." (**Ex. 28**, pg. 9). UMMDs never see patients. (*Id*.) They almost never review a patient's medical records or communicate with a patient's treating physician when making approve/defer decisions. (**Ex. 28**, pg. 29-30). In fact, the UM department usually "does not have access" to the patient's medical records.[3] *Id*.

Defendant Dr. Keith Papendick, the only Corizon UMMD in Michigan, reviews eighty-five to one hundred requests per day, spending, on average, a few minutes on each request. (**Ex. 8**, pg. 12-13). In the vast majority of instances, Dr. Papendick bases his decisions solely on the information contained in the request form. (**Ex. 8**, pg. 29-30). Dr. Papendick is not board-certified in any specialty (**Ex. 28**, pg. 28) and does not have access to any reference materials that are unavailable to the on-site physicians who submit requests to him. (**Ex. 28**, pg. 16). Dr. Papendick insists that he does not "deny" anything; he only "*defers*" requests for treatment and issues "*Alternative Treatment Plans*" (ATP's). (**Ex. 8**, pg. 28-29; **Ex. 28**, pg. 99-101; **Ex. 29**, pg. 49-52). Corizon UMMDs are required to issue an "ATP" when declining to approve a request for an offsite service. (**Ex. 8**, pg. 29). Dr. Papendick's ATPs are mostly "a list of blurbs that I have developed over the years where I could just copy and paste." (**Ex. 29**, pg. 28).

3   Thus, anything NP Drinkert wrote in Mr. Jackson's medical records about an alleged conversation he had with someone at Dr. Kansakar's office (ECF No. 60-2) could not be relevant to Dr. Papendick's decisionmaking; the only information Dr. Papendick had access to and relied on was the information that Dr. Alsalman placed in the consultation request form.

Some of these ATP-blurbs do not direct the provision of any specific treatment to the patient. For example, an ATP of a request for a gastroenterology consult for a prisoner who had been in pain and defecating blood for three months, which his doctor requested in order to determine the source of the bleeding, read: "ATP: Medical necessity not demonstrated at this time. When symptoms demonstrate medical necessity, resubmit." (**Ex. 50**; **Ex. 30**, pg. 24). The ATP of the request for a general surgery consult for the Plaintiff reads, "ATP: Medical necessity not demonstrated at this time. Continue to follow in on-site clinic by MSP." (**Ex. 7**). Dr. Papendick testified that he would issue an ATP containing identical language if presented with a request for an obviously cosmetic procedure, such as surgery to correct male-pattern baldness. (**Ex. 8**, pg. 33-35).

Dr. Papendick's decisions about whether to approve or ATP an offsite referral are based on his determination of whether there is "medical necessity" for the requested care. (**Ex. 8**, pg. 30). Corizon closely guards the methods and standards that its UM staff use to determine whether a request meets 'medical-necessity' criteria,  considering this information to be highly confidential, proprietary, and a trade secret. (**Ex. 31**, pg. 4-6;[4] **Ex. 20**, pg. 1). Corizon's proprietary 'medical necessity' standards are significantly more restrictive than those employed in the rest of the healthcare industry. For example, Corizon does not consider replacing a lost or broken hearing aide to be medically-necessary if the inmate still has some hearing in one of his ears. (**Ex. 32**; **Ex. 33**, ¶ 11;

---

4  The factual assertions of a party's attorney in another proceeding are admissible under F.R.E. 802(d)(2). *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555-56 (6th Cir. 1986)

12

**Ex. 35**, ¶¶ 4, 13). When a prisoner has bilateral dense cataracts, Corizon believes that "generally, only one cataract needs removal;" Corizon does not believe it is medically-necessary for a person to be able to see out of both eyes. (**Ex. 35**). Courts in this District have found that prisoners' needs for a hearing aide in one ear, or for cataract surgery in one eye, are sufficiently serious to implicate the Eighth Amendment. *See Morris v. Corr. Med. Servs.*, 2012 U.S. Dist. LEXIS 165424 at \*8-\*9 (E.D. Mich. 2012); *Coates v. Jurado*, 2015 U.S. Dist. LEXIS 132313 at \*23-\*25 (E.D. Mich. 2013).

