

Peter B. Ruddell
Office: 517.377.0711
pruddell@honigman.com

*Via E-Mail*
*samuelb@michigan.gov*
*BidProtest-DTMB@michigan.gov*

March 8, 2021

Mr. Brandon Samuel, Solicitation Manager
State of Michigan Procurement
DTMB
P.O. Box 30026
Lansing, MI 48913

*Re:   Protest of RFP 200000002287*

Dear Mr. Samuel:

On behalf of our client, Corizon Health, Inc. ("Corizon Health"), we hereby formally protest the Recommendation of Award issued on February 26, 2021, expressing the Department of Technology, Management & Enterprise Procurement Division's ("DTMB") intent to award the contract for Prisoner Health Care and Pharmacy Services described in Request for Proposal #200000002287 ("RFP") to Grand Prairie Healthcare Services, P.C. ("GPHS").

The award of this contract to GPHS is contrary to the primary purpose of the State of Michigan's bidding process. Simply, the Recommendation of Award fails to ensure that the State will receive the "best value" for the full and adequate performance of the services required by the contract. Accordingly, Corizon Health respectfully requests that DTMB reevaluate and reconsider its decision, and take all other necessary steps to ensure that the State of Michigan receives the best value for the RFP.

**TIMELINESS**

This Bid Protest is timely because it was submitted in advance of the protest deadline of March 8, 2021 at 3:00 p.m.

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 2

## RIGHT TO SUPPLEMENT

On March 5, 2021, DTMB partially responded to Corizon Health's request for documents under the Freedom of Information Act ("FOIA"). Corizon Health believes that the documents DTMB produced clearly demonstrate that there has been an error in the procurement process. There may be additional documents, however, that further support Corizon Health's position and are not yet in its possession. As such, on behalf of Corizon Health, we hereby reserve the right to supplement this Bid Protest after reviewing any additional materials produced in response to our FOIA request.

## BACKGROUND

On August 26, 2020, DTMB issued a RFP for a contract to provide prisoner health care and pharmacy services to the Michigan Department of Corrections ("MDOC"). Corizon Health has held that contract, through a series of corporate changes, since 1997.

The RFP stated that the contract would be awarded to "the responsive and responsible bidder who offers the best value to the State." RFP, Proposal Instructions, ¶ 11. A "responsive" bidder is one that submits a bid "in accordance with the solicitation instructions and meets all mandatory minimum requirements identified in the solicitation." See Michigan Procurement Policy Manual (Revised 4/23/2020) ("Procurement Manual") at § 8.4.2. To be "responsive," a proposal must accord "with the Proposal instructions and Vendor Questions Worksheet, and . . . Evaluation Process." Recommendation of Award, ¶ 1.

A "responsible" bidder is "a vendor that demonstrates it has the ability to successfully perform the duties identified by the solicitation." Procurement Manual at § 8.4.3. To decide whether a vendor is "responsible," DTMB examines the bidder's qualifications, including its past performance, its financial stability, its ability to comply with all legal requirements identified in the solicitation, and its answers to the Vendor Questions Worksheet. *Id.* "Any vendor that is not responsible . . . ***may not*** move to [the next step of the procurement process]." *Id.* (emphasis added).

To decide which proposal provides the "best value" to the State, DTMB considers a combination of the evaluation factors and price. RFP, Proposal Instructions, ¶¶ 7, 11. DTMB must also consider factors like the proposal's overall Michigan economic impact, the vendor's employment practices, and the vendor's environmental track record. Procurement Manual at § 8.4.8.

Responses to the RFP were due by October 19, 2020. DTMB received proposals to provide both prisoner health care and pharmacy services from Centurion of Michigan, LLC ("Centurion"); Corizon Health; GPHS; InGenesis, Inc ("InGenesis").; and Wexford

Mr. Brandon Samuel
March 8, 2021
Page 3

Health Sources, Inc. ("Wexford") See Recommendation of Award, ¶ 3(A)–(F). DTMB awarded the following technical evaluation scores to those bidders:

| Centurion | Corizon | GPHS | InGenesis | Wexford |
|---|---|---|---|---|
| 279 | 264 | 289 | 233 | 297 |

Based on those scores, DTMB determined that Centurion, Corizon Health, GPHS, and Wexford had passed the technical evaluation. It then provided the following price summary for those bidders:

**Total Five Year Contract Pricing**

| Calculation | Centurion | Corizon | GPHS | Wexford |
|---|---|---|---|---|
| Non-Risk Share Base Total Costs | $326,719,000 | $281,748,000 | $262,860,000 | $395,877,000 |
| Risk Share Base Total Costs | $392,192,000 | $359,065,000 | $327,128,000 | $340,490,000 |
| Total Costs | $718,910,000 | $640,813,000 | $589,988,000 | $736,367,000 |

On February 26, 2021, DTMB determined that GPHS provided the best value to the State and recommended that the contract be awarded to GPHS to provide the prisoner health care and pharmacy services for $589,988,000.00.

### CORIZON HEALTH'S BACKGROUND AND QUALIFICATIONS

Corizon Health is the pioneer and foremost provider of correctional health care in the United States. Built on more than 40 years of innovation and expertise in the industry, Corizon Health provides health care and pharmacy services to over 101,000 inmates in 14 states, including 128 state prisons, municipal jails, and other facilities. Corizon Health has an unparalleled record of providing quality correctional health care and pharmacy services in Michigan, and has held the contract described in the RFP since 1997.

Despite the improper deductions described below, Corizon Health was among the bidders who passed the technical evaluation. Its high scores in the RFP evaluation process, and its record of performance under the contract, demonstrate the strength and capabilities Corizon Health offers to the State of Michigan.

### SUMMARY OF PROTEST GROUNDS

The Recommendation of Award is contrary to Michigan law because GPHS lacks the ability to fully perform the contract duties, as required by the Procurement Manual and the RFP. In an attempt to cure this deficiency, GPHS repeatedly relied on the

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 4

qualifications of a separate company, Wellpath, throughout its proposal. But *Wellpath did not bid for the contract*. And under GPHS's proposal, *Wellpath would be nothing more than a subcontractor*. There is no joint venture between GPHS and Wellpath. They are separate corporate entities and, as a subcontractor, Wellpath would not be in any direct contractual relationship with the State if the State awarded the contract to GPHS.

GPHS is not a responsible bidder—and cannot hold the contract in its own right—because it lacks the legal ability to perform *any* of the extensive non-clinical duties required by the contract. Moreover, GPHS is not a responsive bidder either because, rather than answering the RFP's questions about its own company, GPHS repeatedly provided information about Wellpath and attempted to pass Wellpath's background, experience, and resources off as its own. Because GPHS lacks the ability to perform the contract and failed to comply with the RFP's instructions, it should have been disqualified as a non-responsive and non-responsible bidder.

Corizon Health suffered from the failure to disqualify GPHS as a non-responsible and non-responsive bidder, and from numerous prejudicial and improper deductions from the scoring of its own proposal. Accordingly, as set forth in detail below, we respectfully submit that the Recommendation of Award should be withdrawn, GPHS's proposal should be disqualified, and DTMB should recommend the award to Corizon Health as the remaining qualified bidder that provides the "best value" to the State.

**I.   GPHS Is Not Legally Capable of Performing the Contract.**

GPHS is not a "responsible bidder" because it cannot legally provide the non-clinical services required by the contract. Specifically, GPHS lacks the capacity to perform those services due to limitations on its corporate purposes in its Articles of Incorporation under Indiana law, as well as under its Application for Certificate of Authority filed with the Michigan Department of Licensing and Regulatory Affairs ("LARA") and attached as **Exhibit A** ("Certificate of Authority").

GPHS is an Indiana professional corporation formed to provide medical services. Under Indiana law, a professional corporation may be formed to render professional services, including those that may legally be performed only by a licensed health care professional.[1] Indiana law additionally provides that, while corporations generally may incorporate to engage in any lawful business, corporations engaging in businesses subject to regulation—such as medicine—must incorporate under applicable laws addressing

---

[1] IC 23-1.5-2-3(a)(4).

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 5

incorporation of that business.[2] And corporations subject to the professional corporation requirements may only operate in accordance with their limited professional purposes.

In its Articles of Incorporation, attached as **Exhibit B**, GPHS provided a Certificate of Registration from the Indiana Professional Licensing Agency certifying that the Indiana Medical Licensing Board found that GPHS's officers and directors are appropriately licensed by the medical board to organize a corporation that provides medical services. Therefore, GPHS's permissible purposes under Indiana law are only to provide professional services that may be legally performed by an individual licensed by the Medical Licensing Board.

In order to transact business in Michigan, GPHS registered as a foreign corporation, indicating in its Certificate of Authority that the specific and only business to be conducted in Michigan is the provision of "medical services." This is consistent with Michigan law, which limits the business activities of professional corporations. Specifically, Michigan law provides that "[a] professional corporation shall not engage in any business other than providing the professional service or services for which it was specifically incorporated."[3] Further, Michigan law only permits corporations to "[h]ave and exercise all powers necessary or convenient to effect any purpose for which the corporation is formed."[4]

If GPHS wishes to enlarge or otherwise change its permissible business activities in the State of Michigan to engage in services other than providing medical services, it must file an amendment to its Certificate of Authority or otherwise risk becoming unauthorized to transact business in Michigan.[5] But it can only do so if those activities are necessary to effect the purposes for which it is formed. LARA cannot permit a foreign professional corporation, such as GPHS, to provide services that are beyond those permitted by the entity's state of formation, which in the case of GPHS is Indiana. Since GPHS cannot provide non-medical services in Indiana, it cannot do so in Michigan. Additionally, LARA is unlikely to permit GPHS to provide non-medical services in Michigan because of Michigan's prohibition of professional corporations providing non-professional services.

---

[2] IC 23-1-22-1(b).

[3] MCL 450.1287(1).

[4] MCL 450.1261(q).

[5] MCL 450.2021.

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 6

The contract requires the performance of many services that do not constitute medical services. These non-medical services include, but are not limited to, the following:

1. **Utilization review of outside medical care:** These services do not require a medical license and are typically provided by insurance companies, hospitals, and other utilization review organizations. Utilization review does not involve providing clinical medical care but rather assessing the necessity and cost of the care and approving it for payment.

2. **Claim processing:** The claims processing services required in the contract involve processing bills for medical care provided by outside providers. This does not require a medical license. Under Michigan law, this is beyond the scope of activities for Michigan medical professional corporations.

3. **Pharmacy staffing:** Under the contract, GPHS is required to act as a pharmacy staffing agency. Holding a medical license is not necessary to employ pharmacists or pharmacy technicians and is not considered the practice of medicine.

4. **Dental staffing:** Under the contract, GPHS must consult and/or collaborate with dental staff and provide dental staffing as needed. Consulting with, collaborating with, and providing dental staffing is not the practice of medicine.

5. **Managing day-to-day non-clinical operations covered by the Contract:**  The contract requires GPHS to manage MDOC's day-to-day non-clinical operations related to its health care services. Managing the operations of other, non-medical, organizations does not constitute providing medical services and is distinct from managing an entity's own medical services. Many non-professional entities in Michigan permissibly manage health care operations.

6. **Establishing an off-site network of specialty services:** The contract requires GPHS to provide an off-site network of specialty services, claims payment, utilization management services, general health and psychiatric performance measurement, polypharmacy prevention and management, quality improvement activities, and supports to re-entry and discharge planning. Establishing such an expansive off-site network involves a large range of activities beyond the scope of providing medical services, including administrative and claims processing services.

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 7

7. **Providing training to correctional officers:** The Recommendation of Award highlights that GPHS "will provide beneficial training to Correctional Officers." As an example, it cites GPHS's "Crisis Intervention Team training," which "provides officers with specialized skills and knowledge that will enable them to . . . prevent escalation of crisis situations and reduce physical harm and emotional distress/trauma to patients and officers." Providing crisis intervention and de-escalation training to correctional officers is not the practice of medicine.

In sum, GPHS is not authorized to perform the majority of services required by the contract under GPHS's organizing documents under either Michigan or Indiana law. Because GPHS lacks the legal ability to perform the duties identified in the RFP, it is not a "responsible" bidder and should be disqualified from receiving the award. See Procurement Manual at § 8.4.8 ("A responsible vendor is a vendor that demonstrates *it has the ability* to successfully perform the duties identified by the solicitation.").

II. **GPHS's Proposal Improperly Relies on Its Subcontractor's Qualifications.**

Apparently recognizing that it is prohibited from providing non-medical services, GPHS has engaged Wellpath "to *serve as a subcontractor* on non-clinical matters." See GPHS Proposal at x (emphasis added). Throughout its proposal, GPHS attempted to blur the lines between itself and Wellpath, representing that "*[w]e* are the nation's largest provider of correctional health care," "*[w]e* have provided comprehensive health services in DOC settings since 2003," and "*[w]e* have provided comprehensive health care services for county correctional agencies throughout Michigan for more than 25 years." *Id.* at i, iii, iv (emphasis added).

Let there be no mistake: GPHS is *not* the nation's largest provider of correctional health care. And GPHS has *not* provided comprehensive health services in DOC settings since 2003 or provided services for county correctional agencies throughout Michigan for more than 25 years. In fact, GPHS *did not even exist* until November 18, 2014. See **Exhibit B**. And Michigan-based prisoner-advocacy groups had never even heard of GPHS before the Recommendation of Award. See Gongwer, *New MDOC Health Care Provider Would Save $100M, Prompts Alarm* (Mar 2, 2021), attached as **Exhibit C**.

By repeatedly providing information about *its subcontractor* when the RFP requested information about *the bidder*, GPHS failed to submit a responsive proposal. See Recommendation of Award, ¶ 1 (to be "responsive," a proposal must comply with "the Proposal instructions and Vendor Questions Worksheet, and . . . Evaluation Process."). Examples of GPHS's blatantly non-responsive answers abound:

**HONIGMAN**

Mr. Brandon Samuel
March 8, 2021
Page 8

- In response to the RFP's questions about the bidder's company history and growth, GPHS provided "information relating to annual revenue and the amount and source of economic resources **to which Wellpath**, a privately held company, has access." See GPHS Technical Response, xxv (emphasis added).

- In response to the RFP's question about whether receiving the contract would increase the bidder's gross revenue by more than 25%, GPHS said, "[t]his contract would increase GPHS' revenue by more than 25%. However, **our subcontracting partner—Wellpath LLC**—is currently operating at a scale required to deliver quality statewide healthcare and pharmacy services on behalf of the MDOC." *Id.* at 3 (emphasis added).

- In response to questions about the bidder's prior experience operating in Michigan, GPHS responded that "***Wellpath*** has operated in Michigan since 1993." *Id.* at 5 (emphasis added).

- In response to questions about the bidder's prior experience, GPHS repeatedly provided Wellpath's prior experience instead. See *id.* at 7 ("For a more detailed summary of our experience delivering quality healthcare services, please see **Attachment 12 – Wellpath Organizational Overview**."); *id.* at 8 (Experience 1) (listing a contract entered 11 months before GPHS existed); *id.* at 9 (Experience 2) (listing a contract entered two years before GPHS existed); *id.* at 11 (Experience 3) ("***Wellpath*** has successfully operated the comprehensive clinical services for the Massachusetts DOC since 2018." (emphasis added)).

These answers are non-responsive in the literal sense that they do not respond to the questions GPHS was asked. See, e.g., RFP, Vendor Questions Worksheet, No. 2 ("Discuss *your company's history*."); ("Has *your company* been a party to litigation against the State of Michigan?"); ("Within the last 5 years, has *your company* or any of its related business entities defaulted on a contract or had a contract terminated for cause?"); ("State *your* gross annual sales each of the last 5 years."); *Id.* at No. 5 ("Does *your company* have experience working with the State of Michigan?"); ("Does *your company* have experience working with other states?"); ("[D]escribe at least 3 relevant experiences for Health Care Services and 3 relevant experiences for Pharmacy Services from the last 5 years supporting *your ability* to successfully manage a contract of similar size and scope for the work described in this RFP.").

There is a good reason that both DTMB's Procurement Manual and the RFP specifically request this information about the bidder's company: the State needs to know who it is contracting with. There is nothing wrong with utilizing a subcontractor to

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 9

perform a portion of the contract. But the State is not entering into a contract with the bidder's subcontractors, and ultimately, it is the bidder's responsibility to provide the services required by the contract. For example, the RFP requires that:

- "*[The c]onractor* must perform the Services and provide the Deliverables described in [the RFP]." RFP, Standard Contract Terms, ¶ 2.

- "*[The c]ontractor* must at all times have financial resources sufficient . . . to ensure performance of the Contract . . . ." *Id.* ¶ 7.

- "*[The c]ontractor*, at its sole expense, must maintain the insurance identified [in the RFP]." *Id.* ¶ 8.

- "*[The c]ontractor* must defend, indemnify and hold the State, its departments, divisions, agencies, offices, commissions, officers, and employees harmless, without limitation, from and against any and all actions, claims, losses, liabilities, damages, costs, attorney fees, and expenses (including those required to establish the right to indemnification) . . . ." *Id.* ¶ 32.

- "*[The c]ontractor* represents and warrants: (a) *[the c]ontractor* is the owner or licensee of any Contract Activities that it licenses, sells, or develops and Contractor has the rights necessary to convey title, ownership rights, or licensed use; (b) *[the c]ontractor* will perform the Contract Activities in a timely, professional, safe, and workmanlike manner consistent with standards in the trade, profession, or industry; (c) *[the c]ontractor* will meet or exceed the performance and operational standards, and specifications of the Contract; (d) *[the c]ontractor* will provide all Contract Activities in good quality, with no material defects; (d) *[the c]ontractor* will not interfere with the State's operations; . . . and that (j) *[the c]ontractor* is neither currently engaged in nor will engage in the boycott of a person based in or doing business with a strategic partner as described in 22 USC 8601 to 8606." *Id.* ¶ 43.

- "*[The c]ontractor* will uphold high ethical standards and is prohibited from: (a) holding or acquiring an interest that would conflict with this Contract; (b) doing anything that creates an appearance of impropriety with respect to the award or performance of the Contract; (c) attempting to influence or appearing to influence any State employee by the direct or indirect offer of anything of value; or (d) paying or agreeing to pay any person, other than employees and consultants working for Contractor, any consideration contingent upon the award of the Contract. Contractor must immediately notify the State of any violation or potential violation of these standards." *Id.* ¶ 44.

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 10

The State needs to be able to hold the entity ultimately responsible for performing the contract accountable if it fails to comply with the contract's terms. And the State cannot hold ***non-parties*** to the contract liable if they fail to satisfy ***the successful bidder's*** contractual obligations. The State thus needs to ensure that the entity holding the contract is "responsible" in the sense that it "has the ability to successfully perform the duties identified by the solicitation." Procurement Manual at § 8.4.3.

The State also needs to know that the entity holding the contract has the financial wherewithal to cover the substantial liabilities—to both the provider and the State—that come along with providing correctional health care services. As Wellpath knows, providing these services entails substantial liability risks. See *Tanner v McMurray*, No 19-2166, 2021 WL 787455 (10th Cir Mar 2, 2021) (concluding that Wellpath was not immune from suit for money damages based on allegations that it provided deliberately indifferent medical care). For this reason, the State obligates the successful bidder, who is bound by contract, to provide the State with certain protections. Among other things, the State requires a "bondability letter" "to verify ***bidders'*** financial ability to perform all services required under the contract." See 2/16/2021 E-mail from Brandon Samuel, attached as **Exhibit D** (emphasis added). But, upon information and belief, GPHS did not submit a bondability letter demonstrating that *it* has the financial ability to perform the contract. Instead, it again relied on Wellpath's financial resources and bonding capacity. But a bondability letter from Wellpath—a third party that owes no contractual obligations to the State—simply does not provide the State with the protection it requires.

Moreover, even if GPHS's reliance on Wellpath were permissible (it is not), GPHS's corporate structure raises significant questions about whether GPHS and Wellpath can legally enter into the arrangement GPHS has proposed. As described above, GPHS's limited corporate purposes, and Indiana and Michigan law, prohibit GPHS from engaging in activities that go beyond the practice of medicine. And entering into a contract with Wellpath to provide the extensive non-clinical services required by the contract is not the practice of medicine. Simply put, GPHS cannot enter into a contract for Wellpath to provide services GPHS cannot itself provide. Thus, even if GPHS were theoretically allowed to rely on a subcontract with Wellpath to satisfy the RFP, it could not enter into a valid and binding subcontract with Wellpath in the first place.

Corizon Health is aware that, in 2017, DTMB awarded a contract to Blue Cross Blue Shield of Michigan ("BCBSM") to provide Medicaid children's dental benefits management over objections that BCBSM relied on a third-party subcontractor, DentaQuest, to provide a significant amount of the services required by the contract and used DentaQuest's experience as its own. The problems identified in this Bid Protest, however, are categorically different—and much more serious—than the complaints about BCBSM's proposal. In that case, BCBSM was legally authorized to perform all the

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 11

services required by the RFP. And, as Michigan's largest health insurer and part of a major nationwide association, BCBSM had more than enough assets to provide the contract services. The State thus entered into a contract with—and had direct contractual remedies against—a major corporation that was able to provide the State with the protection it required.

Here, by contrast, the State would only be in a direct contractual relationship with GPHS—an entity with assets woefully insufficient to guarantee a $589,988,000.00 contract. And, as a mere subcontractor, Wellpath would be able to simply walk away from the contract if it turned out not to be profitable, without any recourse for the State. This provides Wellpath with a substantial liability advantage over the other bidders. But the proposed arrangement only works if the State agrees to contract with GPHS, despite its insufficient experience and assets, based on the experience and assets of Wellpath, a separate entity with which GPHS plans to enter into a separate contract. DTMB's policies and the RFP specifically prohibit this. See Procurement Manual at § 8.4.3 ("Any vendor that is not responsible . . . may not move to [the next step of the procurement process]."). And they do so for good reason: accepting the lowest price from a non-responsible bidder that cannot guarantee its own contract simply fails to provide the "best value" to the State.

If Wellpath wants to provide the services in the RFP, it must follow the same process as every other bidder—submit the bid on behalf of its own company, sign the contract in its own name, and provide the contractual guarantees required to give security to the State. Wellpath failed to submit such a bid, and the bid GPHS submitted is neither "responsible" nor "responsive." Because GPHS has insignificant background, experience, or financial resources of its own, and impermissibly used its subcontractors' qualifications throughout its proposal, GPHS should have been disqualified.

### III. The Scoring of Corizon Health's Proposal Was Arbitrary and Capricious and Improperly Deducted Points from Corizon Health's Score.

Under Michigan law, an agency decision is arbitrary if it is "[w]ithout adequate determining principle[,] . . . [f]ixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned." *City of Romulus v Michigan Dep't of Environmental Quality*, 260 Mich App 54, 62–64; 678 NW2d 444 (2003). A decision is capricious if it is "apt to change suddenly; freakish; whimsical; humorsome." *Id.* An action that is arbitrary or capricious is "not authorized by law" and subject to reversal. *Id.*; *Wescott v Civil Service Comm'n*, 298 Mich App 158, 161–62; 825 NW2d 674 (2012). Similarly, Michigan courts will restrain an administrative agency when "the discretionary power of an administrative agency is abused or its judgment improperly exercised."

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 12

*Sterling Secret Service, Inc v Michigan Dept of State Police*, 20 Mich App 502, 509–10; 174 NW2d 298 (1969).

Corizon Health respectfully submits that the following scoring recommendations were arbitrary and capricious under Michigan law, and it asks that they be reconsidered for the reasons set forth below:

**2. Schedule A – SOW, Section 1.0 B. On-Site Primary Care Providers**
- Page 36, #4 Ambulatory Care (a) – Bidder response did not describe in detail how they would keep current in screening recommendations.

As described in Corizon Health's response, its current practice has enabled it to keep current in screening recommendations. This process includes the use of the Impact Pro Connect Portal to identify each patient with individual risk score and show gaps in care as well as screenings that need to be completed. Nursing staff schedules an annual health care screening appointment for each prisoner in an MDOC facility within 30 calendar days before or after the prisoner's birthday, unless the prisoner is in SAI. Prisoners who are not seen on the scheduled day are rescheduled within a 30-day period.

Prisoners who do not attend the subsequent health care screening appointment are rescheduled and seen by a Medical Provider to discuss the reason for the screening and to sign a release of responsibility if the prisoner declines the screening. Prisoners who are hospitalized at the time of their regularly scheduled annual health screen may have the time adjusted, as necessary.

**5. Schedule A – SOW, Section 1.0 E. Off-Site Services: Page 100, #4, Bidder provided examples, however, did not address specialty care clinics in a correctional facility.**

Corizon Health's response described the specialty care clinics that are provided on site at the Missouri Department of Corrections facilities.

**6. Schedule A – SOW, Section 1.0 F. Pharmaceutical Services: Page 102, Bidder did not provide detail how they would provide 340B pricing to the MDOC. Bidder response indicated continued discussion upon contract award.**

As the incumbent provider, Corizon Health has been working with the MDOC to provide 340B pricing for the MDOC. Our response indicated the progress that has been made to date which included obtaining (and providing as an attachment to our proposal) a letter of intent from McLaren Greater Lansing Hospital ("MGLH"), which is part of Corizon Health's off-site network.

**HONIGMAN**

Mr. Brandon Samuel
March 8, 2021
Page 13

Additionally, Corizon Health obtained and provided a letter of intent from Charleston Area Medical Center, a 340B covered entity based in Charleston, West Virginia.

Corizon Health's proposal indicated our commitment to continue discussions with these two covered entities to provide the MDOC with a 340B program.

**Page 107, 3. Mail order delivery of prescriptions: Bidder response and attachment 2 – Unit Dose Packaging indicated Bidder would not be providing all medications in unit dose as required.**

Corizon Health's packaging is unit of use and offered credit for partial cards, which is the sole benefit of the unit-dose packaging.

**Page 110, 5 (a-e) Rebates/Discounts/Revenue: Bidder checked acknowledged box, but noted conditions on the pricing page related to rebates.**

Corizon Health confirms our acknowledgement of page 110, 5, (a-e) Rebates/Discounts/Revenue.

As noted in our pricing proposal, Corizon Health's price "includes a 100% rebate if the annual <u>actual</u> combined PPPM of Off-site and On-site Specialty and Pharmacy Risk Share is less than the combined proposed Risk Share PPPM." (Attachment 12 – Schedule B – Pricing.) This rebate was not intended to be a condition on item 5. (a-e) Rebates/Discounts/Revenue.

**9. Schedule A – SOW, Section 1.0 I. General Health, Psychiatric and Pharmacy Staffing**

**Page 118, I.9 Bidder provided proposed staffing plans, however, no evening or night shift FTEs provided for DWHC.**

Corizon Health provided the following response to this question in our response to the *MDOC's Notice of Deficiency and Clarification Request #1 – 11/16/20:*

3. On page 118, I.9 staffing plans was provided. It was indicated you will subcontract for 24/7 coverage DWHC. Please clarify what duties does that entail.

  Bidder's Response:
  The 24/7 independent contractor coverage will provide emergency department (ED) services and inpatient (IP) hospitalist services for DWHC. This is in addition to the 5

# HONIGMAN®

Mr. Brandon Samuel
March 8, 2021
Page 14

> days per week and weekend rotations of the DWHC hospitalist that are proposed and currently assigned to DWHC.

**Page 119, I.10, Bidder did not describe how it would establish productivity benchmarks.**

Corizon Health believes it provided a robust response to our process of establishing productivity benchmarks as shown in the following responses in its proposal:

1. The Contractor must optimize provider productivity to assure that providers are engaged in patient care and performing duties for which they are licensed. Providers must play a role in the scheduling of their visits to coordinate appointments to minimize duplicate visits and limit unnecessary prisoner movement.

| **Bidder must describe how they will establish productivity benchmarks at the outset, and update/monitor throughout the duration of the contract.** | |
|---|---|
| Bidder Response: | Corizon Health sets productivity standards for providers across all disciplines. Standards are based on productivity data, such as ADP, provider types/counts, hours worked, number of encounters by type, per day/month. Additionally, variables such as location of medication passes, and patient access are considered.<br><br>In our contract with the MDOC, this information is tracked on our productivity tracking tool. We also have a Waitlist Tracking spreadsheet to track waitlist trends. This enables us proactively allocate resources to ensure patients' clinical needs are being met. For example, in facilities where the acuity level of patients is high, there may be a need to schedule additional time for a provider to attend to patient visits.<br><br>Productivity standards are tracked through COMS and monitored daily. Results are discussed with sites on a monthly basis to ensure we are utilizing our current resources to the maximum and that our patients' clinical needs are being met.<br><br>Additional detail about the productivity benchmarks we have incorporated into our contract with the MDOC are provided in our response to Question 14, below. |

2. MDOC anticipates that recruitment and retention of correctional health care staff will become more challenging over time as the health care system evolves and as changes in

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 15

the health care workforce occur. MDOC has received Health Professional Shortage Area (HPSA) designation for facilities throughout the State.

| **Bidder must check only one box below and identify exception(s):** | |
|---|---|
| ☒ Bidder has reviewed the above section and agrees with no exception(s). | |
| ☐ Bidder has reviewed the above section and has noted all exception(s) in column to the right. | List all exception(s), including the justification as to why each exception is requested. |

| **NOTE: IF BIDDING PHARMACY SERVICES ONLY THIS IS APPLICABLE FOR PHARMACY STAFF ONLY.** <br> **Bidders must provide a description of at least one successful means of increasing provider and pharmacy staff productivity used in a prison or jail.** | |
|---|---|
| **Bidder Response:** | As noted above, in our contract with the MDOC, productivity is tracked on our productivity tracking tool. We also have a Waitlist Tracking spreadsheet to track waitlist trends. This enables us proactively allocate resources to ensure patients' clinical needs are being met. For example, in facilities where the acuity level of patients is high, there may be a need to schedule additional time for a provider to attend to patient visits. Productivity standards are tracked through COMS and monitored daily. Results are discussed with sites on a monthly basis to ensure we are utilizing our current resources to the maximum and that our patients' clinical needs are being met. <br><br> Productivity standards are tracked through COMS and monitored daily. Results are discussed with sites on a monthly basis to ensure we are utilizing our current resources to the maximum and that our patients' clinical needs are being met. <br><br> In 2019 we implemented a scheduling pilot at four sites. The pilot was evaluated after several months, a determination was made to roll the program out statewide. We developed a standardized schedule for all sites and conducted training for our providers. We also provided collaborative (MDOC and Corizon) virtual "refresher" course in January 2020, going across the entire state by the use of TEAMS meeting. In attendance at the January sessions were schedulers, HUMs, and providers. Since the lag in direct patient care in the clinics due to COVID, a reminder was provided at our recent Annual Conference held October 7, 2020, for medical and psychiatric providers. An example of the scheduling template is shown below. An example of the scheduling template for medical providers is shown below. |

**HONIGMAN**®

Mr. Brandon Samuel
March 8, 2021
Page 16

| | Eight Hour Day | | Ten Hour Day |
|---|---|---|---|
| 8:00 | review PAQ, check emails, review schedule | 8:00 | review PAQ, check emails, review schedule |
| 8:30 | open for add-on - patient 1 | 8:30 | open for add-on patient 1 |
| 9:00 | patient 2 | 9:00 | patient 2 |
| 9:30 | patient 3 | 9:30 | patient 3 |
| 10:00 | patient 4 | 10:00 | patient 4 |
| 10:30 | patient 5 | 10:30 | patient 5 |
| 11:00 | lunch | 11:00 | lunch |
| 11:30 | lunch/chart reviews (don't scheduled any - this would be time to check emails and work on 407s, 409s & ACMO) | 11:30 | lunch/chart reviews (don't scheduled any - this wou time to check emails and work on 407s & 409s) |
| 12:00 | 5 chart reviews | 12:00 | 5 chart review |
| 12:30 | patient 6 | 12:30 | patient 6 |
| 1:00 | patient 7 | 1:00 | patient 7 |
| 1:30 | patient 8 | 1:30 | patient 8 |
| 2:00 | patient 9 | 2:00 | patient 9 |
| 2:30 | patient 10 | 2:30 | patient 10 |
| 3:00 | patient 11 or 5 chart reviews | 3:00 | patient 11 |
| 3:30 | open for add-on - patient 12 | 3:30 | patient 12 |
| 4:00 | check emails, wrap up charting, finish PAQ | 4:00 | patient 13 |
| 4:30 | leave for day | 4:30 | patient 14 |
| | | 5:00 | open for add-on - patient 15 |
| | | 5:30 | chart reviews |
| | | 6:00 | check emails, wrap up charting, finish PAQ |
| | | 6:30 | leave for day |

As part of the scheduling process, we developed scheduling guidelines to facilitate the process:

- Medical care providers will be scheduled a total of 12 appointments each for a 30-minute appointment per day for an eight-hour shift. A ten-hour shift would be 16 appointments for 30 minutes per appointment. This allows for downtime for lunch along with time for charting, documentation, etc.

- For psychiatry providers the productivity goal is: 18 follow ups or 6 new patient visits per 8-hour day. For a 10-hour day the goal is 22 follow ups and 7 new patient visits.

- Provider shift schedules match the hours of when prisoners are seen in health care.

- Schedulers make the provider schedule, with input from the team based on risk score, higher acuity equals more time for the appointment. The 30-minute appointment window allows for the amount of time needed and

**HONIGMAN**

Mr. Brandon Samuel
March 8, 2021
Page 17

provides flexibility, thereby avoiding rescheduling of patients if they are tardy. The scheduling pilot and now the scheduling template are flexible, even with the identified slots, it is anticipated with the use of the IPRO risk scores to drive follow up appointments for Chronic Care Clinics, the patients with highest needs are seen in a timely fashion. What has been learned is that even though the number of required Chronic Care Clinic visits have decreased, the patients seen per day has not, though more satisfaction for patient and provider is seen, because those with complex medical care are seen more frequently to avoid untoward events with their health.

- Providers need to check in their appointments in COMS and look for other appointments for the prisoner. Consolidating multiple appointments is the priority.

- Providers are given credit for Case Management and other meetings or duties. One patient equals one half hour. Thus, for example, a one-hour case management meeting equals a credit for 2 patients.

We also evaluated nurse referral appointments for routine screening to enable to the provider the discretion to determine if the appointment is needed. We expanded the appointment scheduling window providing additional days, so the patient is not sent to the waitlist. Facilities with waitlists add additional appointment slots to facilitate the timeliness of appointments and eliminate the need for waitlists.

Two other factors that impact productivity standards are **provider onboarding that is specific to corrections and triage.**

Providers who are educated and oriented to the uniqueness of the correctional healthcare environment are most likely to succeed and optimize their performance.

To ensure the success of our providers and reduce the likelihood of turnover, in June 2013 we introduced a hands-on Physicians Onboarding Program at the MDOC designed to educate and orient providers to correctional healthcare. Upon completion of the MDOC's mandatory training and Corizon Health's new employee orientation, providers are brought on site to be mentored by the facility's medical and psychiatric providers and midlevels.

Mr. Brandon Samuel
March 8, 2021
Page 18

Triage is also important for productivity. In sorting out patients with complex needs and making the individuals the first patients to be seen, a medical provider sees complex patients early in the day to allow more time get referrals or additional clinical work accomplished and address needs proactively. This approach of triaging and seeing the complex patients first can also facilitates custody staff assistance as necessary. Another approach is to consider group appointments for common primary care problems – for example, during a round of winter colds and flu when a quick assessment, patient education and supportive treatment are appropriate to use in a group setting as long as patients are given the option of a more private encounter.

**Measuring Productivity**

As shown in the graph below, we have made significant improvement in psychiatric provider productivity over the past two years. This is attributable to the education and director provided by the Regional Psychiatric Director and Psychiatric Operations Directors to psychiatric providers and schedulers as to how patients should be scheduled in order to maximize the productivity of the psychiatric providers.



# HONIGMAN

Mr. Brandon Samuel
March 8, 2021
Page 19

**27. Schedule A – SOW, Section 3.0 Staffing: Bidder proposed candidate for the SUD Director does not have relevant experience or credentials.**

Corizon Health proposed both Dr. Danielle Bradshaw and Dr. Patricia Schmidt, indicating that they would be appropriately credentialed for the SUD Director role at the start of the new contract. (Note, the table in this section 3.0 staffing did not allow for any narrative to explain this, however, an explanation was provided on page 19 of our response (as shown below)).

> **Pg. 19 1.0.A Collaborative Model**
> **Identification of a Substance Use Disorders Director**
> In accordance with the RFP's Key Personnel requirement, Corizon Health recognizes the MDOC's desire to have a Substance Use Disorder Director to provide clinical management and oversight of substance use disorders treatment and prevention. We also understand that the individual proposed can be the Medical Director or the Psychiatric Director. It is our intention under the new contract to have both our State Medical Director, Patricia Schmidt, DO, FACOI and our Regional Psychiatric Director, Danielle Bradshaw, DO serve in this position. We believe that their experience with the MDOC population, combined with their knowledge of the integrated care program and MDOC protocols, will allow for a seamless transition into this role without providing any disruption to patient care.

Corizon Health will assume the responsibility of ensuring that Dr. Schmidt and Dr. Bradshaw are appropriately credentialed for the responsibilities of this position at the start of the new contract. Additionally, Dr. Ravi Yarid, one of our Michigan providers and MAT Champion, is addiction-trained.

IV.     **Request for Relief.**

For the foregoing reasons, we respectfully submit that DTMB erred by making an Award Recommendation to GPHS because GPHS is an unexperienced provider without the legal capacity to provide the non-medical services required by the contract. Additionally, DTMB improperly deducted points from Corizon Health's application, as described more fully above. Accordingly, we respectfully request that:

1. DTMB withdraw its Recommendation of Award to GPHS;

2. DTMB deem GPHS a non-responsible and non-responsive bidder, which is ineligible for the RFP Award;

**HONIGMAN**

Mr. Brandon Samuel
March 8, 2021
Page 20

3. DTMB reevaluate and rescore Corizon Health's proposal to correct the errors described above; and

4. DTMB recommend the award of the contract to Corizon Health as the remaining qualified bidder that provides the "best value" to the State.

Very truly yours,

HONIGMAN LLP

Peter B. Ruddell

cc: Mr. Brom Stibitz
Ms. Bree Anderson
Ms. Michelle Lange
Mr. James Colangelo
Mr. Jared Ambrosier
Mr. William Camp