## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **KOHCHISE JACKSON**,<br> Plaintiff,<br><br>v.<br><br>**CORIZON HEALTH, Inc.,,** et al,<br>Defendants. | Case No.: 2:19-cv-13382<br>Hon.: Terrence G. Berg<br>Mag.: Patricia T. Morris |

| | |
|---|---|
| | |
| | |
| | |

## DECLARATION OF DR. RALPH SILVERMAN, M.D.

Declarant, Dr. Ralph Silverman, states as follows based on his personal knowledge:

1. My name is Dr. Ralph Silverman, M.D. and I am over 18 years of age.

2. I am a board-certified colorectal surgeon. I am also board-certified in general surgery.

3. I have extensive experience creating and closing colostomies. I have been regularly creating colostomies and performing colostomy takedown procedures for approximately seventeen years.

4. In a typical week, I create one to two colostomies and perform one to two colostomy takedown procedures.

5. I perform approximately seventy colostomy takedown procedures per year, and I have performed approximately one thousand of these procedures over the course of my career.

6. I have been provided with, and reviewed, medical records for Kohchise Jackson for the time he was housed in the St. Clair County Jail in 2016 and 2017 and in the Michigan Department of Corrections from 2017 through 2019. I also reviewed the records of Mr. Jackson's colostomy reversal surgery in the summer of 2019, after he was released from prison.

7. Between July and December of 2016 Mr. Jackson exhibited classic symptoms of a colovesical fistula, such as fecaluria and pneumaturia. Subsequent workup revealed that the fistula was caused by diverticulitis.

8. Mr. Jackson's symptoms were initially misdiagnosed as a urinary tract infection. Because he did not receive appropriate treatment for colovesical fistula when his symptoms began, the inflammation associated with the fistula was allowed to progress uncontrolled for several months.

9. As a result, when Mr. Jackson finally underwent surgery in December of 2016, a one-stage procedure to address his condition, called a "primary

2

anastamosis," was no longer feasible due to the excessive inflammation of the colon.

10. Instead of primary anastamosis, Mr. Jackson underwent a Hartmann's procedure in December of 2016. The procedure involved cutting out the damaged section of Mr. Jackson's colon and bringing the proximal, i.e. "upstream," end out of an opening created in his abdomen.

11. The purpose of this procedure was to divert the fecal stream away from the lower end of the colon and rectum to allow the inflammation to go down in those structures before the two ends of the colon are reconnected.

12. Generally, in the practice of medicine, the medical community reaches a broad consensus about what treatment is appropriate for various medical conditions.

13. There is a broad consensus that in the absence of contraindications, a colostomy formed as a result of diverticulitis, such as Mr. Jackson's colostomy, should be reversed about eight to twelve weeks after placement.

14. Reversing a colostomy less than eight weeks after placement increases the risks of the surgery, because inflammation in the abdominal cavity caused by the first surgery will not have had time to fully resolve.

15. Excessively delaying colostomy reversal also increases the risks associated with the procedure. The longer the reversal surgery is delayed, the more

3

likely the chance of developing fibrosis in the pelvis where the rectal stump sits. This can cause not only a difficult reconnection procedure but also poor functional results such as incontinence and stricture formation.

16. The overwhelming majority of patients who undergo Hartmann's procedure for diverticulitis can be safely reversed after around eight weeks, and are, in fact, reversed around eight weeks.

17. While the risks of surgery vary from patient to patient, colostomy takedowns are generally not a particularly dangerous procedure.

18. I have performed approximately one thousand colostomy takedowns in my career, and to my knowledge, none of my patients have ever died as a result of that surgery.

19. Mr. Jackson's medical records show no contraindications to a colostomy reversal surgery within two to three months of placement. Mr. Jackson did not have any relevant comorbidities that would make the surgery more difficult or higher-risk than normal.

20. Simply put, there was absolutely no medical reason to justify delaying the procedure for Mr. Jackson for over two years.

21. Indefinitely delaying Mr. Jackson's colostomy reversal surgery with no medical justification was not an adequate treatment for his condition. Delaying the reversal procedure for multiple years needlessly increased the

4

risks of poor functional outcomes when the reversal was belatedly performed, including stricture formation and incontinence. Delaying the procedure also needlessly and dramatically increased the amount of time Mr. Jackson had to live with a colostomy bag.

22. Colostomy reversal surgeries are generally considered to be medically-necessary. Failing to reverse a colostomy will not normally cause the patient to die, but surgical procedures can be medically necessary even when failing to perform them will not result in the patient's death.

23. I participate in the Medicare program.

24. In the course of my practice, I routinely perform colostomy reversal surgeries on Medicare beneficiaries whose colostomies are functional.

25. Every time I perform a colostomy reversal surgery on a Medicare beneficiary, I bill Medicare for my services.

26. I am aware that billing Medicare for a service that is not medically-necessary is a federal crime.

27. I bill Medicare for colostomy reversal surgeries even when the colostomy is functional and there are no complications.

28. To my knowledge, I have never been denied reimbursement by the Medicare program for a surgery to reverse a functional colostomy. I have sought and

5

received reimbursement from Medicare for this procedure hundreds of times in my career.

29. Most commercial health insurance plans also have a coverage exclusion for procedures that are not "medically necessary." To my knowledge, I have never been denied reimbursement from a commerical insurance provider for a reversal of a functional colostomy on the basis that the surgery was not "medically necessary."

30. I declare under penalty of perjury that the foregoing is true and correct, and my opinions are stated within a reasonable degree of medical certainty.

Executed on (date):

9-10-21

By:

Dr. Ralph Silverman, M.D.