## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KOHCHISE JACKSON,

     *Plaintiff,*               CASE NO. 19-cv-13382

*v.*                         DISTRICT JUDGE TERRENCE G. BERG
                             MAGISTRATE JUDGE PATRICIA T. MORRIS

CORIZON HEALTH, INC.,
PRIME HEALTHCARE SERVICES
– PORT HURON, LLC, COLLEEN
MARIE SPENCER, and KEITH
PAPENDICK,

     *Defendants.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS KRAUS,[1] PRIME HEALTHCARE SERVICES AND SPENCER'S MOTION FOR SUMMARY JUDGMENT (ECF No. 58) AND DEFENDANTS CORIZON HEALTH AND PAPENDICK'S MOTION FOR SUMMARY JUDGMENT (ECF No. 60)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that  Defendants Spencer and Prime Healthcare's motion for summary judgment (ECF 58) be **GRANTED** and that Defendant Papendick and Corizon's motion for summary judgment (ECF 60) be **DENIED**.

---

[1] Defendant Kraus was terminated from to case on June 30, 2021. (ECF No. 32.)

1

## II.   <u>REPORT</u>

### A.   **Background**

Plaintiff Kohchise Jackson ("Plaintiff") filed the original complaint in this matter on November 15, 2019. (ECF No. 1.) Plaintiff alleged that his civil rights were violated, citing 42 U.S.C. § 1983. Specifically, he alleged the following counts: (1) deprivation of substantive due process rights under the 14th Amendment against Defendants Spencer, Doe, and Prime Healthcare; and (2) deprivation of his 8th Amendment right against deliberate indifference to serious medical needs against Defendant Corizon. (ECF No. 1.) On January 3, 2020, Plaintiff filed an amended complaint alleging the following claims against the following Defendants: (1) deprivation of substantive due process rights under the 14th Amendment against Defendants Spencer, Kraus, and Prime Healthcare; and (2) deprivation of his 8th Amendment right against deliberate indifference to serious medical needs against Defendants Corizon and Papendick. (ECF No. 12.)

Plaintiff alleges that in July 2016, he was a pretrial detainee at the St. Clair Correctional Facility and he developed a colovesical fistula, i.e., a hole in the tissue that separates the large intestine from the bladder. (ECF No. 12, PageID.186.) As a result of this condition, Plaintiff suffered from bladder infections, urinary tract infections, high fevers, chills, nausea, vomiting, and pain. (*Id*.) Plaintiff alleges that from July through December 2016, he complained of the above symptoms and "that he was 'farting out my penis' and that feces was coming out in his urine.'" (*Id*.) Plaintiff further contends that "[i]n response to his requests for medical attention" Plaintiff was seen by Defendant Kraus "at least four times between July and December of 2016." (ECF No. 12, PageID.187.) During

"each examination, he was diagnosed with a urinary tract infection and prescribed an antibiotic, despite the fact that he exhibited symptoms of a fistula such as passing gas and feces through his urethra." (*Id*.) Plaintiff submits that the "only possible cause of 'fecaluria,' the condition of feces passing out of the urethra in the patient's urine stream, is a fistula." (*Id*.) On December 6, 2016, Plaintiff was taken to a local hospital's emergency room, was diagnosed with a "colovesical fistula, and Dr. Erina Kansakar elected to treat it via Hartmann's procedure[,] [] an emergency surgical procedure used in situations involving a pathology in the sigmoid colon or rectum that makes primary anastomosis (cutting out the damaged section of a colon and connecting the two ends) unsafe." (*Id*.) Plaintiff describes the Hartmann's procedure as follows:

> First, the large intestine is cut upstream from the pathology and diverted out through the patient's skin. Following the first operation, the patient passes gas and feces through the resulting stoma, into a colostomy bag. The pathology in the downstream section of the colon is also addressed in the first operation. After the downstream section of the colon has had time to heal, a second operation is performed to reconnect the two sections of colon and close the stoma. After the reversal operation the patient will again pass gas and feces out of their anus.

(ECF No. 12, PageID.187-188.)

Plaintiff went through the first surgery on December 10, 2016; he recovered normally, and was scheduled for the colostomy reversal on February 9, 2017, but Defendant Spencer "'postponed' the surgery for a nonmedical reason, pursuant to an official policy, practice, or custom of her employer, Prime Healthcare Services – Port Huron LLC." (ECF No. 12, PageID.188.) Plaintiff then clarified that "Defendant Spencer postponed the surgery because it was not 'emergent or life-threatening'" and that [o]n

information and belief, Defendant Spencer postponed [Plaintiff's] surgery in order to pass the cost of surgery onto the Michigan Department of Corrections" (MDOC) because "Defendant Spencer knew that [Plaintiff] would soon be transferred to a state prison, at which point MDOC, rather than St. Clair County and Prime Healthcare Services – Port Huron LLC, would be responsible for his healthcare needs." (ECF No. 12, PageID.189.)

Plaintiff was "told by his medical staff at the St. Clair County Correctional Facility that he would receive the colostomy reversal surgery after he arrived in prison" and Plaintiff was transferred to the custody of the MDOC on March 23, 2017. (*Id*.) Once at the MDOC, Corizon became the provider of medical services and Defendant Dr. Papendick was "Corizon's Director of Utilization Management for Michigan prisons." (*Id*.) Defendant Papendick "is an official with final decision-making authority with respect to whether 407 requests [for referrals to outside providers] . . . are approved." (ECF No. 12, PageID.191.) The possible responses to a 407 request are approve, alternate treatment plan (ATP), or need more information (NMI). (*Id*.) Plaintiff alleges that Defendant Papendick "does not approve 407 requests if he finds that 'medical necessity' is not demonstrated" and Defendant Papendick "considers treatment to be 'medically necessary' only if failure to provide the treatment would create risks to life or limb, or would create difficulty with Activities of Daily Living ('ADLs')." (ECF No. 12, PageID.192.) Plaintiff adds that the "six generally-recognized ADLs are bathing, dressing, eating, transferring (getting in and out of bed, or getting from a bed to a wheelchair), toileting, and continence." (ECF No. 12, PageID.193.) Plaintiff contends that Defendant Papendick's "restrictive definition of 'medical necessity' is not congruent with Corizon's contractual responsibilities under its

contract with the State of Michigan, with MDOC policy, or with the constitutional standard for a 'serious medical need' for purposes of the objective component of an Eighth Amendment deliberate indifference claim." (*Id*.)

Plaintiff alleges that on or about April 18, 2017, "a Corizon MP stationed at the Cooper Street Correctional Facility submitted a 407 request for a surgical consult for colostomy reversal" for Plaintiff. (*Id*.) Plaintiff further avers that "[s]ometime between April 18, 2017, and April 27, 2017, Dr. Papendick refused/deferred the request for a surgical consult for colostomy reversal for [Plaintiff] because he determined that reversal of the colostomy was not 'medically necessary.'" (*Id*.) Plaintiff contends that although his "colostomy was intended to be temporary, it was not reversed at any point during his two-year and two-month stay in the Michigan prison system." (ECF No. 12, PageID.195.)

Motions to dismiss were filed in this case and an Order adopting a previously filed R&R in part resulted in Defendant Kraus's motion to dismiss being granted and him being dismissed without prejudice. (ECF No. 32, PageID.630.)

On August 9, 2021, the above referenced motions for summary judgment were filed (ECF Nos. 58, 60). Responses and replies were filed, and the motions are ripe for consideration. (ECF Nos. 65, 66, 67, 68.) The court has reviewed and considered all the arguments made in the motions, responses, and replies.

### B.   Summary Judgment Standards

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists.  Fed. R. Civ. P. 56(a).  In reviewing the motion, the court must view all facts and inferences in the light most favorable to the

non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493.

After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or

6

whether it is so onesided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52).  Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

###### C.     Eighth Amendment Deliberate Indifference Standard

In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's Cruel and Unusual Punishment Clause because it constitutes the "unnecessary and wanton infliction of pain" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 97, 104 (1976)). To establish a cognizable claim, Plaintiff's allegations must show Defendant's 'sufficiently harmful' acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care . . . will not violate the Constitution." *Id.*

The "deliberate indifference" inquiry has objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The objective inquiry asks whether the deprivation was "sufficiently serious," which a claimant satisfies when his or her condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted). The former standard focuses on the "effect of delay in treatment." *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th 2017). In *Napier v. Madison*

7

*Co.*, 238 F.3d 739 (6th Cir. 2001), the court held that a plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Id.* (citation omitted). This rule applies more broadly to claims "based on the prison's failure to treat a condition adequately." *Blackmore v. Kalamazoo Co.*, 390 F.3d 890 (6th Cir. 2004). The Sixth Circuit recently explained that

> when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment.

*Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

The subjective inquiry, by contrast, considers whether official's state of mind was sufficiently culpable; it requires a showing that an official "'knows of and disregards an excessive risk to inmate health or safety[.]'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quotation omitted). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the

inference." *Id.* Inferences from circumstantial evidence can suffice to satisfy the subjective showing. *Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).

The Supreme Court examined the subjective prong in *Farmer v. Brennan*, 511 U.S. 825, 834-847 (1994). The subjective nature of deliberate indifference follows from the Eighth Amendment's principal proscription of "only the unnecessary and wanton infliction of pain," and focus on the defendant's culpability. *Id.* at 834 (citation omitted). The culpable state of mind, the Court said, was not ordinary negligence—cruel and unusual punishment is something more than run of the mill medical malpractice. *Id.* at 835; *see also Estelle*, 429 U.S. at 110. But not so much more that the defendant must intentionally or purposefully inflict injury. *Farmer*, 511 U.S. at 837. Instead, as noted above, the standard turns on whether the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The upshot, for present purposes, is that defendants who "responded reasonably to the risk," even if the potential harm subsequently eventuates, have not violated the Eighth Amendment. *Id.* at 844-845.

Courts are reluctant "to second guess medical judgments ," *Oliver v. Wolfenbarger*, No. 07-12672, 2008 WL 4387210, at *8 (E.D. Mich. Sept. 24, 2008) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)), and thus "differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim," *Pettway v. Squier*, 2014 WL 4924302, at *3 (E.D. Mich. Sept. 25, 2014). "[A] desire for additional or different

9

treatment does not suffice by itself to support an Eighth Amendment claim." *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). Instead, when treatment is afforded, "the Eighth Amendment is violated if the care [was] 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (citation omitted). The treatment must be "so woefully inadequate as to amount to no treatment at all." *Mitchell*, 553 F. App'x at 604.

Courts have accordingly rejected inadequate-treatment claims when the plaintiff received treatment but complained it was insufficient. *Bright v. Martin*, 37 F. App'x 136, 138 (6th Cir. 2002) ("In sum, it is clear that Bright received medical treatment for many years while incarcerated and has now concluded that he has a liver condition which Dr. Messany did not treat properly. Accepting Bright's allegations as true, they amount to a medical malpractice claim and not an Eighth Amendment claim."); *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) ("An examination of the record shows that the defendants provided Powell with medical treatment for his condition, even though he may not have been satisfied with the treatment that he received. . . . Under these circumstances, Powell has alleged no more than a medical malpractice claim that is not cognizable under 42 U.S.C. § 1983.").

These standards apply to "a private entity contracted to perform the traditional state function of prison medical care." *Baker v. Stevenson*, 605 F. App'x 514, 520 (6th Cir. 2015).

As concluded in the Order adopting the previous R&R in part, *Kingley v. Hendrickson*, 576 U.S. 389 (2015) does not "alter[] the constitutional standard for

10

Fourteenth Amendment due process claims by pretrial detainees outside of the excessive-force context." (ECF No. 32, PageID.628- 629.)

### E.   Analysis and Conclusions

### 1.   Defendants Spencer and Prime Healthcare

The allegations against "defendant county jail nurse Colleen Spencer [are that she] failed to implement 'plaintiff's prescribed plan of treatment' because, she allegedly 'postponed' his February 9, 2017, scheduled surgery to reverse his colostomy to 'pass' the cost of surgery to others." (ECF No. 58, PageID.971.) The allegations against "defendant Prime Healthcare [are that it] maintained a policy to postpone surgeries 'in order to pass the cost of the surgery onto the MDOC…rather than…Prime.'" (ECF No. 58, PageID.971.)

Defendants Spencer and Prime Healthcare summarize their defenses stating "[t]here was no Prime Healthcare policy against out of jail appointments to save money" because St. Clair County, not Prime Healthcare "was responsible to pay for plaintiff's out of jail appointments; thus, there could be no policy [on Prime Healthcare's part] to deny plaintiff out of jail treatment to defer costs (just the opposite)." (ECF No. 58, PageID.971.) Defendants also argue that Plaintiff was provided with at least six out of jail appointments, that Defendant Spencer did not have the authority to grant or deny out of jail appointments, and that Plaintiff's criticism of his medical care denotes, at most, medical malpractice which is not sufficient to state a claim. (ECF No. 58, PageID.972.)

Defendant supports its motion with reference to deposition testimony of Tracy DeCaussin, jail administrator for the St. Clair County Jail, who testified that if an inmate's insurance or secondary insurance does not pay for outside medical care, payment "would

fall on the responsibility of the County." (ECF No. 58, PageID.974; Ex. C, PageID.1087.) Defendants also proffer Plaintiff's deposition testimony wherein he agreed that he was taken out of the jail for medical care at least six times. (ECF No. 58, PageID.975; Ex. E, PageID.1106.) Defendants also rely on the affidavit of Defendant Spencer wherein she indicates that she did not have the authority to grant or deny out of jail appointments and that she would not and could not make such decisions. (ECF No. 58, PageID.975, Ex. D, PageID.1095.) Defendants also provide an affidavit of their expert, one Dr. McKenna, who stated that the standard of care did not require the colostomy be reversed, and deposition testimony from Plaintiff's expert, Dr. Ralph Silverman, that different physicians using their professional medical judgment could arrive at different decisions based on the same standards regarding whether to have a colostomy reversed. (ECF No. 58, pageID.977-78, Ex. G.)

Plaintiff responds that the County "delegated authority to make healthcare decisions for its jail inmates to 'our contracted medical provider'" and that jail personnel "'did not make medical decisions'" nor did they "ever overrule[] decisions made by the contractor's medical staff." (ECF No. 65, PageID.1604-1605.)

Plaintiff also argues that any participation in the decision to deny care is sufficient to confer liability on Defendant Spencer who was the head nurse and case manager who coordinated medical services. (ECF No. 65, PageID.1607.) Plaintiff proffers kite responses that he believes shows the surgeon's request (Dr. Kansakar) for approval of the recommended colostomy reversal was sent to Defendant Spencer, and that she was responsible for coordinating services and her responses to Plaintiff's "kites suggest that

12

Ms. Spencer was aware of and supported the decision to postpone the surgery"; thus, a "jury could find that she participated in the decision to deny treatment." (ECF No. 65, PageID.1608.)

Finally, Plaintiff notes that "every Eighth Amendment deprivation-of-adequate-medical-treatment claim is also cognizable as medical malpractice" and the distinguishing element is the mental state required for constitutional violations, which can be proven by the obviousness of the medical need. (ECF No. 65, PageID.1611-1615.)  Plaintiff contends that Dr. Kansakar's plan was known to the Prime healthcare Defendants and that the decision not to provide the colostomy reversal as recommended "'due to the fact that it is not emergent or life-threatening'" are "not valid excuses for refusing to provide a surgical procedure recommended by a prisoner's treating physician." (ECF No. 65, PageID.1615, Ex. B, Dr. Kansakar letter, Ex. D, Defendant Spencer kite response.)

These Defendants argue that Plaintiff cannot establish a motive for any decision to delay a colostomy reversal because the costs of any surgery performed while Plaintiff was in the county jail would fall on the County, not upon Prime Healthcare. (ECF No. 58, PageID.974; Ex. C, PageID.1087.) Although motive is not a necessary element, it can be relevant to the subjective inquiry because a motive to deny care could provide a basis for determining whether the official's state of mind was sufficiently culpable. *Harrison,* 539 F.3d at 518. Here, the sole allegation regarding the subjective component is the motive to avoid costs and pass them on to the MDOC.

Based on the evidence presented by Defendants that it is the County and not Prime Healthcare that would bear any costs, I find that Defendants have properly supported their

motion and that Plaintiff has not proffered any evidence that would create a genuine issue of material fact regarding the subjective prong of the deliberate indifference inquiry. I therefore conclude that even if Plaintiff could satisfy the objective prong, there is no genuine issue of material fact as to the subjective prong. Accordingly, I recommend that Defendants Spencer and Prime Healthcare's motion for summary judgment be granted.

### 2. Defendants Corizon Health and Papendick

Defendants Corizon Health and Papendick's motion for summary judgment argues that colostomy reversal surgery was not medically necessary, Plaintiff's claim amounts only to a disagreement over differing medical judgments, Plaintiff was provided with adequate supplies and care Defendant Dr. Papendick is not the final decisionmaker, and Plaintiff cannot establish a *Monell* claim against Corizon. (ECF No. 60.)

Defendants proffer deposition testimony from Defendant Papendick and a Dr. Bomber (Corizon's State Medical Director) "that neither Dr. Papendick nor Corizon is the final decision-maker with respect to whether a 407 request for a colostomy reversal is approved, and that it was the MDOC, according to the MDOC's policy, that made the final determination denying Plaintiff's medical request" and that the MDOC considers colostomy reversals to be cosmetic. (ECF No. 60, PageID.1278-1279, Ex. D, Ex. E.) They also proffer Plaintiff's deposition testimony that the MDOC told him they would not approve the surgery because it was cosmetic and the MDOC does not approve reconstructive or cosmetic surgery. (ECF No. 60, PageID.1279-1280, Ex. G.) Defendants also rely on Dr. Bomber's deposition testimony that "'we're instructed by operations to practice medicine based on medical necessity, not costs'" and Dr. Papendick's testimony

14

that he absolutely did not make approvals based on cost considerations. (ECF No. 60, PageID.1281, Ex. E, Ex. D.)

Plaintiff responds that Corizon sought and achieved massive reductions in spending in 2017. (ECF No. 66, PageID.1886-1889.) Defendant Papendick reviews nearly one hundred requests for offsite services each day and his decisions are based "solely on the information contained in the request form." (ECF No. 66, PageID.1889, Ex. 28.) Plaintiff indicates that Corizon "does not consider reversing a functional colostomy to be medically necessary" and that Corizon has "repeatedly refused to reverse colostomies for MDOC prisoners." (ECF No. 66, PageID.1891, Ex. 8, 36, 37, 39, 40, 41.) Plaintiff notes that approximately one month after he was paroled, he received a colostomy reversal surgery at the Detroit Medical Center, "financed by the Michigan Medicaid program." (ECF No. 66, PageID.1892.) Plaintiff cites to testimony from Drs. Kansakar and Silverman  who regularly perform colostomy reversal surgeries around two months after placement whenever reversal is possible and who participate in the Medicare program. (ECF No. 66, PageID.1892-1893, Ex. 3, 11, 43.) Plaintiff contends that Dr. Papendick's "alternative explanation" for why he did not approve the surgery, i.e., "that the risk of death from the surgery outweighs the benefits" was a post hoc and not credible rationale, especially where Dr. Papendick denied even a consultation with a surgeon which would pose no threat to Plaintiff's health. (ECF No. 66, PageID.1894.) Plaintiff also refers to Defendant Papendick understanding the "relationship between his ATP rate, the amount Corizon spends on outpatient treatment, and the number of lawsuits filed against Corizon[,]" i.e., when costs are higher, and there are more approvals than ATPs, the number of lawsuits goes down.

(ECF No. 66, PageID.1896.) Conversely, when costs are cut and less is spent on outpatient care, millions of dollars are saved in prisoner care but the number of lawsuits increase. (*Id.*)

Plaintiff further contends that MDOC policy did not require Defendants to deny Plaintiff's surgery and even if it were true, it would not provide insulation from liability. (ECF No. 66, PageID.1897.) MDOC policy merely requires any corrective or reconstructive surgery to be medically necessary and approved by the Chief Medical Officer but the medically necessary phrase is not defined and should be interpreted in light of other statements in the MDOC policy that provides that healthcare should be consistent with contemporary standards of medical practice in the community. Drs. Kansakar and Silverman have testified that the medical standard practice is to reverse colostomies within approximately eight weeks after the initial surgery. (ECF No. 66, pageID.1900, Ex. 3, 8, 11, 47.) Finally, Plaintiff argues that Dr. Papendick does not have to be a final decisionmaker to be liable under *Monell*. (ECF No. 66, PageID.1901-1903.)

As to Defendant Papendick, there is case law regarding circumstances similar to the instant case that would support a decision granting summary judgment. *Colwell v. Corizon Healthcare, Inc.*, 2014 WL 6686764, at *21 (E.D. Mich. Nov. 26, 2014) (granting summary judgment where defendant doctor "overrode a treating physician's surgery consult" because "[a] difference of opinion between a prisoner and prison medical staff, or even between various doctors involved in a prisoner's medical care regarding the treatment [] of a medical condition does not constitute deliberate indifference."); *Ross v. Carpenter*, 2016 WL 3223620, at *5-6 (D. S.D. June 8, 2016) (granting summary judgment where Plaintiff's colostomy was "doing well" and because "there is no timeframe within which a colostomy

16

must be reversed [or one will] suffer permanent loss of normal rectal functions due to his colostomy" and because Plaintiff's contention that his "colostomy is 'gross' and has an 'odor' does not establish medical necessity under a serious medical need analysis.").

On the other hand, at least where the Defendant physician's review of the records lacks indicia that he considered medically sound factors an applied those factors to the individual plaintiff's medical status, summary judgment should be denied. *Jones v. Gaetz*, 2017 WL 1132560, at *4-5 (S.D. Ill. Mar. 27, 2017) (denying summary judgment where there was no evidence the defendant physician "exercised his professional judgment with regard to Jones's request for colostomy reversal" "despite Jones's protestations that his surgeon indicated that his colostomy could and should be reversed" because although the defendant physician stated he reviewed the records and that there are various factors to consider in determining whether a colostomy should be reversed, the doctor did not indicate how those factors would apply to this plaintiff).

In the instant case, as Plaintiff argues, Dr. Papendick had no specific explanation for why he did not approve the surgery other than a generalized notion "that the risk of death from the surgery outweighs the benefits[.]" In addition, Dr. Papendick denied even a consultation with a surgeon which would pose no threat to Plaintiff's health. (ECF No. 66, PageID.1894.) Finally, Plaintiff offers testimony from Drs. Kansakar and Silverman who regularly perform colostomy reversal surgeries around two months after placement whenever reversal is possible and who participate in the Medicare program. (ECF No. 66, PageID.1892-1893, Ex. 3, 11, 43.) Under these circumstances, I suggest that this case is closer to the *Jones* case cited above than the cases granting summary judgment in favor of

17

a defendant physician. I therefore find that Plaintiff has proffered sufficient evidence to raise a genuine issue of material fact as to whether Defendant Papendick acted with deliberate indifference to Plaintiff's serious medical needs.

As to Corizon, in order to prevail on a claim under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978), a plaintiff must show that the corporation had a policy or custom that caused his injury. Plaintiffs must "identify the policy, connect the policy to the city itself[,] and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1994)(marks and citations omitted). "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified the illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgee v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

"In this case, where no formal policy exists, the critical question is whether there is a particular custom or practice that "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (citations omitted).

Inaction in the face of employees habitually acting unconstitutionally can provide the basis for liability under *Monell* as long as the policy amounts to: "(1) 'a clear and persistent' pattern of unconstitutional conduct by municipal employees; (2) the

municipality's 'notice or constructive notice' of the unconstitutional conduct; (3) the municipality's 'tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction'; and (4) that the policy of inaction was the 'moving force' of the unconstitutional deprivation, such that plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee." *D'Ambrosia v. Marino*, 747 F.3d 378, 387-388 (6th Cir. 2014) (citations omitted).

In the instant case, Plaintiff contends that Corizon has a permanent and well-settled custom to unconstitutionally deny colostomy reversals to save costs. Plaintiff points to the fact that Corizon sought and achieved massive reductions in spending in 2017. (ECF No. 66, PageID.1886-1889.) Plaintiff further argues that Corizon "does not consider reversing a functional colostomy to be medically necessary" and that Corizon has "repeatedly refused to reverse colostomies for MDOC prisoners." (ECF No. 66, PageID.1891, Ex. 8, 36, 37, 39, 40, 41.)

I first find that Defendant's labeling colostomy reversal surgery as elective or cosmetic is not dispositive because a colostomy remains a serious medical need despite the label. *Champion v. Dicocco*, 2018 WL 4097482, at *5 (E.D. Va. Aug. 24, 2018) (Plaintiff's use of a colostomy bag is a serious medical need and "Defendants cannot avoid this result by categorizing stoma reversal surgery as elective.")

Although a close call, I suggest that Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to whether Corizon had a policy or custom of denying reversal of colostomies without engaging in any individualized

assessment of each prisoner's condition for the purpose of cutting costs as further evidenced by Corizon's achieved goal of reducing spending. *Strayhorn v. Caruso*, 2015 WL 5013772, at *11 (E.D. Mich. July 31, 2015) (denying summary judgment where defendant PHS "received a significant penalty if the projected medical costs per prisoner under contract with MDOC were exceeded" and where "all of the questionable medical decisions resulted [in] cost savings, at a minimum, creates an inference that Defendant PHS engaged in a pattern and practice that resulted in depriving Plaintiff [of] constitutionally adequate medical care.")

### F.    Conclusion

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants Spencer and Prime Healthcare's motion for summary judgment (ECF 58) be **GRANTED** and that Defendant Papendick and Corizon's motion for summary judgment (ECF 60) be **DENIED**.


## III.    <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making

some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 16, 2021

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

21