## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Kohchise Jackson,

      Plaintiff,

v.

Corizon Health, Inc., et al.

      Defendants.

Case No: 2:19-cv-13382
District Judge: Terrence G. Berg
Magistrate Judge: Patricia T. Morris

---

MARGOLIS, GALLAGHER & CROSS
Lawrence H. Margolis (P69635)
Ian T. Cross (P83367)
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Defendants Corizon Health, Inc.
and Keith Papendick, M.D.
1441 West Long Lake Road, Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
dscarber@chapmanlawgroup.com

CORBET, SHAW, ESSAD, & BONASSO, PLLC
Daniel R. Corbet (P37306)
Kenneth A. Willis (P55045)
Attorneys for Prime Healthcare Services,
Colleen M. Spencer, and David A. Krause
30500 Van Dyke Ave., Suite 500
Warren, MI 48093
(313) 964-6300
daniel.corbet@cseb-law.com
kenneth.willis@cseb-law.com

---

## DEFENDANTS CORIZON HEALTH INC., AND KEITH PAPENDICK M.D.'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING THEIR MOTION FOR SUMMARY JUDGMENT(ECF. NO. 69)

The Magistrate Judge Act requires district courts to review *de novo* those portions of the magistrate judge's report to which a timely objection is made. 28 § U.S.C. 636(b)(1)(C). The statute grants district courts the discretion to "accept, reject, or modify, in whole or in part" the findings or recommendations of the magistrate judge and to "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

A district court has the discretion to consider evidence presented for the first time in a party's objections to a magistrate judge's report. *Muhammad v. Close*, No. 08-1944, 2009 WL 8755520, at *2 (6th Cir. Apr. 20, 2009) ("We find persuasive *United States v. Howell*, 231 F.3d 615, 621 (9th Cir.2000), and *Freeman v. Bexar*, 142 F.3d 848, 850–53 (5th Cir.1998), both of which held that district courts have the discretion, though they are not required, to consider evidence presented for the first time in a party's objections to a magistrate judge's report.").

## Objection #1 – The Report and Recommendation Erred in Finding that Dr. Papendick's Decision to Not Approve Plaintiff's Colostomy Reversal Did Not Constitute Medical Judgment.  (ECF No. 69, PageID.2785-86)

There were four (4) doctors in this case, being sworn under oath, that testified that the decision to perform Mr. Jackson's colostomy reversal constituted medical judgment (i.e., Dr. Kansakar (Plaintiff's initial surgeon), Dr. Silverman (Plaintiff's retained expert), Dr. McQuiston (Corizon Defendants' expert surgeon – by way of sworn affidavit), and Dr. Papendick.  These doctors also testified that, in April 2017

when Plaintiff Jackson's colostomy reversal was considered by the Corizon Defendants, he was not suffering from any particular serious medical condition that mandated a reversal. They further testified that there was no evidence that Plaintiff suffered any damages or injuries by not having his colostomy reversed sooner.[1] Yet, the Magistrate Judge failed to apply this evidence in reaching her conclusions. The Magistrate's Judge recognized the following testimony from Dr. Silverman:

> "Defendant also provided…deposition testimony from Plaintiff's expert, Dr. Silverman, that different physicians using their professional judgment could arrive at different decisions based on the same standards regarding whether to have a colostomy reversed." (**ECF NO. 69, PageID.2780**).

However, the Magistrate Judge failed to actually apply this testimony and ignored all of the several other portions of testimony and evidence demonstrating that Dr. Papendick's decision to perform a colostomy reversal constitutes medical judgment. In addition to the actual medical testimony, peer-reviewed articles were submitted in this case stating that the decision is left to medical judgment, that there is no mandate for a colostomy reversal at all, and no time mandate. See **ECF No. 12-6, PageID.227**, *Up-to-Date – Acute colonic diverticulitis: Surgical Management*, stating: "Subsequent closure of a colostomy is a technically difficult operation

---

[1] Co-Defendant's expert surgeon, Dr. Timothy McKenna, D.O., also provided similar opinions. (**ECF No. 58-9, PageID.1238**). That makes five (5) doctors who opined that (a) the colostomy reversal is a medical judgment decision allowing for different opinions, (b) is not mandated, (c) has no time mandate, and (d) that Plaintiff suffered no injuries as a result of not getting it within two (2) years.

associated with <u>high morbidity and mortality rates</u>.  As a result, <u>colostomy closure is only performed in approximately 50-60 percent of all patients</u> after a Hartmann's procedure;" "of 1660 patient who underwent Hartmann's procedure…<u>only 28.3 percent underwent colostomy reversal within a year</u>.  Outcomes of the reversal surgery were not influenced by time lapsed from index operation;" "…<u>the optimal timing of colostomy reversal remains undefined and <i>at the discretion of the surgeon</i></u>."  (emphasis added). This information is based upon several medical studies (**ECF, No.12-6, PageID.241**).  Dr. Kansakar was questioned regarding these studies and <u>agreed</u> with them. Dr. Kansakar, testified that, with respect to colostomy reversals, "there can be ***differences of opinion***, amongst doctors, regarding colostomy reversal, whether we do it, [and] the timing of when it can be done." She further testified that, as to colostomy reversals for Hartmann's Procedures (i.e., Plaintiff's original colostomy procedure), it is "within a particular medical provider's ***medical judgment*** as to what they are going to do or what they think is appropriate for a particular patient." (**ECF No. 60, PageID.1243-44, 1268-69**):

> Q. …<u>What this basically says, these different studies that it's talking about, is basically saying that there can be differences of opinion, differences of opinions amongst doctors regarding colostomy reversal, right, whether we do it, the timing of when it can be done, things like that, correct</u>?
> A. Yes, sir.
> Q. And you don't disagree with that, right?
> A. <u>No, I do not disagree with that</u>.  (**ECF 60-3,** Dep p. 57).
> \* \* \*

> Q. Doctor, just to follow up with you regarding what we were talking about when we last left off, <u>here are some of those articles that were filed or that were referenced in a court filing</u>. Are you able to see my screen?
> A. Yes, sir.
> Q. Okay. One of the articles being "What Proportion of Patients with an Ostomy for Diverticulitis Get Reversed", another one being "Restoration of Bowel Continuity After Surgery for Acute Perforated Diverticulitis: Should Hartmann's Procedure be Considered a One-Stage Procedure, Feasibility and Morbidity of Reversal of Hartmann's, so Avoiding or Reversing Hartmann's Procedures." <u>So there's a number of articles that would seem to indicate that it's certainly within a particular medical provider's medical judgment as to what they are going to do or what they think is appropriate for a particular patient, correct</u>?
> A. <u>Correct, sir</u>.
> Q. And you don't disagree with that, right?
> A. <u>I do not disagree with that</u>. (**ECF 60-3**, Dep, p. 58).

Dr. Silverman testified that it is medical judgment that doctors use in making decisions regarding a patient's treatment options <u>and</u> that doctors could arrive at different treatment decisions using their medical judgment. (**ECF 60-10**, Dep., p. 9). He further testified that **<u>this case</u>** is a disagreement regarding medical judgment:

> Q. Dr. Silverman, <u>your opinion in this case is that Dr. Papendick failed to exercise proper medical judgment in treating Mr. Jackson, correct?</u>
> A. **Yes**. (**ECF No. 60, PageID.1272**; **ECF No. 60-10**, Dep., p. 10)

Plaintiff Jackson testified that he "**disagreed with Dr. Papendick's medical judgment**," and wished to receive a reversal instead of the other numerous medical treatments he received for his colostomy: (**ECF 60, PageID.1267**, Dep. pp. 173-4)

Q. <u>Do you disagree with Dr. Papendick's medical</u>
<u>judgment that you did not require a colostomy reversal?</u>
**A Yeah.**

\* \* \*

Q. …So…is it fair to say that <u>you believe that instead of</u>
<u>treating you the way they did when you were in the MDOC</u>
<u>in terms of giving you medical assessments, supplies,</u>
<u>referring you to the ER, determining what type of supplies</u>
<u>you might need, performing labs and X-rays, you believe</u>
<u>that they should have also been doing a colostomy reversal</u>
<u>as well; right</u>?
A I believe they should have did (sic) the colostomy
reversal.
Q <u>Instead of all the other stuff they were doing</u>?
**A Yes. (*Id.*)**

Therefore, based upon Plaintiff's own witnesses, <u>this case is the essence of a</u>
<u>medical malpractice claim, not a deliberate indifference claim</u>.  "[F]ederal courts are
generally reluctant to second guess medical judgments and to constitutionalize
claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir.
1976). See *Rhinehart v. Scutt*, 894 F.3d 721, 752 (6th Cir. 2018), holding: "Neither
negligence alone, nor a disagreement over the wisdom or correctness of a medical
judgment is sufficient for the purpose of a deliberate indifference claim."

Dr. Papendick testified that he ***exercised his medical judgment*** in determining
that an alternative treatment plan for Plaintiff to continue to follow with his provider
was appropriate and that reversal was not medically necessary **(ECF No. 60,**
**PageID.1244-145, 1272-1273,** Dep., pp. 73-74, 105). Dr. McQuiston affirmed that
"there is no specific time frame or standard for whether or when a reversal surgery

must occur. Mr. Jackson had no medical necessity that required him to have a reversal surgery done before he completed his incarceration." (**ECF No. 60, PageID.1269; ECF No. 60-9**, ¶5). Dr. McQuiston further opined that Plaintiff was not put at any risk nor suffered any damages or injuries by not having his colostomy reversal during his incarceration. ***Id.***

Numerous federal courts have recognized that Dr. Papendick's role as a utilization manager entails medical judgment. See *Calhoun v Corizon Health*, 2021 U.S. Dist. LEXIS 229969, at *17-18 (W.D. Mich., Nov. 1, 2021)(**Ex A**), holding:

> Dr. Papendick is not involved with the day-to-day medical care of inmates. Instead, his duties include evaluation of provider requests for offsite medical services that cannot be provided at MDOC facilities. When considering a provider's request, he reviews the associated prisoner medical records that are either identified by the medical provider or are determined to be associated with the outpatient healthcare request based on the information provided by the medical provider. Dr. Papendick then ***recommends*** an appropriate course of treatment, which may involve the treatment requested or an alternative treatment plan (ATP). (emphasis added)
>
> * * *
>
> His claim against Dr. Papendick—that he should have approved the request for an orthopedic consult instead of requiring physical therapy—amounts only to disagreement with Dr. Papendick's exercise of medical judgment, not a deliberate indifference claim. (citations omitted).

*Calhoun* made it clear that because of Dr. Papendick' limited involvement only at the review stage, he cannot be held deliberately indifferent for things that are not part of his review or present at the time of his review. *Id.* See also *Tietz v. Corizon Health, Inc.*, 2021 U.S. Dist. LEXIS 14100, *44 (E.D. Mich. Jan. 26, 2021)(**Ex B**).

<u>The Court finds that Papendick's alleged decision not to refer Plaintiff to a specialist following those two hospitalizations and treatment **implicate medical judgments** and fails to state an Eighth Amendment claim</u>. *See Mitchell*, 553 F. App'x at 605 (differences of opinion between prison doctors and a specialist's recommended treatment did not establish deliberate indifference); *Lowe v. Prison Health Serv.*, No. 13-10058, 2015 U.S. Dist. LEXIS 129942, 2015 WL 5675748, at *6 (E.D. Mich. Sept. 28, 2015) (plaintiff's claims that defendants failed to refer him to an off-site specialist "merely presented a difference of medical opinion, which does not generally fall within the scope of an Eighth Amendment claim"); *Wright v. Genovese*, 694 F. Supp. 2d 137, 155 (N.D.N.Y. 2010) ("Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.").

The Magistrate Judge's determination that the dangers of the procedure would not constitute a sufficient basis to warrant denial of a colostomy reversal (**ECF No. 69, PageID.2785**), **is unfounded**, especially where Dr. Silverman testified that as part of medical judgment, physicians, including himself, should always consider the possibility that risks may occur to a patient when determining what treatment is appropriate: (**ECF No. 60, PageID.1274; ECF No. 60-10**, Dep.**, p. 41**).

> Q. It was worth you mentioning that these things could happen, that these are risks that could happen, when you were trying to consider, with your medical judgment, what the standard should be, right?
> A. That's right. (***Id.***)

Moreover, even the cited articles recognized the risks, dangers, and morbidity rates of colostomy reversals. (**ECF No. 12-6, PageID.227**, cited above.) Dr. Kansakar testified that the risks of such surgery are "real" and "significant" and

include an unsuccessful surgery, need for reoperation, complications, injury, bleeding, damage to ureter and surrounding structures, leakage, infection, bleeding, and death, that these are real risks that do happen, and that Mr. Jackson, even being a younger patient, can equally experience these same severe complications. (**ECF No. 60, PageID.1244**; **ECF No. 60-3,** Dep. pp. 37,39, 65-66).

The Magistrate Judge improperly concluded that Plaintiff's surgeon testified that the "**medical standard practice** is to reverse colostomies within approximately eight weeks  after the initial surgery." (**ECF No.69, PageID.2784**).  This is simply not true.[2]  In fact, Dr. Kansakar actually testified that it is "**her** practice", not some national practice for every doctor, to try to reverse during that time frame.

```
25  Q.   And I'm just going back to your testimony as well as
 1       your letter, and your testimony was very clear when we
 2       started this deposition that it's your practice to do
 3       that.  Your letter even said my practice or my
 4       standard is to do that.
 5            You're talking about -- what you're talking
 6       about is what you do, correct, not necessarily what
 7       everybody else does, right?
 8  A.   Yes, sir.  (ECF No. 60-3, Dep. pp. 39-40)
```

And, as referenced above, Dr. Kansakar very clearly testified that the decision of whether to do a reversal and the timing is subject to differences of opinions amongst doctors and within a particular medical provider's medical judgment.

---

[2] The Magistrate's reliance upon such a standard renders her entire Recommendation seriously conflicting.  It makes no sense that the Corizon Defendants are liable for not following this alleged standard and the Prime Healthcare Defendants are not.

The Magistrate Judge improperly premised her conclusion on an opinion that Dr. Papendick somehow violated a standard of practice, which is not true <u>and further would deem this a malpractice case</u>, not deliberate indifference. For the above reasons, the Magistrate Judge's failure to address the significant medical judgment evidence and failure to conclude that the decision to perform a colostomy reversal is subject to the medical judgment exercised by Dr. Papendick was clearly erroneous. Furthermore, <u>this Honorable Court has previously recognized that if discovery commenced and it was "demonstrated that the decision to deny the colostomy reversal surgery was based on a medical professional's judgment of the *medical risks and benefits associated with the surgery* – not mere economic considerations," dismissal would be consistent with the law and the actions of other courts that have decided this issue</u>. (See **ECF No. 32, PageId.623**). **<u>This is exactly what the evidence in this case demonstrated</u>**.   Yet, the Magistrate Judge ignored this key evidence.  Summary judgment is proper as to Plaintiff's claim against Dr. Papendick.

**<u>Objection #2 – The Report and Recommendation Erred in Finding that *Jones v Gaetz* Was Similar to the Herein Case and that *Jones v Gaetz* Served as a Basis to Deny Summary Judgment. (ECF No. 69, PageID.2785)</u>**

The Magistrate Judge erred in finding that this case "is closer" to *Jones v Gaetz*, 2017 U.S. Dist. LEXIS 44590 (S.D. Ill. Mar. 27, 2017)(**Ex C**).  In *Jones*, the inmate had also undergone a prior colostomy reversal.  The defendant jail physician was not a utilization review physician like Dr. Papendick but instead was a physician

who had actually examined the inmate at the jail and was the physician with whom the patient personally spoke to "the most" about needing a colostomy reversal. *Id.* 4. Not only did the plaintiff in *Jones* assert that he needed a colostomy reversal because his original surgeon told him that it "should be reversed" (*Id.*), but he also asserted medical conditions "that his colostomy causes frequent abdominal pain, and it has led to significant weight gain, as well as high blood pressure." *Id.* at 9-10. The *Jones* Court found that the defendant physician could not offer any date upon which his review of the need for a colostomy reversal took place and did not testify that he actually considered the request:

> the record is bereft of any evidence that Dr. Shah actually considered Jones's request despite Jones's protestations that his surgeon indicated his colostomy could and should be reversed. The only medical record pertaining to Jones's colostomy indicates simply that the wound surrounding his stoma was clean. *Id.* at 12.

In *Jones*, there was also no indication or testimony that the defendant doctor ever applied any medical reasoning to *Jones'* specific situation. Here, the evidence is the exact opposite. The record and evidence is clear that Dr. Papendick reviewed the materials and issued a decision regarding his review by April 19, 2017. (**ECF No. 60-1, PageID.1285-1286**). Also, Dr. Papendick testified that he specifically reviewed the medical records submitted by the physician who treated Mr. Jackson <u>and</u> that it was Mr. Jackson's actual medical condition and complaints that he considered in evaluating whether Jackson's circumstances would warrant a reversal:

14  Q    You think you made the right call.
15  A    Yes.
16  Q    Why do you think you made the right call?
                              *  *  *
21  A    The danger of surgery in anyone does not depend on
22        how sick they are or how old they are, there is a
23        baseline question about whether its risk is worse
24        than its benefit.  **His** risk was more than **his**
25        benefit for a colonosc -- yeah, colonos -- colostomy
1        reversal.  **He** was having absolutely no complaints,
2        except that he wanted his reversal.  **He** was having
3        no medical problems whatsoever, according to the
4        provider who saw him on a regular basis.
5   BY MR. CROSS:
6   Q    So you believed that the risks of the reversal
7        surgery outweighed the benefits for **Mr. Jackson?**
8   **A    Yes.** (ECF No. 60, PageID.1272; ECF No. 60-4, Dep p.73-4)

It is undisputed that, at the time that Dr. Papendick received the 407 request

for a utilization review of Mr. Jackson's request for a colostomy reversal between

April 18, 2017 to April 19, 2017, Mr. Jackson's records and exam specifically stated:

"currently doing well," "having functional colostomy," "denies abdominal pain or

UTIs," "Colostomy in place that's functioning well," "normal abdominal muscles,"

abdomen "soft, nontender, no organomegaly," "no hepatic enlargement," negative

for palpable masses." (**ECF No. 60, PageID.1260**; **ECF No. 60-1, pp. 43-45**).

There is nothing in the records whatsoever that Plaintiff was suffering from any

serious medical condition.  Dr. Papendick made an individualized assessment of Mr.

Jackson's condition and it served as his determination. (**ECF No. 60-4, pp.73-74**).

11

Although the Report and Recommendation states that Dr. Papendick did not approve a consultation with a surgeon and that a surgical consultation was not a threat to Plaintiff's health (**ECF No. 69, PageId.2785**), this is a distinction without a difference. Dr. Papendick clearly testified that where there were no complications indicating a reversal surgery, in his opinion there would be no need for a surgical consult.[3] (**ECF No. 60-4, PageID.1355**, Dep., p. 79).

Therefore, unlike the *Jones* case, the evidence in the case at bar is that Dr. Papendick (a) did perform an individualized assessment of Mr. Jackson's condition, (b) provides a date upon which he completed his assessment, and (c) specifically applied his medical reasoning to Mr. Jackson's condition (the risks and dangers of the reversal procedure is supported by the records, articles, and the testimony of the other doctors in this case. For the above reasons, the Magistrate Judge's analysis and conclusion that this case was similar to *Jones* instead of the numerous other "cases granting summary judgment in favor of the defendant physician" was erroneous. This case is more akin to the cases cited by Defendants (i.e., *Ayala v. Terhune,* 195 Fed. Appx. 87 (3rd Cir. 2006); *Swarbrick v. Frantz*, 2012 U.S. Dist.

---

[3] Similarly, if a patient were not complaining of physical problems or limitations concerning his heart, he would likely not be referred to a cardiac surgeon to consider heart surgery. This is particularly true where there was a recent thorough exam and x-rays and the patient's records and condition were reviewed by another doctor (i.e., Dr. Papendick) who already determined that a surgery was not medically necessary.

LEXIS 33461 (D Colo, Feb. 21, 2012), etc.) (See **ECF No. 60, PageID.1270-71**).

Summary Judgment is proper as to Plaintiff's claim against Dr. Papendick.

**Objection #3 – The Report and Recommendation Erred By Not Finding that there Was No Medical Necessity for Plaintiff's Requested Colostomy Reversal, and Thereby Failed to Properly Recommend Summary Judgment Based Upon Plaintiff's Failure to Satisfy the Objective Prong of Deliberate Indifference.**

The Magistrate Judge completely failed to address Defendants' specific arguments and evidence regarding there being no medical necessity established for Plaintiff's requested surgery. (See **ECF No. 60, PageID.1266-1272**).  Instead, the Recommendation completely ignored the facts and evidence in this case, and instead only focused on a case (*Jones v Gaetz*) that is inapposite to the evidence confronting Mr. Jackson.  The Report and Recommendation never even discussed or analyzed the testimony and evidence regarding the lack of medical necessity in **this** case.

Without a showing of medical necessity based upon the evidence **in Plaintiff's case**, he cannot demonstrate the Eighth Amendment's objective component's requirement of a serious medical need for him to receive a colostomy reversal. In claims alleging that the medical treatment was "inadequate," there "must be **medical proof** that the provided treatment was not adequate medical treatment of the [inmate's] condition." *Rhinehart, supra,* at 737 (citing *Santiago v Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). *Rhinehart* holds that where "an inmate ha[s] a medical need 'diagnosed by a physician as **mandating** treatment,' the plaintiff can establish the objective component by showing that the prison failed to provide treatment." *Id.*

(citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)).

Additionally, "a deliberate-indifference claim based on a 'desire for additional or different treatment' will typically require evidence, likely expert medical testimony, 'showing the **medical necessity** for such a treatment.'" *Rhinehart, supra,* at 746. (See also Corizon Defs' Brief, **ECF No. 60, PageID.1266**). To the extent that Plaintiff claims that the treatment he received was inadequate and/or delayed, he must demonstrate resulting harm. *Blackmore, supra,* at 898, citing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). Here, N.P. Drinkert and his documented medical records specifically stated that on two occasions he contacted Dr. Kansakar's office **regarding Mr. Jackson** (not simply an arbitrary patient) and was advised "that there were no urgent medical issues, the colostomy was functional, and there was no medical necessity for a colostomy reversal." (See **ECF No.60-1, PageId.1293-1294 –** MDOC Records and **ECF No. 60-2, PageID.1298-1299** – N.P. Drinkert Affidavit): Yet, somehow, the Report and Recommendation completely ignored this evidence. Dr. Kansakar specifically testified that:

```
24  Q.  You can answer the question.  Would Kathy have been
25       incorrect to tell that to the jail person that this
 1       was not medically necessary, it was a lifestyle
 2       preference?
 3  A.  I think I would agree with the first part which says
 4       it's not medically necessary, but I do not agree with
 5       just the second part that it's just a lifestyle
 6       preference. (ECF No. 60, PageID.1268; ECF No.60-3, p.31-2)
```

Dr. Kansakar testified that the reversal was "not medically necessary" and testified that during her post-op visits with Mr. Jackson, **he never made any complaints about his colostomy**, and that her follow-up exams on December 27, 2016, and January 10, 2017, both demonstrated that his colostomy was in good condition, productive, functioning properly, and he had no pain issues. (**ECF No. 60, PageID.1258**; **ECF NO. 60-3**, pp. 41-43, 53). Also, she never documented anything about him complaining about needing a reversal nor it affecting him psychologically (**Id. at 44**). Dr. Silverman testified:

> Q. And you're not aware of any particular **mandate** that says, after you have a colostomy, you must 100 percent, absolutely have to have a colostomy reversal?
> A. Correct. (**ECF No. 60, PageID.1268**).

When one adds Dr. Silverman's testimony that the records showed "absolutely no complaints, no medical problems," but only Plaintiff "just saying he wanted a reversal," and that  there is nothing in Plaintiff's MDOC records prior to April 19, 2017 showing that Plaintiff "was making any medical complaints, talking about pain, or that his colostomy wasn't functioning properly" (**Id.** at 1273), it is clear that there was no medical necessity for Plaintiff's reversal.  Yet, the Magistrate Judge completely failed to address Dr. Kansakar's and Dr. Silverman's testimony at all. Also, as indicated above, and as Defendants' Brief pointed out, Dr. Silverman clearly testified that Plaintiff was having no physical injuries or physical complaints:

> Q. And did you review where he [Plaintiff] testified that he essentially came to prison, saying he would sue the prison too, even though he had no physical complaints about the colostomy?
> A. **I do recall that**. (*Id.* **at 1274**).

Dr. Silverman further confirmed that Plaintiff suffered no medical injuries by not having his colostomy reversed in the MDOC.

> Q. Doctor, you mentioned in your report, that the longer a reversal is delayed, the more likely the chance of developing fibrosis in the pelvis, where the rectal stump sits, and it can cause a difficult reconnection procedure, and poor functional results of incontinence and stricture formation. Do you recall that?
> A. Yes.
> Q. None of these problems existed with Mr. Jackson, did they?
> A. **Nope.** (*Id.* **at 1269-70**; **ECF No. 60-10**, Dep,. p. **30**).
>                         * * *
> Q. Did you notice any difference in his medical condition between the time he was released and the time that he was in prison, that would make a colostomy reversal, say, more urgent after he was released?
> A. So **I saw no difference in the medical condition**. (*Id.* **at 1270**; **ECF No. 60-10**, Dep., pp. **62-63**).

The Magistrate Judge's focus on the whether the surgery is labeled "elective" or "cosmetic" is irrelevant where the evidence, including testimony provided by Plaintiff's own treater and expert, demonstrates that "Plaintiff Jackson's reversal surgery" was "not medically necessary."  Therefore, the Magistrate Judge's reliance upon *Champion v. Dicocco*, 2018 U.S. Dist. LEXIS 144711 (E.D. Va., Aug. 14, 2018) (**Ex E**), for a broad proposition that the use of a colostomy bag is a serious

need and that labeling it as "elective" cannot defeat the seriousness (**ECF No. 69, PageID.2787**) <u>must be placed in the context of that particular case</u>. In *Champion*, the plaintiff suffered numerous physical complications from his colostomy, including losing over sixty pounds, being sent to the emergency room multiple times for abdominal pain, being seen by medical for persistent severe pain, constipation, and was thought to have developed a urinary tract infection. *Id.* at 6, 9. His reversal was ultimately approved by the jail physician but delayed for years <u>for no reason</u>. *Id.* at 9. *Champion* merely recognized that a colostomy patient should be provided "'necessary medical treatment' to treat him." *Id.* at 15. In reaching that finding, *Champion* relied upon *Johnson v. Bowers*, 884 F.2d 1053, 1056 (8th Cir., 1989), another case in which a defendant physician had <u>already acknowledged the need for surgery</u> but delayed surgery for over nine (9) years. It was in that regard that these two courts held that labeling a surgery as "elective" cannot negate a serious medical need. Here, the Corizon Defendants never had subjective knowledge of a serious medical need for a reversal surgery, Plaintiff's own surgeon stated there was no medical necessity, and the records and testimony of the witnesses do not demonstrate that. Based upon Dr. Kansakar's and Dr. Silverman's depositions, Plaintiff is unable to maintain his claim. The Report and Recommendation should have determined that Plaintiff's inability to establish the objective prong of a serious medical injury mandating treatment and failing to establish a resulting medical harm

17

by his experts, <u>based upon **Plaintiff's facts** (not unrelated cases about reversals in general)</u>, warranted summary judgment. When *Champion* is read it in <u>proper</u> context, it demonstrates that summary judgment is proper in Jackson.  *Champion* held:

> this is not an instance where an inmate and a doctor or two <u>medical professionals disagreed **[\*16]**  about the appropriate course of treatment</u>.  Rather, <u>the record indicates that Defendants DiCocco and Laybourn were aware of Champion's condition and deemed a stoma reversal surgery to be the appropriate medical treatment</u>. Nevertheless, **these same individuals have stood flagrantly indifferent even though years have passed since the date scheduled for Champion's surgery** and no surgery has been performed.  *Id.* at 16.

## Objection #4 – The Magistrate Judge's Report and Recommendation Erred in Finding That Summary Judgment Was Not Proper at to Plaintiff's *Monell* Claim.

The sole basis for the Magistrate Judge's Recommendation that summary judgment was not proper for Plaintiff's *Monell* claim is because Plaintiff "has come forward with sufficient evidence to create a genuine issue of material fact as to whether Corizon had a policy or custom of denying reversal of colostomies <u>without engaging in any **individualized assessment of each prisoner's condition** for the purposes of cutting costs</u> as…evidenced by Corizon's achieved goal of reducing spending."  (See **ECF No. 69, PageID.2787-2788**, citing to *Strayhorn v. Caruso*, 2015 U.S. Dist. LEXIS 114980, (E.D. Mich. Aug. 14, 2015) (**Ex E**).

The Magistrate Judge's reasoning and conclusion is incorrect for several reasons.  First, the records and documentary evidence are very clear that, in Mr. Jackson's situation, Corizon and its employees <u>did engage</u> in an "individualized

assessment" of his medical condition and that Corizon does not have a policy to not

investigate whether a colostomy reversal is necessary.  In fact, Ronald Drinkert,

N.P., (who is a Corizon employee) even contacted the Plaintiff's surgeon (Dr.

Kansakar) on two occasions to assess if there was medical necessity for a reversal.

On both occasions it is documented in the medical records that Dr. Kansakar's office

stated that there was "no medical necessity." (See **ECF No.60-1, PageId.1293-1294**

– MDOC Records and **ECF No. 60-2, PageID.1298-1299** – N.P. Drinkert

Affidavit):

> 5. On or about March 29, 2017 and April 7, 2017, in following up and obtaining further information regarding Mr. Jackson's care, I contacted his colostomy surgeon Dr. Kansakar's office and discussed the patient's care. During these conversations, I was advised by Dr. Kansakar's office that there were no urgent medical issues, the colostomy was functional, and there was no medical necessity for a colostomy reversal. I documented these conversations in the patient's Michigan Department of Corrections medical chart.

These actions are completely contrary to a company having a policy not to help

patients with colostomies, not to investigate if reversal surgery is warranted, and not

to conduct "any individual assessments of a prisoner's condition for the purpose of

cutting costs."   Also, the records are very clear that in addition to the individual

assessment by N.P. Drinkert, the Corizon physician who submitted the 407 request

(Dr. Alsalman) also conducted an individualized assessment of Plaintiff's medical

condition, and particularly found that Plaintiff was "currently doing well," "having

functional colostomy," "denies abdominal pain or UTIs," "Colostomy in place that's

functioning well," "normal abdominal muscles," abdomen "soft, nontender, no organomegaly," "no hepatic enlargement," negative for palpable masses." (**ECF No.60-1, PageId.1285-1291** – MDOC Records).

Second, the Magistrate Judge's reliance upon *Strayhorn* is misplaced. *Strayhorn* is easily factually distinguished. In that case, the plaintiff alleged that the defendant physician saw Plaintiff on multiple occasions after he had had a recent heart attack at the prison, failed to document all of his complaints, told the plaintiff that "he complained too much," falsified records in attempt to mispresent that he saw and treated plaintiff on dates that he never saw him, "verbally chastised" him for going to the hospital while at the prison and receiving an angioplasty for chest pain and shortness of breath, and told plaintiff "we will not send you again." *Id.* at *4-6, 23-24). The *Strayhorn* plaintiff was alleging a pattern of his particular medical conditions being repeatedly ignored for nonmedical reasons by the defendant physician, even after it was determined that his condition led to him having a heart attack. Therefore, the magistrate judge in *Strayhorn* believed that these repeated actions demonstrated that there was a "costs-saving" reason for not sending the inmate to the emergency room. Such is not the situation in Plaintiff Jackson's case. Here, Dr. Papendick was only asked to review Plaintiff's medical condition at one point in time (i.e., April 2017) to determine if a colostomy reversal, in his medical opinion, was warranted at that time. There is no pattern of Papendick ignoring him.

20

**Third, and perhaps most importantly**, the Magistrate Judge Morris' reliance upon the *Strayhorn* Report and Recommendation which recommended that the *Monell* claim could survive a motion for summary judgment because of an MDOC/PHS[4] contract that emphasized costs savings and a company's efforts "keep health costs contained" is clearly improper. The *Strayhorn* Report and Recommendation regarding the *Monell* claim **was overruled**. Specifically, the presiding judge in *Strayhorn* ruled as follows:

> Strayhorn also points to the contract between PHS and the State of Michigan, which ***links PHS's profits to prisoner healthcare costs***. **If the contract were sufficient, PHS would be liable for the unconstitutional actions of all of its employees**. The Sixth Circuit has found, however, that prison contractors are not liable under a theory of respondeat superior. See Order, ECF No. 215; *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). Strayhorn has not shown that Dr. Khan's decision to delay sending Strayhorn to the hospital was connected to any unconstitutional policy or custom. (See **Ex F**, **ECF 216, PageID.4109, 4123-4**, Strayhorn Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Dismissing Defendant Prison Health Services)  (See also **Ex G**, *Strayhorn* docket report for case No. 11-15216).

Therefore, respectfully, it was improper for Magistrate Judge Morris to base her recommendation upon a *Monell* analysis and conclusion from a Report and Recommendation that had been overruled on that particular issue. As demonstrated above, the *Strayhorn* Court actually ruled that a company such as Corizon's and/or

---

[4] Prison Health Services, Inc., (a/k/a "PHS") is the predecessor of Corizon Health, Inc., and previously contracted with the Michigan Department of Corrections.

its predecessor's business model to make a profit and their contractual obligation to consider healthcare costs **is not** unconstitutional and **does not** indicate deliberate indifference. In fact, *Strayhorn* actually ruled that <u>if contracts that discussed profits and health care costs could establish deliberate indifference, PHS and Corizon would essentially be liable for every unconstitutional act that occurs</u>. *Id.* The presiding judge's ruling in *Strayhorn* is consistent with the well-settled law that having a policy of keeping costs down is not itself a constitutional violation. *Higgins v Correctional Med. Servs.*, 178 F.3d 508, 513-514 (7th Cir. 1999); see also *Colwell v. Corizon Healthcare*, 2014 U.S. Dist. LEXIS 165866, *33 (E.D. Mich. Aug. 11, 2014) (citing *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society")(see Reply, **ECF No. 68, PageID.2715**).

The Report and Recommendation further erred by not properly addressing and concluding that Dr. Papendick was not a final decision-maker with respect to Plaintiff's colostomy reversal. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker <u>unless</u> the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). That Dr. Papendick was not the final

decision-maker is clearly demonstrated by the fact that the determination of whether Plaintiff's colostomy reversal was medically necessary was "reviewable" (**and was in fact reviewed**) by the MDOC. (**ECF No. 60-8, PageID.1521**)  The  MDOC's review clearly demonstrates that any decision or medical discretion utilized by Dr. Papendick regarding Plaintiff's colostomy reversal was "constrained by the official policies of superior officials (i.e., the MDOC). Here, the record is also clear that the decision regarding Plaintiff's colostomy reversal could have also been appealed through Corizon prior to the MDOC final review:

```
21   Q   How does that process usually work?  If an inmate
22       requests a particular procedure, and, in this case,
23       a colostomy reversal, and no medical necessity was
24       determined, if an inmate wanted to continue to
25       pursue this, at least through Corizon, as it
 1     pertains to you, what would happen at that point?
 2   A   The provider who put in the initial request would do
 3       one of two things to an ATP:  He would either accept
 4       it or he can appeal it to his RMD, regional medical
 5       director.  The regional medical director then looks
 6       at the case and decides whether they agree with the
 7       ATP or want to overturn it.  If they agree with the
 8       ATP, the provider can take it to the state medical
 9       director for Corizon and continue the appeal.  We
10       then meet on Monday, Wednesday and Thursday evenings
11       and make decisions about that specific case.  If --
12       and that's considered the state medical director's
13       decision.  If the state medical director ATPs, and
14       the provider still wants to appeal, he can appeal to
15       the Michigan Department of Corrections, who,
16       ultimately, the appeal would then be to the CMO for
17       Michigan Department of Corrections.
18   Q   So if I understand your testimony just now, there
19       are several steps that an inmate may pursue
```

20      regarding a request for a colostomy reversal that go
21      beyond and above you.
22  **A   Correct.  (ECF No. 60, p. 1279; ECF No. 60-4, pp. 92-3)**

Yet, neither Plaintiff nor his provider who put in the 407 request ever instituted an such appeal with Corizon. Instead, Plaintiff argues **without merit** that merely because Dr. Papendick issued an alternative treatment plan on April 19, 2017, it was final even where a Corizon appeal process existed and even where Plaintiff pursued the MDOC appeal process and the MDOC told him that the MDOC policy would not allow for his reversal surgery, stating:

> "Per documentation, you are doing fine with current condition, the reversal is a major surgery with potential complications up to death and the Department will not okay a dangerous unnecessary elective procedure, a reversal for a functional colostomy is considered non-essential. POLICY IS NO REVERSAL UNLESS there is a MEDICAL REASON. (**ECF No. 60-8, PageID.1521; ECF No. 60, PageID.1263**)(emphasis as in original).

Plaintiff even admitted that the "MDOC told me they wouldn't do the surgery because it was cosmetic, and they said I was more worried about my appearance." (**ECF No. 60, PageID.1279; ECF No. 60-7, Dep. p. 136**). Regardless of what avenue Plaintiff chooses to pursue his *Monell* claim, still "he must show that the particular injury was incurred because of [a Corizon] policy." *Garner v Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1994). Here, the sole basis of the Magistrate Judge's recommendation to deny summary judgment is an "alleged" policy or custom of denying reversal of colostomies without engaging in any **individualized**

**assessment of each prisoner's condition** for the purposes of cutting costs…" (**ECF No. 69, PageID.2787-2788**).  But as demonstrated above, this was simply not true in Plaintiff's case.  Instead, as the sole basis of her recommendation on the *Monell* claim, the Magistrate Judge attempts to rely upon an overruled Report and Recommendation on this issue.  This is improper.  For the above reasons, the Magistrate Judge's analysis and conclusions regarding the *Monell* claim were erroneous and summary judgment is proper as to Plaintiff's *Monell* claim.

**Objection #5 – The Report and Recommendation Erred in Failing to Address Defendants' Argument That Plaintiff Cannot Support a Deliberate Indifference Claim Regarding Receiving Inadequate Supplies.**

The Report and Recommendation completely ignored this argument. (See **ECF No. 60, PageID.1277**).  It was supported by Plaintiff's own testimony (*Id.*).  This evidence also demonstrated plaintiff received medical care, just not a reversal.  Failure to consider this was erroneous. Summary judgment is proper on this issue.

**WHEREFORE**, this Honorable Court should GRANT the Corizon Defendants' Objections to the Magistrate Judge's Report and Recommendation Regarding the Corizon Defendants' Motion for Summary Judgment (**ECF No. 60**), thereby GRANTING the Defendants' Motion to Dismiss in all respects.

Dated: December 30, 2021

CHAPMAN LAW GROUP
/s/Devlin Scarber
Ronald W. Chapman, Sr. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Corizon Defendants

## <u>LOCAL RULE CERTIFICATION</u>

I, DEVLIN K. SCARBER, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3)

/s/Devlin K. Scarber
Devlin K. Scarber (P64532)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

## <u>PROOF OF SERVICE</u>

I hereby certify that on December 30, 2021, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

/s/Devlin K. Scarber
Devlin K. Scarber (P64532)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com