# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**KOHCHISE JACKSON**,

  Plaintiff,

v.

**CORIZON HEALTH, Inc.,**, et al,
Defendants.

Case No.: 2:19-cv-13382
Hon.: Terrence G. Berg
Mag.: Patricia T. Morris

Laurence H. Margolis (P69635)
Ian T. Cross (P83367)
*Margolis, Gallagher & Cross*
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: larry@lawinannarbor.com
Email: ian@lawinannarbor.com

Daniel R. Corbet (P37306)
Kenneth A. Willis (P55045)
*Corbet, Shaw, Essad & Bonasso, Pllc*
Attorneys for Defendant Prime Healthcare
Services and Colleen Spencer
30500 Van Dyke Ave., Suite 500
Warren, MI 48093
Phone: (313) 964-6300
Email: daniel.corbet@cseb-law.com
Email: kenneth.willis@cseb-law.com

Ronald W. Chapman Sr., (P37603)
Delvin Scarber (P64532)
*Chapman Law Group*
Attorneys for Defendants Corizon Health, Inc.
and Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: rchapman@chapmanlawgroup.com
Email: dscarber@chapmanlawgroup.com

## PLAINTIFF'S RESPONSE TO DEFENDANTS CORIZON HEALTH, INC. AND DR. KEITH PAPENDICK'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (ECF No. 69)

**<u>Response to Objection 1:</u>**

Consider the cited testimony that the Corizon Defendants allege the Magistrate Judge "failed to actually apply" (ECF No. 70, PageID.2792) in this case:

Silverman, M.D., Ralph (Pages 8:24 to 9:16)

```
24    Q.  Do you agree, Doctor, that medical professionals
25   are taught to exercise medical judgment based upon their
 1    training and knowledge of medicine, and to make
 2   decisions regarding treatment?
 3    A.  Yes.
 4    Q.  And, in fact, you use your medical judgment every
 5   day to make decisions regarding what treatment options
 6   to use regarding the healthcare of your patients,
 7   correct?
 8    A.  True.
 9    Q.  And you would agree that medical professionals
10   use medical judgment in making healthcare decisions
11   regarding patients?
12    A.  Yes.
13    Q.  You agree, Doctor, that doctors/physicians could
14   arrive at different treatment decisions using reasonable
15   medical judgment?
16    A.  It's possible.
```

(ECF No. 58, PageID.977-78) (cited at ECF No. 69, PageID.2780).

This testimony has no bearing on the question of whether Dr. Papendick "considered medically sound factors and applied those factors to the individual plaintiff's medical status" in this case. (ECF No. 69, PageID.2785). If this testimony, which is about how physicians generally make decisions, demonstrated

1

the absence of any material fact as to the subjective component of a deliberate-indifference claim, then no denial of medical care could ever be actionable under the Eighth Amendment so long as the official who issued the denial was a licensed medical professional. "This is not the law: as the Supreme Court noted in *Estelle*, 429 U.S. at 104-05 & n.10, a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment." *Comstock v. McCrary,* 273 F.3d 693, 707 n.5 (6th Cir. 2001).

Nor do the Corizon Defendants' citations to medical literature and testimony concerning *ostomy closures in general*, removed from the context of Mr. Jackson's specific medical condition, demonstrate an absence of any material fact with respect to either the objective or subjective prong of Mr. Jackson's claim. Per the testimony in this case, ostomies are created[1] in response to a variety of disease processes involving the colon and/or rectum, and in patients with a wide range of comorbidities. (ECF No. 60-10, PageID.1551, Dep. pp. 84, 85; ECF No. 66-3, PageID.2041, Dep. p. 22). As Dr. Silverman explained, "all of the different reasons for why colostomies may be formed are inside of that data, not just one particular disease process." (ECF No. 60-10, PageID.1550, Dep. pp. 81).

---

1   The creation of an ostomy is the definition of a "Hartmann's procedure." (ECF No. 60-10, PageID.1551, Dep. p. 82).

2

According to the surgeons who testified in this matter, there are many situations in which colostomy reversal is not possible. Colostomies may be permanent when the underlying disease process is "a tumor or cancer very low in the colon," (ECF No. 66-3, PageID.2041, Dep. p. 22), or when the patient has a "very severe cardiac condition or lung condition which would make another surgery very high-risk." *Id*. There are also legitimate medical reasons that a surgeon may need to delay colostomy reversal. (ECF No. 60-10, PageID.1552-53, pp. 88-90). Medical reasons to delay reversal include allowing time for morbidly-obese patients to lose weight before the procedure (which is necessary to decrease the incidence of wound infections and hernias), to wait until diabetes is better-controlled for patients with poorly-controlled diabetes, or to allow additional time prior to surgery for very sick, elderly patients to establish proper nutritional support. (ECF No. 60-10, PageID.1552-53, Dep. pp. 88-90).

So while the evidence demonstrates that there are some legitimate medical reasons not to reverse colostomies, and that there are medical reasons why reversal surgery may need to be delayed, it also demonstrates that <u>none of those reasons were applicable in Mr. Jackson's case.</u> (ECF 60-10, PageID.1553, Dep. p. 90). Mr. Jackson was not obese, he did not have diabetes, and he did not have colon cancer. He had no other serious medical conditions. Most patients who have a colostomy

3

placed due to diverticulitis are elderly, (ECF 66-3, PageID.2051, Dep. p. 62), but Mr. Jackson was only thirty-four years old. *Id*. Dr. Kansakar and Dr. Silverman, who both regularly perform colostomy reversals, (ECF No. 60-10, PageID.1540-41, Dep. p. 41-42; ECF No. 66-3, PageID.2038, Dep. p. 13), testified that when colostomy reversal is possible for a patient, the procedure is almost always performed. (ECF No. 60-10, PageID.1551, pg. 85; ECF No. 66-3, PageID.2041, pp. 21-22). Dr. Kansakar testified that Mr. Jackson "did not have any other comorbidities that would make him high risk for colostomy reversal," (ECF No. 66-3, PageID.2050, pg. 61), that, "**I would say it is medically necessary to have the colostomy reversed** for the general well-being of the patient," (ECF No. 66-3, PageID.2043, pg. 31), and that she knew of no medical reason not to perform the reversal procedure. (ECF No. 66-3, PageID.2039, pg. 17). Dr. Silverman similarly testified, "**there was absolutely no reason to delay Mr. Jackson's colostomy reversal.**" (ECF No. 60-10, PageID.1546, pg. 64; ECF No. 66-43, PageID.2667).

Dr. Papendick all but admitted that he did not review Mr. Jackson's medical records when he made his decision to deny colostomy reversal. (ECF No. 66-8, PageID.2080-81, 2100, Dep. pp. 29-30, 107). Dr. Papendick, who was at the time the only Corizon UMMD in Michigan, (ECF No. 21-1, PageID.407), reviewed eighty-five to one hundred referral requests per day, spending, on average, only a

few minutes on each request. (ECF No. 66-8, PageID.2076, pp. 12-13). He testified that this was his sole job duty. (ECF No. 66-8, PageID.2075, pg. 9). In the vast majority of instances, Dr. Papendick based his decisions only on the information contained in the request form. (ECF No. 66-8, PageID.2080-81, pp. 29-30). He almost never communicated with the patient's treating physician when deciding whether to approve or defer a request. (ECF No. 66-8, PageID.2081, pg. 30). He was not board-certified in any specialty, (ECF No. 66-28, PageID.2567), and the last time he performed a colostomy reversal was "in medical school 30 years ago." (ECF No. 66-8, PageID.2084, pg. 43). While he claimed to be concerned about the risk that Mr. Jackson would die if he approved the procedure, he did not know the fatality rate from colostomy reversal surgery. (ECF No. 66-8, PageID.2093, pg. 80-81). Dr. Papendick declined to even authorize Dr. Alsalman's request to refer Mr. Jackson for a consult with a general surgeon, to *evaluate the risks and benefits of surgery*, reasoning: "there was no reason to do – even look at a reversal if there's no complications, except to get the surgeon $350." (*Id*. at pg. 79).

In this case, the Court has ruled that allegations that "Defendants denied [Mr. Jackson] a colostomy reversal not based on the medical opinion of a medical professional on the appropriate course of treatment, but because of a policy or practice of delaying or denying all non-emergent or life threatening treatments in

5

order to save money," are sufficient to state an actionable Eighth Amendment claim. (ECF No. 32, PageID.626). The fact that Dr. Papendick did not admit that he denied the referral request in order to save money, rather than because he actually believed that reversal surgery was medically-contraindicated for Mr. Jackson, is not dispositive. Defendants "do not readily admit the subjective component of [the deliberate indifference] test[.]" *Richko v. Wayne County*, 819 F.3d 907, 916 (6th Cir. 2016). Therefore, "it may be demonstrated in the usual ways, including inference from circumstantial evidence." *Id*.

In this case there is a wealth of circumstantial evidence tending to show that Dr. Papendick's decision was based on "economic considerations" rather than on "a medical professional's judgment of the *medical* risks and benefits associated with the surgery." (ECF No. 32, PageID.623). Such circumstantial evidence includes:

**1)** Dr. Papendick's job performance was measured in part based on his "ATP rate," meaning the percentage of referral requests that he "ATP'd"; (ECF No. 66-8, PageID.2085-86; ECF No. 66-45, PageID.2676, 2680)

**2)** Dr. Papendick issued "Alternative Treatment Plans" that did not direct the provision of any specific treatment at all; (*See* ECF No. 66, PageID.1890)

6

**3)** Dr. Papendick knew his "cost per thousand patients . . . over a year," and was aware of this metric for the other four Corizon UMMD's, testifying, "I'm not the highest. I'm not the worst." (ECF No. 66-28, PageID.2572)

**4)** Dr. Papendick submitted a monthly report to Corizon concerning his cost per thousand patients; (ECF No. 66-28, PageID.2568)

**5)** Dr. Papendick's 'medical necessity' reviews are cursory, taking place in only a few minutes, and only rarely involve discussions with the treating physician, examination of the patient, or review of medical records beyond the two-page request form; (*See* ECF No. 66, PageID.1889)

**6)** When an entity <u>other than Corizon</u>, such as a worker's comp policy, or another State in the case of interstate-compact inmates, was responsible for paying for an off-site medical service, the request for that service was <u>automatically approved without any review by Dr. Papendick</u>, strongly suggesting that the only purpose of Dr. Papendick's 'medical necessity' reviews was to save money for Corizon by denying care; (ECF No. 66-8[2], PageID.2077, pg. 17; ECF No. 66-27, PageID.2558, 2559, 2561)

**7)** Corizon itself has represented that its Utilization Management activities in Michigan "do not constitute medical services . . . Utilization review does not

---

2   This testimony was mis-cited as "Ex. 28" in Plaintiffs' Brief (PageID.1888). The first two references to "Ex. 28" at PageID.1889 should have been to "Ex. 8." Also, the citation to "Ex. 44" at PageID.1895 should have been to "Ex. 45."

involve providing clinical medical care but rather assessing the necessity and cost of the care and approving it for payment;" (ECF No. 66-1, PageID.1909)

**8)** A jury could infer that Corizon and Dr. Papendick exhibited deliberate indifference because they "repeatedly acted in a certain manner." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). Corizon and Dr. Papendick repeatedly denied colostomy reversals to various Michigan prisoners over an extended period of time, even when those prisoners had complications such as bleeding and prolapse, (ECF No. 66-36; ECF No. 66-37; ECF No. 66-38; ECF No. 66-39; ECF No. 66-40, PageID.2620-2659), and also denied referral requests for procedures that posed no realistic risks to the prisoner, such as an audiogram for a hearing aide; (ECF No. 66-32; ECF No. 66-33; ECF No. 66-34, PageID.2602-2617)

**9)** Corizon's leadership maintained "a 'laser' focus" on the volume of offsite specialty care, and set explicit goals to reduce the number of prisoner referrals to specialists; (*See* ECF No. 66, PageID.1887)

**10)** Between 2009 and 2016, Corizon cut spending on outpatient specialty care for the Michigan prison population by **an astonishing 75%**; saving, by its own estimation, "**hundreds of millions of dollars;**" (ECF No. 66-19, PageID.2300-2301, 2310):



**11)** Corizon's outpatient Utilization Management program was a central component of Corizon's efforts to reduce the volume of specialty care, and the success of the Utilization Management program was measured via the "outpatient referrals per 1000" Key Performance Indicator; (ECF No. 66-21, PageID.2321, ECF No. 66-26, PageID.2548 ECF No. 66-27, PageID.2562)

**12)** Corizon also pursued an initiative in Michigan to take seriously-mentally-ill prisoners off of psychiatric medication in order to save money; (ECF No. 66-18, PageID.2286)

**13)** Corizon pursued the same aggressive cost-cutting strategies that were implemented in Michigan in other state prison systems; (*See* ECF No. 66, PageID.1886-87)

**14)** Corizon's training materials explicitly instruct its staff to employ a definition of "medical necessity" that is significantly more restrictive than that employed in the rest of the healthcare industry, and that is so restrictive that in some cases, treatment of conditions that federal courts have found to constitute "serious medical needs" under the Eighth Amendment does not fall within Corizon's internal definition of "medically necessary" care. (*See* ECF No. 66, PageID.1890-91;  ECF No. 66-41, PageID.2662).

The Magistrate Judge did not err in concluding that, when all of this evidence is viewed in the light most favorable to the Plaintiff, and all reasonable inferences are drawn in his favor, a question of material fact exists as to whether Dr. Papendick's decision was based on "the *medical* risks and benefits associated with the surgery—not mere economic considerations." (ECF No. 32, PageID.623).

10

Additionally, after briefing was completed for the Corizon Defendants' motion, Plaintiff's counsel obtained some of Dr. Papendick's email correspondence on his michigan.gov email account via the Michigan Freedom of Information Act. Dr. Papendick's emails contain even more evidence that his approve-or-ATP decisions were based, in many cases, on economic considerations rather than a determination of what is best for the patient from a medical standpoint. One email exchange with a prison doctor concerned a patient with a hernia. The requesting physician explains that, "[w]hen the hernia protrudes he is in extreme pain and has had 4 hospital visits in the last month as we are not able to reduce it here. It seems cost effective to have it repaired." Dr. Papendick responds, "Still not convinced." (Ex A). In another exchange, Dr. Papendick refused to authorize replacement of an amputee's broken prosthesis, because he believed the amputee prisoner did not need a functional prosthesis. (Ex. B). Another set of emails show Dr. Papendick expressing anger at Dr. Narkiewicz, a surgeon who repaired a patient's hernia and removed a mass, because a hernia repair and mass removal were not among the services that Dr. Papendick had specifically authorized when he approved the referral for surgery. (Ex. C). Dr. Papendick told Mason Gill, Corizon's Program Manager for the Michigan contract, (ECF No. 66-2, PageID.2026), that "[t]he hernia and mass removal should not be paid for." (Ex. C).

11

**Response to Objection 2:**

The Magistrate Judge did not err in relying on *Jones v. Gaetz*, U.S. Dist. LEXIS 44590 (S.D.Ill. 2017). The facts and legal issues considered in *Jones* are very similar to the facts and legal issues in the present case. The following testimony (via affidavit) and legal arguments were proffered by the defendant physician in *Jones*:

> **The doctor claims that his examinations of Jones's colostomy site revealed that it is stable and asymptomatic, and therefore, a reversal would be considered an elective procedure.** Consequently, Defendant Dr. Shah characterizes Jones's complaints as mere disagreements with his treatment decisions, which he asserts is not sufficient to state a claim for deliberate indifference.

*Jones* at *10. (emphasis added).

> Dr. Shah contends that summary judgment in his favor is appropriate because Jones has failed to provide any evidence or testimony that he has a serious medical need. **Dr. Shah urges the Court to accept his (rather inarticulate) argument that Jones's colostomy does not qualify as such because it was functioning with no problems**[.]

*Jones* at *8-*9. (emphasis added).

> Defendant Dr. Shah attests that during the time he has treated Jones, the colostomy site has remained stable and asymptomatic, and it is functioning with no problems . . . [t]here is also no medical indication that a reversal of Jones's colostomy is necessary at this time and, as such, the procedure would be considered elective.

*Jones* at *4-*5.

12

The Corizon Defendants' assertion that: "[i]n *Jones*, there was also no indication or testimony that the defendant doctor ever applied any medical reasoning to *Jones'* specific situation," (ECF No. 70, PageID.2800), misconstrues the facts of that case. The defendant in *Jones* testified that 1) he personally examined the patient, 2) he determined that the patient's colostomy was stable, asymptomatic, and functioning with no problems, and 3) he *reasoned,* presumably using his *'medical judgment,'* that because Jones' colostomy was stable and asymptomatic, there was "no medical indication that a reversal of Jones's colostomy is necessary at this time." *Jones* at *5, U.S. Dist. LEXIS 44590 (S.D.Ill. 2017).

What the defendant in *Jones* **did not do** was "make any effort to investigate . . . whether a colostomy reversal was possible." *Id*. at *13 (emphasis added). While the defendant in *Jones* testified that "there are various factors that determine whether a colostomy may be reversed, including how much bowel remains and whether the patient has any co-morbidities that would be a contraindication for surgery," *Id*., he did not indicate how those factors applied to Mr. Jones. *Id*. As the Supreme Court recognized in *Estelle*, there is a world of difference between "throwing away the prisoner's ear and stitching the stump," *Estelle v. Gamble*, 429 U.S. at 104 & n.10 (citing *Williams v. Vincent*, 508 F.2d 541 (2nd Cir. 1974)), based on a doctor's medical judgment that reattaching the ear "is

13

impossible under the circumstances," *Williams*, 508 F.2d at 444, and pursuing the exact same course of treatment due to a physician's determination that, "he did not need his ear." *Id*.

## **Response to Objection 3:**

The Corizon Defendants assert that the Magistrate Judge erred in finding that an issue of material fact exists as to the objective component of the deliberate-indifference inquiry: the existence of a "serious medical need." Defendants claim that Mr. Jackson requires (and lacks) medical evidence showing the 'medical necessity' of a colostomy reversal, and, citing the discussion of *Napier v. Madison Cnty*, 238 F.3d 739 (6th Cir. 2001) in *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004), they argue that "[t]o the extent that Plaintiff claims that the treatment he received was inadequate and/or delayed, he must demonstrate resulting harm." (ECF No. 70, PageID.2804).

But *Blackmore* clearly stands for the opposite proposition:

> To the extent our previous opinions would benefit from clarification, we hold today that where a plaintiff's claims arise from an injury or illness "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," *Gaudreault,* 923 F.3d at 208, **the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated.** Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.

*Blackmore*, 390 F.3d 890, 899-900 (6th Cir. 2004) (emphasis added).

The requirement to place "verifying medical evidence" in the record to establish the objective component only applies "in cases involving 'minor maladies or non-obvious complaints[.]'" *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021). Where the medical need is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," verifying medical evidence of a detrimental effect of the delay in treatment is not required. *Id*.

A prisoner's medical condition does not need to be an acute medical emergency for the need for treatment to qualify as "obvious." For example, the need for cataract removal surgery in one eye, when the prisoner can still see out of the other, is obvious to a layperson. *See Morris v. Corr. Med. Servs.* 2012 U.S. Dist. LEXIS 165424 at *8 (E.D. Mich. 2012) ("The Court finds a lay person would easily recognize the necessity for a doctor to extract a cataract . . . [t]herefore, Plaintiff does not have to provide medical evidence to show her medical condition worsened because of the delay to establish a serious medical need.") The need to provide actual *treatment* for multiple sclerosis, rather than merely examining the patient, concluding that his MS is likely in remission, and prescribing no specific treatment, is also "obvious" to a layperson. *See Estate of Majors v. Gerlach*, 821 Fed. Appx. 533, 542 (6th Cir. 2020). And, as the case cited by the Magistrate Judge

15

on this point held: "**[i]ndeed, 'even a lay person would easily recognize' alleviating an individual from the prolonged and medically unnecessary use of a colostomy** would satisfy the Eighth Amendment's objective prong." *Champion v. Dicocco,* 2018 U.S. Dist. LEXIS 144711 at \*15 (E.D. Va. 2018) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (emphasis added).

Assuming, *arguendo*, that the need for colostomy reversal were not obvious, Mr. Jackson still is not without medical evidence supporting his claim. Dr. Kansakar and Dr. Silverman both testified that living with a stoma generally results in significant suffering for the patient. (ECF No. 66-3, PageID.2042-43 pg. 29-30; ECF No. 60-10, PageID.1547, pp. 69-70). Even Dr. Papendick admits that living with a stoma is not "a trivial thing." (ECF No. 66-8, PageID.2093, pg. 79). Dr. Kansakar and Dr. Silverman testified that colostomies for diverticulitis should be reversed about eight weeks after placement. (ECF No. 66-3, pp. 14-15, 22-23, 28, 39, 45-46; ECF No. 60-10, pp. 64, 80, 85-87). Dr. Kansakar testified, "I would say it is medically necessary to have the colostomy reversed for the general well-being of the patient." (ECF No. 66-3, PageID.2043, pg. 31). She testified that Mr. Jackson's colostomy "was meant to be temporary . . . and the original plan was to kind of hook him back up. So that was the plan to do a colostomy reversal." (ECF No. 66-3, PageID.2039, pg. 16). She further testified, "it's a lifestyle-altering

16

procedure for the patient, and it's – it would be very normal for the patient to have a natural route established. I would recommend colostomy reversal." (ECF No. 66-3, PageID.2042, pg. 28).

The Magistrate Judge took note of Plaintiff's evidence that his colostomy reversal was medically-necessary, although the significance of the facts are not readily apparent. The Report recognizes that Mr. Jackson's eventual reversal surgery, performed by Dr. John Webber, was "financed by the Michigan Medicaid program." (ECF No. 69, PageID.2783). It cites testimony that Drs. Kansakar and Silverman, "who regularly perform colostomy reversal surgeries around two months after placement whenever reversal is possible . . . participate in the Medicare program." (ECF No. 69, PageID.2785). These facts are significant, because billing Medicare or Medicaid for a service that is not "medically necessary" is a felony. (*See* ECF No. 66, PageID.1892). "Every Medicare claim includes an express or implied certification that treatment was medically necessary. Claims for unnecessary treatment are false claims." *Winter ex. Rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1112 (9th Cir. 2020).

The squabbling in this case about whether reversing a functional colostomy is "medically necessary" does not reflect any significant disagreement between the parties about the actual consequences of failing to reverse a colostomy. As Dr.

17

Kansakar explained, "it's not a life-threatening situation. As I said, it's more of a quality of life." (ECF No. 66-3, PageID.2042, p. 29). Rather than a disagreement about medical science, the parties have a *semantic* disagreement about the definition of the term, "medically necessary." Reversing a functional colostomy fits within the definition of "medically necessary care" used by the Medicare and Medicaid programs. (ECF No. 66-43, PageID.2668-69). But it does not fit within the definition of "medical necessity" *used by Corizon*. (ECF No. 66-41, PageID.2662). Corizon does not consider any healthcare service to be medically-necessary unless failure to timely provide the service will cause: 1) excessive pain which is not controlled by medication, 2) measurable decline in function (including organ function), 3) substantial risk to the public health, or, 4) death. *Id*.

The case from which the Corizon Defendants glean an alleged requirement that Mr. Jackson present expert testimony showing the 'medical necessity' of colostomy reversal in order to establish the objective component, *Rhinehart v. Scutt*, 894 F.3d 721, 746-47 (6th Cir. 2018), did not apply a 'medical necessity' test congruent with Corizon's internal definition. In *Rhinehart*, to demonstrate the 'medical necessity' of the treatment the plaintiff sought (a liver transplant), the plaintiff was required to present medical evidence showing **1)** that the requested treatment "likely would have alleviated his symptoms," *Rhinehart*, 894 F.3d at

18

747, and, **2)** that there was a causal relationship between the challenged decision (the denial of the referral for a liver transplant) and the fact that the plaintiff did not receive a new liver. *Id*. The *Rhinehart* plaintiff was required to present expert testimony on these points only because he was, "'<u>a plaintiff with a complex diagnosis</u> . . . [who] [must] provide expert testimony as to the proper treatment' so that a fact-finder <u>can determine that the inmate's symptoms 'would have been alleviated by' the desired treatment.</u>" *Rhinehart,* 894 F.3d at 746-47 (quoting *Anthony v. Swanson*, 701 Fed.Appx. 460, 464 (6th Cir. 2017)) (emphasis added).

In this case, demonstrating that a colostomy reversal "likely would have alleviated [Mr. Jackson's] symptoms" is trivial. Just as jurors do not need expert testimony to understand that a prisoner will not be able to see out of her right eye unless a doctor removes her cataract, *Morris v. Corr. Med. Servs.* 2012 U.S. Dist. LEXIS 165424 at *8 (E.D. Mich. 2012), they do not need a medical expert to tell them that surgery is the only way to close the hole in Mr. Jackson's abdomen and allow him to defecate normally. Nor is there any dispute that Mr. Jackson was a good candidate for surgery: Dr. Kansakar and Dr. Silverman both testified that he was, (ECF No. 60-10, PageID.1546, pg. 64; ECF No. 66-3, PageID.2039, pg. 17), and he actually received the surgery as soon as he was released from prison. (ECF No. 60-10, PageID.1537, pg 26-27). With respect to the second prong, Dr.

19

Papendick's testimony is sufficient for a jury to find a causal relationship between

Dr. Papendick's challenged action and Plaintiff not receiving surgery:

> 16   Q    I believe you testified previously that you have
> 17          approved colostomy reversal surgeries for prisoners.
> **18   A    Okay.**
> 19   Q    What happened after you approved it?
> **20   A    It got repaired.**
> 21   Q    Okay.  So, if you had approved Mr. Jackson's
> 22          request, he would have received the surgery or at
> 23          least the consultation?
> **24   A    Yes.**

(ECF No. 66-8, PageID.2101, pg. 112)

The Corizon Defendants next attempt to distinguish *Champion* and *Jones* by

arguing that the plaintiffs in those cases experienced stoma-related medical

complications. This is a stretch. Robert Champion lost 60 lbs, but he lost the

weight intentionally, <u>in order to be eligible for surgery</u>, not because his colostomy

caused him to involuntarily lose weight. *Champion*, 2018 U.S. Dist. LEXIS

144711 at *6 (E.D. Va. 2018). Champion was sent to the hospital on one occasion

for acute stomach pain or a possible urinary tract infection, but "the CT scan of

Champion's stomach was negative for acute pathology," and Champion's

allegations about this incident appear to be an attempt to plead an unrelated claim

against Defendant Ramsey. *Id.* at *2, *10, *17-*18.  It is not clear that this incident

was in any way related to his colostomy. *Id*. at *10. Both the *Champion* and *Jones*

20

plaintiffs were unrepresented, and neither appears to have proffered any expert testimony. The plaintiff in *Champion* did not even file a response to the motions for summary judgment. *Id*. at *5. But the defendants submitted medical evidence in both cases: Defendant Dr. DiCocco swore that he was "not aware of any complications . . . Champion has experienced concerning his colostomy bag .... [or] of any risks associated with . . . Champion's continued use of the colostomy bag while he awaits surgery." *Id*. at *11.  The defendant in *Jones* swore "that during the time he has treated Jones, the colostomy site has remained stable and asymptomatic, and it is functioning with no problems[.]" *Jones v. Gaetz*, 2017 U.S. Dist. LEXIS 44590 at *4 (S.D.Ill. 2017).  The Magistrate Judge did not err in relying on these cases to find that the need for colostomy reversal can constitute an objectively serious medical need, even when the colostomy is functional and there are no serious complications. <u>Mr. Jackson did not allege in his complaint that his colostomy was non-functional, or that he experienced any serious complications at the stoma site</u>. Yet the Court found that Mr. Jackson's allegations, as pled, were sufficient to state an Eighth Amendment claim. (ECF No. 32, PageID.625)

**Response to Objection 4:**

There are three requirements to make out a *Monell* claim under § 1983: "a plaintiff must show '(1) that a violation of a federal right took place, (2) that the

defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen.'" *Kellom v. Quinn*, 2021 U.S. App. LEXIS 26749 at *10 (6th Cir. 2021) (quoting *Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014).

In this case, Plaintiff alleged that Defendant Corizon maintained an excessively-restrictive internal definition of "medical necessity" in order to save money, (ECF No. 32, PageID.627) and that the application of this internal definition of 'medical necessity' to the plaintiff caused him to not receive colostomy reversal surgery. *Id*. After all, the response to the request to refer Plaintiff for a surgical consult reads: "ATP: Medical necessity not demonstrated at this time." (ECF No. 66-7, PageID.2071).

Then, in discovery, Plaintiff obtained some of Corizon's employee training materials. The training materials contain a powerpoint slide showing a definition of "medical necessity." (ECF No. 66-41, PageID.2662). Applying the definition on the slide, a cataract removal, a prosthesis for an amputee, (Ex. B), a hearing aid, ((ECF No. 66-32, 66-33, 66-34, PageID.2602-2617), a hernia repair, (Ex. A; Ex. C), and *a colostomy reversal* all would not be 'medically-necessary,' since failing to provide any of those treatments would not cause the patient to suffer extreme pain, experience a measurable decline in function/organ function, or die.

22

If the purpose of Dr. Papendick's 'medical necessity' reviews was not to apply Corizon's definition of 'medical necessity' to requests for offsite services in order to save money, but rather, to conduct an analysis of "the *medical* risks and benefits associated with the surgery" for the safety of the patient, then why would Corizon have established an administrative process whereby procedures covered by worker's comp, or paid for by another state, were automatically approved without coming to Dr. Papendick? (ECF No. 66, PageID.1893-94). There is sufficient evidence for a jury to conclude that applying Corizon's restrictive internal definition of 'medical necessity' to requests for treatment for Michigan prisoners, in order to save money, was Dr. Papendick's job, and that in this case, **Dr. Papendick did exactly what Corizon hired and trained him to do.** When municipal employees act as they are instructed to act by the municipality's employee training materials, the municipality bears responsibility for their actions. *See Wright v. City of Euclid*, 962 F.3d 852, 880-81 (6th Cir. 2020).

Relying on Judge Murphy's January 5, 2016 Order (which is not available on LEXIS) adopting in part and overruling in part the Report and Recommendation on the PHS Defendants' motion for summary judgment in *Stayhorn v. Caruso*, Defendants argue that "Corizon's and/or its predcessor's [sic] business model to make a profit and their contractual obligation to consider healthcare costs **is not**

23

unconstitutional," (ECF No. 70, PageID.2811-2812) (emphasis in original), and, essentially, that this opinion establishes that a policy of denying healthcare to prisoners to save money cannot form the basis of a *Monell* claim. (ECF No. 70, PageID.2812). "To the contrary, though, '[f]ederal district courts in Michigan have expressly found that a complaint identifying a policy of denying care to save costs may be sufficient to state a Monell claim.'" *Dittmer v. Corizon Health, Inc.*, 2021 U.S. Dist. LEXIS 13068 at *28 (E.D. Mich. 2021) (citing *Ferguson v. Corizon*, 2013 U.S. Dist. LEXIS 126206 at *26 (E.D. Mich. 2013) (collecting cases)). *Monell* does not require the challenged policy or custom to be facially unconstitutional: municipal liability can be premised on a policy that "is itself facially lawful" if the plaintiff demonstrates "that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006).

When Corizon **a)** decided to maintain "a 'laser' focus" on Key Performance Indicators such as "Offender Patient Referrals per/1000 Offenders" with the explicit goal of reducing the volume of patient referrals to specialists in order to save money, **b)** hired UMMDs like Dr. Papendick whose sole job duty was screening requests for referrals to specialists, **c)** trained those UMMDs to apply a very restrictive definition of 'medical necessity' when screening requests, (ECF

24

No. 66-41, PageID.2662), **d)** evaluated the performance of the UMMDs, in part, based on the percentage of requests they "ATP'd," and **e)** as a result, succeeded in reducing the volume of specialty care provided to Michigan prisoners by over 75%, saving "hundreds of millions of dollars," (ECF No. 66, PageID.1886), Corizon was aware of the obvious consequences of its actions. Corizon *knew and intended* that people like Mr. Jackson would not receive surgical procedures. Corizon even knew that as a result of its actions, more people like Mr. Jackson would file lawsuits. (ECF No. 66, PageID.1896). The evidence in this case raises a genuine issue of material fact as to whether Corizon hired, trained, and encouraged Dr. Papendick to take the very action that Mr. Jackson complains of. After all, he and his predecessors took that action repeatedly, with respect to various prisoners, over an extended period of time.

/s/ Ian T. Cross
Ian T. Cross (P83367)
Attorney for Plaintiff

25