UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **KOCHISE JACKSON**, | **2:19-CV-13382-TGB-PTM** |
| Plaintiff, | |
| vs. | **ORDER ADOPTING REPORT AND RECOMMENDATION** |
| **CORIZON HEALTH INC**, **et al.**, | |
| Defendants. | |

Kochise Jackson alleges that Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment when he was a state prisoner in Michigan. Two groups of Defendants each filed a Motion for Summary Judgment on his claims: Prime Healthcare Services and Nurse Colleen Spencer (ECF No. 58) and Corizon Health Inc. and Dr. Keith Papendick (ECF No. 60). This matter is before the Court on Magistrate Judge Patricia T. Morris' Report and Recommendation of December 16, 2021, which recommends that the Court grant Prime and Spencer's motion but deny Corizon and Papendick's motion, allowing the case to move forward against those two Defendants. ECF No. 69.

1

The law provides that either party may serve and file written objections "[w]ithin fourteen days after being served with a copy" of the Report and Recommendation. 28 U.S.C. § 636(b)(1). Defendants Corizon and Papendick timely filed five Objections to the Report and Recommendation on December 30, 2021. ECF No. 70. Jackson filed a Response (ECF No. 71), and Defendants filed a Reply (ECF No. 72).

A district court must conduct a de novo review of the parts of a Report and Recommendation to which a party objects. *See* 28 U.S.C. § 636(b)(1). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id*.

The Court has reviewed Magistrate Judge Morris' Report and Recommendation, as well as the Objections, and conducted a de novo review. For the reasons that follow, Defendant's Objections are **OVERRULED**. The Court does not disturb any of Judge Morris' findings of fact or conclusions of law related to Prime and Spencer, and therefore their Motion for Summary Judgment (ECF No. 58) is **GRANTED** and those Defendants are **DISMISSED WITH PREJUDICE**. Except as to the reasoning herein that differs from the analysis of Judge Morris, the Report and Recommendation is **ADOPTED.** Regardless, the Court agrees with Judge Morris that the Corizon and Papendick Motion for Summary Judgment (ECF No. 60) should be **DENIED**.

2

# I.   BACKGROUND

## A. Factual background

The Court outlined the background of this case in a previous Order, denying Defendants' Motion to Dismiss. *See* ECF No. 32. Judge Morris' latest summary of the facts is accurate and comprehensive, so the Court reiterates only some key points here. ECF No. 69, PageID.2770-73.

In July 2016, when Mr. Jackson was a pretrial detainee at St. Clair Correctional Facility, he developed a colovesical fistula, or a hole in the tissue that separates the large intestine from the bladder. In December 2016, he was diagnosed and operated on by surgeon Dr. Erica Kansekar. A portion of Mr. Jackson's colon was disconnected and diverted to allow the downstream portion to heal. This initial surgery proceeded without incident: the colon was re-routed to an opening in his skin that was connected to a receptacle outside his body, called a colostomy bag.

As a routine part of this procedure, feces and gas are collected and disposed of via the colostomy bag while the colon heals. A second operation, called a colostomy reversal, is necessary to reconnect the two parts of the colon, close the opening in the skin, and allow the individual to pass gas and feces through their body again. Unless and until a colostomy reversal occurs, the individual continues day-to-day life with the colostomy bag on their person.

Mr. Jackson was tentatively scheduled by Dr. Kansekar to have the reversal procedure in six to eight weeks, but it did not happen while he

was at St. Clair. He was transferred to the custody of the Michigan Department of Corrections in March 2017, where Defendant Corizon provides medical services. When Mr. Jackson submitted a request for an outside referral to have the colostomy reversal surgery, it was not approved by Defendant Dr. Keith Papendick, who determined that the reversal was not "medically necessary." Mr. Jackson ended up having the surgery only after he left MDOC custody; he lived with the colostomy bag the entire time he was in detention (December 2016 through May 2019). On this basis, he alleges Defendants violated his constitutional rights under the Eighth Amendment by being deliberately indifferent to his medical needs while he was in their custody.

Judge Morris' Report and Recommendation of December 16, 2021 disposed of Defendants' two separate Motions for Summary Judgment. The R&R recommended that Defendants Prime and Spencer be dismissed and their motion granted, but that the claims against Corizon and Papendick be allowed to proceed to trial. These Defendants filed five Objections to the Report and Recommendation. The Court has conducted a de novo review of the relevant portions of Judge Morris' R&R and has sufficient evidence before it to resolve all five Objections.

**B. Deliberate indifference standard**

Because it is central to the resolution of the Objections, the Court will briefly summarize the deliberate indifference standard that applies to medical treatment claims under the Eighth Amendment brought by

4

prisoners. The Supreme Court has held that "deliberate indifference" to the serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" and is therefore "proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). To establish this type of claim, a prisoner must show (1) a serious medical need, and (2) deliberate indifference to that medical need on the part of a defendant. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Therefore, a deliberate indifference claim has both an objective (1) and subjective (2) component. *Mattox v. Edelman*, 851 F.3d 583, 597 (6th Cir. 2017).

To satisfy the objective component of the analysis, a plaintiff must show the existence of a serious medical need: "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004)). The subjective component of the analysis has to do with the mens rea of the accused state actors: the plaintiff must show that a defendant acted with a mental state "equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40). This showing requires proof that a defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk"

5

by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). Negligence does not suffice to establish deliberate indifference.

Therefore, to overcome a motion for summary judgment, a plaintiff must be able to at minimum create a genuine issue of material fact as to *both* the objective and subjective prongs of the standard.

## II.   ANALYSIS

### A. Objections One and Two

Defendants' first Objection contends Judge Morris erred by finding that Dr. Papendick's decision to not approve Plaintiff's colostomy reversal did not constitute medical judgment. ECF No. 69, PageID.2785-86. In the context of the deliberate indifference standard, this Objection is focused on whether Plaintiff has provided sufficient evidence to show that Dr. Papendick's decision not to approve the surgery satisfies the subjective prong of a deliberate indifference claim.

The analysis of the subjective prong requires a plaintiff to establish whether a Defendant's decision to deny medical care is accompanied by a mental state of reckless or intentional disregard of risk such that it rises to a level of a constitutional violation. A prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as intentional denial or delay of treatment. *Comstock v. McCrary*, 273 F. 3d 693, 707 n.5 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 n.10, (1976)).

6

A plaintiff's mere disagreement with a doctor's decision, when that decision is based on the professional's medical judgment, is generally not enough to establish that the doctor recklessly or intentionally harmed the patient. *See, e.g., Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) ("A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.") (citing *Estelle*, 429 U.S. at 107-08). But if Plaintiff raises a genuine issue of material fact that the decision was not based on medical judgment, but rather on non-medical factors such as cost, the decision of whether the subjective prong has been met must be left to the factfinder. *See, e.g., Rhinehart*, 894 F.3d at 761 (Moore, J., concurring) ("If a rational factfinder could conclude that [Defendant's] justification for denying [Plaintiff] a TIPS procedure was mere pretext to mask deliberate indifference, then summary judgment is improper.").

In reviewing the record, the Court agrees with Judge Morris' determination that Plaintiff has raised a genuine issue of material fact as to the subjective prong: there is no clear indication Dr. Papendick considered specific medical factors relevant to Plaintiff in making his decision. His testimony does cite his belief that in general, "the risk of death from the surgery outweighs the benefit[s]." ECF No. 69, PageID.2785. And according to his testimony, the question of whether risk outweighs benefits informs all of his decisions to approve or not approve surgeries, including Plaintiff's case:

7

Q: Why did you think you made the right call?
A: The danger of surgery in anyone does not depend on how sick they are or how old they are, there is a baseline question about whether its risk is worse than its benefit. [Plaintiff's] risk was more than his benefit for a colonsc – yeah, colons – colostomy reversal. He was having absolutely no complaints, except that he wanted his reversal. He was having no medical problems whatsoever, according to the provider who saw him on a regular basis.
Q: So you believe that the risks of the reversal surgery outweighed the benefits for Mr. Jackson?
A: Yes.

Papendick Dep. 73:16-74:4, ECF No. 66-8. But when questioned as to the particular comorbidities and risks applying to *Plaintiff*,[1] specifically as related to the risk of death from anesthesia, Defendant could only cite to the general factors used in his evaluation:

Q: So you're saying that the baseline is three percent and it can go up with age or comorbidities; is that your testimony? Certain things could increase the risk, but the risk can never be lower than three percent.
A: My testimony is you have a three percent risk for going under anesthesia, that's my testimony.
Q: For everyone, and it is not –
A: Every age, everyone.

*Id.* at 111:2-10.

Dr. Papendick's deposition includes testimony that prompts concern as to whether medical judgment was at the forefront of his medical decision-making, or, as discussed in more detail *infra* Section C,

[1] Dr. Kansakar testified that Plaintiff "did not have any comorbidities that would make him high risk for colostomy reversal." Kansakar Dep. 61:8-17, ECF No. 66-3.

8

whether he may have been influenced by some other internal policy or cost-cutting rationale. For example, in response to questioning, Dr. Papendick states:

> Q: So if a patient has a colostomy bag and a life sentence, you think that they should never have it reversed, unless – as long as the colostomy is functioning.
> A: If the colostomy is functioning with no issue whatsoever, yes, he should continue to have his colostomy.
> Q: For his whole life.
> A: If that's what it takes.

*Id.* at 75:6-14. It seems beyond doubt that any patient with a colostomy who was eligible for the reversal surgery would enjoy a demonstrable improvement in their quality of life from being able to use a toilet in a normal manner rather than enduring the daily inconvenience of having their waste discharge into a plastic bag attached to a stump of their colon sticking outside their body. Given that, it is difficult not to question whether in this testimony Dr. Papendick is basing his denial of a colostomy reversal on sound medical judgment as to what is best for the patient's health or on MDOC and/or Corizon policies to never approve colostomy reversal surgery (so long as there are no serious complications).

Furthermore, there is evidence that Dr. Papendick did not consider the physical or mental health impacts of the colostomy bag on Plaintiff. In his deposition, Mr. Jackson noted that the odor of the bag made him physically sick:

> Q: Were there any other activities that you engaged in that I have
> not mentioned?
> A: Well, eating was a problem at times. I would get sick and
> nauseous when I would smell that bad. I vomited sometimes.

Jackson Dep. 256:10-15, ECF No. 66-10. He also described that his
interactions with other inmates due to his colostomy bag caused him
significant mental anguish: "everyone had a problem with [him]" once
they learned he had a colostomy bag, to the point where a cellmate
started a fight with Mr. Jackson because the cellmate did not want to
have to share a cell with him. *Id.* at 123:16-124:15. He noted that "I had
a problem about the way they reacted to me. The things they did." *Id.* at
138:18-19.

The testimony of Drs. Silverman and Kansakar provides further
evidence of the psychological impact a colostomy bag can have. Speaking
on the psychological component of evaluating a patient for a colostomy
reversal, Dr. Kansakar indicated that "if you consider the medical well-
being of the person . . . for psychological well-being – feeling well in
general, I think having a colostomy reversal would be much more
preferable than having a colostomy." Kansekar Dep. 30:2-6, ECF No 66-
3. In responding to a question about Plaintiff's medical problems, Dr.
Silverman stated as follows:

> Q: From the records that you saw, would you please tell me what
> physical medical problem that you saw, that Mr. Jackson had back
> in March or April of 2017, with respect to his colostomy?
> A: The records will reflect that Mr. Jackson, in fact, developed not
> only anxiety, psychological issues and stress about having a

colostomy that was perfectly able to be reversed, but also that he was – tried to, in fact, hide the smell of his colostomy, and the fact that he was assaulted, and punched in the colostomy because of his issues, causing, at least on paper, issues regarding his colostomy.

Silverman Dep. 20:24-25, 21:1-11, ECF No. 66-11. Both Drs. Silverman and Kansakar contend that any medical assessment of a patient with a colostomy bag would consider the psychological component of the patient's well-being. Yet Dr. Papendick's testimony is bereft of any evidence that he considered Plaintiff's psychological well-being or mental health when coming to his decision.

Based on this testimony, Plaintiff raises a genuine issue of fact as to whether Defendant performed a meaningful individualized assessment of Plaintiff's particular medical condition and how it impacted the need for the surgery in his case. To be clear, the mere fact that Drs. Kansekar and Silverman would have done the analysis differently is not enough to conclude that Dr. Papendick's decision meets the subjective standard. Different physicians can have different approaches; conflicting testimony on medical judgment alone is not enough to show that the defendant doctor was reckless or intentional, and courts must give deference to properly stated and supported medical judgments. But on the facts of this case, there is *also* evidence that raises a genuine issue of material fact as to whether the decision to deny Plaintiff the surgery was in fact based on sound medical judgment, or whether the justification now offered is post-hoc and pretextual.

Defendant has failed to establish credible, specific reasons for denying Plaintiff's medical treatment. And Plaintiff plausibly alleges, as is discussed more thoroughly *infra* in Section C, that the denial was instead primarily or wholly driven by economic considerations. This is sufficient to create a question as to whether Defendant's conduct was reckless or intentional such that it meets the subjective prong, and the Objection is overruled.

The second Objection Defendants raise is related, claiming that Judge Morris erred in relying upon *Jones v. Gatez* as support for her decision to deny summary judgment related to the subjective prong. ECF No. 69, PageID. 2785. Defendants argue that *Jones v. Gaetz* is an improper comparison because, in contrast to the doctor in *Jones*, Dr. Papendick (1) performed an individualized assessment of Mr. Jackson's condition; (2) provided a date upon which he completed his assessment; and (3) specifically applied his medical reasoning to Plaintiff's condition. ECF No. 70, PageID.2802. But Judge Morris' citation of *Jones* was not an assertion that the two cases are exactly the same; rather, *Jones* merely provides an example of a case where the evidence raised a genuine issue of material fact as to whether the defendant "exercised his professional judgment with regard to [plaintiff's] request for colostomy reversal." *Jones v. Gaetz*, No. 3:15-CV-25-NJR-DGW, 2017 WL 1132560, at *4 (S.D. Ill. Mar. 27, 2017). There, the record indicated the doctor had not performed an individualized assessment. Here, the record indicates that

the individualized assessment may have been so cursory as to be meaningless, and that the doctor's decision may instead have been motivated by non-medical cost considerations. Even if the circumstances are different, the premise is the same: there is a question of fact that cannot be resolved definitively in favor of Defendant regarding his mental state in not approving the colostomy reversal.

For the reasons stated above, Plaintiff has raised a genuine issue of material fact as to whether the Defendant physician's review of the records considered medically sound factors and applied those to Plaintiff. And Judge Morris did not err in citing to *Jones v. Gaetz* for relevant authority in analyzing her recommendation to deny summary judgment. Accordingly, the Court overrules these two objections.

## B. Objection Three

Defendants' third Objection indicates that Judge Morris erred in finding that a colostomy reversal surgery qualifies as a "serious medical need" such that Plaintiff can meet the objective prong of the deliberate indifference analysis. ECF No. 70, PageID.2803-08. The Objection is wholly focused on whether Plaintiff has presented sufficient evidence that his ongoing treatment plan and decision to not approve the surgery was constitutionally deficient, and points to conflicting expert testimony about the course of his treatment.

But the Court need not resolve the question of whether Plaintiff's expert testimony is sufficient to create a genuine issue of material fact as

to whether Plaintiff had a serious medical need for the reversal surgery. Instead, the Court reiterates its previous finding in this case that the serious medical need here is demonstrated by the presence of the *colostomy itself*, which "even a lay person" would recognize as creating a serious need for medical attention. ECF No. 32, PageID.625.

Plaintiff's testimony has multiple descriptions of the ways that the colostomy bag made him nauseous, caused altercations with other inmates, and generally affected his quality of life. Jackson Dep. 190:15-20, 124:9-14, 255:13-17, ECF No. 66-10. His internal appeal to MDOC, filed after Dr. Papendick's decision, describes constant leaking from his bag, pain due to having to sleep only on one side and having to kneel anytime he cleaned or emptied his bag, and the depression he suffered from having to constantly deal with unsanitary leaks as he went about his day-to-day life. ECF No. 66-38, PageID.2636, 2643. He has provided sufficient evidence that having to use the bag for over two years in and of itself led to the kind of "unnecessary suffering . . . inconsistent with contemporary standards of decency" that the Supreme Court had in mind when it developed the deliberate indifference standard. *Estelle v. Gamble*, 429 U.S. at 103; *see, e.g. Baker v. Blanchette,* 186 F. Supp. 2d 100, 103 (D. Conn. 2001) ("[v]iewing the evidence in a manner most favorable to the plaintiff, a reasonable jury could find that his colostomy constituted a serious medical condition"). This is sufficient to satisfy the objective prong of the analysis, and the Objection is overruled.

14

**C. Objection Four**

Corizon next objects to Judge Morris' finding that Plaintiff has provided sufficient evidence regarding his *Monell* claim.

To establish *Monell* liability against Corizon, acting under color of state law as the healthcare provider for MDOC prisoners, Plaintiff must show that a violation of his constitutional rights occurred because of a Corizon policy or custom. 436 U.S. 658, 694 (1978). This showing can be made by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). The plaintiff must also identify a connection between the policy or custom and the unconstitutional conduct that led to his injury; the policy or custom must be the "moving force" behind the eventual constitutional violation. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

Plaintiff's main argument seems to be under theory (1): he alleges that Corizon had an internal policy to "repeatedly and intentionally den[y] colostomy reversals to various Michigan prisoners" in order to save

15

money. ECF No. 66, PageID.1902-03.[2] This requires a showing of "formal rules or understandings—often but not always committed to writing—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)). So Plaintiff needs to show facts indicating the existence of such a policy, as well as facts and law showing why such a policy is unconstitutional, in order to maintain a deliberate indifference claim against Corizon.

Here, Plaintiff has provided sufficient circumstantial evidence that cost-cutting motives, rather than assessment of health risks and medical needs of patients, drive the approval of off-site referral procedures like colostomy reversals. When a prisoner or their treating physician submits a request for an off-site procedure, it is sent to Corizon's Utilization Management department for review. If the procedure is not on a short list of automatic approvals, it goes to a Utilization Management Medical Director ("UMMD"), who can either approve the request, suggest an Alternate Treatment Plan (ATP, effectively a denial), or request more

---

[2] The Court will not address Corizon's arguments in this Objection regarding whether Dr. Papendick has final decision-making authority over treatment approvals, because it is not relevant under this theory of liability. While Plaintiff's briefing as well as the Report and Recommendation discuss possible liability under theory (4), because there is sufficient evidence to create a genuine issue of material fact under (1), the Court will not address the potential of a claim under (4).

16

information. Dr. Papendick was the UMMD for Corizon in Michigan at the time Plaintiff submitted his requests to have a colostomy reversal. ECF No. 66, PageID.1887-89. Dr. Papendick testified that he is trained to approve only procedures that are "medically necessary." Papendick Dep. 30:13-22, ECF No. 66-8. Plaintiff puts forward evidence that Corizon has its own proprietary, restrictive definition of this term. Pl.'s Ex. 41, ECF No. 66-41, PageID.2662.

The evidence shows that Corizon's contract with the state includes a formula by which Corizon and MDOC share the costs for off-site procedures such as surgeries, up to a certain per-patient cost threshold. Pl.'s Ex. 2, ECF No. 66-2, PageID.2009-11. Corizon therefore has a financial incentive to keep its off-site costs below that threshold, because it is wholly responsible for any costs above that amount. ECF No. 66, PageID.1884-85. Plaintiff presents evidence that Corizon has achieved significant reduction in expenditures towards off-site utilization services since it began working with MDOC in 2009. Pl.'s Ex. 19, ECF No. 66-19, PageID.2300-01. Plaintiff further presents evidence of key performance indicators, or KPIs, tracked by Corizon for its MDOC contract per 1000 prisoners, including: inpatient hospital days, outpatient referrals, and offsite procedure utilization. Pl.'s Ex. 24, ECF No. 66-24, PageID.2415-18. Plaintiff plausibly alleges that these metrics are tracked against set targets in order to keep costs down.

There are also two affidavits from MDOC prisoners, one who had a colostomy reversal approved only after suffering severe complications, and one who has to this day never had the reversal surgery done and has been told more than once that "a request to reverse a functional colostomy would never be approved." Exs. 36, 37, ECF No. 66. These examples fit the pattern of the alleged policy to not approval colostomy reversals if the colostomy is generally functioning, thereby avoiding the cost of the off-site procedure.

There is, predictably, no admission in the record that Corizon refuses to approve colostomy reversals solely in order to reduce costs. But a reasonable jury, on these circumstantial facts, could conclude that Corizon employees in roles like Dr. Papendick's are trained to take a "fixed plan of action" when presented with patients who seek colostomy reversals but otherwise have no serious complications. Once that criterion is met, there is no more individualized assessment: an alternative treatment plan is always chosen, the surgical procedure is denied. Dr. Papendick's admission, previously referenced, that he would recommend even a patient with a life sentence to "continue to have his colostomy" as long as there were no complications, seems consistent with applying a fixed rule or policy in coming to that conclusion. Plaintiff plausibly alleges that by *defining* the reversal of an otherwise functional colostomy as not medically necessary in its policies, Corizon avoids any obligation to review other individualized circumstances that might merit

18

approval. Instead, it has created a blanket category for a procedure that is never conducted as a way to keep down costs.

Defendants argue that Dr. Papendick *did* perform an individualized assessment, but as already noted, there is at least a question of fact as to the sufficiency of his individualized assessment and whether it was in whole or in part motivated by economic considerations, such that his conduct would still satisfy the subjective prong of the deliberate indifference standard. Defendant also argues that Judge Morris improperly relied on a Report and Recommendation in *Strayhorn v. Caruso*, 2015 WL 5013772, at *11 (E.D. Mich. July 31, 2015), in concluding that Plaintiff presented enough evidence regarding cost-saving motives. While Defendant correctly notes that *Strayhorn* is not authoritative, for the reasons set out above, Court comes to the same conclusion without relying on it.

The state has complete control over prisoners: they cannot seek a second opinion or find another avenue for medical treatment if it is denied to them. The state, and any contractors it employs by extension, therefore have a constitutional obligation to provide medical care that is informed by the legitimate medical needs of the individuals in their care, not by cost considerations. The Court finds that Plaintiff has provided sufficient evidence regarding his *Monell* claim against Corizon. This Objection is overruled.

19

### D. Objection Five

Defendants' last Objection is that Judge Morris did not address Plaintiff's claim of deliberate indifference based on inadequate provision of colostomy supplies. ECF No. 70, PageID.2815. While it is correct that this issue is not in the Report and Recommendation, it was also not addressed by *Plaintiff* in his Response to Defendants' Motion for Summary Judgment. The Court interprets this as a concession that inadequate provision of supplies is no longer part of Plaintiff's deliberate indifference claim. As a result, there was no need for Judge Morris to address this argument, and her failure to do so does not affect the outcome of the case. This Objection is therefore overruled.

### CONCLUSION

Except for the differences in reasoning herein noted, Judge Morris' Report and Recommendation of December 16, 2021 (ECF No. 69) is **ADOPTED**. Defendants Prime and Spencer's Motion for Summary Judgment (ECF No. 58) is **GRANTED** and those Defendants are **DISMISSED WITH PREJUDICE**. Defendants Papendick and Corizon's Motion for Summary Judgment (ECF No. 60) is **DENIED.**

**SO ORDERED** this 31st day of March, 2022.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

20