**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**KOHCHISE JACKSON**,
 Plaintiff,

Case No.: 2:19-cv-13382

v.                                                        Hon.: Terrence G. Berg

**CORIZON HEALTH, Inc.,**, et al,
Defendants.

---

Laurence H. Margolis (P69635)
Ian T. Cross (P83367)
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: larry@lawinannarbor.com
Email: ian@lawinannarbor.com

Ronald W. Chapman Sr., (P37603)
Delvin Scarber (P64532)
*Chapman Law Group*
Attorneys for Defendants Corizon Health,
Inc. and Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: rchapman@chapmanlawgroup.com
Email: dscarber@chapmanlawgroup.com

**PLAINTIFF'S MOTION FOR AN ORDER SUBSTITUTING YESCARE CORP. AND CHS TX, INC. AS PARTY DEFENDANTS IN PLACE OF CORIZON HEALTH, INC., AND REQUIRING YESCARE CORP. AND CHS TX, INC. TO ASSUME CORIZON HEALTH, INC.'S DUTY TO INDEMNIFY DEFENDANT PAPENDICK**

NOW COMES Plaintiff Kohchise Jackson, by and through his attorneys, Laurence

H. Margolis and Ian T. Cross, and pursuant to Fed. R. Civ. P. 25(c), seeks an order

i

substituting CHS TX Inc. and Yescare Corp., both Texas corporations, for Defendant Corizon Health, Inc. as an alter-egos or successor entities in this action, and requiring CHS TX Inc. and Yescare Corp. to assume Defendant Corizon Health, Inc.'s duty to indemnify Defendant Dr. Papendick. In support of his Motion, Plaintiff states as follows:

1. From December 2021 through June of 2022, the officers and directors of the entity formerly known as Corizon Health, Inc. executed a corporate restructuring that effectively secreted substantially all of the assets of the Corizon family of companies into one or more new successor entities.

2. The effect of the corporate restructuring was to place the Corizon assets beyond the reach of Corizon's unsecured creditors, including personal injury claimants such as the Plaintiff, former employees owed duties of defense and indemnification, such as Defendant Papendick, and trade creditors whom Corizon Health, Inc. has recently failed to pay in the ordinary course of business. (Ex. 1; Ex. 2).

3. In the time this case has been pending, Corizon has rapidly lost market share in the correctional healthcare industry, and its ability to satisfy its obligations

to its creditors has consequently deteriorated. Corizon has recently defaulted on substantial obligations to its trade vendors.

4.  On information and belief, the purpose of the corporate restructuring was to preserve value for the equity participants in the enterprise by hindering, delaying, and defrauding all of Corizon's unsecured creditors.

5.  On information and belief, the 2022 corporate restructuring was not an arms-length transaction in which Corizon sold substantially all of its assets to a third party for their fair-market value. Rather, it was an insider transaction in which Corizon's beneficial owners placed Corizon's assets into new entities that they also control, for the purpose of carrying on the business enterprise.

6.  The removal of substantially all assets from Defendant Corizon Health, Inc. rendered Corizon Health, Inc. insolvent and likely unable to meet its indemnity obligations to Defendant Papendick, in this case and at least thirteen others. (Ex. 3).

7.  Yescare Corp. and CHS TX, Inc. are alter-egos, successors, or mere continuations of Corizon Health, Inc., and are responsible for assuming Corizon's obligations to Plaintiff and Defendant Papendick.

8.  Fed. R. Civ. P. 25(c) provides that, "If an interest is transferred, the action may be continued by or against the original party unless the court, on

motion, orders the transferee to be substituted in the action or joined with the

original party. The motion must be served as provided in Rule 25(a)(3)."

9. In reviewing a contested Rule 25(c) motion, "the court must first determine

whether the evidence before the court shows that there is no genuine issue as

to any material fact and that the moving party is entitled to joinder or

substitution as a matter of law. Cf. Fed. R. Civ. P. 56(c). If it does, the court

should grant the motion; if it does not, however, the court should conduct an

evidentiary hearing to decide whether the motion should be granted." *United*

*States v. Harold,* 423 F.Supp. 3d 410, 414 (E.D. Mich. 2019) (cleaned up)

(quoting *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72-73

(3rd Cir. 1993)).

10. Plaintiff has sought concurrence in this motion from counsel for Defendants

Corizon Health, Inc. and Dr. Papendick, via emails on June 27, 2022 and

July 11, 2022, and a phone conversation on July 13, 2022. Counsel for

Defendants Corizon and Papendick did not concur in the relief sought.


WHEREFORE, for the reasons more fully set forth in Plaintiff's Brief in Support,

Plaintiff respectfully requests that this Honorable Court grant his Motion,

substitute CHS TX, Inc, and YesCare Corp., both Texas corporations, for

iv

Defendant Corizon Health, Inc. as an alter-egos or successor entities in this action, and order CHS TX, Inc. and Yescare Corp. to assume Defendant Corizon Health, Inc.'s indemnity obligations to co-Defendant Dr. Papendick, and grant such other relief as the Court deems just and equitable under the circumstances.

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Laurence H. Margolis (P69635)
Attorneys for Plaintiff
402 W. Liberty St.
Ann Arbor, MI 48103
Phone: (734) 994-9590
Email: larry@lawinannarbor.com
Email: ian@lawinannarbor.com

v

# TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| NO. | |

Table of Contents………..……………….………....…………   vi.

Index of Exhibits ………...……………………………………   vii.

Table of Authorities…………………………………………   x.

Statement of Issues Presented………..………………………..   xiii.

Controlling or Most Appropriate Authorities…………….………   xiv.

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION

I) Statement of Facts…………………………………………....   1

## ARGUMENT

II) Michigan law governs whether CHS TX, Inc. and Yescare Corp. are alter-egos or successor entities to Corizon Health, Inc. in this matter. In the alternative, if Michigan law does not apply, federal common law applies……………………………………………………………   12

III) Tehum Care Services, Inc. ("New Corizon") is an alter-ego of CHS TX, Inc. and Yescare Corp……....……………………….…………….   17

IV) CHS TX, Inc. and Yescare Corp. are also successor entities to which Corizon's liabilities attach under Michigan law…..………………..…..   19

# Index of Exhibits

**Ex. 1**: University of Missouri Complaint

**Ex. 2**: Blue Cross Blue Shield of Michigan Complaint

**Ex. 3**: Pending Michigan federal cases in which Keith Papendick is a Defendant

**Ex. 4**: Corizon News announcement of James Hyman's appointment as CEO, September 19, 2019

**Ex. 5**: YesCare May 16, 2022 Press Release

**Ex. 6**: Corizon litigation history disclosure from 11-30-2020  bid for Missouri Department of Corrections healthcare contract

**Ex. 7**: Consolidated Financial Statements of the Corizon family of entities, 2010-2011

**Ex. 8**: Yescare Corp. Certificate of Formation

**Ex. 9**: Sara Tirschwell marketing Op-Ed for Corizon/Yescare, April 26, 2022

**Ex. 10**: Florida Annual Report for Corizon Health, Inc., April 19, 2022

**Ex. 11**: CHS Care TX LLC Certificate of Formation

**Ex. 12**: Corizon Health, Inc. conversion from a Delaware corporation to a Texas corporation, April 28, 2022

**Ex. 13**: Valitas Health Services, Inc. conversion from a Delaware corporation to a Texas corporation, April 28, 2022

**Ex. 14**: Four-way Texas merger of Corizon Health, Inc., Valitas Health Services, Inc, Corizon Health of New Jersey, LLC, and Corizon, LLC, May 3, 2022

**Ex. 15**: Corizon Health, Inc. Texas divisional merger into CHS TX, Inc. and Corizon Health, Inc., May 3, 2022

**Ex. 16**: May 13, 2022 Email to St. Clair County, MI jail administrator, subject: "Excited to announce that Corizon Health is now YesCare."

**Ex. 17**: YesCare press release, May 16, 2022

**Ex. 18**: UCC-1 Financing Statement for Yescare Corp., filed May 16, 2022

**Ex. 19**: UCC-1 Financing Statement for CHS TX, Inc., filed May 16, 2022

**Ex. 20**: UCC-3 Release of lien on Corizon, LLC in Missouri, filed May 19. 2022

**Ex. 21**: UCC Financing Statements filed on Corizon Health of New Jersey, LLC in New Jersey

**Ex. 22**: Original Corizon, LLC UCC-1 Financing Statement filed in Missouri in 2017

**Ex. 23**: Corizon Health, Inc. name change to Tehum Care Services, Inc., June 1, 2022

**Ex. 24**: Corizon's April 2017 recapitalization press release

**Ex. 25**: "Flacks Group Takes a Longer-Term View of Corizon and Reduces its Debt" Nashville Business Journal article reposted on Flacks Group website

**Ex. 26**: Email from Corizon/Yescare Assistant General Counsel Jennifer Finger to Steve Tomlin, June 1, 2022

**Ex. 27**: Jennifer Finger's June 1, 2022 edits to Memorandum of Understanding with Brevard County Sheriff's Department

**Ex. 28**: Email from Karen Davies to Corizon/Yescare's Brevard County Sheriff's Department client, June 2, 2022

**Ex. 29**: Yescarecorp.com Careers webpage, accessed 7-19-2022

viii

**Ex. 30**: Sara Tirschwell Bio from Corizon website

**Ex. 31**: Sara Tirschwell Bio from Quest Turnaround Advisors website

**Ex. 32**: Quest Turnaround Advisors published physical address

**Ex. 33**: YesCare Client Q&A sheet sent to Brevard County Sheriff's Department

**Ex. 34**: Corizon insurance declarations page, 1-1-17 through 1-1-18

**Ex. 35**: Executive Bios from Corizon's February 2021 bid for Indiana DOC health-care contract

**Ex. 36**: Email from Karen Davies to Brevard County Sheriff's Office, 5-13-2022

**Ex. 37**: Choosing Yescare webpage

**Ex. 38**: Choosing Corizon client testimonials

TABLE OF AUTHORITIES

*Cases:*

*Anwar v. Dow Chem. Co.*, 876 F3d 841 (6th Cir. 2017)…..………………..……………………13

*Atchison, T. & S.F. Ry. v. Brown & Bryant*, 159 F.3d 358 (9th Cir. 1997)…...………………14

*Atherton v. FDIC*, 519 U.S. 213, 218 (1997)……………………………………..……………...13

*Austin v. Tecumseh Nat'l Bank*, 49 Neb. 412 (Neb. 1896)……………………...…………….23

*Chase v. Mich. Tel. Co*., 121 Mich. 631 (Mich. 1899) ………………………..………………22

*Cobb v. Contract Transp. Inc.*, 452 F.3d. 543 (6th Cir. 2006)……………...……………...12

*Cohen v. Gilmore (In re Ala. &amp; Dunlavy, Ltd.)*, 983 F.3d 766 (5th Cir. 2020)………..…10

*Commonwealth Land Title Ins. Co. v. Metro Title Corp*., 315 Mich. App. 312 (2016)…..……20

*CT Charlton & Assocs., Inc. v. Thule*, 541 Fed. Appx. 549 (6th Cir.2013)……………..…...20

*DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918 (6th Cir. 2006)…...14

*Daymon v. Fuhrman,* 474 Mich. 920 (2005)…………………………………………..…...17

*DBMP LLC v. Those Parties Listed On Appendix A To Complaint (In re DBMP)*,
No. 20-30080 (Bankr. W.D.N.C. Aug. 10, 2021)……………….……………….…...…3-4, 10

*Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368 (6th Cir. 2019)…12

*Enterprise Group Planning v. Falba*, 1995 U.S. App. LEXIS 38844 (6th Cir. 1995)…...….…14

*Ferguson v. Glaze*, 2008 Mich. App. LEXIS 274 (Mich. App. 2008)…..……………..…..…23

*First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc*.,
2010 U.S. Dist. LEXIS at (E.D. Mich. 2010)…………………….……………….……20, 21

*Foodland Distribs. v. Al-Naimi*, 220 Mich. App. 453 (1996)…………………………..……..17

*Foster v. Cone-Blanchard Mach.Co.,* 460 Mich. 696. 597 N.W. 2d 506 (1999)..……..….……24

*Gougeon Bros. v. Phoenix Resins, Inc*., 2000 Mich. App. LEXIS 2697  (2000)…………..…..23

x

*Green v. Zeigelman*, 310 Mich. App. 436 (2015)……………………………...……....……17

*Grenell v. Detroit Gas Co.*, 112 Mich. 70 (Mich. 1897)……………………….....……...……23

*Hefferan v. Ethicon Endo-Surgery, Inc.*, 828 F.3d 488 (6th Cir. 2016)…………....……...15, 16

*In re Aldrich Pump LLC.,* 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)……...……3, 14

*In re K & D Indus. Servs. Holding Co.*, 602 B.R. 16 (Bankr. E.D. Mich. 2019)…………….…10

*Klager v. Robert Meyer Co.*, 415 Mich. 402 (1982)………...……………………….…...…....18

*Larca v. United States*, 302 F.R.D. 148 (N.D. Ohio 2014)…..……………………….……..15

*Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69 (3rd Cir. 1993)…………….....…..iv

*Med. Mut. v. DeSoto*, 245 Mich. 561 (6th Cir. 2001)……………………………...……....……15

*Mickowski v. Visi-Trac Worldwide, LLC*, 415 F.3d 501 (6ᵗʰ Cir.2005)………………………14

*People ex rel. Potter v. Michigan Bell Tel. Co.*, 246 Mich. 198 (1929)……...……………….17

*Pearce v. Schneider*, 242 Mich. 28 (Mich.1928)……………………………….………23, 25

*Plastronics Socket, Ltd. v. Hwang,* 2022 U.S. App, 883  (Fed. Cir. Jan. 12, 2022)………….10,13

*Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269 (W.D. Mich. 2017)……...…….....17, 19, 24

*Shue & Voeks, Inc. v. Amenity Design & Mfg., Inc.*, 203 Mich. App. 124 (1993)……...............23

*Stramaglia v. United States*, 377 Fed. Appx. 472 (6th Cir.2010)…………..……….…….22-23

*Turner v. Bituminous Casualty Co.*, 397 Mich. 406 (1976)……...………………….……19, 25

*Well v. Firestone Tire & Rubber Co.*, 421 Mich. 641 (1984)……………………….….……..17

*Wells v. THB Am., LLC (In re Clements Mfg. Liquidation Co., LLC)*,
521 B.R. 231 (Bankr. E.D. Mich. 2014)…………………………………....…….…22, 24

*United States v. Carell*, 681 F.Supp. 2d 874 (M.D. Tenn. 2009)……………………….…..…...12

*United States v. Harold,*  423 F.Supp. 3d 410 (E.D. Mich. 2019)………………………..…..iv

*United States v. WRW Corp.*, 986 F.2d 138 (6th Cir. 1993)…………………………….………12

*Yolton v. El Paso Tenn. Pipeline Co*., 435 F.3d 571 (6th Cir. 2006)…………………….......12

**Statutes:**

Tex. Bus. Orgs. Code Ann. § 10.008……………………………………………………….9

6 DE Code § 18-217(l)(4)……………………………………………………………..……9

**Restatements:**

Restatement (Second) of Conflicts of Law § 172…………………………………….……15

## **Statement of Issues Presented**

I. WHAT LAW APPLIES TO SUCCESSOR LIABILITY AND ALTER EGO IS-SUES IN THIS CASE?

Plaintiff Answers: **Michigan law, or in the alternative, federal common law.**

Corizon Defendants May Answer: **Texas law.**

II. IS CORIZON HEALTH, INC. AN ALTER-EGO OF TWO NEW TEXAS EN-TITIES THAT HAVE RECENTLY TAKEN POSSESSION OF ALL OF CORI-ZON'S ASSETS, CHS TX, Inc. AND YESCARE CORP.?

Plaintiff Answers: **Yes.**

Corizon Defendants May Answer: **No.**

III. DOES SUCCESSOR LIABILITY ATTACH TO CHS TX, Inc. AND YESCARE CORP. UNDER MICHIGAN LAW?

Plaintiff Answers: **Yes.**

Corizon Defendants May Answer: **No.**

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

1)  *United States v. Harold,*  423 F.Supp. 3d 410 (E.D. Mich. 2019)

2) *Plastronics Socket, Ltd. v. Hwang,* 2022 U.S. App. LEXIS 883  (Fed. Cir. Jan. 12, 2022)

3)  *Green v. Zeigelman*, 310 Mich. App. 436 (2015)

4) *Turner v. Bituminous Casualty Co.,* 397 Mich. 406  (1976)

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO SUBSTITUTE PARTIES

## I. Statement of Facts

In the time this case has been pending, Corizon has rapidly lost market share in the correctional healthcare industry and its ability to satisfy its obligations to creditors has deteriorated. In September of 2019, Corizon operated in 149 correctional facilities. (Ex. 4). Between 2020 and the 2022 restructuring, Corizon lost state Department of Corrections' contracts in Michigan, Kansas, Missouri, Tennessee, and Idaho to competitors. It gained no new statewide contracts during this period. By May of 2022, Corizon had only two remaining state DOC clients: Maryland and Wyoming, and it operated in just 52 facilities nationwide. (Ex. 5). While Corizon is no longer receiving revenue for the five statewide contracts it recently lost, Corizon's tort liabilities and indemnity obligations in those jurisdictions continue to accumulate; in most cases, its last day of service is still within the applicable statute of limitations.

Over the same time period, Corizon became seriously delinquent on trade debts incurred in the ordinary course of business. By May of 2022, Corizon's accrued liabilities to third-party healthcare providers were at least $15.4 million. On May 11, 2022, the University of Missouri filed suit against Corizon, alleging that since 2020, Corizon had failed to pay its bills for treatment provided to

1

Missouri prisoners at the University's hospital. The University of Missouri alleges that Corizon's past-due balance is over $12,000,000.00. (Ex. 1, pg. 12). Also, on June 14, 2022, Blue Cross Blue Shield of Michigan sued Corizon for Blue Cross' unpaid bills, totaling $3,410,136.51, that Corizon incurred during its 2016-2021 service contract with the MDOC. (Ex. 2, pg. 3). Given Corizon's unwillingness or inability to pay its bills to Blue Cross and the University of Missouri over the past two years, it is probable that Corizon owes similar trade debts to other third-party healthcare providers who treated Corizon patients from 2020 to the present.

In addition to trade debts, Corizon continuously accrued substantial liabilities for inmate tort claims in the ordinary course of its business. A large portion of this liability is not recoverable from its insurance policies. In November of 2020, Corizon reported that it made payments to prisoner-plaintiffs in approximately 12% of the suits that were both *filed and resolved* between September 1, 2015 and August 31, 2020.[1] (Ex. 6).   Consolidated financial statements prepared by Ernst & Young in 2012 hint at the magnitude of Corizon's accrued tort liabilities: for calendar year 2011, the first year of Corizon's existence,

_____

1This is likely to be an underestimate of the percentage of prisoner claims that require payment by Corizon, since cases dismissed on 28 U.S.C. § 1915A screening or PLRA exhaustion grounds remain open for relatively short periods of time, while cases that survive summary judgment typically remain pending for several years. A paid claim is thus less likely than a suit dismissed on screening or exhaustion grounds to be both *filed* and *resolved* within a specified date range.

Corizon estimated its accrued medical tort liability expenses <u>that were not recoverable from its insurance policies</u> at $65.3 million. An *additional* $58.5 million of estimated medical tort liability was incurred in 2011, which the corporation believed would be covered by insurance. (Ex. 7, pp. 19, 22-23). While Corizon treated a larger population of prisoners in 2011 than it has in recent years, its accrued liabilities for medical tort claims undoubtedly remain substantial.

In the face of this financial distress, Corizon followed a path first blazed in 2017 by several solvent corporations with substantial asbestos-related tort liabilities:  sequestration of their liabilities into shell companies via Texas divisional mergers.[2] *See  In re LTL Mgmt. LLC*, 2021 Bankr. LEXIS 3155 at *26-*27 (Bankr. W.D.N.C. Nov. 16, 2021) (chronicling recent history of Texas divisional mergers). The legality of this maneuver, which has come to be known as the "Texas two-step," is being vigorously litigated in several forums. *DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, 2021 Bankr. LEXIS 2194 (Bankr. W.D.N.C. Aug. 10, 2021), describes a representative example of this type of corporate restructuring:

---

[2] These shell companies often declare bankruptcy, but not without first agreeing to "indemnify" their solvent corporate sponsor, so that the sponsor can argue that it should also benefit from the automatic bankruptcy stay. *See, e.g. Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)*, 2021 Bankr. LEXIS 2294 at *34-*35, *73 (Bankr. W.D.N.C. Aug. 23, 2021).

On October 23, 2019, CertainTeed Corporation ("Old CertainTeed"), a building products manufacturer with significant asbestos liabilities, underwent a corporate restructuring, including a Texas state law divisional merger, where it divided itself into two new entities. One, CertainTeed LLC ("New CertainTeed"), was essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors. The other entity, DBMP LLC ("DBMP" or the "Debtor") was quite different. The merger allocated to DBMP no employees, no operations, and few assets. However, in one respect the merger was generous with DBMP: it was allocated 100% of Old CertainTeed's considerable asbestos liabilities.

*DBMP LLC*, 2021 Bankr. LEXIS 2194 at *6-*7 (Bankr. W.D.N.C. Aug. 10, 2021).

Corizon's Plan of Merger, which divided pre-divisional-merger Corizon Health, Inc.'s (hereafter "Old Corizon's") assets and liabilities between post-merger Corizon Health, Inc. (hereafter "New Corizon") and CHS TX Inc., was not made public. But it is evident, from the timing and content of the financing statements filed by Old Corizon's secured creditors, that substantially all of the assets of Old Corizon were assigned to CHS TX, Inc. New Corizon, now Tehum Care Services, Inc., is a shell company, left with all of Old Corizon's liabilities and no operating business, employees, or assets. The Corizon restructuring transaction proceeded as follows:

4

a. On January 31, 2022, Yescare Corp. was incorporated in Texas. Its registered agent and sole Director at the time of formation were both Corizon's CEO, Sara Tirschwell. (Ex. 8; Ex. 9; Ex. 10).

b. On April 7, 2022, Sara Tirschwell formed CHS Care TX, LLC in Texas. Its manager at the time of formation was Yescare Corp. (Ex. 11).

c. On April 28, 2022, Corizon Health, Inc. and its parent company, Valitas Health Services, Inc., were converted from Delaware corporations to Texas corporations. (Ex. 12, Ex. 13). At the time of the conversions, Corizon had no significant operations in Texas. Corizon's corporate headquarters was in Brentwood, Tennessee, and it maintained a second major corporate office in St. Louis, Missouri.

d. On May 3, 2022, Valitas Health Services, Inc., Corizon Health, Inc., and two Corizon subsidiaries, Corizon, LLC (a Missouri entity) and Corizon Health of New Jersey, LLC, (a New Jersey entity) completed a four-way merger under the Texas Business Organizations Code. The four entities merged into one surviving Texas corporation: Corizon Health, Inc. ("Old Corizon"). (Ex. 14).

e. Also on May 3, 2022, immediately following the four-way merger, the combined entity, "Old Corizon," underwent a Texas divisional merger under Chapter 10 of the Texas Business Organizations Code.

5

**f.** Two Texas entities resulted from the divisional merger. One retained the name "Corizon Health, Inc." ("New Corizon"). The other resulting entity is CHS TX, Inc. (not to be confused with CHS *Care* TX, LLC). (Ex. 15).

**g.** On Friday, May 13, 2022, Corizon informed its clients that on the following Monday, May 16, 2022, it would publicly announce that Corizon Health is now YesCare. (Ex. 16).

**h.** On May 16, 2022, YesCare issued a press release entitled, "Leading Healthcare Group Forms YesCare, Debuting New Vision and Leadership," and introducing YesCare's top management. All eleven executives listed in the press release previously held management positions in Old Corizon. The release was published by Businesswire at 8:07 AM on May 16, 2022. (Ex. 17).

**i.** Seven minutes before the announcement was published, on May 16, 2022, at 8:00 AM, a secured creditor filed two UCC-1s in Texas, covering Yescare Corp. and CHS TX, Inc., and asserting security interests in "all assets of debtor, whether now owned or hereafter acquired" for both entities. (Ex. 18, Ex. 19).

**j.** On May 19, 2022 and May 20, 2022, the same secured creditor filed UCC-3s in Missouri and New Jersey, releasing its previously-filed liens on the assets of the Corizon subsidiaries that were parties to the four-way-merger-followed-by-split executed on May 3, 2022. (Ex. 20, Ex. 21). These released liens had been in

6

place since April of 2017 and had covered all assets of the respective debtors. (Ex. 21, Ex. 22).

**k.** On June 1, 2022, New Corizon changed its name to "Tehum Care Services, Inc." (Ex. 23). To date, no creditor has filed a UCC-1 in Texas covering assets of either Corizon Health, Inc. or Tehum Care Services, Inc.

The behavior of Corizon's secured creditors is telling. Corizon has carried long-term corporate debt since it was created via a merger of two correctional healthcare contractors, CMS and PHS, in 2011. All of the corporation's assets were pledged as collateral for this debt. (See Ex. 7, pg. 25; Ex. 24, Ex. 25). Since the secured creditors perfected their liens on all assets of CHS TX Inc. and Yescare Corp. minutes before the YesCare transaction was made public, they must have had advance notice of, and consented to, the corporate restructuring. And because the secured creditors filed UCC-1s in Texas covering all of the assets of CHS TX, Inc. and Yescare Corp., but did not file a UCC-1 in Texas covering the assets of Corizon Health, Inc. or Tehum Care Services, Inc., they must also have known that New Corizon/Tehum was not assigned any significant assets of Old Corizon in the divisional merger. If New Corizon was assigned anything of value in the Plan of

Merger, the institutional secured creditors of Old Corizon would undoubtedly have perfected their security interests in whatever assets New Corizon had.

The UCC-1 filings also suggest that Yescare Corp. has acquired possession of at least some of the encumbered Old Corizon assets. This inference is further supported by the fact that Yescare Corp. is performing Corizon's contracts, and holding itself out to Corizon's former clients as Corizon's successor. (Ex. 16). Based on the available evidence, it appears that CHS TX, Inc. has become a wholly-owned subsidiary of Yescare Corp. On June 1, 2022, YesCare's (and formerly Corizon's) Assistant General Counsel, Jennifer Finger, made edits to a yet-to-be-signed Memorandum of Understanding involving YesCare and the Brevard County Sheriff's Office. She changed the name of the contracting party from, "Yescare, Inc. (f/k/a Corizon Health)," to "CHS TX, Inc., d/b/a YesCare, successor by merger to the rights and obligations of Corizon Health, Inc. hereunder ("YesCare")." (Ex. 26, Ex. 27 pg. 2). On the following day, June 2, 2022, YesCare informed the Brevard County Sheriff's Office that, "YesCare acquired all the active business of Corizon. As part of this acquisition, your contract with Corizon is now vested with CHS TX, LLC ("CHS"), and [sic] a wholly owned subsidiary of YesCare."[3] (Ex. 28).

---

[3] "CHS TX LLC" is not a Texas entity. YesCare is likely referring to one of two involved entities, either "CHS *Care* TX LLC" or "CHS TX, *Inc.*"

YesCare's explanation of the transaction to its clients foreshadows its argument as to why this is not a fraudulent transfer. YesCare represents, "[b]ecause CHS was split from Corizon through a merger transaction, your contract has not been assigned or transferred." (Ex. 28). The basis for this assertion is found in Texas Business Organizations Code § 10.008, which provides that:

> "all rights, title, and interests to all . . . property owned by each organization that is a party to the merger is allocated to and vested . . . in one or more of the surviving or new organizations as provided in the plan of merger **without . . . any transfer or assignment having occurred.**" (emphasis added).

If there is no *transfer*, the argument goes, there can be no *fraudulent transfer*. It is the availability of this textualist argument that makes Texas the forum of choice for these transactions. Delaware also permits divisional mergers, *See* 6 DE Code § 18-217, and Delaware also allows assignment of the assets and liabilities among the surviving entities. But Delaware permits such assignment only, "so long as the plan of division does not constitute a fraudulent transfer under applicable law." 6 DE Code § 18-217 (l)(4).

This transaction cannot possibly constitute an arms-length sale of assets for fair value. If a third-party buyer, or even Old Corizon's owners themselves, wanted to purchase the assets of an insolvent Old Corizon and continue the business free from all of Old Corizon's liabilities and insulated from any potential alter-ego,

9

fraudulent transfer, or successor liability claims, bankruptcy law provides a means to do so: a Chapter 11 filing followed by a § 363(f) sale. *See, e.g., In re K & D Indus. Servs. Holding Co.*, 602 B.R. 16, 30-31 (Bankr. E.D. Mich. 2019). In contrast, the novel Texas divisional merger procedure employed in this case "may constitute an avoidable fraudulent transfer or otherwise be subject to attack under remedial doctrines like alter ego and successor liability." *DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, 2021 Bankr. LEXIS 2194 at *14 (Bankr. W.D.N.C. Aug. 10, 2021); *See also, Plastronics Socket, Ltd. v. Hwang*, 2022 U.S. App. LEXIS 883 at *6 (Fed. Cir. Jan. 12, 2022) ("the question before us is whether the Texas divisive merger statute permits Plaintiffs to avoid liability for sales of sockets with H-Pins under the Royalty Agreement by assigning the liability for royalty payments to a new subsidiary that does not sell such sockets while Plastronics Socket continues to sell the sockets. We hold it does not").

Since the novel restructuring strategy chosen by Corizon/YesCare may be voidable as a fraudulent transfer, any potential asset buyer would be assuming a substantial risk that a court will invalidate its title to the assets. *See Cohen v. Gilmore (In re Ala. & Dunlavy, Ltd.)*, 983 F.3d 766, 776 (5th Cir. 2020) ("[u]nder Texas law, good-faith purchaser defenses will fail [if the buyer was] on inquiry

10

notice of fraud.").   Even if the transaction were upheld, the hypothetical buyer would be dogged by alter-ego and successor-liability claims brought in various jurisdictions for years to come. An asset purchase under these circumstances would not be appealing to a bona-fide third-party buyer. The purchase price, if in fact there was a sale, would need to be deeply discounted relative to the value of the assets if sold out of bankruptcy.

There is only one reason for an insolvent company to engage in this type of transaction rather than a restructuring under Chapter 11: a desire to preserve value for the equity participants in the enterprise by hindering, delaying, and defrauding the unsecured creditors. If the Old Corizon equity participants wanted to buy the remaining Corizon assets out of bankruptcy, they would need to compete against other potential buyers in a transparent process, pay the actual, fair-market enterprise value of the business, and see the proceeds distributed to Old Corizon's creditors. Equity holders would likely receive nothing from the proceeds and would lose the entirety of their original investments. Instead, the equity holders and corporate insiders of Old Corizon appear to have chosen to secrete Old Corizon's remaining assets into new corporate entities that they also control, while abandoning Old Corizon's substantial accrued liabilities to hospitals, tort claimants, and former employees in a rump shell company.

11

ARGUMENT

**II. Michigan law governs whether Yescare Corp. And CHS TX, Inc are alter-egos or successor entities to Corizon Health, Inc. in this matter. In the alternative, if Michigan law does not apply, federal common law applies**

Before reaching the ultimate issue of whether Yescare Corp. is a successor or alter-ego of Defendant Corizon, the Court must address a threshold choice-of-law issue. Federal common law sometimes applies to questions of alter-ego and successor liability in federal-question cases. It is generally applicable in the labor law context, *see, e.g., Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 586 (6th Cir. 2006); *Trs. of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 375-76 (6th Cir. 2019), and in the Title VII context. *Cobb v. Contract Transp. Inc.*, 452 F.3d 543, 551 (6th Cir. 2006). Some courts in this Circuit have taken the maximalist position that "federal common law determines the parameters of the alter ego doctrine where the underlying cause of action is based on a federal question." *United States v. Carell*, 681 F.Supp. 2d 874, 890 (M.D. Tenn. 2009) (applying federal common law to alter-ego issue for False Claims Act claim, but not with respect to pendent state-law claims). Yet the Sixth Circuit has also applied state law to successor-liability and alter-ego issues in some federal-question cases. *See United States v. WRW Corp.*, 986 F.2d 138, 143 (6th

Cir. 1993) (Federal Mine Safety and Health Act)*; Mickowski v. Visi-Trac Worldwide, LLC,* 415 F.3d 501, 513 (6th Cir. 2005) (patent-enforcement context).

The question of whether federal common law applies to alter-ego or successor-liability issues in a federal-question case based on a constitutional tort appears to be one of first impression in this Circuit. *Anwar v. Dow Chem. Co.*, 876 F3d 841 (6th Cir. 2017) suggests that the standard for determining whether to apply the federal common law of veil-piercing to a new genre of federal-question cases is whether "a federal interest is implicated," *Id.* at 848-49, while *Mickowski*, which addresses the issue in more detail, articulates the standard as "a 'significant conflict between some federal policy or interest and the use of state law." *Mickowski*, 415 F.3d at 512 (quoting *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)). *Mickowski* suggests one scenario in which the application of state alter-ego or successor-liability law would conflict with a federal policy or interest: when applying state law would result in a particular state "becom[ing] a haven for companies seeking to avoid their obligations[.]" *Mickowski*, 415 F.3d at 513. So if a) Texas law applied to the alter-ego and successor-liability questions in this matter, and b) the Texas Business Organizations Code really allows corporations to do things like separate the duty to pay royalties from the business that sells the product subject to the royalty agreement, *Plastronics Socket*, 2022 U.S. App.

13

LEXIS 883 at *6-*7 (Fed. Cir. 2022), or dump their asbestos liabilities into a shell company which immediately files for bankruptcy, and thereby benefit from all of the debtor protections of Chapter 11 without subjecting any of their assets to bankruptcy-court oversight, *Aldrich Pump, LLC*, 2021 Bankr. LEXIS 2294 at *29-*34 (Bankr. W.D.N.C. Aug. 23, 2021), then a significant conflict between federal policies and interests and the use of state law would arise. In other words, if Corizon and the other entities attempting to exploit the Texas divisional merger statute are ultimately correct about the legality of their maneuver, Texas would indeed "provide[] a haven for liable companies," *Mickowski*, 415 F.3d at 513 (quoting *Atchison, T. & S.F. Ry. v. Brown & Bryant*, 159 F.3d 358 (9th Cir. 1997)), and the application, or if necessary, the creation, of federal common-law rules would be warranted to prevent the Texas Business Organizations Code from wholly undermining a diverse array of federal policies and interests.

Fortunately, this a likely a moot point, because if state law governs, the law that applies is Michigan's. "In a federal question case, choice-of-law principles are derived from federal common law." *Enterprise Group Planning v. Falba*, 1995 U.S. App. LEXIS 38844 at *5-*6 (6th Cir. 1995). Federal-common-law choice-of-law rules are, essentially, the Restatement (Second) of Conflicts of Law. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922

14

(6th Cir. 2006); *Med. Mut. v. DeSoto,* 245 F.3d 561, 570 (6th Cir. 2001). In the tort context, the Restatement "calls for the "the local law of the state where the injury occurred," "unless, with respect to the particular issue, some other state has a more significant relationship[.]"" *Larca v. United States,* 302 F.R.D. 148, 154 (N.D. Ohio 2014) (citing Restatement (2d) of Conflicts § 146). In cases involving "joint torts," where "two or more persons are liable to a third person for the acts of each other," the 'most significant relationship' test of § 145 applies, but "[t]he applicable law will usually be the local law of the state where the injury occurred." Restatement (2d) of Conflicts, § 172.

No jurisdiction has a more significant relationship to this case than Michigan. To determine the jurisdiction with the most-significant relationship in the tort context, the Restatement takes into account: a) the place where the injury occurred, b) the place where the conduct causing the injury occurred, c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and d) the place where the relationship, if any between the parties is centered. *See Hefferan v. Ethicon Endo-Surgery, Inc.,* 828 F.3d 488, 496 (6th Cir. 2016). In this case, the injury occurred in Michigan. The conduct causing the injury, Dr. Papendick's decision to deny surgery, also occurred in Michigan. Both the Plaintiff and Defendant Papendick are Michigan residents. While Yescare

15

Corp., CHS TX, Inc., and New Corizon are now Texas entities, Old Corizon was a Delaware entity prior to the 2022 corporate restructuring, and the principal place of business of all the corporate entities is and at all relevant times has been Brentwood, Tennessee. (Ex. 18, Ex. 15). Yescare Corp. has no significant operations in Texas. Of the more than seven-hundred total available positions (classified by State) that are posted on YesCare's "Careers" webpage, 266 are in Maryland, 128 are in Pennsylvania, and 78 are in Florida. None of the jobs are classified as being located in Texas.[4] (Ex. 29). But YesCare does have several job openings in Michigan, because Yescare continues to perform all of Old Corizon's service contracts at various Michigan jails. (Ex. 16, Ex. 29). Finally, to the extent to which there is a relationship between the parties, that relationship is centered in Michigan. Corizon's liability stems from its performance of a public contract entered into with the State of Michigan, under which it agreed to provide for the Plaintiff's medical needs during his incarceration in Michigan's prison system. *See also, Hefferan*, 159 F.3d at 497 (relationship between patient and medical-device company was in state where healthcare provider received and used device).

_____

4       YesCare's only connection to Texas (besides its unilateral selection of Texas as the venue for its machinations to defraud creditors) is the fact that its CEO, Sara Tirschwell, allegedly became a Texas resident around the time of the subject transactions. Prior to her sudden decision to move to Texas, Ms. Tirschwell resided in Manhattan for over thirty years and ran for Mayor of New York City in 2021. (Ex. 30). Her (permanent) employer, Quest Turnaround Advisors, has its offices in New York. (Ex. 31, Ex. 32).

### III. Tehum Care Services, Inc. ("New Corizon"), is an alter-ego of CHS TX, Inc. and Yescare Corp.

Michigan common law has traditionally disregarded the corporate form "to protect a corporation's creditors, or other outsiders, where the corporate entity has been used to avoid legal obligations[.]" *Well v. Firestone Tire & Rubber Co.*, 421 Mich. 641, 650-51 (1984); *See also, Green v. Zeigelman*, 310 Mich. App. 436, 452 (2015) ("[w]hen a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity") (quoting *People ex rel. Potter v. Michigan Bell Tel. Co.*, 246 Mich. 198, 204 (1929)). But there are no hard-and-fast rules to Michigan's veil-piercing inquiry. *See Foodland Distribs. v. Al-Naimi*, 220 Mich. App. 453, 456 (1996); *accord. Daymon v. Fuhrman*, 474 Mich. 920, 922 (2005) (Michigan's Supreme Court "has never adopted a clear test to determine when piercing the corporate veil is appropriate") (Young, J. Dissenting). Michigan's precedents <u>do not require</u> the complainant to prove that the entity "was used to commit a specific harm or wrong," *Green v. Zeigelman*, 310 Mich. App. 436, 457 (2015), to prove fraud, *Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 281-82 (W.D. Mich. 2017), or "to prove that the owner caused the entity to directly harm the complainant[.]" *Zeigelman*, 310 Mich. App. at 458. Rather than prescribe the application of a "mechanical test," Michigan law calls for consideration of the "totality of the circumstances" and the "entire spectrum of

17

relevant fact . . . in light of the corporation's economic justification to determine if the corporate form has been abused." *Id.* at 457 (citing *Klager v. Robert Meyer Co.*, 415 Mich. 402, 411-412 (1982)).

If anything constitutes abuse of the corporate form, it is the separation of a corporation's assets from its liabilities via a Texas divisional merger. Consider the implications if these transactions are not set aside. Any corporate person could render virtually any legal obligation unenforceable by abandoning the liability in a 'DebtCo,' while assigning all its assets to a new Texas 'AssetCo.' Corporate entities could do this as often as they liked, meaning, in practice, whenever their accrued liabilities exceeded the relevant transaction costs. 'Limited-Liability' entities would become, in practice, 'No-Liability' entities. Success of this strategy would both revolutionize tort law and disrupt the broader American economy, as businesses would become less willing to supply each other with goods and services on credit.

Considering the "totality of the circumstances," and "the entire spectrum of relevant fact," Michigan courts would likely pierce the corporate veil between New Corizon and the successor entities that received its assets. Their separate legal personalities serve no legitimate business purpose and were merely contrived over the last few months as a device to evade legal obligations to creditors. *See*

18

*Zeigelman*, 310 Mich. App. at 449. (piercing veil where, "[b]y establishing a new entity to cover the expenses previously paid by Ziegelman Architects, Ziegelman was able to abandon Ziegelman Architects and evade its creditors without losing any of the benefits provided by Ziegelman Architects"); *accord. Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 281-82 (W.D. Mich. 2017) (piercing veil where "Gentilozzi . . . transferred Rocketsports' assets to RSR in order to protect Rocketsports' assets, and any revenue that it might have received under contracts with Jaguar and Yokohama, from collection by Plaintiff").

### IV.  Yescare Corp.  and CHS TX, Inc. are also successor entities to which Corizon's liabilities attach under Michigan law

Michigan recognizes five circumstances in which successor liability attaches to a corporation which acquires the business of its predecessor:

> (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 417 n.3 (1976).

Exceptions (2), (3), (4), and (5) are all applicable to Yescare in the present matter.

Exception (2), a "de-facto merger," contains the following four elements:

> 1) continuation of the enterprise, 2) continuity of shareholders, 3) ending of ordinary business operations by the seller, and 4) assumption of liabilities and obligations necessary for uninterrupted continuation of business operations by the purchaser.

*Commonwealth Land Title Ins. Co. v. Metro Title Corp.,* 315 Mich. App. 312, 321 (2016) (quoting *CT Charlton & Assocs., Inc. v. Thule,* 541 Fed. Appx. 549, 551-52 (6th Cir. 2013)).

Here, all of Old Corizon's contracts are being performed by Yescare without interruption. (Ex. 16). There is likely continuity of shareholders, because YesCare itself has referred to the transaction as a "merger" rather than a sale of assets for cash. (Ex. 28). The successor entity was even using the same Federal ID number (Ex. 33) and the same bank account (Ex. 28) as Old Corizon as of June 2, 2022. New Corizon has no remaining "active business." (Ex. 28). While Corizon/Yescare is stiffing trade creditors like the University of Missouri and Blue Cross of Michigan, these creditors have claims stemming from service contracts that Corizon lost to competitors, and their cooperation is not necessary for the uninterrupted continuation of the entity's remaining operations. YesCare presumably assumed trade debts relevant to the extant service contracts it is continuing to perform.

The third and fourth exceptions to the rule against successor liability do not require continuity of beneficial ownership. *See First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.,* 2010 U.S. Dist. LEXIS at *20 (E.D.

20

Mich. 2010). Rather, they "allow successor liability to attach where transfers between new and old companies leave the old company's creditors with nothing to collect." *Id.* Here, Plaintiff has almost certainly been left with nothing to collect from the named corporate defendant. All of Old Corizon's assets were assigned to CHS TX, Inc. in the divisional merger and Corizon's only applicable insurance policy is functionally useless. The policy provides for an $18.5 million aggregate self-insured retention ("SIR") on what is effectively a $4-million aggregate policy limit, and Corizon's SIR is not reduced by defense costs. (Ex. 34). This means that the insurer has no obligation to provide any coverage until Corizon has paid $18.5 million in damages to tort claimants. Once Corizon has paid $18.5 million, the insurer will pay damages (but not defense costs, which always remain Corizon's responsibility) of up to $2 million per claim, until it has reached its aggregate policy limit of $4 million. Thus, Corizon has only insured itself for a thin tranche of medical tort liability, between $18.5 and $22.5 million, for the applicable policy period. Given that Corizon selected a SIR that is nearly 500% of what its insurer can ever be obligated pay, this policy may have more to do with technically satisfying contractual requirements to carry insurance than actually protecting Corizon (or its employees) from exposure to tort liability. If Corizon Health. Inc.

21

cannot pay its $3.4 million debt to Blue Cross, it will not be tendering $18.5 million to tort claimants.

Corizon is now assetless and functionally uninsured, its creditors were not provided for in the restructuring, and "some elements of a purchase in good faith were lacking." *Wells v. THB Am., LLC (In re Clements Mfg. Liquidation Co., LLC)*, 521 B.R. 231, 254 (Bankr. E.D. Mich. 2014). The practical effect of the entire transaction, consisting of a merger of the parent with subsidiaries, then a divisional merger of the combined entity into a 'DebtCo' and an 'AssetCo,' and then an acquisition of the stock of the 'AssetCo' by a related party, was to effectuate "a shifting of assets of a debtor to a corporation whereby the only assets from which the creditors could expect to be paid are placed beyond the reach of their process." *First Presbyterian*, 2010 U.S. Dist. LEXIS at *20 (E.D. Mich. 2010) (quoting 19 Am. Jur. 2d Corps. § 2322). Exceptions (3) and (4) to Michigan's general rule against successor liability are thus applicable in these circumstances.

The fifth and final basis under which Michigan imposes successor liability, the "mere continuation" exception, appears to be the most commonly applied. The scope of this exception is elegantly summarized in *Stramaglia v. United States*, 377 Fed. Appx. 472 (6th Cir. 2010):

> The Michigan Supreme Court has recognized the "mere continuation" exception since the turn of the twentieth century. *See Chase v. Mich. Tel.*

22

*Co.,* 121 Mich. 631, 80 N.W. 717, 718 (Mich. 1899) (citing *Austin v. Tecumseh Nat'l Bank*, 49 Neb. 412 (Neb. 1896)). The court has indicated that the exception rests on two related principles. *See Pearce v. Schneider*, 242 Mich. 28 (Mich. 1928) (imposing liability on a corporation because it was a "reincarnation" of its predecessor). First, "courts will not tolerate any species of transaction where the stockholders in the debtor corporation are permitted, by virtue of their stock ownership, to retain for themselves an interest in the corporate assets until the debts of the corporation shall have been paid." *Id.* at 762 (quoting 15 A.L.R. 1112). Second, a "corporation which acquires the entire property of another corporation under an arrangement which has the effect of distributing the assets of the latter corporation among its stockholders, to the exclusion of its creditors, takes the property subject to payment of the debts of its vendor." *Ibid.* (quoting *Grenell v. Detroit Gas Co.*, 112 Mich. 70, 70 N.W. 413, 413-14 (Mich. 1897).

To determine whether a successor corporation is a mere continuation of its predecessor, Michigan courts examine the totality of the circumstances and engage in a multi-factor analysis. See, e.g., *id.* at 762; *Shue & Voeks, Inc. v. Amenity Design & Mfg., Inc.,* 203 Mich. App. 124, 511 N.W.2d 700, 702 (Mich. App. 1993); *Ferguson v. Glaze,* 2008 Mich. App. LEXIS 274 at *5 (Mich. App. 2008). The only indispensable prerequisites to application of the exception appear to be common ownership and a transfer of substantially all assets. *See, e.g., Pearce,* 217 N.W. at 762; *Shue & Voeks, Inc.,* 511 N.W.2d at 702; *Gougeon Bros. v. Phoenix Resins, Inc.,* 2000 Mich. App. LEXIS 2697 at *2 (Mich. App. 2000). Beside these two factors, the most important consideration appears to be the nature of the business performed by the successor corporation--that is, whether its "main corporate purpose was to conduct the same business" as its predecessor. *Pearce,* 217 N.W. at 762; *see also Shue v. Voeks, Inc.,* 511 N.W.2d at 702; *Ferguson*, 2008 Mich. App. LEXIS 274 at *2. Several other factors also bear upon "mere continuation" analysis: the new corporation's retention of the old corporation's officers and employees, see *Shue & Voeks, Inc.,* 511 N.W.2d at 702; *Ferguson*, 2008 Mich. App. LEXIS 274 at *5; the new corporation's occupancy of the old corporation's place of business; see *Gougeon Bros.,* 2000 Mich. App. LEXIS 2697 at *2; and the new corporation's selective repayment of the old corporation's debts, see ibid.

*Stramaglia,* 377 Fed. Appx. at 475-76.

23

Here, there has been a transfer of substantially all assets. Corizon's clients have been informed that, "YesCare acquired all the active business of Corizon." (Ex. 28). The same individuals served as officers and directors of all of the involved entities throughout the transaction. (Ex. 8, Ex. 9, Ex. 10, Ex. 15, Ex. 35). Because the asset transfer was effectuated by a novel and largely-untested corporate restructuring maneuver designed to shed liabilities outside of bankruptcy, such that any arms-length purchaser would be assuming an extreme risk of having its title to the assets invalidated if it acquired them shortly thereafter, there must be commonality of ownership between YesCare and Old Corizon. In any case, "Michigan case law does not require a 100% identity in ownership in order to meet the common ownership requirement." *Wells v. THB Am., LLC (In re Clements Mfg. Liquidation Co., LLC)*, 521 B.R. 231, 257 n.53 (Bankr. E.D. Mich. 2014).

All other factors that Michigan courts consider also weigh in favor of imposing successor liability. Top management is the same. The main corporate purpose is to conduct the same business as the predecessor. The places of business are the same, all the employees are the same, and the clients are the same. "An additional relevant factor is 'whether the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.'" *Ryan Racing, LLC v. Gentilozzi*, 231 F.Supp. 3d. 269, 283 (quoting *Foster*, 460 Mich. at 703

24

(1999)). Yescare clearly holds itself out in the marketplace as the continuation of Corizon. (Ex. 36, Ex. 33). YesCare brazenly touts "Over 40 years" of experience in the correctional healthcare field, (Ex. 37, pg. 5), even though Yescare Corp. has only existed since January of 2022. YesCare's website even features a "YesCare Testimonial" from its Wyoming Department of Corrections client, where the name of the company the client is praising has been changed from, "Corizon," to "YesCare." (*Compare* Ex. 37, pg. 5; Ex. 38).

YesCare is nothing but Corizon with new branding and a questionable legal argument that it is not responsible for the liabilities it incurred before May of 2022. Imposition of successor liability in this case is wholly consistent with the underlying rationale for the doctrine. *See Turner*, 397 Mich. 406, 415 (1976) ("going concerns, should not be permitted to discharge their liabilities to injured persons simply by shuffling paper and manipulating corporate entities"); *Pearce v. Schneider*, 242 Mich. 28, 31 (1928) ("[t]he courts will not tolerate any species of transaction where the stockholders in the debtor corporation are permitted . . . to retain for themselves an interest in the corporate assets until the debts of the corporation shall have been paid.")

>*/s/ Ian T. Cross*
>Ian T. Cross (P83367)
>Attorney for Plaintiff

25