## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KOCHISE JACKSON,

      *Plaintiff,*

                             CASE NO. 2:19-cv-13382

*v.*

                             DISTRICT JUDGE GERSHWIN A. DRAIN

CORIZON HEALTH INC., and
KEITH PAPENDICK,             MAGISTRATE JUDGE PATRICIA T.
                             MORRIS

      *Defendants.*

_____/

## ORDER ON PLAINTIFF'S MOTION FOR SUBSTITUTION
## (ECF No. 77)[1]

## I.    Introduction

After Kochise Jackson initiated this suit, Corizon Health split into two corporations. The first corporation, CHS TX, obtained all of Corizon's employees, facilities, equipment, secured creditors, and active contracts. The second corporation kept Corizon's name, but only inherited a limited supply of cash, access to a conditional funding agreement, and the rights to collect on Corizon's insurance policies—that, and liability for Corizon's pending, prisoner lawsuits. Currently,

---

[1] A motion for substitution is a nondispositive, pretrial matter which a magistrate judge may "hear and determine." *Boldrini v. Federal Nat. Mortg. Ass'n*, No. 3:19-CV-1576, 2019 WL 554645, at *1 n.1 (M.D. Pa. Oct. 24, 2019).

Corizon is listed as a defendant in this matter. At issue is whether the Court should substitute CHS TX (and its parent company) for Corizon.

## II.    Background

For years, Corizon Health provided healthcare services to prisons throughout the country. (*See* ECF No. 77-4, PageID.3129). In recent years, however, business has begun to dwindle, and by 2022, Corizon lost statewide contracts in Michigan, Kansas, Missouri, Tennessee, and Idaho. (ECF No. 77, PageID.3009; ECF No. 77-5, PageID.3133). Consequently, Corizon served only fifty-two prisons by May 2022—a sharp decline from the 149 prisons it served in 2019. (ECF No. 77-5, PageID.3133).

Despite this plunge in revenue, Corizon continued to accrue considerable liabilities. Indeed, Corizon remained potentially liable for numerous prisoner tort actions, including actions that originated in prisons where Corizon no longer had active contracts. (*See* ECF No. 77-6, PageID.3135). By the end of 2021, Corizon became "insolvent" and "was headed towards bankruptcy." (ECF No. 83, PageID.3337).

Rather than declare bankruptcy, Corizon restructured its organization through a Texas "divisional merger." While a merger in most states refers to a combination of two or more business organizations, Texas defines mergers to include statutory divisions of a single corporation. Tex. Bus. Orgs. Code § 1.002(55)(A) (2015); *see*

2

*also In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335, at *27 & n.215 (W.D.N.C. Aug. 23, 2021).  Thus, a Texas Corporation can undergo a corporate-mitosis where it splits into multiple successor corporations and apportion its assets and liabilities among its successors as it sees fit.  Tex. Bus. Orgs. Code §§ 10.001(a), 10.003.  After the split, a creditor can generally only recover from the entity assigned its debt.  *Id.* § 10.008(a)(3)–(4).

Corizon took the first step towards its divisional merger in April 2022 when it converted to a Texas Corporation.  (ECF No. 83-2, PageID.3386).  Days later, three of its sister companies merged into Corizon Health, with Corizon Health remaining as the surviving corporation.  (ECF No. 83-1, PageID.3370–71).  Corizon Health then underwent a divisional merger which it survived while creating a new corporation, CHS TX, Incorporated.  (ECF No. 83-4, PageID.3408–09).

The divisional merger allocated the bulk of Corizon's assets to CHS TX.  Specifically, CHS TX inherited all of Corizon's employees, all of Corizon's active contracts, and nearly all of Corizon's cash, equipment, real estate, and other assets.  (*Id.* at PageID.3417–28).  Both pre-division Corizon and CHS TX were owned by the same, sole-shareholder, and CHS TX also inherited Corizon's CEO and Chair, Sara Tirschwell.  (*Compare id.* at PageID.3410, *with* ECF No 83-1, PageID.3371, *and* ECF No. 83-2, PageID.3391).

3

Corizon retained all of its expired contracts and their corresponding liabilities. Corizon also held onto one million dollars in cash, the right to collect on its insurance policies, and the right to collect up to four million dollars under a "funding agreement" with an affiliate of Corizon Health, provided that Corizon met "certain conditions." (ECF No. 83-4, PageID.3429–30). All other assets and liabilities passed to CHS TX. (*Id.* at PageID.3417–18).

After the divisional merger, YesCare, Inc., a corporation owned by CHS TX's CEO, acquired CHS TX, and CHS TX began informally doing business under its parent company's name. (ECF No. 83, PageID.3343; ECF No. 83-7; *see, e.g.*, ECF No. 77-27 (explaining that CHS TX does business under the name "YesCare")). Corizon later changed its name to Tehum Care Services, Incorporated. (ECF No. 83-4, PageID.3587).

Kochise Jackson filed this civil rights action against Corizon almost two years before the divisional merger. (ECF No. 1). And after learning of the divisional merger, Jackson moved this Court to substitute YesCare and CHS TX for Corizon (now Tehum) as the real parties in interest. (ECF No. 77). YesCare and CHS TX filed a response brief, contesting Jackson's motion, and Corizon filed its own brief in which it adopted YesCare and CHS TX's arguments by reference. (ECF Nos. 82, 83).

4

### III.    Standard of Review

Federal Rule of Civil procedure 25(c) governs motions for substitution where a party has transferred its interest in an ongoing action.  The moving party carries the burden of proof on a Rule 25 motion.  *See* Fed. R. Civ. P. 25(c); *Kowalski v. Integral Seafood LLC*, Nos. 05-00679, 06-00182, 2007 WL 1376378, at *5 (D. Haw. May 4, 2007).

Rule 25(c) itself does not require courts to conduct a hearing, and while due process may sometimes require "notice and an opportunity to be heard" before a party is deprived of a property interest, a court may decide a Rule 25(c) motion without a hearing if it determines that there is no genuine dispute of material fact. *Luxliner P.L. Export, Co. v. RGI/Luxliner, Inc.*, 13 F.3d 69, 72–73 (3d Cir. 1993); *Webster v. Yelverton Farms, Ltd.*, No. 5.-09-CV-331-FL, 2011 WL 13128121, at *2 (E.D.N.C. Apr. 13, 2011).[2]  In other words, there is no need to conduct a hearing if doing so would not help the court resolve any "material issues in dispute." *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 359 (7th Cir. 2014); *see also Elam*

---

[2] In most cases which have held that courts must conduct a hearing to resolve genuine dispute of material fact on a Rule 25(c) motion, the court had already entered judgment against the original defendant before the plaintiff moved for substitution under Rule 25(c).  *E.g.*, *Luxliner*, 13 F.3d at 72–73; *Software Freedom Conservancy, Inc. v. Best Buy Co., Inc.*, No. 09 Civ. 10155(SAS), 2010 WL 4860780, at *1 (S.D.N.Y. Nov. 29, 2010).  So granting the Rule 25(c) motion would undoubtedly deprive the transferee of a property interest without notice or a hearing.  However, it is less clear whether due process requires a hearing under the circumstances here, where the case has yet to proceed to trial, but the parties have completed discovery.  At any rate, for the reasons explained below, there are no genuine disputes of material fact for the Court to resolve.

& *Miller, P.S.C. v. Nat. City Bank of Ky.*, No. 04-239-JBC, 2007 WL 9751965, at \*1–2 (E.D. Ky. Fed. 2, 2007).

As in a motion for summary judgment, to determine whether there is a genuine dispute of material fact, the court must view all facts and inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted).

In response, the non-moving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010).

## IV. Discussion

When a party's interest in an ongoing lawsuit has been transferred to another individual or organization, courts may either substitute the transferee for the original party or join the transferee to the action alongside the original party.  Fed. R. Civ. P. 25(c).  Courts frequently utilize this rule to determine whether a corporate party has transferred its interest when it merges or dissolves during ongoing litigation.[3]  7C Wright & Miller, *supra*, § 1958 (first citing *Arnold Graphics Industries, Inc., v. Indep. Agent Ctr., Inc.*, 775 F.2d 38, 39–40 (2d Cir. 1985), and then citing *Devilliers v. Atlas Corp.*, 360 F.2d 292, 297 (10th Cir. 1966)); *see, e.g.*, *Sullivan*, 739 F.3d at 358–60; *Froning's, Inc. v. Johnston Feed Serv., Inc.*, 568 F.2d 108, 110 (8th Cir. 1978).

The parties dispute whether Corizon transferred its interest in this matter to YesCare or CHS TX.  But before reaching this issue, the court must resolve a threshold, choice of law question to determine whether Michigan, Texas, or federal law governs.[4]

---

[3] Thus, Jackson need not file a new action or supplement his pleadings to add CHS TX or YesCare to this action.  (*Contra* ECF No. 83, PageID.3358–61).

[4] YesCare, CHS TX, and Tehum argue that the Court lacks personal jurisdiction over CHS TX and YesCare.  But because personal jurisdiction is imputed to successor entities, their argument rests on the premise that neither YesCare nor CHS TX are transferees of Tehum's interest in this matter. 7C Wright & Miller, *supra*, § 1958; *see, e.g.*, *Perception, Inc. v. Silicon Video, Inc.*, 423 F. Supp. 2d 722, 725–28 (E.D. Mich. 2006).  Accordingly, the Court need not address their personal jurisdiction argument because it rises and falls with the Rule 25(c) issue.

### 1.    Choice of Law

Because Rule 25(c) "is merely a procedural device," it does not define what constitutes a "transfer of interest" between corporations. *Simplifi Health Benefit Mgmt., LLC v. Cayman Islands Nat Ins. Co.*, No. 2:13-cv-714, 2015 WL 5251234, at *3 (S.D. Ohio Sept. 9, 2015) (internal quotation marks omitted) (quoting *Roxane Labs., Inc. v. Abbott Labs.*, No. 2:12-CV-312, 2012 WL 5511138, at *2 (S.D. Ohio Nov. 14, 2012)). Instead, the Rule leaves this task to the courts. *Id.*; *see also* 6 Moore's Federal Practice § 25.31 (Matthew Bender 3d ed. 2022).   The Rule's unwillingness to define a "transfer of interest," however, presents a dilemma for federal courts.  On the one hand, federal courts generally are not in the business of manufacturing law—we are to interpret laws, not create them. *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77, 95 (1981).  Yet on the other hand, Rule 25 authorizes courts to add or substitute a party where there has been a transfer of interest, and to do so, the court must apply some sort of standard to delineate between what does, and what does not, constitute a transfer of interest.

In situations like this, a federal court's first recourse is to look to state law. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991).  But federal courts need only borrow state law if the application of state law would be consistent with federal interests.  *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 87–88 (1994).  Where the

application of state law would conflict with a "federal policy or interest," federal courts should apply (and if necessary, create) federal common law to avoid this conflict. *Id.* There are "few" cases where the application of federal common law would be appropriate. *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963).

With those general principles in mind, most courts have recognized that state law typically governs under Rule 25(c). Moore's Federal Practice, *supra*, § 25.31. That is unless, of course, the application of state law will frustrate some federal policy. *O'Melveny*, 512 U.S. at 87–88. And these principles not only guide courts in determining the applicable rules to determine whether a transfer of interest has occurred, but they also guide courts in determining the applicable choice of law rules. *See* Recent Case, *Federal Civil Procedure—Choice of Law—D.C. Circuit Applies Forum Choice-of-Law Rules in Edge Act Suit*—A.I. Trade Finance, Inc. v. Petra International Banking Corp., 62 F.3d 1454 (D.C. Cir. 1995), 109 Harv. L. Rev. 1156, 1160–61 (1996) [hereinafter *Edge Act Suit*].

Accordingly here, for the Court to determine whether Corizon transferred its interest in this matter to either YesCare or CHS TX, it must first resolve two threshold questions. First, do Michigan, Texas, or federal choice of law rules govern? And second, under the applicable choice of law rules, should the Court apply Michigan, Texas, or federal common law to determine whether Corizon transferred its interest in this lawsuit to CHS TX and Yescare?

9

### a.   Applicable Choice of Law Rules

In diversity cases, federal courts borrow the choice of law rules of the forum state. *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998). This bright line rule leaves little room for ambiguity. However, the rule is less clear in the handful of circumstances where federal courts must apply state law in federal question cases. *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996); *Edge Act Suit*, *supra*, at 1156–57. In these circumstances, courts have split into two opposing views. *Pescatore*, 97 F.3d at 12. In the first camp are courts who hold that, like in diversity cases, federal courts deciding state law issues in other circumstances should also apply the forum state's choice of law rules. *Id.* On the other side of the dispute, several courts have held that "[w]hen jurisdiction is not based on diversity of citizenship, choice of law questions are appropriately resolved as matters of federal common law." *Id.*; *e.g.*, *Edelmann v. Chase Manhattan Bank, N.A.*, 861 F.2d 1291, 1294 n.14 (1st Cir. 1988).

Of these two approaches, only the former is consistent with Supreme Court precedent. As explained above, federal courts should be reluctant to apply federal common law. *See O'Melveny*, 512 U.S. at 87–88. Cases warranting the application of federal common law are "few and restricted"—reserved for only those rare instances where the adoption of state law would "conflict" with some federal interest. *Wheeldin*, 373 U.S. at 651. Thus, courts who apply "a blanket rule in favor

10

of federal common law" ignore decades of "Supreme Court guidance." *Edge Act Suit*, *supra*, at 1160. The correct approach, then, is to adopt state choice of law rules unless those rules conflict with a federal interest. *See A.I. Trade Fin., Inc. v. Petra Intern. Banking Corp.*, 62 F.3d 1454, 1461 (D.C. Cir. 1995).

And not only should federal courts apply state conflict of law rules, but they should specifically apply the rules belonging to the forum state. In *Klaxon Co. v. Stentor Electric Mfg. Co.*, the Supreme Court held that federal courts sitting in diversity jurisdiction must adopt the choice of law rules of the forum state. 313 U.S. 487, 496–97 (1941). The Court reasoned that such a rule was necessary to prevent forum shopping between federal and state courts sitting in the same state. *Id.* *See generally Tafflin v. Levitt*, 493 U.S. 455, 458–59 (1990) ([S]tate courts have inherent authority . . . to adjudicate claims arising under the laws of the United States."). Although the Court recognized that forum shopping between states was an unavoidable byproduct of the country's federalist system, it reasoned that federal courts should nonetheless strive to avoid "disturb[ing] [the] equal administration of justice in . . . state and federal courts sitting side by side." *Klaxon*, 313 U.S. at 496–97 (citing *Erie Railroad v. Tompkins*, 304 U.S. 64, 74–77 (1938)). Thus, the Court concluded that federal courts were not to "enforce[e] an independent 'general law' of conflict" rules. *Id.*

11

True enough, *Klaxon* only addressed this issue in the context of diversity cases, but its concern with promoting uniformity between federal and state courts "sitting side by side" is no less important in federal question cases—at least where issues of state law are concerned. *See id.* There is no reason why *Klaxon* should not extend to the few federal question cases where federal courts must apply state law. Accordingly, the Court must apply Michigan's choice of law rules unless they conflict with a federal policy—which they do not. If anything, the application of Michigan's conflict rules promotes federal interests by encouraging "uniformity" between federal and state courts. *See O'Melveny*, 512 U.S. at 88.

### b.    Choice of Law Analysis

The next task for the Court is to determine whether Michigan's choice of law rules compel the Court to apply Michigan or Texas law to determine whether Corizon transferred its interest in the matter to CHS TX or YesCare. When analyzing corporate law issues, nearly every state bifurcates its choice of law inquiry into two categories. *See* Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law*, 95 Harv. L. Rev. 853, 862–63 (1982) [hereinafter *Piercing*]. The first category—a rigid, hardline rule referred to as the "internal affairs doctrine"—concerns the relationship between the corporation and its shareholders, directors, and officers. *Id.*; *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983). This covers issues

12

such as shareholder "voting rights" and payments of "dividends."  *See National-Standard Co. v. Dept. of Treasury*, 384 Mich. 184, 191 (1970).  Without exception, these matters are determined by the law of the state of incorporation.  *See Stewart v. Geostar Corp.*, 617 F. Supp. 2d, 532, 537–38 (E.D. Mich. 2007).  The second category, however, concerns matters involving the corporation and external parties. *Container Life Cycle Mgmt, LLC v. Safety Mgmt, Servs. Co.*, No. 6:20-CV-06001, at *4 (W.D. Ark. June 1, 2020).  And in these cases, courts employ more flexible, interest-balancing tests to determine which state's law should apply.  *Id.*; *see also Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997) ("[I]n matters external to the corporation, more general choice of law rules apply.").

Although Michigan's conflict rules in this area are murky, Michigan courts appear to follow the internal affairs doctrine.  Indeed, two early Michigan cases explicitly recognize that Michigan Courts should apply the law of the state of incorporation when a corporation's internal affairs are at issue, and a recent opinion from the Michigan Court of Appeals confirmed that Michigan still recognizes this doctrine.  *Benton Harbor Fed. Of Women's Clubs v. Nelson*, 301 Mich 465, 474 (1942); *Orr v. Lacey*, 1846 WL 2867 (2 Doug.) at *5 (Mich. 1846); *Daystar Seller Fin., LLC, v. Hundley*, 326 Mich. App. 31, 35–38 (2018).

According to the Michigan Supreme Court, an "internal affair" is an act, performed on behalf of the corporation, which "affects the complainant solely in his

capacity as a member of the corporation." *Wojtczak v. American United Life Ins. Co.*, 293 Mich. 449, 453–54 (1940) (internal quotation marks omitted); *see Daystar*, 326 Mich. App. at 35 (explaining that while *Wojtczak* held that Michigan courts have discretion to decline jurisdiction over the internal affairs of foreign corporations, the internal affairs doctrine described in *Wojtczak* is also a choice of law principle). But Jackson, of course, is not a member of the corporation, and the theories he relies on to show a transfer of interest concern CHS TX and YesCare's liability for actions which affected an external party. Because his successor liability and alter ego theories concern CHS TX and YesCare's liability to a third party—instead of their shareholders, directors, or officials—this Court is not required by the internal affairs doctrine to apply Texas substantive law. *Piercing*, *supra*, at 862–63 (citing *Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 465 (1981)); *see Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 99 (2004).

Because the internal affairs doctrine does not apply, the Court must look instead to "broader" choice of law principles. *Chrysler*, 972 F. Supp. at 1102, 1104. The only snag is that outside of the internal affairs doctrine, Michigan courts have not addressed the choice of law rules applicable to corporate law issues. And to make matters more complicated, courts have not reached a clear consensus as to whether issues involving successorship liability and veil-piercing should be treated as corporate, contract, or tort issues—a distinction which matters because Michigan,

like other states, applies different choice of law rules depending on the area of law at issue. *See Lopez v. Delta Int'l Machinery Corp.*, No. CIV 15-0193, 2017 WL 3142028, at *33 (D.N.M. July 24, 2017).

The Court's task, then, is to predict how a Michigan court would decide this issue. *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007); *see also Container Life Cycle Mgmt.*, 2020 WL 2843224, at *3. And to do so, the Court may look to the Second Restatement to help fill the gaps in Michigan's jurisprudence. *Cf. Chrysler*, 972 F. Supp. at 1102.

According to the Restatement, the applicable choice of law rules depend on whether the act at issue is one that can be performed by both corporations and individuals. Restatement (Second) of Conflict of Laws §§ 301–02 (Am. Law Inst. 1971). If both corporations and individuals can perform the act, then the issue is analyzed under either tort or contract choice of law rules. *Id.* § 301. But if the act at issue is unique to corporations, then it is treated as a corporate law issue, and the choice of law rules for corporate law disputes apply. *Id.* § 302(1). And to be clear, the relevant "act," is not the underlying claim, but the "transaction giving rise to potential successor liability . . . ." *Lopez*, 2017 WL 3142028, at *33 (quoting *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1174 (C.D. Cal. 2011)); *see also Maine State Retirement Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302, 2011 WL 1765509, at *3–4 (C.D. Cal. Apr. 20, 2011).

15

So here, the Court must ask whether Jackson's corporate veil, alter ego, and successorship theories concern conduct that can be performed by both private individuals and corporations—not whether Jackson's § 1983 claims concern conduct that can be performed by both private individuals and corporations. *See Lopez*, 2017 WL 3142028, at *33; *see also* Restatement (Second) of Conflict of Laws § 302 cmt. G, illus. 1–2.  And each of these theories is "peculiar" to corporations.  *Chrysler*, 972 F. Supp. at 1102.  Therefore, the Court must treat these issues as sounding in corporate law for purposes of its choice of law analysis.

When addressing issues which are unique to corporations, courts should apply the law of the state with "the most significant relationship to the occurrence and the parties . . . ."  Restatement (Second) of Conflict of Laws § 302(1).  Six factors are relevant to this inquiry:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* §§ 6(2), 306.  Applying these factors, courts almost always find that the state of incorporation should govern corporate law disputes.  *See, e.g.*, *Bouchillon v. Deutz-Fahr*, 268 F. Supp. 3d 890, 905 (N.D. Miss. 2017); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991).  Thus, because

16

of both "the force of precedent" and the "application" of these factors, the restatement advises courts to apply the law of the state of incorporation "except in the extremely rare situation where a contrary result is required by the overriding interest of another state in having its rule applied." Restatement (Second) of Conflict of Laws § 302 cmt. g. To determine whether another state has such an "overriding interest," courts should consider: (1) the "corporation's relationship to [its] state of incorporation," (2) the "corporation's relationship to the state whose local law is sought to be applied," and (3) "whether the act" can "practicably be governed by the local law of more than one state." *Id.* Yet even where a foreign state's interests outweigh those of the state of incorporation, many courts hesitate to apply the foreign state's rules. *Id.*

There is little doubt that a Michigan court would fall in line with the growing consensus that the law of the state of incorporation presumptively governs corporate law issues. Indeed, Michigan courts already do just that when addressing the internal affairs of a foreign corporation. *See Daystar*, 326 Mich. App. 31, 35–38. However, this appears to be one of the "rare situation[s]" where a Michigan court might depart from the presumption in favor of applying the law of the state of incorporation. Restatement (Second) of Conflict of Laws § 302 cmt. g.

As an initial matter, the Restatement's assertion that courts "almost invariably" apply the law of the state of incorporation "to determine matters that are

peculiar to corporations" appears to be exaggerated. *Id.* Section 302 of the Restatement does not differentiate between "internal" and "external" affairs as distinct classifications, subject to different choice of law rules. *Id.* § 302 cmt. e, g. Instead, it conceptualizes both kinds of issues under the six-factor test described above, but it recognizes that when internal affairs are at issue, courts categorically find that the applicable factors weigh in favor of applying the law of the state of incorporation. *Id.* So, when the Restatement mentions that courts "almost invariably" apply the law of the state of incorporation, it is including cases which fall under the internal affairs doctrine. *Id.* § 302 cmt. g. Indeed, the Restatement acknowledges that the rare instances where courts have been willing to apply the law "of some other state," are those which (1) concern external affairs and (2) involve a foreign state with "important policy" interests at stake. *Id.*; *see also id.* § 302 cmt. e ("[C]ertain issues which are peculiar to corporations or to other organizations do not affect matters of organic structure or internal administration and need not, as a practical matter, be governed by a single law.").

Even so, YesCare and CHS TX correctly point out that many courts apply the law of the state of incorporation even to matters concerning external affairs, and even where a state other than the state of incorporation has important policy interests at stake. *See, e.g.*, *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132–33 (2d Cir. 1993); *Leitner v. Sadhana Temple of N.Y., Inc.*, No. CV 13-07902, 2014 WL

12588643, at *16 (C.D. Cal. Oct. 17, 2014). These courts reason that applying the laws of the state of incorporation "advance[s] the principles of certainty, predictability, and uniformity of result." *Bouchillion*, 268 F. Supp .3d at 905. This approach, they argue, is "vastly preferable to" determining successor liability based on "whichever state an injury happened to occur" in. *Id.* And many of these courts appear to follow this approach as though it were an inflexible rule, with little to no consideration of the interests of other states. *See, e.g.*, *Kalb*, 8 F.3d at 132–33.

But such a rigid method is at odds with the typical approach to choice of law inquiries. *Cf. Liberty Mut. Fire Ins. Co. v. Holka*, 984 F. Supp. 2d 688, 694 (E.D. Mich. 2013); *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 471 (1997). Although predictability of result, and Texas's interests in enforcing its own corporate laws, are relevant and important considerations, they are not dispositive. *See* Restatement (Second) of Conflict of Laws § 6(2), 302. Like all other choice of law inquiries, the court's inquiry is a flexible one, accounting for several different factors. Predictability and Texas's interests are just two of many relevant considerations, and their mere presence, standing alone, does not compel the Court to apply Texas law. *Id.* Though some cases suggest otherwise, the Court cannot end its inquiry after finding that applying Texas law would promote predictability and uniformity of result.

And that is particularly true here because the importance of both uniformity and Texas's interests are at a minimum under these facts. As to Texas's interest in enforcing its own laws, the Restatement instructs that "when the corporation has little or no contact with [a] state other than the fact that it was incorporated there . . . some other state will almost surely have a greater interest than the state of incorporation in the determination of the particular issue." *Id.* § 302 cmt. g. That is precisely the situation here. All parties agree that CHS TX and YesCare have virtually no connection to Texas other than their incorporation. (*See* ECF No. 77, PageID.3024; ECF No. 83, PageID.3347). Indeed, Corizon, Tehum, and CHS TX all held their principal place of business in Tennessee. (ECF No. 77-8, PageID.3173; ECF No. 73-10, PageID.3181; ECF No. 83-4, PageID.3556–57).[5] Corizon did not conduct any business in Texas when it began the merger, and following the merger, neither Tehum, CHS TX, nor YesCare conduct any business in Texas. (*See* ECF No. 83-4, PageID.3417–22, 3429–30).

Likewise, predictability is not as important of a factor as Yescare and CHS TX would make it out to be. In other choice of law contexts, Michigan has shown

---

[5] Jackson also provides some evidence that YesCare holds its principal place of business in Tennessee by supplying two financing documents, filed separately against YesCare and CHS TX, in which a creditor lists YesCare's principal place of business as Tennessee. (ECF Nos. 77-18, 77-19; *see also* ECF No. 77, PageID.3024). In response, YesCare concedes that its principal place of business in in Tennessee, not Texas (ECF No. 83, PageID.3347)—although the exhibit YesCare attaches in support of this concession does not mention YesCare's principal place of business. (ECF No. 83-7).

that it is willing to look past predictability in the interest of justice.  In tort cases, for instance, Michigan has abandoned the doctrine of "lex loci delicti," under which it invariably applied the law of the state where the tortious conduct occurred. *Sutherland*, 454 Mich. at 278–84.  Though this doctrine simplified choice of law questions, it could also be "harsh" and lead to "unjust results," and for those reasons, Michigan rejected this rigid approach to resolving conflicts in tort law.  *Id.* at 278–79.

It seems unlikely that Michigan courts would be more receptive to a rigid, predictability-focused approach in the corporate law context.   True, such an approach makes sense in matters concerning internal affairs, because these issues "can only be governed by the local law of a single state."  Restatement (Second) of Conflict of Laws § 302 cmt. g.  But the theories at issue here—successorship liability and piercing of the corporate veil—do not involve internal matters.  In fact, these are equitable remedies, intended to empower courts to "disregard traditional corporate law principles" when necessary to "provide a source of recovery for injured plaintiffs."  *Craig*, 471 Mich. at 99; *see also ITT Corp. v. Borgwarner Inc.*, No. 1:05-CV-674, 2009 WL 2242904, at *5 (W.D. Mich. July 22, 2009) ("Courts in this circuit have generally applied the law of the forum state in their veil-piercing analysis."); *Piercing*, *supra*, at 862–63.

21

Moreover, the very purpose of these doctrines—disregarding the corporate form to provide relief to outside parties—is also why the Court cannot disregard Michigan's interests in this matter, as YesCare and CHS TX insist the Court should. *See Lakeview Commons v. Empower Yourself*, 290 Mich. App. 503, 509–10 (2010) ("Traditionally, the 'basis for piercing the corporate veil has been to protect a corporation's creditors . . . .'"). While these equitable doctrines are unquestionably rooted in corporate law, their purpose is to permit injured tort and contract plaintiffs to circumvent the corporate from when that form has been abused. *See id.*; *see also Craig*, 471 Mich. at 99.

For that reason, "a state's interest in applying its law to citizens injured by foreign corporations [often] outweighs the interest of the incorporating state." *Chrysler*, 972 F. Supp. at 1104; *see also Korzetz v. Amsted Indus., Inc.*, 472 F. Supp. 136, 142 (E.D. Mich. 1979); *Lopata v. Bemis Co.*, 406 F. Supp. 521, 524 (E.D. Pa. 1975). Indeed, "a state in which a parent and its subsidiary do business must be able to regulate the extent to which one is liable for the wrongs of the other, particularly when those wrongs are committed within the state." *Chrysler*, 972 F. Supp. at 1104. And that is particularly true where, as here, the corporation commits a tort against a third-party plaintiff. *See Allstate*, F. Supp. 3d at 1174 n.11. Indeed, "when the plaintiff is a third party who had no business relationship with the defendant" the plaintiff's state "has a stronger interest in applying its law to disregard the corporate

22

form." *Id.*  Thus, Michigan has a heightened interest in applying its own laws to determine whether it should disregard the corporate form.

The bottom line is that because the equitable doctrines at issue are designed to provide remedies for torts, Michigan, as the Plaintiff's home state, has a relatively strong interest in applying its own law to determine whether the Court should disregard the corporate form.  By comparison, while applying Texas law might simplify the choice of law inquiry, Texas has a relatively weak interest in enforcing its successorship liability and alter ego doctrines under these circumstances.[6] Accordingly, the Court must look to Michigan law to determine whether Corizon transferred its interest in the matter to CHS TX and YesCare.[7]

## 2.    Transfer of Interest

Applying Michigan law, Jackson argues that Corizon (now Tehum) transferred its interest in this is matter to CHX TX and YesCare under two distinct theories.  First, he argues that both companies are successors to Corizon, carrying on essentially the same business.  And second, he argues that YesCare and CHS TX

---

[6] CHS TX and YesCare argue in the alternative that "following a statutory merger, courts look to the governing statute to determine which party bears post-merger liability."  (ECF No. 83, PageID.3350).  But neither case they cite directly supports this proposition, and neither case even addresses a conflict of law issue.  *See Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 347 (1993) (citing *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 417–18 (1976)); *Payne v. Sec. Sav. & Loan Ass'n, F.A.*, 924 F.2d 109, 111 (7th Cir. 1991).  At most, these authorities simply recognize that a state may create its own successorship liability rules by statute.  *See Welco*, 67 Ohio St. 3d at 347.

[7] Neither party argues that Michigan law conflicts with a federal policy such that the Court must fashion its own common law rules, and I agree that there is no conflict between Michigan law and federal policy.

are alter egos of pre-division Corizon, so the Court should disregard the corporate form and treat each corporation as the same entity.

### a.   Successorship Liability

Historically, mergers and acquisitions have come in three flavors.  David R. Langdon, *Ohio Upholds Traditional Exception to General Rule of Corporate Successor Nonliability*, 28 Akron L. Rev. 333, 334 & n.10 (1995); *see also* Christopher M. Turoski, Intellectual Property in Mergers & Acquisitions § 2:13 (2022).  First, is a true, statutory merger in which two or more companies combine their stock to form a single corporate entity by following procedures set forth in the state's business corporations act.  Turoski, *supra*, at § 2:16.  In Michigan, merging companies do not form an entirely new entity; one corporation is designated as the "surviving" corporation into which the other corporations merge.  Mich. Comp. L. §§ 450.1736(4), 450.2736a(1)(b)(i) (2015).  The second type of merger is an asset purchase.  Turoski, *supra*, at § 2:14.  This occurs where a corporation buys the assets of another company—their employees, contracts, equipment, and so forth—without buying equity in the purchased company.  *Id.*  The advantage of this type of merger is that it allows the purchasing corporation to cherry pick the assets and liabilities it acquires from the purchased company.  *See id.*  Following the asset purchase, the selling company lives on as a legal entity until it dissolves.  *See id.*  The third type of merger, an equity purchase, is not really a merger at all, but an acquisition of a

24

subsidiary.  Turoski, *supra*, at § 2:15.  In this situation, a purchasing company buys controlling shares in another corporation.  *Id.*  The selling company lives on as a distinct entity, although it is owned by a parent corporation.  *Id.*  And the parent corporation, like any other shareholder, does not acquire the subsidiary's liabilities unless a court is willing to pierce the corporate veil.  *Finley v. Union Joint Stock Land Bank of Detroit*, 281 Mich. 214, 218–19 (1937).

Michigan's law on successorship liability has evolved against the backdrop of these types of mergers.  So, under Michigan's "traditional rule," successorship liability depends largely on the type of merger at issue.  *Craig*, 471 Mich. at 96.  Specifically, "the successor corporation 'generally assumes all its predecessor's liabilities'" following a statutory "merger in which stock is exchanged as consideration . . . ."  *Id.* (quoting *Foster v. Cone–Blanchard Machine Co.*, 460 Mich. 696, 702 (1999)).  But if the "successor purchases assets" then the successor corporation will not assume any of the predecessor's liabilities unless one of five, narrow exceptions apply.  *Id.*

This approach proved adequate to resolve most successorship liability questions, but in the late twentieth century, Texas introduced an entirely new type of merger—the oxymoronically named "divisional merger."  Richard A. Booth, Financing the Corporation § 1:19 (2022).  Under the Texas Business Organizations Code, a single business organization may undergo a "merger" in which it divides

into two or more new entities. *Id.* The pre-division corporation may allocate its assets and liabilities freely among the new entities, and each new entity—at least as a matter of Texas law—is liable only for the liabilities assigned to it under the plan of merger. *Id.*

Whatever Texas may have to say about successorship liability following a divisional merger, Michigan has its own rules. The problem, however, is that the divisional merger does not fall squarely under the category of a "merger" or an "asset purchase." There was no "purchase" of one existing corporation by another, nor was there a "merger" where two or more business organizations combined into one. *See Craig*, 471 Mich. at 96.

For those reasons, analyzing divisional mergers under Michigan's framework for successorship liability is a difficult task, but not an impossible one. To start, although Texas defines mergers to include divisions, it does not appear that the division here was a "merger" that would automatically warrant successorship liability under Michigan's traditional rule. Tex. Bus. Org. Code § 1.002(55)(A). Unlike Texas, when Michigan uses the term "merger," it means a merger. *See* Mich. Comp. L. §§ 450.1736(4), 450.2736a(1)(b)(i). Because two or more organizations did not combine their equity into a single corporation, the first prong of the traditional rule does not apply. *See Craig*, 471 Mich. at 96.

A divisional merger might possibly be conceptualized as an asset purchase. Like an asset purchase, the division was little more than a transfer of assets between corporations.   (*See* ECF No. 83-4, PageID.3408–16).   The only real difference between the division and an asset purchase is that under the division, the transfer, the dissolution of the "selling" corporation, and the formation of the "purchasing" corporations all occurred simultaneously.   (*Id.*)   True, an asset purchase generally involves two distinct parties who provide consideration, but consideration is not a defining characteristic of an asset purchase.   *See Craig*, 471 Mich. at 96–97 (recognizing that an asset purchase can occur without consideration).

In any event, whether the Court conceptualizes the divisional merger as an asset purchase or some distinct, restructuring process that is neither an asset purchase nor a true statutory merger, there is one well established doctrine in Michigan law that controls in either situation.   That is the mere continuation doctrine. [8]   Under the mere continuation doctrine, a successor corporation will be treated as the same entity as a past corporation if the successor corporation is nothing more than "a reincarnation of the old" corporation.   *Pearce v. Schneider*, 242 Mich. 28, 31 (1928); *see also Stramaglia v. United States*, 377 F. App'x 472, 475–76 (6th Cir. 2010).

---

[8] Not to be confused with the continuity of enterprise doctrine, which is a distinct concept only applicable in products liability actions.   *Retail Works Funding LLC v. Tubby's Sub Shops Inc.*, No. 332453, 2017 WL 3798500, at *5–6 (Mich. Ct. App. Aug. 31, 2017).

Without taking a firm stance, CHS TX and YesCare speculate that the mere continuation rule might only apply to asset purchases. (ECF No. 83, PageID.3365 n.47). I disagree. Although it is true that this doctrine is often discussed in the context of asset purchases, where it comprises one of the five exceptions to the general rule of nonliability, it is an independent rule which applies to all successor corporations, not just those who purchase another corporation.

Consider, for instance, an early case applying the mere continuation rule. In *Pearce v. Schneider*, the three shareholders of the Albion Coal Company (a Michigan corporation) formed a new corporation called People's Coal Company. 242 Mich. at 29. Under People's articles of incorporation, its purpose was to "take over the assets of the Albion Coal Company" and carry on the Albion Coal Company's business of "mining and selling coal." *Id.* And in practice, that is precisely what the People's Coal Company did. *Id.* at 29–30. After forming the new corporation, the three shareholders of the People's Coal Company sold stock to the Albion Coal Company in exchange for all of its assets, and once it obtained Albion's assets, it carried on the same business the same three shareholders had conducted under the Albion Coal Company. *Id.*

The Michigan Supreme Court held that the although the People's Coal Company had conducted an asset purchase, it was still obligated to pay the creditors of the Albion Coal Company. *Id.* at 31. The Court reasoned that People's and

Albion were effectively the same company: they had the same three shareholders, the same assets, and conducted the same business. *Id.* Recognizing that when a corporation dissolves, it must first pay off its shareholders before retaining assets for themselves, the Court held that the shareholders could not circumvent this obligation by selling their own assets to themselves so that they could conduct the same business under a new corporate identity. *Id.*

Thus, what the court's analysis turned on was not the existence of an asset purchase, but the fact that the shareholders continued to conduct the same business, attempting to evade liability through a mere technicality. *See id.* Because People's and Albion were essentially the same entity, the shareholders could not evade their general duty to pay their creditors before dissolution of their corporate identity. *Id.* The fact that this transfer occurred through an asset purchase did not influence the Court's holding. *Cf. Shue & Voeks, Inc v. Amenity Design & Mfg, Inc.*, 203 Mich. App. 124, 128 (1993). So when Michigan courts now describe the mere continuation doctrine as an exception to the general rule of nonliability for asset purchases, this is nothing more than a natural consequence of the reality that, until the recent invention of divisional mergers, a mere continuation could only arise after an asset purchase.

Accordingly, the mere continuation doctrine remains applicable even if there was no "asset purchase" in this case. Under the mere continuation rule, courts

engage in a "multi-factor analysis," looking to the "totality of the circumstances," to determine whether one corporation is a mere reincarnation of another. *Stramaglia*, 377 F. App'x at 475–76. Relevant factors include (1) the degree of common ownership, (2) the amount and nature of any transferred assets, (3) the "new corporation's retention of the old corporation's officers and employees, and (4) whether the "main corporate business was to conduct the same business." *Id.*

In a nonbinding case, the Sixth Circuit has stated that the first two of these factors are "required," but that is not an accurate description of Michigan's law. *Id.* According to the Sixth Circuit, a plaintiff cannot demonstrate a mere continuation unless the old corporation transferred "substantially all" of its assets to the new corporation and the two corporations had completely "common ownership." *Id.* In support of that proposition, the Sixth Circuit cited *Pearce*; *Shue*; *Gougen Bros v. Phoenix Resins, Inc.*, No. 211738, 2000 WL 33534582, at *2 (Mich. Ct. App. Feb. 8, 2000); and *Ferguson v. Glaze*, No. 268586, 2008 WL 314544, at *5 (Mich. Ct. App. Feb. 5, 2008). *Id.* But in not one of these cases did a Michigan appellate court reverse a lower court's finding that a new corporation was a mere continuation solely on the grounds that one of these two "required" elements had been satisfied. Take *Shue*, for example. There, the Michigan Court of Appeals reversed a trial court's finding that a new corporation was a mere continuation of another corporation. *Shue*, 203 Mich. App. At 128. Although the *Shue* Court noted that there was "no continuity

30

of ownership," it also cited the fact that the new company retained just eight of the prior corporation's thirty employees, as well as the fact that the new corporation changed its business from "primarily manufacturing to primarily sales." *Id.* And, importantly, the Court placed no emphasis on any particular factor. *Id.*

So even if any of these cases made such a bold proposition, it would be nothing more than dicta. None of these courts directly confronted the issue of whether totally common ownership or a transfer of substantially all assets are required elements to establish mere continuation. *See, e.g.*, *id.* But more to the point, none of these cases even hint at the idea that totally common ownership or a transfer of "substantially all assets" are *always* required. *See, e.g.*, *id.*; *Gougen*, 2000 WL 33534582, at *2. Each case treats ownership and transfer of assets as nothing more than factors to be considered when assessing the totality of the circumstances. The ultimate test is whether the new corporation is a "reincarnation" of the old organization. *Pearce*, 242 Mich. at 31.

Considering the totality of the circumstances here, I find that CHS TX is a mere continuation of pre-division Corizon. Although YesCare later acquired CHS TX, under the divisional merger plan, both CHS and Corizon had the same sole shareholder: Valitas Intermediate Holdings. (ECF No. 83-4, PageID.3408–10). This is more than what is required to demonstrate common ownership under Michigan law. *In re Clements Mfg. Liquidation Co.*, LLC, 521 B.R. 231, 257 n.53

31

(E.D. Mich. Oct. 17, 2014). And although CHS TX did not acquire *all* of Corizon's assets, it did acquire Corizon's active contracts, all of their equipment, all of their employees, and Corizon's CEO and Chair. (ECF No 83-1, PageID.3371; ECF No. 83-2, PageID.3391; ECF No. 83-4, PageID.3410, 3417–30). In fact, only cash, a funding agreement, access to an insurance policy, and responsibility for expired contracts remained with Corizon following the divisional merger. (ECF No. 32-4, PageID.1533–34).

Evidently, CHS TX picked up right where Corizon left off. Indeed, CHS TX holds itself out to clients as Corizon's successor. *Ryan Racing LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 283 (W.D. Mich. 2017) ("An additional relevant factor is whether 'the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.'"). Informally doing business under its parent corporation's name, CHS TX has informed its clients that it has acquired "all the active business of Corizon." (ECF Nos. 77-16, 77-17, 77-28, 77-33, 77-36, 77-37, PageID.3279; *see also* ECF No. 77-27 (explaining that CHS TX does business under the name "YesCare")). Thus, CHS TX is a mere continuation of Corizon, conducting the same business.[9]

---

[9] Under the "de facto merger" and "continuity of the enterprise" doctrines, the predecessor corporation only imputes its liabilities to a successor corporation if it is legally or practically defunct. *Foster*, 460 Mich. at 705; *see Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, 315 Mich. App. 312 (2016). However, the mere continuation doctrine is a distinct concept, and Michigan courts have not extended the requirement that the original corporation be "defunct" to the mere continuation doctrine. *See Commonwealth Land Title Ins. Co.*, 315 Mich. App. at 315–

But although successorship liability attaches to CHS TX, it does not attach to YesCare.  Successorship liability does not apply to equity purchases.  *See Craig*, 471 Mich. at 96.  So if YesCare obtained Corizon's interest in this lawsuit, it could only have done so under an alter ego theory.

### b.    Alter Ego

In essence, Jackson argues that a Michigan Court "would likely pierce the corporate veil between [pre-division Corizon] and the successor entities that received its assets" because each entity is the alter ego of pre-division Corizon.  (ECF No. 77, PageID.3026).

That is not how the alter ego doctrine works. Alter ego liability is an equitable remedy that holds shareholders (both individuals and organizations) personally liable for acts of corporation.  *Green v. Ziegelman*, 310 Mich. App. 436, 450–51 (2015).  Although shareholders generally are not personally liable for corporate acts, courts may "pierce the corporate veil" to hold shareholders individually liable when

---

21.  And it seems unlikely that they would.  The de facto merger and continuity exceptions are designed to afford relief to plaintiffs who cannot recover against the original corporation, and they apply to situations where an asset purchase amounts to a merger.  *Foster*, 460 Mich. at 705; *Turner*, 397 Mich. at 420.  Thus, either doctrine can only apply where one company purchased assets with stock and the selling company dissolved soon after the sale.  *Foster*, 460 Mich. at 705.  On the other hand, the mere continuation doctrine simply asks whether a successor corporation is the reincarnation of its predecessor—and a successor corporation can be a continuation of its predecessor even if the predecessor corporation continues to exist with just enough assets to satisfy its liabilities.  *See Stramaglia*, 377 F. App'x at 475–76.  Indeed, cases which have endeavored to enumerate the factors and requirements of the mere continuation doctrine do not list the predecessor's capacity to satisfy judgments as a relevant consideration. *See, e.g.*, *id.*

they have abused the corporate form. *Id.* Specifically, Courts ask whether a shareholder used the corporation as a "mere instrumentality" to evade liability for some "fraud or wrong" against the plaintiff. *Id.* at 454.

So if the alter ego doctrine applies at all, it would only be relevant as to YesCare's relationship with CHS TX. Yet because of Jackson's Counsel's fundamental misunderstanding of alter ego liability, he neglects to discuss YesCare's relationship to CHS TX, providing no explanation of how CHS TX is a "mere instrumentality" of YesCare. (ECF No. 77, PageID.3025–27). Jackson's entire argument centers on the relationship between pre-division Corizon and its "successor entities" (a group which does not even include YesCare). (*Id.*) But as YesCare and CHS TX correctly state, "neither YesCare nor CHS TX is Corizon Health's parent or [subsidiary] so alter ego theory does not apply." (ECF No. 83, PageID.3361).

If there was any abuse of the CHS TX's corporate form by YesCare, it is not obvious from the record, and it is not the Court's responsibility to construct Jackson's arguments for him. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1989) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293 (1st Cir. 1995)); *see also Ricks v. Pauch*, No. 17-12784, 2020 WL 1640166, at *25 (E.D. Mich. Apr. 2, 2020). Accordingly, Jackson has waived his alter ego argument.

### 3.     Relief

That nearly resolves Jackson's motion, but there is one final wrinkle to iron out.  Although CHS TX is a mere continuation of Corizon, the divisional merger did not dissolve Corizon.  In fact, it provides that Corizon (now Tehum), "survive[d]" the merger and "continue[d] its existence as a Texas Corporation."  (ECF No. 83-4, PageID.3408).  As Tehum, YesCare, and CHS TX concede, the Corizon that entered this lawsuit is the same entity as the Corizon that came out of the divisional merger. (*See id.*)

Because Corizon survived the merger, the Corizon listed in the docket (now going by the name Tehum) is the same entity as the Corizon which Jackson originally brought this lawsuit against.  (ECF No. 83-4, PageID.3408).  In other words, Corizon transferred its interest to CHS TX, but it also retained its own interest in this lawsuit.  (*See id.*)  Yet while Rule 25 would allow the Court to join, rather than substitute, CHS TX, Jackson only asks the Court to substitute CHS TX for Corizon.  Fed. R. Civ. P. 25(c).

In my view, adding CHS TX as a codefendant, rather than substituting it for Tehum, is the proper route. Although it is true that a trial court can only act pursuant to Rule 25(c) on motion, authorities agree that trial courts have wide discretion in deciding how to properly dispose of a Rule 25(c) motion.  Wright & Miller, *supra*, § 1958 (explaining that faced with a Rule 25(c) motion, courts have discretion to

substitute the transferee or add the transferee as they "see[] fit"); Moore's Federal Practice, *supra*, § 25.34.[10]  And at any rate, Tehum, CHS TX, and YesCare all ask that Tehum remain as a defendant.  (ECF No. 83, PageID.3366).

## V. Conclusion

For these reasons, Plaintiff's motion to substitute (ECF No. 77) is **GRANTED IN PART**.  Specifically, Corizon Health Inc. (now named Tehum Care Services, Inc.) will remain as a defendant, CHS TX, Inc., will be added as a defendant pursuant to Rule 25(c), and YesCare Corporation will not be added to the action.

**IT IS SO ORDERED**.

Review of this order is governed by 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72, and E.D. Mich. LR 72.1(d).

Date:  November 1, 2022

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

---

[10] Thus, even if Corizon did not retain its own interest in this suit, the Court would still have discretion to retain Corizon as a defendant.  *See Melton v. Bank of Lexington*, No. 02-1152, 2008 U.S. Dist. LEXIS 26303 at *6–7 (W.D. Tenn. Mar. 28, 2008).