## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**KOHCHISE JACKSON**,
Plaintiff,

v.

**CORIZON HEALTH, Inc.,** et al,
Defendants.

Case No.: 2:19-cv-13382
Hon.: Gershwin A. Drain
Mag.: Patricia T. Morris

## PLAINTIFF'S RESPONSE TO CHS TX, INC.'S OBJECTIONS TO ORDER ON PLAINTIFF'S MOTION FOR SUBSTITUTION [ECF NO. 92]

i

# TABLE OF CONTENTS

| SECTION NO. | PAGE |
|---|---|

Table of Contents………..………………….………....………… ii.

Index of Exhibits ………....…………………………………… iii.

Statement of Questions Presented…………..……………………… iv.

Controlling or Most Appropriate Authorities…………..………… v.

## PLAINTIFF'S BRIEF IN RESPONSE

Preliminary Statement…..……………………………………….......   1

I) CHS TX Has Waived or Forfeited its Argument
that the Magistrate Judge Lacked Authority to Issue
an Order on Plaintiff's Motion to Substitute……………………………   5

II) The Magistrate Judge's Conclusion that CHS TX
is Not Entitled to an Evidentiary Hearing is not
Clearly Erroneous or Contrary to Law…………………………………   7

III) The Magistrate Judge's Conclusion that the
Internal Affairs Doctrine does not Apply is not
Clearly Erroneous or Contrary to Law………………………..………..   12

IV) Corizon's Asset and Liability Allocations
Are Not Enforceable Against Creditors Under
Texas Law..……………………….………..……………..………..   20

## <u>Index of Exhibits</u>

**Ex. A**: Declaration of Nathan K. Lumbard Re: Authentication of Motion Exhibits

## STATEMENT OF QUESTIONS PRESENTED

**1. Whether CHS TX, Inc. waived its Argument that a Rule 25(c) Motion to Substitute Cannot Be Referred for to a Magistrate Judge for Determination Under 28 U.S.C. § 636(b)(1)(A) by Failing to Raise it Until After the Magistrate Judge Decided the Motion.**

Plaintiff Answers: **YES**

CHS TX, Inc. May Answer: **NO**

**2. Whether the Magistrate Judge's Determination that CHS TX, Inc. is Not Entitled to an Evidentiary Hearing was Clearly Erroneous or Contrary to Law.**

Plaintiff Answers: **NO**

CHS TX, Inc. May Answer: **YES**

**3. Whether the Magistrate Judge's Determination that the Internal Affairs Doctrine Does not Apply to Successor-Liability Claims Brought by Third-Party Creditors was Clearly-Erroneous or Contrary to Law.**

Plaintiff Answers: **NO**

CHS TX, Inc. May Answer: **YES**

**4. Whether Texas Law Permits Corporations to Render Themselves Uncollectable by Using Divisional Mergers to Separate their Liabilities from Their Assets.**

Plaintiff Answers: **NO**

CHS TX, Inc. May Answer: **YES**

iv

## <u>Controlling or Most Appropriate Authorities</u>

1. *Sullivan v. Running Waters Irrigation Inc.,* 739 F.3d 354 (7th Cir. 2014)

2. *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611 (1983)

3. *Turner v. Bitumous Casualty Co.,* 397 Mich. 406, 410-413 (1976)

4. *Chrysler Corp. v. Ford Motor Co.,* 972 F. Supp. 1097 (E.D. Mich. 1997).

## PRELIMINARY STATEMENT

CHS TX argues that: **1)** any challenge by a creditor to the allocation of assets and liabilities in a Texas divisional merger must be governed only by the law of the state of incorporation, i.e., Texas, (ECF No. 92, PageID.3747); **2)** under Texas law, an assignment of assets and liabilities in a divisional merger does not constitute a "transfer," either for purposes of Rule 25(c), (ECF No. 92, PageID.3765), or for purposes of fraudulent-transfer law, (ECF No. 83, PageID.3360-61); **3)** remedial successor-liability doctrines are banned in Texas, (No. 92, PageID.3766-3767); and **4)** the only entity which can be held liable for a debt following a Texas divisional merger is the entity that was assigned the debt in the plan of merger. (ECF No. 92, PageID.3765-3766).

Consider the far-reaching implications if CHS TX is right. What recourse does a creditor have when a debtor entity reincorporates itself in Texas, then divides into a hopelessly-undercapitalized "DebtCo" that receives all of the entity's unsecured debt, and an "AssetCo" that is assigned all of the valuable assets? Per CHS TX, **<u>none</u>**. The creditor's recovery is limited to whatever assets, if any, the dividing entity chooses to leave behind in the DebtCo. Any corporate person can thus unilaterally cap (or discharge) its liability for any unsecured debt by simply engaging in this transaction with itself.

1

If this is the law, the consequences will be far-reaching. Limited-liability entities will become, in practice, no-liability entities. Regulatory bodies will have little incentive to impose civil fines that are greater than the transaction costs of a Texas divisional merger. The value of patent rights and other intellectual property will plummet, tort law will be revolutionized, and the broader American economy will be disrupted as businesses become less willing to supply each other with goods and services on credit. The full implications of a legal regime in which no effective enforcement mechanism exists for any but the smallest of unsecured liabilities are difficult to fathom.

While Texas law has permitted divisional mergers for over thirty years, use of the Texas Business Organizations Code ("TBOC") to place a corporation's assets beyond the reach of its unsecured creditors appears to be a recent innovation. *See In re Aldrich Pump LLC,* 2021 Bankr. LEXIS 2294 at *37 (Bankr. W.D.N.C. Aug. 23, 2021); *In re LTL Mgmt. LLC*, 2021 Bankr. LEXIS 3155 at *27 (Bankr. W.D.N.C. Nov. 16, 2021) ("[t]he first time any debtor in the country used this procedure was in *Bestwall* in 2017"). The few courts that have examined these transactions to date have generally taken a dim view, either holding or strongly suggesting that when a dividing entity's assignment of its assets and liabilities in a Texas divisional merger is prejudicial to creditors, it is unenforceable. *See*

2

*Plastronics Socket, Ltd. v. Hwang*, 2022 U.S. App. LEXIS 883 at *9-*11 (Fed. Cir. 2022) (holding that both successor entities are liable for royalty payments; "the Texas divisive merger statute does not enable an entity to eliminate royalty payments due under a contract with the predecessor entity"); *In re DBMP LLC,* 2021 Bankr. LEXIS 2194 at *62 (Bankr. W.D.N.C. Aug. 10, 2021) ("while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors"); *In re Aldrich Pump LLC,* 2021 Bankr. LEXIS 2294 at *17 (Bankr. W.D.N.C. Aug. 23, 2021) ("[d]ue to the apparent negative effects of the Divisional Merger (and these ensuing bankruptcy filings) on the legal rights of Asbestos Claimants, that Merger and its allocations may constitute avoidable fraudulent transfers and/or be subject to attack under remedial creditor doctrines like alter ego and successor liability.").

Perhaps cognizant that a transaction a corporation engages in with itself to purportedly discharge its debt outside of bankruptcy is unlikely to withstand judicial scrutiny, CHS TX relies on an undisclosed fairness opinion, an undisclosed funding agreement,[1] and its own unsupported representations about the value of its assets to argue that its restructuring transaction actually *helped* creditors such as

---

[1] Creditors are considered materially prejudiced by a Texas divisional merger that substitutes their access to the debtor's assets with a conditional, third-party funding agreement enforceable not by the creditors, but only by the shell-company debtor. *In re DBMP LLC,* 2021 Bankr. LEXIS 2194 at *66-*67 (Bankr. W.D.N.C. Aug. 10, 2021).

the Plaintiff. (ECF No. 92, PageID.3750-3751). Plaintiff vehemently disagrees. *See* (ECF No. 85, PageID.3605-3607). The economic reality of what Defendants are seeking to do is reorganize an insolvent company by imposing a unilateral, cram-down settlement on a subset of the company's unsecured creditors, while its equity-holders retain an interest in the reorganized entity without needing to bid against other potential buyers for that interest. Congress categorically prohibited such an outcome in a bankruptcy proceeding; it is a per-se violation of the absolute priority rule. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 437 (1999).

The Magistrate Judge did not clearly err in declining to enforce Defendants' unilateral asset and liability allocations against Plaintiff, limiting his potential recovery to whatever pool of funds Defendants chose to provide for the majority of their unsecured creditors. "[T]he [Supreme] Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies." *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 630 (1983); *see also, Anderson v. Abbott*, 321 U.S. 349, 365 (1944) (holding that "no State may endow its corporate creatures with the power to place themselves above the Congress of the United States" by subverting the policy underlying a federal statute). As federal law would prohibit an economically-equivalent

4

transaction even if a bankruptcy court found it fair and equitable, *203 N. Lasalle St. P'ship*, 526 U.S. at 454, this Court need not enforce Defendants' self-imposed liability cap on the basis of an undisclosed fairness opinion from Defendants' consultant. The Magistrate Judge's Order should be upheld.

## I. CHS TX Has Waived or Forfeited its Argument that the Magistrate Judge Lacked Authority to Issue an Order on Plaintiff's Motion to Substitute

The Order that referred Plaintiff's Motion to Magistrate Judge Morris, issued on July 25, 2022, reads:

> IT IS ORDERED that the following motion(s) are referred to U.S. Magistrate Judge Patricia T. Morris for a hearing and determination pursuant to ***28 U.S.C. § 636(b)(1)(A)***:
>
> Motion to Substitute Party – #77
>
> (ECF No. PageID.3283) (emphasis added).

When proceeding under a 28 U.S.C. § 636(b)(1)(A) order of reference, a Magistrate Judge may "hear and determine" a pretrial matter, and issue an "order." Such orders are reviewable by the district court under a differential "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

Judge Berg did not err in referring Plaintiff's Rule 25(c) motion for determination by the Magistrate Judge under § 636(b)(1)(A) rather than for a

5

report and recommendation under § 636(b)(1)(B). While there is little law directly on point, other courts that have considered the question have found Rule 25(c) motions to be non-dispositive for purposes of the Federal Magistrates Act.[2] *See, e.g. Guar. Residential Lending, Inc. v. Homestead Mortg. Co.. LLC*, 2009 U.S. Dist. LEXIS 120493 at *14 (E.D. Mich. 2009); *Grant v. Witherspoon*, 2020 U.S. Dist. LEXIS 1767 at *1 n.1 (S.D.N.Y. 2020).

Like a motion to strike an affirmative defense under Rule 12(f), "a rule 25(c) decision is generally within the district court's discretion." *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 72 (3rd Cir. 1993). Magistrate judges in this circuit routinely rule on Rule 12(f) motions to strike affirmative defenses by order under § 636(b)(1)(A), rather than by report and recommendation under § 636(b)(1)(B). *HLFIP Holding, Inc. v. Rutherford Cnty.,* 2022 U.S. Dist. LEXIS 53127 at *9 (M.D. Tenn. 2022) (collecting cases).  This is permissible because although a Rule 12(f) motion to strike an affirmative defense may, obviously, dispose of a party's defense, the *discretionary* nature of a Rule 12(f) motion distinguishes it from its dispositive-motion analogue, the Rule 12(b)(6) motion to dismiss. *See HLFIP Holding, Inc.,* 2022 U.S. Dist. LEXIS 53127 at *6-*9. The same logic is applicable to a Rule 25(c) motion.

_____

[2]   As did Magistrate Judge Morris. (ECF No. 89, PageID.3654).

6

In any case, CHS TX has waived its argument that a Rule 25(c) motion can only be referred under § 636(b)(1)(B) by failing to timely raise it. "Ordinarily a party who objects to a reference to a magistrate must make his objections known either at the time of reference or shortly thereafter." *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998) (quoting *Hill v. Duriron Co.*, 656 F.2d 1208, 1213 (6th Cir. 1981)). CHS TX, Yescare Corp., and Corizon filed their responses to Plaintiff's Motion to Substitute on August 17, 2022, twenty-three days after Judge Berg's order of reference. None of these parties objected at the time to a § 636(b)(1)(A) referral. CHS TX did not challenge the Magistrate Judge's authority to proceed on this Motion via order under § 636(b)(1)(A) until three months later, on November 15, and only after the Magistrate Judge had issued an order adverse to CHS TX. A party who waits to assert its challenge to the Magistrate Judge's authority until after the Magistrate Judge has adjudicated a matter has waived the challenge. *Waters*, 158 F.3d at 936; *see also, Jones-Bey v. Caruso*, 2009 U.S. Dist. LEXIS 101105 at *3-*5 (W.D. Mich. 2009) (arguments raised for the first time at the district-court stage of review are waived in the Sixth Circuit; collecting cases).

## II. The Magistrate Judge's Conclusion that CHS TX is Not Entitled to an Evidentiary Hearing is not Clearly Erroneous or Contrary to Law

The Magistrate Judge correctly determined that a court is not required to hold an evidentiary hearing prior to granting a contested Rule 25(c) motion. (ECF

7

No. 89, PageID.3658). *See, e.g. United States v. Harold*, 423 F.Supp. 3d 410, 419 n.2 (E.D. Mich 2019) (party opposing Rule 25(c) substitution had no right to an evidentiary hearing); *Sullivan v. Running Waters Irrigation*, 739 F.3d 354, 359 (7th Cir. 2014) (same). The case that CHS TX relies on in support of its argument that it is entitled to an evidentiary hearing, *Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72 (3d Cir. 1993), does not mandate a hearing in the present circumstance. *Luxliner* holds that the court must conduct a hearing and make witness credibility determinations when, a) the respondent is "joined not merely in ongoing litigation but on a judgment already entered," and b) the evidence presented in the parties' briefing shows one or more genuine issues of material fact in dispute. *Luxliner*, 13 F.3d at 72-73. Neither circumstance is present here.

The only specific facts that CHS TX identifies as in dispute are the extent of CHS TX' contacts with Michigan, and the extent of its contacts with Texas. (ECF No. 92, PageID.3756). But the motion papers did not evidence a significant factual disagreement as to the extent of CHS TX' contacts with these states. CHS TX cites the fact that its CEO, Sara Tirschwell, is "based in Texas" as an alleged point in dispute, (ECF No. 92, PageID.3756), but Plaintiff acknowledged Ms. Tirschwell's recent relocation to Texas in his Motion.[3] (ECF No. 77, PageID.3024). The parties

---

3  CHS TX also did not mention Ms. Tirschwell's domicile in its motion papers or raise any argument that her Texas residency favored application of Texas law. The Magistrate Judge cannot err by failing to consider an argument that CHS

are similarly in agreement that CHS TX' activities in Michigan consist of performing Corizon's service contracts at county jails. (ECF No. 77, PageID.3024); (ECF No. 83, PageID.3347). What CHS TX is actually contesting are not the *facts* relevant to its contacts with Texas and Michigan, but their *legal significance*. And without demonstrating a bona-fide *factual* dispute, CHS TX has not "show[n] what [an evidentiary] hearing would produce or why the proceedings before the magistrate judge were inadequate." *Sullivan*, 739 F.3d at 359.

Next, without affirmatively contesting the authenticity of any specific document, CHS TX broadly attacks the exhibits attached to Plaintiff's Motion as "unauthenticated hearsay."[4] (ECF No. 92, PageID.3755). With respect to the authentication objection:

> submission of such unauthenticated documents would have been condemnable as sloppy lawyering as late as November 30, 2010. By reason of the 2010 amendments, however, submission of unauthenticated exhibits is not a violation of any express obligation imposed by the Rules.

*FourWord Magazine, Inc. v. OverDrive, Inc.,* 2011 U.S. Dist. LEXIS 125373 at *6-*7 (W.D. Mich. 2011). While a party may still object to an opponent's exhibit on

---

TX did not raise. *See Jones-Bey v. Caruso*, 2009 U.S. Dist. LEXIS 101105 at *3-*5 (W.D. Mich. 2009).

4 While objecting to Plaintiff's exhibits on authentication grounds, CHS TX relies in support of its position on **1)** a fairness opinion prepared by its consultant, and **2)** a funding agreement with M2 LoanCo, without attaching either of those documents as exhibits. (ECF No. 92, PageID.3751).

9

admissibility grounds following the 2010 amendments, "the objection contemplated by the amended Rule is not that the material "has not" been submitted in admissible form, but that it "cannot" be." *FourWord Magazine* at *5. Once an objection is lodged, the proponent must be given an opportunity "to either authenticate the document or propose a method to doing so at trial." *Id.* at *6. Screen shots of commercial websites can be authenticated with the affidavit of a person who visited the website.[5] *Id.* at *9-*11.  The emails attached to Plaintiff's Motion were obtained through FOIA requests submitted to government agencies. "[D]ocuments produced in response to FOIA requests generally are admissible as self-authenticating." *Fareed v. Cent. Rivers Power MA, LLC,* 2021 U.S. Dist. LEXIS 154903 at *14 (D. Mass. 2021); *see also Sullivan v. Dollar Tree Stores, Inc.,* 2008 U.S. Dist. LEXIS 89478 at *5-*6 (E.D. Wa. 2008).   Even where an exhibit itself cannot be authenticated, the court may consider the exhibit for purposes of ruling on a motion if the underlying facts the exhibit is offered to demonstrate are themselves capable of presentation in admissible form at trial. *See Wyndham Vacation Ownership, Inc. v. Vacation Transfers Unlimited LLC,* 2019 U.S. Dist. LEXIS 241637 at *23 (M.D. Tenn. 2019).

---

5  See Ex. A: Declaration of Nathan Lumbard re: Authentication of Motion Exhibits.

10

CHS TX' prefunctory hearsay objection to the statements of its own employees and agents is similarly unavailing. "A statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay." *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009). When Plaintiff argues, for example, that, "YesCare brazenly touts 'Over 40 years' of experience in the correctional healthcare field, (Ex. 37, pg. 5), even though Yescare Corp. has only existed since January of 2022," (ECF No. 77, PageID.3033), the out-of-court statement is being offered as evidence of the fact that it was made rather than as evidence that its content is true. Statements that constitute verbal acts, "such as contracts . . . cannot be hearsay." *Robertson v. United States Bank, N.A.*, 831 F.3d 757, 764 (6th Cir. 2016). So when CHS TX' attorney modified a contract to replace "Yescare, Inc. (f/k/a Corizon Health)," with "CHS TX, Inc., d/b/a YesCare, successor by merger to the rights and obligations of Corizon Health, Inc. hereunder ("YesCare")," as the contracting party, (ECF No. 77, PageID.3016),  the attorney's edits constitute a verbal act rather than a factual assertion capable of truth or falsity and thus fall outside the hearsay rule.  To the extent that any of the statements are offered to show that the assertions therein are true, rather than as evidence that they were made to Corizon's clients, the emails of a corporation's employees or agents may be admitted under Fed. R. Evid. 803(6) or 801(d)(2)(D) in a suit against the

11

corporation. *Mahaney v. Novartis Pharms Corp.*, 835 F.Supp. 2d 299, 309 (W.D. Ky 2011).

### III. The Magistrate Judge's Conclusion that the Internal Affairs Doctrine does not Apply is not Clearly Erroneous or Contrary to Law

Neither the Supreme Court of Michigan, nor the Supreme Court of the United States, have applied the internal affairs doctrine when faced with a successor-liability question involving the claim of a third-party creditor.[6] *See First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621 (1983) (superceded by statute on other grounds); *Turner v. Bitumous Casualty Co.*, 397 Mich. 406, 410-413 (1976). In *First Nat'l City Bank,* the Supreme Court made clear that the Restatement (2d) of Conflicts does not mandate application of the law of the state of incorporation to successor-liability issues in claims brought by third parties:

> As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation. See Restatement (Second) of

---

6  CHS TX' reliance on *Wojtczak* for its argument that Michigan applies the internal affairs doctrine to creditor claims is inapposite. "The *Wojtczak* Court noted in particular that "[t]he suit at bar [was] not upon any pecuniary obligation due plaintiff."" *Daystar Seller Fin., LLC v. Hundley,* 326 Mich. App. 31, 38 (2018) (quoting *Wojtczak*, 293 Mich. at 453). Rather than seeking to impose liability for money damages, the *Wojczak* plaintiff sought to "exercise control over the ongoing internal operation and management" of the corporate defendant. *Id*.

12

> Conflict of Laws § 302, Comments *a* and *e* (1971). Cf. *Cort* v. *Ash*, 422
> U.S. 66, 84 (1975). Different conflicts principles apply, however, where
> the rights of third parties *external* to the corporation are at issue. See
> Restatement (Second) of Conflict of Laws, *supra*, § 301.

*First Nat'l City Bank,* 462 U.S. at 621 (1983) (emphasis in original).

*See also, Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich.

1997) ("even under § 302, the law of the state with the greatest interest -- in this

case, Michigan -- should prevail over the law of the state of incorporation"); *Ward*

*v. Auerbach,* 2017 U.S. Dist. LEXIS 97147 at *16 (D. Mass. 2017) ("successor

liability . . . is not an issue of internal corporate affairs. . . . [B]ecause this is a

personal injury case, the law of the state where the plaintiff is domiciled should

apply, as that state has a greater interest in the litigation than the state where the

corporate defendant is incorporated"). Even the case CHS TX relies on for its

argument that application of the law of the state of incorporation is required in this

context, *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D.

Cal. 2011), expressly limited its holding to exclude those tort claims where "the

plaintiff is a third party who had no business relationship with the defendant."

*Allstate,* 824 F. Supp. 2d at 1174 n. 11.

Citing two district-court cases applying Michigan law, CHS TX argues that

the Magistrate Judge "ignores binding authority that the internal affairs doctrine

13

applies to corporate mergers and reorganizations, including the divisional merger at issue here." (ECF No. 92, PageID.3759). This is wrong. First, "[a] district court decision is *never* precedentially binding." *Argue v. Burnett*, 2010 U.S. Dist. LEXIS 31817 at *14-*15 (W.D. Mich. 2010) (emphasis in original; collecting cases). Second, both cases cited by CHS TX were shareholder disputes. Neither involved a plaintiff who was a corporate outsider, such as a tort victim.

Under Michigan's choice-of-law rules, not only is the internal affairs doctrine inapplicable, but the issue would not even be analyzed as a question of corporate law. On this point, *Turner v. Bitumous Casualty Co.,* 397 Mich. 406 (1976) is instructive. In *Turner*, a New York corporation entered into an agreement to purchase all the assets of a second New York corporation for cash. *Turner*, 397 Mich. at 411-413. Five years later, a machine that had been manufactured by the now-dissolved selling corporation caused an injury in Michigan, and the injured person brought a products-liability claim against the asset purchaser. *Id.* at 410. The Court held that the successor-liability issue must be analyzed under tort principles, rather than corporate law principles. *Id.* at 423. Applying a tort-based analysis, the Court then modified Michigan's common law to hold the purchasing New York corporation liable for the injury caused by the selling New York corporation's product. *Id.*

14

*Turner* did not discuss choice of law, but it did not need to. Until *Sexton v. Ryder Truck Rental,* decided six years after *Turner,* Michigan followed the bright-line *lex loci delicti* choice-of-law rule in tort cases. *Sutherland v. Kennington Truck Serv.,* 454 Mich. 274, 283 (1997). Once the *Turner* Court had determined that successor liability would be determined on the basis of tort-law principles rather than contract or corporate-law principles, the choice-of-law question was answered. Subsequent cases have confirmed that under Michigan law, successor-liability questions in tort cases are governed by tort-based choice-of-law rules, not by the rules applicable to matters of corporate internal affairs. *See Korzetz v. Amsted Industries, Inc.,* 472 F. Supp. 136, 142 (E.D. Mich. 1979); *Chrysler Corp. v. Ford Motor Co.,* 972 F. Supp. 1097, 1103 (E.D. Mich. 1997).

Under Michigan's current choice-of-law rules for torts, Michigan law would apply in this case. "In a tort action, Michigan courts recognize a presumption in favor of *lex fori* and apply Michigan law unless a 'rational reason' to do otherwise exists." *Doe v. Etihad Airways, P.J.S.C.,* 870 F.3d 406, 435 (6th Cir. 2017). This approach most frequently results in application of Michigan law. *See Hall v. GMC,* 229 Mich. App. 580, 585 (1998). The tort cases in which Michigan has applied foreign law tend to involve the *inverse* of the situation in the present matter: a non-Michigan resident, who suffers an injury in his home state, where the fact that the

15

defendant corporation's principal place of business is in Michigan is Michigan's only connection to the matter. *See, e.g. Radeljak v. DaimlerChrysler Corp.*, 475 Mich. 598, 610 (2006); *Olmstead v. Anderson,* 428 Mich. 1, 22 (1987). If Michigan courts do not consider the corporate home of a Michigan-based corporate defendant to be a sufficiently compelling reason to apply Michigan law to an out-of-state tort claim, they would not apply the law of the defendant's state of incorporation to a Michigan resident's tort claim arising in Michigan.

Even assuming, *arguendo*, that corporate-law-based conflicts rules apply, it is not clear that § 302 of the Restatement does. "The rule of [§ 302 of the Restatement] is to be contrasted with that of § 301."   Restatement § 302, cmt a. The separation of a corporation's assets from its liabilities via a Texas divisional merger, a species of transaction that did not exist when the Restatement (Second) was published, does not appear to be the sort of corporate act incapable of being performed by an individual that the authors of the Restatement intended to exclude from § 301. While an individual cannot undergo a Texas divisional merger, an individual can be a transferree of a corporation's assets. As a result of such a transfer, an individual can also be added to an action as a defendant under Rule 25(c). *See, e.g. Rodriguez-Miranda v. Benin,* 829 F.3d 29, 44 (1st Cir. 2016) (corporation's principal's mother added under Rule 25(c) as alter-ego of corporate

16

defendant, where she received corporation's assets for purpose of making corporation judgment-proof). The Restatement's official commentary indicates that the effects of asset transfers fall squarely under § 301:

> Many acts can be done both by corporations and by individuals. Thus, corporations and individuals alike make contracts, commit torts and ***receive* and *transfer assets***. Issues involving acts such as these when done by a corporation are determined by the same choice-of-law principles as are applicable to non-corporate parties. . . . ***The choice-of-law rule applied to determine whether a transfer is in fraud of creditors will also be the same whether the transfer was made by a corporation or by an individual***.

Restatement § 301, cmt. a (emphasis added).

If Corizon Health's sole shareholder, Valitas Intermediate Holdings, had first incorporated CHS TX as its subsidiary, then transferred all of Corizon Health's assets to CHS TX, the transaction would clearly constitute a transfer of assets falling within the scope of § 301. As the Magistrate Judge recognized, the transaction at issue in this case was no different is substance: "the division was little more than a transfer of assets between corporations." (ECF No. 89, PageID.3680). It was not a "merger" as that term was understood in the mid-twentieth century, "[b]ecause two or more organizations did not combine their equity into a single corporation." (ECF No. 89, PageID.3677-3679). When the commentary to § 302 speaks of "mergers," it is referring to a type of transaction that, at the time, "would automatically warrant successorship liability." (ECF No.

17

89, PageID.3679). The § 302 commentary further demonstrates that the Restatement's use of the term "merger" did not refer to a transaction that places assets beyond the reach of creditors:

> Matters . . . **which involve primarily a corporation's relationship to its shareholders include** . . . **mergers**, consolidations and reorganizations and the reclassification of shares. **Matters which may also affect the interests of the corporation's creditors include** the issuance of bonds, the declaration and payment of dividends, loans by the corporation to directors, officers and shareholders, and the purchase and redemption by the corporation of outstanding shares of its own stock.

Restatement § 301, cmt. a (emphasis added).

Since a Texas divisional merger that separates assets from liabilities is a new species of transaction which is functionally equivalent to an asset transfer, then to the extent that corporate-law conflicts principles apply at all, the transaction should be treated as an asset transfer, rather than a "merger," for purposes of the Restatement, and fall within § 301.

The inapplicability of § 302 in this context becomes even more apparent when considering the rationale behind § 302. The purpose of § 302 is to apply one state's law to "matters involving a corporation [that] cannot practicably be determined differently in different states." Restatement § 302, cmt e. But successor liability for tort claims is not such a matter. Not only *can* the question of CHS TX' successor liability for Corizon's tort claims practicably be determined differently in

18

different states, it **will** be. That is because each state applies its own conflicts-of-laws rules when analyzing successor liability for its local tort claims.

Take, for example, the many tort claims pending against Corizon in Missouri. (ECF No. 83-4, PageID.3539-3551). Missouri courts decide successor-liability questions in Missouri tort cases under Missouri law, "not by the law of a state in which the transaction between the corporations happened to occur." *Young v. Fulton Ironworks Co.,* 709 S.W.2d 927, 937 (Mo. Ct. App. 1986); *see also, Rickey v. Owens-Corning Fiberglass Corp.*, 1990 U.S. Dist. LEXIS at *1 n.2 (W.D. Mo. 1990). So Missouri courts will not apply Texas law when they decide this issue. While inconsistent rulings about, say, "the election or appointment of directors and officers" or "methods of voting" would be impractical as they could expose a corporation to conflicting demands, *See* Restatement § 302, cmt e, heterogeneity in a corporation's level of tort exposure under the laws of various states is not only practical, but inevitable. There is nothing impractical about exposing a corporation to liability for some tort claims and not others.

Even if § 302 applied, the Magistrate Judge's application of Michigan law to this matter still would not be erroneous. "[T]he terms of § 302 do not mandate the law of the state of incorporation in this case, where the matter is not one of internal corporate governance but rather external liability." *Chrysler Corp. v. Ford*

19

*Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997).  CHS TX argues that the law of a state other than the state of incorporation can be applied under § 302 only when *all* of the corporation's significant contacts, other than its state of incorporation, are with the forum state. (ECF No. 92, PageID.3762). But this was not the case in *Chrysler:* "KMC's principal places of business were in Michigan, Ohio and California and not its state of incorporation, Pennsylvania," *Chrysler,* 972 F. Supp. at 1102, and the court applied Michigan law even though KMC had major manufacturing operations in Ohio. *Id.* at 1106. The Magistrate Judge thus did not err in relying on *Chrysler* to find that application of Michigan law is appropriate in this case, even under § 302.

## IV. Corizon's Allocations of Assets and Liabilities is not Enforceable Against Creditors Under Texas Law

Even if Texas law were applied, it would not require denial of Plaintiff's Motion. Texas permits courts to "disregard the corporate fiction . . . when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners v Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270 at 271-72 (Tex. 1986)); *see also, Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443-44 (5th Cir. 2013).  In tort cases (as opposed to contract cases), only "constructive fraud" is required, meaning "the breach of some legal or equitable duty which,

irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *See Spring St. Partners IV*, 730 F.3d at 443-444 (quoting *Castleberry*, 720 S.W.2d at 273). "[N]either fraud nor an intent to defraud need be shown," but only that "recognizing the separate corporate existence would bring about an inequitable result." *Ibid*. (quoting *Castleberry*, 720 S.W.2d at 272-73)..

The present Texas divisional merger transaction has, indeed, "been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners,* 275 S.W.3d at 454. Corizon used this transaction not only to unilaterally cap its liability to Michigan tort victims, but also to unjustly enrich itself at the expense of its Michigan-based subcontractors. In the final months of its MDOC contract, Corizon received monthly payments from the State of Michigan on a net-15 basis to provide healthcare services to Michigan's prisoners. (ECF No. 66-2, PageID.1924). To perform its obligations under the contract, Corizon employed a network of subcontractors to furnish various healthcare services to the prisoners. (ECF No. 66-2, PageID.1931). In the latter half of 2021, Corizon stopped paying these subcontractors, while continuing to collect payments from the State of Michigan for the services the subcontractors provided. (ECF No. 77-2, PageID.3120-3124) (Affidavit of Yvonne Johnson); *see also,* 2:22-cv-11981 No. 1-

21

3, PageID.56-59 (Affidavit of Robin Damschroder). Corizon's conduct caused losses of $3.4 million dollars to Blue Cross Blue Shield of Michigan and $4.2 million dollars to Henry Ford Allegiance Health. *Id*. Corizon apparently engaged in similar conduct in Missouri; the University of Missouri's health system claims to have suffered losses in excess of $12 million for unreimbursed services provided to prisoners in connection with Corizon's recently-expired Missouri DOC contract. (ECF No. 77-1, PageID.3045).

These losses, caused by Corizon, accrued directly to Corizon's benefit by increasing Corizon's profit margin on its expiring contracts by over nineteen million dollars. A few months later, all but one million dollars of these funds (along with all of Corizon's other valuable assets) were allocated in the Texas divisional merger to the "NewCo," CHS TX. Meanwhile, Corizon's resulting debts to its Michigan and Missouri subcontractors were left behind in the functionally-assetless "RemainCo," currently known as Tehum Care Services.[7] (ECF No. 92, PageID.3750). Also left with the RemainCo were hundreds of pending medical tort claims and dozens of employment-law claims. (ECF No. 83-4, PageID.3539-3552). Corizon's insurance coverage for these claims is illusory, because the

---

[7] Corizon's (and now CHS TX') current beneficial owners appear to have acquired the company in the latter half of 2021, when it was already insolvent, likely for the purpose of profiting from this liability-shedding transaction. *See Kelly v. Corizon Health, Inc.*, 2:22-cv-10589 ECF No. 34, PageID.1710-1712 and 2:22-cv-10589 ECF No. 34-2, PageID.1718-1727.

22

RemainCo has not been allocated sufficient funds to meet the $18.5 million deductible under its relevant medical tort liability policy. *See* (ECF No. 77, PageID.3029; ECF No. 77-34, PageID.3267).

Texas law does not allow corporations to evade creditors in this manner. While Texas does not recognize the de-facto-merger doctrine, Texas courts achieve the same result by applying the alter-ego doctrine 'horizontally,' holding the asset-recipient corporation liable for the debts of the transferor corporation regardless of whether the asset-recipient is a parent or shareholder of the transferor. *See, e.g. Tryco Enters., Inc. v. Robinson,* 390 S.W.3d 497, 509-511 (Tex. App. 2012) (holding new corporation liable as alter-ego of predecessor corporation, where owners of predecessor "transferred all of Tryco's assets to Crown Staffing for the purpose of avoiding payment of the judgment"); *Dick's Last Resort of the West End, Inc. v. Market/Ross, Ltd.*, 273 S.W.3d 905, 911 (Tex. App. 2008) (affirming imposition of alter-ego liability where "Schiff transferred ownership of the restaurant and obligations under the lease among Dick's Texas, Dick's Dallas, and Dick's West End to avoid certain obligations under the lease."). In fact, "[b]ecause disregarding the corporate fiction is an equitable doctrine, Texas takes a flexible fact-specific approach focusing on equity" in determining whether the corporate

23

veil should be pierced. *Castleberry,* 721 S.W.2d at 273; *see also Wilson v. Davis,* 305 S.W.3d 57, 69 (Tex.App. 2009).

While it appears that no Texas state court has addressed the issue, it is unlikely that Texas courts would decide a case like *Tryco* differently if, rather than transferring Tryco's assets to Crown Staffing on the day the Plaintiff obtained his judgment, the Tryco principals had instead carried out a divisional merger that allocated all of the company's assets to a new entity formed from the merger, while leaving the Plaintiff's judgment behind in Tryco. The TBOC itself specifically provides that, "[t]his code does not . . . abridge any right or rights of any creditor under existing laws." TBOC § 10.901. Thus, "while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors." *In re Aldrich Pump LLC,* 2021 Bankr. LEXIS 2294 at *76 (W.D.N.C. 2021). And while ""a merger will not involve a 'transfer' of assets in the traditional sense," the "allocation of assets in a merger should constitute both a 'transfer' and 'conveyance' of assets under both the letter and spirit of the UFTA, the UFCA and the Bankruptcy Code."" *Id.* at *78 (quoting Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109 (1989)).

24

The only circuit court to have examined this issue to date has held that under Texas law, an allocation of liabilities in a Texas divisional merger cannot adversely affect the rights of a creditor. *See Plastronics Socket, Ltd. v. Hwang*, 2022 U.S. App. LEXIS 883 at *8-*10 (Fed. Cir. 2022). When the dividing entity attempted such an allocation in *Plastronics Socket*, the panel held <u>both</u> surviving entities liable for the obligation. *Id.* at *11. A contemporaneous analysis of the statute by Curtis Huff, the primary author of the Texas divisional merger law, suggests that this was the appropriate result:

> "**if in a merger with multiple survivors, the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation, that creditor will have the right to challenge the merger as a fraudulent transfer.**"
>
> As for a remedy, and "[a]lthough various remedies are possible where the allocation of a liability in a merger constitutes a fraudulent transfer, **the most appropriate remedy in such a case would generally be to reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities liable for all or a portion of the liabilities** of the predecessor debtor corporation.""

*In re DBMP LLC*, 2021 Bankr. LEXIS 2194 at *65 (Bankr. W.D.N.C. 2021) (quoting Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109 (1989)) (emphasis in original).

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff
402 W. Liberty St, Ann Arbor MI
734-994-9590 / ian@lawa2.com

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel duly certifies that on this 29th day of November, 2022,

he uploaded the foregoing document into the Court's CM/ECF system for filing and all

opposing counsel are CM/ECF participants who will be served upon completion of filing

through that system.


*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff