# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

KOHCHISE JACKSON,

        Plaintiff,

-vs-

CHS TX, INC., *et al.,*

        Defendants.

Case No. 19-cv-13382
Hon. Gershwin A. Drain

---

LAWRENCE H. MARGOLIS (P69635)
IAN T. CROSS (P83367)
**MARGOLIS, GALLAGHER & CROSS**
Attorneys for Plaintiff
214 S. Main St., Ste. 200
Ann Arbor, MI 48104
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com


JONATHAN R. MARKO (P72450)
MICHAEL L. JONES (P85223)
**MARKO LAW, PLLC**
Co-counsel for Plaintiff
220 W. Congress, 4th Floor
Detroit, Michigan 48226
P: (313) 777-7529 / F: (313) 470-2011
jon@markolaw.com
michael@markolaw.com

THOMAS G. HACKNEY (P81283)
**HACKNEY ODLUM & DARDAS**
Attorney for Keith Papendick, M.D.
10850 E. Traverse Hwy., Ste. 4440
Traverse City, MI 49684
(231) 642-5057
thackney@hodlawyers.com


ADAM MASIN
SUNNY REHSI (P80611)
**BOWMAN AND BROOKE LLP**
Attorney for CHS TX, Inc.
101 W. Big Beaver Rd., Ste. 1100
Troy, MI 48084
(248) 205-3300
Adam.masin@bowmanandbrooke.com
Sunny.rehsi@bowmanandbrooke.com

---

## PLAINTIFF'S MOTION TO DESIGNATE PORTIONS OF DR. KANSKAR'S DEPOSITION FOR USE AT TRIAL

NOW COMES Plaintiff, **KOHCHISE JACKSON**, by and through his attorneys, **MARKO LAW, PLLC**, and for his Motion to Designate Portions of Dr. Kansakar's Deposition for Use at Trial, states as follows:

Pursuant to Fed. R. Civ. P 32 and Fed. R. Evid. 804, Plaintiff moves for an Order permitting him to use certain designated portions of Dr. Erina Kansakar's deposition transcript at trial, as she is located in Washington, more than 100 miles away from this Court.

Per Local Rule 7.1, Plaintiff's counsel sought concurrence regarding the relief at issue in this Motion. Defense counsel concurred with the designation of the deposition of Dr. Kansakar for use at trial. **Exhibit 1**, Concurrence Email.

WHEREFORE, for the reasons more fully set forth in the attached Brief, Plaintiff respectfully requests this Honorable Court grant Plaintiff's Motion to Designate Portions of Kansakar's Deposition for Use at Trial.

Respectfully submitted,

*/s/ Jonathan R. Marko*
Jonathan R. Marko (P72450)
Attorney for Plaintiff
**MARKO LAW, PLLC**
220 W. Congress, 4th Floor
Detroit, MI 48226
P: (313) 777-7529 / F: (313) 771-5785
Date: July 8, 2025       Email: jon@markolaw.com

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KOHCHISE JACKSON,

       Plaintiff,

-vs-

CHS TX, INC., *et al.,*

       Defendants.

Case No. 19-cv-13382

Hon. Gershwin A. Drain

---

LAWRENCE H. MARGOLIS (P69635)
IAN T. CROSS (P83367)
**MARGOLIS, GALLAGHER & CROSS**
Attorneys for Plaintiff
214 S. Main St., Ste. 200
Ann Arbor, MI 48104
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

JONATHAN R. MARKO (P72450)
MICHAEL L. JONES (P85223)
**MARKO LAW, PLLC**
Co-counsel for Plaintiff
220 W. Congress, 4th Floor
Detroit, Michigan 48226
P: (313) 777-7529 / F: (313) 470-2011
jon@markolaw.com
michael@markolaw.com

THOMAS G. HACKNEY (P81283)
**HACKNEY ODLUM & DARDAS**
Attorney for Keith Papendick, M.D.
10850 E. Traverse Hwy., Ste. 4440
Traverse City, MI 49684
(231) 642-5057
thackney@hodlawyers.com

ADAM MASIN
SUNNY REHSI (P80611)
**BOWMAN AND BROOKE LLP**
Attorney for CHS TX, Inc.
101 W. Big Beaver Rd., Ste. 1100
Troy, MI 48084
(248) 205-3300
Adam.masin@bowmanandbrooke.com
Sunny.rehsi@bowmanandbrooke.com

---

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO DESIGNATE PORTIONS OF DR. KANSKAR'S DEPOSITION FOR USE AT TRIAL

## <u>TABLE OF CONTENTS</u>

Concise Statement of Issues Presented ........................................................................3

Controlling or Most Appropriate Authority ...............................................................4

Law and Argument...........................................................................................................5

Conclusion .........................................................................................................................8

MARKOLAW.COM

220 W. CONGRESS, 4TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 470-2011

MARKO LAW

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

I.  Whether this Honorable Court should permit Plaintiff to use certain designated portions of Dr. Kansakar's deposition transcript at trial.

**Plaintiff states: Yes.**

**This Court should state: Yes.**

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

## Federal Rules

Fed. R. Civ. P. 32

Fed. R. Evid. 804

## Cases

*U.S. v. Florence*, No. 2:13-CV-00035, 2021 WL 5772340, (M.D. Tenn. Dec. 5, 2021)

## LAW AND ARGUMENT

Plaintiff moves for an Order allowing it to admit in to evidence certain portions of the deposition transcript of Dr. Kansakar. Defendants have agreed to the designation of Dr. Kansakar's deposition transcript. **Ex. 1.**

Dr. Kansakar is an "unavailable" witness within the meaning of Fed. R. Civ. P. 32, and use of her deposition transcript is appropriate under Fed. R. Evid. 804.

In further support, Plaintiff states as follows:

On March 5, 2021, Plaintiff took the deposition of Dr. Erina Kansakar. On May 6, 2025, this Court issued its Amended Scheduling Order. ECF No. 119. Trial is currently set for August 18, 2025. *Id.* In preparation for trial, Plaintiff has identified Dr. Erina Kansakar as a potential witness. Dr. Kansakar is located in Washington, however, which is more than 100 miles from this Honorable Court. Plaintiff thus seeks to admit certain portions of her deposition testimony into evidence pursuant to the Federal Rules of Civil Procedure.

Fed. R. Civ. P. 32 governs the use of depositions at trial. *U.S. v. Florence*, No. 2:13-CV-00035, 2021 WL 5772340, at *3-4 (M.D. Tenn. Dec. 5, 2021).

In general, "all or part of a deposition may be used against a party on these conditions:

> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;

(B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and

(C) the use is allowed by Rule 32(a)(2) through (8)."

Rule 32(a)(1). A party may use for any purpose the deposition of a witness if the court finds that:

(A) The witness is dead;

**(B) The witness is more than 100 miles from the courthouse;**

(C) The deponent is unable to attend trial due to age, sickness, infirmity or imprisonment;

(D) The party offering the deposition was unable to procure the deponent's attendance at trial by subpoena; or

(E) Exceptional other circumstances exist.

*See* Fed. R. Civ. P. 32(a)(4) (emphasis added).

In addition, Fed. R. Evid. 804 allows for a hearsay exception when a witness is unavailable, but provided testimony at a deposition in the current proceeding. Fed. R. Evid. 804(a) and (b).

Defense counsel had reasonable notice of Dr. Kansakar's March 5, 2021 deposition.

Judge Stephen J. Murphy, III just yesterday – as of the date of writing – issued an order granting this exact relief under Fed. R. Civ. P. 32, allowing the

6

defendant in that case to designate portions of a doctor's deposition testimony for use at trial. **Exhibit 2**, Judge Murphy 7/7/2025 Order.

As Dr. Kansakar is located more than 100 miles from this Court and because the requirements of Fed. R. Civ. P. 32 and Fed. R. Evid 804 are met, Dr. Kansakar's prior deposition testimony is admissible. Plaintiff, therefore, requests that the Court allow Plaintiff to designate the following portions of Dr. Kansakar's deposition transcript for use at trial:

- **Exhibit 3**, Kansakar Dep. at 6:6-25
- *Id.* at 7:6-8
- *Id.* at 7:24-13:5
- *Id.* at 13:10-14:19
- *Id.* at 14:25-15:10
- *Id.* at 15:21-17:7
- *Id.* at 17:19-22
- *Id.* at 18:9-19:6
- *Id.* at 19:12-21
- *Id.* at 21:21-22:20
- *Id.* at 22:23-23:7
- *Id.* at 26:21-30:6

7

- *Id.* at 31:6-13

- *Id.* at 34:16-35:4

- *Id.* at 45:14-24

- *Id.* at 46:1-47:20

- *Id.* at 59:1-15

- *Id.* at 60:6-21

- *Id.* at 60:24-61:10

- *Id.* at 61:13-17

## **CONCLUSION**

The designated portions of Dr. Kansakar's March 1, 2021 deposition are admissible as substantive evidence at trial. Dr. Kansakar is located further than 100 miles away from the courthouse, permitting the designation of deposition testimony in lieu of live testimony. Accordingly, Plaintiff respectfully requests that the Court enter an Order permitting him to use those designated portions of Dr. Kansakar's deposition testimony at trial.

Respectfully submitted,

*/s/ Jonathan R. Marko*
Jonathan R. Marko (P72450)
Attorney for Plaintiff
**MARKO LAW, PLLC**
220 W. Congress, 4th Floor

8

Detroit, MI 48226
P: (313) 777-7529 / F: (313) 771-5785
Date: July 8, 2025                          Email: jon@markolaw.com

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon
all parties to the above cause to each attorney of record on **July 8, 2025**
via:

☐ U.S. Mail              ☐ Fax
☐ Hand Delivered         ☐ Overnight Carrier
☐ Certified Mail         ☐ Other: _____
☒ ECF System             ☐ Email

*/s/Mackenzie S. Kell*

MARKOLAW.COM

220 W. CONGRESS, 4TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 470-2011

JM MARKO LAW

9

# EXHIBIT 1

**From:** Adam Masin <Adam.Masin@bowmanandbrooke.com>
**Sent:** Tuesday, July 8, 2025 12:03 PM
**To:** Jared Reardon <jared@markolaw.com>; thackney@hodlawyers.com <thackney@hodlawyers.com>; Sunny Rehsi
<Sunny.Rehsi@bowmanandbrooke.com>; Rachel Weil <Rachel.Weil@bowmanandbrooke.com>
**Cc:** Larry Margolis <larry@lawinannarbor.com>; Ian Cross <ian@lawinannarbor.com>; Samantha Teal <steal@smtlitigationconsulting.com>;
Jon Marko <jon@markolaw.com>; Michael Jones <michael@markolaw.com>
**Subject:** RE: Jackson v. CHS TX, Inc., et al. - Concurrence re Designation of Portions of Dr. Erina Kansakar Deposition

Jared,

We do not generally object to the use of Dr. Kansakar's deposition at trial.  We reserve the right to object to specific
testimony/designations.

Thanks,
Adam

**Adam Masin**
Partner
P +1 646-914-6790 | M +1 212-495-9641
Adam.Masin@bowmanandbrooke.com

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AIMEE STURGILL,

               Plaintiff,

v.

THE AMERICAN RED CROSS,

               Defendant.

_____/

Case No. 2:22-cv-11837

HONORABLE STEPHEN J. MURPHY, III

## ORDER GRANTING MOTION TO DESIGNATE
## DAISY ANGELES' DEPOSITION FOR USE AT TRIAL [113]

The Red Cross moved to designate portions of Dr. Daisy Angeles's deposition for use at trial. ECF No. 113, PageID.3686. Sturgill opposed the request and argued that the Red Cross failed to show that Angeles was served or cannot appear, and that the deposition testimony is irrelevant. ECF No. 122, PageID.3965. The Court will grant the motion and state its disappointment with the parties' inability to resolve the simple dispute.

Federal Rule of Civil Procedure 32 addresses parties' use of depositions in court proceedings. Rule 32(a)(1) allows that a deposition may be used at trial against a party if:

> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
> (C) the use is allowed by Rule 32(a)(2) through (8).

1

And Rule 32(a)(4) states that a "party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . (B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." Here, Sturgill had reasonable notice of Angeles's deposition, ECF 113-1, PageID.3692, 3699, and defense counsel represented to the Court that Angeles is in Europe and will remain there until July 15. ECF No. 113.

Sturgill maintained that the Red Cross did not prove service of a trial subpoena on Angeles. Although true, Sturgill cited no law to explain why that failure is material. Rule 32(a)(4)(A)–(D) presents disjunctive options, and 32(a)(4)(B) is sufficient to authorize the use of the deposition here. At this late stage, the Court has no reason to doubt defense counsel's representation submitted in a signed filing governed by Federal Rule of Civil Procedure 11. If Plaintiff has actual evidence to suggest that defense counsel (or the witness) is being untruthful, the Court will address it.

Next, Sturgill suggested that the deposition transcript itself constitutes inadmissible hearsay. ECF No. 122, PageID.3967. Not so. Federal Rule of Evidence 802 notes that hearsay is not admissible *unless* a federal statute, the rules of evidence, or other federal rules provide otherwise. Civil Rule 32 is one of those "other federal rules." In fact, Rule 32 mandates that the Court treat the deposition as if it was in court testimony. So, the hearsay rules, in particular Evidence Rule 804's regulation of unavailable witnesses, governs not the deposition itself, but its content.

2

In other words, there is only one layer of hearsay in play and one hearsay inquiry: whether Angeles's deposition answers, if given in court, would constitute inadmissible hearsay. *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914–15 (9th Cir. 2008) (collecting cases explaining the Rule 32 exception and Rule 804). Sturgill developed no argument on that question here, and the Court will address the concern at trial.

Last, Sturgill attacked the relevance of the deposition testimony. ECF No. 122, PageID.3969. She argued that, because the Red Cross did not rely on or ask for her medical history at the time of the accommodation denial, the evidence is irrelevant. *Id.* at 3696–3670. The Court observes that both parties have alluded, at different times and somewhat inconsistently (when beneficial to their positions) to the notion that the jury can consider only that evidence presented to or relied upon by Red Cross or the reasoning that the Red Cross employed at the time it made its accommodation decision. *See, e.g.*, *id.* at PageID.3969–3970; ECF No. 118, PageID.3897; *but see* ECF No. 127, PageID.4024–4025, 4027 (recognizing the tension and arguing that evidence of sincerity is not limited to that presented to the employer during the accommodation process). The Court is aware of that type of principle in other discrimination contexts, but that principle is likely inapplicable here. *See Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir. 1985) (holding that evidence not known to the employer could not support the "reasonableness" of its decision but could be relevant to showing whether employee was "qualified" under the ADA); *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023) (rejecting consideration of evidence undermining the

undue hardship posed by an accommodation because the evidence was not presented to the employer), *vacated on denial of reh'g on other grounds,* No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023); *but see id.* at 906 (Brennan, J., dissenting in part) (concluding opposite). Neither party presented authority that permissible evidence of every or any element of Sturgill's claim is so cabined.

Rather, jury instructions used in this district, *see, e.g.*, *Domski v. Blue Cross Blue Shield of Mich.*, 2:23-cv-12023 PageID.3981–3982 (E.D. Mich. November 12, 2024), and recitations of the elements of Sturgill's cause of action focus on, for example, the employee's sincerity and not the employer's perception of that sincerity. *See, e.g.*, *Sturgill v. Am. Red Cross*, 114 F.4th 803, 808–09 (6th Cir. 2024) (noting that the prima facie case for failure to accommodate a religious belief requires showing that "(1) the employee holds a sincere religious belief that conflicts with an employment requirement; (2) the employee informed the employer about that conflict; and (3) the employer took an adverse employment action against the employee for failing to comply with the conflicting employment requirement"); *Brown v. MGM Grand Casino*, No. 2:22-cv-12978, 2024 WL 4819575, at *4 (E.D. Mich. Nov. 18, 2024). And to this point, there are likely relevant uses of the evidence. For example, the testimony could buttress or attack the sincerity of Sturgill's religious objection.

At this juncture, the Court will not conclude that the entirety of the medical deposition, including its discussion of Sturgill's bases for refusing certain medical treatments, is so wholly irrelevant as to warrant complete exclusion. *See* Fed. R. Evid. 401.

**WHEREFORE**, it is hereby **ORDERED** that Defendant's Motion [113] is **GRANTED.**

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: July 7, 2025

5

# EXHIBIT 3

**Erina Kansakar**
**03/05/2021**

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN
2                      SOUTHER DIVISION

3    KOHCHISE JACKSON,

4          Plaintiff,              Case No.:  2:19-cv-13382

5       -v-                        Hon. Terrence G. Berg

6    CORIZON HEALTH, INC., et al.,

7          Defendant.
     _____/
8

9    PAGE 1 TO 70

10

11       The Zoom recorded deposition of

12       ERINA KANSAKAR, M.D.,

13       Seattle, Washington,

14       Commencing at 1:05 p.m.,

15       Friday, March 5, 2021,

16       Before Cheryl McDowell, CSR-2662.

17

18

19

20

21

22

23

24

25
```



**Erina Kansakar**
03/05/2021

Pages 2..5

**Page 2**

1  APPEARANCES:
2  MR. LAURENCE H. MARGOLIS - P69635
3  MR. IAN CROSS - P83367
4  Laurence H. Margolis PC
5  214 South Main Street, Suite 200
6  Ann Arbor, Michigan  48104
7  (734) 994-9590
8  larry@lawinannarbor.com
9  ian@lawinannarbor.com
10     Appearing remotely on behalf of the Plaintiff.
11
12  MR. DANIEL R. CORBET - P37306
13  MR. KENNETH A. WILLIS - P55045
14  Corbet Shaw Essad & Bonasso
15  30500 Van Dyke Avenue, Suite 500
16  Warren, Michigan  48093
17  (313) 964-6300
18  daniel.corbet@cseb-law.com
19  kenneth.willis@cseb-law.com
20     Appearing remotely on behalf of the Defendants
21     Prime Healthcare Services and Colleen Spencer.
22
23
24
25

**Page 3**

1  APPEARANCES, CONTINUED:
2  MR. DEVLIN K. SCARBER - P64532
3  Chapman Law Group
4  1441 West Long Lake Road
5  Troy, Michigan  48098
6  (248) 644-6326
7  dscarber@chapmanlawgroup.com
8     Appearing remotely on behalf of the Defendant
9     Corizon Health, Inc., and Keith Papendick, M.D.
10
11  MR. MARC OSWALD - P74204
12  Fletcher Fealko Shoudy & Francis PC
13  1411 Third Street, Suite F
14  Port Huron, Michigan  48060
15  (810) 987-8444
16  oswald@fletcherfealko.com
17     Appearing remotely on behalf of the Witness.
18
19  ALSO PRESENT:  MR. NEAL ROGERS, VIDEOGRAPHER
20
21
22
23
24
25

**Page 4**

1                    TABLE OF CONTENTS
2  Witness                                    Page
3  ERINA KANSAKAR, M.D.
4
5  EXAMINATION BY MR. CROSS:                    6
6  EXAMINATION BY MR. CORBET:                  23
7  EXAMINATION BY MR. SCARBER:                 32
8  REEXAMINATION BY MR. CROSS:                 59
9  REEXAMINATION BY MR. CORBET:                63
10  REEXAMINATION BY MR. SCARBER:              65
11
12                    EXHIBITS
13  PLAINTIFF'S EXHIBIT NO. 1                    5
14  Procedure Report
15  PLAINTIFF'S EXHIBIT NO. 4                    5
16  Fax and Document from Hope Surgical Services
17  DEFENDANTS' EXHIBIT NO. 1                    5
18  Note dated February 1, 2017
19  DEFENDANTS' EXHIBIT NO. 2                    5
20  Note dated March 29, 2017
21  DEFENDANTS' EXHIBIT NO. 3                    5
22  Note dated April 7, 2017
23
24     (Exhibits premarked and retained by Counsel.)
25

**Page 5**

1  Seattle, Washington
2  Friday, March 5, 2021
3  About 1:05 p.m.
4            - - -
5       (Plaintiff's Exhibits Nos. 1 and 4 and
6       Defendants' Exhibits Nos. 1, 2, and 3
7       premarked and retained by Counsel.)
8       THE VIDEOGRAPHER:  We are on the record.
9  This is the video recorded deposition of Doctor Erina
10  Kansakar being taken remotely via Zoom.  Today is
11  March 5th, 2021, and the time is 1:05 p.m. Eastern
12  Time.
13       Would the attorneys please identify
14  themselves and the court reporter please swear in the
15  witness.
16       MR. CROSS:  Ian Cross for the plaintiff,
17  Kohchise Jackson.
18       MR. CORBET:  Hi.  This is Dan Corbet and
19  Ken Willis, and we're on behalf of Prime Healthcare
20  and Colleen Spencer.
21       MR. OSWALD:  Mark Oswald of behalf of
22  Doctor Erina Kansakar.
23       MR. SCARBER:  Good afternoon.  Devlin
24  Scarber appearing on behalf of the Corizon defendants
25  as well as Doctor Papendick.



**Erina Kansakar**
03/05/2021
Pages 6..9

**Page 6**

1                          - - -
2                  ERINA KANSAKAR, M.D.,
3       having first been duly remotely sworn, was examined and
4       testified on her oath as follows:
5   EXAMINATION BY MR. CROSS:
6   Q.   Good morning, Doctor Kansakar.  My name is Ian Cross.
7        I represent the plaintiff, Kohchise Jackson.
8                  Have you ever had your deposition taken
9        before?
10  **A.   Yes.**
11  Q.   So you know that we need verbal responses, no head
12       nods, yes or no?
13  **A.   Correct.**
14  Q.   And I just want to let you know if you don't
15       understand any of my questions, that's fine.  You can
16       ask me to clarify.
17                 Also, this isn't an endurance test, so if
18       you need a break, if you want to go to the bathroom,
19       just let me know, okay?
20  **A.   Okay.**
21  Q.   So did you take the opportunity to review any
22       records --
23  **A.   Yes.**
24  Q.   -- to prepare for this deposition?
25  **A.   Yes.  I got a copy of the medical records, and I did**

**Page 7**

1   **get a chance to review those records.**
2                  THE COURT REPORTER:  Doctor, can you speak
3        up a little bit?  You're soft spoken and it's a little
4        difficult.
5                  Okay.  Thank you.
6                  **THE WITNESS:  Yes, I did get a copy of all**
7        **the medical records, and I did get a chance to review**
8        **those medical records.**
9   BY MR. CROSS:
10  Q.   Okay.
11                 MR. SCARBER:  I don't want to interrupt.
12       Just is there any way we can get more light in the
13       room where the doctor is?
14                 **THE WITNESS:  Yeah.  I'm at my home office**
15       **and --**
16                 MR. SCARBER:  I see.
17                 **THE WITNESS:  Let me see if I can open this**
18       **curtain to get some more light.**
19                 MR. SCARBER:  Okay.  I couldn't really see
20       you.  I can definitely hear you, so if that's the
21       case, that's fine.
22                 Oh, that's better actually.  Thank you.
23  BY MR. CROSS:
24  Q.   Okay.  So let's start with a little background,
25       Doctor Kansakar.  Can you give us an overview of your

**Page 8**

1        training and education since high school?
2   **A.   Sure.  I did my medical school at B.P. Koirala**
3        **Institute of Health Sciences in Dharan, Nepal.**
4                  **I came to the United States for my general**
5        **surgical residency.  That was from 2006 to 2012.**
6                  **After completing my general surgical**
7        **residency, I did a fellowship in minimally invasive**
8        **surgery at Detroit Medical Center from 2012 to 2013.**
9   Q.   What is a residency?
10  **A.   Residency is training in a medical specialty in order**
11       **to be able to practice that specialty.**
12  Q.   And if I heard you correctly, your medical speciality
13       is general surgery?
14  **A.   Correct.**
15  Q.   Are you currently practicing as a general surgeon?
16  **A.   Yes, I am.**
17  Q.   How many years have you practiced general surgery?
18  **A.   I've been in practice since August of 2013.**
19  Q.   Continuously?
20  **A.   Yes.**
21  Q.   Are you board certified?
22  **A.   Yes, I am a board certified general surgeon.**
23  Q.   Where did you work after your fellowship?
24  **A.   After completion of my fellowship, I was at Port Huron**
25       **with Physician Healthcare Network.**

**Page 9**

1   Q.   And how long did you work there?
2   **A.   I worked there until February of 2018.**
3   Q.   While you were working in Port Huron, did you treat an
4        individual by the name of Kohchise Jackson?
5   **A.   Yes, I did.**
6   Q.   Do you recall what treatment, what condition you
7        provided Mr. Jackson treatment for?
8   **A.   I remember Mr. Jackson, but I do not recall all the**
9        **details.**
10                 **After reviewing the medical records, I**
11       **treated him for a complicated sigmoid diverticulitis.**
12  Q.   All right.  I'm going to show you a document.  I'm
13       going to try to share the screen here.
14  **A.   Sure.**
15  Q.   And I want you to look over the document.
16                 Can you see it?
17  **A.   Yes.**
18  Q.   All right.  And let me know when you're done reviewing
19       it and if you need me to scroll.
20                 And this has been marked as Plaintiff's
21       Exhibit 1.
22  **A.   I'm okay with that.**
23  Q.   Okay.  Do you recognize this document?
24  **A.   Yes.**
25  Q.   What is it?



**Erina Kansakar**
**03/05/2021**                                                    Pages 10..13

Page 10

1  A.  This is a procedure report.  I did a colonoscopy for
2      Mr. Jackson.
3  Q.  And I see down here in this findings section, you
4      indicated he has a colovesical fistula, is that
5      correct?
6  A.  Correct.
7  Q.  What is a colovesical fistula?
8  A.  So a colovesical fistula is a condition where there is
9      abnormal communication between the colon and the
10     urinary bladder.
11 Q.  What's a colon?
12 A.  Colon is a part of the GI tract which is it was the
13     end of the gastrointestinal tract where the stool is
14     being formed and kind of sits there before somebody
15     kind of has a bowel movement.
16 Q.  Okay.  And I see above those findings in this
17     recommendation section, you recommended an open
18     sigmoid colectomy, is that correct?
19 A.  Correct.
20 Q.  What is an open sigmoid colectomy?
21 A.  So the open sigmoid colectomy is a surgery where we
22     make an incision right in the middle to identify the
23     colon, usually the sigmoid colon which has a
24     communication with the bladder in this case, to resect
25     that portion of the colon, and that would be a sigmoid

Page 11

1      colectomy.
2  Q.  When you say communication with the bladder, what do
3      you mean by that?
4  A.  That's an abnormal connection.  Sigmoid colon, sigmoid
5      diverticulitis which this patient has is a condition
6      where the colon has these weak pouches or protrusions
7      through -- which are, like, weak points, and that can
8      get infected, as a result of which they can establish
9      abscesses or pus pockets, or it could be complicated
10     and have communication with the adjacent organs like
11     the urinary bladder.
12         So when there is an abnormal connection
13     between the colon and the urinary bladder, it's called
14     a fistula.
15 Q.  All right.  Now, in the recommendations section, you
16     said:  With primary anastomosis.
17         Am I pronouncing that correctly?
18 A.  Correct.
19 Q.  Possible ostomy.
20         What is primary anastomosis?
21 A.  So primary anastomosis is doing a one-stage surgery
22     where the plan is to hook the patient back to
23     establish the natural route at the same time.
24 Q.  So if I'm understanding you correctly, with primary
25     anastomosis, you would do one surgery where you resect

Page 12

1      the infected section of colon and connect the two ends
2      together?
3  A.  Correct.
4  Q.  Okay.  What is an ostomy?
5  A.  So ostomy is a procedure where we do not hook the
6      patient's two ends of the colon together but bring a
7      bag through the abdominal wall so that the bowel --
8      excuse me -- the stool is rerouted into the bag, and
9      basically patient is having bowel movements into a
10     bag.  It's a diversion.
11 Q.  Why would you do a diversion like that, an ostomy,
12     rather than a primary anastomosis?
13 A.  It depends upon the condition during the surgery, if
14     there is a lot of swelling or it would be called
15     edema, a lot of scar tissue.
16         There is a concern that putting the two
17     ends together would result in a potential leak.  Then
18     it would be safer to do an ostomy or a diversion.
19 Q.  Okay.  And for Mr. Jackson, did you perform a primary
20     anastomosis?
21 A.  No, I did not perform a primary anastomosis.
22 Q.  Did you create an ostomy?
23 A.  Yes, I did.
24 Q.  Was that the first time you created an ostomy in your
25     career?

Page 13

1  A.  No.
2  Q.  About how many times have you created an ostomy?
3  A.  I would be -- it would be very hard for me to kind of
4      give a number, but I would say definitely close to a
5      hundred or more.
6  Q.  A hundred or more times.
7          Have you ever --
8          MR. SCARBER:  Just objection to the
9      timeframe.  It hasn't been specified.
10 BY MR. CROSS:
11 Q.  Have you ever reversed an ostomy?
12 A.  Yes, I have.
13 Q.  Do you know approximately how many times you performed
14     that procedure?
15 A.  I do not recall a number just on top of my head.  I'm
16     not able to give an exact number.
17 Q.  But more than once I assume?
18 A.  Absolutely more than once.  More than, again, maybe
19     closer to a hundred or more.
20 Q.  Okay.  So after you created an ostomy for Mr. Jackson,
21     did you prescribe a plan of treatment?
22 A.  Yes, I did.
23 Q.  And did your prescribed plan of treatment include a
24     barium enema?
25 A.  Correct.



**Erina Kansakar**
03/05/2021                                          Pages 14..17

Page 14

1  Q.  Why did the plan of treatment -- well, first, what is
2      a barium?
3  A.  **A barium enema is a radiological study where contrast**
4      **which is barium in this case is injected through the**
5      **rectum or the anal canal or the anal opening to kind**
6      **of see the anatomy of the rectum and give us idea**
7      **about the length that's available in the distal -- in**
8      **the remaining colon -- excuse me -- in the remaining**
9      **rectum.**
10 Q.  And why would you need to know that?
11 A.  **It helps with surgical planning to kind of get an idea**
12     **how much length is available distally to help with the**
13     **anastomosis or hooking the colon back up.**
14         **Sometimes it also helps to identify any**
15     **other abnormality like a mass or a growth.**
16 Q.  Did your prescribed plan of treatment include a
17     colostomy reversal surgery in February of 2017?
18 A.  **Yes, I did include that as my plan of treatment.**
19 Q.  Why did you include that in the plan of treatment?
20         MR. CORBET:  Just for the record, leading
21     on these last couple or that earlier question.  I was
22     trying to unmute it.
23 BY MR. CROSS:
24 Q.  You may answer.
25 A.  **Okay.  So my standard care for anybody that gets a**

Page 15

1      **colostomy is to wait for about six to eight weeks.**
2      **The reason I wait for six to eight weeks is to reduce**
3      **any swelling or inflammation or edema from the surgery**
4      **so that the second surgery or colostomy takedown**
5      **becomes easier.**
6          **The goal is to establish the natural route**
7      **for the patient so that he or she can have natural**
8      **route to poop and have bowel movements.**
9  Q.  Did I hear you use the term standard of care just now?
10 A.  **This is my standard practice.**
11 Q.  Okay.  Are you familiar with the term standard of
12     care?
13         MR. SCARBER:  I'm just going to place an
14     objection to relevancy.  This isn't a malpractice
15     case.
16         MR. CORBET:  Join.
17 BY MR. CROSS:
18 Q.  You may answer.
19 A.  **I'm sorry.  I didn't get that question again.**
20     **Could you repeat that?**
21 Q.  Are you familiar with the term standard of care?
22 A.  **Yes, I am.**
23 Q.  What is the standard of -- what does that term mean?
24 A.  **To me it means what I would normally do in a**
25     **particular situation or a health condition.**

Page 16

1  Q.  Okay.  And I'm going to show you another document.
2          Can you see the document?
3  A.  **Yes.**
4  Q.  Do you recognize what it is?
5  A.  **Yes.  I think this was a letter to kind of make a**
6      **request for approval for his colostomy reversal**
7      **surgery.**
8  Q.  Okay.  And is that your signature?
9  A.  **Yes, it is.**
10 Q.  Are you the author of this letter?
11 A.  **Yes.**
12 Q.  So you wrote:  My recommendation and standard of care
13     for this patient is to have a barium enema x-ray via
14     the distal rectal stump and a colostomy reversal?
15 A.  **Correct.**
16 Q.  Why did you recommend a colostomy reversal?
17 A.  **Colostomy is a diversion, and for this patient, it was**
18     **meant to be a temporary plan to let the infection**
19     **settle, and the original plan was to kind of hook him**
20     **back up.  So that was the plan to do a colostomy**
21     **reversal.**
22 Q.  So were you able to follow your prescribed plan of
23     treatment for this patient?
24 A.  **I had plan for tentative surgery in February, but I**
25     **was told that his surgery was not approved.  So I was**

Page 17

1      **not able to perform the second surgery for the**
2      **patient.**
3  Q.  Was there a medical reason the patient could not have
4      undergone the second surgery that you were aware of?
5  A.  **Not that I'm aware of.  He did not have any other**
6      **medical conditions that I was aware that would make**
7      **him ineligible for surgery.**
8  Q.  So --
9          MR. CORBET:  Just a relevance objection.
10 BY MR. CROSS:
11 Q.  Would it be fair to say that your prescribed plan of
12     treatment was interfered with for a nonmedical reason?
13         MR. CORBET:  Form and foundation.
14         MR. SCARBER:  Leading.
15         MR. CORBET:  Join.
16 BY MR. CROSS:
17 Q.  You may answer.
18 A.  **I do not know that.**
19 Q.  Do you know who was responsible for approving or not
20     approving the colostomy reversal surgery that you
21     planned?
22 A.  **I do not know that.**
23 Q.  Okay.  Let me go back to this exhibit.  This has been
24     marked as Plaintiff's Exhibit 4.
25         MR. SCARBER:  Ian, I don't want to



Page 18

1  interrupt, but I got Exhibit 1, and that was her
2  original note.
3        But did we go through 2 and 3 already?
4        MR. CROSS:  No, we haven't.
5        MR. SCARBER:  Okay.  I'm sorry.  All right.
6        MR. CROSS:  I skipped to 4.
7        MR. SCARBER:  Okay.  I thought I missed
8  something.
9 BY MR. CROSS:
10 Q.  Okay.  And I'm going to draw your attention to this
11   last page here, this fax cover sheet.
12        Do you see it says Hope Surgical Services
13   at the top?  What is Hope Surgical Services, if you
14   know?
15 **A.  Hope Surgical Services was the surgical group or the**
16   **surgical division of Physician Healthcare Network.**
17 Q.  And this person that faxed this from, Kathy, do you
18   know who that person is?
19 **A.  Kathy was my office manager at that time.**
20 Q.  Do you know her last name?
21 **A.  I do not remember her last name right now.**
22 Q.  Do you know any other information that would be useful
23   if we wanted to find Kathy to identify her?
24 **A.  I would contact Physical Healthcare Network.**
25 Q.  And I see the fax is to a Colleen.

Page 19

1        Do you know who Colleen is?
2 **A.  I do not know who Colleen is.**
3 Q.  Do you know if this fax was sent at your direction?
4 **A.  I do not remember but I believe so.**
5 Q.  Okay.  Why would you direct your office manager to fax
6   this letter and this document to a Colleen?
7        MR. SCARBER:  Foundation, calls for
8   speculation.
9 BY MR. CROSS:
10 Q.  You may answer.
11        MR. CORBET:  Join.
12        **THE WITNESS:  Usually the protocol is**
13   **whenever we get -- in my practice when we schedule a**
14   **surgery, we get an insurance authorization.**
15        **So it could be that the patient was not**
16   **authorized for surgery, and I wrote this letter to**
17   **make a case for the surgery and asked her to fax it**
18   **over to the insurance company.**
19        **But I do not know for sure if Colleen is a**
20   **part of that because it doesn't say anything, any more**
21   **details.**
22 BY MR. CROSS:
23 Q.  Okay.
24 **A.  Can I take a break?**
25 Q.  Sure.

Page 20

1        How long do you need?
2 **A.  About five minutes.**
3 Q.  Sure.
4 **A.  Thank you.**
5        THE VIDEOGRAPHER:  We are going off the
6   record at 1:27 p.m.
7        (Off the record at 1:27 p.m.)
8        (Back on the record at 1:33 p.m.)
9        THE VIDEOGRAPHER:  We are back on the
10   record at 1:33 p.m.
11 BY MR. CROSS:
12 Q.  Doctor Kansakar, I believe you testified before that
13   you had performed at least dozens, perhaps a hundred
14   colostomy reversal procedures in your career.
15        Do you currently treat patients with
16   Medicare?
17 **A.  Yes, I do.**
18 Q.  Are you a participant in the Medicare program?
19 **A.  Currently I'm employed through CHI which is Franciscan**
20   **Health, Catholic Health Initiative, and I believe I am**
21   **a part of the Medicare provider, but I have to check**
22   **to verify that.**
23 Q.  Have you ever performed a colostomy reversal procedure
24   for a Medicare recipient?
25 **A.  I haven't -- I do not check that to see if it's a**

Page 21

1   **Medicare or any other insurance, so I do not know the**
2   **answer to that.**
3        MR. CORBET:  Relevance objection.
4        MR. SCARBER:  Same.
5 BY MR. CROSS:
6 Q.  Do you typically have issues with health insurance
7   companies declining to cover colostomy reversal
8   procedures?
9        MR. SCARBER:  I'm just going to place an
10   objection.
11        MR. CORBET:  Same objection.
12        MR. SCARBER:  Go ahead.
13        MR. CORBET:  Just same objection, form and
14   foundation.
15        MR. SCARBER:  Same objection to relevancy.
16 BY MR. CROSS:
17 Q.  You may answer.
18 **A.  I'm not aware of.  I do not know.**
19 Q.  You don't know?
20 **A.  No.**
21 Q.  What are -- let me ask you this.  Do you ever place an
22   ostomy with the intention that the ostomy be
23   permanent?
24 **A.  Yes, there are occasions where I would place an ostomy**
25   **knowing that that would be a permanent ostomy.**



**Erina Kansakar**
03/05/2021                                Pages 22..25

### Page 22

1  Q.  And when would you do that?
2  A.  There are certain medical conditions where there could
3      be tumor or cancer which is very low in the colon.  It
4      may involve the sphincter that's responsible for the
5      continence or incontinence.
6           And if that is involved, then,
7      unfortunately, it would not be an option to hook the
8      colostomy back to any remnant there because that would
9      lead to incontinence.
10 Q.  I see.
11 A.  There could be certain medical conditions like
12     patients having very severe cardiac condition or lung
13     condition which would make another surgery very high
14     risk, and in those individuals, colostomy would be
15     permanent.
16 Q.  So barring those situations, would you typically try
17     to reverse a colostomy at some point after you placed
18     it?
19 A.  Yes, that would be my recommendation to try and
20     reverse the colostomy.
21          MR. CORBET:  Same objection.
22 BY MR. CROSS:
23 Q.  And how long would you typically wait before reversing
24     the colostomy?
25 A.  I typically wait between six to eight weeks from the

### Page 23

1      original surgery.
2  Q.  Would there be a medical reason that you might wait,
3      say, five years?
4           MR. CORBET:  Same objection.
5           THE WITNESS:  Not to my knowledge.
6           MR. CROSS:  Okay.  I don't have further
7      questions.
8           MR. CORBET:  Devlin, would you like to go
9      first or would you like me to go first?
10          MR. SCARBER:  You go ahead and I'll follow.
11 EXAMINATION BY MR. CORBET:
12 Q.  Okay.  Hi, Doctor Kansakar.  My name is Dan Corbet.
13     I'm going to ask you a few follow-up questions, okay?
14 A.  Sure.
15 Q.  You said you remembered the name Kathy.
16          Was that your office manager from the
17     Port Huron office I believe?
18 A.  Correct.  She was our office manager at Hope Surgical
19     Services.
20 Q.  And do you happen to remember a conversation with her
21     that about this patient in February of 2017?
22 A.  No.  It's been long, and I really do not remember any
23     other than what's in the medical records.
24 Q.  And I don't blame you one bit.  I wouldn't remember
25     something four years ago, either, that specific, and

### Page 24

1      that's why we have some records.
2           So I'm going to see if I can try to refresh
3      your recollection, okay?
4  A.  Okay.
5  Q.  Let me see if I can pull up a document here.
6           Doctor, can you see the note that I put up
7      on the screen?
8  A.  Uh-huh, yes, I can.
9  Q.  We can call this Defendant's Exhibit 1.
10          And do you see the date on the left-hand
11     side, it says February 1, 2017?
12 A.  Okay.  Yes, I do.
13 Q.  And if we read the note, can you read it to yourself,
14     see if it will refresh your recollection?
15 A.  Inmate's colostomy reversal is currently pending.  Per
16     Doctor Kansakar's office manager, Kathy, the colostomy
17     reversal is not life threatening or emergent.  When
18     Kathy was asked for a specific timeframe to have the
19     procedure completed per recommended standard of care,
20     she stated there is not a timeframe.  It is not a
21     life-threatening condition.  It is based on personal
22     comfort of the patient.  Inmate's surgery will remain
23     postponed at this time.  Will continue to assess and
24     monitor.  Colleen Dwean.
25 Q.  I'm sorry.  Go ahead.

### Page 25

1           Okay.  So does that refresh your
2      recollection of having a conversation with Kathy back
3      then?
4  A.  No, it doesn't.
5  Q.  Let me try another one.
6           Doctor, here's a note from the state
7      prison, and near the bottom of it, can you read -- can
8      you see my mouse?
9  A.  Yes, I do.
10 Q.  Can you read that, two sentences?
11 A.  No urgent – yeah.  Okay.  No urgent medical issues
12     were reported from the surgeon's office, and the
13     colostomy is functional.  It is not likely that the
14     colostomy will be reversed in the MDOC.
15 Q.  Now, do you see the date on this one?
16 A.  That is March 29, 2017.
17 Q.  All right.  Where it talks about no urgent medical
18     issues were reported from the surgeon's office and the
19     colostomy is functional, do you happen to have a
20     recollection of maybe talking to either your office
21     manager or somebody about the patient back on or about
22     March 29, 2017?
23 A.  No.  When I reviewed the medical records, I think the
24     last office note was 1-10, and, unfortunately, I do
25     not have any other, you know, recollection of the



**details.**

Q. Okay. So we'll call this one for the record Defendants' Exhibit 2. Yeah, 2.

So, Doctor, let me try to refresh your recollection with one more note. Doctor, let me get the date of this thing. So here's another note from the state prison.

Can you read the date of that for us?

**A. It's 4-7, 2017.**

Q. Okay. And the only place it mentions surgeon is -- can you see where my mouse is and start reading there, just that sentence?

**A. No medical necessity per outside documentation or from conversation with surgeon's office, Doctor Kansakar.**

Q. So does this refresh your recollection that maybe you had a conversation with somebody either from the state prison or in your office?

**A. Unfortunately, I do not.**

Q. Okay. Nobody expects you to. This is four years ago.

So if Kathy had come to you either in February, March, or April and asked you is the reversal of the colostomy medically necessary, would it be correct to say that you may have told her it's not medically necessary, it's more for the preference

of the patient, is that fair?

**A. I cannot say that for sure because in my mind, you know, I want the natural route to be established for the patient.**

Q. Certainly.

But if you were asked is this more for the preference of the patient or is this a medically necessary procedure, would it be your custom, habit, and procedure if you were asked that question at that time that you may have said, yes, it is more for the preference of the patient than required as a medical necessity?

MR. CROSS: Objection, calls for speculation.

BY MR. CORBET:

Q. Do you remember the question, Doctor?

**A. Could you repeat that again?**

Q. Sure. If you had talked to somebody in your office, possibly Kathy, in January -- I'm sorry -- in February, March, or April of 2017 and she told you that the jail or the prison had called and wanted to know if this is a medically necessary procedure to reverse the colostomy, is it possible you may have said, well, it's more for the preference of the patient, it's not technically a medically necessary

procedure. Based on your custom, habit, and practice, would you have said something along those lines to Kathy?

**A. I do not know that. Usually my answer would be it's a lifestyle-altering procedure for the patient, and it's -- it would be very normal for the patient to have a natural route established.**

**I would recommend colostomy reversal. The timeframe is usually after the initial six to eight weeks' window. It's not, it's not definite, like, when I would do it, but, you know, I would prefer to do it within, within some reasonable time as long as the initial six to eight weeks is over, and it could depend upon, you know, surgeon's availability or operating room availability and patient's time preference.**

Q. If Kathy had told these -- the persons that called from either the jail and/or the prison, had told them that it was a preference as opposed to a medical necessity, would she have been in error doing that?

**A. I do not know if she said that, so I cannot answer that question.**

Q. Well, I'm allowed to ask you hypotheticals, and I'm going based on these notes in the chart here, and I showed you three notes.

If Kathy had actually said something along those lines that it's not medically necessary according to Doctor Kansakar, it's more of a lifestyle preference, are you saying she was in error telling that to the jail person?

**A. No, it's not a life-threatening situation. As I said, it's more of a quality of life.**

Q. Okay. And the term I used was medically necessary I think at one point in time because I think I saw that in one of the notes, so let me use that term again.

If Kathy had told someone from the jail or someone from the prison that the reversal of the colostomy was a lifestyle preference as opposed to medically necessary, would Kathy have told us -- told them something that was incorrect?

**A. I -- again, it's when you say about medical necessity, it also depends upon, like, the psychological well-being of a person.**

**So if I was a, if I was a patient, I was, you know, I believe he was thirty-four or thirty-five at that time, and I did not have any other medical conditions which would prohibit me from getting a surgery, I would like to have my normal anatomy established so that, you know, I don't have to have a bag which can potentially leak and cause a problem**

**Erina Kansakar**
03/05/2021                                        Pages 30..33

Page 30

1    and, you know, potential embarrassment.
2         So I would say if you consider the medical
3    well-being of the person both, like, for psychological
4    well-being, for being -- feeling well in general, I
5    think having a colostomy reversal would be much more
6    preferred than having a colostomy.
7         MR. CORBET: For the record, motion to
8    strike as being way over what I asked.
9    BY MR. CORBET:
10   Q.  Doctor, my question was a little bit shorter and
11   simpler.  If Kathy had told somebody from the jail who
12   called or somebody from the prison who called that the
13   reversal of the colostomy was a lifestyle preference
14   as opposed to a medical necessary procedure, would she
15   have been incorrect to tell them that?
16        MR. CROSS: Objection, asked and answered.
17   But you can answer.
18        THE WITNESS: Well, I do not, I do not know
19   that answer, you know.  Yes, as I said, it's something
20   that would be -- it's not a life-threatening
21   condition.
22        If she had said that, again, it's a
23   hypothetical scenario, and I would prefer not to
24   answer hypothetical questions, especially when I
25   wasn't the one who gave that answer.

Page 31

1    BY MR. CORBET:
2    Q.  Right, but we're allowed to ask you hypothetical
3    questions, and we'll get a chance to ask Kathy
4    questions and try to connect the dots.
5         But at this moment, I still need to ask you
6    that question.  Would that have been something
7    incorrect for Kathy to have told the jail or prison or
8    whoever called and talked to her that the reversal was
9    not medically necessary but it is a lifestyle
10   preference?
11   A.  I think I would say it is medically necessary to have
12   the colostomy reversed for the general well-being of
13   the patient.
14   Q.  And is there a time limit on when you think that --
15   strike that.
16        MR. CORBET: I'm going to move to strike
17   that answer.
18   BY MR. CROSS:
19   Q.  Would Doctor -- Doctor, would Kathy have been
20   incorrect, though, if she told that to the jail
21   person?
22        MR. CROSS: Objection, asked and answered.
23   BY MR. CORBET:
24   Q.  You can answer the question.  Would Kathy have been
25   incorrect to tell that to the jail person that this

Page 32

1    was not medically necessary, it was a lifestyle
2    preference?
3    A.  I think I would agree with the first part which says
4    it's not medically necessary, but I do not agree with
5    just the second part that it's just a lifestyle
6    preference.  It's for the mental and, you know,
7    psychological well-being to have a natural colostomy, I
8    mean colostomy reversed and having a natural route
9    reestablished.
10        MR. CORBET: Okay.  Thank you.  That's all
11   I have.
12   EXAMINATION BY MR. SCARBER:
13   Q.  Good afternoon again, Doctor Kansakar.  Devlin Scarber
14   appearing on behalf of the Corizon defendants, the
15   individuals at the -- who provided health care at the
16   Michigan Department of Corrections prison.
17   A.  Good afternoon.
18   Q.  I think I mentioned during our break, if you'd be kind
19   enough to provide Mr. Oswald with a copy of your CV, I
20   guess what we also call a resume, that would be great,
21   and he can get that over to us probably shortly after
22   you provide it to him, and that will give us a little
23   bit more information about your background.
24   A.  That would not be a problem.
25   Q.  Okay.  So thank you.  I sure would appreciate that.

Page 33

1         I'm just going to follow up on the last
2    couple of exhibits that the plaintiff -- I'm sorry --
3    that Mr. Corbet asked you about with respect to those
4    documentations from Kathy who was -- who you indicated
5    was your office manager.  And we discussed the fact
6    that it's -- it was over -- it was four years ago when
7    these conversations or notes took place.
8         Is it fair to say that you're not saying
9    those conversations didn't happen; you're just saying
10   that you can't recall that at this point because now
11   it's four years later?
12   A.  I agree.
13   Q.  Okay.
14   A.  It's been four years, and I do not have the
15   recollection of all the conversations I've had.
16   Q.  So it could have happened, it couldn't have happened,
17   you just don't remember at this point, right?
18   A.  Yes, sir.
19   Q.  Okay.  And with respect to the documentation that was,
20   that was done by the jail health care staff as well as
21   the prison health care staff, they got documentation
22   about a conversation that took place.
23        And as far as you know, you don't have any
24   documentation about that, correct?
25   A.  Yeah.  The last -- this is the first time when it was

**Erina Kansakar**
03/05/2021                                                    Pages 34..37

Page 34

1  shown here at the exhibit that I have seen those two
2  documents.
3  Q.  Right.
4  A.  The only communication that I had from my side is the
5  note that was a typewritten note on Hope Surgical
6  letterhead from January 24th, and that's all I have in
7  writing as my reference.
8  Q.  Okay.  So the answer to my question would probably be
9  correct then.  It's fair to say that you have no
10  documentation regarding anything that would dispute
11  you having such conversations or your office having
12  conversations with the jail on January or -- I'm
13  sorry -- February 1st of 2017 and again with the
14  prison health care professionals on March 29, on or
15  around March 29th, 2017, or April 7th, 2017, correct?
16  A.  Correct.
17  Q.  Now, there was when you performed your original surgery on
18  Mr. Jackson back in December of 2016, would you
19  consider that that surgery was medically emergent, it
20  was absolutely necessary that you had to perform that
21  surgery immediately for his well-being?
22  A.  Yes.  I agree that he needed that surgery sooner than
23  later.
24  Q.  And he needed it as soon as possible, correct?
25  A.  Yes, because he was having -- from what I understand,

Page 35

1  he had a communication or a fistula between his colon
2  and the bladder, as a result of which the stool was
3  leaking into the bladder, and he was having urinary
4  tract infection.
5  Q.  And when you performed that particular procedure on
6  him on December 10th of 2016, there were risks
7  associated with that procedure, right, even though it
8  was an emergency kind of situation or a medically
9  necessary kind of situation, right?
10  A.  Could you repeat that question, please?
11  Q.  When you performed the colostomy surgery that you
12  performed on him back in December 10th of 2016, there
13  were risks and complications that could have resulted
14  from that surgery even though he needed it.  There
15  were risks that were facing him potentially, correct?
16  A.  Correct.
17  Q.  And you advised him of those risks, correct?
18  A.  I think that was -- that would be part of my
19  discussion with him.
20  Q.  Okay.  Let me move around a little bit here, Doctor.
21  I apologize.  If there's a delay on my end, it's
22  because I'm trying to use my screen that's not
23  necessarily connected to my computer.  I'm on a cloud,
24  so give me a minute.  If there are any delays, I
25  apologize in advance here because I've got to do

Page 36

1  scrolling.
2           MR. CORBET:  Devlin, is any of the records
3  I had up there do you want me to pop up for you?
4           MR. SCARBER:  No, no.  I've got some other
5  stuff.
6           MR. CORBET:  All right.  No problem.
7           MR. SCARBER:  And I'm getting it together.
8  I think once I get rolling, I'll be good.
9  BY MR. SCARBER:
10  Q.  Doctor, are you able to see this note on the screen?
11  A.  Yes, I do.
12  Q.  Okay.  And this is explaining the risk of anesthesia.
13           Now, I understand you performed -- what was
14  that surgery you performed on him on December the 10th
15  of 2016?  What was the name of that?
16  A.  It's called a sigmoid colectomy.
17  Q.  Okay.  And there are risks associated with that
18  particular procedure, correct?
19  A.  Correct.
20  Q.  And I've just highlighted one of the risks, and one of
21  the risks is anesthesia, correct?
22  A.  Correct.
23  Q.  And are you able to see this on your screen again?
24  A.  Yes.
25  Q.  Okay.  And I think it indicates here that some of

Page 37

1  those complications with anesthesia are possibility of
2  infection, bleeding, drug reaction, blood clots, loss
3  of sensation, loss of limb function, paralysis,
4  stroke, brain damage, heart attack, and death.
5           Did I just read those correctly?
6  A.  Yes.
7  Q.  And those are the things that are explained to the
8  patient before he has a procedure like that, right?
9  A.  Correct.
10  Q.  And that's just with anesthesia, but there's also
11  risks just associated with the surgery, period, and
12  here it indicates that -- are you able to see my
13  screen?
14  A.  Yes, sir.
15  Q.  Here it indicates that these operations and procedures
16  carry the risk of unsuccessful results, complications,
17  injury, or even death.
18           That's correct, right?
19  A.  Yes, sir.
20  Q.  And those are possibilities that can happen with these
21  surgeries, correct?
22  A.  Yes, sir.
23  Q.  And, in fact, you're so concerned about those
24  particular type of things occurring that you actually
25  have the patient sign an informed consent indicating



**Erina Kansakar**
**03/05/2021**                                    Pages 38..41

Page 38

1    that he's aware that those things could happen, right?
2  A.  Yes.
3  Q.  Give me one second here.  In a perfect world, I would
4       have just photocopied each page and just had it
5       simpler so I didn't have to do all this scrolling.
6            I think I'm on my operative report, but I
7       want to go to a specific page here.
8            Now, this is from your operative report in
9       December of 2016, and can you see what I've kind of
10      highlighted right there?
11 A.  Yes, sir.
12 Q.  And it indicates that even in your -- not just the
13      hospital forms that the patient signed but it also
14      appears that even in your operative report, you double
15      document that you explained the risks and dangers
16      associated with the procedure that you performed,
17      correct?
18 A.  Yes, sir.
19 Q.  And you indicate here that the risks and potential
20      complications could be bleeding, infection,
21      inadvertent urethral injury.  Patient elected to
22      undergo an open sigmoid colectomy but not before you
23      put in here what the risk could be, right?
24 A.  I'm sorry.  Could you explain -- restate the question?
25 Q.  Yeah.  You explained these risks to him, correct?

Page 39

1  A.  Yes, I did.
2  Q.  All right.  And before you would perform this surgery,
3       he had to understand these risks and be aware that
4       these things could happen, correct?
5  A.  Yes.  That would be part of my practice to explain
6       that to my patients.
7  Q.  And you're not just making this stuff up, right?
8       Something has told you that these things can happen,
9       and that's why you're informing them, right?
10 A.  Yes, sir.
11 Q.  Now, I understand that you indicated that you had a
12      plan to -- you had established a plan of care for
13      Mr. Jackson, and I understand that that was based upon
14      certain things that you wanted to do, particularly in
15      your practice, correct?
16 A.  Yes, that's correct.
17 Q.  As per what your practice is, right?
18 A.  Correct.
19 Q.  Not anybody else's practice but per what your practice
20      is, right?
21 A.  I do not know about other's practice, but that's how I
22      was trained to wait for about six to eight weeks to
23      minimize any swelling and infection and then put the
24      patient or put the colostomy back together.
25 Q.  And I'm just going back to your testimony as well as

Page 40

1       your letter, and your testimony was very clear when we
2       started this deposition that it's your practice to do
3       that.  Your letter even said my practice or my
4       standard is to do that.
5            You're talking about -- what you're talking
6       about is what you do, correct, not necessarily what
7       everybody else does, right?
8  A.  Yes, sir.
9  Q.  Okay.
10           MR. CROSS:  Objection, mischaracterizes the
11      exhibit.
12 BY MR. SCARBER:
13 Q.  And, in fact, when you -- I've got to ask you, do you
14      have a chart in front of you?
15 A.  Patient's chart, yes, the medical records.
16 Q.  Okay.  And what exactly do you have in front of you?
17      Is that something that you got from the medical
18      office, or what do you have in front of you?
19 A.  So I have my office notes, the operative report, and I
20      have a letter that was written on the Hope Surgical
21      Services letterhead dated January 24th and then a
22      handwritten note dated 12-27.
23 Q.  Okay.  So let's go to your -- do you have your records
24      from your post-op records where you treated
25      Mr. Jackson?

Page 41

1  A.  Yes, I have access to my post-op records when I saw
2       him after surgery.
3  Q.  Okay.  So the first time you saw Mr. Jackson after
4       surgery, would that have been December 27th, 2016?
5  A.  Let me check real quick.
6            Yes, December 27, 2016.
7  Q.  Okay.  Is this your record here?
8  A.  Yes.
9  Q.  Okay.  This should be -- this is probably what you
10      have in front of you.
11           I know we've got three attorneys here, and
12      I think we've all gotten records, and some of them
13      might -- I think they all say the same thing on them,
14      but maybe they've got a line or two here that's
15      different or one line is on page five instead of page
16      six.  I don't know how they print them out, but I
17      think we've got the same documents here.
18           So this is your December 27th visit in
19      2016.
20 A.  Uh-huh.  Yes, sir.
21 Q.  And you note that his ostomy is pink and productive,
22      right?
23 A.  Correct.
24 Q.  And I seem to remember that they talked about -- this
25      is based upon prior, prior experience I've got with



**Erina Kansakar**
**03/05/2021**

Pages 42..45

Page 42

1    colostomies, but there's, like, three Ps in ostomy
2    care, right?  Have you ever heard that?
**3  A.  The three Ps?  I'm not quite sure, sir.**
4  Q.  Pink, patent, and productive.
**5  A.  Okay.  Yes.**
6  Q.  It doesn't matter.  If you haven't heard of it, you
7    haven't heard of it.
8         But you say it's pink and productive,
9    right?
**10 A.  Correct.**
11 Q.  And it's got no problems and no problems with
12   functioning, right?
**13 A.  Not according to my note.**
14 Q.  And you've got written in here no new complaints,
15   right?
**16 A.  Correct.**
17 Q.  That means the patient wasn't complaining to you about
18   anything, right?
**19 A.  No new complaints at that point, correct.**
20 Q.  All right.  Functional colostomy, correct?
**21 A.  Correct.**
22 Q.  You see him again on 1-10, January 10, 2017, right?
**23 A.  Yes, that was my office note from January 10, 2017.**
24 Q.  When you see him on January 10th, 2017, his colostomy
25   was functioning fine, right?

Page 43

**1  A.  Yeah.  It says colostomy was pink and productive.**
2  Q.  Even -- he was even -- even when you did a, you did a
3    physical examination on him, he was able to stand and
4    walk properly, correct?
**5  A.  Yes, I believe so.  It doesn't -- as per my note,**
**6    there was nothing that says he wasn't able to walk.**
7  Q.  And at that point he was not having any issues that
8    you recorded in your report, correct?
**9  A.  Correct.  As per my note, you know, pain was well**
**10   controlled, and some drainage was noted from the**
**11   incision.**
12 Q.  Is there anything indicating here that his colostomy
13   was not functional?
**14 A.  No, sir.**
15 Q.  All right.  In fact, you said it was, right?
**16 A.  Correct.**
17 Q.  Is there anything in here, Doctor, where you have
18   anything noted about this particular patient
19   complaining about he wants a reversal or he absolutely
20   has to have a reversal and he's discussing that with
21   you and discussing anything in detail about how this
22   is affecting him and all that kind of stuff?  I didn't
23   see anything, but you tell me.  Is there anything in
24   here?
**25 A.  Not that I can see.**

Page 44

1  Q.  You certainly didn't document anything like that,
2    right?
**3  A.  Correct.  Again, I did not document that.**
4  Q.  And that, I mean, concerns that are important that you
5    get from a patient you document, right?
**6  A.  Yes.**
7  Q.  Okay.  And this was the last visit that you actually
8    saw Mr. Jackson, January 10th, 2017, correct?
**9  A.  Yeah.  That's the last note I have from the medical**
**10   records, so I believe that's the last time I saw him.**
11 Q.  And I know you had indicated a plan, you know, your
12   plan that you wanted to do or were anticipating doing
13   a reversal, but I didn't see any note where you
14   specifically explained anything about a reversal to
15   Mr. Jackson.
**16 A.  I think there was a handwritten note from**
**17   December 7 -- excuse me -- December 27th which laid**
**18   out a plan for surgery.  It's a handwritten note on my**
**19   office letterhead.  That was part of my -- of the**
**20   medical records that was given to me.**
21 Q.  Did you discuss anything with him on January 10th, the
22   next time you saw him?
**23 A.  I do not know that, sir, because it's not in my**
**24   medical records, and I do not remember what happened**
**25   on that day.**

Page 45

1  Q.  Okay.  And the note you're referencing from
2    December 27th on your letterhead, is that a discussion
3    you had with Mr. Jackson, or is that just some notes
4    that you had written down about a potential plan?
**5  A.  No.  This is what I discussed with the patient I**
**6    believe.  This is, you know, this is a documentation.**
**7    So I'm very much sure that I discussed this with the**
**8    patient.**
9  Q.  But nothing on January 10th, the last time you saw
10   him?
**11 A.  Yeah.  I don't see any, like, repetition of those**
**12   reports.  I do see that, you know, there's a colostomy**
**13   reversal planned for February 9th.**
14 Q.  Okay.  This, this colostomy reversal plan for February
15   9th of 2017, was that a date?  Who picked that date?
16   How did that date even come about, do you know?
**17 A.  The index surgery or the first surgery was on 12-10 I**
**18   believe, and, again, after the surgery is done, I wait**
**19   about six to eight weeks to let all the infection, the**
**20   inflammation, swelling, scarring to settle down.**
**21        So eight weeks from that would put us in**
**22   February, and that's how I chose that tentative date**
**23   to -- depending upon my schedule, the OR availability**
**24   to choose a date.**
25 Q.  Okay.  I got it.  I think I understand this.



**Erina Kansakar**
03/05/2021                                                    Pages 46..49

Page 46

1   So this date you put in here was really
2   just some calculation that you had from the time you
3   had done the original surgery, right?
4 A.  So, yes.  Again, I would generally wait for six to
5   eight weeks after this kind of surgery to start to do
6   the second surgery because trying to go any time
7   earlier than that would cause a lot of swelling and
8   potentially more harm than or injury because of the,
9   you know, the adhesions or scar tissues.
10   So six to eight weeks' time, make sure that
11   the scars are not as bad, and second surgery is going
12   to be done much more easier.
13 Q.  Right.
14   And I think I'm just asking you, though,
15   and you might have answered it, but just my simple
16   question is this date is a date it sounds like that
17   you just selected based upon your calculation of when
18   he would heal and when you thought he could do a
19   surgery, right?
20 A.  Correct.
21 Q.  Okay.  You never spoke with the individual health care
22   professionals at the Michigan Department of
23   Corrections about this or Corizon or any of the health
24   care professions there, correct?
25 A.  I do not recall.

Page 47

1 Q.  Well, let me just tell you this.  He wasn't even in
2   prison at that time in February 9th, 2017.  He wasn't
3   even there yet, so you obviously didn't discuss this
4   with them, correct?
5 A.  I don't think so, sir, but I do not have any notes to
6   refer to that.  So I do not know the answer to that.
7   I don't recall any conversations.
8 Q.  So assuming that he doesn't even get to the Michigan
9   Department of Corrections until March, late March of
10   2017, then you would agree that this was never a plan
11   that you communicated to the health care professionals
12   at the prison, right, assuming that he wasn't even
13   there yet, correct?
14 A.  I do not know, like, how, how or where he was housed
15   during this time, you know.
16   I kind of laid out my plan as per the
17   medical records, you know.  Everything that I did is
18   in the medical records, and, you know, the plan was to
19   do a colostomy reversal with a tentative date of
20   February 9th.
21 Q.  Doctor, I don't want to interrupt you, but I think you
22   might have almost answered my question but not quite
23   answered it, and I don't want to cut you off because I
24   think I got the response to the end of your answer
25   there already.

Page 48

1   But my question is assuming that
2   Mr. Jackson was not even in prison in February of
3   2017, then this particular date that you came up with
4   in December or January is obviously not something that
5   you could have discussed with him because he wasn't
6   even there yet.
7   You would agree with that, right?
8 A.  I'm sorry.  I don't think I understand the
9   hypothetical situation.
10 Q.  The hypothetical is you apparently wrote a note in
11   your record indicating a reversal for February 9th of
12   2017.
13   Now, if Mr. Jackson was not even in prison
14   until after March of 2017, then you would agree that
15   you never discussed the February 9th, 2017, date with
16   the prison?  It's just a simple question.
17 A.  Yeah.  If he wasn't in the prison, then I guess, like,
18   I wouldn't have discussed that.
19 Q.  Okay.
20 A.  It could be any other, like, a patient who would come
21   to my office, and I would discuss the plan with the
22   patient.
23 Q.  Okay.  Now, we know that Mr. Jackson ultimately
24   underwent a reversal surgery on June 9th, June 19th of
25   2019.

Page 49

1   My question for you is did you ever discuss
2   any of the risks and complications that could arise
3   from a reversal surgery with Mr. Jackson?
4 A.  I believe I did, but, again, I'll have to refer to my
5   notes, and I do not recall, like, anything in
6   particular.
7 Q.  Do your notes indicate that just like your prior notes
8   from the hospital where you were telling him, you
9   know, that you were going to proceed with the surgery
10   and you discussed the risks, benefits, and
11   complications of the procedure for the procedure that
12   occurred in December.
13   Do your notes in any way from the Hope
14   Surgical Services or anyplace you saw him as far as
15   you know indicate that you had such discussions with
16   him for a potential reversal surgery in February of
17   2017?
18 A.  Yes, there is a date mentioned that there is, you
19   know, that's the tentative date for surgery, and I
20   believe it mentions in my operative report that I had
21   the discussion, but I may not have documented that in
22   my office note.
23 Q.  Well, let me -- my question might have been confusing.
24   You never got to the -- there was never a reversal
25   surgery done by you in February, so there is no



**Erina Kansakar**
03/05/2021                                                      Pages 50..53

**Page 50**

1  operative report regarding that.
2        What I want to know is if any of your
3  office notes where you saw him specifically discuss
4  the risks and complications that could arise from a
5  reversal surgery.
**6  A.  There's no documentation that I can see in my notes.**
7  Q.  And if you were -- when you get ready to perform a
8  surgery, you actually do document that in your notes,
9  right?  Because I saw one in the December 2016 notes.
**10  A.  Yes, but, yes, that's true, I would have documented,**
**11      but probably it could be that I was waiting or**
**12      anticipating another meeting, office meeting with him**
**13      just, like, closer to the surgery date to kind of go**
**14      over the instructions again, to explain everything in**
**15      detail.  So that could have been a potential plan.**
16  Q.  Right.
17        So I guess what I'm saying is although you
18  had planned to do a surgery, you didn't really
19  complete all of the normal protocols that you would
20  have actually done in order to actually definitively
21  say that that surgery was going to happen, correct?
**22  A.  Well, I had plan for sure.  I had, you know, surgical**
**23      date chosen.  So I would say I had, like, a plan for**
**24      colostomy reversal.**
**25      I had -- as per my note, I had mentioned**

**Page 51**

**1      that he needs antibiotics one day before surgery.  I**
**2      had, you know, plan for him to drink the prep for the**
**3      colostomy reversal at 7:00 a.m. the day before**
**4      surgery.  I had instructed him to use, like, bath**
**5      scrubs, special soap scrub.  So I was kind of -- I had**
**6      done my part in terms of preparing for the second**
**7      surgery.**
8  Q.  But you hadn't gotten around to doing all of the
9  things that you would normally do if you were going to
10  perform a surgery, correct?
11        For instance, we don't have any
12  documentation of you actually discussing the risks and
13  complications and benefits of the procedure like we
14  have in your previous records, and you also wanted a
15  barium enema to be done.
16        So you were still waiting on tests,
17  correct?
**18  A.  Yes.  I was still waiting for the workup to be**
**19      completed at that time, yes.**
20  Q.  Right.
21        And it hadn't been completed as of February
22  of 2019 as far as you know, correct?
**23  A.  Well, from what I --**
24  Q.  Doctor, my question is -- let me strike that.  My
25  question's bad.

**Page 52**

1        MR. CROSS:  Let her answer the question.
2        MR. SCARBER:  But it was an improper
3  question, and that's why she's having trouble
4  answering.
5  BY MR. SCARBER:
6  Q.  What I should say is as of January 10th, 2017, when
7  you last saw him, there was still things you were
8  waiting on in terms of the final workup before you
9  actually would have performed the surgery, correct?
**10  A.  Yes.**
11  Q.  Okay.  And it's my understanding that with reversal
12  surgeries, there is also significant risk, right, with
13  colostomy reversal surgeries?
**14  A.  Yes.**
15  Q.  And, in fact, when he had his surgery done in June of
16  2019, it looks like some of that stuff is discussed.
17  Here's the operative report from the doctor who
18  performed the reversal surgery, and I have highlighted
19  here, it says:  The patient was made aware of risks
20  and benefits of the procedure, including but not
21  limited to the risk of heart attack, stroke, death,
22  infection, the potential need for reoperation and the
23  potential for a leak or potential for damage to
24  surrounding structures including the ureter and
25  genitourinary system.  I probably pronounced that word

**Page 53**

1  wrong.
2        But do you see that?
**3  A.  Yes, sir.**
4  Q.  And these are real things that can occur, correct?
**5  A.  Yes, sir.**
6  Q.  And that's why the doctors explain these things to the
7  patient before they perform these procedures, right,
8  so that they're aware that these are things and
9  complications and risks that can occur, right?
**10  A.  Yes, sir.**
11  Q.  Now, it also notes in this record, it indicates that
12  the doctor is recognizing the fact that you performed
13  a procedure on him on December 10th, 2016, your
14  exploratory laparotomy with sigmoid colectomy and
15  Hartmann's procedure.  It indicates that the urologist
16  also fixed his urinary bladder.
17        And it says here, can you read that for me?
**18  A.  He now has no issues.**
19  Q.  All right.  And he didn't have any issues when you saw
20  him last on January 10th, 2017, with respect to the
21  functioning of his colostomy, correct?
**22  A.  Yes, sir.**
23  Q.  Am I correct in that?
**24  A.  Yes, sir, you are correct.**
25  Q.  And he didn't have any issues on June --



**Erina Kansakar**
**03/05/2021**                                                    Pages 54..57

Page 54

1  A.  I'm sorry.  I didn't get that last part.
2  Q.  And he also didn't have any issues, at least according
3       to the surgeon, on June 19th, 2019, right?
4  A.  As per --
5
6              MR. OSWALD:  Objection with respect to it's
7       calling Doctor Kansakar to testify regarding another
8       doctor's note.  She didn't treat.
9              MR. SCARBER:  Okay.  No speaking
10      objections.
11             What's your objection?
12             MR. OSWALD:  That it's not within her
13      knowledge of what the note was at that time.
14             MR. SCARBER:  So calls for speculation and
15      foundation.  I got it.
16  BY MR. SCARBER:
17  Q.  Per this note, this note is dated surgery as June
18      19th, 2019, correct?
19  A.  Yes, sir.
20  Q.  And in this particular note, I just read it to you,
21      it's highlighted here, he has no issues, correct?
22  A.  Yes, it's written as he has no issues.
23  Q.  Okay.  Now, we talked about complications and medical
24      risks associated with surgeries, particularly your
25      first colostomy -- I'm sorry -- your initial colostomy

Page 55

1       surgery as well as a reversal surgery.
2              I want to take you to a document that was
3       filed with the court by the plaintiffs in this
4       particular case, and this is a document called
5       UpToDate.
6              And you're familiar with UpToDate?
7  A.  Yes, I am.
8  Q.  And this document was filed as ECF number 12-6, page
9       ID 227.
10             And it indicates -- can you read this to
11      yourself here, what's highlighted?
12  A.  Subsequent closure of the colostomy is a technically
13      difficult operation associated with higher -- this is
14      kind of hidden here.
15             Could you move the screen?  It's kind of
16      hidden behind the --
17  Q.  Oh, I'm sorry.
18             MR. CORBET:  You might want to scroll down
19      so it will be at the bottom margin.
20             THE WITNESS:  I'm just going to move my
21      screen a little bit.
22  BY MR. SCARBER:
23  Q.  Are you having difficulty reading it?
24  A.  The videos are kind of blocking the text.
25  Q.  How about, how about there, better?

Page 56

1  A.  Thank you.
2  Q.  Okay.
3  A.  It says:  Subsequent closure of the colostomy is a
4       technically difficult operation associated with high
5       morbidity and mortality rates.  As a result, colostomy
6       closure is only performed in approximately fifty to
7       sixty percent of all patients after a Hartmann
8       procedure.
9  Q.  And you did a Hartmann's procedure, correct?
10  A.  Yes, sir, I did.
11  Q.  And how about this one that I'm going to show you
12      here, starting here.
13  A.  In a retrospective administrative database study of
14      sixteen sixty patients who underwent Hartmann
15      procedure for diverticulitis, only twenty-eight point
16      three percent underwent colostomy reversal within a
17      year.  Outcomes of the reversal surgery were not
18      influenced by the time lapse from the index operation.
19      The optimal timing of colostomy reversal remains
20      undefined and at the discretion of the surgeon.
21  Q.  Now, you don't disagree with that medical literature,
22      do you?
23  A.  No, I do not disagree, but, again, it's quoted only
24      one study, so I do not know if that's, like, that's
25      the -- I'm sure there are other studies kind of giving

Page 57

1       more information.  So it looks like one study there,
2       and it references --
3  Q.  It actually quotes about three studies.
4  A.  I see.
5  Q.  Each one of these items here is a particular study.
6       Let me go down.  So we've got 21, 22, 23, and 24.
7       Hang on a minute.  Let me see if I can go down it.
8              Well, let me just ask you this to save some
9       time here.  What this basically says, these different
10      studies that it's talking about, is basically saying
11      that there can be differences of opinion, differences
12      of opinions amongst doctors regarding colostomy
13      reversal, right, whether we do it, the timing of when
14      it can be done, things like that, correct?
15  A.  Yes, sir.
16  Q.  And you don't disagree with that, right?
17  A.  No, I do not disagree with that.
18  Q.  Okay.
19  A.  Could I take another break?
20  Q.  Yes.
21  A.  Thank you.  For five minutes, please?
22             THE VIDEOGRAPHER:  We're going off the
23      record at 2:35 p.m.
24             (Off the record at 2:35 p.m.)
25             (Back on the record at 2:44 p.m.)

**Erina Kansakar**
03/05/2021                                    Pages 58..61

Page 58

1      THE VIDEOGRAPHER:  We are back on the
2   record at 2:44 p.m.
3  BY MR. SCARBER:
4  Q.  Doctor, just to follow up with you regarding what we
5   were talking about when we last left off, here are
6   some of those articles that were filed or that were
7   referenced in a court filing.
8      Are you able to see my screen?
9  **A.  Yes, sir.**
10 Q.  Okay.  One of the articles being What Proportion of
11  Patients with an Ostomy for Diverticulitis Get
12  Reversed, another one being Restoration of Bowel
13  Continuity After Surgery for Acute Perforated
14  Diverticulitis:  Should Hartmann's Procedure be
15  Considered a One-Stage Procedure, Feasibility and
16  Morbidity of Reversal of Hartmann's, so Avoiding or
17  Reversing Hartmann's Procedures.
18      So there's a number of articles that would
19  seem to indicate that it's certainly within a
20  particular medical provider's medical judgment as to
21  what they are going to do or what they think is
22  appropriate for a particular patient, correct?
23 **A.  Correct, sir.**
24 Q.  And you don't disagree with that, right?
25 **A.  I do not disagree with that.**

Page 59

1  Q.  When you're going to do a reversal, essentially what
2   you're trying to do is alter or adjust the patient's
3   body or their body structure, right, back to what it
4   was, correct?
5  **A.  Yes, sir.**
6  Q.  I mean, you're trying to put a patient back in some
7   kind of original way, correct?
8  **A.  Correct.  The goal is to establish the natural**
9  **continuity.**
10 Q.  And it's reconstructive in the sense that you're
11  trying to reform the body structure back to how it was
12  previously in terms of what you indicated in terms of
13  how to have their waste excreted in the original way,
14  correct?
15 **A.  Yes, sir.**
16      MR. SCARBER:  Doctor Kansakar, I don't
17  think I have anything further.  I want to thank you
18  for your time.
19      **THE WITNESS:  Thank you, sir.**
20      MR. CROSS:  I have a little bit of
21  redirect.
22 REEXAMINATION BY MR. CROSS:
23 Q.  Doctor Kansakar, I believe you --
24      MR. CORBET:  Is anybody else there, Ian?  I
25  thought we ought to identify everybody in the room.

Page 60

1      MR. CROSS:  Yes.  Larry Margolis is here.
2      MR. MARGOLIS:  Good afternoon, people.  I
3   identified myself with the court reporter.  I
4   apologize if I didn't let you know.  Mr. Margolis,
5   Larry Margolis.
6  BY MR. CROSS:
7  Q.  Doctor Kansakar, I believe you testified about some
8   risks that are associated with the procedure to place
9   the ostomy, is that correct?
10 **A.  Could you, could you reframe the question again?**
11 Q.  Were there risks associated with the Hartmann's
12  procedure?
13 **A.  Yes, there are.**
14 Q.  Were there risks associated with a colostomy takedown?
15 **A.  Yes, there are.**
16 Q.  Are there risks associated with every surgical
17  procedure that involves general anesthesia?
18 **A.  Yes, there are.**
19 Q.  Do you recommend a surgery when you believe the risks
20  of the surgery outweigh the benefits to the patient?
21 **A.  No, I do not.**
22      MR. SCARBER:  I'm just going to place an
23  objection to relevance and foundation.
24 BY MR. CROSS:
25 Q.  I believe you testified before that you performed

Page 61

1   perhaps a hundred ostomy placements in your career?
2  **A.  That's a rough estimate.  I do not know the exact**
3  **number.**
4  Q.  And did you testify that Mr. Jackson was thirty-four
5   years old at the time you placed his ostomy?
6  **A.  I believe as per his date of birth which is 2-5, 1982,**
7  **he would have been thirty-four years old at that time.**
8  Q.  And I believe you testified he had no other medical
9   complications that would make reversal especially
10  difficult or contraindicated, is that correct?
11      MR. SCARBER:  I'm just going to place an
12  objection to asked and answered and leading.
13 BY MR. CROSS:
14 Q.  You may answer.
15 **A.  The patient did not have any other medical**
16  **comorbidities that would make him high risk for**
17  **colostomy reversal.**
18 Q.  Do many of the patients you have placed an ostomy in
19  have comorbidities?
20 **A.  Some patients do have comorbidities.**
21      **I'm sorry.  Sorry about that.**
22 Q.  How does Mr. Jackson's age compare to the ages of most
23  of the patients you perform this procedure on?
24      MR. SCARBER:  I'm just going to place an
25  objection now to outside, completely outside the scope



**Erina Kansakar**
03/05/2021                    Pages 62..65

Page 62

1   of my redirect, my direct or my redirect as well as
2   Mr. Corbet's.
3           MR. CORBET:  Join.
4   BY MR. CROSS:
5   Q.  Go ahead.
6   A.  So generally diverticulitis is a condition in older
7       age group, usually sixty or higher age group.  He is a
8       younger individual getting this condition at age
9       thirty-four.
10  Q.  So would it be fair to say that most of the
11      individuals you placed an ostomy in are older and
12      sicker than Mr. Jackson?
13  A.  Yes.
14          MR. SCARBER:  Foundation.
15  BY MR. CROSS:
16  Q.  Okay.  Go ahead.
17  A.  Sorry.  So generally they are older patients than
18      Mr. Jackson, not necessarily always sicker.
19  Q.  Okay.  And is it more difficult to reverse a colostomy
20      in an older patient typically?
21  A.  I do not think technically it is a difficult procedure
22      to reverse the ostomy in an older individual.
23          However, in an older individual, they do
24      have -- they do tend to have more medical
25      comorbidities like a heart condition or a lung

Page 63

1       condition which can be challenging for the
2       postoperative or intraoperative care.
3   Q.  And does that render the procedure higher risk?
4   A.  Yes, it can be a higher risk to perform based upon
5       other medical comorbidities of the patient.
6           MR. CROSS:  Okay.  I don't have further
7       questions.  Thank you for your time, Doctor Kansakar.
8           THE WITNESS:  Thank you, sir.
9   REEXAMINATION BY MR. CORBET:
10  Q.  Doctor, I just have a little bit of follow-up.  This
11      is Dan Corbet again.  Just some housekeeping.
12          I don't know if I identified the April 7th
13      jail note as an exhibit, but if I didn't, it's
14      Defendants' Exhibit 3.
15          And then just, Doctor, you don't have any
16      personal recollection of talking to the jail nurse,
17      Colleen, or any other jail or prison personnel about
18      reversing the colostomy, do you?
19  A.  I do not have any recollection of talking to any other
20      individual in person.  I am just referring to my
21      medical notes at this time.
22  Q.  Right.
23          And I didn't see any notes that you
24      personally talked to anybody at the jail regarding
25      reversing the -- the jail or the prison regarding

Page 64

1   reversing the colostomy, is that fair?
2   A.  I do not see any note in person, but, again, this
3       letter says to whom it may concern.  I'm not sure
4       where it was faxed to.  From what was shown earlier,
5       it was faxed to Colleen, but that's about it.
6   Q.  Okay.  And did you participate -- well, strike that.
7           I showed you several notes from the jail
8       and prison about where it was noted that discussions
9       were held with your office -- in one particular case,
10      Kathy -- about reversing the colostomy.
11          Do you remember me showing you those notes?
12  A.  Yes, sir.
13  Q.  Okay.  You don't know if Kathy told the jail or the
14      prison nurses or personnel that this was medically
15      necessary or not, do you?
16  A.  I do not know that.  From what I recall and referring
17      back to my notes, you know, the letter states that,
18      you know, this is what I would recommend for him, and
19      Kathy at that time being my office manager would have
20      taken the lead on the communication part.
21  Q.  Right.
22          And the letter that you're talking about,
23      that's dated January 24th, correct?
24  A.  Yes, sir.
25  Q.  And the conversation that I talked -- that I showed

Page 65

1   you in the jail note is dated February 1, about a week
2   later, a little more than a week later, correct?
3   A.  Yes.  I believe that was the date, but I currently
4       don't have access to that note.
5   Q.  Okay.  You can take my word for it.  Exhibit --
6       defendants' exhibit does show that it's February 1,
7       2017.  But nowhere in that note -- well, strike that.
8           That note suggests that someone at the
9       jail -- namely, Nurse Colleen -- spoke with your
10      office manager, Kathy, correct?
11  A.  Yes.
12          MR. CORBET:  Thank you.  That's all I have.
13          THE WITNESS:  Thank you.
14  REEXAMINATION BY MR. SCARBER:
15  Q.  Doctor Kansakar, just a couple follow-up questions.
16          First question.  When you were advising
17      Mr. Jackson about the risks and potential
18      complications of these procedures, you didn't tell him
19      you're young, so these things aren't going to happen
20      to you, did you?
21  A.  I'm sorry.  These things refer to --
22  Q.  I'm sorry.  When you were -- let me rephrase my
23      question, and let me be a little more specific.
24      That's my fault.
25          When you were discussing the risks and



**Erina Kansakar**
03/05/2021                                    Pages 66..69

Page 66

1    potential complications of this procedure with
2    Mr. Jackson, you didn't tell him, oh, by the way,
3    you're young, so you don't have a risk of infection,
4    you don't have a risk for potential need for
5    reoperation, you don't have a risk for potential
6    leakage or damage to the surrounding structures
7    including the ureter. You didn't tell him that he was
8    at any less risk than anybody else, did you?
9  A. No, I did not tell him that he was at any risk. I
10    don't think that would -- at least in my note, I don't
11    mention that, and I do not recollect.
12 Q. Right.
13        And I think you said any risk, but you
14    didn't tell him that he was at any less of a risk than
15    any other person, did you?
16 A. Again, that's -- that depends upon every patient and
17    their risk factors. It would be hard to compare him
18    against an eighty-year-old with a lot of other
19    comorbidities. So I don't know if this is less in
20    terms of somebody who is eighty versus somebody who is
21    fifty.
22        Again, looking at his history, he did not
23    have any other medical comorbidities, so I would
24    assume the risks would be less, but, again, there
25    could still be complications like bleeding which is

Page 67

1    not an age-related factor or age-related complication.
2  Q. And I think you might have answered my question, but
3    let me just ask it in a more defined way.
4        When you were explaining to him the risks
5    and complications of this potential procedure, you
6    didn't tell him when you were explaining this stuff to
7    him that you're only thirty-four years old or you're
8    only -- you're just over thirty, so don't worry about
9    it. You told him these risks because these risks can
10    happen, correct?
11 A. I don't believe I told him that just because of his
12    age factor.
13        The surgery itself has potential risks, and
14    that's true with any surgery.
15 Q. Okay. So you didn't give him any kind of special,
16    special risks and complications. You told him the
17    same risks and complications that can occur with
18    everybody, right?
19 A. Yes, sir.
20 Q. Do you see this note here?
21 A. Retrograde cystogram, yeah.
22 Q. Is this the handwritten note you were referring to?
23 A. No, sir.
24 Q. Is there a page number at the bottom of the note
25    you're referring to?

Page 68

1  A. I think it's page number 91.
2  Q. Can you hold it up to your camera because I think
3    we've all got different notes here.
4        All right. Let's take a quick break, and
5    I'll wrap this up. I don't want to waste your time
6    while I'm looking at it on my computer, so let's just
7    take a pause for the cause for a second.
8        THE VIDEOGRAPHER: We're going off the
9    record at 3:00 p.m.
10        (Off the record at 3:00 p.m.)
11        (Back on the record at 3:03 p.m.)
12        THE VIDEOGRAPHER: We are back on the
13    record at 3:03 p.m.
14        MR. SCARBER: Doctor Kansakar, thank you
15    for your time again. I don't have anything further at
16    this time.
17        I would note that we do reserve the right
18    to call you later in the case if we need to for a
19    discovery deposition as we are just at the early
20    stages of discovery in this case.
21        THE WITNESS: Yes.
22        MR. CORBET: I'm sorry. Thank you, Doctor.
23    I would join in that request or statement. Thank you.
24        MR. SCARBER: And just for my housekeeping,
25    I tried to reference the records. I think some of us

Page 69

1    might have the same set of records, so, Ian, we'll
2    have to figure out I guess if we're going to be using
3    the same set, same page numbers and all that kind of
4    stuff.
5        But the records I referenced I tried to
6    identify and I think I did on the record, so but if I
7    need to go back and fix that, you know, I will. But
8    hopefully everything is identified properly in the
9    transcript.
10        MR. CROSS: Sure, no problem.
11        I don't have any further questions, either.
12    Thank you for your time, Doctor Kansakar.
13        THE WITNESS: Thank you, everybody.
14        THE VIDEOGRAPHER: This concludes today's
15    deposition. We are off the record at 3:05 p.m.
16
17        (Deposition concluded at 3:05 p.m.)
18
19
20
21
22
23
24
25

**Erina Kansakar**
03/05/2021                                          Page 70
                    Page 70

```
 1  STATE OF MICHIGAN    )
                         )SS.
 2  COUNTY OF LIVINGSTON )
 3              CERTIFICATE OF NOTARY PUBLIC
 4                   I certify that this transcript
 5     is a complete, true, and correct record of the
 6     testimony of the deponent to the best of my ability
 7     taken on Friday, March 5, 2021.
 8                   I also certify that prior to
 9     taking this deposition, the witness was duly remotely
10     remotely sworn by me to tell the truth.
11                   I also certify that I am not a
12     relative or employee of a party, or a relative or
13     employee of an attorney for a party, have a contract
14     with a party, or am financially interested in the
15     action.
16
17
18
19
20
21
       Cheryl McDowell, CSR-2662
22     Notary Public, Livingston County
       State of Michigan
23     Commission Expires September 13, 2025
24
25
```

**Erina Kansakar**
**03/05/2021**

1

---

**1**

**1** 5:5,6 9:21 18:1 24:9,11 65:1,6

**1-10** 25:24 42:22

**10** 42:22,23

**10th** 35:6,12 36:14 42:24 44:8,21
45:9 52:6 53:13,20

**12-10** 45:17

**12-27** 40:22

**12-6** 55:8

**1982** 61:6

**19th** 48:24 54:3,18

**1:05** 5:3,11

**1:27** 20:6,7

**1:33** 20:8,10

**1st** 34:13

---

**2**

**2** 5:6 18:3 26:3

**2-5** 61:6

**2006** 8:5

**2012** 8:5,8

**2013** 8:8,18

**2016** 34:18 35:6,12 36:15 38:9
41:4,6,19 50:9 53:13

**2017** 14:17 23:21 24:11 25:16,22
26:9 27:20 34:13,15 42:22,23,24
44:8 45:15 47:2,10 48:3,12,14,
15 49:17 52:6 53:20 65:7

**2018** 9:2

**2019** 48:25 51:22 52:16 54:3,18

**2021** 5:2,11

**21** 57:6

**22** 57:6

**227** 55:9

**23** 57:6

---

**24** 57:6

**24th** 34:6 40:21 64:23

**27** 41:6

**27th** 41:4,18 44:17 45:2

**29** 25:16,22 34:14

**29th** 34:15

**2:35** 57:23,24

**2:44** 57:25 58:2

---

**3**

**3** 5:6 18:3 63:14

**3:00** 68:9,10

**3:03** 68:11,13

**3:05** 69:15,17

---

**4**

**4** 5:5 17:24 18:6

**4-7** 26:9

---

**5**

**5** 5:2

**5th** 5:11

---

**7**

**7** 44:17

**7:00** 51:3

**7th** 34:15 63:12

---

**9**

**91** 68:1

**9th** 45:13,15 47:2,20 48:11,15,24

---

**A**

**a.m.** 51:3

---

**abdominal** 12:7

**abnormal** 10:9 11:4,12

**abnormality** 14:15

**abscesses** 11:9

**absolutely** 13:18 34:20 43:19

**access** 41:1 65:4

**Acute** 58:13

**adhesions** 46:9

**adjacent** 11:10

**adjust** 59:2

**administrative** 56:13

**advance** 35:25

**advised** 35:17

**advising** 65:16

**affecting** 43:22

**afternoon** 5:23 32:13,17 60:2

**age** 61:22 62:7,8 67:12

**age-related** 67:1

**ages** 61:22

**agree** 32:3,4 33:12 34:22 47:10
48:7,14

**ahead** 21:12 23:10 24:25 62:5,16

**allowed** 28:23 31:2

**alter** 59:2

**anal** 14:5

**anastomosis** 11:16,20,21,25
12:12,20,21 14:13

**anatomy** 14:6 29:23

**and/or** 28:18

**anesthesia** 36:12,21 37:1,10
60:17

**answering** 52:4

**antibiotics** 51:1

**anticipating** 44:12 50:12

**anyplace** 49:14

---



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Erina Kansakar**
03/05/2021
2

apologize 35:21,25 60:4

apparently 48:10

appearing 5:24 32:14

appears 38:14

approval 16:6

approved 16:25

approving 17:19,20

approximately 13:13 56:6

April 26:22 27:20 34:15 63:12

arise 49:2 50:4

articles 58:6,10,18

assess 24:23

assume 13:17 66:24

assuming 47:8,12 48:1

attack 37:4 52:21

attention 18:10

attorneys 5:13 41:11

August 8:18

author 16:10

authorization 19:14

authorized 19:16

availability 28:14,15 45:23

Avoiding 58:16

aware 17:4,5,6 21:18 38:1 39:3
  52:19 53:8

---

**B**

B.P. 8:2

back 11:22 14:13 16:20 17:23
  20:8,9 22:8 25:2,21 34:18 35:12
  39:24,25 57:25 58:1 59:3,6,11
  64:17 68:11,12 69:7

background 7:24 32:23

bad 46:11 51:25

bag 12:7,8,10 29:25

---

barium 13:24 14:2,3,4 16:13
  51:15

barring 22:16

based 24:21 28:1,24 39:13 41:25
  46:17 63:4

basically 12:9 57:9,10

bath 51:4

bathroom 6:18

behalf 5:19,21,24 32:14

benefits 49:10 51:13 52:20 60:20

birth 61:6

bit 7:3 23:24 30:10 32:23 35:20
  55:21 59:20 63:10

bladder 10:10,24 11:2,11,13
  35:2,3 53:16

blame 23:24

bleeding 37:2 38:20 66:25

blocking 55:24

blood 37:2

board 8:21,22

body 59:3,11

bottom 25:7 55:19 67:24

bowel 10:15 12:7,9 15:8 58:12

brain 37:4

break 6:18 19:24 32:18 57:19
  68:4

bring 12:6

---

**C**

calculation 46:2,17

call 24:9 26:2 32:20 68:18

called 11:13 12:14 27:21 28:17
  30:12 31:8 36:16 55:4

calling 54:7

calls 19:7 27:13 54:14

camera 68:2

---

canal 14:5

cancer 22:3

cardiac 22:12

care 14:25 15:9,12,21 16:12
  24:19 32:15 33:20,21 34:14
  39:12 42:2 46:21,24 47:11 63:2

career 12:25 20:14 61:1

carry 37:16

case 7:21 10:24 14:4 15:15 19:17
  55:4 64:9 68:18,20

Catholic 20:20

Center 8:8

certified 8:21,22

challenging 63:1

chance 7:1,7 31:3

chart 28:24 40:14,15

check 20:21,25 41:5

CHI 20:19

choose 45:24

chose 45:22

chosen 50:23

clarify 6:16

clear 40:1

close 13:4

closer 13:19 50:13

closure 55:12 56:3,6

clots 37:2

cloud 35:23

colectomy 10:18,20,21 11:1
  36:16 38:22 53:14

Colleen 5:20 18:25 19:1,2,6,19
  24:24 63:17 64:5 65:9

colon 10:9,11,12,23,25 11:4,6,13
  12:1,6 14:8,13 22:3 35:1

colonoscopy 10:1

colostomies 42:1



**colostomy** 14:17 15:1,4 16:6,14,
16,17,20 17:20 20:14,23 21:7
22:8,14,17,20,24 24:15,16
25:13,14,19 26:23 27:23 28:8
29:13 30:5,6,13 31:12 32:7,8
35:11 39:24 42:20,24 43:1,12
45:12,14 47:19 50:24 51:3 52:13
53:21 54:25 55:12 56:3,5,16,19
57:12 60:14 61:17 62:19 63:18
64:1,10

**colovesical** 10:4,7,8

**comfort** 24:22

**communicated** 47:11

**communication** 10:9,24 11:2,10
34:4 35:1 64:20

**comorbidities** 61:16,19,20 62:25
63:5 66:19,23

**companies** 21:7

**company** 19:18

**compare** 61:22 66:17

**complaining** 42:17 43:19

**complaints** 42:14,19

**complete** 50:19

**completed** 24:19 51:19,21

**completely** 61:25

**completing** 8:6

**completion** 8:24

**complicated** 9:11 11:9

**complication** 67:1

**complications** 35:13 37:1,16
38:20 49:2,11 50:4 51:13 53:9
54:23 61:9 65:18 66:1,25 67:5,
16,17

**computer** 35:23 68:6

**concern** 12:16 64:3

**concerned** 37:23

**concerns** 44:4

**concluded** 69:17

**concludes** 69:14

**condition** 9:6 10:8 11:5 12:13
15:25 22:12,13 24:21 30:21
62:6,8,25 63:1

**conditions** 17:6 22:2,11 29:22

**confusing** 49:23

**connect** 12:1 31:4

**connected** 35:23

**connection** 11:4,12

**consent** 37:25

**Considered** 58:15

**contact** 18:24

**continence** 22:5

**continue** 24:23

**continuity** 58:13 59:9

**Continuously** 8:19

**contraindicated** 61:10

**contrast** 14:3

**controlled** 43:10

**conversation** 23:20 25:2 26:14,
17 33:22 64:25

**conversations** 33:7,9,15 34:11,
12 47:7

**copy** 6:25 7:6 32:19

**Corbet** 5:18 14:20 15:16 17:9,13,
15 19:11 21:3,11,13 22:21 23:4,
8,11,12 27:15 30:7,9 31:1,16,23
32:10 33:3 36:2,6 55:18 59:24
62:3 63:9,11 65:12 68:22

**Corbet's** 62:2

**Corizon** 5:24 32:14 46:23

**correct** 6:13 8:14 10:5,6,18,19
11:18 12:3 13:25 16:15 23:18
26:24 33:24 34:9,15,16,24
35:15,16,17 36:18,19,21,22
37:9,18,21 38:17,25 39:4,15,16,
18 40:6 41:23 42:10,16,19,20,21
43:4,8,9,16 44:3,8 46:20,24
47:4,13 50:21 51:10,17,22 52:9

53:4,21,23,24 54:18,21 56:9
57:14 58:22,23 59:4,7,8,14 60:9
61:10 64:23 65:2,10 67:10

**Corrections** 32:16 46:23 47:9

**correctly** 8:12 11:17,24 37:5

**Counsel** 5:7

**couple** 14:21 33:2 65:15

**court** 5:14 7:2 55:3 58:7 60:3

**cover** 18:11 21:7

**create** 12:22

**created** 12:24 13:2,20

**Cross** 5:16 6:5,6 7:9,23 13:10
14:23 15:17 17:10,16 18:4,6,9
19:9,22 20:11 21:5,16 22:22
23:6 27:13 30:16 31:18,22 40:10
52:1 59:20,22 60:1,6,24 61:13
62:4,15 63:6 69:10

**curtain** 7:18

**custom** 27:8 28:1

**cut** 47:23

**CV** 32:19

**cystogram** 67:21

**D**

**damage** 37:4 52:23 66:6

**Dan** 5:18 23:12 63:11

**dangers** 38:15

**database** 56:13

**date** 24:10 25:15 26:6,8 45:15,
16,22,24 46:1,16 47:19 48:3,15
49:18,19 50:13,23 61:6 65:3

**dated** 40:21,22 54:17 64:23 65:1

**day** 44:25 51:1,3

**death** 37:4,17 52:21

**December** 34:18 35:6,12 36:14
38:9 41:4,6,18 44:17 45:2 48:4
49:12 50:9 53:13



**Erina Kansakar**
03/05/2021
4

declining 21:7

Defendant's 24:9

defendants 5:24 32:14

defendants' 5:6 26:3 63:14 65:6

defined 67:3

definite 28:10

definitively 50:20

delay 35:21

delays 35:24

Department 32:16 46:22 47:9

depend 28:14

depending 45:23

depends 12:13 29:17 66:16

deposition 5:9 6:8,24 40:2 68:19 69:15,17

detail 43:21 50:15

details 9:9 19:21 26:1

Detroit 8:8

Devlin 5:23 23:8 32:13 36:2

Dharan 8:3

differences 57:11

difficult 7:4 55:13 56:4 61:10 62:19,21

difficulty 55:23

direct 19:5 62:1

direction 19:3

disagree 56:21,23 57:16,17 58:24,25

discovery 68:19,20

discretion 56:20

discuss 44:21 47:3 48:21 49:1 50:3

discussed 33:5 45:5,7 48:5,15, 18 49:10 52:16

discussing 43:20,21 51:12 65:25

discussion 35:19 45:2 49:21

discussions 49:15 64:8

dispute 34:10

distal 14:7 16:14

distally 14:12

diversion 12:10,11,18 16:17

diverticulitis 9:11 11:5 56:15 58:11,14 62:6

division 18:16

doctor 5:9,22,25 6:6 7:2,13,25 20:12 23:12 24:6,16 25:6 26:4,5, 15 27:16 29:3 30:10 31:19 32:13 35:20 36:10 43:17 47:21 51:24 52:17 53:12 54:7 58:4 59:16,23 60:7 63:7,10,15 65:15 68:14,22 69:12

doctor's 54:8

doctors 53:6 57:12

document 9:12,15,23 16:1,2 19:6 24:5 38:15 44:1,3,5 50:8 55:2,4, 8

documentation 26:13 33:19,21, 24 34:10 45:6 50:6 51:12

documentations 33:4

documented 49:21 50:10

documents 34:2 41:17

dots 31:4

double 38:14

dozens 20:13

drainage 43:10

draw 18:10

drink 51:2

drug 37:2

duly 6:3

Dwean 24:24

---

**E**

earlier 14:21 46:7 64:4

early 68:19

easier 15:5 46:12

Eastern 5:11

ECF 55:8

edema 12:15 15:3

education 8:1

eighty 66:20

eighty-year-old 66:18

elected 38:21

else's 39:19

embarrassment 30:1

emergency 35:8

emergent 24:17 34:19

employed 20:19

end 10:13 35:21 47:24

ends 12:1,6,17

endurance 6:17

enema 13:24 14:3 16:13 51:15

Erina 5:9,22 6:2

error 28:20 29:4

essentially 59:1

establish 11:8,23 15:6 59:8

established 27:3 28:7 29:24 39:12

estimate 61:2

exact 13:16 61:2

examination 6:5 23:11 32:12 43:3

examined 6:3

excreted 59:13

excuse 12:8 14:8 44:17

exhibit 9:21 17:23,24 18:1 24:9 26:3 34:1 40:11 63:13,14 65:5,6

exhibits 5:5,6 33:2

expects 26:20


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Erina Kansakar**
**03/05/2021**

5

experience 41:25

explain 38:24 39:5 50:14 53:6

explained 37:7 38:15,25 44:14

explaining 36:12 67:4,6

exploratory 53:14

---
**F**
---

facing 35:15

fact 33:5 37:23 40:13 43:15
52:15 53:12

factor 67:1,12

factors 66:17

fair 17:11 27:1 33:8 34:9 62:10
64:1

familiar 15:11,21 55:6

fault 65:24

fax 18:11,25 19:3,5,17

faxed 18:17 64:4,5

Feasibility 58:15

February 9:2 14:17 16:24 23:21
24:11 26:22 27:20 34:13 45:13,
14,22 47:2,20 48:2,11,15 49:16,
25 51:21 65:1,6

feeling 30:4

fellowship 8:7,23,24

fifty 56:6 66:21

figure 69:2

filed 55:3,8 58:6

filing 58:7

final 52:8

find 18:23

findings 10:3,16

fine 6:15 7:21 42:25

fistula 10:4,7,8 11:14 35:1

fix 69:7

fixed 53:16

follow 16:22 23:10 33:1 58:4

follow-up 23:13 63:10 65:15

form 17:13 21:13

formed 10:14

forms 38:13

foundation 17:13 19:7 21:14
54:15 60:23 62:14

Franciscan 20:19

Friday 5:2

front 40:14,16,18 41:10

function 37:3

functional 25:13,19 42:20 43:13

functioning 42:12,25 53:21

---
**G**
---

gastrointestinal 10:13

gave 30:25

general 8:4,6,13,15,17,22 30:4
31:12 60:17

generally 46:4 62:6,17

genitourinary 52:25

GI 10:12

give 7:25 13:4,16 14:6 32:22
35:24 38:3 67:15

giving 56:25

goal 15:6 59:8

good 5:23 6:6 32:13,17 36:8 60:2

great 32:20

group 18:15 62:7

growth 14:15

guess 32:20 48:17 50:17 69:2

---
**H**
---

habit 27:8 28:1

handwritten 40:22 44:16,18

67:22

Hang 57:7

happen 23:20 25:19 33:9 37:20
38:1 39:4,8 50:21 65:19 67:10

happened 33:16 44:24

hard 13:3 66:17

harm 46:8

Hartmann 56:7,14

Hartmann's 53:15 56:9 58:14,16,
17 60:11

head 6:11 13:15

heal 46:18

health 8:3 15:25 20:20 21:6
32:15 33:20,21 34:14 46:21,23
47:11

Healthcare 5:19 8:25 18:16,24

hear 7:20 15:9

heard 8:12 42:2,6,7

heart 37:4 52:21 62:25

held 64:9

helps 14:11,14

hidden 55:14,16

high 8:1 22:13 56:4 61:16

higher 55:13 62:7 63:3,4

highlighted 36:20 38:10 52:18
54:21 55:11

history 66:22

hold 68:2

home 7:14

hook 11:22 12:5 16:19 22:7

hooking 14:13

Hope 18:12,13,15 23:18 34:5
40:20 49:13

hospital 38:13 49:8

housed 47:14

housekeeping 63:11 68:24



**Erina Kansakar**
**03/05/2021**

6

**hundred** 13:5,6,19 20:13 61:1

**Huron** 8:24 9:3 23:17

**hypothetical** 30:23,24 31:2 48:9, 10

**hypotheticals** 28:23

---

**I**

**Ian** 5:16 6:6 17:25 59:24 69:1

**ID** 55:9

**idea** 14:6,11

**identified** 60:3 63:12 69:8

**identify** 5:13 10:22 14:14 18:23 59:25 69:6

**immediately** 34:21

**important** 44:4

**improper** 52:2

**inadvertent** 38:21

**incision** 10:22 43:11

**include** 13:23 14:16,18,19

**including** 52:20,24 66:7

**incontinence** 22:5,9

**incorrect** 29:15 30:15 31:7,20,25

**index** 45:17 56:18

**indicating** 37:25 43:12 48:11

**individual** 9:4 46:21 62:8,22,23 63:20

**individuals** 22:14 32:15 62:11

**ineligible** 17:7

**infected** 11:8 12:1

**infection** 16:18 35:4 37:2 38:20 39:23 45:19 52:22 66:3

**inflammation** 15:3 45:20

**influenced** 56:18

**information** 18:22 32:23 57:1

**informed** 37:25

**informing** 39:9

**initial** 28:9,13 54:25

**Initiative** 20:20

**injected** 14:4

**injury** 37:17 38:21 46:8

**Inmate's** 24:15,22

**instance** 51:11

**Institute** 8:3

**instructed** 51:4

**instructions** 50:14

**insurance** 19:14,18 21:1,6

**intention** 21:22

**interfered** 17:12

**interrupt** 7:11 18:1 47:21

**intraoperative** 63:2

**invasive** 8:7

**involve** 22:4

**involved** 22:6

**involves** 60:17

**issues** 21:6 25:11,18 43:7 53:18, 19,25 54:2,21,22

**items** 57:5

---

**J**

**Jackson** 5:17 6:7 9:4,7,8 10:2 12:19 13:20 34:18 39:13 40:25 41:3 44:8,15 45:3 48:2,13,23 49:3 61:4 62:12,18 65:17 66:2

**Jackson's** 61:22

**jail** 27:21 28:18 29:5,11 30:11 31:7,20,25 33:20 34:12 63:13, 16,17,24,25 64:7,13 65:1,9

**January** 27:19 34:6,12 40:21 42:22,23,24 44:8,21 45:9 48:4 52:6 53:20 64:23

**join** 15:16 17:15 19:11 62:3 68:23

**judgment** 58:20

**June** 48:24 52:15 53:25 54:3,17

---

**K**

**Kansakar** 5:10,22 6:2,6 7:25 20:12 23:12 26:15 29:3 32:13 54:7 59:16,23 60:7 63:7 65:15 68:14 69:12

**Kansakar's** 24:16

**Kathy** 18:17,19,23 23:15 24:16, 18 25:2 26:21 27:19 28:3,17 29:1,11,14 30:11 31:3,7,19,24 33:4 64:10,13,19 65:10

**Ken** 5:19

**kind** 10:14,15 13:3 14:5,11 16:5, 19 32:18 35:8,9 38:9 43:22 46:5 47:16 50:13 51:5 55:14,15,24 56:25 59:7 67:15 69:3

**knowing** 21:25

**knowledge** 23:5 54:13

**Kohchise** 5:17 6:7 9:4

**Koirala** 8:2

---

**L**

**laid** 44:17 47:16

**laparotomy** 53:14

**lapse** 56:18

**Larry** 60:1,5

**late** 47:9

**lead** 22:9 64:20

**leading** 14:20 17:14 61:12

**leak** 12:17 29:25 52:23

**leakage** 66:6

**leaking** 35:3

**left** 58:5

**left-hand** 24:10

**length** 14:7,12



**Erina Kansakar**
**03/05/2021**

7

let all 45:19

letter 16:5,10 19:6,16 40:1,3,20 64:3,17,22

letterhead 34:6 40:21 44:19 45:2

life 24:17 29:7

life-threatening 24:21 29:6 30:20

lifestyle 29:3,13 30:13 31:9 32:1, 5

lifestyle-altering 28:5

light 7:12,18

limb 37:3

limit 31:14

limited 52:21

lines 28:2 29:2

literature 56:21

long 9:1 20:1 22:23 23:22 28:12

loss 37:2,3

lot 12:14,15 46:7 66:18

low 22:3

lung 22:12 62:25

**M**

M.D. 6:2

made 52:19

make 10:22 16:5 17:6 19:17 22:13 46:10 61:9,16

making 39:7

malpractice 15:14

manager 18:19 19:5 23:16,18 24:16 25:21 33:5 64:19 65:10

March 5:2,11 25:16,22 26:22 27:20 34:14,15 47:9 48:14

margin 55:19

Margolis 60:1,2,4,5

Mark 5:21

marked 9:20 17:24

mass 14:15

matter 42:6

MDOC 25:14

means 15:24 42:17

meant 16:18

medical 6:25 7:7,8 8:2,8,10,12 9:10 17:3,6 22:2,11 23:2,23 25:11,17,23 26:13 27:11 28:19 29:16,21 30:2,14 40:15,17 44:9, 20,24 47:17,18 54:23 56:21 58:20 61:8,15 62:24 63:5,21 66:23

medically 26:23,25 27:7,22,25 29:2,8,14 31:9,11 32:1,4 34:19 35:8 64:14

Medicare 20:16,18,21,24 21:1

meeting 50:12

mental 32:6

mention 66:11

mentioned 32:18 49:18 50:25

mentions 26:10 49:20

Michigan 32:16 46:22 47:8

middle 10:22

mind 27:2

minimally 8:7

minimize 39:23

minute 35:24 57:7

minutes 20:2 57:21

mischaracterizes 40:10

missed 18:7

moment 31:5

monitor 24:24

morbidity 56:5 58:16

morning 6:6

mortality 56:5

motion 30:7

mouse 25:8 26:11

move 31:16 35:20 55:15,20

movement 10:15

movements 12:9 15:8

**N**

natural 11:23 15:6,7 27:3 28:7 32:8 59:8

necessarily 35:23 40:6 62:18

necessity 26:13 27:12 28:20 29:16

needed 34:22,24 35:14

Nepal 8:3

Network 8:25 18:16,24

nods 6:12

nonmedical 17:12

normal 28:6 29:23 32:7 50:19

Nos 5:5,6

note 18:2 24:6,13 25:6,24 26:5,6 34:5 36:10 40:22 41:21 42:13,23 43:5,9 44:9,13,16,18 45:1 48:10 49:22 50:25 54:8,13,17,20 63:13 64:2 65:1,4,7,8 66:10 67:20,22, 24 68:17

noted 43:10,18 64:8

notes 28:24,25 29:10 33:7 40:19 45:3 47:5 49:5,7,13 50:3,6,8,9 53:11 63:21,23 64:7,11,17 68:3

number 13:4,15,16 55:8 58:18 61:3 67:24 68:1

numbers 69:3

nurse 63:16 65:9

nurses 64:14

**O**

oath 6:4

objection 13:8 15:14 17:9 21:3, 10,11,13,15 22:21 23:4 27:13



**Erina Kansakar**
**03/05/2021**
8

30:16 31:22 40:10 54:6,11 60:23
61:12,25

**objections** 54:10

**occasions** 21:24

**occur** 53:4,9 67:17

**occurred** 49:12

**occurring** 37:24

**office** 7:14 18:19 19:5 23:16,17,
18 24:16 25:12,18,20,24 26:14,
18 27:18 33:5 34:11 40:18,19
42:23 44:19 48:21 49:22 50:3,12
64:9,19 65:10

**older** 62:6,11,17,20,22,23

**one-stage** 11:21 58:15

**open** 7:17 10:17,20,21 38:22

**opening** 14:5

**operating** 28:15

**operation** 55:13 56:4,18

**operations** 37:15

**operative** 38:6,8,14 40:19 49:20
50:1 52:17

**opinion** 57:11

**opinions** 57:12

**opportunity** 6:21

**opposed** 28:19 29:13 30:14

**optimal** 56:19

**option** 22:7

**order** 8:10 50:20

**organs** 11:10

**original** 16:19 18:2 23:1 34:17
46:3 59:7,13

**ostomy** 11:19 12:4,5,11,18,22,24
13:2,11,20 21:22,24,25 41:21
42:1 58:11 60:9 61:1,5,18 62:11,
22

**Oswald** 5:21 32:19 54:6,12

**other's** 39:21

**Outcomes** 56:17

**outweigh** 60:20

**overview** 7:25

---

**P**

---

**p.m.** 5:3,11 20:6,7,8,10 57:23,24,
25 58:2 68:9,10,11,13 69:15,17

**pain** 43:9

**Papendick** 5:25

**paralysis** 37:3

**part** 10:12 19:20 20:21 32:3,5
35:18 39:5 44:19 51:6 54:1
64:20

**participant** 20:18

**participate** 64:6

**patent** 42:4

**patient** 11:5,22 12:9 15:7 16:13,
17,23 17:2,3 19:15 23:21 24:22
25:21 27:1,4,7,11,25 28:5,6
29:19 31:13 37:8,25 38:13,21
39:24 42:17 43:18 44:5 45:5,8
48:20,22 52:19 53:7 58:22 59:6
60:20 61:15 62:20 63:5 66:16

**patient's** 12:6 28:15 40:15 59:2

**patients** 20:15 22:12 39:6 56:7,
14 58:11 61:18,20,23 62:17

**pause** 68:7

**pending** 24:15

**people** 60:2

**percent** 56:7,16

**perfect** 38:3

**Perforated** 58:13

**perform** 12:19,21 17:1 34:20
39:2 50:7 51:10 53:7 61:23 63:4

**performed** 13:13 20:13,23 34:17
35:5,11,12 36:13,14 38:16 52:9,
18 53:12 56:6 60:25

**period** 37:11

**permanent** 21:23,25 22:15

**person** 18:17,18 29:5,18 30:3
31:21,25 63:20 64:2 66:15

**personal** 24:21 63:16

**personally** 63:24

**personnel** 63:17 64:14

**persons** 28:17

**photocopied** 38:4

**physical** 18:24 43:3

**Physician** 8:25 18:16

**picked** 45:15

**pink** 41:21 42:4,8 43:1

**place** 15:13 21:9,21,24 26:10
33:7,22 60:8,22 61:11,24

**placements** 61:1

**plaintiff** 5:16 6:7 33:2

**plaintiff's** 5:5 9:20 17:24

**plaintiffs** 55:3

**plan** 11:22 13:21,23 14:1,16,18,
19 16:18,19,20,22,24 17:11
39:12 44:11,12,18 45:4,14
47:10,16,18 48:21 50:15,22,23
51:2

**planned** 17:21 45:13 50:18

**planning** 14:11

**pockets** 11:9

**point** 22:17 29:9 33:10,17 42:19
43:7 56:15

**points** 11:7

**poop** 15:8

**pop** 36:3

**Port** 8:24 9:3 23:17

**portion** 10:25

**possibilities** 37:20

**possibility** 37:1

**possibly** 27:19



**Erina Kansakar**
**03/05/2021**

9

post-op  40:24 41:1

postoperative  63:2

postponed  24:23

potential  12:17 30:1 38:19 45:4
    49:16 50:15 52:22,23 65:17
    66:1,4,5 67:5,13

potentially  29:25 35:15 46:8

pouches  11:6

practice  8:11,18 15:10 19:13
    28:1 39:5,15,17,19,21 40:2,3

practiced  8:17

practicing  8:15

prefer  28:11 30:23

preference  26:25 27:7,11,24
    28:16,19 29:4,13 30:13 31:10
    32:2,6

preferred  30:6

premarked  5:7

prep  51:2

prepare  6:24

preparing  51:6

prescribe  13:21

prescribed  13:23 14:16 16:22
    17:11

previous  51:14

previously  59:12

primary  11:16,20,21,24 12:12,19,
    21

Prime  5:19

print  41:16

prior  41:25 49:7

prison  25:7 26:7,18 27:21 28:18
    29:12 30:12 31:7 32:16 33:21
    34:14 47:2,12 48:2,13,16,17
    63:17,25 64:8,14

problem  29:25 32:24 36:6 69:10

problems  42:11

procedure  10:1 12:5 13:14 20:23
    24:19 27:8,9,22 28:1,5 30:14
    35:5,7 36:18 37:8 38:16 49:11
    51:13 52:20 53:13,15 56:8,9,15
    58:14,15 60:8,12,17 61:23 62:21
    63:3 66:1 67:5

procedures  20:14 21:8 37:15
    53:7 58:17 65:18

proceed  49:9

productive  41:21 42:4,8 43:1

professionals  34:14 46:22 47:11

professions  46:24

program  20:18

prohibit  29:22

pronounced  52:25

pronouncing  11:17

properly  43:4 69:8

Proportion  58:10

protocol  19:12

protocols  50:19

protrusions  11:6

provide  32:19,22

provided  9:7 32:15

provider  20:21

provider's  58:20

Ps  42:1,3

psychological  29:17 30:3 32:7

pull  24:5

pus  11:9

put  24:6 38:23 39:23,24 45:21
    46:1 59:6

putting  12:16

**Q**

quality  29:7

question  14:21 15:19 27:9,16
    28:22 30:10 31:6,24 34:8 35:10

38:24 46:16 47:22 48:1,16 49:1,
    23 51:24 52:1,3 60:10 65:16,23
    67:2

question's  51:25

questions  6:15 23:7,13 30:24
    31:3,4 63:7 65:15 69:11

quick  41:5 68:4

quoted  56:23

quotes  57:3

**R**

radiological  14:3

rates  56:5

reaction  37:2

read  24:13 25:7,10 26:8 37:5
    53:17 54:20 55:10

reading  26:11 55:23

ready  50:7

real  41:5 53:4

reason  15:2 17:3,12 23:2

reasonable  28:12

recall  9:6,8 13:15 33:10 46:25
    47:7 49:5 64:16

recipient  20:24

recognize  9:23 16:4

recognizing  53:12

recollect  66:11

recollection  24:3,14 25:2,20,25
    26:5,16 33:15 63:16,19

recommend  16:16 28:8 60:19
    64:18

recommendation  10:17 16:12
    22:19

recommendations  11:15

recommended  10:17 24:19

reconstructive  59:10



**Erina Kansakar**
**03/05/2021**

10

record 5:8 14:20 20:6,7,8,10 26:2
   30:7 41:7 48:11 53:11 57:23,24,
   25 58:2 68:9,10,11,13 69:6,15

recorded 5:9 43:8

records 6:22,25 7:1,7,8 9:10
   23:23 24:1 25:23 36:2 40:15,23,
   24 41:1,12 44:10,20,24 47:17,18
   51:14 68:25 69:1,5

rectal 16:14

rectum 14:5,6,9

redirect 59:21 62:1

reduce 15:2

reestablished 32:9

REEXAMINATION 59:22 63:9
   65:14

refer 47:6 49:4 65:21

reference 34:7 68:25

referenced 58:7 69:5

references 57:2

referencing 45:1

referring 63:20 64:16 67:22,25

reform 59:11

reframe 60:10

refresh 24:2,14 25:1 26:4,16

relevance 17:9 21:3 60:23

relevancy 15:14 21:15

remain 24:22

remaining 14:8

remains 56:19

remember 9:8 18:21 19:4 23:20,
   22,24 27:16 33:17 41:24 44:24
   64:11

remembered 23:15

remnant 22:8

remotely 5:10 6:3

render 63:3

reoperation 52:22 66:5

repeat 15:20 27:17 35:10

repetition 45:11

rephrase 65:22

report 10:1 38:6,8,14 40:19 43:8
   49:20 50:1 52:17

reported 25:12,18

reporter 5:14 7:2 60:3

reports 45:12

represent 6:7

request 16:6 68:23

required 27:11

rerouted 12:8

resect 10:24 11:25

reserve 68:17

residency 8:5,7,9,10

respect 33:3,19 53:20 54:6

response 47:24

responses 6:11

responsible 17:19 22:4

restate 38:24

Restoration 58:12

result 11:8 12:17 35:2 56:5

resulted 35:13

results 37:16

resume 32:20

retained 5:7

Retrograde 67:21

retrospective 56:13

reversal 14:17 16:6,14,16,21
   17:20 20:14,23 21:7 24:15,17
   26:23 28:8 29:12 30:5,13 31:8
   43:19,20 44:13,14 45:13,14
   47:19 48:11,24 49:3,16,24 50:5,
   24 51:3 52:11,13,18 55:1 56:16,
   17,19 57:13 58:16 59:1 61:9,17

reverse 22:17,20 27:23 62:19,22

reversed 13:11 25:14 31:12 32:8
   58:12

reversing 22:23 58:17 63:18,25
   64:1,10

review 6:21 7:1,7

reviewed 25:23

reviewing 9:10,18

risk 22:14 36:12 37:16 38:23
   52:12,21 61:16 63:3,4 66:3,4,5,
   8,9,13,14,17

risks 35:6,13,15,17 36:17,20,21
   37:11 38:15,19,25 39:3 49:2,10
   50:4 51:12 52:19 53:9 54:24
   60:8,11,14,16,19 65:17,25 66:24
   67:4,9,13,16,17

rolling 36:8

room 7:13 28:15 59:25

rough 61:2

route 11:23 15:6,8 27:3 28:7 32:8

---

**S**

safer 12:18

save 57:8

scar 12:15 46:9

Scarber 5:23,24 7:11,16,19 13:8
   15:13 17:14,25 18:5,7 19:7 21:4,
   9,12,15 23:10 32:12,13 36:4,7,9
   40:12 52:2,5 54:9,14,16 55:22
   58:3 59:16 60:22 61:11,24 62:14
   65:14 68:14,24

scarring 45:20

scars 46:11

scenario 30:23

schedule 19:13 45:23

school 8:1,2

Sciences 8:3

scope 61:25



**screen** 9:13 24:7 35:22 36:10,23 37:13 55:15,21 58:8

**scroll** 9:19 55:18

**scrolling** 36:1 38:5

**scrub** 51:5

**scrubs** 51:5

**Seattle** 5:1

**section** 10:3,17 11:15 12:1

**selected** 46:17

**sensation** 37:3

**sense** 59:10

**sentence** 26:12

**sentences** 25:10

**Services** 18:12,13,15 23:19 40:21 49:14

**set** 69:1,3

**settle** 16:19 45:20

**severe** 22:12

**share** 9:13

**sheet** 18:11

**shorter** 30:10

**shortly** 32:21

**show** 9:12 16:1 56:11 65:6

**showed** 28:25 64:7,25

**showing** 64:11

**shown** 34:1 64:4

**sicker** 62:12,18

**side** 24:11 34:4

**sigmoid** 9:11 10:18,20,21,23,25 11:4 36:16 38:22 53:14

**sign** 37:25

**signature** 16:8

**signed** 38:13

**significant** 52:12

**simple** 46:15 48:16

**simpler** 30:11 38:5

**sir** 33:18 37:14,19,22 38:11,18 39:10 40:8 41:20 42:3 43:14 44:23 47:5 53:3,5,10,22,24 54:19 56:10 57:15 58:9,23 59:5, 15,19 63:8 64:12,24 67:19,23

**sits** 10:14

**situation** 15:25 29:6 35:8,9 48:9

**situations** 22:16

**sixteen** 56:14

**sixty** 56:7,14 62:7

**skipped** 18:6

**soap** 51:5

**soft** 7:3

**sooner** 34:22

**sounds** 46:16

**speak** 7:2

**speaking** 54:9

**special** 51:5 67:15,16

**speciality** 8:12

**specialty** 8:10,11

**specific** 23:25 24:18 38:7 65:23

**specifically** 44:14 50:3

**speculation** 19:8 27:14 54:14

**Spencer** 5:20

**sphincter** 22:4

**spoke** 46:21 65:9

**spoken** 7:3

**staff** 33:20,21

**stages** 68:20

**stand** 43:3

**standard** 14:25 15:9,10,11,21,23 16:12 24:19 40:4

**start** 7:24 26:11 46:5

**started** 40:2

**starting** 56:12

**state** 25:6 26:7,17

**stated** 24:20

**statement** 68:23

**states** 8:4 64:17

**stool** 10:13 12:8 35:2

**strike** 30:8 31:15,16 51:24 64:6 65:7

**stroke** 37:4 52:21

**structure** 59:3,11

**structures** 52:24 66:6

**studies** 56:25 57:3,10

**study** 14:3 56:13,24 57:1,5

**stuff** 36:5 39:7 43:22 52:16 67:6 69:4

**stump** 16:14

**Subsequent** 55:12 56:3

**suggests** 65:8

**surgeon** 8:15,22 26:10 54:3 56:20

**surgeon's** 25:12,18 26:14 28:14

**surgeries** 37:21 52:12,13 54:24

**surgery** 8:8,13,17 10:21 11:21,25 12:13 14:17 15:3,4 16:7,24,25 17:1,4,7,20 19:14,16,17 22:13 23:1 24:22 29:23 34:17,19,21,22 35:11,14 36:14 37:11 39:2 41:2, 4 44:18 45:17,18 46:3,5,6,11,19 48:24 49:3,9,16,19,25 50:5,8,13, 18,21 51:1,4,7,10 52:9,15,18 54:17 55:1 56:17 58:13 60:19,20 67:13,14

**surgical** 8:5,6 14:11 18:12,13,15, 16 23:18 34:5 40:20 49:14 50:22 60:16

**surrounding** 52:24 66:6

**swear** 5:14

**swelling** 12:14 15:3 39:23 45:20 46:7

**sworn** 6:3



**Erina Kansakar**
03/05/2021                                                                                          12

**system** 52:25

---

**T**

---

**takedown** 15:4 60:14

**talked** 27:18 31:8 41:24 54:23 63:24 64:25

**talking** 25:20 40:5 57:10 58:5 63:16,19 64:22

**talks** 25:17

**technically** 27:25 55:12 56:4 62:21

**telling** 29:4 49:8

**temporary** 16:18

**tend** 62:24

**tentative** 16:24 45:22 47:19 49:19

**term** 15:9,11,21,23 29:8,10

**terms** 51:6 52:8 59:12 66:20

**test** 6:17

**testified** 6:4 20:12 60:7,25 61:8

**testify** 54:7 61:4

**testimony** 39:25 40:1

**tests** 51:16

**text** 55:24

**thing** 26:6 41:13

**things** 37:7,24 38:1 39:4,8,14 51:9 52:7 53:4,6,8 57:14 65:19, 21

**thirty** 67:8

**thirty-five** 29:20

**thirty-four** 29:20 61:4,7 62:9 67:7

**thought** 18:7 46:18 59:25

**threatening** 24:17

**time** 5:11,12 11:23 12:24 18:19 24:23 27:10 28:12,15 29:9,21 31:14 33:25 41:3 44:10,22 45:9 46:2,6,10 47:2,15 51:19 54:13

56:18 57:9 59:18 61:5,7 63:7,21 64:19 68:5,15,16 69:12

**timeframe** 13:9 24:18,20 28:9

**times** 13:2,6,13

**timing** 56:19 57:13

**tissue** 12:15

**tissues** 46:9

**Today** 5:10

**today's** 69:14

**told** 16:25 26:24 27:20 28:17,18 29:11,14 30:11 31:7,20 39:8 64:13 67:9,11,16

**top** 13:15 18:13

**tract** 10:12,13 35:4

**trained** 39:22

**training** 8:1,10

**transcript** 69:9

**treat** 9:3 20:15 54:8

**treated** 9:11 40:24

**treatment** 9:6,7 13:21,23 14:1, 16,18,19 16:23 17:12

**trouble** 52:3

**true** 50:10 67:14

**tumor** 22:3

**twenty-eight** 56:15

**type** 37:24

**typewritten** 34:5

**typically** 21:6 22:16,23,25 62:20

---

**U**

---

**Uh-huh** 24:8 41:20

**ultimately** 48:23

**undefined** 56:20

**undergo** 38:22

**undergone** 17:4

**understand** 6:15 34:25 36:13 39:3,11,13 45:25 48:8

**understanding** 11:24 52:11

**underwent** 48:24 56:14,16

**United** 8:4

**unmute** 14:22

**unsuccessful** 37:16

**Uptodate** 55:5,6

**ureter** 52:24 66:7

**urethral** 38:21

**urgent** 25:11,17

**urinary** 10:10 11:11,13 35:3 53:16

**urologist** 53:15

---

**V**

---

**verbal** 6:11

**verify** 20:22

**versus** 66:20

**video** 5:9

**videos** 55:24

**visit** 41:18 44:7

---

**W**

---

**wait** 15:1,2 22:23,25 23:2 39:22 45:18 46:4

**waiting** 50:11 51:16,18 52:8

**walk** 43:4,6

**wall** 12:7

**wanted** 18:23 27:21 39:14 44:12 51:14

**Washington** 5:1

**waste** 59:13 68:5

**weak** 11:6,7

**week** 65:1,2



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**weeks** 15:1,2 22:25 28:13 39:22
45:19,21 46:5

**weeks'** 28:10 46:10

**well-being** 29:18 30:3,4 31:12
32:7 34:21

**Willis** 5:19

**window** 28:10

**word** 52:25 65:5

**work** 8:23 9:1

**worked** 9:2

**working** 9:3

**workup** 51:18 52:8

**world** 38:3

**worry** 67:8

**wrap** 68:5

**writing** 34:7

**written** 40:20 42:14 45:4 54:22

**wrong** 53:1

**wrote** 16:12 19:16 48:10

---

**X**

---

**x-ray** 16:13

---

**Y**

---

**year** 56:17

**years** 8:17 23:3,25 26:20 33:6,
11,14 61:5,7 67:7

**young** 65:19 66:3

**younger** 62:8

---

**Z**

---

**Zoom** 5:10

