# EXHIBIT B

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF MICHIGAN

3           SOUTHERN DIVISION

4

5

6    KOHCHISE JACKSON,          Case No.:

7                    2:19-cv-13382

8      Plaintiff,          Honorable

9      vs.              Terrence G. Berg

10    CORIZON HEALTH, Inc.,       Magistrate:

11    et al.,            Patricia T. Morris

12

13      Defendants.

14    - - - - - - - - - - - - - /

15    Pages 1-102

16

17      The Virtual, Videotaped Deposition of

18    Jeffrey Bomber, D.O., taken pursuant to Notice in

19    the above-entitled cause, via Zoom, on May 28, 2021,

20    at 11:00 a.m., before Carol Marie Hicks, CSR-3345,

21    Notary Public in and for the County of Livingston.

22

23

24

25

1   APPEARANCES:

2        IAN T. CROSS (P83367)

3        MARGOLIS, GALLAGHER & CROSS

4        214 S. Main Street, Suite 200

5        Ann Arbor, Michigan 48104

6        734.994.9590

7        larry@lawinannarbor.com

8

9            Appearing on behalf of the Plaintiff.

10

11        KENNETH A. WILLIS (P55045)

12        CORBET, SHAW, ESSAD & BONASSO, PLLC

13        30500 Van Dyke Avenue, Suite 500

14        Warren, Michigan 48093

15        313.964.6300

16        kenneth.willis@cseb-law.com

17

18            Appearing on behalf of the Defendant

19            Prime Healthcare Services and

20            Colleen Spencer.

21

22

23

24

25

1   APPEARANCES - (cont'd.)

2

3          DEVLIN SCARBER (P64532)

4          CHAPMAN LAW GROUP

5          1441 West Long Lake Road, Suite 310

6          Troy, Michigan 48098

7          248.644.6326

8          dscarber@chapmanlawgroup.com

9

10              Appearing on behalf of Defendants

11              Corizon Health, Inc., and

12              Keith Papendick, M.D.

13

14       ALSO PRESENT:  STEVE ALFONSI, VIDEOGRAPHER

15

16        (All parties appeared via Zoom.)

17

18

19

20

21

22

23

24

25

1              INDEX TO EXAMINATIONS

2    Witness                          Page

3    JEFFREY BOMBER, D.O.

4    EXAMINATION BY MR. CROSS              6, 92, 97

5    EXAMINATION BY MR SCARBER              92, 96, 99

6

7              EXHIBITS

8    Deposition Exhibit                    Page

9    BOMBER EXHIBIT 1  LARA Corporations Online      35

10              Filing System for Quality

11              Correctional Care of

12              Michigan

13    BOMBER EXHIBIT 2  Corizon Practitioner        12

14              Clinical Onboarding form

15    BOMBER EXHIBIT 3  Resume of Bethany Chester      18

16    BOMBER EXHIBIT 4  InGauge screenshots        22

17    BOMBER EXHIBIT 5  Resume of Lori Mignon Ernst    29

18    BOMBER EXHIBIT 6  Corizon Utilization        33

19              Management Manual 2017

20    BOMBER EXHIBIT 7  (Not marked)

21    BOMBER EXHIBIT 8  Corizon Performance Review    51

22              for Dr. Papendick

23    BOMBER EXHIBIT 9  (Not marked)

24

25

1              EXHIBITS - (cont'd.)

2  Deposition Exhibit                        Page

3    BOMBER EXHIBIT 10  Declaration of Erin        85

4              Orlebecke, M.D.,

5              November 10, 2014

6    BOMBER EXHIBIT 11  Declaration of Harriet      86

7              Squier, M.D.,

8              November 18, 2014

9

10   (Attached.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  May 28, 2021

2  At or about 11:00 a.m.

3            JEFFREY BOMBER, D.O.,

4  having first been duly sworn, was examined and testified

5  on his oath as follows:

6            THE VIDEOGRAPHER:  We're now on the

7    record.  This is the video-recorded deposition of

8    Dr. Jeffrey Bomber, being taken virtually.  Today is

9    May 28, 2021, and the time is 11 a.m.  Would the

10    attorneys please identify themselves and the court

11    reporter please swear in the witness.

12            MR. CROSS:  Good morning.  Ian Cross

13    on behalf of the plaintiff Kohchise Jackson.

14            MR. WILLIS:  Good morning.  Kenneth

15    Willis on behalf of defendant Prime Healthcare

16    Services and Colleen Spencer.

17            MR. SCARBER:  Good morning.  Devlin

18    Scarber appearing on behalf of the Corizon

19    defendants in this case, Corizon and Dr. Papendick.

20            JEFFREY BOMBER, D.O.,

21  having first been duly sworn, was examined and testified

22  on his oath as follows:

23            EXAMINATION

24  BY MR. CROSS:

25  Q   Good morning, Dr. Bomber.  Have you ever had your

1   deposition taken before?

2   A   Yes, I have.

3   Q   So I'm just going to go over some ground rules, even

4       though you probably already know.  I need verbal

5       responses, no head nod, head shaking, so that the

6       court reporter can get something on the record.

7       It's not an endurance test.  If you need a break, if

8       you need to use the bathroom, just let me know, and

9       we'll take a break.  I'd just ask that you answer

10       the last question that I pose before the break,

11       okay?

12   A   Yes.

13   Q   And if you don't understand any of my questions, I

14       don't want you to guess, I want you to ask me to

15       clarify, all right?

16   A   Yes.

17   Q   All right.  When was the last time you were deposed?

18   A   Last time I was deposed; approximately one year ago.

19   Q   Do you remember what case it was?

20   A   I believe it was -- there were a couple of cases in

21       a row, so I'd have to look back at the record.

22   Q   Okay.  So, there was one involving a gentleman by

23       the name of Kensu; is that correct?

24   A   I appeared in court for a Kensu case, and did one

25       deposition, as well, for a Kensu case.

1  Q   Okay.  And there was a Spiller?

2  A   Yes, I recall a Spiller.

3  Q   And there was an Estate of Franklin?

4  A   I recall a Franklin.

5  Q   And there was an estate of Warren?

6  A   Warren, yes.

7  Q   Are there any that I'm missing?

8  A   Those are the ones that come to mind right now.

9  Q   But it's possible there's another?

10  A   It's possible.

11  Q   Okay.  Can you give me a run down of your employment

12      history since 2009.

13  A   In 2009 I served as the site medical provider at the

14      Newberry Correctional Facility, and also worked at

15      Helen Newberry Joy as a staff physician.  Subsequent

16      to that, I became the northern regional medical

17      director for PHS, which is now Corizon Health.

18  Q   Okay.  How long did you do that?

19  A   I was a northern regional medical director for six

20      years.

21  Q   What were your duties as a northern regional medical

22      director?

23  A   My duties were to supervise the medical providers in

24      the region.

25  Q   What did you do after you were the northern regional

Jeffrey Bomber, D.O.
05/28/2021                                        Page 9

1    medical director?

2  A    After I was the northern regional medical director I

3       became the state medical director for Corizon

4       Health.

5  Q    And when did that -- was that a promotion?

6  A    Yes.

7  Q    When did you get that promotion?

8  A    I served as state medical director for four years,

9       so that would be from 2015 through August of 2019.

10 Q    And you are no longer the state medical director?

11 A    I am not.  I concluded that in August of 2019.

12 Q    So what have you done for a living between

13      August 2019 and the present?

14 A    I am a staff physician at Schoolcraft Memorial

15      Hospital in Manistique, Michigan, and I'm the

16      medical director for the Naubinway Rural Health

17      Clinic, and I also consult with Corizon Health.  I'm

18      a contract employee, still, for Corizon Health.

19 Q    So why did you cease to be the state medical

20      director?

21 A    I was the medical director for four years, and it

22      required living in Lansing for a significant amount

23      of time, and my main home is in Naubinway, and I was

24      ready to be back home.

25 Q    I see.  And what are your duties now as a contractor

1    for Corizon Health?

2  A   As a contract employee I help to supervise the

3     providers at seven sites in the northern region.

4  Q   So how is that different from when you were the

5     northern regional medical director?

6  A   Well, I only have seven sites at this time.  When I

7     was the northern director, I had 21 sites.

8  Q   Oh, okay.  So is there another individual who's now

9     the northern regional medical director?

10  A   The sites have been redistributed.

11  Q   Was there ever a time when you worked in utilization

12     management, perhaps temporarily, due to a vacancy?

13  A   Yes, when I was the northern regional medical

14     director we were without a utilization management

15     physician for a couple of months and so all of us

16     pitched in for that time period.  The state medical

17     director at the time was Dr. Orlebeck and I was one

18     of her regional medical directors and we assisted

19     with the process.

20  Q   Can you describe what you did, what those temporary

21     duties consisted of.

22  A   Yes.  So, there's a form, a No. 407, which is an

23     MDOC form, that a provider completes in order to

24     request a specialty service of some type, and that

25     request is reviewed by the utilization management

Jeffrey Bomber, D.O.
05/28/2021                                    Page 11

1    physician.

2  Q   Okay.  And what does the utilization management

3     physician do when reviewing that request?

4  A   They review it for medical necessary; and, if

5     medical necessity is demonstrated, the procedure or

6     the referral is approved or an alternative treatment

7     plan is offered.

8  Q   All right.  In your current position as a

9     contractor, are you able to hire medical providers?

10  A   I am involved in the hiring process, I'm part of the

11     interview team.

12  Q   Were you able to hire medical providers when you

13     were the regional medical director for the northern

14     region?

15  A   Yes; again, I was part of a team, it was a team

16     evaluation.

17  Q   I see.  Do you train the providers?

18  A   I trained the providers up until the time I became

19     state medical director.

20  Q   And have you trained new providers since you became

21     a contractor?

22  A   I have not trained them in the formal sense --

23     formal sense being when we met with them and went

24     over the training materials -- I don't do that

25     anymore.  I do follow up with them, do phone

1    meetings and chart reviews in order to make sure

2    that they're acclimating and doing well.

3  Q    Okay.  Tell me about the onboarding process for a

4    new provider; what training materials do they

5    receive, if any?

6  A    So, they -- before COVID -- they would have two days

7    of training in the Lansing office, in person, with

8    an RMD and review the Corizon provider training

9    manual; they would also have training in IT for the

10    electronic medical record; and there were also

11    modules required by the Michigan Department of

12    Corrections.

13  Q    So, in the course of the onboarding process, did the

14    new provider ever watch a video?

15  A    I do not recall any videos.

16  Q    Are there any quizzes that they have to take?

17  A    There was a questionnaire, I believe it was based on

18    the clinical modules; I think there was a module on

19    diabetes, prostate cancer, a couple others.  So

20    there were some questions, medical questions.

21              (Bomber Deposition Exhibit No. 2 was

22              marked for identification.)

23  Q    Okay.  I'm going to show you an exhibit.  We'll call

24    this Plaintiff's Exhibit 2.  Can you see the

25    document?

Jeffrey Bomber, D.O.
05/28/2021                                    Page 13

1  A   Yes, I can.

2  Q   You recognize it?

3  A   That looks like, yeah, the "Practitioner Clinical

4      Onboarding Checklist."

5  Q   Okay.  Did you provide any of the training in this

6      checklist to new providers?

7  A   I did provide some of the training, yes.

8  Q   Was there another person who provided other portions

9      of the training?

10  A   Yes, there are other people.

11  Q   Who are they?

12  A   The office manager, the IT director, and the

13      regional operations manager.

14  Q   And are those Corizon employees?

15  A   Yes.

16  Q   And regional operations manager is what you said?

17  A   Yes.  Oh, and some of the siting -- some of the

18      training was done on-site with the MDOC health unit

19      manager.

20  Q   Okay.  So HUM did some of it.

21  A   Correct.

22  Q   So this is Corizon's training; is there a separate

23      set of modules that are MDOC training that they also

24      received?

25  A   Yes, there are modules.  Most of those deal with

1    safety in the correctional environment.

2  Q   So, can you point out which portion of this

3    onboarding you were responsible for providing the

4    training for.

5  A   Sure.  I would review the "Corizon Culture of

6    Patient Safety" in our patient safety program; I

7    would review --

8  Q   Where is that?  Culture of patient, okay.

9  A   Yeah, I would review that portion.  I would review

10    some of it in "The Correctional Environment"; of

11    course, some of that is done with the MDOC and

12    on-site.  We would review the "Behavioral Health"

13    section; we would review the "Correctional

14    Healthcare Policies and Procedures," I believe all

15    of those were reviewed; I would review the

16    "Documentation and Medical Records"; and the

17    "Utilization Management portion; and "Pharmacy."

18  Q   How about in Phase II --

19  A   And that's down on that page.

20  Q   -- were you involved in any of these trainings?

21  A   The "Correctional Environment" would be done on-site

22    with the HUM.

23  Q   Um-hum.

24  A   The "Medical Management Model:  Decision Support

25    System," that would be done by me or the regional

1    medical director; the pharmacy training, a lot of

2    that had to do with the IT and how to put in orders

3    so IT would do part of that and we would do part of

4    the pharmacy training; the "Quality Improvement

5    Program," yes, we would do that; and the "Behavioral

6    Health," we would do that; under "Legal and Risk

7    Management," I recall some training on forensics and

8    patient safety reporting; "Correctional Healthcare

9    Policies and Procedures," we also reviewed, we

10    reviewed those as well.

11   Q    Okay.  And this first part, "Accountable Care in the

12    Patient Centered Medical Home Environment," who was

13    responsible for this section?

14   A   I was responsible for the "Corizon Culture of

15    Patient Safety."  I'm not sure, I would think the

16    regional managers did the "Accountable Care

17    Organization" sections.  The "Contract Overview,"

18    the "Full Risk, Shared Risk, Pass Through," I'm not

19    familiar with what all those mean.  So that would be

20    something that operations and office manager would

21    train on.

22   Q   Who is the regional operations manager?

23   A   The head, VP of operations, Mason Gill; and he has

24    had several people over the last ten years report to

25    him, generally, there are two; I believe, currently,

1     it's Sara Goff.

2  Q   Sara Goff.  So she would be the one to do the first

3     section, like the "Contract Overview, Full Risk

4     Shared Risk, Pass Through"?

5  A   Right, that wasn't a medical part.  We focused on

6     the medical parts.  Anything that deal with

7     operations, they would have to do.

8  Q   So, you said you did this "Quality Improvement

9     Program" section?

10 A   Yes.

11 Q   I want to direct your attention to the second to

12     last bullet point, "Key performance indicators,

13     slash, Process Indicators and Quality Indicators."

14     What is that?

15 A   I didn't calculate or have anything to do with those

16     KPIs.  We did report quality data to the MDOC, as

17     required in the contract.

18 Q   Well, I'm asking you what you trained the new

19     providers about with respect to that issue.

20 A   We trained the providers on what quality indicators

21     the Michigan Department of Correction tracked.

22 Q   What about key performance indicators?  What did you

23     teach them about key performance indicators?

24 A   Nothing.

25 Q   Nothing?

Jeffrey Bomber, D.O.
05/28/2021                                         Page 17

1  A   Nothing.

2  Q   Does Corizon have any key performance indicators,

3      that you're aware of?

4          MR. SCARBER:  I'll just make an

5      objection to form; broad, overbroad base.  But if

6      the witness can go, go ahead.

7  A   I do not have anything to do with key performance

8      indicators or calculations.  I'm familiar with the

9      term, and I do believe that the corporate office

10      does have KPIs.

11  BY MR. CROSS:

12  Q   So what's a KPI?

13  A   As I -- and, again, we don't use the term -- we

14      don't use the term when discussing the quality

15      indicators with the Michigan Department of

16      Corrections.  But I believe healthcare organizations

17      use KPIs to track emergency room runs,

18      hospitalization days, all-around utilization.

19  Q   All-around utilization; what do you mean by that?

20  A   So, if I have a patient go to the ER and utilize the

21      ER, that's a utilization.

22  Q   So ER runs would be a KPI?

23  A   Again, I don't calculate them.  I don't look at the

24      data.  I can't tell I exactly what Corizon's KPIs

25      are.

1  Q   Okay.  I'm going to show you another document.

2            THE COURT REPORTER:  And are you

3     marking these as exhibits, Mr. Cross?

4            MR. CROSS:  Yes, the previous one was

5     Exhibit 2.

6            (Bomber Deposition Exhibit No. 3 was

7               marked for identification.)

8  BY MR. CROSS:

9  Q   I'm sorry, can you see the document?

10  A   Yes.

11  Q   Have you ever interacted with this Bethany Chester

12     person in a professional capacity?

13  A   Yes.

14  Q   She work for Corizon?

15  A   Yes.

16  Q   I want to direct your attention to the second

17     dash -- well, what is this document, first of all?

18     What does it appear to be?

19  A   It looks like a job description.

20            MR. SCARBER:  Is that a resume?  I'm

21     sorry, Ian.

22            MR. CROSS:  I think it's a resume.

23            MR. SCARBER:  Okay.  I mean, I see --

24  A   I don't know.

25            MR. SCARBER:  He's looking at

1    segments of it 'cause the way it was being scrolled

2    down.

3  A   Yeah, now I see the name.  So, I guess, it looks

4    like a resume.

5  BY MR. CROSS:

6  Q   Okay.  I want to go to the second dash in her

7    "Professional Experience"; it says, "Creating,

8    maintaining, managing emergency room, inpatient,

9    hospice and palliative care, utilization management

10    and COVID-19 data for monthly reporting to state

11    medical director and Michigan Department of

12    Corrections."  You were the state medical director

13    after October of 2017; is that correct?

14  A   Correct.

15  Q   Did you receive monthly reports containing emergency

16    room, inpatient, hospice and palliative care,

17    utilization management, et cetera, data from this

18    Bethany Chester person?

19  A   Yes.  If you look at the MDOC contract, those

20    numbers are required, that we are required to report

21    those numbers to the Michigan Department of

22    Corrections on a monthly basis.

23  Q   And she didn't just report those numbers to the

24    Michigan Department of Corrections, she also

25    reported them to you, right?

1  A   Well, to me, but the numbers were shared as part of

2      the monthly report with the Department.

3  Q   So did you -- you received the report, Exhibit 1?

4  A   Yes.

5  Q   What did you do with that data?

6  A   It was given to the MDOC in a monthly report.

7  Q   So the only reason it came to you was for to you

8      give it to the MDOC?

9  A   No, several people help write that report, including

10     myself.

11  Q   Okay.  So you participate in creating a report for

12     the MDOC --

13  A   Yes.

14  Q   -- containing all of this data.

15  A   Yes, there's a whole list of the required numbers in

16     the contract.

17  Q   And is the only reason that Corizon tracks that data

18     to comply with the contractual requirement to report

19     it to the MDOC?

20  A   I can't tell you all the reasons Corizon would track

21     that data.

22  Q   Can you tell me any of the reasons?

23            MR. SCARBER:  I'll just place an

24     objection; calls for speculation.

25  A   My role was to provide the numbers per the

Jeffrey Bomber, D.O.
05/28/2021                                            Page 21

1    contractual agreement.

2  BY MR. CROSS:

3  Q    So you can't tell me any of the reasons?

4              MR. SCARBER:  Just going to place

5     another objection; asked and answered.

6  A    I can't tell you the reasons Corizon would want to

7     see the data.  I can tell you that I needed to see

8     the data because it was required that I report that

9     to the Michigan Department of Corrections.

10  BY MR. CROSS:

11  Q    Okay.  So, does Corizon track any performance

12     measures or indicators for the MDOC contract?

13              MR. SCARBER:  Just going to place an

14     objection; that seems like that was asked and

15     answered and it's been discussed over the last

16     several minutes of your questions.  But to the

17     extent it's a different question or you have a

18     different answer.

19  A    I do not have a different answer.  My requirement

20     was to provide the data to the Department of

21     Corrections.

22  BY MR. CROSS:

23  Q    I'm not asking if you provided data to the

24     Department of Corrections.  I'm asking if Corizon

25     tracks any performance measures or indicators for

Jeffrey Bomber, D.O.
05/28/2021                                    Page 22

1    the MDOC contract, to your knowledge?

2              MR. SCARBER:  Objection; asked and

3        answered.

4    A   I believe that they looked at the monthly reports

5        that we provided to the DOC; beyond that, I don't

6        know.

7    BY MR. CROSS:

8    Q   All right.  I'm going to show you another document.

9        We'll mark this Plaintiff's Exhibit 4.

10             (Bomber Deposition Exhibit No. 4 was

11               marked for identification.)

12   Q   Have you ever used a computer program that looks

13       like that, sir?

14   A   I have not used it.  I know that Corizon has

15       something called InGauge that they used to use for

16       their utilization management.  We didn't use the

17       data.

18   Q   So, who uses InGauge?

19   A   I believe corporate, it's used at the corporate

20       level.

21   Q   So that would be, what, C Suite executives?

22             MR. SCARBER:  I'm going to place an

23       objection; calls for speculation; if you know, any

24       more than you said.

25   A   I know Corizon leadership looks at InGauge.

Jeffrey Bomber, D.O.
05/28/2021                                                Page 23

1  BY MR. CROSS:

2  Q   So you've never used this.

3  A   I've not used their data, no.  We generated our data

4      for the DOC from the electronic medical record, as

5      well as the inpatient team and the on-site

6      utilization management clerks and RNs.

7  Q   Do you know if this program is still in use?

8  A   I, frankly, don't.  Like I said, I don't use it.

9  Q   Okay.  If I wanted to talk to someone who uses it,

10     who would that be?

11 A   That would be somebody at the corporate level for

12     Corizon.

13 Q   What's the corporate level?  What does that mean?

14 A   That would mean those at the Corizon headquarters

15     Nashville, Tennessee.

16 Q   Okay.  So no one in Michigan uses this.

17 A   We don't use it.

18 Q   What is utilization management?

19 A   Utilization management is monitoring the amount of

20     utilization in a medical contract.

21 Q   What's the purpose of utilization management?

22 A   From my point of view, providing numbers to the

23     Michigan Department of Corrections, as contractually

24     obligated to; also, to monitor, like, if there's

25     been an intervention.  For example, when we started

1    to utilize the Impact Pro, we wanted to ensure that

2    quality measures were being met and that inmates

3    were -- we were ensuring that inmates were getting

4    their medical needs met.  So we would monitor the

5    number of referrals, for example, to make sure that

6    they were getting adequate care.

7   Q    So the purpose of utilization management is to

8    report data to the MDOC?

9   A    No, and also monitor the quality of care.

10  Q    Monitor the quality of care.  So, when you were

11   acting as a utilization review physician, in a

12   temporary capacity, you were monitoring the quality

13   of care?

14  A    As a utilization management physician, I was

15   monitoring the off-site referral request, ensuring

16   medical necessity, and approving or giving an ATP.

17  Q    I see.  Does the utilization management physician

18   reviewer consider costs when making his or her

19   decisions?

20  A    No, cost is never an issue in anything we do as

21   medical providers.

22  Q    So utilization management never considers cost.

23  A    Not from my perspective; in fact, we're instructed

24   by operations to practice medicine based on medical

25   necessity, not cost.

**Jeffrey Bomber, D.O.**
**05/28/2021**

1   Q   Not cost.  Okay.  Well, that's -- let me show you

2       another document.  Hold on, this is -- got this

3       clock in the way so I can't click on it.  Here we

4       go.  Can you see the document, sir?

5   A   Yes.

6   Q   All right.  For the record, this is a 30(b)(6)

7       deposition you gave in Estate of Franklin.  And I

8       would like you to read out loud, for the record,

9       lines 10 through 12 on this page.

10              MR. SCARBER:  Let me have an

11      opportunity to review the document, counsel.  What

12      lines do you want him to review?

13              MR. CROSS:  10 through 12.

14              MR. SCARBER:  Okay.

15              MR. CROSS:  We'll call this

16      exhibit -- what are we on, 6?

17              MR. SCARBER:  I thought the last one

18      you said was 3.

19              MR. CROSS:  All right, 4, then.

20              MR. SCARBER:  I don't know.  You

21      better ask Carol.

22              THE COURT REPORTER:  I don't know

23      because I'm not marking them, I don't know.

24              MR. SCARBER:  Okay.  Maybe ken got

25      another one, I was right and you could have said

1      another one, I'm not sure.  Hang on.

2             MR. WILLIS:  I only heard 3 or for

3      the last one, I think, but I could be wrong.

4   BY MR. CROSS:

5   Q   This InGauge screenshot, we'll call this Exhibit 4,

6      and then I haven't shown you another one since this,

7      before the deposition transcript, so we'll call the

8      deposition transcript -- you know, we'll call it 7,

9      'cause I've already saved a couple as 5 and 6.

10            So could you read lines 10 through 12

11      of this transcript for the record?

12  A   Sure.

13            "And that the utilization management

14      component of the review process takes into

15      consideration cost, correct"?

16            "Yes."

17            Did you say line 13, too?

18  Q   Nope.

19  A   Okay.

20  Q   So it sounds like your testimony, in this case, was

21      that the utilization management component of the

22      review process -- well, this review process, I want

23      you to look at lines 3 through 8, so we know what

24      review process we're talking about here.

25            MR. SCARBER:  Well, hang on, I'm

1    going to object to form, 'cause it sounds like you

2    were asking him a question and now you're asking him

3    to review something again.

4              MR. CROSS:  Okay.

5              MR. SCARBER:  So what do you want him

6    to look at now?

7              MR. CROSS:  Lines 3 through 8, or 3

8    through 9.

9              MR. SCARBER:  Okay.  Hang on.  Take a

10    look at that.  Okay.  Go ahead.

11   BY MR. CROSS:

12   Q   Okay.  So would it be fair to say that your

13    testimony, in this case, was that the utilization

14    management component of the 407 review process takes

15    into consideration cost?

16             MR. SCARBER:  I'm going to place an

17    objection that it looks like it's taken out of

18    context, so I object to form and mischaracterization

19    of the document.  But go ahead.

20   A   So the context is as a provider, as a utilization

21    management reviewer, as a state medical director, I

22    do not consider costs, it's always medical

23    necessity.

24             Yes, I'm sure that at the -- probably

25    the DOC and at the corporate level they do review

1    costs.  But, yes, they do consider costs.  On a

2    daily basis, I don't think about cost.

3  Q   So what were you talking about here in this

4    testimony when you said it "takes into consideration

5    costs"?  "Yes."

6           MR. SCARBER:  Let me place another

7    objection.  I mean, to give him two lines out of a,

8    it looks like this is page 232 of a deposition, and

9    ask him what he was talking about, I think, is an

10   unfair question.  So I object that the -- I'll

11   object to form and taking the document out of

12   context.

13          MR. CROSS:  I'll object to your

14   speaking objection.

15          MR. SCARBER:  Can you tell him what

16   you were talking about in just one page of a

17   200-page deposition?

18          THE WITNESS:  I'm speculating.

19          MR. SCARBER:  Okay.

20          MR. CROSS:  Devlin, you're coaching

21   the witness.

22          MR. SCARBER:  You just asked the

23   witness, with all due respect, counsel, to tell him

24   what he was talking about after reading 12 lines of

25   a deposition.

1           MR. CROSS:  If you'd like to read

2    more of it, he can.

3           MR. SCARBER:  He's not going to sit

4    here and read -- the question has to be a question

5    he can answer without reading 100 pages or 200 pages

6    of a deposition.  I mean, if you want to put it in

7    some kind of context, that's fine.  But my objection

8    is to form, and I'm not trying to coach the witness

9    on this, but I think it's -- I think it's an unfair

10    question that requires a very detailed objection.

11             (Bomber Deposition Exhibit No. 5 was

12             marked for identification.)

13  BY MR. CROSS:

14  Q   Okay.  Let's move on.  I'm going to show you what's

15     been marked Plaintiff's Exhibit 5.  Have you ever

16     interacted with this Lori Mignon Ernst individual in

17     a professional capacity?

18  A   Yes.

19  Q   Okay.  You know who she is?

20  A   Yes.

21  Q   And what is this document, for the record?

22  A   It looks like another resume.

23  Q   Okay.  I want to direct your attention to the one,

24     two, three, four, fifth dash here, under "Director

25     of Utilization Management:  Set up UM processes

1    within each region with CCO/COO to ensure maximum

2    effectiveness" -- oh, I'm sorry, the next one --

3    strike that.  "Work with CCO/RMD within regions to

4    identify barriers and to find solutions for problems

5    and align the contract in meeting with UM targets."

6  A   Yes, I see it.

7  Q   Did Ms. Ernst ever work with you to align the

8    Michigan contract in meeting with UM targets?

9  A   No.

10 Q   Is it fair to say that UM stands for utilization

11   management?

12 A   Yes.

13 Q   Okay.  Did anyone work with you to align the

14   Michigan contract in meeting with utilization

15   management targets?

16 A   I'm not even sure how targets is defined.

17 Q   Well, how would you define it?

18 A   I have no idea how they define it, it's not given

19   here.

20        MR. SCARBER:  And let me just place

21   an objection as to foundation.  This isn't his

22   resume, he didn't draft this, he has no idea what

23   this stuff means.

24 BY MR. CROSS:

25 Q   So you testified that you have interacted with

1      Ms. Ernst in a professional capacity, correct?

2   A    Correct.

3   Q    And between 2013 and 2015, you were the regional

4       medical director, that was your title, correct?

5   A    Yes.

6   Q    So, if Ms. Ernst is saying that she worked with RMD,

7       does RMD stand for regional medical director?

8   A    Yes.

9   Q    So what did you -- strike that.  When you worked

10       with Ms. Ernst, what did you do?

11   A    So, my main interaction with Ms. Ernst was when we

12       went to a centralized model for utilization

13       management, our portion, our participation for

14       Michigan.

15   Q    Are there utilization management targets for the

16       Michigan contract?

17   A    No.

18   Q    Were there ever utilization management targets for

19       the Michigan contract?

20   A    Not for me, sir, never.

21   Q    Not for you, sir?  What do you mean by that?

22   A    Not for the medical providers, not for the regional

23       medical directors, we were never given targets.

24   Q    So who are the targets for?

25   A    I don't even know how they're defined.  I would just

1    be guessing.

2  Q   All right.  The next one in this resume, "Daily

3      review of Pipes/QNXT"; do you know what that is?

4  A   I do not.

5  Q   "Reports including inpatient tracking and outpatient

6      referrals of all contacts to monitor and ensure

7      compliance with targeted budget."

8           Is there a targeted budget for the

9      MDOC contracts for Corizon?

10  A   I'm not sure what targeted budget is.  We did have a

11      budget from the DOC contract.  I have no idea what a

12      targeted budget is.

13  Q   How is the budget set?

14  A   Well, there were a certain number of dollars over a

15      five-year period that were allotted for medical

16      management.

17  Q   By Corizon.

18  A   No, actually, by the DOC; that was in the DOC

19      contract.

20  Q   So there's a contract with the DOC that states how

21      much the DOC is paying Corizon for medical

22      management, correct --

23  A   Yes.

24  Q   -- more or less?  And then does Corizon internally

25      have a budget for how much it wants to spend on

1    medical management in Michigan?

2    A   I would -- I think.  I don't know.

3    Q   You don't know anything about that.

4    A   I don't have anything to do with preparing those

5        budgets, if they exist.

6    Q   And you don't know how reviewing inpatient tracking

7        and outpatient referrals could help ensure

8        compliance with the targeted budget?

9    A   I would be speculating.  I have no part in that.

10   Q   Okay.  So you testified that your interactions with

11       Ms. Ernst were primarily related to a move to

12       centralize utilization management?

13   A   Yes.

14               (Bomber Deposition Exhibit No. 6 was

15               marked for identification.)

16   Q   All right.  Let's look at what we will call

17       Plaintiff's Exhibit 6.  And this resume was 5, in

18       case I forgot to note it.  And this is Bates 103,

19       the "Utilization Management Manual," produced by

20       Corizon.  So, see here it says the "Utilization

21       Management Core Process will launch in January of

22       2017"?

23   A   Yes, I see that.

24   Q   What is the Utilization Management Core Process?

25   A   I believe that was when we went to the centralized

1      UM process.

2   Q   And how is that different from the previous

3       practice?

4   A   In the previous practice, there was just one

5       utilization management physician.  But in the new

6       practice now, Dr. Papendick, who's currently the

7       UMMD for the Michigan contract, is now supported by

8       two other utilization management physicians; he has

9       back up and support, you know, if he needs vacation

10      or whatever.  So those physicians are now all

11      Corizon employees.

12  Q   So Dr. Papendick is a Corizon employee?

13  A   I don't know what -- if he's Quality Correction or

14      Corizon now.  I haven't been the state medical

15      director for going on two years, so I'm not sure

16      what his current designation is.

17  Q   When you were the state medical director, were you a

18      Corizon employee?

19  A   No, I was employed by Quality Correctional Care of

20      Michigan.

21  Q   What is Quality Correctional Care of Michigan?

22  A   Quality Correctional Care of Michigan is a

23      professional corporation, a PC.

24  Q   In, say, 2017, who was the president of Quality

25      Correctional Care of Michigan?

 1  A   I was.

 2  Q   And this is a corporation, correct?

 3  A   A professional corporation.

 4  Q   Who were the shareholders of Quality Correctional

 5      Care of Michigan, PC?

 6  A   I believe there was myself and Dr. Sylvia McQueen.

 7  Q   Dr. Sylvia McQueen; is she licensed to practice

 8      medicine in Michigan?

 9  A   I don't know.

10              (Bomber Deposition Exhibit No. 1 was

11               marked for identification.)

12  Q   All right.  I'm going to show you what's been marked

13      Plaintiff's Exhibit 1; and this is from the LARA

14      Corporations Online Filing System; and it says the

15      names and addresses of all shareholders, and we just

16      have one shareholder here, and that would be you,

17      correct?

18  A   It looks like it.

19  Q   So you were the sole shareholder of this

20      corporation.

21              MR. SCARBER:  I'm just going to place

22      an objection only to a time -- a point in time, like

23      when is it dated or when is this from?

24              MR. CROSS:  This was filed in 2018.

25              MR. SCARBER:  Okay.

 1   BY MR. CROSS:

 2   Q   So, did Quality Correctional -- what is this --

 3       Quality Correctional Care of Michigan, PC, make a

 4       profit in that year?

 5   A   No, there's no profit, none.

 6   Q   Did it lose money?

 7   A   You'd have to ask the operations director because I

 8       believe there may have been a loss year.  But that

 9       would be information you'd have to obtain from

10       operations.  It was, essentially, a nonprofit.

11   Q   It was a nonprofit.

12   A   Essentially, it was a way -- in Michigan you can

13       only practice medicine under, I think it's four

14       different entities, and a PC is one of them.  So

15       Corizon would contract with Quality Correctional

16       Care to provide the medical care to provide the

17       providers.

18   Q   Did Quality Correctional Care of Michigan have any

19       other clients other than Corizon?

20   A   No.

21   Q   Does Quality Correctional Care of Michigan have any

22       plans for mass layoffs in the near future?

23               MR. SCARBER:  Let me just place an

24       objection to relevance, and, you know, asking about

25       the business decisions, which are probably

1    proprietary or confidential concerning a defendant

2    that's not even in the case or party that's not even

3    in the case.  But go ahead, if you can answer.

4  A   I'm not a part of the leadership with Quality

5    Correctional Care, so I don't know.

6  BY MR. CROSS:

7  Q   Okay.  Is it fair to say that Quality Correctional

8    Care passes through its expenses to Corizon?

9  A   Yes.

10  Q   Okay.  So let's go back to what we were talking

11    about before.  This is Exhibit 6, the "Utilization

12    Management Core Process."

13            I want to direct your attention to

14    this section about how the success of the program

15    will be measured.  It says, "We will focus

16    specifically on outpatient referrals per thousand,

17    claims per thousand, referrals per UMMD, claims

18    without a referral, ATPs and percent ATPs

19    overturned."

20            What's the difference between

21    outpatient referrals per thousand and claims per

22    thousand?

23  A   I'm not sure.  It's nothing that we tracked or

24    presented.  I would speculate that the outpatient

25    referrals are the pure number of patients referred;

Jeffrey Bomber, D.O.
05/28/2021                                    Page 38

1    and, claims, that would, to me, infer that there was

2    some sort of cost claim made or charge associated

3    with that.

4  Q   Like a dollar amount.

5  A   Yeah, like if you go to the emergency room there's,

6    you know, a cost associated with that; or if you see

7    a specialist, there's an office fee; if they do a

8    surgery, there'd be a surgery fee.  That's generally

9    what I understand to be a claim.  So that specialist

10    would file a claim or a charge.

11  Q   All right.  And see this, like, first clear, or not

12    filled-in, bullet point here that says, "30/60/90

13    day review RMDs and UMMDs"?

14  A   I see it.

15  Q   Were you involved in those 30-, 60- or 90-day

16    reviews of the success of this program?

17  A   No.

18  Q   Okay.  Do you know how a metric like outpatient

19    referrals per thousand would indicate success versus

20    failure of this program?

21  A   I wasn't part of the development of that program nor

22    was I part of the ongoing meetings with that

23    program; it wasn't part of my job description, my

24    duties.

25  Q   Okay.  So, let's go to this section about how RMDs

1     will monitor and remain knowledgeable of referral

2     and ATP activity.  "RMDs will review:  Detailed

3     daily reports of all ATPs."  Did you do that?

4  A   Yeah, as you can see in the monthly report to the

5     DOC, we did report the percentage of ATPs.

6  Q   And was the only reason you did that to report it to

7     the DOC?

8  A   Well, I certainly wouldn't want the number of ATPs

9     to start going up.  So I would look at it to make

10    sure that we were, you know, at or around our

11    average, because we want to make sure that the

12    inmates are getting the care that they need.  So we

13    would look at it from a quality point of view.

14  Q   So is there a goal or target for the percentage of

15    ATPs that are -- I mean -- or, I'm sorry, the

16    percentage of requests that are approved versus

17    ATP'd?

18  A   There's no goal or requirement, that I'm aware of.

19    We did track it to make sure that, if there was a

20    trend, we'd want to explain why.

21  Q   Okay.  Is that something you track at the individual

22    provider level?

23  A   We would look at that in the beginning with a new

24    provider.  Often, when you first get into the system

25    and you're learning how to use Uptodate and learning

**Jeffrey Bomber, D.O.**
05/28/2021                                              Page 40

1    the referral system, a new provider might have a

2    higher number of ATPs, and so we would help them be

3    able to write more detailed and more medically

4    necessary type referrals.

5           As far as tracking it provider by

6    provider, there were times where we did that.  It

7    wasn't anything that we did regularly.

8  Q   So when would you do that?

9  A   There were a couple of times where the Michigan

10   Department of Corrections requested that, so we did

11   provide that data.

12  Q   I'm going to take you down a page, this is still the

13   same exhibit.  This chart here, does that accurately

14   represent the workflow of the Utilization Management

15   Core Process, as you understand it?

16  A   It's very small and I would need a few minutes to

17   look at it.

18  Q   All right.

19  A   Actually, I have to take my glasses off to do -- oh,

20   we have a copy right here.  Okay.  Yeah, this looks

21   to be the process that's being used now.

22  Q   Okay.  Let's go through it.  So it starts with the

23   outpatient referral request; that's done by a

24   medical provider at the site, correct?

25  A   Yes.

1   Q    And if that request is missing information or it's

2        not detailed enough, there's this UM nurse review,

3        and it looks like there's an arrow that goes back to

4        the provider.  So would the UM nurse determine if

5        there wasn't enough information in the request and

6        then ask the provider to resubmit it, if that the

7        case?

8   A    Not resubmit.  If there was a missing section, a

9        blank part of the form, the provider would give that

10       information to the UM nurse and they would complete

11       the same 407.  So they wouldn't have to file a new

12       one.

13  Q    Okay.  So the UM nurse makes sure that the request

14       is complete.

15  A    Correct.

16  Q    And it has all the information that the physician

17       reviewer would need to make a decision.

18  A    From a clerical point of view, not a medical

19       decision-making point of view.

20  Q    Okay.  But she's not making the medical decision,

21       but she's making sure that there's enough

22       information for a physician to make a medical

23       decision.

24  A    Correct.

25  Q    Okay.  So then the next box we have is called pass

 1     through list.  What's that?

 2  A   That would be like a pacemaker check; automatic

 3     approvals.

 4  Q   All right.  So there's a list of things that are

 5     automatically approved.

 6  A   Correct.

 7  Q   And if it's on the pass through list, then we get a

 8     yes, and we go directly to referral authorized,

 9     right?

10  A   Correct.

11  Q   And does the physician reviewer determine if the

12     procedure is on the pass through list?

13  A   That list was developed by physicians.

14  Q   Okay.  But the person who compares the request to

15     the list, is that a physician?

16  A   No, they review the pass through list, and, if it's

17     appropriate for that, it's automatically given an

18     authorization.

19  Q   Okay.  And that's the nurse reviewer who does that?

20  A   Correct.

21  Q   Okay.  Now, if it's not on the pass through list,

22     then it goes to the utilization management medical

23     director, right?

24  A   Yes.

25  Q   And it goes to him via, what, an email?

1   A   Yes, it's -- well, now it's all electronic now.

2   Q   Okay.

3   A   Yes.

4   Q   If I say the word "407 group," do you know what that

5        is?

6   A   That's the email group that the 407 request is sent

7        out to.

8   Q   And who's in the email group?

9   A   That would be the provider, the UMMD nurse and

10       provider, and then whoever on-site helps to manage

11       the 407 process, usually the HUM, as well as the

12       health information manager.

13  Q   And are those sent to the Michigan.gov emails for

14       these individuals or are they sent to Corizon health

15       emails?

16  A   That would all be through the EMR now.  So, back

17       then, it would be through the DOC email process.

18  Q   So the email is within the EMR?

19  A   Yeah, now there are messages within the EMR

20       regarding the 407s.  I believe they still have the

21       email groups, though, too.

22  Q   So if I were to order a prisoner's medical records,

23       they would include those messages or would they not?

24           MR. SCARBER:  Just going to place an

25       objection to foundation, as to whether he would know

Jeffrey Bomber, D.O.
05/28/2021                                    Page 44

1    that.  But go ahead.

2  A   I'm not sure.

3          MR. SCARBER:  And my objection, Ian,

4    is, more or less, he doesn't know what the MDOC

5    would give you or be able to produce for you because

6    I think your question asked 'if you ordered records,

7    what would you get'?

8          MR. CROSS:  Okay.

9          MR. SCARBER:  That's the basis of my

10   objection.

11 A   I don't know.

12 BY MR. CROSS:

13 Q   And you believe it would be the Michigan.gov emails

14   for those people would receive --

15 A   Yes.

16 Q   -- those messages?  Okay.  So, where were we?  On

17   UMMD review.  Now, if the UMMD approves the request,

18   it goes to the UM nurse, who adds detail attributes.

19   What does that mean?

20 A   Well, there has to be an authorization number

21   attached now to the 407 so that whoever the

22   specialist or whatever the provider is has an

23   authorization number.

24 Q   So the UM nurse adds an authorization number and

25   then the referral is authorized?

1  A   Correct.

2  Q   So once the UMMD approves, there's no one else who

3      has to approve the referral, it's done?

4  A   Correct.

5  Q   All right.  Now, if the UMMD does not approve, are

6      they required to issue an alternative treatment

7      plan?

8  A   Yes.

9  Q   The UMMD cannot deny without issuing an alternative

10      treatment plan, correct?

11  A   There is no such thing as deny.

12  Q   Okay.

13  A   It's either approved or given an alternative

14      treatment plan.

15  Q   And is the alternative treatment plan typically

16      something that can be done on-site at the prison?

17  A   Not always.  It could be that the UMMD physician

18      thought that an ultrasound may be more appropriate

19      than a CT scan.  So it may be an alteration in the

20      request or given an ATP, such as self -- a home

21      exercise program, which can be done on-site.  So it

22      could be either.

23  Q   Could be either.  Does the UMMD physician have

24      access to any information that the site physicians

25      don't have access to, in terms of what is medically

1    indicated for a given problem?

2  A    Site providers have access to whatever they need;

3       they're provided a subscription to Uptodate;

4       They're -- I don't know if it's the same.  I can

5       tell you that they both have adequate resources.

6  Q    So the site provider has Uptodate and the UMMD also

7       have Uptodate.

8  A    Correct.

9  Q    And the UMMD uses Uptodate to make his

10      determinations?

11              MR. SCARBER:  I'm just going to place

12      an objection to foundation.  Are you asking what he

13      does or what somebody else might do or what they're

14      supposed to do?  I guess that's my question; form.

15  BY MR. CROSS:

16  Q    Okay.  So what did you do when you were doing this?

17  A    As a site provider?

18  Q    No, as a UMMD, as a reviewer.

19  A    Oh, for the two months when I did that?  Yes, I

20      would utilize Uptodate, at the time, was my main

21      resource; also, the National Cancer website

22      information, sometimes.  Mostly Uptodate.

23  Q    Okay.  So if you -- if an alternative treatment plan

24      is issued, then the ATP goes to the site provider

25      for review, correct?

1  A   Correct.

2  Q   And the site provider has two options:  They can

3      either accept the ATP or they cannot accept the ATP.

4  A   That's correct.

5  Q   And this not accepting the ATP, that's referred to

6      as an appeal?

7  A   Yes, then they have the right to appeal.

8  Q   How common are appeals?

9  A   I can't quantify it for you.  Generally, I

10     understand, currently, there are one or two a week.

11  Q   Has that volume changed at all in your time with

12      Corizon?

13  A   No, it seems to be somewhat steady.

14  Q   Okay.  Do you know about how many alternative

15      treatment plans there are a week?

16  A   I do not know that, no.

17  Q   So, if the site provider does not accept the ATP,

18      then it goes to the regional medical director,

19      which, at one point, was you, correct?

20  A   Correct.

21  Q   And do these appeals go to you now in your current

22      role?

23  A   Yes.

24  Q   All right.  And are you able to unilaterally

25      overturn the ATP?

Jeffrey Bomber, D.O.
05/28/2021                                    Page 48

1  A    No, not as a regional director.

2  Q    Not as a regional director.  So you have two

3       options:  You can uphold the ATP, right?

4  A    Correct.

5  Q    And then you would discuss that with the site

6       provider, and that would be the end of the process.

7  A    No.

8  Q    No?  I mean -- so here I see the arrow goes to

9       uphold ATP, nurse acknowledges, site provider

10       accepts ATP.

11  A    No, that is not our process in Michigan.

12  Q    So beside upholding, you have another option, you

13       can appeal the ATP, right?

14  A    Correct.

15  Q    So it comes to you, you can't say, 'I overturn,' but

16       you can uphold or you can appeal again to the CMO.

17       Who's the CMO?

18  A    So this doesn't delineate the entire process in

19       Michigan.  But the pathway that you just asked me a

20       question on:  If the provider comes to me and

21       appeals it, then I send that appeal to the CMO or

22       SMD, state medical director, RMD, council, which

23       meets three times a week, and we discuss the appeal.

24  Q    So the appeals -- you're saying, in Michigan,

25       appeals don't go to the Corizon CMO.

1   A    No, no, not -- no.  Go ahead.

2   Q    This is not an accurate description of the process.

3   A    No, no.  There are some components not included in

4        this document.

5   Q    All right.  So the RMD gets it; the RMD appeals it

6        to the state medical director; you used to be the

7        state medical director; then what happens?

8   A    It's the state medical director -- there's a council

9        that meets, it includes the state medical director,

10       the regional medical director, and they then decide

11       whether or not to overturn the ATP or uphold the

12       ATP.

13  Q    So that's kind of like this appeals committee review

14       up here.

15  A    I have to look closer.  No, it's not exactly like

16       that, because ultimately the chief medical officer

17       of the state of Michigan has the ultimate authority.

18       So, can I walk you through the actual process?

19  Q    Yeah, yeah, go ahead.

20  A    Okay.  So, we're at the appeal level.  So the RMD

21       appeals to the state medical director RMD council;

22       and if they uphold the ATP, the provider still has

23       another option and that is to appeal to the chief

24       medical officer of the state of Michigan that has

25       ultimate authority, they can do that there; and

1   then, also, if I uphold the ATP, the provider always

2   has the option to go to the chief medical officer

3   for the state of Michigan.  There's several levels

4   of appeal.

5          MR. SCARBER:  When you say "state of

6   Michigan," are you talking about, what, what --

7   Corizon or another entity?

8          MR. CROSS:  I'm asking the questions

9   here.

10          MR. SCARBER:  I understand, but I

11   need to be clear.

12          THE WITNESS:  So it's just between

13   Corizon and DOC.  At this point, there's no one from

14   Corizon corporate involved in the process.

15  BY MR. CROSS:

16  Q   All right.  Can the prisoner initiate the appeal

17      process?

18  A   They have a system of grievances.

19  Q   I understand they can file a grievance, and that's

20      handled by the MDOC, right?

21  A   Correct.

22  Q   But can they initiate the Corizon appeal process

23      that you just described?

24  A   No, I don't believe so.

25  Q   Okay.  Does Corizon review the performance of

1    site-level medical providers?

2  A    There's an annual review process, yes.

3  Q    Have you ever done any kind of performance review of

4    a provider as an RMD or state medical director?

5  A    Yes.

6              (Bomber Deposition Exhibit No. 8 was

7              marked for identification.)

8  Q    All right.  I'm going to show you what we will call

9    Exhibit 8.  Do you recognize this document?  I mean

10    not what's filled out in it, but just the form

11    itself?

12  A    It's not -- it looks like a document that's similar

13    to what we review.  We used to review providers in

14    Michigan, but it's not exactly the same, this is a

15    little different.

16  Q    How is it different?

17  A    Well, the form is a little different, the

18    organization is different; some of the questions are

19    similar, though.

20  Q    Okay.  Tell me how the form is different; what are

21    the differences, what are the different questions?

22  A    Well, I'd have to have the other form in front of

23    me.  It's just the way it's organized, the lines,

24    the boxes, they're all a little different.

25  Q    Interesting.  And you know who this person Keith

1      Papendick is, right?

2  A   Yes.

3  Q   And what's his job?

4  A   He is a utilization management physician.

5  Q   And do you know who this person, James Powell, is?

6  A   That would be Dr. Powell, who used to be the chief

7      medical officer of Corizon.

8  Q   Okay.  So I'm noticing on this form -- like, let me

9      direct your attention to No. 5, "Demonstrates

10     compassion in patient encounters, NA"; that would

11     stand for not applicable, right?  Is that a fair

12     assumption?

13  A   That question, seems to me, would be directed

14     towards someone who's seeing patients eye to eye,

15     face to face.

16  Q   Exactly.  And does Dr. Papendick, in his current

17     role, see patients eye to eye, face to face?

18  A   No.

19  Q   So, this form probably isn't specific to utilization

20     management medical directors, is it?

21             MR. SCARBER:  Just going to place an

22     objection to speculation and foundation.  But go

23     ahead.

24  A   I can't answer that question 'cause I didn't develop

25     this form nor do I use this exact form.

1  BY MR. CROSS:

2  Q   Okay.  Do you have access to the form that you do

3      use?

4  A   Not immediately, no.

5  Q   So, I want to direct your attention to the Medical/

6      Clinical Judgment Section."  On the form that you

7      use, is there something similar to No. 3,

8      "Prescribes pharmaceutical therapy within the

9      guidelines of Corizon Health or contracted

10      formulary"?

11 A   There is a question around pharmacy and

12      pharmaceutical use.  Can't tell you exactly if it

13      reads the same, there is a question.

14 Q   There's a question like that?

15 A   Yes.

16 Q   And what would be the answer that would reflect

17      better on the site provider, yes or no?

18 A   Yes.

19 Q   Yes.  What's a formulary?

20 A   A formulary is a list of medications provided by any

21      healthcare organization.  The MDOC has a formulary

22      and we're -- that's preferred that we use a drug on

23      the formulary.  It's not the only drugs we can use,

24      but those are the preferred medications.

25 Q   What's the purpose of having a drug formulary?

1  A   A drug, what, I'm sorry?

2  Q   What is the purpose of having a drug formulary?

3  A   Purpose of having a drug formulary is to make sure

4      that you provide medications in every category

5      needed for the patients.

6  Q   Well, wouldn't you be able to provide medications in

7      every category needed for the patients without a

8      drug formulary?

9          MR. SCARBER:  Just going to place an

10     objection to relevance.  Go ahead.

11  A   I know there are other reasons for having a

12     formulary; health entities, hospitals, for example,

13     clinics, are provided better cost in volume buying

14     participating in a formulary.

15  BY MR. CROSS:

16  Q   So is part of the reason that a health care

17     organization would use a drug formulary to control

18     costs?

19         MR. SCARBER:  Place an objection as

20     speculation and mischaracterizes his testimony.  But

21     go ahead.

22  A   They use it to provide better pricing and help with

23     cost, yes.

24  BY MR. CROSS:

25  Q   Okay.  And so below this question you have a --

1    strike that.  See where it says, "Percentage of

2    non-formulary medication on-site"?

3  A   Yeah, I can tell you we don't track that for the

4    providers.

5  Q   You don't?

6  A   No.

7  Q   All right.  Do you track the number of UM requests

8    during the last year for the providers?

9  A   We do not, and there's a question on that, we just

10    don't have the data available.  So, no, we don't

11    discuss that in our reviews.

12  Q   Do you track the percentage of requests that are

13    approved?

14  A   We track the overall -- now we track the overall

15    percent of ATPs, yes.

16  Q   But do you track the percentage of an individual

17    providers' 407 requests that are approved?

18  A   Previously, I was asked that question, and I did

19    answer that question before, and, yes,

20    intermittently that number has been tracked and

21    provided to the DOC.

22  Q   Do you use that number at all in evaluating the

23    performance of the individual provider?

24  A   I don't, no.

25  Q   Did Corizon ever use that number in evaluating the

1   performance of the individual provider?

2  A   Not actively.

3  Q   What do you mean by "not actively"?

4  A    That number may have been provided intermittently to

5      us and the providers.  But it was not a part of

6      their annual assessment, it wasn't a factor in

7      evaluating them.

8  Q   If a provider has something like a 50 percent ATP

9      approval rate, would they receive any kind of

10      coaching or performance improvement plan?

11  A    Intermittently, like I said earlier, typically that

12      would be a new provider who just needs some coaching

13      to help learn the system better.  Most of our

14      providers are overall seasoned.  We have many

15      providers that have been with us for many years, and

16      they don't have many ATPs.

17  Q   They don't have many ATPs at all or they don't have

18      many ATPs as a percentage of their requests?

19  A    There are some providers who have virtually hundred

20      percent of their 407s approved, and, you know,

21      others 90, 85 percent.  Occasionally, like I say, we

22      get somebody who has a lower approval rate and we

23      want to make sure that they have the tools required

24      to be successful.

25  Q    So if someone has a -- if a provider has a lower

1    approval rate, what changes do they need to make to

2    be more successful?

3  A   Generally, their 407s don't include enough

4    information or they haven't demonstrated medical

5    necessity.

6  Q   So if it doesn't include enough information -- we

7    were talking before about this nurse reviewer --

8    hold on -- this nurse review portion of the

9    "Utilization Management Core Process Workflow" --

10  A   Right.

11  Q   -- where the nurse should help them correct that

12    before it even gets to the physician reviewer,

13    right?

14  A   Usually, yes.

15  Q   So if they're not including enough information,

16    shouldn't that not really affect their ATP

17    percentage because it gets fixed before it gets to

18    the doctor?

19  A   Yeah, we've improved that part.  So, you're correct,

20    that would be a very, very small percentage of them

21    now.

22  Q   Okay.  So, usually, if their percentage is -- their

23    approval rate is low, it's because they're

24    requesting things that aren't medically necessary?

25  A   Yes.

1  Q    So how does Corizon define medially necessary?

2  A    Well, the MDOC has policies, and we also use

3         Uptodate, sometimes available other medical

4         literature, whatever is required.

5  Q    So you're telling me that there are some MDOC

6         policies that indicate what's medically necessary

7         and what's not medically necessary?

8  A    Yes, there are some policies.  They also use

9         InterQual.

10  Q    Does the MDOC have a definition of medical

11         necessity?

12  A    I don't think so, per se.

13  Q    Has the standard of what meets medical necessity

14         changed at all over the course of your time working

15         in the Michigan prison system?

16  A    Only in the sense that Uptodate changes every day.

17  Q    All right.  So what's the definition of medical

18         necessity that you apply?

19  A    So, medical necessity is based on the medical

20         literature and the standard of care.  So any

21         procedure, intervention, is based on the medical

22         evidence whether or not it's necessary.

23  Q    What do you mean by "necessary"?

24  A    So, you know, in medicine we have a saying, 'Do no

25         harm,' and if we order a test we want to make sure

Jeffrey Bomber, D.O.
05/28/2021                                        Page 59

1     that that test will be the appropriate test and also

2     be thinking that it may lead to other procedures, so

3     want to make sure that it's the right type of

4     imaging, for example.  We want to make sure that

5     the -- there are -- you know, everything in medicine

6     we weigh the risk versus benefit.  So the benefit of

7     a treatment or a procedure should outweigh any risk,

8     based on the medical evidence.

9   Q   So if the benefit outweighs the risk is the

10      procedure then medically necessary?

11  A   No, that's only part of my answer.

12  Q   That's only part of it?  What else -- so you have to

13      have benefit outweighing risk; what else do you

14      need?

15            MR. SCARBER:  I'm just going to place

16      an objection; asked and answered in his last answer.

17      He mentioned a number of things that go into it.

18  BY MR. CROSS:

19  Q   You may answer.

20  A   So, yeah, there are numerous research studies and

21      FDA approvals, et cetera, to lead to the

22      determination of medical necessity and benefit

23      versus risk.

24  Q   All right.  So you're talking about efficacy and

25      evidence-based medicine; is that right?

Jeffrey Bomber, D.O.
05/28/2021                                    Page 60

1   A   Correct.

2   Q   So if there is research that indicates that the

3       requested service, whatever it is, is effective for

4       the condition, whatever it is, and the benefit of

5       the service or procedure outweighs the risk, it is

6       then medically necessary?

7   A   You have to take it by -- patient by patient, you

8       have to individualize this.  You can't just make a

9       blanket -- there are some generalizations, but you

10      just can't just make a blanket statement.

11  Q   Did you review any documents in preparation for

12      today's deposition?

13  A   Yes.

14  Q   What documents did you review?

15  A   I only reviewed documents provided by my attorney.

16  Q   Did you review any medical records?

17  A   I reviewed portions of medical records I was

18      provided by my attorney.

19  Q   Did you review medical records for an individual by

20      the name of Kohchise Jackson?

21  A   Yes.

22  Q   What medical records did you review?

23  A   There were excerpts from his chart, I believe; there

24      was a 407 request.

25  Q   What else?

1  A   I would have to have my attorney provide those

2      documents again.

3           MR. SCARBER:  Ian, we gave him the

4      MDOC chart, he looked through that.  I can't say he

5      looked at every page, but he had that to skim

6      through.

7  BY MR. CROSS:

8  Q   All right.  Did you receive any records about

9      Mr. Jackson's treatment after he left the MDOC or

10      before he entered the MDOC?

11  A   I believe there was a document related to his time

12      in a jail.

13  Q   Okay.  How about afterwards?

14  A   I did not see any medical records afterwards, that I

15      recall.

16  Q   Have you ever met Mr. Jackson?

17  A   No, with the caveat being that I do visit a lot of

18      sites and do meet patients intermittently, but I

19      can't say for sure.

20  Q   Okay.  But fair to say you've never evaluated him as

21      a medical provider.

22  A   No, I have not evaluated him.

23  Q   Did you form any opinions about whether any

24      procedures were medically necessary on the basis of

25      your review of medical records for Mr. Jackson?

Jeffrey Bomber, D.O.
05/28/2021                                     Page 62

1  A   Yes, there was a request for revision of a

2      colostomy.

3  Q   And you formed an opinion about whether reversing

4      that colostomy was medically necessary; is that

5      correct?

6  A   Yes.

7  Q   Based on your review of those medical records.

8  A   Medical records and MDOC policy, yes.

9  Q   Okay.  So MDOC policy determines what's medically

10     necessary?

11 A   No.

12 Q   So, then, how did MDOC policy factor into your

13     clinical judgment about whether a colostomy reversal

14     was medically necessary?

15 A   MDOC has policies based on medical necessity.  They

16     don't do the research that determines medical

17     necessity, but their policies are based on medical

18     necessity.

19 Q   Okay.  But is it fair to say that you were able to

20     form an opinion about whether a colostomy reversal

21     was medically necessary or not based on reviewing

22     medical records?

23 A   No, I would review Uptodate and see what the current

24     recommendation is, whether it's medically necessary.

25 Q   So you looked at Uptodate and you looked at medical

1    records?

2  A   I have looked at Uptodate on a daily basis.  I can't

3       say that I looked at colostomy reversal in the last

4       month, but I have reviewed that before.

5  Q   Okay.  But you were able to form an opinion on the

6       basis of the medical records you reviewed in

7       preparation for today's deposition and your

8       experience and what you previously read on Uptodate?

9  A   Yes.

10  Q   Okay.  So if I were to show you some medical records

11      for Mr. Jackson from a time period after he was

12      released from the Michigan Department of

13      Corrections, would you be able to form a medical

14      opinion about whether or not colostomy reversal was

15      appropriate or medically necessary at that time?

16  A   I can't say, I'd have to review the information.

17  Q   And --

18              MR. SCARBER:  Let me just place an

19      objection to this line of questioning.  This witness

20      isn't a named defendant in this particular case.

21      There is no allegations about whether this witness'

22      medical judgment was involved in making the

23      decisions in this particular case; and, you know,

24      he's not really a part of the claim that's being

25      made here.

1          MR. CROSS:  Is he going to testify

2    about whether or not colostomy reversal is medically

3    necessary?

4          MR. SCARBER:  Are you talking about

5    at the time that the request was made or are you

6    talking about two-and-a-half years later?

7          MR. CROSS:  I'm talking about at

8    either time.

9          MR. SCARBER:  If you're going to ask

10   him the question, I suppose he could answer the

11   question as to what was necessary at that particular

12   time.  But this is way outside the scope of what

13   your claim is.  And I don't want to go any further,

14   you know, making any speaking objections, but my

15   objection is that that's not what this witness is

16   here for.  He's not here to establish any standard

17   of care testimony for your guy or your standard of

18   care of testimony with respect to what happened

19   later in the case with Dr. Weber or anything of that

20   nature, if that's where you're going with it.

21          If you're going to ask him about the

22   407 process, what was presented based upon what he's

23   seen from the 407 process at that particular time in

24   April of 2017 or that summer, based upon whatever

25   was submitted or whatever the appeal or the

1    grievance was, I mean, obviously, I think that's

2    pertinent.

3           MR. CROSS:  But you don't think it's

4    pertinent to ask him about -- well --

5           MR. SCARBER:  It doesn't matter if I

6    think it's pertinent.  I guess what I'm saying is

7    that's my objection.

8           MR. CROSS:  Okay.

9           MR. SCARBER:  And I'll reserve it.  I

10   mean, you can ask him -- you certainly can -- if you

11   got a question to ask, I'll make my objection as you

12   ask it.  I was just laying the foundation so that I

13   didn't have to keep objecting to a whole bunch of

14   questions that you might ask.  But go ahead.

15   BY MR. CROSS:

16   Q   Okay.  So did you apply the same definition of

17       medical necessity you just discussed when you were

18       doing utilization review?

19   A   Yes, the literature and the MDOC policy on

20       revisions, I think, is very clear.

21   Q   So who trained you to do utilization review?

22   A   That would be my predecessor as state medical

23       director, was Dr. Orlebeck.

24   Q   And she taught you what constitutes medical

25       necessity?

Jeffrey Bomber, D.O.
05/28/2021                                        Page 66

1  A   No.

2  Q   No?  Who taught you that?

3  A   We use Uptodate, InterQual and other relevant

4      medical literature to determine medical necessity.

5  Q   So you look at the literature and if the literature

6      indicates that a given treatment is, well, effective

7      and the benefit outweighs the risk, is it then

8      medically necessary or is there something else that

9      you need?

10 A   I would ask what is the consensus opinion, what does

11     Uptodate say.

12 Q   All right.  Let me give you an example:  Say a

13     patient has cataracts, dense cataracts in both eyes;

14     is it medically necessary to remove both cataracts

15     or is it just good enough to remove one?

16 A   I'd really have to know about the particular inmate

17     and their symptoms.  I'd have to have more details

18     than that.

19 Q   What details would you need?

20         MR. SCARBER:  Just going to place an

21     objection to asked and answered.

22 A   I'd want to know more about the inmate, what's his

23     vision, does he meet the medically necessary

24     criteria.

25

1  BY MR. CROSS:

2  Q   So that's what I'm getting at here.  What is the

3      necessary medical criteria?

4           MR. SCARBER:  Objection; asked and

5      answered now quite a few times.

6  A   About cataract removal, I would have to look it up.

7  BY MR. CROSS:

8  Q   So there's a specific policy somewhere about

9      cataract removal and when it's medically necessary

10     to remove a cataract?

11 A   No, consensus opinion and Uptodate, for example, is

12     where I would look.

13 Q   So you would look at Uptodate and see if Uptodate

14     says do it, then you do it?

15          MR. SCARBER:  Objection;

16     mischaracterizes his testimony about -- I won't make

17     a speaking objection.  But he's already given you

18     indications as to what might help his decision as to

19     medical necessity.

20 A   There are other guidelines.  Medicare, I believe,

21     has guidelines for cataract removal.

22 BY MR. CROSS:

23 Q   So if something meets Medicare's guidelines, is

24     it -- of medical necessity, is it then medically

25     necessary, according to Corizon?

1  A   It's multifactorial.  I'm just trying to explain

2      that there's not just one thing that we look at, but

3      Uptodate is our core resource.

4  Q   All right.  Is it possible that Corizon's definition

5      of medical necessity is more restrictive than

6      Medicare's?

7  A   Wow.  I couldn't really answer that.  You're talking

8      about a lot of information.  I just really couldn't

9      answer that.

10  Q   Well, are there some procedures that Medicare would

11      consider medically necessary and pay for that

12      Corizon would not do for a prisoner?

13  A   I can't answer that, there's just too many

14      variables.

15          MR. CROSS:  Why don't we take a break

16      now.

17          THE VIDEOGRAPHER:  Going off the

18      record, the time is 12:33 p.m.

19          (Break was taken.)

20          THE VIDEOGRAPHER:  We're back on the

21      record.  The time is 12:52 p.m.

22  BY MR. CROSS:

23  Q   Okay.  I'm going to take you back to Exhibit 6, this

24      Utilization Management Manual, the portion about the

25      UM core process.  See where it says here, at the

Jeffrey Bomber, D.O.
05/28/2021                                    Page 69

1    bottom, that some training will be provided to

2    support a successful launch?

3  A   Yes.

4  Q   Did you receive any training in connection with the

5    launch of the UM core process?

6  A   Yes, we received training and we did review the

7    process.

8  Q   All right.  How was the training provided?

9  A   I believe there was some live training, as well as

10    some virtual training.

11  Q   Virtual training, interesting.  How did you do the

12    virtual training?

13  A   With -- actually, I think, Mignon, at one time, did

14    some training.

15            THE COURT REPORTER:  Excuse me, what

16    was that?

17  A   Yes, I did receive training, yes.

18  Q   Okay.  Did you -- were there any materials provided

19    to you during that training?

20  A   I can't recall precisely what was provided, there

21    were some materials.

22  Q   What kind of materials?

23  A   I think there was an algorithm similar to the one

24    you showed me about -- it was focusing on the

25    process and procedure that is what happens to the

Jeffrey Bomber, D.O.
05/28/2021                                    Page 70

1    407 once it's generated, who it goes to, and the

2    appeal process.  That's what the focus of that

3    training was.

4  Q   So was it this manual?  Is that what you were shown?

5  A   No, we weren't trained in this manual.  There are

6    parts of it, perhaps, but I didn't see this

7    particular manual that you're showing me.

8  Q   Okay.  Did you go through a training module called

9    RMD Utilization Management 101?

10  A   I don't think so, no.

11  Q   So the online training, was it live or was it

12    recorded?

13  A   There were --

14              MR. SCARBER:  Just going to place an

15    objection; I don't know if he said "online" or if he

16    said "virtual."  But go ahead.

17  A   Yeah, no, it was live, either telephone or virtual.

18  BY MR. CROSS:

19  Q   Do you know if that session was recorded?

20  A   I do not.

21  Q   Okay.  And the in-person training, where did that

22    take place?

23  A   There was training at our annual state-wide meeting.

24  Q   Who provided that training?

25  A   I believe it was actually one of the VPs of

Jeffrey Bomber, D.O.
05/28/2021                                    Page 71

1       operation and Mignon Ernst.

2   Q   Did they give you any handouts or did they put up a

3       PowerPoint slide, any kind of the materials, or did

4       they just talk?

5   A   There were materials.  I don't have them.

6   Q   Do you remember what they were?

7   A   There were some -- there was a PowerPoint

8       presentation at the state-wide meeting.

9   Q   Okay.

10  A   And then there were subsequent calls, group calls.

11  Q   Do you know what a 30(b)(6) witness is?

12  A   I believe that is where you testify on behalf of a

13      corporation.

14  Q   And you get specific subjects you're going to

15      testify about, correct?

16  A   Correct.

17  Q   And you have to become reasonably knowledgeable

18      about those subjects before you testify, correct?

19  A   Correct.

20  Q   Have you ever been a 30(b)(6) witness for Corizon?

21  A   Yes, but, I'm sorry, sometimes the numbers or the

22      designations are confusing.

23  Q   Were you ever designated to testify about Corizon's

24      document retention policies?

25  A   I may have been asked a question about them.  But I

1     don't have anything to do with their document

2     retention.

3  Q   So you're not familiar with their document retention

4     policies at all.

5  A   No, I'm not a part of what happens at the corporate

6     level.

7  Q   Okay.  Do you have a computer at work?

8  A   Yes.

9  Q   Do you need to retain documents that you create on

10    your computer, pursuant to a policy?

11 A   Pursuant to a policy.  I had -- at one time, I had

12    the MDOC policies and procedures and a copy of the

13    contract.  I do -- the Corizon forms, I do have the

14    annual review form for providers on my computer.

15    But I don't retain any documents for the company.

16 Q   All right.  Is there like a provider handbook or a

17    manual that's provided to Corizon providers in

18    Michigan?

19 A   Yes.

20 Q   Do you have access to that document?

21 A   Yes, there are hard copies in the Lansing office.

22 Q   And what's the title of it?

23 A   Corizon Provider Training Manual?

24 Q   Corizon Provider Training Manual?  Okay.  Is there a

25    virtual version that providers can access online?

1  A   Not that I'm aware of.  I have not.

2  Q   Okay.  I'm going to go back to this deposition you

3      gave in Franklin.  So here, at 15 through 16, you

4      said, "The resources are now part of the onboarding

5      manual which is available via the web to the

6      providers."  Do you have any idea what resources you

7      were talking about there?

8  A   I don't believe that ever materialized.  That's what

9      we were told was going to happen to it.  But during

10     my tenure, it actually did not.

11 Q   And then at line 23 to 24, you were asked, "So it's

12     an online manual now"?  And you said, "Yes."

13 A   Yes.

14 Q   But, in fact, it was not actually an online manual?

15 A   That was my understanding, that it was going to be

16     online and was online, but it did not materialize.

17 Q   Okay.  So, in your opinion, is it medically

18     necessary to reverse a functional colostomy, ever?

19             MR. SCARBER:  Just going to place an

20     objection to relevance, foundation.  But go ahead.

21 A   My opinion is based on medical necessity as per

22     Uptodate and following MDOC policy.  I'm not an

23     expert in colostomies.

24 BY MR. CROSS:

25 Q   Okay.  What MDOC policy are you referring to, sir?

1   A   There is a policy that discusses cosmetic surgeries;

2       and under their policy, colostomy reversal is

3       considered more of a cosmetic procedure, and that is

4       not approved.

5   Q   So you're saying there's an MDOC policy that

6       prohibits cosmetic surgeries; is that correct?

7   A   Yes.

8   Q   And under that policy a colostomy reversal is

9       considered cosmetic.

10  A   They refer to it as being part of a cosmetic group,

11      yes.

12  Q   What differentiates a cosmetic from a non-cosmetic

13      surgical procedure?

14  A   You'd have to ask the MDOC how they define that.

15      But a cosmetic procedure is meant to reverse the way

16      something looks.

17  Q   Okay.  So this policy that you're talking about,

18      does it specifically say that colostomy reversals

19      are cosmetic?

20  A   I did see the policy prior to this deposition today,

21      and it is present.  Is it okay to refer to that

22      policy?

23  Q   Sure.  Yeah.

24  A   Do you want to bring it up or you want me to just

25      to --

**Jeffrey Bomber, D.O.**
**05/28/2021**                                              Page 75

1  Q   I'll need a second to grab it.  But I think I can

2      bring it up here.  Let me find that policy.  And you

3      have a copy in front of you?

4  A   I do.

5          MR. SCARBER:  We have one, Ian.

6  BY MR. CROSS:

7  Q   Okay, let me just find it myself.  What's the policy

8      number?

9  A   It's Policy Directive No. 03.04.100.

10  Q   All right, 03.04.100, and what version of the policy

11     are you referring to?

12  A   The effective date is 2-1-2015, but this was

13     filed -- oh, no, that's an evidence number, right?

14     So, yeah, 2-1-2015.

15  Q   All right.  So we're looking at the same policy

16     right now.

17  A   Okay.

18  Q   What portion of the policy indicates that a

19     colostomy reversal is cosmetic?

20  A   So they state under Section AA and BB, "Corrective

21     surgery is a surgical procedure to alter or adjust

22     body parts or the body's structure.  Reconstructive

23     surgery is a surgical procedure to reform body

24     structure or correct defects.  For purposes of this

25     policy, corrective and reconstructive surgery does

1    not include procedures which can be done under local

2    anesthesia.  Corrective and reconstructive surgeries

3    shall be authorized by a prisoner only if determined

4    medically necessary and only if approved by the CMO.

5    It shall not be approved if the sole purpose is to

6    improve appearance."

7  Q   Okay.  So I don't see anything in that policy

8    specifically about colostomy reversals.  Can you

9    explain how you believe that policy prohibits

10   colostomy reversals.

11  A   That's what we were told by the MDOC, that they

12   consider colostomy reversals to be under this

13   particular policy.

14  Q   So is a colostomy reversal a reconstructive surgery

15   or a corrective surgery?

16  A   I -- again, I'm not an expert in interpreting that.

17   It looks like the MDOC considers it a

18   reconstructive-type surgery.

19  Q   Okay.  And does this policy say that corrective and

20   reconstructive surgeries are not permitted for

21   prisoners?

22          MR. SCARBER:  Just going to place an

23   objection; the policy speaks for itself, he didn't

24   write the policy; and object to speculation as to

25   what's meant by it, other than what the MDOC has

1      already told the inmate.  Go ahead, if you can

2      answer.

3   A   It does state only if determined medically necessary

4      and only if approved by the chief medical officer,

5      which would be the chief medical officer of the

6      MDOC.

7   BY MR. CROSS:

8   Q   In your time as a provider for the MDOC, are you

9      aware of any prisoners who received a surgery to

10     reform body structure or correct defects?

11  A   Well, correcting defects can be interpreted much

12     more broadly in the face of an orthopedic injury,

13     for example, that affects function, which may be

14     medically necessary.  So, in that context,

15     certainly.

16  Q   Are you aware of any inmates who received a surgical

17     procedure to alter or adjust body parts during your

18     time as a provider?

19  A   Not for cosmetic purposes, no.

20  Q   Okay.  So cosmetic purposes means what?  The sole

21     purpose is to improve appearance?

22          MR. SCARBER:  Just going to object to

23     form, and asked and answered already.

24  A   That's what the policy says.

25

Jeffrey Bomber, D.O.
05/28/2021                                                    Page 78

1 BY MR. CROSS:

2 Q   Do you think the sole purpose of reversing a

3     colostomy is to improve appearance?

4 A   I can tell you it's not considered medically

5     necessary with -- according to Uptodate; and if it's

6     not medically necessary, no, we don't approve them.

7 Q   So do you think it was medically necessary in June

8     of 2019 after Mr. Jackson got out of MDOC custody?

9 A   I couldn't say.  I don't have that information.

10 Q   What information would you need?

11 A   What was the patient presenting with, what was the

12     opinion of the surgeon, what was the reasoning of

13     it.

14 Q   All right.  I want to you assume, for the purposes

15     of this question, that the patient's presentation at

16     the time he received the surgery was the same in all

17     material respects to his presentation when the

18     surgical request was ATP'd while he was in the MDOC.

19 A   So I don't understand what that presentation has to

20     do with the policy that we were instructed to follow

21     at the time.

22 Q   It's not about the policy, sir, it's about what is

23     medically necessary.  So you're saying that the

24     reversal surgery wasn't medically necessary because

25     of the policy or because of the state of medical

1    practice?

2   A   That was not only the policy, that's, I believe,

3       what even the patient's own surgeon said at the

4       time.

5   Q   Was it not medically necessary because of this

6       policy or was it not medically necessary because of

7       the state of medical practice?

8                MR. SCARBER:  Just going to place an

9       objection, asked and answered.

10  A   Right, there's no evidence I'm aware of that says

11      that it's medically necessary.

12  BY MR. CROSS:

13  Q   So why isn't it medically necessary?

14               MR. SCARBER:  Just place an objection

15      to asked and answered, now quite a few times, again.

16  A   Well, we'd had have to go and look at all the

17      literature that resulted in that consensus opinion.

18      So it would be a number of reasons it's considered

19      not necessary.

20  BY MR. CROSS:

21  Q   Are you aware that the colostomy was eventually

22      reversed?

23  A   Yes.

24  Q   So do you think that -- hold on.  Strike that.  Are

25      you aware that the Michigan Medicaid program was

Jeffrey Bomber, D.O.
05/28/2021                                    Page 80

1      billed for the cost of the reversal surgery?

2  A    No.

3  Q    All right.  Well, I want to you just assume that

4      it's true.  Are you aware that medical necessity is

5      a condition of payment under both the Medicare and

6      the Michigan Medicaid programs?

7  A    I've not seen the language.

8  Q    Are you aware that a physician who directly or

9      indirectly seeks reimbursement from Michigan

10     Medicaid for a service that is not medically

11     necessary is committing healthcare fraud, a ten-year

12     felony?

13  A    As you say.

14  Q    So do you think Dr. Weber, the doctor who reversed

15     Mr. Jackson's colostomy shortly after he was

16     released from prison, committed healthcare fraud?

17  A    I cannot speak to the specifics of that case.

18  Q    So, the way I see it, there are three possibilities

19     here:  Either, one, his condition changed between

20     the time he was in prison and the time that he was

21     released such that, while it wasn't medically

22     necessary when he was in prison, it became medically

23     necessary when he was released; or Dr. Weber

24     committed healthcare fraud by performing a procedure

25     and billing for a procedure that's not medically

1    necessary; or Corizon's definition or the MDOC's

2    definition of medical necessity is different from

3    the definition used by the Michigan Medicaid

4    program.  Can you think of another possibility?

5            MR. SCARBER:  I'm just going to place

6    an objection to the form of the question and to

7    speculation all over the question.  Your question

8    started out even with speculation on your behalf.

9    So object to form, speculation.  He can't answer

10    that kind of question.  But go ahead, if you can.

11  A   I can't, there's too many variables.  There's always

12    a difference of opinion among medical providers.

13    But I can't speak to the legalities of whether they

14    committed a crime or fraud.

15  BY MR. CROSS:

16  Q   Well, do you think it was medically necessary to

17    reverse the colostomy after he got out if we assume

18    that his condition was the same?

19            MR. SCARBER:  Objection; asked and

20    answered, calls for speculation, foundation.

21  A   Again, you're asking me to speculate.  I don't know.

22  BY MR. CROSS:

23  Q   Well, what kind of information would you need to

24    know?

25  A   I'd want to see the surgeon's note prior to the

1    procedure, the nature of the procedure, what

2    procedure was done; and even then, I mean, you're

3    going to find difference of opinion among different

4    surgeons.  His previous surgeon, I understand, said

5    it wasn't medically necessary.

6  Q   Well, would it help you if I showed you the

7    surgeon's note prior to the procedure?  Would you be

8    able to form an opinion then?

9  A   Again, you're asking me to speculate?

10  Q   Well --

11  A   I can't do that.

12  Q   -- didn't you testify earlier that you formed an

13    opinion about whether a colostomy reversal was

14    medically necessary for Mr. Jackson based on your

15    review of some medical records in preparation for

16    today's deposition?

17           MR. SCARBER:  I'm going to place an

18    objection; that mischaracterizes his testimony.  And

19    I don't want to make a speaking objection, but a lot

20    more went into that answer.

21  A   I believe I answered as to medical necessity and how

22    that MDOC policy dictated what they would approve

23    and what they would not.

24  BY MR. CROSS:

25  Q   So you didn't have an opinion as to whether the

1    reversal surgery was medically necessary in April of

2    2017.

3              MR. SCARBER:  You mean did he

4    formulate an opinion in April of 2017?

5              MR. CROSS:  No, I'm asking him does

6    he have an opinion today that he was able to

7    formulate, based on reviewing medical records from

8    Mr. Jackson's time in the MDOC, about whether or not

9    a colostomy reversal was medically necessary for

10    Mr. Jackson.

11              MR. SCARBER:  And I'm going to

12    object, again, that it's been asked and answered

13    repeatedly about what he thinks about that

14    particular procedure, whether it should have been

15    done or whether it was medically necessary or what

16    the basis of his opinion already was concerning

17    that.  But I think the record will speak for itself

18    that he's been asked that a number of times and

19    given reasons as to his opinion.  But go ahead.

20  A    No, it did not meet the criteria for medical

21    necessity.

22  BY MR. CROSS:

23  Q    So why couldn't you determine, based on medical

24    records from June of 2019, whether it met criteria

25    for medical necessity at that time?

1          MR. SCARBER:  I'm just going to place

2     app objection, also, to, at this point, what

3     difference does it make for this doctor, at this

4     point, to be talking about something that happened

5     well after this time period.  But go ahead.  He

6     didn't make any decisions -- but go ahead.

7   A   Yes, the decision would be the same based on the

8     policy.

9   BY MR. CROSS:

10  Q   The decision would be the same based on the policy,

11    meaning, in June of '19, the decision would be the

12    same?

13  A   Unless this policy has been changed, yes.

14  Q   Okay.  So the determination of whether it's

15    medically necessary or not is based on a policy of

16    the MDOC.

17          MR. SCARBER:  Objection; asked and

18    answered, many times, and taken out of context of

19    what his prior testimony was.

20  A   So, again, my answer is the same, the MDOC base

21    their policy on medical necessity.

22  BY MR. CROSS:

23  Q   Is it possible that medical necessity in the MDOC

24    context is different from medical necessity in the

25    Michigan Medicaid program context?

1         MR. SCARBER:  I'm going to place an

2    objection; calls for speculation.  The question

3    itself asked him is it possible; anything is

4    possible.  But if you can answer.

5  A   It's possible, but I don't have those Medicaid

6    policies in my hands for review.

7              (Bomber Deposition Exhibit No. 10 was

8              marked for identification.)

9  BY MR. CROSS:

10  Q   Okay.  Let me show you a document.  We'll call this

11    Exhibit 10.  This is a declaration of Dr. Erin

12    Orlebecke, and I believe you testified earlier that

13    Dr. Erin Orlebecke trained you how to do utilization

14    management activities; is that correct, sir?

15  A   Yes.

16  Q   And she was the state medical director before you

17    were the state medical director; is that correct?

18  A   Yes.

19  Q   Okay.  Now, down here on page six of the

20    declaration, if we look at the bottom of No. 13, it

21    says, "If a patient can hear out of one ear without

22    a hearing aid, then no hearing aid is necessary for

23    the other ear."  Do you agree with that?

24         MR. SCARBER:  I'll just place an

25    objection, before the witness answers, as to we

1    don't know anything about this particular case at

2    this point, what this is referring to, what the

3    facts are, and what this doctor was actually

4    responding to.  But if you can answer, go ahead.

5  A   I believe that the MDOC did have policies on hearing

6    aid and replacement and what the criteria were for

7    approval of hearing aids; that has changed

8    throughout the years.  So, at the time -- and Dr.

9    Orlebecke didn't train me, per se, on this

10    particular patient, but there was a policy at the

11    time that we would follow.

12  BY MR. CROSS:

13  Q   Do you know a Dr. Harriet Squier?

14  A   Yes.

15            (Bomber Deposition Exhibit No. 11 was

16            marked for identification.)

17  Q   Okay.  I'm going to show you what's been marked

18    Plaintiff's Exhibit 11.  This is a declaration of

19    Dr. Harriet Squier, and here, at page six, she says,

20    "Mr. Coates's examination suggested that he had very

21    good hearing in the right ear; therefore, a hearing

22    aid in the other ear would not add much benefit and

23    there was no medical necessity for Mr. Coates to

24    have a hearing aid."

25            Do you agree that there's no medical

1   necessity to have a hearing aid in one ear if you

2   can hear out of the other ear?

3              MR. SCARBER:  Same objection as

4   before, but go ahead, with respect to the affidavit

5   by -- or declaration by Dr. Orlebecke.  But go

6   ahead, so I don't have to repeat it, go ahead.

7  A   I would have to know what Uptodate said at the time,

8      as well as the MDOC policy.

9  BY MR. CROSS:

10 Q   Okay.  Do you know what Dr. Squier's job was when

11     she worked in the MDOC?

12 A   Yes, she worked for PHS, which became Corizon, as a

13     utilization management physician.

14 Q   And you started doing utilization management at the

15     point that she retired; is that correct?

16 A   Yes, I believe that was around the time I left.

17 Q   And then who took over from you?

18 A   Dr. Papendick replaced Dr. Squier.

19 Q   Okay.  So, fair to say, at some point in, you know,

20     2012 to 2014, it was not considered medically

21     necessary for a prisoner to hear out of both ears?

22             MR. SCARBER:  I'm going to place an

23     objection.  He has already said he would have to

24     review a policy -- objection; calls for speculation,

25     foundation.  Go ahead.

1  A   Yeah, I'm sure that, at the time, Uptodate and MDOC

2      policy spelled out what type of hearing loss

3      required corrective aids, but I don't remember the

4      details.

5  BY MR. CROSS:

6  Q   Is there a risk of death associated with getting a

7      hearing aid?

8  A   Not that I'm aware.

9  Q   Okay.  Are there some benefits to being able to hear

10     out of both of your ears?

11             MR. SCARBER:  Just going to place an

12     objection to relevance as well.  Go ahead.  It has

13     nothing to do with the medical issue we're talking

14     about here.  But go ahead.

15  A   Yes, it's better if you have hearing from both of

16     your ears.

17  BY MR. CROSS:

18  Q   Okay.  So, from the patient's perspective, is it

19     possible that the benefits of a hearing aid outweigh

20     the risks?

21  A   It's possible.

22  Q   Okay.  So, do you think the utilization management

23     department is considering something else besides the

24     risks versus the benefits to a patient of a

25     particular procedure?

1          MR. SCARBER:  Calls for speculation.

2      He wasn't involved in any of those cases.  But go

3      ahead.

4  A   No, I wasn't involved in determining that policy.

5      But I know that it was a joint process between

6      Corizon and the DOC.

7  BY MR. CROSS:

8  Q   Can you answer the question that I asked you, sir?

9  A   Can you repeat the question.

10          MR. CROSS:  Ms. Hicks, can you repeat

11      that question.

12          (Page 88, lines 22-25 were read

13          back.)

14  A   Can you tell me what "something else" means?

15  Q   Well, I'm asking you that, sir.  Are they

16      considering something besides a risk-to-benefit

17      analysis?

18  A   Well, they're considering what the MDOC thinks about

19      the issue, as well, and what their policy is.

20  Q   Okay.  You talked before about Uptodate and the need

21      to establish that the treatment -- that there's

22      evidence to support the treatment, right?  That's

23      part of medical necessity?

24  A   Correct.

25  Q   Do you know if there's evidence that hearing aids

1    help with hearing loss?

2              MR. SCARBER:  I'll place another

3    objection to relevance, particularly with respect to

4    this issue.  It has nothing to do with the Monell

5    claim that we're talking about here or possible

6    Monell claim.  Go ahead.

7  A   I would have to read up on the benefits of hearing

8    aids.  Sorry, I don't know off the top of my head.

9  BY MR. CROSS:

10  Q   So I'm just -- it seems to me like there's something

11    else being considered besides a risk/benefit

12    analysis and whether the procedure is supported by

13    evidence, at least in this case with the hearing

14    aide.  Do you agree with that?

15  A   Not that I'm aware of, no.

16  Q   So those are the only things that are being

17    considered, is whether it's A1 evidence that the

18    procedure helps the problem and the risks to the

19    patient and the potential benefits to the patient?

20              MR. SCARBER:  Just going to place an

21    objection, asked and answered.  Go ahead.

22  A   That's how I practice medicine, yes.

23  BY MR. CROSS:

24  Q   You practice outside of a prison as well, correct?

25  A   Yes.

1   Q   Do you look at MDOC policies when determining

2       whether a given test or procedure is medically

3       necessary for your non-prisoner patients?

4              MR. SCARBER:  I'm just going to place

5       an objection to relevance.  We're not talking about

6       what this particular doctor does outside of what's

7       involved in the treatment of Mr. Jackson, who, at

8       the time of his lawsuit, was an inmate in the county

9       jail, as well as a prisoner in the Michigan

10      Department of Corrections.  So we're not -- it's

11      irrelevant to the issue in this case.  Go ahead.

12  A   I do not use MDOC policy outside of the MDOC.

13  BY MR. CROSS:

14  Q   So are there things that might be medically

15      necessary outside of the MDOC that wouldn't be

16      medically necessary inside the MDOC?

17  A   It just so happens that what I use out in the world

18      is Uptodate, it's very similar.

19  Q   But Uptodate is not the only thing you use inside

20      the MDOC, right?

21             MR. SCARBER:  Asked and answered.

22      But go ahead.

23  A   No, they also use InterQual, National Cancer

24      Coalition data, and then sometimes a literature

25      search is done, too, to see if there's anything new

1    and current.

2            MR. CROSS:  All right.  I don't have

3    further questions.  Thank you for your time, sir.

4            MR. WILLIS:  I don't have anything.

5                  EXAMINATION

6    BY MR. SCARBER:

7    Q   Doctor, I have one question for you.  Specifically,

8        when you were talking about the appeals procedure

9        with respect to a final determination as to whether

10       or not Mr. Jackson would have a colostomy reversal

11       or not, who has the -- who makes the final

12       determination as to whether or not that procedure

13       would be done?

14   A   The final determination is made by the chief medical

15       officer of the Michigan Department of Corrections.

16   Q   Corizon is not the final decision-maker with respect

17       to that procedure?

18   A   That's correct, Corizon is not.

19           MR. SCARBER:  I don't have anything

20       further.

21           MR. CROSS:  I have some follow-up.

22                  EXAMINATION

23   BY MR. CROSS:

24   Q   Does Corizon have any policies about what is

25       medically necessary?

1  A   No, because we're told -- we're instructed to use

2      Uptodate.  They have clinical modules -- I mentioned

3      that earlier -- for diabetes, hypertension, prostate

4      cancer.  But they're just modules based on the

5      evidence, and, on a day-to-day basis, we're

6      instructed to use Uptodate.  Corizon pays for that

7      for all of its providers.

8  Q   Well, does Corizon instruct its providers at all

9      about what's medically necessary and what's not

10     medically necessary?

11  A   Yeah, based on what's in Uptodate and what the

12     policies of the MDOC are.  But there's no Corizon

13     policy saying, 'Hey, you need to approve this for

14     this and not this.'  There's nothing like that.

15  Q   Let's go back to the exhibit we talked about before,

16     "Practitioner Clinical Onboarding"; and one of the

17     modules here under "Utilization Management" is

18     called "Determining Medical Necessity"; and did you

19     testify that you provide that training?

20          MR. SCARBER:  Hey, Ian, you've got

21     the wrong exhibit up, I'm sorry.

22          MR. CROSS:  What do I have up?

23          MR. SCARBER:  You got a declaration

24     up.  Just maybe go back a few.

25          MR. CROSS:  Hold on.

1         MR. SCARBER:  While you're getting

2    it, I'm just going to note this is -- I thought this

3    wasn't, but now it's clear that this is outside the

4    scope of what I had asked the witness in my one

5    question.  So it's outside the scope of my direct of

6    the witness.  But go ahead.

7   BY MR. CROSS:

8   Q    You train people about that, determining medical

9        necessity?

10        MR. SCARBER:  Place an objection,

11   asked and answered, about maybe an hour-and-a-half

12   or so ago.  But go ahead.

13        MR. CROSS:  Yeah, I don't remember

14   what he said.

15        MR. SCARBER:  Okay.

16  A    Sure.  The answer is that yes, we direct them to

17       Uptodate and the other resources available for

18       medical decision-making.

19  BY MR. CROSS:

20  Q    And so all you tell them to do to determine medical

21       necessity is look at Uptodate?

22  A    Uptodate, National Cancer.

23  Q    Cancer.

24  A    The same.  There's no Corizon policy like that.

25       We're using Uptodate 'cause it's current

1    information, it's dynamic.

2  Q   Okay.

3           MR. SCARBER:  And let me just place

4    another objection to all -- he's already answered

5    all of the various things that go into determining

6    medical necessity for a particular patient in his

7    testimony over the last couple of hours.  But go

8    ahead.

9  BY MR. CROSS:

10 Q   Your testimony is that there's no Corizon definition

11    of medical necessity anywhere that's given to the

12    providers?

13 A   Not -- when I train my providers, I show them

14    Uptodate, we review it, there are -- there's no,

15    something similar to Uptodate, that Corizon has that

16    I'm aware of.

17           In the training manual, there are a

18    couple statements about medical necessity.  But

19    there's no, like, algorithm or rules for making a

20    decision inside Corizon outside of that.  So, no,

21    I'm not sure what, you know --

22 Q   But there's something in the training manual about

23    determining medical necessity.

24 A   Yeah, there are some guidelines.

25           MR. CROSS:  Okay.  Thanks.  That's

1      all I have.

2                     EXAMINATION

3    BY MR. SCARBER:

4    Q    With respect to whether there are guidelines in the

5          training manual determining medical necessity or

6          not, is there any specific direction or order that

7          Corizon gives to its medical providers or reviewers

8          limiting their ability at all -- and I'm not talking

9          about MDOC policy, but I'm talking about something

10         from Corizon -- limiting their ability to be able to

11         factor in the things that they feel are important

12         for medical necessity?

13   A    No, quite the contrary; in fact, we tell them if you

14         find something outside of Uptodate in the medical

15         literature -- for example, sometimes new things came

16         out in "The New England Journal" or "The Journal of

17         American Medicine" that Uptodate was a little behind

18         on -- and we considered that information as well.

19         So, no, they're never limited.

20   Q    And is the patient's presenting condition and

21         symptoms something that is also very important in

22         determining whether something is medically necessary

23         for that particular patient?

24   A    Yes.

25   Q    And if the patient, in this particular situation,

1    has a functional colostomy and no complaints of

2    physical issues or pain or any type of suffering

3    related to that particular colostomy, would that be

4    something that would be considered in determining

5    whether it was medically necessary?

6  A   Yes.

7  Q   In addition to all of the other factors that you

8    already spent time discussing here.

9  A   Correct.

10  Q   Again, these are factors; is that correct?

11  A   Yes, sir.

12          MR. SCARBER:  I have nothing further.

13            EXAMINATION

14  BY MR. CROSS:

15  Q   Doctor, do you have an understanding of what

16    prisoners are entitled to under the Eighth Amendment

17    in terms of health care?

18          MR. SCARBER:  All right, I'm going to

19    place an objection; that's way outside of the scope

20    of my redirect at this point.  So what do you want

21    to do?

22          MR. CROSS:  Are you going to instruct

23    him not to answer?

24          MR. SCARBER:  I'm going to place a

25    very, very strong limit on what we discuss after

1    this point, if you got one question or something

2    like that, but now this is going in a whole other

3    direction.  This is not follow-up.  This is stuff

4    that could have been covered on your direct or

5    cross.  Go ahead.

6  A   It's been some time since I've read the Eighth

7     Amendment.  But the bottom line is inmates are

8     entitled to the same standard of care as that as

9     available in the community.  So I'd have to go back

10     and look at the Eighth Amendment.

11          MR. SCARBER:  And I'm going to place

12     an objection that it calls for a legal conclusion.

13  BY MR. CROSS:

14  Q   Okay.  Now, Devlin, your attorney just asked you

15     some questions about the factors that Corizon

16     providers consider when they are determining whether

17     a colostomy reversal is medically necessary, like is

18     the patient in pain or having issues with the

19     colostomy.  Are those the same things that a

20     provider would consider in the community when

21     determining whether a colostomy reversal is

22     medically necessary?

23          MR. SCARBER:  Place an objection to

24     foundation.  But go ahead.

25  A   Yes.

**Jeffrey Bomber, D.O.**
05/28/2021                                    Page 99

1  BY MR. CROSS:

2  Q   So if you were at a community hospital and someone

3      came in with a functional colostomy, you would say,

4      'I'm not going to refer you to a surgeon because you

5      don't need this to be reversed'?

6  A   I definitely would explain the medical necessity and

7      the risks versus benefits of any procedure.

8  Q   But would you refer them to a general surgeon or no?

9  A   Yeah, if a patient came to me requesting -- any

10     procedure, really -- and if they were adamant that

11     they wanted to see a specialist, absolutely I would

12     facilitate that.

13              MR. CROSS:  Okay.  I don't have any

14     further questions.  Thank you, sir.

15              MR. SCARBER:  I have a follow-up

16     question.

17                   EXAMINATION

18  BY MR. SCARBER:

19  Q   Is it true that Mr. Jackson was incarcerated at the

20     time of this particular event that he's talking

21     about, his colostomy reversal request?

22  A   Yes.

23  Q   Mr. Jackson was not on the -- in the outside

24     community, was he?

25  A   Not at that time.

1  Q   Were there any specific -- and I think you've

2      already testified -- but there was not an MDOC

3      policy involved in that particular determination as

4      to when he was on the outside of the medical

5      community?

6  A   I don't believe so.

7  Q   I'm sorry, on the outside of the Department of

8      Corrections.

9  A   No.

10 Q   And you testified earlier about your understanding

11     of the Eighth Amendment.  Were you speculating about

12     the Eighth Amendment and what the legal requirements

13     were?

14 A   It's been a long day and I'm just drawing a blank

15     there.

16 Q   All right.  Do you have an understanding that under

17     the Eighth Amendment Mr. Jackson would have to

18     demonstrate a serious medical need for a particular

19     procedure?

20 A   Thank you for reminding me; yes.

21 Q   Would it also be your understanding that he would

22     have to have a serious medical need that was

23     willfully ignored or disregarded by a healthcare

24     professional that caused him some kind of harm,

25     substantial harm, with respect to whether or not a

1     procedure was done?

2  A   Yes, thank you, that's what I recall now.

3  Q   Are you aware, from any records that you've

4     reviewed, of seeing a serious medical need for a

5     colostomy reversal demonstrated, by Mr. Jackson in

6     this particular case, during the time of his

7     incarceration in the MDOC?

8  A   I am not.

9  Q   Have you been advised of any serious physical harm

10     or pain or suffering in any physical manner that was

11     experienced by Mr. Jackson as a result of not

12     getting a colostomy reversal in the MDOC?

13  A   I am not.

14          MR. SCARBER:  I have nothing further.

15          MR. CROSS:  All right.  I don't have

16     anything further.

17          MR. WILLIS:  Nothing for me.  Thank

18     you.

19          THE VIDEOGRAPHER:  This concludes the

20     deposition.  The time is 1:40 p.m.

21          (The virtual, videotaped deposition

22          concluded at 1:40 p.m.)

23

24

25

1              CERTIFICATE OF NOTARY

2   STATE OF MICHIGAN     )

3                    ) SS

4   COUNTY OF LIVINGSTON  )

5      I, Carol Marie Hicks, Certified Shorthand Reporter,

6   a Notary Public in and for the above county and state, do

7   hereby certify that the above deposition was taken before

8   me at the time and place hereinbefore set forth; that the

9   witness was by me first duly sworn to testify to the

10   truth, and nothing but the truth, that the foregoing

11   questions and answers made by the witness were duly

12   recorded by me stenographically and reduced to computer

13   transcription; that this is a true, full and correct

14   transcript of my stenographic notes so taken; and that I

15   am not related to, nor of counsel to either party nor

16   interested in the event of this cause.

17

18

19              _____

20              Carol Marie Hicks

21              CSR 3345 Notary Public,

22              Livingston County, Michigan

23   My Commission expires:  September 4, 2021

24

25

**0**

**03.04.100** 75:9,10

**1**

**1** 20:3 35:10,13
**10** 25:9,13 26:10 85:7,11
**100** 29:5
**101** 70:9
**103** 33:18
**11** 6:9 86:15,18
**11:00** 6:2
**12** 25:9,13 26:10 28:24
**12:33** 68:18
**12:52** 68:21
**13** 26:17 85:20
**15** 73:3
**16** 73:3
**19** 84:11
**1:40** 101:20,22

**2**

**2** 12:21,24 18:5
**2-1-2015** 75:12,14
**200** 29:5
**200-page** 28:17
**2009** 8:12,13
**2012** 87:20
**2013** 31:3
**2014** 87:20
**2015** 9:9 31:3
**2017** 19:13 33:22 34:24 64:24
   83:2,4
**2018** 35:24

**2019** 9:9,11,13 78:8 83:24
**2021** 6:1,9
**21** 10:7
**22-25** 89:12
**23** 73:11
**232** 28:8
**24** 73:11
**28** 6:1,9

**3**

**3** 18:6 25:18 26:2,23 27:7 53:7
**30(b)(6)** 25:6 71:11,20
**30-** 38:15
**30/60/90** 38:12

**4**

**4** 22:9,10 25:19 26:5
**407** 10:22 27:14 41:11 43:4,6,
   11 44:21 55:17 60:24 64:22,
   23 70:1
**407s** 43:20 56:20 57:3

**5**

**5** 26:9 29:11,15 33:17 52:9
**50** 56:8

**6**

**6** 25:16 26:9 33:14,17 37:11
   68:23
**60-** 38:15

**7**

**7** 26:8

**8**

**8** 26:23 27:7 51:6,9
**85** 56:21
**88** 89:12

**9**

**9** 27:8
**90** 56:21
**90-day** 38:15

**A**

**a.m.** 6:2,9
**A1** 90:17
**AA** 75:20
**ability** 96:8,10
**absolutely** 99:11
**accept** 47:3,17
**accepting** 47:5
**accepts** 48:10
**access** 45:24,25 46:2 53:2
   72:20,25
**acclimating** 12:2
**Accountable** 15:11,16
**accurate** 49:2
**accurately** 40:13
**acknowledges** 48:9
**acting** 24:11
**actively** 56:2,3
**activities** 85:14
**activity** 39:2
**actual** 49:18
**adamant** 99:10
**add** 86:22

Jeffrey Bomber, D.O.
05/28/2021

2

**addition** 97:7

**addresses** 35:15

**adds** 44:18,24

**adequate** 24:6 46:5

**adjust** 75:21 77:17

**advised** 101:9

**affect** 57:16

**affects** 77:13

**affidavit** 87:4

**agree** 85:23 86:25 90:14

**agreement** 21:1

**ahead** 17:6 27:10,19 37:3 44:1
49:1,19 52:23 54:10,21 65:14
70:16 73:20 77:1 81:10 83:19
84:5,6 86:4 87:4,6,25 88:12,
14 89:3 90:6,21 91:11,22
94:6,12 95:8 98:5,24

**aid** 85:22 86:6,22,24 87:1
88:7,19

**aide** 90:14

**aids** 86:7 88:3 89:25 90:8

**algorithm** 69:23 95:19

**align** 30:5,7,13

**all-around** 17:18,19

**allegations** 63:21

**allotted** 32:15

**alter** 75:21 77:17

**alteration** 45:19

**alternative** 11:6 45:6,9,13,15
46:23 47:14

**Amendment** 97:16 98:7,10
100:11,12,17

**American** 96:17

**amount** 9:22 23:19 38:4

**analysis** 89:17 90:12

**anesthesia** 76:2

**annual** 51:2 56:6 70:23 72:14

**answers** 85:25

**anymore** 11:25

**app** 84:2

**appeal** 47:6,7 48:13,16,21,23
49:20,23 50:4,16,22 64:25
70:2

**appeals** 47:8,21 48:21,24,25
49:5,13,21 92:8

**appearance** 76:6 77:21 78:3

**appeared** 7:24

**appearing** 6:18

**applicable** 52:11

**apply** 58:18 65:16

**approval** 56:9,22 57:1,23 86:7

**approvals** 42:3 59:21

**approve** 45:3,5 78:6 82:22
93:13

**approved** 11:6 39:16 42:5
45:13 55:13,17 56:20 74:4
76:4,5 77:4

**approves** 44:17 45:2

**approving** 24:16

**approximately** 7:18

**April** 64:24 83:1,4

**arrow** 41:3 48:8

**assessment** 56:6

**assisted** 10:18

**assume** 78:14 80:3 81:17

**assumption** 52:12

**ATP** 24:16 39:2 45:20 46:24
47:3,5,17,25 48:3,9,10,13
49:11,12,22 50:1 56:8 57:16

**ATP'D** 39:17 78:18

**ATPS** 37:18 39:3,5,8,15 40:2
55:15 56:16,17,18

**attached** 44:21

**attention** 16:11 18:16 29:23
37:13 52:9 53:5

**attorney** 60:15,18 61:1 98:14

**attorneys** 6:10

**attributes** 44:18

**August** 9:9,11,13

**authority** 49:17,25

**authorization** 42:18 44:20,23,
24

**authorized** 42:8 44:25 76:3

**automatic** 42:2

**automatically** 42:5,17

**average** 39:11

**aware** 17:3 39:18 73:1 77:9,16
79:10,21,25 80:4,8 88:8 90:15
95:16 101:3

---

**B**

**back** 7:21 9:24 34:9 37:10
41:3 43:16 68:20,23 73:2
89:13 93:15,24 98:9

**barriers** 30:4

**base** 17:5 84:20

**based** 12:17 24:24 58:19,21
59:8 62:7,15,17,21 64:22,24
73:21 82:14 83:7,23 84:7,10,
15 93:4,11

**basis** 19:22 28:2 44:9 61:24
63:2,6 83:16 93:5

**Bates** 33:18

**bathroom** 7:8

**BB** 75:20

**beginning** 39:23

**behalf** 6:13,15,18 71:12 81:8

**Behavioral** 14:12 15:5

**benefit** 59:6,9,13,22 60:4 66:7
86:22

**benefits** 88:9,19,24 90:7,19
99:7

**Bethany** 18:11 19:18

**billed** 80:1

**billing** 80:25

**blank** 41:9 100:14

**blanket** 60:9,10

**body** 75:22,23 77:10,17

**body's** 75:22

**bomber** 6:3,8,20,25 12:21
18:6 22:10 29:11 33:14 35:10
51:6 85:7 86:15

**bottom** 69:1 85:20 98:7

**box** 41:25

**boxes** 51:24

**break** 7:7,9,10 68:15,19

**bring** 74:24 75:2

**broad** 17:5

**broadly** 77:12

**budget** 32:7,8,10,11,12,13,25
33:8

**budgets** 33:5

**bullet** 16:12 38:12

**bunch** 65:13

**business** 36:25

**buying** 54:13

——————————————
C
——————————————

**calculate** 16:15 17:23

**calculations** 17:8

**call** 12:23 25:15 26:5,7,8
33:16 51:8 85:10

**called** 22:15 41:25 70:8 93:18

**calls** 20:24 22:23 71:10 81:20
85:2 87:24 89:1 98:12

**cancer** 12:19 46:21 91:23 93:4

94:22,23

**capacity** 18:12 24:12 29:17
31:1

**care** 15:11,16 19:9,16 24:6,9,
10,13 34:19,21,22,25 35:5
36:3,16,18,21 37:5,8 39:12
54:16 58:20 64:17,18 97:17
98:8

**Carol** 25:21

**case** 6:19 7:19,24,25 26:20
27:13 33:18 37:2,3 41:7
63:20,23 64:19 80:17 86:1
90:13 91:11 101:6

**cases** 7:20 89:2

**cataract** 67:6,9,10,21

**cataracts** 66:13,14

**category** 54:4,7

**caused** 100:24

**caveat** 61:17

**CCO/COO** 30:1

**CCO/RMD** 30:3

**cease** 9:19

**Centered** 15:12

**centralize** 33:12

**centralized** 31:12 33:25

**cetera** 19:17 59:21

**changed** 47:11 58:14 80:19
84:13 86:7

**charge** 38:2,10

**chart** 12:1 40:13 60:23 61:4

**check** 42:2

**checklist** 13:4,6

**Chester** 18:11 19:18

**chief** 49:16,23 50:2 52:6 77:4,
5 92:14

**claim** 38:2,9,10 63:24 64:13
90:5,6

**claims** 37:17,21 38:1

**clarify** 7:15

**clear** 38:11 50:11 65:20 94:3

**clerical** 41:18

**clerks** 23:6

**click** 25:3

**clients** 36:19

**Clinic** 9:17

**clinical** 12:18 13:3 53:6 62:13
93:2,16

**clinics** 54:13

**clock** 25:3

**closer** 49:15

**CMO** 48:16,17,21,25 76:4

**coach** 29:8

**coaching** 28:20 56:10,12

**Coalition** 91:24

**Coates** 86:23

**Coates's** 86:20

**Colleen** 6:16

**colostomies** 73:23

**colostomy** 62:2,4,13,20 63:3,
14 64:2 73:18 74:2,8,18 75:19
76:8,10,12,14 78:3 79:21
80:15 81:17 82:13 83:9 92:10
97:1,3 98:17,19,21 99:3,21
101:5,12

**committed** 80:16,24 81:14

**committee** 49:13

**committing** 80:11

**common** 47:8

**community** 98:9,20 99:2,24
100:5

**company** 72:15

**compares** 42:14

**compassion** 52:10

**complaints** 97:1

**complete** 41:10,14

**completes** 10:23

**compliance** 32:7 33:8

**comply** 20:18

**component** 26:14,21 27:14

**components** 49:3

**computer** 22:12 72:7,10,14

**concluded** 9:11 101:22

**concludes** 101:19

**conclusion** 98:12

**condition** 60:4 80:5,19 81:18
  96:20

**confidential** 37:1

**confusing** 71:22

**connection** 69:4

**consensus** 66:10 67:11 79:17

**consideration** 26:15 27:15
  28:4

**considered** 74:3,9 78:4 79:18
  87:20 90:11,17 96:18 97:4

**considers** 24:22 76:17

**consisted** 10:21

**constitutes** 65:24

**consult** 9:17

**contacts** 32:6

**context** 27:18,20 28:12 29:7
  77:14 84:18,24,25

**contract** 9:18 10:2 15:17 16:3,
  17 19:19 20:16 21:12 22:1
  23:20 30:5,8,14 31:16,19
  32:11,19,20 34:7 36:15 72:13

**contracted** 53:9

**contractor** 9:25 11:9,21

**contracts** 32:9

**contractual** 20:18 21:1

**contractually** 23:23

**contrary** 96:13

**control** 54:17

**copies** 72:21

**copy** 40:20 72:12 75:3

**core** 33:21,24 37:12 40:15
  57:9 68:3,25 69:5

**Corizon** 6:18,19 8:17 9:3,17,
  18 10:1 12:8 13:14 14:5 15:14
  17:2 18:14 20:17,20 21:6,11,
  24 22:14,25 23:12,14 32:9,17,
  21,24 33:20 34:11,12,14,18
  36:15,19 37:8 43:14 47:12
  48:25 50:7,13,14,22,25 52:7
  53:9 55:25 58:1 67:25 68:12
  71:20 72:13,17,23,24 87:12
  89:6 92:16,18,24 93:6,8,12
  94:24 95:10,15,20 96:7,10
  98:15

**Corizon's** 13:22 17:24 68:4
  71:23 81:1

**corporate** 17:9 22:19 23:11,13
  27:25 50:14 72:5

**corporation** 34:23 35:2,3,20
  71:13

**Corporations** 35:14

**correct** 7:23 13:21 19:13,14
  26:15 31:1,2,4 32:22 35:2,17
  40:24 41:15,24 42:6,10,20
  45:1,4,10 46:8,25 47:1,4,19,
  20 48:4,14 50:21 57:11,19
  60:1 62:5 71:15,16,18,19 74:6
  75:24 77:10 85:14,17 87:15
  89:24 90:24 92:18 97:9,10

**correcting** 77:11

**Correction** 16:21 34:13

**correctional** 8:14 14:1,10,13,
  21 15:8 34:19,21,22,25 35:4
  36:2,3,15,18,21 37:5,7

**Corrections** 12:12 17:16
  19:12,22,24 21:9,21,24 23:23
  40:10 63:13 91:10 92:15
  100:8

**corrective** 75:20,25 76:2,15,
  19 88:3

**cosmetic** 74:1,3,6,9,10,12,15,
  19 75:19 77:19,20

**cost** 24:20,22,25 25:1 26:15
  27:15 28:2 38:2,6 54:13,23
  80:1

**costs** 24:18 27:22 28:1,5
  54:18

**council** 48:22 49:8,21

**counsel** 25:11 28:23

**county** 91:8

**couple** 7:20 10:15 12:19 26:9
  40:9 95:7,18

**court** 6:10 7:6,24 18:2 25:22
  69:15

**covered** 98:4

**COVID** 12:6

**COVID-19** 19:10

**create** 72:9

**creating** 19:7 20:11

**crime** 81:14

**criteria** 66:24 67:3 83:20,24
  86:6

**cross** 6:12,24 17:11 18:3,4,8,
  22 19:5 21:2,10,22 22:7 23:1
  25:13,15,19 26:4 27:4,7,11
  28:13,20 29:1,13 30:24 35:24
  36:1 37:6 44:8,12 46:15 50:8,
  15 53:1 54:15,24 59:18 61:7
  64:1,7 65:3,8,15 67:1,7,22
  68:15,22 70:18 73:24 75:6
  77:7 78:1 79:12,20 81:15,22
  82:24 83:5,22 84:9,22 85:9
  86:12 87:9 88:5,17 89:7,10
  90:9,23 91:13 92:2,21,23
  93:22,25 94:7,13,19 95:9,25
  97:14,22 98:5,13 99:1,13
  101:15

**CT** 45:19

**Culture** 14:5,8 15:14

Jeffrey Bomber, D.O.
05/28/2021

5

**current** 11:8 34:16 47:21 52:16 62:23 92:1 94:25

**custody** 78:8

---

**D**

---

**D.O.** 6:3,20

**daily** 28:2 32:2 39:3 63:2

**dash** 18:17 19:6 29:24

**data** 16:16 17:24 19:10,17 20:5,14,17,21 21:7,8,20,23 22:17 23:3 24:8 40:11 55:10 91:24

**date** 75:12

**dated** 35:23

**day** 38:13 58:16 100:14

**day-to-day** 93:5

**days** 12:6 17:18

**deal** 13:25 16:6

**death** 88:6

**decide** 49:10

**decision** 14:24 41:17,20,23 67:18 84:7,10,11 95:20

**decision-maker** 92:16

**decision-making** 41:19 94:18

**decisions** 24:19 36:25 63:23 84:6

**declaration** 85:11,20 86:18 87:5 93:23

**defects** 75:24 77:10,11

**defendant** 6:15 37:1 63:20

**defendants** 6:19

**define** 30:17,18 58:1 74:14

**defined** 30:16 31:25

**definition** 58:10,17 65:16 68:4 81:1,2,3 95:10

**delineate** 48:18

**demonstrate** 100:18

**demonstrated** 11:5 57:4 101:5

**Demonstrates** 52:9

**dense** 66:13

**deny** 45:9,11

**department** 12:11 16:21 17:15 19:11,21,24 20:2 21:9,20,24 23:23 40:10 63:12 88:23 91:10 92:15 100:7

**deposed** 7:17,18

**deposition** 6:7 7:1,25 12:21 18:6 22:10 25:7 26:7,8 28:8, 17,25 29:6,11 33:14 35:10 51:6 60:12 63:7 73:2 74:20 82:16 85:7 86:15 101:20,21

**describe** 10:20

**description** 18:19 38:23 49:2

**designated** 71:23

**designation** 34:16

**designations** 71:22

**detail** 44:18

**detailed** 29:10 39:2 40:3 41:2

**details** 66:17,19 88:4

**determination** 59:22 84:14 92:9,12,14 100:3

**determinations** 46:10

**determine** 41:4 42:11 66:4 83:23 94:20

**determined** 76:3 77:3

**determines** 62:9,16

**determining** 89:4 91:1 93:18 94:8 95:5,23 96:5,22 97:4 98:16,21

**develop** 52:24

**developed** 42:13

**development** 38:21

**Devlin** 6:17 28:20 98:14

**diabetes** 12:19 93:3

**dictated** 82:22

**difference** 37:20 81:12 82:3 84:3

**differences** 51:21

**differentiates** 74:12

**direct** 16:11 18:16 29:23 37:13 52:9 53:5 94:5,16 98:4

**directed** 52:13

**direction** 96:6 98:3

**Directive** 75:9

**directly** 42:8 80:8

**director** 8:17,19,22 9:1,2,3,8, 10,16,20,21 10:5,7,9,14,17 11:13,19 13:12 15:1 19:11,12 27:21 29:24 31:4,7 34:15,17 36:7 42:23 47:18 48:1,2,22 49:6,7,8,9,10,21 51:4 65:23 85:16,17

**directors** 10:18 31:23 52:20

**discuss** 48:5,23 55:11 97:25

**discussed** 21:15 65:17

**discusses** 74:1

**discussing** 17:14 97:8

**disregarded** 100:23

**DOC** 22:5 23:4 27:25 32:11, 18,20,21 39:5,7 43:17 50:13 55:21 89:6

**doctor** 57:18 80:14 84:3 86:3 91:6 92:7 97:15

**document** 12:25 18:1,9,17 22:8 25:2,4,11 27:19 28:11 29:21 49:4 51:9,12 61:11 71:24 72:1,3,20 85:10

**Documentation** 14:16

**documents** 60:11,14,15 61:2 72:9,15

**dollar** 38:4

**dollars** 32:14

**draft** 30:22

**drawing** 100:14

**drug** 53:22,25 54:1,2,3,8,17

**drugs** 53:23

**due** 10:12 28:23

**duly** 6:4,21

**duties** 8:21,23 9:25 10:21
38:24

**dynamic** 95:1

---

E

---

**ear** 85:21,23 86:21,22 87:1,2

**earlier** 56:11 82:12 85:12 93:3
100:10

**ears** 87:21 88:10,16

**effective** 60:3 66:6 75:12

**effectiveness** 30:2

**efficacy** 59:24

**Eighth** 97:16 98:6,10 100:11,
12,17

**electronic** 12:10 23:4 43:1

**email** 42:25 43:6,8,17,18,21

**emails** 43:13,15 44:13

**emergency** 17:17 19:8,15
38:5

**employed** 34:19

**employee** 9:18 10:2 34:12,18

**employees** 13:14 34:11

**employment** 8:11

**EMR** 43:16,18,19

**encounters** 52:10

**end** 48:6

**endurance** 7:7

**England** 96:16

**ensure** 24:1 30:1 32:6 33:7

**ensuring** 24:3,15

**entered** 61:10

**entire** 48:18

**entities** 36:14 54:12

**entitled** 97:16 98:8

**entity** 50:7

**environment** 14:1,10,21 15:12

**ER** 17:20,21,22

**Erin** 85:11,13

**Ernst** 29:16 30:7 31:1,6,10,11
33:11 71:1

**essentially** 36:10,12

**establish** 64:16 89:21

**estate** 8:3,5 25:7

**evaluated** 61:20,22

**evaluating** 55:22,25 56:7

**evaluation** 11:16

**event** 99:20

**eventually** 79:21

**evidence** 58:22 59:8 75:13
79:10 89:22,25 90:13,17 93:5

**evidence-based** 59:25

**exact** 52:25

**examination** 6:23 86:20 92:5,
22 96:2 97:13 99:17

**examined** 6:4,21

**excerpts** 60:23

**Excuse** 69:15

**executives** 22:21

**exercise** 45:21

**exhibit** 12:21,23,24 18:5,6
20:3 22:9,10 25:16 26:5
29:11,15 33:14,17 35:10,13
37:11 40:13 51:6,9 68:23
85:7,11 86:15,18 93:15,21

**exhibits** 18:3

**exist** 33:5

**expenses** 37:8

**experience** 19:7 63:8

**experienced** 101:11

**expert** 73:23 76:16

**explain** 39:20 68:1 76:9 99:6

**extent** 21:17

**eye** 52:14,17

**eyes** 66:13

---

F

---

**face** 52:15,17 77:12

**facilitate** 99:12

**Facility** 8:14

**fact** 24:23 73:14 96:13

**factor** 56:6 62:12 96:11

**factors** 97:7,10 98:15

**facts** 86:3

**failure** 38:20

**fair** 27:12 30:10 37:7 52:11
61:20 62:19 87:19

**familiar** 15:19 17:8 72:3

**FDA** 59:21

**fee** 38:7,8

**feel** 96:11

**felony** 80:12

**file** 38:10 41:11 50:19

**filed** 35:24 75:13

**Filing** 35:14

**filled** 51:10

**filled-in** 38:12

**final** 92:9,11,14,16

**find** 30:4 75:2,7 82:3 96:14

**fine** 29:7

Jeffrey Bomber, D.O.
05/28/2021

7

five-year 32:15

fixed 57:17

focus 37:15 70:2

focused 16:5

focusing 69:24

follow 11:25 78:20 86:11

follow-up 92:21 98:3 99:15

forensics 15:7

forgot 33:18

form 10:22,23 17:5 27:1,18 28:11 29:8 41:9 46:14 51:10, 17,20,22 52:8,19,25 53:2,6 61:23 62:20 63:5,13 72:14 77:23 81:6,9 82:8

formal 11:22,23

formed 62:3 82:12

forms 72:13

formulary 53:10,19,20,21,23, 25 54:2,3,8,12,14,17

formulate 83:4,7

foundation 30:21 43:25 46:12 52:22 65:12 73:20 81:20 87:25 98:24

Franklin 8:3,4 25:7 73:3

frankly 23:8

fraud 80:11,16,24 81:14

front 51:22 75:3

Full 15:18 16:3

function 77:13

functional 73:18 97:1 99:3

future 36:22


G

gave 25:7 61:3 73:3

general 99:8

generalizations 60:9

generally 15:25 38:8 47:9 57:3

generated 23:3 70:1

gentleman 7:22

get' 44:7

Gill 15:23

give 8:11 20:8 28:7 41:9 44:5 66:12 71:2

giving 24:16

glasses 40:19

goal 39:14,18

Goff 16:1,2

good 6:12,14,17,25 66:15 86:21

grab 75:1

grievance 50:19 65:1

grievances 50:18

ground 7:3

group 43:4,6,8 71:10 74:10

groups 43:21

guess 7:14 19:3 46:14 65:6

guessing 32:1

guidelines 53:9 67:20,21,23 95:24 96:4

guy 64:17


H

handbook 72:16

handled 50:20

handouts 71:2

hands 85:6

hang 26:1,25 27:9

happen 73:9

happened 64:18 84:4

hard 72:21

harm 100:24,25 101:9

harm,' 58:25

Harriet 86:13,19

head 7:5 15:23 90:8

headquarters 23:14

health 8:17 9:4,16,17,18 10:1 13:18 14:12 15:6 43:12,14 53:9 54:12,16 97:17

healthcare 6:15 14:14 15:8 17:16 53:21 80:11,16,24 100:23

hear 85:21 87:2,21 88:9

heard 26:2

hearing 85:22 86:5,7,21,24 87:1 88:2,7,15,19 89:25 90:1, 7,13

Helen 8:15

helps 43:10 90:18

Hey 93:13,20

Hicks 89:10

higher 40:2

hire 11:9,12

hiring 11:10

history 8:12

hold 25:2 57:8 79:24 93:25

home 9:23,24 15:12 45:20

hospice 19:9,16

hospital 9:15 99:2

hospitalization 17:18

hospitals 54:12

hour-and-a-half 94:11

hours 95:7

hundred 56:19

hypertension 93:3


I

Ian 6:12 18:21 44:3 61:3 75:5

93:20

idea  30:18,22 32:11 73:6

identification  12:22 18:7
22:11 29:12 33:15 35:11 51:7
85:8 86:16

identify  6:10 30:4

II  14:18

imaging  59:4

immediately  53:4

Impact  24:1

important  96:11,21

improve  76:6 77:21 78:3

improved  57:19

improvement  15:4 16:8 56:10

in-person  70:21

incarcerated  99:19

incarceration  101:7

include  43:23 57:3,6 76:1

included  49:3

includes  49:9

including  20:9 32:5 57:15

indications  67:18

indicators  16:12,13,20,22,23
17:2,8,15 21:12,25

indirectly  80:9

individual  10:8 29:16 39:21
55:16,23 56:1 60:19

individualize  60:8

individuals  43:14

infer  38:1

information  36:9 41:1,5,10,16,
22 43:12 45:24 46:22 57:4,6,
15 63:16 68:8 78:9,10 81:23
95:1 96:18

Ingauge  22:15,18,25 26:5

initiate  50:16,22

injury  77:12

inmate  66:16,22 77:1 91:8

inmates  24:2,3 39:12 77:16
98:7

inpatient  19:8,16 23:5 32:5
33:6

inside  91:16,19 95:20

instruct  93:8 97:22

instructed  24:23 78:20 93:1,6

interacted  18:11 29:16 30:25

interaction  31:11

interactions  33:10

interesting  51:25 69:11

intermittently  55:20 56:4,11
61:18

internally  32:24

interpreted  77:11

interpreting  76:16

Interqual  58:9 66:3 91:23

intervention  23:25 58:21

interview  11:11

involved  11:10 14:20 38:15
50:14 63:22 89:2,4 91:7 100:3

involving  7:22

irrelevant  91:11

issue  16:19 24:20 45:6 88:13
89:19 90:4 91:11

issued  46:24

issues  97:2 98:18

issuing  45:9

J

Jackson  6:13 60:20 61:16,25
63:11 78:8 82:14 83:10 91:7
92:10 99:19,23 100:17 101:5,
11

Jackson's  61:9 80:15 83:8

jail  61:12 91:9

James  52:5

January  33:21

Jeffrey  6:3,8,20

job  18:19 38:23 52:3 87:10

joint  89:5

Journal  96:16

Joy  8:15

judgment  53:6 62:13 63:22

June  78:7 83:24 84:11

K

Keith  51:25

ken  25:24

Kenneth  6:14

Kensu  7:23,24,25

key  16:12,22,23 17:2,7

kind  29:7 49:13 51:3 56:9
69:22 71:3 81:10,23 100:24

knowledge  22:1

knowledgeable  39:1 71:17

Kohchise  6:13 60:20

KPI  17:12,22

KPIS  16:16 17:10,17,24

L

language  80:7

Lansing  9:22 12:7 72:21

LARA  35:13

launch  33:21 69:2,5

lawsuit  91:8

laying  65:12

layoffs  36:22

lead 59:2,21

leadership 22:25 37:4

learn 56:13

learning 39:25

left 61:9 87:16

legal 15:6 98:12 100:12

legalities 81:13

level 22:20 23:11,13 27:25 39:22 49:20 72:6

levels 50:3

licensed 35:7

limit 97:25

limited 96:19

limiting 96:8,10

lines 25:9,12 26:10,23 27:7 28:7,24 51:23 89:12

list 20:15 42:1,4,7,12,13,15, 16,21 53:20

literature 58:4,20 65:19 66:4,5 79:17 91:24 96:15

live 69:9 70:11,17

living 9:12,22

local 76:1

long 8:18 100:14

longer 9:10

looked 22:4 61:4,5 62:25 63:2, 3

Lori 29:16

lose 36:6

loss 36:8 88:2 90:1

lot 15:1 61:17 68:8 82:19

loud 25:8

low 57:23

lower 56:22,25

**M**

made 38:2 63:25 64:5 92:14

main 9:23 31:11 46:20

maintaining 19:8

make 12:1 17:4 24:5 36:3 39:9,11,19 41:17,22 46:9 54:3 56:23 57:1 58:25 59:3,4 60:8, 10 65:11 67:16 82:19 84:3,6

makes 41:13 92:11

making 24:18 41:20,21 63:22 64:14 95:19

manage 43:10

management 10:12,14,25 11:2 14:17,24 15:7 19:9,17 22:16 23:6,18,19,21 24:7,14, 17,22 26:13,21 27:14,21 29:25 30:11,15 31:13,15,18 32:16,22 33:1,12,19,21,24 34:5,8 37:12 40:14 42:22 52:4,20 57:9 68:24 70:9 85:14 87:13,14 88:22 93:17

manager 13:12,13,16,19 15:20,22 43:12

managers 15:16

managing 19:8

Manistique 9:15

manner 101:10

manual 12:9 33:19 68:24 70:4, 5,7 72:17,23,24 73:5,12,14 95:17,22 96:5

mark 22:9

marked 12:22 18:7 22:11 29:12,15 33:15 35:11,12 51:7 85:8 86:16,17

marking 18:3 25:23

Mason 15:23

mass 36:22

material 78:17

materialize 73:16

materialized 73:8

materials 11:24 12:4 69:18,21, 22 71:3,5

matter 65:5

maximum 30:1

Mcqueen 35:6,7

MDOC 10:23 13:18,23 14:11 16:16 19:19 20:6,8,12,19 21:12 22:1 24:8 32:9 44:4 50:20 53:21 58:2,5,10 61:4,9, 10 62:8,9,12,15 65:19 72:12 73:22,25 74:5,14 76:11,17,25 77:6,8 78:8,18 82:22 83:8 84:16,20,23 86:5 87:8,11 88:1 89:18 91:1,12,15,16,20 93:12 96:9 100:2 101:7,12

MDOC's 81:1

meaning 84:11

means 30:23 77:20 89:14

meant 74:15 76:25

measured 37:15

measures 21:12,25 24:2

medially 58:1

Medicaid 79:25 80:6,10 81:3 84:25 85:5

medical 8:13,16,19,21,23 9:1, 2,3,8,10,16,19,21 10:5,9,13, 16,18 11:4,5,9,12,13,19 12:10,20 14:16,24 15:1,12 16:5,6 19:11,12 23:4,20 24:4, 16,21,24 27:21,22 31:4,7,22, 23 32:15,21 33:1 34:14,17 36:16 40:24 41:18,20,22 42:22 43:22 47:18 48:22 49:6, 7,8,9,10,16,21,24 50:2 51:1,4 52:7,20 53:5 57:4 58:3,10,13, 17,19,21 59:8,22 60:16,17,19, 22 61:14,21,25 62:7,8,15,16, 17,22,25 63:6,10,13,22 65:17, 22,24 66:4 67:3,19,24 68:5 73:21 77:4,5 78:25 79:7 80:4 81:2,12 82:15,21 83:7,20,23,

25 84:21,23,24 85:16,17
86:23,25 88:13 89:23 92:14
93:18 94:8,18,20 95:6,11,18,
23 96:5,7,12,14 99:6 100:4,
18,22 101:4

**medically** 40:3 45:25 57:24
58:6,7 59:10 60:6 61:24 62:4,
9,14,21,24 63:15 64:2 66:8,
14,23 67:9,24 68:11 73:17
76:4 77:3,14 78:4,6,7,23,24
79:5,6,11,13 80:10,21,22,25
81:16 82:5,14 83:1,9,15 84:15
87:20 91:2,14,16 92:25 93:9,
10 96:22 97:5 98:17,22

**Medicare** 67:20 68:10 80:5

**Medicare's** 67:23 68:6

**medication** 55:2

**medications** 53:20,24 54:4,6

**medicine** 24:24 35:8 36:13
58:24 59:5,25 90:22 96:17

**meet** 61:18 66:23 83:20

**meeting** 30:5,8,14 70:23 71:8

**meetings** 12:1 38:22

**meets** 48:23 49:9 58:13 67:23

**Memorial** 9:14

**mentioned** 59:17 93:2

**messages** 43:19,23 44:16

**met** 11:23 24:2,4 61:16 83:24

**metric** 38:18

**Michigan** 9:15 12:11 16:21
17:15 19:11,21,24 21:9 23:16,
23 30:8,14 31:14,16,19 33:1
34:7,20,21,22,25 35:5,8 36:3,
12,18,21 40:9 48:11,19,24
49:17,24 50:3,6 51:14 58:15
63:12 72:18 79:25 80:6,9 81:3
84:25 91:9 92:15

**Michigan.gov** 43:13 44:13

**Mignon** 29:16 69:13 71:1

**mind** 8:8

**minutes** 21:16 40:16

**mischaracterization** 27:18

**mischaracterizes** 54:20 67:16
82:18

**missing** 8:7 41:1,8

**model** 14:24 31:12

**module** 12:18 70:8

**modules** 12:11,18 13:23,25
93:2,4,17

**Monell** 90:4,6

**money** 36:6

**monitor** 23:24 24:4,9,10 32:6
39:1

**monitoring** 23:19 24:12,15

**month** 63:4

**monthly** 19:10,15,22 20:2,6
22:4 39:4

**months** 10:15 46:19

**morning** 6:12,14,17,25

**move** 29:14 33:11

**multifactorial** 68:1

**N**

**NA** 52:10

**named** 63:20

**names** 35:15

**Nashville** 23:15

**National** 46:21 91:23 94:22

**nature** 64:20 82:1

**Naubinway** 9:16,23

**necessity** 11:5 24:16,25 27:23
57:5 58:11,13,18,19 59:22
62:15,17,18 65:17,25 66:4
67:19,24 68:5 73:21 80:4 81:2
82:21 83:21,25 84:21,23,24
86:23 87:1 89:23 93:18 94:9,
21 95:6,11,18,23 96:5,12 99:6

**needed** 21:7 54:5,7

**Newberry** 8:14,15

**nod** 7:5

**non-cosmetic** 74:12

**non-formulary** 55:2

**non-prisoner** 91:3

**nonprofit** 36:10,11

**northern** 8:16,19,21,25 9:2
10:3,5,7,9,13 11:13

**note** 33:18 81:25 82:7 94:2

**noticing** 52:8

**number** 24:5 32:14 37:25 39:8
40:2 44:20,23,24 55:7,20,22,
25 56:4 59:17 75:8,13 79:18
83:18

**numbers** 19:20,21,23 20:1,15,
25 23:22 71:21

**numerous** 59:20

**nurse** 41:2,4,10,13 42:19 43:9
44:18,24 48:9 57:7,8,11

**O**

**oath** 6:5,22

**object** 27:1,18 28:10,11,13
76:24 77:22 81:9 83:12

**objecting** 65:13

**objection** 17:5 20:24 21:5,14
22:2,23 27:17 28:7,14 29:7,10
30:21 35:22 36:24 43:25 44:3,
10 46:12 52:22 54:10,19
59:16 63:19 64:15 65:7,11
66:21 67:4,15,17 70:15 73:20
76:23 79:9,14 81:6,19 82:18,
19 84:2,17 85:2,25 87:3,23,24
88:12 90:3,21 91:5 94:10 95:4
97:19 98:12,23

**objections** 64:14

**obligated** 23:24

**obtain** 36:9

Jeffrey Bomber, D.O.
05/28/2021

11

**Occasionally** 56:21

**October** 19:13

**off-site** 24:15

**offered** 11:7

**office** 12:7 13:12 15:20 17:9
38:7 72:21

**officer** 49:16,24 50:2 52:7
77:4,5 92:15

**on-site** 13:18 14:12,21 23:5
43:10 45:16,21 55:2

**onboarding** 12:3,13 13:4 14:3
73:4 93:16

**ongoing** 38:22

**online** 35:14 70:11,15 72:25
73:12,14,16

**operation** 71:1

**operations** 13:13,16 15:20,22,
23 16:7 24:24 36:7,10

**opinion** 62:3,20 63:5,14 66:10
67:11 73:17,21 78:12 79:17
81:12 82:3,8,13,25 83:4,6,16,
19

**opinions** 61:23

**opportunity** 25:11

**option** 48:12 49:23 50:2

**options** 47:2 48:3

**order** 10:23 12:1 43:22 58:25
96:6

**ordered** 44:6

**orders** 15:2

**organization** 15:17 51:18
53:21 54:17

**organizations** 17:16

**organized** 51:23

**Orlebeck** 10:17 65:23

**Orlebecke** 85:12,13 86:9 87:5

**orthopedic** 77:12

**outpatient** 32:5 33:7 37:16,21,
24 38:18 40:23

**outweigh** 59:7 88:19

**outweighing** 59:13

**outweighs** 59:9 60:5 66:7

**overbroad** 17:5

**overturn** 47:25 48:15 49:11

**overturned** 37:19

**Overview** 15:17 16:3

---

**P**

**p.m.** 68:18,21 101:20,22

**pacemaker** 42:2

**pages** 29:5

**pain** 97:2 98:18 101:10

**palliative** 19:9,16

**Papendick** 6:19 34:6,12 52:1,
16 87:18

**part** 11:10,15 15:3,11 16:5
20:1 33:9 37:4 38:21,22,23
41:9 54:16 56:5 57:19 59:11,
12 63:24 72:5 73:4 74:10
89:23

**participate** 20:11

**participating** 54:14

**participation** 31:13

**parts** 16:6 70:6 75:22 77:17

**party** 37:2

**pass** 15:18 16:4 41:25 42:7,
12,16,21

**passes** 37:8

**pathway** 48:19

**patient** 14:6,8 15:8,12,15
17:20 52:10 60:7 66:13 78:11
85:21 86:10 88:24 90:19 95:6
96:23,25 98:18 99:9

**patient's** 78:15 79:3 88:18
96:20

**patients** 37:25 52:14,17 54:5,7
61:18 91:3

**pay** 68:11

**paying** 32:21

**payment** 80:5

**pays** 93:6

**PC** 34:23 35:5 36:3,14

**people** 13:10 15:24 20:9 44:14
94:8

**percent** 37:18 55:15 56:8,20,
21

**percentage** 39:5,14,16 55:1,
12,16 56:18 57:17,20,22

**performance** 16:12,22,23
17:2,7 21:11,25 50:25 51:3
55:23 56:1,10

**performing** 80:24

**period** 10:16 32:15 63:11 84:5

**permitted** 76:20

**person** 12:7 13:8 18:12 19:18
42:14 51:25 52:5

**perspective** 24:23 88:18

**pertinent** 65:2,4,6

**pharmaceutical** 53:8,12

**pharmacy** 14:17 15:1,4 53:11

**Phase** 14:18

**phone** 11:25

**PHS** 8:17 87:12

**physical** 97:2 101:9,10

**physician** 8:15 9:14 10:15
11:1,3 24:11,14,17 34:5
41:16,22 42:11,15 45:17,23
52:4 57:12 80:8 87:13

**physicians** 34:8,10 42:13
45:24

**Pipes/qnxt** 32:3

**pitched** 10:16

Jeffrey Bomber, D.O.
05/28/2021

12

**place** 20:23 21:4,13 22:22 27:16 28:6 30:20 35:21 36:23 43:24 46:11 52:21 54:9,19 59:15 63:18 66:20 70:14,22 73:19 76:22 79:8,14 81:5 82:17 84:1 85:1,24 87:22 88:11 90:2,20 91:4 94:10 95:3 97:19,24 98:11,23

**plaintiff** 6:13

**Plaintiff's** 12:24 22:9 29:15 33:17 35:13 86:18

**plan** 11:7 45:7,10,14,15 46:23 56:10

**plans** 36:22 47:15

**point** 14:2 16:12 23:22 35:22 38:12 39:13 41:18,19 47:19 50:13 84:2,4 86:2 87:15,19 97:20 98:1

**policies** 14:14 15:9 58:2,6,8 62:15,17 71:24 72:4,12 85:6 86:5 91:1 92:24 93:12

**policy** 62:8,9,12 65:19 67:8 72:10,11 73:22,25 74:1,2,5,8, 17,20,22 75:2,7,9,10,15,18,25 76:7,9,13,19,23,24 77:24 78:20,22,25 79:2,6 82:22 84:8,10,13,15,21 86:10 87:8, 24 88:2 89:4,19 91:12 93:13 94:24 96:9 100:3

**portion** 14:2,9,17 31:13 57:8 68:24 75:18

**portions** 13:8 60:17

**pose** 7:10

**position** 11:8

**possibilities** 80:18

**possibility** 81:4

**potential** 90:19

**Powell** 52:5,6

**Powerpoint** 71:3,7

**practice** 24:24 34:3,4,6 35:7 36:13 79:1,7 90:22,24

**Practitioner** 13:3 93:16

**precisely** 69:20

**predecessor** 65:22

**preferred** 53:22,24

**preparation** 60:11 63:7 82:15

**preparing** 33:4

**Prescribes** 53:8

**present** 9:13 74:21

**presentation** 71:8 78:15,17,19

**presented** 37:24 64:22

**presenting** 78:11 96:20

**president** 34:24

**previous** 18:4 34:2,4 82:4

**previously** 55:18 63:8

**pricing** 54:22

**primarily** 33:11

**Prime** 6:15

**prior** 74:20 81:25 82:7 84:19

**prison** 45:16 58:15 80:16,20, 22 90:24

**prisoner** 50:16 68:12 76:3 87:21 91:9

**prisoner's** 43:22

**prisoners** 76:21 77:9 97:16

**Pro** 24:1

**problem** 46:1 90:18

**problems** 30:4

**procedure** 11:5 42:12 58:21 59:7,10 60:5 69:25 74:3,13,15 75:21,23 77:17 80:24,25 82:1, 2,7 83:14 88:25 90:12,18 91:2 92:8,12,17 99:7,10 100:19 101:1

**procedures** 14:14 15:9 59:2 61:24 68:10 72:12 76:1

**process** 10:19 11:10 12:3,13 16:13 26:14,22,24 27:14

**processes** 29:25

**produce** 44:5

**produced** 33:19

**professional** 18:12 19:7 29:17 31:1 34:23 35:3 100:24

**profit** 36:4,5

**program** 14:6 15:5 16:9 22:12 23:7 37:14 38:16,20,21,23 45:21 79:25 81:4 84:25

**programs** 80:6

**prohibits** 74:6 76:9

**promotion** 9:5,7

**proprietary** 37:1

**prostate** 12:19 93:3

**provide** 13:5,7 20:25 21:20 36:16 40:11 54:4,6,22 61:1 93:19

**provided** 13:8 21:23 22:5 46:3 53:20 54:13 55:21 56:4 60:15, 18 69:1,8,18,20 70:24 72:17

**provider** 8:13 10:23 12:4,8,14 27:20 39:22,24 40:1,5,6,24 41:4,6,9 43:9,10 44:22 46:6, 17,24 47:2,17 48:6,9,20 49:22 50:1 51:4 53:17 55:23 56:1,8, 12,25 61:21 72:16,23,24 77:8, 18 98:20

**providers** 8:23 10:3 11:9,12, 17,18,20 13:6 16:19,20 24:21 31:22 36:17 46:2 51:1,13 55:4,8 56:5,14,15,19 72:14, 17,25 73:6 81:12 93:7,8 95:12,13 96:7 98:16

**providers'** 55:17

**providing** 14:3 23:22

**pure** 37:25

**purpose** 23:21 24:7 53:25

54:2,3 76:5 77:21 78:2

**purposes** 75:24 77:19,20 78:14

**pursuant** 72:10,11

**put** 15:2 29:6 71:2

---

**Q**

**quality** 15:4 16:8,13,16,20 17:14 24:2,9,10,12 34:13,19, 21,22,24 35:4 36:2,3,15,18,21 37:4,7 39:13

**quantify** 47:9

**question** 7:10 21:17 27:2 28:10 29:4,10 44:6 46:14 48:20 52:13,24 53:11,13,14 54:25 55:9,18,19 64:10,11 65:11 71:25 78:15 81:6,7,10 85:2 89:8,9,11 92:7 94:5 98:1 99:16

**questioning** 63:19

**questionnaire** 12:17

**questions** 7:13 12:20 21:16 50:8 51:18,21 65:14 92:3 98:15 99:14

**quizzes** 12:16

---

**R**

**rate** 56:9,22 57:1,23

**read** 25:8 26:10 29:1,4 63:8 89:12 90:7 98:6

**reading** 28:24 29:5

**reads** 53:13

**ready** 9:24

**reason** 20:7,17 39:6 54:16

**reasoning** 78:12

**reasons** 20:20,22 21:3,6 54:11 79:18 83:19

**recall** 8:2,4 12:15 15:7 61:15 69:20 101:2

**receive** 12:5 19:15 44:14 56:9 61:8 69:4,17

**received** 13:24 20:3 69:6 77:9, 16 78:16

**recognize** 13:2 51:9

**recommendation** 62:24

**reconstructive** 75:22,25 76:2, 14,20

**reconstructive-type** 76:18

**record** 6:7 7:6,21 12:10 23:4 25:6,8 26:11 29:21 68:18,21 83:17

**recorded** 70:12,19

**records** 14:16 43:22 44:6 60:16,17,19,22 61:8,14,25 62:7,8,22 63:1,6,10 82:15 83:7,24 101:3

**redirect** 97:20

**redistributed** 10:10

**refer** 74:10,21 99:4,8

**referral** 11:6 24:15 37:18 39:1 40:1,23 42:8 44:25 45:3

**referrals** 24:5 32:6 33:7 37:16, 17,21,25 38:19 40:4

**referred** 37:25 47:5

**referring** 73:25 75:11 86:2

**reflect** 53:16

**reform** 75:23 77:10

**region** 8:24 10:3 11:14 30:1

**regional** 8:16,19,21,25 9:2 10:5,9,13,18 11:13 13:13,16 14:25 15:16,22 31:3,7,22 47:18 48:1,2 49:10

**regions** 30:3

**regularly** 40:7

**reimbursement** 80:9

**related** 33:11 61:11 97:3

**released** 63:12 80:16,21,23

**relevance** 36:24 54:10 73:20 88:12 90:3 91:5

**relevant** 66:3

**remain** 39:1

**remember** 7:19 71:6 88:3 94:13

**reminding** 100:20

**removal** 67:6,9,21

**remove** 66:14,15 67:10

**repeat** 87:6 89:9,10

**repeatedly** 83:13

**replaced** 87:18

**replacement** 86:6

**report** 15:24 16:16 19:20,23 20:2,3,6,9,11,18 21:8 24:8 39:4,5,6

**reported** 19:25

**reporter** 6:11 7:6 18:2 25:22 69:15

**reporting** 15:8 19:10

**reports** 19:15 22:4 32:5 39:3

**represent** 40:14

**request** 10:24,25 11:3 24:15 40:23 41:1,5,13 42:14 43:6 44:17 45:20 60:24 62:1 64:5 78:18 99:21

**requested** 40:10 60:3

**requesting** 57:24 99:9

**requests** 39:16 55:7,12,17 56:18

**required** 9:22 12:11 16:17 19:20 20:15 21:8 45:6 56:23 58:4 88:3

**requirement** 20:18 21:19 39:18

**requirements** 100:12

**requires** 29:10

**research** 59:20 60:2 62:16

**reserve** 65:9

**resource** 46:21 68:3

**resources** 46:5 73:4,6 94:17

**respect** 16:19 28:23 64:18 87:4 90:3 92:9,16 96:4 100:25

**respects** 78:17

**responding** 86:4

**responses** 7:5

**responsible** 14:3 15:13,14

**restrictive** 68:5

**resubmit** 41:6,8

**result** 101:11

**resulted** 79:17

**resume** 18:20,22 19:4 29:22 30:22 32:2 33:17

**retain** 72:9,15

**retention** 71:24 72:2,3

**retired** 87:15

**reversal** 62:13,20 63:3,14 64:2 74:2,8 75:19 76:14 78:24 80:1 82:13 83:1,9 92:10 98:17,21 99:21 101:5,12

**reversals** 74:18 76:8,10,12

**reverse** 73:18 74:15 81:17

**reversed** 79:22 80:14

**reversed'** 99:5

**reversing** 62:3 78:2

**review** 11:4 12:8 14:5,7,9,12, 13,15 24:11 25:11,12 26:14, 22,24 27:3,14,25 32:3 38:13 39:2 41:2 42:16 44:17 46:25 49:13 50:25 51:2,3,13 57:8 60:11,14,16,19,22 61:25 62:7, 23 63:16 65:18,21 69:6 72:14 82:15 85:6 87:24 95:14

**reviewed** 10:25 14:15 15:9,10 60:15,17 63:4,6 101:4

**reviewer** 24:18 27:21 41:17 42:11,19 46:18 57:7,12

**reviewers** 96:7

**reviewing** 11:3 33:6 62:21 83:7

**reviews** 12:1 38:16 55:11

**revision** 62:1

**revisions** 65:20

**risk** 15:6,18 16:3,4 59:6,7,9, 13,23 60:5 66:7 88:6

**risk-to-benefit** 89:16

**risk/benefit** 90:11

**risks** 88:20,24 90:18 99:7

**RMD** 12:8 31:6,7 48:22 49:5, 20,21 51:4 70:9

**RMDS** 38:13,25 39:2

**RNS** 23:6

**role** 20:25 47:22 52:17

**room** 17:17 19:8,16 38:5

**row** 7:21

**rules** 7:3 95:19

**run** 8:11

**runs** 17:17,22

**Rural** 9:16

S

**safety** 14:1,6 15:8,15

**Sara** 16:1,2

**saved** 26:9

**scan** 45:19

**Scarber** 6:17,18 17:4 18:20, 23,25 20:23 21:4,13 22:2,22 25:10,14,17,20,24 26:25 27:5, 9,16 28:6,15,19,22 29:3 30:20 35:21,25 36:23 43:24 44:3,9 46:11 50:5,10 52:21 54:9,19 59:15 61:3 63:18 64:4,9 65:5, 9 66:20 67:4,15 70:14 73:19 75:5 76:22 77:22 79:8,14 81:5,19 82:17 83:3,11 84:1,17

85:1,24 87:3,22 88:11 89:1 90:2,20 91:4,21 92:6,19 93:20,23 94:1,10,15 95:3 96:3 97:12,18,24 98:11,23 99:15, 18 101:14

**Schoolcraft** 9:14

**scope** 64:12 94:4,5 97:19

**screenshot** 26:5

**scrolled** 19:1

**search** 91:25

**seasoned** 56:14

**section** 14:13 15:13 16:3,9 37:14 38:25 41:8 53:6 75:20

**sections** 15:17

**seeks** 80:9

**segments** 19:1

**send** 48:21

**sense** 11:22,23 58:16

**separate** 13:22

**served** 8:13 9:8

**service** 10:24 60:3,5 80:10

**Services** 6:16

**session** 70:19

**set** 13:23 29:25 32:13

**shaking** 7:5

**shared** 15:18 16:4 20:1

**shareholder** 35:16,19

**shareholders** 35:4,15

**shortly** 80:15

**show** 12:23 18:1 22:8 25:1 29:14 35:12 51:8 63:10 85:10 86:17 95:13

**showed** 69:24 82:6

**showing** 70:7

**shown** 26:6 70:4

**significant** 9:22

**similar** 51:12,19 53:7 69:23 91:18 95:15

**sir** 22:13 25:4 31:20,21 73:25 78:22 85:14 89:8,15 92:3 97:11 99:14

**sit** 29:3

**site** 8:13 40:24 45:24 46:2,6, 17,24 47:2,17 48:5,9 53:17

**site-level** 51:1

**sites** 10:3,6,7,10 61:18

**siting** 13:17

**situation** 96:25

**skim** 61:5

**slash** 16:13

**slide** 71:3

**small** 40:16 57:20

**SMD** 48:22

**sole** 35:19 76:5 77:20 78:2

**solutions** 30:4

**sort** 38:2

**sounds** 26:20 27:1

**speak** 80:17 81:13 83:17

**speaking** 28:14 64:14 67:17 82:19

**speaks** 76:23

**specialist** 38:7,9 44:22 99:11

**specialty** 10:24

**specific** 52:19 67:8 71:14 96:6 100:1

**specifically** 37:16 74:18 76:8 92:7

**specifics** 80:17

**speculate** 37:24 81:21 82:9

**speculating** 28:18 33:9 100:11

**speculation** 20:24 22:23 52:22 54:20 76:24 81:7,8,9,20

**spelled** 88:2

**Spencer** 6:16

**spend** 32:25

**spent** 97:8

**Spiller** 8:1,2

**Squier** 86:13,19 87:18

**Squier's** 87:10

**staff** 8:15 9:14

**stand** 31:7 52:11

**standard** 58:13,20 64:16,17 98:8

**stands** 30:10

**start** 39:9

**started** 23:25 81:8 87:14

**starts** 40:22

**state** 9:3,8,10,19 10:16 11:19 19:10,12 27:21 34:14,17 48:22 49:6,7,8,9,17,21,24 50:3,5 51:4 65:22 75:20 77:3 78:25 79:7 85:16,17

**state-wide** 70:23 71:8

**statement** 60:10

**statements** 95:18

**states** 32:20

**steady** 47:13

**strike** 30:3 31:9 55:1 79:24

**strong** 97:25

**structure** 75:22,24 77:10

**studies** 59:20

**stuff** 30:23 98:3

**subjects** 71:14,18

**submitted** 64:25

**subscription** 46:3

**subsequent** 8:15 71:10

**substantial** 100:25

85:2 87:24 89:1

**success** 37:14 38:16,19

**successful** 56:24 57:2 69:2

**suffering** 97:2 101:10

**suggested** 86:20

**Suite** 22:21

**summer** 64:24

**supervise** 8:23 10:2

**support** 14:24 34:9 69:2 89:22

**supported** 34:7 90:12

**suppose** 64:10

**supposed** 46:14

**surgeon** 78:12 79:3 82:4 99:4, 8

**surgeon's** 81:25 82:7

**surgeons** 82:4

**surgeries** 74:1,6 76:2,20

**surgery** 38:8 75:21,23,25 76:14,15,18 77:9 78:16,24 80:1 83:1

**surgical** 74:13 75:21,23 77:16 78:18

**swear** 6:11

**sworn** 6:4,21

**Sylvia** 35:6,7

**symptoms** 66:17 96:21

**system** 14:25 35:14 39:24 40:1 50:18 56:13 58:15

**T**

**takes** 26:14 27:14 28:4

**taking** 28:11

**talk** 23:9 71:4

**talked** 89:20 93:15

**talking** 26:24 28:3,9,16,24 37:10 50:6 57:7 59:24 64:4,6, 7 68:7 73:7 74:17 84:4 88:13 90:5 91:5 92:8 96:8,9 99:20

Jeffrey Bomber, D.O.
05/28/2021

16

**target** 39:14

**targeted** 32:7,8,10,12 33:8

**targets** 30:5,8,15,16 31:15,18, 23,24

**taught** 65:24 66:2

**teach** 16:23

**team** 11:11,15 23:5

**telephone** 70:17

**telling** 58:5

**temporarily** 10:12

**temporary** 10:20 24:12

**ten** 15:24

**ten-year** 80:11

**Tennessee** 23:15

**tenure** 73:10

**term** 17:9,13,14

**terms** 45:25 97:17

**test** 7:7 58:25 59:1 91:2

**testified** 6:4,21 30:25 33:10 85:12 100:2,10

**testify** 64:1 71:12,15,18,23 82:12 93:19

**testimony** 26:20 27:13 28:4 54:20 64:17,18 67:16 82:18 84:19 95:7,10

**therapy** 53:8

**there'd** 38:8

**thing** 45:11 68:2 91:19

**things** 42:4 57:24 59:17 90:16 91:14 95:5 96:11,15 98:19

**thinking** 59:2

**thinks** 83:13 89:18

**this.'** 93:14

**thought** 25:17 45:18 94:2

**thousand** 37:16,17,21,22 38:19

**time** 6:9 7:17,18 9:23 10:6,11, 16,17 11:18 35:22 46:20 47:11 58:14 61:11 63:11,15 64:5,8,12,23 68:18,21 69:13 72:11 77:8,18 78:16,21 79:4 80:20 83:8,25 84:5 86:8,11 87:7,16 88:1 91:8 92:3 97:8 98:6 99:20,25 101:6,20

**times** 40:6,9 48:23 67:5 79:15 83:18 84:18

**title** 31:4 72:22

**today** 6:8 74:20 83:6

**today's** 60:12 63:7 82:16

**told** 73:9 76:11 77:1 93:1

**tools** 56:23

**top** 90:8

**track** 17:17 20:20 21:11 39:19, 21 55:3,7,12,14,16

**tracked** 16:21 37:23 55:20

**tracking** 32:5 33:6 40:5

**tracks** 20:17 21:25

**train** 11:17 15:21 86:9 94:8 95:13

**trained** 11:18,20,22 16:18,20 65:21 70:5 85:13

**training** 11:24 12:4,7,8,9 13:5, 7,9,18,22,23 14:4 15:1,4,7 69:1,4,6,8,9,10,11,12,14,17, 19 70:3,8,11,21,23,24 72:23, 24 93:19 95:17,22 96:5

**trainings** 14:20

**transcript** 26:7,8,11

**treatment** 11:6 45:6,10,14,15 46:23 47:15 59:7 61:9 66:6 89:21,22 91:7

**trend** 39:20

**true** 80:4 99:19

**two-and-a-half** 64:6

**type** 10:24 40:4 59:3 88:2 97:2

**typically** 45:15 56:11

---

**U**

**ultimate** 49:17,25

**ultimately** 49:16

**ultrasound** 45:18

**Um-hum** 14:23

**UMMD** 34:7 37:17 43:9 44:17 45:2,5,9,17,23 46:6,9,18

**UMMDS** 38:13

**understand** 7:13 38:9 40:15 47:10 50:10,19 78:19 82:4

**understanding** 73:15 97:15 100:10,16,21

**unfair** 28:10 29:9

**unilaterally** 47:24

**unit** 13:18

**uphold** 48:3,9,16 49:11,22 50:1

**upholding** 48:12

**Uptodate** 39:25 46:3,6,7,9,20, 22 58:3,16 62:23,25 63:2,8 66:3,11 67:11,13 68:3 73:22 78:5 87:7 88:1 89:20 91:18,19 93:2,6,11 94:17,21,22,25 95:14,15 96:14,17

**utilization** 10:11,14,25 11:2 14:17 17:18,19,21 19:9,17 22:16 23:6,18,19,20,21 24:7, 11,14,17,22 26:13,21 27:13, 20 29:25 30:10,14 31:12,15, 18 33:12,19,20,24 34:5,8 37:11 40:14 42:22 52:4,19 57:9 65:18,21 68:24 70:9 85:13 87:13,14 88:22 93:17

**utilize** 17:20 24:1 46:20

---

**V**

**vacancy** 10:12

**vacation** 34:9

**variables** 68:14 81:11

**verbal** 7:4

**version** 72:25 75:10

**versus** 38:19 39:16 59:6,23 88:24 99:7

**video** 12:14

**video-recorded** 6:7

**videos** 12:15

**view** 23:22 39:13 41:18,19

**virtual** 69:10,11,12 70:16,17 72:25 101:21

**virtually** 6:8 56:19

**vision** 66:23

**visit** 61:17

**volume** 47:11 54:13

**VP** 15:23

**VPS** 70:25

---

### W

**walk** 49:18

**wanted** 23:9 24:1 99:11

**Warren** 8:5,6

**watch** 12:14

**web** 73:5

**Weber** 64:19 80:14,23

**website** 46:21

**week** 47:10,15 48:23

**weigh** 59:6

**willfully** 100:23

**Willis** 6:14,15 26:2 92:4 101:17

**witness'** 63:21

**word** 43:4

**work** 18:14 30:3,7,13 72:7

**worked** 8:14 10:11 31:6,9 87:11,12

**workflow** 40:14 57:9

**working** 58:14

**world** 91:17

**Wow** 68:7

**write** 20:9 40:3 76:24

**wrong** 26:3 93:21

---

### Y

**year** 7:18 36:4,8 55:8

**years** 8:20 9:8,21 15:24 34:15 56:15 64:6 86:8