# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KONCHISE JACKSON,

                    Plaintiff,

        vs.                                    Case No. 19-13382

                                               Hon. Gershwin A. Drain

CORIZON HEALTH, INC., et al.,

                    Defendant.

_____/

        The Remote Videoconference Deposition of

        SONYA FULKS, R.N.,

        Taken at 8635 Benn Road,

        Parma, Michigan,

        Commencing at 2:31 p.m.,

        Thursday, June 12, 2025,

        Before Leisa M. Pastor, CSR-3500, RPR, CRR.

Page 2

APPEARANCES:

IAN T. CROSS

Cross Law, PLLC

402 West Liberty Street, Suite 100

Ann Arbor, Michigan 48103

(724) 994-9590

ian@lawinannarbor.com

    Appearing on behalf of Plaintiff.


ADAM MASIN

SUNNY REHSI

Bowman and Brooke, LLP

750 Lexington Avenue

New York, New York 10022

(646) 914-6790

adam.masin@bowmanandbrooke.com

sunny.rehsi@bowmanandbrooke.com

    Appearing on behalf of Defendant.

Page 3

TABLE OF CONTENTS

WITNESS                                          PAGE

SONYA FULKS, R.N.


EXAMINATION BY MR. MASIN                           4

EXAMINATION BY MR. CROSS                          61

RE-EXAMINATION BY MR. MASIN                       70


           EXHIBITS


EXHIBIT                                          PAGE

(Exhibits retained.)


EXHIBIT 1                                         10

EXHIBIT 2                                         40

Page 4

Parma, Michigan

Thursday, June 12, 2025

2:31 p.m.

          SONYA FULKS, R.N.,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

          EXAMINATION

BY MR. MASIN:

Q.   Good morning, ma'am, my name is Adam Masin, I'm an attorney with Bowman and Brooke.  I'm here to take your deposition today.

    Can you please state your full name and address for the record.

A.   Sonya Jean Fulks, 8635 Benn Road, Parma, Michigan 48269.

Q.   And are you currently employed?

A.   Yes.

Q.   Who's your current employer?

A.   Vital Core Health Strategies.

Q.   And is that an in-person job or remote job?

A.   In person.

Q.   Where is your office located?

Page 5

A.   In Lansing.

Q.   Okay.  Have you ever had a deposition taken before?

A.   No.

Q.   Okay.  So I'm going to go over some of the basic ground rules for a deposition, then.

    First thing is we are on video, but this is not being recorded.  Everything that we are saying is being recorded by the court reporter, so it is important that you speak up and that we don't speak over each other, okay?

A.   Okay.

Q.   So do your best to wait for me to finish my question even if you know what I'm going to ask you and, likewise, I will do my best to wait for you to finish your answer until I ask my next question, okay?  Okay?

    Ms. Fulks, can you hear me?  I think she froze.

    (Off the record at 2:32 p.m.)

    (On the record at 2:32 p.m.)

BY MR. MASIN:

Q.   Okay, so as you just saw, we had a little technical issue.  That does happen from time to time with video depositions.

    If for some reason you can't hear me, if my screen freezes, if you don't see anything that you're

Page 6

being shown today, please let us know right away so that we don't have an issue with technology, okay?

A. Okay.

Q. If you don't understand my question for some reason, I do my best to ask pretty simple questions, but if you don't understand my question, will you please let me know?

A. Yes.

Q. If you answer my question, I'm going to assume that you understood the question; is that fair?

A. Yes.

Q. Okay. If you need to take a break for any reason today, I don't anticipate we'll be here too long, but if you need to take a break for any reason today, just say so. Just if there's a question pending, just answer the question first, okay?

A. Okay.

Q. Now, where are you sitting today?

A. I am in my home office.

Q. Okay. Is anybody in the room there with you?

A. No.

Q. Okay. Do you have anything open on your computer other than this video call?

A. No.

Q. Okay. Have you ever testified at a trial before?

Page 7

A. No.

Q. Have you ever been a party to a lawsuit before?

A. No.

Q. So when I say "party," I mean a plaintiff, somebody who's brought a lawsuit or been a defendant in a lawsuit. Do you understand that?

A. Yes. Do divorces count?

Q. If you've had -- if that's been the only time, that's fine, but other than that, any sort of marital issues, have you ever been a plaintiff or a defendant in a lawsuit before?

Ms. Fulks, I think you froze again.

A. Sorry. No, I have not.

Q. Okay, thank you.

What did you do to prepare for your deposition today?

A. Repeat that, please.

Q. Sure. What did you do to prepare for your deposition today?

A. -- to understand what was expected of me.

Q. Okay. I think the first part of your answer cut out, so can you please repeat what you said?

A. Yes. I spoke with the other attorney on the phone to understand what was expected of me today.

Q. What was the name of the attorney that you spoke with?

Page 8

A. I believe his last name is Cross.

Q. Okay. And one thing I should tell you also from the beginning is that I don't want you to tell me anything that you've said to Mr. Cross or anything that he may have said to you during the course of the -- our deposition today, okay?

A. Okay.

Q. Is it your understanding that Mr. Cross is representing you for purposes of the deposition today?

A. Yes.

Q. Okay. When is the first time that you met with Mr. Cross ever?

A. The first time I met with Mr. Cross was a couple days ago, but I did speak with his assistant the first time about a year ago.

Q. Okay. And how is it that you came to speak with Mr. Cross's assistant a year ago?

A. My name was on healthcare charts of a client that they were working with and they contacted me.

Q. Okay. Were you -- and I take it from your testimony that you did not testify in that case, correct?

A. Correct.

Q. Okay. Was that client in Michigan?

A. I'm sorry, can you repeat that?

Q. Was the person -- was that client that you referred to

Page 9

in Michigan?

A. Was he -- I'm sorry, let me try to turn --

(Technical difficulties.)

(Off the record at 2:37 p.m.)

A. All right I'm back.

BY MR. MASIN:

Q. All right, let's try it with the camera on.

Do you remember the name of the client who you were originally asked about?

A. Yes. His last name was Lyles.

Q. Did you -- did you bring any documents with you today? Do you have any documents in front of you?

A. No, I do not.

Q. From time to time during the deposition, I might only do this a couple of times, I'm going to show you some documents on your screen, and I'm hoping you'll be able to he see them. So I'm going to share my screen with you now.

If you have any trouble seeing this document, please let me know, okay?

A. Okay.

Q. Okay. You should be seeing a document entitled Defendant CHS Texas, Inc.'s Notice of Taking Duces Tecum Deposition of Sonya Fulks, RN. Can you see that?

Sonya Fulks, RN.
June 12, 2025

Page 10

A.   Yes.

Q.   And for the record, we'll mark this as Exhibit 1.
                MARKED FOR IDENTIFICATION:
                EXHIBIT 1
                2:39 p.m.

BY MR. MASIN:

Q.   Have you ever seen this document before?

A.   No.

Q.   I'm going to direct your attention to Schedule A of this document and ask you to take a look at it.  You can start reading it down, it goes on for another page or so.
                But do you recall ever seeing a Schedule A before?

A.   No.

Q.   Were you aware that you were supposed to look for and produce any documents that were responsive to Schedule A for purposes of your deposition today?

A.   No.

Q.   Okay.  So let's go over some of these, then.  Do you have a current CV?

A.   Yes.

Q.   Okay.  Is that like on your computer right now, something like that?

A.   No, I'm -- I'm actually on my phone right now, but I

Page 11

did email that over as requested.

Q.   Okay.  No. 2 asks you for complete file related to the caption case.
                You understand that you're here in a case that's captioned Jackson v. Corizon Health, Inc., right?

A.   Yes.

Q.   So do you have something that you would consider to be a file related to this case?

A.   No.

Q.   Okay.  The third bullet asks you for a listing of consulting matters, litigation related or otherwise, for which you have been retained in the last five years.
                Have you been retained as a litigation consultant in any litigation in the last five years?

A.   No.

Q.   And I think we covered 4, but 4 asks for a listing of all cases in the last five years in which you've given testimony at trial or through deposition, and I believe you said that you have not given any testimony, correct?

A.   Correct.

Q.   Okay.  No. 5 asks for any and all documents which you received or reviewed related to this case, meaning the

Page 12

Jackson case, including documents that you relied upon for your opinions as well as those which you did not rely upon.  This includes, but is not limited to, any witness statements, the videos, or testimony.  Do you see that?

A.   Yes.

Q.   Do you have any documents that meet that description?

A.   No.

Q.   No. 6 asks you for any notes, memoranda, recordings, diagrams, sketches, phone messages, or other tangible evidence of any conversations, communications, or exchanges of information between the deponent and any other expert witness or consultant retained by plaintiffs in this action.  Do you see that?

A.   Yes.

Q.   Do you have any documents that meet that criteria?

A.   No.

Q.   No. 7 asks for any and all documents which refer, to relate, or evidence your findings, conclusions, opinions, advice or other communications in this case.  Do you see that?

A.   Yes.

Q.   Do you have any documents that meet that description?

A.   No.

Q.   No. 8 asks you for any and all documents exchanged

Page 13

between you and any other person or entity related to the facts or issues in this case.  Do you see that?

A.   Yes.

Q.   Do you have any documents meeting that description?

A.   No.

Q.   No. 10, let's go to that one, asks you for any drawings, charts, models, exemplars, data, technical papers or books, videos, photographs, or visual or demonstrative aids or exhibits of any kind which you anticipate using in connection with any deposition or trial testimony in the captioned case.  Do you see that?

A.   Yes.

Q.   Do you have any of the materials described here?

A.   No.

Q.   Have you been paid for any of your time related to this case?

A.   No.

Q.   Are you billing for any of your time related to this case?

A.   No.

Q.   If you testify at trial, are you going to be charging for your time testifying at trial?

A.   No.

Q.   Have you been promised to receive any compensation

Sonya Fulks, RN.
June 12, 2025

Page 14

relating for your time spending on this case?

A. No.

Q. No. 13 asks for all written documentation and data for any and all testing conducted in this action. Do you see that?

A. Yes.

Q. Have you performed any testing conducted for this action -- strike that.

Have you performed any testing related at all to this action?

A. No.

Q. In No. 18, it asks for all documents regarding other allegedly similar incidents or other incidents and claims which you have reviewed and which you claim support your opinions. Do you see that?

A. Yes.

Q. Do you have any documents that fit that description?

A. No.

Q. No. 19 asks for all documents that you reviewed or relied on to support any opinions that you intend to offer in this case. Do you see that?

A. Yes.

Q. Do you have any documents that meet that description?

A. No.

Q. Did you review or rely on any documents to support any

Page 15

opinions that you intend to offer in this case?

A. The -- I have a question about your question to understand it.

Q. Okay.

A. Are you -- my opinion relies on all the documents I have to -- my daily career. Are you talking about specific documents I had to review or just my actual literature that I have to review to do my job?

Q. Are there any particular documents that you can think of that you are relying on for purposes of your testimony in the Jackson case?

A. I'll say no.

Q. Okay. No. 20 asks for all published literature that you authored or coauthored that you intend to rely on in this case. Do you see that?

A. Yes.

Q. Do you have any documents that meet that description?

A. No.

Q. Can you please describe your educational background?

A. I attended Jackson College to receive my nursing degree. In 2008 I graduated.

Q. Where is Jackson College?

A. It is in Jackson, Michigan.

Q. And after you received your nursing degree in 2008, what did you do next?

Page 16

A. I went and accepted a position at University of Michigan Hospital.

Q. Okay. Other than your nursing degree, do you hold any other postgraduate degrees?

A. No.

Q. Was a nursing degree an undergraduate degree or a graduate degree?

A. I believe that was a graduate degree.

Q. Did you go to some institution after high school but before Jackson College?

A. No.

Q. Okay. So after you graduated, you started working for the University of Michigan, correct?

A. That's correct.

Q. And what did you do for them?

A. I was a registered nurse on the hematology oncology floor.

Q. And where -- was that a particular hospital?

A. It was the main University of Michigan Hospital in Ann Arbor.

Q. Okay. And what were your job responsibilities?

A. I performed patient care as well as administered chemotherapy blood products, we did med-surg overflow, dealt with all types of surgeries.

Q. And your work there was in oncology, correct?

Page 17

A. Yes.

Q. How long did you work for the University of Michigan Hospital?

A. Nine years.

Q. And what did you do next?

A. I accepted a position at the Michigan Department of Corrections at their Duane Waters Health Center in Jackson, Michigan.

Q. And what were your responsibilities -- if I call it the MDOC, do you understand that?

A. Yes.

Q. What were your responsibilities at the MDOC when you first joined?

A. For the first four months that I worked there, I was a RN on the floor, so my responsibility was to oversee the floor, give IV medications, and accept any new admissions from the hospitals, and deal with all of the medical/surgical needs of the inmate population.

After four months, I then accepted -- accepted an acting supervisor position for their house supervisor.

Q. When you say you worked on the floor, was there a particular specialty that you were working in?

A. No, it's just general in-house medicine.

Q. Okay. And after four months, what did you do next

Sonya Fulks, RN.
June 12, 2025

Page 18

after four months?

A. I became the acting health supervisor there.

Q. And how long did you hold that position for?

A. Eight months.

Q. And what were your responsibilities as the acting health supervisor during those eight months?

A. I was to oversee and manage all healthcare staff as well as schedule for the complex, and I was a liaison for out- -- inmates' outside family members.

Q. And when did that position end?

A. And that ended in May of 2018.

Q. So if I understand your work history correct, you started at the University of Michigan Hospital in 2009; you worked for four months on the floor, then you became a health supervisor for eight months after that.  Is that right?

A. You -- I think you misspoke.  I started at the University of Michigan in 2008 and I was there nine years.

Q. Oh, okay.  So you were there until 2017?

A. Yes.

Q. Okay.  What did you do starting in May of 2018?

A. I became an oncology manager for Corizon.

Q. Was that the first time -- well, strike that.
Was Corizon your actual employer?

Page 19

A. Yes.

Q. Was that the first time you were working for Corizon?

A. Yes.

Q. Do you remember the date that you started working for Corizon?

A. I don't remember the exact date, but it was the end of May of 2018.

Q. Prior to May of 2018, had you ever worked for Corizon?

A. No.

Q. Have you ever worked for an entity called CHS Texas, Inc.?

A. O.

Q. Have you ever worked for an entity called Yescare?

A. No.

Q. Do you recall what your last day working for Corizon was?

A. The day the contract, their contract ended in Michigan.

Q. Do you remember what date that was?

A. No, I don't.

Q. Does September 28th, 2021 sound about right?

A. Yes.

Q. Okay.  What was your responsibility during the time that you were working for Corizon?

A. My responsibility was to case manage all oncology and

Page 20

hematology inmates in the state of Michigan as well as run and administer chemotherapy at the prison chemo clinic.  I also acted as a liaison between the inpatient providers through MDOC and the outpatient oncologists.

Q. And was that your position the entire time that you worked for Corizon?

A. Yes.

Q. Did you have a supervisor during that time?

A. Yes.

Q. Did the supervisor change over that time or was it always the same person?

A. It was always the same person.

Q. What was the name of your supervisor?

A. Mason Gill.

Q. Can you spell that?  Mason what?

A. Gill, G-I-L-L.

Q. So is it M-A-S-O-N and then G-I-L-L?

A. Yes.

Q. Okay.  And what was Mason Gill's title?

A. Vice president of operations.

Q. Vice president of operations for what?

A. For the Michigan regional office.

Q. Was there anybody who was working under you during that period of time?

Page 21

A. No.

Q. So Mr. Gill was the only person that you were reporting to directly; is that fair?

A. He was my direct -- he was my main supervisor, I -- I reported directly to him, although there was a medical -- the State medical director I also would go to for clinical needs.

Q. And who was that?

A. It started out as Dr. Bomber, and then it ended with Dr. Schmidt.

Q. And when you say "clinical needs," you're referring to clinical needs for oncology patients?

A. Yes.

Q. During the time that you were working for Corizon, were you seeing patients?

A. I saw them at my chemo clinic.

Q. Okay.  So it's -- is it fair to say that the only patients that you were treating as a nurse were patients that you saw in your chemo clinic?

A. Physically, yes.

Q. Okay.  What do you mean by "physically"?

A. Because my -- the majority of my role was for me to interact with the onsite providers and get the orders needed for all of their labs and testing, and to catch anybody falling through the cracks.  So I was behind

Sonya Fulks, RN.
June 12, 2025

Page 22

the scenes making sure they were getting all the care they needed.

Q. And when you say the "onsite providers," are you referring to physicians and other nurses?

A. I'm referring to the physicians and advanced practice practitioners employed by Corizon.

Q. Now, you yourself are not a medical doctor, correct?

A. Correct.

Q. Okay. Have you ever performed any medical or scientific research?

A. No.

Q. Have you ever done any research related to colostomies or colostomy reversals?

A. No.

Q. Do you intend to offer any opinions at trial relating to the need for a colostomy or a colostomy reversal?

A. Yes.

Q. What opinions do you intend to offer?

A. My experience. I've taken care of a lot of colostomies and colostomy -- and had lots of patients with colostomy reversal during my time at U of M, so I have opinions on standard of care for colostomy care and colostomy reversals.

Q. And during the time -- so let me understand then. Your testimony is that your experience with

Page 23

patients who've had colostomies was during your time at the University of Michigan; is that right?

A. Yes, and I did have some patients with colostomies when I worked for the MDOC.

Q. So you believe that you're qualified to testify as to what the standard of care is for colostomy reversals?

A. Yes.

Q. What is the basis of your belief that you're qualified to testify to that?

A. As a nurse, I am well-versed in standard of care for med-surg patients, especially anybody that was in my direct care over the years, so --

Q. What do -- okay.

A. I'm sorry.

Q. But when you say you're well-versed in standard of care, are you referring to a standard of care that was in a place at the University of Michigan or are you referring to something else?

A. I'm referring to the national standard of care for medical providers and practitioners. We have something called the gold standard. It's nationally known for medical care of human beings, and the standard of care, I believe I have a good grasp on the standard of care for colostomies.

Q. If I wanted to look up the standard of care for

Page 24

colostomies, where would I look that up?

A. So it's in medical -- it's in our books, our testing, it's in policy. So I could pull a medical book for GI consult and it -- it would discuss colostomies, standard of care.

You'll see it in any medical doctor has journals, you can look up any journals on standard of care for colostomies.

Q. Can you -- can you name a book that you're talking about?

A. No. I don't have a book here, but no --

Q. Is it a journal that you're talking about?

A. Well, you could look up the medical journal on colostomies. I think that's through the -- I don't want to say because I don't want to misspeak, but it's very easy to find medical journals on the standard of care.

Q. Do you think that every medical journal agrees that there is a standard of care for colostomy reversals?

A. I believe that there is a standard of care for colostomies. I can't speak to whether or not every journal in existence agrees to the standard of care, no, I cannot.

Q. Is it your opinion that there is a standard of care relating to colostomy reversals?

Page 25

A. It is my opinion, yes.

Q. And what is it that you base that opinion on?

A. I base the opinion on my experience with colostomies, with talking with other medical doctors, with having patients that had colostomy reversals in the hospital and what the doctors there stated would be -- there's a certain criteria that everybody meets in order to have certain -- if you have a medical procedure done, there's a criteria to meet, and the standard of care is -- has to meet that criteria.

Q. What is your opinion as to the standard of care if you have one relating to colostomy reversals?

A. So a colostomy reversal, standard of care for a colostomy reversal is that colostomies in general if they can be reversed should. They can cause infections, skin irritation. I've seen necrotizing fasciitis for colostomies that are left alone and not reversed when need be.

It is always better for the patient to have their intestines reattached so that we don't have fecal matter coming on to the skin outside of the body.

Q. Have you ever performed a colostomy surgery?

A. No.

Q. Have you ever performed a colostomy reversal?

Sonya Fulks, RN.
June 12, 2025

Page 26

A. No.

Q. Have you ever been present for a colostomy surgery?

A. No.

Q. Have you ever been present for a colostomy reversal?

A. No.

Q. Have you ever diagnosed a patient for needing a colostomy?

A. No.

Q. Have you ever diagnosed a patient as needing a colostomy reversal?

A. No.

Q. Do you have any idea what the percentage of people who have a colostomy have it reversed is?

A. Not off the top of my head, no.

Q. In terms of your work -- well, strike that.
. When -- you testified earlier that you first spoke about -- well, let me see if I understand your testimony correctly.
The first time that you spoke to Mr. Cross about this case was approximately a year ago; is that right?

A. No, that was the case for Lyle's and I didn't speak to Mr. Cross, I spoke to his assistant.

Q. When is the first time that you spoke to anybody about the Jackson case?

Page 27

A. When his assistant contacted me several weeks ago.

Q. Okay. Since the time that you were contacted about the Jackson case, have you done any research relating to colostomies?

A. No.

Q. As a registered nurse, do you have any certificate or coursework or training relating to colostomies?

A. Every two years we have to take our CEUs, and over the years I have done some CEUs on GI and colostomy.

Q. Other than that, have you had any other training relating to the need for colostomy reversal surgery?

A. No.

Q. Have you ever published any literature on colostomy reversal?

A. No.

Q. Have you ever published any literature on colostomies?

A. No.

Q. Have you ever published a chapter of a medical textbook?

A. No.

Q. Have you ever spoken in a conference or in a forum on any medical-related issues?

A. No.

Q. Have you ever been qualified by a court of law to be an expert testimony in any lawsuit?

Page 28

A. No.

Q. Have you ever been retained in any case to provide expert testimony relating to colostomies?

A. No.

Q. Do you do anything to advertise yourself as an expert in any field?

A. No.

Q. Have you ever met the plaintiff in this case, Mr. Jackson?

A. No.

Q. Have you ever spoken to Mr. Jackson?

A. No.

Q. In your capacity as a nurse, did you ever provide any care to Mr. Jackson?

A. No.

Q. In your capacity as an employee of Corizon, did you have any interaction at all with Mr. Jackson or his medical needs?

A. No.

Q. Have you ever diagnosed Mr. Jackson or treated him for any medical condition?

A. No.

Q. Have you ever reviewed Mr. Jackson's medical records?

A. No.

Q. Is it fair to say that you are not intending to offer

Page 29

any opinions in this case relating to Mr. Jackson's medical condition?

A. Correct.

Q. Have you ever reviewed any documents from the MDOC about Mr. Jackson?

A. No.

Q. Is it fair to say that during your time working for Corizon that you had no role or responsibility at the MDOC to review Mr. Jackson's medical condition?

A. That's correct.

Q. During your time working for Corizon, did you have any opportunity to review any documents from Corizon about Mr. Jackson?

A. No.

Q. And since the time that you've been involved in this case, have you reviewed any documents from Corizon about Mr. Jackson?

A. No.

Q. During the time that you were working for Corizon, is it fair to say that you had no role or responsibility to review Mr. Jackson's medical condition?

A. Correct.

Q. And as part of your work for Corizon, you actually did not do that, right?

A. For Mr. Jackson?

Sonya Fulks, RN.
June 12, 2025

Page 30

Q. Right.

A. Correct.

Q. To the extent that Mr. Jackson himself had made healthcare requests while he was in prison, did you have any role or responsibility to review those requests?

A. No.

Q. And you did not review those requests to the extent he made any, correct?

A. Correct.

Q. Do you know somebody named Dr. Keith Papendick?

A. Yes.

Q. How do you know him?

A. He was the reviewer for 407s placed, and I worked with him because he reviewed my patients' cases.

Q. And when you say "my patients," you mean oncology patients, correct?

A. Yes.

Q. How long did you work with him?

A. The entire time I worked for Corizon.

Q. Okay. What was the nature of your work with Dr. Papendick?

A. I would contact Dr. Papendick when I disagreed with a decision he made, or he would contact me if he had questions about a patient.

Page 31

Q. Was it part of your job responsibility to contact Dr. Papendick to question his decisions?

A. Yes.

Q. Why do you think that?

A. It -- I am contracted -- my position is a requirement of the MDOC in the contract and it is to make sure that we are meeting standard of care for all oncology hematology patients. So as a nurse I am responsible for advocating for my patient, that is a huge part of my nursing role, so when I would see something that I knew was an NCCN guideline that needed to be followed and he had denied it, I would email him and ask to speak with him about why he denied that.

Q. How often did that occur that you emailed him?

A. A couple times a month, and we only had a few phone calls. A lot of time I didn't have to email Dr. Papendick, I could contact the provider to get an appeal or what I needed, but there were occasions where after the appeal had been denied I had to go directly to him.

Q. So during your time working for Corizon, approximately how many times do you think you emailed or spoke to Dr. Papendick?

A. Oh, over the course of the three years, I don't know. Twenty maybe.

Page 32

Q. And those were all about oncology patients, correct?

A. Yes, and hematology, yes.

Q. Okay. Now, it was not your understanding that you were Dr. Papendick's supervisor, correct?

A. Correct.

Q. And did you have any authority to change Dr. Papendick's decisions?

A. I could go above his head to the medical director, which I did a couple times, but mostly a conversation with Dr. Papendick would change his decision.

Q. So if you reached out to Dr. Papendick and expressed some concern about a decision that he made, he was amenable to changing that decision based on your recommendation, correct?

A. Correct.

Q. And when you say you went above his head sometimes to the medical director, who are you referring to?

A. Dr. Schmidt or Dr. Bomber.

Q. And the times that you did that, did Dr. Schmidt or Dr. Bomber change the decision that had been made by Dr. Papendick?

A. They would talk with Dr. Papendick and a decision would be made. Sometimes his decision stood and sometimes it didn't.

Q. Did you ever -- strike that.

Page 33

If you had a question about Dr. Papendick's decision in a particular case, did you ever go to someone who worked directly for the MDOC?

A. No.

Q. During the time that you worked with Corizon, did you have any role or responsibility in preparing written requests for a prisoner to receive care outside of the MDOC?

A. No. I did act as a liaison. I was in close contact with the outside oncologists, but I don't believe -- I mean, I emailed them. I don't know if that's considered a written request.

Q. So --

A. But I did have correspondence with community caregivers for the inmates.

Q. To the extent that Dr. Papendick had information about oncology patients for him to make a decision about whether to approve an off-site visit or not, is the information that he had in front of him something that you would have written up?

A. No.

Q. Apart from any interactions that you may have had with Dr. Papendick about oncology patients, did you have any other role or responsibility in deciding whether to approve written requests for a prisoner to receive

Sonya Fulks, RN.
June 12, 2025

Page 34

care outside of the MDOC?

A. No.

Q. During your time working both for the MDOC and Corizon, were you familiar with the fact that the MDOC had a grievance process related to healthcare requests?

A. Yes.

Q. And what is your understanding of the grievance process?

A. My understanding was that a patient could -- or an inmate could grieve if it he felt his needs weren't being met and it went through the grievance committee, but I don't have extensive knowledge on the hands that that exchanged through and I know that they would then render a decision.

Q. Were you aware that if a prisoner filed a grievance with the MDOC, they could also appeal that decision within the MDOC?

A. Yes.

Q. And you didn't have any role in reviewing any grievances or grievance appeals within the MDOC, correct?

A. Correct.

Q. Sitting here today, are you aware of any facts relating to Mr. Jackson's grievance or grievance

Page 35

appeals for any reason?

A. I'm sorry, can you --

Q. Sure.

A. I missed the first part.

Q. Do you know whether Mr. Jackson utilized the MDOC's grievance procedure for any reason?

A. No, I'm not aware of any.

Q. After you left Corizon in September of 2021, what did you do next?

A. I stayed in my position when they transitioned into a new company with Wellpath, and Wellpath came in and started their contract with the MDOC.

Q. And so you remained within oncology at that time, correct?

A. Yes, the same position.

Q. How long did you work for Wellpath?

A. Until their contract was terminated, so that was May of 2024.

Q. After you left Wellpath, what did you do next?

A. I stayed in my position and VitalCore came in and took over the contract with the MDOC.

Q. And is that the same position that you have now?

A. Yes.

Q. So you're currently working for VitalCore within the MDOC; is that right?

Page 36

A. Yes, correct.

Q. Prior to agreeing to testify in this case, did you check with anyone at VitalCore as to whether or not you're allowed to testify in a lawsuit?

A. I had checked with Wellpath first because it's -- this came about at first with Wellpath, and they told me just to keep them abreast of the situation, and then VitalCore, the CEO of VitalCore had held a meeting and just let us all know that if there were subsequent court cases we were involved in and we needed help to let them know, but, no, I did not directly say, hey, I might have to testify.

Q. Do you know what VitalCore's policy is for allowing its employees to testify as a nonretained expert in a lawsuit?

A. No.

Q. Do you know whether the MDOC allows VitalCore employees to testify about events that occurred at the MDOC?

A. No, I don't know.

Q. And you didn't check?

A. No.

Q. What is the name of the entity that you're currently working for, the full name if you know?

A. VitalCore Health Strategies.

Page 37

Q. Is that an Inc. or LLC or something else?

A. It's an Inc.

Q. To the best of your knowledge, have you ever spoken to someone named Dr. Erina Kansakar?

A. No.

Q. I'm going to go through a list and I'll ask -- it's the same question every time which is to the best of your knowledge, have you ever spoken with this person.

A. Okay.

Q. So just let me know whether you've spoken with the person. I don't want to have to repeat that every time, okay, do you understand?

A. Okay, I understand.

Q. Dr. John Weber?

A. No.

Q. Steven Bergman?

A. Bergman?

Q. Bergman.

A. Yes.

Q. Who is Steven Bergman?

A. If it's the Dr. Bergman I'm thinking of, he worked for Corizon in Michigan.

Q. And what kind of interaction, if any, did you have with him?

A. Dr. Bergman would come into the Michigan regional

Sonya Fulks, RN.
June 12, 2025

Page 38

office at times and I had conversations with him there.

Q. Do you remember any particular conversations?

A. Yes, but it wasn't about a patient.

Q. Okay. When is the last time that you recall having any interaction with Mr. Bergman?

A. When I still worked for Corizon.

Q. Have you ever spoken with somebody named William Bordering or Bodering?

A. No.

Q. What about Colleen Spencer?

A. No.

Q. Jeffrey Steve?

A. No.

Q. Sabrina Akin?

A. No.

Q. Hallin Pfeil?

A. What's the last name?

Q. It's P-F-E-I-L.

A. No.

Q. No? What about Dr. Maher Al Salam?

A. No.

Q. No? Ronald Drinkit?

A. Drinkit? Drinkert?

Q. Drinkert, sorry.

Page 39

A. Yes.

Q. Okay. And what was your interaction with him?

A. I had to contact him for a lab that was supposed to be drawn for a chemo patient that he did not draw or that he did not order.

Q. Was that your only interaction with him?

A. I've had multiple interactions with him about patients, but that was the one that stood out.

Q. Okay. What about a Robert Lacey?

A. Yes.

Q. What was your interaction with Robert Lacey?

A. Dr. Lacey was the lead physician a few years ago at Duane Waters. His role changed to State medical director acting for a short time during Wellpath, and I still work with him today with VitalCore.

Q. Was he employed by Corizon, to your knowledge?

A. Yes.

Q. And is it fair to say that any interactions you had with Dr. Lacey were relating to oncology or hematology patients?

A. Yes.

Q. Have you ever spoken with somebody named Whitney Tompkins?

A. No.

Q. Have you ever spoken to somebody named Timothy

Page 40

McKenna?

A. No.

Q. Have you ever spoken to somebody named Dr. Ralph Silverman?

A. No.

Q. Since you've been involved in this case, did you ever prepare a written summary of your proposed testimony?

A. No.

Q. Do you remember the date that you first got involved in this case?

A. No, I don't remember the date.

Q. Have you ever seen a written summary of your proposed testimony in this case?

A. No.

Q. Did you know that a written summary of your testimony has been prepared?

A. I don't believe so, no.

Q. I'm going to show you another document on your screen. And for the record this is Plaintiff Konchise Jackson's Expert Disclosures Pursuant to Fed R. Civ. P.26(a)(2), and we'll mark this as Exhibit 2 to the deposition.

          MARKED FOR IDENTIFICATION:
          EXHIBIT 2
          3:23 p.m.

Page 41

BY MR. MASIN:

Q. Ms. Fulks, have you ever seen this document before?

A. No.

Q. And just to make sure about that, this document on the last page is dated May 20th, '25. So you don't recall seeing a document like this prior to May 20th, 2025?

A. No.

Q. And so I take it then you haven't reviewed this document since then either, correct?

A. Correct.

Q. So if we'd go to this page of the document which is -- what page is this? Well, there's no page numbers. Anyway, if we go to the page of the document that has your name on it, it says Sonya Fulks, RN and there's an address and phone number. Is that information correct?

A. Yes.

Q. I'd like you to read the document. Are you able to see it?

A. Yes.

Q. Do you need it any bigger?

A. I think I can -- I think I can do with it.

Q. Okay. So I'm going to scroll down, you tell me when to keep scrolling, okay? And I'd like you to read the section about you.

Sonya Fulks, RN.
June 12, 2025

Page 42

A. Okay, go ahead and scroll.

Okay, go ahead.

Okay.

Go ahead.

Okay.

Okay.

All right.

Q. Okay. Having had a chance to read this for the first time, my first question is, do you know who wrote this?

A. No.

Q. Do you know where the information in this section came from?

A. Yes.

Q. Where did it come from?

A. It came from me.

Q. How is it that you communicated the information such that it ended up in this document?

A. Via phone call.

Q. Who were you speaking to?

A. I was speaking to both Attorney Cross and, I believe, his assistant. There was another person there. I believe it was the assistant that I had spoken to earlier.

Q. Do you remember what date that phone call took place

Page 43

on?

A. I do not remember the date, no. What's today? Maybe Tuesday? I don't know, I don't remember the date.

Q. Tuesday of what?

A. This week. But I will say that some of that information was given a year ago in my conversation in person with the assistant.

Q. Okay. So some of this information was given a year ago in respect to the Lyles case; is that right?

A. Yeah. Well, yes. So my original conversation with the assistant was about the Lyles case, and then I had a second conversation with just the assistant on the phone, and a lot of this information was given, and then when I had the conversation with Mr. Cross and his assistant, a lot of that was to go over everything that we had -- or I had already discussed with the assistant again with him.

Q. Okay. So let me ask you this question. In what you just read, can you tell me what in here is something that you did not talk about a year ago, that's newer than a year ago?

A. Can you scroll down through?

Q. Sure.

A. So the only thing that I added that wasn't from a year ago were the instances with -- oh, I don't see it.

Page 44

The punching instance I added a year ago because I knew about that. Most of this is from a year ago. That's definitely from a year ago about how do we know he's telling the truth.

The -- it's -- I'm pretty sure that the conversation about the man with the trach was from my second conversation with the assistant, but that was still a while ago.

The emergency room conversation, I believe, was the newest conversation, but all of this stuff, most of this stuff was discussed and then rediscussed with Mr. Cross later.

Q. Okay. So since you've been involved in the Jackson case, is there any information in this section that has been added to this discussion since you've been involved in the Jackson case?

A. So most of this was -- the second time I was contacted by the assistant was for the Jackson case, and so it was at that time that we talked about the ATPs, the man with the trach, the ER stuff, but a year ago I gave him quite an overview as well, and if I'm being completely honest, the two -- the two conversations blur together for me. But when he contacted me again when he was in this case, we discussed all of this stuff.

Page 45

Q. Do you agree with me that nothing in this discussion claims that you are an expert in colostomies, correct?

A. Correct.

Q. And nothing in this discussion says that you're intending to offer an opinion as to the standard of care for colostomies or colostomy reversals, correct?

A. Correct.

Q. And you would agree with me that there's nothing in this discussion in this document that refers or relates to Mr. Jackson himself, correct?

A. Correct.

Q. And, in fact, the document doesn't speak to colostomy or colostomy reversals at all, right?

A. Right.

Q. So does this discussion -- strike that.

If you testify in this case, does this document fairly summarize the subject matter of the testimony that you would provide?

A. I believe so, yes.

Q. And does the document fairly summarize the facts that you would testify to in this case?

A. Yes.

Q. And does this document fairly summarize all of the opinions that you would intend to provide in this case?

Sonya Fulks, RN.
June 12, 2025

Page 46

A.   Unless I'm asked something different, yes.

Q.   Have you ever read any of the depositions taken in this case?

A.   No.

Q.   Since May 20th, 2025, have you been asked to perform any work related to this case, other than anything you did to prepare for this deposition?

A.   No.

Q.   We can take a break if you want for five minutes or I can keep going.  I don't have -- well, I don't have that much longer to go, but if you want to take five minutes, now would be a good time.

A.   No, I think I'm good.

Q.   Keep going?  Okay.

A.   Yep.

            (Off the record at 3:35 p.m.)

            (Back on the record at 3:38 p.m.)

BY MR. MASIN:

Q.   Okay.  Ms. Fulks, welcome back.  Can you still hear me okay?

A.   Yes.

Q.   As a oncology case manager for Corizon, did you become aware of any statistics relating to Corizon's care of cancer patients?

A.   We had meetings that had statistical data and bar

Page 47

graphs that they would present to see, you know, how many -- I carry, I take care of monthly stats, so in the meetings I would present monthly stats of all the oncology prisoners in the state.

Q.   What kind of stats did you present?

A.   So I would present how many are on chemotherapy/radiation, how many are in active treatment, active surveillance, long surveillance, how many people were going to the chemotherapy clinic at Duane Waters versus the chemo clinics at the outside hospitals, what kind of chemos they were getting.  I tracked all of them by their facilities, their age, and their diagnosis.

Q.   Do you have any access to any of those records now?

A.   I have access to my current records, but I don't have access to any of the records from Corizon.

Q.   Do you know how many biopsies Corizon approved between 2016 and 2020?

A.   Not off the top of my head, no.

Q.   Do you know the number of radiation-related tests that Corizon approved between 2016 and 2020?

A.   No.

Q.   Are you aware of any statistics relating to the health of cancer patients in the MDOC between 2016 and 2020?

A.   The health --

Page 48

Q.   Yeah.

A.   -- of them?  I guess health is a broad term.  Do you mean their death rates or -- because I do keep track of all deaths as well.

Q.   Is that any information that you currently have?

A.   I have all the deaths, yes, I do have that information.

Q.   From 2016?

A.   I have it from 2018 -- no, actually, I actually might have it from 2016 on all the deaths that were cancer-related deaths.

Q.   Do you have any statistics relating to the outcome of care for cancer patients in the MDOC compared to facilities in other states?

A.   No.

Q.   In the document that we just looked at, you claim that there were certain cancer-related tests or treatment that were routinely delayed.  Are you basing that contention on any documents?

A.   I'm basing it on my spreadsheet that I keep.

Q.   What spreadsheet are you talking about?

A.   I have a oncology registry that I maintain and keep for -- that keeps track of all oncology/hematology inmates in the state, and in that registry each individual patient I have a record of when a 407 was

Page 49

placed to when the date of it actually occurred, and I have several, several patients that we would ask for a biopsy, and a year later I'm still fighting to get a biopsy.

Q.   Do you -- do you maintain those records from 2016 to 2020 now?

A.   I -- I -- I was grandfathered that, I was given that spreadsheet in 2018 when I started, but it looks like it goes back to January of 2016 total.

Q.   And have you ever provided that information to counsel?

A.   No.

Q.   You saw that there was a request for any documents that you relied on relating to any of the opinions that you intended to offer, and you have not provided that document to counsel, correct?

A.   Correct.  That's a HIPAA -- that is a HIPAA-protected document.  I don't even let the MDOC see that without permissions, and I wasn't aware that was a -- that was considered a document I relied on.

        I did ask you if you meant what I was looking at to do my job.

Q.   So is it your testimony that because it is a HIPAA-protected document that you would not be able to use that document at trial?

Page 50

A. It would have to be -- it would -- I don't know all the ins and outs of using a document that's HIPAA protected in trial, I will say that.

Q. Okay.  Did you --

A. Based on my understanding is a medical release from every inmate would have to be given.

Q. Did you maintain some sort of record or log of the types of cancer-related tests or treatment that you believed were not approved that should have been approved?

A. Not a separate log, no.  The information is in my spreadsheet probably, but, no, I don't have a separate log.

Q. Does the spreadsheet indicate your opinion as to whether the treatment should have been approved or not approved?

A. The spreadsheet indicates how many times I email to get something done or approved, but it does not state my opinion, no.

Q. Okay.  And have you provided that spreadsheet to counsel?  Ms. Fulks, can you hear me?  Ms. Fulks, can you hear me?  I think we lost her again.

Ms. Fulks, if you can hear us, we cannot hear you and your screen is frozen if you could maybe log back in.

Page 51

A. All right, I'm back, sorry.

Q. All right, there we go, okay.

MR. MASIN:  Ms. Pastor, can you please read back the last question?

(Record read.)

A. No, I have not.

BY MR. MASIN:

Q. Ms. Fulks, do you know how many requests there were in the MDOC for a colostomy reversal between 2016 and 2020?

A. No.

Q. That is not information that you kept, correct?

A. Correct.  Unless one of my patients needed a colostomy or a reversal, but, no, not just in general.

Q. Do you know how many requests for colostomy referral were approved for prisoners in the MDOC between 2016 and 2020?

A. No.

Q. Do you know how many requests for a colostomy reversal that Dr. Papendick proved in the MDOC between 2016 and 2020?

A. No.

Q. Are you aware of the justification for approving or not approving a colostomy reversal for any patient in the MDOC between 2016 and 2020?

Page 52

A. I am aware of a few that I saw.  I work with the UM, utilization management women that assisted Dr. Papendick, and I know that several stated not medically necessary.

Q. Do you know the names of those patients?

A. Not off the top of my head, no.

Q. And when you say "stated medically necessary," who stated that?

A. So in the charting system in COMS, when a 407 is ATP'd, if you scrolled scroll to the bottom under "comments," the utilization management will put in the reviewer's name and what -- why it was ATP'd, what the reviewer said, so it would say Dr. Papendick ATP'd, not medically necessary.

Q. Do you know how many patients had colostomy reversal ATP'd in the MDOC between 2016 and 2020?

A. No.

Q. Is there a particular reason why it is that you have any recollection as to colostomy reversals given the fact that you worked in oncology?

A. Yes.  I sit with the utilization management team, and I sit with them while they are on those calls, and they complained frequently, they still do actually, but they complained frequently when something wasn't done.

Page 53

Also, I would be looking in my patient's chart for various reasons, and if I had it down in my chart say, this person was going into general surgery because I keep track of that, and then I would look and it would be ATP'd, I would click it and scroll down to see why it was ATP'd before I took it off my spreadsheet.

Q. Did you have any patients that you were caring for in oncology that in your opinion needed a colostomy reversal?

A. Not off of the of my head I can't remember, no.

Q. And you don't recall the names of any of the patients that you're talking about?

A. No.  I would be able to look them up most likely, but, no, I cannot recall that at this time.

Q. Do you recall the dates that you had any conversations relating to colostomy reversals?

A. No.

Q. Did you have any discussions with any physicians relating to any colostomies or colostomy reversals that you believed were ATP'd?

A. No.

Q. Are you aware of the medical history of any of the patients who you believed were ATP'd for a colostomy reversal?

Sonya Fulks, RN.
June 12, 2025

Page 54

A. I would have that on my spreadsheet if they were one of mine. I would have their medical history.

Q. But sitting here today, you have no --

A. No, no, correct.

Q. I'm going to put this back up and get to the right part here.

In your -- in Exhibit 2 that we looked at, this summary, it refers to one instance relating to Dr. Papendick which says here, "Called her to question or request for cancer-related testing for an inmate with a reported cancer history asking how do we even know if it's true." Do you see that?

A. Yes.

Q. Do you recall the name of the patient?

A. No.

Q. Do you recall the date of this conversation?

A. I don't recall the exact date, no.

Q. What cancer-related testing was at issue?

A. The patient was a brand new admission into the MDOC, and he was needing a oncology consult because he stated that he had a history of cancer, and Dr. Papendick called me and said -- he called and he said he -- the patient, the inmate is stating that he has cancer, had cancer outside, but we don't know if that's true. And I said, well, I -- I think that we

Page 55

still need to do an oncology consult because if he did have cancer, it would be bad to not have him followed by an oncologist.

Q. Do you have any other information about this particular case --

A. No.

Q. -- other than what's stated here?

A. No.

Q. So do you know whether or not Dr. Papendick approved an oncology consult?

A. He did. After he spoke with me, he did approve it.

Q. I want to turn your attention to the last sentence here. You say -- strike that.

This document says, "She will testify that in her experience Corizon routinely denied or delayed necessary medical care based on financial considerations alone." Do you see that?

A. Yes.

Q. Did you, Ms. Fulks, ever deny or delay necessary medical care based on financial considerations?

A. Did I?

Q. Yeah.

A. No, it was not in my power to delay or deny.

Q. And did financial considerations ever come into play with any of the decisions that you made while you were

Page 56

working for Corizon?

A. No.

Q. And did Corizon train you that you should consider financial considerations when it came to any of the care that you were providing?

A. No, but I wasn't providing the care. I was overseeing the providers to make sure they were providing the care.

Q. And in overseeing the providers to make sure that they were providing the care, you as a Corizon employee were basing the -- the decisions that you were making on what you thought was in the best interest of the patient, correct?

A. Correct, and based on NCCN guidelines.

Q. You were not aware of any decision to approve or not approve a colostomy reversal based on cost, correct?

A. Correct.

Q. But do you know what the cost of a colostomy reversal surgery is?

A. No.

Q. Do you know what the cost associated with caring for a colostomy are?

A. No.

Q. If Mr. Jackson had had a colostomy reversal surgery while he was incarcerated, do you know if Corizon

Page 57

would have been responsible for any of the costs related to that surgery?

A. Yes.

Q. What do you know about that?

A. They would have been responsible for the cost of the surgery.

Q. And what do you base that opinion on?

A. My knowledge of how the entire contract worked. So --

Q. What is it -- what is it that you claim would have caused Corizon to have had to bear the cost of that surgery?

A. So I know that it costs around $6.5 million per month to provide for the entire State the necessary costs for all medical procedures, and I know that the MDOC only pays 3.5 million per month. So they absolutely would have been having to pay more than what they were receiving from the MDOC for any surgical procedures.

Q. Okay. I move to strike that as nonresponsive.

Do you have any idea why Dr. Papendick made any decisions relating to Mr. Jackson's care?

A. No.

Q. Now in your -- well, strike that.

In this statement that was submitted to us, is it fair to say that there are certain things that happened during your time working for Corizon that you

Page 58

were unhappy about?

A. Yes.

Q. Okay. And you mentioned a couple of times that you had conversations with Dr. Papendick, Dr. Bomber, Dr. Schmidt about times when you may have disagreed with the decision and hoped to have that decision changed, correct?

A. Correct.

Q. And sometimes the decision did get changed, right?

A. Right.

Q. Other than those conversations, did you ever file any sort of formal complaint within Corizon to complain about any of the situations that you've -- that have been identified to us in this document?

A. No, I wasn't aware of a formal complaint form or anything to file. I was only instructed to contact the state medical director.

Q. Okay. Did you ever file a written complaint with the state medical director?

A. Via email, yes.

Q. And when did you do that?

A. I filed one when we had an inmate -- let's see, this was in -- I want to say this was pre-COVID so around 2019. I could not get ahold of a single provider and the inmate was a suspected prostate cancer. It took

Page 59

me a year to get somebody to follow up with him, and I had to file an email -- multiple emails with the state medical director. She then admitted she forget and dropped the ball, and so I had that -- I had that on record because he did, when they finally got to him, he had stage 4.

Q. Which state medical director are you referring to?

A. Dr. Schmidt.

Q. And that incident that you're describing is not something that was part of this written disclosure, correct?

A. You mean the paperwork we just reviewed?

Q. The -- the incident that you just described --

A. Yes.

Q. -- that incident is not described in this written disclosure, correct?

A. Correct.

Q. During your training with Corizon, were you made aware that Corizon had a code of conduct and ethics policy that it expected all of its employees to follow?

A. Yes.

Q. And were you aware that a failure to report a code of conduct or ethical violation itself violated the code of ethics?

A. Yes.

Page 60

Q. Okay. Let's take five minutes. I need five minutes and then we'll finish up. Thank you. Off the record.

(Recess taken at 3:58 p.m.)

(On the record at 4:02 p.m.)

BY MR. MASIN:

Q. Ms. Fulks, are you familiar with the risks of colostomy reversal surgery?

A. A little.

Q. Do you know what the mortality or morbidity rate associated with colostomy reversal surgery is?

A. No.

Q. Do you have -- strike that.

Are you aware of any literature relating to the amount of time that patients who've had a Hartmann's procedure wait until they have a colostomy reversal if they do?

A. Am I -- can you repeat that?

Q. Sure. Are you aware of any literature relating to the amount of time that passes between the time that somebody has a Hartmann's procedure and the time that that procedure is reversed, if any?

A. I have not -- I have not read any literature on that, no.

Q. So, Ms. Fulks, we've gone over this May 20th disclosure and you've testified to several other

Page 61

things that were not in the disclosure today.

Are there any other opinions that you intend to offer in this case that we've not discussed today in your deposition?

A. I don't think so. I mean, I don't know what I'm going to be asked.

Q. But as you sit here today now, to the extent that you've been asked questions, you've seen this disclosure, you're not intending to offer any other opinions, correct?

A. Correct.

Q. Okay. Ms. Fulks, unless your counsel has any questions for you, I am through with my examination, and appreciate your time.

MR. CROSS: Thanks. I have a few questions.

EXAMINATION

BY MR. CROSS:

Q. Ms. Fulks, did Corizon deny medical care to prisoners for cost reasons?

MR. MASIN: Objection.

A. Yes.

BY MR. CROSS:

Q. And is that opinion based in part on your training and experience working as an oncology nurse for Corizon?

Sonya Fulks, RN.
June 12, 2025

Page 62

A.   Yes.

Q.   Can you give me an example of an instance you're aware of when that happened?

A.   Yes.  5-FU is a chemotherapy that requires a three-day inpatient stay, so Corizon -- we had many meetings with the oncologists at Henry Ford and Corizon reviewers because they would not approve the inpatient stay and wanted an alternative chemotherapy treatment instead of the 5-FU.

Q.   And was that because of the cost of the inpatient stay?

         MR. MASIN:  Object to form.

A.   The cost of the --

BY MR. CROSS:

Q.   I'm sorry, what was that?

         MR. MASIN:  I objected to your question.

         MR. CROSS:  What was the objection?

         MR. MASIN:  I -- I -- I don't need to state the basis for my objections, but I will if you want me to.

         Your question is completely irrelevant to this case.  Go ahead.

BY MR. CROSS:

Q.   Continue.

A.   I'm sorry, can you -- I'm sorry, I don't remember what

Page 63

exactly --

         MR. CROSS:  Could you read back the last question, please, ma'am?

         (Record read.)

         MR. MASIN:  Yeah, note my objection.

A.   Yes, it was stated that an inpatient stay was significantly higher than an outpatient chemo, and -- and they were asked if there was a cost-effective treatment that could be as effective.

BY MR. CROSS:

Q.   When Corizon was the MDOC's medical provider, what was the process for an MDOC inmate to access healthcare?

A.   They would kite the onsite provider to be seen, and then it would be up to the onsite provider to set up an appointment to see the inmate, unless, of course, it was an emergency.

Q.   Were there specialists who worked onsite or were they just general practitioners?

A.   General practitioners.

Q.   So what happens if a patient needs to see a specialist?

         MR. MASIN:  Object to form.

BY MR. CROSS:

Q.   Go ahead, you can answer.

A.   Okay.  So they would be seen by the general

Page 64

practitioner who would then, if they felt that this was a -- that they had a valid issue, they would put in a 407 to be reviewed by Corizon.

Q.   And what is a 407?

A.   A 407 is the form filed to -- it's a consult request, and it's -- it's saying we're requesting the inmate to have or see this specialty.

Q.   Who reviewed the requests?

         MR. MASIN:  Objection.

A.   Dr. Papendick, and there were two other reviewers as well that were Corizon employees.

BY MR. CROSS:

Q.   So no MDOC employees were reviewing the requests or were there MDOC employees?

         MR. MASIN:  Objection.

A.   To my knowledge, it was Corizon reviewers.

BY MR. CROSS:

Q.   To your knowledge, did the MDOC require Corizon to deny certain categories of care or were those Corizon's decisions?

         MR. MASIN:  Objection.  I'd like to note for the record this is now beyond the scope of the disclosure, but go ahead and --

A.   They were Corizon's decisions.  The only things I'm aware of that the MDOC had were things that would be

Page 65

considered elective or that would be considered experimenting on a prisoner such as we could never do on chemotherapies that were experimental chemotherapies or trials because that would be -- you know, that was a MDOC hard rule, but other than that, it was the Corizon reviewers.

BY MR. CROSS:

Q.   And what kind of result did the reviewers give the onsite physician?  What was --

         MR. MASIN:  Object to -- object to form.

A.   I'm sorry, can you say -- you said what were the --

BY MR. CROSS:

Q.   I'll rephrase that.  What output did the reviewers produce after they reviewed the request?

         MR. MASIN:  Object to form.

A.   They would put in a 409 if it was approved.  If not, they would -- they would do an ATP and they would put it in the -- in the 407 commentary why it was ATP'd.

BY MR. CROSS:

Q.   So did you and your colleagues use the term ATP as a verb like --

A.   Yes.

         MR. MASIN:  Object to form.

BY MR. CROSS:

Q.   And what does it mean to ATP a requested procedure?

Sonya Fulks, RN.
June 12, 2025

Page 66

MR. MASIN: Object to form.

A. It's denied.

BY MR. CROSS:

Q. If you looked at a patient's chart after requests had been ATP'd, would it say that it was denied in the chart?

A. No.

Q. Why not?

MR. MASIN: Object to form.

A. We're not to put denial in the charts for lit- -- because prisoners re litigious so we were to always say "alternative treatment plan."

BY MR. CROSS:

Q. And what kind of things did it say in the alternative treatment plan? What would the alternative treatment plan typically consist of?

MR. MASIN: Object to form.

A. They -- it would consist of -- they might say something along the lines if they were requesting a CT or a pulmonary consult, they might say ATP'd, please get a chest x-ray first.

Sometimes if it was a consult or like a follow-up that they didn't feel was really necessary, they would say ATP follow onsite, and then if it was a procedure that they didn't feel was necessary, they

Page 67

would say not medically necessary.

BY MR. CROSS:

Q. Are you familiar with contemporary standards of medical practice from your time working in a community hospital before you worked in the prison system?

MR. MASIN: Object to form.

A. Yes.

BY MR. CROSS:

Q. And in your opinion, do you believe that Corizon made healthcare available to prisoners consistent with contemporary standards of medical practice in the community?

MR. MASIN: Object to form.

A. No.

BY MR. CROSS:

Q. Could you answer that a little louder? I didn't get the that.

A. I'm sorry. No.

Q. And why do you believe that they didn't provide the same standard of care that was available in the community?

MR. MASIN: Object to form.

A. Because there were testings like a CT, a lung CT for a current smoker that was current or a former smoker, it was standard of care to get a lung CT, and those were

Page 68

always denied until -- they were always denied with Corizon. I didn't start seeing them getting approved until it became a -- some kind of a law that where they would to, they had no choice, they had to approve those, so the lung CTs started getting approved.

It would take -- I also saw that I would -- the lab -- trying to get labs drawn, anything like that, it -- it just didn't happen. They would say I just drew them two months ago, well, no we need orders. Again, this is a chemo patient. Or, you know, we had patients that were not diagnosed as early as they could have been because they weren't drawing standard PSAs for prostate cancers, and that's something that's in a -- that's in a general practitioner in a hospital would have drawn.

There's -- there's -- it's basically like running under water when I'm trying to get some of the care done for these -- for that's inmates.

BY MR. CROSS:

Q. What do you mean by that?

MR. MASIN: Object to form.

BY MR. CROSS:

Q. Why is it running underwater?

A. It feels like you're just swimming against a current all the time. There's something always working

Page 69

against you. If a contact a provider and say, hey, we got chemo coming up, I got to have C- -- you know, they want to argue about it. Then I have to fight them again and, you know, go above their heads sometimes.

In the beginning during Corizon especially it was bad. I'm not saying that because of Corizon, I think it was because I was somebody they didn't know and I was new in the role.

Nowadays it's not as hard because they see my name and they just do it, but it's -- it's a fight --

(Technical difficulties.)

Q. I'm sorry, you froze for a second. I missed the end of the question after "it's a fight."

A. Oh, I said it's a fight to get things done that should be automatic.

Q. Did you notice any difference in your ability to get care approved after Corizon was no longer the MDOC healthcare contractor?

MR. MASIN: Object to form.

A. Yes. When Wellpath came on, they started to approve 5-FU in the hospital. They approved the lung CT scans. I saw a big difference in the approvals going through. It was a lot easier to get PET scans and

Sonya Fulks, RN.
June 12, 2025

Page 70

things done.

BY MR. CROSS:

Q.   Mr. Masin asked you some questions earlier in the deposition about a list of documents that he wanted you to produce.

A.   Yes.

Q.   Did you receive an email from my office on June 3rd with an attachment containing that list of documents?

A.   Oh, probably.  I can check now, but I -- I get hundreds of emails for work so it's possible I missed it.

Q.   Do you remember if you responded to that email and attached your résumé?

A.   Oh, I did yes, I did attach my résumé, but I don't -- I opened that email at work and sent my résumé over, but to be honest, I don't know that I saw or opened the attachments.

        MR. CROSS:  Okay.  I think that's all I have for right now.

        MR. MASIN:  I just have a couple of follow-ups.

            RE-EXAMINATION

BY MR. MASIN:

Q.   Ms. Fulks, you've given some testimony just now that it's been your opinion that Corizon's care during your

Page 71

employment did not comply with community health standards based upon your experience in a community hospital at the University of Michigan; is that right?

A.   Yes.

Q.   Okay.  You were employed by Corizon for more than three years, right?

A.   Correct.

Q.   Did you ever write to anyone to tell them that Corizon was not complying with community health standards?

A.   I wrote within Corizon.

Q.   Did you ever write anything that said that Corizon was not complying with community health standards?

A.   I did not say that exact sentence, no.

Q.   Were all of the issues that you had issues about individual patients and the decisions that were being made with regard to those patients?

A.   I -- I -- all of the patients that I had issues with I escalated always and stated this is not standard of care.

Q.   Right.  But my question is a broader question than that.

A.   Okay.

Q.   Is it true that during your employment with Corizon for more than three years, you never once complained to anyone in writing that Corizon was not complying

Page 72

with community healthcare standards generally, right?

A.   Not generally, no.

Q.   And to the extent that you had issues with particular decisions that were being made, those decisions were with oncology patients that you were involved with, correct?

A.   Correct.

Q.   The -- to the extent that you're testifying about community health standards, is there some literature or book or textbook or something like that that someone would be able to look at for us to know what it is you mean by that term?

A.   You are -- there is a way to look up what gold standard of care is and what's expected in that, but it's individualized per specialty per situation, but, yeah, you can find that information.

Q.   But if I generally wanted to know what a community healthcare standard was, you don't -- you can't direct me to a particular book or piece of literature, right?

A.   No.  There's a definition of that, but, no, I don't know of a particular book that just asks that question.

Q.   Okay.  I don't have any other questions right now.

        MR. CROSS:  Okay.  I don't have anymore.

        COURT REPORTER:  Did you want to order the

Page 73

transcript, Adam?

        MR. MASIN:  Yes, I do.

        COURT REPORTER:  And Ian?

        MR. CROSS:  Yes, please.

        MR. MASIN:  I need electronic and I need it expedited.

        (The deposition was concluded at 4:21 p.m. Signature of the witness was not requested by counsel for the respective parties hereto.)

Sonya Fulks, RN.
June 12, 2025

Page 74

CERTIFICATE OF NOTARY

STATE OF MICHIGAN)

) SS

COUNTY OF MONROE )

I, LEISA PASTOR, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

LEISA PASTOR, CSR-3500, CRR,

Notary Public,

Monroe County, Michigan

My Commission expires: 9/7/27

Sonya Fulks, RN.
June 12, 2025

| **$** | **2019** | **4** | **A** |
|---|---|---|---|
| | 58:24 | | |

**$**

**$6.5**
57:12

**1**

**1**
10:2,4
**10**
13:6
**12**
4:2
**13**
14:3
**18**
14:12
**19**
14:19

**2**

**2**
11:2 40:21,
24 54:7
**20**
15:13
**2008**
15:21,24
18:18
**2009**
18:14
**2016**
47:18,21,24
48:8,10
49:5,9 51:9,
16,20,25
52:16
**2017**
18:20
**2018**
18:11,22
19:7,8 48:9
49:8

**2019**
58:24
**2020**
47:18,21,24
49:6 51:10,
17,21,25
52:16
**2021**
19:21 35:8
**2024**
35:18
**2025**
4:2 41:6
46:5
**20th**
41:5,6 46:5
60:24
**25**
41:5
**28th**
19:21
**2:31**
4:3
**2:32**
5:18,19
**2:37**
9:4
**2:39**
10:5

**3**

**3.5**
57:15
**3:23**
40:25
**3:35**
46:16
**3:38**
46:17
**3:58**
60:3
**3rd**
70:7

**4**

**4**
11:18 59:6
**407**
48:25 52:9
64:3,4,5
65:18
**407s**
30:14
**409**
65:16
**48269**
4:18
**4:02**
60:4
**4:21**
73:7

**5**

**5**
11:24
**5-FU**
62:4,9 69:23

**6**

**6**
12:9

**7**

**7**
12:18

**8**

**8**
12:25
**8635**
4:17

**A**

**ability**
69:18
**able**
9:17 41:18
49:24 53:14
72:11
**above**
32:8,16 69:4
**abreast**
36:7
**absolutely**
57:15
**accept**
17:16
**accepted**
16:1 17:6,
19,20
**access**
47:14,15,16
63:12
**act**
33:9
**acted**
20:3
**acting**
17:20 18:2,5
39:14
**action**
12:14 14:4,
8,10
**active**
47:7,8
**actual**
15:7 18:25
**Adam**
4:12 73:1
**added**
43:24 44:1,
15
**address**
4:16 41:15
**administer**
20:2

Sonya Fulks, RN.
June 12, 2025

administered
 16:22
admission
 54:19
admissions
 17:17
admitted
 59:3
advanced
 22:5
advertise
 28:5
advice
 12:20
advocating
 31:9
age
 47:12
ago
 8:14,15,17
 26:20 27:1
 39:12 43:6,
 9,20,21,25
 44:1,2,3,8,
 20 68:9
agree
 45:1,8
agreeing
 36:2
agrees
 24:18,22
ahead
 42:1,2,4
 62:22 63:24
 64:23
ahold
 58:24
aids
 13:9
Akin
 38:15
allegedly
 14:13
allowed
 36:4
allowing
 36:13

allows
 36:17
alternative
 62:8 66:12,
 14,15
amenable
 32:13
amount
 60:14,19
Ann
 16:19
answer
 5:15 6:9,16
 7:21 63:24
 67:16
anticipate
 6:13 13:10
anybody
 6:20 20:24
 21:25 23:11
 26:24
anymore
 72:24
anyone
 36:3 71:8,25
Apart
 33:22
appeal
 31:18,19
 34:17
appeals
 34:21 35:1
appointment
 63:15
appreciate
 61:14
approvals
 69:24
approve
 33:18,25
 55:11 56:15,
 16 62:7 68:4
 69:22
approved
 47:17,21
 50:9,10,15,
 16,18 51:16

 55:9 65:16
 68:2,5
 69:19,23
approving
 51:23,24
approximately
 26:20 31:21
Arbor
 16:20
argue
 69:3
around
 57:12 58:23
asked
 9:9 46:1,5
 61:6,8 63:8
 70:3
asking
 54:11
asks
 11:2,11,18,
 24 12:9,18,
 25 13:6
 14:3,12,19
 15:13 72:21
assistant
 8:14,17
 26:23 27:1
 42:22,23
 43:7,11,12,
 15,17 44:7,
 18
assisted
 52:2
associated
 56:21 60:10
assume
 6:9
ATP
 65:17,20,25
 66:24
ATP'D
 52:10,12,13,
 16 53:5,6,
 21,24 65:18
 66:5,20

ATPS
 44:19
attach
 70:14
attached
 70:13
attachment
 70:8
attachments
 70:17
attended
 15:20
attention
 10:9 55:12
attorney
 4:13 7:23,25
 42:21
authored
 15:14
authority
 32:6
automatic
 69:17
available
 67:10,20
aware
 10:16 34:16,
 24 35:7
 46:23 47:23
 49:19 51:23
 52:1 53:23
 56:15 58:15
 59:18,22
 60:13,18
 62:2 64:25

———————
        B
———————

back
 9:5 46:17,19
 49:9 50:25
 51:1,4 54:5
 63:2
background
 15:19
bad
 55:2 69:7

Sonya Fulks, RN.
June 12, 2025

**ball**
59:4
**bar**
46:25
**base**
25:2,3 57:7
**based**
32:13 50:5
55:16,20
56:14,16
61:24 71:2
**basic**
5:4
**basically**
68:16
**basing**
48:18,20
56:11
**basis**
23:8 62:19
**bear**
57:10
**beginning**
8:3 69:6
**behind**
21:25
**beings**
23:22
**belief**
23:8
**believe**
8:1 11:21
16:8 23:5,23
24:20 33:10
40:17 42:21,
23 44:9
45:19 67:9,
19
**believed**
50:9 53:21,
24
**Benn**
4:17
**Bergman**
37:16,17,18,
20,21,25
38:6

**best**
5:12,14 6:5
37:3,7 56:12
**better**
25:19
**big**
69:24
**bigger**
41:21
**billing**
13:19
**biopsies**
47:17
**biopsy**
49:3,4
**blood**
16:23
**blur**
44:23
**Bodering**
38:9
**body**
25:22
**Bomber**
21:9 32:18,
20 58:4
**book**
24:3,9,11
72:10,19,21
**books**
13:8 24:2
**Bordering**
38:9
**bottom**
52:10
**Bowman**
4:13
**brand**
54:19
**break**
6:12,14 46:9
**bring**
9:11
**broad**
48:2
**broader**

71:20
**Brooke**
4:13
**brought**
7:5
**bullet**
11:11

---

**C**

**C-**
69:2
**call**
6:23 17:9
42:19,25
**called**
4:6 19:10,13
23:21 54:9,
22
**calls**
31:16 52:22
**camera**
9:7
**cancer**
46:24 47:24
48:13 54:11,
21,24 55:2
58:25
**cancer-**
48:10
**cancer-related**
48:17 50:8
54:10,18
**cancers**
68:13
**capacity**
28:13,16
**caption**
11:3
**captioned**
11:5 13:11
**care**
16:22 22:1,
19,22 23:6,
10,12,16,19,
22,23,24,25

24:5,8,17,
19,20,22,24
25:9,11,13
28:14 31:7
33:7 34:1
45:6 46:23
47:2 48:13
55:16,20
56:5,6,8,10
57:20 61:19
64:19 67:20,
25 68:18
69:19 70:25
71:19 72:14
**career**
15:6
**caregivers**
33:15
**caring**
53:8 56:21
**carry**
47:2
**case**
8:21 11:3,4,
9,25 12:1,20
13:2,11,17,
20 14:1,21
15:1,11,15
19:25 26:20,
22,25 27:3
28:2,8 29:1,
16 33:2 36:2
40:6,10,13
43:9,11
44:14,16,18,
24 45:16,21,
25 46:3,6,22
55:5 61:3
62:22
**cases**
11:19 30:15
36:10
**catch**
21:24
**categories**
64:19
**caused**
57:10

Sonya Fulks, RN.
June 12, 2025

**Center**
  17:7
**CEO**
  36:8
**certain**
  25:7,8 48:17
  57:24 64:19
**certificate**
  27:6
**CEUS**
  27:8,9
**chance**
  42:8
**change**
  20:11 32:6,
  10,20
**changed**
  39:13 58:7,9
**changing**
  32:13
**chapter**
  27:18
**charging**
  13:22
**chart**
  53:2,3 66:4,
  6
**charting**
  52:9
**charts**
  8:18 13:7
  66:10
**check**
  36:3,21 70:9
**checked**
  36:5
**chemo**
  20:2 21:16,
  19 39:4
  47:10 63:7
  68:10 69:2
**chemos**
  47:11
**chemotherapie
s**
  65:3,4

**chemotherapy**
  16:23 20:2
  47:9 62:4,8
**chemotherapy/
radiation**
  47:7
**chest**
  66:21
**choice**
  68:4
**CHS**
  9:23 19:10
**Civ**
  40:20
**claim**
  14:14 48:16
  57:9
**claims**
  14:14 45:2
**click**
  53:5
**client**
  8:18,23,25
  9:8
**clinic**
  20:3 21:16,
  19 47:9
**clinical**
  21:7,11,12
**clinics**
  47:10
**close**
  33:9
**coauthored**
  15:14
**code**
  59:19,22,23
**colleagues**
  65:20
**Colleen**
  38:11
**College**
  15:20,22
  16:10
**colostomies**
  22:12,20
  23:1,3,24

  24:1,4,8,14,
  21 25:3,14,
  17 27:4,7,16
  28:3 45:2,6
  53:20
**colostomy**
  22:13,16,20,
  21,22,23
  23:6 24:19,
  25 25:5,12,
  13,14,23,25
  26:2,4,7,10,
  13 27:9,11,
  13 45:6,12,
  13 51:9,13,
  15,19,24
  52:15,19
  53:9,17,20,
  24 56:16,18,
  22,24 60:7,
  10,15
**come**
  37:25 42:15
  55:24
**commentary**
  65:18
**comments**
  52:11
**committee**
  34:12
**communicated**
  42:17
**communication
s**
  12:11,20
**community**
  33:14 67:4,
  12,21 71:1,
  2,9,12 72:1,
  9,17
**company**
  35:11
**compared**
  48:13
**compensation**
  13:25

**complain**
  58:12
**complained**
  52:23,24
  71:24
**complaint**
  58:12,15,18
**complete**
  11:2
**completely**
  44:22 62:21
**complex**
  18:8
**comply**
  71:1
**complying**
  71:9,12,25
**computer**
  6:22 10:23
**COMS**
  52:9
**concern**
  32:12
**concluded**
  73:7
**conclusions**
  12:19
**condition**
  28:21 29:2,
  9,21
**conduct**
  59:19,23
**conducted**
  14:4,7
**conference**
  27:21
**connection**
  13:10
**consider**
  11:8 56:3
**consideration
s**
  55:17,20,24
  56:4
**considered**
  33:12 49:20
  65:1

Sonya Fulks, RN.
June 12, 2025

consist
  66:16,18
consistent
  67:10
consult
  24:4 54:20
  55:1,10 64:5
  66:20,22
consultant
  11:16 12:13
consulting
  11:12
contact
  30:23,24
  31:1,17 33:9
  39:3 58:16
  69:1
contacted
  8:19 27:1,2
  44:17,23
contemporary
  67:3,11
contention
  48:19
Continue
  62:24
contract
  19:17 31:6
  35:12,17,21
  57:8
contracted
  31:5
contractor
  69:20
conversation
  32:9 43:6,
  10,12,14
  44:6,7,9,10
  54:16
conversations
  12:11 38:1,3
  44:22 53:16
  58:4,11
Core
  4:22
Corizon
  11:5 18:23,

25 19:2,5,8,
15,24 20:7
21:14 22:6
28:16 29:8,
11,12,16,19,
23 30:20
31:21 33:5
34:4 35:8
37:22 38:7
39:16 46:22
47:16,17,21
55:15 56:1,
3,10,25
57:10,25
58:12 59:18,
19 61:19,25
62:5,6 63:11
64:3,11,16,
18 65:6 67:9
68:2 69:6,7,
19 71:5,8,
10,11,23,25
Corizon's
  46:23 64:20,
  24 70:25
correct
  8:21,22
  11:22,23
  16:13,14,25
  18:12 22:7,8
  29:3,10,22
  30:2,9,10,17
  32:1,4,5,14,
  15 34:22,23
  35:14 36:1
  41:9,10,16
  45:2,3,6,7,
  10,11 49:16,
  17 51:12,13
  54:4 56:13,
  14,16,17
  58:7,8
  59:11,16,17
  61:10,11
  71:7 72:6,7
Corrections
  17:7

correctly
  26:18
correspondenc
e
  33:14
cost
  56:16,18,21
  57:5,10
  61:20 62:10,
  13
cost-
effective
  63:8
costs
  57:1,12,13
counsel
  49:11,16
  50:21 61:12
  73:9
count
  7:7
couple
  8:13 9:15
  31:15 32:9
  58:3 70:20
course
  8:5 31:24
  63:15
coursework
  27:7
court
  5:8 27:24
  36:10 72:25
  73:3
covered
  11:18
cracks
  21:25
criteria
  12:16 25:7,
  9,10
Cross
  8:1,4,8,12,
  13 26:19,23
  42:21 43:14
  44:12 61:15,
  18,23 62:14,

17,23 63:2,
10,23 64:12,
17 65:7,12,
19,24 66:3,
13 67:2,8,15
68:19,22
70:2,18
72:24 73:4
Cross's
  8:17
CT
  66:19 67:23,
  25 69:23
CTS
  68:5
current
  4:21 10:21
  47:15 67:24
  68:24
cut
  7:21
CV
  10:21

_____

        D
_____

daily
  15:6
data
  13:7 14:3
  46:25
date
  19:4,6,19
  40:9,11
  42:25 43:2,3
  49:1 54:16,
  17
dated
  41:5
dates
  53:16
day
  19:15,17
days
  8:13
deal
  17:17

Sonya Fulks, RN.
June 12, 2025

**dealt**
16:24
**death**
48:3
**deaths**
48:4,6,10,11
**deciding**
33:24
**decision**
30:24 32:10,
12,13,20,22,
23 33:2,17
34:15,17
56:15 58:6,9
**decisions**
31:2 32:7
55:25 56:11
57:20 64:20,
24 71:15
72:4
**defendant**
7:5,10 9:23
**definitely**
44:3
**definition**
72:20
**degree**
15:21,24
16:3,6,7,8
**degrees**
16:4
**delay**
55:19,23
**delayed**
48:18 55:15
**demonstrative**
13:9
**denial**
66:10
**denied**
31:12,13,19
55:15 66:2,5
68:1
**deny**
55:19,23
61:19 64:19

**Department**
17:6
**deponent**
12:12
**deposition**
4:14 5:2,5
7:16,18 8:6,
9 9:14,24
10:18 11:20
13:10 40:22
46:7 61:4
70:4 73:7
**depositions**
5:23 46:2
**describe**
15:19
**described**
13:14 59:13,
15
**describing**
59:9
**description**
12:7,23 13:4
14:17,23
15:17
**diagnosed**
26:6,9 28:20
68:11
**diagnosis**
47:13
**diagrams**
12:10
**difference**
69:18,24
**different**
46:1
**difficulties**
9:3 69:13
**direct**
10:9 21:4
23:12 72:18
**directly**
21:3,5 31:20
33:3 36:11
**director**
21:6 32:8,17
39:14 58:17,

19 59:3,7
**disagreed**
30:23 58:5
**disclosure**
59:10,16
60:25 61:1,9
64:23
**Disclosures**
40:20
**discuss**
24:4
**discussed**
43:16 44:11,
24 61:3
**discussion**
44:15 45:1,
4,9,15
**discussions**
53:19
**divorces**
7:7
**doctor**
22:7 24:6
**doctors**
25:4,6
**document**
9:20,22
10:7,10
40:18 41:2,
4,6,9,11,13,
18 42:18
45:9,12,17,
20,23 48:16
49:16,18,20,
24,25 50:2
55:14 58:14
**documentation**
14:3
**documents**
9:11,12,16
10:17 11:24
12:1,7,16,
18,23,25
13:4 14:12,
17,19,23,25
15:5,7,9,17
29:4,12,16

48:19 49:13
70:4,8
**draw**
39:4
**drawing**
68:12
**drawings**
13:7
**drawn**
39:4 68:7,15
**drew**
68:9
**Drinkert**
38:24,25
**Drinkit**
38:23,24
**dropped**
59:4
**Duane**
17:7 39:13
47:10
**Duces**
9:23
**duly**
4:7

---

E

**earlier**
26:16 42:24
70:3
**early**
68:11
**easier**
69:25
**easy**
24:16
**educational**
15:19
**effective**
63:9
**eight**
18:4,6,15
**either**
41:9

Sonya Fulks, RN.
June 12, 2025

elective
 65:1
electronic
 73:5
email
 11:1 31:12,
 16 50:17
 58:20 59:2
 70:7,12,15
emailed
 31:14,22
 33:11
emails
 59:2 70:10
emergency
 44:9 63:16
employed
 4:19 22:6
 39:16 71:5
employee
 28:16 56:10
employees
 36:14,18
 59:20 64:11,
 13,14
employer
 4:21 18:25
employment
 71:1,23
end
 18:10 19:6
 69:14
ended
 18:11 19:17
 21:9 42:18
entire
 20:6 30:20
 57:8,13
entitled
 9:22
entity
 13:1 19:10,
 13 36:23
ER
 44:20
Erina
 37:4

escalated
 71:18
ethical
 59:23
ethics
 59:19,24
events
 36:18
everybody
 25:7
evidence
 12:11,19
exact
 19:6 54:17
 71:13
exactly
 63:1
examination
 4:10 61:13,
 17
examined
 4:9
exchanged
 12:25 34:14
exchanges
 12:12
exemplars
 13:7
Exhibit
 10:2,4
 40:21,24
 54:7
exhibits
 13:9
existence
 24:22
expected
 7:20,24
 59:20 72:14
expedited
 73:6
experience
 22:19,25
 25:3 55:15
 61:25 71:2
experimental
 65:3

experimenting
 65:2
expert
 12:13 27:25
 28:3,5 36:14
 40:20 45:2
expressed
 32:11
extensive
 34:13
extent
 30:3,8 33:16
 61:7 72:3,8

_____

F
_____

facilities
 47:12 48:14
fact
 34:4 45:12
 52:20
facts
 13:2 34:24
 45:20
failure
 59:22
fair
 6:10 21:3,17
 28:25 29:7,
 20 39:18
 57:24
fairly
 45:17,20,23
falling
 21:25
familiar
 34:4 60:6
 67:3
family
 18:9
fasciitis
 25:17
fecal
 25:21
Fed
 40:20

feel
 66:23,25
feels
 68:24
felt
 34:11 64:1
field
 28:6
fight
 69:3,12,15,
 16
fighting
 49:3
file
 11:2,9
 58:11,16,18
 59:2
filed
 34:16 58:22
 64:5
finally
 59:5
financial
 55:16,20,24
 56:4
find
 24:16 72:16
findings
 12:19
fine
 7:9
finish
 5:12,14 60:2
first
 4:7 5:6 6:16
 7:21 8:11,
 13,14 17:13,
 14 18:24
 19:2 26:17,
 19,24 35:4
 36:5,6 40:9
 42:8,9 66:21
fit
 14:17
five
 11:13,16,19
 46:9,11 60:1

Sonya Fulks, RN.
June 12, 2025

floor
  16:17 17:15,
  16,22 18:14
follow
  59:1,20
  66:24
follow-up
  66:23
follow-ups
  70:21
followed
  31:11 55:2
follows
  4:9
Ford
  62:6
forget
  59:3
form
  58:15 62:12
  63:22 64:5
  65:10,15,23
  66:1,9,17
  67:6,13,22
  68:21 69:21
formal
  58:12,15
forum
  27:21
four
  17:14,19,25
  18:1,14
freezes
  5:25
frequently
  52:23,24
front
  9:12 33:19
froze
  5:17 7:12
  69:14
frozen
  50:24
Fulks
  4:5,17 5:16
  7:12 9:24
  41:2,14

  46:19 50:21,
  23 51:8
  55:19 60:6,
  24 61:12,19
  70:24
full
  4:15 36:24

---

### G

G-I-L-L
  20:17,18
gave
  44:21
general
  17:24 25:14
  51:14 53:3
  63:18,19,25
  68:14
generally
  72:1,2,17
getting
  22:1 47:11
  68:2,5
GI
  24:3 27:9
Gill
  20:15,17
  21:2
Gill's
  20:20
give
  17:16 62:2
  65:8
given
  11:19,21
  43:6,8,13
  49:7 50:6
  52:19 70:24
goes
  10:11 49:9
going
  5:4,13 6:9
  9:15,17 10:9
  13:22 37:6
  40:18 41:23
  46:10,14

  47:9 53:3
  54:5 61:5
  69:24
gold
  23:21 72:13
good
  4:12 23:23
  46:12,13
graduate
  16:7,8
graduated
  15:21 16:12
grandfathered
  49:7
graphs
  47:1
grasp
  23:23
grievance
  34:5,8,12,
  16,21,25
  35:6
grievances
  34:21
grieve
  34:11
ground
  5:5
guess
  48:2
guideline
  31:11
guidelines
  56:14

---

### H

Hallin
  38:17
hands
  34:13
happen
  5:22 68:8
happened
  57:25 62:3

hard
  65:5 69:10
Hartmann's
  60:15,20
head
  26:14 32:8,
  16 47:19
  52:6 53:11
heads
  69:4
health
  4:22 11:5
  17:7 18:2,6,
  15 36:25
  47:23,25
  48:2 71:1,9,
  12 72:9
healthcare
  8:18 18:7
  30:4 34:5
  63:12 67:10
  69:20 72:1,
  18
hear
  5:16,24
  46:19 50:21,
  22,23,24
held
  36:8
help
  36:10
hematology
  16:16 20:1
  31:8 32:2
  39:19
Henry
  62:6
hereto
  73:10
hey
  36:11 69:1
high
  16:9
higher
  63:7
HIPAA
  49:17 50:2

Sonya Fulks, RN.
June 12, 2025

HIPAA-
PROTECTED
  49:17,24
history
  18:12 53:23
  54:2,11,21
hold
  16:3 18:3
home
  6:19
honest
  44:22 70:16
hoped
  58:6
hoping
  9:16
hospital
  16:2,18,19
  17:3 18:13
  25:5 67:5
  68:15 69:23
  71:3
hospitals
  17:17 47:11
house
  17:20
huge
  31:9
human
  23:22
hundreds
  70:10

I

Ian
  73:3
idea
  26:12 57:19
IDENTIFICATIO
N
  10:3 40:23
identified
  58:14
important
  5:9

in-house
  17:24
in-person
  4:23
Inc.'s
  9:23
incarcerated
  56:25
incident
  59:9,13,15
incidents
  14:13
includes
  12:3
including
  12:1
indicate
  50:14
indicates
  50:17
individual
  48:25 71:15
individualize
d
  72:15
infections
  25:16
information
  12:12 33:16,
  19 41:15
  42:12,17
  43:6,8,13
  44:14 48:5,7
  49:10 50:11
  51:12 55:4
  72:16
inmate
  17:18 34:11
  50:6 54:10,
  23 58:22,25
  63:12,15
  64:6
inmates
  20:1 33:15
  48:24 68:18
inmates'
  18:9

inpatient
  20:4 62:5,7,
  10 63:6
ins
  50:2
instance
  44:1 54:8
  62:2
instances
  43:25
institution
  16:9
instructed
  58:16
intend
  14:20 15:1,
  14 22:15,18
  45:24 61:3
intended
  49:15
intending
  28:25 45:5
  61:9
interact
  21:23
interaction
  28:17 37:23
  38:6 39:2,6,
  11
interactions
  33:22 39:7,
  18
interest
  56:12
intestines
  25:20
involved
  29:15 36:10
  40:6,9
  44:13,16
  72:5
irrelevant
  62:21
irritation
  25:16
issue
  5:22 6:2

  54:18 64:2
issues
  7:9 13:2
  27:22 71:14,
  17 72:3
IV
  17:16

J

Jackson
  11:5 12:1
  15:11,20,22,
  23 16:10
  17:8 26:25
  27:3 28:9,
  11,14,17,20
  29:5,13,17,
  25 30:3 35:5
  44:13,16,18
  45:10 56:24
Jackson's
  28:23 29:1,
  9,21 34:25
  40:20 57:20
January
  49:9
Jean
  4:17
Jeffrey
  38:13
job
  4:23 15:8
  16:21 31:1
  49:22
John
  37:14
joined
  17:13
journal
  24:12,13,18,
  22
journals
  24:7,16
June
  4:2 70:7

Sonya Fulks, RN.
June 12, 2025

justification
  51:23

**K**

Kansakar
  37:4
keep
  36:7 41:24
  46:10,14
  48:3,20,22
  53:4
Keith
  30:11
kept
  51:12
kind
  13:9 37:23
  47:5,11 65:8
  66:14 68:3
kite
  63:13
knew
  31:11 44:2
know
  5:13 6:1,7
  9:20 30:11,
  13 31:24
  33:11 34:14
  35:5 36:9,
  11,13,17,20,
  24 37:10
  40:15 42:9,
  12 43:3 44:3
  47:1,17,20
  50:1 51:8,
  15,19 52:3,
  5,15 54:12,
  24 55:9
  56:18,21,25
  57:4,12,14
  60:9 61:5
  65:5 68:11
  69:2,4,8
  70:16 72:11,
  17,21

knowledge
  34:13 37:3,8
  39:16 57:8
  64:16,18
known
  23:22
Konchise
  40:19

**L**

lab
  39:3 68:7
labs
  21:24 68:7
Lacey
  39:9,11,12,
  19
Lansing
  5:1
law
  27:24 68:3
lawsuit
  7:2,5,6,11
  27:25 36:4,
  15
lead
  39:12
left
  25:17 35:8,
  19
liaison
  18:8 20:3
  33:9
likewise
  5:14
limited
  12:3
lines
  66:19
list
  37:6 70:4,8
listing
  11:11,18
lit-
  66:10

literature
  15:8,13
  27:13,16
  60:13,18,22
  72:9,19
litigation
  11:12,15,16
litigious
  66:11
little
  5:21 60:8
  67:16
LLC
  37:1
located
  4:25
log
  50:7,11,13,
  25
long
  6:13 17:2
  18:3 30:19
  35:16 47:8
longer
  46:11 69:19
look
  10:10,16
  23:25 24:1,
  7,13 53:4,14
  72:11,13
looked
  48:16 54:7
  66:4
looking
  49:22 53:1
looks
  49:8
lost
  50:22
lot
  22:19 31:16
  43:13,15
  69:25
lots
  22:20
louder
  67:16

lung
  67:23,25
  68:5 69:23
Lyle's
  26:22
Lyles
  9:10 43:9,11

**M**

M-A-S-O-N
  20:18
made
  30:3,9,24
  32:12,20,23
  55:25 57:19
  59:18 67:9
  71:16 72:4
Maher
  38:21
main
  16:19 21:4
maintain
  48:22 49:5
  50:7
majority
  21:22
make
  31:6 33:17
  41:4 56:7,9
making
  22:1 56:11
man
  44:6,20
manage
  18:7 19:25
management
  52:2,11,21
manager
  18:23 46:22
marital
  7:9
mark
  10:2 40:21
MARKED
  10:3 40:23

Sonya Fulks, RN.
June 12, 2025

**Masin**
  4:11,12 5:20
  9:6 10:6
  41:1 46:18
  51:3,7 60:5
  61:21 62:12,
  16,18 63:5,
  22 64:9,15,
  21 65:10,15,
  23 66:1,9,17
  67:6,13,22
  68:21 69:21
  70:3,20,23
  73:2,5
**Mason**
  20:15,16,20
**materials**
  13:14
**matter**
  25:21 45:17
**matters**
  11:12
**Mckenna**
  40:1
**MDOC**
  17:10,12
  20:4 23:4
  29:4,9 31:6
  33:3,8 34:1,
  3,4,17,18,21
  35:12,21,25
  36:17,19
  47:24 48:13
  49:18 51:9,
  16,20,25
  52:16 54:19
  57:14,17
  63:12 64:13,
  14,18,25
  65:5 69:19
**MDOC's**
  35:5 63:11
**mean**
  7:4 21:21
  30:16 33:11
  48:3 59:12
  61:5 65:25
  68:20 72:12

**meaning**
  11:25
**meant**
  49:21
**med-surg**
  16:23 23:11
**medical**
  21:5,6 22:7,
  9 23:20,22
  24:2,3,6,13,
  16,18 25:4,8
  27:18 28:18,
  21,23 29:2,
  9,21 32:8,17
  39:13 50:5
  53:23 54:2
  55:16,20
  57:14 58:17,
  19 59:3,7
  61:19 63:11
  67:4,11
**medical-**
**related**
  27:22
**medical/**
**surgical**
  17:18
**medically**
  52:4,7,14
  67:1
**medications**
  17:16
**medicine**
  17:24
**meet**
  12:7,16,23
  14:23 15:17
  25:9,10
**meeting**
  13:4 31:7
  36:8
**meetings**
  46:25 47:3
  62:5
**meets**
  25:7

**members**
  18:9
**memoranda**
  12:9
**mentioned**
  58:3
**messages**
  12:10
**met**
  8:11,13 28:8
  34:12
**Michigan**
  4:1,17 8:23
  9:1 15:23
  16:2,13,19
  17:2,6,8
  18:13,18
  19:18 20:1,
  23 23:2,17
  37:22,25
  71:3
**million**
  57:12,15
**mine**
  54:2
**minutes**
  46:9,12 60:1
**missed**
  35:4 69:14
  70:10
**misspeak**
  24:15
**misspoke**
  18:17
**models**
  13:7
**month**
  31:15 57:12,
  15
**monthly**
  47:2,3
**months**
  17:14,19,25
  18:1,4,6,14,
  15 68:9
**morbidity**
  60:9

**morning**
  4:12
**mortality**
  60:9
**move**
  57:18
**multiple**
  39:7 59:2

---

**N**

---

**name**
  4:12,15 7:25
  8:1,18 9:8,
  10 20:14
  24:9 36:23,
  24 38:18
  41:14 52:12
  54:14 69:11
**named**
  30:11 37:4
  38:8 39:22,
  25 40:3
**names**
  52:5 53:12
**national**
  23:19
**nationally**
  23:21
**nature**
  30:21
**NCCN**
  31:11 56:14
**necessary**
  52:4,7,14
  55:16,19
  57:13 66:23,
  25 67:1
**necrotizing**
  25:16
**need**
  6:12,14
  22:16 25:18
  27:11 41:21
  55:1 60:1
  62:18 68:9
  73:5

Sonya Fulks, RN.
June 12, 2025

**needed**
  21:24 22:2
  31:11,18
  36:10 51:13
  53:9
**needing**
  26:6,9 54:20
**needs**
  17:18 21:7,
  11,12 28:18
  34:11 63:20
**never**
  65:2 71:24
**newer**
  43:20
**newest**
  44:10
**nine**
  17:4 18:18
**nonresponsive**
  57:18
**nonretained**
  36:14
**note**
  63:5 64:21
**notes**
  12:9
**notice**
  9:23 69:18
**Nowadays**
  69:10
**number**
  41:15 47:20
**numbers**
  41:12
**nurse**
  16:16 21:18
  23:10 27:6
  28:13 31:8
  61:25
**nurses**
  22:4
**nursing**
  15:20,24
  16:3,6 31:10

---

**O**

---

**object**
  62:12 63:22
  65:10,15,23
  66:1,9,17
  67:6,13,22
  68:21 69:21
**objected**
  62:16
**objection**
  61:21 62:17
  63:5 64:9,
  15,21
**objections**
  62:19
**occasions**
  31:18
**occur**
  31:14
**occurred**
  36:18 49:1
**off-site**
  33:18
**offer**
  14:21 15:1
  22:15,18
  28:25 45:5
  49:15 61:3,9
**office**
  4:25 6:19
  20:23 38:1
  70:7
**okay**
  5:2,4,10,11,
  15,21 6:2,3,
  12,16,17,20,
  22,25 7:14,
  21 8:2,6,7,
  11,16,20,23
  9:20,21,22
  10:20,23
  11:2,11,24
  15:4,13
  16:3,12,21
  17:25 18:20,

22 19:23
  20:20 21:17,
  21 22:9
  23:13 27:2
  30:21 32:3
  37:9,12,13
  38:5 39:2,9
  41:23,24
  42:1,2,3,5,
  6,8 43:8,18
  44:13 46:14,
  19,20 50:4,
  20 51:2
  57:18 58:3,
  18 60:1
  61:12 63:25
  70:18 71:5,
  22 72:23,24
**once**
  71:24
**oncologist**
  55:3
**oncologists**
  20:5 33:10
  62:6
**oncology**
  16:16,25
  18:23 19:25
  21:12 30:16
  31:7 32:1
  33:17,23
  35:13 39:19
  46:22 47:4
  48:22 52:20
  53:9 54:20
  55:1,10
  61:25 72:5
**oncology/
hematology**
  48:23
**one**
  8:2 13:6
  25:12 39:8
  51:13 54:1,8
  58:22
**onsite**
  21:23 22:3
  63:13,14,17

65:9 66:24
**open**
  6:22
**opened**
  70:15,16
**operations**
  20:21,22
**opinion**
  15:5 24:24
  25:1,2,3,11
  45:5 50:14,
  19 53:9 57:7
  61:24 67:9
  70:25
**opinions**
  12:2,20
  14:15,20
  15:1 22:15,
  18,22 29:1
  45:24 49:14
  61:2,10
**opportunity**
  29:12
**order**
  25:7 39:5
  72:25
**orders**
  21:23 68:10
**original**
  43:10
**originally**
  9:9
**out-**
  18:9
**outcome**
  48:12
**outpatient**
  20:4 63:7
**output**
  65:13
**outs**
  50:2
**outside**
  18:9 25:21
  33:7,10 34:1
  47:10 54:24

Sonya Fulks, RN.
June 12, 2025

overflow
  16:23
oversee
  17:15 18:7
overseeing
  56:6,9
overview
  44:21

_____

**P**

_____

P-F-E-I-L
  38:19
P.26(a)(2)
  40:21
p.m.
  4:3 5:18,19
  9:4 10:5
  40:25 46:16,
  17 60:3,4
  73:7
page
  10:11 41:5,
  11,12,13
paid
  13:16
Papendick
  30:11,22,23
  31:2,17,23
  32:10,11,21,
  22 33:16,23
  51:20 52:3,
  13 54:9,22
  55:9 57:19
  58:4 64:10
Papendick's
  32:4,7 33:1
papers
  13:8
paperwork
  59:12
Parma
  4:1,17
part
  7:21 29:23
  31:1,9 35:4
  54:6 59:10

61:24
particular
  15:9 16:18
  17:23 33:2
  38:3 52:18
  55:5 72:3,
  19,21
parties
  73:9
party
  7:2,4
passes
  60:19
Pastor
  51:3
patient
  16:22 25:19
  26:6,9 30:25
  31:9 34:10
  38:4 39:4
  48:25 51:24
  54:14,19,23
  56:13 63:20
  68:10
patient's
  53:1 66:4
patients
  21:12,15,18,
  19 22:20
  23:1,3,11
  25:5 30:16,
  17 31:8 32:1
  33:17,23
  39:8,20
  46:24 47:24
  48:13 49:2
  51:13 52:5,
  15 53:8,12,
  24 60:14
  68:11 71:15,
  16,17 72:5
patients'
  30:15
pay
  57:16
pays
  57:15

pending
  6:15
people
  26:12 47:9
percentage
  26:12
perform
  46:5
performed
  14:7,9 16:22
  22:9 25:23,
  25
period
  20:25
permissions
  49:19
person
  4:24 8:25
  13:1 20:12,
  13 21:2
  37:8,11
  42:22 43:7
  53:3
PET
  69:25
Pfeil
  38:17
phone
  7:23 10:25
  12:10 31:15
  41:15 42:19,
  25 43:13
photographs
  13:8
physically
  21:20,21
physician
  39:12 65:9
physicians
  22:4,5 53:19
piece
  72:19
place
  23:17 42:25
plaintiff
  7:4,10 28:8
  40:19

plaintiffs
  12:14
plan
  66:12,15,16
play
  55:24
please
  4:15 6:1,6
  7:17,22 9:20
  15:19 51:3
  63:3 66:20
  73:4
policy
  24:3 36:13
  59:19
population
  17:18
position
  16:1 17:6,20
  18:3,10 20:6
  31:5 35:10,
  15,20,22
possible
  70:10
postgraduate
  16:4
power
  55:23
practice
  22:5 67:4,11
practitioner
  64:1 68:15
practitioners
  22:6 23:20
  63:18,19
pre-covid
  58:23
prepare
  7:15,18 40:7
  46:7
prepared
  40:16
preparing
  33:6
present
  26:2,4 47:1,
  3,5,6

Sonya Fulks, RN.
June 12, 2025

| | | | |
|---|---|---|---|
| **president**<br>20:21,22<br>**pretty**<br>6:5 44:5<br>**prior**<br>19:8 36:2<br>41:6<br>**prison**<br>20:2 30:4<br>67:5<br>**prisoner**<br>33:7,25<br>34:16 65:2<br>**prisoners**<br>47:4 51:16<br>61:19 66:11<br>67:10<br>**probably**<br>50:12 70:9<br>**procedure**<br>25:8 35:6<br>60:15,20,21<br>65:25 66:25<br>**procedures**<br>57:14,17<br>**process**<br>34:5,9 63:12<br>**produce**<br>10:17 65:14<br>70:5<br>**products**<br>16:23<br>**promised**<br>13:25<br>**proposed**<br>40:7,12<br>**prostate**<br>58:25 68:13<br>**protected**<br>50:3<br>**proved**<br>51:20<br>**provide**<br>28:2,13<br>45:18,24<br>57:13 67:19 | **provided**<br>49:10,15<br>50:20<br>**provider**<br>31:17 58:24<br>63:11,13,14<br>69:1<br>**providers**<br>20:4 21:23<br>22:3 23:20<br>56:7,9<br>**providing**<br>56:5,6,7,10<br>**PSAS**<br>68:13<br>**published**<br>15:13 27:13,<br>16,18<br>**pull**<br>24:3<br>**pulmonary**<br>66:20<br>**punching**<br>44:1<br>**purposes**<br>8:9 10:18<br>15:10<br>**Pursuant**<br>40:20<br>**put**<br>52:11 54:5<br>64:2 65:16,<br>17 66:10<br><br>**Q**<br><br>**qualified**<br>23:5,8 27:24<br>**question**<br>5:12,15 6:4,<br>6,9,10,15,16<br>15:2 31:2<br>33:1 37:7<br>42:9 43:18<br>51:4 54:9<br>62:16,21<br>63:3 69:15 | 71:20 72:22<br>**questions**<br>6:5 30:25<br>61:8,13,16<br>70:3 72:23<br>**quite**<br>44:21<br><br>**R**<br><br>**R.N.**<br>4:5<br>**radiation-<br>related**<br>47:20<br>**Ralph**<br>40:3<br>**rate**<br>60:9<br>**rates**<br>48:3<br>**RE-<br>EXAMINATION**<br>70:22<br>**reached**<br>32:11<br>**read**<br>41:18,24<br>42:8 43:19<br>46:2 51:3,5<br>60:22 63:2,4<br>**reading**<br>10:11<br>**reason**<br>5:24 6:4,12,<br>14 35:1,6<br>52:18<br>**reasons**<br>53:2 61:20<br>**reattached**<br>25:20<br>**recall**<br>10:13 19:15<br>38:5 41:5<br>53:12,15,16<br>54:14,16,17 | **receive**<br>13:25 15:20<br>33:7,25 70:7<br>**received**<br>11:25 15:24<br>**receiving**<br>57:17<br>**recess**<br>60:3<br>**recollection**<br>52:19<br>**recommendatio<br>n**<br>32:14<br>**record**<br>4:16 5:18,19<br>9:4 10:2<br>40:19 46:16,<br>17 48:25<br>50:7 51:5<br>59:5 60:2,4<br>63:4 64:22<br>**recorded**<br>5:7,8<br>**recordings**<br>12:9<br>**records**<br>28:23 47:14,<br>15,16 49:5<br>**rediscussed**<br>44:11<br>**refer**<br>12:18<br>**referral**<br>51:15<br>**referred**<br>8:25<br>**referring**<br>21:11 22:4,5<br>23:16,18,19<br>32:17 59:7<br>**refers**<br>45:9 54:8<br>**regard**<br>71:16<br>**regarding**<br>14:12 |

regional
  20:23 37:25
registered
  16:16 27:6
registry
  48:22,24
relate
  12:19
related
  11:2,9,12,25
  13:1,16,19
  14:9 22:12
  34:5 46:6
  48:11 57:2
relates
  45:10
relating
  14:1 22:15
  24:25 25:12
  27:3,7,11
  28:3 29:1
  34:25 39:19
  46:23 47:23
  48:12 49:14
  53:17,20
  54:8 57:20
  60:13,18
release
  50:5
relied
  12:1 14:20
  49:14,20
relies
  15:5
rely
  12:3 14:25
  15:14
relying
  15:10
remained
  35:13
remember
  9:8 19:4,6,
  19 38:3
  40:9,11
  42:25 43:2,3
  53:11 62:25

70:12
remote
  4:23
render
  34:15
repeat
  7:17,22 8:24
  37:11 60:17
rephrase
  65:13
report
  59:22
reported
  21:5 54:11
reporter
  5:8 72:25
  73:3
reporting
  21:3
representing
  8:9
request
  33:12 49:13
  54:10 64:5
  65:14
requested
  11:1 65:25
  73:8
requesting
  64:6 66:19
requests
  30:4,6,8
  33:7,25 34:6
  51:8,15,19
  64:8,13 66:4
require
  64:18
requirement
  31:5
requires
  62:4
research
  22:10,12
  27:3
respect
  43:9

respective
  73:9
responded
  70:12
responsibilit
ies
  16:21 17:9,
  12 18:5
responsibilit
y
  17:15 19:23,
  25 29:8,20
  30:5 31:1
  33:6,24
responsible
  31:8 57:1,5
responsive
  10:17
result
  65:8
retained
  11:13,15
  12:13 28:2
reversal
  22:16,21
  25:13,14,25
  26:4,10
  27:11,14
  51:9,14,19,
  24 52:15
  53:10,25
  56:16,18,24
  60:7,10,16
reversals
  22:13,23
  23:6 24:19,
  25 25:5,12
  45:6,13
  52:19 53:17,
  20
reversed
  25:15,18
  26:13 60:21
review
  14:25 15:7,8
  29:9,12,21
  30:5,8

reviewed
  11:25 14:14,
  19 28:23
  29:4,16
  30:15 41:8
  59:12 64:3,8
  65:14
reviewer
  30:14 52:13
reviewer's
  52:12
reviewers
  62:7 64:10,
  16 65:6,8,13
reviewing
  34:20 64:13
right
  6:1 9:5,7
  10:23,25
  11:6 18:16
  19:21 23:2
  26:21 29:24
  30:1 35:25
  42:7 43:9
  45:13,14
  51:1,2 54:5
  58:9,10
  70:19 71:3,
  6,20 72:1,
  19,23
risks
  60:6
RN
  9:24 17:15
  41:14
Road
  4:17
Robert
  39:9,11
role
  21:22 29:8,
  20 30:5
  31:10 33:6,
  24 34:20
  39:13 69:9
Ronald
  38:23

Sonya Fulks, RN.
June 12, 2025

**room**
  6:20  44:9
**routinely**
  48:18  55:15
**rule**
  65:5
**rules**
  5:5
**run**
  20:2
**running**
  68:17,23
**résumé**
  70:13,14,15

---

**S**

**Sabrina**
  38:15
**Salam**
  38:21
**saying**
  5:7  64:6
  69:7
**says**
  41:14  45:4
  54:9  55:14
**scans**
  69:24,25
**scenes**
  22:1
**schedule**
  10:9,13,17
  18:8
**Schmidt**
  21:10  32:18,
  19  58:5  59:8
**school**
  16:9
**scientific**
  22:10
**scope**
  64:22
**screen**
  5:25  9:16,17
  40:18  50:24

**scroll**
  41:23  42:1
  43:22  52:10
  53:5
**scrolled**
  52:10
**scrolling**
  41:24
**second**
  43:12  44:7,
  17  69:14
**section**
  41:25  42:12
  44:14
**see**
  5:25  9:17,24
  12:5,14,21
  13:2,11
  14:5,15,21
  15:15  24:6
  26:17  31:10
  41:19  43:25
  47:1  49:18
  53:6  54:12
  55:17  58:22
  63:15,20
  64:7  69:10
**seeing**
  9:19,22
  10:13  21:15
  41:6  68:2
**sentence**
  55:12  71:13
**separate**
  50:11,12
**September**
  19:21  35:8
**set**
  63:14
**several**
  27:1  49:2
  52:3  60:25
**share**
  9:17
**short**
  39:14

**show**
  9:15  40:18
**shown**
  6:1
**Signature**
  73:8
**significantly**
  63:7
**Silverman**
  40:4
**similar**
  14:13
**simple**
  6:5
**single**
  58:24
**sit**
  52:21,22
  61:7
**sitting**
  6:18  34:24
  54:3
**situation**
  36:7  72:15
**situations**
  58:13
**sketches**
  12:10
**skin**
  25:16,21
**smoker**
  67:24
**Sonya**
  4:5,17  9:24
  41:14
**sort**
  7:9  50:7
  58:12
**sound**
  19:21
**speak**
  5:9  8:14,16
  24:21  26:22
  31:13  45:12
**speaking**
  42:20,21

**specialist**
  63:21
**specialists**
  63:17
**specialty**
  17:23  64:7
  72:15
**specific**
  15:7
**spell**
  20:16
**Spencer**
  38:11
**spending**
  14:1
**spoke**
  7:23,25
  26:17,19,23,
  24  31:22
  55:11
**spoken**
  27:21  28:11
  37:3,8,10
  38:8  39:22,
  25  40:3
  42:23
**spreadsheet**
  48:20,21
  49:8  50:12,
  14,17,20
  53:7  54:1
**staff**
  18:7
**stage**
  59:6
**standard**
  22:22  23:6,
  10,15,16,19,
  21,23,24,25
  24:5,7,16,
  19,20,22,24
  25:9,11,13
  31:7  45:5
  67:20,25
  68:13  71:18
  72:14,18

Sonya Fulks, RN.
June 12, 2025

standards
  67:3,11
  71:2,9,12
  72:1,9
start
  10:11 68:2
started
  16:12 18:13,
  17 19:4 21:9
  35:12 49:8
  68:5 69:22
starting
  18:22
state
  4:15 20:1
  21:6 39:13
  47:4 48:24
  50:18 57:13
  58:17,19
  59:2,7 62:18
stated
  25:6 52:3,7,
  8 54:21 55:7
  63:6 71:18
statement
  57:23
statements
  12:4
states
  48:14
stating
  54:23
statistical
  46:25
statistics
  46:23 47:23
  48:12
stats
  47:2,3,5
stay
  62:5,8,11
  63:6
stayed
  35:10,20
Steve
  38:13

Steven
  37:16,20
stood
  32:23 39:8
Strategies
  4:22 36:25
strike
  14:8 18:24
  26:15 32:25
  45:15 55:13
  57:18,22
  60:12
stuff
  44:10,11,20,
  25
subject
  45:17
submitted
  57:23
subsequent
  36:9
summarize
  45:17,20,23
summary
  40:7,12,15
  54:8
supervisor
  17:20,21
  18:2,6,15
  20:9,11,14
  21:4 32:4
support
  14:15,20,25
supposed
  10:16 39:3
sure
  7:18 22:1
  31:6 35:3
  41:4 43:23
  44:5 56:7,9
  60:18
surgeries
  16:24
surgery
  25:23 26:2
  27:11 53:3
  56:19,24

57:2,6,11
  60:7,10
surgical
  57:17
surveillance
  47:8
suspected
  58:25
swimming
  68:24
sworn
  4:7
system
  52:9 67:5

————————

**T**

————————

take
  4:13 6:12,14
  8:20 10:10
  27:8 41:8
  46:9,11 47:2
  60:1 68:6
taken
  5:2 22:19
  46:2 60:3
Taking
  9:23
talk
  32:22 43:20
talked
  44:19
talking
  15:6 24:9,12
  25:4 48:21
  53:13
tangible
  12:10
team
  52:21
technical
  5:21 9:3
  13:7 69:13
technology
  6:2
Tecum
  9:24

tell
  8:2,3 41:23
  43:19 71:8
telling
  44:4
term
  48:2 65:20
  72:12
terminated
  35:17
terms
  26:15
testified
  4:9 6:25
  26:16 60:25
testify
  4:7 8:21
  13:22 23:5,9
  36:2,4,12,
  14,18 45:16,
  21 55:14
testifying
  13:23 72:8
testimony
  8:20 11:20,
  22 12:4
  13:11 15:11
  22:25 26:18
  27:25 28:3
  40:7,13,15
  45:18 49:23
  70:24
testing
  14:4,7,9
  21:24 24:2
  54:10,18
testings
  67:23
tests
  47:20 48:17
  50:8
Texas
  9:23 19:10
textbook
  27:19 72:10
thank
  7:14 60:2

Sonya Fulks, RN.
June 12, 2025

Thanks
  61:15
thing
  5:6  8:2
  43:24
things
  57:24  61:1
  64:24,25
  66:14  69:16
  70:1
think
  5:16  7:12,21
  11:18  15:9
  18:17  24:14,
  18  31:4,22
  41:22  46:13
  50:22  54:25
  61:5  69:8
  70:18
thinking
  37:21
third
  11:11
thought
  56:12
three
  31:24  71:6,
  24
three-day
  62:4
Thursday
  4:2
time
  5:22  7:8
  8:11,13,14
  9:14  13:16,
  19,23  14:1
  18:24  19:2,
  23  20:6,9,
  11,25  21:14
  22:21,24
  23:1  26:19,
  24  27:2
  29:7,11,15,
  19  30:20
  31:16,21
  33:5  34:3
  35:13  37:7,

12  38:5
  39:14  42:9
  44:17,19
  46:12  53:15
  57:25  60:14,
  19,20  61:14
  67:4  68:25
times
  9:15  31:15,
  22  32:9,19
  38:1  50:17
  58:3,5
Timothy
  39:25
title
  20:20
today
  4:14  6:1,13,
  14,18  7:16,
  19,24  8:6,9
  9:11  10:18
  34:24  39:15
  43:2  54:3
  61:1,4,7
told
  36:6
Tompkins
  39:23
top
  26:14  47:19
  52:6
total
  49:9
trach
  44:6,20
track
  48:3,23  53:4
tracked
  47:12
train
  56:3
training
  27:7,10
  59:18  61:24
transcript
  73:1

transitioned
  35:10
treated
  28:20
treating
  21:18
treatment
  47:8  48:17
  50:8,15  62:8
  63:9  66:12,
  15
trial
  6:25  11:20
  13:11,22,23
  22:15  49:25
  50:3
trials
  65:4
trouble
  9:19
true
  54:12,25
  71:23
truth
  4:7,8  44:4
try
  9:2,7
trying
  68:7,17
Tuesday
  43:3,4
turn
  9:2  55:12
Twenty
  31:25
two
  27:8  44:22
  64:10  68:9
types
  16:24  50:8
typically
  66:16

_____

          U

_____

undergraduate
  16:6

understand
  6:4,6  7:6,
  20,24  11:4
  15:3  17:10
  18:12  22:24
  26:17  37:12,
  13
understanding
  8:8  32:3
  34:8,10  50:5
understood
  6:10
underwater
  68:23
unhappy
  58:1
University
  16:1,13,19
  17:2  18:13,
  18  23:2,17
  71:3
utilization
  52:2,11,21
utilized
  35:5

_____

          V

_____

valid
  64:2
various
  53:2
verb
  65:21
versus
  47:10
Vice
  20:21,22
video
  5:6,22  6:23
videos
  12:4  13:8
violated
  59:23
violation
  59:23

Sonya Fulks, RN.
June 12, 2025

**visit**
  33:18
**visual**
  13:8
**Vital**
  4:22
**Vitalcore**
  35:20,24
  36:3,8,17,25
  39:15
**Vitalcore's**
  36:13

---

**W**

**wait**
  5:12,14
  60:15
**want**
  8:3 24:15
  37:11 46:9,
  11 55:12
  58:23 62:19
  69:3 72:25
**wanted**
  23:25 62:8
  70:4 72:17
**water**
  68:17
**Waters**
  17:7 39:13
  47:10
**way**
  72:13
**Weber**
  37:14
**week**
  43:5
**weeks**
  27:1
**well-versed**
  23:10,15
**Wellpath**
  35:11,16,19
  36:5,6 39:14
  69:22

**went**
  16:1 32:16
  34:12
**Whitney**
  39:22
**who've**
  23:1 60:14
**William**
  38:8
**witness**
  4:6 12:4,13
  73:8
**women**
  52:2
**work**
  16:25 17:2
  18:12 26:15
  29:23 30:19,
  21 35:16
  39:15 46:6
  52:1 70:10,
  15
**worked**
  17:14,22
  18:14 19:8,
  10,13 20:7
  23:4 30:14,
  20 33:3,5
  37:21 38:7
  52:20 57:8
  63:17 67:5
**working**
  8:19 16:12
  17:23 19:2,
  4,15,24
  20:24 21:14
  29:7,11,19
  31:21 34:3
  35:24 36:24
  56:1 57:25
  61:25 67:4
  68:25
**write**
  71:8,11
**writing**
  71:25
**written**

  14:3 33:6,
  12,20,25
  40:7,12,15
  58:18 59:10,
  15
**wrote**
  42:9 71:10

---

**X**

---

**x-ray**
  66:21

---

**Y**

---

**yeah**
  43:10 48:1
  55:22 63:5
  72:16
**year**
  8:15,17
  26:20 43:6,
  8,20,21,24
  44:1,2,3,20
  49:3 59:1
**years**
  11:14,16,19
  17:4 18:19
  23:12 27:8,9
  31:24 39:12
  71:6,24
**Yescare**
  19:13