**John Webber, M.D.**
**07/29/2025**

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DIVISION

4   KOHCHISE JACKSON,

5           Plaintiff,

6                                 Case No. 19-cv-13382

7       -vs-                      Hon. Gershwin A. Drain

8

9   CHS TX, INC., et al.,

10          Defendants.

11  _____/

12  PAGE 1 TO 81

13

14      The de bene esse video deposition of

15      JOHN WEBBER, M.D.,

16      Taken at 1 William Carls Drive, Conference Room 1C,

17      Commerce Charter Township, Michigan,

18      Commencing at 4:40 p.m.,

19      Tuesday, July 29, 2025,

20      Before Jennifer Wilke, CSR-8575.

21

22

23

24

25

**John Webber, M.D.**
**07/29/2025**                                                    Page 2

```
 1   APPEARANCES:

 2   MR. JONATHAN ROBERT MARKO - P72450

 3   Marko Law PLLC

 4   220 West Congress Street, 4th Floor

 5   Detroit, Michigan 48226-3289

 6   (313) 777-7529

 7   jon@markolaw.com

 8       Appearing on behalf of the Plaintiff.

 9

10   MS. RACHEL BETH WEIL - #49844 (PA)

11   Bowman and Brooke LLP

12   123 South Broad Street, Suite 1512

13   Philadelphia, Pennsylvania 19109-1029

14   (610) 715-5566

15   rachel.weil@bowmanandbrooke.com

16       Appearing on behalf of the Defendants.

17

18   THE VIDEOGRAPHER:   Marc Myers

19

20   ALSO PRESENT:       Ian Cross, Esq.

21                       Neal Rogers

22                       Nathan Lumbard

23

24

25
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**John Webber, M.D.**
**07/29/2025**                                    Page 3

```
 1                    TABLE OF CONTENTS

 2   Witness

 3   JOHN WEBBER, M.D.

 4

 5                 E X A M I N A T I O N S

 6                                                      Page

 7   VOIR DIRE EXAMINATION BY MR. MARKO:                  5

 8   DIRECT EXAMINATION BY MR. MARKO:                    20

 9   CROSS-EXAMINATION BY MS. WEIL:                      54

10   REDIRECT EXAMINATION BY MR. MARKO:                  71

11

12

13                   E X H I B I T S

14   Exhibit                                           Page

15   PLAINTIFF EXHIBIT NO. 106                           15

16    Dr. Webber's Curriculum Vitae (16 pages)

17   PLAINTIFF EXHIBIT NO. 13                            48

18    Claims with From Date of Service between Jan 1,

19    2000 and July 15, 2021 for Kohchise Jackson

20    (22 pages)

21   DEFENSE EXHIBIT H                                   69

22    Surgical Documents (6 pages)

23   DEPOSITION WEBBER EXHIBIT NO. 1                     80

24    Deposition Notes (2 pages)

25            (Exhibits attached to transcript.)
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025                                      Page 4

1   Commerce Charter Township, Michigan

2   July 29, 2025

3   About 4:40 p.m.

4            THE VIDEOGRAPHER:  We are now on the record.

5   This is the video-recorded deposition of Dr. John Webber

6   being taken in Commerce Township, Michigan.  Today's

7   date is July 29th, 2025.  The time is now 4:40 p.m.

8            And at this time, will the attorneys please

9   state their appearances for the record, and the court

10  reporter, please swear in the doctor.

11           MR. MARKO:  Good afternoon, ladies and

12  gentlemen of the jury, Judge Drain.  This is Jon Marko

13  on behalf of the plaintiff, Kohchise Jackson.

14           MS. WEIL:  Good afternoon.  This is

15  Rachel Weil from Bowman & Brooke on behalf of the

16  defendants CHX Texas and Dr. Keith Papendick.

17           THE COURT REPORTER:  And, Dr. Webber, please

18  raise your right hand.  Do you solemnly swear or affirm

19  that the testimony you are about to give will be the

20  truth, the whole truth, and nothing but the truth?

21           DR. WEBBER:  Yes, I do.

22                    JOHN WEBBER, M.D.,

23  having first been duly sworn, was examined and testified

24  on his oath as follows:

25           MR. MARKO:  Good afternoon, Doctor.



John Webber, M.D.
07/29/2025                                        Page 5

1              THE WITNESS:  Good afternoon, Mr. Marko.

2   VOIR DIRE EXAMINATION BY MR. MARKO:

3   Q.   I'm Jon Marko.  I met you today for the first time; is

4        that true?

5   A.   That is true.

6   Q.   And tell the jury who you are.

7   A.   I'm John Webber, and I am a general surgeon --

8        board-certified general surgeon.

9   Q.   And just so we can orient ourself as to how you came in

10       to be a character in this case --

11  A.   Yes.

12  Q.   -- you are the doctor that performed the colostomy

13       reversal on my client, Mr. Jackson?

14  A.   I am.

15  Q.   And so if we look at -- this is a demonstrative timeline

16       that the jury will have seen by now, but assuming

17       Mr. Jackson was released on May 16th, 2019, you

18       performed the surgery on June 19th, 2019, to reverse the

19       colostomy that he had?

20  A.   Yes.  If that is what the record states, yes.

21  Q.   Okay.  And are you some doctor that anybody went out and

22       found to pay to be in this case, or are you a treating

23       doctor?

24  A.   So, I am a treating doctor.  And I was offered paid in

25       this case, but I have not accepted payment for this



John Webber, M.D.
07/29/2025                                        Page 6

1         case.

2    Q.   You're testifying without payment even though you know

3         you're entitled to it for your time as a medical

4         professional?

5    A.   **That's correct.  I am not.**

6    Q.   Why, Doctor?

7    A.   **Well, one, because I think in this case, my morals**

8         **wouldn't allow me to be paid for it because I'm a**

9         **treating physician here and I am going to speak my**

10        **opinion about what I believe should or should not have**

11        **been done.**

12   Q.   Thank you so much on behalf of Mr. Jackson, Doctor.

13   A.   **All right.**

14   Q.   I appreciate your time, and I will try to respect it as

15        much as I can and move this along, okay?

16   A.   **Thank you, sir.**

17   Q.   So, we're gonna give the jury a little road map here.

18        So, we're gonna talk about your credentials, your

19        background, and then we're gonna talk about how you

20        began -- you became to treat as a treating physician to

21        try to heal Kohchise Jackson, then we're gonna talk

22        about some of your opinions in this case.  Does that

23        sound fair?

24   A.   **Yes.**

25   Q.   So, let's just get the million doctor question out of



1        the way here.  Dr. Webber, in your professional medical

2        opinion, as a treating physician, a neutral treating

3        physician, was Mr. Jackson's reversal surgery that you

4        performed on June 19th of 2019 medically necessary?

5   A.   Yes.  Without a doubt.

6   Q.   Without a doubt, you say?

7   A.   Yes.

8   Q.   One other area that we're gonna cover today:  Was a

9        delay in Mr. Jackson's reversal surgery of at least two

10       years to get this colostomy reversed, did it pose

11       medical harm risks to Mr. Jackson to have it delayed

12       that long?

13  A.   So, yes.  There are different types of harm that could

14       occur from failure or delay in reversal.  If you broadly

15       categorize the harm into psychological harm versus

16       physical or physiologic harm, two different categories.

17              Obviously, there's a psychological component

18       to wearing a colostomy bag for the patient.  They're --

19       again, you know, people don't like them, that's not

20       natural, you're not born with a colostomy, and

21       therefore, patients see a psychological issue with it.

22       It usually lowers or devalues the patient's sense of

23       self-worth to some extent.  They are afraid to, you

24       might say, interact socially with people because of how

25       they may be perceived by others who don't have a

1    colostomy bag; meaning, they don't look like all the

2    other people that they may be present with.  If you go

3    to events like a pool party or something like that, they

4    would have difficulty interacting in that environment.

5               And, again, there's a lot of emotional toll

6    that it takes on a patient to have to wear a colostomy

7    bag for a prolonged period of time.  And some of that

8    emotional damage is hard to recover, even after the

9    colostomy is reversed.

10              But speaking to the physical harm that

11   potentially could occur, colostomies are not without

12   complication, and colostomies are known to develop

13   complications in quite a few percentage of the patients.

14   Q.   You're talking about the bag, the colostomy --

15   A.   The actual colostomy itself.

16              Now, when you say bag, that's a physical

17   appliance that covers the actual colostomy.  The

18   colostomy, we abbreviate in the medical field as a

19   stoma, S-T-O-M-A, and that literally means that the part

20   of the intestine where the rest of the colon, in that

21   case, it would be the colostomy, or the ileum, in that

22   case, it would be an ileostomy, the actual bowel is

23   brought out through the abdominal wall and sutured to

24   the skin so that the patient literally defecates onto

25   their skin.



1          Obviously, we don't want them to defecate onto

2     their skin, but they -- that's why we pouch it with a

3     bag.  So, the bag is technically just the appliance that

4     you place over the colostomy itself.

5   Q.   Understood.  And is that delay in getting reversal, is

6        there a risk of physical harm?

7   A.   Yes.  So, the physical harm that can occur when you

8        don't reverse a colostomy is they can develop what is

9        called prolapse of a colostomy, and that's where the

10       colostomy protrudes out for some distance from the skin

11       level.  Typically, when we put them there, they're only

12       protruding maybe a couple centimeters above the level of

13       the skin.

14  Q.   Understood.

15  A.   But in a case of a prolapse, they can protrude to be

16       many centimeters, even 15, 20 centimeters.

17  Q.   Understood.

18  A.   And that could cause problems with the actual process of

19       defecation.

20            Another complication of a colostomy is the

21       development of what we would call a paracolostomy or a

22       parastomal hernia where the original hole that the colon

23       goes through, although, we try to make the hole in the

24       muscle layers or fascia snug around the colostomy, in

25       time, as it occurs in almost all patients, the hole



John Webber, M.D.
07/29/2025                                Page 10

1       widens.  And then you get a bigger hole.  The colon

2       itself or the colostomy remains the same size or

3       diameter, but the hole around it is now wider and so

4       knuckles of bowel can sneak into there and develop what

5       we call a bowel obstruction.  And bowel obstructions can

6       and sometimes are life-threatening.  I mean --

7   Q.  So, these are all risks of harm that Mr. Jackson would

8       have been exposed to due to the prolonged delay in

9       getting the reversal?

10  A.  Yes.  And --

11          MS. WEIL:  Objection.  Argumentative.

12  Q.  Go ahead.

13  A.  And another complication of a colostomy is the

14      development of what we call a colostomy stenosis, or a

15      recessed colostomy, where the colostomy shrinks.

16      Instead of being rose budded off the abdominal wall by

17      two centimeters, it actually recesses into the skin so

18      that it's hard to even see.  And if it becomes stenotic

19      or recessed or sunken, some people call it a sunken

20      colostomy, it's hard to defecate through that colostomy,

21      and that would mimic a large bowel obstruction which is

22      also life-threatening.

23  Q.  These are serious risks?

24  A.  Again --

25          MS. WEIL:  Objection.  Argumentative.



1   Q.   Are they serious risks?

2   A.   **Not only serious risks, but potentially life-threatening**

3        **risks.**

4   Q.   Understood.  Let's talk about who you are and some of

5        your background so the jury knows how you're qualified

6        to give opinions in this case.  Tell the jury, where

7        were you born, and tell us about your education.

8   A.   **Sure.  I was born in Osaka, Japan, many, many years ago,**

9        **and I was actually put in an orphanage, my twin brother**

10       **and I.  And thank God my adoptive parents, for better or**

11       **worse, couldn't have their own children so they -- my**

12       **dad was actually flying in Vietnam during the Vietnam**

13       **War for the U.S. military, and he decided, he -- my**

14       **mother -- I'm sorry.  My mother and him decided to adopt**

15       **us, my twin brother and I.**

16            So, we came to the United States in 1969, went

17       to U.S. schools, ended up living in Georgia -- it's

18       pertinent to the story -- and one day, I was watching TV

19       and watched the Wolverines play, and I loved the

20       helmets.

21            And I said to my dad, because he was flying in

22       Michigan for a company in Michigan now, and I said, "Who

23       are these guys with these helmets?"

24            And he goes, "Those are the Michigan

25       Wolverines."  They go -- he goes, "I fly out of



1       Ypsilanti right by Ann Arbor."

2              And I had good grades, and I said, "I want to

3       go to that school."

4              So, I applied U of M after I toured it, flew

5       up with my dad and toured it, and went to University of

6       Michigan Ann Arbor for my undergraduate degree.

7              And then my mother developed a brain cancer,

8       and I decided watching the neurosurgeon talk to my dad

9       during -- after the surgery, I said, "I want to be a

10      surgeon."

11  Q.  That experience led you to become a surgeon?

12  A.  Yes.

13             So, I said, "Man, I want to be a surgeon.  I

14      want to be like that guy."

15             And so that was my goal when I went to medical

16      school, to become a surgeon.  Actually, I wanted to be a

17      neurosurgeon, but I decided I prefer to be a general

18      surgeon, so.

19  Q.  And is that what you are today?

20  A.  I am a general surgeon today.

21  Q.  And what does that mean that you're a general surgeon?

22  A.  So, a general surgeon sounds like exactly what it means

23      to some extent, general meaning we are not focused on

24      the brain and stuff like that because we don't do brain

25      surgery, we don't do orthopedic surgery.  We do surgery



1    of the bowels, of the breast, of soft tissues.  We do

2    trauma surgery.  We do weight loss surgery, hernia

3    surgeries, colon surgeries, colostomies, meaning

4    creating colostomies and reversing colostomies.  We

5    do --

6  Q.  How many of those have you done?  Like, we're here to

7    talk about a colostomy surgery, right, that was

8    originally done, and then a reversal that was done by

9    you.  How many of these reversals have you done in your

10   career, Doctor?

11 A.  Yeah, it's hard to say.  I mean, I'll guesstimate that I

12   do about one to two reversals a month, maybe 18 a year,

13   and I've been in practice for 26 years.  So if you want

14   to take a rough estimate, it would be about 26 years

15   multiplied by 18, and that would give you a rough

16   estimate of how many colostomy reversals I've done.

17 Q.  Now, I went to law school because I wasn't very good at

18   math, but hundreds, is that --

19 A.  Hundreds, yes.

20 Q.  Hundreds?

21 A.  It would be in the hundreds ballpark area.

22 Q.  And how long have you been practicing?

23 A.  I've been in practice 26 years, but I also did seven

24   years of residency so I've been a doctor for 33 years.

25 Q.  Did you ever teach medical students, future doctors of



1       America and of the world?

2   A.  Yes.  So, I was in an academic group until December of

3       last year.  I worked for Wayne State University or Wayne

4       Health, and I was responsible for teaching residents.

5   Q.  These are students at Wayne State Medical School?

6   A.  So, I was responsible for teaching both medical students

7       who are not doctors yet, they're on the pathway to

8       become doctors after they matriculate for four years in

9       medical school.  So, I taught medical students in the

10      third and fourth year, meaning their second to last

11      year -- last year of medical school, and then I teach

12      residents.

13              Now, residents, although they're not

14      full-fledged surgeons, surgical residents are in

15      surgical training.  And depending on, you know, what

16      program they're in, whether it's a five-year or

17      seven-year program, I teach residents at all levels,

18      meaning from interns, meaning a first-year resident to a

19      chief resident.

20              And then I developed what we call a minimally

21      invasive bariatric surgery fellowship, only one of three

22      in Michigan.  It was the second in Michigan when I

23      developed it in 2008.  And I taught one fellow a year

24      who had completed residency and was now getting what we

25      call subspecialty post-residency training.  And



```
 1        actually --

 2   Q.   Are you still teaching fellows --

 3   A.   I am.

 4   Q.   -- here at the hospital?

 5   A.   I am.  I've stepped down as the program director of the

 6        fellowship, and my last fellow will be graduating in two

 7        days.

 8   Q.   Congratulations.

 9   A.   So, and then I'll start just as an adjunct member of

10        the -- I won't be as much into the teaching of bowels

11        starting August the 1st of this year.

12   Q.   And you used to be the chief of surgery.

13             Here's your CV.  It's marked as Plaintiff's --

14   A.   I was.

15   Q.   -- 106.

16             PLAINTIFF EXHIBIT NO. 106

17             Dr. Webber's Curriculum Vitae (16 pages)

18             WAS MARKED FOR IDENTIFICATION

19   A.   I was the chief of surgery at Harper from February of

20        2010, I believe, until July of last year.

21   Q.   Director of the surgery program, you told us about that?

22   A.   Right.

23   Q.   And, Doctor, are you what's called board-certified?

24   A.   I am board-certified.

25             So, board certification in the United States
```



John Webber, M.D.
07/29/2025                                    Page 16

1        is fairly necessary to essentially practice in most

2        settings; meaning, when we achieve board certification,

3        we have to take a test which is a written test that we

4        have to pass, that all surgical residents will take.

5        And I'm sorry.  Yeah.  All surgeons will take.  And then

6        an oral board examination that is administered by, you

7        might say, seasoned and experienced surgeons to make

8        sure that you meet the certification to be a qualified

9        surgeon in the United States.

10               So, board certification is very important to

11       be able to practice in the field of surgery and not to

12       be limited as to where you can practice.

13   Q.  And you said that you practiced in the board of surgery.

14       It looks like here's your board certification.  You were

15       recertified.

16               What does it tell you about being a surgeon

17       and being board-certified?  You described it as fairly

18       necessary.  Does it tell you anything as a doctor that

19       the defendant in this case, Dr. Papendick, was not

20       board-certified at the time that he was making surgical

21       decisions for outpatient care?

22               MS. WEIL:  Objection.  Foundation,

23       argumentative.

24   A.  Was --

25   Q.  Go ahead.



1   A.     -- Dr. Papendick a surgeon?

2   Q.     No, he was not.

3   A.     Well, what kind of physician is he, if I might ask?

4               MS. WEIL:  Objection.  The witness is asking

5         questions.

6               MR. MARKO:  Yeah.  That's okay.

7   BY MR. MARKO:

8   Q.     I want you to assume that Dr. Papendick is not a

9         surgeon, and not only is he not a surgeon, that he's not

10        board-certified, but that the defendant corporation put

11        him in charge of the utilization management decisions --

12              MS. WEIL:  Objection.

13  Q.     -- does that --

14              MS. WEIL:  Foundation, argumentative.

15  Q.     -- what does that tell you --

16              MR. MARKO:  Excuse me.  Can I please finish?

17              MS. WEIL:  I'm sorry.  I didn't --

18              MR. MARKO:  You're interrupting me --

19              MS. WEIL:  I thought you were finished.

20              MR. MARKO:  -- in the middle of my questions.

21              MS. WEIL:  I wasn't.  I thought you --

22              MR. MARKO:  It's unprofessional.

23              MS. WEIL:  -- were finished.

24  BY MR. MARKO:

25  Q.     I want you to assume, and the jury will hear in this



John Webber, M.D.
07/29/2025                          Page 18

1    case, that Dr. Papendick is not a surgeon, not only is

2    he not a surgeon but he is not board-certified, yet he

3    is making decisions and making recommendations on

4    surgery for outpatient purposes.  What does that tell

5    you, Doctor?

6              MS. WEIL:  Objection.  Foundation,

7       argumentative.

8    Q.  Go ahead.

9    A.  Am I allowed to answer?

10   Q.  Yes.

11   A.  Okay.  So, I think the fact that he's not

12   board-certified in any field is very suspect.  I think

13   it's very strange not to be board-certified in any field

14   of medicine whether it be family practice, internal

15   medicine, or surgery.

16              I think it's hard for a person, one, who is

17   not board-certified and, two, who is not a surgeon to

18   make medical decisions regarding the medical necessity

19   whether somebody needs a surgical procedure or not.

20   Q.  Why?

21   A.  Because they're not qualified and they're not an expert.

22   It's not their wheelhouse.  They have no business making

23   those decisions.

24              MS. WEIL:  Objection.  Assumes facts not in

25       evidence.



```
 1   Q.   Now, going back to your qualification -- oh, it looks
 2        like you were Top Doc by Our Detroit Magazine.  What
 3        happened?  2021, you dropped off?
 4   A.   I know I put 2025 [sic] as the date, but I have been Top
 5        Doc every year.
 6   Q.   Oh, so this is --
 7   A.   So, I just --
 8   Q.   -- just not updated?
 9   A.   It's not really updated.
10   Q.   All right.  Okay.  So, that's good.
11             And you were in the military.  Tell the jury
12        about that, Doctor, and thank you for your service by
13        the way.
14   A.   So, I joined the United States Army as a reservist as a
15        volunteer because America has been good to me.  I had an
16        opportunity to get educated in the United States, to
17        become a doctor in the United States, and I felt that I
18        owed the United States something back after 9/11.  So I
19        volunteered to serve in Iraq, and I was deployed to Iraq
20        with a forward surgical team from Fort Snelling,
21        Minnesota, where I took care of injured soldiers in 2003
22        in Iraq.
23   Q.   So, you were -- were you in like a combat --
24   A.   I was in a -- what we call a forward surgical team.  It
25        was a 20-person team made up of three general surgeons
```



1      and one orthopedic surgeon, multiple nurses, and some

2      support people who had a mobile unit.  We could pick up

3      and be out in six hours to a combat area to treat

4      casualties.

5   Q.   Are you sleeping in tents and stuff like that or...

6   A.   We're on the ground.

7   Q.   On the ground?

8   A.   At times.

9   Q.   Doctor, thank you for your service.

10  A.   Thank you.

11  Q.   I appreciate it on behalf of my client.

12           MR. MARKO:  And at this time, I move to

13      qualify Dr. Webber as an expert in his respective fields

14      of general surgery.

15           MS. WEIL:  No objection.

16  DIRECT EXAMINATION BY MR. MARKO:

17  Q.   Okay.  Doctor, let's talk about Mr. Jackson, why we're

18      here.  Do you remember -- I know you've seen -- you've

19      probably treated a lot of patients and tried to heal

20      them in your career?

21  A.   I have.

22  Q.   Do you remember Mr. Jackson?

23  A.   Vividly.

24  Q.   Vividly?  Tell the jury, how is it that of all the

25      patients that you've treated and tried to help and heal



1       over your career, Doctor, that you remember Mr. Jackson?

2   A.  Solely because of his name.

3   Q.  What is that?  What's his name?

4   A.  So, I'm a historical buff.  And when I first met him,

5       he's an African American, at least, you know,

6       externally, he looks African American to me, and he had

7       the name of Kohchise, and I knew Cochise was an Apache

8       chief.

9           And so I literally asked him, I said, "How did

10      you get the name Kohchise?"

11          And he told me he was part Indian, I believe,

12      and that's how -- why he was named of Kohchise, which

13      I've never in my life seen a person named Cochise except

14      in the historical record of the Apache Chief Cochise.

15  Q.  Yeah.

16  A.  And it's not spelled the same, but phenotypically -- or

17      phonetically, it sounds the same.

18  Q.  Yeah.  And do you -- and so you remember Mr. Jackson?

19      Did he -- was he -- can you just describe his demeanor?

20      I'm sure you see all kinds of different patients, some

21      cranky, some --

22  A.  Sure.  So --

23  Q.  -- nice?

24  A.  -- I knew -- I think he was very upfront with me and he

25      told me he was -- had been released from the department



1    of corrections or prison.  I don't know if he said

2    department of corrections, but he had told me that, you

3    know, upfront that he had been released from prison.

4         So, you're always a little bit leery with

5    prisoners because, you know -- whatever.  Anyway, he was

6    a nice guy.  And I was, you know, pleasantly surprised

7    at how nice he was.  He was genuinely a nice guy, and,

8    you know, I remember, you know, having pleasant

9    conversations with him during his hospital stay,

10   postoperatively, and even before the surgery.

11   Q.   And if we look at the timeline here which is a

12   demonstrative, it looks like he was released on May 16th

13   of 2019.  He was able to get in the OR with you --

14   A.   Yeah.  We saw him in my clinic on Friday, May the 31st

15   of 2019.

16   Q.   Two weeks after he was let out of prison?

17   A.   Roughly 15 days after discharge from the prison.

18   Q.   And so 15 days after getting released, he was in your

19   office in where?  Commerce Township or --

20   A.   No.  He actually saw me at Harper.

21   Q.   Harper?

22   A.   Yes.

23   Q.   Okay.

24   A.   Which is downtown Detroit.

25   Q.   Downtown Detroit?



1  A.   M-hm.

2  Q.   And then you were able to get him in the OR to do this

3       reversal on June 19th, 2019.  So, within a month or

4       almost a month?

5  A.   A little bit over a month of his release, yes.

6  Q.   Now, Doctor, you said you've done hundreds of these

7       surgeries.  Would you ever do a surgery on someone like

8       Mr. Jackson if you didn't feel that it was medically

9       indicated?

10  A.   No.  That would not be appropriate to perform

11      non-medically indicated operations.  Like I said, I

12      believe the colostomy reversals are medically indicated

13      and necessary so it was indicated to reverse his

14      colostomy.  Most people do not want to maintain their

15      colostomies longer than they have to.

16  Q.   And we'll talk about that and why not, but for

17      Mr. Jackson, did you have any qualms?  Did you say, you

18      know, did you have -- you know, think to yourself:

19      Well, you know what, maybe he should just keep this

20      colostomy forever?  Did you ever have any second

21      guessing of yourself?

22             MS. WEIL:  Objection.  Leading.

23  A.   First of all, again, as I said earlier, colostomies, if

24      the patient is in good health and has some longevity to

25      them, meaning they're not -- you know, I don't think I



 1          would reverse a colostomy in somebody who is over

 2          90-years-old unless they were really in good health, but

 3          if they have longevity in their life -- or they have

 4          life expectancy and they're in good health and there's

 5          no medical contraindication to reversing them, they

 6          don't have terminal cancer or something like that, they

 7          should be reversed.

 8                    So, I never even thought twice about not

 9          offering him reversal.  I think reversal was indicated,

10          and as a medical provider, I thought that's the least I

11          could do is to offer him my expertise in reversing his

12          colostomy.

13   Q.   Was it an easy decision?

14   A.   It was, because there was no algorithm of really

15        thinking about it.  Here's a man with a colostomy.  He's

16        young.  I think -- how old was he at the time?

17   Q.   He was in his 30s.

18   A.   Okay.  He was in his 30s.  I don't think anybody in

19        their 30s wants to -- if his life expectancy is 75 to

20        80, I don't think it would be fair to have a colostomy

21        for that long.  So --

22   Q.   Did he have any health issues that made you think:  You

23        know what, there might be -- we might need to take a

24        second look at this?

25   A.   I don't believe so because he was young enough,


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025                                    Page 25

1      meaning -- I think, you know, in my clinics, if the

2      patient is over 50, we are going to cardiac clear them

3      and send them for clearances.  People who are sub-50 or

4      under 50, we assume are -- and we'll ask them, you know,

5      we take an appropriate history.

6   Q.  Right.

7   A.  We take an appropriate history and ask them.  You know,

8      there are some people who are sub -- or under 50 who are

9      medical train wrecks and may not be candidates for

10      reversal.  Let's say a patient with terminal cancer at

11      age 28 who has a colostomy and has a limited life

12      expectancy, I would not offer them a colostomy reversal.

13              But a person like Kohchise whose colostomy was

14      placed on him for benign disease, it is indicated to

15      reverse his colostomy.

16   Q.  Was Mr. Jackson eager to get that bag off?

17   A.  Oh, I would say it was an underestimate.  And, again,

18      he's not really different than a lot of patients, even

19      older patients of mine.  I literally reversed a

20      colostomy two weeks ago in a 77 year old.  She was very

21      eager to have it reversed.  People don't want a

22      colostomy.  They don't want to wear it for a day longer

23      than they have to.

24   Q.  Let me show you...

25              MR. MARKO:  Can we go to this?  How do I do



1        that?  Is it easy to switch over?

2               THE VIDEOGRAPHER:  I don't have it switched

3        that way where he can see it on the monitor.  I would

4        have to do some switching around, because I had to do it

5        at the last second.

6               MR. MARKO:  Well, can we show the jury, and

7        then I'll reference the exhibit here?

8               THE VIDEOGRAPHER:  Yeah, the jury will see it.

9   BY MR. MARKO:

10  Q.   All right.  So, let's switch to this.  I'm going to

11       reference to you Exhibit 2, Plaintiff's Exhibit 2.  This

12       is admitted into evidence by stipulation of the party,

13       and this is a letter by the woman named Dr. Kansakar.

14       Do you know Dr. Kansakar?

15  A.   I do.

16  Q.   And she's a surgeon?

17  A.   She is a board-certified general surgeon.

18  Q.   And the jury's gonna hear from her in this case, and

19       Dr. Kansakar is the doctor who did the original

20       colostomy surgery where the bag was attached on

21       Mr. Jackson in December of 2016.

22  A.   That's what the record states, yes.

23  Q.   Now, Dr. Kansakar, in Exhibit 2, which the jury's gonna

24       see, wrote a letter that says (as read):  "My

25       recommendation and the standard of care for this patient



1              is to have an X-ray via the distal rectal stump and a

2              colostomy reversal.  Please see attached note."

3                        Do you agree with the board-certified treating

4              physician who wasn't hired by anybody in this case, that

5              Mr. Jackson's -- it was medically indicated to have, and

6              the standard of care required, a colostomy reversal

7              surgery?

8                        MS. WEIL:  Objection.  Argumentative.

9    Q.   Go ahead.  Do you agree with her?

10   A.   **I believe after you defined the standard of care is what**

11        **the average general surgeon of average learning,**

12        **intelligence, training, and expertise would do in given**

13        **a similar circumstance, this is what all general**

14        **surgeons would do.  It would be to reverse this**

15        **colostomy.**

16   Q.   Thank you, Doctor.

17                  We can go back to this now just for the jury.

18        Okay.  Now, Doctor, what if somebody were to say, "Well,

19        you know what, he had on this colostomy bag so what's

20        the big deal?  It wasn't medically necessary."  Would

21        you agree with that?

22                  MS. WEIL:  Objection.  Leading, argumentative.

23   Q.   Would you agree if the defense says in this case that he

24        could have -- you know what?  Let's go.  We'll make this

25        real easy.  Let me show you which has been -- is gonna



1    be admitted as an exhibit from Dr. Papendick.

2              MR. MARKO:  Is that -- are we ready?

3              THE VIDEOGRAPHER:  It's black.  You don't have

4    anything up there.

5              MR. MARKO:  So, it's not playing?

6              THE VIDEOGRAPHER:  No.  Because it's --

7              MR. MARKO:  Oh, here we go.

8              THE VIDEOGRAPHER:  Okay.  I see it.

9              (Video playing.)

10             MR. MARKO:  There's no sound, though.

11             **THE WITNESS:  Maybe you have to unplug the**

12    **white cord.**

13             MR. MARKO:  Can we just go off the record for

14    a second and fix this?

15             (Video stops.)

16             THE VIDEOGRAPHER:  Going off the record at

17    5:07 p.m.

18             (An off-the-record discussion was held at 5:07

19             p.m.)

20             (Back on the record at 5:10 p.m.)

21             THE VIDEOGRAPHER:  We're back on the record at

22    5:10 p.m.

23             (Video playing and transcribed as follows:

24             "QUESTION:  So, if a patient has a colostomy

25             bag and a life sentence, do you think that



1           they should never have it reversed unless --

2           as long as the colostomy is functioning?

3           "ANSWER:  If the colostomy is functioning

4           with no issue whatsoever, yes, he should

5           continue to have his colostomy.

6           "QUESTION:  For his whole like?

7           "ANSWER:  If that's what it takes.")

8           (Video stops.)

9    BY MR. MARKO:

10   Q.   Doctor, do you agree with Dr. Papendick that this can be

11        left, these colostomy surgeries, without reversal, in

12        someone like Mr. Jackson for the rest of his life?

13             MS. WEIL:  Objection.  That's not what the

14        testimony said.  Assuming facts not in evidence.

15   Q.   Well, do you agree -- let me rephrase.  Do you agree

16        with what Dr. Papendick testified to?

17   A.   I believe he testified that a person who has a life

18        sentence -- I believe the question was:  "Can a person

19        who has a functioning colostomy with a life sentence

20        continue to wear his colostomy for the duration of his

21        imprisonment?"

22             And he said yes.  I completely disagree with

23        that.

24   Q.   Why do you completely disagree with Dr. Papendick?

25   A.   Because a colostomy can cause a patient harm in the



1      future and develop complications.  And we like to

2      practice preventative medicine, and preventative

3      medicine would be to reverse the colostomy in a timely

4      fashion, when it's medically suitable to reverse it.

5      And most colostomies can be reversed about six months.

6      Some earlier, some a little bit later, but sometime

7      in -- time period around six months after the original

8      surgery that placed the colostomy, and to delay it is an

9      central risk of harm to the patient.

10   Q.  Were you able to see through your review, history,

11      review of records, everything that you did in this case,

12      any reason to delay the colostomy reversal of

13      Mr. Jackson?

14   A.  Not at all.

15   Q.  You said that it poses a risk of harm not to get it

16      reversed.  Now, you talked about two types of harm;

17      physical and emotional harm -- sorry.  Psychological and

18      emotional harm, and physical harm?

19   A.  Correct.

20   Q.  Okay.  So, let's talk about psychological harm to have

21      this thing.  Here's a demonstrative that the jury's

22      gonna see, okay?  Do you agree that a -- can a colostomy

23      bag -- and I know that's not the technical medical --

24      what is it?  It's a -- a stoma?

25   A.  Yeah.  It's a stoma.



1    Q.    It's a stoma?

2    A.    Yeah.

3    Q.    With a bag cause physical discomfort and health

4          challenges?

5    A.    Yes.  Absolutely.  I mean, it's -- first of all, you're

6          wearing a bag on the outside of your body.  So, when

7          you -- you can't wear tight-fitting clothes at all

8          because it would show.  Most people wear baggy clothes.

9                You have to apply some kind of adhesive to the

10         skin around the stoma in order to have the appliance

11         stick to the stoma.  So, you can develop contact

12         dermatitis there, skin excoriation there, even a rash

13         and bleeding from that appliance.  You can develop skin

14         irritation.

15               And one of the biggest complications of a

16         colostomy that we didn't even mention is leakage of the

17         bag, so.

18   Q.    Tell us about that.

19   A.    The skin surface is not always flat, okay?  Someone --

20         when you look at my belly, there are rolls to my belly,

21         and when you put the colostomy bag, you might say in an

22         area where there is a depression in the skin from a

23         roll, the bag has a hard time fitting and so the bag

24         leaks.

25   Q.    I want you to assume that in this case, Mr. Jackson, and



1      the records are going to show, that there were occasions

2      where feces would leak out of the bag and onto him like

3      when he was out in the yard.  Is that consistent with

4      your experience of what can happen?

5  A.  It happens in every patient with a colostomy.  Despite

6      our best efforts to locate the colostomy in the best

7      place possible for the patient, colostomy's always leak.

8      And it's a -- they're a nightmare scenario for the

9      patient, and the leakage is, obviously, as you can

10     imagine, extremely foul.

11  Q.  Tell us.

12  A.  Well, you're leaking stool onto your skin.  And stool on

13     the skin is not only unsanitary, but it smells bad, it

14     can permanently stain your clothes, and patients have

15     had to get rid of clothes for staining of their clothing

16     because of the leakage.

17         But leakage is part and parcel of what

18     colostomies do because, again, we weren't born with

19     these.  We weren't meant to have these on, but they are

20     an end to a means, and survival is key in people with

21     ruptured diverticulitis such as Mr. Jackson had.

22         So, colostomies were meant to be a temporary

23     procedure in most instances, unless we have a

24     conversation with the patient where we're, you know,

25     talking about a permanent colostomy.  But, you know, in



John Webber, M.D.
07/29/2025                                           Page 33

1        any of these colostomy procedures that patients consent

2        for, the patient's inevitably will ask, "Is this a

3        temporary bag?"

4                And the answer is, "Yes, in all instances,

5        unless we've removed the mechanism of anal defecation

6        which is the anus and rectum."

7                These bags are meant to be temporary, and

8        there is not only a verbal understanding with the

9        patient that it's temporary, but in the medical

10       community, there's an implicit understanding that these

11       bags are temporary.  Or stomas are temporary.

12   Q.  Now, the other issues.  You talked about these potential

13       for rash, irritation, leakage of the bag, the smell.

14       What about -- how does this affect somebody's

15       interactions with other people, like, socially?  Do

16       you -- is there social stigma and isolation that can

17       occur?

18   A.  There is.  Because, again, these bags burp, you might

19       say, gasses from the colon which we would called flatus

20       or flatulence.

21   Q.  What do you mean they would burp gasses?  Is that like

22       passing gas?

23   A.  They pass gas into the bag without any warning, and

24       they're often very noisy.  And so a patient who has a

25       colostomy, I've seen them in my clinic, will sit there



John Webber, M.D.
07/29/2025                                    Page 34

```
 1        and pass gas in front of me, and they're always very
 2        embarrassed.
 3                  And they say, "Excuse me, Doctor.  I'm sorry."
 4                  And I tell them, "Listen, I put the bag on
 5        you.  I understand.  You have no control over your
 6        flatulence."
 7                  People with a -- who don't have a colostomy
 8        have control of their flatulence because they have an
 9        anal sphincter mechanism that they can squeeze to
10        tighten so that the flatus doesn't come out and cause
11        them to be socially ostracized, you might say, or
12        embarrassed.
13   Q.   So, how does that work when they pass gas and have a
14        colostomy bag?  Because it's your intestine, right,
15        that's going out?
16   A.   It's your -- the gasses from your colon that are being
17        passed through the -- so the big fills up and --
18   Q.   With gas?  With gas?
19   A.   Gas.  With --
20   Q.   Smelly gas?
21   A.   Absolutely smelly gas.
22                  MS. WEIL:  Objection.
23   A.   It's flatulence.  It fills up with --
24   Q.   Is it smelly gas?
25   A.   It is --
```



1                  MR. MARKO:  What's the objection?

2                  MS. WEIL:  You're leading him.  You're putting

3          words in his mouth.

4    BY MR. MARKO:

5    Q.   What type of gas is it?  What does it smell like?

6    A.   **It smells like, for lack of a better word, a fart.**

7    Q.   And this -- does the person have any control over their

8         ability?  Like as human beings --

9    A.   **Zero.**

10   Q.   -- do people generally hold them in?

11   A.   **Yes.  Well, if I'm alone, I'm gonna let it out and it**

12        **doesn't matter.**

13   Q.   Okay.  All right.

14   A.   **But if I'm -- if I need to --**

15   Q.   Fair enough.

16   A.   **-- do it here right now in front of a jury trial, I'm**

17        **gonna hold it in.**

18             **But a person with a bag has zero option for**

19        **that.  They are going to expel the air.  As soon as that**

20        **air develops and wants to come out, there's zero control**

21        **over that.  There's no sphincter at the stoma, zero**

22        **sphincter control.**

23   Q.   And so if the records show, and Mr. Jackson testifies,

24        that as a result of this bag, that it smelled around him

25        and caused him to even be physically assaulted, do these



 1     bags, can they emanate a smell when they leak or when

 2     gas is passed?

 3  A.  Yes.

 4  Q.  Can that cause social stigma, isolation, or even harm if

 5     you're in a prison environment, for example?

 6  A.  Again, it certainly could.  Again, I'm not around

 7     prisoners so I wouldn't know.

 8  Q.  Right.

 9  A.  But they're there for reasons so though they might not

10     like somebody passing gas around them.

11  Q.  All right.  What about emotionally?  Does having to have

12     this bag, can that cause emotional or psychological

13     burden?

14  A.  I said that earlier, that there is emotional harm caused

15     by the presence of an appliance.  Again, people are

16     embarrassed by it.  They don't feel it's natural which

17     it isn't.  They don't feel -- a lot of them don't feel

18     it's a part of them, and some of them are even afraid to

19     look at it.

20  Q.  What do you mean?  Tell me about that.

21  A.  Well, I mean, looking at it.  And it's literally a part

22     of your inside sticking out of you, and so it doesn't

23     look like anything that they've ever seen before or

24     experienced before.  And to watch it burp stool out

25     is -- the first time they see it, I would tell you that


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1          most of them are taken aback by it.

2    Q.    Let me show you a record.  This is MDOC record 72.  It's

3          in evidence by stipulation with regards to that.  It

4          says here -- this is for Mr. Kohchise Jackson.  See that

5          right there?

6                And it says that he stated, "I am only

7          35 years old and I cannot have this my whole life."

8                Is that type of comment consistent with what

9          you see in these -- with not getting a reversal surgery?

10   A.    **I see it in patients who are 77 years old.  I told you I**

11         **reversed a -- they don't -- well, a 77 year old has less**

12         **life expectancy than Kohchise at 35.  That 77 year old**

13         **didn't want their bag there a minute longer than she had**

14         **to have it.**

15   Q.    Okay.  Well, now, we talked about the emotional toll

16         that you said.  What about lifestyle restrictions and

17         daily challenges?  Do you have to alter your lifestyle

18         at all?  Are there special restrictions?

19   A.    **There is lifestyle restrictions.  Some people, again,**

20         **will limit the type of foods they will eat because**

21         **certain foods will transit through the colon faster than**

22         **others.  And so, obviously, if you're going to go to a**

23         **function or a party, some people would not eat before**

24         **that because they don't want the bag to be erupting**

25         **during the party or during the function that they're at**



1        like a concert or a movie.

2               Obviously, I mentioned the swimming pool

3        example.  People who have colostomies, you don't see

4        them at the pool.  You ever see anybody with a colostomy

5        at the pool walking around with a bag exposed hanging

6        off their belly?  No, you're never gonna see that.

7   Q.   What about interfering -- like, Mr. Jackson will testify

8        that, you know, he'd go and try to lift weight --

9        obviously, at corrections, at least I don't think so, I

10       don't think they have very nice pools there.  But, you

11       know, like, he'd go lift weights.  He's gonna testify

12       that, and the records will show that, you know, he'd go

13       lift weights and try to exercise because he's in prison,

14       and the feces would start leaking out.  Is that

15       consistent with what you see?

16  A.   **Absolutely.  Increases in intra-abdominal pressure**

17       **caused by weight lifting would tend to make stool come**

18       **out.**

19  Q.   And what about body image issues?  Is that something

20       that can be a psychological harm of a colostomy bag?

21  A.   **Well, I think that's obvious to the average person that**

22       **a colostomy is a negative factor in body image and how**

23       **somebody perceives their body image.**

24  Q.   What about physical harm?  You said that -- we talked

25       about the psychological and emotional.  You said that a



John Webber, M.D.
07/29/2025                                      Page 39

1        delay of not getting this reversal can cause physical

2        harm and you listed some things.  Can we go through

3        those?  What are the -- what are high-risk physical

4        harms for not letting somebody get this surgery?

5                MS. WEIL:  Objection.  Asked and answered.

6    Q.  No.  Go ahead.

7    A.  Okay.  So, the one that I would point out mostly would

8        be the development of what we call a parastomal hernia.

9        So, it would be the exception or the exceptional

10       colostomy that did not develop a hernia around it.  And,

11       again, a hernia is the hole in the fascia surrounding

12       the actual stoma as the stoma transits from the

13       abdominal cavity onto the skin.

14                Again, we try to make those holes so that

15       they're snug, but over time, physics and mechanics allow

16       for these holes to get larger.  And so now you have a

17       large defect that's only occupied in one part of it by

18       the actual stoma or the colon itself, and that allows

19       bowel to get into the colostomy and literally --

20       literally cause an obstruction.

21                So, I recently did an emergency bowel surgery

22       on a patient who had a complete bowel obstruction from a

23       previous colostomy.

24   Q.  What other physical risks of harm are there to not

25       getting a reversal?



John Webber, M.D.
07/29/2025                                    Page 40

1    A.    Well, again, let me just finish up with the bowel

2          obstruction --

3    Q.    Oh, I'm sorry.

4    A.    -- issue.

5    Q.    I'm sorry.

6    A.    So, the bowel obstruction issue -- bowel obstructions

7          are at times surgical emergencies because if the bowel

8          is stuck and incarcerated in the -- and we call it

9          literally incarceration of the bowel, in the colostomy

10         site, the bowel gets in there, gets swollen, and then

11         just gets stuck, and it can't be physically -- or the

12         patient can't reduce it themselves.

13               And so the bowel can then turn gangrenous

14         because if it's incarcerated, it might become

15         strangulated, meaning the blood supply is choked off to

16         that loop of bowel, and then the bowel will die.  And

17         then that becomes a very life-threatening condition and

18         requires immediate and emergent medical or surgical

19         intervention to correct the bowel obstruction and to fix

20         the actual hernia itself.

21               So, that's one potential complication or a bad

22         outcome of a colostomy.  The other is a development

23         which I alluded to earlier of a prolapsed colostomy

24         where the --

25   Q.    What does that mean?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025                                    Page 41

1    A.    Where the bowel -- the mucosa -- the bowel has several

2          layers.  The inner layer of the colon itself is called

3          the colonic mucosa.  And sometimes, for whatever reason,

4          the mucosa literally pops through and you literally have

5          these long -- I think I saw a picture of one of those.

6    Q.    Yeah.  Let me show you this as an example.  Would this

7          be an example?

8    A.    That is a perfect example of a colostomy prolapse.

9                MS. WEIL:  Objection.  Objection to the

10         exhibit.  Objection to the question.  Objection on

11         relevance, and 401, 403.  There is no evidence that

12         Mr. Jackson had any of this.  This is irrelevant, this

13         is prejudicial, and we object to the entire line of --

14               MR. MARKO:  Okay.  So --

15               MS. WEIL:  -- testimony.

16               MR. MARKO:  -- let me just respond to this for

17         Judge Drain's ratification when he's ruling on this

18         objection.

19               So first of all, this is a case about whether

20         the defendant was deliberately indifferent to

21         Mr. Kohchise's legitimate medical need.  As you know,

22         the defense in this case has been, since the beginning,

23         that it was not medically necessary for Mr. Jackson to

24         get this, that he didn't need it, for lack of a better

25         term, that it was just an elective surgery that he

1   didn't need.  As Dr. Papendick testified to and will

2   testify to at trial, that he didn't meet the criteria

3   for getting this surgery because there was "no risk of

4   harm" to Mr. Jackson.  That's what he said in his

5   deposition.  We can play the clip, and I will play the

6   clip.

7            And that's just not true as demonstrated by

8   this doctor's testimony related to the various risks of

9   harm.  We don't Monday morning quarterback this and say,

10  "Well, what did or didn't happen to Mr. Jackson?"  What

11  we do is we say, "At the time that the decision was

12  made, what are the risks and ramifications of not

13  getting the surgery?"  It was recommended by

14  Dr. Kansakar.  There is no other treating doctor that

15  said that it wasn't, and the defense is that he just

16  didn't need it and that there was no harm.

17           Dr. Webber is clearly testifying, and I'm

18  gonna continue to ask him questions because it's

19  relevant, it rebuts the defense -- this ridiculous

20  defense in this case that Mr. Jackson's surgery was not

21  necessary and that there was no risk of harm.

22           So, that's why it's relevant.  This exhibit is

23  relevant for many reasons.  Number one, it's admissible

24  as substantive evidence because it shows -- for the

25  Monell claim, it shows from another patient what



 1   happens.  It's relevant as a demonstrative exhibit to

 2   show what happens, what the risk of harm is.  Because

 3   this is something that Dr. Papendick should have been

 4   considering, was required to consider when he was

 5   denying Mr. Jackson's reversal surgery.

 6            So, your objection's made.  The judge can rule

 7   on it.  I'm going to continue to show this, and I'm

 8   gonna ask questions about it.

 9            MS. WEIL:  I'm gonna move to strike that

10   entire speech.  That was your closing argument,

11   congratulations, but I'm gonna move to strike the entire

12   speech.  That is not a response to an objection.  It's

13   entirely inappropriate in this context.  You've assumed

14   facts not in evidence.  You have speechified about

15   things we haven't even heard yet in this case and may

16   not hear in this case.  You're characterizing testimony.

17            MR. MARKO:  Okay.

18            MS. WEIL:  And I'm moving to strike the whole

19   speech and --

20            MR. MARKO:  Okay.  Yeah.  Well --

21            MS. WEIL:  -- the objection stands.

22            MR. MARKO:  -- I mean, Counsel, my objections

23   and speech -- my response to your objection is --

24            MS. WEIL:  My objection was proper; your

25   speech was not.



```
 1              MR. MARKO:  Excuse me.  Now you're

 2    interrupting me.

 3              MS. WEIL:  Yes, I am.

 4              MR. MARKO:  You know, and this is about the

 5    third time you've done it in this deposition.  It's very

 6    rude and unprofessional.  I don't know why you would --

 7    why do you insist on interrupting me when I'm trying to

 8    respond?  I've been nothing but courteous to you, I've

 9    been respectful, and I haven't interrupted you.  You

10    need to stop.  It's not appropriate.  And I'm not gonna

11    allow it to happen.  And it's disrespectful to me and

12    it's disrespectful to the doctor and it's disrespectful

13    to the court.

14              Now, I'm gonna proceed.

15              MS. WEIL:  How -- excuse me.  How --

16              MR. MARKO:  Excuse me.

17              MS. WEIL:  -- am I supposed --

18              MR. MARKO:  Excuse me.

19              MS. WEIL:  -- to stop the speech without

20    interrupting you?

21              MR. MARKO:  Ma'am, ma'am --

22              MS. WEIL:  Am I just supposed to let you --

23              MR. MARKO:  Ma'am --

24              MS. WEIL:  -- keep speechifying?

25              MR. MARKO:  Ma'am --
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

 1              MS. WEIL:  Am I just supposed to let you --

 2              MR. MARKO:  Ma'am --

 3              MS. WEIL:  -- keep talking?

 4              MR. MARKO:  Ma'am --

 5              MS. WEIL:  No.

 6              MR. MARKO:  Tell me when you're done, ma'am.

 7         Tell me --

 8              MS. WEIL:  No.  You tell --

 9              MR. MARKO:  -- when you're done.

10              MS. WEIL:  -- me when you're done because I'm

11         not gonna let you just keep giving speeches by telling

12         you -- that I am forbidden from interrupting you.  Can

13         we get back to the questioning?  I mean, this is not

14         helping anybody.

15              MR. MARKO:  Are you done, ma'am?

16              MS. WEIL:  I -- if you are.

17    BY MR. MARKO:

18    Q.   Okay.  So, as I was saying -- Doctor, I'm so sorry about

19         that.

20              So, Doctor, as I was saying, so you were

21         describing a risk, a potential complication of not

22         getting this reversal.  Is this something that a medical

23         provider should take into consideration, potential

24         risks, when they're making a decision on whether someone

25         should get a colostomy reversal?



1    A.    Well, again, the medical provider who should opine about

2          whether a patient needs a colostomy reversed or not

3          should really be a surgeon because I don't think a

4          provider who is not a surgeon has any idea whatsoever

5          what the potential complications of having a colostomy

6          in place are.

7                    So, this is a prolapse, looking at this

8          picture, which I don't believe Mr. Jackson had but this

9          is what could potentially happen.  This is obviously the

10         herniation of mucosa through -- and you can see that

11         it's very long, and so that makes the placement of a bag

12         somewhat difficult because these bags aren't that long,

13         usually.  So, it's hard to get an appliance over it and

14         to keep the appliance over it.

15                   And then these prolapses desiccate because

16         they're stuck out like this.  And so they become

17         problematic and they get irritated because of

18         desiccation, and they bleed.  So, bleeding is a

19         complication of this prolapse.

20                   But the biggest problem with the prolapse is

21         that if it gets too large like this one, it'd be -- it's

22         hard to get the stool to come through there.  And they

23         could develop an obstruction just from the prolapse, and

24         that would require emergent surgical intervention.

25   Q.    So, this condition that we see right here, was this a



1    risk that Mr. Jackson would have faced for not getting a

2    timely reversal?

3  A.  **I would go one -- the answer is yes, but I would go one**

4      **above it and say that any patient with a colostomy is at**

5      **risk for this complication.**

6  Q.  And is that something that a provider needs to consider

7      when they're deciding whether to do a reversal or not?

8  A.  **Well, any surgeon would know that this is a potential**

9      **risk, and that's why we choose to reverse colostomies,**

10     **and that's why it's medically necessary to reverse these**

11     **colostomies.**

12 Q.  Now, Doctor, was there any other physical risks?  You

13     told us about these physical risks here that -- was

14     there any other physical risks that were prominent in

15     your mind as it relates to the need for Mr. Jackson's

16     reversal?

17 A.  **No.  These are the most significant risks associated**

18     **with a colostomy.**

19 Q.  Now, Doctor, let's talk about, like, the surgery that

20     you ended up doing from a cost-benefit analysis.  So I'm

21     gonna show you, this is Plaintiff's Exhibit 13.  It's

22     admitted.

23     ///

24     ///

25     ///



1          PLAINTIFF EXHIBIT NO. 13

2          Claims with From Date of Service between Jan 1,

3          2000 and July 15, 2021 for Kohchise Jackson

4          (22 pages)

5          WAS MARKED FOR IDENTIFICATION

6    BY MR. MARKO:

7    Q.   Now, when somebody comes and gets an operation at the

8         hospital, it costs money, right?

9    A.   I would assume so.

10   Q.   Okay.

11   A.   I don't deal with the handover of the money, and

12        nobody's ever handed me a check.

13   Q.   Right.  Now -- I hear you.  Now, you said previously, I

14        believe, would you ever perform an operation that you

15        believe was not medically indicated?

16   A.   No.  No, I would not.

17   Q.   Would you ever bill an insurance provider such as

18        Medicaid for a service that was not medically necessary?

19   A.   I would not.

20             MS. WEIL:  Objection.  Foundation.

21   Q.   Okay.

22   A.   I would not.

23   Q.   Why would you not bill Medicaid for a medically

24        unnecessary surgery?  Or --

25             MS. WEIL:  Objection.



1  Q.   -- in other words -- let me rephrase it.  Why would you

2       only bill Medicaid for a medically necessary surgery?

3            MS. WEIL:  Objection.  Foundation.  There's

4       been no foundation laid about Medicaid or about his

5       knowledge of Medicaid or anything else.

6  Q.   Go ahead.

7  A.   **I -- so, obviously, if you provide a medically necessary**

8       **service, then I think we should be remunerated for that**

9       **service.  So, I think it's completely acceptable to bill**

10      **insurance carriers for the service provided.**

11 Q.   All right.  So, let's look at how much you got paid.

12      Well, you work for a practice.  Did you work for a

13      practice group at the time that you performed the --

14 A.   **I did.  For -- at that time, I believe it was University**

15      **Physicians Group.**

16 Q.   All right.  So, let's look.  This is Plaintiff's

17      Exhibit 13.  It's been admitted.  So, University

18      Physicians Group?

19 A.   **Yep.**

20 Q.   We have Mr. Jackson, Kohchise Jackson over here,

21      6/19/2019.  I know that's kind of hard to see.  Can you

22      see that?

23 A.   **I can see it.  Yes, sir.**

24 Q.   Okay.  The total amount of the cost of the surgery, the

25      whopping amount was $919.78?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025                                    Page 50

 1   A.   Was the other number --

 2            MS. WEIL:  Objection.  Argumentative.

 3   A.   -- to the left of that, the 5,000 number, was that what

 4        was billed out?

 5   Q.   Correct.

 6   A.   Was that the charge?

 7   Q.   Yep.

 8   A.   Okay.

 9   Q.   But it looks like that was what was paid.

10   A.   So, was this -- I can't -- am I allowed to ask a

11        question?  Was this Medicare or Medicaid?

12   Q.   It was Medicaid.

13   A.   Okay.  So, the Medicaid payment was $919 on a $5,000

14        charge.

15   Q.   Yeah.  So, I mean, are these -- were you doing this

16        surgery for the money?

17   A.   No.

18            MS. WEIL:  Objection.

19   A.   Well, I mean, in the grand sense of being a physician,

20        we do provide services, and we --

21   Q.   Yeah.

22   A.   -- do get -- we expect payment for the services;

23        although, I would say that a significant portion of my

24        patient population, because I work in the inner city of

25        Detroit, do not pay ever for their services.  But the



1       expected gain is to, you know, get payment for the

2       service.

3               So, did I do it specifically for the money?

4       No.  But you, as a physician, expect payment in some

5       form; although, I don't go chase down the payment.

6    Q.   So, was this a -- given that Plaintiff's Exhibit 13 of

7        $919.78 to -- for your Physicians Group to do this

8        surgery, is this an expensive surgery comparatively

9        speaking?

10               MS. WEIL:  Objection.  Argumentative, no

11        foundation, no relevance.  Objection.

12   Q.   Go ahead.

13   A.   I think the $919 payout for the complexity of the case,

14        the preoperative evaluation of the patient, the actual

15        operation itself and duration and length of the

16        operation, and again, the complexity of the operation,

17        and then the postoperative care -- most colostomy

18        patients like this are in the hospital for about seven

19        to eight days.  And I think that's a very low payout for

20        the amount of time and investment that I spent in this

21        particular case.

22   Q.   But you did it anyways?

23   A.   Again, I don't look at the insurances that -- of the

24        patients that I see.  My group takes the insurance.

25        I'll do the surgery.



John Webber, M.D.
07/29/2025                                    Page 52

1    Q.   Would you do surgery on a patient who was -- needed

2         surgery who was in the department of corrections who was

3         sent to you?

4                   MS. WEIL:  Objection.  Relevance.

5    A.   Yes, I would.

6    Q.   Why?

7    A.   Because they're a patient, and just because they're in

8         the department of corrections doesn't mean that they

9         need to be treated differently than other citizens of

10        the country.  And so if they have a medically necessary

11        condition, whether it be the reversal of a colostomy or

12        the repair of a hernia, these conditions need to be

13        repaired.  And that's why I took a Hippocratic Oath to

14        be a doctor and a surgeon, and I will do what I believe

15        is medically necessary on any patient regardless.

16   Q.   And you said that you're not even charging for your time

17        today?  We're here at the hospital.  Tell the jury where

18        we are.

19   A.   We are at Huron Valley Sinai Hospital in Commerce,

20        Michigan.

21                   And I am not charging for my time nor do I

22        expect any payment for my time.

23   Q.   Now, do you understand, you're entitled as a medical

24        professional to be reimbursed for your time?

25                   MS. WEIL:  Objection.  Leading, argumentative,



1        irrelevant.

2    Q.   Go ahead.

3    A.   I do understand that I'm entitled to ask for payment for

4         my time and services here or service or -- no.  But I

5         don't need it; don't want it.

6    Q.   Tell the jury why you're not charging Mr. Jackson for

7         your time here today.

8    A.   Well, one, because I don't think, from my moral

9         perspective, that I should charge for this.  I believe

10        that Mr. Jackson should have had his hernia -- or his

11        colostomy reversed while he was incarcerated because it

12        was medically necessary.  And I don't believe that I

13        should take money for something that -- for harm that

14        occurred to a patient, and I just refuse to take the

15        money.

16             MR. MARKO:  Doctor, thank you so much on

17        behalf of Mr. Jackson.  I don't have any other

18        questions.  The attorney for the defendants might.

19             MS. WEIL:  Yeah.  Can we take five minutes off

20        the record?

21             MR. MARKO:  M-hm.

22             THE VIDEOGRAPHER:  Going off the record at

23        5:38 p.m.

24             (Recess taken at 5:38 p.m.)

25             (Back on the record at 5:44 p.m.)



John Webber, M.D.
07/29/2025                                    Page 54

1              THE VIDEOGRAPHER:  We're back on the record at

2       5:44 p.m.

3              MS. WEIL:  Good afternoon, Dr. Webber.  And

4       I'll try not to take too much of your time because I

5       know you have a commitment.

6              I think we introduced ourselves before, but my

7       name is Rachel Weil, and along with my colleagues at

8       Bowman & Brooke, I represent the defendants in the case

9       CHX Texas and Dr. Papendick.  Do you understand that?

10             THE WITNESS:  Yes.

11      CROSS-EXAMINATION BY MS. WEIL:

12      Q.   Dr. Webber, do you live in Detroit?

13      A.   No, I do not.

14      Q.   Where do you live?

15      A.   I live in Northville.

16      Q.   Okay.  And how far is that from downtown Detroit?

17      A.   I think 35 minutes, roughly, by car.

18      Q.   And so you're within about how many miles of downtown

19           Detroit?

20      A.   I'm not sure.  Maybe somewhere between 30 and 34,

21           probably.

22      Q.   Okay.  And are you available to testify in person at the

23           trial of this case?

24      A.   Probably not.

25      Q.   And why not?



 1   A.   I have many commitments as far as surgery is concerned.

 2   Q.   Okay.  So, you're just a really busy doctor and it would

 3        be hard for you to break away to testify in court; is

 4        that right?

 5   A.   Extremely busy.  Yes.

 6   Q.   Okay.  And that's -- but you're within 35 miles or so of

 7        the courthouse; am I correct?

 8   A.   That is correct.

 9   Q.   Okay.  Dr. Webber, did you ever treat or see Mr. Jackson

10        when he was incarcerated in the Michigan Department of

11        Corrections?

12   A.   I did not.

13   Q.   Okay.  So, you never saw him before May 31st of 2019

14        when he was in your office; is that right?

15   A.   That is correct.

16   Q.   Okay.  Did you review any of the records from the time

17        that Mr. Jackson was incarcerated in the Missouri DOC?

18   A.   I think I had --

19   Q.   Excuse me.  Michigan DOC.

20   A.   Sure.  I don't believe that I actually reviewed any

21        records from the DOC; although, I had probably reviewed

22        the operative report of Dr. Kansakar when I believe

23        Mr. Jackson had his surgery at Lake Huron Medical Center

24        in Port Huron.

25   Q.   In 2016; is that right?



John Webber, M.D.
07/29/2025                                          Page 56

1    A.    Yes.  Yes.

2    Q.    Okay.  Did you review any of the records or

3          communications that involve Dr. Papendick?

4    A.    No, I did not.

5    Q.    Okay.  So, you don't have any idea what Dr. Papendick

6          did or considered before he decided to approve

7          continuing care of Mr. Jackson's colostomy rather than a

8          reversal surgery; is --

9                    MR. MARKO:  Objection.

10   Q.    -- that a correct statement?

11                   MR. MARKO:  Objection.  Form and foundation.

12   A.    Other than the segments that were played, no.

13   Q.    Okay.  So, you -- let me just go back and make sure --

14   A.    Okay.

15   Q.    -- we're clear on the record.  You did not review

16         anything that Dr. Papendick reviewed before he made his

17         decision; is that correct?

18   A.    That is correct.

19                   MR. MARKO:  Object.  Same objection.

20                   MS. WEIL:  Okay.  What's the nature of the

21         objection?

22                   MR. MARKO:  It's form and foundation.

23   BY MS. WEIL:

24   Q.    Did you review anything that Dr. Papendick -- any record

25         that Dr. Papendick created?



1   A.   Record, meaning something put into the EMR or paper?

2   Q.   Any sort of record, any sort of medical record or any --

3   A.   No.

4   Q.   -- record of any communication.

5   A.   No.

6   Q.   Okay.  Do you have any idea what Dr. Papendick

7        considered when he was making his decision?

8   A.   I do not.

9   Q.   Do you have any idea of anyone Dr. Papendick spoke to

10       when he was making his decision?

11  A.   No, I do not know.

12  Q.   Okay.  Now, you went through a whole list of horrific

13       problems that can befall someone that are risks to

14       someone who has a surgery two years later rather than

15       two years earlier; is that a fair statement?  In other

16       words, let me say that a different way.

17  A.   Yes.

18  Q.   You talked about a lot of things that were risks to

19       Mr. Jackson because he waited until 2019 to have his

20       colostomy reversed instead of having it reversed in

21       2017; is that fair?

22  A.   Yes.

23  Q.   Okay.  So, let's talk about some of those.  You talked

24       about prolapse?

25  A.   Yes.



1  Q.  And once again, prolapse is when more of the intestine

2      comes out of the body; is that right?

**3  A.  That is correct.**

4  Q.  Okay.  Did Mr. Jackson have prolapse?

**5  A.  I don't believe so.**

6  Q.  Okay.  You talked about a parastomal hernia, I think; is

7      that right?

**8  A.  Yes.**

9  Q.  And that was when the opening widens; is that right?

**10  A.  The fascial opening.  Yes.**

11  Q.  Okay.  That's right.

**12  A.  It becomes larger --**

13  Q.  Yeah.  Because there's lots of openings, right?

**14  A.  Yes.**

15  Q.  Yeah.

**16  A.  It becomes larger than the actual colostomy diameter**

**17      itself or colon diameter itself.**

18  Q.  Okay.  That's called, again, a parastomal hernia?

**19  A.  Parastomal hernia.**

20  Q.  Okay.  Parastomal...

**21  A.  Yes.**

22  Q.  Parastomal.

**23  A.  Parastomal hernia.**

24  Q.  Parastomal.  Around the stoma, parastomal.

**25  A.  That's correct.**



1    Q.    Got it.  Did Mr. Jackson have a parastomal hernia?

2    A.    **I don't remember if he did or not, but I'm sure he did**

3          **to some extent because almost everybody has it.  Almost**

4          **everybody has it.**

5    Q.    Is it anywhere in your records that you diagnosed

6          Mr. Jackson with a parastomal hernia?

7    A.    **No, it is not.  But I wouldn't necessarily even included**

8          **it in my records.**

9    Q.    Okay.  Why not?

10   A.    **Because they're almost uniform so I often don't put it**

11         **in there unless it's significant.**

12   Q.    So, it's not significant to have a parastomal hernia?

13   A.    **It is significant, but his may not have had any bowel in**

14         **it so I would not have listed it.**

15   Q.    Okay.  So if he had one, it was not significant; is

16         that --

17   A.    **Right.  Meaning the fascial opening is always going to**

18         **be bigger than the actual colon diameter that's going**

19         **through the fascia.**

20         **But he didn't have any complications, per se,**

21         **at that time of the parastomal herniation so I did not**

22         **include that.  But more than likely, yes, he did have**

23         **it.**

24   Q.    Okay.  Now, you said that another possible complication

25         if someone waited longer to have a colostomy reversal



John Webber, M.D.
07/29/2025                                    Page 60

1      was colostomy stenosis.  Did I remember that right or --

2  A.  That's correct.

3  Q.  -- write it down?

4  A.  Correct.

5  Q.  What is that?

6  A.  That's where the colon becomes recessed.

7  Q.  Okay.

8  A.  And once it becomes recessed, the skin starts to close

9      over the actual opening, you might say, and it becomes a

10     stenotic or narrowed opening.  Stenosis means narrowing.

11 Q.  Okay.  And so instead of the -- maybe is it the reverse

12     of the first one we talked about, the prolapse?  Instead

13     of the intestine being out too far, it's in too far; is

14     that a fair lay way to put it?

15 A.  That's a -- I guess an okay way to put it from a

16     layman's perspective.  Sure.

17 Q.  Okay.  Did Mr. Jackson have a colostomy stenosis?

18 A.  No, he did not.

19 Q.  Okay.  You talked about the risk of large bowel

20     obstructions, and you talked about that -- those being

21     very serious; is that right?

22 A.  They are surgical emergencies.

23 Q.  Okay.

24 A.  A large bowel obstruction is considered a surgical

25     emergency.



John Webber, M.D.
07/29/2025                                              Page 61

1   Q.   Did Mr. Jackson have a large bowel obstruction?

2   A.   **No, he did not.**

3   Q.   Okay.  You talked about contact dermatitis.  What is

4        that?

5   A.   **That's where the colostomy appliance is attached to the**

6        **skin, and there's a reaction to the, you might say,**

7        **adhesive that is applied to the skin to get the bag**

8        **to -- or to get the colostomy appliance to stick.  Or it**

9        **can be caused by the actual deposition of stool onto the**

10       **skin.**

11  Q.   Okay.  Did Mr. Jackson have contact dermatitis?

12  A.   **I can't remember.**

13  Q.   Okay.  And it's not in your records anywhere that --

14  A.   **No.**

15  Q.   -- there was contact dermatitis?

16  A.   **Right.  But I -- again, I wouldn't have put something**

17       **like that in my record most likely.**

18  Q.   Okay.  You also talked about skin excoriation which I

19       think kind of follows onto the contact dermatitis --

20  A.   **Right.**

21  Q.   -- is that right?

22  A.   **Yes.**

23  Q.   What is skin excoriation?

24  A.   **Again, the skin becomes irritated by the -- either the**

25       **appliance adhesive or stool leaking out around the**



HANSON RENAISSANCE
COURT REPORTERS & VIDEO          hansonreporting.com
                                 313.567.8100

1      appliance.  And there's some, you might say, sloughing

2      of the skin or redness or reaction around the area where

3      the appliance is applied.  And almost all patients have

4      that to some extent.

5   Q.  Okay.  But there's nothing in the record to suggest that

6      Mr. Jackson had skin excoriation; is that right?

7   A.  No.  There's nothing in the record, but I'm sure he had

8      some element of it.

9   Q.  Okay.  Now, I also -- I have some other -- I found some

10     other things that can happen --

11  A.  Sure.

12  Q.  -- that are risks of -- risks to people who have

13     colostomies.

14  A.  Okay.

15  Q.  So, I want to ask you about a few of those.  What is

16     stoma necrosis?

17  A.  So, that stoma necrosis wasn't a risk for Mr. Jackson

18     because stoma necrosis is when we place the appliances

19     on the patient during the surgery, you have to -- you

20     know, the colon is a living, viable structure and has a

21     blood supply to it that's external to the actual lumen

22     of the colon.

23          If you think about the colon as a cylinder,

24     and the functioning part of that cylinder is the inside

25     of this bottle, you might say, and the stool comes



1    through that passage, external to that is going to be

2    what we call the mesentery of the colon, the blood

3    supply to the colon, the lymphatic drainage of the

4    colon.  And that part has to be -- the hole has to be

5    wide enough to get that part of it through either --

6    also.  And if there's any interruption or tightness to

7    that fatty tissue that's attached to the colon, the

8    mesentery of the colon, then it can cause a lack of

9    blood supply to the colon and result in stoma necrosis.

10              That is something that occurs in the immediate

11   aftermath, usually within a few days of the actual

12   creation of a colostomy, and would -- he would not be at

13   risk for that.

14   Q.   Okay.  And there's no indication that -- anywhere in the

15        records that you've seen that he ever had it; is that

16        right?

17   A.   That's correct.

18   Q.   Okay.  Is bleeding a risk to someone who has a

19        colostomy?

20   A.   Bleeding from the excoriation around the skin or

21        bleeding from the actual colostomy itself?

22   Q.   I guess either or both.

23   A.   So, bleeding from a colostomy can be from a multiplicity

24        of factors.  It can be from GI bleeding from the upper

25        GI tract, meaning a bleeding peptic ulcer from the


HANSON RENAISSANCE
COURT REPORTERS & VIDEO          hansonreporting.com
                                  313.567.8100

1       stomach.  It can drain through the entire intestinal

2       tract and come out as blood in a colostomy.

3               It can actually be from proximal, meaning

4       upstream colon pathology, such as diverticulosis, or

5       somebody who might have what we call inflammatory bowel

6       disease such as Crohn's colitis or ulcerative colitis.

7       Those autoimmune inflammatory bowel diseases are known

8       to cause bleeding, so forth and so on.

9               And then bleeding can occur because

10      colostomies -- or, again, you know, stomas that are

11      sticking or protruding out of the abdomen, and for any

12      number of reason, they can bleed from just the mucosa.

13      Because, again, the mucosa, the pink part that you see

14      sticking out, is not meant to be sticking outside of

15      anybody's body, and so just any form of irritation can

16      cause that mucosa to bleed.

17   Q.  Is there any indication in the records that Mr. Jackson

18      had bleeding from his stoma at any point?

19   A.  I don't know --

20   Q.  Okay.

21   A.  -- is the answer.

22   Q.  And not during the time that you saw him or treated --

23   A.  Right.

24   Q.  -- him; is that right?

25               Okay.  Is abscess a risk of a -- for a patient



1      with a stoma?

2   A.   Again, an abscess related to a stoma is usually a very

3        near term complication of an immediate stomal surgery.

4        So, I don't believe that Mr. Jackson was at risk for

5        that.

6   Q.   Okay.  Now, when you saw Mr. Jackson in June -- well,

7        the first time you saw him was the end of May in 2019.

8        Was his -- his colostomy was functioning well, was it

9        not?

10  A.   I can't remember whether it was functioning well or not,

11       to be honest.  It was functional.

12  Q.   Okay.  And you didn't --

13  A.   So, I'm --

14  Q.   I'm sorry.  Go ahead.

15  A.   I'm not going to qualify it by saying it was functioning

16       well or not because I don't remember.

17  Q.   Okay, but you didn't put anything in your records to

18       suggest that it was not functioning well, did you?

19  A.   That's correct.

20  Q.   Okay.

21  A.   Yeah.  It was functioning, and I will stand by that.

22  Q.   Okay.  And he was not having any of this list of

23       problems that we just went through; is that right?

24  A.   Right.  But, again, these are potential complications

25       that could occur.



1    Q.   Right, but he did not have any of them; is that right?

2    A.   **That is correct.**

3    Q.   Okay.  And you did not make any notation in your record

4         of any other problem that Mr. Jackson was having with

5         his colostomy in May or June of 2019; is that a fair

6         statement?

7    A.   **I would again say it's a fair statement, but, again,**

8         **there is psychological and emotional harm caused by a**

9         **colostomy.  And I am not going to make a record of that**

10        **in my EMR or electronic medical record, but there is**

11        **invariably some emotional harm and psychological harm**

12        **caused by the creation of a colostomy.**

13   Q.   Doctor, you talked about the fact that -- I think you

14        called it ruptured diverticulitis, that Mr. Jackson had

15        the colostomy in the first place because he had a

16        fistula that --

17   A.   **Correct.**

18   Q.   -- developed because of his diverticulitis; is that

19        right?

20   A.   **That's correct.  Yes.**

21   Q.   And that was causing feces to leak places where they

22        were not supposed to be, like into his --

23   A.   **I believe one of --**

24   Q.   -- I think his bladder, right?

25   A.   **Yeah.  I think one of his issues was a leakage or an**



John Webber, M.D.
07/29/2025                                          Page 67

1    abnormal communication between the colon and his

2    bladder.

3  Q.  Okay.  And that's dangerous, right?

4  A.  It can be.

5  Q.  Okay.  And then, I mean, it can be life-threatening,

6    can't it?

7  A.  It can be.

8  Q.  Okay.  So, the colostomy at the time that Mr. Jackson

9    got the colostomy was a good thing, right?

10  A.  It was medically necessary.

11  Q.  It was medically necessary, and potentially saved his

12    life, right?

13  A.  And potentially life-saving, I would agree with that.

14  Q.  Okay.  Doctor, do you have any knowledge of whether --

15    strike that.

16        We looked at -- or counsel showed you a

17    notation in Dr. Kansakar's record at the time that she

18    was about to perform Mr. Jackson's colostomy; is that

19    right?

20  A.  Yes.

21  Q.  And she was talking about contemplating a reversal in

22    the near term; is that right?

23  A.  Sometime in the future.  Yeah.

24  Q.  Do you have any knowledge whether Dr. Kansakar was

25    consulted later by anyone from the Missouri Department



John Webber, M.D.
07/29/2025                                    Page 68

```
 1        of Corrections about whether colostomy reversal for

 2        Mr. Jackson was medically necessary?

 3   A.   Did you say Missouri Department of Corrections?

 4   Q.   I probably did, but I meant Michigan.

 5   A.   Okay.

 6   Q.   Thank you.  I don't know why --

 7   A.   I used to live in Missouri so I was kind of shocked

 8        about that.

 9   Q.   No.  Let's try that again.

10   A.   Okay.

11   Q.   Do you have any knowledge of whether Dr. Kansakar was

12        ever consulted by anyone from the Michigan Department of

13        Corrections later, after Mr. Jackson had his colostomy,

14        about whether it was medically necessary to reverse the

15        colostomy?

16                 MR. MARKO:  Objection.  Foundation and

17        hearsay.

18   A.   I don't know.

19   Q.   Okay.  Doctor, colostomy reversals have risks, too,

20        don't they?

21   A.   Yes.  Any surgery has risks.

22   Q.   Okay.  I'm gonna show you something.

23   A.   Sure.

24   Q.   And we haven't figured out.  This is a defense exhibit

25        and --
```



John Webber, M.D.
07/29/2025                                    Page 69

```
 1   A.    Okay.

 2   Q.    -- we will figure out exactly how to mark it, but...

 3             DEFENSE EXHIBIT H

 4             Surgical Documents (6 pages)

 5             WAS MARKED FOR IDENTIFICATION

 6                  MR. MARKO:  Well, hold on.  I'd like to see a

 7         copy.

 8                  MS. WEIL:  I have a copy for you.

 9                  MR. MARKO:  Okay.

10                  MS. WEIL:  Do you need copies for anybody

11         else?

12                  MR. MARKO:  No, no.

13   BY MS. WEIL:

14   Q.    Doctor, what I have handed to you I will represent is a

15         portion of your record.  It is page 573 of 579 is what

16         it says on the bottom.  I don't see a litigation

17         Bates number on it, but I see page 573 of 579 is the

18         first page.  And I just want to direct your attention to

19         the third page which is page 575 of 579.

20   A.    Okay.

21   Q.    Okay?  And I'm in the paragraph that says indications

22         for procedure.  Do you see that?

23   A.    Yes.  Yes, I do.  M-hm.

24   Q.    And about two-thirds of the way-ish down, there's a

25         sentence that starts, "Informed consent was obtained and
```



 1      secured in the chart."  Do you see that?

 2   A.   Yes, I do.

 3   Q.   Okay.  And after that, I want to read you something.

 4        And you can tell me if I read it correctly.

 5             It says, "after patient was made aware of all

 6        risks and benefits of the procedure including but not

 7        limited to the risk of heart attack, stroke, death,

 8        infection, the potential need for reoperation, and the

 9        potential for a leak or potential for damage to

10        surrounding structures including the ureter and

11        genitourinary system, the patient signed informed

12        consent after a lengthy discussion."

13             Did I read that correctly?

14   A.   That is correct.

15   Q.   Okay.  And those are all serious risks that were

16        involved -- that were -- this surgery carried all of

17        those serious risks; is that true?

18   A.   Yes.

19   Q.   Okay.  And do you remember anything about the lengthy

20        discussion you had with Mr. Jackson?

21   A.   Again, I have these discussions with all my patients,

22        so --

23   Q.   Okay.

24   A.   -- I don't remember the specifics.

25   Q.   Okay.



John Webber, M.D.
07/29/2025                                    Page 71

1   A.   But this sounds like something we would discuss.

2        Absolutely.

3   Q.   And do you have any specific recollection of any -- of

4        anymore that you would have discussed?

5   A.   Not really, other than what's already, you know, I guess

6        memorialized in this dictation.

7             MS. WEIL:  Okay.  I have no further questions

8        subject to anything else that Mr. Marko may ask you.

9             THE WITNESS:  Sure.

10            MR. MARKO:  Tell me when you guys are ready.

11            THE VIDEOGRAPHER:  We're all set, John.  It's

12       all set, John.

13            MR. MARKO:  Ready?  Oh, I'm sorry.

14  REDIRECT EXAMINATION BY MR. MARKO:

15  Q.   Okay.  Doctor, let's go over.  So, you were asked about

16       what Dr. Papendick did or didn't do.  Do you have any

17       idea what Dr. Papendick did or didn't do?

18  A.   No.

19  Q.   If Dr. Papendick testifies to this jury consistent with

20       his deposition testimony on page 10 that he made

21       decisions regarding the approval or otherwise of this

22       colostomy reversal procedure, and that in doing so, he

23       did not meet with or talk to the patient, do you think

24       that's appropriate?

25            MS. WEIL:  Objection.  Leading and foundation



John Webber, M.D.
07/29/2025                          Page 72

```
 1          and assumes facts not in evidence.

 2    A.    Yeah.  Unfortunately, I don't think it's appropriate,

 3          but again, I think people that make these decisions

 4          never meet with their patients.  They sit in --

 5                MS. WEIL:  I move to -- I'm sorry.

 6    A.    -- some kind of...

 7                MS. WEIL:  I'm sorry.  I'm sorry.  I thought

 8          you were finished.

 9                MR. MARKO:  Yeah.  Please don't interrupt the

10          doctor.

11                MS. WEIL:  I'm sorry.  I thought he was

12          finished.  I apologized.

13    A.    I think it's kind of a sterilized procedure where

14          patients -- or doctors like Dr. Papendick sit in

15          boardrooms and make decisions on cost cutting and

16          whatever based on, you might say, administrative orders

17          from whom he works.

18    Q.    Would you ever make a decision --

19                MS. WEIL:  I'm sorry.  I never got to object

20          because you didn't let me -- you didn't let me object

21          after he was finished.

22                I'm going to object and move to strike the

23          whole answer as speculation, as lacking foundation, as

24          irrelevant, and as 401, 403.

25                MR. MARKO:  Are you done?
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025                                    Page 73

1                    MS. WEIL:  I am done.

2    BY MR. MARKO:

3    Q.    Okay.  Now, would you ever make a medical decision

4          affecting the future of one of your patients without

5          ever seeing or talking to the patient?

6                    MS. WEIL:  Objection.  Argumentative.

7    A.    Again, I'm a front-line clinician or physician, surgeon,

8          whatever you want to say.  I talk to my patients,

9          period.  I don't think I would ever offer a patient

10         surgery without sitting down and talking to them

11         face-to-face or even by Zoom and, you know,

12         telemedicine --

13   Q.    Yeah.

14   A.    -- and telling them, you know, the potentials, risks of

15         any surgery, and the reason why we're doing the surgery,

16         and allowing and affording the patient the opportunity

17         to ask the questions that they want to ask so that all

18         of their questions are answered to their satisfactions.

19   Q.    You were asked questions about Dr. Kansakar who you said

20         you know.  If Dr. Kansakar testifies to this jury that

21         in her professional medical opinion that Mr. Jackson's

22         reversal surgery was medically necessary, do you agree

23         with that opinion?

24                   MS. WEIL:  Objection.  Foundation, leading,

25         assumes facts not in evidence.



1                    MR. MARKO:  Well, she already did testify to

2        that, and it's under -- I mean when you --

3                    MS. WEIL:  Well, we don't know that.

4                    MR. MARKO:  -- say these things -- what do you

5        mean, we --

6                    MS. WEIL:  But we don't --

7                    MR. MARKO:  -- don't know that?

8                    MS. WEIL:  -- know that.  I mean, she's --

9        okay.

10                   MR. MARKO:  We do know that.

11                   MS. WEIL:  The objection's on the record.

12                   MR. MARKO:  We do know that.  We know it as a

13       fact because she's already testified under oath and it's

14       gonna be played to the jury.

15                   MS. WEIL:  Well --

16                   MR. MARKO:  So we know that.  So when you say

17       those things, it's just very disingenuous because we

18       know it.  We all know it.  Me and you know it.  They

19       know it.  Everybody knows it.  The jury's gonna know it.

20    BY MR. MARKO:

21    Q.    Okay.  So, I want you to assume that Dr. Kansakar will

22          testify that Mr. Jackson's reversal surgery was

23          medically necessary in her professional opinion.  Do you

24          agree with that opinion?

25    A.    I agree with it, but I also have my own opinion which



John Webber, M.D.
07/29/2025                          Page 75

1         I've already stated for the record that I believe the

2         surgery was medically necessary.

3    Q.   Doctor, you were asked questions about risks of a

4         surgery.  Is there risk in everything, in any surgery

5         anywhere?

6    A.   There is a risk in living, period.  I mean, you can --

7         one of us can walk out today and get hit by a car or get

8         in a car accident on the way home.  There is a risk to

9         any surgery.

10             The fact that we discussed these risks with

11        the patient and memorialized them in this dictation is

12        important because it tells the record that we discussed

13        the risks with the patient, that we didn't just whisk

14        the patient off to surgery without having an in-depth

15        conversation with the patient.

16             And because -- I mean just because there are

17        risks to any surgery or to this surgery in particular

18        does not contraindicate the surgery itself; meaning,

19        there are patients who we remove cancers from who --

20        there are immense risks of the surgery, but yet, the

21        patient should have the surgery despite the risks.  And

22        the risks may be prohibitive in some instances, but the

23        options are limited for the patient.

24             And so we have a conversation with these

25        patients and tell them there are risks, but I will tell



John Webber, M.D.
07/29/2025                          Page 76

1   you, there is absolutely no way that you're gonna tell

2   me that these risks that we specifically enumerated to

3   Mr. Jackson would in any way be considered

4   contraindications to proceeding with the surgery;

5   otherwise, none of us would have surgery for anything.

6           Like I said -- or I will tell you, yesterday,

7   I removed a 28-centimeter kidney cancer from a patient

8   yesterday with enormous risks to the patient, and

9   included fixing a large incisional hernia.  And I told

10  the patient this is an eight-hour operation and there is

11  a chance that you may die from this operation from

12  hemorrhage.  And he accepts the risks, and we enumerate

13  these risks in the dictations.

14          But I think it's very disingenuous to say that

15  these operations have a risk and say that risks of

16  surgery contraindicate any form of surgery and that we

17  should deny surgeries to patients because they

18  inherently have a risk.  Every surgery, albeit small, I

19  mean, even a small surgery, has a risk.  The risk --

20  there is just a risk of going under anesthesia, whether

21  it's local anesthesia or general anesthesia even without

22  making a cut on a patient.

23          Every patient is subjected to risk, and that's

24  why we do risk stratification, but we don't stop doing

25  surgery on patients unless the risks are so prohibitive.



John Webber, M.D.
07/29/2025                                    Page 77

1      We do what's called a risk-benefit analysis to any

2      surgery.

3              And we say to the patient, "Listen, here is

4      the benefit of doing this surgery versus the risk."

5              The risk here of these complications in the

6      hands of an experienced, board-certified surgeon such as

7      myself are minimal, minimal, and certainly do not

8      contraindicate not performing the surgery.

9              I tell him these things because there are

10     things that can happen anatomically or things that can

11     happen in any surgery that might cause one of these

12     unfortunate complications to occur, but we try to, you

13     might say, mitigate against these risks and we operate

14     very carefully and judiciously and prudently.  I'm not a

15     surgeon that works hard or fast.  I am a surgeon who is

16     meticulous about what I do.  I respect the tissues.  And

17     this is what I did when I did the surgery with

18     Mr. Jackson.

19             And although these risks are stated for the

20     record, these risks should not be considered a reason

21     for denying any patient this kind of surgery.

22  Q.  Thank you, Doctor.

23             MS. WEIL:  I'm gonna move to strike that as

24     nonresponsive after the first sentence because the only

25     question was whether there risks in every surgery.  I'm



 1   gonna move to strike --

 2              MR. MARKO:  Well, I think it --

 3              MS. WEIL:  -- the entire rest of the speech as

 4   unresponsive.

 5              MR. MARKO:  I think it was very responsive,

 6   and rather than ask each individual question and waste

 7   everybody's time, I think he was explaining his answer

 8   and was responsive.

 9              Doctor, thank you so much.  I don't have any

10   other questions.

11              MS. WEIL:  Thank you, Doctor.  I don't either.

12              **THE WITNESS:  All right.  Thank you.**

13              THE VIDEOGRAPHER:  This concludes the

14   deposition.  We're going off the record at 6:08 p.m.

15              (Video recording ended at 6:08 p.m.)

16              MR. MARKO:  Okay.  Just for the deposition

17   transcript, I'd like to stay on the record real quick.

18              So, I heard you ask the doctor questions about

19   his distance from the courthouse.  We noticed this as a

20   video deposition due to his unavailability.  There was

21   no objection from the defendants.  This was noticed as a

22   trial deposition.  Now, you haven't said this.  You

23   certainly haven't said this before today.

24              This has been noticed for how long guys?

25   Weeks?



1          MR. LUMBARD:  Weeks.

2          MR. CROSS:  Yeah, weeks.

3          MR. MARKO:  I think two weeks, I think, we

4   noticed it for.  So, I hope that you'll follow the rules

5   and that you're not gonna now, after this doctor has

6   taken time out, attempt to disrespect his schedule and

7   all of us and the costs that we have by doing a

8   after-the-fact objection to his testimony when we all

9   knew, and you were told, that this was going to be a

10  trial dep due to his unavailability.

11         MS. WEIL:  Okay.  I'm not going to -- this

12  should not be on the record, and I move to strike all of

13  that from the record because it has nothing to do with

14  anything, and it doesn't belong on the record.

15         But, nevertheless, we will all see what

16  happens procedurally as it plays out, and that's all I'm

17  going to say.  We all need to comply with the rules, and

18  we will do it, and you will do it as well.

19         MR. MARKO:  Yeah.  I just don't want any

20  trickery because that's what I'm getting.

21         MS. WEIL:  Can we please go off the record?

22         MR. MARKO:  Sure.

23         (Deposition concluded at 6:10 p.m.)

24  ///

25  ///



1    DEPOSITION WEBBER EXHIBIT NO. 1

2    Deposition Notes (2 pages)

3    WAS MARKED FOR IDENTIFICATION

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN      )

4                           ) SS

5    COUNTY OF OAKLAND      )

6        I, Jennifer Wilke, Certified Shorthand Reporter, a

7    Notary Public in and for the above county and state, do

8    hereby certify that the above deposition was taken

9    before me at the time and place hereinbefore set forth;

10   that the witness, JOHN WEBBER, M.D., was by me first

11   duly sworn to testify to the truth, and nothing but the

12   truth; that the foregoing questions asked and answers

13   made by the witness were duly recorded by me

14   stenographically and reduced to computer transcription;

15   that this is a true, full and correct transcript of my

16   stenographic notes so taken; and that I am not related

17   to, nor of counsel to either party nor interested in the

18   event of this cause.

19

20

21   _____

22   Jennifer Wilke, CSR-8575

23   Notary Public,

24   Oakland County, Michigan

25   My Commission expires:  October 4, 2030



**John Webber, M.D.**
07/29/2025

1

---

**$**

---

**$5,000** 50:13

**$919** 50:13 51:13

**$919.78** 49:25 51:7

---

**1**

---

**1** 48:2 80:1

**10** 71:20

**106** 15:15,16

**13** 47:21 48:1 49:17 51:6

**15** 9:16 22:17,18 48:3

**16** 15:17

**16th** 5:17 22:12

**18** 13:12,15

**1969** 11:16

**19th** 5:18 7:4 23:3

**1st** 15:11

---

**2**

---

**2** 26:11,23 80:2

**20** 9:16

**20-person** 19:25

**2000** 48:3

**2003** 19:21

**2008** 14:23

**2010** 15:20

**2016** 26:21 55:25

**2017** 57:21

**2019** 5:17,18 7:4 22:13,15
   23:3 55:13 57:19 65:7 66:5

**2021** 19:3 48:3

**2025** 4:2,7 19:4

**22** 48:4

---

**26** 13:13,14,23

**28** 25:11

**28-centimeter** 76:7

**29** 4:2

**29th** 4:7

---

**3**

---

**30** 54:20

**30s** 24:17,18,19

**31st** 22:14 55:13

**33** 13:24

**34** 54:20

**35** 37:7,12 54:17 55:6

---

**4**

---

**401** 41:11 72:24

**403** 41:11 72:24

**4:40** 4:3,7

---

**5**

---

**5,000** 50:3

**50** 25:2,4,8

**573** 69:15,17

**575** 69:19

**579** 69:15,17,19

**5:07** 28:17,18

**5:10** 28:20,22

**5:38** 53:23,24

**5:44** 53:25 54:2

---

**6**

---

**6** 69:4

**6/19/2019** 49:21

**6:08** 78:14,15

---

**6:10** 79:23

---

**7**

---

**72** 37:2

**75** 24:19

**77** 25:20 37:10,11,12

---

**8**

---

**80** 24:20

---

**9**

---

**9/11** 19:18

**90-years-old** 24:2

---

**A**

---

**aback** 37:1

**abbreviate** 8:18

**abdomen** 64:11

**abdominal** 8:23 10:16 39:13

**ability** 35:8

**abnormal** 67:1

**abscess** 64:25 65:2

**absolutely** 31:5 34:21 38:16
   71:2 76:1

**academic** 14:2

**acceptable** 49:9

**accepted** 5:25

**accepts** 76:12

**accident** 75:8

**achieve** 16:2

**actual** 8:15,17,22 9:18 39:12,
   18 40:20 51:14 58:16 59:18
   60:9 61:9 62:21 63:11,21

**adhesive** 31:9 61:7,25

**adjunct** 15:9

**administered** 16:6

**administrative** 72:16

**admissible** 42:23

**admitted** 26:12 28:1 47:22
49:17

**adopt** 11:14

**adoptive** 11:10

**affect** 33:14

**affecting** 73:4

**affirm** 4:18

**affording** 73:16

**afraid** 7:23 36:18

**African** 21:5,6

**after-the-fact** 79:8

**aftermath** 63:11

**afternoon** 4:11,14,25 5:1 54:3

**age** 25:11

**agree** 27:3,9,21,23 29:10,15
30:22 67:13 73:22 74:24,25

**ahead** 10:12 16:25 18:8 27:9
39:6 49:6 51:12 53:2 65:14

**air** 35:19,20

**albeit** 76:18

**algorithm** 24:14

**allowed** 18:9 50:10

**allowing** 73:16

**alluded** 40:23

**alter** 37:17

**America** 14:1 19:15

**American** 21:5,6

**amount** 49:24,25 51:20

**anal** 33:5 34:9

**analysis** 47:20 77:1

**anatomically** 77:10

**anesthesia** 76:20,21

**Ann** 12:1,6

**anus** 33:6

**anybody's** 64:15

**anymore** 71:4

**Apache** 21:7,14

**apologized** 72:12

**appearances** 4:9

**appliance** 8:17 9:3 31:10,13
36:15 46:13,14 61:5,8,25
62:1,3

**appliances** 62:18

**applied** 12:4 61:7 62:3

**apply** 31:9

**approval** 71:21

**approve** 56:6

**Arbor** 12:1,6

**area** 7:8 13:21 20:3 31:22 62:2

**argument** 43:10

**argumentative** 10:11,25 16:23
17:14 18:7 27:8,22 50:2 51:10
52:25 73:6

**Army** 19:14

**assaulted** 35:25

**assume** 17:8,25 25:4 31:25
48:9 74:21

**assumed** 43:13

**assumes** 18:24 72:1 73:25

**assuming** 5:16 29:14

**attached** 26:20 27:2 61:5 63:7

**attack** 70:7

**attempt** 79:6

**attention** 69:18

**attorney** 53:18

**attorneys** 4:8

**August** 15:11

**autoimmune** 64:7

**average** 27:11 38:21

**aware** 70:5

---

**B**

---

**back** 19:1,18 27:17 28:20,21
45:13 53:25 54:1 56:13

**background** 6:19 11:5

**bad** 32:13 40:21

**bag** 7:18 8:1,7,14,16 9:3 25:16
26:20 27:19 28:25 30:23 31:3,
6,17,21,23 32:2 33:3,13,23
34:4,14 35:18,24 36:12 37:13,
24 38:5,20 46:11 61:7

**baggy** 31:8

**bags** 33:7,11,18 36:1 46:12

**ballpark** 13:21

**bariatric** 14:21

**based** 72:16

**Bates** 69:17

**befall** 57:13

**began** 6:20

**beginning** 41:22

**behalf** 4:13,15 6:12 20:11
53:17

**beings** 35:8

**belly** 31:20 38:6

**belong** 79:14

**benefit** 77:4

**benefits** 70:6

**benign** 25:14

**big** 27:20 34:17

**bigger** 10:1 59:18

**biggest** 31:15 46:20

**bill** 48:17,23 49:2,9

**billed** 50:4

**bit** 22:4 23:5 30:6

John Webber, M.D.
07/29/2025

3

---

**C**

---

black 28:3

bladder 66:24 67:2

bleed 46:18 64:12,16

bleeding 31:13 46:18 63:18,
20,21,23,24,25 64:8,9,18

blood 40:15 62:21 63:2,9 64:2

board 15:25 16:2,6,10,13,14

board-certified 5:8 15:23,24
16:17,20 17:10 18:2,12,13,17
26:17 27:3 77:6

boardrooms 72:15

body 31:6 38:19,22,23 58:2
64:15

born 7:20 11:7,8 32:18

bottle 62:25

bottom 69:16

bowel 8:22 10:4,5,21 39:19,
21,22 40:1,6,7,9,10,13,16,19
41:1 59:13 60:19,24 61:1
64:5,7

bowels 13:1 15:10

Bowman 4:15 54:8

brain 12:7,24

break 55:3

breast 13:1

broadly 7:14

Brooke 4:15 54:8

brother 11:9,15

brought 8:23

budded 10:16

buff 21:4

burden 36:13

burp 33:18,21 36:24

business 18:22

busy 55:2,5

call 9:21 10:5,14,19 14:20,25
19:24 39:8 40:8 63:2 64:5

called 9:9 15:23 33:19 41:2
58:18 66:14 77:1

cancer 12:7 24:6 25:10 76:7

cancers 75:19

candidates 25:9

car 54:17 75:7,8

cardiac 25:2

care 16:21 19:21 26:25 27:6,
10 51:17 56:7

career 13:10 20:20 21:1

carefully 77:14

carried 70:16

carriers 49:10

case 5:10,22,25 6:1,7,22 8:21,
22 9:15 11:6 16:19 18:1 26:18
27:4,23 30:11 31:25 41:19,22
42:20 43:15,16 51:13,21 54:8,
23

casualties 20:4

categories 7:16

categorize 7:15

caused 35:25 36:14 38:17
61:9 66:8,12

causing 66:21

cavity 39:13

Center 55:23

centimeters 9:12,16 10:17

central 30:9

certification 15:25 16:2,8,10,
14

challenges 31:4 37:17

chance 76:11

character 5:10

characterizing 43:16

charge 17:11 50:6,14 53:9

charging 52:16,21 53:6

chart 70:1

Charter 4:1

chase 51:5

check 48:12

chief 14:19 15:12,19 21:8,14

children 11:11

choked 40:15

choose 47:9

CHX 4:16 54:9

circumstance 27:13

citizens 52:9

city 50:24

claim 42:25

Claims 48:2

clear 25:2 56:15

clearances 25:3

client 5:13 20:11

clinic 22:14 33:25

clinician 73:7

clinics 25:1

clip 42:5,6

close 60:8

closing 43:10

clothes 31:7,8 32:14,15

clothing 32:15

Cochise 21:7,13,14

colitis 64:6

colleagues 54:7

colon 8:20 9:22 10:1 13:3
33:19 34:16 37:21 39:18 41:2
58:17 59:18 60:6 62:20,22,23
63:2,3,4,7,8,9 64:4 67:1

colonic 41:3

colostomies 8:11,12 13:3,4
23:15,23 30:5 32:18,22 38:3
47:9,11 62:13 64:10

colostomy 5:12,19 7:10,18,20
8:1,6,9,14,15,17,18,21 9:4,8,
9,10,20,24 10:2,13,14,15,20
13:7,16 23:12,14,20 24:1,12,
15,20 25:11,12,13,15,20,22
26:20 27:2,6,15,19 28:24
29:2,3,5,11,19,20,25 30:3,8,
12,22 31:16,21 32:5,6,25
33:1,25 34:7,14 38:4,20,22
39:10,19,23 40:9,22,23 41:8
45:25 46:2,5 47:4,18 51:17
52:11 53:11 56:7 57:20 58:16
59:25 60:1,17 61:5,8 63:12,
19,21,23 64:2 65:8 66:5,9,12,
15 67:8,9,18 68:1,13,15,19
71:22

colostomy's 32:7

combat 19:23 20:3

comment 37:8

Commerce 4:1,6 22:19 52:19

commitment 54:5

commitments 55:1

communication 57:4 67:1

communications 56:3

community 33:10

company 11:22

comparatively 51:8

complete 39:22

completed 14:24

completely 29:22,24 49:9

complexity 51:13,16

complication 8:12 9:20 10:13
40:21 45:21 46:19 47:5 59:24
65:3

complications 8:13 30:1
31:15 46:5 59:20 65:24 77:5,
12

comply 79:17

component 7:17

concerned 55:1

concert 38:1

concluded 79:23

concludes 78:13

condition 40:17 46:25 52:11

conditions 52:12

congratulations 15:8 43:11

consent 33:1 69:25 70:12

consideration 45:23

considered 56:6 57:7 60:24
76:3 77:20

consistent 32:3 37:8 38:15
71:19

consulted 67:25 68:12

contact 31:11 61:3,11,15,19

contemplating 67:21

context 43:13

continue 29:5,20 42:18 43:7

continuing 56:7

contraindicate 75:18 76:16
77:8

contraindication 24:5

contraindications 76:4

control 34:5,8 35:7,20,22

conversation 32:24 75:15,24

conversations 22:9

copies 69:10

copy 69:7,8

cord 28:12

corporation 17:10

correct 6:5 30:19 40:19 50:5
55:7,8,15 56:10,17,18 58:3,25
60:2,4 63:17 65:19 66:2,17,20
70:14

corrections 22:1,2 38:9 52:2,8
55:11 68:1,3,13

correctly 70:4,13

cost 49:24 72:15

cost-benefit 47:20

costs 48:8 79:7

counsel 43:22 67:16

country 52:10

couple 9:12

court 4:9,17 44:13 55:3

courteous 44:8

courthouse 55:7 78:19

cover 7:8

covers 8:17

cranky 21:21

created 56:25

creating 13:4

creation 63:12 66:12

credentials 6:18

criteria 42:2

Crohn's 64:6

CROSS 79:2

CROSS-EXAMINATION 54:11

Curriculum 15:17

cut 76:22

cutting 72:15

CV 15:13

cylinder 62:23,24

---

**D**

dad 11:12,21 12:5,8

daily 37:17

damage 8:8 70:9

dangerous 67:3


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

date 4:7 19:4 48:2

day 11:18 25:22

days 15:7 22:17,18 51:19
63:11

deal 27:20 48:11

death 70:7

December 14:2 26:21

decided 11:13,14 12:8,17 56:6

deciding 47:7

decision 24:13 42:11 45:24
56:17 57:7,10 72:18 73:3

decisions 16:21 17:11 18:3,
18,23 71:21 72:3,15

defecate 9:1 10:20

defecates 8:24

defecation 9:19 33:5

defect 39:17

defendant 16:19 17:10 41:20

defendants 4:16 53:18 54:8
78:21

defense 27:23 41:22 42:15,19,
20 68:24 69:3

defined 27:10

degree 12:6

delay 7:9,14 9:5 10:8 30:8,12
39:1

delayed 7:11

deliberately 41:20

demeanor 21:19

demonstrated 42:7

demonstrative 5:15 22:12
30:21 43:1

deny 76:17

denying 43:5 77:21

dep 79:10

department 21:25 22:2 52:2,8
55:10 67:25 68:3,12

depending 14:15

deployed 19:19

deposition 4:5 42:5 44:5 61:9
71:20 78:14,16,20,22 79:23
80:1,2

depression 31:22

dermatitis 31:12 61:3,11,15,
19

describe 21:19

describing 45:21

desiccate 46:15

desiccation 46:18

Detroit 19:2 22:24,25 50:25
54:12,16,19

devalues 7:22

develop 8:12 9:8 10:4 30:1
31:11,13 39:10 46:23

developed 12:7 14:20,23
66:18

development 9:21 10:14 39:8
40:22

develops 35:20

diagnosed 59:5

diameter 10:3 58:16,17 59:18

dictation 71:6 75:11

dictations 76:13

die 40:16 76:11

differently 52:9

difficult 46:12

difficulty 8:4

DIRE 5:2

direct 20:16 69:18

director 15:5,21

disagree 29:22,24

discharge 22:17

discomfort 31:3

discuss 71:1

discussed 71:4 75:10,12

discussion 28:18 70:12,20

discussions 70:21

disease 25:14 64:6

diseases 64:7

disingenuous 74:17 76:14

disrespect 79:6

disrespectful 44:11,12

distal 27:1

distance 9:10 78:19

diverticulitis 32:21 66:14,18

diverticulosis 64:4

Doc 19:2,5 55:17,19,21

doctor 4:10,25 5:12,21,23,24
6:6,12,25 13:10,24 15:23
16:18 18:5 19:12,17 20:9,17
21:1 23:6 26:19 27:16,18
29:10 34:3 42:14 44:12 45:18,
20 47:12,19 52:14 53:16 55:2
66:13 67:14 68:19 69:14
71:15 72:10 75:3 77:22 78:9,
11,18 79:5

doctor's 42:8

doctors 13:25 14:7,8 72:14

Documents 69:4

doubt 7:5,6

downtown 22:24,25 54:16,18

drain 4:12 64:1

Drain's 41:17

drainage 63:3

dropped 19:3

due 10:8 78:20 79:10

duly 4:23

duration 29:20 51:15

## E

eager 25:16,21

earlier 23:23 30:6 36:14 40:23
57:15

easy 24:13 26:1 27:25

eat 37:20,23

educated 19:16

education 11:7

efforts 32:6

eight-hour 76:10

elective 41:25

electronic 66:10

element 62:8

emanate 36:1

embarrassed 34:2,12 36:16

emergencies 40:7 60:22

emergency 39:21 60:25

emergent 40:18 46:24

emotional 8:5,8 30:17,18
36:12,14 37:15 38:25 66:8,11

emotionally 36:11

EMR 57:1 66:10

end 32:20 65:7

ended 11:17 47:20 78:15

enormous 76:8

entire 41:13 43:10,11 64:1
78:3

entitled 6:3 52:23 53:3

enumerate 76:12

enumerated 76:2

environment 8:4 36:5

erupting 37:24

essentially 16:1

estimate 13:14,16

evaluation 51:14

events 8:3

everybody's 78:7

evidence 18:25 26:12 29:14
37:3 41:11 42:24 43:14 72:1
73:25

examination 5:2 16:6 20:16
71:14

examined 4:23

exception 39:9

exceptional 39:9

excoriation 31:12 61:18,23
62:6 63:20

excuse 17:16 34:3 44:1,15,16,
18 55:19

exercise 38:13

exhibit 15:16 26:7,11,23 28:1
41:10 42:22 43:1 47:21 48:1
49:17 51:6 68:24 69:3 80:1

expect 50:22 51:4 52:22

expectancy 24:4,19 25:12
37:12

expected 51:1

expel 35:19

expensive 51:8

experience 12:11 32:4

experienced 16:7 36:24 77:6

expert 18:21 20:13

expertise 24:11 27:12

explaining 78:7

exposed 10:8 38:5

extent 7:23 12:23 59:3 62:4

external 62:21 63:1

externally 21:6

extremely 32:10 55:5

## F

face-to-face 73:11

faced 47:1

fact 18:11 66:13 74:13 75:10

factor 38:22

factors 63:24

facts 18:24 29:14 43:14 72:1
73:25

failure 7:14

fair 6:23 24:20 35:15 57:15,21
60:14 66:5,7

fairly 16:1,17

family 18:14

fart 35:6

fascia 9:24 39:11 59:19

fascial 58:10 59:17

fashion 30:4

fast 77:15

faster 37:21

fatty 63:7

February 15:19

feces 32:2 38:14 66:21

feel 23:8 36:16,17

fellow 14:23 15:6

fellows 15:2

fellowship 14:21 15:6

felt 19:17

field 8:18 16:11 18:12,13

fields 20:13

figure 69:2

figured 68:24

fills 34:17,23

finish 17:16 40:1

finished 17:19,23 72:8,12,21

first-year 14:18

fistula 66:16

fitting 31:23

five-year 14:16

fix 28:14 40:19

fixing 76:9

flat 31:19

flatulence 33:20 34:6,8,23

flatus 33:19 34:10

flew 12:4

fly 11:25

flying 11:12,21

focused 12:23

follow 79:4

foods 37:20,21

forbidden 45:12

forever 23:20

form 51:5 56:11,22 64:15
76:16

Fort 19:20

forward 19:20,24

foul 32:10

found 5:22 62:9

foundation 16:22 17:14 18:6
48:20 49:3,4 51:11 56:11,22
68:16 71:25 72:23 73:24

fourth 14:10

Friday 22:14

front 34:1 35:16

front-line 73:7

full-fledged 14:14

function 37:23,25

functional 65:11

functioning 29:2,3,19 62:24
65:8,10,15,18,21

future 13:25 30:1 67:23 73:4

## G

gain 51:1

gangrenous 40:13

gas 33:22,23 34:1,13,18,19,
20,21,24 35:5 36:2,10

gasses 33:19,21 34:16

general 5:7,8 12:17,20,21,22,
23 19:25 20:14 26:17 27:11,
13 76:21

generally 35:10

genitourinary 70:11

gentlemen 4:12

genuinely 22:7

Georgia 11:17

GI 63:24,25

give 4:19 6:17 11:6 13:15

giving 45:11

goal 12:15

God 11:10

good 4:11,14,25 5:1 12:2
13:17 19:10,15 23:24 24:2,4
54:3 67:9

grades 12:2

graduating 15:6

grand 50:19

ground 20:6,7

group 14:2 49:13,15,18 51:7,
24

guess 60:15 63:22 71:5

guessing 23:21

guesstimate 13:11

guy 12:14 22:6,7

guys 11:23 71:10 78:24

## H

hand 4:18

handed 48:12 69:14

handover 48:11

hands 77:6

hanging 38:5

happen 32:4 42:10 44:11 46:9
62:10 77:10,11

happened 19:3

hard 8:8 10:18,20 13:11 18:16
31:23 46:13,22 49:21 55:3
77:15

harm 7:11,13,15,16 8:10 9:6,7
10:7 29:25 30:9,15,16,17,18,
20 36:4,14 38:20,24 39:2,24
42:4,9,16,21 43:2 53:13 66:8,
11

harms 39:4

Harper 15:19 22:20,21

heal 6:21 20:19,25

health 14:4 23:24 24:2,4,22
31:3

hear 17:25 26:18 43:16 48:13

heard 43:15 78:18

hearsay 68:17

heart 70:7

held 28:18

helmets 11:20,23

helping 45:14

hemorrhage 76:12

hernia 9:22 13:2 39:8,10,11
40:20 52:12 53:10 58:6,18,19,
23 59:1,6,12 76:9

herniation 46:10 59:21

high-risk 39:3

Hippocratic 52:13



hired 27:4

historical 21:4,14

history 25:5,7 30:10

hit 75:7

hold 35:10,17 69:6

hole 9:22,23,25 10:1,3 39:11
    63:4

holes 39:14,16

home 75:8

honest 65:11

hope 79:4

horrific 57:12

hospital 15:4 22:9 48:8 51:18
    52:17,19

hours 20:3

human 35:8

hundreds 13:18,19,20,21 23:6

Huron 52:19 55:23,24

---

**I**

idea 46:4 56:5 57:6,9 71:17

IDENTIFICATION 15:18 48:5
    69:5 80:3

ileostomy 8:22

ileum 8:21

image 38:19,22,23

imagine 32:10

immense 75:20

implicit 33:10

important 16:10 75:12

imprisonment 29:21

in-depth 75:14

inappropriate 43:13

incarcerated 40:8,14 53:11
    55:10,17

incarceration 40:9

incisional 76:9

include 59:22

included 59:7 76:9

including 70:6,10

increases 38:16

Indian 21:11

indication 63:14 64:17

indications 69:21

indifferent 41:20

individual 78:6

inevitably 33:2

infection 70:8

inflammatory 64:5,7

informed 69:25 70:11

inherently 76:18

injured 19:21

inside 36:22 62:24

insist 44:7

instances 32:23 33:4 75:22

insurance 48:17 49:10 51:24

insurances 51:23

intelligence 27:12

interact 7:24

interacting 8:4

interactions 33:15

interfering 38:7

internal 18:14

interns 14:18

interrupt 72:9

interrupted 44:9

interrupting 17:18 44:2,7,20
    45:12

interruption 63:6

intervention 40:19 46:24

intestinal 64:1

intestine 8:20 34:14 58:1
    60:13

intra-abdominal 38:16

introduced 54:6

invariably 66:11

invasive 14:21

investment 51:20

involve 56:3

involved 70:16

Iraq 19:19,22

irrelevant 41:12 53:1 72:24

irritated 46:17 61:24

irritation 31:14 33:13 64:15

isolation 33:16 36:4

issue 7:21 29:4 40:4,6

issues 24:22 33:12 38:19
    66:25

---

**J**

Jackson 4:13 5:13,17 6:12,21
    7:11 10:7 20:17,22 21:1,18
    23:8,17 25:16 26:21 29:12
    30:13 31:25 32:21 35:23 37:4
    38:7 41:12,23 42:4,10 46:8
    47:1 48:3 49:20 53:6,10,17
    55:9,17,23 57:19 58:4 59:1,6
    60:17 61:1,11 62:6,17 64:17
    65:4,6 66:4,14 67:8 68:2,13
    70:20 76:3 77:18

Jackson's 7:3,9 27:5 42:20
    43:5 47:15 56:7 67:18 73:21
    74:22

Jan 48:2

Japan 11:8

John 4:5,22 5:7 71:11,12

joined 19:14

**Jon** 4:12 5:3

**judge** 4:12 41:17 43:6

**judiciously** 77:14

**July** 4:2,7 15:20 48:3

**June** 5:18 7:4 23:3 65:6 66:5

**jury** 4:12 5:6,16 6:17 11:5,6
17:25 19:11 20:24 26:6,8
27:17 35:16 52:17 53:6 71:19
73:20 74:14

**jury's** 26:18,23 30:21 74:19

---

### K

**Kansakar** 26:13,14,19,23
42:14 55:22 67:24 68:11
73:19,20 74:21

**Kansakar's** 67:17

**Keith** 4:16

**key** 32:20

**kidney** 76:7

**kind** 17:3 31:9 49:21 61:19
68:7 72:6,13 77:21

**kinds** 21:20

**knew** 21:7,24 79:9

**knowledge** 49:5 67:14,24
68:11

**knuckles** 10:4

**Kohchise** 4:13 6:21 21:7,10,
12 25:13 37:4,12 48:3 49:20

**Kohchise's** 41:21

---

### L

**lack** 35:6 41:24 63:8

**lacking** 72:23

**ladies** 4:11

**laid** 49:4

**Lake** 55:23

**large** 10:21 39:17 46:21 60:19,
24 61:1 76:9

**larger** 39:16 58:12,16

**law** 13:17

**lay** 60:14

**layer** 41:2

**layers** 9:24 41:2

**layman's** 60:16

**leading** 23:22 27:22 35:2
52:25 71:25 73:24

**leak** 32:2,7 36:1 66:21 70:9

**leakage** 31:16 32:9,16,17
33:13 66:25

**leaking** 32:12 38:14 61:25

**leaks** 31:24

**learning** 27:11

**led** 12:11

**leery** 22:4

**left** 29:11 50:3

**legitimate** 41:21

**length** 51:15

**lengthy** 70:12,19

**letter** 26:13,24

**letting** 39:4

**level** 9:11,12

**levels** 14:17

**life** 21:13 24:3,4,19 25:11
28:25 29:12,17,19 37:7,12
67:12

**life-saving** 67:13

**life-threatening** 10:6,22 11:2
40:17 67:5

**lifestyle** 37:16,17,19

**lift** 38:8,11,13

**lifting** 38:17

**limit** 37:20

**limited** 16:12 25:11 70:7 75:23

**list** 57:12 65:22

**listed** 39:2 59:14

**Listen** 34:4 77:3

**literally** 8:19,24 21:9 25:19
36:21 39:19,20 40:9 41:4

**litigation** 69:16

**live** 54:12,14,15 68:7

**living** 11:17 62:20 75:6

**local** 76:21

**locate** 32:6

**long** 7:12 13:22 24:21 29:2
41:5 46:11,12 78:24

**longer** 23:15 25:22 37:13
59:25

**longevity** 23:24 24:3

**looked** 67:16

**loop** 40:16

**loss** 13:2

**lot** 8:5 20:19 25:18 36:17
57:18

**lots** 58:13

**loved** 11:19

**low** 51:19

**lowers** 7:22

**LUMBARD** 79:1

**lumen** 62:21

**lymphatic** 63:3

---

### M

**M-HM** 23:1 53:21 69:23

**M.D.** 4:22

**made** 19:25 24:22 42:12 43:6
56:16 70:5 71:20

**Magazine** 19:2

**maintain** 23:14


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**make** 9:23 16:7 18:18 27:24 38:17 39:14 56:13 66:3,9 72:3,15,18 73:3

**makes** 46:11

**making** 16:20 18:3,22 45:24 57:7,10 76:22

**man** 12:13 24:15

**management** 17:11

**map** 6:17

**mark** 69:2

**marked** 15:13,18 48:5 69:5 80:3

**Marko** 4:11,12,25 5:1,2,3 17:6, 7,16,18,20,22,24 20:12,16 25:25 26:6,9 28:2,5,7,10,13 29:9 35:1,4 41:14,16 43:17, 20,22 44:1,4,16,18,21,23,25 45:2,4,6,9,15,17 48:6 53:16, 21 56:9,11,19,22 68:16 69:6, 9,12 71:8,10,13,14 72:9,25 73:2 74:1,4,7,10,12,16,20 78:2,5,16 79:3,19,22

**math** 13:18

**matriculate** 14:8

**matter** 35:12

**MDOC** 37:2

**meaning** 8:1 12:23 13:3 14:10, 18 16:2 23:25 25:1 40:15 57:1 59:17 63:25 64:3 75:18

**means** 8:19 12:22 32:20 60:10

**meant** 32:19,22 33:7 64:14 68:4

**mechanics** 39:15

**mechanism** 33:5 34:9

**Medicaid** 48:18,23 49:2,4,5 50:11,12,13

**medical** 6:3 7:1,11 8:18 12:15 13:25 14:5,6,9,11 18:18 24:5, 10 25:9 30:23 33:9 40:18 41:21 45:22 46:1 52:23 55:23 57:2 66:10 73:3,21

**medically** 7:4 23:8,12 27:5,20 30:4 41:23 47:10 48:15,18,23 49:2,7 52:10,15 53:12 67:10, 11 68:2,14 73:22 74:23 75:2

**Medicare** 50:11

**medicine** 18:14,15 30:2,3

**meet** 16:8 42:2 71:23 72:4

**member** 15:9

**memorialized** 71:6 75:11

**mention** 31:16

**mentioned** 38:2

**mesentery** 63:2,8

**met** 5:3 21:4

**meticulous** 77:16

**Michigan** 4:1,6 11:22,24 12:6 14:22 52:20 55:10,19 68:4,12

**middle** 17:20

**miles** 54:18 55:6

**military** 11:13 19:11

**million** 6:25

**mimic** 10:21

**mind** 47:15

**mine** 25:19

**minimal** 77:7

**minimally** 14:20

**Minnesota** 19:21

**minute** 37:13

**minutes** 53:19 54:17

**Missouri** 55:17 67:25 68:3,7

**mitigate** 77:13

**mobile** 20:2

**Monday** 42:9

**Monell** 42:25

**money** 48:8,11 50:16 51:3 53:13,15

**monitor** 26:3

**month** 13:12 23:3,4,5

**months** 30:5,7

**moral** 53:8

**morals** 6:7

**morning** 42:9

**mother** 11:14 12:7

**mouth** 35:3

**move** 6:15 20:12 43:9,11 72:5, 22 77:23 78:1 79:12

**movie** 38:1

**moving** 43:18

**mucosa** 41:1,3,4 46:10 64:12, 13,16

**multiple** 20:1

**multiplicity** 63:23

**multiplied** 13:15

**muscle** 9:24

---

**N**

**named** 21:12,13 26:13

**narrowed** 60:10

**narrowing** 60:10

**natural** 7:20 36:16

**nature** 56:20

**necessarily** 59:7

**necessity** 18:18

**necrosis** 62:16,17,18 63:9

**needed** 52:1

**negative** 38:22

**neurosurgeon** 12:8,17

**neutral** 7:2

**nice** 21:23 22:6,7 38:10

**nightmare** 32:8

**nobody's** 48:12

**noisy** 33:24



non-medically 23:11

nonresponsive 77:24

Northville 54:15

notation 66:3 67:17

note 27:2

Notes 80:2

noticed 78:19,21,24 79:4

number 42:23 50:1,3 64:12 69:17

nurses 20:1

**O**

oath 4:24 52:13 74:13

object 41:13 56:19 72:19,20, 22

objection 10:11,25 16:22 17:4,12 18:6,24 20:15 23:22 27:8,22 29:13 34:22 35:1 39:5 41:9,10,18 43:12,21,23,24 48:20,25 49:3 50:2,18 51:10, 11 52:4,25 56:9,11,19,21 68:16 71:25 73:6,24 78:21 79:8

objection's 43:6 74:11

objections 43:22

obstruction 10:5,21 39:20,22 40:2,6,19 46:23 60:24 61:1

obstructions 10:5 40:6 60:20

obtained 69:25

obvious 38:21

occasions 32:1

occupied 39:17

occur 7:14 8:11 9:7 33:17 64:9 65:25 77:12

occurred 53:14

occurs 9:25 63:10

off-the-record 28:18

offer 24:11 25:12 73:9

offered 5:24

offering 24:9

office 22:19 55:14

older 25:19

opening 58:9,10 59:17 60:9, 10

openings 58:13

operate 77:13

operation 48:7,14 51:15,16 76:10,11

operations 23:11 76:15

operative 55:22

opine 46:1

opinion 6:10 7:2 73:21,23 74:23,24,25

opinions 6:22 11:6

opportunity 19:16 73:16

option 35:18

options 75:23

oral 16:6

order 31:10

orders 72:16

orient 5:9

original 9:22 26:19 30:7

originally 13:8

orphanage 11:9

orthopedic 12:25 20:1

Osaka 11:8

ostracized 34:11

ourself 5:9

outcome 40:22

outpatient 16:21 18:4

owed 19:18

**P**

p.m. 4:3,7 28:17,19,20,22 53:23,24,25 54:2 78:14,15 79:23

pages 15:17 48:4 69:4 80:2

paid 5:24 6:8 49:11 50:9

Papendick 4:16 16:19 17:1,8 18:1 28:1 29:10,16,24 42:1 43:3 54:9 56:3,5,16,24,25 57:6,9 71:16,17,19 72:14

paper 57:1

paracolostomy 9:21

paragraph 69:21

parastomal 9:22 39:8 58:6,18, 19,20,22,23,24 59:1,6,12,21

parcel 32:17

parents 11:10

part 8:19 21:11 32:17 36:18,21 39:17 62:24 63:4,5 64:13

party 8:3 26:12 37:23,25

pass 16:4 33:23 34:1,13

passage 63:1

passed 34:17 36:2

passing 33:22 36:10

pathology 64:4

pathway 14:7

patient 7:18 8:6,24 23:24 25:2, 10 26:25 28:24 29:25 30:9 32:5,7,9,24 33:9,24 39:22 40:12 42:25 46:2 47:4 50:24 51:14 52:1,7,15 53:14 62:19 64:25 70:5,11 71:23 73:5,9,16 75:11,13,14,15,21,23 76:7,8, 10,22,23 77:3,21

patient's 7:22 33:2

patients 7:21 8:13 9:25 20:19, 25 21:20 25:18,19 32:14 33:1 37:10 51:18,24 62:3 70:21 72:4,14 73:4,8 75:19,25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

76:17,25

**pay** 5:22 50:25

**payment** 5:25 6:2 50:13,22
51:1,4,5 52:22 53:3

**payout** 51:13,19

**people** 7:19,24 8:2 10:19 20:2
23:14 25:3,8,21 31:8 32:20
33:15 34:7 35:10 36:15 37:19,
23 38:3 62:12 72:3

**peptic** 63:25

**perceived** 7:25

**perceives** 38:23

**percentage** 8:13

**perfect** 41:8

**perform** 23:10 48:14 67:18

**performed** 5:12,18 7:4 49:13

**performing** 77:8

**period** 8:7 30:7 73:9 75:6

**permanent** 32:25

**permanently** 32:14

**person** 18:16 21:13 25:13
29:17,18 35:7,18 38:21 54:22

**perspective** 53:9 60:16

**pertinent** 11:18

**phenotypically** 21:16

**phonetically** 21:17

**physical** 7:16 8:10,16 9:6,7
30:17,18 31:3 38:24 39:1,3,24
47:12,13,14

**physically** 35:25 40:11

**physician** 6:9,20 7:2,3 17:3
27:4 50:19 51:4 73:7

**Physicians** 49:15,18 51:7

**physics** 39:15

**physiologic** 7:16

**pick** 20:2

**picture** 41:5 46:8

**pink** 64:13

**place** 9:4 32:7 46:6 62:18
66:15

**placement** 46:11

**places** 66:21

**plaintiff** 4:13 15:16 48:1

**Plaintiff's** 15:13 26:11 47:21
49:16 51:6

**play** 11:19 42:5

**played** 56:12 74:14

**playing** 28:5,9,23

**plays** 79:16

**pleasant** 22:8

**pleasantly** 22:6

**point** 39:7 64:18

**pool** 8:3 38:2,4,5

**pools** 38:10

**pops** 41:4

**population** 50:24

**Port** 55:24

**portion** 50:23 69:15

**pose** 7:10

**poses** 30:15

**post-residency** 14:25

**postoperative** 51:17

**postoperatively** 22:10

**potential** 33:12 40:21 45:21,
23 46:5 47:8 65:24 70:8,9

**potentially** 8:11 11:2 46:9
67:11,13

**potentials** 73:14

**pouch** 9:2

**practice** 13:13,23 16:1,11,12
18:14 30:2 49:12,13

**practiced** 16:13

**practicing** 13:22

**prefer** 12:17

**prejudicial** 41:13

**preoperative** 51:14

**presence** 36:15

**present** 8:2

**pressure** 38:16

**preventative** 30:2

**previous** 39:23

**previously** 48:13

**prison** 22:1,3,16,17 36:5
38:13

**prisoners** 22:5 36:7

**problem** 46:20 66:4

**problematic** 46:17

**problems** 9:18 57:13 65:23

**procedurally** 79:16

**procedure** 18:19 32:23 69:22
70:6 71:22 72:13

**procedures** 33:1

**proceed** 44:14

**proceeding** 76:4

**process** 9:18

**professional** 6:4 7:1 52:24
73:21 74:23

**program** 14:16,17 15:5,21

**prohibitive** 75:22 76:25

**prolapse** 9:9,15 41:8 46:7,19,
20,23 57:24 58:1,4 60:12

**prolapsed** 40:23

**prolapses** 46:15

**prolonged** 8:7 10:8

**prominent** 47:14

**proper** 43:24

**protrude** 9:15



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025

13

protrudes 9:10

protruding 9:12 64:11

provide 49:7 50:20

provided 49:10

provider 24:10 45:23 46:1,4
  47:6 48:17

proximal 64:3

prudently 77:14

psychological 7:15,17,21
  30:17,20 36:12 38:20,25 66:8,
  11

purposes 18:4

put 9:11 11:9 17:10 19:4 31:21
  34:4 57:1 59:10 60:14,15
  61:16 65:17

putting 35:2

**Q**

qualification 19:1

qualified 11:5 16:8 18:21

qualify 20:13 65:15

qualms 23:17

quarterback 42:9

question 6:25 28:24 29:6,18
  41:10 50:11 77:25 78:6

questioning 45:13

questions 17:5,20 42:18 43:8
  53:18 71:7 73:17,18,19 75:3
  78:10,18

quick 78:17

**R**

Rachel 4:15 54:7

raise 4:18

ramifications 42:12

rash 31:12 33:13

ratification 41:17

reaction 61:6 62:2

read 26:24 70:3,4,13

ready 28:2 71:10,13

real 27:25 78:17

reason 30:12 41:3 64:12 73:15
  77:20

reasons 36:9 42:23

rebuts 42:19

recently 39:21

recertified 16:15

recess 53:24

recessed 10:15,19 60:6,8

recesses 10:17

recollection 71:3

recommendation 26:25

recommendations 18:3

recommended 42:13

record 4:4,9 5:20 21:14 26:22
  28:13,16,20,21 37:2 53:20,22,
  25 54:1 56:15,24 57:1,2,4
  61:17 62:5,7 66:3,9,10 67:17
  69:15 74:11 75:1,12 77:20
  78:14,17 79:12,13,14,21

recording 78:15

records 30:11 32:1 35:23
  38:12 55:16,21 56:2 59:5,8
  61:13 63:15 64:17 65:17

recover 8:8

rectal 27:1

rectum 33:6

REDIRECT 71:14

redness 62:2

reduce 40:12

reference 26:7,11

refuse 53:14

reimbursed 52:24

related 42:8 65:2

relates 47:15

release 23:5

released 5:17 21:25 22:3,12,
  18

relevance 41:11 51:11 52:4

relevant 42:19,22,23 43:1

remains 10:2

remember 20:18,22 21:1,18
  22:8 59:2 60:1 61:12 65:10,16
  70:19,24

remove 75:19

removed 33:5 76:7

remunerated 49:8

reoperation 70:8

repair 52:12

repaired 52:13

rephrase 29:15 49:1

report 55:22

reporter 4:10,17

represent 54:8 69:14

require 46:24

required 27:6 43:4

requires 40:18

reservist 19:14

residency 13:24 14:24

resident 14:18,19

residents 14:4,12,13,14,17
  16:4

respect 6:14 77:16

respectful 44:9

respective 20:13

respond 41:16 44:8

response 43:12,23

responsible 14:4,6

responsive 78:5,8

rest 8:20 29:12 78:3

restrictions 37:16,18,19

result 35:24 63:9

reversal 5:13 7:3,9,14 9:5 10:9
13:8 23:3 24:9 25:10,12 27:2,
6 29:11 30:12 37:9 39:1,25
43:5 45:22,25 47:2,7,16 52:11
56:8 59:25 67:21 68:1 71:22
73:22 74:22

reversals 13:9,12,16 23:12
68:19

reverse 5:18 9:8 23:13 24:1
25:15 27:14 30:3,4 47:9,10
60:11 68:14

reversed 7:10 8:9 24:7 25:19,
21 29:1 30:5,16 37:11 46:2
53:11 57:20

reversing 13:4 24:5,11

review 30:10,11 55:16 56:2,
15,24

reviewed 55:20,21 56:16

rid 32:15

ridiculous 42:19

risk 9:6 30:9,15 42:3,21 43:2
45:21 47:1,5,9 60:19 62:17
63:13,18 64:25 65:4 70:7
75:4,6,8 76:15,18,19,20,23,24
77:4,5

risk-benefit 77:1

risks 7:11 10:7,23 11:1,2,3
39:24 42:8,12 45:24 47:12,13,
14,17 57:13,18 62:12 68:19,
21 70:6,15,17 73:14 75:3,10,
13,17,20,21,22,25 76:2,8,12,
13,15,25 77:13,19,20,25

road 6:17

roll 31:23

rolls 31:20

rose 10:16

rough 13:14,15

roughly 22:17 54:17

rude 44:6

rule 43:6

rules 79:4,17

ruling 41:17

ruptured 32:21 66:14

**S**

S-T-O-M-A 8:19

satisfactions 73:18

saved 67:11

scenario 32:8

schedule 79:6

school 12:3,16 13:17 14:5,9,
11

schools 11:17

seasoned 16:7

secured 70:1

segments 56:12

self-worth 7:23

send 25:3

sense 7:22 50:19

sentence 28:25 29:18,19
69:25 77:24

serve 19:19

service 19:12 20:9 48:2,18
49:8,9,10 51:2 53:4

services 50:20,22,25 53:4

set 71:11,12

settings 16:2

seven-year 14:17

shocked 68:7

show 25:24 26:6 27:25 31:8

32:1 35:23 37:2 38:12 41:6
43:2,7 47:21 68:22

showed 67:16

shows 42:24,25

shrinks 10:15

sic 19:4

signed 70:11

significant 47:17 50:23 59:11,
12,13,15

similar 27:13

Sinai 52:19

sir 6:16 49:23

sit 33:25 72:4,14

site 40:10

sitting 73:10

size 10:2

skin 8:24,25 9:2,10,13 10:17
31:10,12,13,19,22 32:12,13
39:13 60:8 61:6,7,10,18,23,24
62:2,6 63:20

sleeping 20:5

sloughing 62:1

small 76:18,19

smell 33:13 35:5 36:1

smelled 35:24

smells 32:13 35:6

smelly 34:20,21,24

sneak 10:4

Snelling 19:20

snug 9:24 39:15

social 33:16 36:4

socially 7:24 33:15 34:11

soft 13:1

soldiers 19:21

Solely 21:2

solemnly 4:18

somebody's 33:14

sort 57:2

sound 6:23 28:10

sounds 12:22 21:17 71:1

speak 6:9

speaking 8:10 51:9

special 37:18

specific 71:3

specifically 51:3 76:2

specifics 70:24

speculation 72:23

speech 43:10,12,19,23,25
44:19 78:3

speeches 45:11

speechified 43:14

speechifying 44:24

spelled 21:16

spent 51:20

sphincter 34:9 35:21,22

spoke 57:9

squeeze 34:9

stain 32:14

staining 32:15

stand 65:21

standard 26:25 27:6,10

stands 43:21

start 15:9 38:14

starting 15:11

starts 60:8 69:25

state 4:9 14:3,5

stated 37:6 75:1 77:19

statement 56:10 57:15 66:6,7

states 5:20 11:16 15:25 16:9
19:14,16,17,18 26:22

stay 22:9 78:17

stenosis 10:14 60:1,10,17

stenotic 10:18 60:10

stepped 15:5

sterilized 72:13

stick 31:11 61:8

sticking 36:22 64:11,14

stigma 33:16 36:4

stipulation 26:12 37:3

stoma 8:19 30:24,25 31:1,10,
11 35:21 39:12,18 58:24
62:16,17,18 63:9 64:18 65:1,2

stomach 64:1

stomal 65:3

stomas 33:11 64:10

stool 32:12 36:24 38:17 46:22
61:9,25 62:25

stop 44:10,19 76:24

stops 28:15 29:8

story 11:18

strange 18:13

strangulated 40:15

stratification 76:24

strike 43:9,11,18 67:15 72:22
77:23 78:1 79:12

stroke 70:7

structure 62:20

structures 70:10

stuck 40:8,11 46:16

students 13:25 14:5,6,9

stuff 12:24 20:5

stump 27:1

sub-50 25:3

subject 71:8

subjected 76:23

subspecialty 14:25

substantive 42:24

suggest 62:5 65:18

suitable 30:4

sunken 10:19

supply 40:15 62:21 63:3,9

support 20:2

supposed 44:17,22 45:1
66:22

surface 31:19

surgeon 5:7,8 12:10,11,13,16,
18,20,21,22 16:9,16 17:1,9
18:1,2,17 20:1 26:16,17 27:11
46:3,4 47:8 52:14 73:7 77:6,
15

surgeons 14:14 16:5,7 19:25
27:14

surgeries 13:3 23:7 29:11
76:17

surgery 5:18 7:3,9 12:9,25
13:2,7 14:21 15:12,19,21
16:11,13 18:4,15 20:14 22:10
23:7 26:20 27:7 30:8 37:9
39:4,21 41:25 42:3,13,20 43:5
47:19 48:24 49:2,24 50:16
51:8,25 52:1,2 55:1,23 56:8
57:14 62:19 65:3 68:21 70:16
73:10,15,22 74:22 75:2,4,9,
14,17,18,20,21 76:4,5,16,18,
19,25 77:2,4,8,11,17,21,25

surgical 14:14,15 16:4,20
18:19 19:20,24 40:7,18 46:24
60:22,24 69:4

surprised 22:6

surrounding 39:11 70:10

survival 32:20

suspect 18:12

sutured 8:23

swear 4:10,18

swimming 38:2

switch 26:1,10

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

John Webber, M.D.
07/29/2025

16

switched 26:2

switching 26:4

swollen 40:10

sworn 4:23

system 70:11

**T**

takes 8:6 29:7 51:24

talk 6:18,19,21 11:4 12:8 13:7 20:17 23:16 30:20 47:19 57:23 71:23 73:8

talked 30:16 33:12 37:15 38:24 57:18,23 58:6 60:12,19, 20 61:3,18 66:13

talking 8:14 32:25 45:3 67:21 73:5,10

taught 14:9,23

teach 13:25 14:11,17

teaching 14:4,6 15:2,10

team 19:20,24,25

technical 30:23

technically 9:3

telemedicine 73:12

telling 45:11 73:14

tells 75:12

temporary 32:22 33:3,7,9,11

tend 38:17

tents 20:5

term 41:25 65:3 67:22

terminal 24:6 25:10

test 16:3

testified 4:23 29:16,17 42:1 74:13

testifies 35:23 71:19 73:20

testify 38:7,11 42:2 54:22 55:3 74:1,22

testifying 6:2 42:17

testimony 4:19 29:14 41:15 42:8 43:16 71:20 79:8

Texas 4:16 54:9

thing 30:21 67:9

things 39:2 43:15 57:18 62:10 74:4,17 77:9,10

thinking 24:15

thought 17:19,21 24:8,10 72:7,11

tight-fitting 31:7

tighten 34:10

tightness 63:6

time 4:7,8 5:3 6:3,14 8:7 9:25 16:20 20:12 24:16 30:7 31:23 36:25 39:15 42:11 44:5 49:13, 14 51:20 52:16,21,22,24 53:4, 7 54:4 55:16 59:21 64:22 65:7 67:8,17 78:7 79:6

timeline 5:15 22:11

timely 30:3 47:2

times 20:8 40:7

tissue 63:7

tissues 13:1 77:16

today 5:3 7:8 12:19,20 52:17 53:7 75:7 78:23

Today's 4:6

told 15:21 21:11,25 22:2 37:10 47:13 76:9 79:9

toll 8:5 37:15

Top 19:2,4

total 49:24

toured 12:4,5

Township 4:1,6 22:19

tract 63:25 64:2

train 25:9

training 14:15,25 27:12

transcribed 28:23

transcript 78:17

transit 37:21

transits 39:12

trauma 13:2

treat 6:20 20:3 55:9

treated 20:19,25 52:9 64:22

treating 5:22,24 6:9,20 7:2 27:3 42:14

trial 35:16 42:2 54:23 78:22 79:10

trickery 79:20

true 5:4,5 42:7 70:17

truth 4:20

turn 40:13

TV 11:18

twin 11:9,15

two-thirds 69:24

type 35:5 37:8,20

types 7:13 30:16

Typically 9:11

**U**

U.S. 11:13,17

ulcer 63:25

ulcerative 64:6

unavailability 78:20 79:10

underestimate 25:17

undergraduate 12:6

understand 34:5 52:23 53:3 54:9

understanding 33:8,10

Understood 9:5,14,17 11:4

unfortunate 77:12

uniform 59:10

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

unit 20:2

United 11:16 15:25 16:9 19:14,16,17,18

University 12:5 14:3 49:14,17

unnecessary 48:24

unplug 28:11

unprofessional 17:22 44:6

unresponsive 78:4

unsanitary 32:13

updated 19:8,9

upfront 21:24 22:3

upper 63:24

upstream 64:4

ureter 70:10

utilization 17:11

V

Valley 52:19

verbal 33:8

versus 7:15 77:4

viable 62:20

video 28:9,15,23 29:8 78:15, 20

video-recorded 4:5

Vietnam 11:12

Vitae 15:17

Vividly 20:23,24

VOIR 5:2

volunteer 19:15

volunteered 19:19

W

waited 57:19 59:25

walk 75:7

walking 38:5

wall 8:23 10:16

wanted 12:16

War 11:13

warning 33:23

waste 78:6

watch 36:24

watched 11:19

watching 11:18 12:8

way-ish 69:24

Wayne 14:3,5

wear 8:6 25:22 29:20 31:7,8

wearing 7:18 31:6

Webber 4:5,17,21,22 5:7 7:1 20:13 42:17 54:3,12 55:9 80:1

Webber's 15:17

weeks 22:16 25:20 78:25 79:1, 2,3

weight 13:2 38:8,17

weights 38:11,13

Weil 4:14,15 10:11,25 16:22 17:4,12,14,17,19,21,23 18:6, 24 20:15 23:22 27:8,22 29:13 34:22 35:2 39:5 41:9,15 43:9, 18,21,24 44:3,15,17,19,22,24 45:1,3,5,8,10,16 48:20,25 49:3 50:2,18 51:10 52:4,25 53:19 54:3,7,11 56:20,23 69:8,10,13 71:7,25 72:5,7,11, 19 73:1,6,24 74:3,6,8,11,15 77:23 78:3,11 79:11,21

whatsoever 29:4 46:4

wheelhouse 18:22

whisk 75:13

white 28:12

whopping 49:25

wide 63:5

widens 10:1 58:9

wider 10:3

Wolverines 11:19,25

woman 26:13

word 35:6

words 35:3 49:1 57:16

work 34:13 49:12 50:24

worked 14:3

works 72:17 77:15

world 14:1

worse 11:11

wrecks 25:9

write 60:3

written 16:3

wrote 26:24

X

X-RAY 27:1

Y

yard 32:3

year 13:12 14:3,10,11,23 15:11,20 19:5 25:20 37:11,12

years 7:10 11:8 13:13,14,23, 24 14:8 37:7,10 57:14,15

yesterday 76:6,8

young 24:16,25

Ypsilanti 12:1

Z

Zoom 73:11

