**Dr. Keith Papendick**
**05/10/2021**

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4

5

6  KOHCHISE JACKSON,               Case No.:

7                                  2:19-cv-13382

8        Plaintiff,                Honorable

9        vs.                       Terrence G. Berg

10 CORIZON HEALTH, Inc.,           Magistrate:

11 et al.,                         Patricia T. Morris

12

13       Defendants.

14 - - - - - - - - - - - - - /

15 Pages 1-116

16

17       The Virtual, Videotaped Deposition of

18 Keith Papendick, M.D., taken pursuant to Notice in

19 the above-entitled cause, via Zoom, on May 10, 2021,

20 at 10:30 a.m., before Carol Marie Hicks, CSR-3345,

21 Notary Public in and for the County of Livingston.

22

23

24

25



# Dr. Keith Papendick
## 05/10/2021
**Pages 2..5**

**Page 2**

```
1    APPEARANCES:
2            IAN T. CROSS (P83367)
3            MARGOLIS, GALLAGHER & CROSS
4            214 S. Main Street, Suite 200
5            Ann Arbor, Michigan 48104
6            734.994.9590
7            larry@lawinannarbor.com
8
9                    Appearing on behalf of the Plaintiff.
10
11           KENNETH A. WILLIS (P55045)
12           CORBET, SHAW, ESSAD & BONASSO, PLLC
13           30500 Van Dyke Avenue, Suite 500
14           Warren, Michigan 48093
15           313.964.6300
16           kenneth.willis@cseb-law.com
17
18                   Appearing on behalf of the Defendant
19                   Prime Healthcare Services and
20                   Colleen Spencer.
21
22
23
24
25
```

**Page 3**

```
1    APPEARANCES - (cont'd.)
2
3            DEVLIN SCARBER (P64532)
4            CHAPMAN LAW GROUP
5            1441 West Long Lake Road, Suite 310
6            Troy, Michigan 48098
7            248.644.6326
8            dscarber@chapmanlawgroup.com
9
10                   Appearing on behalf of Defendants
11                   Corizon Health, Inc., and
12                   Keith Papendick, M.D.
13
14    ALSO PRESENT:  NEAL ROGERS, VIDEOGRAPHER
15
16    (All parties appeared via Zoom.)
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                    INDEX TO EXAMINATIONS
2    Witness                                          Page
3    KEITH PAPENDICK, M.D.
4      EXAMINATION BY MR. CROSS                      6, 106
5      EXAMINATION BY MR. SCARBER                    91, 114
6
7                    EXHIBITS
8    Deposition Exhibit                               Page
9      PAPENDICK EXHIBIT 1    Corizon Utilization       15
10                            Management Manual, 2017
11     PAPENDICK EXHIBIT 2    Corizon 3-1-14 Revision    18
12                            UM004
13     PAPENDICK EXHIBIT 3    UMMD job description       21
14     PAPENDICK EXHIBIT 4    Dr. Papendick's deposition 24
15                            transcript in Wright versus
16                            Corizon, et al., taken on
17                            June 25, 2018
18     PAPENDICK EXHIBIT 5    PIP Manual 1               27
19     PAPENDICK EXHIBIT 6    PIP Manual 2               27
20     PAPENDICK EXHIBIT 7    Dr. Papendick's deposition 51
21                            transcript in Spiller
22                            versus Stieve, taken
23                            March 27, 2019
24     PAPENDICK EXHIBIT 8    InGauge screenshots        57
25     PAPENDICK EXHIBIT 9    Dr. Papendick's resume     61
```

**Page 5**

```
1                    EXHIBITS - (cont'd.)
2    Deposition Exhibit                               Page
3      PAPENDICK EXHIBIT 10   Corizon Practitioner       58
4                             Clinical Onboarding
5                             training form
6      PAPENDICK EXHIBIT 11   (Not marked)
7      PAPENDICK EXHIBIT 12   MDOC Policy                82
8                             Directive 03.04.100
9
10
11    (Attached.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



**Page 6**

1  May 10, 2021
2  At or about 10:30 a.m.
3          KEITH PAPENDICK, M.D.
4  having first been duly sworn, was examined and testified
5  on his oath as follows:
6          THE VIDEOGRAPHER:  We are on the
7    record.  This is the video-recorded deposition of
8    Dr. Keith Papendick, being taken remotely via Zoom.
9    Today is May 10, 2021, and the time is 10:30 a.m.
10         Will the attorneys please identify
11   themselves and the court reporter please swear in
12   the witness.
13         MR. SCARBER:  Good morning, Ian Cross
14   on behalf of the plaintiff Kohchise Jackson.
15         MR. WILLIS:  Kenneth Willis on behalf
16   of defendants Prime and Colleen Spencer.
17         MR. SCARBER:  Good morning, Devlin
18   Scarber on behalf of the Corizon defendants, here
19   with Dr. Papendick, and on his behalf.
20         EXAMINATION
21  BY MR. CROSS:
22  Q   God morning, Dr. Papendick.  My name is Ian Cross, I
23   represent the plaintiff.  Just want to go over a few
24   ground rules before we start.  This isn't an
25   endurance test, so if you need a break at any time

**Page 7**

1    just let me know.  I just ask that you respond to
2    the last question posed before the break if you want
3    to take a break, okay?
4  A   Yes.
5  Q   And if you don't understand any of my questions, I
6    don't want you to guess, I want to you ask me to
7    clarify them.
8  A   Yes.
9  Q   Okay.  What did you do for a living from January of
10   2014 to December of 2016?
11  A   A utilization management physician.
12  Q   Who did you work for?
13  A   Quality Correctional Care of Michigan PC.
14  Q   And what did you do for a living from January of
15   2017 to the present?
16  A   Utilization management medical director for --
17  Q   I think you're frozen, sir.  I didn't get the answer
18   to that second question.  I think you froze or your
19   screen froze, from my perspective.
20  A   Yeah, something happened over here.  Yeah?
21  Q   Is it resolved now?
22         MR. SCARBER: Can you see him?
23         MR. CROSS:  Yeah, I can see him.
24         THE WITNESS:  Can you hear me?
25         MR. CROSS:  I can.

**Page 8**

1          MR. SCARBER:  Yep, we got it.
2  Something popped up on my screen, that's all.  Go
3  ahead.
4          MR. CROSS:  Okay.
5          MR. SCARBER:  He said he was still
6  employed by --
7  A  I worked for -- it's kind of a mixed-up situation in
8    Michigan -- I worked for a company called Quality
9    Correctional Care of Michigan PC, because physicians
10   are not allowed to be employed by corporate.
11 BY MR. CROSS:
12 Q   That'd be the corporate practice of medicine?
13 A   That would be a corporate practice of medicine and
14   we're not allowed to do that.
15 Q   Do you know why you're not allowed to do that?
16 A   State law.
17 Q   Do you know why the State prohibits that practice?
18          MR. SCARBER:  Just going to object to
19   foundation.
20 BY MR. CROSS:
21 Q   You can answer.
22          MR. SCARBER:  You can answer, if you
23   know and you can answer if you don't know.
24 A   I can only surmise, and I'd rather not do that.
25

**Page 9**

1  BY MR. CROSS:
2  Q   Okay.  So from January of 2017 to present, you
3    worked for -- what was your job title?
4  A   Utilization management medical director.
5  Q   And how was that different from your previous job
6    between 2014 and 2016?
7  A   Utilization management at Corizon Health is now a
8    corporate endeavor, i.e., we work together as a
9    group for all of our state contracts.
10 Q   So what changed, in terms of your job duties?
11 A   Very little, actually.
12 Q   Okay.  Well, what changed?
13 A   I'm placed under a different supervisor.
14 Q   But were you doing the same tasks day in and day
15   out?
16 A   Yes.
17 Q   Okay.  What are your job duties?
18 A   Evaluate requests from providers for off-site
19   consults or follow-ups and either approve or defer
20   those requests.
21 Q   Do you have any other duties?
22 A   No.
23 Q   Do you respond to healthcare kites from inmates?
24 A   Never.  I've never seen one, since 2012 when I
25   started working for them.



1  Q   Do you respond to inmate healthcare grievances?
2  **A   Nope, never seen one.**
3  Q   Are you ever interviewed as part of the grievance
4      process?
5  **A   No.**
6  Q   Do you ever personally meet with prisoners?
7  **A   No.**
8  Q   Do you ever meet with prisoners via telemedicine?
9  **A   No.**
10  Q   Okay.  Do you review requests for off-site treatment
11      for people in county jail?
12  **A   No.**
13  Q   Do you review requests for off-site treatment for
14      prisoners in states other than Michigan?
15  **A   Only when colleagues are on vacation or on PTO.**
16  Q   Okay.  And do they review requests for you when you
17      go on vacation?
18  **A   Yes.**
19  Q   Okay.  Do you participate in a weekly conference
20      call?
21  **A   Yes.**
22  Q   What do you discuss in that conference call?
23          MR. SCARBER:  Just going to place an
24      objection it can be it may go to anything
25      regarding peer-review material or anything protected

1      by the Patient Safety Quality Improvement Act.  But
2      go ahead, to the extent that's --
3  **A   We talk about what's going on in the department, we**
4      **talk about who's off next week, we talk about who's**
5      **covering for next week, we talk about our nursing**
6      **staff and who's covering -- going to cover when**
7      **nursing staff is off.  It's purely administrative.**
8  Q   Okay.  You don't talk about your performance?
9  **A   No.**
10  Q   All right.  So would it be fair to say that your
11      primary job duties since 2014 has been reviewing
12      requests for off-site care for DOC inmates?
13          MR. SCARBER:  Just going to place an
14      objection, asked and answered, but go ahead.
15  **A   I answered that, but yes.**
16  BY MR. CROSS:
17  Q   Okay.  If I say the word 407 request, do you know
18      what that is?
19  **A   It's a request in the medical record for Michigan**
20      **Department of Corrections.**
21  Q   Continue, I'm sorry.
22  **A   That's all right, go ahead.**
23  Q   What is it a request for?
24  **A   Could be anything from a test to a procedure to a**
25      **change in food, it's myriad.**

1  Q   So the requests you review, are they called 407
2      requests?
3  **A   No, they're off-site requests.**
4  Q   They're off --
5  **A   407 is a number by -- that the MDOC use for when it**
6      **was a paper process, and the paper number, form**
7      **number, was 407, and it's just remained, been called**
8      **that since, as far as I know.**
9  Q   Okay.  How many off-site requests do you typically
10      review in a day?
11          MR. SCARBER:  Just going to place an
12      objection, to the extent it calls for speculation,
13      but if you know.
14  **A   I'm going to say 85 to 100.**
15  BY MR. CROSS:
16  Q   How many hours do you work per day?
17  **A   Ten to twelve.**
18  Q   Do you take a break for lunch?
19  **A   No, I do not.**
20  Q   So in a ten-hour day, you're spending, on average,
21      say, six minutes per request?
22  **A   Some of them don't even take six minutes.**
23  Q   Okay.  Do you --
24  **A   So you're taking -- nevermind.**
25  Q   Go ahead.  Continue.

1  **A   You're extrapolating it to an average to all of them**
2      **and you can't do that.**
3  Q   Okay.  I understand that some will take longer than
4      others.  I'm just asking you what the average is.
5          Do you review the patient's medical
6      record when you make a decision on an off-site
7      request?
8  **A   All off-site requests are to be in total, they are**
9      **to have everything I need to know to determine**
10      **medical necessity.**
11  Q   Do you review the patient's medical record, besides
12      what's in the request, when making a determination?
13  **A   Occasionally.**
14  Q   Occasionally.  Okay.  Has the number of requests
15      you're asked to review gone up or down since you
16      began doing this job in 2014?
17  **A   I would say it's about the same.**
18  Q   About the same.  Is there anyone else in Michigan
19      who has similar job duties to you?
20  **A   Not in Michigan.**
21  Q   Not in Michigan.  Is there anyone, besides you, who
22      works in Corizon's utilization management department
23      in Michigan?
24  **A   I have a nurse, I have a nurse, part-time, out of**
25      **Missouri, and I have two data entry secretarial-type**



1    positions.
2  Q   Okay.  Is the nurse's name Lori Minor?
3  A   **Yes, it is.**
4  Q   What does Lori Minor do?
5  A   **She evaluates InterQual and makes sure that I have**
6     **the information that I need in the request.**
7  Q   What is InterQual?
8  A   **Where is InterQual?**
9  Q   I said -- I'm sorry, what is InterQual?
10 A   **It's a system for looking at medical necessity.**
11 Q   Is it a computer system?
12 A   **It's a computer program.**
13 Q   Is there a search bar in this computer program?
14 A   **I've never used it.**
15 Q   You've never used it.
16 A   **I only look at the results.**
17 Q   I see.  So what do the results show you?
18 A   **Whether it meets InterQual or not.**
19 Q   So an InterQual review would say, given this
20    patient's data and their symptoms, this procedure or
21    test is medically necessary or not medically
22    necessary?
23 A   **Says InterQual met or InterQual not met.**
24 Q   InterQual met or InterQual not met.
25 A   **That's it.**

1  Q   Do you -- and how is that information transmitted to
2     you?
3  A   **It's typed on the request and sent to me by Lori.**
4  Q   All right.  So everything you need to make your
5     decision is contained in the request form?
6  A   **Everything that I need to make the decision is**
7     **supposed to be in the request form.  That's a big**
8     **difference.**
9  Q   All right.  If I say the words "Abbreviated Review
10    List," do you know what that is, within the context
11    of utilization management?
12 A   **Yes.**
13 Q   What is the Abbreviated Review List?
14 A   **It's a list of procedures and requests that can be**
15    **approved by the nurse.  If it meets specific**
16    **criteria, it can be approved.**
17 Q   What is the purpose of the Abbreviated Review List?
18 A   **Expedite answers to specific requests.**
19         (Papendick Deposition Exhibit No. 1
20         was marked for identification.)
21 Q   Okay.  I'm going to show you a document.  Can you
22    see that?
23 A   **Yes.**
24 Q   Okay.  We're going to go down to --
25 A   **That's very old.**

1  Q   The document I'm showing you, it's very old; is that
2     what you said?
3  A   **It's 2016.  What is it you wanted me to look at?**
4  Q   So I want to direct your attention to this page and
5     the second sentence of the first paragraph.
6          MR. SCARBER:  I'm sorry, Ian, what
7     page are you on?
8          MR. CROSS:  Page 29.
9          MR. SCARBER:  Of the records?  Okay.
10         MR. CROSS:  Oh, are you looking for
11    the Bates number?
12         MR. SCARBER:  Yeah.
13         MR. CROSS:  29.
14         MR. SCARBER:  Okay.  Thank you.
15 BY MR. CROSS:
16 Q   Okay.  "These services will be subject to review by
17    utilization management nurse reviewers based on a
18    limited set of criteria developed by the physician
19    reviewer team."  Are you part of the physician
20    reviewer team?
21 A   **Yes.**
22 Q   What is the limited set of criteria that your team
23    developed for Abbreviated Review List requests?
24         **THE WITNESS:  No idea what this has**
25    **to do with this case.**

1  A   **This is -- for example, pacemakers have to be every**
2     **six months.**
3  BY MR. CROSS:
4  Q   Okay.
5  A   **So that's the limited criteria.**
6  Q   So is it fair to say that if a request is on the
7     Abbreviated Review List it doesn't come to you?
8  A   **Correct.**
9  Q   Okay.  Why is biopsy of vocal cord lesion on the
10    Abbreviated Review List?
11 A   **'Cause a vocal cord lesion has been seen by an ENT**
12    **has to be biopsied.  It doesn't matter what I think**
13    **or my input whatsoever.**
14 Q   You just know that that's something that always
15    needs to be done.
16 A   **The entire corporation knows.**
17 Q   Okay.  I'm going to move us up to page, I believe it
18    is 19.  Do you recognize this document?
19 A   **Not offhand, but. . .**
20 Q   Well, it was produced in discovery by Corizon, so
21    we're going to talk about it.  What is the Patient
22    Centered Care Tracking List?
23 A   **It's a list of things that the nurse can do nothing**
24    **about and needs to come to me, it's called the**
25    **T-list.**



1  Q   The T-list.  What's the purpose of the T-list?
2  A   **It's how the system has worked since I started in**
3      **2014.**
4  Q   It says here that the ARL and T-list are updated
5      annually, as needed.  Do you participate in updating
6      the list?
7  A   **I don't believe I ever have.  I have the Abbreviated**
8      **Review List, but not the T-list.**
9  Q   Okay.  Why does certain services on the T-list not
10     require InterQual review?
11 A   **Anything that has InterQual review is reviewed.**
12 Q   So if a request comes in for a service that is
13     neither on the Abbreviated Review List nor the
14     T-list, what happens to that request?
15 A   **It's sent to me with an InterQual statement.**
16 Q   Okay.  Is that the way it was always done?
17 A   **Yep.  Yes.**
18         (Papendick Deposition Exhibit No. 2
19         was marked for identification.)
20 Q   All right.  I'm going to show you another document,
21     call this Plaintiff's Exhibit 2.  It was filed in a
22     case called Lashuay versus DeLine, and it is, or at
23     least appears to be, an older version of the same
24     policy from 3-1-2014.  Do you know if there was a
25     version of this policy issued between 3-1-14 and

1      10-1-17?
2  A   **No, I do not know.**
3          MR. SCARBER:  I'm just going to place
4      an objection to relevance, it seems to -- to the
5      extent that this is a policy from another case or
6      another time period.
7  BY MR. CROSS:
8  Q   So I want to direct your attention to No. 3, that
9      sort of third Corizon logo down there; it says, "For
10     services not included in Pass through list or T-list
11     apply the following:  If InterQual criteria are met,
12     approve and send authorization back to site," or "If
13     InterQual criteria is not met refer to RMD for
14     determination."  Do you know what RMD stands for?
15 A   **Regional medical director.**
16 Q   Does the regional medical director review requests
17     for off-site service in Michigan?
18 A   **Not anymore, that's an old policy.**
19 Q   Do RMDs in other states review requests for off-site
20     service?
21         MR. SCARBER:  Foundation and
22     relevance.  Go ahead, if you know.
23 A   **We have three RMDs and a state medical director, all**
24     **the other states have a RMD.  So, yes, RMDs do, but**
25     **utilization management is being utilized in every**

1      state.
2  BY MR. CROSS:
3  Q   So it appears that, under this older version of the
4      policy, if InterQual criteria were met for a service
5      that was not on either the Pass through list or the
6      T-list they can be authorized without physician
7      review.
8  A   **Only if it's on the ARL.**
9  Q   Only if it's on the ARL.  So that was never the
10     case, in your experience in Michigan, that --
11 A   **What was never the case?**
12 Q   It looks like there are three buckets that a request
13     can fall into under this old version of the policy;
14     would you agree with me?
15         MR. SCARBER:  Can you scroll down to
16     the second page so we can see if there's something
17     else down there.  Okay, go ahead, I got you.
18 BY MR. CROSS:
19 Q   So under No. 3, the request could be on the
20     Abbreviated Review List or it could be on the T-list
21     or it could be on neither list?
22 A   **Frankly, we don't see whether it's on a T-list or**
23     **any list, we only see that it's InterQual criteria**
24     **are met.  InterQual criteria are recommendations for**
25     **care.**

1  Q   So are you saying that in 2014, when you started
2      doing this, this policy did not reflect the
3      practices of the organization in Michigan?
4          MR. SCARBER:  Just going to place an
5      objection to foundation.  Go ahead.
6  A   **I started in January of 2014.  I don't know what was**
7      **going on before I got there.**
8  BY MR. CROSS:
9  Q   So, I want to point out that the date of this policy
10     or the revision date was 3-1-14.
11 A   **That was a corporate revision.  I wasn't working for**
12     **corporate at the time.**
13         (Papendick Deposition Exhibit No. 3
14         was marked for identification.)
15 Q   Okay.  I'm going to show you what we've marked
16     Plaintiff's Exhibit 3, the job description for
17     utilization management medical director.  Could you
18     read the second sentence of the first paragraph, for
19     the record.
20         MR. SCARBER:  Ian, and I don't want
21     to interrupt, but I'm on the side of the computer,
22     so if you could just tell me what the pages are,
23     that way I can kind of look along with him.  318?
24     618, I'm sorry.
25         MR. CROSS:  618.



**Dr. Keith Papendick**
**05/10/2021**                                   **Pages 22..25**

Page 22

1  A   Could you go back to the top so that I can read it?
2  BY MR. CROSS:
3  Q   Yes, of course.
4  A   "He or she will utilize InterQual reviews as
5      provided by Corizon Health's utilization management
6      nurses along with Corizon Health's standard medical
7      guidelines to determine whether a request will be
8      approved as an off-site encounter or if an
9      alterative treatment plan should be employed."
10 Q   What are Corizon Health's standard medical
11     guidelines?
12 A   Depends on --
13                MR. SCARBER:  I'll object to
14     foundation, but go ahead.
15 A   What year?
16                MR. SCARBER:  2017 through '18.
17 BY MR. CROSS:
18 Q   It appears that the last revision was 11-3-16 for
19     this document.  But what are Corizon Health's
20     standard medical guidelines?
21 A   We use up-to-date and NCCN guidelines for evaluation
22     of medical necessity, and, again, up-to-date
23     recommendations only.
24 Q   Are there any Corizon proprietary medical guidelines
25     that you also use?

Page 23

1  A   Yes.
2  Q   Do you have access to those guidelines?
3  A   No.
4  Q   Where are those guidelines contained?
5  A   I don't have a clue.  My brain.
6  Q   How did you learn what the standard medical
7      guidelines were?
8  A   Well, which one are you talking about?  If you want
9      to talk about HTV --
10 Q   I'm talking about the Corizon medical guidelines,
11     not InterQual or the cancer guidelines.
12 A   I don't understand this.
13                MR. SCARBER:  I'll just place an
14     objection; to the extent that you are referring to a
15     particular policy -- and I know we gave you a bunch
16     of documents -- I just ask that you would show
17     whatever the document you're referring to to the
18     witness.  I doubt if he's memorized the particular
19     areas of where the policies might be or whatever the
20     definitions are.
21 BY MR. CROSS:
22 Q   Dr. Papendick, did you testify that Corizon health
23     had proprietary internal standard medical
24     guidelines?
25                MR. SCARBER:  Are you talking about

Page 24

1      today did he testify to that or are you asking him
2      has he testified previously?
3  BY MR. CROSS:
4  Q   I'm asking if he just testified to that five minutes
5      ago.
6                MR. SCARBER:  Okay.
7  A   Yes.  And then you refused my answer.
8  BY MR. CROSS:
9  Q   I'm sorry, would you like to say your answer again?
10 A   Certainly.  If you're talking about Hepatitis C and
11     cirrhosis and the need for six-months' ultrasounds,
12     that is a policy we have.  If you're talking about
13     hernia repair in patients who have pain or danger of
14     incarceration, yes, we have a policy about that.
15     But I don't know what you're even wanting me to
16     discuss.
17 Q   Okay.
18                MR. SCARBER:  Object to form.
19                (Papendick Deposition Exhibit No. 4
20                was marked for identification.)
21 BY MR. CROSS:
22 Q   I'm going to show you another document.  This is a
23     transcript of a deposition that you gave in Wright V
24     Corizon Health.  We're going to go to page -- do you
25     remember this case at all?

Page 25

1  A   No.
2  Q   I want to direct your attention to line six; you
3      said, "Yes, it was in the provider handbook."
4  A   Okay.
5  Q   Line seven through ten, I believe you indicated that
6      the provider handbook contains information that
7      providers need to supply care the way the State of
8      Michigan and Corizon wants it supplied.  Do you
9      recall saying that?
10 A   No.
11 Q   Are you aware of a provider handbook?
12 A   Yes.
13 Q   Do you have access to the provider handbook?
14 A   Not at this time.
15 Q   If you wanted to obtain the provider handbook, how
16     would you go about doing that?
17 A   It depends on if you're talking about Corizon
18     provider handbook --
19 Q   Yes.
20 A   -- or a --
21 Q   Or a, what?
22 A   Quality Correctional Care of Michigan, PC, provider
23     handbook.
24 Q   Oh, so there are two provider handbooks.
25 A   Well, I would assume so.



**Dr. Keith Papendick**
05/10/2021                                          Pages 26..29

Page 26

1          MR. SCARBER: I'll just object that
2    the question may be taken out of context. I don't
3    know what specific question this answer is in
4    response to. We're only looking at an answer and
5    not really the whole sequence of the questions as to
6    what it's talking about. So I think the doctor may
7    be speculating a little bit without having all that
8    background; so, object to form, calls for
9    speculation as well.
10   BY MR. CROSS:
11   Q    So at line 12 -- 11, 12, you said predominantly
12       Corizon generates the provider handbook, or this
13       provider handbook, the one that was being discussed
14       in this deposition?
15   A    **I don't recall.**
16          MR. SCARBER: Same objection. Which
17   provider handbook is being discussed in the
18   deposition? You haven't identified that.
19   BY MR. CROSS:
20   Q    Well, Dr. Papendick, why don't you tell me about all
21       of the provider handbooks that you are aware of.
22          MR. SCARBER: I'll just place an
23   objection as to form and relevance.
24   BY MR. CROSS:
25   Q    You may answer.

Page 27

1    A    **I know there is a Corizon health handbook.**
2    Q    What is it called?
3    A    **I believe it's called the Corizon Health Provider**
4        **Handbook.**
5    Q    Okay. Have you ever seen the Corizon Health
6        Provider Handbook?
7    A    **Years ago.**
8    Q    Did you read it?
9    A    **2014 -- no, 2012.**
10   Q    2012.
11   A    **When I was a provider.**
12          (Papendick Deposition Exhibit Nos. 5
13          and 6 were marked for
14          identification.)
15   Q    Okay. I'm going to show you another document. Does
16       this document look similar in it's content to that
17       provider handbook?
18          MR. SCARBER: Can you identify the
19   document, for the record.
20          MR. CROSS: For the record, this is
21   the PIP manual from Weinberger V Corizon, recently
22   produced by defendant Corizon.
23          MR. SCARBER: You're talking about
24   the case from Missouri?
25          MR. CROSS: Yes.

Page 28

1          MR. SCARBER: Okay.
2    A    **All right. I don't know what this is. What's the**
3        **date on this? 2007, isn't it?**
4    BY MR. CROSS:
5    Q    Yeah.
6          MR. SCARBER: So we'll object to
7    relevance; different case, different time period.
8    BY MR. CROSS:
9    Q    All right. How about this one?
10          MR. SCARBER: What's your question?
11   BY MR. CROSS:
12   Q    Does this look like the provider handbook that you
13       read in 2012?
14   A    **No idea.**
15   Q    Okay. So what are your options in responding to a
16       request for off-site treatment?
17   A    **Approve, ATP defer, need more information. I think**
18       **that's the only three.**
19   Q    What is ATP?
20   A    **ATP is an alternative treatment plan.**
21   Q    Are you allowed to deny a request without issuing an
22       alternative treatment plan?
23   A    **I don't deny.**
24          MR. SCARBER: Court reporter, could you
25       read back that last question.

Page 29

1          (The last question was read back.)
2          MR. SCARBER: Wait. There's no
3    question.
4    BY MR. CROSS:
5    Q    Could you answer that question, please.
6    A    **I don't --**
7          MR. SCARBER: I'm going to object to
8    asked and answered, but go ahead.
9    A    **I don't deny anything.**
10   BY MR. CROSS:
11   Q    So are you allowed to defer a request without
12       issuing an alternative treatment plan?
13   A    **No.**
14   Q    Why not?
15   A    **Because that's what alternative treatment plan is**
16       **all about. How can I defer it if I only have three**
17       **choices: Approval, ATP, or need more information.**
18   Q    When do you respond with need more information?
19   A    **When I need more information. I do "NMI:" and tell**
20       **them what I need.**
21   Q    Okay. Do you look in the medical records to find
22       more information?
23   A    **I do not. Most of the time I don't have access, and**
24       **anyone else, who is in the group doing my job, does**
25       **not have access. So all the information must be in**



**Dr. Keith Papendick**
05/10/2021                    Pages 30..33

Page 30

1     the request.
2  Q   Do you ever communicate with your colleagues while
3     you are deciding how to respond to a request?
4  A   No.
5  Q   Never?
6  A   Very rare.
7  Q   In what circumstance would you do that?
8  A   Typically if I'm working on a request from a
9     different state and I need to know that state's
10     procedures.
11 Q   Under what circumstances do you issue an ATP rather
12     than approving a request?
13 A   When there's no medical necessity demonstrated.
14 Q   Do you ever issue ATPs rather than approvals based
15     on a cost consideration?
16 A   Absolutely not.
17 Q   In the context of your job, how do you define
18     medically necessary?
19 A   Medically necessary is when it will do harm if you
20     don't do it, if the patient is in significant pain,
21     if there is no reason to do the test or do the
22     procedure.
23 Q   So if there's no reason to do the procedure, it's
24     medically necessary to do it?
25 A   That's what medical necessity means, it is necessary

Page 31

1     to do it.  So if there is no necessity, then it is
2     not medically necessary.
3  Q   Okay.  So, I want to go back to the definition; you
4     said if they're in significant pain.  What else did
5     you say?
6         MR. SCARBER:  Just going to place an
7     objection as asked and answered.
8  A   If not doing it will harm the patient physically,
9     have to have medical necessity supplied by the
10     provider.
11 BY MR. CROSS:
12 Q   Have to have medical necessity supplied by the
13     provider?  What does that --
14 A   Correct.  Okay, if something is not necessary
15     medically, it should never be asked for, there
16     should never be a request for it.
17 Q   I understand.  Thank you.
18 A   So the provider has to convince me that there's a
19     medical necessity for what he is requesting, he or
20     she is requesting.
21 Q   Okay.  Has the definition of medical necessity that
22     you use changed at all since you started doing
23     utilization management in 2014?
24 A   Very little.
25 Q   How has it changed?

Page 32

1  A   I should probably say no, because it really hasn't.
2  Q   It has not.
3  A   No.
4  Q   Are there any procedures or types of requests that
5     you are approving as medically necessary, when you
6     started doing this in 2014, that you would not
7     approve as medically necessary today?
8         MR. SCARBER:  Just going to place an
9     objection to the overbroad nature of the question,
10     form, relevancy.
11 A   If there was no medical necessity in 2014, they'll
12     be no medical necessity now.
13 BY MR. CROSS:
14 Q   Do you apply the same definition of medical
15     necessity when you're covering for other UMMDs in
16     other states?
17 A   Yes.
18 Q   So if you are covering in Missouri, and,
19     hypothetically, there was a request for a reversal
20     of a functional colostomy, would you approve or ATP
21     that request?
22         MR. SCARBER:  Just going to place an
23     objection to the form of the question; it's a
24     hypothetical without any sufficient facts to allow
25     the doctor to really be able to answer what the

Page 33

1     medical provider actually put in the request, what
2     the patient's condition was, what underlying
3     problems that the patient was facing, and things of
4     that nature, so objection.
5         MR. CROSS:  I'm going to object to
6     your speaking objection.
7         MR. SCARBER:  Object to form; object
8     to vague and broad nature of the question.
9  BY MR. CROSS:
10 Q   You may answer.
11 A   Please repeat the question.
12 Q   You know what, I'll move on.  I'm going to give you
13     a series of hypothetical requests for off-site
14     services and I want you to tell me if, in your
15     opinion, each requested service is medically
16     necessary.
17         First, a 39-year-old male presents
18     with androgenetic alopecia; the condition causes him
19     emotional distress; the 407 request seeks an
20     off-site consult for a hair follicle transplant; is
21     that medically necessary?
22         MR. SCARBER:  I'm just going to place
23     an objection to the, still, the vagueness of your
24     hypothetical, it's an improper hypothetical, it has
25     nothing to do with the particular issue in this



**Dr. Keith Papendick**
05/10/2021
Pages 34..37

Page 34

1    case; objection, relevance.
2    BY MR. CROSS:
3    Q   You may answer.
4    A   **On its face, no.**
5    Q   How come?
6            MR. SCARBER:  Same objection.  If you
7    feel like you've got enough facts to answer, go
8    ahead.
9    A   **Well, I don't have enough facts to make a permanent**
10   **answer.  I can tell you that the State of Michigan**
11   **does not allow cosmetic care.**
12   BY MR. CROSS:
13   Q   What other facts would you need to make an answer?
14   A   **Something that takes it out of cosmetic care.**
15   Q   What is cosmetic care?
16   A   **Cosmetic care is a procedure that is only being done**
17   **because it looks better.**
18   Q   I see.  So if you got a request like that, would you
19   recommend Finasteride as an ATP?
20   A   **I don't have anything to do with that.**
21           MR. SCARBER:  Same objection.
22   BY MR. CROSS:
23   Q   What would you be your ATP if you got that request?
24   A   **My ATP would be medical -- ATP, medical necessity**
25   **not demonstrated at this time, follow in on-site**

Page 35

1    clinic.
2    Q   Okay.  Same scenario, but the emotional distress
3    causes the patient to engage in self-injurious
4    behavior; does that change your answer?
5    A   **Medical necessity not demonstrated at this time,**
6    **consult psychiatry.**
7    Q   Okay.  Next, a 74-year-old female patient has a very
8    dense cataract in the right eye, but has good vision
9    in her left eye; request seeks cataract extraction
10   with lens implant in the right eye because her
11   vision is extremely poor in the right eye.
12           MR. SCARBER:  I guess I'm going to
13   object to the nature of all the hypotheticals as
14   being not relevant, not providing enough information
15   to the doctor to be able to really answer the
16   question, and it calls for speculation.
17   A   **My providers know the answer to that question.  They**
18   **would not send it to me without the information that**
19   **I need.**
20   BY MR. CROSS:
21   Q   So what information would you need?
22   A   **I would need to have the visual acuities in both**
23   **eyes, I would have to have a list of medical**
24   **problems and medications, which you have not**
25   **supplied.**

Page 36

1    Q   Okay.  So under what circumstances would you approve
2    that request, in terms of the visual acuity in each
3    eye?
4            MR. SCARBER:  I'm going to place an
5    objection to relevance, foundation; and I'm also
6    going to place an objection to prejudice because I
7    think this is getting out -- getting to the point
8    where you're raising specific issues and other
9    inmates may be trying to seek these particular
10   conditions and now you're going to be trying to use
11   Dr. Papendick's speculation and guess as to whether
12   or not somebody will get something under a specific
13   hypothetical set of circumstances.  So now you're
14   getting into the safety of the Department of
15   Corrections with these questions at this point.
16   BY MR. CROSS:
17   Q   You may answer.
18           MR. SCARBER:  If you feel you can
19   answer the question.
20   A   **Not with the information I've been given, I cannot**
21   **answer the question.**
22   BY MR. CROSS:
23   Q   So your response would be NMI, need more
24   information?
25   A   **Absolutely.**

Page 37

1    Q   And you would request the visual acuity in each eye.
2    So, say, the visual acuity is 20/30 in the good eye
3    and 2600 in the bad eye.
4    A   **Okay, it's still not enough information.**
5    Q   What else do you need?
6    A   **Medication list and medical conditions.**
7    Q   Assume no relevant medical condition and they're not
8    on any medication.
9            MR. SCARBER:  (Audio disruption.)
10           THE COURT REPORTER:  Excuse me, what
11   was the objection?
12           MR. SCARBER:  I'm sorry, I said same
13   objection.
14   A   **Give me the old ophthalmology note.  You're not**
15   **giving me any information.**
16   BY MR. CROSS:
17   Q   All right.  A 53-year-old male has a history of
18   hearing loss since ten years ago; the patient
19   experiencing difficulty discriminating voices; the
20   patient previously used hearing aids, which
21   significantly improved hearing loss; patient can
22   perceive a whispered voice and finger rub in his
23   right ear but not in his left ear; he can hear a
24   person talking in a quiet room; the request is for
25   an audiogram evaluation for hearing aids.



1  A   And your question?
2  Q   And my question is, would you consider that
3      medically necessary?
4  A   Yes.
5  Q   Yes?
6          MR. SCARBER:  I'm still going to
7      place an objection to the form of the question, as
8      well as the relevancy to this particular issue, as
9      well as any potential safety concerns in the
10     Department of Corrections regarding inmates who are
11     trying to get procedures.
12 BY MR. CROSS:
13 Q   Why is it medically necessary?
14         MR. SCARBER:  Object to a
15     misstatement of the witness' answer.
16 BY MR. CROSS:
17 Q   I'm sorry.  Did you say yes or no, sir?
18 A   It will be approved.
19 Q   Why would it be approved?
20 A   Because the McBride settlement with the State of
21     Michigan require it.
22 Q   A 30-year-old male patient injured his back six
23     months ago while doing heavy lifting during a prison
24     work assignment; he complains of continuous lower
25     back pain; the patient is able to walk, but is not

1      able to play sports or do his previous prison job;
2      he also reports numbness and weakness in his right
3      leg; he recently had an MRI, which shows disc
4      herniations with nerve root impingement at L4 to 5
5      and L5-S1; request is for epidural steroid
6      injections.
7          THE WITNESS:  I'd like to know where
8      he got these cases.
9          MR. SCARBER:  What's your question?
10     I'm still going to object to unfair hypothetical and
11     for all the other prejudicial reasons I said, but
12     what's the question?
13 BY MR. CROSS:
14 Q   Would you approve that request or issue an ATP or
15     need more information?
16 A   It would not be approved.  I do need more
17     information.
18 Q   Why wouldn't it be approved?
19         MR. SCARBER:  Same objection.
20 A   There's not enough information supplied.
21 BY MR. CROSS:
22 Q   So what additional information would you need and
23     how would that information determine your decision?
24 A   I need a diagnosis.
25 Q   Okay.

1  A   And if it was a surgical diagnosis it would go to
2      neurosurgery before it went to whoever they were
3      gonna send it to for an injection.
4  Q   25-year-old male with no significant comorbidities
5      had part of his left ear severed in a fight with
6      another inmate; the patient's wound is bandaged, he
7      has normal vitals, and he is hemodynamically stable;
8      the on-site provider has placed the ear on ice;
9      urgent request to send the patient and ear to the
10     hospital to attempt to reattach the ear.  Approve or
11     ATP?
12         MR. SCARBER:  Same objection; form,
13     unfair hypothetical, calls for speculation, not
14     relevant.
15 A   So your question is?  Evidently we've lost sound.
16         MR. SCARBER:  I think he's pausing.
17 BY MR. CROSS:
18 Q   So approve or ATP?  That's the question.
19 A   Neither one.
20 Q   Neither one?
21 A   Correct.
22 Q   What would you do instead?
23 A   I would never receive this.  This patient would
24     automatically go to the emergency room to be
25     evaluated and treated, it would never come to me.

1  Q   All right.  A 55-year-old male patient has been
2      incarcerated for 30 years; his earliest release date
3      is five years away; the patient has a colostomy
4      established ten years ago in management of acute
5      diverticulitis; request authorization of a general
6      surgeon consult for consideration of colostomy
7      reversal.
8  A   Not enough information.
9  Q   What other information do you need?
10 A   I need to know if there's any complications of him
11     having a colostomy at this time.
12 Q   And how would that information help you make a
13     decision?
14 A   There are dangers, risks, to having surgery, and the
15     only thing that a surgeon will do for this patient
16     is do surgery.  So there is no reason, no medical
17     reason, to send him to a general surgeon if the risk
18     outweighs the benefit.
19 Q   I see.  So let's change the question a little.
20     Let's say the patient has a disease that, if not
21     promptly treated by a specialist, could result in
22     the eventual loss of the patient's colon and rectum
23     and the need for a permanent lifetime ileostomy.
24     Would off-site treatment to prevent that outcome be
25     medically necessary if the patient would be able to



**Dr. Keith Papendick**
05/10/2021                    Pages 42..45

1    complete activities of daily living and have no
2    problems with the ileostomy bag after the eventual
3    removal of their colon and rectum?
4  A    I would say I don't have enough information.
5  Q    You don't have enough information.
6  A    No.
7              MR. SCARBER:  And I'm going to place
8    an objection to the question, as well, because
9    you're presuming some of these potential risks that
10   could happen to the patient if he didn't have the
11   ileostomy, or whatever the other medical condition
12   is here.
13             I haven't seen anything from any
14   doctor talking about what the other person needed or
15   nor has this particular doctor or witness here that
16   you're asking a question about at this particular
17   time.  So calls for speculation, foundation,
18   relevance, and, again, I think this is starting to
19   get -- starting to border on you trying to represent
20   other patients or inmates in this particular case,
21   which is objectionable, and we'll move to strike
22   some of this line of questioning.  It's one thing to
23   try to show that there is some type of Monnell
24   claim, but now you're getting -- I think you've gone
25   beyond that.

1  BY MR. CROSS:
2  Q    When is the last time you performed a colostomy
3    take-down surgery, if ever?
4  A    Did it in medical school 30 years ago.
5  Q    Would you agree that the risks associated with
6    surgery vary from patient to patient?
7  A    Certainly.
8  Q    Would you agree that a general surgeon who sees the
9    patient for a consultation would be in a better
10   position to evaluate the risks and benefits of the
11   surgery than you would?
12 A    Not enough information.
13 Q    What other information would you need?
14 A    I'd need to know the number of cases that the
15   surgeon has done.
16 Q    All right.  So if the surgeon has done at least 100
17   take-down procedures in their career, colostomy
18   take-down procedures in their career, could you
19   answer the question then?
20             MR. SCARBER:  I'm going to place the
21   same objection, that it doesn't -- the hypothetical
22   doesn't provide enough information and it has no
23   relevancy to Mr. Jackson.
24 BY MR. CROSS:
25 Q    Go ahead.

1  A    I don't recall the form of your question.  Could you
2    please reask your question.
3              MR. CROSS:  Can you read the question
4    back.
5              (Page 43, lines 16-19 were read
6              back.)
7  A    And the question is?
8  BY MR. CROSS:
9  Q    Would you agree that a general surgeon who sees the
10   patient for a consultation would be in a better
11   position to evaluate the risks and benefits of the
12   surgery than you would?
13 A    No.
14 Q    No?  How come?  Do you have an answer, sir?
15 A    I have several answers.
16 Q    Let's hear them.
17 A    You're not hearing all of them.  You're hearing one
18   of them.
19             MR. SCARBER:  (Audio disruption).
20             THE COURT REPORTER:  Excuse me, could
21   you repeat that, Mr. Scarber.
22             MR. SCARBER:  I'm sorry, I asked the
23   doctor do you have enough information?  Do you need
24   more information?  Are you able to answer the
25   question.

1  A    I need more information.
2  BY MR. CROSS:
3  Q    What other information do you need?
4  A    Outcome.  He may have done 100, but if 99 of them
5    had complications, do you have that information?  Do
6    most physicians have that information?  No.
7  Q    Do you?  Do you learn about the general surgeon's
8    experience and the outcomes of their previous
9    surgeries before you make a decision on a 407
10   request for a consultation with a general surgeon
11   for colostomy reversal?
12             MR. SCARBER:  Going to place an
13   objection to relevance in this particular case,
14   doesn't seem to have anything to do with
15   Mr. Jackson's case, and you haven't put in context
16   the general surgeon's involvement with the
17   particular inmate, when that involvement occurred or
18   anything of that nature.  I'm going on without
19   trying to make a speaking objection, but I think I'm
20   just trying to lay the foundation that there's
21   clearly not enough facts here for this witness to be
22   able to answer the question without it being placed
23   in the proper context.  If you can answer his
24   question, go ahead, I made my objection.
25 A    Yeah, there's just no way to answer what he's



1    asking.
2  BY MR. CROSS:
3  Q   I'm asking if you evaluate the surgeon's experience
4      and success rate when you decide whether or not to
5      approve a consult with that surgeon when you're
6      doing your job?
7           MR. SCARBER:  I'm sorry, was there a
8      particular consult in this case with respect to
9      Mr. Jackson?  I'm going to object to relevance.
10          MR. CROSS:  Devlin, you asked my
11     client about his sex life.
12          THE WITNESS:  I did?
13          MR. CROSS:  You didn't, your attorney
14     did.
15          MR. SCARBER:  Mr. Jackson's sex life
16     was all throughout the records, throughout his
17     medical records, and it had to do with what his
18     damages were.  They were in his own records before
19     and after the -- before and after he went to jail.
20          MR. CROSS:  All right.
21          MR. SCARBER:  So, clearly, your
22     client's medical records are relevant.  What you're
23     asking this particular witness is a hypothetical
24     about what he would do about evaluating a particular
25     surgeon if the surgeon needed a consult.

1  BY MR. CROSS:
2  Q   I'm sorry, I'll be clearer.  I'm not asking you a
3      hypothetical question, sir.  I'm asking you when you
4      review these requests for a surgical consult for
5      colostomy reversals while doing your job -- for
6      example, the request you reviewed for my client --
7      did you learn about the success rate of the surgeon
8      before you decided whether or not to approve the
9      consult?
10          MR. SCARBER:  I'm going to place an
11     objection because it's still not relevant.  There
12     was no surgical consult requested for a particular
13     surgeon in this case.  There was a request made for
14     a colostomy reversal.  So, relevance and outside of
15     the facts of the case.
16  BY MR. CROSS:
17  Q   Do you get annual performance evaluations at your
18     job, sir?
19  A   I'm assuming so.  We get a decision on pay raise or
20     not.
21  Q   So you're not aware if you get annual performance
22     evaluations?
23  A   It depends on what you would call a performance
24     evaluation.  If you're talking about how long it
25     takes me to turn around a case, yes.  There is

1    nothing specific to a case.
2  Q   Is a portion of your annual performance evaluation
3      based on the percentage of requests that you ATP?
4  A   No.
5  Q   It's not.
6  A   No.
7  Q   So your ATP rate has no effect on how your
8      performance is evaluated?
9  A   No, it's reported, not evaluated.
10  Q   Has it ever been evaluated?
11          THE WITNESS:  Can we stop a minute?
12          MR. SCARBER:  Yeah, let's take a --
13     there's a question on the record and I don't want to
14     stop you from getting the answer to your question,
15     but after you do I want to take a quick break.  I
16     just want to --
17          MR. CROSS:  Sure.
18          MR. SCARBER:  Yeah.
19  BY MR. CROSS:
20  Q   Can you answer the last question and then we'll take
21     a break?
22  A   No, I cannot.
23  Q   You cannot answer that question?
24  A   No.
25          MR. CROSS:  Can you read the question

1    back, ma'am.
2          (Page 48, lines 7, 8 and 10 were read
3          back.)
4  A   No, it has never been evaluated in performance -- or
5      enumerating my performance.
6  Q   Okay.  Thank you.  Do you want -- how much time
7      would you like?
8  A   Five.
9  Q   Five?  All right.  Why don't we take ten.
10  A   I'm good with five.
11          THE VIDEOGRAPHER:  We're going off
12     the record at 11:36 a.m.
13          (Break was taken.)
14          THE VIDEOGRAPHER:  We are back on the
15     record at 11:51 a.m.
16          MR. SCARBER:  Ian, Attorney Devlin
17     Scarber here.  I talked with the doctor afterwards,
18     after our break, and I think he was having a
19     misunderstanding about what you were saying.  So I'm
20     going to let him -- he wants to discuss his prior
21     answer with you, or at least explain it.
22          MR. CROSS:  To which question?
23          MR. SCARBER:  You asked him a
24     question about his ATPs or something about what's a
25     part of his job review or something like that.

**Dr. Keith Papendick**
05/10/2021
Pages 50..53

1  BY MR. CROSS:
2  Q   All right.  Dr. Papendick, now that you've talked to
3      your attorney, what do you want to tell me about
4      your ATPs and your job review?
5  **A   There is a job review form that is put out by the**
6  **supervisors to us, and it does so that there is a**
7  **scale for the percent ATPs and other items.  So**
8  **there is an evaluation made of our abilities, of our**
9  **performance, but it has nothing to do with how much**
10 **I make.**
11 Q   Okay.  So there's a performance evaluation, but it
12     doesn't factor into your pay, is what you're saying.
13 **A   That's correct.**
14          MR. SCARBER:  Explain.
15 **A   I rarely get an increase in pay.  I haven't had one**
16 **in four years, I got one this year, and I think I**
17 **got one last year.  But I haven't had an increase in**
18 **pay in years.  And so, yeah, it looks like it is.**
19 **But when your increase in pay is two percent,**
20 **essentially the cost of living, it's hardly a**
21 **significant increase in pay.  Also, the ATP rate is**
22 **generic, it has absolutely nothing to do with**
23 **specific ATPs.**
24 BY MR. CROSS:
25 Q   Okay.  I'm going to show you another document -- by

1      the way, did you take the opportunity to review any
2      documents during the break, sir?
3  **A   No.**
4  Q   No.  Okay.
5  **A   Well, we looked at the fact that there was an**
6  **evaluation form.**
7  Q   So you've reviewed the evaluation form?
8  **A   Correct.**
9  Q   Okay.  Did you review any other documents?
10 **A   I don't think so, no.**
11 Q   Okay.  Let me bring up another document.  Can you
12     see it?
13 **A   Yes.**
14          (Papendick Deposition Exhibit No. 7
15          was marked for identification.)
16 Q   This is what we will call Plaintiff's Exhibit 7,
17     deposition of Keith Papendick in Spiller V Stieve.
18     Do you remember that case?
19 **A   Names.**
20 Q   Okay.  I want you to read, for the record, lines 13
21     through 17, that question and answer.
22 **A   Okay.**
23 Q   "Has anybody ever sat down with you, talked about
24     your cost per thousand patients?  Has anybody ever
25     sat down with you and had discussions about your

1      cost per thousand patients being too high"?  And you
2      said, "No, it's not.  I'm not the highest.  I'm not
3      the worst."  Who are the other people that you are
4      comparing yourself to in that answer?
5  **A   I don't recall.**
6          MR. SCARBER:  Hang on, I'm just going
7      to place an objection to form, because it was a
8      couple of questions that you asked.  But you want
9      him to answer the last question?
10         MR. CROSS:  Yes.
11 **A   Okay.  I have no idea.**
12 BY MR. CROSS:
13 Q   You don't know who those people you are comparing
14     yourself to in that answer are.
15 **A   No, it was sometime ago.**
16 Q   So, let me ask you the question again today.  Has
17     anybody ever sat down with you, talked about your
18     cost per thousand patients?
19 **A   Never have I been told what my cost per thousand**
20 **patients is.  And, by the way, it's cost per**
21 **thousand patients year, is how --**
22 Q   Cost per thousand patients, what was that, I'm
23     sorry?
24 **A   Year, over a year.**
25 Q   Over a year.  Okay.

1  **A   And it's not just cost per thousand.  And, no, I**
2  **have never talked with anybody about my cost per**
3  **thousand.**
4  Q   Did you say that you don't know what your cost per
5      thousand is?
6  **A   I do have no clue.**
7  Q   All right.  I want you to read, for the record,
8      lines 21 to 23 of this deposition transcript aloud.
9  **A   "Has your cost per thousand patients gone up or down**
10 **since you've been there"?**
11 **"It originally went up and**
12 **malpractice cases went down.  The number of**
13 **malpractice cases filed went down and they**
14 **attributed that -- they attributed the end" --**
15 Q   Well, that's fine.  So based on your answer, it
16     sounds like, at the time, you knew how your cost per
17     thousand patients had changed over time.
18         MR. SCARBER:  I'm just going to place
19     an objection; calls for speculation and foundation.
20 BY MR. CROSS:
21 Q   Did you know that at the time?
22 **A   I did not know at the time what my cost per --**
23         THE WITNESS:  I already told him
24     this.
25 **A   I have never discussed cost per thousand.**



Dr. Keith Papendick
05/10/2021

1  BY MR. CROSS:
2  Q   So then why did you say, "I'm not the highest. I'm
3      not the worst"?
4  A   I already told you I don't recall saying that and
5      don't remember why.
6  Q   Okay. Why did you say, "It originally went up and
7      malpractice cases went down"?
8  A   Because my ATP rate -- my ATP rate, in the first
9      month I was there in 2014, went down; in other
10     words, I had more approvals than I did ATPs; thus,
11     there were less malpractice cases, and so we knew
12     that we were spending more on outpatient, but I
13     don't know what the numbers are.
14 Q   So you don't know the number that is spent, but you
15     know your ATP rate?
16         MR. SCARBER: I'm just going to place
17     an objection; mischaracterizes his answers.
18         MR. CROSS: I'm asking him to
19     clarify.
20 A   When your boss comes to you and says your ATP rate
21     has gone down, meaning you're approving more --
22 BY MR. CROSS:
23 Q   Um-hum.
24 A   -- what am I to know?
25 Q   What do you mean by that?

1          MR. SCARBER: Same objection; form,
2      relevance.
3          THE WITNESS: I already answered.
4  BY MR. CROSS:
5  Q   Who is your boss?
6  A   Right this minute?
7  Q   No, at the time when they told you that your ATP
8      rate had gone down.
9          MR. SCARBER: I don't think he ever
10     said anybody told him that. I'm sorry,
11     mischaracterizes his testimony. I think he was
12     giving you a hypothetical, but mischaracterizes his
13     testimony.
14 A   My boss at -- I'm not sure.
15 BY MR. CROSS:
16 Q   You don't know?
17 A   No, that's not what I said. I said I'm not sure.
18     It could be one of two people.
19 Q   And who are those two people?
20 A   Jeffrey Bomber and Erin Orlebeck.
21 Q   When you said malpractice cases went down here, on
22     line 23, were you referring specifically to state
23     law medical malpractice claims or were you also
24     including Eighth Amendment claims, like the one
25     we're here for today?

1  A   The Eighth Amendment claims started later in my time
2      with Corizon.
3  Q   What do you mean by started later?
4  A   We weren't getting Eighth Amendment claims in
5      January of 2014.
6  Q   So nobody sued Corizon for violating their Eighth
7      Amendment rights in 2014; is that your testimony?
8  A   I don't know of any. Most of the Eighth Amendment
9      claims came later.
10 Q   So --
11         MR. SCARBER: I'm just going to place
12     an objection to foundation also. I don't know how
13     he would possibly know how many cases were being
14     filed or who was being sued against Corizon,
15     but. . .
16 BY MR. CROSS:
17 Q   Well, how do you know that, sir?
18 A   How do I know what?
19 Q   You know the volume of claims filed against Corizon.
20 A   I do not know the volume of claims filed against
21     Corizon.
22 Q   Well, you just testified that the Eighth Amendment
23     claims came later, and you testified here that the
24     malpractice cases went down. So it sounds like you
25     have some knowledge of the volume of claims like

1  A   No, I do not.
2  Q   No?
3  A   No. I just told you that twice now.
4  Q   Okay. Do you know what InGauge is?
5  A   InGuage. No.
6  Q   InGauge.
7          THE COURT REPORTER: What was that?
8  A   Don't know either.
9          THE COURT REPORTER: Mr. Cross, what
10     did you say?
11         MR. CROSS: InGauge, I-n-G-a-u-g-e.
12 A   InGauge?
13     (Papendick Deposition Exhibit No. 8
14     was marked for identification.)
15 BY MR. CROSS:
16 Q   Yeah, I don't know how to pronounce it.
17 A   The program is no longer used, that I know of.
18 Q   I'm going to show you another document. Have you
19     ever used a program that looks like this?
20 A   I have never used a program that looks like that.
21         MR. CROSS: For the record, this is
22     Bates 460.
23 BY MR. CROSS:
24 Q   You said it was no longer in use, that you know of?
25 A   That I know of.



1  Q   Okay.  Do you know what a KPI is?
2  A   **No, not a clue.**
3  Q   Did you ever receive any training from Corizon about
4       KPIs or --
5  A   **I don't know of it.**
6           THE COURT REPORTER:  "Or," what was
7       the last?
8  BY MR. CROSS:
9  Q   Key performance indicators.
10 A   **No.**
11          (Papendick Deposition Exhibit No. 10
12           was marked for identification.)
13 Q   All right.  I'm going to show I another document,
14      Bates 266.  This was produced in discovery.  Do you
15      recognize any of these training modules?
16 A   **That was eight years ago; no, I don't remember.**
17 Q   But you did complete this training, correct?
18 A   **Obviously.**
19 Q   And then there's a module here called "Key
20      Performance Indicators, slash, Profit Indicators"?
21 A   **I can't recall that.**
22 Q   You don't remember anything about that training.
23 A   **No.**
24 Q   Do you remember if the training was done on a
25      computer?

1  A   **I don't recall even doing it.  How would I know to**
2      **recall if it's on a computer?  Oh, I'm sorry, I'm**
3      **not supposed to ask questions.**
4  Q   That's all right.  Back to exhibit -- I want to go
5      back to this document.  In your time working in
6      utilization management, have you ever looked at a
7      graph similar to this one that shows a benchmark and
8      a line representing an actual value?
9  A   **For inpatient days, no, I have nothing to do with**
10     **inpatient days.**
11 Q   Well, what about referrals?
12 A   **I don't recall this.  It's InGauge, I told you I**
13     **don't recall it.**
14 Q   I'm asking you if you have ever seen a graph that
15     looks similar to this one, whether InGauge or
16     anywhere else, with a benchmark and a line showing
17     the actual value?
18 A   **No, I don't believe so.**
19 Q   No?  Okay.
20          MR. SCARBER:  I think he said I
21      don't -- "No, I don't believe so,"' that was his
22      answer.
23          THE COURT REPORTER:  Excuse me, Mr.
24      Scarber, can you repeat that.
25          MR. SCARBER:  I said I think his

1      answer was "No, I don't believe so."
2  A   **And I will verify that is my answer.**
3  BY MR. CROSS:
4  Q   All right.  See on this page, they have an
5      abbreviation here, PMPM?  Do you know what that
6      stands for?  PMPM by primary category, for example?
7      What is PMPM?
8  A   **In the insurance days, when I was in private**
9      **practice, PMPM meant something.  I don't recall.**
10     **Per member per month.**
11 Q   Per member per month.  Okay.  And is the value in
12     that -- strike that.  Do you have a target value for
13     your ATP rate, sir?
14 A   **No.**
15 Q   Does anyone in Corizon have a target value for their
16     percentage of off-site requests approved, that
17     you're aware of?
18 A   **No.**
19 Q   No?  Okay.
20          MR. SCARBER:  Answer the question?
21          **THE WITNESS:  I did.**
22          MR. SCARBER:  Once you answer the
23      question you don't have to go back and --
24          **THE WITNESS:  I know.**
25          MR. SCARBER:  Okay?

1          **THE WITNESS:  I was going to explain,**
2      **but I don't need to.**
3  BY MR. CROSS:
4  Q   Could you explain, say what you were going to say.
5          MR. SCARBER:  Was it responsive to
6      the question or was it --
7          **THE WITNESS:  It's responsive to the**
8      **question.**
9          MR. SCARBER:  All right.
10 A   **If you have no clue what requests are coming to you**
11     **on a daily, weekly, monthly or yearly basis, how can**
12     **you set up a percent ATP gauge?  You can't, you just**
13     **can't.  And if you can, you need to be, in medicine,**
14     **giving that information to a medical community.**
15          (Papendick Deposition Exhibit No. 9
16           was marked for identification.)
17 BY MR. CROSS:
18 Q   All right.  I'm going to show you another document,
19     call this Plaintiff's Exhibit 9.  You recognize this
20     document?
21 A   **It's a CV printed by Corizon.**
22 Q   Okay.  I want to direct your attention to the "Key
23     Accomplishments" section.  Can you read your first
24     key accomplishment, for the record, out loud.
25 A   **"Worked with providers one-on-one and increased**



Page 62

1    approval rate for outpatient consult request to 90
2    percent consistently."
3  Q   So was 90 percent a goal or target value for
4    approval rate for outpatient consult requests for
5    providers?
6  A   No.
7  Q   Can you describe what you did to achieve that key
8    accomplishment.
9            MR. SCARBER:  I'll place an objection
10    to form and overbroad or vagueness of the question.
11    But if you can understand it, go ahead.
12  A   Teaching providers what they need to put into a 407
13    to get it approved.
14  BY MR. CROSS:
15  Q   All right.  What do providers need to put in a 407
16    to get it approved?
17  A   Medical necessity.
18  Q   They just need to -- I'm assuming they don't just
19    need to write "medical necessity" on the form.
20  A   That's a very good assumption.
21  Q   So what specific things do they have to do on their
22    form to get it approved?
23  A   We already talked about that; did we not?
24  Q   I'm asking you what you trained them to do in order
25    to get their request rate above 90 percent.

Page 63

1            MR. SCARBER:  I'll just object, asked
2    and answered, but --
3            THE COURT REPORTER:  Excuse me,
4    excuse me --
5            MR. SCARBER:  I'm sorry, I've got
6    this mask on because I'm sitting right next to the
7    witness.  But what I'm objecting to, I just objected
8    to asked and answered, 'cause he's already explained
9    it.  But to the extent the question is different,
10    I've asked the doctor to answer, if he can answer.
11  A   It is no different.
12  BY MR. CROSS:
13  Q   So when you worked with the providers one-on-one,
14    how did you communicate with them?
15  A   We talked on the phone mostly.
16  Q   Talked on the phone?  Did you send emails?
17  A   Rarely.  I hate email.  They take too long to type.
18    And I have a finger cut off (indicating).
19  Q   It was the phone provided to you by Corizon?
20  A   There was the phone on my desk.
21  Q   Is that your personal cell phone?
22  A   No, it was the phone on my desk.  I don't know if
23    it's Corizon's or if it's the company that we're
24    renting the building from.
25  Q   Okay.  Do you work from home?

Page 64

1  A   Now or then?
2  Q   Let's say in 2017.
3  A   Mid-2017 I started working from home.
4  Q   Okay.  Did you ever counsel providers to limit what
5    they submitted requests for in order to increase
6    their approval rate?
7  A   Absolutely not.  It's unethical.
8  Q   So you didn't counsel them to avoid requesting
9    services that aren't medically necessary?
10  A   That's not the same question.  Please don't phrase
11    it like it is.
12  Q   Well --
13  A   They were always told if it's not medically
14    necessary, do not ask for the procedure.
15  Q   All right.  So, I'm a provider.  How do I know
16    whether or not a procedure is medically necessary?
17  A   I've already answered that.  Didn't I?  Didn't I
18    tell you what was medically necessary?
19  Q   I think I interrupted you in the middle of your
20    definition and I didn't get the end of it and I want
21    to get the whole thing, for the record.
22            MR. SCARBER:  I'm going to place an
23    objection, asked and answered.  He went through like
24    a multistep process previously where he gave you the
25    definition of factors to be considered for medical

Page 65

1    necessity.  But that was at -- near the beginning of
2    the deposition.
3  BY MR. CROSS:
4  Q   Well, were there any factors that you did not
5    include in your previous answer?
6  A   I don't believe so.
7  Q   You don't believe so?
8  A   Correct, I don't believe so.
9  Q   All right.  Let's go back to, this is Exhibit 1
10    again, and I'm going to direct your -- we're on
11    Bates 104 and 103.  What is the utilization
12    management core process?
13            MR. SCARBER:  I'm sorry, did you say
14    what is it or where is it?  I didn't hear --
15            MR. CROSS:  I said what is it?  What
16    is the utilization management core process?
17            MR. SCARBER:  Okay.  If you know.
18  A   The utilization management on a centralized basis.
19  BY MR. CROSS:
20  Q   How is that different from the previous practice?
21  A   The previous practice, the RMDs in all the states,
22    and the SMD in Michigan, who were all Corizon
23    employees, did all of the approvals.
24  Q   And who did the approvals under the centralized core
25    process?



**Page 66**

1  A   Utilization management medical directors.
2  Q   When did this change take place in Michigan?
3  A   2017, I don't recall the date, I think it was June.
4  Q   June 2017?  All right.  I want to direct your
5      attention to this last paragraph on Bates 104 about
6      how success of this program will be measured.  What
7      is the difference between outpatient referrals per
8      thousand and claims per thousand?
9  A   Referrals are what we approve in order to get the
10     claim paid.
11 Q   So when you -- is what do you for a living approve
12     or deny outpatient referrals?  I'm sorry --
13 A   I do not deny outpatient referrals.
14 Q   But do you approve or ATP outpatient referrals?
15 A   Or I ask for more information.
16 Q   Okay.  And you are not involved in the claims
17     portion.
18 A   No, what I do is, but I don't.
19 Q   What is referrals per UMMD?
20 A   I think that's pretty much explanatory.
21 Q   So the number of referrals you process or the number
22     that you approve or --
23 A   I'm not actually sure what that means.  I'm assuming
24     it's the number that we process.
25         MR. SCARBER:  I'm going to object;

**Page 67**

1      calls for speculation.
2  BY MR. CROSS:
3  Q   All right.
4          MR. SCARBER:  If he's assuming.
5  A   I'm assuming.
6  BY MR. CROSS:
7  Q   So it says, "Each state will be assigned two primary
8      UMMDs to support objectivity and reduce the
9      likelihood of UMMD bias."  Was there another UMMD
10     assigned to Michigan besides you?
11 A   There are three.
12 Q   There are three.  Who are they?
13 A   Two other are UMMDs.
14 Q   What are their names?
15         MR. SCARBER:  I'm just going to place
16     an objection to relevance.  But he's asked the
17     question, I can't object --
18         THE WITNESS:  You can't stop me from
19     answering it.
20         MR. SCARBER:  It's not privileged.
21 A   Dr. Dorsey and Dr. Stacey.
22 BY MR. CROSS:
23 Q   So if I was a prisoner in Michigan and a request was
24     submitted for off-site care, it might be reviewed by
25     you or it might be reviewed by Dr. Dorsey or it

**Page 68**

1      might be reviewed by Dr. Stacey?
2  A   Correct.
3  Q   If there a way that the work flow is assigned
4      between the three of you?  Do you handle certain
5      types of requests, in other words?
6  A   It's two, one and one.
7  Q   Two, one and one?  What do you mean by that?
8  A   I get two, they each get one.
9  Q   Why do you get more than them?
10 A   Because they have other states to do and my workload
11     got so high that they wanted to put some of that on
12     the two of the other UMMDs.
13 Q   Got it.  Were there three UMMDs in 2017?
14 A   I don't know, but I don't think so.
15 Q   You think you were the only one then.
16 A   Correct.
17 Q   So it says they're implementing a feedback loop so
18     we can adjust as needed based on quantitative and
19     qualitative results with 30/60/90 day review, RMD
20     and UMMDs.  Did you participate in those 30-, 60-
21     and 90-day reviews?
22 A   No, that's supervision.
23         THE COURT REPORTER:  Excuse me?
24 A   That is supervision.
25 Q   So who did the reviews?

**Page 69**

1  A   I don't know.  I can make an assumption, but I'm not
2      going to.
3  Q   Okay.  Did you participate in quarterly interrater
4      reviews of other UMMDs?
5  A   We do a quarterly evaluation of two cases that we
6      denied and they -- excuse me, we ATP'd, and the ATP
7      was overturned on appeal.
8  Q   Tell me what you do in that interrater review
9      process, like how do you -- what's the results?
10     What's the input?
11 A   We look at what I -- okay, let's say we're looking
12     at my two cases every quarter.
13 Q   Sure.
14 A   My two cases are evaluated in a meeting if my ATP is
15     overturned on appeal.  Is that straight?
16 Q   Okay.  And they decide, what, in that meeting?
17 A   The appropriateness of what we did.
18 Q   Okay.
19 A   It's a quality control thing.
20         MR. SCARBER:  And then I'm going to,
21     again, object to the extent you get into more detail
22     about the peer-review privilege, as well as the
23     Patient Safety Quality Improvement Act.
24 BY MR. CROSS:
25 Q   All right.  It says they are measuring the success



# Dr. Keith Papendick
## 05/10/2021

**Page 70**

1  of this program via outpatient referrals per
2  thousand? How would the outpatient referrals per
3  thousand metric indicate success versus failure?
4         MR. CROSS: I'm just going to place
5  an objection to foundation. He's already said he
6  doesn't do these particular reviews and already
7  discussed his limited knowledge of exactly the
8  meanings of those.
9         **THE WITNESS: Do I answer now?**
10  BY MR. CROSS:
11  Q  Yeah, go ahead.
12  **A  It has nothing to do with me. This is a board of**
13     **directors' report.**
14  Q  Do you have any knowledge of how success is
15     measured --
16  **A  No, that's the point I've been making.**
17  Q  Okay. Do you submit a monthly report as part of
18     your job duties?
19  **A  What kind of monthly report are you talking about?**
20  Q  Well, why don't you tell me all the monthly reports
21     that you submit.
22         MR. SCARBER: I'm going to place an
23     objection and I'm not going to let him continue to
24     answer questions that you have not specified have
25     any relation to this particular incident. So he's

**Page 71**

1  not going to talk about every last thing he -- every
2  last report he does. I mean, are you talking about
3  utilization management? Are you talking about how
4  many times he went to the bathroom? You know what
5  I'm saying? I mean, you've got to put this stuff in
6  some kind of context. It's too broad to be
7  answered.
8  BY MR. CROSS:
9  Q  I would like to know what reports you submit.
10         MR. SCARBER: Same objection.
11         **THE WITNESS: Am I supposed to answer**
12     **it?**
13         MR. SCARBER: If you can answer the
14     question and recall what you specifically; if you
15     can't, you indicate that.
16  **A  I report a time sheet every two weeks --**
17  BY MR. CROSS:
18  Q  Okay.
19  **A  -- period. Nothing else. There are no more reports**
20     **coming out of my computer.**
21  Q  Were there ever any other reports coming out of your
22     computer?
23  **A  Years and years ago.**
24  Q  How many years ago?
25  **A  Eight.**

**Page 72**

1  Q  So not in --
2  **A  No, more than that, ten, ten.**
3  Q  You didn't submit any monthly reports in 2017?
4  **A  No, I don't believe so. I was corporate in 2017.**
5  Q  In 2016 did you submit reports?
6  **A  I don't remember.**
7  Q  You don't remember if you submitted a monthly report
8     in 2016.
9  **A  No, I don't remember. That's what I said, right?**
10  Q  Yep.
11  **A  Okay.**
12  Q  All right. Did you review any documents to prepare
13     for today's deposition?
14  **A  Very little.**
15  Q  What documents did you review?
16  **A  Medical record. The only thing I have any access to**
17     **and the only thing I need is medical record, if I**
18     **had access to it, because that was about the time**
19     **they were changing the medical record system. I**
20     **have no access to anything prior to that time.**
21  Q  What medical records did you review?
22  **A  I don't recall. Probably an ATP.**
23  Q  Did you review a request for a surgical consult for
24     a colostomy reversal from April of 2017 for a
25     patient by the name of Kohchise Jackson?

**Page 73**

1  **A  Yes, and didn't I just say that?**
2         MR. SCARBER: Just answer his
3     question.
4         **THE WITNESS: Okay.**
5  BY MR. CROSS:
6  Q  Did you make a determination when you received that
7     request in April of 2017?
8  **A  A determination of. . .**
9  Q  Either an NMI, ATP or approve?
10  **A  ATP.**
11  Q  Do you think you made a mistake when you issued that
12     ATP?
13  **A  No.**
14  Q  You think you made the right call.
15  **A  Yes.**
16  Q  Why do you think you made the right call?
17         MR. SCARBER: Hang on one second,
18     Ian, I apologize, the doctor's phone is ringing. Go
19     ahead. His question was why did you make the right
20     call.
21  **A  The danger of surgery in anyone does not depend on**
22     **how sick they are or how old they are, there is a**
23     **baseline question about whether its risk is worse**
24     **than its benefit. His risk was more than his**
25     **benefit for a colonosc -- yeah, colonos -- colostomy**



**Dr. Keith Papendick**
05/10/2021

1    reversal.  He was having absolutely no complaints,
2    except that he wanted his reversal.  He was having
3    no medical problems whatsoever, according to the
4    provider who saw him on a regular basis.
5  BY MR. CROSS:
6  Q   So you believed that the risks of the reversal
7    surgery outweighed the benefits for Mr. Jackson?
8  A   Yes.
9           MR. SCARBER:  I'll place an objection
10    to a number of the other things he just mentioned,
11    but. . .
12  BY MR. CROSS:
13  Q   Your answer is "yes"?
14  A   Yes.
15  Q   Okay.  Are you aware that Mr. Jackson has since had
16    a colostomy reversal surgery?
17  A   I heard that.
18  Q   So would you disagree with -- you think the doctor
19    who performed that surgery made the wrong call in
20    doing it?
21  A   That is not my place to say.
22  Q   Why not?
23  A   I have no idea where he was when he had it done, I
24    have no idea what his medical care was like, what
25    was that, ten years later?  No, three years later.

1  Q   Do you consider or take into account in any way
2    whether or not a procedure could be done just as
3    effectively after a patient is released from
4    custody?
5  A   No, I do not.  That would -- nevermind.
6  Q   So if a patient has a colostomy bag and a life
7    sentence, you think that they should never have it
8    reversed, unless -- as long as the colostomy is
9    functioning.
10  A   If the colostomy is functioning with no issue
11    whatsoever, yes, he should continue to have his
12    colostomy.
13  Q   For his whole life.
14  A   If that's what it takes.
15  Q   So you don't think, in general, the benefits of
16    reversing a functional colostomy ever outweigh the
17    risks of that surgery?
18  A   Okay, you're asking me to answer questions that I
19    don't get circumstances for.  It all depends on the
20    circumstances.  So I can't give you an answer for a
21    nonspecific question.
22  Q   Well, if you need more information to make a
23    determination, tell me what that information is and
24    how that information would allow you to say yes or
25    no.

1  A   Are you trying to take over my job?
2  Q   I'm asking the questions here.
3           MR. SCARBER:  Let me just place an
4    objection to form of the question; again, I think
5    these are unfair hypothetical questions.  I think
6    you have to put all of this stuff in some kind of
7    context relative to the patient, the presenting
8    circumstances, the conditions of that particular
9    patient.
10  A   So is there a question that I need to answer?
11  BY MR. CROSS:
12  Q   Yes, unfortunately.  Do you think that, in general,
13    when a patient is otherwise healthy and has a
14    functional colostomy that is not causing other
15    health issues the risks of reversal surgery outweigh
16    the benefits?
17  A   Again, comes down to the circumstance.  I don't have
18    a medical record laying in front of me in order to
19    evaluate that.
20  Q   So if you had a medical record, what things would
21    you look for in it and how would those things affect
22    your answer?
23  A   Complications of the colostomy.
24  Q   Um-hum.
25  A   Breakdown -- well, that's complication of the

1    colostomy.  Complications of the colostomy.
2  Q   Is that the only thing?
3  A   If there is no medical complication of a colostomy
4    there's no reason to reverse it.
5  Q   Are you aware that colostomies without complications
6    are sometimes reversed?
7  A   Absolutely.  I've ordered them to be reversed.
8  Q   Why did you order a colostomy without complications
9    to be reversed?
10  A   I'm sorry, I'm sorry, that's not true, they had
11    complications.  I'm sorry, I made a mistake.
12  Q   So you think a surgeon who reverses a colostomy,
13    when there are no complications, is exposing the
14    patient to risks that outweigh the benefits of the
15    surgical procedure?
16           MR. SCARBER:  Let me just place an
17    objection to relevance.  In this particular case,
18    we're not talking about a standard of care of any
19    follow-up doctors, there's no malpractice claim.
20    What we're talking about is whether there was a
21    cruel and unusual punishment, a violation of
22    Mr. Jackson's deliberate indifference rights.  Dr.
23    Papendick isn't here to talk about the standard of
24    care of Dr. Weber or anybody else.  He's here to
25    talk about what was in front of him at the time he



Page 78

1    made his decision or performed his review.
2              MR. CROSS: I'm objecting to the
3    speaking objection.
4    BY MR. CROSS:
5    Q   Go ahead and answer.
6    A   What was the question again?
7              MR. CROSS: Can you read the question
8    back.
9              (Page 77, lines 12-15 were read
10             back.)
11             MR. SCARBER: Same objection, and I
12   think this was kind of asked and answered previously
13   a few minutes ago --
14             THE WITNESS: It was.
15             MR. SCARBER: -- but go ahead.
16   A   First of all, I cannot judge another physician's
17       decision-making, that's not my job. Second of all,
18       I don't understand why this question is even being
19       asked. I have an opinion, as anyone else, and I
20       should be able to express my opinion.
21   BY MR. CROSS:
22   Q   Can you answer the question, sir?
23             MR. SCARBER: I'm going to place an
24   objection. I think he just answered the question.
25   I think he just told you -- without restating it, he

Page 79

1    answered the question and is, first of all, part of
2    his answer. So, asked and answered, now going on
3    three times.
4    A   I've already answered this.
5    BY MR. CROSS:
6    Q   Aren't you judging another physician's opinion when
7        you issue an ATP in response to their request?
8    A   There was no request from a physician who would be
9        doing the procedure. There was a request from a
10       fairly new provider in the Michigan Department of
11       Corrections, who were employed by Corizon Health --
12       well, Quality Correctional Care, PC, of Michigan.
13   Q   Now, was that request for a surgery or for a consult
14       with a surgeon to evaluate the risks and benefits of
15       a potential surgery?
16   A   Consult to see the surgeon, but there was no reason
17       to do it. There was no reason to do -- even look at
18       a reversal if there's no complications, except to
19       get the surgeon $350.
20   Q   Do you think it's a trivial thing to live with a
21       colostomy bag for the rest of your life?
22   A   No. Did I say that?
23   Q   No.
24   A   Okay.
25   Q   But don't you think there are some benefits to the

Page 80

1    patient of being able to have normal bowel
2    movements?
3    A   Maybe.
4    Q   But you believe the risks of the surgery outweigh
5        those benefits?
6    A   I didn't name any benefits, but I believe the risk
7        of the surgery outweighs not reversing it.
8    Q   Does the patient has any input on whether they're
9        willing to assume those risks?
10   A   No, because if he did -- if we allowed him to and he
11       died from his surgery, I'd be sitting at this table
12       anyway; correct or incorrect? Except then he would
13       not be living, which is much worse than a colostomy.
14       Even if his -- no, I won't go there.
15   Q   Go ahead. What were you going to say?
16   A   I don't know that, I can't say it.
17             MR. SCARBER: All right. He's done
18   with his answer.
19   BY MR. CROSS:
20   Q   What were you going to say?
21             MR. SCARBER: Was it responsive to
22   the question or --
23             THE WITNESS: No.
24             MR. SCARBER: Okay. Thank you.
25

Page 81

1    BY MR. CROSS:
2    Q   Do you know the fatality rate for colostomy reversal
3        surgeries?
4    A   No. I have --
5              THE WITNESS: I know, I'm settling
6        down.
7    BY MR. CROSS:
8    Q   No, you don't?
9    A   No, I don't. I already told that you.
10             MR. SCARBER: Ian, let's take a quick
11   five-minute break.
12             MR. CROSS: All right. Sounds good.
13             MR. SCARBER: Thank you.
14             THE VIDEOGRAPHER: We're going off
15   the record at 12:43 p.m.
16             (Break was taken.)
17             THE VIDEOGRAPHER: We're back on the
18   record at 12:53 p.m.
19   BY MR. CROSS:
20   Q   Dr. Papendick, when you issued the ATP for
21       Mr. Jackson, did you do it pursuant to an MDOC
22       policy?
23   A   There is an MDOC policy that surgeries must be
24       approved through medical necessity and, yes.
25   Q   Yes?



Page 82

1  A   Yes.
2          (Papendick Deposition Exhibit No. 12
3          was marked for identification.)
4  Q   Okay.  I'm going to show you a document that your
5      lawyer filed in this case.  So, this policy, are you
6      saying that you didn't approve the surgery because
7      of this policy?
8  A   Yes.
9  Q   All right.  Can you point out the part of this
10     policy that you believe -- let me ask you this:  Did
11     this policy control the outcome of your decision?
12 A   Well, if it's direct, yes.  Do you want to know
13     where it is?
14 Q   I want to know if the policy controlled the outcome
15     of your decision.
16         MR. SCARBER:  Asked and answered.
17 A   Yes.
18 BY MR. CROSS:
19 Q   You said, "If it's direct, yes"; what does that
20     mean?
21 A   If the policy is a directive, yes.  If you go down
22     to "AA" under "Corrective and Reconstructive
23     Services."
24 Q   Okay.  So tell me about what part of this policy you
25     believe constrained your decision.

Page 83

1          MR. SCARBER:  Just going to place an
2      objection to the phrasing of the question.  You said
3      it controlled his decision, not constrained it, if
4      there's a difference.
5  BY MR. CROSS:
6  Q   I'm sorry.  What part of the policy controlled your
7      decision?
8  A   It looks like "AA" and "BB."
9  Q   "AA" and "BB"?
10 A   Correct.
11 Q   So you believe that a colostomy take-down procedure
12     is a corrective surgery or a reconstructive surgery?
13 A   Reconstructive.
14 Q   Okay, "a surgical procedure to reform body structure
15     or correct defects."  So, what part of "BB"
16     controlled your decision?
17 A   Only if determined medically necessary and if
18     approved by the CMO.
19 Q   So did you contact the CMO?
20 A   No, I don't have to.  I have a policy.
21 Q   You have a policy.
22 A   Right, that's what I just read you.
23 Q   How can we know if the CMO approves it or not if you
24     don't contact the CMO?
25 A   The way the contact with the CMO occurs is if the

Page 84

1      provider decides that he wants to appeal, and then
2      appeal is a very large process that ends with the
3      CMO.
4  Q   So the only way that a -- correct me if I'm wrong,
5      it sounds like the only way that a corrective or
6      reconstructive surgery could happen is if the
7      request came to you, you deferred or ATP'd the
8      request, the provider then appealed, the appeal
9      moves through the appeals process to the CMO; am I
10     right about that?
11 A   In a general, a generalized step, yes.
12 Q   What do you mean by that, in a general --
13 A   You're not being specific.
14 Q   Specifically, is it possible that an MDOC prisoner
15     could receive a corrective or reconstructive surgery
16     without you first issuing an ATP and then the
17     provider on-site starting an appeal process and the
18     appeal process culminating with the CMO?
19 A   That's one way.
20 Q   That's one way.  But are there --
21 A   If it is medically necessary, it will be done.
22 Q   It will be done.
23 A   Correct, and I have done colostomy reversals because
24     they were medically necessary.
25 Q   So the part of this policy that controlled your

Page 85

1      decision was the requirement for CMO approval or the
2      requirement that the surgery be determined medically
3      necessary?  I'm sorry, I think you're frozen.  Can
4      anybody hear the witness?
5          THE VIDEOGRAPHER:  No, this is Neal,
6      I don't hear him.  You want to go off for a minute?
7      It looks like they disconnected.  We are going off
8      the record at 1 p.m.
9          (Break was taken.)
10         THE VIDEOGRAPHER:  We are back on the
11     record at 1:03 p.m.
12         MR. CROSS:  Can you read back the
13     last question.
14         (Page 84, line 25 and page 85, lines
15         1-3 were read back.)
16 A   That's what -- that's what I've been saying all
17     along, it has to be medical necessity, and, in
18     cosmetic situations, there has to be an CMO
19     approval.
20 BY MR. CROSS:
21 Q   So is it the requirement that there is a CMO
22     approval, that controlled your decision, or is it
23     the requirement that the surgery be medically
24     necessary that controlled your decision?
25         MR. SCARBER:  I'm just going to place



**Dr. Keith Papendick**
05/10/2021
Pages 86..89

Page 86

1    an objection to asked and answered. He indicated
2    that -- asked and answered.
3  BY MR. CROSS:
4  Q   Go ahead.
5  A   **I already said that it takes both.**
6  Q   It takes -- both of them controlled the decision; is
7    that your answer?
8        THE COURT REPORTER: Can you repeat
9    your question.
10 BY MR. CROSS:
11 Q   Both of them controlled the decision; is that your
12   answer?
13 A   **Yes.**
14 Q   Okay. So if it were not for the requirement for CMO
15   approval, would you have approved the surgical
16   consult for Mr. Jackson?
17 A   **No, it did not meet IQ and it is not medically**
18   **necessary.**
19 Q   If this policy didn't exist, would you have approved
20   the surgical consult for Mr. Jackson?
21 A   **No.**
22       MR. SCARBER: I'm just going to place
23   an objection. The policy does exist, and they're
24   under obligation to follow the policies.
25

Page 87

1  BY MR. CROSS:
2  Q   Can I have your answer, sir?
3  A   **I believe you want to know if the policy did not**
4    **exist would I have done it, correct?**
5  Q   Yes.
6  A   **No, the policy does exist.**
7  Q   That doesn't answer the question, sir. I'm asking
8    you would you have done it if the policy did not
9    exist?
10 A   **And I did answer that when I said there's no medical**
11   **necessity and it doesn't meet IQ requirements.**
12       THE COURT REPORTER: "And it doesn't
13   meet" --
14       **THE WITNESS: I'm sorry, InterQual,**
15   **I-n-t-e-r-Q-u-a-l.**
16 BY MR. CROSS:
17 Q   So there was an InterQual review done for that
18   request?
19 A   **Yeah, you want to see it?**
20 Q   I would love to.
21 A   **Right there. It says --**
22 Q   Hold on.
23 A   **-- "Criteria met: No."**
24 Q   Is this the form that you just showed me on the
25   camera? I couldn't really see it.

Page 88

1  A   **Yes.**
2  Q   Okay.
3  A   **Down at the bottom, right now, it says, "Criteria**
4    **met: No."**
5  Q   And it says, "Criteria source: MNR, InterQual,
6    Other"?
7  A   **It's InterQual.**
8  Q   So there's nothing next to "InterQual"; the
9    "Criteria met" is "No."
10 A   **It is InterQual, that's all we use.**
11 Q   That's all you use. All right. Do you know if
12   Corizon tracks any utilization management data for
13   the Michigan contract?
14 A   **Do I know? I don't know.**
15 Q   You don't know whether they do or not.
16       MR. SCARBER: Just going to place an
17   objection, asked and answered. He just answered the
18   question.
19 A   **And I don't know what they track.**
20 BY MR. CROSS:
21 Q   I'm asking you do they track anything, in terms of
22   utilization management --
23       MR. SCARBER: Object to form of the
24   question. Same objection. Hey, Ian, ask the
25   question again. It got broken up a little bit while

Page 89

1    I was making my objection. Go ahead, I'm sorry.
2  BY MR. CROSS:
3  Q   Does Corizon track any utilization management data
4    at all for the Michigan contract?
5  A   **What do you mean by "utilization management data at**
6    **all"? What is your definition? So I know what to**
7    **answer you.**
8  Q   Well, I don't know specifically what they track,
9    sir, and I'm trying to find out.
10 A   **You do know that they track percent ATPs.**
11 Q   Okay. What else do they track?
12 A   **I don't know.**
13 Q   The only thing you know about is percent ATPs.
14 A   **You showed it to me.**
15 Q   You don't know about anything else that they track?
16 A   **No, I do not. I am not --**
17       MR. SCARBER: Enough; asked and
18   answered three times, going on the fourth.
19       **THE WITNESS: I know. Right. Okay.**
20   **Thank you.**
21 BY MR. CROSS:
22 Q   Okay. These InterQual reviews --
23       THE COURT REPORTER: Excuse me?
24 BY MR. CROSS:
25 Q   You've never seen the actual InterQual review



1    itself, you just get a "yes" or "no" checked by
2    somebody; is that correct?
3  A    Yes.
4  Q    And the person who sends those "yes" or "no" checks
5    is Lori Minor or is it ever someone else?
6  A    Lori Minor.
7  Q    Lori Minor, okay.  Where are those InterQual reviews
8    maintained?
9  A    I don't know offhand.
10  Q    You don't know.
11            MR. CROSS:  All right, I don't think
12    I have further questions.
13            MR. WILLIS:  I have no questions.
14            THE VIDEOGRAPHER:  Mr. Scarber, do
15    you have any questions or --
16            MR. SCARBER:  Yeah, I'm sorry.
17            THE VIDEOGRAPHER:  I'm just making
18    sure.
19            MR. SCARBER:  Can you hear me okay if
20    I'm not shown on the camera?
21            THE VIDEOGRAPHER:  Yes, I hear you
22    fine.
23            EXAMINATION
24  BY MR. SCARBER:
25  Q    Dr. Papendick, Mr. Cross was just asking you some

1    questions about the MDOC policy and the policies
2    that you said control this particular situation with
3    Mr. Jackson.
4            Did you refer Mr. Cross to MDOC
5    Policy 03.04.100, section about corrective and
6    reconstructive surgery services --
7  A    Yes.
8  Q    AA, BB?
9  A    Yes.
10  Q    And those were the policies that you were following
11    when you were determining whether or not Mr. Jackson
12    would be -- whether there was medical necessity for
13    Mr. Jackson with respect to his colostomy reversal
14    request?
15  A    Correct.
16  Q    Do you write this particular policy?
17  A    No.
18  Q    Are you the final decision-maker as to whether or
19    not Mr. Jackson would have received a colostomy
20    reversal while he was in the Michigan Department of
21    Corrections?  Let me rephrase my question, strike
22    it.
23            Are you the final decision-maker as
24    to whether or not Mr. Jackson would have received a
25    colostomy reversal surgery while he was in the

1    Michigan Department of Corrections?
2  A    No.
3  Q    Based upon your testimony, Dr. Papendick, are you
4    really only the maybe first or second step in that
5    process?
6  A    Yes.
7  Q    Did you specifically deny Mr. Jackson's request for
8    a colostomy reversal?
9  A    No.
10  Q    Was the request denied based upon the Michigan
11    Department of Corrections policy directive that we
12    just discussed?
13  A    Yes.
14  Q    As far as you can recall, Dr. Papendick, after you
15    made an initial review of this case regarding
16    medical necessity, was there any appeal or response
17    back to you, that you're aware of, requesting
18    another review of Mr. Jackson's request for a
19    colostomy reversal?
20  A    No.
21  Q    How does that process usually work?  If an inmate
22    requests a particular procedure, and, in this case,
23    a colostomy reversal, and no medical necessity was
24    determined, if an inmate wanted to continue to
25    pursue this, at least through Corizon, as it

1    pertains to you, what would happen at that point?
2  A    The provider who put in the initial request would do
3    one of two things to an ATP:  He would either accept
4    it or he can appeal it to his RMD, regional medical
5    director.  The regional medical director then looks
6    at the case and decides whether they agree with the
7    ATP or want to overturn it.  If they agree with the
8    ATP, the provider can take it to the state medical
9    director for Corizon and continue the appeal.  We
10    then meet on Monday, Wednesday and Thursday evenings
11    and make decisions about that specific case.  If --
12    and that's considered the state medical director's
13    decision.  If the state medical director ATPs, and
14    the provider still wants to appeal, he can appeal to
15    the Michigan Department of Corrections, who,
16    ultimately, the appeal would then be to the CMO for
17    Michigan Department of Corrections.
18  Q    So if I understand your testimony just now, there
19    are several steps that an inmate may pursue
20    regarding a request for a colostomy reversal that go
21    beyond and above you.
22  A    Correct.
23            MR. CROSS:  Objection; misstates
24    testimony.
25            THE WITNESS:  What did he say?



1    What'd she say?
2          MR. SCARBER:  That's okay.
3  BY MR. SCARBER:
4  Q   Have you been provided with any information, that
5      you're aware of, where additional steps, in terms of
6      an appeal to the Corizon process, took place beyond
7      what the inmates -- what the inmate originally
8      sought in his 407 request back in 2018?
9  A   No.
10 Q   There's an allegation from the plaintiff that says
11     that Dr. Papendick is an official with final
12     decision-making authority with respect to whether
13     407 requests from an on-site MP are approved or ATP.
14     Is that a false statement?
15 A   **That's a false statement.  I am not the final**
16     **decision-maker.**
17 Q   In this particular case, Dr. Papendick, the
18     plaintiff has supplied documents and represented
19     that he filed an appeal with the MDOC in this
20     particular case.  What I want to show you now is
21     what we have -- what I'll identify is ECF No. 12-9,
22     page ID 268, it's entitled Step II Grievance Appeal
23     Response, and this was submitted with the
24     plaintiff's complaint.
25          Can you just take a look at that for

1      a second.  While you're reading that, I'll make a
2      statement for the record.  It's going to be
3      difficult for me to do screen sharing on my end,
4      just 'cause I'm right here with the witness and
5      trying to face him and the computer and all that
6      stuff.  So, I'll reference, to the best of my
7      ability, any pages in the record that I'm going to
8      refer to.
9  A   **Go ahead, I've probably read enough to tell you what**
10     **you need.**
11 Q   So, based upon this grievance appeal response, would
12     it be accurate to say that it was the MDOC who
13     denied Mr. Jackson's colostomy reversal?
14 A   **Actually, it is.  The grievance process is an MDOC**
15     **process that's equivalent to the Corizon appeals**
16     **process.  So, if there had been a reason to overturn**
17     **the reason for -- or the fact that there was no**
18     **medical necessity, it could have been done here and**
19     **it would have gone to the CMO, and the CMO could**
20     **have then changed it.  But they're in agreement with**
21     **the Corizon system, as far as the need for that**
22     **surgery or consult for surgery.**
23 Q   Does this particular document that we just read,
24     Step II Grievance Appeal Response, does it indicate,
25     down in the conclusion, that the Policy Directive

1      03.04.100 Health Service is a basis for the
2      conclusion of denying this request?
3  A   **That would be correct.**
4  Q   Can you read the "Grievance Denied" section down at
5      the bottom of this particular page where it
6      references Mr. -- starting with "Mr. Jackson."
7  A   **Yeah.**
8  Q   And you can stop after that, the cap letters right
9      there, can you read that for the record.
10 A   **Yes.  "Mr. Jackson, per documentation, you are doing**
11     **fine with current condition.  The reversal is a**
12     **major surgery with potential complications up to**
13     **death and the Department will not okay a dangerous,**
14     **unnecessary elective procedure.  A reversal for a**
15     **functioning" -- excuse me, "a functional colostomy**
16     **is considered nonessential.  Policy is no reversals**
17     **unless there is medical reason."**
18 Q   And this particular denial here, the basis for this
19     denial, again, is coming from the MDOC; is that
20     correct?
21 A   **That's correct, I have nothing to do with the**
22     **grievance process.**
23 Q   There's a Step III part to this particular document.
24     Can you just take a look at that for a second and
25     then I'll ask you some questions.

1          MR. SCARBER:  Now, counsel, I'm
2      referring to the Step III part at page ID 269.
3  BY MR. SCARBER:
4  Q   Just take a look at that and I'll ask you some
5      questions.
6  A   **Okay.**
7  Q   Does this particular grievance response, is this
8      prepared by Corizon?
9  A   **No.**
10 Q   Is this something from the MDOC?
11 A   **It's from the MDOC; it says, "Response of the Bureau**
12     **of Health Care Services," which is over the Michigan**
13     **Department of Corrections.**
14 Q   Okay.  And does this particular grievance say
15     anything about what a disagreement with a plan of
16     care is?
17 A   **It says, "Disagreement with plan of care does not**
18     **support a denial of care or inadequate medical**
19     **treatment."**
20 Q   Does this particular grievance response by the MDOC
21     indicate anything about what will happen -- what the
22     result is of this particular Step III process of the
23     grievance response?
24 A   **"Grievant appeal denied."**
25 Q   And, again, is this document something from the



**Dr. Keith Papendick**
05/10/2021        **Pages 98..101**

1   MDOC?
2   **A**   **Correct.**
3   **Q**   And, in fact, is it true that the two documents that
4      I just read to you, the Step II process, grievance
5      appeal response, as well as the Step III grievance
6      response, both come well after anything you would
7      have reviewed back in -- or done with respect to the
8      request back in April of 2017?
9   **A**   **Correct.**
10   **Q**   In fact, is the date of the Step II grievance appeal
11      response --
12   **A**   **June 8th of 2017.**
13   **Q**   And how about the date of the Step III grievance
14      response denying his appeal?
15   **A**   **It was signed 10-13 of 2017, the manager. . .**
16   **Q**   There's two dates on here. Would it be fair to say,
17      though, that this response is done in late October
18      of 2017?
19   **A**   **Correct, it was finished then.**
20   **Q**   And as far as you're aware, were any other appeals
21      made to you with respect to this process?
22   **A**   **None.**
23   **Q**   Any other appeals made to Corizon with respect to
24      this process?
25   **A**   **Not that I could find.**

1   **Q**   I want you to take a look at what I'm going to
2      identify as ECF No. 12-7, page ID 261. This is a
3      letter of the Office of Legislative Corrections
4      Ombudsman. And can you read this sentence that I
5      have highlighted here in the first paragraph -- or
6      the second paragraph of page one of this letter.
7   **A**   **"Corrective and reconstructive surgery shall be**
8      **authorized for a prisoner only if determined**
9      **medically necessary and only if approved by the**
10      **CMO."**
11   **Q**   And does this letter indicate that it's referencing
12      Policy Directive 03.04.100?
13   **A**   **Yes, sir.**
14   **Q**   Sections "AA" and "BB"?
15   **A**   **Yes, sir.**
16   **Q**   And you indicated that, based upon your
17      understanding, Mr. Jackson's colostomy reversal
18      procedure would be considered reconstructive surgery
19      under those categories?
20   **A**   **That's correct.**
21   **Q**   When determining whether or not there's medical
22      necessity, you indicated something about considering
23      the risks of a particular procedure versus the
24      benefits?
25   **A**   **Correct.**

1   **Q**   Explain that again; what were you discussing about
2      that.
3   **A**   **If the risk is higher than the benefit, then it's**
4      **not worth doing the procedure. If the benefit is**
5      **higher than the risk, then it's worth doing the**
6      **procedure.**
7   **Q**   Are some of the risks -- well, let me ask you this:
8      What are some of the risks associated with doing a
9      colostomy reversal?
10   **A**   **Death. Death, three percent.**
11      THE COURT REPORTER: What was the
12      percentage?
13   **A**   **Three. And you might find a provider who's a little**
14      **less, but, in general, it's three percent.**
15   **Q**   Plaintiff's counsel, Mr. Cross, asked you some
16      questions about were you aware that Mr. Jackson had
17      the colostomy reversal after, at some point -- at
18      some point in time after he was released from the
19      MDOC.
20   **A**   **Correct.**
21   **Q**   And can you take a look at this document here, which
22      we're going to -- which I'll identify here as the
23      operative report of June 19th of 2019. It is from
24      the DMC records, page 574 through 579. Just take a
25      look at the front and back of pages 574 and 575 for

1      me, please.
2   **A**   **Okay.**
3   **Q**   In the "Indications for Procedure" section on page
4      575 of this document, does it indicate here anything
5      about whether or not Mr. Jackson now has any issues?
6   **A**   **No, he actually says he now has no issues.**
7   **Q**   At the bottom of this particular paragraph in the
8      "Indications for Procedure," the first paragraph,
9      does doctor -- does the surgeon who performs the
10      reversal talk about the potential risks of this
11      particular procedure?
12   **A**   **Yes, he says, "All risks and benefits of the**
13      **procedure, including but not listed to the risk to**
14      **heart attack, stroke, death, infection, the**
15      **potential need for a reoperation, the potential for**
16      **a leak and potential for damage to surrounding**
17      **structures, including the ureter, general urinary**
18      **system," and the patient signed the consent.**
19   **Q**   Now, let me ask you about those particular risks.
20      Are those some of the risks that you have to
21      consider when you're trying to follow the MDOC's
22      policy regarding determining medical necessity and
23      whether -- and in the manner in which you're
24      considering your evaluation of an ATP?
25      MR. CROSS: Objection.



Page 102

1   A   Yes.  Interestingly, that is the list of the damage
2       or the danger that we give the patient normally.
3       So, a good share of them will refuse to have those
4       kind of surgeries because of the risk and the
5       benefit ratio, and, in this case, it's not small.
6   BY MR. SCARBER:
7   Q   We took the deposition of Mr. Jackson's original
8       surgeon who performed the colostomy reversal, Dr.
9       Kansakar, and she indicated that, irrespective of a
10      person's age or comorbidities, that these are still
11      risks that can occur.
12  A   That's correct.
13  Q   You would agree with that?
14  A   Absolutely.
15  Q   Doctor, we've had an opportunity for you to look at
16      the grievance response from the MDOC, and did you
17      see the references in this particular grievance
18      where it referenced that there were no urgent
19      medical issues reported from the surgeon's office
20      and the colostomy is functional?  Do you see that
21      reference?
22  A   Yes.
23  Q   There's a note in the MDOC records, page 72, that I
24      will read, or at least show you.  Can you take a
25      look at this particular note here.

Page 103

1   A   Okay.
2   Q   Does this particular note indicate that --
3   A   It indicates that there's no urgent medical issues
4       reported from the surgeon's office and the colostomy
5       is functional.
6   Q   Would that be an indication to you that would
7       support your determination that there was no medical
8       necessity for Mr. Jackson's colostomy reversal at
9       the time that you were presented with that request?
10  A   Yes.
11  Q   Doctor, I want you to now take a look at MDOC
12      records, the records are pages 62 through 65, and
13      these records are from April the 7th of 2017.  Can
14      you just take a look at the record and then I'll ask
15      you a question or two.  Just look at it so we can
16      get some kind of understanding or context.
17          Does this record indicate to you that
18      Mr. Jackson's colostomy is functioning
19      appropriately?
20  A   Yeah, "Stoma is pink and" -- "deep pink and
21      functioning with soft light brown stool and no
22      evidence of blood or blood in the stool.  Continues
23      to verbalize that ostomy has to be temporary and
24      reversed.  No medical necessity per outside
25      documentation from" -- "or from conversation with

Page 104

1       surgeon's office, Dr. Kansakar, who was the first
2       physician who did the colostomy."
3   Q   Based upon that particular record, would that record
4       support the decision that you came to that there was
5       no medical necessity at the time that you reviewed
6       Mr. Jackson's case, at least back in April of 2017?
7   A   Yes.
8   Q   And just so we're clear, the only involvement that
9       you had in this particular incident would have been
10      in April of 2017, correct?
11  A   Correct.
12  Q   Mr. Cross, plaintiff's counsel, asked you some
13      questions about whether you were critical of other
14      doctors and what your opinions were of what other
15      doctors did.  I want you to assume that plaintiff's
16      surgeon, Dr. Kansakar, has testified in this
17      particular case that the determination of various
18      medical procedures, including whether to do a
19      colostomy reversal, when to do a colostomy reversal,
20      how to do it, the timing of when to do it, is
21      something that is up to the medical judgment of
22      different providers in determining what the plan of
23      treatment should be for a particular patient.  Would
24      you agree with that?
25  A   Yes.

Page 105

1   Q   So when you were asked about what another doctor
2       did, do you focus more on the information that you
3       have in front of you at the time to help you make a
4       determination about medical necessity or do you
5       focus on what another doctor does three or
6       two-and-a-half years later?
7   A   I only have data for what we're doing at the time,
8       so I can only use data for what's going on at the
9       time to make my decision.
10  Q   And you allow yourself to use your medical judgment
11      and allow other doctors to use their medical
12      judgment.
13  A   Correct.
14  Q   And there was a particular portion that we read in
15      the Step III grievance response that specifically
16      talked about medical opinions; do you recall that?
17  A   Not offhand.
18  Q   Give me one second.  And the response indicated
19      something like 'a difference of medical opinion is
20      not a denial of care.'
21  A   Correct.
22  Q   You would agree with that.
23  A   Yes.
24  Q   Based upon all of the information that we have
25      discussed just now that you have reviewed concerning



Page 106

```
 1   your involvement in this particular matter, do you
 2   believe that your recommendation at the time of
 3   April 19th of 2017 was the appropriate
 4   recommendation at that time?
 5 A  Without question.
 6            MR. SCARBER:  I don't anything
 7   further for the witness at this time.
 8            MR. CROSS:  I have some, few more
 9   follow-up questions.
10              EXAMINATION
11 BY MR. CROSS:
12 Q   You were just asked by your attorney, Dr. Papendick,
13   about a variety of sections from Mr. Jackson's
14   medical records.  Did you review those medical
15   records at the time you made the decision to issue
16   an ATP in April of 2017?
17            THE WITNESS:  I didn't hear what he
18   said.
19 BY MR. CROSS:
20 Q   I'm sorry.
21            MR. SCARBER:  He didn't hear you, but
22   I heard you, and so what I'm going to at least do is
23   object to foundation of the question just because
24   some of the reference I referenced hadn't even
25   occurred yet.
```

Page 107

```
 1            MR. CROSS:  Okay.
 2            MR. SCARBER:  Yeah.
 3 BY MR. CROSS:
 4 Q   So, Dr. Papendick, your attorney just asked you a
 5   series of questions about Mr. Jackson's medical
 6   records.  Did you review those medical records at
 7   the time you issued the ATP in April of 2017 or any
 8   of them?
 9 A   I usually do look at the medical records, unless
10   everything I need is in the 407.
11 Q   Okay.  Was everything you needed in the 407?
12 A   I cannot tell you that, that was a few years ago.
13 Q   Let's look at the 407, then.  Can you see it?
14 A   Yeah, I have it here in front of me also.
15 Q   Was everything you needed in that 407?
16 A   As far as can I see, yes.
17 Q   So would it be fair to say that you did not review
18   other medical records outside of the 407?
19 A   That is not a fair question.
20 Q   Can you answer it?
21 A   I don't know.  I already told you that answer.
22 Q   So you don't remember if you reviewed any records or
23   not.
24 A   Correct.  And would it be your custom, habit or
25   practice to review records outside the 407 if the
```

Page 108

```
 1   407 contains all the information that you need to
 2   make a determination?
 3            MR. SCARBER:  I'm just going to place
 4   an objection to asked and answered.  He's already
 5   kind of explained his position on that.  But go
 6   ahead.
 7 A   I already said it depends on what is there.  And he
 8   didn't meet InterQual.  I may have.  That's all I'm
 9   going to say.
10 BY MR. CROSS:
11 Q   Okay.  Your attorney asked you some questions about
12   age or comorbidities and whether risks exist,
13   regardless of age and comorbidities, in a surgical
14   procedure, such as a colostomy take-down.
15 A   Was there a question there?
16 Q   Yes --
17            MR. SCARBER:  He's laying his
18   foundation.
19            THE WITNESS:  Oh, okay.
20 BY MR. CROSS:
21 Q   -- I'm just explaining what part of the record we're
22   going to.  Do the age or comorbidities of the
23   patient generally affect the level of risk involved
24   with a surgical procedure?
25 A   It depends on the comorbidity in the -- and the
```

Page 109

```
 1   medical condition.  I mean, I can't make a
 2   generalized statement.
 3 Q   Okay.  Well, is it possible for certain
 4   comorbidities to increase the risk involved in a
 5   surgical procedure?
 6            MR. SCARBER:  Just going to place an
 7   objection to the term "possible."  I suppose
 8   anything is possible.
 9 A   Are you asking me about this patient's
10   comorbidities?
11 BY MR. CROSS:
12 Q   I'm asking you in general.
13            MR. SCARBER:  Object to relevancy.
14   If you can answer his question, answer the question.
15   I'm still going to make my objection, asked and
16   answered.
17 A   It can't be -- you can't make a statement, you just
18   can't make a flat-out statement like that.  Depends
19   on what is happening.  It's just not necessarily
20   true.
21 BY MR. CROSS:
22 Q   Okay.  So, for example, I believe you testified that
23   the risk of death with a colostomy reversal
24   procedure is three percent.
25 A   Anesthesia, three percent, flat-out.
```



Page 110

1  Q   Any procedure using general anesthesia has a three
2      percent chance of death.
3  A   **Correct.**
4  Q   Okay.  Does that chance of death change ever based
5      on the age or the comorbidities?
6  A   **No.**
7  Q   No.
8  A   **Not necessarily.  And I've answered that before.**
9  Q   So every patient has a three percent chance of
10     death.
11 A   **Yes.  If you go in -- nevermind.**
12 Q   Go ahead --
13 A   **Yes, every patient, three percent chance of death.**
14 Q   There are no patients for which the risk is higher?
15 A   **Might be higher, but everybody has three percent.**
16 Q   I understand the average is three percent, but I'm
17     asking --
18 A   **No, no, everybody has a three percent chance risk.**
19     **Anything else adds onto it.**
20 Q   Okay.
21 A   **So do you want to be one of three out of hundred who**
22     **dies because they went under anesthesia?  Is that**
23     **what you want?  I mean, is that what I got to do to**
24     **prove it to you?**
25 Q   I'm asking the questions, sir.

Page 111

1  A   **Yeah, I know.**
2  Q   So you're saying that the baseline is three percent
3      and it can go up with age or comorbidities; is that
4      your testimony?  Certain things could increase the
5      risk, but the risk can never be lower than three
6      percent.
7  A   **My testimony is you have three percent risk for**
8      **going under anesthesia, that's my testimony.**
9  Q   For everyone, and it is not --
10 A   **Every age, everyone.**
11         MR. SCARBER:  I'm going to place an
12     objection again, asked and answered.
13 BY MR. CROSS:
14 Q   We talked a bit about the appeals process for
15     Corizon.
16 A   **Okay.**
17 Q   Can a prisoner initiate an appeal of an ATP?
18 A   **It's an MDOC --**
19 Q   Through the Corizon process -- I'm not done with my
20     process, sir -- through the Corizon appeals process
21     can a prisoner initiate an appeal?
22 A   **I have the same response:  Through a grievance with**
23     **the MDOC or having his provider put in a**
24     **grievance -- or an appeal to the Corizon process.**
25 Q   All right.  Do you know the percentage of your ATPs

Page 112

1      that are appealed through the Corizon appeals
2      process?
3  A   **I could speculate, but no.**
4  Q   Can you give me an estimate?  Is it one percent?  Is
5      it 50 percent?
6          MR. SCARBER:  Just going to place an
7      objection; calls for speculation.
8  A   **No, I already said that.**
9  BY MR. CROSS:
10 Q   I understand.  So you don't know if it's 99 percent?
11     Is it 99 percent?
12 A   **No, I do not know how many get appealed.  I don't**
13     **even know that they've been appealed.**
14 Q   I see.
15 A   **I get no notification.**
16 Q   I believe you testified previously that you have
17     approved colostomy reversal surgeries for prisoners.
18 A   **Okay.**
19 Q   What happened after you approved it?
20 A   **It got repaired.**
21 Q   Okay.  So, if you had approved Mr. Jackson's
22     request, he would have received the surgery or at
23     least the consultation?
24 A   **Yes.**
25 Q   Okay.  Is there a difference between medically

Page 113

1      indicated and medically necessary care?
2  A   **I guess you could say so.**
3  Q   What is that difference?
4  A   **One is medically necessary and the other one is**
5      **approvable.**
6  Q   Is what?
7  A   **Approvable.**
8  Q   Approvable.  So there are some things that are
9      approvable that are not medically necessary?
10 A   **It depends on the insurance company and what kind of**
11     **approvals they have.**
12         MR. SCARBER:  I'm going to place an
13     objection to relevance, unless you're talking about
14     specific MDOC policy and what's going on with the
15     inmates at the Michigan Department of Corrections.
16 BY MR. CROSS:
17 Q   Who is Kalen -- well, you know what, that's outside
18     the scope.
19         MR. CROSS:  I don't think I have
20     further questions.  Thank you for your time, Dr.
21     Papendick.
22         THE WITNESS:  Thank you.
23         MR. SCARBER:  Ken?
24         MR. WILLIS:  I don't have any
25     questions.



**Dr. Keith Papendick**
05/10/2021                                          Pages 114..116

Page 114

1                     EXAMINATION
2  BY MR. SCARBER:
3  Q   Doctor, just one last question for me.  Mr. Cross
4      asked you a question about what would happen if you
5      had found, based upon your review with the
6      information you had, about something being medically
7      necessary in terms of a colostomy reversal.
8  A   **Right.**
9  Q   Does that process still have to go through, even
10     after you say it's medically necessary, does it
11     still have to go through the -- be consistent with
12     the MDOC policy that we discussed?
13 A   **Well, I really believe that this would be evaluated**
14     **by the State of Michigan -- or, no, the state**
15     **medical director for Corizon before it went to**
16     **surgery because of that statement.  Yes, it's going**
17     **to have to be reviewed by the medical director for**
18     **the Michigan Department of Corrections.**
19 Q   So irrespective of whatever you would do with
20     respect to your evaluation, it still has to go
21     through the process of getting some kind of final
22     approval from the other bodies or process that we
23     talked about that involved the MDOC's policy.
24 A   **Correct, it's still going to have to go back to the**
25     **medical CMO.**

Page 115

1              MR. SCARBER:  Okay.  I have nothing
2  further.  Thank you.
3              MR. CROSS:  All right.  I don't have
4  any recross.
5              THE VIDEOGRAPHER:  Okay.  That's
6  concludes today's testimony.  We are off the record
7  at 1:54 p.m.
8              (The virtual, videotaped deposition
9              concluded at 1:54 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 116

1                    CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN    )
3                       ) SS
4  COUNTY OF LIVINGSTON )
5      I, Carol Marie Hicks, Certified Shorthand Reporter,
6  a Notary Public in and for the above county and state, do
7  hereby certify that the above deposition was taken before
8  me at the time and place hereinbefore set forth; that the
9  witness was by me first duly sworn to testify to the
10 truth, and nothing but the truth; that the foregoing
11 questions and answers made by the witness were duly
12 recorded by me stenographically and reduced to computer
13 transcription; that this is a true, full and correct
14 transcript of my stenographic notes so taken; and that I
15 am not related to, nor of counsel to either party nor
16 interested in the event of this cause.
17
18
19
20                    Carol Marie Hicks
21                    CSR 3345 Notary Public,
22                    Livingston County, Michigan
23 My Commission expires:  September 4, 2021
24
25

**Dr. Keith Papendick**
**05/10/2021**

1

## $

**$350** 79:19

## 0

**03.04.100** 91:5 96:1 99:12

## 1

**1** 15:19 65:9 85:8
**1-3** 85:15
**10** 6:1,9 49:2 58:11
**10-1-17** 19:1
**10-13** 98:15
**100** 12:14 43:16 45:4
**103** 65:11
**104** 65:11 66:5
**10:30** 6:2,9
**11** 26:11
**11-3-16** 22:18
**11:36** 49:12
**11:51** 49:15
**12** 26:11 82:2
**12-15** 78:9
**12-7** 99:2
**12-9** 94:21
**12:43** 81:15
**12:53** 81:18
**13** 51:20
**16-19** 44:5
**17** 51:21
**18** 22:16
**19** 17:18
**19th** 100:23 106:3
**1:03** 85:11

**1:54** 115:7,9

## 2

**2** 18:18,21
**20/30** 37:2
**2007** 28:3
**2012** 9:24 27:9,10 28:13
**2014** 7:10 9:6 11:11 13:16 18:3 21:1,6 27:9 31:23 32:6,11 54:9 56:5,7
**2016** 7:10 9:6 16:3 72:5,8
**2017** 7:15 9:2 22:16 64:2 66:3,4 68:13 72:3,4,24 73:7 98:8,12,15, 18 103:13 104:6,10 106:3,16 107:7
**2018** 94:8
**2019** 100:23
**2021** 6:1,9
**21** 53:8
**23** 53:8 55:22
**25** 85:14
**25-year-old** 40:4
**2600** 37:3
**261** 99:2
**266** 58:14
**268** 94:22
**269** 97:2
**29** 16:8,13

## 3

**3** 19:8 20:19 21:13,16
**3-1-14** 18:25 21:10
**3-1-2014** 18:24
**30** 41:2 43:4
**30-** 68:20
**30-year-old** 38:22

**30/60/90** 68:19
**318** 21:23
**39-year-old** 33:17

## 4

**4** 24:19
**407** 11:17 12:1,5,7 33:19 45:9 62:12,15 94:8,13 107:10,11,13, 15,18,25 108:1
**43** 44:5
**460** 57:22
**48** 49:2

## 5

**5** 27:12 39:4
**50** 112:5
**53-year-old** 37:17
**55-year-old** 41:1
**574** 100:24,25
**575** 100:25 101:4
**579** 100:24

## 6

**6** 27:13
**60-** 68:20
**618** 21:24,25
**62** 103:12
**65** 103:12

## 7

**7** 49:2 51:14,16
**72** 102:23
**74-year-old** 35:7
**77** 78:9
**7th** 103:13


HANSON RENAISSANCE COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Dr. Keith Papendick**
**05/10/2021**

---
**8**
---

**8** 49:2 57:13

**84** 85:14

**85** 12:14 85:14

**8th** 98:12

---
**9**
---

**9** 61:15,19

**90** 62:1,3,25

**90-day** 68:21

**99** 45:4 112:10,11

---
**A**
---

**a.m.** 6:2,9 49:12,15

**AA** 82:22 83:8,9 91:8 99:14

**Abbreviated** 15:9,13,17 16:23 17:7,10 18:7,13 20:20

**abbreviation** 60:5

**abilities** 50:8

**ability** 95:7

**absolutely** 30:16 36:25 50:22 64:7 74:1 77:7 102:14

**accept** 93:3

**access** 23:2 25:13 29:23,25 72:16,18,20

**accomplishment** 61:24 62:8

**Accomplishments** 61:23

**account** 75:1

**accurate** 95:12

**achieve** 62:7

**Act** 11:1 69:23

**activities** 42:1

**actual** 59:8,17 89:25

**acuities** 35:22

**acuity** 36:2 37:1,2

**acute** 41:4

**additional** 39:22 94:5

**adds** 110:19

**adjust** 68:18

**administrative** 11:7

**affect** 76:21 108:23

**age** 102:10 108:12,13,22 110:5 111:3,10

**agree** 20:14 43:5,8 44:9 93:6,7 102:13 104:24 105:22

**agreement** 95:20

**ahead** 8:3 11:2,14,22 12:25 19:22 20:17 21:5 22:14 29:8 34:8 43:25 45:24 62:11 70:11 73:19 78:5,15 80:15 86:4 89:1 95:9 108:6 110:12

**aids** 37:20,25

**allegation** 94:10

**allowed** 8:10,14,15 28:21 29:11 80:10

**alopecia** 33:18

**aloud** 53:8

**alterative** 22:9

**alternative** 28:20,22 29:12,15

**Amendment** 55:24 56:1,4,7,8,22

**androgenetic** 33:18

**anesthesia** 109:25 110:1,22 111:8

**annual** 47:17,21 48:2

**annually** 18:5

**answering** 67:19

**answers** 15:18 44:15 54:17

**anymore** 19:18

**apologize** 73:18

**appeal** 69:7,15 84:1,2,8,17,18 92:16 93:4,9,14,16 94:6,19,22

**appealed** 84:8 112:1,12,13

**appeals** 84:9 95:15 98:20,23 111:14,20 112:1

**appears** 18:23 20:3 22:18

**apply** 19:11 32:14

**appropriately** 103:19

**appropriateness** 69:17

**approvable** 113:5,7,8,9

**approval** 29:17 62:1,4 64:6 85:1, 19,22 86:15 114:22

**approvals** 30:14 54:10 65:23,24 113:11

**approve** 9:19 19:12 28:17 32:7, 20 36:1 39:14 40:10,18 46:5 47:8 66:9,11,14,22 73:9 82:6

**approved** 15:15,16 22:8 38:18,19 39:16,18 60:16 62:13,16,22 81:24 83:18 86:15,19 94:13 99:9 112:17,19,21

**approves** 83:23

**approving** 30:12 32:5 54:21

**April** 72:24 73:7 98:8 103:13 104:6,10 106:3,16 107:7

**areas** 23:19

**ARL** 18:4 20:8,9

**assigned** 67:7,10 68:3

**assignment** 38:24

**assume** 25:25 37:7 80:9 104:15

**assuming** 47:19 62:18 66:23 67:4,5

**assumption** 62:20 69:1

**ATP** 28:17,19,20 29:17 30:11 32:20 34:19,23,24 39:14 40:11, 18 48:3,7 50:21 54:8,15,20 55:7 60:13 61:12 66:14 69:6,14 72:22 73:9,10,12 79:7 81:20 84:16 93:3,7,8 94:13 101:24 106:16 107:7 111:17



ATP'D 69:6 84:7

ATPS 30:14 49:24 50:4,7,23 54:10 89:10,13 93:13 111:25

attack 101:14

attempt 40:10

attention 16:4 19:8 25:2 61:22 66:5

attorney 46:13 49:16 50:3 106:12 107:4 108:11

attorneys 6:10

attributed 53:14

audio 37:9 44:19

audiogram 37:25

authority 94:12

authorization 19:12 41:5

authorized 20:6 99:8

automatically 40:24

average 12:20 13:1,4 110:16

avoid 64:8

aware 25:11 26:21 47:21 60:17 74:15 77:5 92:17 94:5 98:20 100:16

**B**

back 19:12 22:1 28:25 29:1 31:3 38:22,25 44:4,6 49:1,3,14 59:4,5 60:23 65:9 78:8,10 81:17 85:10, 12,15 92:17 94:8 98:7,8 100:25 104:6 114:24

background 26:8

bad 37:3

bag 42:2 75:6 79:21

bandaged 40:6

bar 14:13

based 16:17 30:14 48:3 53:15 68:18 92:3,10 95:11 99:16 104:3 105:24 110:4 114:5

baseline 73:23 111:2

basis 61:11 65:18 74:4 96:1,18

Bates 16:11 57:22 58:14 65:11 66:5

bathroom 71:4

BB 83:8,9,15 91:8 99:14

began 13:16

beginning 65:1

behalf 6:14,15,18,19

behavior 35:4

believed 74:6

benchmark 59:7,16

benefit 41:18 73:24,25 100:3,4 102:5

benefits 43:10 44:11 74:7 75:15 76:16 77:14 79:14,25 80:5,6 99:24 101:12

bias 67:9

big 15:7

biopsied 17:12

biopsy 17:9

bit 26:7 88:25 111:14

blood 103:22

board 70:12

bodies 114:22

body 83:14

Bomber 55:20

border 42:19

boss 54:20 55:5,14

bottom 88:3 96:5 101:7

bowel 80:1

brain 23:5

break 6:25 7:2,3 12:18 48:15,21 49:13,18 51:2 81:11,16 85:9

Breakdown 76:25

bring 51:11

broad 33:8 71:6

broken 88:25

brown 103:21

buckets 20:12

building 63:24

bunch 23:15

Bureau 97:11

**C**

call 10:20,22 18:21 47:23 51:16 61:19 73:14,16,20 74:19

called 8:8 12:1,7 17:24 18:22 27:2,3 58:19

calls 12:12 26:8 35:16 40:13 42:17 53:19 67:1 112:7

camera 87:25 90:20

cancer 23:11

cap 96:8

care 7:13 8:9 11:12 17:22 20:25 25:7,22 34:11,14,15,16 67:24 74:24 77:18,24 79:12 97:12,16, 17,18 113:1

care.' 105:20

career 43:17,18

case 16:25 18:22 19:5 20:10,11 24:25 27:24 28:7 34:1 42:20 45:13,15 46:8 47:13,15,25 48:1 51:18 77:17 82:5 92:15,22 93:6, 11 94:17,20 102:5 104:6,17

cases 39:8 43:14 53:12,13 54:7, 11 55:21 56:13,24 69:5,12,14

cataract 35:8,9

categories 99:19

category 60:6

causing 76:14

cell 63:21

Centered 17:22



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Dr. Keith Papendick
05/10/2021

4

**centralized** 65:18,24

**chance** 110:2,4,9,13,18

**change** 11:25 35:4 41:19 66:2
110:4

**changed** 9:10,12 31:22,25 53:17
95:20

**changing** 72:19

**checked** 90:1

**checks** 90:4

**choices** 29:17

**circumstance** 30:7 76:17

**circumstances** 30:11 36:1,13
75:19,20 76:8

**cirrhosis** 24:11

**claim** 42:24 66:10 77:19

**claims** 55:23,24 56:1,4,9,19,20,
23,25 66:8,16

**clarify** 7:7 54:19

**clear** 104:8

**clearer** 47:2

**client** 46:11 47:6

**client's** 46:22

**clinic** 35:1

**clue** 23:5 53:6 58:2 61:10

**CMO** 83:18,19,23,24,25 84:3,9,
18 85:1,18,21 86:14 93:16 95:19
99:10 114:25

**colleagues** 10:15 30:2

**Colleen** 6:16

**colon** 41:22 42:3

**colonos** 73:25

**colonosc** 73:25

**colostomies** 77:5

**colostomy** 32:20 41:3,6,11 43:2,
17 45:11 47:5,14 72:24 73:25
74:16 75:6,8,10,12,16 76:14,23
77:1,3,8,12 79:21 80:13 81:2

**83**:11 84:23 91:13,19,25 92:8,
19,23 93:20 95:13 96:15 99:17
100:9,17 102:8,20 103:4,8,18
104:2,19 108:14 109:23 112:17
114:7

**communicate** 30:2 63:14

**community** 61:14

**comorbidities** 40:4 102:10
108:12,13,22 109:4,10 110:5
111:3

**comorbidity** 108:25

**company** 8:8 63:23 113:10

**comparing** 52:4,13

**complains** 38:24

**complaint** 94:24

**complaints** 74:1

**complete** 42:1 58:17

**complication** 76:25 77:3

**complications** 41:10 45:5 76:23
77:1,5,8,11,13 79:18 96:12

**computer** 14:11,12,13 21:21
58:25 59:2 71:20,22 95:5

**concerns** 38:9

**concluded** 115:9

**concludes** 115:6

**conclusion** 95:25 96:2

**condition** 33:2,18 37:7 42:11
96:11 109:1

**conditions** 36:10 37:6 76:8

**conference** 10:19,22

**consent** 101:18

**consideration** 30:15 41:6

**considered** 64:25 93:12 96:16
99:18

**consistent** 114:11

**consistently** 62:2

**constrained** 82:25 83:3

**consult** 33:20 35:6 41:6 46:5,8,
25 47:4,9,12 62:1,4 72:23 79:13,
16 86:16,20 95:22

**consultation** 43:9 44:10 45:10
112:23

**consults** 9:19

**contact** 83:19,24,25

**contained** 15:5 23:4

**content** 27:16

**context** 15:10 26:2 30:17 45:15,
23 71:6 76:7 103:16

**continue** 11:21 12:25 70:23
75:11 92:24 93:9

**Continues** 103:22

**continuous** 38:24

**contract** 88:13 89:4

**contracts** 9:9

**control** 69:19 82:11 91:2

**controlled** 82:14 83:3,6,16 84:25
85:22,24 86:6,11

**conversation** 103:25

**convince** 31:18

**cord** 17:9,11

**core** 65:12,16,24

**Corizon** 6:18 9:7 17:20 19:9
22:5,6,10,19,24 23:10,22 24:24
25:8,17 26:12 27:1,3,5,21,22
56:2,6,14,19,21 58:3 60:15
61:21 63:19 65:22 79:11 88:12
89:3 92:25 93:9 94:6 95:15,21
97:8 98:23 111:15,19,20,24
112:1 114:15

**Corizon's** 13:22 63:23

**corporate** 8:10,12,13 9:8 21:11,
12 72:4

**corporation** 17:16

**correct** 17:8 31:14 40:21 50:13
51:8 58:17 65:8 68:2,16 80:12
83:10,15 84:4,23 87:4 90:2
91:15 93:22 96:3,20,21 98:2,9,



19 99:20,25 100:20 102:12
104:10,11 105:13,21 107:24
110:3 114:24

**Correctional** 7:13 8:9 25:22
79:12

**Corrections** 11:20 36:15 38:10
79:11 91:21 92:1,11 93:15,17
97:13 99:3 113:15 114:18

**corrective** 82:22 83:12 84:5,15
91:5 99:7

**cosmetic** 34:11,14,15,16 85:18

**cost** 30:15 50:20 51:24 52:1,18,
19,20,22 53:1,2,4,9,16,22,25

**counsel** 64:4,8 97:1 100:15
104:12

**county** 10:11

**couple** 52:8

**court** 6:11 28:24 37:10 44:20
57:7,9 58:6 59:23 63:3 68:23
86:8 87:12 89:23 100:11

**cover** 11:6

**covering** 11:5,6 32:15,18

**criteria** 15:16 16:18,22 17:5
19:11,13 20:4,23,24 87:23 88:3,
5,9

**critical** 104:13

**Cross** 6:13,21,22 7:23,25 8:4,11,
20 9:1 11:16 12:15 16:8,10,13,
15 17:3 19:7 20:2,18 21:8,25
22:2,17 23:21 24:3,8,21 26:10,
19,24 27:20,25 28:4,8,11,24
29:4,10 31:11 32:13 33:5,9 34:2,
12,22 35:20 36:16,22 37:16
38:12,16 39:13,21 40:17 43:1,24
44:3,8 45:2 46:2,10,13,20 47:1,
16 48:17,19,25 49:22 50:1,24
52:10,12 53:20 54:1,18,22 55:4,
15 56:16 57:9,11,15,21,23 58:8
60:3 61:3,17 62:14 63:12 65:3,
15,19 67:2,6,22 69:24 70:4,10
71:8,17 73:5 74:5,12 76:11 78:2,
4,7,21 79:5 80:19 81:1,7,12,19
82:18 83:5 85:12,20 86:3,10
87:1,16 88:20 89:2,21,24 90:11,

25 91:4 93:23 100:15 101:25
104:12 106:8,11,19 107:1,3
108:10,20 109:11,21 111:13
112:9 113:16,19 114:3 115:3

**cruel** 77:21

**culminating** 84:18

**current** 96:11

**custody** 75:4

**custom** 107:24

**cut** 63:18

**CV** 61:21

---

# D

**daily** 42:1 61:11

**damage** 101:16 102:1

**damages** 46:18

**danger** 24:13 73:21 102:2

**dangerous** 96:13

**dangers** 41:14

**data** 13:25 14:20 88:12 89:3,5
105:7,8

**date** 21:9,10 28:3 41:2 66:3
98:10,13

**dates** 98:16

**day** 9:14 12:10,16,20 68:19

**days** 59:9,10 60:8

**death** 96:13 100:10 101:14
109:23 110:2,4,10,13

**December** 7:10

**decide** 46:4 69:16

**decided** 47:8

**decides** 84:1 93:6

**deciding** 30:3

**decision** 13:6 15:5,6 39:23 41:13
45:9 47:19 78:1 82:11,15,25
83:3,7,16 85:1,22,24 86:6,11
93:13 104:4 105:9 106:15

**decision-maker** 91:18,23 94:16

**decision-making** 78:17 94:12

**decisions** 93:11

**deep** 103:20

**defects** 83:15

**defendant** 27:22

**defendants** 6:16,18

**defer** 9:19 28:17 29:11,16

**deferred** 84:7

**define** 30:17

**definition** 31:3,21 32:14 64:20,25
89:6

**definitions** 23:20

**deliberate** 77:22

**Deline** 18:22

**demonstrated** 30:13 34:25 35:5

**denial** 96:18,19 97:18 105:20

**denied** 69:6 92:10 95:13 96:4
97:24

**dense** 35:8

**deny** 28:21,23 29:9 66:12,13
92:7

**denying** 96:2 98:14

**department** 11:3,20 13:22 36:14
38:10 79:10 91:20 92:1,11
93:15,17 96:13 97:13 113:15
114:18

**depend** 73:21

**depends** 22:12 25:17 47:23
75:19 108:7,25 109:18 113:10

**deposition** 6:7 15:19 18:18 21:13
24:19,23 26:14,18 27:12 51:14,
17 53:8 57:13 58:11 61:15 65:2
72:13 82:1 102:7 115:8

**describe** 62:7

**description** 21:16

**desk** 63:20,22



**detail** 69:21

**determination** 13:12 19:14 73:6, 8 75:23 103:7 104:17 105:4 108:2

**determine** 13:9 22:7 39:23

**determined** 83:17 85:2 92:24 99:8

**determining** 91:11 99:21 101:22 104:22

**developed** 16:18,23

**Devlin** 6:17 46:10 49:16

**diagnosis** 39:24 40:1

**died** 80:11

**dies** 110:22

**difference** 15:8 66:7 83:4 105:19 112:25 113:3

**difficult** 95:3

**difficulty** 37:19

**direct** 16:4 19:8 25:2 61:22 65:10 66:4 82:12,19

**directive** 82:21 92:11 95:25 99:12

**director** 7:16 9:4 19:15,16,23 21:17 93:5,9,13 114:15,17

**director's** 93:12

**directors** 66:1

**directors'** 70:13

**disagree** 74:18

**disagreement** 97:15,17

**disc** 39:3

**disconnected** 85:7

**discovery** 17:20 58:14

**discriminating** 37:19

**discuss** 10:22 24:16 49:20

**discussed** 26:13,17 53:25 70:7 92:12 105:25 114:12

**discussing** 100:1

**discussions** 51:25

**disease** 41:20

**disruption** 37:9 44:19

**distress** 33:19 35:2

**diverticulitis** 41:5

**DMC** 100:24

**DOC** 11:12

**doctor** 26:6 32:25 35:15 42:14,15 44:23 49:17 63:10 74:18 101:9 102:15 103:11 105:1,5 114:3

**doctor's** 73:18

**doctors** 77:19 104:14,15 105:11

**document** 15:21 16:1 17:18 18:20 22:19 23:17 24:22 27:15, 16,19 50:25 51:11 57:18 58:13 59:5 61:18,20 82:4 95:23 96:23 97:25 100:21 101:4

**documentation** 96:10 103:25

**documents** 23:16 51:2,9 72:12, 15 94:18 98:3

**Dorsey** 67:21,25

**doubt** 23:18

**duly** 6:4

**duties** 9:10,17,21 11:11 13:19 70:18

---

### E

**ear** 37:23 40:5,8,9,10

**earliest** 41:2

**ECF** 94:21 99:2

**effect** 48:7

**effectively** 75:3

**Eighth** 55:24 56:1,4,6,8,22

**elective** 96:14

**email** 63:17

**emails** 63:16

**emergency** 40:24

**emotional** 33:19 35:2

**employed** 8:6,10 22:9 79:11

**employees** 65:23

**encounter** 22:8

**end** 53:14 64:20 95:3

**endeavor** 9:8

**ends** 84:2

**endurance** 6:25

**engage** 35:3

**ENT** 17:11

**entire** 17:16

**entitled** 94:22

**entry** 13:25

**enumerating** 49:5

**epidural** 39:5

**equivalent** 95:15

**Erin** 55:20

**essentially** 50:20

**established** 41:4

**estimate** 112:4

**evaluate** 9:18 43:10 44:11 46:3 76:19 79:14

**evaluated** 40:25 48:8,9,10 49:4 69:14 114:13

**evaluates** 14:5

**evaluating** 46:24

**evaluation** 22:21 37:25 47:24 48:2 50:8,11 51:6,7 69:5 101:24 114:20

**evaluations** 47:17,22

**evenings** 93:10

**eventual** 41:22 42:2

**evidence** 103:22

**Evidently** 40:15



Dr. Keith Papendick
05/10/2021

7

**EXAMINATION** 6:20 90:23 106:10 114:1

**examined** 6:4

**excuse** 37:10 44:20 59:23 63:3,4 68:23 69:6 89:23 96:15

**exhibit** 15:19 18:18,21 21:13,16 24:19 27:12 51:14,16 57:13 58:11 59:4 61:15,19 65:9 82:2

**exist** 86:19,23 87:4,6,9 108:12

**Expedite** 15:18

**experience** 20:10 45:8 46:3

**experiencing** 37:19

**explain** 49:21 50:14 61:1,4 100:1

**explained** 63:8 108:5

**explaining** 108:21

**explanatory** 66:20

**exposing** 77:13

**express** 78:20

**extent** 10:24 11:2 12:12 19:5 23:14 63:9 69:21

**extraction** 35:9

**extrapolating** 13:1

**extremely** 35:11

**eye** 35:8,9,10 36:3 37:1,2,3

**eyes** 35:23

---

**F**

**face** 34:4 95:5

**facing** 33:3

**fact** 51:5 95:17 98:3,10

**factor** 50:12

**factors** 64:25 65:4

**facts** 32:24 34:7,9,13 45:21 47:15

**failure** 70:3

**fair** 11:10 17:6 98:16 107:17,19

**fairly** 79:10

**fall** 20:13

**false** 94:14,15

**fatality** 81:2

**feedback** 68:17

**feel** 34:7 36:18

**female** 35:7

**fight** 40:5

**filed** 18:21 53:13 56:14,19,20 82:5 94:19

**final** 91:18,23 94:11,15 114:21

**Finasteride** 34:19

**find** 29:21 89:9 98:25 100:13

**fine** 53:15 90:22 96:11

**finger** 37:22 63:18

**finished** 98:19

**five-minute** 81:11

**flat-out** 109:18,25

**flow** 68:3

**focus** 105:2,5

**follicle** 33:20

**follow** 34:25 86:24 101:21

**follow-up** 77:19 106:9

**follow-ups** 9:19

**food** 11:25

**form** 12:6 15:5,7 24:18 26:8,23 32:10,23 33:7 38:7 40:12 44:1 50:5 51:6,7 52:7 55:1 62:10,19, 22 76:4 87:24 88:23

**found** 114:5

**foundation** 8:19 19:21 21:5 22:14 36:5 42:17 45:20 53:19 56:12 70:5 106:23 108:18

**fourth** 89:18

**Frankly** 20:22

**front** 76:18 77:25 100:25 105:3

107:14

**froze** 7:18,19

**frozen** 7:17 85:3

**functional** 32:20 75:16 76:14 96:15 102:20 103:5

**functioning** 75:9,10 96:15 103:18,21

---

**G**

**gauge** 61:12

**gave** 23:15 24:23 64:24

**general** 41:5,17 43:8 44:9 45:7, 10,16 75:15 76:12 84:11,12 100:14 101:17 109:12 110:1

**generalized** 84:11 109:2

**generally** 108:23

**generates** 26:12

**generic** 50:22

**give** 33:12 37:14 75:20 102:2 105:18 112:4

**giving** 37:15 55:12 61:14

**goal** 62:3

**God** 6:22

**good** 6:13,17 35:8 37:2 49:10 62:20 81:12 102:3

**graph** 59:7,14

**grievance** 10:3 94:22 95:11,14, 24 96:4,22 97:7,14,20,23 98:4,5, 10,13 102:16,17 105:15 111:22, 24

**grievances** 10:1

**Grievant** 97:24

**ground** 6:24

**group** 9:9 29:24

**guess** 7:6 35:12 36:11 113:2

**guidelines** 22:7,11,20,21,24 23:2,4,7,10,11,24


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**H**

habit 107:24

hair 33:20

handbook 25:3,6,11,13,15,18,23 26:12,13,17 27:1,4,6,17 28:12

handbooks 25:24 26:21

handle 68:4

Hang 52:6 73:17

happen 42:10 84:6 93:1 97:21 114:4

happened 7:20 112:19

happening 109:19

harm 30:19 31:8

hate 63:17

health 9:7 23:22 24:24 27:1,3,5 76:15 79:11 96:1 97:12

Health's 22:5,6,10,19

healthcare 9:23 10:1

healthy 76:13

hear 7:24 37:23 44:16 65:14 85:4,6 90:19,21 106:17,21

heard 74:17 106:22

hearing 37:18,20,21,25 44:17

heart 101:14

heavy 38:23

hemodynamically 40:7

Hepatitis 24:10

hernia 24:13

herniations 39:4

Hey 88:24

high 52:1 68:11

higher 100:3,5 110:14,15

highest 52:2 54:2

highlighted 99:5

history 37:17

Hold 87:22

home 63:25 64:3

hospital 40:10

hours 12:16

HTV 23:9

hundred 110:21

hypothetical 32:24 33:13,24 36:13 39:10 40:13 43:21 46:23 47:3 55:12 76:5

hypothetically 32:19

hypotheticals 35:13

**I**

I-N-G-A-U-G-E 57:11

I-N-T-E-R-Q-U-A-L 87:15

i.e. 9:8

Ian 6:13,22 16:6 21:20 49:16 73:18 81:10 88:24

ice 40:8

ID 94:22 97:2 99:2

idea 16:24 28:14 52:11 74:23,24

identification 15:20 18:19 21:14 24:20 27:14 51:15 57:14 58:12 61:16 82:3

identified 26:18

identify 6:10 27:18 94:21 99:2 100:22

II 94:22 95:24 98:4,10

III 96:23 97:2,22 98:5,13 105:15

ileostomy 41:23 42:2,11

impingement 39:4

implant 35:10

implementing 68:17

improper 33:24

improved 37:21

Improvement 11:1 69:23

inadequate 97:18

incarcerated 41:2

incarceration 24:14

incident 70:25 104:9

include 65:5

included 19:10

including 55:24 101:13,17 104:18

incorrect 80:12

increase 50:15,17,19,21 64:5 109:4 111:4

increased 61:25

indicating 63:18

indication 103:6

Indications 101:3,8

indicators 58:9,20

indifference 77:22

infection 101:14

information 14:6 15:1 25:6 28:17 29:17,18,19,22,25 35:14,18,21 36:20,24 37:4,15 39:15,17,20, 22,23 41:8,9,12 42:4,5 43:12,13, 22 44:23,24 45:1,3,5,6 61:14 66:15 75:22,23,24 94:4 105:2,24 108:1 114:6

Ingauge 57:4,6,11,12 59:12,15

Inguage 57:5

initial 92:15 93:2

initiate 111:17,21

injection 40:3

injections 39:6

injured 38:22

inmate 10:1 40:6 45:17 92:21,24 93:19 94:7

inmates 9:23 11:12 36:9 38:10 42:20 94:7 113:15



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

inpatient 59:9,10

input 17:13 69:10 80:8

insurance 60:8 113:10

Interestingly 102:1

internal 23:23

Interqual 14:5,7,8,9,18,19,23,24
18:10,11,15 19:11,13 20:4,23,24
22:4 23:11 87:14,17 88:5,7,8,10
89:22,25 90:7 108:8

interrater 69:3,8

interrupt 21:21

interrupted 64:19

interviewed 10:3

involved 66:16 108:23 109:4
114:23

involvement 45:16,17 104:8
106:1

IQ 86:17 87:11

irrespective 102:9 114:19

issue 30:11,14 33:25 38:8 39:14
75:10 79:7 106:15

issued 18:25 73:11 81:20 107:7

issues 36:8 76:15 101:5,6 102:19
103:3

issuing 28:21 29:12 84:16

items 50:7

J

Jackson 6:14 43:23 46:9 72:25
74:7,15 81:21 86:16,20 91:3,11,
13,19,24 96:6,10 100:16 101:5

Jackson's 45:15 46:15 77:22
92:7,18 95:13 99:17 102:7
103:8,18 104:6 106:13 107:5
112:21

jail 10:11 46:19

January 7:9,14 9:2 21:6 56:5

Jeffrey 55:20

job 9:3,5,10,17 11:11 13:16,19
21:16 29:24 30:17 39:1 46:6
47:5,18 49:25 50:4,5 70:18 76:1
78:17

judge 78:16

judging 79:6

judgment 104:21 105:10,12

June 66:3,4 98:12 100:23

K

Kalen 113:17

Kansakar 102:9 104:1,16

Keith 6:3,8 51:17

Ken 113:23

Kenneth 6:15

key 58:9,19 61:22,24 62:7

kind 8:7 21:23 70:19 71:6 76:6
78:12 102:4 103:16 108:5
113:10 114:21

kites 9:23

knew 53:16 54:11

knowledge 56:25 70:7,14

Kohchise 6:14 72:25

KPI 58:1

KPIS 58:4

L

L4 39:4

L5-s1 39:5

large 84:2

Lashuay 18:22

late 98:17

law 8:16 55:23

lawyer 82:5

lay 45:20

laying 76:18 108:17

leak 101:16

learn 23:6 45:7 47:7

left 35:9 37:23 40:5

leg 39:3

Legislative 99:3

lens 35:10

lesion 17:9,11

letter 99:3,6,11

letters 96:8

level 108:23

life 46:11,15 75:6,13 79:21

lifetime 41:23

lifting 38:23

light 103:21

likelihood 67:9

limit 64:4

limited 16:18,22 17:5 70:7

lines 44:5 49:2 51:20 53:8 78:9
85:14

list 15:10,13,14,17 16:23 17:7,10,
22,23 18:6,8,13 19:10 20:5,20,
21,23 35:23 37:6 102:1

listed 101:13

live 79:20

living 7:9,14 42:1 50:20 66:11
80:13

logo 19:9

long 47:24 63:17 75:8

longer 13:3 57:17,24

looked 51:5 59:6

loop 68:17

Lori 14:2,4 15:3 90:5,6,7

loss 37:18,21 41:22

lost 40:15

loud 61:24



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

love 87:20

lower 38:24 111:5

lunch 12:18

---

**M**

M.D. 6:3

made 45:24 47:13 50:8 73:11,14,
16 74:19 77:11 78:1 92:15
98:21,23 106:15

maintained 90:8

major 96:12

make 13:6 15:4,6 34:9,13 41:12
45:9,19 50:10 69:1 73:6,19
75:22 93:11 95:1 105:3,9 108:2
109:1,15,17,18

makes 14:5

making 13:12 70:16 89:1 90:17

male 33:17 37:17 38:22 40:4 41:1

malpractice 53:12,13 54:7,11
55:21,23 56:24 77:19

management 7:11,16 9:4,7 13:22
15:11 16:17 19:25 21:17 22:5
31:23 41:4 59:6 65:12,16,18
66:1 71:3 88:12,22 89:3,5

manager 98:15

manner 101:23

manual 27:21

marked 15:20 18:19 21:14,15
24:20 27:13 51:15 57:14 58:12
61:16 82:3

mask 63:6

material 10:25

matter 17:12 106:1

Mcbride 38:20

MDOC 12:5 81:21,23 84:14 91:1,
4 94:19 95:12,14 96:19 97:10,
11,20 98:1 100:19 102:16,23
103:11 111:18,23 113:14 114:12

MDOC's 101:21 114:23

meaning 54:21

meanings 70:8

means 30:25 66:23

meant 60:9

measured 66:6 70:15

measuring 69:25

medical 7:16 9:4 11:19 13:5,10,
11 14:10 19:15,16,23 21:17
22:6,10,20,22,24 23:6,10,23
29:21 30:13,25 31:9,12,19,21
32:11,12,14 33:1 34:24 35:5,23
37:6,7 41:16 42:11 43:4 46:17,
22 55:23 61:14 62:17,19 64:25
66:1 72:16,17,19,21 74:3,24
76:18,20 77:3 81:24 85:17 87:10
91:12 92:16,23 93:4,5,8,12,13
95:18 96:17 97:18 99:21 101:22
102:19 103:3,7,24 104:5,18,21
105:4,10,11,16,19 106:14 107:5,
6,9,18 109:1 114:15,17,25

medically 14:21 30:18,19,24
31:2,15 32:5,7 33:15,21 38:3,13
41:25 64:9,13,16,18 83:17
84:21,24 85:2,23 86:17 99:9
112:25 113:1,4,9 114:6,10

medication 37:6,8

medications 35:24

medicine 8:12,13 61:13

meet 10:6,8 86:17 87:11,13
93:10 108:8

meeting 69:14,16

meets 14:18 15:15

member 60:10,11

memorized 23:18

mentioned 74:10

met 14:23,24 19:11,13 20:4,24
87:23 88:4,9

metric 70:3

Michigan 7:13 8:8,9 10:14 11:19
13:18,20,21,23 19:17 20:10 21:3

25:8,22 34:10 38:21 65:22 66:2
67:10,23 79:10,12 88:13 89:4
91:20 92:1,10 93:15,17 97:12
113:15 114:14,18

Mid-2017 64:3

middle 64:19

Minor 14:2,4 90:5,6,7

minute 48:11 55:6 85:6

minutes 12:21,22 24:4 78:13

mischaracterizes 54:17 55:11,12

Missouri 13:25 27:24 32:18

misstatement 38:15

misstates 93:23

mistake 73:11 77:11

misunderstanding 49:19

mixed-up 8:7

MNR 88:5

module 58:19

modules 58:15

Monday 93:10

Monnell 42:23

month 54:9 60:10,11

monthly 61:11 70:17,19,20 72:3,
7

months 17:2 38:23

morning 6:13,17,22

move 17:17 33:12 42:21

movements 80:2

moves 84:9

MP 94:13

MRI 39:3

multistep 64:24

myriad 11:25



## N

**names** 51:19 67:14

**nature** 32:9 33:4,8 35:13 45:18

**NCCN** 22:21

**Neal** 85:5

**necessarily** 109:19 110:8

**necessity** 13:10 14:10 22:22 30:13,25 31:1,9,12,19,21 32:11, 12,15 34:24 35:5 62:17,19 65:1 81:24 85:17 87:11 91:12 92:16, 23 95:18 99:22 101:22 103:8,24 104:5 105:4

**needed** 18:5 42:14 46:25 68:18 107:11,15

**nerve** 39:4

**neurosurgery** 40:2

**nevermind** 12:24 75:5 110:11

**NMI** 29:19 36:23 73:9

**nonessential** 96:16

**nonspecific** 75:21

**normal** 40:7 80:1

**Nos** 27:12

**note** 37:14 102:23,25 103:2

**notification** 112:15

**number** 12:5,6,7 13:14 16:11 43:14 53:12 54:14 66:21,24 74:10

**numbers** 54:13

**numbness** 39:2

**nurse** 13:24 15:15 16:17 17:23

**nurse's** 14:2

**nurses** 22:6

**nursing** 11:5,7

## O

**oath** 6:5

**object** 8:18 22:13 24:18 26:1,8 28:6 29:7 33:5,7 35:13 38:14 39:10 46:9 63:1 66:25 67:17 69:21 88:23 106:23 109:13

**objected** 63:7

**objecting** 63:7 78:2

**objection** 10:24 11:14 12:12 19:4 21:5 23:14 26:16,23 31:7 32:9, 23 33:4,6,23 34:1,6,21 36:5,6 37:11,13 38:7 39:19 40:12 42:8 43:21 45:13,19,24 47:11 52:7 53:19 54:17 55:1 56:12 62:9 64:23 67:16 70:5,23 71:10 74:9 76:4 77:17 78:3,11,24 83:2 86:1, 23 88:17,24 89:1 93:23 101:25 108:4 109:7,15 111:12 112:7 113:13

**objectionable** 42:21

**objectivity** 67:8

**obligation** 86:24

**obtain** 25:15

**Occasionally** 13:13,14

**occur** 102:11

**occurred** 45:17 106:25

**occurs** 83:25

**October** 98:17

**off-site** 9:18 10:10,13 11:12 12:3, 9 13:6,8 19:17,19 22:8 28:16 33:13,20 41:24 60:16 67:24

**offhand** 17:19 90:9 105:17

**office** 99:3 102:19 103:4 104:1

**official** 94:11

**older** 18:23 20:3

**Ombudsman** 99:4

**on-site** 34:25 40:8 84:17 94:13

**one-on-one** 61:25 63:13

**operative** 100:23

**ophthalmology** 37:14

**opinion** 33:15 78:19,20 79:6

105:19

**opinions** 104:14 105:16

**opportunity** 51:1 102:15

**options** 28:15

**order** 62:24 64:5 66:9 76:18 77:8

**ordered** 77:7

**organization** 21:3

**original** 102:7

**originally** 53:11 54:6 94:7

**Orlebeck** 55:20

**ostomy** 103:23

**outcome** 41:24 45:4 82:11,14

**outcomes** 45:8

**outpatient** 54:12 62:1,4 66:7,12, 13,14 70:1,2

**outweigh** 75:16 76:15 77:14 80:4

**outweighed** 74:7

**outweighs** 41:18 80:7

**overbroad** 32:9 62:10

**overturn** 93:7 95:16

**overturned** 69:7,15

## P

**p.m.** 81:15,18 85:8,11 115:7,9

**pacemakers** 17:1

**pages** 21:22 95:7 100:25 103:12

**paid** 66:10

**pain** 24:13 30:20 31:4 38:25

**papendick** 6:3,8,19,22 15:19 18:18 21:13 23:22 24:19 26:20 27:12 50:2 51:14,17 57:13 58:11 61:15 77:23 81:20 82:2 90:25 92:3,14 94:11,17 106:12 107:4 113:21

**Papendick's** 36:11

**paper** 12:6



**paragraph** 16:5 21:18 66:5 99:5, 6 101:7,8

**part** 10:3 16:19 40:5 49:25 70:17 79:1 82:9,24 83:6,15 84:25 96:23 97:2 108:21

**part-time** 13:24

**participate** 10:19 18:5 68:20 69:3

**Pass** 19:10 20:5

**patient** 11:1 17:21 30:20 31:8 33:3 35:3,7 37:18,20,21 38:22, 25 40:9,23 41:1,3,15,20,25 42:10 43:6,9 44:10 69:23 72:25 75:3,6 76:7,9,13 77:14 80:1,8 101:18 102:2 104:23 108:23 110:9,13

**patient's** 13:5,11 14:20 33:2 40:6 41:22 109:9

**patients** 24:13 42:20 51:24 52:1, 18,20,21,22 53:9,17 110:14

**pausing** 40:16

**pay** 47:19 50:12,15,18,19,21

**PC** 7:13 8:9 25:22 79:12

**peer-review** 10:25 69:22

**people** 10:11 52:3,13 55:18,19

**perceive** 37:22

**percent** 50:7,19 61:12 62:2,3,25 89:10,13 100:10,14 109:24,25 110:2,9,13,15,16,18 111:2,6,7 112:4,5,10,11

**percentage** 48:3 60:16 100:12 111:25

**performance** 11:8 47:17,21,23 48:2,8 49:4,5 50:9,11 58:9,20

**performed** 43:2 74:19 78:1 102:8

**performs** 101:9

**period** 19:6 28:7 71:19

**permanent** 34:9 41:23

**person** 37:24 42:14 90:4

**person's** 102:10

**personal** 63:21

**personally** 10:6

**perspective** 7:19

**pertains** 93:1

**phone** 63:15,16,19,20,21,22 73:18

**phrase** 64:10

**phrasing** 83:2

**physically** 31:8

**physician** 7:11 16:18,19 20:6 79:8 104:2

**physician's** 78:16 79:6

**physicians** 8:9 45:6

**pink** 103:20

**PIP** 27:21

**place** 10:23 11:13 12:11 19:3 21:4 23:13 26:22 31:6 32:8,22 33:22 36:4,6 38:7 42:7 43:20 45:12 47:10 52:7 53:18 54:16 56:11 62:9 64:22 66:2 67:15 70:4,22 74:9,21 76:3 77:16 78:23 83:1 85:25 86:22 88:16 94:6 108:3 109:6 111:11 112:6 113:12

**plaintiff** 6:14,23 94:10,18

**plaintiff's** 18:21 21:16 51:16 61:19 94:24 100:15 104:12,15

**plan** 22:9 28:20,22 29:12,15 97:15,17 104:22

**play** 39:1

**PMPM** 60:5,6,7,9

**point** 21:9 36:7,15 70:16 82:9 93:1 100:17,18

**policies** 23:19 86:24 91:1,10

**policy** 18:24,25 19:5,18 20:4,13 21:2,9 23:15 24:12,14 81:22,23 82:5,7,10,11,14,21,24 83:6,20, 21 84:25 86:19,23 87:3,6,8 91:1, 5,16 92:11 95:25 96:16 99:12 101:22 113:14 114:12,23

**poor** 35:11

**popped** 8:2

**portion** 48:2 66:17 105:14

**posed** 7:2

**position** 43:10 44:11 108:5

**positions** 14:1

**possibly** 56:13

**potential** 38:9 42:9 79:15 96:12 101:10,15,16

**practice** 8:12,13,17 60:9 65:20, 21 107:25

**practices** 21:3

**predominantly** 26:11

**prejudice** 36:6

**prejudicial** 39:11

**prepare** 72:12

**prepared** 97:8

**present** 7:15 9:2

**presented** 103:9

**presenting** 76:7

**presents** 33:17

**presuming** 42:9

**pretty** 66:20

**prevent** 41:24

**previous** 9:5 39:1 45:8 65:5,20, 21

**previously** 24:2 37:20 64:24 78:12 112:16

**primary** 11:11 60:6 67:7

**Prime** 6:16

**printed** 61:21

**prior** 49:20 72:20

**prison** 38:23 39:1

**prisoner** 67:23 84:14 99:8 111:17,21

**prisoners** 10:6,8,14 112:17



private 60:8

privilege 69:22

privileged 67:20

problems 33:3 35:24 42:2 74:3

procedure 11:24 14:20 30:22,23
34:16 64:14,16 75:2 77:15 79:9
83:11,14 92:22 96:14 99:18,23
100:4,6 101:3,8,11,13 108:14,24
109:5,24 110:1

procedures 15:14 30:10 32:4
38:11 43:17,18 104:18

process 10:4 12:6 64:24 65:12,
16,25 66:21,24 69:9 84:2,9,17,
18 92:5,21 94:6 95:14,15,16
96:22 97:22 98:4,21,24 111:14,
19,20,24 112:2 114:9,21,22

produced 17:20 27:22 58:14

Profit 58:20

program 14:12,13 57:17,19,20
66:6 70:1

prohibits 8:17

promptly 41:21

pronounce 57:16

proper 45:23

proprietary 22:24 23:23

protected 10:25

prove 110:24

provide 43:22

provided 22:5 63:19 94:4

provider 25:3,6,11,13,15,18,22,
24 26:12,13,17,21 27:3,6,11,17
28:12 31:10,13,18 33:1 40:8
64:15 74:4 79:10 84:1,8,17 93:2,
8,14 100:13 111:23

providers 9:18 25:7 35:17 61:25
62:5,12,15 63:13 64:4 104:22

providing 35:14

psychiatry 35:6

PTO 10:15

punishment 77:21

purely 11:7

purpose 15:17 18:1

pursuant 81:21

pursue 92:25 93:19

put 33:1 45:15 50:5 62:12,15
68:11 71:5 76:6 93:2 111:23

---

## Q

qualitative 68:19

quality 7:13 8:8 11:1 25:22
69:19,23 79:12

quantitative 68:18

quarter 69:12

quarterly 69:3,5

question 7:2,18 26:2,3 28:10,25
29:1,3,5 32:9,23 33:8,11 35:16,
17 36:19,21 38:1,2,7 39:9,12
40:15,18 41:19 42:8,16 43:19
44:1,2,3,7,25 45:22,24 47:3
48:13,14,20,23,25 49:22,24
51:21 52:9,16 60:20,23 61:6,8
62:10 63:9 64:10 67:17 71:14
73:3,19,23 75:21 76:4,10 78:6,7,
18,22,24 79:1 80:22 83:2 85:13
86:9 87:7 88:18,24,25 91:21
103:15 106:5,23 107:19 108:15
109:14 114:3,4

questioning 42:22

questions 7:5 26:5 36:15 52:8
59:3 70:24 75:18 76:2,5 90:12,
13,15 91:1 96:25 97:5 100:16
104:13 106:9 107:5 108:11
110:25 113:20,25

quick 48:15 81:10

quiet 37:24

---

## R

raise 47:19

raising 36:8

rare 30:6

rarely 50:15 63:17

rate 46:4 47:7 48:7 50:21 54:8,
15,20 55:8 60:13 62:1,4,25 64:6
81:2

ratio 102:5

read 21:18 22:1 27:8 28:13,25
29:1 44:3,5 48:25 49:2 51:20
53:7 61:23 78:7,9 83:22 85:12,
15 95:9,23 96:4,9 98:4 99:4
102:24 105:14

reading 95:1

reask 44:2

reason 30:21,23 41:16,17 77:4
79:16,17 95:16,17 96:17

reasons 39:11

reattach 40:10

recall 25:9 26:15 44:1 52:5 54:4
58:21 59:1,2,12,13 60:9 66:3
71:14 72:22 92:14 105:16

receive 40:23 58:3 84:15

received 73:6 91:19,24 112:22

recently 27:21 39:3

recognize 17:18 58:15 61:19

recommend 34:19

recommendation 106:2,4

recommendations 20:24 22:23

reconstructive 82:22 83:12,13
84:6,15 91:6 99:7,18

record 6:7 11:19 13:6,11 21:19
27:19,20 48:13 49:12,15 51:20
53:7 57:21 61:24 64:21 72:16,
17,19 76:18,20 81:15,18 85:8,11
95:2,7 96:9 103:14,17 104:3
108:21 115:6

records 16:9 29:21 46:16,17,18,
22 72:21 100:24 102:23 103:12,
13 106:14,15 107:6,9,18,22,25

recross 115:4

Dr. Keith Papendick
05/10/2021

14

**rectum** 41:22 42:3

**reduce** 67:8

**refer** 19:13 91:4 95:8

**reference** 95:6 102:21 106:24

**referenced** 102:18 106:24

**references** 96:6 102:17

**referencing** 99:11

**referrals** 59:11 66:7,9,12,13,14, 19,21 70:1,2

**referring** 23:14,17 55:22 97:2

**reflect** 21:2

**reform** 83:14

**refuse** 102:3

**refused** 24:7

**regional** 19:15,16 93:4,5

**regular** 74:4

**relation** 70:25

**relative** 76:7

**release** 41:2

**released** 75:3 100:18

**relevance** 19:4,22 26:23 28:7 34:1 36:5 42:18 45:13 46:9 47:14 55:2 67:16 77:17 113:13

**relevancy** 32:10 38:8 43:23 109:13

**relevant** 35:14 37:7 40:14 46:22 47:11

**remained** 12:7

**remember** 24:25 51:18 54:5 58:16,22,24 72:6,7,9 107:22

**remotely** 6:8

**removal** 42:3

**renting** 63:24

**reoperation** 101:15

**repair** 24:13

**repaired** 112:20

**repeat** 33:11 44:21 59:24 86:8

**rephrase** 91:21

**report** 70:13,17,19 71:2,16 72:7 100:23

**reported** 48:9 102:19 103:4

**reporter** 6:11 28:24 37:10 44:20 57:7,9 58:6 59:23 63:3 68:23 86:8 87:12 89:23 100:11

**reports** 39:2 70:20 71:9,19,21 72:3,5

**represent** 6:23 42:19

**represented** 94:18

**representing** 59:8

**request** 11:17,19,23 12:21 13:7, 12 14:6 15:3,5,7 17:6 18:12,14 20:12,19 22:7 28:16,21 29:11 30:1,3,8,12 31:16 32:19,21 33:1, 19 34:18,23 35:9 36:2 37:1,24 39:5,14 40:9 41:5 45:10 47:6,13 62:1,25 67:23 72:23 73:7 79:7,8, 9,13 84:7,8 87:18 91:14 92:7,10, 18 93:2,20 94:8 96:2 98:8 103:9 112:22

**requested** 33:15 47:12

**requesting** 31:19,20 64:8 92:17

**requests** 9:18,20 10:10,13,16 11:12 12:1,2,3,9 13:8,14 15:14, 18 16:23 19:16,19 32:4 33:13 47:4 48:3 60:16 61:10 62:4 64:5 68:5 92:22 94:13

**require** 18:10 38:21

**requirement** 85:1,2,21,23 86:14

**requirements** 87:11

**resolved** 7:21

**respect** 46:8 91:13 94:12 98:7, 21,23 114:20

**respond** 7:1 9:23 10:1 29:18 30:3

**responding** 28:15

**response** 26:4 36:23 79:7 92:16 94:23 95:11,24 97:7,11,20,23 98:5,6,11,14,17 102:16 105:15,

18 111:22

**responsive** 61:5,7 80:21

**rest** 79:21

**restating** 78:25

**result** 41:21 97:22

**results** 14:16,17 68:19 69:9

**reversal** 32:19 41:7 45:11 47:14 72:24 74:1,2,6,16 76:15 79:18 81:2 91:13,20,25 92:8,19,23 93:20 95:13 96:11,14 99:17 100:9,17 101:10 102:8 103:8 104:19 109:23 112:17 114:7

**reversals** 47:5 84:23 96:16

**reverse** 77:4

**reversed** 75:8 77:6,7,9 103:24

**reverses** 77:12

**reversing** 75:16 80:7

**review** 10:10,13,16 12:1,10 13:5, 11,15 14:19 15:9,13,17 16:16,23 17:7,10 18:8,10,11,13 19:16,19 20:7,20 47:4 49:25 50:4,5 51:1,9 68:19 69:8 72:12,15,21,23 78:1 87:17 89:25 92:15,18 106:14 107:6,17,25 114:5

**reviewed** 18:11 47:6 51:7 67:24, 25 68:1 98:7 104:5 105:25 107:22 114:17

**reviewer** 16:19,20

**reviewers** 16:17

**reviewing** 11:11

**reviews** 22:4 68:21,25 69:4 70:6 89:22 90:7

**revision** 21:10,11 22:18

**rights** 56:7 77:22

**ringing** 73:18

**risk** 41:17 73:23,24 80:6 100:3,5 101:13 102:4 108:23 109:4,23 110:14,18 111:5,7

**risks** 41:14 42:9 43:5,10 44:11 74:6 75:17 76:15 77:14 79:14



80:4,9 99:23 100:7,8 101:10,12, 19,20 102:11 108:12

**RMD** 19:13,14,24 68:19 93:4

**RMDS** 19:19,23,24 65:21

**room** 37:24 40:24

**root** 39:4

**rub** 37:22

**rules** 6:24

---

**S**

**safety** 11:1 36:14 38:9 69:23

**sat** 51:23,25 52:17

**scale** 50:7

**Scarber** 6:13,17,18 7:22 8:1,5, 18,22 10:23 11:13 12:11 16:6,9, 12,14 19:3,21 20:15 21:4,20 22:13,16 23:13,25 24:6,18 26:1, 16,22 27:18,23 28:1,6,10 29:2,7 31:6 32:8,22 33:7,22 34:6,21 35:12 36:4,18 37:9,12 38:6,14 39:9,19 40:12,16 42:7 43:20 44:19,21,22 45:12 46:7,15,21 47:10 48:12,18 49:16,17,23 50:14 52:6 53:18 54:16 55:1,9 56:11 59:20,24,25 60:20,22,25 61:5,9 62:9 63:1,5 64:22 65:13, 17 66:25 67:4,15,20 69:20 70:22 71:10,13 73:2,17 74:9 76:3 77:16 78:11,15,23 80:17,21,24 81:10,13 82:16 83:1 85:25 86:22 88:16,23 89:17 90:14,16,19,24 94:2,3 97:1,3 102:6 106:6,21 107:2 108:3,17 109:6,13 111:11 112:6 113:12,23 114:2 115:1

**scenario** 35:2

**school** 43:4

**scope** 113:18

**screen** 7:19 8:2 95:3

**scroll** 20:15

**search** 14:13

**secretarial-type** 13:25

**section** 61:23 91:5 96:4 101:3

**sections** 99:14 106:13

**seek** 36:9

**seeks** 33:19 35:9

**sees** 43:8 44:9

**self-injurious** 35:3

**send** 19:12 35:18 40:3,9 41:17 63:16

**sends** 90:4

**sentence** 16:5 21:18 75:7 99:4

**sequence** 26:5

**series** 33:13 107:5

**service** 18:12 19:17,20 20:4 33:15 96:1

**services** 16:16 18:9 19:10 33:14 64:9 82:23 91:6 97:12

**set** 16:18,22 36:13 61:12

**settlement** 38:20

**settling** 81:5

**severed** 40:5

**sex** 46:11,15

**share** 102:3

**sharing** 95:3

**sheet** 71:16

**show** 14:17 15:21 18:20 21:15 23:16 24:22 27:15 42:23 50:25 57:18 58:13 61:18 82:4 94:20 102:24

**showed** 87:24 89:14

**showing** 16:1 59:16

**shown** 90:20

**shows** 39:3 59:7

**sick** 73:22

**side** 21:21

**signed** 98:15 101:18

**significant** 30:20 31:4 40:4 50:21

**significantly** 37:21

**similar** 13:19 27:16 59:7,15

**sir** 7:17 38:17 44:14 47:3,18 51:2 56:17 60:13 78:22 87:2,7 89:9 99:13,15 110:25 111:20

**site** 19:12

**sitting** 63:6 80:11

**situation** 8:7 91:2

**situations** 85:18

**six-months'** 24:11

**slash** 58:20

**small** 102:5

**SMD** 65:22

**so,"'** 59:21

**soft** 103:21

**sort** 19:9

**sought** 94:8

**sound** 40:15

**sounds** 53:16 56:24 81:12 84:5

**source** 88:5

**speaking** 33:6 45:19 78:3

**specialist** 41:21

**specific** 15:15,18 26:3 36:8,12 48:1 50:23 62:21 84:13 93:11 113:14

**specifically** 55:22 71:14 84:14 89:8 92:7 105:15

**speculate** 112:3

**speculating** 26:7

**speculation** 12:12 26:9 35:16 36:11 40:13 42:17 53:19 67:1 112:7

**Spencer** 6:16

**spending** 12:20 54:12

**spent** 54:14

**Spiller** 51:17


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

sports 39:1

stable 40:7

Stacey 67:21 68:1

staff 11:6,7

standard 22:6,10,20 23:6,23
77:18,23

stands 19:14 60:6

start 6:24

started 9:25 18:2 21:1,6 31:22
32:6 56:1,3 64:3

starting 42:18,19 84:17 96:6

state 8:16,17 9:9 19:23 20:1 25:7
30:9 34:10 38:20 55:22 67:7
93:8,12,13 114:14

state's 30:9

statement 18:15 94:14,15 95:2
109:2,17,18 114:16

states 10:14 19:19,24 32:16
65:21 68:10

step 84:11 92:4 94:22 95:24
96:23 97:2,22 98:4,5,10,13
105:15

steps 93:19 94:5

steroid 39:5

Stieve 51:17

Stoma 103:20

stool 103:21,22

stop 48:11,14 67:18 96:8

straight 69:15

strike 42:21 60:12 91:21

stroke 101:14

structure 83:14

structures 101:17

stuff 71:5 76:6 95:6

subject 16:16

submit 70:17,21 71:9 72:3,5

submitted 64:5 67:24 72:7 94:23

success 46:4 47:7 66:6 69:25
70:3,14

sued 56:6,14

sufficient 32:24

supervision 68:22,24

supervisor 9:13

supervisors 50:6

supplied 25:8 31:9,12 35:25
39:20 94:18

supply 25:7

support 67:8 97:18 103:7 104:4

suppose 109:7

supposed 15:7 59:3 71:11

surgeon 41:6,15,17 43:8,15,16
44:9 45:10 46:5,25 47:7,13
77:12 79:14,16,19 101:9 102:8
104:16

surgeon's 45:7,16 46:3 102:19
103:4 104:1

surgeries 45:9 81:3,23 102:4
112:17

surgery 41:14,16 43:3,6,11 44:12
73:21 74:7,16,19 75:17 76:15
79:13,15 80:4,7,11 82:6 83:12
84:6,15 85:2,23 91:6,25 95:22
96:12 99:7,18 112:22 114:16

surgical 40:1 47:4,12 72:23
77:15 83:14 86:15,20 108:13,24
109:5

surmise 8:24

surrounding 101:16

swear 6:11

sworn 6:4

symptoms 14:20

system 14:10,11 18:2 72:19
95:21 101:18

T-LIST 17:25 18:1,4,8,9,14 19:10
20:6,20,22

table 80:11

take-down 43:3,17,18 83:11
108:14

takes 34:14 47:25 75:14 86:5,6

taking 12:24

talk 11:3,4,5,8 17:21 23:9 71:1
77:23,25 101:10

talked 49:17 50:2 51:23 52:17
53:2 62:23 63:15,16 105:16
111:14 114:23

talking 23:8,10,25 24:10,12
25:17 26:6 27:23 37:24 42:14
47:24 70:19 71:2,3 77:18,20
113:13

target 60:12,15 62:3

tasks 9:14

Teaching 62:12

team 16:19,20,22

telemedicine 10:8

temporary 103:23

ten 12:17 25:5 37:18 41:4 49:9
72:2 74:25

ten-hour 12:20

term 109:7

terms 9:10 36:2 88:21 94:5 114:7

test 6:25 11:24 14:21 30:21

testified 6:4 24:2,4 56:22,23
104:16 109:22 112:16

testify 23:22 24:1

testimony 55:11,13 56:7 92:3
93:18,24 111:4,7,8 115:6

That'd 8:12

thing 41:15 42:22 64:21 69:19
71:1 72:16,17 77:2 79:20 89:13


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

things  17:23 33:3 62:21 74:10
76:20,21 93:3 111:4 113:8

thousand  51:24 52:1,18,19,21,22
53:1,3,5,9,17,25 66:8 70:2,3

Thursday  93:10

time  6:9,25 19:6 21:12 25:14
28:7 29:23 34:25 35:5 41:11
42:17 43:2 49:6 53:16,17,21,22
55:7 56:1 59:5 71:16 72:18,20
77:25 100:18 103:9 104:5 105:3,
7,9 106:2,4,7,15 107:7 113:20

times  71:4 79:3 89:18

timing  104:20

title  9:3

today  6:9 24:1 32:7 52:16 55:25

today's  72:13 115:6

told  52:19 53:23 54:4 55:7,10
57:3 59:12 64:13 78:25 81:9
107:21

top  22:1

total  13:8

track  88:19,21 89:3,8,10,11,15

Tracking  17:22

tracks  88:12

trained  62:24

training  58:3,15,17,22,24

transcript  24:23 53:8

transmitted  15:1

transplant  33:20

treated  40:25 41:21

treatment  10:10,13 22:9 28:16,
20,22 29:12,15 41:24 97:19
104:23

trivial  79:20

true  77:10 98:3 109:20

turn  47:25

twelve  12:17

two-and-a-half  105:6

type  42:23 63:17

typed  15:3

types  32:4 68:5

typically  12:9 30:8

---

## U

ultimately  93:16

ultrasounds  24:11

Um-hum  54:23 76:24

UMMD  66:19 67:9

UMMDS  32:15 67:8,13 68:12,13,
20 69:4

underlying  33:2

understand  7:5 13:3 23:12 31:17
62:11 78:18 93:18 110:16
112:10

understanding  99:17 103:16

unethical  64:7

unfair  39:10 40:13 76:5

unnecessary  96:14

unusual  77:21

up-to-date  22:21,22

updated  18:4

updating  18:5

ureter  101:17

urgent  40:9 102:18 103:3

urinary  101:17

utilization  7:11,16 9:4,7 13:22
15:11 16:17 19:25 21:17 22:5
31:23 59:6 65:11,16,18 66:1
71:3 88:12,22 89:3,5

utilize  22:4

utilized  19:25

---

## V

vacation  10:15,17

vague  33:8

vagueness  33:23 62:10

variety  106:13

vary  43:6

verbalize  103:23

verify  60:2

version  18:23,25 20:3,13

versus  18:22 70:3 99:23

video-recorded  6:7

violating  56:6

violation  77:21

virtual  115:8

vision  35:8,11

visual  35:22 36:2 37:1,2

vitals  40:7

vocal  17:9,11

voice  37:22

voices  37:19

volume  56:19,20,25

---

## W

Wait  29:2

walk  38:25

wanted  16:3 25:15 68:11 74:2
92:24

wanting  24:15

weakness  39:2

Weber  77:24

Wednesday  93:10

week  11:4,5

weekly  10:19 61:11

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

weeks 71:16

Weinberger 27:21

What'd 94:1

whatsoever 17:13 74:3 75:11

whispered 37:22

Willis 6:15 90:13 113:24

witness' 38:15

word 11:17

words 15:9 54:10 68:5

work 7:12 9:8 12:16 38:24 63:25
  68:3 92:21

worked 8:7,8 9:3 18:2 61:25
  63:13

working 9:25 21:11 30:8 59:5
  64:3

workload 68:10

works 13:22

worse 73:23 80:13

worst 52:3 54:3

worth 100:4,5

wound 40:6

Wright 24:23

write 62:19 91:16

wrong 74:19 84:4

---

**Y**

---

year 22:15 50:16,17 52:21,24,25

yearly 61:11

years 27:7 37:18 41:2,3,4 43:4
  50:16,18 58:16 71:23,24 74:25
  105:6 107:12

---

**Z**

---

Zoom 6:8

