UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KONCHISE JACKSON,

             Plaintiff,

     vs.                           Case No. 19-13382

                                   Hon. Gershwin A. Drain

CORIZON HEALTH, INC., et al.,

             Defendants.

_____

     The Remote Deposition of CRISTIN RETTLER, P.A.,

     Commencing at 3:03 p.m.,

     Friday, June 20, 2025,

     Before Helen F. Benhart, CSR-2614,

     Appearing remotely from Wayne County, Michigan.

REMOTE APPEARANCES:


IAN T. CROSS

Cross Law, P.L.L.C.

402 West Liberty Street

Ann Arbor, Michigan  48103

(734) 994-9590

ian@lawinannarbor.com

    Appearing on behalf of the Plaintiff.


ADAM MASIN

Bowman and Brooke, L.L.P.

750 Lexington Avenue

New York, New York  10022

(646) 914-6790

adam.masin@bowmanandbrooke.com

    Appearing on behalf of CHS TX, Inc., d/b/a YesCare.

Cristin Rettler, P.A.
June 20, 2025

TABLE OF CONTENTS


WITNESS                                                    PAGE

CRISTIN RETTLER, P.A.


EXAMINATION

BY MR. MASIN:                                               5

EXAMINATION

BY MR. CROSS:                                              57

RE-EXAMINATION

BY MR. MASIN:                                              82

RE-EXAMINATION

BY MR. CROSS:                                              83

RE-EXAMINATION

BY MR. MASIN:                                              84


                          EXHIBITS


EXHIBIT                                                    PAGE

(Exhibits retained by Mr. Masin.)


DEPOSITION EXHIBIT A                                        18

DEPOSITION EXHIBIT B                                        24

DEPOSITION EXHIBIT C                                        48

Cristin Rettler, P.A.
June 20, 2025

Remote Proceedings

Friday, June 20, 2025

3:03 p.m.

THE REPORTER:  U.S. Legal Support's standard transcript includes a word index.  If you do not wish to receive a word index, please inform me at the conclusion of today's proceeding.

The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room.  They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record.

MR. CROSS:  Ian Cross, counsel for the plaintiff, I agree.

MR. MASIN:  Adam Masin, counsel for CHS Texas, I agree.

CRISTIN RETTLER, P.A., Was thereupon called as a witness herein, and after having been first duly sworn to testify to the truth,

Cristin Rettler, P.A.
June 20, 2025

the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. MASIN:

Q. Good afternoon, Ms. Rettler. My name is Adam Masin. I represent a company called CHS Texas. You and I have never met before, right?

A. No.

Q. Okay. Can you please state your full name and address for the record. Ms. Rettler, your screen is frozen.

A. I reside in --

Q. Ms. Rettler, your screen has frozen and we cannot hear you. If you can hear me, can you maybe log out and try to log back in.

(Off the record at 3:05 p.m.)

(Back on the record at 3:09 p.m.)

BY MR. MASIN:

Q. Can you please state your full name and address for the record.

A. Yeah my name is Cristin Angela Rettler, and I currently are reside in Cottonwood, Arizona.

Q. I'm not sure if some of that got cut off or not. Your Internet connection appears to be bad, but what I heard was that you said your name is Cristin Rettler and you live in Cottonwood, Arizona. Was there

Cristin Rettler, P.A.
June 20, 2025

anything else that you said?

A.   That's where I live.

Q.   Okay.  Your screen keeps freezing and your voice seems
     to be cutting in and out.  Is there somewhere else
     maybe in your -- wherever you are that might have a
     stronger Internet connection than where you're
     currently sitting?

A.   I can try and go to another room.  I don't know that
     the Internet -- is the Internet connection better in
     here?

Q.   No.  You've frozen again.

A.   Is that better?

Q.   I can hear you better I think, but your screen is
     frozen.  Can you see us?

A.   Yeah, I can.

Q.   Yeah.  Your voice keeps --

A.   I can hear you just fine.

Q.   It sounds like your voice keeps cutting out and your
     screen is frozen.  It's going to be very hard to
     conduct a deposition if I don't know if what you're
     saying is a complete sentence or not and the court
     reporter doesn't know.

               MR. CROSS:  Adam, do you want to try
     turning off the video?

               MR. MASIN:  Try turning off your video,

Cristin Rettler, P.A.
June 20, 2025

Ms. Rettler, and see if that helps at all.

THE WITNESS:  Okay.  How's that?

MR. MASIN:  That sounds better I think.
Let's -- we can see how it --

THE WITNESS:  Let me know if that helps.

MR. MASIN:  Okay.  That seems to have
helped somewhat so let's see how it goes.  For the
record, Ms. Rettler's video does not appear to be
working and we're going to try to do this deposition
without her being on screen.  The rest of us are on
screen.

BY MR. MASIN:

Q.   Ms. Rettler, who is your current employer?

A.   I work for Northern Arizona Healthcare in general
     surgery.

Q.   Can you repeat your answer?  I'm not sure we got all
     of it.

A.   Health care in general surgery.

Q.   Yeah.  We're not getting all of the audio from when
     you're speaking.  Are you on a laptop or are you on
     your phone?

A.   Yeah, I'm on a laptop.

Q.   Is it possible for you to maybe try doing this on your
     phone?  You might get better reception that way.

A.   Okay.  I'll log out and I'll log into my phone.

Cristin Rettler, P.A.
June 20, 2025

Q.   Okay.

                    (Off the record at 3:14 p.m.)

                    (Back on the record at 3:19 p.m.)

                    MR. MASIN:  I'm going to start over since I
     think that's the easiest thing to do.

BY MR. MASIN:

Q.   Can you please state your full name and address for
     the record.

A.   Okay.  So my name is Cristin Angela Rettler, and I
     live at 2005 Franquero Lane in Cottonwood, Arizona.

Q.   Can you spell the name of that street?

A.   It's F-R-A-N-Q-U-E-R-O lane, and then my mailing
     address is in Prescott, but this is where I physically
     live.

Q.   Okay.  And is there anyone there in the room with you?

A.   No, just my dog.

Q.   Okay.  And what is the name of your current employer?

A.   Northern Arizona Healthcare.  I work in general
     surgery.

Q.   And where are they located?

A.   In Cottonwood, Arizona.

Q.   Have you ever had your deposition taken before?

A.   Yes.

Q.   When was the last time that you had a deposition
     taken?

Cristin Rettler, P.A.
June 20, 2025

A.   I think that was in -- it was for the Corizon case.  I don't know when that would have been.  Like 2014 or 2015, something like that.

Q.   So since it's been quite a while since you've had a deposition taken, I'll go over some basic ground rules for the deposition, the first of which is if we have any further technological problems, you can't hear me, if my screen freezes, if you have any other problems along those lines, will you let us know right away?

A.   Sure.

Q.   Thank you.  I am going to be asking you a bunch of questions today.  If for some reason you don't understand one of my questions, you can't hear me, please let me know and I will either ask you a different question or have the question repeated, okay?

A.   Okay.

Q.   If you answer my questions, I'm going to assume that you understood them.  Is that fair?

A.   Yes.

Q.   Okay.  If you need a break for any reason today, just let us know.  You just have to answer the question that's pending and then we'll take a break, okay?

A.   Okay.

Q.   Are you being represented by counsel today?

A.    No.

Q.    You mentioned you were deposed in a Corizon case back in 2014 or 2015.  How many times prior to that have you been deposed?

A.    None.

Q.    Have you ever given testimony at a trial?

A.    No.

Q.    Have you ever been retained as an expert witness in any case?

A.    Yes.

Q.    When was the last time that you were retained as an expert witness?

A.    Was about five years ago.

Q.    And what kind of case was that?

A.    It was for a corrections health case.

Q.    Where was the case located?

A.    In Portland, Oregon.

Q.    Do you know the name of the plaintiff in that case?

A.    I don't recall.  There were two of them, actually. They were right around the same time.  I provided that information to the attorneys.

Q.    Did you give a deposition in that case?

A.    I don't believe so.  I think it was just an expert witness testimony that I provided in written form and then the cases settled.  I don't remember giving any

Cristin Rettler, P.A.
June 20, 2025

depositions.

Q.   Did you write a report in that case?

A.   Yes, I did, for both of them.

Q.   Okay.  Do you know if those reports were submitted to the court?

A.   I don't know.

Q.   Do you recall the names of either of the plaintiffs in that case?

A.   One was Thompson I remember.  I don't recall the other one.

Q.   And what was the case about?

A.   They were death in custody.

Q.   What was the alleged cause of death in those cases?

A.   Well, it was failure to provide appropriate medical care.

Q.   What was the care that was allegedly not appropriately provided?

A.   You know, I would need to review those cases to speak in detail about them.

Q.   Do you recall any of the facts about them, about why they died?

A.   I believe one guy died of an MI and the other guy died of a drug overdose.

Q.   Who was the defendant in those cases?

A.   I think one of them was NaphCare and the other one was

Cristin Rettler, P.A.
June 20, 2025

Corizon, if I recall correctly.

Q. These were two separate cases?

A. Yeah, they're two separate cases. It was the same attorney that asked me to provide expert witness -- which, you know, entailed reviewing all of the medical charts and the information from the correctional institute.

Q. You mentioned one plaintiff's name was Thompson. Was that the Corizon case or the other defendant?

A. I didn't review those cases. I didn't know that I was going to be asked to speak on them so I didn't review them.

Q. Do you recall what the alleged failure to provide care was relating to the Corizon case?

A. Again, I didn't know I was going to be asked to speak on those cases and so I didn't review them and I don't want to misspeak.

Q. In those cases, what is it that you claimed your expertise to be?

A. I'm a physician assistant. I worked for two years at the Washington County Jail and I worked most recently for about seven years at the Multnomah County Jail, and, you know, I've been a PA since 2002.

Q. And you were a retained expert in those cases, meaning you were paid, correct?

Cristin Rettler, P.A.
June 20, 2025

A.    Yes.

Q.    Have you been paid for your time in this case?

A.    No.

Q.    Has anyone promised you that you would be paid for your time in this case?

A.    No.

Q.    Have you ever been retained as an expert in any other case other than the two we've just mentioned?

A.    There were a couple other ones that I reviewed but then they did not go forward and I don't -- you know, I don't recall any of the details of that.  I didn't do any big write-ups for those.

Q.    What years were those?

A.    That was probably prior to the other two.  It was the same law firm.

Q.    Okay.  Do you recall who the defendants were in those cases?

A.    No, I do not.

Q.    Have you ever been sued?

A.    I have never -- so when cases had come up with Multnomah County Jail, then they were dismissed so nothing like successfully went forward and I was never specifically, you know, like named in a lawsuit at the Multnomah County Jail.  That's the only time that lawsuits came about in my 23-year career.  I've never

Cristin Rettler, P.A.
June 20, 2025

personally been sued, no.

Q. So you've never been named as a defendant in a lawsuit before?

A. Well, I was listed as one of the people that administered care in, you know, several lawsuits at Multnomah County, but all of them were dismissed. They never went forward, never settled, never went to trial.

Q. My question is were you named as a defendant in those cases.

A. Yes, I was named.

Q. Okay.

A. Along with a lot of other people.

Q. Are those cases the only times you've ever been a defendant in a lawsuit?

A. Yes.

Q. Have you ever brought a lawsuit against anyone or any company?

A. No.

Q. Other than the depositions that you've testified about, is that the only time that you've ever testified under oath for any reason?

A. Yeah, I believe so.  The only time that I was actually deposed to my recollection is with that big Corizon lawsuit.

Q. In the cases in which you were retained as an expert, you never made it as far as testifying in court, correct?

A. No, those cases were settled.

Q. Okay. Have you ever lived in Michigan?

A. No.

Q. Have you --

A. I take that back. I take that back. I did live there briefly when I was applying to PA school in Detroit. My husband and I lived there for about a year. This is before I was a PA so I didn't practice there.

Q. What year did you live there?

A. So I started PA school in 2000, so that would have been 1998 or 1999.

Q. Okay. Did you have a job while you were living in Michigan?

A. Yeah. I worked in the ER at Henry Ford Hospital I believe --

Q. What was your --

A. -- as like a -- it's like before they had medical assistants so it was like -- I don't know what they would have called them then.

Q. Okay.

A. It's before being a medical assistant was an actual like degree.

Cristin Rettler, P.A.
June 20, 2025

Q.   So other than that position you've never held any other employment in the state of Michigan, correct?

A.   Right.  Yeah.  That was before PA school.

Q.   Have you ever been employed by a company called CHS Texas, Inc?

A.   I don't think so.

Q.   Have you ever been employed by a company called YesCare?

A.   No.  I've never heard of that.

Q.   Have you ever worked for a company called Quality Correctional Care of Michigan, P.C.?

A.   No.

Q.   Have you ever done any work at all relating to the Michigan Department of Corrections?

A.   No.

Q.   Do you hold any professional licenses?

A.   Do I hold any professional licenses?

Q.   Yes.

A.   I'm a PA.

Q.   What state do you hold that license in?

A.   I hold it in three states, Arizona, California and Oregon.

Q.   Is it active in all states?

A.   Yes, it is.

Q.   When did you earn your PA license in Arizona?

Cristin Rettler, P.A.
June 20, 2025

A.    Maybe January of this year.

Q.    When did you earn your PA license in California?

A.    Maybe five years ago, six years ago.

Q.    Have you ever practiced as a PA in the state of California?

A.    I have not.

Q.    When did you earn your PA in license in Oregon?

A.    I graduated in '02, and I've had an active license since then.

Q.    Have you had to do anything since 2002 to renew your license?

A.    Absolutely.  I have a slew of activities I need to do every year for continuing medical education to maintain my PA license.

Q.    When is the last time that you applied to renew your license?

A.    You have to reapply every two years.  I think maybe -- I just did it last year so now I've got two years until I need to reapply.

Q.    During the time that you were working for the hospital in Michigan back in 1998 approximately, did you hold any licenses at that time?

A.    No.

Q.    Do you recall the name of your employer at that time?

A.    Henry Ford Hospital system.

Cristin Rettler, P.A.
June 20, 2025

Q. Other than this video, is there anything else on your screen?

A. No.

Q. Did you bring any documents with you today?

A. No.

Q. There are a few documents that I'm going to show you. I recognize you're on your phone, so if you need me to blow them up, make them larger or anything like that so that you can see them, will you let me know?

A. Yeah.  I think it's going to be hard to see documents on my phone.

Q. Understood.  I'm just going to -- I'm going to do my best to show them to you, but for now we're going to mark this as Exhibit A.  This is Defendant CHS Texas, Inc.'s, Notice of Taking Duces Tecum Deposition of Plaintiff's expert, Cristin Rettler, PA.

                  REMOTELY INTRODUCED:

                  DEPOSITION EXHIBIT A

                  3:31 p.m.

BY MR. MASIN:

Q. Are you able to see that document?

A. No.  You'll just have to read it to me.

Q. Okay.  Do you ever recall seeing a document with the title that I just read?

A. No.  I mean, CHS sounds a little bit familiar, but, I

Cristin Rettler, P.A.
June 20, 2025

mean, I don't recall, you know, the lawsuits that I was an expert on.  If this is one of them, if one of them was not with Corizon and against CHS or NaphCare, that wouldn't have been relevant to my testimony, so if that's what you're talking about, I don't know.

Q.    That's not what I'm talking about.  The question that I'm asking you is have you ever seen a document that is a notice of a deposition in this case?

A.    Okay.  Let me look.  Okay.  When is -- which one is this one for?

Q.    You'll see that this -- well, this is the wrong day, but today is June 20th.  It says Tuesday, but it's obviously Friday.  Have you ever seen a notice of any kind in writing that lets you know when your deposition is supposed to take place?

A.    For this?

Q.    This deposition, yes.

A.    I mean, the attorneys have sent me just e-mails telling me when the deposition is.

Q.    Okay.  The last page -- or the last couple pages of this document includes a Schedule A with a list of requests numbered one all the way down through number 20.  Have you seen that list before?

A.    Oh, so this was for this testimony, right, requesting --

Cristin Rettler, P.A.
June 20, 2025

Q.   Right.

A.   Yeah.  This looks familiar, requesting that I send my CV and whatever other within the last five years lawsuits I was involved in.

Q.   Okay.  Did you read this entire list, one to 20?

A.   Yeah.  I didn't -- I thought that the only ones that I -- that applied to me were the CV that I needed to send and the two lawsuits I was involved in in the last five years.

Q.   Okay.  Just so I'm clear about that, when you say that you thought the only ones that applied to you were those two, does that mean you did not look for other documents or does that mean you only believed that you needed to provide your CV and the cases?

A.   Yeah.  I read through the list.  I thought those were the only things that applied to me.

Q.   Okay.  And just so I'm clear, that means there were no other documents that you had that were responsive to these requests other than your CV and the list of cases, is that right?

A.   I guess I -- I don't really understand what you're asking.  Are you insinuating that I missed something?  I don't know what you're --

Q.   I'm not insinuating anything.  Your testimony is that you read this entire list, correct, from one --

Cristin Rettler, P.A.
June 20, 2025

A.    I read the list.

Q.    -- through 20?  Okay.  Let's take an example.  Number seven says any and all documents which refer to, relate to or evidence your findings, conclusions, opinions, advice or other communications in this case. Do you see that?

A.    Mm-hum.

Q.    Do you have any of those documents?

A.    No.  I don't have any documents relating to this case.

Q.    Okay.

A.    I'm not providing expert testimony for this case.

Q.    Are you intending to provide opinions in this case?

A.    I'm intending to answer the questions that you ask me.

Q.    Okay.  So number 19 asks you for all documents that you reviewed or relied on to support any opinions that you intend to offer in this case.  Do you have any such documents?

A.    No.  I don't have any documents related to this case.

Q.    Okay.  And you didn't review or rely on any documents to support any of the opinions that you intend to give in this case, correct?

A.    So I don't even know the details of this case.  Like I'm not part of this case.  I'm not giving expert witness testimony.

Q.    Is it your intent to offer testimony about your time

Cristin Rettler, P.A.
June 20, 2025

working at the Washington County Jail?

A.    Yes.

Q.    Do you have any documents that you have reviewed or relied on to support your testimony about your time at the Washington County Jail?

A.    So I don't have any documents saved anywhere. Yesterday the attorneys read back to me some of my testimony from the original Corizon case, but I do not have any of those documents.

Q.    What is the name of that case?

A.    That was the ten million dollar lawsuit that Corizon lost.  Madelyn was her first name.

Q.    That was a wrongful death case, is that right, back in 2014?

A.    Yes, that's the one.  That's the one I was deposed in, mm-hum.

Q.    Okay.  And you don't have any documents from that case?

A.    No.

Q.    Or any --

A.    No.  I don't have any of that.  Why would I keep that?

Q.    Have you ever published any literature?

A.    No.  I mean -- no.  I mean, I think some of those court documents must have been published, but I did not publish them.

Cristin Rettler, P.A.
June 20, 2025

Q.   You're certainly familiar with what a medical journal
     is, right?

A.   Yes.

Q.   You've never published an article in a medical
     journal, correct?

A.   I've never participated in any research or anything
     like that so, no, not to my knowledge, hum-mm.

Q.   How is it that you came into contact with Mr. Cross'
     firm?

A.   Is that the firm that Nathan works for Nathan Lombard?

Q.   I'm not sure who Nathan Lombard is, but let me ask you
     this question.  Have you ever spoken with Mr. Cross
     before?

A.   So there are two attorneys that have been in contact
     with me.  Ian is one of their first names, and the
     second one is Nathan, and they are out of Michigan.
     They contacted me when they came across my information
     for the Corizon lawsuit in Hillsboro, Oregon.

Q.   When is the first time that you came into contact with
     the Michigan attorneys?

A.   I think maybe two years ago, maybe 18 months ago or
     something and then I guess Corizon filed for
     bankruptcy, then they said that it was on hold, then
     they re-contacted me maybe a month or two ago.

Q.   Have you been asked to testify as a witness in any

Cristin Rettler, P.A.
June 20, 2025

other cases involving Corizon in Michigan?

A.   No.

Q.   When is the last time that you spoke with a Michigan attorney about this case?

A.   Yesterday.

Q.   And that's when they read back some of your prior testimony, correct?

A.   Yes.

Q.   And how long was that meeting?

A.   Maybe about an hour.

Q.   Was that over the phone or video call?

A.   It was over the phone.

Q.   Prior to that meeting, when is the last time that you had met with a Michigan attorney?

A.   I guess that was when they initially contacted me two years or 18 months ago, around there.

Q.   During your meeting with the Michigan attorneys, did they show you any documents?

A.   No.

Q.   Now, we received from the attorneys a copy of what we'll mark as Exhibit B.

               REMOTELY INTRODUCED:

               DEPOSITION EXHIBIT B

               3:41 p.m.

BY MR. MASIN:

Cristin Rettler, P.A.
June 20, 2025

Q.   Can you see that on your phone?

A.   Yes.  Well, sort of.

Q.   This appears to be a CV of yours, is that right?

A.   Yes.

Q.   When did you provide this to the attorneys?

A.   Recently.

Q.   Have you provided them with any other documents other than this?

A.   And then just the names of those two lawsuits that I gave expert witness testimony in and the case numbers I believe I provided.

Q.   When is the last time that you updated your CV?

A.   Well, I quick updated it when they asked for it to include my most recent job.

Q.   Okay.  So this CV is as up to date as it could be, correct?

A.   Yes.

Q.   Okay.  This CV indicates that you graduated from the University of South Florida in Tampa in 1994, is that correct?

A.   Yes.

Q.   And then you went on and you got a masters of science in physician assistant studies from Pacific University, is that right?

A.   Yes.

Cristin Rettler, P.A.
June 20, 2025

Q.   And you graduated there 2002, correct?

A.   That's correct.

Q.   Other than any continuing education that you've done as a PA, do you have any other degrees?

A.   No.

Q.   Now, you mentioned that you had spent some time in the late '90s at a hospital in Detroit.  I don't see that on your CV.

A.   No.  I was like a glorified receptionist, so, yeah, that's not really relevant to anything and I worked there like six months or something.  I forgot about it, actually, until you just mentioned it.

Q.   Does this CV contain all of the jobs that you've had since you graduated with your physician's assistant degree?

A.   I mean, frankly, it's all the relevant jobs.  I frequently had, you know, as you can see, the dates regularly overlapped.  When I was working at the Corizon jail job, I also was working in the ER at Tuality part time.  I frequently had like, you know, little side gigs of urgent cares and stuff like that.  Those are all the relevant ones.

Q.   Understood.  I'm not going to go over everything in detail but just a couple of questions for you about your CV.  There's a listing for primary care medical

Cristin Rettler, P.A.
June 20, 2025

provider at the Maple Street Clinic in Forest Grove, Oregon, from February 2003 to December 2006, right?

A.   That sounds right.

Q.   And your description of that says primary care provider to diverse patient population.  Did you -- you were acting as a physician's assistant at that time, right?

A.   Yes.  The whole CV is my PA career, yes.

Q.   As a physician's assistant, over the years have you had a particular specialty that you've been working in or have you just been generally working?

A.   So for the most part, when you graduate from PA school, because we have optional residencies to work in primary care first as like a residency and then from there to move on.  So from there I worked in urgent care and then I went on to the ER, and when I worked in the ER, then I worked after that in general surgery, and I would say corrections is sort of a hybrid between inpatient and primary care, substance abuse, mental health, kind of a hodgepodge.  Now, most recently I'm in general surgery again.  So I've worked in many different areas in my 23 years as a physician assistant.  And it's physician assistant.  There's no S.

Q.   As a physician assistant, have you ever been involved

Cristin Rettler, P.A.
June 20, 2025

in a surgery to create a colostomy?

A.   Yeah, yesterday.

Q.   Okay.  Was that your first time?

A.   No.  I've probably done a hundred of then.

Q.   Okay.  And when was the last time that you did that other than yesterday?

A.   The day before that.  That's what general surgery does.  That's one of the mainstays of --

Q.   Have you ever participated in a colostomy reversal surgery?

A.   Yes.

Q.   And when you're participating in those surgeries, what is your role?

A.   I'm the first assist.

Q.   What does that mean?  What do you do?

A.   I suture, I operate the camera, I operate the instruments, I prep the patient for surgery, I remove the instruments when we're done.  I'm a surgical first assist.

Q.   As a physician's assistant, you're not diagnosing a patient with a need to have a colostomy, right?

A.   Well, I do do consults in the hospital, emergency consults in the ER and then we do bring them to surgery, yes.

Q.   So there are circumstances in emergency situations

Cristin Rettler, P.A.
June 20, 2025

where you as a physician's assistant and not a doctor are diagnosing a patient with a need to have a colostomy? Is that your testimony?

A. So we work collaboratively. I mean, I go to the ER, I do a consult, I order imaging, I give my opinion and then, you know, the surgeon reviews that. If they agree, then sometimes they have an emergency surgery of any kind of acute abdomen and then I am the surgical first assist and then I follow up with the patients in the hospital and discharge them and then we see them in clinic.

Q. I guess my question is that you need a surgeon to agree to the surgery, correct?

A. Yes. I work with three different surgeons, so I'm in surgery a lot, and I previously worked also in general surgery at -- in Portland at Legacy Emanuel Hospital. Sorry. Legacy Good Sam Hospital.

Q. Is it fair to say that you're not intending to offer any opinions about colostomy surgeries for purposes of this case, correct?

A. I am very knowledgeable about abdominal surgeries. If you have a question, I mean, I can answer it. I don't know. I mean --

Q. Okay. We'll talk about that a little later. So you worked for a time at the Multnomah County Jail in

Cristin Rettler, P.A.
June 20, 2025

Oregon, correct?

A.    Yes, for almost seven years.

Q.    In Portland, right?

A.    Yes.

Q.    Who was the care provider at that jail?

A.    Multnomah County.

Q.    The county itself provided that care?

A.    Yes.

Q.    Okay.  And then prior to Multnomah County you worked for the Washington County Jail in Hillsboro, Oregon, right?

A.    Yes.

Q.    What dates did you work there?

A.    You'd have to look on my CV.  I worked there -- I worked for -- the last seven years I was at the Multnomah County Jail, and prior to that I did a few years in surgery and I worked in the ER overlapping all of those dates, and before that I worked at the Washington County Jail just for like a couple years I want to say 2014 -- or 2012 to 2014, something along those liens.

Q.    Your CV indicates that you worked at the Washington County Jail in Hillsboro, Oregon, from April of 2012 to April of 2014.  Does that sound right?

A.    Yes, that sounds right.

Cristin Rettler, P.A.
June 20, 2025

Q.   Who was the health care provider at that jail at the time?

A.   Corizon.

Q.   Were you employed by Corizon?

A.   I was employed by Corizon.

Q.   And is that the only time that you've ever been employed by Corizon?

A.   Yes.  I have no plans for ever working for Corizon again, absolutely.

Q.   So the last time that you worked for Corizon in any capacity was April of 2014, correct?

A.   Correct.

Q.   And prior to April of 2012, you had never worked for Corizon, correct?

A.   Correct.

Q.   How big is the Washington County Jail?  Well, let me strike that.  Let me ask that question differently.

At the time that you were working there between 2012 and 2014, do you know how many inmates there were approximately at a given time?

A.   Well, I would only be offering a guess.  So I know Multnomah County Jail was 1,400 inmates at maximum capacity, and if I had to render a guess, I would say it's more like 800 inmates at the Washington County Jail, but that's just a guess.

Cristin Rettler, P.A.
June 20, 2025

Q.   Does about 570 sound right to you?

A.   Okay.

Q.   Other than your time at Multnomah County Jail and Washington County Jail, have you worked in any other correctional facilities?

A.   No, but I did do a clinical rotation at Sheridan Prison when I was in school for six weeks.

Q.   Did you say six weeks?

A.   Yes.  They were six-week long rotations.

Q.   That's when you were studying to get your PA degree, right?

A.   Yes.

Q.   So is it fair to say that as a physician's assistant, you've never worked in a prison?

A.   Well, not including those six weeks, yes.

Q.   During the time that you were working for Corizon, did you ever attend any meetings outside of Oregon?

A.   Well, I attend CME meetings every year, and most of them are not local, and I also did attend a corporate Corizon event over like a five-day weekend.  I think it was in -- I believe it was in Tennessee.

Q.   When was that?

A.   That was during my time when I was working for Corizon.

Q.   Yeah.  What dates did you attend that meeting?

Cristin Rettler, P.A.
June 20, 2025

A.   Well, it had to have been between 2012 and 2014.

Q.   No.  I mean -- I realize that, obviously, but do you recall the specific dates that you were in Tennessee?

A.   No.  Why would I really?

Q.   Was it -- do you recall whether it was in 2012, 2013 --

A.   No.

Q.   -or 2014?

A.   It's 2025.  I attend conferences every year.  I don't remember.

Q.   Okay.  So you're unable to identify when it is that you were in Tennessee, correct?

A.   The exact dates.  I know the range within two years, yes.  It was the time I worked at Corizon.

Q.   Okay.  Did you attend any presentations during that time?

A.   I attended several days of presentations.

Q.   Do you remember the names of any individuals who spoke at those presentations?

A.   No, I don't recall the names of any of the people who presented at the presentation.

Q.   Do you have any documents that you may have received during your time in Tennessee?

A.   No.

Q.   Did you take any notes of your time in Tennessee?

Cristin Rettler, P.A.
June 20, 2025

A.   I did take notes during that time.  I no longer have
     those notes.

Q.   When is it that you no longer have the notes?  When
     did you lose them or dispose of them?

A.   Well, I usually don't keep notes for more than like a
     year or two.

Q.   And I presume you didn't record anything during --

A.   No.  I wish I had, though.

Q.   Do you recall the titles of any presentations that you
     heard during that time?

A.   Well, the theme was how to save Corizon money.  That I
     remember.

Q.   I didn't ask you about the theme.  I asked you did you
     recall the name of any titles of any of the
     presentations that you heard.

A.   I don't remember -- recall the specific titles.

Q.   Do you remember how many people attended the meeting?

A.   Probably -- they were the medical directors and office
     managers I guess they would call them, although that's
     not the title.  HSA I think is what they called them.
     So there was probably a hundred people, 70 people,
     something around there.

Q.   Do you remember the names of any of the individuals
     you met while you were in Tennessee?

A.   No, but Stevens Hyppolite, who was the HSA at

Cristin Rettler, P.A.
June 20, 2025

Washington County Jail, was also in attendance there.

Q. Okay. But you don't the names of any people that you saw in Tennessee other than that individual who was from Oregon, right?

A. No. I didn't exchange numbers with anyone.

Q. Did you ever exchange any e-mails with anyone about the meetings in Tennessee?

A. I don't recall.

Q. Do you recall whether this meeting was towards the beginning of your time with Corizon, towards the middle, towards the end, anything that you can recall about the timing?

A. Not really. It's a pretty tight window, two years. I mean --

Q. Do you have any documentation that would demonstrate that you were present at that meeting?

A. Documentation? No.

Q. Do you have -- you probably don't. It's been a long time, I understand. I'm just asking if you have anything.

A. No.

Q. Okay. Other than that meeting in Tennessee, did you attend any other meetings involving Corizon that were outside of the state of Oregon?

A. No, I don't believe so.

Cristin Rettler, P.A.
June 20, 2025

Q.   You may have answered this, forgive me, but have you performed any medical or scientific research?

A.   I don't believe so.  I mean -- no.

Q.   In preparation for your testimony today, did you review any medical literature?

A.   No.

Q.   Did you review any literature on any subject in preparation for your testimony?

A.   Literature?  No.

Q.   Did you review any documents in preparation for your testimony other than having Mr. Cross read back your testimony from a prior case?

A.   No.

Q.   Okay.  You've mentioned that you've attended some colostomy and colostomy reversal surgeries as a PA. Have you done any research related to colostomies or colostomy reversals?

A.   Of course, yes.

Q.   What research have you done?

A.   I work in general surgery.  Of course I've done continuing medical education in regards to acute abdomens, which would include colostomy and colostomy reversals.

Q.   That's not quite the question that I'm asking you.  My question is have you ever -- let me ask it a different

Cristin Rettler, P.A.
June 20, 2025

way.  Have you ever participated in any sort of study involving colostomy or colostomy reversals?

A. Research, no.

Q. Okay.  So you've learned things about colostomy and colostomy reversals as part of continuing education programs, right?

A. And from working in general surgery where this is like something very common to what general surgeons do.  Also of note, my mom had a colostomy and was reversed a couple years ago so I've actually interacted with someone in their home, my family member, day-to-day living with a colostomy bag.  I feel like I'm pretty knowledgeable about colostomies.

Q. I'm sorry.  You said who had one?

A. My mom.  My mom had a colostomy bag.  She had it reversed.

Q. Have you ever published any textbook chapter of any kind?

A. No, I don't think so.

Q. Have you ever spoken in public to offer any sort of medical opinions at a conference or a lecture?

A. Yeah, for the Portland-Vancouver PA Society.  I spoke on bariatric surgery one time, specifically the sleeve.  That's the only one that comes to mind.  And I taught at Pacific University for many years, and I

Cristin Rettler, P.A.
June 20, 2025

gave guest lectures there.  That's not a conference, but I did lecture.

Q.   What was the subject of your lectures?

A.   Well, I was a professor.  I gave lectures every day. I worked there for a few years and then sometimes I did guest lectures there for many years on myriad topics.

Q.   I'm sorry.  You were a professor where?

A.   At Pacific University.

Q.   And that was in November of 2002 to September 2008, is that right?

A.   Yes.  So I worked there part time mostly and full time for like a couple years first as the clinical coordinator and then later as like part of the core faculty.

Q.   Your CV indicates that you were a course instructor and lecturer.  Is that a correct way of saying what your titles were?

A.   Yeah.  I was a professor there, mm-hum.

Q.   You keep using the word professor, but your CV doesn't use that word.  Were you actually a full professor at the university?

A.   So define full.

Q.   I don't know.  I'm asking you.

A.   I worked there part time giving guest lectures for

Cristin Rettler, P.A.
June 20, 2025

part of that time, and I worked there full time for two years, so if that's full, then yes.

Q. Were you ever told or awarded a position of professor at --

A. Yes.

Q. -- the university?

A. Yes.

Q. When?

A. I worked full time as a university professor for two years during that time.

Q. Why don't you use that word on your CV?  Why do you say course instructor and lecturer and not professor?

A. I'll make the correction.  Thank you for your feedback.

Q. Do you know what an assistant professor is?  Have you ever heard that term?

A. Well, there's adjunct faculty, there's assistant professor and there's professor.  I was a professor there for two years.

Q. Were you ever an assistant professor there?

A. I guess I don't recall the distinct -- like what are the distinguishing factors between assistant and full professor, but I was employed full time for two of those years then and I was addressed as professor Rettler, so I don't know.  I guess that meets criteria

Cristin Rettler, P.A.
June 20, 2025

as professor.

Q. Do you have anything like a certificate or any other documentation that demonstrates that you were a professor or had the title of professor during that time?

A. A certificate?  Do they give people certificates when they work at the universities?

Q. I don't know.  I'm trying to understand your testimony because your CV doesn't say professor on it.  So do you have any documentation that demonstrates that you had the title professor at Pacific University during that time?

A. I don't know.  I mean, I guess you could contact them or, I mean --

Q. But you don't have any documentation?

A. I mean, maybe I do somewhere.  I didn't know I was going to be asked to prove my full-time status at Pacific University.  That was many years ago, many, many years ago.

Q. Again, your CV doesn't use that word.  I think that word has significance in the academic world.  Your CV doesn't use it.  I'm trying to understand why your CV says course instructor and lecturer and doesn't use the word professor.

A. Thank you for the feedback.  I'll make that correction

Cristin Rettler, P.A.
June 20, 2025

in the future.

Q. Have you ever held the title professor since 2008?

A. No.  I've given just a few guest lectures here and there at the university and I've taken students, but I haven't taught full time at Pacific University since I guess it was 2008.

Q. Have you ever published any research on correctional health care in the United States?

A. No, hum-mm.

Q. Have you ever performed any research related to correctional health care in the United States?

A. No.

Q. Do you have a website that you use to advertise yourself as an expert in any subject?

A. No.

Q. Are you a member of any referral services where you hold yourself out as an expert in any subject?

A. No.  I never advertised for that.  They -- my testimony was found and they sought me out.

Q. Now, you received your BA from the University of Florida in 1994 and your physician's assistant degree in 2002.  What did you do in between that time?

A. In between when I graduated from undergrad and I started --

Q. Yeah.  Let me ask that again.  What did you do after

Cristin Rettler, P.A.
June 20, 2025

you graduated from the university of South Florida but before you went to Pacific University to get your PA degree?

A.   Yeah.  So I worked in myriads of different capacities within health care trying to figure out where I wanted to go to graduate school.  I, you know, wasn't sure if I should apply to medical school or PA school or podiatry school and so I worked at different hospitals.

Q.   How long was your PA program at Pacific University?

A.   It was 27 months and then we had to take our boards after that.

Q.   You're not -- you're not a medical doctor, correct?

A.   I'm a physician assistant.

Q.   Which means you're not a medical doctor, right?

A.   Because I'm a physician assistant, correct.

Q.   You're not board certified in any medical specialty, correct?

A.   I'm board certified as a physician assistant or associate I guess we're now called, actually.

Q.   As a physician's assistant, are you board certified in any particular medical specialty?

A.   We don't have -- that's not how our license is.

Q.   So as a physician's assistant, you cannot get a license in a particular specialty, correct?

Cristin Rettler, P.A.
June 20, 2025

A.   Right.  You can get certified training in, you know, different specialized areas, but our license is different than nurse practitioners and physicians in that we aren't board certified in one specific area.

Q.   Are you certified as a physician's assistant in any particular area?

A.   We don't have that kind of certification so no.

Q.   Okay.  Is there any sort of recognition or subspecialty training or title that you've earned as a physician's assistant that relates to any particular kind of specialty?

A.   No.  I have specialized training, like I'm ACLS certified, you know.  I'm BLS certified, you know, that sort of training, but our license is different than physicians and nurse practitioners in that we don't have those designations.

Q.   Okay.  You have not been asked to give expert testimony in this case relating to colostomies, correct?

A.   I have not been asked to give expert testimony in this case at all to my understanding.

Q.   Have you ever spoken to the plaintiff in this case, Mr. Jackson?

A.   No.

Q.   Have you ever treated Mr. Jackson?

A.    No.

Q.    Have you reviewed Mr. Jackson's medical records?

A.    No.

Q.    Have you reviewed any documents from the Michigan Department of Corrections about Mr. Jackson?

A.    No.

Q.    Have you ever reviewed any documents from the Michigan Department of Corrections about any person or subject?

A.    No.

Q.    Have you ever reviewed any documents relating to Corizon's work in Michigan between 2017 and 2019?

A.    No, I don't believe so.

Q.    Is it fair to say that you have no personal knowledge of any Corizon policy, practice or custom after April of 2014?

A.    Right.  That's when I worked -- when I stopped working for Corizon, and after that time I was involved in a couple correctional lawsuits, one of which I believe involved Corizon, but other than that, no.

Q.    Your testimony that you are asked to give has nothing to do with Mr. Jackson himself, correct?

A.    I'm not testifying about Mr. Jackson's medical issues, no.

Q.    To your knowledge, did any of the employees that you interacted with who worked for Corizon in Oregon work

Cristin Rettler, P.A.
June 20, 2025

in Michigan?

A.    Not to my knowledge.

Q.    I'm going to read you a list of names and I'm going to ask if you to the best of your knowledge have ever spoken to any of these individuals, okay?

A.    Okay.

Q.    And if you have, you let me know.  If not, let me know that, okay?

A.    Okay.

Q.    Dr. Keith Papendick?

A.    No.

Q.    Dr. Erina Kansakar?

A.    No.

Q.    Dr. John Webber?

A.    I don't think so.  That's a common name, though.

Q.    To your knowledge have you ever spoken with any doctors who practice in Michigan?

A.    No.

Q.    Have you ever spoken to somebody named Sonya Fulks?

A.    I don't believe so.

Q.    Have you ever spoken to somebody named Steve Bergman or Steven Bergman?

A.    None of these names sound familiar to me.

Q.    What about William Borgerding, B-O-R-G-E-R-D-I-N-G?

A.    No.

Cristin Rettler, P.A.
June 20, 2025

Q.    Colleen Spencer?

A.    No.

Q.    Jeffrey Stieve?

A.    No.

Q.    Sabrina Aiken?

A.    No.

Q.    Kaelynn Pfeil?

A.    No.

Q.    A Dr. Mahir Alsalman?

A.    No.

Q.    Ronald Drinket?

A.    No.

Q.    A Dr. Jeffrey Bomber?

A.    No.

Q.    A Mason Gill?

A.    No.

Q.    A Dr. Robert Lacy?

A.    I don't think so.

Q.    A Dr. Jan Watkins?

A.    No.

Q.    Excuse me.  Dr. Jan Watson.

A.    No.

Q.    Whitney Thompkins?

A.    No.

Q.    A Timothy McKenna?

Cristin Rettler, P.A.
June 20, 2025

A.    No.

Q.    Did you prepare any sort of written summary of your
      proposed testimony in this case?

A.    No.

Q.    Have you ever seen any written summary of your
      proposed testimony in this case?

A.    No.

Q.    Did you ever tell the Michigan lawyers that you spoke
      to what it is that you intended to testify about in
      this case?

A.    So we reviewed yesterday like what was going to happen
      today.

Q.    Prior to yesterday's conversation, have you ever
      spoken with the Michigan lawyers about what it is that
      you might testify to in this case?

A.    I don't think so.  I don't think it got that far last
      time.

Q.    During your time in the Washington County Jail in
      Oregon, do you know how many requests for colostomy
      reversal surgery were approved?

A.    I don't recall.  I don't think I recall ever any
      elective surgery being approved during my time there.

Q.    Do you recall how many requests for colostomy reversal
      surgery were made during the time that you worked in
      the Washington County Jail?

Cristin Rettler, P.A.
June 20, 2025

A.    No, I don't recall.

Q.    Are you aware of any facts relating to the request for colostomy reversal surgery in the Michigan Department of Corrections?

A.    No.

Q.    I'm going show you what we'll mark as Exhibit C.

            MR. MASIN:   And for the record, this is plaintiff's Konchise Jackson's expert disclosures pursuant to FED.R.CIV.P.26(a)(2).

            REMOTELY INTRODUCED:

            DEPOSITION EXHIBIT C

            4:17 p.m.

BY MR. MASIN:

Q.    Can you see this document on your screen, Ms. Rettler?

A.    Okay.

Q.    Do you recall ever seeing a document with this title on it before relating to the Jackson case?

A.    No.

Q.    I'm going show you at the bottom of this page that this document is dated May 20th, 2025.  Do you see that?

A.    Mm-hum.

Q.    Do you ever recall testifying -- strike that.

            Do you recall speaking to the Michigan attorneys about your testimony in this case prior to

Cristin Rettler, P.A.
June 20, 2025

May 20th, '25?

A.   No.

Q.   I want to show you that this document here has your name on it.  Do you see that?

A.   Okay.

Q.   And is that the correct address and phone number?

A.   That's my mailing address, yeah.

Q.   And is the phone number correct?

A.   Yes.

Q.   And do you recall ever seeing a document like this with your name on it?

A.   No, I don't remember -- so, again, I can't scroll up or down on this.

Q.   I'm going do that for you if you can see it, but my question is do you ever recall seeing a document like this with your name on it relating to the Jackson case?

A.   So I can't see this document.  It just says Ms. Rettler is expected to testify regarding her experience working as a physician's assistant for Corizon in a county jail but --

Q.   Correct.  There's more, but my question is have you ever seen this before?

A.   I mean, perhaps.  That's accurate, that I'm going to testify about working for Corizon.  I'm not giving

Cristin Rettler, P.A.
June 20, 2025

expert witness testimony on this specific case.

Q. Right.  That's not my question.  My question is have you seen this document before?

A. I'm not sure.

Q. We looked earlier at this date, May 20th, 2025.  Do you see that?

A. Uh-huh.

Q. Have you seen a document that purports to summarize the testimony that you would give in this case prior to May 20th of 2025?

A. I don't recall.

Q. Are you able to read the text of this?  Do you need me to make it larger for you on your phone?

A. Can you scroll down?

Q. Yeah.  I'm just making sure you can read it.  Can you read it?

A. Yep.

Q. You can read it to yourself and let me know when you're done.  I'll keep scrolling whenever you need me to.

A. Yeah, this all sounds about right.  There's nothing inaccurate here.

Q. So I just have a couple of questions about this.

A. Okay.

Q. The first sentence says that you're expected to

testify regarding your experience working as a physician's assistant for Corizon in a county jail. Do you see that?

A.   Yep.

Q.   And that refers to your time at the Washington County Jail between 2012 and 2014, correct?

A.   That's correct.

Q.   And everything that you just read in this paragraph, does that also relate to the time that you worked in the Washington County Jail in Oregon between 2012 and 2014?

A.   Correct.

Q.   This paragraph refers to a Corizon regional medical director. Do you remember that person's name?

A.   Dr. Garlick and later it was Harold Ott, but mostly I interacted with Dr. Garlick.

Q.   Can you spell that?

A.   I think it's like garlic the normal way but then with a K on the end.

Q.   Do you remember that person's first name?

A.   No, I don't.

Q.   And the other person you said was who?

A.   Harald Ott or Orr. He was I believe -- he was either Dr. Garlick's replacement or he was Dr. Garlick's boss, and I did meet him one time when he came into

the jail.

Q.   Is it fair to say that you've not spoken with either of those individuals since 2014 at least?

A.   Correct.  That's correct.

Q.   You'll see that this paragraph refers to this conference that you testified about in Tennessee.  Do you see that?

A.   Yes.

Q.   Is there anything else that you recall -- strike that.

Is there anyone else -- well, strike that.

A.   That was at the conference that I recall.

Q.   Yeah.  Let me ask the question.  Does reading this refresh your recollection in any way about the names of any individuals that presented at that conference?

A.   No.

Q.   Does reading this refresh your recollection in any way about the names of any individuals that you spoke to at that conference other than the other person you mentioned from Oregon?

A.   No.  I mean, I believe Dr. Garlick was at that conference, but I don't think he -- I don't remember him presenting anything and I would have avoided him so --

Q.   Okay.  And does reading this in any way refresh your recollection about the title of any presentation that

Cristin Rettler, P.A.
June 20, 2025

you heard at the conference?

A.   No.

Q.   Does reading this at all refresh your recollection at all about the dates that you were at the conference? I'm sorry.  We might have missed your answer.  Did you say anything?

A.   No.

Q.   Okay.  Is it your understanding then that the testimony that you would intend to give in this case relates to the time you spent working at the Washington County Jail in Oregon between 2012 and 2014?

A.   Yes.

Q.   Since May of -- well, strike that.

          Since May 20th of 2025, have you been asked by the Michigan attorneys or anyone else to perform any other work relating to this case?

A.   No.

Q.   All right.  Give me a couple minutes and I might be done.

                 MR. CROSS:  Okay.

                 MR. MASIN:  Take a short break.

                 (Off the record at 4:26 p.m.)

                 (Back on the record at 4:32 p.m.)

BY MR. MASIN:

Cristin Rettler, P.A.
June 20, 2025

Q.   Ms. Rettler, just a couple more questions for you. What was the name of your supervisor during the time that you worked at the Washington County Jail?

A.   Stevens Hyppolite and then the other HSA woman was Vicky, and then when Stevens was demoted, she was promoted.  I don't recall her last name.

Q.   Did you say Hyppolite?

A.   Hyppolite, mm-hum.

Q.   What was that person's title?

A.   I guess -- I remember like HSA was -- I don't know what that would stand for, but he's like the -- in charge of the medical department.  He's not -- the medical director was Joe McCarthy.  He was the physician that I worked with and then Stevens was in charge of the medical department.

Q.   Was Dr. McCarthy a Corizon employee?

A.   He was.

Q.   Okay.  Do you know the names of any of the Washington County officials who worked at the prison at the time -- or, excuse me, worked at the jail at the time?

A.   Like the deputies?  No.

Q.   Did the Washington County Jail have some sort of inmate grievance process where the inmates could complain about the care that they were receiving?

A.   I believe so.

Cristin Rettler, P.A.
June 20, 2025

Q.  Were you involved in that aspect of the inmates' care?

A.  Well, the nurses collected them.  I believe they were called grievances.  Well -- so there was two levels, I believe.  They sent like a kite, like a MERF, like a medical request form, if they had any medical needs, and then if those medical needs went unaddressed, then it escalated to the next level and I believe it was called a grievance at that time, and the nurses collected them, and once it got to the level of a grievance, then it was brought to the attention of the HSA or the office manager, whatever their official title was, which would be Vicky and Stevens, and then they had to be addressed in some like specific -- some amount of time that they had to be addressed.

Q.  At the jail were the grievances addressed by employees of the county or by Corizon employees?

A.  Corizon employees.

Q.  Are you familiar with the grievance process at all with the Michigan Department of Corrections?

A.  I am not.

Q.  The case that you testified in -- strike that.

                 The case that you testified about in Oregon, that related to a patient who passed away from a heroine withdrawal, correct?

A.  Yeah.  She died of dehydration I believe is what they

Cristin Rettler, P.A.
June 20, 2025

established.  And, also, there is great pride in Corizon standardization across different, you know, clinics and hospitals.  Like that was something that was widely discussed, like this is how we do it at all Corizon facilities.  That was a frequent refrain.

MR. MASIN:  I'll move to strike that as completely nonresponsive to my question.

BY MR. MASIN:

Q.  My question was the inmate who died you say from dehydration, that was as a result of heroine withdrawal, correct?

A.  She was withdrawing from heroine, correct.

Q.  Are you aware of any statistics about the length of incarceration of the inmates at the Washington County Jail during the time that you worked there?

A.  So I can tell you that the average length of stay in Oregon is 14 days.

Q.  In jail in Oregon you mean?

A.  In jail in Oregon is 14 days.

Q.  Okay.

A.  There's a great range.  Some people stay for hours and some people stay for years depending on their charges so that's just an average.

Q.  Okay.  I don't have anymore questions for you at this time.  I reserve any questions if Mr. Cross has any

Cristin Rettler, P.A.
June 20, 2025

just to follow up, but other than that, thank you for your time.

                          EXAMINATION

BY MR. CROSS:

Q.   Good afternoon, Ms. Rettler.  Why did you leave your employment with Corizon?

A.   Well, I had grave concerns about the lack of medical care that was being provided to the inmates, and I felt that -- I went to the sheriff on two different -- I had two different meetings with him to discuss this specifically, and I -- there were so many near misses that I felt it was just a matter of time before there was a catastrophic outcome, and, frankly, I was concerned for my medical license, and that ten million dollar lawsuit that Corizon lost happened just months after I left there.

Q.   What specific things were you concerned about?

A.   Well, they were not following the matrix, which is the minimum number of staff that needed to be provided. Instead of hiring RNs -- like, for example, they were supposed to have eight nurses, RNs, on staff, and they would have half that number, and of those four that they actually had on staff, three of them would be LPNs, not RNs, that had just graduated or medical assistants.  So they weren't coming anywhere near

Cristin Rettler, P.A.
June 20, 2025

meeting the matrix.

No matter what the best of intentions that those medical people, the staff that worked there, you know, they were under trained and they were, you know, spread way too thin to be caring for the extremely complicated patients that we had on the unit, and I would accidentally come across a chart or just be walking by in the unit and I'd realize someone was, you know, nonresponsive, not breathing, you know, having some severe medical crisis.  Just by luck I had come across these people, and that happened so many times I was -- and because, you know, I expressed my fears to the sheriff and to Corizon and, you know, that went nowhere and so I left.

Q.  Were there any other practices that you were concerned about?

MR. MASIN:  Object to form.

THE WITNESS:  Well, the reason that people ended up I think a lot with these extreme or emergency medical situations that we were unequipped to deal with because of our low staffing and understaffing and under trained medical personnel was because -- well, a couple different policies.

The first one is that when people came into the jail, they -- we had a very strict formulary, so

Cristin Rettler, P.A.
June 20, 2025

they were taken off their chronic care medications which would be like, you know, for COPD, chronic obstructive pulmonary disease, chronic kidney disease, you know, BPH, which is benign prostate hypertrophy so then they couldn't urinate, they couldn't breathe and they were replaced with, you know, these generic medications that -- which were not sufficient or they were not -- just taken off the meds altogether. Like HIV meds was one of them. They had big issues getting HIV meds. There were no HIV meds on the formulary and some people would end up having a medical crisis.

The second thing was that, for instance, if someone had chronic kidney disease and they needed a specialist follow-up, if I would write a referral for a specialist, that would go nowhere. They would just say it's under review, it's under review, and it would never result in -- almost never resulted in an actual appointment taking place, and if I would call Dr. Garlick and advocate for the patient, he would say, well, they're about to leave anyway so they don't need that appointment, and I would say, well, can we just schedule the appointment. If they leave in the meantime, you know, then they can at least get in the queue to get that appointment taken care of.

Also, any time that I sent people out for

any emergency medical services, on Tuesdays I had to review all of the charts of every single patient that I had sent out, and he always gave me pushback like 100 percent of the time why that person did not need to be sent out, and we didn't even have a working EKG machine much less, you know, stat, you know, cardiac enzymes or serial troponins or anything like that, so, you know -- and I was working in the ER at the time, so I had a very good understanding of what an emergency medical situation was and what we could handle at the jail, and his response when he would say, oh, that person didn't need to go out, I would say okay.  Well, you know, I believe they did.  That's my expert medical opinion on the ground, and if you believe this person doesn't need to go out, then, you know, per policy is what you're saying, I would like you to put that in written form and send me an e-mail, which, of course, he never did because he has a medical license, too, and he also is trying to protect his medical license.

BY MR. CROSS:

Q.    Why were you concerned about your medical license?

A.    Because if I don't offer -- like Corizon's trying to deny medical care to patients, and I cannot tell the American Medical Association that I'm just following

policy at Corizon.  That will not protect me, and ethically I'm not okay with that, either, by the way. I didn't go to -- for my medical training with the hopes of making money by depriving care for some like corporate entity.  You know, my goal is to provide the appropriate level of care to people in need who are under my care, and this is a very vulnerable and very sick population.

Also, psych meds, they frequently changed the psych meds when people come in so that would destabilize them.  They would end up having extreme mental health crises, and they were very reluctant to do anything off formulary because some of those meds can be expensive and they were, you know, reluctant to make any kind of changes there.

Q.  What is a formulary?

MR. MASIN:  Object to form.

THE WITNESS:  The formulary -- every insurance company has it.  It's usually tier one, tier two, tier three is what the rest of America is used to.  Tier one is like the super cheap stuff that's been around forever.  Tier two, you know, it's, you know, generic but it's still more expensive, and tier three is like the expensive stuff.

Typically in the community, like if someone

has a severe mental health issue and they've been tried on all the easy to access inexpensive medications and -- for any medical condition -- and they require a higher level of medication to stabilize their condition, then their insurance company, which, you know, for the most part with this population was the Oregon Health Plan, then their insurance was paying for that and they were stable on it.

When they came to Corizon -- at Multnomah County Jail, they just maintain people on those same medications. Whatever they're stable on in the community, they just keep those medications, but for Corizon, you were not allowed to prescribe anything that was called off formulary, which is not like tier one, not like the cheap stuff, so I had to switch them off of their medication, and that frequently destabilized people.

BY MR. CROSS:

Q. Are these medications that were already prescribed to the patient --

A. Yes.

Q. -- at the time they came in?

A. Prescriptions that they were stable on in the medical community and had already been prescribed to them.

Q. If I understand your testimony correctly, Corizon was

Cristin Rettler, P.A.
June 20, 2025

interrupting prescribed plans of treatment that had been initiated by the patient's outside medical provider before the patient entered the jail?

A.   Yes.

MR. MASIN:  Object to form.

BY MR. CROSS:

Q.   Did you ever try to continue a treatment plan that a patient's doctor had prescribed for them before they came into jail?

A.   Yes.

MR. MASIN:  Object to form.

THE WITNESS:  Sometimes when they, you know, then, you know, became, you know, destabilized we'll just say because these are a wide range of medications from many, many different drug classes, when their symptoms exacerbated when they were taken off their chronic care medication, then I would advocate to say, okay, the cheap -- the generic medications are not working sufficiently.  Let's return them to the medications that they were on, and sometimes, you know, yeah, sometimes the medications are, you know, thousands of dollars a month and that requires more of a conversation.  However, frequently they were not that much more expensive.

Like some of these COPD meds, they're

Cristin Rettler, P.A.
June 20, 2025

inhaled steroids versus oral steroids and, you know, that's, you know, very common in the -- there's no like cheap inhaled steroids like Advair. They're, you know, like $250 a month or something like that, but it's important for people to be able to breath in jail. Well, anywhere but especially in jail because they don't have -- they're locked in their cell and they're a very vulnerable population. So that's an example of medications that I would advocate for, you know, this person really needs to be returned, and there was tremendous push back.

BY MR. CROSS:

Q.   Were you ever successful in getting them back on their prescribed medications?

          MR. MASIN:  Object to form.

          THE WITNESS:  I'm not sure about that.  I mean, I remember having a lot of different conversations about returning people and, you know, the importance of returning them to their, you know, baseline medications.  I don't recall if I was ever successful in any specific patient, but it was a big, you know, conversation, and the fact that they were taking people off of their HIV medications, I mean, that's just unbelievable.  There were no HIV medications on formulary.

Cristin Rettler, P.A.
June 20, 2025

The other thing that Corizon used to like to do is to advocate if they were on expensive medications to have them released from custody, which, you know, it's fine.  I don't have any disagreement with that, but they would want me to go to the custody staff and say this patient's medication is X amount of dollars a month.  You know, they need to be released from custody because we can't afford it.

My understanding was there was a cap every year on how much Corizon would pay like for all the inmates every year, and if they went beyond that, then Washington County was on the hook to pay for whatever was, you know, left of the bill.  So Washington County was motivated also to, you know, keep people out of custody that had expensive medications.

BY MR. CROSS:

Q.   Did you ever report your concerns to anyone within Corizon in writing?

A.   I wrote Dr. Garlick e-mails, which he didn't like.  He didn't want me -- he specifically told me not to e-mail him.  He wanted me to call him because, of course, he doesn't want this in written form, and I e-mailed the sheriff twice and had two different meetings with the sheriff about my concerns.

Q.   Did you have oral discussions with Dr. Garlick --

Cristin Rettler, P.A.
June 20, 2025

A.   Yes.

Q.   -- about your concerns?

A.   And with Dr. Ott I believe was his name as well.  When he came to tour the jail when he was coming in, you know, I told him the difficulties that I had with Dr. Garlick, with him not wanting me to send people to the ER and with him not approving referrals that I had placed for very like time sensitive referrals that I placed for like, you know, chronic kidney disease and people were in kidney failure, you know, things like that.  I was never requesting that people have, you know, surgery for -- you know, like elective like knee surgery or something like that.  It was always things that were like very time sensitive that needed to be addressed while they were incarcerated in a timely fashion.

Q.   When you say elective surgery, what do you mean by that phrase?

A.   So really there's just two kinds of surgery, emergency surgery, everybody's knows what that means, then there's elective surgery.  So some elective surgery --

          MR. MASIN:  Objection, form of the question.  Go ahead.

          THE WITNESS:  Some elective surgeries, you know, never need to be done, like, you know, a face

Cristin Rettler, P.A.
June 20, 2025

lift or a knee, an ACL repair. You can live your life without that. However, some surgeries they do need to be performed but they need to be scheduled, and, you know, that would be an example of an elective surgery that is also a necessary surgery. So those are the things that I was putting in referrals for sometimes. Like I remember this one guy had this huge basal cell carcinoma on his face. That needs to be addressed in a timely fashion.

BY MR. CROSS:

Q.   Would that be an elective surgery?

          MR. MASIN:  Objection.

          THE WITNESS:  Falls under the guise of elective surgery. It's a scheduled surgery. It's not an emergency surgery.

BY MR. CROSS:

Q.   What's a cosmetic surgery?

          MR. MASIN:  Object to form, beyond the scope.

          THE WITNESS:  Well, a cosmetic procedure would be, you know, like a face lift or something. Of course, that's not even on the table. I'm just talking about getting people referrals for, you know, pressing medical issues that they had.

BY MR. CROSS:

Cristin Rettler, P.A.
June 20, 2025

Q.   When you raised your concerns with Dr. Garlick, how
did those discussions go?

MR. MASIN:  Object to form.

THE WITNESS:  Well, usually what he would
say is, you know -- I would say -- like I would put in
a referral.  That was the process, and, you know, for
this basal cell carcinoma on this guy's face and it
would go nowhere.  I kept checking.  Like, okay, where
are we with this process and then the answer that I
would get is, oh, it's under review, it's under review
and it would just be eternally under review.  So
sometimes when I really, you know, needed this person
to have this appointment, like, for instance, if he
is -- he has some really big Measure 11 charges, I
knew he was going to be incarcerated for an extended
period of time, he didn't have other options to seek
other care, then I would express my concerns to
Dr. Garlick, and sometimes he would say, oh, you know,
he's going to be released soon anyways, we don't need
to do that, and sometimes he would just, you know,
say, well, we'll continue to review it.

Now, there were a few times that I was
successful in getting referrals for people, and there
was a separate issue that came up.  I worked in that
community for many years, and Corizon was not paying

Cristin Rettler, P.A.
June 20, 2025

their bills so I was -- I had this referral for a nephrologist in the community.  There weren't a lot of them because this is Hillsboro right outside Portland, and he -- you know, I worked at the hospital.  I knew this guy and so I called the office and said what's going on, we put this referral in, and they said, well, Corizon hasn't paid their bills, which predated when I worked there, and so we've never been paid so Corizon needs to pay the bill in order for us to schedule new appointments and so then I had to see if I could get an appointment, you know, in Portland with someone who didn't know Corizon and they hadn't stiffed them on the bill.  It's just amazing, I mean, just the level of -- their skill at avoiding paying for things was impressive.

MR. MASIN:  Move to strike.

BY MR. CROSS:

Q.   To your knowledge, were any changes made as a result of your complaints?

A.   No.  They lost their contract, though, after they lost that ten million dollar lawsuit.

MR. MASIN:  Object to form.

BY MR. CROSS:

Q.   I believe you testified you worked in another county jail in Oregon where the medical care was not provided

Cristin Rettler, P.A.
June 20, 2025

by Corizon Health, is that correct?

A.   Right.  It wasn't provided by any private health company.  It was county and it was run completely differently, their focus is on wraparound services, they're community health focused, they provided, you know, care to the inmates as, you know, needed, as it was appropriate.

Q.   Do you experience the same difficulties obtaining referrals to outside specialists at --

A.   Not --

Q.   -- the county?

A.   -- at all.

MR. MASIN:  Object to form.

THE WITNESS:  Not at all.  It was completely different.

BY MR. CROSS:

Q.   What was it like?

MR. MASIN:  Object to form.

BY MR. CROSS:

Q.   I'm sorry.  How is it different?

MR. MASIN:  Object to form.

THE WITNESS:  We provided referrals as appropriate, and sometimes I did review them with my medical director, but there was no endless, you know, queue of, you know, you'd write a referral and it just

Cristin Rettler, P.A.
June 20, 2025

falls to the wayside while they, you know, try to avoid providing that referral.  There was none of that.  If I wrote a referral, then, you know, I sometimes reviewed it with the medical director and then the appointment was scheduled and they were able to go out for care.

BY MR. CROSS:

Q.   Now, you testified a bit on direct examination about attending a conference at Corizon's headquarters.  Do you remember that?

A.   Yes, and it was like no medical conference I had ever attended.  I thought that we were going to be discussing like how to determine the appropriate level of care for, which is a worthwhile conversation, in the correctional setting, but really what the conversation was was how to deny care, which is shocking because there's a room full of medical directors and they -- I remember this one example they gave that this poor gentleman had gotten in a physical altercation from going from jail to prison with the deputy staff and he had fractured his spine which resulted in him being paralyzed and so when he sued Corizon, they were able to win the lawsuit, which they were really proud of because he -- the nurse was able to document that he had neurological function before

Cristin Rettler, P.A.
June 20, 2025

they left.

So in stead of -- I thought the conversation was going to be how do we, you know, preserve -- you know, do appropriate medical exams when people are in, you know, assault situations to avoid bad outcomes, but actually the conversation was how to document so that Corizon's not on the hook for the patient's medical bills, which, I mean, is -- it's amazing that they're able to get a bunch of doctors who are onboard with that, but that was really the theme of the whole entire conference.

It was more a medical-legal how do we like reduce our services, avoid paying for services, return them to the community so that the community's on the hook for the bill, and, you know, I came to understand that, you know, through their jargon that they were incentivized, so that helped me to understand how these medical doctors and HSAs were, you know, justifying it to themselves that -- and, you know, really they spoke about these patients like they weren't people.  I mean, it was --

MR. MASIN:  Hold on.  Move to strike that entire testimony as nonresponsive to the question.

BY MR. CROSS:

Q.   I believe you testified --

Cristin Rettler, P.A.
June 20, 2025

MR. MASIN:  Amongst other things.

BY MR. CROSS:

Q.   Let's go back.  Who else was in attendance at that event?

A.   Stevens Hyppolite and all the other directors from all across the country, and as I stated earlier, they took great pride in the fact that they run their facilities all very, you know, similar, so that was surprising to me as well, that this was, you know, a nationwide effort.

MR. MASIN:  Move to strike.

BY MR. CROSS:

Q.   Did you attend any presentations at the conference?

A.   Yeah.  There were lots of lectures and presentations, but it was all the same topic.  It was --

Q.   What was the topic?

A.   The topic was how to avoid like providing medical care to inmates.  That was basically the topic.  No matter what the headline was, it evolved into this whole conversation about, you know, their goals of trying to provide the least care possible and to reduce their medical costs in an effort to, you know, keep their maximum profit, and they had this -- also this like corporate like newsletter that came out, which I also found very weird.  We used to get it at the Hillsboro

Cristin Rettler, P.A.
June 20, 2025

County Jail, and it would say, yay, we're expanding to Kentucky, we're expanding to New York City, we've expanded and we've increased our profit margins, and I thought that that was weird, that they were celebrating that in this newsletter because they were paying so little to their staff. Like the staff weren't sharing in that. Like they had terrible medical care. They had terrible policies towards the nurses. They hired LPNs. That's why they had such difficulty with staff, because they were paying way below the community standard for nurses but yet they were celebrating how rich they were in this newsletter, which I found very strange.

MR. MASIN: Move to strike.

BY MR. CROSS:

Q. Were there any discussions of personal injury litigation during that conference?

A. There was that one that I just --

MR. MASIN: Object to form.

THE WITNESS: -- talked to you about. That guy who was paralyzed tried to sue them. I guess he lost because they were celebrating that fact.

BY MR. CROSS:

Q. How were they celebrating?

MR. MASIN: Object to form.

THE WITNESS: They were talking about how he -- because the nurse had documented that he had neurological function when he left the jail. Even though clearly his injury resulted in him being paralyzed, that Corizon was able to win this lawsuit and so they didn't -- which was -- you know, he was suing for millions of dollars. He was paralyzed. So they were really, you know, excited and proud of that.

BY MR. CROSS:

Q. In your opinion, was Corizon delaying or denying necessary medical care to inmates in order to avoid paying for the care?

MR. MASIN: Object to form.

THE WITNESS: There's no question. They weren't even pretending. I mean, that was like the goal of the conference.

BY MR. CROSS:

Q. What do you mean by that?

A. I mean, of course, you know --

MR. MASIN: Object to --

THE WITNESS: -- many -- you know, there's always discussions about how to allocate resources, right? But that's very different from the conversation that Corizon was having. Corizon was like we don't want to pay for this and so let's try --

Cristin Rettler, P.A.
June 20, 2025

what's our strategy and, you know, reducing care, denying care, not providing care, waiting until they leave custody so they can deal with it in the community and their insurance gets -- or the community, you know, at large gets stuck with the bill, and there was no kind of wraparound service, either.  If people were leaving, they didn't help them get set up in the community for, you know, like mental health services or, you know, they wouldn't help schedule an appointment for their kidney specialists once they left.  It was like once they leave, they're not our problem.

BY MR. CROSS:

Q.   Do you have any reason to believe that Corizon's policies and procedures were standardized across the entire company?

          MR. MASIN:  Object to form.

          THE WITNESS:  Yes.  That's absolutely what they discussed at that conference, which was actually -- you know, I mean, I guess I was a bit surprised, even though that's what Dr. Garlick always told me, but I didn't -- I wasn't sure if he was a reliable source, but, yeah, that was reinforced and so they would -- at the conference, you know, people would raise their hands and say yeah, that's how we do

it in whatever, New York and Kentucky and Massachusetts and, oh, we just opened and that's how our referral process works, too.

You know, they were really striving for standardization, and that's the way to make -- not make money but to keep your money, you know.  They get a bucket of money from Washington County Jail and, you know, they're trying to keep that.  They're trying to not use their resources on patients.

MR. MASIN:  Move to strike.

MR. CROSS:  All right.  Can we take just a five-minute break?  I need to look over my notes.

MR. MASIN:  Sure.

(Off the record at 5:03 p.m.).

(Back on the record at 5:05 p.m.)

BY MR. CROSS:

Q.   Ms. Rettler, what is a physician's assistant?  I'm sorry, physician assistant.

A.   Yes.  So I am considered a physician extender.  So in primary care I function the same as a nurse practitioner or a physician, but the difference becomes more obvious in our training when I have functioned in specialty care such as where I work right now which is general surgery.  Like I can do minor procedures by myself in the clinic, which I very

Cristin Rettler, P.A.
June 20, 2025

commonly did in the jails and in the ER, but I cannot do a surgery by myself.  So that's kind of the short answer of how my training and experience and medical license, scope of practice is different from a physician.

Also, as I indicated, physicians and nurse practitioners are specialized in their area of specialty such as neonatology or general surgery, and they cannot function outside of that narrow scope where they're licensed, but I can practice in any specialty as long as I find a group that is willing to, you know, train me.

Q. So can you perform a surgery under the supervision of a physician?

A. So I'm a surgical first assist at the hospital, but I can perform minor surgeries on my own in the clinic and in the ER, which I commonly did, which would be like, you know, suturing people's faces, removing foreign bodies, I and Ds, incision and drainage of abscesses, minor surgical procedures.

Q. Can you prescribe medication?

A. Absolutely, yes.  We all prescribe medication, all three of us, nurse practitioners, PAs and physicians, and we diagnose, treat, order imaging.

Q. Sorry.  We lost you.

A.    You okay?

Q.    Yeah.  We just lost the video.

A.    Oh.  I don't know.

Q.    Well, if you can still hear me, that's fine.

A.    Yeah, I can still hear you.

Q.    So were you ever discouraged from reporting your
      concerns about Corizon either internally or
      externally?

A.    Yes.  I was told not to talk to corrections staff
      about my concerns, that all issues would be addressed
      internally, and when I did, I was brought into a
      meeting to, you know, discuss that because sometimes,
      you know, I did feel like issues needed to be
      escalated.  I didn't feel like Washington County, you
      know, corrections were aware of really what the level
      of care -- the substandard level of care we were
      providing and the possible liability it was opening
      them up to.

            As I said, I went to the sheriff, and
      sometimes even in the moment I would go to like the
      corrections staff, like the, you know, higher-ups and
      say, you know, this person -- you know, I referred
      them for specialty care.  It was denied and now they
      have a medical issue and they need to go out, and then
      if the corrections staff would talk to the Corizon

Cristin Rettler, P.A.
June 20, 2025

higher-ups and report that I had said that, then I would be called into a meeting with them, that I was not supposed to have those discussions with -- you know, they wanted them to be happy -- blissfully unaware and happy with the level of care that was provided, and the way to do that was to keep them out of the loop and to make -- so that the corrections staff was really not aware of the substandard level of care that was being provided.

Q. Were you ever retaliated against by Corizon for raising your concerns?

MR. MASIN: Object to form.

THE WITNESS: Yeah, I was. I was written up one time for -- and this is the day after I had been confronted about, you know, some issue related to me, you know, advocating to corrections staff. I brought a glass bottle of salad dressing and they said I had brought a weapon into the jail. That was one. Then the second one was I had a student and, you know, I would -- as part of my duties of having a student, I would -- a PA student from Pacific University. I would review his chart, and if there were any errors in it, I would write a line through it, put my initials and then have a conversation with him about -- you know, he's learning how to chart. They

Cristin Rettler, P.A.
June 20, 2025

said I was falsifying a medical record. It was very obvious to me that they were retaliating for my -- you know, they were trying to maintain my silence. Those are the two times I was written up.

BY MR. CROSS:

Q. Were you written up by custody staff or by --

A. No.

Q. -- Corizon staff?

A. By Corizon for talking to custody staff. I found custody staff to be very responsive, very, you know, willing to have conversations with me, interested in having conversations with me. They knew that I was getting pushback to not talk to them.

MR. MASIN: Move to strike as nonresponsive.

BY MR. CROSS:

Q. You testified earlier about Corizon taking people off of their HIV medication when they were admitted to the jail.

A. Yep.

MR. CROSS: What does this have to do with anything in our case, Ian? Seriously. Object to form.

BY MR. CROSS:

Q. What are the risks of interrupting a course of

Cristin Rettler, P.A.
June 20, 2025

treatment with HIV?

MR. MASIN:  Object to form, beyond the scope of disclosure, irrelevant.

THE WITNESS:  Well, HIV is a chronic disease state much like chronic kidney disease, COPD, you know, and many of those medications were expensive and they were not, you know, formulary, so by denying people access to their chronic care medications, it, you know, speeds up the progression of their chronic disease state and they can end up having these emergency episodes, which often happened at the jail, especially in regards to patients that had preexisting breathing conditions.

MR. CROSS:  Okay.  I don't think I have any further questions.

MR. MASIN:  I just have a couple of follow-ups.

RE-EXAMINATION

BY MR. MASIN:

Q.  You in your testimony just now referred to e-mails that you'd sent.  Do you have those e-mails?

A.  No.  But I think they were part of the discovery for that ten million dollar lawsuit so you should be able to locate them.  There were two different e-mails I sent to the sheriff.

Cristin Rettler, P.A.
June 20, 2025

Q.   But you don't have those e-mails?

A.   No, I don't have those e-mails.

Q.   Okay.  All of the testimony that you just gave in response to Mr. Cross' questions referred to the time period that you were working at the Washington County Jail in Hillsboro Oregon between April of 2012 and April of 2014, correct?

A.   Yes, and during by tenure at the Washington County Jail.

Q.   Okay.  And you have no personal knowledge of any facts relating to Corizon's care for prisoners in the Michigan Department of Corrections between 2017 and 2019, correct?

A.   That's correct.

          MR. MASIN:  I have no further questions at this time.  Ian, do you have anything else?

          MR. CROSS:  Yeah, just one follow-up.

               RE-EXAMINATION

BY MR. CROSS:

Q.   Ms. Rettler, you testified that you were retained as an expert witness in a lawsuit involving Corizon in I believe 2018 or 2019, is that correct?

A.   Yes.

Q.   And did you review records as part of your engagement in that suit?

Cristin Rettler, P.A.
June 20, 2025

A.    Yeah.  I reviewed medical records.

Q.    And did those records relate to care provided by Corizon?

A.    Yes.

Q.    And what time period was that care provided by Corizon, if you know?

A.    I don't recall, but it was after the time that I left Washington County Jail.

Q.    Okay.  Thank you.  I have no further questions.

          MR. MASIN:  Now I have a question.

                    RE-EXAMINATION

BY MR. MASIN:

Q.    Where was that located?  Where was that medical care provided in the case that you reviewed?

A.    So there were two different lawsuits and I believe -- you know, again, you'd have to look it up yourself, but I believe one of them was at Clackamas and one was at Washington County, but I could be -- I'm not sure about that.

Q.    Both in Oregon, correct?

A.    Both of them in Oregon that I remember.

          MR. MASIN:  I don't have any further questions.  For the record, I know we're preserving all our objections to trial anyway, but I move to strike this entire testimony as irrelevant, beyond the

Cristin Rettler, P.A.
June 20, 2025

scope of the disclosure, hearsay, nonresponsive to questions and several other reasons which I will address at an appropriate time.

MR. CROSS:  I have no further questions.

COURT REPORTER:  Would anyone like to order the transcript?

MR. MASIN:  Yes, please, and I need it expedited, sometime -- today's Friday.  Can I get it by Wednesday?

COURT REPORTER:  Yes.  Mr. Cross, would you like the transcript?

MR. CROSS:  Yes.  Electronic only is fine as well.

(The deposition was concluded at 5:16 p.m.

Signature of the witness was not requested by

counsel for the respective parties hereto.)

                      CERTIFICATE OF NOTARY

STATE OF MICHIGAN )

                  ) SS

COUNTY OF WAYNE    )


               I, HELEN F. BENHART, certify that this

    deposition was taken remotely before me on the date

    hereinbefore set forth; that the foregoing questions

    and answers were recorded by me stenographically and

    reduced to computer transcription; that this is a

    true, full and correct transcript of my stenographic

    notes so taken; and that I am not related to, nor of

    counsel to, either party nor interested in the event

    of this cause.


                              _Helen F. Benhart_

                              HELEN F. BENHART, CSR-2614

                              Notary Public,

                              Wayne County, Michigan.

    My Commission expires:  7/7/2027

Cristin Rettler, P.A.
June 20, 2025

**$**

**$250**
64:4

**-**

**-or**
33:8

**0**

**02**
17:8

**1**

**1,400**
31:22

**100**
60:4

**11**
68:14

**14**
56:17,19

**18**
23:21 24:16

**19**
21:14

**1994**
25:19 41:21

**1998**
15:14 17:21

**1999**
15:14

**2**

**20**
4:2 19:23

20:5 21:2

**2000**
15:13

**2002**
12:23 17:10
26:1 38:10
41:22

**2003**
27:2

**2005**
8:10

**2006**
27:2

**2008**
38:10 41:2,6

**2012**
30:20,23
31:13,19
33:1,5 51:6,
10 53:11
83:6

**2013**
33:6

**2014**
9:2 10:3
22:14 30:20,
24 31:11,19
33:1,8 44:15
51:6,11 52:3
53:12 83:7

**2015**
9:3 10:3

**2017**
44:11 83:12

**2018**
83:22

**2019**
44:11 83:13,
22

**2025**
4:2 33:9
48:20 50:5,
10 53:15

**20th**
19:12 48:20
49:1 50:5,10
53:15

**23**
27:22

**23-year**
13:25

**25**
49:1

**27**
42:11

**3**

**3:03**
4:3

**3:05**
5:15

**3:09**
5:16

**3:14**
8:2

**3:19**
8:3

**3:31**
18:19

**3:41**
24:24

**4**

**4:17**
48:12

**4:26**
53:23

**4:32**
53:24

**5**

**570**
32:1

**5:03**
77:14

**5:05**
77:15

**5:16**
85:14

**7**

**70**
34:21

**8**

**800**
31:24

**9**

**90s**
26:7

**A**

**abdomen**
29:8

**abdomens**
36:22

**abdominal**
29:21

**abscesses**
78:20

**absolutely**
17:12 31:9

Cristin Rettler, P.A.
June 20, 2025

76:18 78:22

**abuse**
27:20

**academic**
40:21

**access**
62:2 82:8

**accidentally**
58:7

**accurate**
49:24

**acknowledge**
4:10,12

**ACL**
67:1

**ACLS**
43:12

**acting**
27:6

**active**
16:23 17:8

**activities**
17:12

**actual**
15:24 59:17

**acute**
29:8 36:21

**Adam**
4:21 5:5
6:23

**address**
5:9,18 8:7,
13 49:6,7
85:3

**addressed**
39:24 55:13,
14,15 66:15
67:8 79:10

**adjunct**
39:17

**administered**
4:12 14:5

**admitted**
81:18

**Advair**
64:3

**advertise**
41:13

**advertised**
41:18

**advice**
21:5

**advocate**
59:19 63:18
64:9 65:2

**advocating**
80:16

**afford**
65:8

**afternoon**
5:5 57:5

**agree**
4:20,22
29:7,13

**agreement**
4:17,18

**ahead**
66:23

**Aiken**
46:5

**alleged**
11:13 12:13

**allegedly**
11:16

**allocate**
75:22

**allowed**
62:13

**Alsalman**
46:9

**altercation**
71:20

**altogether**
59:8

**amazing**
69:13 72:9

**America**
61:20

**American**
60:25

**amount**
55:14 65:6

**Angela**
5:20 8:9

**anymore**
56:24

**appears**
5:23 25:3

**applied**
17:15 20:7,
11,16

**apply**
42:7

**applying**
15:9

**appointment**
59:18,21,22,
24 68:13
69:11 71:5
76:10

**appointments**
69:10

**appropriately**
11:16

**approved**
47:20,22

**approving**
66:7

**approximately**
17:21 31:20

**April**
30:23,24
31:11,13
44:14 83:6,7

**area**
43:4,6 78:7

**areas**
27:22 43:2

**Arizona**
5:21,25 7:14
8:10,18,21
16:21,25

**arrangement**
4:16

**article**
23:4

**asks**
21:14

**aspect**
55:1

**assault**
72:5

**assist**
28:14,19
29:9 78:15

**assistant**
12:20 15:24
25:23 26:14
27:6,9,23,25
28:20 29:1
32:13 39:15,
17,20,22
41:21 42:14,
16,19,21,24

Cristin Rettler, P.A.
June 20, 2025

43:5,10
49:20 51:2
77:17,18

**assistants**
15:21 57:25

**associate**
42:20

**Association**
60:25

**assume**
9:18

**attend**
32:17,18,19,
25 33:9,15
35:23 73:13

**attendance**
35:1 73:3

**attended**
33:17 34:17
36:14 71:12

**attending**
71:9

**attention**
55:10

**attorney**
12:4 24:4,14

**attorneys**
4:9 10:21
19:18 22:7
23:14,20
24:17,20
25:5 48:25
53:16

**audio**
7:19

**average**
56:16,23

**avoid**
71:2 72:6,13
73:17 75:11

**avoided**
52:22

**avoiding**
69:14

**awarded**
39:3

**aware**
48:2 56:13
79:15 80:8

———————

**B**

———————

**B-O-R-G-E-R-D-I-N-G**
45:24

**BA**
41:20

**back**
5:14,16 8:3
10:2 15:8
17:21 22:7,
13 24:6
36:11 53:24
64:11,13
73:3 77:15

**bad**
5:23 72:6

**bag**
37:12,15

**bankruptcy**
23:23

**bariatric**
37:23

**basal**
67:7 68:7

**baseline**
64:20

**basic**
9:5

**basically**
73:18

**beginning**
35:10

**believed**
20:13

**benign**
59:4

**Bergman**
45:21,22

**big**
13:12 14:24
31:16 59:9
64:21 68:14

**bill**
65:13 69:9,
13 72:15
76:6

**bills**
69:1,7 72:8

**bit**
18:25 71:8
76:20

**blissfully**
80:4

**blow**
18:8

**BLS**
43:13

**board**
42:17,19,21
43:4

**boards**
42:11

**bodies**
78:19

**Bomber**
46:13

**Borgerding**
45:24

**boss**
51:25

**bottle**
80:17

**bottom**
48:19

**BPH**
59:4

**break**
9:21,23
53:22 77:12

**breath**
64:5

**breathe**
59:5

**breathing**
58:9 82:13

**briefly**
15:9

**bring**
18:4 28:23

**brought**
14:17 55:10
79:11 80:17,
18

**bucket**
77:7

**bunch**
9:11 72:9

———————

**C**

———————

**California**
16:21 17:2,5

**call**
24:11 34:19
59:18 65:21

Cristin Rettler, P.A.
June 20, 2025

**called**
4:24 5:6
15:22 16:4,
7,10 34:20
42:20 55:3,8
62:14 69:5
80:2

**camera**
28:16

**cap**
65:9

**capacities**
42:4

**capacity**
31:11,23

**carcinoma**
67:8 68:7

**cardiac**
60:6

**care**
7:18 11:15,
16 12:13
14:5 16:11
26:25 27:4,
14,16,19
30:5,7 31:1
41:8,11 42:5
54:24 55:1
57:8 59:1,24
60:24 61:4,
6,7 63:17
68:17 69:25
70:6 71:6,
14,16 73:17,
21 74:8
75:11,12
76:1,2
77:20,23
79:16,23
80:5,9 82:8
83:11 84:2,
5,13

**career**
13:25 27:8

**cares**
26:21

**caring**
58:5

**case**
9:1 10:2,9,
14,15,16,18,
22 11:2,8,11
12:9,14
13:2,5,8
19:8 21:5,9,
11,12,16,18,
21,22,23
22:8,10,13,
18 24:4
25:10 29:20
36:12 43:18,
21,22 47:3,
6,10,15
48:17,25
49:17 50:1,9
53:9,17
55:21,22
81:22 84:14

**cases**
10:25 11:13,
18,24 12:2,
3,10,16,18,
24 13:17,20
14:10,14
15:1,4
20:14,20
24:1

**catastrophic**
57:13

**celebrating**
74:5,12,22,
24

**cell**
64:7 67:7

68:7

**certificate**
40:2,6

**certificates**
40:6

**certification**
43:7

**certified**
42:17,19,21
43:1,4,5,13

**changed**
61:9

**chapter**
37:17

**charge**
54:12,15

**charges**
56:22 68:14

**chart**
58:7 80:22,
25

**charts**
12:6 60:2

**cheap**
61:21 62:15
63:18 64:3

**checking**
68:8

**chronic**
59:1,2,3,13
63:17 66:9
82:4,5,8,9

**CHS**
4:21 5:6
16:4 18:14,
25 19:3

**circumstances**
28:25

**City**
74:2

**Clackamas**
84:17

**claimed**
12:18

**classes**
63:15

**clear**
20:10,17

**clinic**
27:1 29:11
77:25 78:16

**clinical**
32:6 38:13

**clinics**
56:3

**CME**
32:18

**collaboratively**
29:4

**collected**
55:2,9

**Colleen**
46:1

**colostomies**
36:16 37:13
43:18

**colostomy**
28:1,9,21
29:3,19
36:15,17,22
37:2,4,5,9,
12,15 47:19,
23 48:3

**common**
37:8 45:15
64:2

Cristin Rettler, P.A.
June 20, 2025

commonly
  78:1,17

communications
  21:5

community
  61:25 62:12,
  24 68:25
  69:2 70:5
  72:14 74:11
  76:4,5,8

community's
  72:14

company
  5:6 14:18
  16:4,7,10
  61:19 62:5
  70:3 76:16

complain
  54:24

complaints
  69:19

complete
  6:21

completely
  56:7 70:3,15

complicated
  58:6

concerned
  57:14,17
  58:15 60:22

concerns
  57:7 65:17,
  24 66:2
  68:1,17
  79:7,10
  80:11

concluded
  85:14

conclusion
  4:8

conclusions
  21:4

condition
  62:3,5

conditions
  82:13

conduct
  6:20

conference
  37:21 38:1
  52:6,11,14,
  18,21 53:1,4
  71:9,11
  72:11 73:13
  74:17 75:16
  76:19,24

conferences
  33:9

confronted
  80:15

connection
  5:23 6:6,9

consent
  4:15

considered
  77:19

consult
  29:5

consults
  28:22,23

contact
  23:8,14,19
  40:13

contacted
  23:17 24:15

continue
  63:7 68:21

continuing
  17:13 26:3

36:21 37:5

contract
  69:20

conversation
  47:13 63:23
  64:22 71:14,
  16 72:3,6
  73:20 75:24
  80:24

conversations
  64:18 81:11,
  12

coordinator
  38:14

COPD
  59:2 63:25
  82:5

copy
  24:20

core
  38:14

Corizon
  9:1 10:2
  12:1,9,14
  14:24 19:3
  22:8,11
  23:18,22
  24:1 26:19
  31:3,4,5,7,
  8,10,14
  32:16,20,24
  33:14 34:11
  35:10,23
  44:14,17,19,
  25 49:21,25
  51:2,13
  54:16 55:16,
  17 56:2,5
  57:6,15
  58:13 61:1
  62:9,13,25
  65:1,10,18

68:25 69:7,
  9,12 70:1
  71:23 75:5,
  10,24 79:7,
  25 80:10
  81:8,9,17
  83:21 84:3,6

Corizon's
  44:11 60:23
  71:9 72:7
  76:14 83:11

corporate
  32:19 61:5
  73:24

correct
  12:25 15:3
  16:2 20:25
  21:21 23:5
  24:7 25:16,
  20 26:1,2
  29:13,20
  30:1 31:11,
  12,14,15
  33:12 38:17
  42:13,16,18,
  25 43:19
  44:21 49:6,
  8,22 51:6,7,
  12 52:4
  55:24 56:11,
  12 70:1
  83:7,13,14,
  22 84:20

correction
  39:13 40:25

correctional
  12:6 16:11
  32:5 41:7,11
  44:18 71:15

corrections
  10:15 16:14
  27:18 44:5,8
  48:4 55:19

Cristin Rettler, P.A.
June 20, 2025

79:9,15,21,
25 80:7,16
83:12

**correctly**
12:1 62:25

**cosmetic**
67:17,20

**costs**
73:22

**Cottonwood**
5:21,25
8:10,21

**counsel**
4:15,19,21
9:25 85:16

**country**
73:6

**county**
12:21,22
13:21,24
14:6 22:1,5
29:25 30:6,
7,9,10,16,
19,23 31:16,
22,24 32:3,4
35:1 47:18,
25 49:21
51:2,5,10
53:11 54:3,
19,22 55:16
56:14 62:10
65:12,13
69:24 70:3,
11 74:1 77:7
79:14 83:5,8
84:8,18

**couple**
13:9 19:20
26:24 30:19
37:10 38:13
44:18 50:23
53:19 54:1

58:23 82:16

**court**
6:21 11:5
15:2 22:24
85:5,10

**create**
28:1

**crises**
61:12

**crisis**
58:10 59:11

**Cristin**
4:23 5:20,24
8:9 18:16

**criteria**
39:25

**Cross**
4:19 6:23
23:12 36:11
53:21 56:25
57:4 60:21
62:18 63:6
64:12 65:16
67:10,16,25
69:17,23
70:16,19
71:7 72:24
73:2,12
74:15,23
75:9,17
76:13 77:11,
16 81:5,16,
21,24 82:14
83:17,19
85:4,10,12

**Cross'**
23:8 83:4

**current**
7:13 8:17

**custody**
11:12 65:3,

5,8,15 76:3
81:6,9,10

**custom**
44:14

**cut**
5:22

**cutting**
6:4,18

**CV**
20:3,7,14,19
25:3,12,15,
18 26:8,13,
25 27:8
30:14,22
38:16,20
39:11 40:9,
20,21,22

———————

**D**

———————

**date**
25:15 50:5

**dated**
48:20

**dates**
26:17 30:13,
18 32:25
33:3,13 53:4

**day**
19:11 28:7
38:4 80:14

**day-to-day**
37:11

**days**
33:17 56:17,
19

**deal**
58:20 76:3

**death**
11:12,13

22:13

**December**
27:2

**declare**
4:13

**defendant**
11:24 12:9
14:2,9,15
18:14

**defendants**
13:16

**define**
38:23

**degree**
15:25 26:15
32:10 41:21
42:3

**degrees**
26:4

**dehydration**
55:25 56:10

**delaying**
75:10

**demonstrate**
35:15

**demonstrates**
40:3,10

**demoted**
54:5

**denied**
79:23

**deny**
60:24 71:16

**denying**
75:10 76:2
82:7

**department**
16:14 44:5,8
48:3 54:12,

Cristin Rettler, P.A.
June 20, 2025

15 55:19 83:12

**depending**
56:22

**deposed**
10:2,4 14:24 22:15

**deposition**
4:10,11 6:20 7:9 8:22,24 9:5,6 10:22 18:15,18 19:8,15,17, 19 24:23 48:11 85:14

**depositions**
11:1 14:20

**depriving**
61:4

**deputies**
54:21

**deputy**
71:21

**description**
27:4

**designations**
43:16

**destabilize**
61:11

**destabilized**
62:17 63:13

**detail**
11:19 26:24

**details**
13:11 21:22

**determine**
71:13

**Detroit**
15:9 26:7

**diagnose**
78:24

**diagnosing**
28:20 29:2

**died**
11:21,22 55:25 56:9

**difference**
77:21

**differently**
31:17 70:4

**difficulties**
66:5 70:8

**difficulty**
74:10

**direct**
71:8

**director**
51:14 54:13 70:24 71:4

**directors**
34:18 71:18 73:5

**disagreement**
65:4

**discharge**
29:10

**disclosure**
82:3 85:1

**disclosures**
48:8

**discouraged**
79:6

**discovery**
82:22

**discuss**
57:10 79:12

**discussed**

56:4 76:19

**discussing**
71:13

**discussions**
65:25 68:2 74:16 75:22 80:3

**disease**
59:3,13 66:9 82:5,10

**dismissed**
13:21 14:6

**dispose**
34:4

**distinct**
39:21

**distinguishing**
39:22

**diverse**
27:5

**doctor**
29:1 42:13, 15 63:8

**doctors**
45:17 72:9, 18

**document**
18:21,23 19:7,21 48:14,16,20 49:3,10,15, 18 50:3,8 71:25 72:7

**documentation**
35:15,17 40:3,10,15

**documented**
75:2

**documents**
18:4,6,10

20:13,18 21:3,8,9,14, 17,18,19 22:3,6,9,17, 24 24:18 25:7 33:22 36:10 44:4, 7,10

**dog**
8:16

**dollar**
22:11 57:15 69:21 82:23

**dollars**
63:22 65:7 75:7

**drainage**
78:19

**dressing**
80:17

**Drinket**
46:11

**drug**
11:23 63:15

**Ds**
78:19

**Duces**
18:15

**duly**
4:25

**duties**
80:20

---

**E**

---

**e-mail**
60:17 65:21

**e-mailed**
65:23

Cristin Rettler, P.A.
June 20, 2025

**e-mails**
19:18 35:6
65:19 82:20,
21,24 83:1,2

**earlier**
50:5 73:6
81:17

**earn**
16:25 17:2,7

**earned**
43:9

**easiest**
8:5

**easy**
62:2

**education**
17:13 26:3
36:21 37:5

**effort**
73:10,22

**EKG**
60:5

**elective**
47:22 66:12,
17,21,24
67:4,11,14

**Electronic**
85:12

**Emanuel**
29:16

**emergency**
28:22,25
29:7 58:19
60:1,10
66:19 67:15
82:11

**employed**
16:4,7 31:4,
5,7 39:23

**employee**
54:16

**employees**
44:24 55:15,
16,17

**employer**
7:13 8:17
17:24

**employment**
16:2 57:6

**end**
35:11 51:19
59:11 61:11
82:10

**ended**
58:19

**endless**
70:24

**engagement**
83:24

**entailed**
12:5

**entered**
63:3

**entire**
20:5,25
72:11,23
76:16 84:25

**entity**
61:5

**enzymes**
60:7

**episodes**
82:11

**ER**
15:17 26:19
27:16,17
28:23 29:4
30:17 60:8
66:7 78:1,17

**Erina**
45:12

**errors**
80:22

**escalated**
55:7 79:14

**established**
56:1

**eternally**
68:11

**ethically**
61:2

**event**
32:20 73:4

**everybody's**
66:20

**evidence**
21:4

**evolved**
73:19

**exacerbated**
63:16

**exact**
33:13

**examination**
5:3 57:3
71:8

**examined**
5:2

**exams**
72:4

**exchange**
35:5,6

**excited**
75:8

**excuse**
46:21 54:20

**Exhibit**
18:14,18
24:21,23
48:6,11

**expanded**
74:3

**expanding**
74:1,2

**expected**
49:19 50:25

**expedited**
85:8

**expensive**
61:14,23,24
63:24 65:2,
15 82:6

**experience**
49:20 51:1
70:8 78:3

**expert**
10:8,12,23
12:4,24 13:7
15:1 18:16
19:2 21:11,
23 25:10
41:14,17
43:17,20
48:8 50:1
60:14 83:21

**expertise**
12:19

**express**
68:17

**expressed**
58:12

**extended**
68:15

**extender**
77:19

Cristin Rettler, P.A.
June 20, 2025

externally
  79:8

extreme
  58:19 61:11

extremely
  58:5

_____

        F
_____

F-R-A-N-Q-U-E-
R-O
  8:12

face
  66:25 67:8,
  21 68:7

faces
  78:18

facilities
  32:5 56:5
  73:7

fact
  64:22 73:7
  74:22

factors
  39:22

facts
  11:20 48:2
  83:10

faculty
  38:15 39:17

failure
  11:14 12:13
  66:10

fair
  9:19 29:18
  32:13 44:13
  52:2

falls
  67:13 71:1

falsifying
  81:1

familiar
  18:25 20:2
  23:1 45:23
  55:18

family
  37:11

fashion
  66:16 67:9

fears
  58:13

February
  27:2

Fed.r.civ.p.
26(a)(2).
  48:9

feedback
  39:14 40:25

feel
  37:12 79:13,
  14

felt
  57:9,12

figure
  42:5

filed
  23:22

find
  78:11

findings
  21:4

fine
  6:17 65:4
  79:4 85:12

firm
  13:15 23:9,
  10

five-day
  32:20

five-minute
  77:12

Florida
  25:19 41:21
  42:1

focus
  70:4

focused
  70:5

follow
  29:9 57:1

follow-up
  59:14 83:17

follow-ups
  82:17

Ford
  15:17 17:25

foreign
  78:19

Forest
  27:1

forever
  61:22

forgive
  36:1

forgot
  26:11

form
  10:24 55:5
  58:17 60:17
  61:17 63:5,
  11 64:15
  65:22 66:22
  67:18 68:3
  69:22 70:13,
  18,21 74:19,
  25 75:13
  76:17 80:12

81:23 82:2

formulary
  58:25 59:10
  61:13,16,18
  62:14 64:25
  82:7

forward
  13:10,22
  14:7

found
  41:19 73:25
  74:13 81:9

fractured
  71:21

frankly
  26:16 57:13

Franquero
  8:10

freezes
  9:8

freezing
  6:3

frequent
  56:5

frequently
  26:17,20
  61:9 62:16
  63:23

Friday
  4:2 19:13
  85:8

frozen
  5:10,12
  6:11,14,19

Fulks
  45:19

full
  5:9,18 8:7
  38:12,21,23
  39:1,2,9,22,

Cristin Rettler, P.A.
June 20, 2025

23 41:5
71:17

full-time
40:17

function
71:25 75:3
77:20 78:9

functioned
77:23

future
41:1

G

garlic
51:18

Garlick
51:15,16
52:20 59:19
65:19,25
66:6 68:1,18
76:21

Garlick's
51:24

gave
25:10 38:1,4
60:3 71:19
83:3

general
7:14,18 8:18
27:17,21
28:7 29:15
36:20 37:7,8
77:24 78:8

generally
27:11

generic
59:6 61:23
63:18

gentleman

71:19

gigs
26:21

Gill
46:15

give
10:22 21:20
29:5 40:6
43:17,20
44:20 50:9
53:9,19

giving
10:25 21:23
38:25 49:25

glass
80:17

glorified
26:9

goal
61:5 75:16

goals
73:20

good
5:5 29:17
57:5 60:9

graduate
27:12 42:6

graduated
17:8 25:18
26:1,14
41:23 42:1
57:24

grave
57:7

great
56:1,21 73:7

grievance
54:23 55:8,
10,18

grievances
55:3,15

ground
9:5 60:14

group
78:11

Grove
27:1

guess
20:21 23:22
24:15 29:12
31:21,23,25
34:19 39:21,
25 40:13
41:6 42:20
54:10 74:21
76:20

guest
38:1,6,25
41:3

guise
67:13

guy
11:22 67:7
69:5 74:21

guy's
68:7

H

half
57:22

handle
60:11

hands
76:25

happen
47:11

happened
57:15 58:11

82:11

happy
80:4,5

Harald
51:23

hard
6:19 18:10

Harold
51:15

headline
73:19

headquarters
71:9

health
7:18 10:15
27:20 31:1
41:8,11 42:5
61:12 62:1,7
70:1,2,5
76:9

Healthcare
7:14 8:18

hear
5:12,13
6:13,17 9:7,
13 79:4,5

heard
5:24 16:9
34:10,15
39:16 53:1

hearsay
85:1

held
16:1 41:2

helped
7:7 72:17

helps
7:1,5

Henry

Cristin Rettler, P.A.
June 20, 2025

15:17 17:25

**hereto**
85:16

**heroine**
55:24 56:10,
12

**higher**
62:4

**higher-ups**
79:21 80:1

**Hillsboro**
23:18 30:10,
23 69:3
73:25 83:6

**hired**
74:9

**hiring**
57:20

**HIV**
59:9,10
64:23,24
81:18 82:1,4

**hodgepodge**
27:20

**hold**
16:16,17,20,
21 17:21
23:23 41:17
72:22

**home**
37:11

**hook**
65:12 72:7,
15

**hopes**
61:4

**hospital**
15:17 17:20,
25 26:7
28:22 29:10,

16,17 69:4
78:15

**hospitals**
42:9 56:3

**hour**
24:10

**hours**
56:21

**How's**
7:2

**HSA**
34:20,25
54:4,10
55:11

**HSAS**
72:18

**huge**
67:7

**hum-mm**
23:7 41:9

**hundred**
28:4 34:21

**husband**
15:10

**hybrid**
27:19

**hypertrophy**
59:4

**Hyppolite**
34:25 54:4,
7,8 73:5

---

**I**

---

**Ian**
4:19 23:15
81:22 83:16

**identify**
33:11

**imaging**
29:5 78:24

**importance**
64:19

**important**
64:5

**impressive**
69:15

**inaccurate**
50:22

**Inc.'s**
18:15

**incarcerated**
66:15 68:15

**incarceration**
56:14

**incentivized**
72:17

**incision**
78:19

**include**
25:14 36:22

**includes**
4:6 19:21

**including**
32:15

**increased**
74:3

**index**
4:6,7

**individual**
35:3

**individuals**
33:18 34:23
45:5 52:3,
14,17

**inexpensive**
62:2

**inform**
4:7

**information**
10:21 12:6
23:17

**inhaled**
64:1,3

**initially**
24:15

**initials**
80:24

**initiated**
63:2

**injury**
74:16 75:4

**inmate**
54:23 56:9

**inmates**
31:19,22,24
54:23 56:14
57:8 65:11
70:6 73:18
75:11

**inmates'**
55:1

**inpatient**
27:19

**insinuating**
20:22,24

**instance**
59:12 68:13

**institute**
12:7

**instructor**
38:16 39:12
40:23

**instruments**
28:17,18

Cristin Rettler, P.A.
June 20, 2025

insurance
  61:19 62:5,7
  76:4

intend
  21:16,20
  53:9

intended
  47:9

intending
  21:12,13
  29:18

intent
  21:25

intentions
  58:2

interacted
  37:10 44:25
  51:16

interested
  81:11

internally
  79:7,11

Internet
  5:23 6:6,9

interrupting
  63:1 81:25

INTRODUCED
  18:17 24:22
  48:10

involved
  20:4,8 27:25
  44:17,19
  55:1

involving
  24:1 35:23
  37:2 83:21

irrelevant
  82:3 84:25

issue

62:1 68:24
79:24 80:15

issues
  44:22 59:9
  67:24 79:10,
  13

———————————

J

———————————

Jackson
  43:23,25
  44:5,21
  48:17 49:16

Jackson's
  44:2,22 48:8

jail
  12:21,22
  13:21,24
  22:1,5 26:19
  29:25 30:5,
  10,16,19,23
  31:1,16,22,
  25 32:3,4
  35:1 47:18,
  25 49:21
  51:2,6,10
  52:1 53:11
  54:3,20,22
  55:15 56:15,
  18,19 58:25
  60:11 62:10
  63:3,9 64:6
  66:4 69:25
  71:20 74:1
  75:3 77:7
  80:18 81:19
  82:11 83:6,9
  84:8

jails
  78:1

Jan
  46:19,21

January
  17:1

jargon
  72:16

Jeffrey
  46:3,13

job
  15:15 25:14
  26:19

jobs
  26:13,16

Joe
  54:13

John
  45:14

journal
  23:1,5

June
  4:2 19:12

justifying
  72:19

———————————

K

———————————

Kaelynn
  46:7

Kansakar
  45:12

Keith
  45:10

Kentucky
  74:2 77:1

kidney
  59:3,13
  66:9,10
  76:10 82:5

kind
  10:14 19:14
  27:20 29:8

37:18 43:7,
11 61:15
76:6 78:2

kinds
  66:19

kite
  55:4

knee
  66:12 67:1

knew
  68:15 69:4
  81:12

knowledge
  23:7 44:13,
  24 45:2,4,16
  69:18 83:10

knowledgeable
  29:21 37:13

Konchise
  48:8

———————————

L

———————————

lack
  57:7

Lacy
  46:17

lane
  8:10,12

laptop
  7:20,22

large
  76:5

larger
  18:8 50:13

late
  26:7

law
  13:15

Cristin Rettler, P.A.
June 20, 2025

lawsuit
  13:23 14:2,
  15,17,25
  22:11 23:18
  57:15 69:21
  71:23 75:5
  82:23 83:21

lawsuits
  13:25 14:5
  19:1 20:4,8
  25:9 44:18
  84:15

lawyers
  47:8,14

learned
  37:4

learning
  80:25

leave
  57:5 59:20,
  22 76:3,11

leaving
  76:7

lecture
  37:21 38:2

lecturer
  38:17 39:12
  40:23

lectures
  38:1,3,4,6,
  25 41:3
  73:14

left
  57:16 58:14
  65:13 72:1
  75:3 76:11
  84:7

Legacy
  29:16,17

Legal

4:5

length
  56:13,16

lets
  19:14

level
  55:7,9 61:6
  62:4 69:14
  71:13 79:15,
  16 80:5,8

levels
  55:3

liability
  79:17

license
  16:20,25
  17:2,7,8,11,
  14,16 42:23,
  25 43:2,14
  57:14 60:19,
  20,22 78:4

licensed
  78:10

licenses
  16:16,17
  17:22

liens
  30:21

lieu
  4:12

life
  67:1

lift
  67:1,21

lines
  9:9

list
  19:21,23
  20:5,15,19,
  25 21:1 45:3

listed
  14:4

listing
  26:25

literature
  22:22 36:5,
  7,9

litigation
  74:17

live
  5:25 6:2
  8:10,14
  15:8,12 67:1

lived
  15:5,10

living
  15:15 37:12

local
  32:19

locate
  82:24

located
  8:20 10:16
  84:13

locked
  64:7

log
  5:13,14 7:25

Lombard
  23:10,11

long
  24:9 32:9
  35:18 42:10
  78:11

longer
  34:1,3

looked
  50:5

loop
  80:7

lose
  34:4

lost
  22:12 57:15
  69:20 74:22
  78:25 79:2

lot
  14:13 29:15
  58:19 64:17
  69:2

lots
  73:14

low
  58:21

LPNS
  57:24 74:9

luck
  58:10

―――――――――

M

―――――――――

machine
  60:6

made
  15:2 47:24
  69:18

Madelyn
  22:12

Mahir
  46:9

mailing
  8:12 49:7

mainstays
  28:8

maintain
  17:14 62:10
  81:3

Cristin Rettler, P.A.
June 20, 2025

**make**
18:8 39:13
40:25 50:13
61:15 77:5,6
80:7

**making**
50:15 61:4

**manager**
55:11

**managers**
34:19

**manner**
4:16

**Maple**
27:1

**margins**
74:3

**mark**
18:14 24:21
48:6

**Masin**
4:21 5:4,5,
17 6:25 7:3,
6,12 8:4,6
18:20 24:25
48:7,13
53:22,25
56:6,8 58:17
61:17 63:5,
11 64:15
66:22 67:12,
18 68:3
69:16,22
70:13,18,21
72:22 73:1,
11 74:14,19,
25 75:13,20
76:17 77:10,
13 80:12
81:14 82:2,
16,19 83:15
84:10,12,22

85:7

**Mason**
46:15

**Massachusetts**
77:2

**masters**
25:22

**matrix**
57:18 58:1

**matter**
4:14 57:12
58:2 73:18

**maximum**
31:22 73:23

**Mccarthy**
54:13,16

**Mckenna**
46:25

**meaning**
12:24

**means**
20:17 42:15
66:20

**meantime**
59:23

**Measure**
68:14

**medical**
11:14 12:5
15:20,24
17:13 23:1,4
26:25 34:18
36:2,5,21
37:21 42:7,
13,15,17,22
44:2,22
51:13 54:12,
13,15 55:5,6
57:7,14,24
58:3,10,20,

22 59:11
60:1,10,14,
19,20,22,24,
25 61:3
62:3,23 63:2
67:24 69:25
70:24 71:4,
11,17 72:4,
8,18 73:17,
22 74:8
75:11 78:3
79:24 81:1
84:1,13

**medical-legal**
72:12

**medication**
62:4,16
63:17 65:6
78:21,22
81:18

**medications**
59:1,7 62:3,
11,12,19
63:15,19,20,
21 64:9,14,
20,23,25
65:3,15
82:6,8

**meds**
59:8,9,10
61:9,10,13
63:25

**meet**
51:25

**meeting**
24:9,13,17
32:25 34:17
35:9,16,22
58:1 79:12
80:2

**meetings**
32:17,18

35:7,23
57:10 65:24

**meets**
39:25

**member**
37:11 41:16

**mental**
27:20 61:12
62:1 76:8

**mentioned**
10:2 12:8
13:8 26:6,12
36:14 52:19

**MERF**
55:4

**met**
5:7 24:14
34:24

**MI**
11:22

**Michigan**
15:5,16
16:2,11,14
17:21 23:16,
20 24:1,3,
14,17 44:4,
7,11 45:1,17
47:8,14
48:3,24
53:16 55:19
83:12

**middle**
35:11

**million**
22:11 57:14
69:21 82:23

**millions**
75:7

**mind**
37:24

Cristin Rettler, P.A.
June 20, 2025

minimum
57:19

minor
77:25 78:16,
20

minutes
53:19

missed
20:22 53:5

misses
57:11

misspeak
12:17

mm-hum
21:7 22:16
38:19 48:22
54:8

mom
37:9,15

moment
79:20

money
34:11 61:4
77:6,7

month
23:24 63:22
64:4 65:7

months
23:21 24:16
26:11 42:11
57:15

motivated
65:14

move
27:15 56:6
69:16 72:22
73:11 74:14
77:10 81:14
84:24

Multnomah
12:22 13:21,
24 14:6
29:25 30:6,
9,16 31:22
32:3 62:9

myriad
38:6

myriads
42:4

— N —

named
13:23 14:2,
9,11 45:19,
21

names
11:7 23:15
25:9 33:18,
20 34:23
35:2 45:3,23
52:13,17
54:18

Naphcare
11:25 19:3

narrow
78:9

Nathan
23:10,11,16

nationwide
73:9

needed
20:7,14
57:19 59:13
66:14 68:12
70:6 79:13

neonatology
78:8

nephrologist
69:2

neurological
71:25 75:3

newsletter
73:24 74:5,
13

nonresponsive
56:7 58:9
72:23 81:15
85:1

normal
51:18

Northern
7:14 8:18

note
37:9

notes
33:25 34:1,
2,3,5 77:12

notice
18:15 19:8,
13

November
38:10

number
19:22 21:2,
14 49:6,8
57:19,22

numbered
19:22

numbers
25:10 35:5

nurse
43:3,15
71:24 75:2
77:20 78:6,
23

nurses
55:2,8 57:21
74:9,11

— O —

oath
4:12 14:22

Object
58:17 61:17
63:5,11
64:15 67:18
68:3 69:22
70:13,18,21
74:19,25
75:13,20
76:17 80:12
81:22 82:2

Objection
66:22 67:12

objections
4:16 84:24

obstructive
59:3

obtaining
70:8

obvious
77:22 81:2

offer
21:16,25
29:18 37:20
60:23

offering
31:21

office
34:18 55:11
69:5

official
55:11

officials
54:19

onboard
72:10

Cristin Rettler, P.A.
June 20, 2025

opened
  77:2

opening
  79:17

operate
  28:16

opinion
  29:5 60:14
  75:10

opinions
  21:5,12,15,
  20 29:19
  37:21

optional
  27:13

options
  68:16

oral
  64:1 65:25

order
  29:5 69:9
  75:11 78:24
  85:5

Oregon
  10:17 16:22
  17:7 23:18
  27:2 30:1,
  10,23 32:17
  35:4,24
  44:25 47:19
  51:10 52:19
  53:11 55:23
  56:17,18,19
  62:7 69:25
  83:6 84:20,
  21

original
  22:8

Orr
  51:23

Ott
  51:15,23
  66:3

outcome
  57:13

outcomes
  72:6

overdose
  11:23

overlapped
  26:18

overlapping
  30:17

—————————

          P
—————————

P.A.
  4:23

P.C.
  16:11

p.m
  77:14

p.m.
  4:3 5:15,16
  8:2,3 18:19
  24:24 48:12
  53:23,24
  77:15 85:14

PA
  12:23 15:9,
  11,13 16:3,
  19,25 17:2,
  4,7,14 18:16
  26:4 27:8,12
  32:10 36:15
  37:22 42:2,
  7,10 80:21

Pacific
  25:23 37:25
  38:9 40:11,
  18 41:5

42:2,10
  80:21

pages
  19:20

paid
  12:25 13:2,4
  69:7,8

Papendick
  45:10

paragraph
  51:8,13 52:5

paralyzed
  71:22 74:21
  75:5,7

part
  21:23 26:20
  27:12 37:5
  38:12,14,25
  39:1 62:6
  80:20 82:22
  83:24

participated
  23:6 28:9
  37:1

participating
  4:9 28:12

parties
  4:15 85:16

PAS
  78:23

passed
  55:23

patient
  27:5 28:17,
  21 29:2
  55:23 59:19
  60:2 62:20
  63:3 64:21

patient's
  63:2,8 65:6

72:8

patients
  29:10 58:6
  60:24 72:20
  77:9 82:12

pay
  65:10,12
  69:9 75:25

paying
  62:8 68:25
  69:14 72:13
  74:6,10
  75:12

penalty
  4:14

pending
  9:23

people
  14:4,13
  33:20 34:17,
  21 35:2 40:6
  56:21,22
  58:3,11,18,
  24 59:11,25
  61:6,10
  62:10,17
  64:5,18,23
  65:14 66:6,
  10,11 67:23
  68:23 72:5,
  21 76:7,24
  81:17 82:8

people's
  78:18

percent
  60:4

perform
  53:16 78:13,
  16

performed
  36:2 41:10

Cristin Rettler, P.A.
June 20, 2025

67:3

**period**
68:16 83:5
84:5

**perjury**
4:14

**person**
4:13 44:8
51:22 52:18
60:4,12,15
64:10 68:12
79:22

**person's**
51:14,20
54:9

**personal**
44:13 74:16
83:10

**personally**
14:1

**personnel**
58:22

**Pfeil**
46:7

**phone**
7:21,24,25
18:7,11
24:11,12
25:1 49:6,8
50:13

**phrase**
66:18

**physical**
71:19

**physically**
4:10 8:13

**physician**
12:20 25:23
27:22,23,25
42:14,16,19

54:14 77:18,
19,21 78:5,
14

**physician's**
26:14 27:6,9
28:20 29:1
32:13 41:21
42:21,24
43:5,10
49:20 51:2
77:17

**physicians**
43:3,15
78:6,23

**place**
19:15 59:18

**plaintiff**
4:20 10:18
43:22

**plaintiff's**
12:8 18:16
48:8

**plaintiffs**
11:7

**plan**
62:7 63:7

**plans**
31:8 63:1

**podiatry**
42:8

**policies**
58:23 74:8
76:15

**policy**
44:14 60:16
61:1

**poor**
71:19

**population**
27:5 61:8

62:6 64:8

**Portland**
10:17 29:16
30:3 69:3,11

**Portland-vancouver**
37:22

**position**
16:1 39:3

**practice**
15:11 44:14
45:17 78:4,
10

**practiced**
17:4

**practices**
58:15

**practitioner**
77:21

**practitioners**
43:3,15
78:7,23

**predated**
69:7

**preexisting**
82:12

**prep**
28:17

**preparation**
36:4,8,10

**prepare**
47:2

**Prescott**
8:13

**prescribe**
62:13 78:21,
22

**prescribed**
62:19,24

63:1,8 64:14

**Prescriptions**
62:23

**present**
4:11 35:16

**presentation**
33:21 52:25

**presentations**
33:15,17,19
34:9,15
73:13,14

**presented**
33:21 52:14

**presenting**
52:22

**preserve**
72:4

**preserving**
84:23

**pressing**
67:24

**presume**
34:7

**pretending**
75:15

**pretty**
35:13 37:12

**previously**
29:15

**pride**
56:1 73:7

**primary**
26:25 27:4,
14,19 77:20

**prior**
10:3 13:14
24:6,13
30:9,16
31:13 36:12

Cristin Rettler, P.A.
June 20, 2025

47:13 48:25
50:9

**prison**
32:7,14
54:19 71:20

**prisoners**
83:11

**private**
70:2

**problem**
76:12

**problems**
9:7,8

**procedure**
67:20

**procedures**
76:15 77:25
78:20

**proceeding**
4:8

**Proceedings**
4:1

**process**
54:23 55:18
68:6,9 77:3

**professional**
16:16,17

**professor**
38:4,8,19,
20,21 39:3,
9,12,15,18,
20,23,24
40:1,4,9,11,
24 41:2

**profit**
73:23 74:3

**program**
42:10

**programs**

37:6

**progression**
82:9

**promised**
13:4

**promoted**
54:6

**proposed**
47:3,6

**prostate**
59:4

**protect**
60:19 61:1

**proud**
71:24 75:8

**prove**
40:17

**provide**
11:14 12:4,
13 20:14
21:12 25:5
61:5 73:21

**provided**
10:20,24
11:17 25:7,
11 30:7
57:8,19
69:25 70:2,
5,22 80:6,9
84:2,5,14

**provider**
27:1,5 30:5
31:1 63:3

**providing**
21:11 71:2
73:17 76:2
79:17

**psych**
61:9,10

**public**
37:20

**publish**
22:25

**published**
22:22,24
23:4 37:17
41:7

**pulmonary**
59:3

**purports**
50:8

**purposes**
29:19

**pursuant**
48:9

**push**
64:11

**pushback**
60:3 81:13

**put**
60:17 68:5
69:6 80:23

**putting**
67:6

───────────

**Q**

───────────

**Quality**
16:10

**question**
9:15,22 14:9
19:6 23:12
29:12,22
31:17 36:24,
25 49:15,22
50:2 52:12
56:7,9 66:23
72:23 75:14
84:10

**questions**
9:12,13,18
21:13 26:24
50:23 54:1
56:24,25
82:15 83:4,
15 84:9,23
85:2,4

**queue**
59:24 70:25

**quick**
25:13

───────────

**R**

───────────

**raise**
76:25

**raised**
68:1

**raising**
80:11

**range**
33:13 56:21
63:14

**re-contacted**
23:24

**RE-EXAMINATION**
82:18 83:18
84:11

**read**
18:22,24
20:5,15,25
21:1 22:7
24:6 36:11
45:3 50:12,
15,16,18
51:8

**reading**
52:12,16,24
53:3

Cristin Rettler, P.A.
June 20, 2025

realize
  33:2 58:8

reapply
  17:17,19

reason
  9:12,21
  14:22 58:18
  76:14

reasons
  85:2

recall
  10:19 11:7,
  9,20 12:1,13
  13:11,16
  17:24 18:23
  19:1 33:3,5,
  20 34:9,14,
  16 35:8,9,11
  39:21 47:21,
  23 48:1,16,
  23,24 49:10,
  15 50:11
  52:9,11 54:6
  64:20 84:7

receive
  4:7

received
  24:20 33:22
  41:20

receiving
  54:24

recent
  25:14

recently
  12:21 25:6
  27:21

reception
  7:24

receptionist
  26:9

recognition
  43:8

recognize
  18:7

recollection
  14:24 52:13,
  16,25 53:3

record
  4:18 5:10,
  15,16,19 7:8
  8:2,3,8 34:7
  48:7 53:23,
  24 77:14,15
  81:1 84:23

records
  44:2 83:24
  84:1,2

reduce
  72:13 73:21

reducing
  76:1

refer
  21:3

referral
  41:16 59:14
  68:6 69:1,6
  70:25 71:2,3
  77:3

referrals
  66:7,8 67:6,
  23 68:23
  70:9,22

referred
  79:22 82:20
  83:4

refers
  51:5,13 52:5

refrain
  56:5

refresh
  52:13,16,24
  53:3

regional
  51:13

regularly
  26:18

reinforced
  76:23

relate
  21:4 51:9
  84:2

related
  21:18 36:16
  41:10 55:23
  80:15

relates
  43:10 53:10

relating
  12:14 16:13
  21:9 43:18
  44:10 48:2,
  17 49:16
  53:17 83:11

released
  65:3,7 68:19

relevant
  19:4 26:10,
  16,22

reliable
  76:23

relied
  21:15 22:4

reluctant
  61:12,14

rely
  21:19

remember
  10:25 11:9
  33:10,18

34:12,16,17,
23 49:12
51:14,20
52:21 54:10
64:17 67:7
71:10,18
84:21

Remote
  4:1

REMOTELY
  18:17 24:22
  48:10

remove
  28:17

removing
  78:18

render
  31:23

renew
  17:10,15

repair
  67:1

repeat
  7:16

repeated
  9:15

replaced
  59:6

replacement
  51:24

report
  11:2 65:17
  80:1

reporter
  4:5 6:22
  85:5,10

reporting
  4:17 79:6

reports

Cristin Rettler, P.A.
June 20, 2025

represent
  5:6

represented
  9:25

request
  48:2 55:5

requested
  85:15

requesting
  19:25 20:2
  66:11

requests
  19:22 20:19
  47:19,23

require
  62:4

requires
  63:23

research
  23:6 36:2,
  16,19 37:3
  41:7,10

reserve
  56:25

reside
  5:11,21

residencies
  27:13

residency
  27:14

resources
  75:22 77:9

respective
  85:16

response
  60:11 83:4

responsive

20:18 81:10

rest
  7:10 61:20

result
  56:10 59:17
  69:18

resulted
  59:17 71:22
  75:4

retained
  10:8,11
  12:24 13:7
  15:1 83:20

retaliated
  80:10

retaliating
  81:2

Rettler
  4:23 5:5,10,
  12,20,24
  7:1,13 8:9
  18:16 39:25
  48:14 49:19
  54:1 57:5
  77:17 83:20

Rettler's
  7:8

return
  63:20 72:13

returned
  64:10

returning
  64:18,19

reversal
  28:9 36:15
  47:20,23
  48:3

reversals
  36:17,23
  37:2,5

reversed
  37:9,16

review
  11:18 12:10,
  11,16 21:19
  36:5,7,10
  59:16 60:2
  68:10,11,21
  70:23 80:22
  83:24

reviewed
  13:9 21:15
  22:3 44:2,4,
  7,10 47:11
  71:4 84:1,14

reviewing
  12:5

reviews
  29:6

rich
  74:12

risks
  81:25

RNS
  57:20,21,24

Robert
  46:17

role
  28:13

Ronald
  46:11

room
  4:11 6:8
  8:15 71:17

rotation
  32:6

rotations
  32:9

rules
  9:5

run
  70:3 73:7

_____

S

_____

Sabrina
  46:5

salad
  80:17

Sam
  29:17

save
  34:11

saved
  22:6

schedule
  19:21 59:22
  69:10 76:10

scheduled
  67:3,14 71:5

school
  15:9,13 16:3
  27:13 32:7
  42:6,7,8

science
  25:22

scientific
  36:2

scope
  67:19 78:4,9
  82:3 85:1

screen
  5:10,12 6:3,
  13,19 7:10,
  11 9:8 18:2
  48:14

scroll
  49:12 50:14

scrolling
  50:19

Cristin Rettler, P.A.
June 20, 2025

**seek**
  68:16

**send**
  20:2,8 60:17
  66:6

**sensitive**
  66:8,14

**sentence**
  6:21 50:25

**separate**
  12:2,3 68:24

**September**
  38:10

**serial**
  60:7

**service**
  76:6

**services**
  41:16 60:1
  70:4 72:13
  76:9

**set**
  76:8

**setting**
  71:15

**settled**
  10:25 14:7
  15:4

**severe**
  58:10 62:1

**sharing**
  74:7

**Sheridan**
  32:6

**sheriff**
  57:9 58:13
  65:23,24
  79:19 82:25

**shocking**
  71:17

**short**
  53:22 78:2

**show**
  18:6,13
  24:18 48:6,
  19 49:3

**sick**
  61:8

**side**
  26:21

**Signature**
  85:15

**significance**
  40:21

**silence**
  81:3

**similar**
  73:8

**single**
  60:2

**sitting**
  6:7

**situation**
  60:10

**situations**
  28:25 58:20
  72:5

**six-week**
  32:9

**skill**
  69:14

**sleeve**
  37:24

**slew**
  17:12

**Society**

  37:22

**Sonya**
  45:19

**sort**
  25:2 27:18
  37:1,20
  43:8,14 47:2
  54:22

**sought**
  41:19

**sound**
  30:24 32:1
  45:23

**sounds**
  6:18 7:3
  18:25 27:3
  30:25 50:21

**source**
  76:23

**South**
  25:19 42:1

**speak**
  11:18 12:11,
  15

**speaking**
  7:20 48:24

**specialist**
  59:14,15

**specialists**
  70:9 76:10

**specialized**
  43:2,12 78:7

**specialty**
  27:10 42:17,
  22,25 43:11
  77:23 78:8,
  11 79:23

**specific**
  33:3 34:16
  43:4 50:1

  55:13 57:17
  64:21

**specifically**
  13:23 37:23
  57:11 65:20

**speeds**
  82:9

**spell**
  8:11 51:17

**Spencer**
  46:1

**spent**
  26:6 53:10

**spine**
  71:21

**spoke**
  24:3 33:18
  37:22 47:8
  52:17 72:20

**spoken**
  23:12 37:20
  43:22 45:5,
  16,19,21
  47:14 52:2

**spread**
  58:5

**stabilize**
  62:4

**stable**
  62:8,11,23

**staff**
  57:19,21,23
  58:3 65:6
  71:21 74:6,
  10 79:9,21,
  25 80:8,16
  81:6,8,9,10

**staffing**
  58:21

Cristin Rettler, P.A.
June 20, 2025

**stand**
  54:11

**standard**
  4:6  74:11

**standardizatio
n**
  56:2  77:5

**standardized**
  76:15

**start**
  8:4

**started**
  15:13  41:24

**stat**
  60:6

**state**
  5:9,18  8:7
  16:2,20  17:4
  35:24  82:5,
  10

**stated**
  73:6

**states**
  16:21,23
  41:8,11

**stating**
  4:17

**statistics**
  56:13

**status**
  40:17

**stay**
  56:16,21,22

**stead**
  72:2

**steroids**
  64:1,3

**Steve**
  45:21

**Steven**
  45:22

**Stevens**
  34:25  54:4,
  5,14  55:12
  73:5

**Stieve**
  46:3

**stiffed**
  69:13

**stopped**
  44:16

**strange**
  74:13

**strategy**
  76:1

**street**
  8:11  27:1

**strict**
  58:25

**strike**
  31:17  48:23
  52:9,10
  53:14  55:21
  56:6  69:16
  72:22  73:11
  74:14  77:10
  81:14  84:25

**striving**
  77:4

**stronger**
  6:6

**stuck**
  76:5

**student**
  80:19,20,21

**students**
  41:4

**studies**

  25:23

**study**
  37:1

**studying**
  32:10

**stuff**
  26:21  61:21,
  24  62:15

**subject**
  36:7  38:3
  41:14,17
  44:8

**submitted**
  11:4

**subspecialty**
  43:9

**substance**
  27:19

**substandard**
  79:16  80:8

**successful**
  64:13,21
  68:23

**successfully**
  13:22

**sue**
  74:21

**sued**
  13:19  14:1
  71:22

**sufficient**
  59:7

**sufficiently**
  63:19

**suing**
  75:7

**suit**
  83:25

**summarize**
  50:8

**summary**
  47:2,5

**super**
  61:21

**supervision**
  78:13

**supervisor**
  54:2

**support**
  21:15,20
  22:4

**Support's**
  4:5

**supposed**
  19:15  57:21
  80:3

**surgeon**
  29:6,12

**surgeons**
  29:14  37:8

**surgeries**
  28:12  29:19,
  21  36:15
  66:24  67:2
  78:16

**surgery**
  7:15,18  8:19
  27:18,21
  28:1,7,10,
  17,24  29:7,
  13,15,16
  30:17  36:20
  37:7,23
  47:20,22,24
  48:3  66:12,
  13,17,19,20,
  21  67:4,5,
  11,14,15,17
  77:24  78:2,

Cristin Rettler, P.A.
June 20, 2025

8,13

**surgical**
28:18 29:9
78:15,20

**surprised**
76:21

**surprising**
73:8

**suture**
28:16

**suturing**
78:18

**switch**
62:15

**sworn**
4:25

**symptoms**
63:16

**system**
17:25

---

**T**

---

**table**
67:22

**taking**
18:15 59:18
64:23 81:17

**talk**
29:24 79:9,
25 81:13

**talked**
74:20

**talking**
19:5,6 67:23
75:1 81:9

**Tampa**
25:19

**taught**
37:25 41:5

**technological**
9:7

**Tecum**
18:15

**telling**
19:19

**ten**
22:11 57:14
69:21 82:23

**Tennessee**
32:21 33:3,
12,23,25
34:24 35:3,
7,22 52:6

**tenure**
83:8

**term**
39:16

**terrible**
74:7,8

**testified**
5:2 14:20,22
52:6 55:21,
22 69:24
71:8 72:25
81:17 83:20

**testify**
4:25 23:25
47:9,15
49:19,25
51:1

**testifying**
15:2 44:22
48:23

**testimony**
4:14 10:6,24
19:4,24
20:24 21:11,

24,25 22:4,8
24:7 25:10
29:3 36:4,8,
11,12 40:8
41:19 43:18,
20 44:20
47:3,6 48:25
50:1,9 53:9
62:25 72:23
82:20 83:3
84:25

**Texas**
4:22 5:6
16:5 18:14

**text**
50:12

**textbook**
37:17

**theme**
34:11,13
72:11

**thin**
58:5

**thing**
8:5 59:12
65:1

**things**
20:16 37:4
57:17 66:10,
13 67:6
69:15 73:1

**Thompkins**
46:23

**Thompson**
11:9 12:8

**thought**
20:6,11,15
71:12 72:2
74:4

**thousands**
63:22

**tier**
61:19,20,21,
22,23 62:14

**tight**
35:13

**time**
8:24 10:11,
20 13:2,5,24
14:21,23
17:15,20,22,
24 21:25
22:4 23:19
24:3,13
25:12 26:6,
20 27:7
28:3,5 29:25
31:2,6,10,
18,20 32:3,
16,23 33:14,
16,23,25
34:1,10
35:10,19
37:23 38:12,
25 39:1,9,
10,23 40:5,
12 41:5,22
44:17 47:17,
18,22,24
51:5,9,25
53:10 54:2,
20 55:8,14
56:15,25
57:2,12
59:25 60:4,8
62:22 66:8,
14 68:16
80:14 83:4,
16 84:5,7
85:3

**timely**
66:15 67:9

**times**
10:3 14:14
58:12 68:22

Cristin Rettler, P.A.
June 20, 2025

timing
35:12

Timothy
46:25

title
18:24 34:20
40:4,11 41:2
43:9 48:16
52:25 54:9
55:12

titles
34:9,14,16
38:18

today
9:12,21,25
18:4 19:12
36:4 47:12

today's
4:8 85:8

told
39:3 65:20
66:5 76:22
79:9

topic
73:15,16,17,
18

topics
38:7

tour
66:4

train
78:12

trained
58:4,22

training
43:1,9,12,14
61:3 77:22
78:3

transcript
4:6 85:6,11

treat
78:24

treated
43:25

treatment
63:1,7 82:1

tremendous
64:11

trial
10:6 14:8
84:24

troponins
60:7

truth
4:25 5:1

Tuality
26:20

Tuesday
19:12

Tuesdays
60:1

turning
6:24,25

Typically
61:25

_____

U

_____

U.S.
4:5

Uh-huh
50:7

unable
33:11

unaddressed
55:6

unaware
80:5

unbelievable
64:24

undergrad
41:23

understaffing
58:21

understand
9:13 20:21
35:19 40:8,
22 62:25
72:15,17

understanding
43:21 53:8
60:9 65:9

understood
9:19 18:12
26:23

unequipped
58:20

unit
58:6,8

United
41:8,11

universities
40:7

university
25:19,24
37:25 38:9,
22 39:6,9
40:11,18
41:4,5,20
42:1,2,10
80:21

updated
25:12,13

urgent
26:21 27:16

urinate
59:5

_____

V

_____

verbally
4:13

versus
64:1

Vicky
54:5 55:12

video
6:24,25 7:8
18:1 24:11
79:2

voice
6:3,16,18

vulnerable
61:7 64:8

_____

W

_____

waiting
76:2

waive
4:16

walking
58:8

wanted
42:5 65:21
80:4

wanting
66:6

Washington
12:21 22:1,5
30:10,19,22
31:16,24
32:4 35:1
47:18,25
51:5,10
53:11 54:3,

Cristin Rettler, P.A.
June 20, 2025

18,22 56:14
65:12,13
77:7 79:14
83:5,8 84:8,
18
**Watkins**
  46:19
**Watson**
  46:21
**wayside**
  71:1
**weapon**
  80:18
**Webber**
  45:14
**website**
  41:13
**Wednesday**
  85:9
**weekend**
  32:20
**weeks**
  32:7,8,15
**weird**
  73:25 74:4
**Whitney**
  46:23
**wide**
  63:14
**widely**
  56:4
**William**
  45:24
**win**
  71:23 75:5
**window**
  35:13
**withdrawal**

55:24 56:11
**withdrawing**
  56:12
**woman**
  54:4
**word**
  4:6,7 38:20,
  21 39:11
  40:20,21,24
**work**
  7:14 8:18
  16:13 27:13
  29:4,14
  30:13 36:20
  40:7 44:11,
  25 53:17
  77:23
**worked**
  12:20,21
  15:17 16:10
  26:10 27:15,
  17,21 29:15,
  25 30:9,14,
  15,17,18,22
  31:10,13
  32:4,14
  33:14 38:5,
  12,25 39:1,9
  42:4,8
  44:16,25
  47:24 51:9
  54:3,14,19,
  20 56:15
  58:3 68:24
  69:4,8,24
**working**
  7:9 17:20
  22:1 26:18,
  19 27:10,11
  31:8,18
  32:16,23
  37:7 44:16
  49:20,25

51:1 53:10
60:5,8 63:19
83:5
**works**
  23:10 77:3
**world**
  40:21
**worthwhile**
  71:14
**wraparound**
  70:4 76:6
**write**
  11:2 59:14
  70:25 80:23
**write-ups**
  13:12
**writing**
  19:14 65:18
**written**
  10:24 47:2,5
  60:17 65:22
  80:13 81:4,6
**wrong**
  19:11
**wrongful**
  22:13
**wrote**
  65:19 71:3

———————
**Y**
———————

**yay**
  74:1
**year**
  15:10,12
  17:1,13,18
  32:18 33:9
  34:6 65:10,
  11

**years**
  10:13 12:20,
  22 13:13
  17:3,17,18
  20:3,9 23:21
  24:16 27:9,
  22 30:2,15,
  17,19 33:13
  35:13 37:10,
  25 38:5,6,13
  39:2,10,19,
  24 40:18,19
  56:22 68:25
**Yescare**
  16:8
**yesterday**
  22:7 24:5
  28:2,6 47:11
**yesterday's**
  47:13
**York**
  74:2 77:1