# *Gysegem v Ohio State University Wexner Medical Center*

**2020 WL 5868677 (Ohio Ct.Cl.) (Trial Order)**
Court of Claims of Ohio.
Franklin County

John GYSEGEM, et al., Plaintiffs,

v.

OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER, Defendant.

No. 2018-00113JD.
September 8, 2020.

### Decision

Brian M Kneafsey Jr, Jeffrey L Maloon, Assistant Attorneys General, 150 East Gay Street 18th Floor, Columbus OH 43215-3130.

Charles M Murray, 111 East Shoreline Drive, Sandusky OH 44870-2517.

Patrick M. McGrath, Judge.

### Introduction

**\*1** Plaintiffs John ("Tim") Gysegem and Cheryl Gysegem bring claims of medical negligence and loss of consortium against defendant Ohio State University Wexner Medical Center (OSUWMC). The Gysegems' claims arise from two surgeries at OSUWMC that Daniel Eiferman, M.D. performed on Tim Gysegem—a laparoscopic appendectomy on February 24, 2015, and a laparoscopic cholecystectomy on March 27, 2015. The Gysegems contend that Dr. Eiferman failed to remove an appendicolith during the laparoscopic appendectomy. Plaintiffs also contend that Dr. Eiferman failed to thoroughly search for gallstones after gallstones spilled from an EndoCatch bag during the laparoscopic cholecystectomy and that Dr. Eiferman failed to thoroughly irrigate Gysegem's abdominal cavity during the laparoscopic cholecystectomy. The Gysegems maintain that Dr. Eiferman's alleged medical negligence during the laparoscopic surgeries proximately caused Tim to sustain abdominal infections and proximately caused Cheryl to sustain a loss of consortium.

The case proceeded to a bench trial on issues of liability and damages. The court permitted the parties to submit proposed findings of fact and proposed conclusions of law. The court ordered the parties in their post-trial submissions to briefly address the Gysegems' request to submit into evidence an unfiled discovery deposition of Matthew Matasar, M.D., M.S.

Both parties filed proposed findings of fact and proposed conclusions of law. The Gysegems, however, have not addressed in their post-trial filing their request to submit into evidence the discovery deposition of Dr. Matasar. OSUWMC maintains in its post-trial filing that the Gysegems have failed to comply with Civ.R. 32(A) (use of depositions in court proceedings). OSUWMC asserts that the Gysegems therefore are precluded from submitting into evidence any portion of Dr. Matasar's testimony from the deposition.

Pursuant to Civ.R. 32(A), every deposition intended to be presented as evidence "must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing." *See Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 46 (trial courts "have a duty to ensure proper adherence to the governing rules, including Civ.R. 32(A), in order to afford fairness to all parties"). The court finds that the Gysegems have not shown good cause to permit the filing of Dr. Matasar's deposition into evidence.

## I. FINDINGS OF FACT

1) The Gysegems were married on September 15, 1995. (Tr., 192.) During the last five years Tim Gysegem suffered pain resulting from his surgeries at OSUWMC. (Tr., 258.) Tim's surgeries and complications from the surgeries have affected the Gysegems' marriage. (Tr., 221-222, 226, 258.)

2) Tim Gysegem previously worked as an x-ray technician; he has worked as an associate in the plumbing department of Lowe's since February 2019. (Tr., 250, 251, 258.) Cheryl Gysegem has been a nurse since 1989. (Tr. 192.) At some point Cheryl stopped working full-time so that she could care for Tim because she was familiar with what Tim had undergone and because she thought that she, instead of a home health nurse, had a better sense of changes that may have been happening to Tim. (Tr., 215.) On August 1, 2016, Cheryl Gysegem (who became a certified nurse consultant in 2011) retired from a nursing position at OSUWMC. (Tr., 222-223.)

### A. Laparoscopic Appendectomy in February 2015 at OSUWMC

 **\*2**  3) In February 2015 Tim Gysegem—who has been diagnosed with, among other things, monoclonal B cell lymphocytosis —presented to the emergency room at OSUWMC after he experienced abdominal pain and other symptoms, including fever and nausea. (Joint Exhibit 1, Tab 1; Joint Exhibit 3; Tr., 194, 297.) Patients with monoclonal B cell lymphocytosis may have an increased risk of infection. (Joint Ex. 3.)

4) On February 23, 2015, a CT scan was performed on Tim Gysegem. (Joint Exhibit 1, Tab 11.) A radiologist noted that the CT scan showed "an extraluminal collection containing an air-fluid level adjacent to the appendix with an appendicolith in this region, measuring approximately 2.6 x 4.4 cm (image 100, series 2). This is consistent with a contained fluid collection secondary to perforated appendicitis." (Joint Exhibit 1, Tab 11.) An extraluminal collection in layman's terms is an abscess. (Tr., 299.) An appendicolith typically is a hardened ball of stool that may be a nidus for an infection. (Tr., 72, 320; Deposition of Hari Nathan, M.D., 16-17.)

5) The emergency department requested a surgery consultation. (Tr., 297.) Dr. Eiferman, M.D. (a faculty member at The Ohio State University since 2010) was the on-call surgeon; Dr. Eiferman responded to the emergency department's request. (Tr., 291-292, 297; Defense Exhibit 1.)

6) Dr. Eiferman has been board certified in general surgery and surgical critical care, since 2010 and 2011, respectively. (Tr., 290-291.) Dr. Eiferman estimates that, as of February 2015, he had performed about 100 to 200 laparoscopic appendectomies. (Tr., 309.) Dr. Eiferman described his practice as typically consisting of intra-abdominal surgeries—"hernia, gallbladders, appendix, bowel resection, ulcer surgeries; cases like that." (Tr. 289-290.)

7) On February 24, 2015, Dr. Eiferman performed a laparoscopic appendectomy on Tim Gysegem at OSUWMC. (Tr., 291-292, Joint Exhibit 1, Tab 7.) Dr. Eiferman does not have a specific recollection of the laparoscopic appendectomy that he performed on Gysegem. (Tr., 309.) The surgical note from the surgery does not reference whether the appendicolith identified in the CT scan of February 23, 2015 was removed during the laparoscopic appendectomy. (Joint Exhibit 1, Tab 7.)

8) Dr. Eiferman testified that he would have used a surgical instrument to "get out what's inside that abscess cavity, that pus, any stones, any inflammatory debris." (Tr., 317.)

9) Tim Gysegem was discharged from the hospital on February 26, 2015 with instructions to follow up with Dr. Eiferman. (Joint Exhibit 1, Tab 3.)

**B. Readmission to OSUWMC in March 2015 and Outpatient Follow-up Visit**

10) Tim Gysegem became feverish, he started to turn yellow, and he had pain in his right side about two to three days after he went home. (Tr., 196.) Tim and Cheryl Gysegem returned to the emergency room at OSUWMC. (Tr., 196; Joint Ex.1, Tab 12.) Tim Gysegem was readmitted to OSUWMC. (Joint Exhibit 1, Tab 17.)

11) On March 1, 2015, a CT scan of Tim Gysegem's abdomen and pelvis was performed. (Joint Ex. 1, Tab 21.) A physician who reviewed the CT scan wrote in a section labeled "IMPRESSION;"

> 4. Mild thickening and fluid attenuation inferior to the liver, bordering the right perinephric fascia. There is a tiny density within this area of thickening, not seen previously. Although well separated from the site of appendectomy, the findings may reflect a small amount of complicated fluid, with a small calcification/ calcified structure, of uncertain relationship to the previously inflamed appendix.

> **\*3** 5. Gallbladder mildly dilated, possibly due to fasting. Multiple dependent gallstones again demonstrated. Choledocholithiasis is again demonstrated. \*\*\*.

(Joint Exhibit 1, Tab 21.)

12) On March 3, 2015, Tim Gysegem underwent an endoscopic retrograde cholangiopancreatography (ERCP) with sphincterotomy to evaluate a potential biliary obstruction. The medical note following the ERCP shows that numerous "stones" and sludge were removed. (Joint Exhibit 1, Tab 14, Tab 17.)

13) An interventional radiology team was consulted to aspirate a fluid collection. (Tr., 196-197, 326; Joint Exhibit 1, Tab 16.) On March 4, 2015, the interventional radiology team drained 10 ml of fluid, which was sent for culture. (Joint Exhibit 1, Tab 16; Tr. 196-197, 326.)

14) On March 9, 2015, Tim Gysegem was discharged from OSUWMC with instructions to schedule a follow-up appointment with Dr. Eiferman. (Joint Exhibit 1, Tab 14.) At the follow-up appointment Dr. Eiferman recommended a laparoscopic cholecystectomy to remove Tim Gysegem's gallbladder. (Tr., 197-198, 328.)

**C. Laparoscopic Cholecystectomy in March 2015 at OSUWMC**

15) On March 27, 2015, Dr. Eiferman performed a laparoscopic cholecystectomy on Tim Gysegem at OSUWMC. (Joint Exhibit 1, Tab 24.) A physician who assisted Dr. Eiferman dictated a surgical note that was reviewed by Dr. Eiferman. (Exhibit J, Dr. Eiferman Deposition.) The surgical notes states that Gysegem's gallbladder "was \*\*\* placed into an EndoCatch bag, however, during removal from the umbilical port, the EndoCatch bag did open. Despite this, the gallbladder was able to be removed out in one complete piece. We searched around the surgical areas and found that there was no evidence of any stones that had dropped or scattered in the abdomen. The gallbladder fossa was then irrigated copiously." (Exhibit J, Dr. Eiferman Deposition; Joint Exhibit 1, Tab 24.) Dr. Eiferman did not perform a complete peritoneal lavage based on concern that to do so may result in adverse consequences, such as spreading bile in the body's cavity. (Tr., 333.)

**D. Exploratory Laparotomy in October 2015 at OSUWMC**

16) Tim Gysegem began to have pain at the port site where the laparoscopic surgeries were performed. (Tr., 201.) Later "green, pussy fluid" began to drain from the port site on Gysegem's body. (Tr., 201.)

17) In October 2015 Tim Gysegem met with Dr. Eiferman; Dr. Eiferman ordered a CT scan of Gysegem's abdomen and pelvis. (Joint Exhibit 1, Tab 28.) A physician who interpreted the CT scan noted, among other things, a "fluid collection with irregular thick soft tissue rim anteriorly in the anterior abdomen that tracks into the periumbilical area with probable external communication. This could be a chronic postoperative collection/hematoma. Superimposed infection is difficult to exclude. No definite contrast noted within this collection." (Joint Exhibit 1, Tab 28.)

18) On October 8, 2015, Dr. Eiferman performed an exploratory laparotomy on Tim Gysegem during which Dr. Eiferman found an abscess and seven calculi (stones) in Gysegem's belly button. (Tr., 342-343.) Dr. Eiferman theorizes that the calculi "must have somehow gotten out of the gallbladder" and became lodged in the area where Dr. Eiferman later discovered them. (Tr., 343.) Dr. Eiferman testified that he thinks that the stones that were found in 2015 are likely related to the gallbladder surgery. (Tr., 409.)

### E. Subsequent Follow up at OSUWMC

 *4  19) In July 2016 Tim Gysegem experienced right upper quadrant pain. (Joint Exhibit 1, Tab 105.). Jonathan R. Wisler, M.D. evaluated Gysegem because Dr. Eiferman was unavailable. (Joint Exhibit 1, Tab 105.) On July 21, 2016, Dr. Wisler indicated in a progress note that he would order a CT scan and RUQ ultrasound. (Joint Exhibit 1, Tab 105.)

20) A physician, who reviewed a CT scan of July 22, 2016, wrote: "IMPRESSION: 1. Rim-enhancing septated fluid collection posterior to the right hepatic lobe. This is amenable to percutaneous drainage. 2. A few small fluid collections are seen near the transverse colon, too small for drain placement." (Joint Exhibit 1, Tab 35.)

21) A physician, who reviewed an ultrasound of July 25, 2016, wrote: "IMPRESSION: 1. No gallstones are seen in the visualized portion of the common bile duct. 2. Fluid collection posterior to the liver, similar to prior CT. This could represent a hematoma or an abscess." The physician who reviewed the ultrasound discussed the results with Dr. Eiferman on July 25, 2016. (Joint Exhibit 1, Tab 105.)

22) Dr. Eiferman consulted members of an interventional radiology team who decided to aspirate the fluid collection in the right upper flank by means of ultrasound guidance. (Joint Exhibit 1, Tabs 38 & 39.) The procedure of July 27, 2016 resulted in the aspiration of 300 milliliters of green purulent fluid and the placement of a drain. (Joint Exhibit 1, Tab 41.) Tim Gysegem was discharged on July 29, 2016 with instructions to see Dr. Eiferman on August 9, 2016. (Joint Exhibit 1, Tab 37.)

23) Tim Gysegem saw Dr. Eiferman as scheduled. During the appointment Dr. Eiferman removed the drain. (Joint Exhibit 1, Tab 104.)

24) Dr. Eiferman and other medical professionals at OSUWMC periodically saw Tim Gysegem during the next twelve months or so. (Joint Exhibit 1.) Gysegem underwent removal of an abdominal wall abscess in October 2016, drainage of a chest wall abscess in November 2016, drainage of a perihepatic fluid collection in January 2017, and drainage of an abdominal wall abscess in June 2017. (Joint Exhibit 1, Tabs 47, 52, 59, 71.)

25) On August 15, 2017 Tim Gysegem presented to the OSUWMC emergency department due to, among other things, shortness of breath, increasing fatigue, muscle aches, and confusion. (Joint Exhibit, Tab 75.) A CT scan of August 16, 2017 suggested: "Interval enlargement of loculated perihepatic fluid collection along the right posterior lateral aspect of the liver. Sterility of this collection cannot be determined on CT." (Tr., 481; Joint Exhibit 1, Tab 84.)

26) Steven M. Steinberg, M.D. (who at the time was head of the surgery division and who had recruited Dr. Eiferman to the surgical team) was consulted. (Tr., 491.) Dr. Steinberg—a professor of surgery at The Ohio State University who has held faculty appointments at the State University of New York at Buffalo, Tulane University, and Case Western Reserve University and who is a self-described acute care surgeon (Tr., 435, 438)—estimated that, as of 2017, he had performed "hundreds" of

appendectomies and treatment of ruptured appendixes and "hundreds" of laparoscopic cholecystectomies. (Tr., 436.) Cheryl Gysegem described Dr. Steinberg as "wonderful" because he was "to the point" in his interactions with the Gysegems. (Tr., 216.)

27) Dr. Steinberg advised the Gysegems that the CT scan demonstrated an abscess in an area not previously seen and that it had encompassed the right lung, had gone through the diaphragm, and had invaded the chest. (Tr., 221-222, 481.) Dr. Steinberg recommended an exploratory laparotomy with an incision and drainage of the fluid collection. (Tr., 216-217, 481-482; Joint Exhibit 1, Tab 80.) According to Dr. Steinberg, he "was concerned at the time that there was retained, either stone or fecalith, that was causing the abscess to recur." (Tr., 482.)

**\*5** 28) Dr. Steinberg performed an exploratory laparotomy on August 17, 2017. Dr. Steinberg found the right lobe of Tim Gysegem's liver adhered to the anterior abdominal wall. (Tr., 482; Joint Exhibit 1, Tab 80.) According to a surgical note (which Dr. Steinberg edited), "3-400 ml of pus" was obtained; the pus was cultured, suctioned, and irrigated until the fluid ran clear. Dr. Steinberg explored the abscess cavity using curettes and a finger, looking for foreign bodies such as retained gallstones. None were identified. (Joint Exhibit 1, Tab 80; Tr., 482-483.) Dr. Steinberg did not perform a complete peritoneal lavage; instead he irrigated the abscess cavity, above the liver and on the inside of the abscess cavity itself. (Tr., 484.)

29) Tim Gysegem saw Dr. Steinberg for follow-up care. (Tr., 485.)

30) In October 2017 Dr. Steinberg ordered a CT scan because Tim Gysegem began to exhibit symptoms again, i.e., night sweats and complaints of not feeling well. (Tr., 485.) The report of the CT scan indicated: "1. Interval resolution of the perihepatic fluid collection identified on prior studies. Interval removal of the previously identified perihepatic drain. 2. Redemonstration of pneumobilia, likely related to prior sphincterotomy and cholecystectomy. 3. Stable hyperdense lesions within the bilateral kidneys, likely representing hemorrhagic or proteinaceous cysts. 4. Nonobstructive right renal calculi." (Joint Exhibit 1, Tab 86.)

31) In December 2017 Dr. Steinberg ordered a CT scan because Tim Gysegem's symptoms had worsened. (Tr., 486-487; Joint Exhibit 1, Tab 108.) A CT scan of December 19, 2017 showed, among other things, a new oval collection medial to the liver dome, which could have been a subphrenic abscess or a sterile collection. (Joint Exhibit 1, Tab 87.)

32) Dr. Steinberg asked a thoracic surgeon to become involved in Tim Gysegem's care. (Tr., 487.) The thoracic surgeon recommended another surgery to drain the area identified on the CT scan. (Tr., 487.) During the surgery Dr. Steinberg drained the component of the abscess that was in the abdomen and a thoracic surgeon drained the collection that was in the chest. Dr. Steinberg also inquired of another surgeon about other possible approaches. The other surgeon did not have any other ideas. (Tr., 487-488.)

33) Dr. Steinberg last saw Tim Gysegem in an office visit in January 2018. (Joint Exhibit 1, Tab 108.) Dr. Steinberg sent a letter wherein he terminated the physician-patient relationship after the Gysegems initiated this litigation. (Tr., 241-242, 488-489.)

## II. CONCLUSIONS OF LAW

1) The Gysegems are required to establish their civil claims of medical negligence and loss of consortium by a preponderance of the evidence. *See Weishaar v. Strimbu*, 76 Ohio App.3d 276, 282, 601 N.E.2d 587 (8th Dist.1991). A preponderance of the evidence "is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54.

2) To recover against a defendant in a tort action, a plaintiff "must produce evidence which furnishes a reasonable basis for sustaining his claim. If his evidence furnishes a basis for only a guess, among different possibilities, as to any essential issue in the case, he fails to sustain the burden as to such issue." *Landon v. Lee Motors, Inc.*, 161 Ohio St. 82, 118 N.E.2d 147 (1954), paragraph six of the syllabus.

3) On the trial of a civil case (or criminal case), the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The court is the trier-of-facts in this case. The court is free to give weight to the evidence and the court is free to believe all, part, or none of the testimony of the witnesses who have appeared before the court in this case. *See State v. Green*, 10th Dist. Franklin No. 03AP-813, 2004-Ohio-3697, ¶ 24.

 **\*6** 4) Generally, an employer or principal "is vicariously liable for the torts of its employees or agents under the doctrine of respondeat superior." *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438, 628 N.E.2d 46 (1994). If a physician is an employee or agent of a hospital or medical center, then liability may be imposed upon the hospital or medical center for any negligent acts performed by that physician under the doctrine of respondeat superior. *See Latham v. Ohio State Univ. Hosp.*, 71 Ohio App.3d 535, 537-538, 594 N.E.2d 1077 (10th Dist.1991). *Accord Berdyck v. Shinde*, 66 Ohio St.3d 573, 577, 613 N.E.2d 1014 (1993). Because Dr. Eiferman was an agent of OSUWMC (a medical center) when he provided care to Tim Gysegem, OSUWMC may be liable for any negligent acts performed by Dr. Eiferman under the doctrine of respondeat superior.

5) The law "imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances. \*\*\* A negligent failure to discharge that duty constitutes 'medical malpractice' if it proximately results in an injury to the patient. Whether negligence exists is determined by the relevant standard of conduct for the physician. That standard is proved through expert testimony. \*\*\* Neither the expert nor the standard is limited by geographical considerations. \*\*\*." *Berdyck* at 579.

6) The Supreme Court of Ohio has discussed requirements for establishing medical malpractice and the concept of standard of care:

> "The standard of care required of a medical doctor is dictated by the custom of the profession:
>
> 'In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances \*\*\*.'"

*Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 93, 529 N.E.2d 449 (1988), quoting *Bruni v. Tatsumi*, 46 Ohio St. 2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus.

7) The court finds, and the parties seemingly agree, that the standard of care for the laparoscopic appendectomy required Dr. Eiferman to search for and remove the appendicolith identified in the pre-surgery CT scan, so long as the appendicolith could be safely removed. (Tr., 75-76, 320, 411, 445, 468-470; Nathan Deposition, 17-18.)

8) Ralph Silverman, M.D. (the Gysegems' expert witness) opined that a calcification shown on the CT scan of March 1, 2015 is "obviously from an appendicolith" because no surgical interventions had been performed on Tim Gysegem since the laparoscopic appendectomy. (Tr., 90-91.)

9) The court is not convinced that the calcified structure identified on the CT scan of March 1, 2015, is an appendicolith, as opined by Dr. Silverman. A post-appendectomy CT scan (CT scan of March 1, 2015) identified "a small calcification/ calcified structure, of uncertain relationship to the previously inflamed appendix"—not an appendicolith. Hari Nathan, M.D. (an expert witness for OSUWMC) testified that the calcification that is seen on the CT scan of March 1st is in a different part of the abdomen, that the calcification is contained within some inflammatory soft tissue, and that the calcification is about half the size of what Dr. Nathan measured the appendicolith to be. (Nathan Deposition, 97.) Dr. Steinberg (a fact witness and expert witness for OSUWMC) testified that the calcification/calcified structure was smaller than the previously identified appendicolith, so that "it's most likely not the same thing." (Tr., 463-464.) Dr. Steinberg further noted that the original appendicolith (and the

structure identified in the CT scan of March 1st) appeared to be calcified, and calcified appendicoliths would not change very rapidly, if at all. (Tr., 464.)

**\*7** 10) The court generally finds that Dr. Silverman's opinions are more biased and less credible than those offered by OSUWMC's expert witnesses. Dr. Silverman lacks the credentials of the opposing experts (e.g., Dr. Silverman does not currently teach any general surgery residents and Dr. Silverman has never taught fellows in any specialty) (Tr., 142.); Dr. Silverman has demonstrated a willingness to testify outside of his area of expertise, *see Wilson v. Dean*, App. No. 334243, 2018 Mich. App. LEXIS 57, at \*9 (Jan. 9, 2018) (concluding that Dr. Silverman was not qualified to testify about a general surgery standard of care because the majority of Dr. Silverman's practice was not in general surgery); and twenty to twenty-five percent of Dr. Silverman's income is generated from Dr. Silverman's case reviews and testimony, with about ninety-five percent of the reviews performed on behalf of plaintiffs. (Tr., 132.) While Dr. Silverman asserts that he has performed "hundreds" of appendectomies and cholecystectomies in his career, Dr. Silverman admits that he performed the "overwhelming majority" of the cholecystectomies early in his career when he was engaged in more general surgery. (Tr., 65-66.) Dr. Silverman thus has less experience with appendectomies or cholecystectomies. With no evidence, Dr. Silverman also suggested that Dr. Eiferman exhibited a lack of care for his patients when he stated that "[y]ou have to pretend that you care and look around" (Tr., 170). Such a suggestion demonstrates bias and affects Dr. Silverman's overall credibility, notwithstanding that, at the same time, Dr. Silverman is critical of Dr. Eiferman's professional performance.

11) Dr. Eiferman's testimony that, during the laparoscopic appendectomy he would have used a surgical instrument to remove any inflammatory debris, is credible and persuasive for the proposition that the appendicolith identified in the pre-appendectomy CT scan likely was removed during the laparoscopic appendectomy. The court concludes by preponderance of the evidence that Dr. Eiferman did not breach the standard of care during the laproscopic appendectomy by failing to remove the appendicolith that was identified in the CT scan of February 23, 2015, based on the evidence presented and in agreement with OSUWMC's experts. (Tr. 468; Nathan Deposition, 28-30). *See Berdyck v. Shinde*, 66 Ohio St.3d 573, 584, 613 N.E.2d 1014 (1993) (whether a standard of care articulated by an expert witness governs a duty of care is a question of fact, determined from all relevant facts and circumstances).

12) With respect to the laparoscopic cholecystectomy, the court determines that the opening of an EndoCatch bag during a laparoscopic cholecystectomy is a recognized complication of that type of surgery. (Nathan Deposition, 38; Tr. 547.) When an EndoCatch bag opens during the extraction of a gallbladder in a laparoscopic cholecystectomy, the standard of care requires a surgeon to remove the gallbladder from a patient's body, inspect the immediate vicinity of the gallbladder extraction and, if stones are identified, to remove the stones, and irrigate the area to ensure that spilled bile, blood, or stones has been completely evacuated. (Nathan Deposition, 38-39; Tr., 450-453.)

13) Based on the evidence presented and in agreement with OSUWMC's experts, the court finds by a preponderance of the evidence that Dr. Eiferman met the standard of care during the laparoscopic cholecystectomy when he searched the surgical areas and when, after he found no evidence of any gallstones that had dropped or scattered in the abdomen, he "copiously" irrigated the gallbladder fossa. (Tr., 471; Nathan Deposition, 36-38.)

14) Dr. Eiferman has theorized that some gallstones "must have somehow gotten out of the gallbladder" and became lodged in the area where Dr. Eiferman later discovered them during an exploratory laparotomy. (Tr., 343.) Dr. Eiferman also testified that he thinks that the stones that were found in 2015 (i.e., during the exploratory laparotomy) are likely related to the gallbladder surgery. (Tr., 409.)

15) The Supreme Court of Ohio, however, has held: "A presumption of negligence is never indulged from the mere fact of injury, but the burden of proof is upon the plaintiff to prove the negligence of the defendant and that such negligence is a proximate cause of injury and damage." *Ault v. Hall*, 119 Ohio St. 422, 422, 164 N.E. 518 (1928), paragraph one of the syllabus. Because Dr. Eiferman acted within the standard of care during the laparoscopic cholecystectomy, the court concludes that a presumption of negligence may not be indulged from the fact gallstones may have spilled during the surgery. *Accord Turner*

*v. Children's Hosp., Inc.*, 76 Ohio App.3d 541, 548, 602 N.E.2d 423 (10th Dist.1991), citing *Ault, supra* (no presumption of malpractice from the mere fact of injury).

**\*8** 16) While the court does not know the precise cause of Tim Gysegem's recurring infections, the evidence does not establish that OSUWMC, through Dr. Eiferman, failed to meet the standard of care in either the laparoscopic appendectomy or laparoscopic cholecystectomy. Consequently, the Gysegems cannot prevail on their claim of medical negligence against OSUWMC. *See Reeves v. Healy,* 192 Ohio App.3d 769, 2011-Ohio-1487, 950 N.E.2d 605, ¶ 38 (10th Dist.) (to establish a cause of action for medical malpractice, a plaintiff is required to show, among other things, a breach of that standard of care by the defendant).

17) A claim for loss of consortium is a derivative claim in that the claim is dependent upon a defendant's having committed a legally cognizable tort upon a spouse who suffers bodily injury. *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 93, 585 N.E.2d 384 (1992). Because the Gysegems have not proven by a preponderance of the evidence that OSUWMC should be held liable for the tort of medical negligence, the court concludes that the claim for loss of consortium fails.

### III. Conclusion

The court holds that the Gysegems have not proven by a preponderance of the evidence that OSUWMC should be held liable for medical malpractice or a derivative loss of consortium. The Gysegems' request to submit into evidence the previously unfiled discovery deposition of Dr. Matasar should be denied.

<<signature>>

PATRICK M. MCGRATH

Judge

### JUDGMENT ENTRY

For the reasons set forth in the decision filed concurrently herewith, the court DENIES plaintiffs' request to submit into evidence a previously unfiled discovery deposition of Matthew Matasar, M.D., M.S. Judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

<<signature>>

PATRICK M. MCGRATH

Judge

cc:

Brian M Kneafsey Jr

Jeffrey L Maloon

Assistant Attorneys General

150 East Gay Street 18th Floor

Columbus OH 43215-3130

Charles M Murray

111 East Shoreline Drive

Sandusky OH 44870-2517

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Pham v. Schrapps*

No *Shepard's* Signal™
As of: August 5, 2025 4:57 PM Z

## *Pham v. Schrapps*

District Court of Texas, 58th Judicial District, Jefferson County

February 10, 2012, Decided; February 10, 2012, Filed

NO. A-190100

**Reporter**
2012 Tex. Dist. LEXIS 414 *

LAM PHAM, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HANH THI NGO, AND LANA TRAN, ANNA BAILEY AND DIEP PHAM vs. JEROME F. SCHRAPPS, M.D., SOUTHEAST TEXAS SURGICAL ASSOCIATES, P.A., CHRISTUS ST. ELIZABETH HOSPITAL AND CHRISTUS DUBUIS HOSPITAL OF BEAUMONT

## Core Terms

attorney's fees, expert report, total amount, re-filing, jointly

**Judges:** [*1] Bob Wortham, Judge.

**Opinion by:** Bob Wortham

## Opinion

### ORDER

CAME ON THIS DAY TO BE HEARD Defendant CHRISTUS HEALTH SOUTHEAST TEXAS D/B/A CHRISTUS HOSPITAL-St. Elizabeth's Objection to Plaintiffs' Amended and Supplemental Expert Reports and Second Motion to Dismiss, and the Court after having reviewed the Objections and Motion, timely filed pleadings, the pertinent case law, and heard the argument of counsel, is of the opinion that Defendant's Objections and Motion are meritorious and the expert reports of Dorothy McDonnell Cooke, RN, PhD, CS, APN, Dr. Thomas Hamilton Gouge, M.D and Dr. Ralph Silverman, fail to meet the statutory requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. It is therefore,

ORDERED that Defendant CHRISTU' Motion to Dismiss with prejudice to re-filing is GRANTED. It is further,

ORDERED that all of Plaintiffs' causes of action against

Defendant CHRISTUS HEALTH SOUTHEAST TEXAS D/B/A CHRISTUS HOSPITAL-St. Elizabeth are dismissed with prejudice to re-filing. It is further,

ORDERED, ADJUDGED AND DECREED that Plaintiffs and their attorneys, jointly and severally, shall pay Defendant reasonable attorney fees in the amount of $10,219.50 and costs of court as determined by the [*2] District Clerk of Jefferson County. It is further,

ORDERED, ADJUDGED AND DECREED that if Plaintiffs appeal this dismissal to the Court of Appeals, an additional $7,500 in attorney's fees (for a total amount of $17,719.50) is to be paid by Plaintiffs and their attorneys, jointly and severally. It is further,

ORDERED, ADJUDGED AND DECREED that if the Plaintiffs appeal this dismissal to the Texas Supreme Court, an additional $7,500 in attorney's fees is awarded to Defendant (for the total amount of $25,219.50).

SIGNED this ___ day of _____, 2012.

JUDGE PRESIDING

---

**End of Document**

*Wilson v Dean*

Case 2:19-cv-13382-GAD-PTM   ECF No. 187-2, PageID.8079   Filed 08/08/25   Page 14 of 17

Wilson v. Dean, Not Reported in N.W. Rptr. (2018)

2018 WL 340930
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Sherri WILSON, Personal Representative
of the Estate of Luella Ehrlinger,
Deceased, Plaintiff–Appellant,
v.
Phillip A. DEAN, M.D., and Mid Michigan
Surgical Specialists, P.C., Defendants–Appellees.

No. 334243
|
January 9, 2018

Saginaw Circuit Court, LC No. 13–019719–NH

Before: O'Connell, P.J., and Hoekstra and Swartzle, JJ.

**Opinion**

Per Curiam.

 **\*1** Plaintiff appeals by delayed leave granted [1] an order granting partial summary disposition in favor of defendants, Phillip A. Dean, M.D. (Dean) and Mid Michigan Surgical Specialists P.C. (MMSS), and denying plaintiff's oral motion to amend her witness list to reinstate a general surgery expert witness. We affirm.

### I. BACKGROUND

This Court previously summarized the pertinent facts and procedural history as follows:

On July 3, 2009, the decedent, Luella Ehrlinger, was admitted to Covenant Medical Center for a surgical procedure to remove a portion of her bowel containing a malignant polyp. Defendant Phil[l]ip Dean, M.D., performed surgery on Ehrlinger by removing a section of her bowel and reconnecting the two adjacent sections. Plaintiff initially alleged that Dean did not perform the

procedure "adequately" because subsequent events determined that there was a "leakage of bowel contents into the abdominal cavity" that Dean did not promptly detect. Plaintiff alleged that Dean performed another surgery on Ehrlinger on July 19, 2009, to remove a section of Ehrlinger's then necrotic bowel.

Notwithstanding the second procedure, Ehrlinger's health continued to decline and she became septic. Ehrlinger remained in an intensive care unit until August 3, 2009, when she was transferred out of the unit with Dean's consent. On August 4, 2009, Ehrlinger became unresponsive and suffered cardiopulmonary arrest requiring resuscitation. Plaintiff alleged that Dean failed to examine Ehrlinger at all on August 4, and that he did not cause any other physician to examine her on his behalf. Plaintiff alleged that Ehrlinger was on several medications and that she was particularly susceptible to the effects of the medications because of her weakened condition and sepsis. Plaintiff alleged that Ehrlinger's medications, in combination with her weakened condition, resulting from Dean's failure to appropriately treat and monitor her, were a proximate cause of her cardiopulmonary arrest. Ehrlinger's health continued to deteriorate, including brain injury and kidney failure. She died on September 7, 2009.

Defendants filed a motion for summary disposition under MCR 2.116(C)(7) and MCR 2.116(C)(8). They argued that plaintiff did not file an affidavit of merit in compliance with MCL 600.2912d, which requires that the physician signing the affidavit of merit must have board certification in the same specialty as the defendant. Defendants asserted that the affidavit of merit executed by Todd C. Campbell, M.D., was insufficient because Dean was board-certified in colorectal surgery and general surgery, while Campbell was only board-certified in general surgery. Defendants also argued that dismissal with prejudice is appropriate because filing a defective affidavit of merit does not toll the statute of limitations when an action is filed under the savings provision of MCL 600.5856, and because plaintiff therefore had filed the case after the running of the two-year statute of limitations.

Case 2:19-cv-13382-GAD-PTM ECF No. 187-2, PageID.8080 Filed 08/08/25 Page 15 of 17

Wilson v. Dean, Not Reported in N.W. Rptr. (2018)

**\*2** Plaintiff responded by filing a motion to amend the affidavit under MCR 2.112 and MCR 2.118 and requested to additionally file the affidavit of Ralph Silverman, M.D., a physician board-certified both in general surgery and in colorectal surgery. Plaintiff also proposed to amend Dr. Campbell's original affidavit of merit by having Silverman sign the affidavit after adding a section indicating that Silverman had read and agreed with the contents of Campbell's affidavit. Plaintiff also argued that Campbell's affidavit was sufficient because the alleged malpractice did not require consideration of the standard of care specific to colorectal surgeons. Additionally, plaintiff filed a motion requesting leave to amend the complaint to remove paragraphs relating to malpractice stemming from the first surgery and to correct mistakes in the complaint. The trial court denied defendant[s'] motion for summary disposition and granted plaintiff leave to file the first amended complaint.

While defendants' application for leave to appeal was pending in the Supreme Court, they filed a motion for summary disposition and/or motion in limine to preclude claims not supported by expert testimony. Plaintiff filed a response brief in which she agreed that her expert testimony did not support the malpractice claims against Dean relating to the first colorectal surgery, the alleged failure to order imag[ ]ing studies after the first surgery, and any delay in performing the second surgery. However, plaintiff asserted that expert testimony did support the malpractice claim relating to Dean's failure to monitor Ehrlinger on August 4, the day she lost consciousness. Upon learning of the Supreme Court's order remanding this matter, the trial court stayed all trial court proceedings until the completion of defendants' appeal in this Court. [*In re Estate of Luella Ehrlinger*, unpublished per curiam opinion of the Court of Appeals, issued October 15, 2015 (Docket No. 320417), pp. 2–3.]

This Court concluded that the affidavit of merit was not defective regarding the allegations against Dr. Dean "concerning alleged failure to provide proper post-surgical care and monitoring following the second surgery[.]" *Id.* at 6. On the basis of plaintiff's concessions that the affidavit did not support a malpractice theory based on the time period

between the first and second surgeries and the absence of allegations of malpractice during the surgeries themselves, this Court determined that "plaintiff could have a reasonable belief that the most relevant standard of care was that of a general surgeon, not a colorectal surgeon, relative to these remaining allegations." *Id.* at 5. This Court stated that "[g]oing forward below, plaintiff's malpractice claim is limited to the allegation that Dean failed to provide post-surgical care following the second surgery or otherwise breached the standard of care applicable to general surgery from August 4, 2009 to the decedent's death." *Id.* at 6. Accordingly, this Court instructed the trial court to grant partial summary disposition "on plaintiff's allegations of malpractice related to Dean's alleged conduct during or between the two surgeries[.]" *Id.*

On remand, the trial court accordingly ordered all claims against Dean and MMSS based on conduct prior to August 4, 2009, dismissed with prejudice. Dean and MMSS then moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff's standard of care expert, Dr. Silverman, was not qualified under MCL 600.2169 to testify about a general surgery standard of care because the majority of his practice was not in general surgery. The trial court granted defendants' motion for summary disposition, agreeing with defendants that Dr. Silverman was not qualified to testify about a general surgery standard of care.

Plaintiff subsequently moved to reinstate Dr. Campbell as her standard of care witness because Dr. Campbell was qualified to testify as a general surgeon. The trial court denied this motion as untimely.

## II. STANDARD OF REVIEW

**\*3** Plaintiff now challenges the grant of defendants' motion for summary disposition and the denial of her motion to reinstate Dr. Campbell as an expert witness. This Court generally reviews the grant or denial of a motion for summary disposition de novo. *Peters v. Dep't. of Corrections*, 215 Mich. App. 485, 486; 546 N.W.2d 668 (1996). This Court also reviews matters of statutory interpretation de novo. *Tate v. Detroit Receiving Hosp.*, 249 Mich. App. 212, 215; 642 N.W.2d 346 (2002). We review a trial court's decision whether an expert witness is qualified to testify for

Case 2:19-cv-13382-GAD-PTM, ECF No. 187-2, PageID.8081 Filed 08/08/25 Page 16 of 17

Wilson v. Dean, Not Reported in N.W. Rptr. (2018)

an abuse of discretion. *Id.* Similarly, this "Court will not disturb a trial court's decision regarding whether to permit a witness to testify, after a party has failed to comply with a deadline for submission of a witness list, absent an abuse of discretion." *Carmack v. Macomb Co. Community College*, 199 Mich. App. 544, 546; 502 N.W.2d 746 (1993). The abuse of discretion standard recognizes "that there will be circumstances in which there will be no single correct outcome ...." *Maldonado v. Ford Motor Co.*, 476 Mich. 372, 388; 719 N.W.2d 809 (2006). Accordingly, this Court defers to the trial court's judgment if its decision is within the range of principled outcomes. *Id.*

## II. DISCUSSION

### A. GENERAL SURGERY STANDARD OF CARE EXPERT

Plaintiff first argues that the trial court abused its discretion by determining that Dr. Silverman was unqualified to testify at trial about the general surgery standard of care. We disagree and conclude that the trial court correctly construed MCL 600.2169.

In relevant part, MCL 600.2169 states:

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, *if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.*

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action*, devoted a*

*majority of his or her professional time to* either or both of the following:

(*i* ) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and*, if that party is a specialist, the active clinical practice of that specialty*.

(*ii* ) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty. [MCL 600.2169(1)(a) and (b) (emphasis added).]

A "specialist can only devote a *majority* of his professional time to *one* specialty." *Woodard v. Custer*, 476 Mich. 545, 560; 719 N.W.2d 842 (2006).

In this case, Dr. Silverman was board-certified in both general surgery and colorectal surgery, and he testified that 70 to 80 percent of his practice for the preceding seven to eight years was in colorectal surgery. Although Dr. Silverman matched defendant Dr. Dean's board certifications, Dr. Silverman is not qualified to testify about a general surgery standard of care because the majority of his practice was not in general surgery. Accordingly, Dr. Silverman does not meet the active clinical practice requirement for the relevant standard of care (general surgery) under MCL 600.2169(1)(b)(*i* ). Consequently, the trial court did not abuse its discretion by determining that Dr. Silverman was not qualified to testify about the relevant standard of care.

**\*4** Plaintiff argues that this Court's prior opinion concerned only the affidavit of merit. Plaintiff is correct that this Court only assessed the expert's qualifications to sign the affidavit of merit in its prior decision. However, plaintiff made concessions before the trial court and this Court that limited plaintiff's allegations of malpractice to postoperative care, reflecting a general surgery standard of care, and agreed to the dismissal of any allegations related to the colorectal surgeries. After remand, plaintiff filed a second amended complaint referring to the

Case 2:19-cv-13382-GAD-PTM ECF No. 187-2, PageID.8082 Filed 08/08/25 Page 17 of 17

Wilson v. Dean, Not Reported in N.W. Rptr. (2018)

general surgery standard of care as it related to Dr. Dean's treatment following the second surgery without reference to the surgeries themselves, in accordance with plaintiff's position summarized in this Court's decision. Plaintiff's theory of the case likewise limited the allegations to postoperative care after the second surgery, although it referred to both the colorectal surgery and general surgery standard of care without specifying which standard of care applied. Plaintiff otherwise raised no objection to or sought to withdraw her concessions.

"The law of the case doctrine provides that a ruling by an appellate court with regard to a particular issue binds the appellate court and all lower tribunals with respect to that issue." *Driver v. Hanley (After Remand), 226 Mich. App. 558, 565; 575 N.W.2d 31 (1997).* The trial court grounded its decision and reasoning in this Court's prior determination that plaintiff's remaining claims were limited to allegations of a breach of the standard of care for general surgery. The trial court properly followed this Court's instructions reflecting plaintiff's position.

### B. PLAINTIFF'S REQUEST TO REINSTATE EXPERT

To remedy the deficiency in plaintiff's expert's qualifications, plaintiff belatedly requested reinstatement of Dr. Campbell, the general surgeon who prepared the affidavit of merit. We conclude that the trial court did not abuse its discretion by refusing this request.

First, plaintiff does not cite a single case, statute, or court rule in support of this argument. If a party fails to provide legal support for its contention, "[t]his Court will not search for authority either to sustain or reject a party's position." *Schellenberg v. Rochester, Michigan, Lodge No. 2225, of the Benevolent and Protective Order of Elks of the United States of America, 228 Mich. App. 20, 49; 577 N.W.2d 163 (1998).* Nonetheless, we conclude that the trial court did not abuse its discretion by refusing plaintiff's request to replace her standard of care witness. The trial court issued a scheduling order on April 1, 2016, after remand from this Court, ordering the filing of the parties' witness lists by May 2, 2016. Plaintiff's final witness list included Dr. Silverman, not Dr. Campbell. Plaintiff did not propose Dr. Campbell as a witness until after the close of discovery and after the trial court signaled its agreement with defendants' position that plaintiff's expert was not qualified, several months after this Court's declaration that the standard of care was for general surgery. Therefore, the trial court did not abuse its discretion by refusing plaintiff's request to reinstate Dr. Campbell as a witness.

We affirm.

### All Citations

Not Reported in N.W. Rptr., 2018 WL 340930

---

### Footnotes

1    *Estate of Luella Ehrlinger v. Phillip A. Dean, M.D.*, unpublished order of the Court of Appeals, entered December 2, 2016 (Docket No. 334243).

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.