Cristin Rettler, P.A.
June 20, 2025

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KONCHISE JACKSON,

                Plaintiff,

        vs.                            Case No. 19-13382

                                       Hon. Gershwin A. Drain

CORIZON HEALTH, INC., et al.,

                Defendants.

_____


        The Remote Deposition of CRISTIN RETTLER, P.A.,

        Commencing at 3:03 p.m.,

        Friday, June 20, 2025,

        Before Helen F. Benhart, CSR-2614,

        Appearing remotely from Wayne County, Michigan.

Cristin Rettler, P.A.
June 20, 2025

```
1    REMOTE APPEARANCES:

2

3    IAN T. CROSS

4    Cross Law, P.L.L.C.

5    402 West Liberty Street

6    Ann Arbor, Michigan  48103

7    (734) 994-9590

8    ian@lawinannarbor.com

9         Appearing on behalf of the Plaintiff.

10

11   ADAM MASIN

12   Bowman and Brooke, L.L.P.

13   750 Lexington Avenue

14   New York, New York  10022

15   (646) 914-6790

16   adam.masin@bowmanandbrooke.com

17        Appearing on behalf of CHS TX, Inc., d/b/a YesCare.

18

19

20

21

22

23

24

25
```

Cristin Rettler, P.A.
June 20, 2025

1                   TABLE OF CONTENTS

2

3     WITNESS                           PAGE

4     CRISTIN RETTLER, P.A.

5

6     EXAMINATION

7     BY MR. MASIN:                      5

8     EXAMINATION

9     BY MR. CROSS:                      57

10    RE-EXAMINATION

11    BY MR. MASIN:                      82

12    RE-EXAMINATION

13    BY MR. CROSS:                      83

14    RE-EXAMINATION

15    BY MR. MASIN:                      84

16

17                   EXHIBITS

18

19    EXHIBIT                           PAGE

20    (Exhibits retained by Mr. Masin.)

21

22    DEPOSITION EXHIBIT A               18

23    DEPOSITION EXHIBIT B               24

24    DEPOSITION EXHIBIT C               48

25

Cristin Rettler, P.A.
June 20, 2025

1   Remote Proceedings

2   Friday, June 20, 2025

3   3:03 p.m.

4

5              THE REPORTER:  U.S. Legal Support's

6       standard transcript includes a word index.  If you do

7       not wish to receive a word index, please inform me at

8       the conclusion of today's proceeding.

9              The attorneys participating in this

10      deposition acknowledge that I am not physically

11      present in the deposition room.  They further

12      acknowledge that in lieu of an oath administered in

13      person, the witness will verbally declare her

14      testimony in this matter is under penalty of perjury.

15      The parties and their counsel consent to this

16      arrangement and waive any objections to this manner of

17      reporting.  Please indicate your agreement by stating

18      your name and your agreement on the record.

19              MR. CROSS:  Ian Cross, counsel for the

20      plaintiff, I agree.

21              MR. MASIN:  Adam Masin, counsel for CHS

22      Texas, I agree.

23                CRISTIN RETTLER, P.A.,

24      Was thereupon called as a witness herein, and after

25      having been first duly sworn to testify to the truth,

Cristin Rettler, P.A.
June 20, 2025

1        the whole truth and nothing but the truth, was

2        examined and testified as follows:

3                              EXAMINATION

4    BY MR. MASIN:

5    Q.    Good afternoon, Ms. Rettler.  My name is Adam Masin.

6          I represent a company called CHS Texas.  You and I

7          have never met before, right?

8    A.    No.

9    Q.    Okay.  Can you please state your full name and address

10         for the record.  Ms. Rettler, your screen is frozen.

11   A.    I reside in --

12   Q.    Ms. Rettler, your screen has frozen and we cannot hear

13         you.  If you can hear me, can you maybe log out and

14         try to log back in.

15                      (Off the record at 3:05 p.m.)

16                      (Back on the record at 3:09 p.m.)

17   BY MR. MASIN:

18   Q.    Can you please state your full name and address for

19         the record.

20   A.    Yeah my name is Cristin Angela Rettler, and I

21         currently are reside in Cottonwood, Arizona.

22   Q.    I'm not sure if some of that got cut off or not.  Your

23         Internet connection appears to be bad, but what I

24         heard was that you said your name is Cristin Rettler

25         and you live in Cottonwood, Arizona.  Was there

Cristin Rettler, P.A.
June 20, 2025

```
 1        anything else that you said?

 2  A.    That's where I live.

 3  Q.    Okay.  Your screen keeps freezing and your voice seems

 4        to be cutting in and out.  Is there somewhere else

 5        maybe in your -- wherever you are that might have a

 6        stronger Internet connection than where you're

 7        currently sitting?

 8  A.    I can try and go to another room.  I don't know that

 9        the Internet -- is the Internet connection better in

10        here?

11  Q.    No.  You've frozen again.

12  A.    Is that better?

13  Q.    I can hear you better I think, but your screen is

14        frozen.  Can you see us?

15  A.    Yeah, I can.

16  Q.    Yeah.  Your voice keeps --

17  A.    I can hear you just fine.

18  Q.    It sounds like your voice keeps cutting out and your

19        screen is frozen.  It's going to be very hard to

20        conduct a deposition if I don't know if what you're

21        saying is a complete sentence or not and the court

22        reporter doesn't know.

23              MR. CROSS:  Adam, do you want to try

24        turning off the video?

25              MR. MASIN:  Try turning off your video,
```

Cristin Rettler, P.A.
June 20, 2025

1       Ms. Rettler, and see if that helps at all.

2                  THE WITNESS:  Okay.  How's that?

3                  MR. MASIN:  That sounds better I think.

4       Let's -- we can see how it --

5                  THE WITNESS:  Let me know if that helps.

6                  MR. MASIN:  Okay.  That seems to have

7       helped somewhat so let's see how it goes.  For the

8       record, Ms. Rettler's video does not appear to be

9       working and we're going to try to do this deposition

10      without her being on screen.  The rest of us are on

11      screen.

12  BY MR. MASIN:

13  Q.  Ms. Rettler, who is your current employer?

14  A.  I work for Northern Arizona Healthcare in general

15      surgery.

16  Q.  Can you repeat your answer?  I'm not sure we got all

17      of it.

18  A.  Health care in general surgery.

19  Q.  Yeah.  We're not getting all of the audio from when

20      you're speaking.  Are you on a laptop or are you on

21      your phone?

22  A.  Yeah, I'm on a laptop.

23  Q.  Is it possible for you to maybe try doing this on your

24      phone?  You might get better reception that way.

25  A.  Okay.  I'll log out and I'll log into my phone.

Cristin Rettler, P.A.
June 20, 2025

1    Q.    Okay.

2                    (Off the record at 3:14 p.m.)

3                    (Back on the record at 3:19 p.m.)

4                    MR. MASIN:   I'm going to start over since I

5          think that's the easiest thing to do.

6    BY MR. MASIN:

7    Q.    Can you please state your full name and address for

8          the record.

9    A.    Okay.  So my name is Cristin Angela Rettler, and I

10         live at 2005 Franquero Lane in Cottonwood, Arizona.

11   Q.    Can you spell the name of that street?

12   A.    It's F-R-A-N-Q-U-E-R-O lane, and then my mailing

13         address is in Prescott, but this is where I physically

14         live.

15   Q.    Okay.  And is there anyone there in the room with you?

16   A.    No, just my dog.

17   Q.    Okay.  And what is the name of your current employer?

18   A.    Northern Arizona Healthcare.  I work in general

19         surgery.

20   Q.    And where are they located?

21   A.    In Cottonwood, Arizona.

22   Q.    Have you ever had your deposition taken before?

23   A.    Yes.

24   Q.    When was the last time that you had a deposition

25         taken?

Cristin Rettler, P.A.
June 20, 2025

```
 1    A.    I think that was in -- it was for the Corizon case.  I

 2          don't know when that would have been.  Like 2014 or

 3          2015, something like that.

 4    Q.    So since it's been quite a while since you've had a

 5          deposition taken, I'll go over some basic ground rules

 6          for the deposition, the first of which is if we have

 7          any further technological problems, you can't hear me,

 8          if my screen freezes, if you have any other problems

 9          along those lines, will you let us know right away?

10    A.    Sure.

11    Q.    Thank you.  I am going to be asking you a bunch of

12          questions today.  If for some reason you don't

13          understand one of my questions, you can't hear me,

14          please let me know and I will either ask you a

15          different question or have the question repeated,

16          okay?

17    A.    Okay.

18    Q.    If you answer my questions, I'm going to assume that

19          you understood them.  Is that fair?

20    A.    Yes.

21    Q.    Okay.  If you need a break for any reason today, just

22          let us know.  You just have to answer the question

23          that's pending and then we'll take a break, okay?

24    A.    Okay.

25    Q.    Are you being represented by counsel today?
```

Cristin Rettler, P.A.
June 20, 2025

```
 1   A.   No.

 2   Q.   You mentioned you were deposed in a Corizon case back

 3        in 2014 or 2015.  How many times prior to that have

 4        you been deposed?

 5   A.   None.

 6   Q.   Have you ever given testimony at a trial?

 7   A.   No.

 8   Q.   Have you ever been retained as an expert witness in

 9        any case?

10   A.   Yes.

11   Q.   When was the last time that you were retained as an

12        expert witness?

13   A.   Was about five years ago.

14   Q.   And what kind of case was that?

15   A.   It was for a corrections health case.

16   Q.   Where was the case located?

17   A.   In Portland, Oregon.

18   Q.   Do you know the name of the plaintiff in that case?

19   A.   I don't recall.  There were two of them, actually.

20        They were right around the same time.  I provided that

21        information to the attorneys.

22   Q.   Did you give a deposition in that case?

23   A.   I don't believe so.  I think it was just an expert

24        witness testimony that I provided in written form and

25        then the cases settled.  I don't remember giving any
```

Cristin Rettler, P.A.
June 20, 2025

```
 1        depositions.
 2   Q.   Did you write a report in that case?
 3   A.   Yes, I did, for both of them.
 4   Q.   Okay.  Do you know if those reports were submitted to
 5        the court?
 6   A.   I don't know.
 7   Q.   Do you recall the names of either of the plaintiffs in
 8        that case?
 9   A.   One was Thompson I remember.  I don't recall the other
10        one.
11   Q.   And what was the case about?
12   A.   They were death in custody.
13   Q.   What was the alleged cause of death in those cases?
14   A.   Well, it was failure to provide appropriate medical
15        care.
16   Q.   What was the care that was allegedly not appropriately
17        provided?
18   A.   You know, I would need to review those cases to speak
19        in detail about them.
20   Q.   Do you recall any of the facts about them, about why
21        they died?
22   A.   I believe one guy died of an MI and the other guy died
23        of a drug overdose.
24   Q.   Who was the defendant in those cases?
25   A.   I think one of them was NaphCare and the other one was
```

Cristin Rettler, P.A.
June 20, 2025

1         Corizon, if I recall correctly.

2    Q.   These were two separate cases?

3    A.   Yeah, they're two separate cases.  It was the same

4         attorney that asked me to provide expert witness --

5         which, you know, entailed reviewing all of the medical

6         charts and the information from the correctional

7         institute.

8    Q.   You mentioned one plaintiff's name was Thompson.  Was

9         that the Corizon case or the other defendant?

10   A.   I didn't review those cases.  I didn't know that I was

11        going to be asked to speak on them so I didn't review

12        them.

13   Q.   Do you recall what the alleged failure to provide care

14        was relating to the Corizon case?

15   A.   Again, I didn't know I was going to be asked to speak

16        on those cases and so I didn't review them and I don't

17        want to misspeak.

18   Q.   In those cases, what is it that you claimed your

19        expertise to be?

20   A.   I'm a physician assistant.  I worked for two years at

21        the Washington County Jail and I worked most recently

22        for about seven years at the Multnomah County Jail,

23        and, you know, I've been a PA since 2002.

24   Q.   And you were a retained expert in those cases, meaning

25        you were paid, correct?

Cristin Rettler, P.A.
June 20, 2025

```
 1   A.   Yes.

 2   Q.   Have you been paid for your time in this case?

 3   A.   No.

 4   Q.   Has anyone promised you that you would be paid for

 5        your time in this case?

 6   A.   No.

 7   Q.   Have you ever been retained as an expert in any other

 8        case other than the two we've just mentioned?

 9   A.   There were a couple other ones that I reviewed but

10        then they did not go forward and I don't -- you know,

11        I don't recall any of the details of that.  I didn't

12        do any big write-ups for those.

13   Q.   What years were those?

14   A.   That was probably prior to the other two.  It was the

15        same law firm.

16   Q.   Okay.  Do you recall who the defendants were in those

17        cases?

18   A.   No, I do not.

19   Q.   Have you ever been sued?

20   A.   I have never -- so when cases had come up with

21        Multnomah County Jail, then they were dismissed so

22        nothing like successfully went forward and I was never

23        specifically, you know, like named in a lawsuit at the

24        Multnomah County Jail.  That's the only time that

25        lawsuits came about in my 23-year career.  I've never
```

Cristin Rettler, P.A.
June 20, 2025

1      personally been sued, no.

2   Q.  So you've never been named as a defendant in a lawsuit

3       before?

4   A.  Well, I was listed as one of the people that

5       administered care in, you know, several lawsuits at

6       Multnomah County, but all of them were dismissed.

7       They never went forward, never settled, never went to

8       trial.

9   Q.  My question is were you named as a defendant in those

10      cases.

11  A.  Yes, I was named.

12  Q.  Okay.

13  A.  Along with a lot of other people.

14  Q.  Are those cases the only times you've ever been a

15      defendant in a lawsuit?

16  A.  Yes.

17  Q.  Have you ever brought a lawsuit against anyone or any

18      company?

19  A.  No.

20  Q.  Other than the depositions that you've testified

21      about, is that the only time that you've ever

22      testified under oath for any reason?

23  A.  Yeah, I believe so.  The only time that I was actually

24      deposed to my recollection is with that big Corizon

25      lawsuit.

Cristin Rettler, P.A.
June 20, 2025

1    Q.   In the cases in which you were retained as an expert,

2         you never made it as far as testifying in court,

3         correct?

4    A.   No, those cases were settled.

5    Q.   Okay.  Have you ever lived in Michigan?

6    A.   No.

7    Q.   Have you --

8    A.   I take that back.  I take that back.  I did live there

9         briefly when I was applying to PA school in Detroit.

10        My husband and I lived there for about a year.  This

11        is before I was a PA so I didn't practice there.

12   Q.   What year did you live there?

13   A.   So I started PA school in 2000, so that would have

14        been 1998 or 1999.

15   Q.   Okay.  Did you have a job while you were living in

16        Michigan?

17   A.   Yeah.  I worked in the ER at Henry Ford Hospital I

18        believe --

19   Q.   What was your --

20   A.   -- as like a -- it's like before they had medical

21        assistants so it was like -- I don't know what they

22        would have called them then.

23   Q.   Okay.

24   A.   It's before being a medical assistant was an actual

25        like degree.

Cristin Rettler, P.A.
June 20, 2025

```
 1   Q.   So other than that position you've never held any

 2        other employment in the state of Michigan, correct?

 3   A.   Right.  Yeah.  That was before PA school.

 4   Q.   Have you ever been employed by a company called CHS

 5        Texas, Inc?

 6   A.   I don't think so.

 7   Q.   Have you ever been employed by a company called

 8        YesCare?

 9   A.   No.  I've never heard of that.

10   Q.   Have you ever worked for a company called Quality

11        Correctional Care of Michigan, P.C.?

12   A.   No.

13   Q.   Have you ever done any work at all relating to the

14        Michigan Department of Corrections?

15   A.   No.

16   Q.   Do you hold any professional licenses?

17   A.   Do I hold any professional licenses?

18   Q.   Yes.

19   A.   I'm a PA.

20   Q.   What state do you hold that license in?

21   A.   I hold it in three states, Arizona, California and

22        Oregon.

23   Q.   Is it active in all states?

24   A.   Yes, it is.

25   Q.   When did you earn your PA license in Arizona?
```

Cristin Rettler, P.A.
June 20, 2025

```
 1    A.    Maybe January of this year.

 2    Q.    When did you earn your PA license in California?

 3    A.    Maybe five years ago, six years ago.

 4    Q.    Have you ever practiced as a PA in the state of

 5          California?

 6    A.    I have not.

 7    Q.    When did you earn your PA in license in Oregon?

 8    A.    I graduated in '02, and I've had an active license

 9          since then.

10    Q.    Have you had to do anything since 2002 to renew your

11          license?

12    A.    Absolutely.  I have a slew of activities I need to do

13          every year for continuing medical education to

14          maintain my PA license.

15    Q.    When is the last time that you applied to renew your

16          license?

17    A.    You have to reapply every two years.  I think maybe --

18          I just did it last year so now I've got two years

19          until I need to reapply.

20    Q.    During the time that you were working for the hospital

21          in Michigan back in 1998 approximately, did you hold

22          any licenses at that time?

23    A.    No.

24    Q.    Do you recall the name of your employer at that time?

25    A.    Henry Ford Hospital system.
```

Cristin Rettler, P.A.
June 20, 2025

1   Q.   Other than this video, is there anything else on your

2        screen?

3   A.   No.

4   Q.   Did you bring any documents with you today?

5   A.   No.

6   Q.   There are a few documents that I'm going to show you.

7        I recognize you're on your phone, so if you need me to

8        blow them up, make them larger or anything like that

9        so that you can see them, will you let me know?

10  A.   Yeah.  I think it's going to be hard to see documents

11       on my phone.

12  Q.   Understood.  I'm just going to -- I'm going to do my

13       best to show them to you, but for now we're going to

14       mark this as Exhibit A.  This is Defendant CHS Texas,

15       Inc.'s, Notice of Taking Duces Tecum Deposition of

16       Plaintiff's expert, Cristin Rettler, PA.

17                    REMOTELY INTRODUCED:

18                    DEPOSITION EXHIBIT A

19                    3:31 p.m.

20  BY MR. MASIN:

21  Q.   Are you able to see that document?

22  A.   No.  You'll just have to read it to me.

23  Q.   Okay.  Do you ever recall seeing a document with the

24       title that I just read?

25  A.   No.  I mean, CHS sounds a little bit familiar, but, I

Cristin Rettler, P.A.
June 20, 2025

1      mean, I don't recall, you know, the lawsuits that I

2      was an expert on.  If this is one of them, if one of

3      them was not with Corizon and against CHS or NaphCare,

4      that wouldn't have been relevant to my testimony, so

5      if that's what you're talking about, I don't know.

6  Q.  That's not what I'm talking about.  The question that

7      I'm asking you is have you ever seen a document that

8      is a notice of a deposition in this case?

9  A.  Okay.  Let me look.  Okay.  When is -- which one is

10     this one for?

11 Q.  You'll see that this -- well, this is the wrong day,

12     but today is June 20th.  It says Tuesday, but it's

13     obviously Friday.  Have you ever seen a notice of any

14     kind in writing that lets you know when your

15     deposition is supposed to take place?

16 A.  For this?

17 Q.  This deposition, yes.

18 A.  I mean, the attorneys have sent me just e-mails

19     telling me when the deposition is.

20 Q.  Okay.  The last page -- or the last couple pages of

21     this document includes a Schedule A with a list of

22     requests numbered one all the way down through number

23     20.  Have you seen that list before?

24 A.  Oh, so this was for this testimony, right,

25     requesting --

Cristin Rettler, P.A.
June 20, 2025

1    Q.    Right.

2    A.    Yeah.  This looks familiar, requesting that I send my

3          CV and whatever other within the last five years

4          lawsuits I was involved in.

5    Q.    Okay.  Did you read this entire list, one to 20?

6    A.    Yeah.  I didn't -- I thought that the only ones that

7          I -- that applied to me were the CV that I needed to

8          send and the two lawsuits I was involved in in the

9          last five years.

10   Q.    Okay.  Just so I'm clear about that, when you say that

11         you thought the only ones that applied to you were

12         those two, does that mean you did not look for other

13         documents or does that mean you only believed that you

14         needed to provide your CV and the cases?

15   A.    Yeah.  I read through the list.  I thought those were

16         the only things that applied to me.

17   Q.    Okay.  And just so I'm clear, that means there were no

18         other documents that you had that were responsive to

19         these requests other than your CV and the list of

20         cases, is that right?

21   A.    I guess I -- I don't really understand what you're

22         asking.  Are you insinuating that I missed something?

23         I don't know what you're --

24   Q.    I'm not insinuating anything.  Your testimony is that

25         you read this entire list, correct, from one --

Cristin Rettler, P.A.
June 20, 2025

```
 1    A.    I read the list.

 2    Q.    -- through 20?  Okay.  Let's take an example.  Number

 3          seven says any and all documents which refer to,

 4          relate to or evidence your findings, conclusions,

 5          opinions, advice or other communications in this case.

 6          Do you see that?

 7    A.    Mm-hum.

 8    Q.    Do you have any of those documents?

 9    A.    No.  I don't have any documents relating to this case.

10    Q.    Okay.

11    A.    I'm not providing expert testimony for this case.

12    Q.    Are you intending to provide opinions in this case?

13    A.    I'm intending to answer the questions that you ask me.

14    Q.    Okay.  So number 19 asks you for all documents that

15          you reviewed or relied on to support any opinions that

16          you intend to offer in this case.  Do you have any

17          such documents?

18    A.    No.  I don't have any documents related to this case.

19    Q.    Okay.  And you didn't review or rely on any documents

20          to support any of the opinions that you intend to give

21          in this case, correct?

22    A.    So I don't even know the details of this case.  Like

23          I'm not part of this case.  I'm not giving expert

24          witness testimony.

25    Q.    Is it your intent to offer testimony about your time
```

Cristin Rettler, P.A.
June 20, 2025

```
 1        working at the Washington County Jail?
 2   A.   Yes.
 3   Q.   Do you have any documents that you have reviewed or
 4        relied on to support your testimony about your time at
 5        the Washington County Jail?
 6   A.   So I don't have any documents saved anywhere.
 7        Yesterday the attorneys read back to me some of my
 8        testimony from the original Corizon case, but I do not
 9        have any of those documents.
10   Q.   What is the name of that case?
11   A.   That was the ten million dollar lawsuit that Corizon
12        lost.  Madelyn was her first name.
13   Q.   That was a wrongful death case, is that right, back in
14        2014?
15   A.   Yes, that's the one.  That's the one I was deposed in,
16        mm-hum.
17   Q.   Okay.  And you don't have any documents from that
18        case?
19   A.   No.
20   Q.   Or any --
21   A.   No.  I don't have any of that.  Why would I keep that?
22   Q.   Have you ever published any literature?
23   A.   No.  I mean -- no.  I mean, I think some of those
24        court documents must have been published, but I did
25        not publish them.
```

Cristin Rettler, P.A.
June 20, 2025

```
 1   Q.   You're certainly familiar with what a medical journal

 2        is, right?

 3   A.   Yes.

 4   Q.   You've never published an article in a medical

 5        journal, correct?

 6   A.   I've never participated in any research or anything

 7        like that so, no, not to my knowledge, hum-mm.

 8   Q.   How is it that you came into contact with Mr. Cross'

 9        firm?

10   A.   Is that the firm that Nathan works for Nathan Lombard?

11   Q.   I'm not sure who Nathan Lombard is, but let me ask you

12        this question.  Have you ever spoken with Mr. Cross

13        before?

14   A.   So there are two attorneys that have been in contact

15        with me.  Ian is one of their first names, and the

16        second one is Nathan, and they are out of Michigan.

17        They contacted me when they came across my information

18        for the Corizon lawsuit in Hillsboro, Oregon.

19   Q.   When is the first time that you came into contact with

20        the Michigan attorneys?

21   A.   I think maybe two years ago, maybe 18 months ago or

22        something and then I guess Corizon filed for

23        bankruptcy, then they said that it was on hold, then

24        they re-contacted me maybe a month or two ago.

25   Q.   Have you been asked to testify as a witness in any
```

Cristin Rettler, P.A.
June 20, 2025

1        other cases involving Corizon in Michigan?

2   A.   No.

3   Q.   When is the last time that you spoke with a Michigan

4        attorney about this case?

5   A.   Yesterday.

6   Q.   And that's when they read back some of your prior

7        testimony, correct?

8   A.   Yes.

9   Q.   And how long was that meeting?

10  A.   Maybe about an hour.

11  Q.   Was that over the phone or video call?

12  A.   It was over the phone.

13  Q.   Prior to that meeting, when is the last time that you

14       had met with a Michigan attorney?

15  A.   I guess that was when they initially contacted me two

16       years or 18 months ago, around there.

17  Q.   During your meeting with the Michigan attorneys, did

18       they show you any documents?

19  A.   No.

20  Q.   Now, we received from the attorneys a copy of what

21       we'll mark as Exhibit B.

22                  REMOTELY INTRODUCED:

23                  DEPOSITION EXHIBIT B

24                  3:41 p.m.

25  BY MR. MASIN:

Cristin Rettler, P.A.
June 20, 2025

```
 1    Q.    Can you see that on your phone?

 2    A.    Yes.  Well, sort of.

 3    Q.    This appears to be a CV of yours, is that right?

 4    A.    Yes.

 5    Q.    When did you provide this to the attorneys?

 6    A.    Recently.

 7    Q.    Have you provided them with any other documents other

 8          than this?

 9    A.    And then just the names of those two lawsuits that I

10          gave expert witness testimony in and the case numbers

11          I believe I provided.

12    Q.    When is the last time that you updated your CV?

13    A.    Well, I quick updated it when they asked for it to

14          include my most recent job.

15    Q.    Okay.  So this CV is as up to date as it could be,

16          correct?

17    A.    Yes.

18    Q.    Okay.  This CV indicates that you graduated from the

19          University of South Florida in Tampa in 1994, is that

20          correct?

21    A.    Yes.

22    Q.    And then you went on and you got a masters of science

23          in physician assistant studies from Pacific

24          University, is that right?

25    A.    Yes.
```

Cristin Rettler, P.A.
June 20, 2025

1    Q.   And you graduated there 2002, correct?

2    A.   That's correct.

3    Q.   Other than any continuing education that you've done

4         as a PA, do you have any other degrees?

5    A.   No.

6    Q.   Now, you mentioned that you had spent some time in the

7         late '90s at a hospital in Detroit.  I don't see that

8         on your CV.

9    A.   No.  I was like a glorified receptionist, so, yeah,

10        that's not really relevant to anything and I worked

11        there like six months or something.  I forgot about

12        it, actually, until you just mentioned it.

13   Q.   Does this CV contain all of the jobs that you've had

14        since you graduated with your physician's assistant

15        degree?

16   A.   I mean, frankly, it's all the relevant jobs.  I

17        frequently had, you know, as you can see, the dates

18        regularly overlapped.  When I was working at the

19        Corizon jail job, I also was working in the ER at

20        Tuality part time.  I frequently had like, you know,

21        little side gigs of urgent cares and stuff like that.

22        Those are all the relevant ones.

23   Q.   Understood.  I'm not going to go over everything in

24        detail but just a couple of questions for you about

25        your CV.  There's a listing for primary care medical

Cristin Rettler, P.A.
June 20, 2025

```
 1            provider at the Maple Street Clinic in Forest Grove,

 2            Oregon, from February 2003 to December 2006, right?

 3     A.     That sounds right.

 4     Q.     And your description of that says primary care

 5            provider to diverse patient population.  Did you --

 6            you were acting as a physician's assistant at that

 7            time, right?

 8     A.     Yes.  The whole CV is my PA career, yes.

 9     Q.     As a physician's assistant, over the years have you

10            had a particular specialty that you've been working in

11            or have you just been generally working?

12     A.     So for the most part, when you graduate from PA

13            school, because we have optional residencies to work

14            in primary care first as like a residency and then

15            from there to move on.  So from there I worked in

16            urgent care and then I went on to the ER, and when I

17            worked in the ER, then I worked after that in general

18            surgery, and I would say corrections is sort of a

19            hybrid between inpatient and primary care, substance

20            abuse, mental health, kind of a hodgepodge.  Now, most

21            recently I'm in general surgery again.  So I've worked

22            in many different areas in my 23 years as a physician

23            assistant.  And it's physician assistant.  There's no

24            S.

25     Q.     As a physician assistant, have you ever been involved
```

Cristin Rettler, P.A.
June 20, 2025

1      in a surgery to create a colostomy?

2  A.  Yeah, yesterday.

3  Q.  Okay.  Was that your first time?

4  A.  No.  I've probably done a hundred of then.

5  Q.  Okay.  And when was the last time that you did that

6      other than yesterday?

7  A.  The day before that.  That's what general surgery

8      does.  That's one of the mainstays of --

9  Q.  Have you ever participated in a colostomy reversal

10     surgery?

11 A.  Yes.

12 Q.  And when you're participating in those surgeries, what

13     is your role?

14 A.  I'm the first assist.

15 Q.  What does that mean?  What do you do?

16 A.  I suture, I operate the camera, I operate the

17     instruments, I prep the patient for surgery, I remove

18     the instruments when we're done.  I'm a surgical first

19     assist.

20 Q.  As a physician's assistant, you're not diagnosing a

21     patient with a need to have a colostomy, right?

22 A.  Well, I do do consults in the hospital, emergency

23     consults in the ER and then we do bring them to

24     surgery, yes.

25 Q.  So there are circumstances in emergency situations

Cristin Rettler, P.A.
June 20, 2025

1       where you as a physician's assistant and not a doctor

2       are diagnosing a patient with a need to have a

3       colostomy?  Is that your testimony?

4  A.   So we work collaboratively.  I mean, I go to the ER, I

5       do a consult, I order imaging, I give my opinion and

6       then, you know, the surgeon reviews that.  If they

7       agree, then sometimes they have an emergency surgery

8       of any kind of acute abdomen and then I am the

9       surgical first assist and then I follow up with the

10      patients in the hospital and discharge them and then

11      we see them in clinic.

12  Q.   I guess my question is that you need a surgeon to

13      agree to the surgery, correct?

14  A.   Yes.  I work with three different surgeons, so I'm in

15      surgery a lot, and I previously worked also in general

16      surgery at -- in Portland at Legacy Emanuel Hospital.

17      Sorry.  Legacy Good Sam Hospital.

18  Q.   Is it fair to say that you're not intending to offer

19      any opinions about colostomy surgeries for purposes of

20      this case, correct?

21  A.   I am very knowledgeable about abdominal surgeries.  If

22      you have a question, I mean, I can answer it.  I don't

23      know.  I mean --

24  Q.   Okay.  We'll talk about that a little later.  So you

25      worked for a time at the Multnomah County Jail in

Cristin Rettler, P.A.
June 20, 2025

```
 1        Oregon, correct?

 2   A.   Yes, for almost seven years.

 3   Q.   In Portland, right?

 4   A.   Yes.

 5   Q.   Who was the care provider at that jail?

 6   A.   Multnomah County.

 7   Q.   The county itself provided that care?

 8   A.   Yes.

 9   Q.   Okay.  And then prior to Multnomah County you worked

10        for the Washington County Jail in Hillsboro, Oregon,

11        right?

12   A.   Yes.

13   Q.   What dates did you work there?

14   A.   You'd have to look on my CV.  I worked there -- I

15        worked for -- the last seven years I was at the

16        Multnomah County Jail, and prior to that I did a few

17        years in surgery and I worked in the ER overlapping

18        all of those dates, and before that I worked at the

19        Washington County Jail just for like a couple years I

20        want to say 2014 -- or 2012 to 2014, something along

21        those liens.

22   Q.   Your CV indicates that you worked at the Washington

23        County Jail in Hillsboro, Oregon, from April of 2012

24        to April of 2014.  Does that sound right?

25   A.   Yes, that sounds right.
```

Cristin Rettler, P.A.
June 20, 2025

1    Q.   Who was the health care provider at that jail at the

2         time?

3    A.   Corizon.

4    Q.   Were you employed by Corizon?

5    A.   I was employed by Corizon.

6    Q.   And is that the only time that you've ever been

7         employed by Corizon?

8    A.   Yes.  I have no plans for ever working for Corizon

9         again, absolutely.

10   Q.   So the last time that you worked for Corizon in any

11        capacity was April of 2014, correct?

12   A.   Correct.

13   Q.   And prior to April of 2012, you had never worked for

14        Corizon, correct?

15   A.   Correct.

16   Q.   How big is the Washington County Jail?  Well, let

17        me strike that.  Let me ask that question differently.

18             At the time that you were working there

19        between 2012 and 2014, do you know how many inmates

20        there were approximately at a given time?

21   A.   Well, I would only be offering a guess.  So I know

22        Multnomah County Jail was 1,400 inmates at maximum

23        capacity, and if I had to render a guess, I would say

24        it's more like 800 inmates at the Washington County

25        Jail, but that's just a guess.

Cristin Rettler, P.A.
June 20, 2025

1   Q.   Does about 570 sound right to you?

2   A.   Okay.

3   Q.   Other than your time at Multnomah County Jail and

4        Washington County Jail, have you worked in any other

5        correctional facilities?

6   A.   No, but I did do a clinical rotation at Sheridan

7        Prison when I was in school for six weeks.

8   Q.   Did you say six weeks?

9   A.   Yes.  They were six-week long rotations.

10  Q.   That's when you were studying to get your PA degree,

11       right?

12  A.   Yes.

13  Q.   So is it fair to say that as a physician's assistant,

14       you've never worked in a prison?

15  A.   Well, not including those six weeks, yes.

16  Q.   During the time that you were working for Corizon, did

17       you ever attend any meetings outside of Oregon?

18  A.   Well, I attend CME meetings every year, and most of

19       them are not local, and I also did attend a corporate

20       Corizon event over like a five-day weekend.  I think

21       it was in -- I believe it was in Tennessee.

22  Q.   When was that?

23  A.   That was during my time when I was working for

24       Corizon.

25  Q.   Yeah.  What dates did you attend that meeting?

Cristin Rettler, P.A.
June 20, 2025

1    A.   Well, it had to have been between 2012 and 2014.

2    Q.   No.  I mean -- I realize that, obviously, but do you

3         recall the specific dates that you were in Tennessee?

4    A.   No.  Why would I really?

5    Q.   Was it -- do you recall whether it was in 2012,

6         2013 --

7    A.   No.

8    Q.   -or 2014?

9    A.   It's 2025.  I attend conferences every year.  I don't

10        remember.

11   Q.   Okay.  So you're unable to identify when it is that

12        you were in Tennessee, correct?

13   A.   The exact dates.  I know the range within two years,

14        yes.  It was the time I worked at Corizon.

15   Q.   Okay.  Did you attend any presentations during that

16        time?

17   A.   I attended several days of presentations.

18   Q.   Do you remember the names of any individuals who spoke

19        at those presentations?

20   A.   No, I don't recall the names of any of the people who

21        presented at the presentation.

22   Q.   Do you have any documents that you may have received

23        during your time in Tennessee?

24   A.   No.

25   Q.   Did you take any notes of your time in Tennessee?

Cristin Rettler, P.A.
June 20, 2025

1    A.   I did take notes during that time.  I no longer have

2         those notes.

3    Q.   When is it that you no longer have the notes?  When

4         did you lose them or dispose of them?

5    A.   Well, I usually don't keep notes for more than like a

6         year or two.

7    Q.   And I presume you didn't record anything during --

8    A.   No.  I wish I had, though.

9    Q.   Do you recall the titles of any presentations that you

10        heard during that time?

11   A.   Well, the theme was how to save Corizon money.  That I

12        remember.

13   Q.   I didn't ask you about the theme.  I asked you did you

14        recall the name of any titles of any of the

15        presentations that you heard.

16   A.   I don't remember -- recall the specific titles.

17   Q.   Do you remember how many people attended the meeting?

18   A.   Probably -- they were the medical directors and office

19        managers I guess they would call them, although that's

20        not the title.  HSA I think is what they called them.

21        So there was probably a hundred people, 70 people,

22        something around there.

23   Q.   Do you remember the names of any of the individuals

24        you met while you were in Tennessee?

25   A.   No, but Stevens Hyppolite, who was the HSA at

Cristin Rettler, P.A.
June 20, 2025

1        Washington County Jail, was also in attendance there.

2   Q.   Okay.  But you don't the names of any people that you

3        saw in Tennessee other than that individual who was

4        from Oregon, right?

5   A.   No.  I didn't exchange numbers with anyone.

6   Q.   Did you ever exchange any e-mails with anyone about

7        the meetings in Tennessee?

8   A.   I don't recall.

9   Q.   Do you recall whether this meeting was towards the

10       beginning of your time with Corizon, towards the

11       middle, towards the end, anything that you can recall

12       about the timing?

13  A.   Not really.  It's a pretty tight window, two years.  I

14       mean --

15  Q.   Do you have any documentation that would demonstrate

16       that you were present at that meeting?

17  A.   Documentation?  No.

18  Q.   Do you have -- you probably don't.  It's been a long

19       time, I understand.  I'm just asking if you have

20       anything.

21  A.   No.

22  Q.   Okay.  Other than that meeting in Tennessee, did you

23       attend any other meetings involving Corizon that were

24       outside of the state of Oregon?

25  A.   No, I don't believe so.

Cristin Rettler, P.A.
June 20, 2025

```
 1   Q.   You may have answered this, forgive me, but have you
 2        performed any medical or scientific research?
 3   A.   I don't believe so.  I mean -- no.
 4   Q.   In preparation for your testimony today, did you
 5        review any medical literature?
 6   A.   No.
 7   Q.   Did you review any literature on any subject in
 8        preparation for your testimony?
 9   A.   Literature?  No.
10   Q.   Did you review any documents in preparation for your
11        testimony other than having Mr. Cross read back your
12        testimony from a prior case?
13   A.   No.
14   Q.   Okay.  You've mentioned that you've attended some
15        colostomy and colostomy reversal surgeries as a PA.
16        Have you done any research related to colostomies or
17        colostomy reversals?
18   A.   Of course, yes.
19   Q.   What research have you done?
20   A.   I work in general surgery.  Of course I've done
21        continuing medical education in regards to acute
22        abdomens, which would include colostomy and colostomy
23        reversals.
24   Q.   That's not quite the question that I'm asking you.  My
25        question is have you ever -- let me ask it a different
```

Cristin Rettler, P.A.
June 20, 2025

```
 1            way.  Have you ever participated in any sort of study

 2            involving colostomy or colostomy reversals?

 3     A.     Research, no.

 4     Q.     Okay.  So you've learned things about colostomy and

 5            colostomy reversals as part of continuing education

 6            programs, right?

 7     A.     And from working in general surgery where this is like

 8            something very common to what general surgeons do.

 9            Also of note, my mom had a colostomy and was reversed

10            a couple years ago so I've actually interacted with

11            someone in their home, my family member, day-to-day

12            living with a colostomy bag.  I feel like I'm pretty

13            knowledgeable about colostomies.

14     Q.     I'm sorry.  You said who had one?

15     A.     My mom.  My mom had a colostomy bag.  She had it

16            reversed.

17     Q.     Have you ever published any textbook chapter of any

18            kind?

19     A.     No, I don't think so.

20     Q.     Have you ever spoken in public to offer any sort of

21            medical opinions at a conference or a lecture?

22     A.     Yeah, for the Portland-Vancouver PA Society.  I spoke

23            on bariatric surgery one time, specifically the

24            sleeve.  That's the only one that comes to mind.  And

25            I taught at Pacific University for many years, and I
```

Cristin Rettler, P.A.
June 20, 2025

```
 1        gave guest lectures there.  That's not a conference,

 2        but I did lecture.

 3   Q.   What was the subject of your lectures?

 4   A.   Well, I was a professor.  I gave lectures every day.

 5        I worked there for a few years and then sometimes I

 6        did guest lectures there for many years on myriad

 7        topics.

 8   Q.   I'm sorry.  You were a professor where?

 9   A.   At Pacific University.

10   Q.   And that was in November of 2002 to September 2008, is

11        that right?

12   A.   Yes.  So I worked there part time mostly and full time

13        for like a couple years first as the clinical

14        coordinator and then later as like part of the core

15        faculty.

16   Q.   Your CV indicates that you were a course instructor

17        and lecturer.  Is that a correct way of saying what

18        your titles were?

19   A.   Yeah.  I was a professor there, mm-hum.

20   Q.   You keep using the word professor, but your CV doesn't

21        use that word.  Were you actually a full professor at

22        the university?

23   A.   So define full.

24   Q.   I don't know.  I'm asking you.

25   A.   I worked there part time giving guest lectures for
```

Cristin Rettler, P.A.
June 20, 2025

1       part of that time, and I worked there full time for

2       two years, so if that's full, then yes.

3   Q.  Were you ever told or awarded a position of professor

4       at --

5   A.  Yes.

6   Q.  -- the university?

7   A.  Yes.

8   Q.  When?

9   A.  I worked full time as a university professor for two

10      years during that time.

11  Q.  Why don't you use that word on your CV?  Why do you

12      say course instructor and lecturer and not professor?

13  A.  I'll make the correction.  Thank you for your

14      feedback.

15  Q.  Do you know what an assistant professor is?  Have you

16      ever heard that term?

17  A.  Well, there's adjunct faculty, there's assistant

18      professor and there's professor.  I was a professor

19      there for two years.

20  Q.  Were you ever an assistant professor there?

21  A.  I guess I don't recall the distinct -- like what are

22      the distinguishing factors between assistant and full

23      professor, but I was employed full time for two of

24      those years then and I was addressed as professor

25      Rettler, so I don't know.  I guess that meets criteria

Cristin Rettler, P.A.
June 20, 2025

```
1          as professor.

2     Q.   Do you have anything like a certificate or any other

3          documentation that demonstrates that you were a

4          professor or had the title of professor during that

5          time?

6     A.   A certificate?  Do they give people certificates when

7          they work at the universities?

8     Q.   I don't know.  I'm trying to understand your testimony

9          because your CV doesn't say professor on it.  So do

10         you have any documentation that demonstrates that you

11         had the title professor at Pacific University during

12         that time?

13    A.   I don't know.  I mean, I guess you could contact them

14         or, I mean --

15    Q.   But you don't have any documentation?

16    A.   I mean, maybe I do somewhere.  I didn't know I was

17         going to be asked to prove my full-time status at

18         Pacific University.  That was many years ago, many,

19         many years ago.

20    Q.   Again, your CV doesn't use that word.  I think that

21         word has significance in the academic world.  Your CV

22         doesn't use it.  I'm trying to understand why your CV

23         says course instructor and lecturer and doesn't use

24         the word professor.

25    A.   Thank you for the feedback.  I'll make that correction
```

Cristin Rettler, P.A.
June 20, 2025

```
 1          in the future.
 2    Q.    Have you ever held the title professor since 2008?
 3    A.    No.  I've given just a few guest lectures here and
 4          there at the university and I've taken students, but I
 5          haven't taught full time at Pacific University since I
 6          guess it was 2008.
 7    Q.    Have you ever published any research on correctional
 8          health care in the United States?
 9    A.    No, hum-mm.
10    Q.    Have you ever performed any research related to
11          correctional health care in the United States?
12    A.    No.
13    Q.    Do you have a website that you use to advertise
14          yourself as an expert in any subject?
15    A.    No.
16    Q.    Are you a member of any referral services where you
17          hold yourself out as an expert in any subject?
18    A.    No.  I never advertised for that.  They -- my
19          testimony was found and they sought me out.
20    Q.    Now, you received your BA from the University of
21          Florida in 1994 and your physician's assistant degree
22          in 2002.  What did you do in between that time?
23    A.    In between when I graduated from undergrad and I
24          started --
25    Q.    Yeah.  Let me ask that again.  What did you do after
```

Cristin Rettler, P.A.
June 20, 2025

| | | |
|---|---|---|
| 1 | | you graduated from the university of South Florida but |
| 2 | | before you went to Pacific University to get your PA |
| 3 | | degree? |
| 4 | A. | Yeah.  So I worked in myriads of different capacities |
| 5 | | within health care trying to figure out where I wanted |
| 6 | | to go to graduate school.  I, you know, wasn't sure if |
| 7 | | I should apply to medical school or PA school or |
| 8 | | podiatry school and so I worked at different |
| 9 | | hospitals. |
| 10 | Q. | How long was your PA program at Pacific University? |
| 11 | A. | It was 27 months and then we had to take our boards |
| 12 | | after that. |
| 13 | Q. | You're not -- you're not a medical doctor, correct? |
| 14 | A. | I'm a physician assistant. |
| 15 | Q. | Which means you're not a medical doctor, right? |
| 16 | A. | Because I'm a physician assistant, correct. |
| 17 | Q. | You're not board certified in any medical specialty, |
| 18 | | correct? |
| 19 | A. | I'm board certified as a physician assistant or |
| 20 | | associate I guess we're now called, actually. |
| 21 | Q. | As a physician's assistant, are you board certified in |
| 22 | | any particular medical specialty? |
| 23 | A. | We don't have -- that's not how our license is. |
| 24 | Q. | So as a physician's assistant, you cannot get a |
| 25 | | license in a particular specialty, correct? |

Cristin Rettler, P.A.
June 20, 2025

```
 1   A.   Right.  You can get certified training in, you know,

 2        different specialized areas, but our license is

 3        different than nurse practitioners and physicians in

 4        that we aren't board certified in one specific area.

 5   Q.   Are you certified as a physician's assistant in any

 6        particular area?

 7   A.   We don't have that kind of certification so no.

 8   Q.   Okay.  Is there any sort of recognition or

 9        subspecialty training or title that you've earned as a

10        physician's assistant that relates to any particular

11        kind of specialty?

12   A.   No.  I have specialized training, like I'm ACLS

13        certified, you know.  I'm BLS certified, you know,

14        that sort of training, but our license is different

15        than physicians and nurse practitioners in that we

16        don't have those designations.

17   Q.   Okay.  You have not been asked to give expert

18        testimony in this case relating to colostomies,

19        correct?

20   A.   I have not been asked to give expert testimony in this

21        case at all to my understanding.

22   Q.   Have you ever spoken to the plaintiff in this case,

23        Mr. Jackson?

24   A.   No.

25   Q.   Have you ever treated Mr. Jackson?
```

Cristin Rettler, P.A.
June 20, 2025

```
1   A.   No.

2   Q.   Have you reviewed Mr. Jackson's medical records?

3   A.   No.

4   Q.   Have you reviewed any documents from the Michigan

5        Department of Corrections about Mr. Jackson?

6   A.   No.

7   Q.   Have you ever reviewed any documents from the Michigan

8        Department of Corrections about any person or subject?

9   A.   No.

10  Q.   Have you ever reviewed any documents relating to

11       Corizon's work in Michigan between 2017 and 2019?

12  A.   No, I don't believe so.

13  Q.   Is it fair to say that you have no personal knowledge

14       of any Corizon policy, practice or custom after April

15       of 2014?

16  A.   Right.  That's when I worked -- when I stopped working

17       for Corizon, and after that time I was involved in a

18       couple correctional lawsuits, one of which I believe

19       involved Corizon, but other than that, no.

20  Q.   Your testimony that you are asked to give has nothing

21       to do with Mr. Jackson himself, correct?

22  A.   I'm not testifying about Mr. Jackson's medical issues,

23       no.

24  Q.   To your knowledge, did any of the employees that you

25       interacted with who worked for Corizon in Oregon work
```

Cristin Rettler, P.A.
June 20, 2025

```
 1        in Michigan?

 2   A.   Not to my knowledge.

 3   Q.   I'm going to read you a list of names and I'm going to

 4        ask if you to the best of your knowledge have ever

 5        spoken to any of these individuals, okay?

 6   A.   Okay.

 7   Q.   And if you have, you let me know.  If not, let me know

 8        that, okay?

 9   A.   Okay.

10   Q.   Dr. Keith Papendick?

11   A.   No.

12   Q.   Dr. Erina Kansakar?

13   A.   No.

14   Q.   Dr. John Webber?

15   A.   I don't think so.  That's a common name, though.

16   Q.   To your knowledge have you ever spoken with any

17        doctors who practice in Michigan?

18   A.   No.

19   Q.   Have you ever spoken to somebody named Sonya Fulks?

20   A.   I don't believe so.

21   Q.   Have you ever spoken to somebody named Steve Bergman

22        or Steven Bergman?

23   A.   None of these names sound familiar to me.

24   Q.   What about William Borgerding, B-O-R-G-E-R-D-I-N-G?

25   A.   No.
```

Cristin Rettler, P.A.
June 20, 2025

```
 1    Q.    Colleen Spencer?

 2    A.    No.

 3    Q.    Jeffrey Stieve?

 4    A.    No.

 5    Q.    Sabrina Aiken?

 6    A.    No.

 7    Q.    Kaelynn Pfeil?

 8    A.    No.

 9    Q.    A Dr. Mahir Alsalman?

10    A.    No.

11    Q.    Ronald Drinket?

12    A.    No.

13    Q.    A Dr. Jeffrey Bomber?

14    A.    No.

15    Q.    A Mason Gill?

16    A.    No.

17    Q.    A Dr. Robert Lacy?

18    A.    I don't think so.

19    Q.    A Dr. Jan Watkins?

20    A.    No.

21    Q.    Excuse me.  Dr. Jan Watson.

22    A.    No.

23    Q.    Whitney Thompkins?

24    A.    No.

25    Q.    A Timothy McKenna?
```

Cristin Rettler, P.A.
June 20, 2025

1   A.   No.

2   Q.   Did you prepare any sort of written summary of your

3        proposed testimony in this case?

4   A.   No.

5   Q.   Have you ever seen any written summary of your

6        proposed testimony in this case?

7   A.   No.

8   Q.   Did you ever tell the Michigan lawyers that you spoke

9        to what it is that you intended to testify about in

10       this case?

11  A.   So we reviewed yesterday like what was going to happen

12       today.

13  Q.   Prior to yesterday's conversation, have you ever

14       spoken with the Michigan lawyers about what it is that

15       you might testify to in this case?

16  A.   I don't think so.  I don't think it got that far last

17       time.

18  Q.   During your time in the Washington County Jail in

19       Oregon, do you know how many requests for colostomy

20       reversal surgery were approved?

21  A.   I don't recall.  I don't think I recall ever any

22       elective surgery being approved during my time there.

23  Q.   Do you recall how many requests for colostomy reversal

24       surgery were made during the time that you worked in

25       the Washington County Jail?

Cristin Rettler, P.A.
June 20, 2025

1   A.   No, I don't recall.

2   Q.   Are you aware of any facts relating to the request for

3        colostomy reversal surgery in the Michigan Department

4        of Corrections?

5   A.   No.

6   Q.   I'm going show you what we'll mark as Exhibit C.

7                 MR. MASIN:   And for the record, this is

8        plaintiff's Konchise Jackson's expert disclosures

9        pursuant to FED.R.CIV.P.26(a)(2).

10                REMOTELY INTRODUCED:

11                DEPOSITION EXHIBIT C

12                4:17 p.m.

13  BY MR. MASIN:

14  Q.   Can you see this document on your screen, Ms. Rettler?

15  A.   Okay.

16  Q.   Do you recall ever seeing a document with this title

17       on it before relating to the Jackson case?

18  A.   No.

19  Q.   I'm going show you at the bottom of this page that

20       this document is dated May 20th, 2025.  Do you see

21       that?

22  A.   Mm-hum.

23  Q.   Do you ever recall testifying -- strike that.

24                Do you recall speaking to the Michigan

25       attorneys about your testimony in this case prior to

Cristin Rettler, P.A.
June 20, 2025

1      May 20th, '25?

2  A.  No.

3  Q.  I want to show you that this document here has your

4      name on it.  Do you see that?

5  A.  Okay.

6  Q.  And is that the correct address and phone number?

7  A.  That's my mailing address, yeah.

8  Q.  And is the phone number correct?

9  A.  Yes.

10 Q.  And do you recall ever seeing a document like this

11     with your name on it?

12 A.  No, I don't remember -- so, again, I can't scroll up

13     or down on this.

14 Q.  I'm going do that for you if you can see it, but my

15     question is do you ever recall seeing a document like

16     this with your name on it relating to the Jackson

17     case?

18 A.  So I can't see this document.  It just says

19     Ms. Rettler is expected to testify regarding her

20     experience working as a physician's assistant for

21     Corizon in a county jail but --

22 Q.  Correct.  There's more, but my question is have you

23     ever seen this before?

24 A.  I mean, perhaps.  That's accurate, that I'm going to

25     testify about working for Corizon.  I'm not giving

Cristin Rettler, P.A.
June 20, 2025

```
 1        expert witness testimony on this specific case.
 2   Q.   Right.  That's not my question.  My question is have
 3        you seen this document before?
 4   A.   I'm not sure.
 5   Q.   We looked earlier at this date, May 20th, 2025.  Do
 6        you see that?
 7   A.   Uh-huh.
 8   Q.   Have you seen a document that purports to summarize
 9        the testimony that you would give in this case prior
10        to May 20th of 2025?
11   A.   I don't recall.
12   Q.   Are you able to read the text of this?  Do you need me
13        to make it larger for you on your phone?
14   A.   Can you scroll down?
15   Q.   Yeah.  I'm just making sure you can read it.  Can you
16        read it?
17   A.   Yep.
18   Q.   You can read it to yourself and let me know when
19        you're done.  I'll keep scrolling whenever you need me
20        to.
21   A.   Yeah, this all sounds about right.  There's nothing
22        inaccurate here.
23   Q.   So I just have a couple of questions about this.
24   A.   Okay.
25   Q.   The first sentence says that you're expected to
```

Cristin Rettler, P.A.
June 20, 2025

```
 1          testify regarding your experience working as a

 2          physician's assistant for Corizon in a county jail.

 3          Do you see that?

 4     A.   Yep.

 5     Q.   And that refers to your time at the Washington County

 6          Jail between 2012 and 2014, correct?

 7     A.   That's correct.

 8     Q.   And everything that you just read in this paragraph,

 9          does that also relate to the time that you worked in

10          the Washington County Jail in Oregon between 2012 and

11          2014?

12     A.   Correct.

13     Q.   This paragraph refers to a Corizon regional medical

14          director.  Do you remember that person's name?

15     A.   Dr. Garlick and later it was Harold Ott, but mostly I

16          interacted with Dr. Garlick.

17     Q.   Can you spell that?

18     A.   I think it's like garlic the normal way but then with

19          a K on the end.

20     Q.   Do you remember that person's first name?

21     A.   No, I don't.

22     Q.   And the other person you said was who?

23     A.   Harald Ott or Orr.  He was I believe -- he was either

24          Dr. Garlick's replacement or he was Dr. Garlick's

25          boss, and I did meet him one time when he came into
```

Cristin Rettler, P.A.
June 20, 2025

```
 1        the jail.

 2   Q.   Is it fair to say that you've not spoken with either

 3        of those individuals since 2014 at least?

 4   A.   Correct.  That's correct.

 5   Q.   You'll see that this paragraph refers to this

 6        conference that you testified about in Tennessee.  Do

 7        you see that?

 8   A.   Yes.

 9   Q.   Is there anything else that you recall -- strike that.

10             Is there anyone else -- well, strike that.

11   A.   That was at the conference that I recall.

12   Q.   Yeah.  Let me ask the question.  Does reading this

13        refresh your recollection in any way about the names

14        of any individuals that presented at that conference?

15   A.   No.

16   Q.   Does reading this refresh your recollection in any way

17        about the names of any individuals that you spoke to

18        at that conference other than the other person you

19        mentioned from Oregon?

20   A.   No.  I mean, I believe Dr. Garlick was at that

21        conference, but I don't think he -- I don't remember

22        him presenting anything and I would have avoided him

23        so --

24   Q.   Okay.  And does reading this in any way refresh your

25        recollection about the title of any presentation that
```

Cristin Rettler, P.A.
June 20, 2025

 1       you heard at the conference?

 2   A.  No.

 3   Q.  Does reading this at all refresh your recollection at

 4       all about the dates that you were at the conference?

 5       I'm sorry.  We might have missed your answer.  Did you

 6       say anything?

 7   A.  No.

 8   Q.  Okay.  Is it your understanding then that the

 9       testimony that you would intend to give in this case

10       relates to the time you spent working at the

11       Washington County Jail in Oregon between 2012 and

12       2014?

13   A.  Yes.

14   Q.  Since May of -- well, strike that.

15                Since May 20th of 2025, have you been asked

16       by the Michigan attorneys or anyone else to perform

17       any other work relating to this case?

18   A.  No.

19   Q.  All right.  Give me a couple minutes and I might be

20       done.

21                    MR. CROSS:  Okay.

22                    MR. MASIN:  Take a short break.

23                    (Off the record at 4:26 p.m.)

24                    (Back on the record at 4:32 p.m.)

25   BY MR. MASIN:

Cristin Rettler, P.A.
June 20, 2025

1    Q.    Ms. Rettler, just a couple more questions for you.

2          What was the name of your supervisor during the time

3          that you worked at the Washington County Jail?

4    A.    Stevens Hyppolite and then the other HSA woman was

5          Vicky, and then when Stevens was demoted, she was

6          promoted.  I don't recall her last name.

7    Q.    Did you say Hyppolite?

8    A.    Hyppolite, mm-hum.

9    Q.    What was that person's title?

10   A.    I guess -- I remember like HSA was -- I don't know

11         what that would stand for, but he's like the -- in

12         charge of the medical department.  He's not -- the

13         medical director was Joe McCarthy.  He was the

14         physician that I worked with and then Stevens was in

15         charge of the medical department.

16   Q.    Was Dr. McCarthy a Corizon employee?

17   A.    He was.

18   Q.    Okay.  Do you know the names of any of the Washington

19         County officials who worked at the prison at the

20         time -- or, excuse me, worked at the jail at the time?

21   A.    Like the deputies?  No.

22   Q.    Did the Washington County Jail have some sort of

23         inmate grievance process where the inmates could

24         complain about the care that they were receiving?

25   A.    I believe so.

Cristin Rettler, P.A.
June 20, 2025

1   Q.   Were you involved in that aspect of the inmates' care?

2   A.   Well, the nurses collected them.  I believe they were

3        called grievances.  Well -- so there was two levels, I

4        believe.  They sent like a kite, like a MERF, like a

5        medical request form, if they had any medical needs,

6        and then if those medical needs went unaddressed, then

7        it escalated to the next level and I believe it was

8        called a grievance at that time, and the nurses

9        collected them, and once it got to the level of a

10       grievance, then it was brought to the attention of the

11       HSA or the office manager, whatever their official

12       title was, which would be Vicky and Stevens, and then

13       they had to be addressed in some like specific -- some

14       amount of time that they had to be addressed.

15  Q.   At the jail were the grievances addressed by employees

16       of the county or by Corizon employees?

17  A.   Corizon employees.

18  Q.   Are you familiar with the grievance process at all

19       with the Michigan Department of Corrections?

20  A.   I am not.

21  Q.   The case that you testified in -- strike that.

22            The case that you testified about in

23       Oregon, that related to a patient who passed away from

24       a heroine withdrawal, correct?

25  A.   Yeah.  She died of dehydration I believe is what they

Cristin Rettler, P.A.
June 20, 2025

1     established.  And, also, there is great pride in

2     Corizon standardization across different, you know,

3     clinics and hospitals.  Like that was something that

4     was widely discussed, like this is how we do it at all

5     Corizon facilities.  That was a frequent refrain.

6                    MR. MASIN:  I'll move to strike that as

7     completely nonresponsive to my question.

8  BY MR. MASIN:

9  Q.   My question was the inmate who died you say from

10     dehydration, that was as a result of heroine

11     withdrawal, correct?

12  A.   She was withdrawing from heroine, correct.

13  Q.   Are you aware of any statistics about the length of

14     incarceration of the inmates at the Washington County

15     Jail during the time that you worked there?

16  A.   So I can tell you that the average length of stay in

17     Oregon is 14 days.

18  Q.   In jail in Oregon you mean?

19  A.   In jail in Oregon is 14 days.

20  Q.   Okay.

21  A.   There's a great range.  Some people stay for hours and

22     some people stay for years depending on their charges

23     so that's just an average.

24  Q.   Okay.  I don't have anymore questions for you at this

25     time.  I reserve any questions if Mr. Cross has any

Cristin Rettler, P.A.
June 20, 2025

1     just to follow up, but other than that, thank you for

2     your time.

3                          EXAMINATION

4  BY MR. CROSS:

5  Q.  Good afternoon, Ms. Rettler.  Why did you leave your

6      employment with Corizon?

7  A.  Well, I had grave concerns about the lack of medical

8      care that was being provided to the inmates, and I

9      felt that -- I went to the sheriff on two different --

10     I had two different meetings with him to discuss this

11     specifically, and I -- there were so many near misses

12     that I felt it was just a matter of time before there

13     was a catastrophic outcome, and, frankly, I was

14     concerned for my medical license, and that ten million

15     dollar lawsuit that Corizon lost happened just months

16     after I left there.

17 Q.  What specific things were you concerned about?

18 A.  Well, they were not following the matrix, which is the

19     minimum number of staff that needed to be provided.

20     Instead of hiring RNs -- like, for example, they were

21     supposed to have eight nurses, RNs, on staff, and they

22     would have half that number, and of those four that

23     they actually had on staff, three of them would be

24     LPNs, not RNs, that had just graduated or medical

25     assistants.  So they weren't coming anywhere near

Cristin Rettler, P.A.
June 20, 2025

1       meeting the matrix.

2               No matter what the best of intentions that

3       those medical people, the staff that worked there, you

4       know, they were under trained and they were, you know,

5       spread way too thin to be caring for the extremely

6       complicated patients that we had on the unit, and I

7       would accidentally come across a chart or just be

8       walking by in the unit and I'd realize someone was,

9       you know, nonresponsive, not breathing, you know,

10      having some severe medical crisis.  Just by luck I had

11      come across these people, and that happened so many

12      times I was -- and because, you know, I expressed my

13      fears to the sheriff and to Corizon and, you know,

14      that went nowhere and so I left.

15   Q. Were there any other practices that you were concerned

16      about?

17              MR. MASIN:  Object to form.

18              THE WITNESS:  Well, the reason that people

19      ended up I think a lot with these extreme or emergency

20      medical situations that we were unequipped to deal

21      with because of our low staffing and understaffing and

22      under trained medical personnel was because -- well, a

23      couple different policies.

24              The first one is that when people came into

25      the jail, they -- we had a very strict formulary, so

Cristin Rettler, P.A.
June 20, 2025

1       they were taken off their chronic care medications

2       which would be like, you know, for COPD, chronic

3       obstructive pulmonary disease, chronic kidney disease,

4       you know, BPH, which is benign prostate hypertrophy so

5       then they couldn't urinate, they couldn't breathe and

6       they were replaced with, you know, these generic

7       medications that -- which were not sufficient or they

8       were not -- just taken off the meds altogether.  Like

9       HIV meds was one of them.  They had big issues getting

10      HIV meds.  There were no HIV meds on the formulary and

11      some people would end up having a medical crisis.

12              The second thing was that, for instance, if

13      someone had chronic kidney disease and they needed a

14      specialist follow-up, if I would write a referral for

15      a specialist, that would go nowhere.  They would just

16      say it's under review, it's under review, and it would

17      never result in -- almost never resulted in an actual

18      appointment taking place, and if I would call

19      Dr. Garlick and advocate for the patient, he would

20      say, well, they're about to leave anyway so they don't

21      need that appointment, and I would say, well, can we

22      just schedule the appointment.  If they leave in the

23      meantime, you know, then they can at least get in the

24      queue to get that appointment taken care of.

25              Also, any time that I sent people out for

Cristin Rettler, P.A.
June 20, 2025

1      any emergency medical services, on Tuesdays I had to

2      review all of the charts of every single patient that

3      I had sent out, and he always gave me pushback like

4      100 percent of the time why that person did not need

5      to be sent out, and we didn't even have a working EKG

6      machine much less, you know, stat, you know, cardiac

7      enzymes or serial troponins or anything like that, so,

8      you know -- and I was working in the ER at the time,

9      so I had a very good understanding of what an

10     emergency medical situation was and what we could

11     handle at the jail, and his response when he would

12     say, oh, that person didn't need to go out, I would

13     say okay.  Well, you know, I believe they did.  That's

14     my expert medical opinion on the ground, and if you

15     believe this person doesn't need to go out, then, you

16     know, per policy is what you're saying, I would like

17     you to put that in written form and send me an e-mail,

18     which, of course, he never did because he has a

19     medical license, too, and he also is trying to protect

20     his medical license.

21  BY MR. CROSS:

22  Q.    Why were you concerned about your medical license?

23  A.    Because if I don't offer -- like Corizon's trying to

24     deny medical care to patients, and I cannot tell the

25     American Medical Association that I'm just following

Cristin Rettler, P.A.
June 20, 2025

1       policy at Corizon.  That will not protect me, and

2       ethically I'm not okay with that, either, by the way.

3       I didn't go to -- for my medical training with the

4       hopes of making money by depriving care for some like

5       corporate entity.  You know, my goal is to provide the

6       appropriate level of care to people in need who are

7       under my care, and this is a very vulnerable and very

8       sick population.

9               Also, psych meds, they frequently changed

10      the psych meds when people come in so that would

11      destabilize them.  They would end up having extreme

12      mental health crises, and they were very reluctant to

13      do anything off formulary because some of those meds

14      can be expensive and they were, you know, reluctant to

15      make any kind of changes there.

16  Q.  What is a formulary?

17              MR. MASIN:  Object to form.

18              THE WITNESS:  The formulary -- every

19      insurance company has it.  It's usually tier one, tier

20      two, tier three is what the rest of America is used

21      to.  Tier one is like the super cheap stuff that's

22      been around forever.  Tier two, you know, it's, you

23      know, generic but it's still more expensive, and tier

24      three is like the expensive stuff.

25              Typically in the community, like if someone

Cristin Rettler, P.A.
June 20, 2025

1       has a severe mental health issue and they've been

2       tried on all the easy to access inexpensive

3       medications and -- for any medical condition -- and

4       they require a higher level of medication to stabilize

5       their condition, then their insurance company, which,

6       you know, for the most part with this population was

7       the Oregon Health Plan, then their insurance was

8       paying for that and they were stable on it.

9              When they came to Corizon -- at Multnomah

10      County Jail, they just maintain people on those same

11      medications.  Whatever they're stable on in the

12      community, they just keep those medications, but for

13      Corizon, you were not allowed to prescribe anything

14      that was called off formulary, which is not like tier

15      one, not like the cheap stuff, so I had to switch them

16      off of their medication, and that frequently

17      destabilized people.

18  BY MR. CROSS:

19  Q.   Are these medications that were already prescribed to

20       the patient --

21  A.   Yes.

22  Q.   -- at the time they came in?

23  A.   Prescriptions that they were stable on in the medical

24       community and had already been prescribed to them.

25  Q.   If I understand your testimony correctly, Corizon was

Cristin Rettler, P.A.
June 20, 2025

1       interrupting prescribed plans of treatment that had

2       been initiated by the patient's outside medical

3       provider before the patient entered the jail?

4   A.   Yes.

5                    MR. MASIN:  Object to form.

6   BY MR. CROSS:

7   Q.   Did you ever try to continue a treatment plan that a

8       patient's doctor had prescribed for them before they

9       came into jail?

10  A.   Yes.

11                   MR. MASIN:  Object to form.

12                   THE WITNESS:  Sometimes when they, you

13      know, then, you know, became, you know, destabilized

14      we'll just say because these are a wide range of

15      medications from many, many different drug classes,

16      when their symptoms exacerbated when they were taken

17      off their chronic care medication, then I would

18      advocate to say, okay, the cheap -- the generic

19      medications are not working sufficiently.  Let's

20      return them to the medications that they were on, and

21      sometimes, you know, yeah, sometimes the medications

22      are, you know, thousands of dollars a month and that

23      requires more of a conversation.  However, frequently

24      they were not that much more expensive.

25                   Like some of these COPD meds, they're

Cristin Rettler, P.A.
June 20, 2025

1       inhaled steroids versus oral steroids and, you know,

2       that's, you know, very common in the -- there's no

3       like cheap inhaled steroids like Advair.  They're, you

4       know, like $250 a month or something like that, but

5       it's important for people to be able to breath in

6       jail.  Well, anywhere but especially in jail because

7       they don't have -- they're locked in their cell and

8       they're a very vulnerable population.  So that's an

9       example of medications that I would advocate for, you

10      know, this person really needs to be returned, and

11      there was tremendous push back.

12  BY MR. CROSS:

13  Q.   Were you ever successful in getting them back on their

14      prescribed medications?

15              MR. MASIN:  Object to form.

16              THE WITNESS:  I'm not sure about that.  I

17      mean, I remember having a lot of different

18      conversations about returning people and, you know,

19      the importance of returning them to their, you know,

20      baseline medications.  I don't recall if I was ever

21      successful in any specific patient, but it was a big,

22      you know, conversation, and the fact that they were

23      taking people off of their HIV medications, I mean,

24      that's just unbelievable.  There were no HIV

25      medications on formulary.

Cristin Rettler, P.A.
June 20, 2025

```
 1                    The other thing that Corizon used to like
 2          to do is to advocate if they were on expensive
 3          medications to have them released from custody, which,
 4          you know, it's fine.  I don't have any disagreement
 5          with that, but they would want me to go to the custody
 6          staff and say this patient's medication is X amount of
 7          dollars a month.  You know, they need to be released
 8          from custody because we can't afford it.
 9                    My understanding was there was a cap every
10          year on how much Corizon would pay like for all the
11          inmates every year, and if they went beyond that, then
12          Washington County was on the hook to pay for whatever
13          was, you know, left of the bill.  So Washington County
14          was motivated also to, you know, keep people out of
15          custody that had expensive medications.
16     BY MR. CROSS:
17     Q.   Did you ever report your concerns to anyone within
18          Corizon in writing?
19     A.   I wrote Dr. Garlick e-mails, which he didn't like.  He
20          didn't want me -- he specifically told me not to
21          e-mail him.  He wanted me to call him because, of
22          course, he doesn't want this in written form, and I
23          e-mailed the sheriff twice and had two different
24          meetings with the sheriff about my concerns.
25     Q.   Did you have oral discussions with Dr. Garlick --
```

Cristin Rettler, P.A.
June 20, 2025

1    A.    Yes.

2    Q.    -- about your concerns?

3    A.    And with Dr. Ott I believe was his name as well.  When

4          he came to tour the jail when he was coming in, you

5          know, I told him the difficulties that I had with

6          Dr. Garlick, with him not wanting me to send people to

7          the ER and with him not approving referrals that I had

8          placed for very like time sensitive referrals that I

9          placed for like, you know, chronic kidney disease and

10         people were in kidney failure, you know, things like

11         that.  I was never requesting that people have, you

12         know, surgery for -- you know, like elective like knee

13         surgery or something like that.  It was always things

14         that were like very time sensitive that needed to be

15         addressed while they were incarcerated in a timely

16         fashion.

17   Q.    When you say elective surgery, what do you mean by

18         that phrase?

19   A.    So really there's just two kinds of surgery, emergency

20         surgery, everybody's knows what that means, then

21         there's elective surgery.  So some elective surgery --

22                MR. MASIN:  Objection, form of the

23         question.  Go ahead.

24                THE WITNESS:  Some elective surgeries, you

25         know, never need to be done, like, you know, a face

Cristin Rettler, P.A.
June 20, 2025

```
 1          lift or a knee, an ACL repair.  You can live your life

 2          without that.  However, some surgeries they do need to

 3          be performed but they need to be scheduled, and, you

 4          know, that would be an example of an elective surgery

 5          that is also a necessary surgery.  So those are the

 6          things that I was putting in referrals for sometimes.

 7          Like I remember this one guy had this huge basal cell

 8          carcinoma on his face.  That needs to be addressed in

 9          a timely fashion.

10   BY MR. CROSS:

11   Q.    Would that be an elective surgery?

12                    MR. MASIN:  Objection.

13                    THE WITNESS:  Falls under the guise of

14          elective surgery.  It's a scheduled surgery.  It's not

15          an emergency surgery.

16   BY MR. CROSS:

17   Q.    What's a cosmetic surgery?

18                    MR. MASIN:  Object to form, beyond the

19          scope.

20                    THE WITNESS:  Well, a cosmetic procedure

21          would be, you know, like a face lift or something.  Of

22          course, that's not even on the table.  I'm just

23          talking about getting people referrals for, you know,

24          pressing medical issues that they had.

25   BY MR. CROSS:
```

Cristin Rettler, P.A.
June 20, 2025

1   Q.   When you raised your concerns with Dr. Garlick, how

2        did those discussions go?

3                  MR. MASIN:  Object to form.

4                  THE WITNESS:  Well, usually what he would

5        say is, you know -- I would say -- like I would put in

6        a referral.  That was the process, and, you know, for

7        this basal cell carcinoma on this guy's face and it

8        would go nowhere.  I kept checking.  Like, okay, where

9        are we with this process and then the answer that I

10       would get is, oh, it's under review, it's under review

11       and it would just be eternally under review.  So

12       sometimes when I really, you know, needed this person

13       to have this appointment, like, for instance, if he

14       is -- he has some really big Measure 11 charges, I

15       knew he was going to be incarcerated for an extended

16       period of time, he didn't have other options to seek

17       other care, then I would express my concerns to

18       Dr. Garlick, and sometimes he would say, oh, you know,

19       he's going to be released soon anyways, we don't need

20       to do that, and sometimes he would just, you know,

21       say, well, we'll continue to review it.

22                  Now, there were a few times that I was

23       successful in getting referrals for people, and there

24       was a separate issue that came up.  I worked in that

25       community for many years, and Corizon was not paying

Cristin Rettler, P.A.
June 20, 2025

1          their bills so I was -- I had this referral for a

2          nephrologist in the community.  There weren't a lot of

3          them because this is Hillsboro right outside Portland,

4          and he -- you know, I worked at the hospital.  I knew

5          this guy and so I called the office and said what's

6          going on, we put this referral in, and they said,

7          well, Corizon hasn't paid their bills, which predated

8          when I worked there, and so we've never been paid so

9          Corizon needs to pay the bill in order for us to

10         schedule new appointments and so then I had to see if

11         I could get an appointment, you know, in Portland with

12         someone who didn't know Corizon and they hadn't

13         stiffed them on the bill.  It's just amazing, I mean,

14         just the level of -- their skill at avoiding paying

15         for things was impressive.

16                    MR. MASIN:  Move to strike.

17    BY MR. CROSS:

18    Q.   To your knowledge, were any changes made as a result

19         of your complaints?

20    A.   No.  They lost their contract, though, after they lost

21         that ten million dollar lawsuit.

22                    MR. MASIN:  Object to form.

23    BY MR. CROSS:

24    Q.   I believe you testified you worked in another county

25         jail in Oregon where the medical care was not provided

Cristin Rettler, P.A.
June 20, 2025

```
 1        by Corizon Health, is that correct?
 2   A.   Right.  It wasn't provided by any private health
 3        company.  It was county and it was run completely
 4        differently, their focus is on wraparound services,
 5        they're community health focused, they provided, you
 6        know, care to the inmates as, you know, needed, as it
 7        was appropriate.
 8   Q.   Do you experience the same difficulties obtaining
 9        referrals to outside specialists at --
10   A.   Not --
11   Q.   -- the county?
12   A.   -- at all.
13                  MR. MASIN:  Object to form.
14                  THE WITNESS:  Not at all.  It was
15        completely different.
16   BY MR. CROSS:
17   Q.   What was it like?
18                  MR. MASIN:  Object to form.
19   BY MR. CROSS:
20   Q.   I'm sorry.  How is it different?
21                  MR. MASIN:  Object to form.
22                  THE WITNESS:  We provided referrals as
23        appropriate, and sometimes I did review them with my
24        medical director, but there was no endless, you know,
25        queue of, you know, you'd write a referral and it just
```

Cristin Rettler, P.A.
June 20, 2025

1          falls to the wayside while they, you know, try to

2          avoid providing that referral.  There was none of

3          that.  If I wrote a referral, then, you know, I

4          sometimes reviewed it with the medical director and

5          then the appointment was scheduled and they were able

6          to go out for care.

7   BY MR. CROSS:

8   Q.    Now, you testified a bit on direct examination about

9          attending a conference at Corizon's headquarters.  Do

10         you remember that?

11  A.    Yes, and it was like no medical conference I had ever

12         attended.  I thought that we were going to be

13         discussing like how to determine the appropriate level

14         of care for, which is a worthwhile conversation, in

15         the correctional setting, but really what the

16         conversation was was how to deny care, which is

17         shocking because there's a room full of medical

18         directors and they -- I remember this one example they

19         gave that this poor gentleman had gotten in a physical

20         altercation from going from jail to prison with the

21         deputy staff and he had fractured his spine which

22         resulted in him being paralyzed and so when he sued

23         Corizon, they were able to win the lawsuit, which they

24         were really proud of because he -- the nurse was able

25         to document that he had neurological function before

Cristin Rettler, P.A.
June 20, 2025

1           they left.

2                   So in stead of -- I thought the

3       conversation was going to be how do we, you know,

4       preserve -- you know, do appropriate medical exams

5       when people are in, you know, assault situations to

6       avoid bad outcomes, but actually the conversation was

7       how to document so that Corizon's not on the hook for

8       the patient's medical bills, which, I mean, is -- it's

9       amazing that they're able to get a bunch of doctors

10      who are onboard with that, but that was really the

11      theme of the whole entire conference.

12                  It was more a medical-legal how do we like

13      reduce our services, avoid paying for services, return

14      them to the community so that the community's on the

15      hook for the bill, and, you know, I came to understand

16      that, you know, through their jargon that they were

17      incentivized, so that helped me to understand how

18      these medical doctors and HSAs were, you know,

19      justifying it to themselves that -- and, you know,

20      really they spoke about these patients like they

21      weren't people.  I mean, it was --

22                  MR. MASIN:  Hold on.  Move to strike that

23      entire testimony as nonresponsive to the question.

24  BY MR. CROSS:

25  Q.   I believe you testified --

Cristin Rettler, P.A.
June 20, 2025

1                    MR. MASIN:  Amongst other things.

2    BY MR. CROSS:

3    Q.   Let's go back.  Who else was in attendance at that

4         event?

5    A.   Stevens Hyppolite and all the other directors from all

6         across the country, and as I stated earlier, they took

7         great pride in the fact that they run their facilities

8         all very, you know, similar, so that was surprising to

9         me as well, that this was, you know, a nationwide

10        effort.

11                   MR. MASIN:  Move to strike.

12   BY MR. CROSS:

13   Q.   Did you attend any presentations at the conference?

14   A.   Yeah.  There were lots of lectures and presentations,

15        but it was all the same topic.  It was --

16   Q.   What was the topic?

17   A.   The topic was how to avoid like providing medical care

18        to inmates.  That was basically the topic.  No matter

19        what the headline was, it evolved into this whole

20        conversation about, you know, their goals of trying to

21        provide the least care possible and to reduce their

22        medical costs in an effort to, you know, keep their

23        maximum profit, and they had this -- also this like

24        corporate like newsletter that came out, which I also

25        found very weird.  We used to get it at the Hillsboro

Cristin Rettler, P.A.
June 20, 2025

1        County Jail, and it would say, yay, we're expanding to

2        Kentucky, we're expanding to New York City, we've

3        expanded and we've increased our profit margins, and I

4        thought that that was weird, that they were

5        celebrating that in this newsletter because they were

6        paying so little to their staff.  Like the staff

7        weren't sharing in that.  Like they had terrible

8        medical care.  They had terrible policies towards the

9        nurses.  They hired LPNs.  That's why they had such

10       difficulty with staff, because they were paying way

11       below the community standard for nurses but yet they

12       were celebrating how rich they were in this

13       newsletter, which I found very strange.

14                      MR. MASIN:  Move to strike.

15   BY MR. CROSS:

16   Q.   Were there any discussions of personal injury

17        litigation during that conference?

18   A.   There was that one that I just --

19                      MR. MASIN:  Object to form.

20                      THE WITNESS:  -- talked to you about.  That

21        guy who was paralyzed tried to sue them.  I guess he

22        lost because they were celebrating that fact.

23   BY MR. CROSS:

24   Q.   How were they celebrating?

25                      MR. MASIN:  Object to form.

Cristin Rettler, P.A.
June 20, 2025

1          THE WITNESS:  They were talking about how

2     he -- because the nurse had documented that he had

3     neurological function when he left the jail.  Even

4     though clearly his injury resulted in him being

5     paralyzed, that Corizon was able to win this lawsuit

6     and so they didn't -- which was -- you know, he was

7     suing for millions of dollars.  He was paralyzed.  So

8     they were really, you know, excited and proud of that.

9  BY MR. CROSS:

10 Q.   In your opinion, was Corizon delaying or denying

11     necessary medical care to inmates in order to avoid

12     paying for the care?

13          MR. MASIN:  Object to form.

14          THE WITNESS:  There's no question.  They

15     weren't even pretending.  I mean, that was like the

16     goal of the conference.

17 BY MR. CROSS:

18 Q.   What do you mean by that?

19 A.   I mean, of course, you know --

20          MR. MASIN:  Object to --

21          THE WITNESS:  -- many -- you know, there's

22     always discussions about how to allocate resources,

23     right?  But that's very different from the

24     conversation that Corizon was having.  Corizon was

25     like we don't want to pay for this and so let's try --

Cristin Rettler, P.A.
June 20, 2025

 1        what's our strategy and, you know, reducing care,

 2        denying care, not providing care, waiting until they

 3        leave custody so they can deal with it in the

 4        community and their insurance gets -- or the

 5        community, you know, at large gets stuck with the

 6        bill, and there was no kind of wraparound service,

 7        either.  If people were leaving, they didn't help them

 8        get set up in the community for, you know, like mental

 9        health services or, you know, they wouldn't help

10        schedule an appointment for their kidney specialists

11        once they left.  It was like once they leave, they're

12        not our problem.

13   BY MR. CROSS:

14   Q.   Do you have any reason to believe that Corizon's

15        policies and procedures were standardized across the

16        entire company?

17             MR. MASIN:  Object to form.

18             THE WITNESS:  Yes.  That's absolutely what

19        they discussed at that conference, which was

20        actually -- you know, I mean, I guess I was a bit

21        surprised, even though that's what Dr. Garlick always

22        told me, but I didn't -- I wasn't sure if he was a

23        reliable source, but, yeah, that was reinforced and so

24        they would -- at the conference, you know, people

25        would raise their hands and say yeah, that's how we do

Cristin Rettler, P.A.
June 20, 2025

1       it in whatever, New York and Kentucky

2       and Massachusetts and, oh, we just opened and that's

3       how our referral process works, too.

4               You know, they were really striving for

5       standardization, and that's the way to make -- not

6       make money but to keep your money, you know.  They get

7       a bucket of money from Washington County Jail and, you

8       know, they're trying to keep that.  They're trying to

9       not use their resources on patients.

10              MR. MASIN:  Move to strike.

11              MR. CROSS:  All right.  Can we take just a

12      five-minute break?  I need to look over my notes.

13              MR. MASIN:  Sure.

14              (Off the record at 5:03 p.m.).

15              (Back on the record at 5:05 p.m.)

16  BY MR. CROSS:

17  Q.  Ms. Rettler, what is a physician's assistant?  I'm

18      sorry, physician assistant.

19  A.  Yes.  So I am considered a physician extender.  So in

20      primary care I function the same as a nurse

21      practitioner or a physician, but the difference

22      becomes more obvious in our training when I have

23      functioned in specialty care such as where I work

24      right now which is general surgery.  Like I can do

25      minor procedures by myself in the clinic, which I very

Cristin Rettler, P.A.
June 20, 2025

1    commonly did in the jails and in the ER, but I cannot

2    do a surgery by myself.  So that's kind of the short

3    answer of how my training and experience and medical

4    license, scope of practice is different from a

5    physician.

6                    Also, as I indicated, physicians and nurse

7    practitioners are specialized in their area of

8    specialty such as neonatology or general surgery, and

9    they cannot function outside of that narrow scope

10   where they're licensed, but I can practice in any

11   specialty as long as I find a group that is willing

12   to, you know, train me.

13   Q.  So can you perform a surgery under the supervision of

14       a physician?

15   A.  So I'm a surgical first assist at the hospital, but I

16       can perform minor surgeries on my own in the clinic

17       and in the ER, which I commonly did, which would be

18       like, you know, suturing people's faces, removing

19       foreign bodies, I and Ds, incision and drainage of

20       abscesses, minor surgical procedures.

21   Q.  Can you prescribe medication?

22   A.  Absolutely, yes.  We all prescribe medication, all

23       three of us, nurse practitioners, PAs and physicians,

24       and we diagnose, treat, order imaging.

25   Q.  Sorry.  We lost you.

Cristin Rettler, P.A.
June 20, 2025

1    A.    You okay?

2    Q.    Yeah.  We just lost the video.

3    A.    Oh.  I don't know.

4    Q.    Well, if you can still hear me, that's fine.

5    A.    Yeah, I can still hear you.

6    Q.    So were you ever discouraged from reporting your

7          concerns about Corizon either internally or

8          externally?

9    A.    Yes.  I was told not to talk to corrections staff

10         about my concerns, that all issues would be addressed

11         internally, and when I did, I was brought into a

12         meeting to, you know, discuss that because sometimes,

13         you know, I did feel like issues needed to be

14         escalated.  I didn't feel like Washington County, you

15         know, corrections were aware of really what the level

16         of care -- the substandard level of care we were

17         providing and the possible liability it was opening

18         them up to.

19                    As I said, I went to the sheriff, and

20         sometimes even in the moment I would go to like the

21         corrections staff, like the, you know, higher-ups and

22         say, you know, this person -- you know, I referred

23         them for specialty care.  It was denied and now they

24         have a medical issue and they need to go out, and then

25         if the corrections staff would talk to the Corizon

Cristin Rettler, P.A.
June 20, 2025

1        higher-ups and report that I had said that, then I

2        would be called into a meeting with them, that I was

3        not supposed to have those discussions with -- you

4        know, they wanted them to be happy -- blissfully

5        unaware and happy with the level of care that was

6        provided, and the way to do that was to keep them out

7        of the loop and to make -- so that the corrections

8        staff was really not aware of the substandard level of

9        care that was being provided.

10   Q.   Were you ever retaliated against by Corizon for

11        raising your concerns?

12               MR. MASIN:  Object to form.

13               THE WITNESS:  Yeah, I was.  I was written

14        up one time for -- and this is the day after I had

15        been confronted about, you know, some issue related to

16        me, you know, advocating to corrections staff.  I

17        brought a glass bottle of salad dressing and they said

18        I had brought a weapon into the jail.  That was one.

19        Then the second one was I had a student and, you know,

20        I would -- as part of my duties of having a student, I

21        would -- a PA student from Pacific University.  I

22        would review his chart, and if there were any errors

23        in it, I would write a line through it, put my

24        initials and then have a conversation with him

25        about -- you know, he's learning how to chart.  They

Cristin Rettler, P.A.
June 20, 2025

```
1        said I was falsifying a medical record.  It was very

2        obvious to me that they were retaliating for my -- you

3        know, they were trying to maintain my silence.  Those

4        are the two times I was written up.

5   BY MR. CROSS:

6   Q.   Were you written up by custody staff or by --

7   A.   No.

8   Q.   -- Corizon staff?

9   A.   By Corizon for talking to custody staff.  I found

10       custody staff to be very responsive, very, you know,

11       willing to have conversations with me, interested in

12       having conversations with me.  They knew that I was

13       getting pushback to not talk to them.

14                   MR. MASIN:  Move to strike as

15       nonresponsive.

16   BY MR. CROSS:

17   Q.   You testified earlier about Corizon taking people off

18       of their HIV medication when they were admitted to the

19       jail.

20   A.   Yep.

21                   MR. CROSS:  What does this have to do with

22       anything in our case, Ian?  Seriously.  Object to

23       form.

24   BY MR. CROSS:

25   Q.   What are the risks of interrupting a course of
```

Cristin Rettler, P.A.
June 20, 2025

1         treatment with HIV?

2                    MR. MASIN:  Object to form, beyond the

3         scope of disclosure, irrelevant.

4                    THE WITNESS:  Well, HIV is a chronic

5         disease state much like chronic kidney disease, COPD,

6         you know, and many of those medications were expensive

7         and they were not, you know, formulary, so by denying

8         people access to their chronic care medications, it,

9         you know, speeds up the progression of their chronic

10        disease state and they can end up having these

11        emergency episodes, which often happened at the jail,

12        especially in regards to patients that had preexisting

13        breathing conditions.

14                   MR. CROSS:  Okay.  I don't think I have any

15        further questions.

16                   MR. MASIN:  I just have a couple of

17        follow-ups.

18                        RE-EXAMINATION

19   BY MR. MASIN:

20   Q.   You in your testimony just now referred to e-mails

21        that you'd sent.  Do you have those e-mails?

22   A.   No.  But I think they were part of the discovery for

23        that ten million dollar lawsuit so you should be able

24        to locate them.  There were two different e-mails I

25        sent to the sheriff.

Cristin Rettler, P.A.
June 20, 2025

1    Q.   But you don't have those e-mails?

2    A.   No, I don't have those e-mails.

3    Q.   Okay.  All of the testimony that you just gave in

4         response to Mr. Cross' questions referred to the time

5         period that you were working at the Washington County

6         Jail in Hillsboro Oregon between April of 2012 and

7         April of 2014, correct?

8    A.   Yes, and during by tenure at the Washington County

9         Jail.

10   Q.   Okay.  And you have no personal knowledge of any facts

11        relating to Corizon's care for prisoners in the

12        Michigan Department of Corrections between 2017 and

13        2019, correct?

14   A.   That's correct.

15             MR. MASIN:  I have no further questions at

16        this time.  Ian, do you have anything else?

17             MR. CROSS:  Yeah, just one follow-up.

18                      RE-EXAMINATION

19   BY MR. CROSS:

20   Q.   Ms. Rettler, you testified that you were retained as

21        an expert witness in a lawsuit involving Corizon in I

22        believe 2018 or 2019, is that correct?

23   A.   Yes.

24   Q.   And did you review records as part of your engagement

25        in that suit?

Cristin Rettler, P.A.
June 20, 2025

1    A.    Yeah.  I reviewed medical records.

2    Q.    And did those records relate to care provided by

3          Corizon?

4    A.    Yes.

5    Q.    And what time period was that care provided by

6          Corizon, if you know?

7    A.    I don't recall, but it was after the time that I left

8          Washington County Jail.

9    Q.    Okay.  Thank you.  I have no further questions.

10                 MR. MASIN:  Now I have a question.

11                      RE-EXAMINATION

12   BY MR. MASIN:

13   Q.    Where was that located?  Where was that medical care

14         provided in the case that you reviewed?

15   A.    So there were two different lawsuits and I believe --

16         you know, again, you'd have to look it up yourself,

17         but I believe one of them was at Clackamas and one was

18         at Washington County, but I could be -- I'm not sure

19         about that.

20   Q.    Both in Oregon, correct?

21   A.    Both of them in Oregon that I remember.

22                 MR. MASIN:  I don't have any further

23         questions.  For the record, I know we're preserving

24         all our objections to trial anyway, but I move to

25         strike this entire testimony as irrelevant, beyond the

Cristin Rettler, P.A.
June 20, 2025

1          scope of the disclosure, hearsay, nonresponsive to

2          questions and several other reasons which I will

3          address at an appropriate time.

4                    MR. CROSS:  I have no further questions.

5                    COURT REPORTER:  Would anyone like to order

6          the transcript?

7                    MR. MASIN:  Yes, please, and I need it

8          expedited, sometime -- today's Friday.  Can I get it

9          by Wednesday?

10                    COURT REPORTER:  Yes.  Mr. Cross, would you

11         like the transcript?

12                    MR. CROSS:  Yes.  Electronic only is fine

13         as well.

14                    (The deposition was concluded at 5:16 p.m.

15              Signature of the witness was not requested by

16              counsel for the respective parties hereto.)

17

18

19

20

21

22

23

24

25

Cristin Rettler, P.A.
June 20, 2025

1                    CERTIFICATE OF NOTARY

2   STATE OF MICHIGAN )

3                     ) SS

4   COUNTY OF WAYNE   )

5

6            I, HELEN F. BENHART, certify that this

7       deposition was taken remotely before me on the date

8       hereinbefore set forth; that the foregoing questions

9       and answers were recorded by me stenographically and

10      reduced to computer transcription; that this is a

11      true, full and correct transcript of my stenographic

12      notes so taken; and that I am not related to, nor of

13      counsel to, either party nor interested in the event

14      of this cause.

15

16

17

18

19

20

21                    _Helen F. Benhart_

22                    HELEN F. BENHART, CSR-2614

23                    Notary Public,

24                    Wayne County, Michigan.

25       My Commission expires:  7/7/2027

Cristin Rettler, P.A.
June 20, 2025

**$**

**$250**
  64:4

**-**

**-or**
  33:8

**0**

**02**
  17:8

**1**

**1,400**
  31:22

**100**
  60:4

**11**
  68:14

**14**
  56:17,19

**18**
  23:21 24:16

**19**
  21:14

**1994**
  25:19 41:21

**1998**
  15:14 17:21

**1999**
  15:14

**2**

**20**
  4:2 19:23

20:5 21:2

**2000**
  15:13

**2002**
  12:23 17:10
  26:1 38:10
  41:22

**2003**
  27:2

**2005**
  8:10

**2006**
  27:2

**2008**
  38:10 41:2,6

**2012**
  30:20,23
  31:13,19
  33:1,5 51:6,
  10 53:11
  83:6

**2013**
  33:6

**2014**
  9:2 10:3
  22:14 30:20,
  24 31:11,19
  33:1,8 44:15
  51:6,11 52:3
  53:12 83:7

**2015**
  9:3 10:3

**2017**
  44:11 83:12

**2018**
  83:22

**2019**
  44:11 83:13,
  22

**2025**
  4:2 33:9
  48:20 50:5,
  10 53:15

**20th**
  19:12 48:20
  49:1 50:5,10
  53:15

**23**
  27:22

**23-year**
  13:25

**25**
  49:1

**27**
  42:11

**3**

**3:03**
  4:3

**3:05**
  5:15

**3:09**
  5:16

**3:14**
  8:2

**3:19**
  8:3

**3:31**
  18:19

**3:41**
  24:24

**4**

**4:17**
  48:12

**4:26**
  53:23

**4:32**
  53:24

**5**

**570**
  32:1

**5:03**
  77:14

**5:05**
  77:15

**5:16**
  85:14

**7**

**70**
  34:21

**8**

**800**
  31:24

**9**

**90s**
  26:7

**A**

**abdomen**
  29:8

**abdomens**
  36:22

**abdominal**
  29:21

**abscesses**
  78:20

**absolutely**
  17:12 31:9

Cristin Rettler, P.A.
June 20, 2025

76:18 78:22

**abuse**
27:20

**academic**
40:21

**access**
62:2 82:8

**accidentally**
58:7

**accurate**
49:24

**acknowledge**
4:10,12

**ACL**
67:1

**ACLS**
43:12

**acting**
27:6

**active**
16:23 17:8

**activities**
17:12

**actual**
15:24 59:17

**acute**
29:8 36:21

**Adam**
4:21 5:5
6:23

**address**
5:9,18 8:7,
13 49:6,7
85:3

**addressed**
39:24 55:13,
14,15 66:15
67:8 79:10

**adjunct**
39:17

**administered**
4:12 14:5

**admitted**
81:18

**Advair**
64:3

**advertise**
41:13

**advertised**
41:18

**advice**
21:5

**advocate**
59:19 63:18
64:9 65:2

**advocating**
80:16

**afford**
65:8

**afternoon**
5:5 57:5

**agree**
4:20,22
29:7,13

**agreement**
4:17,18

**ahead**
66:23

**Aiken**
46:5

**alleged**
11:13 12:13

**allegedly**
11:16

**allocate**
75:22

**allowed**
62:13

**Alsalman**
46:9

**altercation**
71:20

**altogether**
59:8

**amazing**
69:13 72:9

**America**
61:20

**American**
60:25

**amount**
55:14 65:6

**Angela**
5:20 8:9

**anymore**
56:24

**appears**
5:23 25:3

**applied**
17:15 20:7,
11,16

**apply**
42:7

**applying**
15:9

**appointment**
59:18,21,22,
24 68:13
69:11 71:5
76:10

**appointments**
69:10

**appropriately**
11:16

**approved**
47:20,22

**approving**
66:7

**approximately**
17:21 31:20

**April**
30:23,24
31:11,13
44:14 83:6,7

**area**
43:4,6 78:7

**areas**
27:22 43:2

**Arizona**
5:21,25 7:14
8:10,18,21
16:21,25

**arrangement**
4:16

**article**
23:4

**asks**
21:14

**aspect**
55:1

**assault**
72:5

**assist**
28:14,19
29:9 78:15

**assistant**
12:20 15:24
25:23 26:14
27:6,9,23,25
28:20 29:1
32:13 39:15,
17,20,22
41:21 42:14,
16,19,21,24

Cristin Rettler, P.A.
June 20, 2025

43:5,10
49:20 51:2
77:17,18

**assistants**
15:21 57:25

**associate**
42:20

**Association**
60:25

**assume**
9:18

**attend**
32:17,18,19,
25 33:9,15
35:23 73:13

**attendance**
35:1 73:3

**attended**
33:17 34:17
36:14 71:12

**attending**
71:9

**attention**
55:10

**attorney**
12:4 24:4,14

**attorneys**
4:9 10:21
19:18 22:7
23:14,20
24:17,20
25:5 48:25
53:16

**audio**
7:19

**average**
56:16,23

**avoid**
71:2 72:6,13
73:17 75:11

**avoided**
52:22

**avoiding**
69:14

**awarded**
39:3

**aware**
48:2 56:13
79:15 80:8

---

**B**

**B-O-R-G-E-R-D-**
**I-N-G**
45:24

**BA**
41:20

**back**
5:14,16 8:3
10:2 15:8
17:21 22:7,
13 24:6
36:11 53:24
64:11,13
73:3 77:15

**bad**
5:23 72:6

**bag**
37:12,15

**bankruptcy**
23:23

**bariatric**
37:23

**basal**
67:7 68:7

**baseline**
64:20

**basic**
9:5

**basically**
73:18

**beginning**
35:10

**believed**
20:13

**benign**
59:4

**Bergman**
45:21,22

**big**
13:12 14:24
31:16 59:9
64:21 68:14

**bill**
65:13 69:9,
13 72:15
76:6

**bills**
69:1,7 72:8

**bit**
18:25 71:8
76:20

**blissfully**
80:4

**blow**
18:8

**BLS**
43:13

**board**
42:17,19,21
43:4

**boards**
42:11

**bodies**
78:19

**Bomber**
46:13

**Borgerding**
45:24

**boss**
51:25

**bottle**
80:17

**bottom**
48:19

**BPH**
59:4

**break**
9:21,23
53:22 77:12

**breath**
64:5

**breathe**
59:5

**breathing**
58:9 82:13

**briefly**
15:9

**bring**
18:4 28:23

**brought**
14:17 55:10
79:11 80:17,
18

**bucket**
77:7

**bunch**
9:11 72:9

---

**C**

**California**
16:21 17:2,5

**call**
24:11 34:19
59:18 65:21

Cristin Rettler, P.A.
June 20, 2025

called
  4:24 5:6
  15:22 16:4,
  7,10 34:20
  42:20 55:3,8
  62:14 69:5
  80:2

camera
  28:16

cap
  65:9

capacities
  42:4

capacity
  31:11,23

carcinoma
  67:8 68:7

cardiac
  60:6

care
  7:18 11:15,
  16 12:13
  14:5 16:11
  26:25 27:4,
  14,16,19
  30:5,7 31:1
  41:8,11 42:5
  54:24 55:1
  57:8 59:1,24
  60:24 61:4,
  6,7 63:17
  68:17 69:25
  70:6 71:6,
  14,16 73:17,
  21 74:8
  75:11,12
  76:1,2
  77:20,23
  79:16,23
  80:5,9 82:8
  83:11 84:2,
  5,13

career
  13:25 27:8

cares
  26:21

caring
  58:5

case
  9:1 10:2,9,
  14,15,16,18,
  22 11:2,8,11
  12:9,14
  13:2,5,8
  19:8 21:5,9,
  11,12,16,18,
  21,22,23
  22:8,10,13,
  18 24:4
  25:10 29:20
  36:12 43:18,
  21,22 47:3,
  6,10,15
  48:17,25
  49:17 50:1,9
  53:9,17
  55:21,22
  81:22 84:14

cases
  10:25 11:13,
  18,24 12:2,
  3,10,16,18,
  24 13:17,20
  14:10,14
  15:1,4
  20:14,20
  24:1

catastrophic
  57:13

celebrating
  74:5,12,22,
  24

cell
  64:7 67:7

68:7

certificate
  40:2,6

certificates
  40:6

certification
  43:7

certified
  42:17,19,21
  43:1,4,5,13

changed
  61:9

chapter
  37:17

charge
  54:12,15

charges
  56:22 68:14

chart
  58:7 80:22,
  25

charts
  12:6 60:2

cheap
  61:21 62:15
  63:18 64:3

checking
  68:8

chronic
  59:1,2,3,13
  63:17 66:9
  82:4,5,8,9

CHS
  4:21 5:6
  16:4 18:14,
  25 19:3

circumstances
  28:25

City
  74:2

Clackamas
  84:17

claimed
  12:18

classes
  63:15

clear
  20:10,17

clinic
  27:1 29:11
  77:25 78:16

clinical
  32:6 38:13

clinics
  56:3

CME
  32:18

collaboratively
  29:4

collected
  55:2,9

Colleen
  46:1

colostomies
  36:16 37:13
  43:18

colostomy
  28:1,9,21
  29:3,19
  36:15,17,22
  37:2,4,5,9,
  12,15 47:19,
  23 48:3

common
  37:8 45:15
  64:2

Cristin Rettler, P.A.
June 20, 2025

commonly
78:1,17

communications
21:5

community
61:25 62:12,
24 68:25
69:2 70:5
72:14 74:11
76:4,5,8

community's
72:14

company
5:6 14:18
16:4,7,10
61:19 62:5
70:3 76:16

complain
54:24

complaints
69:19

complete
6:21

completely
56:7 70:3,15

complicated
58:6

concerned
57:14,17
58:15 60:22

concerns
57:7 65:17,
24 66:2
68:1,17
79:7,10
80:11

concluded
85:14

conclusion
4:8

conclusions
21:4

condition
62:3,5

conditions
82:13

conduct
6:20

conference
37:21 38:1
52:6,11,14,
18,21 53:1,4
71:9,11
72:11 73:13
74:17 75:16
76:19,24

conferences
33:9

confronted
80:15

connection
5:23 6:6,9

consent
4:15

considered
77:19

consult
29:5

consults
28:22,23

contact
23:8,14,19
40:13

contacted
23:17 24:15

continue
63:7 68:21

continuing
17:13 26:3

36:21 37:5

contract
69:20

conversation
47:13 63:23
64:22 71:14,
16 72:3,6
73:20 75:24
80:24

conversations
64:18 81:11,
12

coordinator
38:14

COPD
59:2 63:25
82:5

copy
24:20

core
38:14

Corizon
9:1 10:2
12:1,9,14
14:24 19:3
22:8,11
23:18,22
24:1 26:19
31:3,4,5,7,
8,10,14
32:16,20,24
33:14 34:11
35:10,23
44:14,17,19,
25 49:21,25
51:2,13
54:16 55:16,
17 56:2,5
57:6,15
58:13 61:1
62:9,13,25
65:1,10,18

68:25 69:7,
9,12 70:1
71:23 75:5,
10,24 79:7,
25 80:10
81:8,9,17
83:21 84:3,6

Corizon's
44:11 60:23
71:9 72:7
76:14 83:11

corporate
32:19 61:5
73:24

correct
12:25 15:3
16:2 20:25
21:21 23:5
24:7 25:16,
20 26:1,2
29:13,20
30:1 31:11,
12,14,15
33:12 38:17
42:13,16,18,
25 43:19
44:21 49:6,
8,22 51:6,7,
12 52:4
55:24 56:11,
12 70:1
83:7,13,14,
22 84:20

correction
39:13 40:25

correctional
12:6 16:11
32:5 41:7,11
44:18 71:15

corrections
10:15 16:14
27:18 44:5,8
48:4 55:19

Cristin Rettler, P.A.
June 20, 2025

79:9,15,21,
25 80:7,16
83:12

**correctly**
12:1 62:25

**cosmetic**
67:17,20

**costs**
73:22

**Cottonwood**
5:21,25
8:10,21

**counsel**
4:15,19,21
9:25 85:16

**country**
73:6

**county**
12:21,22
13:21,24
14:6 22:1,5
29:25 30:6,
7,9,10,16,
19,23 31:16,
22,24 32:3,4
35:1 47:18,
25 49:21
51:2,5,10
53:11 54:3,
19,22 55:16
56:14 62:10
65:12,13
69:24 70:3,
11 74:1 77:7
79:14 83:5,8
84:8,18

**couple**
13:9 19:20
26:24 30:19
37:10 38:13
44:18 50:23
53:19 54:1

58:23 82:16

**court**
6:21 11:5
15:2 22:24
85:5,10

**create**
28:1

**crises**
61:12

**crisis**
58:10 59:11

**Cristin**
4:23 5:20,24
8:9 18:16

**criteria**
39:25

**Cross**
4:19 6:23
23:12 36:11
53:21 56:25
57:4 60:21
62:18 63:6
64:12 65:16
67:10,16,25
69:17,23
70:16,19
71:7 72:24
73:2,12
74:15,23
75:9,17
76:13 77:11,
16 81:5,16,
21,24 82:14
83:17,19
85:4,10,12

**Cross'**
23:8 83:4

**current**
7:13 8:17

**custody**
11:12 65:3,

5,8,15 76:3
81:6,9,10

**custom**
44:14

**cut**
5:22

**cutting**
6:4,18

**CV**
20:3,7,14,19
25:3,12,15,
18 26:8,13,
25 27:8
30:14,22
38:16,20
39:11 40:9,
20,21,22

---

**D**

**date**
25:15 50:5

**dated**
48:20

**dates**
26:17 30:13,
18 32:25
33:3,13 53:4

**day**
19:11 28:7
38:4 80:14

**day-to-day**
37:11

**days**
33:17 56:17,
19

**deal**
58:20 76:3

**death**
11:12,13

22:13

**December**
27:2

**declare**
4:13

**defendant**
11:24 12:9
14:2,9,15
18:14

**defendants**
13:16

**define**
38:23

**degree**
15:25 26:15
32:10 41:21
42:3

**degrees**
26:4

**dehydration**
55:25 56:10

**delaying**
75:10

**demonstrate**
35:15

**demonstrates**
40:3,10

**demoted**
54:5

**denied**
79:23

**deny**
60:24 71:16

**denying**
75:10 76:2
82:7

**department**
16:14 44:5,8
48:3 54:12,

Cristin Rettler, P.A.
June 20, 2025

15 55:19
83:12

**depending**
56:22

**deposed**
10:2,4 14:24
22:15

**deposition**
4:10,11 6:20
7:9 8:22,24
9:5,6 10:22
18:15,18
19:8,15,17,
19 24:23
48:11 85:14

**depositions**
11:1 14:20

**depriving**
61:4

**deputies**
54:21

**deputy**
71:21

**description**
27:4

**designations**
43:16

**destabilize**
61:11

**destabilized**
62:17 63:13

**detail**
11:19 26:24

**details**
13:11 21:22

**determine**
71:13

**Detroit**
15:9 26:7

**diagnose**
78:24

**diagnosing**
28:20 29:2

**died**
11:21,22
55:25 56:9

**difference**
77:21

**differently**
31:17 70:4

**difficulties**
66:5 70:8

**difficulty**
74:10

**direct**
71:8

**director**
51:14 54:13
70:24 71:4

**directors**
34:18 71:18
73:5

**disagreement**
65:4

**discharge**
29:10

**disclosure**
82:3 85:1

**disclosures**
48:8

**discouraged**
79:6

**discovery**
82:22

**discuss**
57:10 79:12

**discussed**

56:4 76:19

**discussing**
71:13

**discussions**
65:25 68:2
74:16 75:22
80:3

**disease**
59:3,13 66:9
82:5,10

**dismissed**
13:21 14:6

**dispose**
34:4

**distinct**
39:21

**distinguishing**
39:22

**diverse**
27:5

**doctor**
29:1 42:13,
15 63:8

**doctors**
45:17 72:9,
18

**document**
18:21,23
19:7,21
48:14,16,20
49:3,10,15,
18 50:3,8
71:25 72:7

**documentation**
35:15,17
40:3,10,15

**documented**
75:2

**documents**
18:4,6,10

20:13,18
21:3,8,9,14,
17,18,19
22:3,6,9,17,
24 24:18
25:7 33:22
36:10 44:4,
7,10

**dog**
8:16

**dollar**
22:11 57:15
69:21 82:23

**dollars**
63:22 65:7
75:7

**drainage**
78:19

**dressing**
80:17

**Drinket**
46:11

**drug**
11:23 63:15

**Ds**
78:19

**Duces**
18:15

**duly**
4:25

**duties**
80:20

**E**

**e-mail**
60:17 65:21

**e-mailed**
65:23

Cristin Rettler, P.A.
June 20, 2025

e-mails
  19:18 35:6
  65:19 82:20,
  21,24 83:1,2

earlier
  50:5 73:6
  81:17

earn
  16:25 17:2,7

earned
  43:9

easiest
  8:5

easy
  62:2

education
  17:13 26:3
  36:21 37:5

effort
  73:10,22

EKG
  60:5

elective
  47:22 66:12,
  17,21,24
  67:4,11,14

Electronic
  85:12

Emanuel
  29:16

emergency
  28:22,25
  29:7 58:19
  60:1,10
  66:19 67:15
  82:11

employed
  16:4,7 31:4,
  5,7 39:23

employee
  54:16

employees
  44:24 55:15,
  16,17

employer
  7:13 8:17
  17:24

employment
  16:2 57:6

end
  35:11 51:19
  59:11 61:11
  82:10

ended
  58:19

endless
  70:24

engagement
  83:24

entailed
  12:5

entered
  63:3

entire
  20:5,25
  72:11,23
  76:16 84:25

entity
  61:5

enzymes
  60:7

episodes
  82:11

ER
  15:17 26:19
  27:16,17
  28:23 29:4
  30:17 60:8
  66:7 78:1,17

Erina
  45:12

errors
  80:22

escalated
  55:7 79:14

established
  56:1

eternally
  68:11

ethically
  61:2

event
  32:20 73:4

everybody's
  66:20

evidence
  21:4

evolved
  73:19

exacerbated
  63:16

exact
  33:13

examination
  5:3 57:3
  71:8

examined
  5:2

exams
  72:4

exchange
  35:5,6

excited
  75:8

excuse
  46:21 54:20

Exhibit
  18:14,18
  24:21,23
  48:6,11

expanded
  74:3

expanding
  74:1,2

expected
  49:19 50:25

expedited
  85:8

expensive
  61:14,23,24
  63:24 65:2,
  15 82:6

experience
  49:20 51:1
  70:8 78:3

expert
  10:8,12,23
  12:4,24 13:7
  15:1 18:16
  19:2 21:11,
  23 25:10
  41:14,17
  43:17,20
  48:8 50:1
  60:14 83:21

expertise
  12:19

express
  68:17

expressed
  58:12

extended
  68:15

extender
  77:19

Cristin Rettler, P.A.
June 20, 2025

externally
  79:8

extreme
  58:19 61:11

extremely
  58:5

_____

          F
_____

F-R-A-N-Q-U-E-
R-O
  8:12

face
  66:25 67:8,
  21 68:7

faces
  78:18

facilities
  32:5 56:5
  73:7

fact
  64:22 73:7
  74:22

factors
  39:22

facts
  11:20 48:2
  83:10

faculty
  38:15 39:17

failure
  11:14 12:13
  66:10

fair
  9:19 29:18
  32:13 44:13
  52:2

falls
  67:13 71:1

falsifying
  81:1

familiar
  18:25 20:2
  23:1 45:23
  55:18

family
  37:11

fashion
  66:16 67:9

fears
  58:13

February
  27:2

Fed.r.civ.p.
26(a)(2).
  48:9

feedback
  39:14 40:25

feel
  37:12 79:13,
  14

felt
  57:9,12

figure
  42:5

filed
  23:22

find
  78:11

findings
  21:4

fine
  6:17 65:4
  79:4 85:12

firm
  13:15 23:9,
  10

five-day
  32:20

five-minute
  77:12

Florida
  25:19 41:21
  42:1

focus
  70:4

focused
  70:5

follow
  29:9 57:1

follow-up
  59:14 83:17

follow-ups
  82:17

Ford
  15:17 17:25

foreign
  78:19

Forest
  27:1

forever
  61:22

forgive
  36:1

forgot
  26:11

form
  10:24 55:5
  58:17 60:17
  61:17 63:5,
  11 64:15
  65:22 66:22
  67:18 68:3
  69:22 70:13,
  18,21 74:19,
  25 75:13
  76:17 80:12

81:23 82:2

formulary
  58:25 59:10
  61:13,16,18
  62:14 64:25
  82:7

forward
  13:10,22
  14:7

found
  41:19 73:25
  74:13 81:9

fractured
  71:21

frankly
  26:16 57:13

Franquero
  8:10

freezes
  9:8

freezing
  6:3

frequent
  56:5

frequently
  26:17,20
  61:9 62:16
  63:23

Friday
  4:2 19:13
  85:8

frozen
  5:10,12
  6:11,14,19

Fulks
  45:19

full
  5:9,18 8:7
  38:12,21,23
  39:1,2,9,22,

Cristin Rettler, P.A.
June 20, 2025

```
       23 41:5
       71:17
full-time
       40:17
function
       71:25 75:3
       77:20 78:9
functioned
       77:23
future
       41:1

_____
           G
_____

garlic
       51:18
Garlick
       51:15,16
       52:20 59:19
       65:19,25
       66:6 68:1,18
       76:21
Garlick's
       51:24
gave
       25:10 38:1,4
       60:3 71:19
       83:3
general
       7:14,18 8:18
       27:17,21
       28:7 29:15
       36:20 37:7,8
       77:24 78:8
generally
       27:11
generic
       59:6 61:23
       63:18
gentleman
```

```
       71:19
gigs
       26:21
Gill
       46:15
give
       10:22 21:20
       29:5 40:6
       43:17,20
       44:20 50:9
       53:9,19
giving
       10:25 21:23
       38:25 49:25
glass
       80:17
glorified
       26:9
goal
       61:5 75:16
goals
       73:20
good
       5:5 29:17
       57:5 60:9
graduate
       27:12 42:6
graduated
       17:8 25:18
       26:1,14
       41:23 42:1
       57:24
grave
       57:7
great
       56:1,21 73:7
grievance
       54:23 55:8,
       10,18
```

```
grievances
       55:3,15
ground
       9:5 60:14
group
       78:11
Grove
       27:1
guess
       20:21 23:22
       24:15 29:12
       31:21,23,25
       34:19 39:21,
       25 40:13
       41:6 42:20
       54:10 74:21
       76:20
guest
       38:1,6,25
       41:3
guise
       67:13
guy
       11:22 67:7
       69:5 74:21
guy's
       68:7

_____
           H
_____

half
       57:22
handle
       60:11
hands
       76:25
happen
       47:11
happened
       57:15 58:11
```

```
       82:11
happy
       80:4,5
Harald
       51:23
hard
       6:19 18:10
Harold
       51:15
headline
       73:19
headquarters
       71:9
health
       7:18 10:15
       27:20 31:1
       41:8,11 42:5
       61:12 62:1,7
       70:1,2,5
       76:9
Healthcare
       7:14 8:18
hear
       5:12,13
       6:13,17 9:7,
       13 79:4,5
heard
       5:24 16:9
       34:10,15
       39:16 53:1
hearsay
       85:1
held
       16:1 41:2
helped
       7:7 72:17
helps
       7:1,5
Henry
```

Cristin Rettler, P.A.
June 20, 2025

15:17 17:25

**hereto**
85:16

**heroine**
55:24 56:10,
12

**higher**
62:4

**higher-ups**
79:21 80:1

**Hillsboro**
23:18 30:10,
23 69:3
73:25 83:6

**hired**
74:9

**hiring**
57:20

**HIV**
59:9,10
64:23,24
81:18 82:1,4

**hodgepodge**
27:20

**hold**
16:16,17,20,
21 17:21
23:23 41:17
72:22

**home**
37:11

**hook**
65:12 72:7,
15

**hopes**
61:4

**hospital**
15:17 17:20,
25 26:7
28:22 29:10,

16,17 69:4
78:15

**hospitals**
42:9 56:3

**hour**
24:10

**hours**
56:21

**How's**
7:2

**HSA**
34:20,25
54:4,10
55:11

**HSAS**
72:18

**huge**
67:7

**hum-mm**
23:7 41:9

**hundred**
28:4 34:21

**husband**
15:10

**hybrid**
27:19

**hypertrophy**
59:4

**Hyppolite**
34:25 54:4,
7,8 73:5

---

**I**

**Ian**
4:19 23:15
81:22 83:16

**identify**
33:11

**imaging**
29:5 78:24

**importance**
64:19

**important**
64:5

**impressive**
69:15

**inaccurate**
50:22

**Inc.'s**
18:15

**incarcerated**
66:15 68:15

**incarceration**
56:14

**incentivized**
72:17

**incision**
78:19

**include**
25:14 36:22

**includes**
4:6 19:21

**including**
32:15

**increased**
74:3

**index**
4:6,7

**individual**
35:3

**individuals**
33:18 34:23
45:5 52:3,
14,17

**inexpensive**
62:2

**inform**
4:7

**information**
10:21 12:6
23:17

**inhaled**
64:1,3

**initially**
24:15

**initials**
80:24

**initiated**
63:2

**injury**
74:16 75:4

**inmate**
54:23 56:9

**inmates**
31:19,22,24
54:23 56:14
57:8 65:11
70:6 73:18
75:11

**inmates'**
55:1

**inpatient**
27:19

**insinuating**
20:22,24

**instance**
59:12 68:13

**institute**
12:7

**instructor**
38:16 39:12
40:23

**instruments**
28:17,18

Cristin Rettler, P.A.
June 20, 2025

insurance
  61:19 62:5,7
  76:4
intend
  21:16,20
  53:9
intended
  47:9
intending
  21:12,13
  29:18
intent
  21:25
intentions
  58:2
interacted
  37:10 44:25
  51:16
interested
  81:11
internally
  79:7,11
Internet
  5:23 6:6,9
interrupting
  63:1 81:25
INTRODUCED
  18:17 24:22
  48:10
involved
  20:4,8 27:25
  44:17,19
  55:1
involving
  24:1 35:23
  37:2 83:21
irrelevant
  82:3 84:25
issue

62:1 68:24
79:24 80:15
issues
  44:22 59:9
  67:24 79:10,
  13

_____

            J

_____

Jackson
  43:23,25
  44:5,21
  48:17 49:16
Jackson's
  44:2,22 48:8
jail
  12:21,22
  13:21,24
  22:1,5 26:19
  29:25 30:5,
  10,16,19,23
  31:1,16,22,
  25 32:3,4
  35:1 47:18,
  25 49:21
  51:2,6,10
  52:1 53:11
  54:3,20,22
  55:15 56:15,
  18,19 58:25
  60:11 62:10
  63:3,9 64:6
  66:4 69:25
  71:20 74:1
  75:3 77:7
  80:18 81:19
  82:11 83:6,9
  84:8
jails
  78:1
Jan
  46:19,21

January
  17:1
jargon
  72:16
Jeffrey
  46:3,13
job
  15:15 25:14
  26:19
jobs
  26:13,16
Joe
  54:13
John
  45:14
journal
  23:1,5
June
  4:2 19:12
justifying
  72:19

_____

            K

_____

Kaelynn
  46:7
Kansakar
  45:12
Keith
  45:10
Kentucky
  74:2 77:1
kidney
  59:3,13
  66:9,10
  76:10 82:5
kind
  10:14 19:14
  27:20 29:8

37:18 43:7,
11 61:15
76:6 78:2
kinds
  66:19
kite
  55:4
knee
  66:12 67:1
knew
  68:15 69:4
  81:12
knowledge
  23:7 44:13,
  24 45:2,4,16
  69:18 83:10
knowledgeable
  29:21 37:13
Konchise
  48:8

_____

            L

_____

lack
  57:7
Lacy
  46:17
lane
  8:10,12
laptop
  7:20,22
large
  76:5
larger
  18:8 50:13
late
  26:7
law
  13:15

Cristin Rettler, P.A.
June 20, 2025

lawsuit
    13:23 14:2,
    15,17,25
    22:11 23:18
    57:15 69:21
    71:23 75:5
    82:23 83:21
lawsuits
    13:25 14:5
    19:1 20:4,8
    25:9 44:18
    84:15
lawyers
    47:8,14
learned
    37:4
learning
    80:25
leave
    57:5 59:20,
    22 76:3,11
leaving
    76:7
lecture
    37:21 38:2
lecturer
    38:17 39:12
    40:23
lectures
    38:1,3,4,6,
    25 41:3
    73:14
left
    57:16 58:14
    65:13 72:1
    75:3 76:11
    84:7
Legacy
    29:16,17
Legal

4:5
length
    56:13,16
lets
    19:14
level
    55:7,9 61:6
    62:4 69:14
    71:13 79:15,
    16 80:5,8
levels
    55:3
liability
    79:17
license
    16:20,25
    17:2,7,8,11,
    14,16 42:23,
    25 43:2,14
    57:14 60:19,
    20,22 78:4
licensed
    78:10
licenses
    16:16,17
    17:22
liens
    30:21
lieu
    4:12
life
    67:1
lift
    67:1,21
lines
    9:9
list
    19:21,23
    20:5,15,19,
    25 21:1 45:3

listed
    14:4
listing
    26:25
literature
    22:22 36:5,
    7,9
litigation
    74:17
live
    5:25 6:2
    8:10,14
    15:8,12 67:1
lived
    15:5,10
living
    15:15 37:12
local
    32:19
locate
    82:24
located
    8:20 10:16
    84:13
locked
    64:7
log
    5:13,14 7:25
Lombard
    23:10,11
long
    24:9 32:9
    35:18 42:10
    78:11
longer
    34:1,3
looked
    50:5

loop
    80:7
lose
    34:4
lost
    22:12 57:15
    69:20 74:22
    78:25 79:2
lot
    14:13 29:15
    58:19 64:17
    69:2
lots
    73:14
low
    58:21
LPNS
    57:24 74:9
luck
    58:10

M

machine
    60:6
made
    15:2 47:24
    69:18
Madelyn
    22:12
Mahir
    46:9
mailing
    8:12 49:7
mainstays
    28:8
maintain
    17:14 62:10
    81:3

Cristin Rettler, P.A.
June 20, 2025

make
   18:8 39:13
   40:25 50:13
   61:15 77:5,6
   80:7

making
   50:15 61:4

manager
   55:11

managers
   34:19

manner
   4:16

Maple
   27:1

margins
   74:3

mark
   18:14 24:21
   48:6

Masin
   4:21 5:4,5,
   17 6:25 7:3,
   6,12 8:4,6
   18:20 24:25
   48:7,13
   53:22,25
   56:6,8 58:17
   61:17 63:5,
   11 64:15
   66:22 67:12,
   18 68:3
   69:16,22
   70:13,18,21
   72:22 73:1,
   11 74:14,19,
   25 75:13,20
   76:17 77:10,
   13 80:12
   81:14 82:2,
   16,19 83:15
   84:10,12,22

85:7

Mason
   46:15

Massachusetts
   77:2

masters
   25:22

matrix
   57:18 58:1

matter
   4:14 57:12
   58:2 73:18

maximum
   31:22 73:23

Mccarthy
   54:13,16

Mckenna
   46:25

meaning
   12:24

means
   20:17 42:15
   66:20

meantime
   59:23

Measure
   68:14

medical
   11:14 12:5
   15:20,24
   17:13 23:1,4
   26:25 34:18
   36:2,5,21
   37:21 42:7,
   13,15,17,22
   44:2,22
   51:13 54:12,
   13,15 55:5,6
   57:7,14,24
   58:3,10,20,

22 59:11
   60:1,10,14,
   19,20,22,24,
   25 61:3
   62:3,23 63:2
   67:24 69:25
   70:24 71:4,
   11,17 72:4,
   8,18 73:17,
   22 74:8
   75:11 78:3
   79:24 81:1
   84:1,13

medical-legal
   72:12

medication
   62:4,16
   63:17 65:6
   78:21,22
   81:18

medications
   59:1,7 62:3,
   11,12,19
   63:15,19,20,
   21 64:9,14,
   20,23,25
   65:3,15
   82:6,8

meds
   59:8,9,10
   61:9,10,13
   63:25

meet
   51:25

meeting
   24:9,13,17
   32:25 34:17
   35:9,16,22
   58:1 79:12
   80:2

meetings
   32:17,18

35:7,23
   57:10 65:24

meets
   39:25

member
   37:11 41:16

mental
   27:20 61:12
   62:1 76:8

mentioned
   10:2 12:8
   13:8 26:6,12
   36:14 52:19

MERF
   55:4

met
   5:7 24:14
   34:24

MI
   11:22

Michigan
   15:5,16
   16:2,11,14
   17:21 23:16,
   20 24:1,3,
   14,17 44:4,
   7,11 45:1,17
   47:8,14
   48:3,24
   53:16 55:19
   83:12

middle
   35:11

million
   22:11 57:14
   69:21 82:23

millions
   75:7

mind
   37:24

Cristin Rettler, P.A.
June 20, 2025

minimum
    57:19

minor
    77:25 78:16,
    20

minutes
    53:19

missed
    20:22 53:5

misses
    57:11

misspeak
    12:17

mm-hum
    21:7 22:16
    38:19 48:22
    54:8

mom
    37:9,15

moment
    79:20

money
    34:11 61:4
    77:6,7

month
    23:24 63:22
    64:4 65:7

months
    23:21 24:16
    26:11 42:11
    57:15

motivated
    65:14

move
    27:15 56:6
    69:16 72:22
    73:11 74:14
    77:10 81:14
    84:24

Multnomah
    12:22 13:21,
    24 14:6
    29:25 30:6,
    9,16 31:22
    32:3 62:9

myriad
    38:6

myriads
    42:4

---

**N**

named
    13:23 14:2,
    9,11 45:19,
    21

names
    11:7 23:15
    25:9 33:18,
    20 34:23
    35:2 45:3,23
    52:13,17
    54:18

Naphcare
    11:25 19:3

narrow
    78:9

Nathan
    23:10,11,16

nationwide
    73:9

needed
    20:7,14
    57:19 59:13
    66:14 68:12
    70:6 79:13

neonatology
    78:8

nephrologist
    69:2

neurological
    71:25 75:3

newsletter
    73:24 74:5,
    13

nonresponsive
    56:7 58:9
    72:23 81:15
    85:1

normal
    51:18

Northern
    7:14 8:18

note
    37:9

notes
    33:25 34:1,
    2,3,5 77:12

notice
    18:15 19:8,
    13

November
    38:10

number
    19:22 21:2,
    14 49:6,8
    57:19,22

numbered
    19:22

numbers
    25:10 35:5

nurse
    43:3,15
    71:24 75:2
    77:20 78:6,
    23

nurses
    55:2,8 57:21
    74:9,11

---

**O**

oath
    4:12 14:22

Object
    58:17 61:17
    63:5,11
    64:15 67:18
    68:3 69:22
    70:13,18,21
    74:19,25
    75:13,20
    76:17 80:12
    81:22 82:2

Objection
    66:22 67:12

objections
    4:16 84:24

obstructive
    59:3

obtaining
    70:8

obvious
    77:22 81:2

offer
    21:16,25
    29:18 37:20
    60:23

offering
    31:21

office
    34:18 55:11
    69:5

official
    55:11

officials
    54:19

onboard
    72:10

Cristin Rettler, P.A.
June 20, 2025

opened
  77:2

opening
  79:17

operate
  28:16

opinion
  29:5 60:14
  75:10

opinions
  21:5,12,15,
  20 29:19
  37:21

optional
  27:13

options
  68:16

oral
  64:1 65:25

order
  29:5 69:9
  75:11 78:24
  85:5

Oregon
  10:17 16:22
  17:7 23:18
  27:2 30:1,
  10,23 32:17
  35:4,24
  44:25 47:19
  51:10 52:19
  53:11 55:23
  56:17,18,19
  62:7 69:25
  83:6 84:20,
  21

original
  22:8

Orr
  51:23

Ott
  51:15,23
  66:3

outcome
  57:13

outcomes
  72:6

overdose
  11:23

overlapped
  26:18

overlapping
  30:17

───────────
      P
───────────

P.A.
  4:23

P.C.
  16:11

p.m
  77:14

p.m.
  4:3 5:15,16
  8:2,3 18:19
  24:24 48:12
  53:23,24
  77:15 85:14

PA
  12:23 15:9,
  11,13 16:3,
  19,25 17:2,
  4,7,14 18:16
  26:4 27:8,12
  32:10 36:15
  37:22 42:2,
  7,10 80:21

Pacific
  25:23 37:25
  38:9 40:11,
  18 41:5

42:2,10
80:21

pages
  19:20

paid
  12:25 13:2,4
  69:7,8

Papendick
  45:10

paragraph
  51:8,13 52:5

paralyzed
  71:22 74:21
  75:5,7

part
  21:23 26:20
  27:12 37:5
  38:12,14,25
  39:1 62:6
  80:20 82:22
  83:24

participated
  23:6 28:9
  37:1

participating
  4:9 28:12

parties
  4:15 85:16

PAS
  78:23

passed
  55:23

patient
  27:5 28:17,
  21 29:2
  55:23 59:19
  60:2 62:20
  63:3 64:21

patient's
  63:2,8 65:6

72:8

patients
  29:10 58:6
  60:24 72:20
  77:9 82:12

pay
  65:10,12
  69:9 75:25

paying
  62:8 68:25
  69:14 72:13
  74:6,10
  75:12

penalty
  4:14

pending
  9:23

people
  14:4,13
  33:20 34:17,
  21 35:2 40:6
  56:21,22
  58:3,11,18,
  24 59:11,25
  61:6,10
  62:10,17
  64:5,18,23
  65:14 66:6,
  10,11 67:23
  68:23 72:5,
  21 76:7,24
  81:17 82:8

people's
  78:18

percent
  60:4

perform
  53:16 78:13,
  16

performed
  36:2 41:10

Cristin Rettler, P.A.
June 20, 2025

67:3

**period**
68:16 83:5
84:5

**perjury**
4:14

**person**
4:13 44:8
51:22 52:18
60:4,12,15
64:10 68:12
79:22

**person's**
51:14,20
54:9

**personal**
44:13 74:16
83:10

**personally**
14:1

**personnel**
58:22

**Pfeil**
46:7

**phone**
7:21,24,25
18:7,11
24:11,12
25:1 49:6,8
50:13

**phrase**
66:18

**physical**
71:19

**physically**
4:10 8:13

**physician**
12:20 25:23
27:22,23,25
42:14,16,19

54:14 77:18,
19,21 78:5,
14

**physician's**
26:14 27:6,9
28:20 29:1
32:13 41:21
42:21,24
43:5,10
49:20 51:2
77:17

**physicians**
43:3,15
78:6,23

**place**
19:15 59:18

**plaintiff**
4:20 10:18
43:22

**plaintiff's**
12:8 18:16
48:8

**plaintiffs**
11:7

**plan**
62:7 63:7

**plans**
31:8 63:1

**podiatry**
42:8

**policies**
58:23 74:8
76:15

**policy**
44:14 60:16
61:1

**poor**
71:19

**population**
27:5 61:8

62:6 64:8

**Portland**
10:17 29:16
30:3 69:3,11

**Portland-vancouver**
37:22

**position**
16:1 39:3

**practice**
15:11 44:14
45:17 78:4,
10

**practiced**
17:4

**practices**
58:15

**practitioner**
77:21

**practitioners**
43:3,15
78:7,23

**predated**
69:7

**preexisting**
82:12

**prep**
28:17

**preparation**
36:4,8,10

**prepare**
47:2

**Prescott**
8:13

**prescribe**
62:13 78:21,
22

**prescribed**
62:19,24

63:1,8 64:14

**Prescriptions**
62:23

**present**
4:11 35:16

**presentation**
33:21 52:25

**presentations**
33:15,17,19
34:9,15
73:13,14

**presented**
33:21 52:14

**presenting**
52:22

**preserve**
72:4

**preserving**
84:23

**pressing**
67:24

**presume**
34:7

**pretending**
75:15

**pretty**
35:13 37:12

**previously**
29:15

**pride**
56:1 73:7

**primary**
26:25 27:4,
14,19 77:20

**prior**
10:3 13:14
24:6,13
30:9,16
31:13 36:12

Cristin Rettler, P.A.
June 20, 2025

47:13 48:25
50:9

**prison**
32:7,14
54:19 71:20

**prisoners**
83:11

**private**
70:2

**problem**
76:12

**problems**
9:7,8

**procedure**
67:20

**procedures**
76:15 77:25
78:20

**proceeding**
4:8

**Proceedings**
4:1

**process**
54:23 55:18
68:6,9 77:3

**professional**
16:16,17

**professor**
38:4,8,19,
20,21 39:3,
9,12,15,18,
20,23,24
40:1,4,9,11,
24 41:2

**profit**
73:23 74:3

**program**
42:10

**programs**

37:6

**progression**
82:9

**promised**
13:4

**promoted**
54:6

**proposed**
47:3,6

**prostate**
59:4

**protect**
60:19 61:1

**proud**
71:24 75:8

**prove**
40:17

**provide**
11:14 12:4,
13 20:14
21:12 25:5
61:5 73:21

**provided**
10:20,24
11:17 25:7,
11 30:7
57:8,19
69:25 70:2,
5,22 80:6,9
84:2,5,14

**provider**
27:1,5 30:5
31:1 63:3

**providing**
21:11 71:2
73:17 76:2
79:17

**psych**
61:9,10

**public**
37:20

**publish**
22:25

**published**
22:22,24
23:4 37:17
41:7

**pulmonary**
59:3

**purports**
50:8

**purposes**
29:19

**pursuant**
48:9

**push**
64:11

**pushback**
60:3 81:13

**put**
60:17 68:5
69:6 80:23

**putting**
67:6

_____

**Q**

**Quality**
16:10

**question**
9:15,22 14:9
19:6 23:12
29:12,22
31:17 36:24,
25 49:15,22
50:2 52:12
56:7,9 66:23
72:23 75:14
84:10

**questions**
9:12,13,18
21:13 26:24
50:23 54:1
56:24,25
82:15 83:4,
15 84:9,23
85:2,4

**queue**
59:24 70:25

**quick**
25:13

_____

**R**

**raise**
76:25

**raised**
68:1

**raising**
80:11

**range**
33:13 56:21
63:14

**re-contacted**
23:24

**RE-EXAMINATION**
82:18 83:18
84:11

**read**
18:22,24
20:5,15,25
21:1 22:7
24:6 36:11
45:3 50:12,
15,16,18
51:8

**reading**
52:12,16,24
53:3

Cristin Rettler, P.A.
June 20, 2025

**realize**
33:2 58:8

**reapply**
17:17,19

**reason**
9:12,21
14:22 58:18
76:14

**reasons**
85:2

**recall**
10:19 11:7,
9,20 12:1,13
13:11,16
17:24 18:23
19:1 33:3,5,
20 34:9,14,
16 35:8,9,11
39:21 47:21,
23 48:1,16,
23,24 49:10,
15 50:11
52:9,11 54:6
64:20 84:7

**receive**
4:7

**received**
24:20 33:22
41:20

**receiving**
54:24

**recent**
25:14

**recently**
12:21 25:6
27:21

**reception**
7:24

**receptionist**
26:9

**recognition**
43:8

**recognize**
18:7

**recollection**
14:24 52:13,
16,25 53:3

**record**
4:18 5:10,
15,16,19 7:8
8:2,3,8 34:7
48:7 53:23,
24 77:14,15
81:1 84:23

**records**
44:2 83:24
84:1,2

**reduce**
72:13 73:21

**reducing**
76:1

**refer**
21:3

**referral**
41:16 59:14
68:6 69:1,6
70:25 71:2,3
77:3

**referrals**
66:7,8 67:6,
23 68:23
70:9,22

**referred**
79:22 82:20
83:4

**refers**
51:5,13 52:5

**refrain**
56:5

**refresh**
52:13,16,24
53:3

**regional**
51:13

**regularly**
26:18

**reinforced**
76:23

**relate**
21:4 51:9
84:2

**related**
21:18 36:16
41:10 55:23
80:15

**relates**
43:10 53:10

**relating**
12:14 16:13
21:9 43:18
44:10 48:2,
17 49:16
53:17 83:11

**released**
65:3,7 68:19

**relevant**
19:4 26:10,
16,22

**reliable**
76:23

**relied**
21:15 22:4

**reluctant**
61:12,14

**rely**
21:19

**remember**
10:25 11:9
33:10,18

34:12,16,17,
23 49:12
51:14,20
52:21 54:10
64:17 67:7
71:10,18
84:21

**Remote**
4:1

**REMOTELY**
18:17 24:22
48:10

**remove**
28:17

**removing**
78:18

**render**
31:23

**renew**
17:10,15

**repair**
67:1

**repeat**
7:16

**repeated**
9:15

**replaced**
59:6

**replacement**
51:24

**report**
11:2 65:17
80:1

**reporter**
4:5 6:22
85:5,10

**reporting**
4:17 79:6

**reports**

Cristin Rettler, P.A.
June 20, 2025

11:4

**represent**
5:6

**represented**
9:25

**request**
48:2 55:5

**requested**
85:15

**requesting**
19:25 20:2
66:11

**requests**
19:22 20:19
47:19,23

**require**
62:4

**requires**
63:23

**research**
23:6 36:2,
16,19 37:3
41:7,10

**reserve**
56:25

**reside**
5:11,21

**residencies**
27:13

**residency**
27:14

**resources**
75:22 77:9

**respective**
85:16

**response**
60:11 83:4

**responsive**

20:18 81:10

**rest**
7:10 61:20

**result**
56:10 59:17
69:18

**resulted**
59:17 71:22
75:4

**retained**
10:8,11
12:24 13:7
15:1 83:20

**retaliated**
80:10

**retaliating**
81:2

**Rettler**
4:23 5:5,10,
12,20,24
7:1,13 8:9
18:16 39:25
48:14 49:19
54:1 57:5
77:17 83:20

**Rettler's**
7:8

**return**
63:20 72:13

**returned**
64:10

**returning**
64:18,19

**reversal**
28:9 36:15
47:20,23
48:3

**reversals**
36:17,23
37:2,5

reversed
37:9,16

**review**
11:18 12:10,
11,16 21:19
36:5,7,10
59:16 60:2
68:10,11,21
70:23 80:22
83:24

**reviewed**
13:9 21:15
22:3 44:2,4,
7,10 47:11
71:4 84:1,14

**reviewing**
12:5

**reviews**
29:6

**rich**
74:12

**risks**
81:25

**RNS**
57:20,21,24

**Robert**
46:17

**role**
28:13

**Ronald**
46:11

**room**
4:11 6:8
8:15 71:17

**rotation**
32:6

**rotations**
32:9

**rules**
9:5

**run**
70:3 73:7

---

**S**

**Sabrina**
46:5

**salad**
80:17

**Sam**
29:17

**save**
34:11

**saved**
22:6

**schedule**
19:21 59:22
69:10 76:10

**scheduled**
67:3,14 71:5

**school**
15:9,13 16:3
27:13 32:7
42:6,7,8

**science**
25:22

**scientific**
36:2

**scope**
67:19 78:4,9
82:3 85:1

**screen**
5:10,12 6:3,
13,19 7:10,
11 9:8 18:2
48:14

**scroll**
49:12 50:14

**scrolling**
50:19

Cristin Rettler, P.A.
June 20, 2025

seek
  68:16

send
  20:2,8 60:17
  66:6

sensitive
  66:8,14

sentence
  6:21 50:25

separate
  12:2,3 68:24

September
  38:10

serial
  60:7

service
  76:6

services
  41:16 60:1
  70:4 72:13
  76:9

set
  76:8

setting
  71:15

settled
  10:25 14:7
  15:4

severe
  58:10 62:1

sharing
  74:7

Sheridan
  32:6

sheriff
  57:9 58:13
  65:23,24
  79:19 82:25

shocking
  71:17

short
  53:22 78:2

show
  18:6,13
  24:18 48:6,
  19 49:3

sick
  61:8

side
  26:21

Signature
  85:15

significance
  40:21

silence
  81:3

similar
  73:8

single
  60:2

sitting
  6:7

situation
  60:10

situations
  28:25 58:20
  72:5

six-week
  32:9

skill
  69:14

sleeve
  37:24

slew
  17:12

Society

37:22

Sonya
  45:19

sort
  25:2 27:18
  37:1,20
  43:8,14 47:2
  54:22

sought
  41:19

sound
  30:24 32:1
  45:23

sounds
  6:18 7:3
  18:25 27:3
  30:25 50:21

source
  76:23

South
  25:19 42:1

speak
  11:18 12:11,
  15

speaking
  7:20 48:24

specialist
  59:14,15

specialists
  70:9 76:10

specialized
  43:2,12 78:7

specialty
  27:10 42:17,
  22,25 43:11
  77:23 78:8,
  11 79:23

specific
  33:3 34:16
  43:4 50:1

55:13 57:17
  64:21

specifically
  13:23 37:23
  57:11 65:20

speeds
  82:9

spell
  8:11 51:17

Spencer
  46:1

spent
  26:6 53:10

spine
  71:21

spoke
  24:3 33:18
  37:22 47:8
  52:17 72:20

spoken
  23:12 37:20
  43:22 45:5,
  16,19,21
  47:14 52:2

spread
  58:5

stabilize
  62:4

stable
  62:8,11,23

staff
  57:19,21,23
  58:3 65:6
  71:21 74:6,
  10 79:9,21,
  25 80:8,16
  81:6,8,9,10

staffing
  58:21

Cristin Rettler, P.A.
June 20, 2025

stand
  54:11

standard
  4:6 74:11

standardizatio
n
  56:2 77:5

standardized
  76:15

start
  8:4

started
  15:13 41:24

stat
  60:6

state
  5:9,18 8:7
  16:2,20 17:4
  35:24 82:5,
  10

stated
  73:6

states
  16:21,23
  41:8,11

stating
  4:17

statistics
  56:13

status
  40:17

stay
  56:16,21,22

stead
  72:2

steroids
  64:1,3

Steve
  45:21

Steven
  45:22

Stevens
  34:25 54:4,
  5,14 55:12
  73:5

Stieve
  46:3

stiffed
  69:13

stopped
  44:16

strange
  74:13

strategy
  76:1

street
  8:11 27:1

strict
  58:25

strike
  31:17 48:23
  52:9,10
  53:14 55:21
  56:6 69:16
  72:22 73:11
  74:14 77:10
  81:14 84:25

striving
  77:4

stronger
  6:6

stuck
  76:5

student
  80:19,20,21

students
  41:4

studies

25:23

study
  37:1

studying
  32:10

stuff
  26:21 61:21,
  24 62:15

subject
  36:7 38:3
  41:14,17
  44:8

submitted
  11:4

subspecialty
  43:9

substance
  27:19

substandard
  79:16 80:8

successful
  64:13,21
  68:23

successfully
  13:22

sue
  74:21

sued
  13:19 14:1
  71:22

sufficient
  59:7

sufficiently
  63:19

suing
  75:7

suit
  83:25

summarize
  50:8

summary
  47:2,5

super
  61:21

supervision
  78:13

supervisor
  54:2

support
  21:15,20
  22:4

Support's
  4:5

supposed
  19:15 57:21
  80:3

surgeon
  29:6,12

surgeons
  29:14 37:8

surgeries
  28:12 29:19,
  21 36:15
  66:24 67:2
  78:16

surgery
  7:15,18 8:19
  27:18,21
  28:1,7,10,
  17,24 29:7,
  13,15,16
  30:17 36:20
  37:7,23
  47:20,22,24
  48:3 66:12,
  13,17,19,20,
  21 67:4,5,
  11,14,15,17
  77:24 78:2,

Cristin Rettler, P.A.
June 20, 2025

8,13

**surgical**
28:18 29:9
78:15,20

**surprised**
76:21

**surprising**
73:8

**suture**
28:16

**suturing**
78:18

**switch**
62:15

**sworn**
4:25

**symptoms**
63:16

**system**
17:25

———————
T
———————

**table**
67:22

**taking**
18:15 59:18
64:23 81:17

**talk**
29:24 79:9,
25 81:13

**talked**
74:20

**talking**
19:5,6 67:23
75:1 81:9

**Tampa**
25:19

**taught**
37:25 41:5

**technological**
9:7

**Tecum**
18:15

**telling**
19:19

**ten**
22:11 57:14
69:21 82:23

**Tennessee**
32:21 33:3,
12,23,25
34:24 35:3,
7,22 52:6

**tenure**
83:8

**term**
39:16

**terrible**
74:7,8

**testified**
5:2 14:20,22
52:6 55:21,
22 69:24
71:8 72:25
81:17 83:20

**testify**
4:25 23:25
47:9,15
49:19,25
51:1

**testifying**
15:2 44:22
48:23

**testimony**
4:14 10:6,24
19:4,24
20:24 21:11,

24,25 22:4,8
24:7 25:10
29:3 36:4,8,
11,12 40:8
41:19 43:18,
20 44:20
47:3,6 48:25
50:1,9 53:9
62:25 72:23
82:20 83:3
84:25

**Texas**
4:22 5:6
16:5 18:14

**text**
50:12

**textbook**
37:17

**theme**
34:11,13
72:11

**thin**
58:5

**thing**
8:5 59:12
65:1

**things**
20:16 37:4
57:17 66:10,
13 67:6
69:15 73:1

**Thompkins**
46:23

**Thompson**
11:9 12:8

**thought**
20:6,11,15
71:12 72:2
74:4

**thousands**
63:22

**tier**
61:19,20,21,
22,23 62:14

**tight**
35:13

**time**
8:24 10:11,
20 13:2,5,24
14:21,23
17:15,20,22,
24 21:25
22:4 23:19
24:3,13
25:12 26:6,
20 27:7
28:3,5 29:25
31:2,6,10,
18,20 32:3,
16,23 33:14,
16,23,25
34:1,10
35:10,19
37:23 38:12,
25 39:1,9,
10,23 40:5,
12 41:5,22
44:17 47:17,
18,22,24
51:5,9,25
53:10 54:2,
20 55:8,14
56:15,25
57:2,12
59:25 60:4,8
62:22 66:8,
14 68:16
80:14 83:4,
16 84:5,7
85:3

**timely**
66:15 67:9

**times**
10:3 14:14
58:12 68:22

Cristin Rettler, P.A.
June 20, 2025

81:4

**timing**
35:12

**Timothy**
46:25

**title**
18:24 34:20
40:4,11 41:2
43:9 48:16
52:25 54:9
55:12

**titles**
34:9,14,16
38:18

**today**
9:12,21,25
18:4 19:12
36:4 47:12

**today's**
4:8 85:8

**told**
39:3 65:20
66:5 76:22
79:9

**topic**
73:15,16,17,
18

**topics**
38:7

**tour**
66:4

**train**
78:12

**trained**
58:4,22

**training**
43:1,9,12,14
61:3 77:22
78:3

**transcript**
4:6 85:6,11

**treat**
78:24

**treated**
43:25

**treatment**
63:1,7 82:1

**tremendous**
64:11

**trial**
10:6 14:8
84:24

**troponins**
60:7

**truth**
4:25 5:1

**Tuality**
26:20

**Tuesday**
19:12

**Tuesdays**
60:1

**turning**
6:24,25

**Typically**
61:25

———————

**U**

———————

**U.S.**
4:5

**Uh-huh**
50:7

**unable**
33:11

**unaddressed**
55:6

**unaware**
80:5

**unbelievable**
64:24

**undergrad**
41:23

**understaffing**
58:21

**understand**
9:13 20:21
35:19 40:8,
22 62:25
72:15,17

**understanding**
43:21 53:8
60:9 65:9

**understood**
9:19 18:12
26:23

**unequipped**
58:20

**unit**
58:6,8

**United**
41:8,11

**universities**
40:7

**university**
25:19,24
37:25 38:9,
22 39:6,9
40:11,18
41:4,5,20
42:1,2,10
80:21

**updated**
25:12,13

**urgent**
26:21 27:16

**urinate**
59:5

———————

**V**

———————

**verbally**
4:13

**versus**
64:1

**Vicky**
54:5 55:12

**video**
6:24,25 7:8
18:1 24:11
79:2

**voice**
6:3,16,18

**vulnerable**
61:7 64:8

———————

**W**

———————

**waiting**
76:2

**waive**
4:16

**walking**
58:8

**wanted**
42:5 65:21
80:4

**wanting**
66:6

**Washington**
12:21 22:1,5
30:10,19,22
31:16,24
32:4 35:1
47:18,25
51:5,10
53:11 54:3,

Cristin Rettler, P.A.
June 20, 2025

18,22 56:14
65:12,13
77:7 79:14
83:5,8 84:8,
18

**Watkins**
46:19

**Watson**
46:21

**wayside**
71:1

**weapon**
80:18

**Webber**
45:14

**website**
41:13

**Wednesday**
85:9

**weekend**
32:20

**weeks**
32:7,8,15

**weird**
73:25 74:4

**Whitney**
46:23

**wide**
63:14

**widely**
56:4

**William**
45:24

**win**
71:23 75:5

**window**
35:13

**withdrawal**

55:24 56:11

**withdrawing**
56:12

**woman**
54:4

**word**
4:6,7 38:20,
21 39:11
40:20,21,24

**work**
7:14 8:18
16:13 27:13
29:4,14
30:13 36:20
40:7 44:11,
25 53:17
77:23

**worked**
12:20,21
15:17 16:10
26:10 27:15,
17,21 29:15,
25 30:9,14,
15,17,18,22
31:10,13
32:4,14
33:14 38:5,
12,25 39:1,9
42:4,8
44:16,25
47:24 51:9
54:3,14,19,
20 56:15
58:3 68:24
69:4,8,24

**working**
7:9 17:20
22:1 26:18,
19 27:10,11
31:8,18
32:16,23
37:7 44:16
49:20,25

51:1 53:10
60:5,8 63:19
83:5

**works**
23:10 77:3

**world**
40:21

**worthwhile**
71:14

**wraparound**
70:4 76:6

**write**
11:2 59:14
70:25 80:23

**write-ups**
13:12

**writing**
19:14 65:18

**written**
10:24 47:2,5
60:17 65:22
80:13 81:4,6

**wrong**
19:11

**wrongful**
22:13

**wrote**
65:19 71:3

---

**Y**

**yay**
74:1

**year**
15:10,12
17:1,13,18
32:18 33:9
34:6 65:10,
11

**years**
10:13 12:20,
22 13:13
17:3,17,18
20:3,9 23:21
24:16 27:9,
22 30:2,15,
17,19 33:13
35:13 37:10,
25 38:5,6,13
39:2,10,19,
24 40:18,19
56:22 68:25

**Yescare**
16:8

**yesterday**
22:7 24:5
28:2,6 47:11

**yesterday's**
47:13

**York**
74:2 77:1