Jan Denise Watson, M.D.
June 17, 2025

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


KONCHISE JACKSON,

      Plaintiff,

-vs-                    Case No. 19-13382

CORIZON HEALTH, INC., et al.,   Hon. Gershwin A. Drain

      Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/

DEPONENT:     DEPOSITION OF JAN DENISE WATSON, M.D.,

             APPEARING REMOTELY FROM  MARICOPA

             COUNTY, ARIZONA

DATE:         Tuesday, June 17, 2025

TIME:         9:59 a.m.


REPORTER:     John J. Slatin, RPR, CSR-5180,

             Certified Shorthand Reporter,

             Appearing Remotely From

             Oakland County, Michigan


             (Appearances listed on page 2)

Jan Denise Watson, M.D.
June 17, 2025

Page 2

REMOTE APPEARANCES:

IAN T. CROSS (P83367)
Cross Law, PLLC
402 W. Liberty Street
Ann Arbor, Michigan  48103
(724) 994-9590
ian@lawinannarbor.com
        Appearing on behalf of the Plaintiff

LAURENCE H. MARGOLIS (P69635)
Margolis Law Firm
214 South Main Street, Suite 202
Ann Arbor, Michigan  48104
(734) 994-9590
assistant@lawinannarbor.com
        Appearing on behalf of the Plaintiff.

(Appearances continued on page 3)

Page 3

REMOTE APPEARANCES CONTINUED:

ADAM MASIN (ADMITTED 5/1/2025)
Bowman and Brooke, LLP
750 Lexington Avenue
New York, NY  10022
(646) 914-6790
adam.masin@bowmanandbrooke.com
        Appearing on behalf of the Defendant,
        CHS TX, Inc.

Page 4

TABLE OF CONTENTS

WITNESS                                 PAGE

JAN DENISE WATSON, M.D.

    Examination by Mr. Masin            5
    Examination by Mr. Cross            60
    Re-Examination by Mr. Masin         87

EXHIBITS (Retained By Mr. Masin):       IDENTIFIED

    Exhibit 1    Notice of Taking Duces     92
                 Tecum Deposition
    Exhibit 2    Expert Disclosures         92

Page 5

                    Tuesday, June 17, 2025
                    Reported Remotely from
                    Oakland County, Michigan
                    9:59 a.m.
              *   *   *
        (Parties present as indicated.
        Mr. Margolis has not joined
        the remote deposition.)
    THE REPORTER:  At this point, Dr. Watson, if you'll
raise your right hand, I'll swear you in.
    THE WITNESS:  (Complying.)
    THE REPORTER:  Do you solemnly swear the testimony
you're about to give will be the truth, the whole truth
and nothing but the truth, so help you God?
    THE WITNESS:  Yes.
    THE REPORTER:  Thank you.
    Ready when you are, Counsel.
              *   *   *
      JAN DENISE WATSON, M.D.,
having been first duly sworn, was examined and testified
as follows:
              EXAMINATION
BY MR. MASIN:
Q.  Good morning, Dr. Watson.  My name is Adam Masin.  I
    represent a company called CHS Texas in this case.

Jan Denise Watson, M.D.
June 17, 2025

Page 6

I know you just did it, but we're going to have you do it on the record now.

So, can you please state your full name and current address for the record?

A.   Jan Denise Watson, 2821 West Monte Way, Laveen, Arizona 85339.

Q.   And where are you sitting today?

A.   In my house.

Q.   And where is that located?

A.   2528 West Monte Way, in Laveen.

Q.   And is anybody in the room there with you?

A.   No.

Q.   You have a computer open; is that right?

Is there anything else on your computer screen other than this -- the -- the image of this video call?

A.   No.

Q.   Okay.  Have you ever had a deposition taken before?

A.   Yes.

Q.   How many times?

A.   Three, four, I believe.

Q.   Okay.  Do you remember the last time you had a deposition taken?

A.   Early 2000s, maybe.

Q.   Okay.  Was that for a personal matter or for a business-related matter?

Page 7

A.   Business-related matter.

Q.   Okay.  We'll come back to that.

So, it's been quite a while since you've had a deposition taken.

So, I want to go over some of the basic ground rules of the deposition today.  You've heard some of them already, before we got on the record, from the court reporter, but I'll let you know what they are.

First of all, it is very important that you allow me to finish asking my question before you start answering.  Even though you may know where I'm going with a question, it's important that the full question gets on the record before you start answering.

Do you understand that?

A.   Yes.

Q.   Okay.  And as the court reporter has already told you, it's important that we don't talk over each other.  So, I'm going to do my best to allow you to finish your answer before I ask my next question.

Do you understand that?

A.   Yes.

Q.   Okay.  If, for some reason, you don't understand one of my questions today, for any reason, will you please let me know?

A.   Yes.

Page 8

Q.   If you answer my question, I'm going to -- I'm going to assume that you understood the question; is that fair?

A.   Yes.

Q.   Okay.  We are on video call.  Obviously, sometimes there are problems with the technology.  The sound might not come through.  The screen might freeze.  You may not be able to see something, potentially.

If for some reason there's some technological issue that you're experiencing or that you notice, will you please let us know about that right away?

A.   Yes.

Q.   And, likewise, if we notice anything, if your screen freezes and you're not aware of that for some reason, then, of course, we'll stop until that issue gets resolved.

Do you understand that, as well?

A.   Yes.

Q.   Okay.  If, for some reason, we need to take a break today, we can take a break.  Just let us know that you need a break, and we'll take a break as soon as you're done answering whatever the question that was pending was; okay?

A.   Okay.

Q.   Okay.  Now, you mentioned that you had been deposed at some point in the year 2000, approximately; is that

Page 9

right?

A.   Maybe, yeah.

Q.   Okay.

A.   I don't remember exactly.

Q.   Well, what was the subject matter of that deposition?

A.   An OB case, an obstetrics case, malpractice case.

Q.   Was it malpractice case brought against you?

A.   It was brought against several members of the group I was a part of.

Q.   Okay.  And was that in Arizona?

A.   Yes.

Q.   What was the name of that group?

A.   Phoenix Perinatal.

Q.   Okay.  Are you still working for Phoenix Perinatal?

A.   No.

Q.   When did you stop working for them?

A.   Well, maybe it wasn't even 2000.  It was in 1990.

Q.   Okay.

A.   '95.

Q.   Okay.  So, between the time of that deposition and now, you have not been deposed again; is that right?

A.   As far as I remember -- I have to look at my C.V.  I don't -- it was a long time ago.

Q.   Okay.  Is there -- what -- what about your C.V. would help you remember when the last time you had a

Jan Denise Watson, M.D.
June 17, 2025

Page 10

deposition was?

A. I would know when I stopped working for Phoenix Perinatal.

Q. Okay. You had mentioned that you had been deposed a few other times, as well, before that.
Were those professional-related depositions, or were those personal?

A. Professional.

Q. Were those all malpractice cases?

A. Yes.

Q. And were you a defendant in all of those cases?

A. Yes.

Q. And were all of those cases in Arizona?

A. Yes. And I was -- I was dismissed.
As far as I remember, they were all with Phoenix Peri- -- Perinatal, and I was dismissed.

Q. Were you dismissed in all of the cases?

A. Yes.

Q. Do you know if the practice was held liable for malpractice in any of the cases?

A. One of them. One of the cases, I do.

Q. Okay. Have you ever had to testify at a trial?

A. Yes.

Q. When was the last time that you testified at a trial?

A. That was 2018.

Page 11

Q. Okay. And what was that trial?

A. That was the -- it was Parsons-versus-Ryan trial, I think --

THE REPORTER: I'm sorry -- Parsons -- I'm sorry? I'm sorry. The audio did not come through.

A. Parsons versus Ryan.

THE REPORTER: Thank you.

BY MR. MASIN:

Q. Were you deposed in the Parsons case?

A. No.

Q. So, the first time that you testified at -- at all in the Parsons case was at your trial; is that -- was at the trial; is that correct?

A. Yes.

Q. Okay. How many times did you testify? Was it just once?

A. Yes.

Q. Okay. Prior to 2018, prior to the Parsons case, had you ever testified at a trial before?

A. Yes.

Q. When was the time before the Parsons case that you testified at a trial?

A. Oh, that was in the 1900s sometime. I was -- I can't even guess what year that was.

Q. Did that relate to the malpractice cases that we talked

Page 12

about?

A. No.

Q. What was that trial about?

A. It was a paternity case, and I had to appear as an expert witness in genetics.

Q. Okay. And that was sometime in the 1990s?

A. Yes.

Q. Was that in Arizona, also?

A. No. That was in Colorado.

Q. Were you living in Colorado at the time?

A. Yes.

Q. Have we covered now all of the times that you have ever had to testify at trial for any reason?

A. Yes. Yes.

Q. Have you -- so, we've covered times that you've testified at a deposition.
And we've covered times that you've testified at a trial.
Have you ever testified under oath for any other occasion?
(Mr. Margolis joins the remote deposition.)

A. No.

BY MR. MASIN:

Q. Other than the times that you were a party in a medical malpractice case, have you ever been sued?

Page 13

A. No.

Q. Have you ever sued anyone? Have you ever brought a lawsuit?

A. Oh, yes.

Q. And what -- what did that relate to?

A. It was a group I had worked for, and --

MR. MARGOLIS: She said she was on, Your Honor. Did she -- was she not logged in?

MR. MASIN: Larry, can you shut your -- can you mute yourself? We can hear you talking. Thank you.

MR. MARGOLIS: My apologies.

MR. MASIN: Can you read back the last question, please, Court Reporter -- John? Thank you.

THE REPORTER: (Reading.)
"Question: And what did that relate to?"

A. Oh, okay.
So, it was an ob-gyn group that I had worked for, and they said I had misrepresented my credentials.

BY MR. MASIN:

Q. So, you were sued in that case?

A. No. I sued them.

Q. What did you sue them for?

A. Because they -- they fired me because they said I had misrepresented my credentials, and I had not.

Q. And was that -- was there a trial of that case?

Jan Denise Watson, M.D.
June 17, 2025

Page 14

A.  No.  That was settled.

Q.  It settled.  Okay.

What did you do to prepare for your deposition today?

A.  I reviewed some of my testimony from the Parsons-Ryan trial.

Q.  You're referring to the Parsons case back in 2018?

A.  Yes.

Q.  Okay.  And that was testimony that you gave in a courtroom in Arizona; correct?

A.  Correct.

Q.  Is there anything else that you did to prepare for your deposition today?

A.  No.

Q.  Okay.  One of the instructions that I should have given you and that I will give you now is -- well, let me ask you this question:  Are you -- are you being represented by counsel today?

A.  No.

Q.  Okay.  Did you meet with Mr. Cross or Mr. Margolis prior to your deposition today?

A.  Physically meet or just talked to them on the phone?

Q.  Either way.

Did you meet with them via the phone?

A.  Yes.

Page 15

Q.  Okay.  When was the last time that you did that?

A.  Yesterday.

Q.  And how long did you speak for?

A.  Twenty minutes.

Q.  Okay.  Prior to yesterday, had you ever spoken with Mr. Cross or Mr. Margolis before?

A.  Yes.

Q.  When was the last time prior to yesterday that you spoke with them?

A.  One or two weeks ago.

Q.  And how long did you speak to them then?

A.  Ten minutes, maybe.

Q.  Was that also over the phone?

A.  Yes.

Q.  During the times that you've spoken with Mr. Cross or Mr. Margolis, did you look at any documents?

A.  No.

Q.  You've testified to two times that you've had a conversation with Mr. Cross or Mr. Margolis.

Were there any other times that you've spoken with either one of them?

A.  They first contacted me years ago.  But I can't tell you exactly what year.  And then I guess about a month or so ago, they -- they contacted me regarding the fact that there was going to be a trial.

Page 16

Q.  Okay.  I might show you a handful of documents during your deposition today.  I'm going to put them up on your screen, and I'll share my screen.

The first thing I want to know is whether you can see them.

And by "see them," I don't mean just look at them.  I mean can you actually read them.  Do you have -- is the image clear?  Is the text big enough?  That kind of thing.

A.  Okay.  I can see that one.

Q.  Okay.  I'll pull that there.

That's not good.  Hold on.  Sorry.  Hold on a second.

Let's get this over here, and let's get back to here.

All right.  There we go.

I'm showing what we'll mark as Exhibit 1, which is "Defendant CHS Texas, Inc.'s, Notice of Taking Duces Tecum Deposition of Plaintiff's Expert, Jan Watson, M.D."

Do you see that?

A.  Yes.

Q.  And I can scroll through the document, but my question for you is, have you ever seen this document before?

A.  No.

Page 17

Q.  Okay.  If you go to the third page, you'll see there's a Schedule A, and it's got a -- a list of about -- well, I'll tell you exactly.

It's got a list of 20 different items that you were asked about to produce for purposes of your deposition.

Have you ever seen "Schedule A" before?

A.  Yes.

Q.  Okay.  And did you read through the whole thing?

A.  Yes.

Q.  And in reading through the whole thing, did you conduct any search for any of the documents that are requested in Schedule A?

A.  Yes.  I --

Q.  And did --

THE REPORTER:  I'm sorry?

BY MR. MASIN:

Q.  Were there any documents that you had that were responsive to any of the requests in Schedule A?

A.  No.

Q.  Do you have a current C.V.?

A.  Yes.

Q.  And did you provide that to your counsel or -- excuse me -- strike that.

Did you provide your C.V. to Mr. Cross or Mr. Margolis or somebody from their firm?

Jan Denise Watson, M.D.
June 17, 2025

Page 18

A.  Yes.

Q.  Okay.  And so just to confirm, you've read through all 20 of these items, and you have no documents or information to produce in response to any of them; correct?

A.  Correct.

Q.  Ms. -- or -- excuse me -- Dr. Watson, are you being compensated for your time spent doing anything relating to this case?

A.  No.

Q.  Have you been compensated for your time spent doing anything related to any of the matters that Mr. Cross or Mr. Margolis have asked you to testify about?

A.  No.

Q.  Have you been promised compensation for any of your time spent doing anything relating to the Jackson case?

A.  No.

Q.  Are you currently employed?

A.  Yes.  I'm self-employed.

Q.  And what is your -- what is your employment?

A.  I do locum tenens assignments.

Q.  I'm sorry.  Can you say that again a little louder?

A.  I do locum tenens assignments.

Q.  Okay.  And what -- and what does "locum tenens" mean?

A.  I'm a temporary fill-in doctor.

Page 19

Q.  And you do those in Arizona?

A.  Yes.

Q.  Do you do those around the Phoenix area?

A.  Yes.  Not too far from Phoenix.

Q.  Okay.  Where?  What is your -- what is the region that you cover as a locum tenens doctor?

A.  I'm willing to travel at least an hour away from Phoenix.  Otherwise, I would prefer not to do that assignment.

Q.  How long have you been self-employed as a locum tenens doctor?

A.  This time -- I started again in March, but I have done locum tenens since at least 2009.

Q.  When is the last time that you were an employee or were a -- worked for -- for an entity of any kind?

A.  Last year, I worked for an entity for a year.

Q.  What was the name of that entity?

A.  MBI.

THE REPORTER:  I'm sorry.  Can you repeat the name?

A.  MBI.

THE REPORTER:  Thank you.

BY MR. MASIN:

Q.  N -- N, as in "Nancy," B, as in "boy," I, "ice"?

A.  M -- M, as in "Mike."  I'm trying to think of what their real name is.

Page 20

I can't think of the -- their other name.  MBI.

Q.  Is it M, as in "Mike," B, as in "boy," I, as in "ice"?

A.  Yes.

Q.  Okay.  Did -- was MBI a medical practice of some kind?

A.  Yes.  It was occupational medicine.

Q.  And what was your job title or responsibility for MBI?

A.  To provide work-related injury care.

Q.  And did you see patients?

A.  Yes.

Q.  What kind of care were you providing for MBI patients generally?

A.  Oh, treat fractures and repair lacerations and treat musculoskeletal injuries.

Q.  Was your work for MBI something that you did at a particular location, or did you see patients in multiple locations?

A.  Multiple locations.

Q.  Were those locations MBI locations or something else?

A.  Yes.  They were all MBI locations.

Q.  Okay.  When did you stop working for MBI?

A.  January.

Q.  January of 2025?

A.  Yes.

Q.  Okay.  And so since January of 2025, through the present, to the extent you've been doing any work as a

Page 21

physician, it's been as a locum tenens position; correct?

A.  Correct.

Q.  And you've been self-employed during that time; right?

A.  Yes.

Q.  Okay.  What states do you hold an active medical license in?

A.  Arizona and New York.

Q.  Have you ever practiced medicine in New York?

A.  I did.

Q.  When did you do that?

A.  2023.

Q.  Were you physically located in New York in 2023?

A.  I lived in New Jersey but worked in New York.

Q.  Okay.  And how long did you work in New York?

A.  Six months.

Q.  And who did you work for when you were in New York?

A.  Rosh MFM.

THE REPORTER:  Can you repeat the name?  I am sorry.

A.  Rosh, R-o-s-h, MFM, Maternal Fetal Medicine.

THE REPORTER:  Thank you.

BY MR. MASIN:

Q.  What is it that -- how -- how is that you ended up living in New Jersey and working in New York?

Jan Denise Watson, M.D.
June 17, 2025

Page 22

A. A friend of mine wanted me to come out and assist her with starting a prenatal diagnosis program at a hospital in New Jersey. And so I went out there to help her with that, and then she also found something for me to do in New York. So, I did that. And then once that was completed, I came back to Arizona.

Q. Okay. So, you came back to Arizona some time in the middle of 2023; is that right?

A. Yes. The end of 2023, I came back.

Q. Okay. So, when you got back to Arizona, what did you do next?

A. I worked at MBI. And then I did the self-employment.

Q. Okay. So, between 2023 and the present, have we now covered all of the employment that you've had?

A. Yes.

Q. Okay. Have you ever had a license to practice medicine in the state of Michigan?

A. No.

Q. Have you ever had a license to practice medicine in any states other than Arizona and New York?

A. New Jersey, Texas and California.
   Oh, Colorado.

Q. Did you --

A. Colorado.

Q. So --

Page 23

A. Colorado.

Q. Okay. So, your licenses to practice medicine in New Jersey, Texas, California and Colorado, have those all lapsed?

A. Yes.

Q. Where did you attend college?

A. University of Colorado.

Q. What year did you graduate?

A. (Inaudible.)

   THE REPORTER: I'm sorry?

A. Oh, '74. 1974.

BY MR. MASIN:

Q. What was your degree in?

A. Biology, chemistry, English.

Q. And where did you go to medical school?

A. Baylor.

Q. What year did you graduate?

A. '77.

Q. Did you do a residency?

A. Yes.

Q. What was your residency in?

A. Ob-gyn.

Q. And where was that?

A. University of Colorado.

Q. Do you recall how long that program was?

Page 24

A. It's four years.

Q. So, did you do your residency in -- sometime in 1981 or '82?

A. It was '82 or '83, because I split the residency and did a genetics fellowship in the middle for two years.

Q. And where was your genetics fellowship?

A. University of Colorado and National Jewish Hospital.

Q. At some point, did you go to London to -- to do genetics work?

A. That was an ultrasound fellowship. I was there four years.

Q. Okay. Other than your residency and fellowship, have you ever had any other formal medical education or training?

A. No.

Q. After -- let me -- let me ask that question again.
   We've talked about medical school. We've talked about your residency and fellowship.
   Have you ever had any other formal medical training?

A. No.

Q. Okay. Are you currently Board-certified in any medical speciality?

A. Yes.

Q. What are you Board-certified in?

Page 25

A. Ob-gyn and genetics.

Q. Did you do -- have to do anything to renew those Board certifications recently?

A. No.

Q. When did you first become Board-certified in ob-gyn?

A. '83.

Q. And did you ever have to renew that Board certification?

A. No.

Q. When did you first become Board-certified in genetics?

A. Or maybe that's backwards.
   During that -- I don't know. Something was in 1985, and the other one was in 1983.

Q. Okay. So, you have -- you -- you've earned Board certifications in ob-gyn and genetics at some point between 1983 and 1985; is that right?

A. Right.

Q. Okay. Have you ever been Board-certified in any other medical specialty?

A. No.

Q. Did you ever have to do anything to renew your Board certification in ob-gyn?

A. No.

Q. Did you ever have to do anything to renew your Board certification in genetics?

A. No.

Jan Denise Watson, M.D.
June 17, 2025

Page 26

Q.  Okay.  After you finished your residency and fellowship, what did you do next?

A.  I worked at the University of Colorado.

Q.  And what did you do for the University of Colorado?

A.  Ob-gyn and genetics.

Q.  Did you have a particular title at the University of Colorado?

A.  I was Director of Prenatal Diagnosis.

Q.  And for how long?  What year did you leave the University of Colorado?

A.  I've -- 1988.

Q.  So, your practice at the University of Colorado, the entire time that you were there was in ob-gyn and -- and genetics; correct?

A.  Correct.

Q.  Okay.  Did you teach at the University of Colorado?

A.  Yes.

Q.  What -- what was your position?

A.  Assistant Professor.
    Is that what you asked me?

Q.  Yeah.
    Was that the title that you had, Assistant Professor?

A.  Yes.

Q.  What were you an assistant professor of?

Page 27

A.  Ob-gyn.

Q.  Did your practice as an ob-gyn have a particular focus?

A.  Prenatal diagnosis.

Q.  And when you say "prenatal diagnosis," what do you mean?

A.  Diagnosing fetal abnormalities, and the treatment of those particular abnormalities.

Q.  And do you have a particular focus on genetics, or was that sort of related to your prenatal diagnosis practice?

A.  It was related to that.

Q.  Okay.  After you left the University of Colorado, what did you do next?

A.  I moved to Phoenix.

Q.  And when you moved to Phoenix, what did you do for work?

A.  Prenatal diagnosis and genetics.

Q.  And did you have a particular practice, or did you work at a hospital?  Where did you work?

A.  I worked in a private practice.

Q.  What was the name of the practice?

A.  Phoenix Perinatal.
    But I also had an attached entity called United Genetics.

Q.  Can you spell that first name, please?

A.  United, U-n --

Q.  Oh, United.  Sorry.  Got it.

Page 28

Q.  How big of a practice was Phoenix Perinatal?  How many doctors did you have on staff?

A.  I don't know.  Eight, nine.  I don't know.

Q.  And your work at Phoenix Perinatal was also in prenatal diagnosis and genetics; is that right?

A.  Yes.

Q.  How long did you work for Phoenix Perinatal?

A.  Two or three years.
    THE REPORTER:  I'm sorry?

A.  Two or three years.
    THE REPORTER:  Thank you.

BY MR. MASIN:

Q.  And what did you do after you stopped working at Phoenix Perinatal?

A.  I had a private -- it was just me -- prenatal diagnosis office, and I did ob-gyn at Cigna when I moved to California.

Q.  Where was your private perinatal diagnosis practice located?

A.  In Phoenix.

Q.  And did you say that you worked for Cigna?

A.  Yeah.  I -- I would do Ob for them.

Q.  Okay.  And was that a particular location?

A.  In Phoenix.

Q.  And what year did you move to California?

Page 29

A.  I'm not sure.  '96?
    I don't know.

Q.  Where in California did you move?

A.  Alameda.

Q.  Up by the Bay Area; right?

A.  Yes.

Q.  Okay.  And did you have employment while you were -- while you were in Alameda?

A.  Yes.

Q.  Who did you work for?

A.  There was a company called Genetrix.

Q.  And what was your position with Genetrix?

A.  I was their regional medical director.

Q.  For what region?

A.  California and -- I guess Arizona was included in that.
    I was their western regional medical director.

Q.  What work did the company Genetrix do?

A.  Mainly laboratory testing, genetic laboratory tests.
    And then they had several prenatal diagnosis centers throughout California.

Q.  What was your job responsibility as the regional medical director at Genetrix?

A.  Basically to maintain quality throughout all of their centers.
    So, I had to supervise -- I hate to call it

Jan Denise Watson, M.D.
June 17, 2025

Page 30

"supervise."

Inspect and give directions to the laboratories, as well as the medical officers.

Q. What was the name of your supervisor at Genetrix?

A. Well, the president of the company was Paul something.

Q. Okay.

A. But I don't -- but I forgot his last name.

THE REPORTER: I'm sorry. Can you repeat the answer?

A. I forgot his last name.

THE REPORTER: Thank you.

BY MR. MASIN:

Q. How long did you work for Genetrix?

A. One to two years, and then they were bought by a different company.

Q. Did you work for the company that they were bought -- buying?

A. No.

Q. So, after you worked for Genetrix, what did you do next?

A. I temporarily worked in some of the prenatal diagnosis centers in California, and then I returned to Arizona.

Q. What year did you return to Arizona?

A. All of these are really guesswork. I don't know.

Q. Okay. Was it before or after the year 2000?

A. It was before.

Page 31

Q. Okay. When you got back to Arizona, after your time at Genetrix, what did you do then?

A. Oh. I was at a ob-gyn private practice for a while, and then joined a maternal-fetal medicine practice and did prenatal diagnosis.

Q. What was the name of the ob-gyn practice that you joined after you got back to Arizona?

A. I don't remember.

Q. How long did you work for that practice?

A. A year or so.

Q. So, after a year or so, you left that practice, and then you worked for a maternal-fetal medicine practice; is that right?

A. Yes.

Q. What was the name of that practice?

A. I don't remember what he called that practice.

Q. How long did you work for the maternal-fetal medicine practice?

A. I don't know, because they were associated with the hospital.

It wasn't perinatal imaging.

THE REPORTER: I'm sorry?

A. I'm sorry. I'm -- I'm thinking out loud.

You know, I'm really guessing now.

I don't remember.

Page 32

BY MR. MASIN:

Q. Okay. Let me -- let me try it this way.

So, we talked earlier that, in 2023, you moved to New York for six months; right?

A. I lived in New Jersey.

Q. New Jersey. Right.

You moved to New Jersey for about six months in 2023; right?

A. I was in -- I was -- I was in New Jersey for about 11 months, six months of that 11, I worked in New York. The other time I helped my friend with what she was doing, starting a prenatal diagnosis program.

Q. Okay. So, before -- right before you moved to New York -- or -- excuse me -- take that back.

Right before you moved to New Jersey, what was your job?

A. Oh, I was self-employed.

Q. And what was your -- what were you doing being self-employed at that time?

A. I did some primary care for a -- a company, and then I had adult genetic patients. I did adult genetics consults.

Q. What was the name of the company that you did primary care for?

A. I did some for Signify, and -- yeah. Signify Health.

Page 33

Q. And did -- did you -- you said you had adult genetics patients, also.

Did you have like a PC or some personal corporate entity that you were running under, or was it just you as --

A. Yes.

Q. -- an independent contractor?

A. Yes.

Q. What was the name of the company?

A. Eudemonia Wellbeing.

Q. Can you spell that, please?

A. E-u-d-e-m-o-n-i-a.

Q. Okay. How long has that entity, Eudemonia, been in existence?

A. That was since like 2017.

Q. Okay. Between 2017 and 2023, did you do any other work for anyone else other than Eudemonia?

A. Well, you know, I could still do locum stuff for them.

Q. Okay. Well, that's what I'm asking.

I'm asking, did you do any other work during that period of time?

A. Yes. I -- actually, that's when I did a locum at the prison.

Q. Yeah. And we're -- we're going to talk about that, but I'm trying to understand what your employment was.

Jan Denise Watson, M.D.
June 17, 2025

Page 34

Did -- let me ask it this way.

Between 2017 and 2023, did you have -- did you work for a particular company during that time?

A. No. No, I was self-employed. I --

Q. Okay. When is the last time that you worked --

THE REPORTER: I'm sorry?

BY MR. MASIN:

Q. -- for a company that you were not self-employed?

A. That was 2024.

Q. Okay. And prior to 2017, when was the last time that you were employed by a company?

A. 2009.

Q. And what was the name of that company?

A. St. Joseph's Hospital.

Q. Okay. And what did -- what kind of work did you do for them?

A. Ob-gyn and genetics.

Q. And you stopped working for them in 2009; right?

A. Yes. Yes.

Q. What did you do for work between 2009 and 2016?

A. Locum.

Q. And so all that time you were working for yourself basically; is that right?

A. Yes.

Q. How is it that you would get assigned locums jobs?

Page 35

A. Well, I would just Google jobs and see what ob-gyn jobs were available, and I would contact that particular company that was handling that.

Q. And then that particular company would assign you to a particular patient or a particular job? Is that how it worked?

A. Yes.

Q. Okay. And so did you stick with patients during a period of time, or was it just that you would see patients for one visit, and then you wouldn't see them again?

A. No. I'd see them current. I'd be there -- it -- it depends on your assignment, how long you're going to be there. If you're there for three months or six months or two months.

So, you -- you see what comes.

Q. So, during the time that you were a locum tenens physician, you -- you get a temp job at a particular practice of some kind; is that right?

A. Yes.

Q. Okay. And then whenever your contract is up, you either renew the contract or you move on to do something else; right?

A. Right.

Q. Do you have more than one locum tenens job at a time, or

Page 36

is it just one at a time?

A. Sometimes I did more than one, because I didn't have to do five days a week at a particular one.

Q. Is there a particular reason during that period of time that you were not working for one practice? Was that just a personal decision or some other reason?

A. Well, because you never know -- give me one second.

Explain that a little bit better.

THE REPORTER: I'm sorry?

BY MR. MASIN:

Q. Sure.

You -- you testified in your career -- and I think you said, "Explain that a little bit better"; is that right?

A. Yes.

Q. Okay. You testified in your career that you've worked for hospital. You worked for practices, and you've worked locum tenens. You worked for a company at one point.

Why is it that you chose to work a locum tenens job or jobs during that time as opposed to working for a particular practice or hospital?

A. The nice thing about locum tenens is you get to see a variety of patients and locations, and it's just kind of -- I won't say "exciting," but it's -- it's

Page 37

interesting to be in multiple places as opposed to being stuck at one place.

Q. Okay. To the extent that you ever worked in a hospital setting, has that always been in perinatology?

A. Well, yes.

Q. Okay. Do you ever work in a hospital setting outside of Arizona?

A. Yes.

Q. Where?

A. Colorado.

Q. At the University of Colorado when you were there; right?

A. Right.

Q. Okay. Prior to 2017, have you ever worked in any correctional facility?

A. Yes.

Q. And tell me, when -- when did you work at a correctional facility prior to 2017?

A. I can't tell you exactly the year, but when I was at St. Joseph, we were also a part of -- we covered the county, as well, the county hospital. And the county hospital provided the care in the prison. So, we would have to go to the prison to deliver care.

Q. Do you remember the name of the prison?

A. Perryville.

Jan Denise Watson, M.D.
June 17, 2025

Page 38

THE REPORTER: I'm sorry. The name?

A. Perryville.

THE REPORTER: Thank you.

BY MR. MASIN:

Q. And where is Perryville prison located?

A. It's in Arizona, a little bit west of Phoenix.
I don't know officially what city it's in.

Q. Do you recall what years you worked at the Perryville prison?

A. Not exactly.

Q. Does --

A. Maybe -- maybe 20- -- oh, my God.
2002 to -- 2005, we had to go out there. I don't -- I'm not sure.

Q. Does 2005 to 2009 sound about right?

A. No.

Q. You think it was earlier than 2005?

A. I think so.

Q. Okay. Who was the health care provider at Perryville during the time that you were there?

A. The County was. We would have to rotate to go out there.

Q. Do you know if the County had subcontracted the provision of health care to any company during that time?

Page 39

A. No.

Q. Okay. How many times a year did you go to the Perryville prison while you were doing any work there?

A. Oh, two or three.

Q. So, two or three times a year for however many years; is that right?

A. Yes.

Q. Does it -- does it sound right to you that you went to the Perryville prison somewhere between eight and ten times total over the course of the time that you were there?

A. Yes. That or less.

Q. Okay.

A. I don't really remember.

Q. Other than your time at the Perryville prison, did you have any other correctional health care experience prior to 2017?

A. No.

Q. Dr. Watson, in your career, have you performed any medical or scientific research?

A. Yes.

Q. What kind of medical or scientific research have you performed?

A. Well, that would be in the area of prenatal diagnosis.

Q. What -- can you describe what kind of research you've

Page 40

done?

A. Maybe I should say clinical studies.

Q. Clinical studies, meaning that you are doing patient -- reviewing a particular patient's case? Is that what you mean?

A. No.
We did evaluations on patients that we were caring for, and then writing up outcomes based on what we had done with those patients.

Q. Okay. Is that --

A. I don't know if that makes sense.

Q. Are you familiar with the term "case report"?

A. Yes. I know what a case report is.
And, no, that's not a case report when you have multiple patients.

Q. Understood. Okay.
Was any of that work published?

A. Yes.

Q. Where was it published?

A. It might have been The Green Journal.
I don't know. I'd have to look it up.

Q. Okay. And that work was all in -- in perinatal medicine; right?

A. Yes.

Q. In preparation for the testimony that you're giving in

Page 41

this case, did you review any medical literature?

A. No.

Q. In preparation for the testimony that you're giving in this case, did you review any literature on any subject?

A. No.

Q. Have you ever in your career done any research related to colostomies or colostomy reversal surgery?

A. No.

Q. Do you intend to offer any opinions at the trial of this case relating to the need for a colostomy or colostomy reversal surgery?

A. No.

Q. Have you ever performed any research on correctional healthcare in the United States?

A. No.

Q. Have you ever published any textbook chapters?

A. I did.

Q. On what?

A. Human genetics.

Q. When was that?

A. 1980 -- 1980-something.

Q. Do you remember the name of the textbook?

A. No.

Q. Have you ever done any sort of speaking engagement or lecture on any medical issues?

Jan Denise Watson, M.D.
June 17, 2025

Page 42

A. Yes.

Q. When is the last time that you did that?

A. Maybe in the nineties.

Q. And to the extent that you've ever spoken or given a lecture on any medical issues, would those also relate to perinatal medicine?

A. Yes.

Q. Okay. Have you ever provided testimony as an expert witness in any lawsuit?

A. Yes.

Q. And when was the last time that you did that?

A. That was back in the eighties.

Q. Was it just the one case that we talked about already?

A. Yes.

Q. And you were testifying as an expert in genetics; is that right?

A. Correct.

Q. Do you do anything to advertise yourself or hold yourself out to the public as an expert on any subject?

A. No.

Q. In the case that you testified as an expert, was that at a trial?

A. Yes.

Q. And that's the only time that you've testified as an expert at trial; right?

Page 43

A. Yes.

Q. Okay. Do you know the name of the plaintiff in this case?

A. No.
    I saw it once, and I already forgot it --

Q. Okay.

A. -- when you put that document up.

Q. So, his name is Kochise Jackson.
    Do you recognize that name?

A. Now I do.

Q. Okay. Have you ever spoken to Mr. Jackson before?

A. No.

Q. And I -- I take it you've never been his physician; correct?

A. Correct.

Q. Have you ever reviewed Mr. Jackson's medical records?

A. No.

Q. Have you ever reviewed any documents from the Michigan Department of Corrections about Mr. Jackson?

A. No.

Q. Have you ever reviewed any documents from the Michigan Department of Corrections about any person?

A. No.

Q. Have you ever reviewed any documents from the Michigan Department of Corrections about any subject?

Page 44

A. No.

Q. Have you ever reviewed any documents relating to Corizon's work in Michigan?

A. No.

Q. Have you ever worked for a company called CHX Texas, Inc.?

A. No.

Q. Have you ever worked for a company called Corizon?

A. No.

Q. Have you ever worked for the Michigan Department of Corrections?

A. No.

Q. Have you ever been employed by Corizon?

A. No.
    Can I make a correction?

Q. Yes.

A. When you asked if I had ever worked for Corizon, I interpreted that as being employed by Corizon.
    So, that's why I said "no."
    I was a locum tenens for Corizon.

Q. During the time that you were a locum tenens, you were not employed by Corizon; correct?

A. Correct.

Q. What was the name of your employer?

A. I think it was Onyx M.D.

Page 45

THE REPORTER: I'm sorry. Can you repeat the name?

A. Onyx, I think. O-n-y-x.

THE REPORTER: Thank you.

BY MR. MASIN:

Q. Is it fair to say you've never been employed by any entity in Michigan?

A. Yes.

Q. To the extent that you're -- you're testifying in this case, you are not intending to offer any opinions about Mr. Jackson; correct?

A. Correct.

Q. Now, you've mentioned that you have provided -- or -- strike that.
    You mentioned that you worked for a company called Onyx; correct?

A. Yes.

Q. And when did you work for them?

A. 2017. It was --

Q. How long --

A. -- May.

Q. How long did you work for Onyx?

A. For five or six months I was at the prison.

Q. What was the name of the prison that you worked at?

A. I was at the Eyman Complex for the Arizona Department of Corrections.

Jan Denise Watson, M.D.
June 17, 2025

Page 46

Q. Where is the Eyman Complex located?
A. Florence, Arizona.
THE REPORTER: I'm sorry?
BY MR. MASIN:
Q. So, you were --
THE REPORTER: I'm sorry. Can you repeat?
A. Oh, Florence, Arizona.
THE REPORTER: Thank you.
BY MR. MASIN:
Q. Do you remember what day you started at the Eyman Complex?
A. No.
Q. Do you remember what month it was?
A. No.
Q. Do you remember what day or month you left your work at the Eyman Complex?
A. It may -- I may have started in May and left in October. Is that right?
Q. Do you recall working at Eyman Complex from May of 2017 until approximately October 12th of 2017?
A. That could be correct.
Q. So, that's about five months; correct?
A. Yes.
Q. During the five months that you worked at the Eyman Complex, how many days a week did you work?

Page 47

A. Three.
Q. What days of the week were those?
A. I don't remember.
Q. Okay. What were your hours during the days that you worked there?
A. 8:00 to 5:00.
Q. 8:00 a.m. to 5:00 p.m.?
A. Yes.
Q. So, to summarize, if I have this right, you worked at the Eyman Complex from May to October of 2017, three days a week, from 8:00 a.m. to 5:00 p.m.; correct?
A. Yes.
Q. Was Onyx a locum tenens company?
A. Yes.
Q. And did you work for Onyx the entire time that you worked at Eyman?
A. Yes.
Q. Did you have a -- one contract with Onyx or more than one contract?
A. Do you mean, did I have other assignments through them, other times?
Q. No.
I mean, when -- when you signed on to work for Onyx, was it for a particular time period?
A. Yes.

Page 48

Q. How long?
A. Six months.
Q. So, is it your testimony that you had one six-month contract with Onyx?
A. Yes.
Q. Do you recall that your original contract with Onyx may have been only three months?
A. Oh.
Q. Do you recall?
A. That -- that is possible.
And then I renewed?
Q. Do you recall renewing a contract with Onyx?
A. Nope. I thought it was six months, but it is possible it was three months, and I renewed it. I don't know for sure.
Q. Did Onyx cover your medical malpractice insurance during that time?
A. Yes.
Q. Other than your time at the Eyman Complex in Arizona in 2017, have you worked in any correctional facility since then?
A. I just completed an assignment at CoreCivic.
Q. When was that?
A. March to May.
Q. March to May of 2025?

Page 49

A. Yes.
Q. And what was your assignment there?
A. Just to do primary care.
Q. How many days a week did you do that?
A. Four.
Q. What were your hours?
A. 8:00 to 6:00.
Q. Who was your employer?
A. CoreCivic.
Or do you mean the locums company?
Q. Yeah.
What was the name of the company that paid -- was signing the paycheck?
A. Integrity Locums.
Q. And is that a locum tenens company?
A. Yes.
Q. So, other than the time at Eyman in 2017 and the time this year, between 2017 and now, have you done any other work in a correctional facility?
A. No.
Q. So, other than the Eyman Complex in Arizona for five months in 2017, is it fair to say that you've not worked for any other correctional facility where Corizon was the -- contracted to be the health care provider?
A. Correct.

Jan Denise Watson, M.D.
June 17, 2025

Page 50

MR. MASIN: Dr. Watson, now would be a good time to take a five-minute break if you want to. We don't have to. It's up to you or the court reporter if the court reporter needs a break.

I don't have an enormous amount of time, but I do have some more questions. So, it would be a good time to take a break if you would like one.

A. I'm okay.

MR. MASIN: Okay.

Mr. Reporter, are you okay to keep going?

THE REPORTER: Yes. Thank you.

MR. MASIN: Okay. Then we'll keep going then.

BY MR. MASIN:

Q. During the time that you were working at the Eyman Complex, did you ever receive any orientation or training in Michigan?

A. No.

Q. When you were working at the Eyman Complex, were you assigned to a particular unit there?

A. Yes.

Q. What was the name of that unit?

A. Cook.

Q. How many prisoners were there in the Cook Unit, approximately?

A. 900.

Page 51

Q. Who was your direct supervisor at the Eyman Complex?

A. Rodney Smith.

THE REPORTER: I'm sorry. The name?

A. Rodney Smith.

THE REPORTER: Thank you.

BY MR. MASIN:

Q. Do you recall the name Rodney Stewart?

A. Oh, sorry.

Stewart.

Q. Okay. So, just so we're clear, for the record, was your direct supervisor at the Eyman Complex a Dr. Rodney Stewart?

A. Yes.

Q. Do you know who Dr. Stewart worked for?

A. Corizon.

Q. Do you know what his title was?

A. Medical Director.

Q. Do you know if Dr. Stewart has ever worked in Michigan?

A. I do not know.

Q. During your time at the Eyman Complex, did you ever speak to Dr. Stewart's supervisor?

A. Yes.

Q. What was that person's name?

A. Babich.

Q. Dr. Babich?

Page 52

A. Yes.

Q. And do you know if Dr. Babich ever worked in Michigan?

A. No.

Q. To your knowledge, did anyone that you interacted with at the Eyman Complex perform any work in Michigan?

A. No.

Q. Other than Dr. Stewart and Dr. Babich, do you have a recollection of any conversations that you had with anyone else from Corizon?

A. Just the staff.

Q. Just the staff talking about what?

A. Well, daily care things.

Q. Are there any specific conversations that you remember with any particular people?

A. Can you clarify -- be more specific?

Q. Sure.

You -- I recognize that you had conversations with people as part of your job, but are there any particular conversations that you recall with particular people from Corizon at the time?

A. I had a lot of them.

Q. Is there -- is there anyone else other than Dr. Babich and Dr. Stewart, who was employed by Corizon, that you remember talking to?

A. You mean like medical director level, nurse level?

Page 53

Q. Anybody.

Can you name anyone else from Corizon that you spoke with during the time that you were at Eyman other than Dr. Babich and Dr. Stewart?

A. Oh. Maureen Gay.

Q. Maureen Day? Is that what you said?

A. Gay.

Q. Gay, G-a-y?

A. Yes.

Q. And what was her position?

A. She was a nurse practitioner.

Q. And she was a nurse practitioner located at Eyman; is that right?

A. Yes.

Q. Is there anyone else from Corizon that you recall speaking to other than her and Dr. Babich and Dr. Stewart?

A. No.

Q. During the time that you worked at Eyman, did you keep a journal of any kind?

A. No.

Q. Did you keep any written notes of any kind?

A. Can you specify?

We write every day in the medical record.

Q. Thank you for clarifying that.

Jan Denise Watson, M.D.
June 17, 2025

Page 54

During the time that you were working at Eyman, did you keep a personal journal of any kind?

A.   No.

Q.   Did you keep personal notes that were different from the notes or records that you were using as part of your practice?

A.   No.

Q.   Okay.  Did you record anything, either audio recording or video recording?

A.   No.

Q.   To your knowledge, have you ever spoken to somebody named Dr. Keith Papendick?

A.   I didn't speak with him, no.

Q.   Is it fair to say that during your time at the Eyman Complex, you were not responsible for approving medical requests that were made by prisoners?

A.   Correct.

Q.   Do you have any familiarity with the Michigan Department of Corrections' grievance process?

A.   No.

Q.   During the time that you were at the Eyman Complex, were you aware of any grievance process that the prisoners had relating to their health care?

A.   Vaguely.

Q.   Okay.  Did you have any role in deciding whether the

Page 55

grievance had merit or not?

A.   No.

Q.   Are you aware of whether or not Mr. Jackson ever filed a grievance related to his health care in Michigan?

A.   No.

Q.   I'm going to read you a list of names right now, and the same question for each one of them is, do you know whether or not you've ever spoken to this person before; okay?

A.   Okay.

Q.   Dr. Erina Kansakar?

A.   No.

Q.   Dr. John Webber?

A.   No.

Q.   Sonia Folks?

A.   No.

Q.   Steve Bergman?

A.   No.

Q.   William Borgerding?

A.   No.

Q.   Colleen Spencer?

A.   No.

Q.   Jeffery Steve?

A.   No.

Q.   Sabrina Aiken?

Page 56

A.   No.

Q.   Kailyn Field?

A.   No.

Q.   A Dr. Mahir Alsalman, A-l-s-a-l-m-a-n?

A.   No.

Q.   Ronald Drinker(ph)

A.   No.

Q.   Dr. Jeffery Bahr(ph)?

A.   No.

Q.   Mason Gill?

A.   No.

Q.   A doctor named Robert Lacy?

A.   No.

Q.   Whitney Tomkins(ph)?

A.   No.

Q.   Timothy Makenna?

A.   No.

Q.   Ralph Silverman?

A.   No.

Q.   Did you ever prepare a written summary of your proposed testimony for this case?

A.   No.

Q.   Have you ever seen a written summary of your proposed testimony in this case?

A.   No.

Page 57

Q.   I'm going to show you what we'll mark as Exhibit 2 on your screen.
     And for the record, this is a document entitled "Plaintiff Kochise Jackson's Expert Disclosures Pursuant to Fed. R. Civ. P.  26(a)(2)."
     Dr. Watson, do you ever recall seeing this document before?

A.   No.

Q.   And I'm going to scroll down to the bottom of it.
     I actually will want to show you that your name is on this document.
     Do you see that that's your name?

A.   Yes.

Q.   And is that your current address?

A.   No.

Q.   What address is 132 East Pebble Beach Drive?

A.   Where I lived prior to where I am now.

Q.   When did you stop living at the Pebble Beach Drive address?

A.   March.

Q.   March of what year?

A.   2025.

Q.   Okay.  And is that your current phone number?

A.   Yes.

Q.   Okay.  So, I want to show you that this document is

Jan Denise Watson, M.D.
June 17, 2025

Page 58

dated on May 20th, '25.

Do you see that?

A. Yes.

Q. So, is it fair to say, then, that you did not review this document on or before May 20th, 2025?

A. Yes.

Q. Have you ever seen any summary of proposed testimony from you in any case?

A. No.

Q. Is it -- is it your understanding that any testimony that you would offer in this case would relate to your time at the Eyman prison?

A. Yes.

Q. Is there any other subject matter that you understand that you would testify about in this case other than anything relating to your time at the Eyman prison?

A. No.

Q. Do you have any information from your time at the Eyman prison about the number of colostomy reversal surgeries that were done during that time in that location?

A. No.

Q. Do you know -- have -- do you have any information from your time at the Eyman location about how many of the patients that you saw had a colostomy?

A. Do I have documentation, or can I remember actually

Page 59

seeing a patient with a colostomy?

Q. Do you have any information about the number of patients at the Eyman facility during the time that you were there that had a colostomy?

A. No.

Q. Do you know whether or not there were any colostomy reversal surgeries performed in Arizona during the time that you worked at the Eyman Complex?

A. No.

Q. Is it fair to say that you have no information about the number of colostomy reversal requests or surgeries that have ever been done in the Michigan Department of Corrections?

A. Correct. I don't know.

Q. Do you have any information from your time at Eyman about whether or not the people in Arizona who were working for Corizon had any interaction with the people in Michigan who were working for Corizon?

A. No.

MR. MASIN: Okay. I need a -- two minutes just to look over my notes, but I think I'm done.

So, we'll just take a two-minute break.

THE REPORTER: Thank you.

(Short recess at 11:22 a.m.)

* * *

Page 60

(Record resumed at 11:25 a.m.)

BY MR. MASIN:

Q. Okay. Thank you, Dr. Watson.

Just a couple more questions. But before I ask you, is there anything about the testimony that you've given thus far that you need to change or amend in any way?

A. No.

Q. Okay. Have you ever spoken with somebody named Kristin Retler(ph)?

A. No.

Q. Okay. During the time that you were at Eyman, did you ever take care of a patient with a colostomy?

A. No.

MR. MASIN: Thank you. Unless Mr. Cross has any other questions for you, then I -- I'm finished and I thank you very much for your time.

A. Okay.

MR. CROSS: Good morning, Dr. Watson.

A. Good morning.

MR. CROSS: I have a few questions.

A. Okay.

* * *

EXAMINATION

BY MR. CROSS:

Page 61

Q. You previously testified in a case concerning Corizon; is that correct?

A. Yes.

Q. What was that about?

A. That was about them not adhering to the monitors that had been placed upon the company because of the previous lawsuit.

Q. What's a monitor?

A. There --

MR. MASIN: Objection. Form.

A. Pardon?

MR. MASIN: You can answer the question. I just made a legal objection.

A. Oh.

So, there were certain benchmarks Corizon was supposed to meet and keep track of to -- in order to be in compliance with a previous court order regarding the care of the prisoners in Arizona.

BY MR. CROSS:

Q. And what was your role in that case?

A. My role in that case?

Q. Yes.

A. Why did I end up testifying?

Q. Yes.

A. I had tried to contact the ACLU regarding the fact that

Jan Denise Watson, M.D.
June 17, 2025

Page 62

we were not meeting the monitors, and I couldn't reach anyone. So, I contacted a journalist who I saw had written an article to ask him who I could talk with. And, instead of giving me a contact at the ACLU, he encouraged me to do a story. And so I did the story for him, and the judge had saw the story and requested that I testify at the trial.

Q. What did you testify to at the trial?

MR. MASIN: Object to form.

A. To the level of care. There were things that we just weren't doing. We were not sending out patients to specialists as often as we should. We had made some suggestions as to things we needed to do, and they had -- "they," being the people who approve referrals, would give us alternate treatment plans.

Those are not -- some of the major things I had to testify to.

BY MR. CROSS:

Q. Okay. We'll come back to that.

Dr. Watson, how many years have you been practicing medicine?

A. Around 40.

Q. Have you ever worked as a primary care physician?

A. Yes. I have done primarily primary care since 2009.

Q. Do you feel you're qualified to work as a primary care

Page 63

physician?

MR. MASIN: Object to form.

A. Yes. Ob-gyn physicians are primary care physicians for women. And, as I learned when I started doing locums, it was easy to transition from doing just primary care for women to also doing primary care for men.

BY MR. CROSS:

Q. During the time you worked in a Corizon-contracted facility, were you working as an ob-gyn?

A. No. I was doing primary care.

Q. What's the difference between a primary care physician and a specialist?

MR. MASIN: Object to form.

A. Well, a primary care physician tries as much as possible to handle all situations that occur when patients walk in, but you must also recognize when you are no longer able to manage a particular case and refer that patient to a specialist for care or at least consultation.

BY MR. CROSS:

Q. So, when you were working at the Eyman Complex, did you ever refer or attempt to refer a patient to a specialist?

A. Yes.

Q. Were you free to just send patients out to a specialist when you felt it was necessary?

Page 64

A. No. You write the referral, and then someone in the utilization team reviews your referral, and they either approve it or tell you an alternate method of handling the situation.

Q. So, who are these people at the utilization team that make these decisions?

MR. MASIN: Object to form.

A. They are -- or were -- physicians who were not in the Department of Corrections system. They're outside and apparently have contracts with Corizon to review referrals and deny or approve them.

BY MR. CROSS:

Q. Do you know if those physicians were located in Arizona?

A. They were not.

MR. MASIN: Object to form.

BY MR. CROSS:

Q. Where were they located?

A. They could be around the country. There was only one who I actually looked up to find out where she was. And, if I remember correctly, she was in Minnesota.

Q. Were you able to communicate directly with the utilization management physicians?

A. No. That communication was -- I would have to communicate with the on-site clinical coordinator. And then the clinical coordinator would contact the -- the

Page 65

utilization doctor. And then whatever their response was, that, too, then went through the clinical coordinator, and they passed it along to us. So, we always had this intermediary.

Q. Did the utilization management physician ever see your patients?

A. No.

Q. Did the utilization management physician have access to your patient's medical records?

MR. MASIN: Object --

A. (Inaudible.)

MR. MASIN: -- to form.

THE REPORTER: I'm sorry. The answer?

A. No.

THE REPORTER: Thank you.

BY MR. CROSS:

Q. Are you aware of any reason why the utilization management physician would be better equipped to determine what treatment was best for the patient than you were?

MR. MASIN: Object to form.

A. No.

BY MR. CROSS:

Q. Was the purpose of Corizon's utilization management program to make sure that patients got the best care?

Jan Denise Watson, M.D.
June 17, 2025

Page 66

MR. MASIN: Object to form.

A. No.

BY MR. CROSS:

Q. So, what was the purpose of Corizon's utilization management program?

MR. MASIN: Object to form. Beyond the scope of your disclosure. Irrelevant.

BY MR. CROSS:

Q. You can answer.

A. To save money.

MR. MASIN: Speculation.

BY MR. CROSS:

Q. Do you know of any medical reason for the utilization management program to exist?

MR. MASIN: Object to form.

A. If it functioned better, I could understand it.

BY MR. CROSS:

Q. Why do you believe the purpose of the utilization management program was to save money?

A. I actually had a case that a referral had been denied, and I called the on-site medical director in to have him tell a patient directly why we could not send him out for the referral like requested.

Q. And who was that person, the on-site medical director?

A. Rodney Stewart.

Page 67

Q. And did he work for Corizon?

A. Yes.

Q. And what did he say?

A. He told the patient --

MR. MASIN: Object to form.

A. He told the patient it would cost too much.

BY MR. CROSS:

Q. What was the procedure you requested?

A. I wanted him -- the patient to see a neurologist.

Q. And why did you feel that that was necessary?

MR. MASIN: Objection.

A. He -- the patient was having frequent seizures. Multiple medications had been tried, and he was not responding. And he came in to the office one day with a black eye from where he had had a seizure, fallen and hit himself. And I was concerned that if we didn't do something, he could injure himself even worse than he did when he hit his face.

BY MR. CROSS:

Q. Do you know how many seizures a day that patient was having approximately?

MR. MASIN: Object to form.

A. At least two to three. And I -- I don't know that he had them every day but several times a week.

BY MR. CROSS:

Page 68

Q. About how often, if you remember, on a percentage basis were your requests for specialty care denied by Corizon's utilization management physicians?

MR. MASIN: Object to form.

A. At least 50 percent of the time.

BY MR. CROSS:

Q. Can you give me some examples of incidents in which that happened?

MR. MASIN: Object to form.

A. One case was when I had documented that the patient had a broken bone in his hand. The initial denial stated that they needed to get an angle as to how the bone was displaced.

And I had the radiologist measure the angle, and resubmitted the referral. And then it was still denied. The person said -- the reviewer said that they needed a -- a new x-ray, and had the angle remeasured.

I never did get an orthopedic referral approved on that person.

BY MR. CROSS:

Q. What is an ATP?

A. Alternate treatment plan.

Q. And is there a difference between an ATP and a denial when we're talking about Corizon's utilization management program?

Page 69

MR. MASIN: Objection to form.

A. In theory, it -- there is. Some of -- and the reason I say "in theory," because some of the alternate treatment plans are not realistic, and therefore it made it the same as a denial.

BY MR. CROSS:

Q. Can you give me an example of an alternate treatment plan that you would say is not realistic?

MR. MASIN: Object to form.

A. The time I had made a referral for the patient to have his hearing aid repaired through -- so, that would require audiology. And the ATP was to have me examine the hearing aid, and I can't fix hearing aids.

So, that was like a denial to me.

BY MR. CROSS:

Q. So, was there a separate response you could get that said "denial," like a denial, ATP, and approved, or was it -- was denial one of the available responses?

A. I think denial was an available response.

Q. How about NMI? Does that ring a bell?

MR. MASIN: Object to form.

A. I don't remember NMI.

BY MR. CROSS:

Q. Mr. Masin asked you a question about whether you had had conversations that you remember with persons other than

Jan Denise Watson, M.D.
June 17, 2025

Page 70

Dr. Babich and Dr. Stewart.

Do you remember exchanging e-mails with anyone who worked for Corizon other than Dr. Babich or Dr. Stewart?

A. Yes. A lot of them.

Well, I shouldn't say a lot.

Several of them, either clinical coordinators and some other people who had different titles, like nursing supervisor, something. I can't remember all of the titles.

But I did have -- exchange e-mails with other people.

Q. What were those e-mails about; if you remember?

MR. MASIN: Object to form.

A. That I can remember with one of the nursing supervisors, it was about the fact that none of the nurses knew how to run a ribbon strip on the EKG machine. And I was told I needed to teach their staff.

Then I had interactions with the clinical coordinators regarding the ATPs, because initially, I didn't even know what an ATP was. And so it took me a while to figure out how that system worked. And I was frequently behind on those.

Then I had communications -- there was some other medical team -- I'm -- I'm not sure where all of those members were -- that managed the hepatitis and HIV

Page 71

patients, but they weren't on-site. So, we would have to communicate through e-mails with them.

BY MR. MASIN:

Q. Did you ever participate or listen in on phone conferences, conference calls while you were working at the Eyman Complex?

A. Yes. We had a weekly patient conference. I don't remember exactly what name they called it, where we would discuss patients who had been sent out from the unit to a hospital from all of the locations in Arizona. And a doctor back east ran that.

THE REPORTER: I'm sorry. I --

A. Oh. A doctor back east ran that conference.

THE REPORTER: Thank you.

A. And it, like I said, was weekly for an hour. And you would discuss whether or not they thought the referral outside to the hospital was appropriate, and then we would also get follow-up on the ones -- the patients who had been sent out.

BY MR. CROSS:

Q. So, when you say the doctor was out east, do you know where he was located?

A. No. I don't remember.

Q. Do you know who he worked for?

A. I assumed he was a Corizon doctor.

Page 72

Q. Okay. And he was outside of Arizona; would that be fair to say?

A. Yes.

Q. Okay. When you worked at the Eyman Complex, were you permitted to call an ambulance if you felt an inmate needed to go to the emergency room?

MR. MASIN: Object to form.

A. Actually, we were. When I first arrived there, we were allowed to make that call.

But sometime during my stay there, we were informed that, in order to send a patient to the hospital, it would have to be approved through the local medical director.

BY MR. CROSS:

Q. And who did the local medical director work for?

A. Corizon.

Q. Do you know why that policy change was put in place?

MR. MASIN: Object to form. Misstates her testimony.

A. To decrease the number of emergency room visits.

BY MR. CROSS:

Q. Why would Corizon want to decrease the number of emergency room visits?

MR. MASIN: Object to form.

A. It costs a lot of money to call an ambulance and have a

Page 73

patient seen in the ER.

BY MR. CROSS:

Q. Did you ever receive any orientation or training from Corizon?

A. Well, our initial orientation, I guess, was more from the Department of Corrections. We went through like a three, four-day orientation about how things worked there and who -- and what -- that's when you also did training on their EMR.

Q. How did you -- did you complete your contract with Corizon -- with Onyx at the Eyman facility, or did you leave early?

MR. MASIN: Object to form.

A. I left early. I asked to leave.

BY MR. CROSS:

Q. And why did you ask to leave?

A. While I was there, they kept initiating new things that made it even more difficult for us to take care of patients.

Q. Like what?

MR. MASIN: Object to form.

A. Okay. Well, the ambulance thing. So, you know, I had -- the patient had a heart attack, but I can't call an ambulance.

They removed everything we had to give for pain.

Jan Denise Watson, M.D.
June 17, 2025

Page 74

He didn't -- he didn't want us to even give ibuprofen to people if they were over 50.  They had absolutely nothing but Tylenol left.  You couldn't use ice.  They didn't want you to write for DMEs, medical equipment.

And what else?

And it was just one after another, and I finally asked to leave early.

BY MR. CROSS:

Q.   I think you said something about a patient having a heart attack, and you couldn't call an ambulance.

Was that a hypothetical situation, or did that actually happen?

MR. MASIN:  Object to form.

A.   No, that actually happened.

BY MR. CROSS:

Q.   That actually happened?

A.   Yes.

Q.   Tell us about that.

MR. MASIN:  Object to form.

A.   Well, the -- the inmate came in with chest pain, and I did an EKG, and it looked abnormal.  I was concerned that he was having a heart attack.  This was after they had initiated the policy that I could not make a decision as to whether or not an ambulance was called.

So, I e-mailed or -- I must have e-mailed a copy of

Page 75

the EKG to the medical director, and I either texted him or called him to let him know about this patient so that I could get permission to send him out, and it was two or three hours later, I still had not heard back from him.

And I called him and finally got -- and got him on the phone.  And I told him about the patient, and asked him what he wanted me to do, and he said I could just send him back to his -- no.  What did he say?

Yeah.  I asked if he wanted me to send him back to the -- his unit.  He said, "Yes."

And I said, "Did you look at his EKG?"

He said, no, he hadn't looked.

I said, "Why don't you try taking a look at it."

And he finally looked at it and said, "Oh, that's acute coronary syndrome.  We need to send him out."

So, this was like two or three hours after he came in with chest pain, I -- I could get an ambulance and send him to the hospital.

Well, I couldn't call.  Stewart had to call.

MR. CROSS:  Adam, can you pull up your Exhibit 2?

I think it's the -- the disclosure.

MR. MASIN:  This?

MR. CROSS:  Yeah.

BY MR. CROSS:

Page 76

Q.   Dr. Watson, I want you to just read this summary of your expected testimony, and let me know when you're done.

A.   Okay.

All right.

That -- that's more detail on that patient that had the heart attack.

Okay.

Yes, that's true.

Okay.

Q.   Are you done?

A.   Yes.

Q.   Is there anything in that summary that is inaccurate?

A.   No.

MR. CROSS:  Okay.  Can we just take five minutes?

MR. MASIN:  Sure.

MR. CROSS:  I need to look at my notes.  Thanks.

(Short recess at 11:54 a.m.)

*   *   *

(Record resumed at 12:00 p.m.)

BY MR. CROSS:

Q.   Dr. Watson, Mr. Masin asked you a question about if you had involvement approving medical requests made by prisoners.

Do you remember that?

A.   Yes.

Page 77

Q.   How would a prisoner typically make a medical request when you worked at the Eyman facility?

MR. MASIN:  Object to form.

A.   Well, he -- you mean how does he make a request to have an appointment to see a doctor?

They had to fill out a form and submit it.  And one of the nurses reviews that form.  And most of the time, they will see a nurse first.  And if the nurse thinks it's appropriate, they will refer the patient to come back and see the doctor.  And sometimes the request would be -- would generate an automatic appointment to the doctor.

BY MR. CROSS:

Q.   All right.  So, are -- is that how patients ended up coming to you when you were working there?

A.   Yes.

Q.   And once you were in the appointment with the patient, what would happen at that point?

A.   Oh, okay.  So, then I can review the visits -- the previous visits to see what's going on.  Or if it's a new problem, then we just start all over again.  And I determine if further evaluation is needed, what diagnostic tests need to be ordered and a follow-up can -- needs to occur, if they come back and see me, or if they need a specialist referral, as well.

Jan Denise Watson, M.D.
June 17, 2025

Page 78

Q. So, is the prisoner making the choice about whether they need a specialist referral?

A. No.

Q. Who makes that initial judgment?

A. The provider does.

Q. And would you be the provider?

A. Yes.

Q. And then, what happens after you've made the judgement that there should be a referral?

A. I write that up. The thing goes to the clinical coordinator, and she passes that on to the specialist that I was requesting. And some things like physical therapy -- well, I -- I don't know how they handle physical therapy. Because --

Q. All right.

A. I don't know who is deciding if physical therapy is necessary.
But, anyway, sometimes I think it would go directly to a physical therapy company that they would be contracted with.

Q. So, you give the request to the clinical coordinator. And does that person then give the request directly to the physical therapy company, or does it go to a utilization management person?

MR. MASIN: Object.

Page 79

A. You know, I'm not sure exactly how that works.

MR. MASIN: Object to form.

A. Once -- once I write the referral, and it's in the computer system, my understanding is it then goes to a clinical coordinator.
What happens then, I don't know, as far as if all of those referrals, such as like physical therapy would go to utilization, or if something more simple like physical therapy might go directly to a therapist. I don't know.

BY MR. CROSS:

Q. Now, you testified you got an ATP about 50 percent of the time when you made a specialist referral; is that correct?

A. Yes.

Q. What were your options after you received the ATP?

A. Some of the time, I just accepted them and figured out another way to do it. Sometimes I would resubmit it and include documentation as to why the ATP was not appropriate and the referral was.

Q. Okay. What kind of documentation would you include?

A. I would go read medical articles identifying studies appropriate for the situation, and then put their findings in to the resubmission so that I had a reference as to why this was appropriate for the

Page 80

situation.

Q. And what happened after that?

MR. MASIN: Object to form.

BY MR. CROSS:

Q. Go ahead.

A. Well, most of the time, I would say it still got denied, but at least I had documented why I felt the referral was appropriate, and so it was someone's opinion other than mine.

Q. Did you ever submit referrals that you believed were unnecessary -- requests for referrals that you believed were unnecessary?

A. No.

Q. Do you remember testifying about a -- in the Parsons-v-Ryan case about an individual with a heart condition?

MR. MASIN: Object to form.

A. The patient that I mentioned with the heart attack, who had the heart attack?

BY MR. CROSS:

Q. Yes. I believe that's the one.

MR. MASIN: Object to form.

A. Okay.

BY MR. CROSS:

Q. Do you remember what his name was?

Page 81

A. I don't any more.

MR. MASIN: Object to form and -- and you shouldn't be disclosing names of patients.

A. And I didn't.

MR. MASIN: HIPAA violation to even ask that question.

A. I wouldn't disclose the name of the patient to you, even -- even if I could remember it.

BY MR. CROSS:

Q. Do you remember what your supervisor wanted to do with that patient?

MR. MASIN: Object to form.

A. After he had returned from the hospital, there was a provider meeting, and the medical director told all of us that if this particular patient had chest pain again, that we were to keep him comfortable and let him die.

BY MR. CROSS:

Q. Did he explain why he wanted you to do that?

MR. MASIN: Object to form.

A. No.

BY MR. CROSS:

Q. Is that appropriate in your medical opinion?

MR. MASIN: Object to form.

A. No.

BY MR. CROSS:

Jan Denise Watson, M.D.
June 17, 2025

Page 82

Q.   Why not?

A.   We're supposed to be there to do everything we can to keep people alive.  The only time I would entertain something like that is if it is the patient's desire for us to withhold care.

Q.   Did you ever speak to the patient about whether that was his desire?

MR. MASIN:  Object to form.

A.   Yes, I did.

BY MR. CROSS:

Q.   Were --

A.   I --

Q.   Yeah.  Go ahead.

MR. MASIN:  Object to -- object to form.

Go ahead.

A.   I had him come into the office, and I went over his results from his admission, his catheterization results, and asked him what his understanding was as to what was going to happen now, and he said that he was expected to see the cardiologist in two weeks.

He did not say that he was denying care.

So, we had to come up with something different to do.

BY MR. CROSS:

Q.   What did you come up with to do?

Page 83

A.   Well, for one thing, nitroglycerin had been ordered, and for all other patients who had coronary artery disease and needed nitroglycerin, it was ordered so that they kept it with them so that they could take it immediately when they had chest pain.

In this case, it had not been written for him to have it as a KOP, which is "keep on person."

So, I had to go find him some nitroglycerin that he could keep with him, number one, and continue to make -- well, I shouldn't say continued.

And I made sure he still had his appointment made to follow-up with the cardiologist.

BY MR. CROSS:

Q.   Why was he not prescribed nitroglycerin to keep on person when all the other patients with a similar condition were prescribed nitroglycerin to keep on person?

MR. MASIN:  Object to form.

A.   Well, yes.  This would be speculation on our case, but considering the fact that I had been instructed to let him die, if he had chest pain, making it difficult for him to get to nitroglycerin would increase the likelihood that he would die if he had chest pain again.

BY MR. CROSS:

Q.   So, you believe that Dr. Stewart wanted the patient to

Page 84

die?

MR. MASIN:  Object to form.

A.   Well, he -- he said it.  It came out of his mouth, "let him die."

BY MR. CROSS:

Q.   Why?

MR. MASIN:  Object to form.

A.   Well, then you don't have to send him to the hospital again, which costs money.

BY MR. CROSS:

Q.   Do you remember what the recommendation was, the alternative treatment plan, if you will, for the patient with the seizures?

A.   Oh.  Well, Dr. Stewart said, after stating that it would cost too much money to send him to the neurologist, that I just get a helmet for him to wear so he wouldn't injure his head.

Q.   Were you able to get him a helmet?

MR. MASIN:  Object to form.

A.   No.  I asked the medical assistant about that, and she never heard of it.  We didn't have helmets.

BY MR. CROSS:

Q.   Was the care provided by Corizon in the Eyman facility consistent with the type of care you were used to providing outside of a prison setting?

Page 85

MR. MASIN:  Object to form.

A.   No.

BY MR. CROSS:

Q.   Was it better or worse?

A.   It was worse.

Q.   How was it worse?

MR. MASIN:  Object to form.

A.   So many things, even if they were simple, were just not done.  As -- as I mentioned, simple things like pain management, if you're outside of prison, I will be able to give you something for pain.  And the ibuprofen, you -- you don't have a blanket denial for giving someone ibuprofen for pain if you're over the age of 50.

You do understand in which patients you would want to avoid that medication, but you just don't decide not to give it to anybody.  That's a simple thing.  It's more understandable that maybe these -- some of the referrals, even though I thought every one I made was appropriate, you could kind of see that more than just simple things.

The durable medical equipment, you know, for joints, you know, if you had strains and sprains and things, because I was told I ordered too much, too many DMEs.  You wouldn't -- that wouldn't be a problem outside of prison.  So, I'm talking really simple

Jan Denise Watson, M.D.
June 17, 2025

Page 86

things, not just referrals to specialists.

BY MR. CROSS:

Q.   Do you believe that those policies you discussed caused harm to the patients at Eyman facility?

MR. MASIN:  Object to form.  I also want to object that we are now well beyond anything pain-wise or fact-wise that is in the disclosure.

BY MR. CROSS:

Q.   You can answer.

A.   Okay.  I'm sorry.  I forgot what -- what you said. What was the question?

MR. CROSS:  Can you read back the question, please?

THE REPORTER:  Yes.  One second, please.

(Reading.)

"Question:  Do you believe that those policies you discussed caused harm to the patients at Eyman facility?"

MR. MASIN:  Same objection.

A.   Okay.  Some of the policies, yes.

BY MR. CROSS:

Q.   Now, you testified earlier that you worked at a Perryville prison?

A.   Yes.

Q.   Right?

Did you experience the same difficulties in

Page 87

providing care to your patients at the Perryville prison that -- as you experienced in the Corizon contracted facility?

MR. MASIN:  Object to form.

A.   No.  It was a lot different back then.  As I stated, the County -- the County hospital, where I worked, was responsible for medical care.  So, we went out there and we provided the same -- it was an ob.

We provided the same level of ob-gyn care there that we would do at the County.  And if there were things that needed to be done that we could not provide at the prison, the patients were then brought over to the County, and we did it there.

MR. CROSS:  Okay.  Thanks, Dr. Watson.  I don't think I have any further questions.  Mr. Masin may have some follow-up.

MR. MASIN:  I just have a couple of quick ones.

*   *   *

RE-EXAMINATION

BY MR. MASIN:

Q.   Dr. Watson, the testimony that you gave in the Parsons case --

A.   Uh-huh.

Q.   -- that testimony was entirely about your experience at the Eyman prison in Arizona between May of 2017 and

Page 88

October of 2017; correct?

A.   Correct.

Q.   And the testimony that you've given just now in response to Mr. Cross's questions was entirely about your experience at the Eyman prison in Arizona between May of 2017 and October of 2017; correct?

A.   Yes, except for that last statement about Perryville.

Q.   And the time that you worked at Perryville, you were at Perryville approximately eight to ten times over four years; correct?

A.   Yes.

Q.   Is it fair to say, Dr. Watson, that you have no personal knowledge of any health decisions made by any patient or relating to any patient in Michigan between 2017 and 2019?

A.   Yes.

Q.   Doctor, one -- one final question.

Your testimony, as I understand it, is that you had a patient in Arizona who came to you, and you believed that that person was having a heart attack; correct?

A.   Yes.

Q.   And you did not call an ambulance for a patient that you believed was having a heart attack; right?

A.   I could not.

Q.   You could not.

Page 89

A.   Could not.

Q.   Was there something in the office that physically prevented you from picking up the phone and calling somebody, calling 911 and saying, "My patient, who is under my care, is having a heart attack.  Please come and help them"?

Did anything physically prevent you, as a doctor, for taking care of your patient that way?

MR. CROSS:  Objection to form.

A.   It wouldn't be approved.

BY MR. MASIN:

Q.   It wouldn't be approved by who?  By the person -- by the ambulance?

Are you saying that the --

A.   The --

Q.   -- ambulance wouldn't show up if you called them?

THE REPORTER:  I'm sorry?

A.   The company would not cover it.

BY MR. MASIN:

Q.   The company would not cover it.

So, that's what you were thinking about.  You were thinking about the cost, of what it would cost instead of thinking about your patient --

A.   Actually --

Q.   -- and you believed he was --

Jan Denise Watson, M.D.
June 17, 2025

Page 90

THE REPORTER: I'm sorry?

BY MR. MASIN:

Q. -- having a heart attack, you were worried about the cost of it --

A. Actually, I was --

Q. Is that true?

A. No. I was thinking about the fact that they told me not to do it.

Q. Doctor, you're a doctor.
Aren't you a doctor?

A. Yes. And --

Q. Don't you have a primary responsibility --
MR. CROSS: Objection --

BY MR. MASIN:

Q. -- to your patient --
THE REPORTER: I'm sorry?

BY MR. MASIN:

Q. -- to pick up the phone and call an ambulance if you think that your patient is having a heart attack? Do you really need somebody's permission to do that?

A. Yes.

BY MR. MASIN:

Q. As a physician, you do?
Okay.
MR. MASIN: I have no more questions for this

Page 91

witness.

A. In the prison --
MR. MASIN: I also want to add -- I also want to add, Mr. Cross, that this entire examination by you and this witness has -- is inadmissible for so many reasons that it would take me to list the entire Federal Rules of Evidence and Civil Procedure in order to make all of the objections that would be necessary, but I will do that at a relevant time.
I -- I want this entire deposition stricken from the record. And to the extent that it ever comes up, this has been an enormous waste of my time and your time because there is no way that any of this testimony is ever going to be admitted at this trial.
I have nothing else to say about this.
MR. CROSS: I don't have any further questions.
THE REPORTER: Really quickly, guys, U.S. Legal requests we ask counsel on the record if they'd like to order.
Adam, would you like to order the transcript today?
MR. MASIN: Yes, please. And I need it expedited.
THE REPORTER: Very good.
Ian, would you like a copy?
MR. MASIN: Yes, please.
THE REPORTER: Okay.

Page 92

(Deposition Exhibits 1 and 2 marked for identification.)
(Deposition concluded at 12:21 p.m.)

* * *

Page 93

STATE OF MICHIGAN )
COUNTY OF OAKLAND )
CERTIFICATE OF NOTARY PUBLIC

I do hereby certify that the witness, whose attached testimony was taken in the above matter, was first duly sworn to tell the truth; the testimony contained herein was reduced to writing via remote attendance of the witness by means of stenography; afterwards transcribed; and is a true and complete transcript of the testimony given.

I further certify that I am not connected by blood or marriage with any of the parties; their attorneys or agents; and that I am not interested, directly or indirectly, in the matter of controversy.

In witness whereof, I have hereunto set my hand this day at Highland, Michigan, County of Oakland, State of Michigan on Friday, June 20, 2025.

_____

_____
John J. Slatin, RPR, CSR-5180
Certified Shorthand Reporter
Notary Public, Oakland County, Michigan
My commission expires: July 25, 2029

Jan Denise Watson, M.D.
June 17, 2025

---

**1**

---

**1**
  16:17 92:1
**11**
  32:9,10
**11:22**
  59:24
**11:25**
  60:1
**11:54**
  76:17
**12:00**
  76:19
**12:21**
  92:3
**12th**
  46:20
**132**
  57:16
**17**
  5:1
**1900s**
  11:23
**1974**
  23:11
**1980**
  41:21
**1980-something**
  41:21
**1981**
  24:2
**1983**
  25:12,15
**1985**
  25:12,15
**1988**

  26:11
**1990**
  9:17
**1990s**
  12:6

---

**2**

---

**2**
  57:1 75:21
  92:1
**20**
  17:4 18:3
**20-**
  38:12
**2000**
  8:25 9:17
  30:24
**2000s**
  6:23
**2002**
  38:13
**2005**
  38:13,15,17
**2009**
  19:13 34:12,
  18,20 38:15
  62:24
**2016**
  34:20
**2017**
  33:15,16 34:2,
  10 37:14,18
  39:17 45:18
  46:19,20 47:10
  48:20 49:17,
  18,22 87:25
  88:1,6,14
**2018**
  10:25 11:18

  14:7
**2019**
  88:15
**2023**
  21:12,13 22:8,
  9,13 32:3,8
  33:16 34:2
**2024**
  34:9
**2025**
  5:1 20:22,24
  48:25 57:22
  58:5
**20th**
  58:1,5
**25**
  58:1
**2528**
  6:10
**26(a)(2)**
  57:5
**2821**
  6:5

---

**4**

---

**40**
  62:22

---

**5**

---

**50**
  68:5 74:2
  79:12 85:13
**5:00**
  47:6,7,11

---

**6**

---

**6:00**

  49:7

---

**7**

---

**74**
  23:11
**77**
  23:18

---

**8**

---

**82**
  24:3,4
**83**
  24:4 25:6
**85339**
  6:6
**8:00**
  47:6,7,11 49:7

---

**9**

---

**900**
  50:25
**911**
  89:4
**95**
  9:19
**96**
  29:1
**9:59**
  5:4

---

**A**

---

**A-L-S-A-L-M-A-N**
  56:4
**a.m.**
  5:4 47:7,11
  59:24 60:1

Jan Denise Watson, M.D.
June 17, 2025

76:17

**abnormal**
74:21

**abnormalities**
27:5,6

**absolutely**
74:2

**accepted**
79:17

**access**
65:8

**ACLU**
61:25 62:4

**active**
21:6

**acute**
75:16

**Adam**
5:24 75:21
91:20

**add**
91:3,4

**address**
6:4 57:14,16,
19

**adhering**
61:5

**admission**
82:17

**admitted**
91:14

**adult**
32:21 33:1

**advertise**
42:18

**age**
85:13

**ahead**
80:5 82:13,15

**aid**
69:11,13

**aids**
69:13

**Aiken**
55:25

**Alameda**
29:4,8

**alive**
82:3

**allowed**
72:9

**Alsalman**
56:4

**alternate**
62:15 64:3
68:22 69:3,7

**alternative**
84:12

**ambulance**
72:5,25 73:22,
24 74:10,24
75:18 88:22
89:13,16 90:18

**amend**
60:6

**amount**
50:5

**angle**
68:12,14,17

**answering**
7:11,13 8:21

**apologies**
13:11

**apparently**
64:10

**appointment**
77:5,11,17
83:11

**approve**
62:14 64:3,11

**approved**
68:18 69:17
72:12 89:10,12

**approving**
54:15 76:22

**approximately**
8:25 46:20
50:24 67:21
88:9

**area**
19:3 29:5
39:24

**Arizona**
6:5 9:10 10:13
12:8 14:10
19:1 21:8
22:6,7,10,20
29:15 30:21,22
31:1,7 37:7
38:6 45:24
46:2,7 48:19
49:21 59:7,16
61:18 64:13
71:10 72:1
87:25 88:5,19

**arrived**
72:8

**artery**
83:2

**article**
62:3

**articles**
79:22

**assign**
35:4

**assigned**
34:25 50:19

**assignment**
19:9 35:13
48:22 49:2

**assignments**
18:21,23 47:20

**assist**
22:1

**assistant**
26:19,22,25
84:20

**assume**
8:2

**assumed**
71:25

**ATP**
68:21,23
69:12,17 70:20
79:12,16,19

**ATPS**
70:19

**attached**
27:21

**attack**
73:23 74:10,22
76:6 80:18,19
88:20,23 89:5
90:3,19

**attempt**
63:21

**attend**
23:6

**audio**
11:5 54:8

**audiology**
69:12

**automatic**
77:11

Jan Denise Watson, M.D.
June 17, 2025

**avoid**
85:15

**aware**
8:13 54:22
55:3 65:17

---

**B**

---

**Babich**
51:24,25 52:2,
7,22 53:4,16
70:1,3

**back**
7:2 13:12 14:7
16:14 22:6,7,
9,10 31:1,7
32:14 42:12
62:19 71:11,13
75:4,9,10
77:10,24 86:12
87:5

**backwards**
25:10

**Bahr(ph)**
56:8

**based**
40:8

**basic**
7:5

**basically**
29:23 34:23

**basis**
68:1

**Bay**
29:5

**Baylor**
23:16

**Beach**
57:16,18

**believed**

80:10,11
88:19,23 89:25

**bell**
69:20

**benchmarks**
61:15

**Bergman**
55:17

**big**
16:8 28:1

**Biology**
23:14

**bit**
36:8,13 38:6

**black**
67:15

**blanket**
85:12

**Board**
25:2,7,13,20,
23

**Board-certified**
24:22,25 25:5,
9,17

**bone**
68:11,12

**Borgerding**
55:19

**bottom**
57:9

**bought**
30:14,16

**boy**
19:23 20:2

**break**
8:18,19,20
50:2,4,7 59:22

**broken**

68:11

**brought**
9:7,8 13:2
87:12

**business-related**
6:25 7:1

**buying**
30:17

---

**C**

---

**C.V.**
9:22,24 17:20,
24

**California**
22:21 23:3
28:17,25 29:3,
15,20 30:21

**call**
6:15 8:4 29:25
72:5,9,25
73:23 74:10
75:20 88:22
90:18

**called**
5:25 27:21
29:11 31:16
44:5,8 45:14
66:21 71:8
74:24 75:2,6
89:16

**calling**
89:3,4

**calls**
71:5

**cardiologist**
82:20 83:12

**care**
20:7,10 32:20,
24 37:22,23
38:19,24 39:16

49:3,24 52:12
54:23 55:4
60:13 61:18
62:10,23,24,25
63:3,5,6,10,
11,14,18 65:25
68:2 73:18
82:5,21 84:23,
24 87:1,7,9
89:5,8

**career**
36:12,16 39:19
41:6

**caring**
40:7

**case**
5:25 9:6,7
11:9,12,18,21
12:4,25 13:20,
25 14:7 18:9,
16 40:4,12,13,
14 41:1,4,10
42:13,21 43:3
45:9 56:21,24
58:8,11,15
61:1,20,21
63:17 66:20
68:10 80:15
83:6,19 87:22

**cases**
10:9,11,13,17,
20,21 11:25

**catheterization**
82:17

**caused**
86:3,16

**centers**
29:20,24 30:21

**certification**
25:7,21,24

**certifications**
25:3,14

Jan Denise Watson, M.D.
June 17, 2025

**change**
  60:6 72:17

**chapters**
  41:16

**chemistry**
  23:14

**chest**
  74:20 75:18
  81:15 83:5,21,
  23

**choice**
  78:1

**chose**
  36:20

**CHS**
  5:25 16:18

**CHX**
  44:5

**Cigna**
  28:16,21

**city**
  38:7

**Civ**
  57:5

**Civil**
  91:7

**clarify**
  52:15

**clarifying**
  53:25

**clear**
  16:8 51:10

**clinical**
  40:2,3 64:24,
  25 65:2 70:6,
  18 78:10,21
  79:5

**Colleen**
  55:21

**college**
  23:6

**Colorado**
  12:9,10 22:22,
  24 23:1,3,7,24
  24:7 26:3,4,7,
  10,12,16 27:11
  37:10,11

**colostomies**
  41:7

**colostomy**
  41:7,10 58:19,
  24 59:1,4,6,11
  60:13

**comfortable**
  81:16

**communicate**
  64:21,24 71:2

**communication**
  64:23

**communications**
  70:23

**company**
  5:25 29:11,17
  30:5,15,16
  32:20,23 33:9
  34:3,8,11,13
  35:3,4 36:18
  38:24 44:5,8
  45:14 47:13
  49:10,12,15
  61:6 78:19,23
  89:18,20

**compensated**
  18:8,11

**compensation**
  18:15

**complete**
  73:10

**completed**

  22:6 48:22

**Complex**
  45:24 46:1,11,
  16,19,25 47:10
  48:19 49:21
  50:15,18 51:1,
  11,20 52:5
  54:15,21 59:8
  63:20 71:6
  72:4

**compliance**
  61:17

**Complying**
  5:11

**computer**
  6:13,14 79:4

**concerned**
  67:16 74:21

**concluded**
  92:3

**condition**
  80:16 83:16

**conduct**
  17:10

**conference**
  71:5,7,13

**conferences**
  71:5

**confirm**
  18:2

**consistent**
  84:24

**consultation**
  63:18

**consults**
  32:22

**contact**
  35:2 61:25
  62:4 64:25

**contacted**
  15:22,24 62:2

**continue**
  83:9

**continued**
  83:10

**contract**
  35:21,22
  47:18,19 48:4,
  6,12 73:10

**contracted**
  49:24 78:20
  87:2

**contractor**
  33:7

**contracts**
  64:10

**conversation**
  15:19

**conversations**
  52:8,13,17,19
  69:25

**Cook**
  50:22,23

**coordinator**
  64:24,25 65:3
  78:11,21 79:5

**coordinators**
  70:6,19

**copy**
  74:25 91:23

**Corecivic**
  48:22 49:9

**Corizon**
  44:8,13,17,18,
  20,22 49:23
  51:15 52:9,20,
  23 53:2,15
  59:17,18 61:1,
  15 64:10 67:1

Jan Denise Watson, M.D.
June 17, 2025

**70:3 71:25
72:16,22 73:4,
11 84:23 87:2**

**Corizon's**
44:3 65:24
66:4 68:3,24

**Corizon-
contracted**
63:8

**coronary**
75:16 83:2

**corporate**
33:3

**correct**
11:13 14:10,11
18:5,6 21:2,3
26:14,15 42:17
43:14,15
44:22,23
45:10,11,15
46:21,22 47:11
49:25 54:17
59:14 61:2
79:14 88:1,2,
6,10,20

**correction**
44:15

**correctional**
37:15,17 39:16
41:13 48:20
49:19,23

**Corrections**
43:19,22,25
44:11 45:25
59:13 64:9
73:6

**Corrections'**
54:19

**correctly**
64:20

**cost**
67:6 84:15
89:22 90:4

**costs**
72:25 84:9

**counsel**
5:17 14:18
17:22 91:18

**country**
64:18

**county**
5:3 37:21
38:21,23 87:6,
10,13

**couple**
60:4 87:17

**court**
7:8,16 13:13
50:3 61:17

**courtroom**
14:10

**cover**
19:6 48:16
89:18,20

**covered**
12:12,15,17
22:14 37:20

**credentials**
13:18,24

**Cross**
14:20 15:6,15,
19 17:24 18:12
60:15,19,21,25
61:19 62:18
63:7,19 64:12,
16 65:16,23
66:3,8,12,17
67:7,19,25
68:6,20 69:6,
15,23 71:20
72:14,21 73:2,

15 74:8,15
75:21,24,25
76:14,16,20
77:13 79:11
80:4,20,24
81:9,17,21,25
82:10,24
83:13,24 84:5,
10,22 85:3
86:2,8,12,20
87:14 89:9
90:13 91:4,16

**Cross's**
88:4

**current**
6:3 17:20
35:12 57:14,23

————————————

**D**

————————————

**daily**
52:12

**dated**
58:1

**day**
46:10,15 53:6,
24 67:14,20,24

**days**
36:3 46:25
47:2,4,11 49:4

**decide**
85:15

**deciding**
54:25 78:16

**decision**
36:6 74:24

**decisions**
64:6 88:13

**decrease**
72:20,22

**defendant**
10:11 16:18

**degree**
23:13

**deliver**
37:23

**denial**
68:11,23 69:5,
14,17,18,19
85:12

**denied**
66:20 68:2,15
80:6

**Denise**
5:19 6:5

**deny**
64:11

**denying**
82:21

**Department**
43:19,22,25
44:10 45:24
54:18 59:12
64:9 73:6

**depends**
35:13

**deposed**
8:24 9:21 10:4
11:9

**deposition**
5:8 6:17,22
7:4,6 9:5,20
10:1 12:16,21
14:3,13,21
16:2,19 17:5
91:10 92:1,3

**depositions**
10:6

**describe**
39:25

Jan Denise Watson, M.D.
June 17, 2025

**desire**
  82:4,7

**detail**
  76:5

**determine**
  65:19 77:22

**Diagnosing**
  27:5

**diagnosis**
  22:2 26:8
  27:3,4,8,15
  28:5,15,18
  29:19 30:20
  31:5 32:12
  39:24

**diagnostic**
  77:23

**die**
  81:16 83:21,23
  84:1,4

**difference**
  63:11 68:23

**difficult**
  73:18 83:21

**difficulties**
  86:25

**direct**
  51:1,11

**directions**
  30:2

**directly**
  64:21 66:22
  78:18,22 79:9

**director**
  26:8 29:13,16,
  22 51:17 52:25
  66:21,24
  72:13,15 75:1
  81:14

**disclose**
  81:7

**disclosing**
  81:3

**disclosure**
  66:7 75:22
  86:7

**Disclosures**
  57:4

**discuss**
  71:9,16

**discussed**
  86:3,16

**disease**
  83:2

**dismissed**
  10:14,16,17

**displaced**
  68:13

**DMES**
  74:4 85:24

**doctor**
  18:25 19:6,11
  56:12 65:1
  71:11,13,21,25
  77:5,10,12
  88:17 89:7
  90:9,10

**doctors**
  28:2

**document**
  16:23,24 43:7
  57:3,6,11,25
  58:5

**documentation**
  58:25 79:19,21

**documented**
  68:10 80:7

**documents**

15:16 16:1
17:11,17 18:3
43:18,21,24
44:2

**Drinker(ph)**
  56:6

**Drive**
  57:16,18

**Duces**
  16:18

**duly**
  5:20

**durable**
  85:21

———————————

**E**

———————————

**e-mailed**
  74:25

**e-mails**
  70:2,10,12
  71:2

**E-U-D-E-M-O-N-I-
A**
  33:12

**earlier**
  32:3 38:17
  86:21

**early**
  6:23 73:12,14
  74:7

**earned**
  25:13

**east**
  57:16 71:11,
  13,21

**easy**
  63:5

**education**
  24:13

**eighties**
  42:12

**EKG**
  70:16 74:21
  75:1,12

**emergency**
  72:6,20,23

**employed**
  18:18 34:11
  44:13,18,22
  45:5 52:23

**employee**
  19:14

**employer**
  44:24 49:8

**employment**
  18:20 22:14
  29:7 33:25

**EMR**
  73:9

**encouraged**
  62:5

**end**
  22:9 61:23

**ended**
  21:24 77:14

**engagement**
  41:24

**English**
  23:14

**enormous**
  50:5 91:12

**entertain**
  82:3

**entire**
  26:13 47:15
  91:4,6,10

**entitled**
  57:3

Jan Denise Watson, M.D.
June 17, 2025

entity
  19:15,16,17
  27:21 33:4,13
  45:6

equipment
  74:4 85:21

equipped
  65:18

ER
  73:1

Erina
  55:11

Eudemonia
  33:10,13,17

evaluation
  77:22

evaluations
  40:7

Evidence
  91:7

examination
  5:22 60:24
  91:4

examine
  69:12

examined
  5:20

examples
  68:7

exchange
  70:10

exchanging
  70:2

exciting
  36:25

excuse
  17:22 18:7
  32:14

Exhibit
  16:17 57:1
  75:21

Exhibits
  92:1

exist
  66:14

existence
  33:14

expected
  76:2 82:19

expedited
  91:21

experience
  39:16 86:25
  87:24 88:5

experienced
  87:2

experiencing
  8:9

expert
  12:5 16:19
  42:8,15,19,21,
  25 57:4

explain
  36:8,13 81:18

extent
  20:25 37:3
  42:4 45:8
  91:11

eye
  67:15

Eyman
  45:24 46:1,10,
  16,19,24
  47:10,16 48:19
  49:17,21
  50:14,18 51:1,
  11,20 52:5
  53:3,12,19

  54:1,14,21
  58:12,16,18,23
  59:3,8,15
  60:12 63:20
  71:6 72:4
  73:11 77:2
  84:23 86:4,17
  87:25 88:5

——————————

F

——————————

face
  67:18

facility
  37:15,18 48:20
  49:19,23 59:3
  63:9 73:11
  77:2 84:23
  86:4,17 87:3

fact
  15:24 61:25
  70:15 83:20
  90:7

fact-wise
  86:7

fair
  8:2 45:5 49:22
  54:14 58:4
  59:10 72:1
  88:12

fallen
  67:15

familiar
  40:12

familiarity
  54:18

Fed
  57:5

Federal
  91:6

feel
  62:25 67:10

fellowship
  24:5,6,10,12,
  18 26:1

felt
  63:25 72:5
  80:7

fetal
  21:21 27:5

Field
  56:2

figure
  70:21

figured
  79:17

filed
  55:3

fill
  77:6

fill-in
  18:25

final
  88:17

finally
  74:6 75:6,15

find
  64:19 83:8

findings
  79:24

finish
  7:10,18

finished
  26:1 60:16

fired
  13:23

firm
  17:25

Jan Denise Watson, M.D.
June 17, 2025

**five-minute**
  50:2

**fix**
  69:13

**Florence**
  46:2,7

**focus**
  27:2,7

**Folks**
  55:15

**follow-up**
  71:18 77:23
  83:12 87:16

**forgot**
  30:7,10 43:5
  86:10

**form**
  61:10 62:9
  63:2,13 64:7,
  15 65:12,21
  66:1,6,15
  67:5,22 68:4,9
  69:1,9,21
  70:13 72:7,18,
  24 73:13,21
  74:13,19 77:3,
  6,7 79:2 80:3,
  17,22 81:2,12,
  19,23 82:8,14
  83:18 84:2,7,
  19 85:1,7 86:5
  87:4 89:9

**formal**
  24:13,19

**found**
  22:4

**four-day**
  73:7

**fractures**
  20:12

**free**
  63:24

**freeze**
  8:6

**freezes**
  8:13

**frequent**
  67:12

**frequently**
  70:22

**friend**
  22:1 32:11

**full**
  6:3 7:12

**functioned**
  66:16

--- G ---

**G-A-Y**
  53:8

**gave**
  14:9 87:21

**Gay**
  53:5,7,8

**generally**
  20:11

**generate**
  77:11

**genetic**
  29:18 32:21

**genetics**
  12:5 24:5,6,8
  25:1,9,14,24
  26:5,14 27:7,
  15,22 28:5
  32:21 33:1
  34:17 41:19
  42:15

**Genetrix**
  29:11,12,17,22
  30:4,13,19
  31:2

**Gill**
  56:10

**give**
  5:13 14:16
  30:2 36:7
  62:15 68:7
  69:7 73:25
  74:1 78:21,22
  85:11,16

**giving**
  40:25 41:3
  62:4 85:12

**God**
  5:14 38:12

**good**
  5:24 16:12
  50:1,6 60:19,
  20 91:22

**Google**
  35:1

**graduate**
  23:8,17

**Green**
  40:20

**grievance**
  54:19,22 55:1,
  4

**ground**
  7:5

**group**
  9:8,12 13:6,17

**guess**
  11:24 15:23
  29:15 73:5

**guessing**
  31:24

**guesswork**
  30:23

**guys**
  91:17

--- H ---

**hand**
  5:10 68:11

**handful**
  16:1

**handle**
  63:15 78:13

**handling**
  35:3 64:3

**happen**
  74:12 77:18
  82:19

**happened**
  68:8 74:14,16
  80:2

**harm**
  86:4,16

**hate**
  29:25

**head**
  84:17

**health**
  32:25 38:19,24
  39:16 49:24
  54:23 55:4
  88:13

**healthcare**
  41:14

**hear**
  13:10

**heard**
  7:6 75:4 84:21

**hearing**

Jan Denise Watson, M.D.
June 17, 2025

**heart**
73:23 74:10,22
76:6 80:15,18,
19 88:20,23
89:5 90:3,19

**held**
10:19

**helmet**
84:16,18

**helmets**
84:21

**helped**
32:11

**hepatitis**
70:25

**HIPAA**
81:5

**hit**
67:16,18

**HIV**
70:25

**hold**
16:12 21:6
42:18

**Honor**
13:7

**hospital**
22:2 24:7
27:17 31:20
34:14 36:17,22
37:3,6,21,22
71:10,17 72:11
75:19 81:13
84:8 87:6

**hour**
19:7 71:15

**hours**
47:4 49:6
75:4,17

**house**
6:8

**Human**
41:19

**hypothetical**
74:11

---

**I**

---

**Ian**
91:23

**ibuprofen**
74:1 85:11,13

**ice**
19:23 20:2
74:3

**identification**
92:2

**identifying**
79:22

**image**
6:15 16:8

**imaging**
31:21

**immediately**
83:4

**important**
7:9,12,17

**inaccurate**
76:12

**inadmissible**
91:5

**Inaudible**
23:9 65:11

**Inc.'s**
16:18

**incidents**
68:7

**include**
79:19,21

**included**
29:15

**increase**
83:22

**independent**
33:7

**individual**
80:15

**information**
18:4 58:18,22
59:2,10,15

**informed**
72:10

**initial**
68:11 73:5
78:4

**initially**
70:19

**initiated**
74:23

**initiating**
73:17

**injure**
67:17 84:17

**injuries**
20:13

**injury**
20:7

**inmate**
72:5 74:20

**Inspect**
30:2

**instructed**
83:20

**instructions**
14:15

**insurance**
48:16

**Integrity**
49:14

**intend**
41:9

**intending**
45:9

**interacted**
52:4

**interaction**
59:17

**interactions**
70:18

**interesting**
37:1

**intermediary**
65:4

**interpreted**
44:18

**involvement**
76:22

**Irrelevant**
66:7

**issue**
8:8,14

**issues**
41:25 42:5

**items**
17:4 18:3

---

**J**

---

**Jackson**
18:16 43:8,11,
19 45:10 55:3

**Jackson's**
43:16 57:4

Jan Denise Watson, M.D.
June 17, 2025

Jan
  5:19 6:5 16:19

January
  20:21,22,24

Jeffery
  55:23 56:8

Jersey
  21:14,25 22:3,
  21 23:3 32:5,
  6,7,9,15

Jewish
  24:7

job
  20:6 29:21
  32:16 35:5,18,
  25 36:20 52:18

jobs
  34:25 35:1
  36:21

John
  13:13 55:13

joined
  5:7 31:4,6

joins
  12:21

joints
  85:22

Joseph
  37:20

Joseph's
  34:14

journal
  40:20 53:20
  54:2

journalist
  62:2

judge
  62:6

judgement
  78:8

judgment
  78:4

June
  5:1

---

### K

Kailyn
  56:2

Kansakar
  55:11

Keith
  54:12

kind
  16:8 19:15
  20:4,10 34:15
  35:19 36:24
  39:22,25
  53:20,22 54:2
  79:21 85:19

knew
  70:15

knowledge
  52:4 54:11
  88:13

Kochise
  43:8 57:4

KOP
  83:7

Kristin
  60:9

---

### L

laboratories
  30:2

laboratory
  29:18

lacerations
  20:12

Lacy
  56:12

lapsed
  23:4

Larry
  13:9

Laveen
  6:5,10

lawsuit
  13:3 42:9 61:7

learned
  63:4

leave
  26:9 73:12,14,
  16 74:7

lecture
  41:25 42:5

left
  27:11 31:11
  46:15,17 73:14
  74:3

legal
  61:13 91:17

level
  52:25 62:10
  87:9

liable
  10:19

license
  21:6 22:16,19

licenses
  23:2

likelihood
  83:23

likewise
  8:12

list
  17:2,4 55:6
  91:6

listen
  71:4

literature
  41:1,4

lived
  21:14 32:5
  57:17

living
  12:10 21:25
  57:18

local
  72:12,15

located
  6:9 21:13
  28:19 38:5
  46:1 53:12
  64:13,17 71:22

location
  20:15 28:23
  58:20,23

locations
  20:16,17,18,19
  36:24 71:10

locum
  18:21,23,24
  19:6,10,13
  21:1 33:18,22
  34:21 35:17,25
  36:18,20,23
  44:20,21 47:13
  49:15

locums
  34:25 49:10,14
  63:4

logged
  13:8

London

Jan Denise Watson, M.D.
June 17, 2025

24:8

**long**
9:23 15:3,11
19:10 21:15
23:25 26:9
28:7 30:13
31:9,17 33:13
35:13 45:19,21
48:1

**longer**
63:16

**looked**
64:19 74:21
75:13,15

**lot**
52:21 70:4,5
72:25 87:5

**loud**
31:23

**louder**
18:22

---

**M**

---

**M.D.**
5:19 16:20
44:25

**machine**
70:16

**made**
54:16 61:13
62:12 69:4,10
73:18 76:22
78:8 79:13
83:11 85:18
88:13

**Mahir**
56:4

**maintain**
29:23

**major**
62:16

**make**
44:15 64:6
65:25 72:9
74:23 77:1,4
83:9 91:7

**Makenna**
56:16

**makes**
40:11 78:4

**making**
78:1 83:21

**malpractice**
9:6,7 10:9,20
11:25 12:25
48:16

**manage**
63:17

**managed**
70:25

**management**
64:22 65:5,8,
18,24 66:5,14,
19 68:3,25
78:24 85:10

**March**
19:12 48:24,25
57:20,21

**Margolis**
5:7 12:21
13:7,11 14:20
15:6,16,19
17:25 18:13

**mark**
16:17 57:1

**marked**
92:2

**Masin**
5:23,24 11:8

12:23 13:9,12,
19 17:16 19:22
21:23 23:12
28:12 30:12
32:1 34:7
36:10 38:4
45:4 46:4,9
50:1,9,12,13
51:6 59:20
60:2,15 61:10,
12 62:9 63:2,
13 64:7,15
65:10,12,21
66:1,6,11,15
67:5,11,22
68:4,9 69:1,9,
21,24 70:13
71:3 72:7,18,
24 73:13,21
74:13,19 75:23
76:15,21 77:3
78:25 79:2
80:3,17,22
81:2,5,12,19,
23 82:8,14
83:18 84:2,7,
19 85:1,7
86:5,18 87:4,
15,17,20
89:11,19 90:2,
14,17,22,25
91:3,21,24

**Mason**
56:10

**Maternal**
21:21

**maternal-fetal**
31:4,12,17

**matter**
6:24,25 7:1
9:5 58:14

**matters**
18:12

**Maureen**
53:5,6

**MBI**
19:18,20 20:1,
4,6,10,14,18,
19,20 22:12

**meaning**
40:3

**measure**
68:14

**medical**
12:24 20:4
21:6 23:15
24:13,17,19,22
25:18 29:13,
16,21 30:3
39:20,22 41:1,
25 42:5 43:16
48:16 51:17
52:25 53:24
54:15 65:9
66:13,21,24
70:24 72:12,15
74:4 75:1
76:22 77:1
79:22 81:14,22
84:20 85:21
87:7

**medication**
85:15

**medications**
67:13

**medicine**
20:5 21:9,21
22:16,19 23:2
31:4,12,17
40:23 42:6
62:21

**meet**
14:20,22,24
61:16

Jan Denise Watson, M.D.
June 17, 2025

**meeting**
  62:1 81:14

**members**
  9:8 70:25

**men**
  63:6

**mentioned**
  8:24 10:4
  45:12,14 80:18
  85:9

**merit**
  55:1

**method**
  64:3

**MFM**
  21:18,21

**Michigan**
  5:3 22:17
  43:18,21,24
  44:3,10 45:6
  50:16 51:18
  52:2,5 54:18
  55:4 59:12,18
  88:14

**middle**
  22:8 24:5

**Mike**
  19:24 20:2

**mine**
  22:1 80:9

**Minnesota**
  64:20

**minutes**
  15:4,12 59:20
  76:14

**misrepresented**
  13:18,24

**Misstates**
  72:18

**money**
  66:10,19 72:25
  84:9,15

**monitor**
  61:8

**monitors**
  61:5 62:1

**Monte**
  6:5,10

**month**
  15:23 46:13,15

**months**
  21:16 32:4,7,
  10 35:14,15
  45:22 46:22,24
  48:2,7,13,14
  49:22

**morning**
  5:24 60:19,20

**mouth**
  84:3

**move**
  28:25 29:3
  35:22

**moved**
  27:13,14 28:16
  32:3,7,13,15

**multiple**
  20:15,17 37:1
  40:15 67:13

**musculoskeletal**
  20:13

**mute**
  13:10

---

**N**

---

**named**
  54:12 56:12
  60:9

**names**
  55:6 81:3

**Nancy**
  19:23

**National**
  24:7

**needed**
  62:13 68:12,16
  70:17 72:6
  77:22 83:3
  87:11

**neurologist**
  67:9 84:15

**nice**
  36:23

**nineties**
  42:3

**nitroglycerin**
  83:1,3,8,14,
  16,22

**NMI**
  69:20,22

**notes**
  53:22 54:4,5
  59:21 76:16

**notice**
  8:9,12 16:18

**number**
  57:23 58:19
  59:2,11 72:20,
  22 83:9

**nurse**
  52:25 53:11,12
  77:8

**nurses**
  70:15 77:7

**nursing**
  70:7,14

---

**O**

---

**O-N-Y-X**
  45:2

**Oakland**
  5:3

**oath**
  12:19

**ob**
  9:6 28:22 87:8

**ob-gyn**
  13:17 23:22
  25:1,5,14,21
  26:5,13 27:1,2
  28:16 31:3,6
  34:17 35:1
  63:3,9 87:9

**object**
  62:9 63:2,13
  64:7,15 65:10,
  21 66:1,6,15
  67:5,22 68:4,9
  69:9,21 70:13
  72:7,18,24
  73:13,21
  74:13,19 77:3
  78:25 79:2
  80:3,17,22
  81:2,12,19,23
  82:8,14 83:18
  84:2,7,19
  85:1,7 86:5
  87:4

**objection**
  61:10,13 67:11
  69:1 86:18
  89:9 90:13

**objections**
  91:8

**obstetrics**
  9:6

Jan Denise Watson, M.D.
June 17, 2025

occasion
12:20

occupational
20:5

occur
63:15 77:24

October
46:17,20 47:10
88:1,6

offer
41:9 45:9
58:11

office
28:16 67:14
82:16 89:2

officers
30:3

officially
38:7

on-site
64:24 66:21,24
71:1

Onyx
44:25 45:2,15,
21 47:13,15,
18,24 48:4,6,
12,16 73:11

open
6:13

opinion
80:8 81:22

opinions
41:9 45:9

opposed
36:21 37:1

options
79:16

order
61:16,17 72:11

91:7,19,20

ordered
77:23 83:1,3
85:23

orientation
50:15 73:3,5,7

original
48:6

orthopedic
68:18

outcomes
40:8

---

**P**

---

p.m.
47:7,11 76:19
92:3

paid
49:12

pain
73:25 74:20
75:18 81:15
83:5,21,23
85:9,11,13

pain-wise
86:6

Papendick
54:12

Pardon
61:11

Parsons
11:4,6,9,12,
18,21 14:7
87:21

Parsons-ryan
14:5

Parsons-v-ryan
80:15

Parsons-versus-
ryan
11:2

part
9:9 37:20
52:18 54:5

participate
71:4

parties
5:6

party
12:24

passed
65:3

passes
78:11

paternity
12:4

patient
35:5 40:3 59:1
60:13 63:17,21
65:19 66:22
67:4,6,9,12,20
68:10 69:10
71:7 72:11
73:1,23 74:9
75:2,7 76:5
77:9,17 80:18
81:7,11,15
82:6 83:25
84:12 88:13,
14,19,22 89:4,
8,23 90:15,19

patient's
40:4 65:9 82:4

patients
20:8,10,15
32:21 33:2
35:8,10 36:24
40:7,9,15
58:24 59:2

62:11 63:15,24
65:6,25 71:1,
9,18 73:19
77:14 81:3
83:2,15 85:14
86:4,17 87:1,
12

Paul
30:5

paycheck
49:13

PC
33:3

Pebble
57:16,18

pending
8:21

people
52:14,18,19
59:16,17 62:14
64:5 70:7,11
74:2 82:3

percent
68:5 79:12

percentage
68:1

perform
52:5

performed
39:19,23 41:13
59:7

Peri-
10:16

perinatal
9:13,14 10:3,
16 27:20 28:1,
4,7,14,18
31:21 40:22
42:6

Jan Denise Watson, M.D.
June 17, 2025

**perinatology**
  37:4

**period**
  33:21 35:9
  36:4 47:24

**permission**
  75:3 90:20

**permitted**
  72:5

**Perryville**
  37:25 38:2,5,
  8,19 39:3,9,15
  86:22 87:1
  88:7,8,9

**person**
  43:22 55:8
  66:24 68:16,19
  78:22,24 83:7,
  15,17 88:20
  89:12

**person's**
  51:23

**personal**
  6:24 10:7 33:3
  36:6 54:2,4
  88:12

**persons**
  69:25

**Phoenix**
  9:13,14 10:2,
  15 19:3,4,8
  27:13,14,20
  28:1,4,7,13,
  20,24 38:6

**phone**
  14:22,24 15:13
  57:23 71:4
  75:7 89:3
  90:18

**physical**
  78:12,14,16,

  19,23 79:7,9

**physically**
  14:22 21:13
  89:2,7

**physician**
  21:1 35:18
  43:13 62:23
  63:1,11,14
  65:5,8,18
  90:23

**physicians**
  63:3 64:8,13,
  22 68:3

**pick**
  90:18

**picking**
  89:3

**place**
  37:2 72:17

**places**
  37:1

**plaintiff**
  43:2 57:4

**Plaintiff's**
  16:19

**plan**
  68:22 69:8
  84:12

**plans**
  62:15 69:4

**point**
  5:9 8:25 24:8
  25:14 36:19
  77:18

**policies**
  86:3,16,19

**policy**
  72:17 74:23

**position**

  21:1 26:18
  29:12 53:10

**potentially**
  8:7

**practice**
  10:19 20:4
  22:16,19 23:2
  26:12 27:2,9,
  16,18,19 28:1,
  18 31:3,4,6,9,
  11,12,15,16,18
  35:19 36:5,22
  54:6

**practiced**
  21:9

**practices**
  36:17

**practicing**
  62:20

**practitioner**
  53:11,12

**prefer**
  19:8

**prenatal**
  22:2 26:8
  27:3,4,8,15
  28:4,15 29:19
  30:20 31:5
  32:12 39:24

**preparation**
  40:25 41:3

**prepare**
  14:3,12 56:20

**prescribed**
  83:14,16

**present**
  5:6 20:25
  22:13

**president**
  30:5

**prevent**
  89:7

**prevented**
  89:3

**previous**
  61:6,17 77:20

**previously**
  61:1

**primarily**
  62:24

**primary**
  32:20,23 49:3
  62:23,24,25
  63:3,5,6,10,
  11,14 90:12

**prior**
  11:18 14:20
  15:5,8 34:10
  37:14,18 39:16
  57:17

**prison**
  33:23 37:22,
  23,24 38:5,9
  39:3,9,15
  45:22,23
  58:12,16,19
  84:25 85:10,25
  86:22 87:1,12,
  25 88:5 91:2

**prisoner**
  77:1 78:1

**prisoners**
  50:23 54:16,22
  61:18 76:23

**private**
  27:18 28:15,18
  31:3

**problem**
  77:21 85:24

**problems**

Jan Denise Watson, M.D.
June 17, 2025

8:5

**procedure**
67:8 91:7

**process**
54:19,22

**produce**
17:5 18:4

**Professional**
10:8

**professional-
related**
10:6

**professor**
26:19,23,25

**program**
22:2 23:25
32:12 65:25
66:5,14,19
68:25

**promised**
18:15

**proposed**
56:20,23 58:7

**provide**
17:22,24 20:7
87:11

**provided**
37:22 42:8
45:12 84:23
87:8,9

**provider**
38:19 49:24
78:5,6 81:14

**providing**
20:10 84:25
87:1

**provision**
38:24

**public**

42:19

**published**
40:17,19 41:16

**pull**
16:11 75:21

**purpose**
65:24 66:4,18

**purposes**
17:5

**Pursuant**
57:4

**put**
16:2 43:7
72:17 79:23

―――――――――

**Q**
―――――――――

**qualified**
62:25

**quality**
29:23

**question**
7:10,12,19
8:1,2,21
13:12,15 14:17
16:23 24:16
55:7 61:12
69:24 76:21
81:6 86:11,12,
15 88:17

**questions**
7:23 50:6
60:4,16,21
87:15 88:4
90:25 91:16

**quick**
87:17

**quickly**
91:17

―――――――――

**R**
―――――――――

**R-O-S-H**
21:21

**radiologist**
68:14

**raise**
5:10

**Ralph**
56:18

**ran**
71:11,13

**RE-EXAMINATION**
87:19

**reach**
62:1

**read**
13:12 16:7
17:8 18:2 55:6
76:1 79:22
86:12

**reading**
13:14 17:10
86:14

**Ready**
5:17

**real**
19:25

**realistic**
69:4,8

**reason**
7:22,23 8:8,
13,18 12:13
36:4,6 65:17
66:13 69:2

**reasons**
91:5

**recall**
23:25 38:8

46:19 48:6,9,
12 51:7 52:19
53:15 57:6

**receive**
50:15 73:3

**received**
79:16

**recently**
25:3

**recess**
59:24 76:17

**recognize**
43:9 52:17
63:16

**recollection**
52:8

**recommendation**
84:11

**record**
6:2,4 7:7,13
51:10 53:24
54:8 57:3 60:1
76:19 91:11,18

**recording**
54:8,9

**records**
43:16 54:5
65:9

**refer**
63:17,21 77:9

**reference**
79:25

**referral**
64:1,2 66:20,
23 68:15,18
69:10 71:16
77:25 78:2,9
79:3,13,20
80:7

Jan Denise Watson, M.D.
June 17, 2025

**referrals**
  62:14 64:11
  79:7 80:10,11
  85:18 86:1

**referring**
  14:7

**region**
  19:5 29:14

**regional**
  29:13,16,21

**relate**
  11:25 13:5,15
  42:5 58:11

**related**
  18:12 27:8,10
  41:6 55:4

**relating**
  18:8,16 41:10
  44:2 54:23
  58:16 88:14

**relevant**
  91:9

**remeasured**
  68:17

**remember**
  6:21 9:4,22,25
  10:15 31:8,16,
  25 37:24 39:14
  41:22 46:10,
  13,15 47:3
  52:13,24 58:25
  64:20 68:1
  69:22,25 70:2,
  8,12,14 71:8,
  23 76:24
  80:14,25 81:8,
  10 84:11

**remote**
  5:8 12:21

**Remotely**
  5:2

**removed**
  73:25

**renew**
  25:2,7,20,23
  35:22

**renewed**
  48:11,14

**renewing**
  48:12

**repair**
  20:12

**repaired**
  69:11

**repeat**
  19:19 21:19
  30:8 45:1 46:6

**report**
  40:12,13,14

**Reported**
  5:2

**reporter**
  5:9,12,16 7:8,
  16 11:4,7
  13:13,14 17:15
  19:19,21
  21:19,22 23:10
  28:9,11 30:8,
  11 31:22 34:6
  36:9 38:1,3
  45:1,3 46:3,6,
  8 50:3,4,10,11
  51:3,5 59:23
  65:13,15
  71:12,14 86:13
  89:17 90:1,16
  91:17,22,25

**represent**
  5:25

**represented**
  14:17

**request**
  77:1,4,10
  78:21,22

**requested**
  17:11 62:6
  66:23 67:8

**requesting**
  78:12

**requests**
  17:18 54:16
  59:11 68:2
  76:22 80:11
  91:18

**require**
  69:12

**research**
  39:20,22,25
  41:6,13

**residency**
  23:19,21 24:2,
  4,12,18 26:1

**resolved**
  8:15

**responding**
  67:14

**response**
  18:4 65:1
  69:16,19 88:3

**responses**
  69:18

**responsibility**
  20:6 29:21
  90:12

**responsible**
  54:15 87:7

**responsive**
  17:18

**resubmission**
  79:24

**resubmit**
  79:18

**resubmitted**
  68:15

**results**
  82:17

**resumed**
  60:1 76:19

**Retler(ph)**
  60:10

**return**
  30:22

**returned**
  30:21 81:13

**reversal**
  41:7,11 58:19
  59:7,11

**review**
  41:1,4 58:4
  64:10 77:19

**reviewed**
  14:5 43:16,18,
  21,24 44:2

**reviewer**
  68:16

**reviewing**
  40:4

**reviews**
  64:2 77:7

**ribbon**
  70:16

**ring**
  69:20

**Robert**
  56:12

**Rodney**
  51:2,4,7,11
  66:25

Jan Denise Watson, M.D.
June 17, 2025

**role**
 54:25 61:20,21

**Ronald**
 56:6

**room**
 6:11 72:6,20,
 23

**Rosh**
 21:18,21

**rotate**
 38:21

**rules**
 7:6 91:6

**run**
 70:16

**running**
 33:4

**Ryan**
 11:6

---

**S**

---

**Sabrina**
 55:25

**save**
 66:10,19

**Schedule**
 17:2,6,12,18

**school**
 23:15 24:17

**scientific**
 39:20,22

**scope**
 66:6

**screen**
 6:14 8:6,12
 16:3 57:2

**scroll**
 16:23 57:9

**search**
 17:11

**seizure**
 67:15

**seizures**
 67:12,20 84:13

**self-employed**
 18:19 19:10
 21:4 32:17,19
 34:4,8

**self-employment**
 22:12

**send**
 63:24 66:22
 72:11 75:3,9,
 10,16,19 84:8,
 15

**sending**
 62:11

**sense**
 40:11

**separate**
 69:16

**setting**
 37:4,6 84:25

**settled**
 14:1,2

**share**
 16:3

**short**
 59:24 76:17

**show**
 16:1 57:1,10,
 25 89:16

**showing**
 16:17

**shut**
 13:9

**signed**
 47:23

**Signify**
 32:25

**signing**
 49:13

**Silverman**
 56:18

**similar**
 83:15

**simple**
 79:8 85:8,9,
 16,20,25

**sitting**
 6:7

**situation**
 64:4 74:11
 79:23 80:1

**situations**
 63:15

**six-month**
 48:3

**Smith**
 51:2,4

**solemnly**
 5:12

**somebody's**
 90:20

**someone's**
 80:8

**Sonia**
 55:15

**sort**
 27:8 41:24

**sound**
 8:5 38:15 39:8

**speak**
 15:3,11 51:21

 54:13 82:6

**speaking**
 41:24 53:16

**specialist**
 63:12,18,22,24
 77:25 78:2,11
 79:13

**specialists**
 62:12 86:1

**speciality**
 24:23

**specialty**
 25:18 68:2

**specific**
 52:13,15

**speculation**
 66:11 83:19

**spell**
 27:23 33:11

**Spencer**
 55:21

**spent**
 18:8,11,16

**split**
 24:4

**spoke**
 15:8 53:3

**spoken**
 15:5,15,20
 42:4 43:11
 54:11 55:8
 60:9

**sprains**
 85:22

**St**
 34:14 37:20

**staff**
 28:2 52:10,11
 70:17

Jan Denise Watson, M.D.
June 17, 2025

**start**
7:10,13 77:21

**started**
19:12 46:10,17
63:4

**starting**
22:2 32:12

**state**
6:3 22:17

**stated**
68:11 87:5

**statement**
88:7

**states**
21:6 22:20
41:14

**stating**
84:14

**stay**
72:10

**Steve**
55:17,23

**Stewart**
51:7,9,12,14,
18 52:7,23
53:4,17 66:25
70:1,3 75:20
83:25 84:14

**Stewart's**
51:21

**stick**
35:8

**stop**
8:14 9:16
20:20 57:18

**stopped**
10:2 28:13
34:18

**story**

62:5,6

**strains**
85:22

**stricken**
91:10

**strike**
17:23 45:13

**strip**
70:16

**stuck**
37:2

**studies**
40:2,3 79:22

**stuff**
33:18

**subcontracted**
38:23

**subject**
9:5 41:4 42:19
43:25 58:14

**submit**
77:6 80:10

**sue**
13:22

**sued**
12:25 13:2,20,
21

**suggestions**
62:13

**summarize**
47:9

**summary**
56:20,23 58:7
76:1,12

**supervise**
29:25 30:1

**supervisor**
30:4 51:1,11,

21 70:8 81:10

**supervisors**
70:14

**supposed**
61:16 82:2

**surgeries**
58:19 59:7,11

**surgery**
41:7,11

**swear**
5:10,12

**sworn**
5:20

**syndrome**
75:16

**system**
64:9 70:21
79:4

———————————

**T**

———————————

**taking**
16:18 75:14
89:8

**talk**
7:17 33:24
62:3

**talked**
11:25 14:22
24:17 32:3
42:13

**talking**
13:10 52:11,24
68:24 85:25

**teach**
26:16 70:17

**team**
64:2,5 70:24

**technological**

8:8

**technology**
8:5

**Tecum**
16:19

**temp**
35:18

**temporarily**
30:20

**temporary**
18:25

**ten**
15:12 39:9
88:9

**tenens**
18:21,23,24
19:6,10,13
21:1 35:17,25
36:18,20,23
44:20,21 47:13
49:15

**term**
40:12

**testified**
5:20 10:24
11:11,19,22
12:16,17,19
15:18 36:12,16
42:21,24 61:1
79:12 86:21

**testify**
10:22 11:15
12:13 18:13
58:15 62:7,8,
17

**testifying**
42:15 45:8
61:23 80:14

**testimony**
5:12 14:5,9

Jan Denise Watson, M.D.
June 17, 2025

40:25 41:3 42:8 48:3 56:21,24 58:7, 10 60:5 72:19 76:2 87:21,24 88:3,18 91:13

**testing**
29:18

**tests**
29:18 77:23

**Texas**
5:25 16:18 22:21 23:3 44:5

**text**
16:8

**textbook**
41:16,22

**texted**
75:1

**theory**
69:2,3

**therapist**
79:9

**therapy**
78:13,14,16, 19,23 79:7,9

**thing**
16:4,9 17:8,10 36:23 73:22 78:10 83:1 85:16

**things**
52:12 62:10, 13,16 73:7,17 78:12 85:8,9, 20,23 86:1 87:11

**thinking**
31:23 89:21,

22,23 90:7

**thinks**
77:8

**thought**
48:13 71:16 85:18

**time**
6:21 9:20,23, 25 10:24 11:11,21 12:10 15:1,8 18:8, 11,15 19:12,14 21:4 22:7 26:13 31:1 32:11,19 33:21 34:3,5,10,22 35:9,17,25 36:1,4,21 38:20,25 39:10,15 42:2, 11,24 44:21 47:15,24 48:17,19 49:17 50:1,5,6,14 51:20 52:20 53:3,19 54:1, 14,21 58:12, 16,18,20,23 59:3,7,15 60:12,17 63:8 68:5 69:10 77:7 79:13,17 80:6 82:3 88:8 91:9,12

**times**
6:19 10:5 11:15 12:12, 15,17,24 15:15,18,20 39:2,5,10 47:21 67:24 88:9

**Timothy**

56:16

**title**
20:6 26:6,22 51:16

**titles**
70:7,9

**today**
6:7 7:6,23 8:19 14:4,13, 18,21 16:2 91:20

**told**
7:16 67:4,6 70:17 75:7 81:14 85:23 90:7

**Tomkins(ph)**
56:14

**total**
39:10

**track**
61:16

**training**
24:14,20 50:16 73:3,9

**transcript**
91:20

**transition**
63:5

**travel**
19:7

**treat**
20:12

**treatment**
27:5 62:15 65:19 68:22 69:3,7 84:12

**trial**
10:22,24 11:1, 2,12,13,19,22

12:3,13,18 13:25 14:6 15:25 41:9 42:22,25 62:7, 8 91:14

**true**
76:8 90:6

**truth**
5:13,14

**Tuesday**
5:1

**Twenty**
15:4

**two-minute**
59:22

**Tylenol**
74:3

**type**
84:24

**typically**
77:1

---

U

---

**U-N**
27:24

**U.S.**
91:17

**Uh-huh**
87:23

**ultrasound**
24:10

**understand**
7:14,20,22 8:16 33:25 58:14 66:16 85:14 88:18

**understandable**
85:17

Jan Denise Watson, M.D.
June 17, 2025

**understanding**
  58:10 79:4
  82:18

**understood**
  8:2 40:16

**unit**
  50:19,21,23
  71:10 75:11

**United**
  27:21,24,25
  41:14

**University**
  23:7,24 24:7
  26:3,4,6,10,
  12,16 27:11
  37:11

**unnecessary**
  80:11,12

**utilization**
  64:2,5,22
  65:1,5,8,17,24
  66:4,13,18
  68:3,24 78:24
  79:8

--- V ---

**Vaguely**
  54:24

**variety**
  36:24

**versus**
  11:6

**video**
  6:15 8:4 54:9

**violation**
  81:5

**visit**
  35:10

**visits**

  72:20,23
  77:19,20

--- W ---

**walk**
  63:15

**wanted**
  22:1 67:9
  75:8,10 81:10,
  18 83:25

**waste**
  91:12

**Watson**
  5:9,19,24 6:5
  16:19 18:7
  39:19 50:1
  57:6 60:3,19
  62:20 76:1,21
  87:14,21 88:12

**wear**
  84:16

**Webber**
  55:13

**week**
  36:3 46:25
  47:2,11 49:4
  67:24

**weekly**
  71:7,15

**weeks**
  15:10 82:20

**Wellbeing**
  33:10

**west**
  6:5,10 38:6

**western**
  29:16

**Whitney**
  56:14

**William**
  55:19

**withhold**
  82:5

**women**
  63:4,6

**work**
  20:14,25
  21:15,17 24:9
  27:14,16,17
  28:4,7 29:10,
  17 30:13,16
  31:9,17 33:16,
  20 34:2,15,20
  36:20 37:6,17
  39:3 40:17,22
  44:3 45:17,21
  46:15,25
  47:15,23 49:19
  52:5 62:25
  67:1 72:15

**work-related**
  20:7

**worked**
  13:6,17 19:15,
  16 21:14 22:12
  26:3 27:18
  28:21 30:19,20
  31:12 32:10
  34:5 35:6
  36:16,17,18
  37:3,14 38:8
  44:5,8,10,17
  45:14,23 46:24
  47:5,9,16
  48:20 49:22
  51:14,18 52:2
  53:19 59:8
  62:23 63:8
  70:3,21 71:24
  72:4 73:7 77:2
  86:21 87:6
  88:8

**working**
  9:14,16 10:2
  20:20 21:25
  28:13 34:18,22
  36:5,21 46:19
  50:14,18 54:1
  59:17,18 63:9,
  20 71:5 77:15

**works**
  79:1

**worried**
  90:3

**worse**
  67:17 85:4,5,6

**write**
  53:24 64:1
  74:4 78:10
  79:3

**writing**
  40:8

**written**
  53:22 56:20,23
  62:3 83:6

--- X ---

**x-ray**
  68:17

--- Y ---

**year**
  8:25 11:24
  15:23 19:16
  23:8,17 26:9
  28:25 30:22,24
  31:10,11 37:19
  39:2,5 49:18
  57:21

**years**
  15:22 24:1,5,
  11 28:8,10

Jan Denise Watson, M.D.
June 17, 2025



30:14 38:8
39:5 62:20
88:10

**yesterday**
  15:2,5,8

**York**
  21:8,9,13,14,
  15,17,25 22:5,
  20 32:4,10,14