**Jeffrey Bomber, D.O.**
**09/04/2025**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KOHCHISE JACKSON,

     Plaintiff,

                              Case No. 19-cv-13382

  -vs-                       Hon. Gershwin A. Drain

CHS TX, INC., CORIZON HEALTH, INC.,

and DR. KEITH PAPENDICK,

     Defendants.

_____/

PAGE 1 TO 77

     The video deposition of JEFFREY BOMBER, D.O.,

     Taken Via Hanson Remote

     Commencing at 10:00 a.m.,

     Thursday, September 4, 2025

     Before Jennifer Wilke, CSR-8575.

 Court reporter, attorneys & witness appearing remotely



HANSON RENAISSANCE COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
09/04/2025                                                    Pages 2..5

**Page 2**

APPEARANCES:

MR. JONATHAN ROBERT MARKO - P72450

Marko Law PLLC

220 West Congress Street, 4th Floor

Detroit, Michigan 48226-3289

(313) 777-7529

jon@markolaw.com

    Appearing on behalf of the Plaintiff.


MR. ADAM MICHAEL MASIN - #4005708 (NY)

Bowman and Brooke LLP

750 Lexington Avenue

New York, NY 10022

(646) 914-6790

adam.masin@bowmanandbrooke.com

    Appearing on behalf of the Defendants CHX TX, Inc.,

    and Dr. Keith Papendick.


MR. CONNOR ALEXANDER McLAUGHLIN - P83229

Hackney Odlum & Dardas

10850 East Traverse Highway, Suite 4440

Traverse City, MI 49684-1364

(231) 642-5026

cmclaughlin@hodlawyers.com

    Appearing on behalf of Dr. Bomber.

**Page 3**

APPEARANCES CONTINUED:


THE VIDEOGRAPHER:   Marc Myers


ALSO PRESENT:       Ian Cross, Esq.

                    Nathan Lumbard

                    Laurence Margolis, Esq.

                    Brittany Sullivan

                    Rachel Weil, Esq.

**Page 4**

                    TABLE OF CONTENTS

Witness

JEFFREY BOMBER, D.O.


            E X A M I N A T I O N S

                                                    Page

DIRECT EXAMINATION BY MR. MARKO:                       6

CROSS-EXAMINATION BY MR. MASIN:                       32

REDIRECT EXAMINATION BY MR. MARKO:                    58

RECROSS-EXAMINATION BY MR. MASIN:                     74

            E X H I B I T S

Exhibit                                             Page

            (Exhibits not offered.)

**Page 5**

Remote deposition

Thursday, September 4, 2025

About 10:00 a.m.

    THE VIDEOGRAPHER:  We are now on the record. This is the video-recorded deposition of Dr. Jeffrey Bomber being taken by Zoom videoconference. Today's date is September 4th, 2025.  The time is now 10:00 a.m.

    And at this time, will the attorneys please state their appearances for the record, and the court reporter, please swear in the doctor.

    MR. MARKO:  Good morning, ladies and gentlemen of the jury, Judge Drain.  This is Jon Marko on behalf of the plaintiff, Kohchise Jackson.  Also with me is Ian Cross.

    MR. MASIN:  Good morning, everyone. Adam Masin on behalf of CHX Texas, Inc., and Dr. Keith Papendick.

    MR. McLAUGHLIN:  And Connor McLaughlin for --

    MR. MASIN:  And that is --

    MR. McLAUGHLIN:  -- Dr. Bomber.

    MR. MASIN:  -- my colleague, Rachel Weil.

    THE COURT REPORTER:  Dr. Bomber, please raise your right hand.  Do you solemnly swear or affirm that the testimony you are about to give will be the truth,



HANSON RENAISSANCE COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                                    **Pages 6..9**

Page 6

the whole truth, and nothing but the truth?

DR. BOMBER:  I do.

JEFFREY BOMBER, D.O.,
having first been duly sworn, was examined and testified on his oath as follows:

MR. MARKO:  Good morning, Dr. Bomber.

**THE WITNESS:  Good morning.**

MR. MARKO:  My name is Jon Marko.  I'm an attorney, and I represent Kohchise Jackson in this case.

DIRECT EXAMINATION BY MR. MARKO:

Q.  You were previously deposed in this case; is that right?

**A.  Yes, that's correct.**

Q.  And you've been deposed several times in the past related to your work for Corizon Healthcare, correct?

**A.  Correct.**

Q.  And at the time that you were deposed in this case, you had an attorney provided by Corizon Healthcare; is that right?

**A.  Yes.  Correct.**

Q.  You have a different attorney here today.  Is Corizon paying for your new attorney's representation?

**A.  No.**

Q.  Okay.  Is that because of -- why is that?

**A.  Well, Corizon Health went bankrupt, and they're not providing any further assistance.**

Page 7

Q.  Did -- you were previously the Medical Director for Corizon?

**A.  I was Medical Director for Corizon Health Michigan under the P.C. that they had operating in Michigan.**

Q.  Right.  I understand that, but that P.C. was just a pass-through.  So, if we go and look at Exhibit 1, Plaintiff's Exhibit 1, this is from the contract with the State of Michigan.

Do you see that Corizon provided an organizational chart here?

**A.  Yes, sir.**

MR. MASIN:  Object to --

**A.  But your question asked me if I was the Chief Medical Officer for Corizon Health.  No, not Corizon Health National; Corizon Health Michigan.**

Q.  Okay.  All right.  Thank you for clarifying.

So, here we go.  Here is the Corizon Health, and you see that they're right here.  Can you see that?

**A.  Yes.**

MR. MASIN:  Objection to this document.  There's no foundation.

MR. MARKO:  This document's already admitted.  It's Plaintiff's Exhibit 1.

MR. MASIN:  Nothing's been admitted at this point.

Page 8

MR. MARKO:  That's false.  We submitted a joint final pretrial order which required objections to be made.  This document was admitted by stipulation, I believe.  Let me check.

Yes.  Exhibit 1 Corizon MDOC service contract, which I'm showing to the doctor, was previously admitted by stipulation in the joint final pretrial order that was submitted pursuant to Judge Drain's statement.  So, your objection is false and untrue.

BY MR. MARKO:

Q.  So, anyways, as I was proceeding before I was interrupted, Doctor, this is Exhibit 1.  It's already been admitted and stipulated to pursuant to Judge Drain's protocol.  This is the contract that Corizon -- between Corizon and the State of Michigan.  Do you see this, sir?

**A.  Yes.**

Q.  Okay.  And it's just so we figure out where you fall in.  You see this is Corizon Health?  You see that logo up there?

**A.  Yes.**

Q.  Okay.  And then it has all these individuals that work for Corizon such as Dr. Calvin Johnson.  Do you see that here?

**A.  Yes.**

Page 9

Q.  And then we have the CEO Karey Witty.  You see that here?

**A.  Yes.**

Q.  And then we have all these other individuals on this chart if we go up and down.  And it looks like you're right here:  Dr. Jeffrey Bomber, State Medical Director.  Is that you, sir?

**A.  Yes.**

Q.  Okay.  And so you report to, according to this organizational chart, these other individuals and entities, right?

**A.  Yes.**

Q.  And under you, over here, if we follow this little line down, is Dr. Keith Papendick who is the UM Outpatient Medical Director; is that true, sir?

**A.  Yes.**

Q.  All right.  Now, you mentioned that you had a P.C. or something related to -- I believe it was Quality Correctional Health, but that was just a pass-through entity for Corizon Health; isn't that true, sir?

**A.  Yes.**

MR. MASIN:  Object to -- objection.

MR. MARKO:  What's the objection?

You can't think of one?  Okay.  I'll move on.

///

**Jeffrey Bomber, D.O.**
09/04/2025                                                Pages 10..13

Page 10

BY MR. MARKO:

Q.  All right.  And so as the medical director, you have knowledge about how this process called the utilization review process or UM -- utilization management, rather, process work; is that true?

A.  Correct.

Q.  All right.  And you -- before we get to this utilization management -- and, right, just for translating this utilization management into common understanding for people like me who do not work in the corrections, that's when an inmate can be referred outside to a specialist for a condition, right?

A.  Yes.

Q.  All right.  Let's talk, before we get there, just a little bit about you.  You have had -- you no longer work for Corizon, although you did some contract work for them in 2021; is that right?

A.  Yes.

Q.  How long did you work for Corizon?

A.  **Well, I started in 2009 as a medical provider at a facility, and then I became the Northern Regional Medical Director and then the State Medical Director after that.**

Q.  All right.  I just want to make sure you've never met my client, Kohchise Jackson; is that true?

Page 11

A.  **I cannot recall meeting him, no.**

Q.  You never reviewed the forms that I know are called 407 Forms, but the forms -- you never reviewed as part of your job for Corizon at the time, you never reviewed those forms that requested an outside specialist for a colostomy reversal, true?

A.  **True.**

Q.  You never provided any patient care for Kohchise Jackson, correct?

A.  **Correct.**

Q.  During the time that he was incarcerated, you never reviewed any of his medical records, correct?

A.  **I reviewed thousands of medical records.  I -- you know, I don't recall reviewing it.**

Q.  And you don't recall making any decisions of his care as it relates to this case; is that true?

A.  **Correct.**

Q.  All right.  And you've testified previously that you are not an expert.  Your words were, "I am not an expert in colostomies."  Is that true?

A.  **True.**

Q.  Okay.  Have you ever performed a colostomy reversal surgery?

A.  **No.**

Q.  Okay.  Let's talk about this utilization review process

Page 12

now.  All right.  So if we go to this, this is in the same exhibit from the -- Corizon's own document here.

So, if a patient -- you said you're familiar with this process, sir, right?  You had to be as the state medical director?

A.  **Yes.**

Q.  All right.  So, the site -- the first step is right here.  Do you see this?  Site medical director sends an outpatient referral to the utilization management, right?

A.  **Yes.**

Q.  Now, this site medical director was a Corizon employee, right?

A.  **Yes.**

Q.  So, Corizon's employee, a doctor or some other medical director, sends a request through -- for an outpatient referral to the utilization management, right?

A.  **Right.**

Q.  And that request is -- basically, that allows the inmate, the patient, to go and see a specialist outside of the prison, correct?

A.  **Correct.**

Q.  And that's because the prison doesn't have specialists and Corizon doesn't have specialists who can perform surgeries such as the colostomy reversal surgery,

Page 13

correct?

A.  **Yes.  Correct.**

Q.  And so because there's no doctors on staff there, if a patient needs that surgery, they have to be sent out to an outside doctor who's not part of Corizon, true?

A.  **True.**

Q.  All right.  Then there's a UM coordinator who's assigned.  Do you see that right there?

A.  **Yes.**

Q.  And then a nurse reviewer applies relevant criteria as defined by Corizon Health.  Do you see that there?

A.  **Yes.**

Q.  Okay.  And so the criteria is defined by Corizon, right?  You have a Corizon doctor, the Corizon criteria, and then Dr. Papendick is also an employee of Corizon, true?

A.  **Criteria as defined includes several databases including InterQual and UpToDate.**

Q.  Yeah.  Sir, that wasn't my question.  My question is --

A.  **But that's the answer.**

MR. MARKO:  Well, I move to strike as nonresponsive.

Q.  According to this document that was provided to the State of Michigan, the nurse reviewer applies relevant criteria as defined by Corizon Health?  Yes or no, sir?

A.  **It's not a yes-or-no question.**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                                    Pages 14..17

Page 14

Q.  Sir, it is.  I --
A.  **No, it's not.**
Q.  -- respectively disagree.  Does this --
A.  **Okay.**
Q.  -- document that was written -- and, look, I'm not
    trying to be cute here, but I'd ask that you answer my
    questions.
        Does this document that was written by Corizon
    and that was in the contract with the State of Michigan
    say that the relevant criteria is defined --
A.  **All right.**
Q.  -- by Corizon Health?  Yes or no, sir.
A.  **I understand.  I understand your question.  The answer
    is "yes".  Okay.**
Q.  Okay.  And then we get to the decision-maker here where
    it says, "UM Outpatient Medical Director reviews for
    appropriateness and medical necessity," correct?
A.  **Correct.**
Q.  And that's Dr. Papendick, correct, in this case?
A.  **I believe it was Dr. Papendick at that time.  Yes.**
Q.  All right.  So, then Dr. Papendick gets this request for
    a specialist outside of Corizon, and he then reviews
    that request for, quote, appropriateness and medical
    necessity; is that true?
A.  **Yes.**

Page 15

Q.  And then Dr. Papendick has two options:  Option one is
    "yes" according to this document, and option two is "no"
    according to this document; is that correct?
A.  **Yes.**
Q.  Okay.  And so if Dr. Papendick gives it the thumbs-up,
    the "yes", then it goes -- it's updated in the system
    and approved, correct?
A.  **Correct.**
Q.  And then the decision is sent back to the site so the
    inmate patient can go and get the service, correct?
A.  **Right.**
Q.  So in this particular case, I understand you didn't have
    particular involvement in this, but applying this chart
    and criteria, if Dr. Papendick had given the "yes" to
    the request for a colostomy reversal for Mr. Jackson, it
    would have then went through to approval, correct?
A.  **Yes.**
Q.  And then it would have been sent back to the site,
    correct?
A.  **Correct.**
Q.  And then Mr. Kohchise Jackson would have been able to
    get a colostomy reversal, correct?
        MR. MASIN:  Object to --
A.  **Correct.**
        MR. MASIN:  -- speculation.

Page 16

Q.  Go ahead.
        MR. MARKO:  He said, "Correct."  Did you get
    the answer?
        THE COURT REPORTER:  Yes.
BY MR. MARKO:
Q.  So, and then -- but there's a whole nother path over
    here.  Do you see this path that says "no"?
A.  **I do.**
Q.  So if Dr. Papendick goes down the "no" path and does not
    give the thumbs-up as we saw over here and instead gives
    the thumbs-down, then it goes to this tree, correct?
A.  **Correct.**
Q.  And that's the alternative treatment plan that I know is
    termed by Corizon and then the person does not get the
    immediate medical care, true?
A.  **False.**
Q.  Okay.  And in fact, when -- I know that Corizon doesn't
    like to use the words "deny", but you've previously
    testified that those words had been used in the past,
    isn't that true?
        MR. MASIN:  Objection to the question, that --
    the commentary in the question.
Q.  True or false?
A.  **I'm sorry.  I lost the question.**
Q.  That these forms for utilization management, this

Page 17

    request for an outside specialist, has -- sometimes
    they've been -- used the words "denied"?
A.  **No.**
Q.  Oh, really?  Let me show you --
A.  **No.**
Q.  -- this, your testimony in -- do you remember the case
    of Franklin?
A.  **We generally use the term alternative treatment program.**
Q.  That's -- my question was not generally, Doctor.  My
    question was that you -- although Corizon's loves to use
    the word alternative treatment program, they've also --
    you've had the word used "deny" before or "defer"; isn't
    that true?
A.  **Maybe deferred.  I don't recall ever denying anything.**
Q.  And let's talk about this process and the purpose of it,
    right?
        The -- a component of this process that the
    patient has to go through through Corizon, this request
    from the doctor, going up to Dr. Papendick in this case,
    a component of the review process takes into
    consideration cost; isn't that true?
A.  **No.  Not on the medical side.**
Q.  Let me show you your previous deposition testimony where
    you were asked (as read), "And the utilization
    management component of the review process takes into


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                    Pages 18..21

Page 18

account -- consideration cost," correct?

MR. MASIN: Objection to the use of this deposition testimony in this matter.

MR. MARKO: Excuse me, Mr. --

MR. MASIN: This is an improper way to impeach a witness.

MR. MARKO: Mr. Masin, I have not finished my question. You interrupted me in the middle of my question. And I'm directly impeaching the witness with a deposition transcript where he literally says the opposite answer.

MR. MASIN: It's an improper way to do it, sir.

MR. MARKO: Your objection is noted.

MR. McLAUGHLIN: I'm gonna object. I don't -- is this from the Franklin case or this case?

MR. MARKO: This is from the Franklin case. I'm allowed to impeach with any -- any document. This was under oath so I'm not sure I understand the objections.

BY MR. MARKO:

Q. Sir, do you see that you previously testified that the utilization management component of the review process takes into consideration cost; do you see that?

MR. MASIN: Objection. It's not an

Page 19

inconsistent statement.

Q. Sir, do you see that?

A. It's -- the MDOC and Corizon did review cost, yes. That was part of their process and procedure. When it came to approving things on a day-to-day basis versus alternative treatment plan, cost was not considered.

Q. Sir, that wasn't my question. My question was: Does the utilization management component of the review process take into consideration the cost of the medical care? And you --

A. On the operation side, yes.

Q. It does. And when you use words like --

A. On the operation side, sir.

Q. Sir, I'm not finished. Please don't interrupt me.

And when I asked you specifically about it, they do take into consider -- when you say operations cost, you mean the operations of Corizon Healthcare takes into considerations cost, true?

A. As part of the contract with the DOC, they had to report cost and consider cost, but --

Q. And --

A. -- not while approving tests.

Q. So, the fair answer is: Corizon considers costs, true?

A. Of course they do. Any health care company does.

Q. And so because Corizon considers costs as part of the

Page 20

utilization management process, they keep track of costs, don't they?

A. Yes.

Q. And let me show you Exhibit 89 which is Corizon's own documents in this case which is their own presentation about this. Do you see this, sir?

MR. MASIN: Objection to this document.

MR. MARKO: What's the objection?

MR. MASIN: To relevance. We stated our objection to this document.

MR. MARKO: Relevance?

MR. MASIN: It's dated 2013.

MR. MARKO: Again, this is all -- this is -- Plaintiff's 88 which is InGauge screenshots admitted at his deposition and have been admitted by stipulation. Sir, please familiarize yourself with the file and stop making objections to exhibits that have already been stipulated to and admitted.

BY MR. MARKO:

Q. Sir, I'm showing you this which is marked Plaintiff's Exhibit 88 on the final pretrial. Do you see that Corizon, as part of its marketing here, says it manages offsite costs by applying industry and standard utilization management criteria? Do you see that?

A. I see it.

Page 21

Q. Okay. And that, if we go down here, Corizon uses trended data to evaluate performance and project future costs. Do you see that?

A. Yes.

Q. Now, let me show you another document which is Exhibit -- which is the 2017 Corizon Utilization Management Review Manual, right? And do you see this, sir?

A. Yes.

Q. And --

A. It says on the page.

Q. And the utilization review process has an exception for what's called a pass-through list; isn't that true?

A. Yes.

Q. And the pass-through list means if you get that -- like, have you ever played Monopoly, you get to go straight around the board to "Go"? You don't have to go through the entire board?

A. I'm sorry. What's the question?

Q. You ever play the Monopoly game? You get the card, you get to go straight to "Go"?

A. Okay. Yes.

Q. Corizon has a list that allows -- that process that we just went through that Mr. Jackson would have to go through, they have a pass-through list where if you are



**Jeffrey Bomber, D.O.**
**09/04/2025**                                    **Pages 22..25**
Page 22

on that list, Corizon does not do a utilization management review of the particular service; it's automatically approved, true?

A.  Yes.

Q.  And have you -- are you aware of -- I'll show you the pass-through list here from the utilization management review.  And if we scroll down here, we see on the pass-through list: Workers' compensation.  Do you see that?

A.  Yes, I see it.

Q.  And then you see it's this abbreviated review or this pass-through review.  Do you see that?

A.  Yes.

Q.  And Corizon is not responsible to pay for those workers' compensation covered benefits, true?

A.  According to that document, but I have no other knowledge other than what you're showing me right now.

Q.  And because Corizon doesn't have to pay, if workers' compensation insurance has to pay, it is on the automatic pass-through list, true?

A.  As you say.  I don't have any detailed knowledge of that.

Q.  So if somebody needs a colostomy reversal because they were injured at work and they have workers' compensation insurance, and workers' compensation insurance approves

Page 23

the procedure, then Corizon doesn't do a medical necessary review because it's on the pass-through list, true?

MR. MASIN:  Objection.  Lack of personal knowledge.  He's just testified he does not have personal knowledge of that.

Q.  Go ahead, sir.

A.  I do not.  I do not have personal knowledge of that.  I can't answer that.

Q.  As the state medical director who is responsible for overseeing the utilization review and management process, you don't have knowledge about what's on the pass-through list in your own documents?

A.  I don't remember those details.

Q.  Okay.  Do you have any reason to dispute that document that was written and provided in evidence and is part of Corizon's own produced documents?

A.  No reason to dispute or affirm.

Q.  So, can you explain why in the world if Corizon doesn't have to pay for the procedure, it can be automatically approved, but if Corizon has to pay for the colostomy reversal, then it has to go through this review process with Dr. Papendick?

A.  As you say.  I don't have any recall of the details of how that worked.

Page 24

Q.  Do you think it might be because Corizon was trying to save money and make money?

A.  That's a very broad question.  Every health care company tries to make a profit.  I don't see that as unusual.

Q.  All right.  And in fact, you helped author a UM, utilization management, stats report, didn't you?

A.  Every month, I provided to the MDOC the number of ER runs, patients in the hospital, and referrals in terms of the number.  It had nothing to do with cost on my end.

Q.  All right.  Nothing to do with cost.  All right.  Let's take a look.  Here's the report.  Do you see it in front of you?  This has been entered as an exhibit.  It's Exhibit 8.  Do you see this?

A.  Right.  Yeah.  We were required to report that every month --

Q.  Right?  And now --

A.  -- in our...

Q.  -- my understanding -- I'm sorry to interrupt you.  Go ahead.

A.  In our contract, this was a required report.

Q.  Right.  Now, Corizon provided -- you helped draft this report with other people is my understanding, true?

A.  True.

Q.  And so let's look at what you would put in this report.

Page 25

So, savings guide.  You actually made a very nice chart here showing the millions of dollars of expenditures saved through the outpatient utilization management process.  Do you see that?

A.  I don't remember who generated that, but --

Q.  Well, sir, it's --

A.  -- I see it, yes.

Q.  -- in the report that you were bookmarked --

A.  I see -- yeah.  I think that was one of the required reports as well.

Q.  Okay.  But you just said that it has absolutely nothing to do with costs, yet, Corizon, in this report, made a nice chart showing the costs going down from $20 million all the way down to, 2016, less than half.  They were cut less than half.  Do you see that?

A.  Of course they tried to save money and make a profit.  All health care companies do, but that did not impact our day-to-day decisions in the 407 review process.

Q.  And one of the ways to make a profit and save money is deny outside medical care that Corizon would have to pay for, isn't it?

A.  We were never told to deny anything.  We were told to base it on medical necessity.

Q.  That wasn't my question.  Corizon saves money if they don't have to pay for additional outside services, true?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**
Page 26

**Pages 26..29**
Page 28

A. They don't deny outside services based on money. It's whether or not the patient needs it or not.

Q. That wasn't my question.

A. Well, that's the answer.

Q. My question was -- well, you previously testified in another case, in the Kensu matter, that you agree that the less money that Corizon spends on treatment, the more money Corizon makes, correct?

MR. MASIN: Objection. Improper -- improper impeachment, not inconsistent statement.

Q. Let me ask you the question. Do you agree that the less money that Corizon spends on treatments, the more money Corizon makes? Do you agree with that statement?

MR. MASIN: I object to this document being shown in respect to that question.

Q. Let me ask you the question, and then if you give an inconsistent answer, I will show the document. Sir, do you agree that the less money that Corizon spends on treating these patients in the prison system, the more money Corizon makes? Yes or no.

A. It's not really that gray. So, okay. The less money anybody spends on health care costs, the more money the company would make. Yes. Okay.

Q. Yes. Right? So the more utilization management reviews that are denied, the more requests for outside services

Page 27

that are denied by Corizon, the more money Corizon makes, correct?

MR. MASIN: Objection. Calls for speculation.

A. That would --

Q. Go ahead.

A. But you're implying that there is an intent to save money by denying treatment, and that does not happen.

Q. Sir --

A. So, the --

Q. -- that wasn't my question.

MR. MARKO: I move to strike.

A. The answer to your very cryptic question which is not broad enough to encompass all the decision-making, the answer is yes.

Q. Okay. And in fact, that was part of this report that you wrote -- I'm now showing you Exhibit 8 again -- where Corizon discusses how it saved hundreds -- the cost savings in the area above is in the hundreds of millions of dollars. Do you see that there, sir?

A. Yes. I think that was taken from the Tableau report.

Q. And this is shown graphically on page 11 where we looked at that graph where it talks about this process that Mr. Jackson had to go through, the outpatient utilization management process, and it talks about how Corizon saved -- it had a cost savings of 60 percent.

Page 28

Do you see that?

A. I see that.

Q. And so you -- I know that you said Corizon doesn't take costs into account at all; yet, the report -- you would agree that the report that you helped author to the department of corrections contained a chart showing millions of dollars in savings and a narrative talking about the millions -- hundreds of millions of dollars that were saved, true?

A. And the answer is, to full disclosure, you have to finish reading the rest of the paragraph. The quality of care actually improved during that time.

Q. Oh, do you think the quality of care improved for Mr. Jackson?

A. The quality of care improved markedly over that time.

Q. Is it your testimony that through this process that saved Corizon hundreds of millions of dollars, that the quality of care improved for Mr. Jackson?

MR. MASIN: Objection to the question.

A. I can't speak to Mr. Jackson. I can tell you the overall quality of health care improved dramatically.

Q. So, you believe that outside services were cut to the point that they saved hundreds of millions of dollars, a reduction of over 60 percent, and Corizon is so well-qualified and amazing, that they actually got

Page 29

better results for people like Mr. Jackson?

A. We had markedly improved quality of care measures over that time. Yes, we did.

Q. Let me show you another Exhibit which is 62 which is part of the bid process where, again, Corizon uses the utilization management process to brag about how much cost savings they're providing to governments. Do you see that?

MR. MASIN: Objection to the use of this document. It's an out-of-state document. It has nothing to do with Michigan. Relevance and 403.

Q. Okay. Do you see that, sir?

A. Yes. And I see that most of the savings is keeping people out of the hospital.

Q. People like Mr. Jackson?

MR. MASIN: Objection --

A. Correct. To keep people from --

MR. MASIN: Objection to --

A. -- getting sick, meet their needs on-site so that they don't have to go to the hospital.

Q. How are you going to meet somebody who needs a colostomy reversal's needs on-site? You agree that that could not be done, right?

A. I can't speak to the specifics of that case, but in general, in the whole system, yes, the amount of



HANSON RENAISSANCE COURT REPORTERS & VIDEO    hansonreporting.com    313.567.8100

utilization of outpatient services decreased because we didn't need it.

Q. Can a colostomy reversal be done on-site? Yes or no.

A. No.

Q. Okay. And Corizon would have to pay if that was done offsite, true?

A. Yes. If that were approved, yes.

Q. And because it wasn't in this case, Corizon didn't have to pay; true or false?

MR. MASIN: Objection to speculation.

A. I don't know the specifics.

Q. You don't know --

A. You asked --

Q. -- whether if a service isn't -- as a doctor, would you bill for a service for a patient that you never did or never saw, sir?

A. I think you mentioned Mr. Jackson specifically, and I can't say.

Q. And you don't have knowledge about Mr. Jackson's case so you're not able to offer testimony as it relates to him; is that fair?

A. I don't remember if he had an approval or not, what the specifics were there, but in general, yes, the less we paid for outpatient services and utilization, yes.

Q. All right. Now, let's look at your contract which is Plaintiff's Exhibit 1, the actual contract with the department of corrections. This is just Michigan by the way. So if we go up there, do you see it says State of Michigan at the top?

A. Yes.

Q. Okay. Just the State of Michigan, do you see the value of the contract, 715-million-dollars-plus? Do you see that?

A. Yes.

Q. It's a big contract, isn't it?

A. In correctional medicine, yes. M-hm.

Q. All right. So you would agree, sir, that from a doctor standpoint, that inmates are entitled to the same level of medical care as a patient in the community, correct?

A. Yes.

Q. And you would agree that in your private practice, that you would refer individuals who requested and needed a colostomy reversal to a specialist, correct?

A. If they were medical necessity, yes.

Q. And if Mr. Jackson required a colostomy reversal, he should have been referred to a specialist, correct?

A. If it was medically necessary.

Q. Are you aware that his treating physicians all testified that it was medically necessary?

MR. MASIN: Object to form, misstates

testimony.

A. I'm not aware of the specifics, no.

MR. MARKO: Okay. Thank you, sir. I don't have any other questions.

MR. MASIN: Dr. Bomber, good morning. My name is Adam Masin.

CROSS-EXAMINATION BY MR. MASIN:

Q. You and I have not spoken before, have we?

A. No.

Q. You haven't spoken with my colleague, Rachel Weil, before, correct?

A. Correct.

Q. Where do you reside, sir?

A. I reside in Naubinway, Michigan, in the Upper Peninsula.

Q. And where did you grow up?

MR. MARKO: Objection --

A. I grew up in --

MR. MARKO: Hold on. I'm sorry. Objection. Relevance.

Q. You can answer.

MR. MARKO: And good character testimony which is inappropriate and not admissible.

MR. MASIN: Where he grew up is good character testimony? Okay.

///

BY MR. MASIN:

Q. Where did you grow up, sir?

A. In Pellston, Michigan.

Q. Where did you go to high school?

A. Pellston High.

MR. MARKO: Same objection. Can I have a continuing objection?

Q. Did you go to -- did you graduate from high school?

A. I did.

Q. Did you attend any postsecondary education?

A. I did.

Q. Where did you go to college?

A. I started at North Central Michigan College, and then I graduated from Jacksonville University with my bachelor's, and then MS/Ph.D. from the Florida Institute of Technology, and then my D.O. degree from Des Moines University.

Q. And what year did you earn your D.O. degree?

A. That was 1993.

Q. After you earned your D.O. degree, did you have a residency?

A. I did. I completed a family practice residency at the Toledo Hospital.

Q. And how long did you -- how long was that residency?

A. Three years.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

Page 34

Q.  What did you do after the residency?

A.  I practiced medicine in Findlay, Ohio, for 12 years, owned my own practice in conjunction with several other partners.

Q.  And what did you do after that practice ended?

A.  I moved back to Northern Michigan to the Upper Peninsula to become a rural health care physician at Helen Newberry Joy Hospital.

Q.  And how long did you do that for?

A.  Well, I did that full-time and part-time off and on for ten years, and then I moved over to the -- to correctional medicine.

Q.  When did you first get involved with correctional medicine?

A.  That would have been 2009 when I started working at the Newberry Correctional facility.

Q.  Do you hold any board certifications?

A.  I do.  The American Board of Family Medicine.

Q.  And how long have you held a board certification in family medicine?

A.  Since I was a resident.  I did let it lapse for a year or two, but overall, yeah, thirty-some years.

Q.  What was your first position with Corizon?

A.  I was -- it actually wasn't with Corizon.  It was PHS which became Corizon.  I was the site physician at the

Page 35

Newberry Correctional facility, then I became the Northern Regional Medical Director.  I was in charge of the correctional facilities in the U.P. and then from Saginaw across to Muskegon and up.

Q.  And after you were the Northern Regional Medical Director, what did you do next?

A.  Then I was asked to become the State Medical Director from when my boss left, and I became the State Medical Director, and that was from 2015-2018.

Q.  And what happened -- what did you do next after 2018?

A.  I came back to practice rural health care by becoming the medical director for the little clinic here in Naubinway and also worked for Schoolcraft Memorial Hospital in Manistique.  I also did nursing homework, and at Manistique, I also served on the quality committee.

Q.  Are you working as a physician currently?

A.  Yes.  I am working two days a week in our rural health care clinic and also consulting for VitalCore which has the contract with the Michigan Department of Corrections.

Q.  Are you being compensated for your time spent on this case?

A.  Not at all.

Q.  There has been some discussion about an alternative --

Page 36

well, strike that.  There's been some discussion about a 407.  Do you know what that is?

A.  I do.

Q.  What is a 407?

A.  That's a number of a state form.  The state has a lot of forms with numbers, and the 407 Form is the utilization management form for requesting off-site services which may be, especially, consultation, MRIs, imaging, all of those things.

Q.  Okay.  And the 407 is a state form, not a Corizon form; is that right?

A.  Correct.  Yes.

Q.  You were shown some options that a utilization manager would have upon receiving a 407.  One of those options would be to approve the request; one would be an alternative treatment plan.  Are you also familiar with the term NMI?

A.  No, not off the top of my head.

Q.  Did the utilization manager have the option of seeking more information from the on-site physician at the time?

A.  Oh, yes.  Yes.  That was done all the time.  Sometimes the submission wasn't complete or an alternative test, like, for example, sometimes if they required an -- requested an MRI and an ultrasound may have been a better test, we would request more information and

Page 37

discuss it with the provider.

Q.  What -- can you explain to the jury, what role did cost have in the utilization manager's consideration of a specific 407?

A.  We were told repeatedly by operations, from my boss Dr. McQueen and on up, not to practice medicine based on cost.  We had a saying that we must meet all the inmates' needs.  And we were never directed to choose a cheaper test or, you know, decline a test ever.

We were required to report the numbers, but never in our decision-making on a day-to-day basis -- I wouldn't participate in anything like that.  I'm a family doctor.  I'm a dad for crying out loud.  You know, we -- you don't go into correctional medicine to make money, okay, as a provider.  You know, the sights are spartan, and you go in because you have a heart for the underserved.

And we never denied care based on what corporate said about money or not, and it was based on medicine.

Q.  What, if any, information did Corizon provide to the utilization managers who were considering 407s about the cost of the requests that they were considering?

A.  I never remember cost being a factor.

Q.  What information, if any, was the utilization manager



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                    Pages 38..41

Page 38

provided relating to the cost of an alternative treatment plan?

A.  None.

Q.  Would a utilization manager who was reviewing a 407 know whether the cost of an approval was more or less than the cost of an alternative treatment plan?

A.  I mean, they might know the cost of an MRI at the time, but, again, it didn't play into our decision-making.  It was all based on medical necessity.  If there was a more cost effective test that would have met the medical necessity, and that might be a factor, but by and large, not on a day-to-day basis.

Q.  So, is it -- was it possible that an alternative treatment plan would actually cost more than the approval would cost?

A.  Oh, yes.  Many times I remember saying: No.  Actually, that person at this point needs surgery; not a brace or, you know, whatever.

Q.  If a utilization manager approves the request, what, if any, other steps are there that are necessary before the request is considered fully approved?

A.  There are a number of steps.  If, for example an alternative treatment plan is suggested and the medical provider disagrees, they have a several step appeal process that goes all the way up to the state medical

Page 39

director on the Michigan Department of Corrections' side.  An inmate can also file a grievance if they don't feel their needs have been met.

Q.  So, let's talk about --

MR. MARKO:  Hold on.  Let me object.  Move to strike.  We filed a motion with regards to both of these, referencing appeal process or grievances processes.  No fault can be a portion on the Michigan Department of Corrections, ECF 160, and we're awaiting a ruling from Judge Drain.  So, I want a continuing objection as it relates to anything, your attempts to cast blame or fault on some other party other than Corizon Healthcare.

BY MR. MASIN:

Q.  I want to talk about Corizon's process for a moment.  If a utilization manager approved an alternative treatment plan and the on-site medical provider disagreed with that decision, did the on-site medical provider have any authority to seek an appeal?

A.  Absolutely.

Q.  How would they go about --

MR. MARKO:  Same objection.

Q.  And we're talking only about Corizon's practice right now.

A.  Yes.  The site medical provider or whoever the

Page 40

submitting provider was could file an appeal.  That would usually start with the regional medical director, and then there was a committee, a regional medical director, state medical director, and also the assistant chief medical officer for the state, and then, of course, the chief medical officer above that was in the Corizon algorithm.

Q.  So if an on-site provider disagreed with the utilization manager's decision and they went to the regional director, what options did the regional director have at that point?

A.  Well, we would discuss the case with the provider and then refer it on up to the committee.  If I disagreed with the medical provider, they still had the option to go beyond me.

Q.  So if the on-site medical provider disagreed with the regional director, the on-site provider had the ability to go above you --

A.  Yes.

Q.  -- to Corizon's state medical director; is that right?

A.  Yeah.  To the committee which included the assistant chief medical officer for the state, chief medical officer for Corizon, and usually a utilization management physician and another medical director, regional medical director.

Page 41

Q.  So, the state medical director was part of that committee; is that right?

A.  At that level, it would be the assistant chief medical officer.

Q.  And did that committee have the ability to overturn the utilization manager's decision, essentially?

A.  Yes.

Q.  And if that committee overturned the utilization manager's decision, what would happen?

A.  Then an authorization number would be issued and the consultation would be approved.

Q.  In your role as a regional medical director for Corizon, when you were involved, were you ever involved in a situation where an on-site provider essentially appealed the utilization manager's decision?

A.  Yes.

Q.  And in your consideration of that appeal, did you ever consider cost?

A.  No.

Q.  Were you ever involved in a situation where an on-site provider went above your head to the committee that you spoke about?

A.  I don't recall.  I was pretty accessible.

Q.  As the State Medical Director for Corizon, were you ever part of a committee that was considering a utilization



HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                          Pages 42..45
Page 42

manager's request?

A.  Yes.

Q.  At the committee level, did the committee consider cost?

A.  No.  Medical necessity.

Q.  What is -- can you explain to the jury, what is the difference between the State Medical Director for Corizon and the Chief Medical Officer for the State of Michigan?

A.  So, the Chief Medical Officer for the State of Michigan is employed by the State of Michigan, and their job is to oversee the contract.  And the Chief Medical Officer for the private side, for Corizon Health, is responsible for all of the employees, et cetera, on the private side, through the stipulations in the contract.

Q.  You testified earlier that you had a contract with the State of Michigan that provided you with the -- you had to report certain information pursuant to that contract, right?

A.  Yes.  I think there were 30 reports in that contract that we had to supply.

Q.  As the contractor for the State of Michigan, what, if any, authority did you have to overturn the State of Michigan's desires?

MR. MARKO:  Again, objection as it relates to casting blame on the State of Michigan pursuant to

Page 43

ECF 160.

A.  I had no authority.

Q.  One of the other avenues of appeal that you had talked about was the option for the prisoner to go directly to the Michigan Department of Corrections; is that right?

MR. MARKO:  Object.  That --

A.  Yes.

MR. MARKO:  Hold on.  That mischaracterizes his testimony, and, again, I object based on ECF 160 and the issues we raised therein.

Q.  If a prisoner did not agree, if the prisoner himself or herself did not agree with the decision of the utilization manager, do they have an option to bypass Corizon?

A.  Yes.  We had nothing to do -- that was an algorithm on their side.  It goes up the chain.

Q.  And are you familiar with the MDOC's grievance process?

A.  Yes.

Q.  Did Corizon have any role in the MDOC's --

MR. MARKO:  Objection, and move to strike to any reference to the grievance process which we filed a motion on and is completely inadmissible.

Q.  You can answer.

A.  We had no authority there.

Q.  Did Corizon have any role at all in the grievance

Page 44

process?

A.  Other than we would be informed if an inmate had a grievance.

Q.  If, as a result of the grievance process, the prisoner's request is ultimately approved by the MDOC, did Corizon have the ability to disagree with that?

MR. MARKO:  Same objection.

A.  No.

Q.  So, is it fair to say that the result of the MDOC grievance process was the final say regarding the prisoner's appeal of a utilization manager's decision?

MR. MARKO:  Same objection.

A.  Yes.

Q.  Did the State of Michigan, as part of your contract, require Corizon to follow certain policies and procedures that the State of Michigan imposed?

A.  Oh, yes.

Q.  And as part of your job as the State Medical Director for Corizon, were you familiar with the MDOC's policies?

A.  Yes.

Q.  I want to show you what has been pre-marked as Exhibit N3.  You'll see this on your screen.

And do you recognize this document?

A.  Yes.

MR. MASIN:  And for the record, this is the

Page 45

Michigan Department of Corrections Policy Directive 03.04.100.

Q.  Are you familiar with that document?

A.  Well, I've seen this before.  Yes.

Q.  Okay.  I'd like to scroll down to the section entitled "Corrective and Reconstructive Surgery Services".  Do you see that?

A.  Yes.

Q.  And AA -- can you read AA, please?

A.  "Corrective surgery is a surgical procedure to alter or adjust body parts or the body structure.  Reconstructive surgery is a surgical procedure to reform body structure or correct defects.  For purposes of this policy, corrective and reconstructive surgery does not include procedures which can be done under local anesthesia."

Q.  And did you understand what you just read in AA to be part of Michigan Department of Corrections' policy during the time that Mr. Jackson was incarcerated?

A.  Yes.

Q.  Can you read BB?

A.  "Corrective and reconstructive surgery shall be authorized for a prisoner only if determined medically necessary and only if approved by the CMO.  It shall not be approved if the sole purpose is to improve appearance."


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

**Jeffrey Bomber, D.O.**
09/04/2025                              Pages 46..49
Page 46

Q.  The CMO here, do you know what that refers to?

A.  Yes.  The chief medical officer.

Q.  Is that the chief medical officer for the State of Michigan or someone else?

A.  I believe that's the State of Michigan, yeah, because...

Q.  And did you understand that BB was the Michigan Department of Corrections policy during the time that Mr. Jackson was incarcerated?

A.  Yes.

Q.  Can you read CC, please?

A.  "Before referring a prisoner for corrective or reconstructive surgery, the medical provider shall monitor the prisoner's condition" -- okay -- "for an appropriate period of time to establish the actual degree of disability or dysfunction.  The feasibility of corrective or reconstructive surgery shall be evaluated to determine whether to make a referral.  This shall include evaluating the expected improvement in the prisoner's level of functioning, any risks and their probabilities, and available non-surgical treatments."

Q.  Did you understand what you just read as part of CC to be part of the Michigan Department of Corrections policies during the time that Mr. Jackson was incarcerated?

A.  Yes.

Page 47

Q.  And what, if any, ability did Corizon have to not follow these policies?

A.  Oh, there would be a long and extensive process to make any changes in the policy.

Q.  Did Corizon have any role in writing these policies?

A.  We were -- we were part of the medical services advisory committee which could make recommendations, but the DOC had to actually finalize any, you know, policies and procedures.

Q.  Do you know whether -- do you, sir, have any personal knowledge as to whether the State of Michigan's Chief Medical Officer ever considered a request for a colostomy reversal surgery for Mr. Jackson?

A.  I do not.  I cannot answer that.

Q.  Regarding the grievance process that the prisoner had the option of going through through the MDOC, did Corizon employ any of the individuals who were involved in that grievance process?

MR. MARKO:  Objection to any reference to the grievance process pursuant to our motion in limine.

A.  No.

Q.  I'm gonna show you what has been pre-marked as Exhibit Q3.

MR. MARKO:  Yeah.  I object to any -- you're now showing a grievance appeal which we object to.

Page 48

Anything related to the grievance process is inadmissible.

Q.  Sir, have -- this is a little small.  I'm trying to blow it up for you.  There we go.

Sir, do you recall ever reviewing this document relating to Mr. Jackson?

A.  Not to Mr. Jackson.  I've seen grievance appeal responses before, but I don't recall seeing this one.

Q.  Okay.  At the bottom of the document, you'll see there's a respondent's name, Subrina Aiken, RN, and at the title:  Clinical Administrative Assistant Jackson Health Care Office Administration.  Do you see that?

A.  I do.

MR. MARKO:  Same objection.

Q.  Was Subrina Aiken employed by Corizon?

A.  No.

Q.  I want to turn your attention to a section of this document.  Here we go.

You'll see in Summary of Step II Investigation, it states, "The Michigan Department of Corrections (MDOC) doesn't reverse colostomies unless it is medically necessary, the surgery you are requesting is non-essential."  Do you see that?

A.  I do.

MR. MARKO:  Same objection.

Page 49

Q.  During your time as Chief Medical Officer for Corizon, was it your understanding that the Michigan Department of Corrections does not reverse colostomies unless it was medically necessary?

MR. MARKO:  Same objection.

A.  Yes, I -- I do.

Q.  Did you consider this statement, "the Michigan Department of Corrections doesn't reverse colostomies unless it is medically necessary", to be consistent with Policy 03.04.100 that we just looked at?

A.  Yes.

MR. MARKO:  Same objection.  Move to strike.

Q.  In the bottom of the section, it says, "Grievance Denied:  Review of the evidence supports that Grievant's medical needs are being addressed.  Mr. Jackson, per documentation, you are doing fine with current condition, the reversal is a major surgery with potential complications up to death and the Department will not ok a dangerous unnecessary elective procedure, a reversal for a functional colostomy is considered non-essential.  POLICY IS NO REVERSALS UNLESS there is a MEDICAL REASON."

Do you see that?

A.  I do.

MR. MARKO:  Same objection, and foundation.



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

He has no knowledge regarding Mr. Jackson's care.

Q. Did you understand policy is no reversals unless there is a medical reason to be consistent with the Michigan Department of Corrections' policy during the time that you were Chief Medical Officer for Corizon?

MR. MARKO: Same --

A. Yes.

MR. MARKO: -- objection.

Q. It also states here, "Grievant can seek outside Services at his Own Expense, by following policy/procedures." Do you see that?

A. Yes.

Q. Were you --

MR. MARKO: Same objection.

Q. Were you familiar with the ability of a prisoner to seek medical services at their own expense by following MDOC prisoners?

MR. MARKO: Same --

A. Yes.

Q. By following --

MR. MARKO: -- objection.

Q. -- MDOC procedures. Excuse me.

A. Yes. I recall that policy.

Q. And if a prisoner wanted to seek outside services at their own expense by following the MDOC procedures,

Page 51

would Corizon have any role in objecting to that?

MR. MARKO: Same objection, and also assumes facts not in evidence, and also is an inappropriate question given that Mr. Jackson's -- given our pending motion in limine that was filed.

Q. You can answer the question.

A. Yes.

Q. So, Corizon would have no role in objecting to that?

A. No. No role.

Q. During your time working at Corizon, did Corizon have a policy to deny medically necessary care to save money?

A. No.

Q. During your time working at Corizon, did Corizon have a policy to deny medically necessary colostomy reversals to save money?

A. No.

Q. In determining medical necessity, did Corizon have a policy to limit the information that providers could consider in making a decision about medical necessity?

A. No.

Q. What information could the utilization manager consider in making a determination about medical necessity?

A. Virtually, you know, any legitimate medical reference. We used UpToDate. We used InterQual. Sometimes providers would cite the medical literature if they

Page 52

found something, you know, that was pertinent to that particular case. We had -- we considered whatever was, you know, efficacious.

Q. You mentioned UpToDate several times during your testimony so far. What is UpToDate?

A. UpToDate is literally an up-to-date medical database, up-to-date to the day that helps you to determine the diagnoses and treatment plan for virtually any medical condition.

Q. What, if any, role did Corizon have in preparing the information that was available on UpToDate?

A. Corizon provided for that for all providers. They paid for that, for subscriptions for everyone to be able to access that.

Q. The information that was provided on UpToDate, was that information that was created by Corizon?

A. No.

Q. Who created that information?

A. The contract physicians that work for UpToDate.

Q. And you mentioned a service called InterQual. What is InterQual?

A. InterQual is another database that's used mostly on, I believe, the hospital side. It's the same thing, you know, a database, a compendium of all literature, and helps you make, you know, treatment plans and decisions.

Page 53

Q. Did Corizon pay for utilization managers to get access to InterQual?

A. Yes.

Q. Did Corizon create any of the information that was available on InterQual?

A. No.

Q. So, is it fair to say that the utilization managers had access to whatever independent medical information they thought was appropriate to look at?

A. Yes.

Q. Did Corizon train anyone to apply any sort of one-size-fits-all type of definition to fit any sort of medical necessity?

A. No.

Q. Did Corizon have a computer program or algorithm that helped providers make medical decisions based on cost?

A. No.

Q. What, if any, role did a patient's presentation have during an examination in making medical necessity decisions?

A. Oh, it's extremely important. Physical exams are an extremely important part of the presentation.

Q. And did Corizon conduct routine medical examinations of incoming prisoners?

A. Yes.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Q. Can you tell the jury, what examinations was Corizon doing of prisoners when they first entered the MDOC?

A. They required both a review of the patient's medical history, their medications they were on, tried to obtain all the old records that we could. They had a full physical assessment and also a full mental health assessment while they were at the intake center.

Q. Did the intake physicians or medical providers who did that examination, did they have the ability to call the patient's outside providers if they wanted to?

A. Yes. And do so.

Q. And if they did call the outside provider and the outside provider gave them information, is that information that the utilization manager could have considered?

A. Yes. It would go into the patient's record into their document section and that could be available for review.

Q. Did Corizon perform medical evaluations on prisoners when they were transferred between prisons or facilities?

A. Yes.

Q. And what was done during those examinations?

A. For -- if they're transferred to another site, first, there's an RN nursing assessment, and then if there's any urgent need, the provider would, you know, see that patient right away; otherwise, they would put them on the schedule for a new assessment.

Q. And would a utilization manager have access to all of the preexisting medical records that were available based upon the care that was provided in the prison?

A. Yes.

Q. Can you explain to the jury, then, how did a Corizon utilization manager determine what was medically necessary during your time at Corizon?

A. Yeah. They would base it on the recommendations in UpToDate and other databases, if needed, based on the current literature and recommendations.

Q. During your time at Corizon, did you consider UpToDate to be an authoritative source of medical information?

A. Yes.

Q. Did you consider InterQual to be an authoritative source of medical information?

A. Yes.

Q. Have you ever used UpToDate yourself outside of the MDOC when you've practiced medicine?

A. I do. In fact, I use it every day in my practice as well as all the physicians that work for the hospital system I'm with. Yes.

Q. And when you were working at Corizon, did you yourself ever consult UpToDate?

A. I did.

Q. Did UpToDate ever provide information about the cost of a procedure or the cost of a potential alternative treatment?

A. I don't recall cost being -- mostly, it's what is the best test.

Q. Did Corizon take any steps during your time there to ensure that on-site providers who requested medically necessary care would have that care approved?

A. Yes.

Q. What steps were taken?

A. Well, the -- can you repeat the question?

Q. Sure. What -- I think the question was: Did Corizon take any steps during your time there to ensure that on-site providers who requested medically necessary care would actually have that care approved?

A. Oh, yes. We were required to see the patient if they had concerns. They could file a kite and ask to be seen, and we had to see them in a certain amount of time and make sure their medical needs were being met.

Q. Did Corizon ever train the medical providers on what to say in a 407 to ensure that a request that was medically necessary would be approved by the utilization manager?

A. There was training in the process and procedure; not necessarily what to say exactly. We -- I would give guidance as a regional director.

They might call and say, "Hey, Doc, I got this patient. I'm not sure. What should I do next? Should I have a, you know, MRI, ultrasound, orthopedic referral? What do you think I should do next?"

And we'd give them guidance, but it wasn't any, you know, black-and-white directive.

Q. And just so the jury is clear: During your time as regional manager, would you have had any review of the facilities that Mr. Jackson was in?

A. I've been to all the facilities. I, you know, worked in 13 of them and met every provider that worked for me at the time. So, yes.

Q. During your time as regional or state medical director, were you ever asked to make a medical decision relating to Mr. Jackson?

A. I don't recall.

Q. To your knowledge, was anyone at Corizon asked to approve a request related to a colostomy reversal surgery for Mr. Jackson after April 19th, 2017?

A. I don't recall.

Q. You were asked some questions in your examination by Mr. Marko about the term "as defined by Corizon Health". Do you recall that?

A. Yes.



**Jeffrey Bomber, D.O.**
**09/04/2025**                              Pages 58..61

Page 58

Q.  Can you explain what that means, as defined by Corizon Health?

A.  **We didn't have an up-to-date database that was created by Corizon Health.  We did define, you know, resources that were available for our providers such as UpToDate, InterQual.  We didn't have any requirement.**

Q.  You were asked some questions about -- generally questions about attempts to be cost effective.  Did you have an understanding as to why the State of Michigan wanted you to be cost effective?

A.  **Well, yes.  We're compelled to answer to the people of the State of Michigan and provide cost effective health care so that's why they monitored -- monitored the costs.  But, I -- you know, from a day-to-day basis in terms of medical decision-making, that was not part of our algorithm.**

MR. MASIN:  Thank you very much for your time, Dr. Bomber.  I don't have any additional questions for you right now.

REDIRECT EXAMINATION BY MR. MARKO:

Q.  Dr. Bomber, you talked about this Corizon appeal process on examination by the attorney.  Do you remember that?

A.  **It's a joint process, Corizon and MDOC.**

Q.  You agree that Mr. Kohchise Jackson does not initiate the Corizon appeal process that you described, correct?

Page 59

A.  **No.  The provider would initiate it.**

Q.  Yeah.  And when you use the words "the provider," you're talking about a Corizon provider, true?

A.  **True.**

Q.  So when we use these words about this appeal process, Corizon would have to start that appeal process that you described through their own employee to begin the process, true?

A.  **Yes.**

Q.  And if we look at the 407 in this case which is the request that was sent to Dr. Papendick, you see, it looks like the site medical provider was Corizon doctor Mahir H. Alsalman, M.D.  Do you see that?

A.  **Yes.**

Q.  And so he's a Corizon employee, correct?

A.  **Correct.**

Q.  So, why didn't he start the appeal process?

MR. MASIN:  Objection.  Lack of personal knowledge.

Q.  Go ahead.

MR. MASIN:  He can't --

A.  **My personal knowledge --**

MR. MASIN:  -- testify as to what another person --

A.  **I have no idea.**

Page 60

(Simultaneous discussion interrupted by the reporter.)

MR. MARKO:  Yeah.  I need a --

MR. MASIN:  He cannot testify as to what another person was thinking.

Q.  Go ahead.

A.  **I have no knowledge.  I can't answer that.**

Q.  Well, certainly, you're not going to fault Mr. Jackson for not having one of Corizon's own doctors initiate an appeal process, correct?

A.  **I'm not gonna fault Mr. Jackson, no.**

Q.  And we had down here, Dr. Papendick, who's the reviewer.  Do you see that?

A.  **Yes.**

Q.  Okay.  Now, did Dr. Papendick, do you know what he did or didn't do when he reviewed this particular request to get Mr. Jackson surgery?

A.  **I do not know specifically what he did, no.**

Q.  Are -- would it -- you talked about how it's important to have a physical exam.  Your words were the physical exam are very important.  Would it surprise you that Dr. Papendick never met Mr. Jackson and never examined him?

A.  **No, it wouldn't surprise me at all.  That wasn't his role.**

Page 61

Q.  Okay.  And so it doesn't surprise you that there was no physical exam done by the utilization management coordinator in this case?

A.  **Correct.**

Q.  And you understand -- we talked about cost of surgery.  In this particular case, it was a request for surgery, you understand that, a colostomy reversal surgery?

A.  **Yes.**

Q.  Which you understand would cost money to Corizon, true?

MR. MASIN:  Objection.  Lack of foundation.

MR. MARKO:  He has absolute -- he's -- you went over his tenure as a doctor.  I think we all know that it costs money.

BY MR. MARKO:

Q.  But go ahead, Doctor.

A.  **A shared expense, MDOC and Corizon.**

Q.  Yep.  And so Corizon, you understand that by doing nothing, that costs nothing, right?

A.  **As you say.**

Q.  And do you know what was done in this case?

A.  **It looks like what you showed me there was a -- it was a deferred alternative treatment plan.**

Q.  Of nothing?  Do you understand that there was no recommendations made by Dr. Papendick for any procedures?  Do you understand that?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Page 62

A. Yes.

MR. MARKO: And you also were asked about -- and I'm gonna ask this question pending the ruling on my motions in limine, but I feel compelled to address some of the areas that I believe were improperly gone into. So, we'll cut this question and answer depending on the judge's rulings on the other ones.

Q. But you understand that -- if we look at this, that Mr. Jackson did not have third-party insurance at the time that this request was done to get him surgery?

MR. MASIN: Objection. Lack of personal knowledge.

Q. This document right here. Do you see that?

A. Okay. I -- yeah. I had no personal knowledge, but...

Q. Well, can you read the document? Do you see where it says...

A. It looks like third-party insurance, VA, workmen's comp, federal, interstate compact, et cetera.

Q. Right. There was no private insurance, at least according to this document, available to Mr. Jackson to get the surgery that he needed while he was in prison?

MR. MASIN: Objection. Misstates the document.

Q. Correct? Are you aware of any?

A. No.

Page 63

Q. That's not unusual, is it, for a prisoner who's incarcerated and locked away from their friends and family and the outside to not have access to private insurance?

A. I can't give you percentages, but a lot of them do not.

Q. And you understand that Mr. Jackson was not free to -- once his utilization management review for this surgery was not approved by Dr. Papendick, he wasn't free to go out and get his own doctor on the outside world without assistance from the Michigan Department of Corrections and Corizon, correct?

MR. MASIN: Objection --

A. I have no personal knowledge --

MR. MASIN: Objection. Misstates his testimony.

Q. Go ahead.

MR. MASIN: Foundation.

A. I have no personal knowledge of his resources.

Q. Well, you understand that a prisoner can't just leave their cell and go see a doctor on the outside, right?

A. Right.

Q. And Mr. Kohchise Jackson, do you have any reason to believe he would be any different than any of the other prisoners who are incarcerated and would need permission to go and get outside medical care?

Page 64

A. They can request to go outside and have medical care. Yes.

Q. Oh, really? And that was done in this case by the Corizon doctor, Dr. -- that I mentioned earlier, Dr. Mahir Alsalman who worked for Corizon, true?

A. Yeah. A policy was shown earlier that they do have the right to seek outside independent consultation.

Q. Are you aware that within a month of being released from the Department of Corrections, that Mr. Jackson was -- had already gone to a treating doctor and then scheduled and underwent a surgery for the colostomy reversal?

A. I am not aware.

Q. Based on your medical experience, that's a pretty quick turnaround, getting a -- going to see a doctor for a consultation, getting a surgery scheduled, and then getting it done all within about a month?

MR. MASIN: Objection to foundation, relevance.

A. It just varies so much month-to-month and location-to-location. Sometimes people wait months; sometimes people just wait a few weeks. It depends on their backlog.

Q. And you understand that these decisions that are shown here on this chart that were made by Dr. Papendick, this "yes or no" on the Corizon doctor's request to get

Page 65

Mr. Jackson's surgery, that they can have real world ramifications for the prisoner, true?

A. I don't understand the question.

Q. Well, they can either give a pass to get medical care or not, true?

A. They can either approve or give an alternative treatment plan. Yes.

Q. Which -- and that you understand that those have real world consequences for these individuals who are asking for and need the surgery?

MR. MASIN: Objection. Lack of foundation.

A. I would say they have medical consequence. I'm not sure what real world consequences mean.

Q. Are you aware of Corizon doing anything after Dr. Papendick did not improve Mr. Jackson's colostomy reversal to look into this matter further or further investigate it?

A. I'm not aware of any other investigation. An inmate certainly would have had his regular appointments, his wellness visits and so forth.

Q. Are you aware of Corizon doing any check-in or Dr. Papendick doing any check-in months or even a year later following his refusal to approve the colostomy reversal surgery?

A. His provider would be following the patient. Yes.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                          Pages 66..69

Page 66

Q.  The Corizon provider?

A.  Yeah.

Q.  And this Corizon provider gets the document from Dr. Papendick.  So just so we understand, the Corizon provider wrote this request to Dr. Papendick for the surgery, correct?

A.  Yes.

Q.  And then it came back to him, and he was told that that surgery was not being approved at that time, correct?

A.  I think it said medical necessity was not demonstrated, something like that.

Q.  Right.  Which was not an approval; you agree with that?

A.  Yes.

Q.  Right?  So the doctor who requested, he's being told by a superior at his own company, Corizon, that it was not medically necessary at that time, true?

A.  Not necessarily a superior.  He's not supervising that provider.  He's making a decision of medical necessity or not.  But, no.  Obviously, it wasn't approved.

Q.  Well, what was -- the title of Dr. Keith Papendick was UM Outpatient Medical Director, correct?

A.  Right.  So, he's in charge of decision-making.

Q.  And decision-making, right?  And what was the title of the Corizon doctor who asked Dr. Papendick to approve this surgery for Mr. Jackson?

Page 67

MR. MASIN:  Objection.  It misstates the document.

Q.  Go ahead.

A.  I don't remember.  I don't remember.

Q.  Site medical provider, right?

A.  Okay.  M-hm.

Q.  Yes?

A.  Yeah.

Q.  You agree that the medical director is higher up, if we go back to that organizational chart, than a site medical provider?

A.  Only in terms of making decisions based on consultation requests.

Q.  And making decisions based on a request, in this case, for surgery, right?

A.  Right.

Q.  Because this -- because the guy who wrote -- Mahir Alsalman, Dr. Alsalman didn't have the authority on his own to send Mr. Jackson out to get the surgery that he was requesting, correct?

A.  Yes.  Correct.  M-hm.

Q.  So he had to ask for permission, ask for the key to go out through Dr. Papendick, correct?

A.  Ask for approval.  Yes.

Q.  And that approval was not given, correct?

Page 68

A.  It looked like there was an alternative treatment plan.

Q.  And are you aware of any follow-up by Dr. Papendick or anyone else at Corizon to ascertain the continuing need for this surgery?

A.  Yes.  Again, the on-site provider is compelled to follow that patient over time.  That could be the alternative treatment plan, to follow the patient, close observation.

Q.  And what did Dr. Papendick do to follow-up and reevaluate his request for surgery?

A.  He's not --

MR. MASIN:  Objection.  Misstates his testimony.

A.  I don't -- I don't know...

Q.  Go ahead.

A.  I don't know if he did anything.  He's not required to.

Q.  He's not required to.  Right.
So, let me ask you about medical necessity because you were -- you used this word, medical necessity.  You were shown a policy from the department of corrections.  You agree with me, sir, that medical necessity is not defined by the Michigan Department of Corrections, true?

A.  Well, we're compelled to follow their policies.

Q.  Let me show you a -- your deposition.  Do you remember

Page 69

when you were deposed in this case?

A.  Which case?

Q.  This case.  Kohchise Jackson versus Corizon Health, Dr. Papendick, and now it's new form, this new CHS that it morphed into.

A.  Yes.  Yes, I remember.

Q.  Okay.  Let's see what you said when I asked you that question there.

MR. MASIN:  Objection.  This is an improper attempt to impeach the witness.

MR. MARKO:  It's not an improper attempt to impeach the witness.  And, additionally, he was a corporate representative at the time of his deposition --

MR. MASIN:  The way in which you're -- the way in which you're going about --

MR. MARKO:  Excuse me --

MR. MASIN:  -- it is not proper.

MR. MARKO:  You're interrupting me, and it's inappropriate.  As I was saying, the -- I'm impeaching the witness, and he is a party opponent at the time of his deposition at the time he gave testimony and at the time that decisions were made in this case so I'm allowed to designate his testimony.  I don't need to use it to impeach him.



**Jeffrey Bomber, D.O.**
**09/04/2025**                                    Pages 70..73

Page 70

(Video playing and transcribed as follows:)

"QUESTION:  Does the MDOC have a definition of medical necessity?

"ANSWER:  I don't think so, per se.

"QUESTION:  Does the MDOC --

MR. MASIN:  It's not inconsistent.

-- "have a definition of medical necessity?"

"ANSWER:  I don't think so, per se."

(Video stopped.)

MR. MASIN:  Objection.  It's not inconsistent.

MR. MARKO:  Again -- well, we'll let the judge decide that.

BY MR. MARKO:

Q.   So, again, the MDOC has no definition of medically necessary, correct?

MR. MASIN:  Objection.  Asked and answered.

A.   I answered that from the general perspective of us using current literature for medical necessity.  Obviously, they have their own policies and procedures as well.

Q.   Sir, that wasn't my question.

MR. MARKO:  I move to strike your answer.

Q.   My question is very simple.  Can you tell me a document, a procedure, a definition contained anywhere that you're aware of that defines medical necessity that is given to Corizon by the Michigan Department of Corrections?

Page 71

A.   Yeah.  You were showing policies earlier that they have.

Q.   Okay.  Sir, show me where it says where the department of corrections tells Corizon the definition of medical necessity?

A.   I believe they showed a document earlier that talked about cosmetic procedures.

Q.   Cosmetic procedures?  What -- this isn't a cosmetic procedure.  Do you know the definition of cosmetic procedure?

MR. MASIN:  Objection.  Relevance.

A.   My answer is that we use -- again, for determining medical necessity, utilization management uses UpToDate, InterQual, and other resources as available.

Q.   Well, that wasn't my question.  Let's start --

A.   That was my answer.

Q.   Well, you're not answering my question so let me ask it again.  And I'll continue to ask it as long as I have to, and I apologize to the jury.

First of all, you use the words cosmetic procedure.  This was not a cosmetic procedure that Mr. Jackson was requesting.  This wasn't like a breast augmentation or a nose job or anything like that.  You understand that?

A.   I don't know.  I'd have to go back -- what is the question?

Page 72

Q.   Getting a colostomy bag reversed where somebody is excreting feces out of a hole in their abdomen is not a cosmetic procedure; you'd agree with that?

A.   Yes.

Q.   Okay.  So, why did you use the word cosmetic procedure when referring to Mr. Jackson's request to get this colostomy bag taken off?

A.   Because you asked me if there was any document stating medical necessity, and I thought that that one contained it.  But I don't know if they have other policies and procedures that show it.

On a day-to-day basis, we used UpToDate.

Q.   Okay.  Again, going back to this medical necessity, you understand that Corizon's saying and they -- and Dr. Papendick wrote in that request that Mr. Jackson's colostomy reversal was not medically necessary?  You understand that?

A.   Yes.

Q.   So it's important for us to look at what the meaning of medical necessity is; you understand that?

A.   Yes.

Q.   Back to my original question:  The MDOC did not define for Corizon what is medically necessary, correct?

MR. MASIN:  Objection.  Asked and answered.

A.   So, no.  Not on a day-to-day basis, no.

Page 73

Q.   So Corizon came up with its definition of what's medically necessary through the ways that you described through examination by brother counsel, correct?

MR. MASIN:  Objection.  Misstates his testimony.  He did not say that Corizon --

MR. MARKO:  No speaking objections, please.

A.   In the initial procedure process, yes, it goes to Corizon first.  Yes.

Q.   And Corizon applies its definition of medical necessity, correct?

A.   Yes.  In the first part of the process, yes.

Q.   Okay.  That's not the department of corrections that tells Corizon what's medically necessary or not, correct?

A.   Yes.  They do have policies and procedures that direct us in certain ways, but, again, that would usually not come to the first pass-through on the utilization management side.  It starts with our side and our providers.  Yes.

Q.   And you had talked about, you know, other health care providers, you were asked that question.  You understand that at the time of this care of the time that Mr. Jackson was at the department of corrections, that Corizon was the sole -- for this particular type of care, Corizon was the sole health care provider pursuant



HANSON RENAISSANCE  COURT REPORTERS & VIDEO   hansonreporting.com   313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**                                    Pages 74..77

Page 74

to contract with the Michigan Department of Corrections, correct?

A.  Yes.

Q.  And they provided the doctors on-site, correct?

A.  Correct.

Q.  And they provided this utilization management review process for requests to go seek outside surgeries, correct?

A.  Correct.

MR. MARKO:  Thank you, sir.  I don't have any other questions.

MR. MASIN:  Just a few, quick follow-ups for you, Dr. Bomber.

RECROSS-EXAMINATION BY MR. MASIN:

Q.  I wanted to show you Exhibit N3 which we looked at earlier.  That's the policy that I believe you were referring to, and you'll see that the policy is entitled, "Corrective and Reconstructive Surgery Services".  Do you see the word cosmetic anywhere in here?

A.  No.

Q.  You had testified that Dr. Papendick did not have the responsibility to conduct follow-up.  Why was that?

A.  He would be part of, you know, following up, I guess, in terms of the overall report to the DOC in terms of

Page 75

utilization management numbers and such, but he was not required to go back and look at individual cases.  The responsibility at that point would go back to the medical provider to follow.

Q.  So if Dr. Papendick did not have a 407 in front of him, it just wasn't his job to actually keep monitoring all of the patients that he was making decisions for; that was the -- was that the on-site provider's job, right?

MR. MARKO:  Objection.

A.  Yes.  Correct.

MR. MARKO:  Leading -- hold on.  Objection.  Form, leading.

Q.  Did Dr. Alsalman have the ability to go around Dr. Papendick if he felt that Dr. Papendick had made an incorrect decision?

A.  He had the right to appeal.  Yes.

Q.  Are you aware of whether Dr. Alsalman ever did that in this case?

A.  I am not.

Q.  Counsel asked you some questions about the fact that Dr. Papendick did not find medical necessity, and as a result, did not approve the colostomy surgery request.  Are you aware of what the alternative treatment plan was in this case?

A.  I'd have to look and see exactly what Dr. Papendick

Page 76

wrote but generally it would be to follow on-site, make sure the patient had his regular visits and follow-up.

Q.  Are you familiar with what is required for continued colostomy care?

A.  Yeah.  In general terms, yeah.  In providing supplies and so forth and monitoring for any breakdown, recurrent infections, dysfunction.

Q.  So to the extent that Mr. Jackson needed continuing care related to his colostomy including future health care visits and colostomy supplies, who paid for that?

A.  It would be jointly through the DOC and Corizon.

Q.  So, Corizon had costs associated with the alternative treatment plan; is that fair?

A.  Yes.

MR. MASIN:  I don't have any further questions at this time.  Thank you very much.

MR. MARKO:  Okay.  We're done.  Thank you, everybody.

MR. MASIN:  Thank you, Dr. Bomber.

MR. McLAUGHLIN:  All right.  Thank you, Doctor.  You can sign off.

THE WITNESS:  Take care.

THE VIDEOGRAPHER:  This concludes the deposition, and we're going off the record at 11:31 a.m.

(Deposition concluded at 11:31 a.m.)

Page 77

CERTIFICATE OF NOTARY

STATE OF MICHIGAN    )
                     ) SS
COUNTY OF OAKLAND    )

I, Jennifer Wilke, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness, JEFFREY BOMBER, D.O., was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.

_____
Jennifer Wilke, CSR-8575
Notary Public,
Oakland County, Michigan
My Commission expires:  October 4, 2030

**Jeffrey Bomber, D.O.**
**09/04/2025**

1

**$**

**$20** 25:13

**0**

**03.04.100** 45:2 49:10

**1**

**1** 7:6,7,23 8:5,12 31:1
**10:00** 5:3,8
**11** 27:21
**11:31** 76:24,25
**12** 34:2
**13** 57:12
**160** 39:9 43:1,9
**1993** 33:19
**19th** 57:20

**2**

**2009** 10:20 34:15
**2013** 20:12
**2015-2018** 35:9
**2016** 25:14
**2017** 21:6 57:20
**2018** 35:10
**2021** 10:17
**2025** 5:2,7

**3**

**30** 42:19

**4**

**4** 5:2
**403** 29:11

**407** 11:2 25:18 36:2,4,6,10,14
  37:4 38:4 56:22 59:10 75:5
**407s** 37:22
**4th** 5:7

**6**

**60** 27:25 28:24
**62** 29:4

**7**

**715-million-dollars-plus** 31:7

**8**

**8** 24:14 27:16
**88** 20:14,21
**89** 20:4

**A**

**a.m.** 5:3,8 76:24,25
**AA** 45:9,16
**abbreviated** 22:11
**abdomen** 72:2
**ability** 40:17 41:5 44:6 47:1
  50:15 54:9 75:13
**absolute** 61:11
**absolutely** 25:11 39:20
**access** 52:14 53:1,8 55:3 63:3
**accessible** 41:23
**account** 18:1 28:4
**actual** 31:1 46:14
**Adam** 5:17 32:6
**additional** 25:25 58:18
**additionally** 69:12
**address** 62:4
**addressed** 49:15

**adjust** 45:11
**Administration** 48:12
**Administrative** 48:11
**admissible** 32:22
**admitted** 7:22,24 8:3,6,13 20:14,
  15,18
**advisory** 47:6
**affirm** 5:24 23:18
**agree** 26:6,11,13,18 28:5 29:22
  31:12,16 43:11,12 58:24 66:12
  67:9 68:21 72:3
**ahead** 16:1 23:7 24:20 27:5
  59:20 60:6 61:15 63:16 67:3
  68:15
**Aiken** 48:10,15
**algorithm** 40:7 43:15 53:15
  58:16
**allowed** 18:18 69:24
**Alsalman** 59:13 64:5 67:18
  75:13,17
**alter** 45:10
**alternative** 16:13 17:8,11 19:6
  35:25 36:16,22 38:1,6,13,23
  39:16 56:3 61:22 65:6 68:1,6
  75:23 76:12
**amazing** 28:25
**American** 34:18
**amount** 29:25 56:19
**anesthesia** 45:15
**answering** 71:16
**apologize** 71:18
**appeal** 38:24 39:7,19 40:1 41:17
  43:3 44:11 47:25 48:7 58:21,25
  59:5,6,17 60:10 75:16
**appealed** 41:14
**appearance** 45:25
**appearances** 5:10
**applies** 13:10,23 73:9



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

2

apply  53:11

applying  15:13 20:23

appointments  65:19

appropriateness  14:17,23

approval  15:16 30:22 38:5,15
  66:12 67:24,25

approve  36:15 57:19 65:6,23
  66:24 75:22

approved  15:7 22:3 23:21 30:7
  38:21 39:16 41:11 44:5 45:23,24
  56:9,16,23 63:8 66:9,19

approves  22:25 38:19

approving  19:5,22

April  57:20

area  27:18

areas  62:5

ascertain  68:3

assessment  54:6,7,24 55:2

assigned  13:8

assistance  6:25 63:10

assistant  40:4,21 41:3 48:11

assumes  51:2

attempt  69:10,11

attempts  39:12 58:8

attend  33:10

attention  48:17

attorney  6:9,17,20 58:22

attorney's  6:21

attorneys  5:9

augmentation  71:22

author  24:5 28:5

authoritative  55:14,16

authority  39:19 42:22 43:2,24
  67:18

authorization  41:10

authorized  45:22

automatic  22:20

automatically  22:3 23:20

avenues  43:3

awaiting  39:10

aware  22:5 31:23 32:2 62:24
  64:8,12 65:14,18,21 68:2 70:24
  75:17,23

---

**B**

---

bachelor's  33:15

back  15:9,18 34:6 35:11 66:8
  67:10 71:24 72:13,22 75:2,3

backlog  64:22

bag  72:1,7

bankrupt  6:24

base  25:23 55:10

based  26:1 37:6,18,19 38:9 43:9
  53:16 55:5,11 64:13 67:12,14

basically  12:19

basis  19:5 37:11 38:12 58:14
  72:12,25

BB  45:20 46:6

begin  59:7

behalf  5:13,17

benefits  22:15

bid  29:5

big  31:10

bill  30:15

bit  10:15

black-and-white  57:7

blame  39:12 42:25

blow  48:3

board  21:17,18 34:17,18,19

body  45:11,12

Bomber  5:6,21,23 6:2,3,6 9:6
  32:5 58:18,21 74:13 76:19

bookmarked  25:8

boss  35:8 37:5

bottom  48:9 49:13

brace  38:17

brag  29:6

breakdown  76:6

breast  71:21

broad  24:3 27:13

brother  73:3

bypass  43:13

---

**C**

---

call  54:9,12 57:2

called  10:3 11:2 21:13 52:20

Calls  27:3

Calvin  8:23

card  21:20

care  11:8,15 16:15 19:10,24 24:3
  25:17,20 26:22 28:12,13,15,18,
  21 29:2 31:14 34:7 35:11,19
  37:18 48:12 50:1 51:11 55:5
  56:9,15,16 58:13 63:25 64:1
  65:4 73:20,22,25 76:4,8,9,22

case  6:9,11,16 11:16 14:19 15:12
  17:6,19 18:16,17 20:5 26:6
  29:24 30:8,19 35:23 40:12 52:2
  59:10 61:3,6,20 64:3 67:14 69:1,
  2,3,23 75:18,24

cases  75:2

cast  39:12

casting  42:25

cell  63:20

center  54:7

Central  33:13

CEO  9:1

certification  34:19

certifications  34:17

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

3

**cetera** 42:13 62:18

**chain** 43:16

**character** 32:21,23

**charge** 35:2 66:22

**chart** 7:10 9:5,10 15:13 25:1,13 28:6 64:24 67:10

**cheaper** 37:9

**check** 8:4

**check-in** 65:21,22

**chief** 7:13 40:5,6,22 41:3 42:7,9, 11 46:2,3 47:11 49:1 50:5

**choose** 37:8

**CHS** 69:4

**CHX** 5:17

**cite** 51:25

**clarifying** 7:16

**clear** 57:8

**client** 10:25

**clinic** 35:12,19

**Clinical** 48:11

**close** 68:7

**CMO** 45:23 46:1

**colleague** 5:22 32:10

**college** 33:12,13

**colostomies** 11:20 48:21 49:3,9

**colostomy** 11:6,22 12:25 15:15, 22 22:23 23:21 29:21 30:3 31:18,20 47:13 49:20 51:14 57:19 61:7 64:11 65:15,23 72:1, 7,16 75:22 76:4,9,10

**commentary** 16:22

**committee** 35:16 40:3,13,21 41:2,5,8,21,25 42:3 47:7

**common** 10:9

**community** 31:14

**comp** 62:17

**compact** 62:18

**companies** 25:17

**company** 19:24 24:3 26:23 66:15

**compelled** 58:11 62:4 68:5,24

**compendium** 52:24

**compensated** 35:22

**compensation** 22:8,15,19,24,25

**complete** 36:22

**completed** 33:22

**completely** 43:22

**complications** 49:18

**component** 17:17,20,25 18:23 19:8

**computer** 53:15

**concerns** 56:18

**concluded** 76:25

**concludes** 76:23

**condition** 10:12 46:13 49:17 52:9

**conduct** 53:23 74:23

**conjunction** 34:3

**Connor** 5:19

**consequence** 65:12

**consequences** 65:9,13

**consideration** 17:21 18:1,24 19:9 37:3 41:17

**considerations** 19:18

**considered** 19:6 38:21 47:12 49:20 52:2 54:15

**considers** 19:23,25

**consistent** 49:10 50:3

**consult** 55:25

**consultation** 36:8 41:11 64:7,15 67:12

**consulting** 35:19

**contained** 28:6 70:23 72:9

**continue** 71:17

**continued** 76:3

**continuing** 33:7 39:11 68:3 76:8

**contract** 7:7 8:5,14 10:16 14:9 19:19 24:21 30:25 31:1,7,10 35:20 42:11,14,15,17,19 44:14 52:19 74:1

**contractor** 42:21

**coordinator** 13:7 61:3

**Corizon** 6:14,17,20,24 7:2,3,9, 14,15,17 8:5,15,19,23 9:20 10:16,19 11:4 12:12,24 13:5,11, 13,14,15,24 14:8,12,22 16:14,17 17:18 19:3,17,23,25 20:22 21:1, 6,23 22:1,14,18 23:1,19,21 24:1, 22 25:12,20,24 26:7,8,12,13,18, 20 27:1,17,25 28:3,17,24 29:5 30:5,8 34:23,24,25 36:10 37:21 39:13 40:7,23 41:12,24 42:7,12 43:14,19,25 44:5,15,19 47:1,5, 17 48:15 49:1 50:5 51:1,8,10,13, 17 52:10,12,16 53:1,4,11,15,23 54:1,18 55:7,9,13,24 56:7,13,21 57:18,23 58:1,4,21,23,25 59:3,6, 12,15 61:9,16,17 63:11 64:4,5, 25 65:14,21 66:1,3,4,15,24 68:3 69:3 70:25 71:3 72:23 73:1,5,8, 9,13,24,25 76:11,12

**Corizon's** 12:2,15 17:10 20:4 23:17 39:15,23 40:20 60:9 72:14

**corporate** 37:19 69:13

**correct** 6:12,14,15,19 10:6 11:9, 10,12,17 12:21,22 13:1,2 14:17, 18,19 15:3,7,8,10,16,19,20,22, 24 16:2,11,12 18:1 26:8 27:2 29:17 31:14,18,21 32:11,12 36:12 45:13 58:25 59:15,16 60:10 61:4 62:24 63:11 66:6,9, 21 67:20,21,23,25 70:15 72:23 73:3,10,14 74:2,4,5,8,9 75:10

**correctional** 9:19 31:11 34:12, 13,16 35:1,3 37:14

**corrections** 10:10 28:6 31:2 35:21 39:9 43:5 45:1 46:7,22 48:21 49:3,8 63:10 64:9 68:21,



Jeffrey Bomber, D.O.
09/04/2025

4

23 70:25 71:3 73:12,23 74:1

**Corrections'** 39:1 45:17 50:4

**corrective** 45:6,10,14,21 46:11, 16 74:18

**cosmetic** 71:6,7,8,19,20 72:3,5 74:19

**cost** 17:21 18:1,24 19:3,6,9,17, 18,20 24:9,11 27:18,25 29:7 37:2,7,23,24 38:1,5,6,7,10,14,15 41:18 42:3 53:16 56:2,3,5 58:8, 10,12 61:5,9

**costs** 19:23,25 20:2,23 21:3 25:12,13 26:22 28:4 58:14 61:13,18 76:12

**counsel** 73:3 75:20

**court** 5:10,23 16:4

**covered** 22:15

**create** 53:4

**created** 52:16,18 58:3

**criteria** 13:10,13,14,16,24 14:10 15:14 20:24

**Cross** 5:15

**CROSS-EXAMINATION** 32:7

**crying** 37:13

**cryptic** 27:12

**current** 49:16 55:12 70:18

**cut** 25:15 28:22 62:6

**cute** 14:6

---

**D**

---

**D.O.** 6:3 33:16,18,20

**dad** 37:13

**dangerous** 49:19

**data** 21:2

**database** 52:6,22,24 58:3

**databases** 13:16 55:11

**date** 5:7

**dated** 20:12

**day** 52:7 55:21

**day-to-day** 19:5 25:18 37:11 38:12 58:14 72:12,25

**days** 35:18

**death** 49:18

**decide** 70:12

**decision** 15:9 39:18 40:9 41:6,9, 15 43:12 44:11 51:19 57:15 66:18 75:15

**decision-maker** 14:15

**decision-making** 27:13 37:11 38:8 58:15 66:22,23

**decisions** 11:15 25:18 52:25 53:16,20 64:23 67:12,14 69:23 75:7

**decline** 37:9

**decreased** 30:1

**defects** 45:13

**defer** 17:12

**deferred** 17:14 61:22

**define** 58:4 72:22

**defined** 13:11,13,16,24 14:10 57:23 58:1 68:22

**defines** 70:24

**definition** 53:12 70:2,7,14,23 71:3,8 73:1,9

**degree** 33:16,18,20 46:15

**demonstrated** 66:10

**denied** 17:2 26:25 27:1 37:18 49:14

**deny** 16:18 17:12 25:20,22 26:1 51:11,14

**denying** 17:14 27:7

**department** 28:6 31:2 35:20 39:1,9 43:5 45:1,17 46:7,22 48:20 49:2,8,18 50:4 63:10 64:9 68:20,22 70:25 71:2 73:12,23 74:1

**depending** 62:6

**depends** 64:21

**deposed** 6:11,13,16 69:1

**deposition** 5:1,5 17:23 18:3,10 20:15 68:25 69:14,22 76:24,25

**Des** 33:16

**designate** 69:24

**desires** 42:23

**detailed** 22:21

**details** 23:14,24

**determination** 51:22

**determine** 46:17 52:7 55:8

**determined** 45:22

**determining** 51:17 71:11

**diagnoses** 52:8

**difference** 42:6

**direct** 6:10 73:15

**directed** 37:8

**directive** 45:1 57:7

**directly** 18:9 43:4

**director** 7:1,3 9:6,15 10:2,22 12:5,8,12,16 14:16 23:10 35:2,6, 7,9,12 39:1 40:2,4,10,17,20,24, 25 41:1,12,24 42:6 44:18 57:1, 14 66:21 67:9

**disability** 46:15

**disagree** 14:3 44:6

**disagreed** 39:17 40:8,13,16

**disagrees** 38:24

**disclosure** 28:10

**discuss** 37:1 40:12

**discusses** 27:17

**discussion** 35:25 36:1 60:1

**dispute** 23:15,18

**Doc** 19:19 47:7 57:2 74:25 76:11

**doctor** 5:11 8:6,12 12:15 13:5,14


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025

5

17:9,19 30:14 31:12 37:13 59:13 61:12,15 63:9,20 64:4,10,14 66:14,24 76:21

**doctor's** 64:25

**doctors** 13:3 60:9 74:4

**document** 7:20 8:3 12:2 13:22 14:5,8 15:2,3 18:18 20:7,10 21:5 22:16 23:15 26:14,17 29:10 44:23 45:3 48:6,9,18 54:17 62:13,15,20,23 66:3 67:2 70:22 71:5 72:8

**document's** 7:22

**documentation** 49:16

**documents** 20:5 23:13,17

**dollars** 25:2 27:19 28:7,8,17,23

**draft** 24:22

**Drain** 5:13 39:10

**Drain's** 8:8,14

**dramatically** 28:21

**duly** 6:4

**dysfunction** 46:15 76:7

---

**E**

**earlier** 42:15 64:4,6 71:1,5 74:16

**earn** 33:18

**earned** 33:20

**ECF** 39:9 43:1,9

**education** 33:10

**effective** 38:10 58:8,10,12

**efficacious** 52:3

**elective** 49:19

**employ** 47:17

**employed** 42:10 48:15

**employee** 12:12,15 13:15 59:7,15

**employees** 42:13

**encompass** 27:13

**end** 24:10

**ended** 34:5

**ensure** 56:8,14,22

**entered** 24:13 54:2

**entire** 21:18

**entities** 9:11

**entitled** 31:13 45:5 74:18

**entity** 9:20

**ER** 24:7

**essentially** 41:6,14

**establish** 46:14

**evaluate** 21:2

**evaluated** 46:16

**evaluating** 46:18

**evaluations** 54:18

**evidence** 23:16 49:14 51:3

**exam** 60:20,21 61:2

**examination** 6:10 53:19 54:9 57:22 58:20,22 73:3

**examinations** 53:23 54:1,22

**examined** 6:4 60:22

**exams** 53:21

**exception** 21:12

**excreting** 72:2

**Excuse** 18:4 50:22 69:17

**exhibit** 7:6,7,23 8:5,12 12:2 20:4,21 21:6 24:13,14 27:16 29:4 31:1 44:22 47:23 74:15

**exhibits** 20:17

**expected** 46:18

**expenditures** 25:2

**expense** 50:10,16,25 61:16

**experience** 64:13

**expert** 11:19

**explain** 23:19 37:2 42:5 55:7 58:1

**extensive** 47:3

**extent** 76:8

**extremely** 53:21,22

---

**F**

**facilities** 35:3 54:20 57:10,11

**facility** 10:21 34:16 35:1

**fact** 16:17 24:5 27:15 55:21 75:20

**factor** 37:24 38:11

**facts** 51:3

**fair** 19:23 30:21 44:9 53:7 76:13

**fall** 8:18

**false** 8:1,9 16:16,23 30:9

**familiar** 12:3 36:16 43:17 44:19 45:3 50:15 76:3

**familiarize** 20:16

**family** 33:22 34:18,20 37:13 63:3

**fault** 39:8,12 60:8,11

**feasibility** 46:15

**feces** 72:2

**federal** 62:18

**feel** 39:3 62:4

**felt** 75:14

**figure** 8:18

**file** 20:16 39:2 40:1 56:18

**filed** 39:6 43:21 51:5

**final** 8:2,7 20:21 44:10

**finalize** 47:8

**find** 75:21

**Findlay** 34:2

**fine** 49:16

**finish** 28:11



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

6

finished 18:7 19:14

fit 53:12

Florida 33:15

follow 9:13 44:15 47:1 68:5,7,24
75:4 76:1

follow-up 68:2,9 74:23 76:2

follow-ups 74:12

form 31:25 36:5,6,7,10 69:4
75:12

forms 11:2,3,5 16:25 36:6

found 52:1

foundation 7:21 49:25 61:10
63:17 64:17 65:11

Franklin 17:7 18:16,17

free 63:6,8

friends 63:2

front 24:12 75:5

full 28:10 54:5,6

full-time 34:10

fully 38:21

functional 49:20

functioning 46:19

future 21:2 76:9

### G

game 21:20

gave 54:13 69:22

general 29:25 30:23 70:17 76:5

generally 17:8,9 58:7 76:1

generated 25:5

gentlemen 5:12

give 5:25 16:10 26:16 56:25 57:6
63:5 65:4,6

good 5:12,16 6:6,7 32:5,21,23

governments 29:7

graduate 33:8

graduated 33:14

graph 27:22

graphically 27:21

gray 26:21

grew 32:17,23

grievance 39:2 43:17,21,25 44:3,
4,10 47:15,18,20,25 48:1,7
49:13

grievances 39:7

Grievant 50:9

Grievant's 49:14

grow 32:15 33:2

guess 74:24

guidance 57:1,6

guide 25:1

guy 67:17

### H

half 25:14,15

hand 5:24

happen 27:7 41:9

happened 35:10

head 36:18 41:21

health 6:24 7:3,14,15,17 8:19
9:19,20 13:11,24 14:12 19:24
24:3 25:17 26:22 28:21 34:7
35:11,18 42:12 48:11 54:6 57:23
58:2,4,12 69:3 73:20,25 76:9

Healthcare 6:14,17 19:17 39:13

heart 37:16

held 34:19

Helen 34:7

helped 24:5,22 28:5 53:16

helps 52:7,25

Hey 57:2

high 33:4,5,8

higher 67:9

history 54:4

hold 32:18 34:17 39:5 43:8 75:11

hole 72:2

homework 35:14

hospital 24:8 29:14,20 33:23
34:8 35:14 52:23 55:22

hundreds 27:17,18 28:8,17,23

### I

Ian 5:15

idea 59:25

II 48:19

imaging 36:8

impact 25:17

impeach 18:5,18 69:10,12,25

impeaching 18:9 69:20

impeachment 26:10

implying 27:6

important 53:21,22 60:19,21
72:19

imposed 44:16

improper 18:5,12 26:9 69:9,11

improperly 62:5

improve 45:24 65:15

improved 28:12,13,15,18,21 29:2

improvement 46:18

inadmissible 43:22 48:2

inappropriate 32:22 51:3 69:20

incarcerated 11:11 45:18 46:8,
24 63:2,24

include 45:14 46:18

included 40:21

includes 13:16



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

7

including 13:16 76:9

incoming 53:24

inconsistent 19:1 26:10,17 70:6,
10

incorrect 75:15

independent 53:8 64:7

individual 75:2

individuals 8:22 9:4,10 31:17
47:17 65:9

industry 20:23

infections 76:7

information 36:20,25 37:21,25
42:17 51:18,21 52:11,15,16,18
53:4,8 54:13,14 55:14,17 56:2

informed 44:2

Ingauge 20:14

initial 73:7

initiate 58:24 59:1 60:9

injured 22:24

inmate 10:11 12:20 15:10 39:2
44:2 65:18

inmates 31:13

inmates' 37:8

Institute 33:15

insurance 22:19,25 62:9,17,19
63:4

intake 54:7,8

intent 27:6

Interqual 13:17 51:24 52:20,21,
22 53:2,5 55:16 58:6 71:13

interrupt 19:14 24:19

interrupted 8:12 18:8 60:1

interrupting 69:19

interstate 62:18

investigate 65:17

investigation 48:20 65:18

involved 34:13 41:13,20 47:17

involvement 15:13

issued 41:10

issues 43:10

---

**J**

---

Jackson 5:14 6:9 10:25 11:9
15:15,21 21:24 27:23 28:14,18,
20 29:1,15 30:17 31:20 45:18
46:8,23 47:13 48:6,7,11 49:15
57:10,16,20 58:24 60:8,11,17,22
62:9,20 63:6,22 64:9 66:25
67:19 69:3 71:21 73:23 76:8

Jackson's 30:19 50:1 51:4 65:1,
15 72:6,15

Jacksonville 33:14

Jeffrey 5:6 6:3 9:6

job 11:4 42:10 44:18 71:22 75:6,
8

Johnson 8:23

joint 8:2,7 58:23

jointly 76:11

Jon 5:13 6:8

Joy 34:8

judge 5:13 8:8,14 39:10 70:11

judge's 62:7

jury 5:13 37:2 42:5 54:1 55:7
57:8 71:18

---

**K**

---

Karey 9:1

keeping 29:13

Keith 5:18 9:14 66:20

Kensu 26:6

key 67:22

kite 56:18

knowledge 10:3 22:17,21 23:5,6,

8,12 30:19 47:11 50:1 57:18
59:19,22 60:7 62:12,14 63:13,18

Kohchise 5:14 6:9 10:25 11:9
15:21 58:24 63:22 69:3

---

**L**

---

Lack 23:4 59:18 61:10 62:11
65:11

ladies 5:12

lapse 34:21

large 38:11

leading 75:11,12

leave 63:19

left 35:8

legitimate 51:23

level 31:13 41:3 42:3 46:19

limine 47:20 51:5 62:4

limit 51:18

list 21:13,15,23,25 22:1,6,8,20
23:2,13

literally 18:10 52:6

literature 51:25 52:24 55:12
70:18

local 45:15

location-to-location 64:20

locked 63:2

logo 8:19

long 10:19 33:24 34:9,19 47:3
71:17

longer 10:15

looked 27:21 49:10 68:1 74:15

lost 16:24

lot 36:5 63:5

loud 37:13

loves 17:10



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**M**

**M-HM**  31:11 67:6,21

**M.D.**  59:13

**made**  8:3 25:1,12 61:24 64:24 69:23 75:14

**Mahir**  59:13 64:5 67:18

**major**  49:17

**make**  10:24 24:2,4 25:16,19 26:23 37:15 46:17 47:3,7 52:25 53:16 56:20 57:15 76:1

**makes**  26:8,13,20 27:2

**making**  11:15 20:17 51:19,22 53:19 66:18 67:12,14 75:7

**management**  10:4,8,9 12:9,17 16:25 17:25 18:23 19:8 20:1,24 21:7 22:2,6 23:11 24:6 25:3 26:24 27:24 29:6 36:7 40:24 61:2 63:7 71:12 73:18 74:6 75:1

**manager**  36:13,19 37:25 38:4,19 39:16 43:13 51:21 54:14 55:3,8 56:23 57:9

**manager's**  37:3 40:9 41:6,9,15 42:1 44:11

**managers**  37:22 53:1,7

**manages**  20:22

**Manistique**  35:14,15

**Manual**  21:7

**marked**  20:20

**markedly**  28:15 29:2

**marketing**  20:22

**Marko**  5:12,13 6:6,8,10 7:22 8:1, 10 9:23 10:1 13:20 16:2,5 18:4, 7,14,17,21 20:8,11,13,19 27:11 32:3,16,18,21 33:6 39:5,22 42:24 43:6,8,20 44:7,12 47:19, 24 48:14,25 49:5,12,25 50:6,8, 14,18,21 51:2 57:23 58:20 60:3 61:11,14 62:2 69:11,17,19 70:11,13,21 73:6 74:10 75:9,11 76:17

**Masin**  5:16,17,20,22 7:12,20,24 9:22 15:23,25 16:21 18:2,5,7,12, 25 20:7,9,12 23:4 26:9,14 27:3 28:19 29:9,16,18 30:10 31:25 32:5,6,7,23 33:1 39:14 44:25 58:17 59:18,21,23 60:4 61:10 62:11,22 63:12,14,17 64:17 65:11 67:1 68:12 69:9,15,18 70:6,10,16 71:10 72:24 73:4 74:12,14 76:15,19

**matter**  18:3 26:6 65:16

**Mclaughlin**  5:19,21 18:15 76:20

**Mcqueen**  37:6

**MDOC**  8:5 19:3 24:7 44:5,9 47:16 48:21 50:16,22,25 54:2 55:19 58:23 61:16 70:2,5,14 72:22

**MDOC's**  43:17,19 44:19

**meaning**  72:19

**means**  21:15 58:1

**measures**  29:2

**medical**  7:1,3,13 9:6,15 10:2,20, 22 11:12,13 12:5,8,12,15 14:16, 17,23 16:15 17:22 19:9 23:1,10 25:20,23 31:14,19 35:2,5,7,8,12 38:9,10,23,25 39:17,18,25 40:2, 3,4,5,6,14,16,20,22,24,25 41:1, 3,12,24 42:4,6,7,9,11 44:18 46:2,3,12 47:6,12 49:1,15,22 50:3,5,16 51:17,19,22,23,25 52:6,8 53:8,13,16,19,23 54:3,8, 18 55:4,14,17 56:20,21 57:14,15 58:15 59:12 63:25 64:1,13 65:4, 12 66:10,18,21 67:5,9,11 68:18, 19,21 70:3,7,18,24 71:3,12 72:9, 13,20 73:9 75:4,21

**medically**  31:22,24 45:22 48:22 49:4,9 51:11,14 55:8 56:8,15,22 66:16 70:14 72:16,23 73:2,13

**medications**  54:4

**medicine**  31:11 34:2,12,14,18,20 37:6,14,20 55:20

**meet**  29:19,21

**meet all**  37:7

**meeting**  11:1

**Memorial**  35:13

**mental**  54:6

**mentioned**  9:17 30:17 52:4,20 64:4

**met**  10:24 38:10 39:3 56:20 57:12 60:22

**Michigan**  7:3,4,8,15 8:15 13:23 14:9 29:11 31:2,4,6 32:14 33:3, 13 34:6 35:20 39:1,9 42:8,9,10, 16,21,25 43:5 44:14,16 45:1,17 46:4,5,7,22 48:20 49:2,8 50:4 58:9,12 63:10 68:22 70:25 74:1

**Michigan's**  42:23 47:11

**middle**  18:8

**million**  25:13

**millions**  25:2 27:19 28:7,8,17,23

**mischaracterizes**  43:8

**misstates**  31:25 62:22 63:14 67:1 68:12 73:4

**Moines**  33:16

**moment**  39:15

**money**  24:2 25:16,19,24 26:1,7, 8,12,18,20,21,22 27:1,7 37:15, 19 51:11,15 61:9,13

**monitor**  46:13

**monitored**  58:13

**monitoring**  75:6 76:6

**Monopoly**  21:16,20

**month**  24:7,16 64:8,16

**month-to-month**  64:19

**months**  64:20 65:22

**morning**  5:12,16 6:6,7 32:5

**morphed**  69:5

**motion**  39:6 43:22 47:20 51:5

**motions**  62:4

**move**  9:24 13:20 27:11 39:5 43:20 49:12 70:21



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

9

moved 34:6,11

MRI 36:24 38:7 57:4

MRIS 36:8

Ms/ph.d. 33:15

Muskegon 35:4

**N**

N3 44:22 74:15

narrative 28:7

National 7:15

Naubinway 32:14 35:13

necessarily 56:25 66:17

necessity 14:17,24 25:23 31:19
 38:9,11 42:4 51:17,19,22 53:13,
 19 66:10,18 68:18,20,22 70:3,7,
 18,24 71:4,12 72:9,13,20 73:9
 75:21

needed 31:17 55:11 62:21 76:8

Newberry 34:8,16 35:1

nice 25:1,13

NMI 36:17

non-essential 48:23 49:21

non-surgical 46:20

nonresponsive 13:21

North 33:13

Northern 10:21 34:6 35:2,5

nose 71:22

noted 18:14

nother 16:6

Nothing's 7:24

number 24:7,9 36:5 38:22 41:10

numbers 36:6 37:10 75:1

nurse 13:10,23

nursing 35:14 54:24

**O**

oath 6:5 18:19

object 7:12 9:22 15:23 18:15
 26:14 31:25 39:5 43:6,9 47:24,
 25

objecting 51:1,8

objection 7:20 8:9 9:22,23 16:21
 18:2,14,25 20:7,8,10 23:4 26:9
 27:3 28:19 29:9,16,18 30:10
 32:16,18 33:6,7 39:11,22 42:24
 43:20 44:7,12 47:19 48:14,25
 49:5,12,25 50:8,14,21 51:2
 59:18 61:10 62:11,22 63:12,14
 64:17 65:11 67:1 68:12 69:9
 70:10,16 71:10 72:24 73:4 75:9,
 11

objections 8:2 18:20 20:17 73:6

observation 68:8

obtain 54:4

off-site 36:7

offer 30:20

Office 48:12

officer 7:14 40:5,6,22,23 41:4
 42:7,9,11 46:2,3 47:12 49:1 50:5

offsite 20:23 30:6

Ohio 34:2

on-site 29:19,22 30:3 36:20
 39:17,18 40:8,16,17 41:14,20
 56:8,15 68:5 74:4 75:8 76:1

one-size-fits-all 53:12

operating 7:4

operation 19:11,13

operations 19:16,17 37:5

opponent 69:21

opposite 18:11

option 15:1,2 36:19 40:14 43:4,
 13 47:16

options 15:1 36:13,14 40:10

order 8:2,7

organizational 7:10 9:10 67:10

original 72:22

orthopedic 57:4

out-of-state 29:10

outpatient 9:14 12:9,16 14:16
 25:3 27:23 30:1,24 66:21

oversee 42:11

overseeing 23:11

overturn 41:5 42:22

overturned 41:8

owned 34:3

**P**

P.C. 7:4,5 9:17

paid 30:24 52:12 76:10

Papendick 5:18 9:14 13:15
 14:19,20,21 15:1,5,14 16:9
 17:19 23:23 59:11 60:12,15,22
 61:24 63:8 64:24 65:15,22 66:4,
 5,20,24 67:23 68:2,9 69:4 72:15
 74:22 75:5,14,21,25

paragraph 28:11

part 11:3 13:5 19:4,19,25 20:22
 23:16 27:15 29:5 41:1,25 44:14,
 18 45:17 46:21,22 47:6 53:22
 58:15 73:11 74:24

part-time 34:10

participate 37:12

partners 34:4

parts 45:11

party 39:12 69:21

pass 65:4

pass-through 7:6 9:19 21:13,15,
 25 22:6,8,12,20 23:2,13 73:17

past 6:13 16:19

path 16:6,7,9



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025

10

**patient** 11:8 12:3,20 13:4 15:10 17:18 26:2 30:15 31:14 55:1 56:17 57:3 65:25 68:6,7 76:2

**patient's** 53:18 54:3,10,16

**patients** 24:8 26:19 75:7

**pay** 22:14,18,19 23:20,21 25:20, 25 30:5,9 53:1

**paying** 6:21

**Pellston** 33:3,5

**pending** 51:4 62:3

**Peninsula** 32:14 34:6

**people** 10:10 24:23 29:1,14,15, 17 58:11 64:20,21

**percent** 27:25 28:24

**percentages** 63:5

**perform** 12:24 54:18

**performance** 21:2

**performed** 11:22

**period** 46:14

**permission** 63:24 67:22

**person** 16:14 38:17 59:24 60:5

**personal** 23:4,6,8 47:10 59:18,22 62:11,14 63:13,18

**perspective** 70:17

**pertinent** 52:1

**PHS** 34:24

**physical** 53:21 54:6 60:20 61:2

**physician** 34:7,25 35:17 36:20 40:24

**physicians** 31:23 52:19 54:8 55:22

**plaintiff** 5:14

**Plaintiff's** 7:7,23 20:14,20 31:1

**plan** 16:13 19:6 36:16 38:2,6,14, 23 39:17 52:8 61:22 65:7 68:1,7 75:23 76:13

**plans** 52:25

**play** 21:20 38:8

**played** 21:16

**playing** 70:1

**point** 7:25 28:23 38:17 40:11 75:3

**policies** 44:15,19 46:23 47:2,5,8 68:24 70:19 71:1 72:10 73:15

**policy** 45:1,13,17 46:7 47:4 49:10,21 50:2,4,23 51:11,14,18 64:6 68:20 74:16,17

**policy/procedures** 50:10

**portion** 39:8

**position** 34:23

**postsecondary** 33:10

**potential** 49:18 56:3

**practice** 31:16 33:22 34:3,5 35:11 37:6 39:23 55:21

**practiced** 34:2 55:20

**pre-marked** 44:21 47:22

**preexisting** 55:4

**preparing** 52:10

**presentation** 20:5 53:18,22

**pretrial** 8:2,7 20:21

**pretty** 41:23 64:13

**previous** 17:23

**previously** 6:11 7:1 8:6 11:18 16:18 18:22 26:5

**prison** 12:21,23 26:19 55:5 62:21

**prisoner** 43:4,11 45:22 46:11 47:15 50:15,24 63:1,19 65:2

**prisoner's** 44:4,11 46:13,19

**prisoners** 50:17 53:24 54:2,18 63:24

**prisons** 54:19

**private** 31:16 42:12,13 62:19 63:3

**probabilities** 46:20

**procedure** 19:4 23:1,20 45:10,12 49:19 56:3,24 70:23 71:8,9,20 72:3,5 73:7

**procedures** 44:16 45:15 47:9 50:22,25 61:25 70:19 71:6,7 72:11 73:15

**proceeding** 8:11

**process** 10:3,4,5 11:25 12:4 17:15,17,20,25 18:23 19:4,9 20:1 21:12,23 23:12,22 25:4,18 27:22,24 28:16 29:5,6 38:25 39:7,15 43:17,21 44:1,4,10 47:3, 15,18,20 48:1 56:24 58:21,23,25 59:5,6,8,17 60:10 73:7,11 74:7

**processes** 39:8

**produced** 23:17

**profit** 24:4 25:16,19

**program** 17:8,11 53:15

**project** 21:2

**proper** 69:18

**protocol** 8:14

**provide** 37:21 56:2 58:12

**provided** 6:17 7:9 11:8 13:22 23:16 24:7,22 38:1 42:16 52:12, 15 55:5 74:4,6

**provider** 10:20 37:1,15 38:24 39:17,18,25 40:1,8,12,14,16,17 41:14,21 46:12 54:12,13,25 57:12 59:1,2,3,12 65:25 66:1,3, 5,18 67:5,11 68:5 73:25 75:4

**provider's** 75:8

**providers** 51:18,25 52:12 53:16 54:8,10 56:8,15,21 58:5 73:19, 21

**providing** 6:25 29:7 76:5

**purpose** 17:15 45:24

**purposes** 45:13

**pursuant** 8:8,13 42:17,25 47:20 73:25

**put** 24:25 55:1

Jeffrey Bomber, D.O.
09/04/2025

11

**Q**

**Q3** 47:23

**quality** 9:18 28:11,13,15,18,21 29:2 35:15

**question** 7:13 13:18,25 14:13 16:21,22,24 17:9,10 18:8,9 19:7 21:19 24:3 25:24 26:3,5,11,15, 16 27:10,12 28:19 51:4,6 56:12, 13 62:3,6 65:3 69:8 70:2,5,20,22 71:14,16,25 72:22 73:21

**questions** 14:7 32:4 57:22 58:7, 8,18 74:11 75:20 76:15

**quick** 64:13 74:12

**quote** 14:23

**R**

**Rachel** 5:22 32:10

**raise** 5:23

**raised** 43:10

**ramifications** 65:2

**read** 17:24 45:9,16,20 46:10,21 62:15

**reading** 28:11

**real** 65:1,8,13

**reason** 23:15,18 49:22 50:3 63:22

**recall** 11:1,14,15 17:14 23:24 41:23 48:5,8 50:23 56:5 57:17, 21,24

**receiving** 36:14

**recognize** 44:23

**recommendations** 47:7 55:10,12 61:24

**reconstructive** 45:6,11,14,21 46:12,16 74:18

**record** 5:4,10 44:25 54:16 76:24

**records** 11:12,13 54:5 55:4

**RECROSS-EXAMINATION** 74:14

**recurrent** 76:6

**REDIRECT** 58:20

**reduction** 28:24

**reevaluate** 68:10

**refer** 31:17 40:13

**reference** 43:21 47:19 51:23

**referencing** 39:7

**referral** 12:9,17 46:17 57:5

**referrals** 24:8

**referred** 10:11 31:21

**referring** 46:11 72:6 74:17

**refers** 46:1

**reform** 45:12

**refusal** 65:23

**regional** 10:21 35:2,5 40:2,3,9, 10,17,25 41:12 57:1,9,14

**regular** 65:19 76:2

**related** 6:14 9:18 48:1 57:19 76:9

**relates** 11:16 30:20 39:11 42:24

**relating** 38:1 48:6 57:15

**released** 64:8

**relevance** 20:9,11 29:11 32:19 64:18 71:10

**relevant** 13:10,23 14:10

**remember** 17:6 23:14 25:5 30:22 37:24 38:16 58:22 67:4 68:25 69:6

**Remote** 5:1

**repeat** 56:12

**repeatedly** 37:5

**report** 9:9 19:19 24:6,12,15,21, 23,25 25:8,12 27:15,20 28:4,5 37:10 42:17 74:25

**reporter** 5:11,23 16:4 60:2

**reports** 25:10 42:19

**represent** 6:9

**representation** 6:21

**representative** 69:13

**request** 12:16,19 14:21,23 15:15 17:1,18 36:15,25 38:19,21 42:1 44:5 47:12 56:22 57:19 59:11 60:16 61:6 62:10 64:1,25 66:5 67:14 68:10 72:6,15 75:22

**requested** 11:5 31:17 36:24 56:8, 15 66:14

**requesting** 36:7 48:22 67:20 71:21

**requests** 26:25 37:23 67:13 74:7

**require** 44:15

**required** 8:2 24:15,21 25:9 31:20 36:23 37:10 54:3 56:17 68:16,17 75:2 76:3

**requirement** 58:6

**reside** 32:13,14

**residency** 33:21,22,24 34:1

**resident** 34:21

**resources** 58:4 63:18 71:13

**respect** 26:15

**respondent's** 48:10

**responses** 48:8

**responsibility** 74:23 75:3

**responsible** 22:14 23:10 42:12

**rest** 28:11

**result** 44:4,9 75:22

**results** 29:1

**reversal** 11:6,22 12:25 15:15,22 22:23 23:22 30:3 31:18,20 47:13 49:17,20 57:19 61:7 64:11 65:16,24 72:16

**reversal's** 29:22

**reversals** 49:21 50:2 51:14

**reverse** 48:21 49:3,8



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025

12

reversed 72:1

review 10:4 11:25 17:20,25 18:23 19:3,8 21:7,12 22:2,7,11,12 23:2,11,22 25:18 49:14 54:3,17 57:9 63:7 74:6

reviewed 11:2,3,4,12,13 60:16

reviewer 13:10,23 60:12

reviewing 11:14 38:4 48:5

reviews 14:16,22 26:24

risks 46:19

RN 48:10 54:24

role 37:2 41:12 43:19,25 47:5 51:1,8,9 52:10 53:18 60:25

routine 53:23

ruling 39:10 62:3

rulings 62:7

runs 24:8

rural 34:7 35:11,18

**S**

Saginaw 35:4

save 24:2 25:16,19 27:6 51:11,15

saved 25:3 27:17,25 28:9,17,23

saves 25:24

savings 25:1 27:18,25 28:7 29:7, 13

schedule 55:2

scheduled 64:10,15

school 33:4,8

Schoolcraft 35:13

screen 44:22

screenshots 20:14

scroll 22:7 45:5

section 45:5 48:17 49:13 54:17

seek 39:19 50:9,15,24 64:7 74:7

seeking 36:19

send 67:19

sends 12:8,16

September 5:2,7

served 35:15

service 8:5 15:10 22:2 30:14,15 52:20

services 25:25 26:1,25 28:22 30:1,24 36:7 45:6 47:6 50:9,16, 24 74:19

shared 61:16

show 17:4,23 20:4 21:5 22:5 26:17 29:4 44:21 47:22 68:25 71:2 72:11 74:15

showed 61:21 71:5

showing 8:6 20:20 22:17 25:2,13 27:16 28:6 47:25 71:1

shown 26:15 27:21 36:13 64:6, 23 68:20

sick 29:19

side 17:22 19:11,13 39:2 42:12, 14 43:16 52:23 73:18

sights 37:15

sign 76:21

simple 70:22

simultaneous 60:1

sir 7:11 8:16 9:7,15,20 12:4 13:18,24 14:1,12 18:13,22 19:2, 7,13,14 20:6,16,20 21:8 23:7 25:6 26:17 27:8,19 29:12 30:16 31:12 32:3,13 33:2 47:10 48:3,5 68:21 70:20 71:2 74:10

site 12:7,8,12 15:9,18 34:25 39:25 54:23 59:12 67:5,10

situation 41:14,20

small 48:3

sole 45:24 73:24,25

solemnly 5:24

sort 53:11,12

source 55:14,16

spartan 37:16

speak 28:20 29:24

speaking 73:6

specialist 10:12 11:5 12:20 14:22 17:1 31:18,21

specialists 12:23,24

specific 37:4

specifically 19:15 30:17 60:18

specifics 29:24 30:11,23 32:2

speculation 15:25 27:3 30:10

spends 26:7,12,18,22

spent 35:22

spoke 41:22

spoken 32:8,10

staff 13:3

standard 20:23

standpoint 31:13

start 40:2 59:6,17 71:14

started 10:20 33:13 34:15

starts 73:18

state 5:10 7:8 8:15 9:6 10:22 12:5 13:23 14:9 23:10 31:3,6 35:7,8 36:5,10 38:25 40:4,5,20, 22 41:1,24 42:6,7,9,10,16,21,22, 25 44:14,16,18 46:3,5 47:11 57:14 58:9,12

stated 20:9

statement 8:8 19:1 26:10,13 49:7

states 48:20 50:9

stating 72:8

stats 24:6

step 12:7 38:24 48:19

steps 38:20,22 56:7,11,14

stipulated 8:13 20:18

stipulation 8:3,7 20:15

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

13

stipulations 42:14

stop 20:16

stopped 70:9

straight 21:16,21

strike 13:20 27:11 36:1 39:6 43:20 49:12 70:21

structure 45:11,12

submission 36:22

submitted 8:1,8

submitting 40:1

Subrina 48:10,15

subscriptions 52:13

suggested 38:23

Summary 48:19

superior 66:15,17

supervising 66:17

supplies 76:5,10

supply 42:20

supports 49:14

surgeries 12:25 74:7

surgery 11:23 12:25 13:4 38:17 45:6,10,12,14,21 46:12,16 47:13 48:22 49:17 57:20 60:17 61:5,6, 7 62:10,21 63:7 64:11,15 65:1, 10,24 66:6,9,25 67:15,19 68:4, 10 74:18 75:22

surgical 45:10,12

surprise 60:21,24 61:1

swear 5:11,24

sworn 6:4

system 15:6 26:19 29:25 55:23

---

**T**

Tableau 27:20

takes 17:20,25 18:24 19:18

talk 10:14 11:25 17:15 39:4,15

talked 43:3 58:21 60:19 61:5 71:5 73:20

talking 28:7 39:23 59:3

talks 27:22,24

Technology 33:16

tells 71:3 73:13

ten 34:11

tenure 61:12

term 17:8 36:17 57:23

termed 16:14

terms 24:8 58:15 67:12 74:25 76:5

test 36:22,25 37:9 38:10 56:6

testified 6:4 11:18 16:19 18:22 23:5 26:5 31:23 42:15 74:22

testify 59:23 60:4

testimony 5:25 17:6,23 18:3 28:16 30:20 32:1,21,24 43:9 52:5 63:15 68:13 69:22,24 73:5

tests 19:22

Texas 5:17

thing 52:23

things 19:5 36:9

thinking 60:5

third-party 62:9,17

thirty-some 34:22

thought 53:9 72:9

thousands 11:13

thumbs-down 16:11

thumbs-up 15:5 16:10

Thursday 5:2

time 5:7,9 6:16 11:4,11 14:20 28:12,15 29:3 35:22 36:20,21 38:7 45:18 46:8,14,23 49:1 50:5 51:10,13 55:9,13 56:7,14,19 57:8,13,14 58:17 62:10 66:9,16 68:6 69:13,21,22,23 73:22 76:16

times 6:13 38:16 52:4

title 48:11 66:20,23

today 6:20

Today's 5:7

told 25:22 37:5 66:8,14

Toledo 33:23

top 31:4 36:18

track 20:1

train 53:11 56:21

training 56:24

transcribed 70:1

transcript 18:10

transferred 54:19,23

translating 10:8

treating 26:19 31:23 64:10

treatment 16:13 17:8,11 19:6 26:7 27:7 36:16 38:2,6,14,23 39:16 52:8,25 56:4 61:22 65:6 68:1,7 75:23 76:13

treatments 26:12 46:20

tree 16:11

trended 21:2

true 9:15,20 10:5,25 11:6,7,16, 20,21 13:5,6,15 14:24 16:15,20, 23 17:13,21 19:18,23 21:13 22:3,15,20 23:3 24:23,24 25:25 28:9 30:6,9 59:3,4,8 61:9 64:5 65:2,5 66:16 68:23

truth 5:25 6:1

turn 48:17

turnaround 64:14

type 53:12 73:24

---

**U**

U.P. 35:3

ultimately 44:5


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Jeffrey Bomber, D.O.**
**09/04/2025**

14

ultrasound 36:24 57:4

underserved 37:17

understand 7:5 14:13 15:12
  18:19 45:16 46:6,21 50:2 61:5,7,
  9,17,23,25 62:8 63:6,19 64:23
  65:3,8 66:4 71:23 72:14,17,20
  73:21

understanding 10:9 24:19,23
  49:2 58:9

underwent 64:11

University 33:14,17

unnecessary 49:19

untrue 8:9

unusual 24:4 63:1

up-to-date 52:6,7 58:3

updated 15:6

Upper 32:14 34:6

Uptodate 13:17 51:24 52:4,5,6,
  11,15,19 55:11,13,19,25 56:2
  58:5 71:12 72:12

urgent 54:25

utilization 10:3,4,7,9 11:25 12:9,
  17 16:25 17:24 18:23 19:8 20:1,
  24 21:6,12 22:1,6 23:11 24:6
  25:3 26:24 27:24 29:6 30:1,24
  36:6,13,19 37:3,22,25 38:4,19
  39:16 40:8,23 41:6,8,15,25
  43:13 44:11 51:21 53:1,7 54:14
  55:3,8 56:23 61:2 63:7 71:12
  73:17 74:6 75:1

**V**

VA 62:17

varies 64:19

versus 19:5 69:3

video 70:1,9

video-recorded 5:5

videoconference 5:6

virtually 51:23 52:8

visits 65:20 76:2,10

Vitalcore 35:19

**W**

wait 64:20,21

wanted 50:24 54:10 58:10 74:15

ways 25:19 73:2,16

week 35:18

weeks 64:21

Weil 5:22 32:10

well-qualified 28:25

wellness 65:20

Witty 9:1

word 17:11,12 68:19 72:5 74:19

words 11:19 16:18,19 17:2 19:12
  59:2,5 60:20 71:19

work 6:14 8:22 10:5,10,16,19
  22:24 52:19 55:22

worked 23:25 35:13 57:11,12
  64:5

workers' 22:8,14,18,24,25

working 34:15 35:17,18 51:10,13
  55:24

workmen's 62:17

world 23:19 63:9 65:1,9,13

writing 47:5

written 14:5,8 23:16

wrote 27:16 66:5 67:17 72:15
  76:1

**Y**

year 33:18 34:21 65:22

years 33:25 34:2,11,22

yes-or-no 13:25

**Z**

Zoom 5:6

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100