Corizon also does not consider reversing a functional colostomy to be medically-necessary, (**Ex. 8**, pg. 75), even if the prisoner would have to live with a colostomy bag for the rest of his life. (**Ex. 8**, pg. 75). Corizon has repeatedly refused to reverse colostomies for MDOC prisoners. (**Ex. 36**; **Ex. 37**). Corizon has refused to reverse prisoner's colostomies even when their stomas get infected and routinely fill the colostomy bag with blood, (**Ex. 39; Ex. 40**), or when the intestine is permanently prolapsed six inches outside of the prisoner's body. (**Ex. 39**; **Ex. 40**). Corizon only considers offsite care to be "medically necessary" when a failure to provide timely medical intervention would cause: 1) "excessive pain which is not controlled by medication"; 2) "measurable deterioration in function (including organ function)"; 3) "substantial risk to the public health," or 4) "death." (**Ex. 41**).

Corizon's internal definition of "medical necessity," at least in the context of colostomy reversals, is not congruent with the way that term is interpreted in the rest of

the healthcare industry. "Medical necessity is a statutory prerequisite to Medicare reimbursement." *Winter ex. rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d. 1108, 1112 (9th Cir. 2020). "Because medical necessity is a condition of payment, <u>every Medicare claim includes an express or implied certification that treatment was medically necessary</u>. Claims for unnecessary treatment are false claims." *Id.* At 1114. (emphasis added). Michigan's Medicaid program also specifically prohibits reimbursement for "all supplies and services that are not medically-necessary." (**Ex. 42**). In addition to exposing the provider to False Claims Act liability, knowingly submitting a claim to Medicare or Medicaid for services that are not "medically necessary" is a felony under both Michigan law, MCL 400.607(2); *In re Rucker*, 121 Mich. App. 798 (1982), and federal law, 18 U.S.C. 1347; *United States v. Bertram*, 900 F.3d 743 (6th Cir. 2018).

Yet, barely a month after Mr. Jackson was paroled, he received a colostomy reversal surgery at Detroit Medical Center, financed by the Michigan Medicaid program. (**Ex. 9**; **Ex. 10,** pg. 219). The surgeon who originally created Mr. Jackson's stoma and planned to reverse it two months later, Dr. Erina Kansakar, testified that she has performed at least 100 colostomy reversals in her career. (**Ex. 3**, pg. 13). She usually reverses colostomies two months after placement, (**Ex. 3**, pg. 14-15), and reverses them whenever reversal is possible. (**Ex. 3**, pg. 21-22). Dr. Kansakar believes she is a participant in the Medicare program, (**Ex. 3**, pg. 20), and does not check to see if a

14

patient is a Medicare recipient when proceeding with a reversal surgery. (**Ex. 3**, pg. 20-21). Plaintiff's expert, Dr. Ralph Silverman, also regularly reverses functional colostomies, usually doing "one or two a week." (**Ex. 11**, pg. 42). He, too, regularly bills Medicare for these services. (**Ex. 43**). Acceptance of Dr. Papendick's claim that reversal of a functional colostomy is not "medically necessary" would imply that Dr. John Webber, who performed Mr. Jackson's 2019 reversal surgery, Dr. Kansakar, and Dr. Silverman are all committing healthcare fraud on a routine basis.

The Corizon witnesses deposed in this case denied that cost considerations were a factor in the Corizon UM department's decisions about whether to authorize a given offsite service.[5] (**Ex. 29**, pg. 30; **Ex. 25**, pg. 24-28). But "because government officials do not readily admit the subjective component of [the deliberate indifference] test, it may be demonstrated in the usual ways, including inference from circumstantial evidence." *Richko v. Wayne County*, 819 F.3d 907, 916 (6th Cir. 2016). In this case, there is a large body of circumstantial evidence to suggest that cost control is the primary, if not the only, purpose of Corizon's Utilization Management program. Consider the composition of the Abbreviated Review List, i.e. the "pass-through" list. (**Ex. 27**, pg. 29-31). One of the procedures designated for automatic approval is "referrals for offsite services that should be covered under worker's comp." (**Ex. 27**, pg. 31). There is no *medical* difference between a procedure covered by worker's comp and an identical

5   In previous sworn testimony, Corizon's State Medical Director for Michigan, Dr. Jeffrey Bomber, admitted that the Utilization Management department makes decisions based on cost considerations. (**Ex. 25**, pg. 26-28; **Ex. 46**, pg. 232).

procedure not covered by worker's comp. But when the procedure is covered by worker's comp, Dr. Papendick does not need to decide whether it is "medically necessary:" the procedure is automatically approved. The same is true for offsite procedures for "Interstate Compact" inmates. (**Ex. 27**, pg. 24). Interstate Compact inmates are inmates transferred from another State, for whom the sending State bears financial responsibility. (**Ex. 27**, pg. 23). Thus, Dr. Papendick's "medical necessity" reviews only occur when Corizon would be responsible for paying for the requested service.

Dr. Papendick's alternative explanation for why he did not approve the consult, that the risk of death from the surgery outweighs the benefits, and that if he had approved the surgery, Mr. Jackson "would not be living, which is much worse than a colostomy," (**Ex. 8**, pg. 80), is not credible. Corizon's UM department has declined to approve outside consults for procedures that involve no risk of death or physical injury, such as an audiogram for a hearing aide. (**Ex. 8**, pg. 32; **Ex. 32**; **Ex. 33**, ¶ 11;  **Ex. 34**, ¶¶ 4, 13).  Dr. Papendick admitted that he did not know the fatality rate from colostomy reversal surgeries. (**Ex. 8**, pg. 81). And Dr. Papendick admitted that the actual service he declined to approve, a *consult* with a general surgeon *to evaluate the risks and benefits of surgery*, itself posed no danger, other than the danger that Corizon would have to pay the general surgeon "$350." (**Ex. 8**, pg. 79).

16

Corizon vigorously protests that "Plaintiff's claim against the Corizon Defendants amounts to a disagreement over medical judgment."[6] (ECF No. 60, PageID.1272). But as Corizon recently explained in its Bid Protest Letter after it lost the MDOC healthcare contract to a competitor, its utilization management activities "do not constitute medical services." (**Ex. 1**, pg. 6). Per Corizon, the "non-medical services" it provided under the MDOC contract include:

> **Utilization review of outside medical care:** These services do not require a medical license and are typically provided by insurance companies, hospitals, and other utilization review organizations. <u>Utilization review does not involve providing clinical medical care but rather assessing the necessity and cost of the care and approving it for payment.</u>

**Ex. 1**: Corizon Bid Protest Letter to Michigan DTMB, pg. 6, Mar. 8, 2021.[7](emphasis added).

Corizon measures the job performance of its UMMDs on the basis of their "ATP rate," meaning the percentage of requests that the UMMD "ATP's." (**Ex. 44**; **Ex. 8**, pg. 47-51). Dr. Papendick is, or was in March of 2019, aware of both his own "cost per thousand patients . . . over a year" (**Ex. 8**, pg. 52-53) and the value of this cost metric for Corizon's other UMMDs. He knew in 2019 that "I'm not the highest. I'm not the

---

6   This argument has been explicity rejected in the context of non-treating, supervisory physicians. *See Titlow v. Corr. Med. Servs.*, 2008 U.S. Dist. LEXIS 125272 at *18-*19 (E.D. Mich. 2008).

7   Available at: https://www.michigan.gov/documents/dtmb/20210413-sab-min_722316_7.pdf

worst." (**Ex. 28**, pg. 106). He also has "a monthly report that says cost per hundred—or per thousand patients." (**Ex. 28**, pg. 42).

Dr. Papendick understands that there is a relationship between his ATP rate, the amount Corizon spends on outpatient treatment, and the number of lawsuits filed against Corizon. When his ATP rate goes down, "in other words, [when he] had more approvals than ATPs," lawsuits also go down, and outpatient spending goes up. (**Ex. 8**, pg. 53-54). This occurred in early 2014, and Dr. Papendick's boss had a discussion with him about it. (**Ex. 8**, pg. 53-54). Dr. Papendick's lower ATP rate in early 2014 is visible in the claims data: outpatient spending rose from $10.1 million in the fourth quarter of 2013 to $11.9 million in the first quarter of 2014, an increase of almost 20%. (**Ex. 19**, pg. 10). By the following quarter, Dr. Papendick's cost-cutting performance had apparently improved. Spending on outpatient care fell by nearly a third, to $8.3 million for the second quarter of 2014, and remained below $10 million for the remainder of the available data series. (**Ex. 19**, pg. 10). Dr. Papendick's change in behavior saved approximately $12.4 million in outpatient treatment costs for the Michigan contract over the remainder of 2014, and $17.2 million in 2015. *Id.*

While Dr. Papendick may have only understood the general relationship between ATP rate, volume of lawsuits, and outpatient spending, and not "what the numbers are," (**Ex. 8**, pg. 54), Corizon knew the numbers. Corizon uses sophisticated data analytics to track numerous performance metrics across all of its contracts in near-real time. (**Ex. 18**,

18

pg. 197-199; **Ex. 19**). Corizon tracks various metrics for outpatient referral activity, including ATP rate (**Ex. 18**, pg. 199)[8], as well as "the average lawsuit rate . . . per 1000 inmates." (**Ex. 20**, Exhibit L, pg. 1; **Ex. 24**, pg. 6). Corizon was sued by prisoners in federal court approximately 2,500 times in the year before Mr. Jackson entered MDOC custody (**Ex. 46**) and it almost knew its average cost to defend a prisoner lawsuit.

From Corizon's perspective, if the savings from "deferring" additional outpatient specialty care for the Michigan prison population are greater than the costs it would incur to defend the resulting additional prisoner lawsuits, denying the care is worth it. That is why Mr. Jackson and other prisoners with stomas were repeatedly denied reversal surgeries by the Utilization Management department. (**Ex. 38**; **Ex. 39**; **Ex. 40**). A reasonable jury could conclude that this longstanding pattern of behavior represents not negligence, but intentional conduct. *See Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994).

## IV. Defendant's Claim that MDOC Policy Required Them to Deny Mr. Jackson a Reversal Surgery Is False, and Would Not be an Excuse if it Were True

A § 1983 claim "has two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law." *League of Women Voters v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008). Generally, public employees act under color of state law when carrying out their duties. *See West v. Atkins*, 487 U.S. 42, 50 (1988). But to satisfy the 'color of state law'

---

8   These screenshots also show that Corizon tracks the "top 10 referring providers," presumably so it can counsel those physicians to make fewer offsite referrals.

element when the defendant is a private corporation, a plaintiff must demonstrate that the private corporation's conduct satisfied one of three tests: "(1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test." *Wilcher v. City of Akron,* 498 F.3d 516, 519 (6th Cir. 2007).

The public function test "requires that the private entity exercise powers that are traditionally exclusively reserved to the state," while the state-compulsion test "requires that <u>a state exercise such coercive power</u> or provide such significant encouragement, either overt or covert, that in law <u>the choice of the private actor is deemed to be that of the state</u>." *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992) (emphasis added). Under the nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that <u>the action of the latter may be fairly treated as that of the state itself</u>." *Id*.

The state action element is not usually at issue in Eighth Amendment § 1983 litigation because it is well-established that operating prisons and providing healthcare to prisoners satisfies the public-function test. *See, e.g. Carl v. Muskegon County*, 763 F.3d 592, 596 (6th Cir. 2014). But in most other contexts, in order to hold a private corporation liable under § 1983, plaintiffs must prove that the state <u>compelled</u> the private corporation to violate their rights. *See, e.g. S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 565 (6th Cir. 2007); *Marble v. Snyder (In re Flint Water Cases)*, 453 F.Supp. 3d 970, 987 (E.D. Mich. 2020).

20

Particularly instructive on this point is *Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co.*, 780 Fed.Appx. 197 (6th Cir. 2019). In *Snodgrass*, the Tennessee Medicaid program hired defendant DentaQuest, a private corporation, to serve as its dental benefits manager. *Snodgrass* at 201. Plaintiff Snodgrass-King was a partnership of dentists whose principals were engaged in a long-running feud with DentaQuest and Tennessee officials. *Id.* at 198-199. After DentaQuest won the Tennessee dental-benefits-manager contract in 2013, DentaQuest executives plotted to, and did, exclude Snodgrass-King from participating in the Tennessee Medicaid program. *Id.* at 201-202. Snodgrass-King then sued DentaQuest under § 1983 for First-Amendment retaliation. *Id.* at 203.

Snodgrass prevailed at trial, but the district court granted JNOV to DentaQuest, finding that while Tennessee officials also wanted to exclude Snodgrass, they did not force DentaQuest to do so: "it is undisputed that DentaQuest made the final decision on which providers were allowed in the network." *Id.* at 204. The Sixth Circuit affirmed: since "DentaQuest 'made a free-will choice to' exclude Snodgrass," it was ___**not**___ liable. *Id.* at 205. Simply put, the Corizon Defendants' argument that they are not liable because their decisionmaking was constrained by a state policy is backwards. State compulsion is not a defense; it is something the *plaintiff* typically has to prove in private-party § 1983 litigation.

21

In addition to being irrelevant to their liability, the Corizon Defendants' state-compulsion claim is unsupported by the evidence. Dr. Papendick's decisionmaking was not constrained by the cited MDOC policy, PD 03.04.100. The policy contained two requirements for corrective or reconstructive surgery: the surgery must be medically-necessary and it must be approved by the CMO. (**Ex. 8**, pg. 83). But MDOC policies do not contain a definition of 'medically necessary,' and Dr. Papendick did not contact the CMO. (**Ex. 8**, pg. 83). What the MDOC considers "medically necessary" can be inferred from another MDOC policy, PD 03.03.130, which provides that "[h]ealthcare . . . shall be available to prisoners <u>consistent with contemporary standards of medical practice in the community</u>.[9]" (**Ex. 47**) (emphasis added). As Dr. Kansakar and Dr. Silverman have testified, the contemporary standard of medical practice in the community with respect to colostomy reversals is to perform them approximately eight weeks after the initial surgery. (**Ex. 3**, pp. 14-15, 22-23, 28, 39, 45-46; **Ex. 11**, pp. 64, 80, 85-87). Corizon's contract with MDOC also provides, "[i]f any applicable MDOC Policy or Procedure for a particular type of treatment provides for a lesser degree of care than good and acceptable medical standards, then such good and acceptable medical standard shall take

---

9   The State has also repeatedly expressed its displeasure with the abysmal quality of care provided by Corizon. The MDOC issued $166,000.00 in fines to Corizon for deficiencies related to timeliness of care in the first two quarters of 2017. (**Ex. 48**). A deficiency notice sent by the State to Corizon executives in May of 2019 declares: "the State is dissatisfied with the significant time and resources necessary to manage Corizon's lack of compliance with the contract. . . . MDOC has incurred direct costs in securing providers to address immediate treatment needs. A root cause is Corizon's failure to dedicate resources sufficient to provide the services required under the contract." (**Ex. 49**)

precedence." (**Ex. 2**, pg. 36). Thus, Corizon's decisionmaking was not constrained by PD 03.04.100.

Dr. Papendick even testified that if the policy he cited did not exist, he still would not have approved the request for Mr. Jackson. (**Ex. 8**, pg. 86.). He testified that in the past, he has approved a request for a colostomy reversal, and when he issued the approval, "it got repaired." (**Ex. 8**, pg. 112). He testified that the same thing would have happened if he had approved Dr. Alsalman's consult request for Mr. Jackson. *Id*. This is sufficient evidence for a jury to find a causal relationship between Dr. Papendick's action and the resulting denial of treatment.

## V. Plaintiff Does Not Need to Prove that Dr. Papendick was a Final Decisionmaker

The Corizon Defendants argue that there is an appeals process for their utilization management decisions that culminates with the MDOC Chief Medical Officer, and therefore, neither Dr. Papendick nor Corizon is a "final decisionmaker" with respect to treatment decisions for prisoners. Thus, according to Defendants, neither can be held liable for their decisions not to approve treatment.[10] (ECF No. 60, PageID.1278-79). But an act taken by an official with final decisionmaking authority is only one of four

---

[10] Corizon created this appeals process "for the sake of . . . our collective legal protection," (**Ex. 27**, pg. 104), and an appeal cannot be initiated by a prisoner. (**Ex. 25**, pg. 50). This appeals process also apparently did not exist in early 2017: According to a site-level Corizon physician, while the process exists now, at that time "there was not an appeals process" and "Dr. Papendick's decisions were final." (**Ex. 30**, pg. 36-38).

23

avenues by which a plaintiff can establish *Monell* liability. *See Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020); *Strayhorn v. Caruso*, 2015 U.S. Dist. LEXIS 114980 at *32-*34 (E.D. Mich. 2015). The final-decisionmaker analysis is applicable where the Plaintiff seeks to hold the municipality liable for "a single decision to take unlawful action made by municipal policymakers," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), i.e. "*Monell* liability on a single-act theory." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013).

*Monell* liability can also be premised on a pattern of constitutional violations which the municipality has notice of and does nothing to address, *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996), or by presenting evidence that the municipality had "formal rules or understandings – often but not always committed to writing – that were intended to, and did, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)). For example, in *Wright*, the municipality's training materials for police officers constituted sufficient evidence to show that the municipality had a custom of permitting or acquiescing to the use of excessive force. *Wright*, 962 F.3d at 880-881.

Similarly, in *Strayhorn v. Caruso*, where "[the UMMD's] 'alternative treatment plan' resulted in cost savings for [Corizon's corporate predecessor]," and "Dr. Khan was 'lauded by his superiors' after he saved the Corizon $1,300,000 by performing 'minor'

24

surgeries . . . at the prison rather than sending the prisoner to the hospital," sufficient evidence existed to support an inference that Corizon "engaged in a pattern and practice that resulted in depriving Plaintiff constitutionally adequate medical care." *Strayhorn v. Caruso*, 2015 U.S. Dist. LEXIS 114980 at *25-*26, *32-*34 (E.D. Mich. 2015). This was true despite Corizon's argument that "the Chief Medical Officer of the MDOC" had 'final' decisionmaking authority. *Strayhorn,* 2015 U.S. Dist. LEXIS 114980 at *31-*33 (E.D. Mich. 2015).

## VI. Conclusion

The evidence in this case shows more than a single, isolated wrongful act. Corizon repeatedly and intentionally denied colostomy reversals to various Michigan prisoners over an extended period of time. (**Ex. 36**; **Ex. 37**; **Ex. 38**). It did so as part of a deliberate plan to save "hundreds of millions of dollars" by cutting offsite specialty care for MDOC prisoners by over 75%. (**Ex. 19**, pg. 21). This plan was "the 'moving force' behind the injury alleged" in this case, *Wright*, 962 F.3d. 852, and holding Corizon responsible is appropriate. Defendants' motion should be denied.

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff