

EXHIBIT

1

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4    KOHCHISE JACKSON,

5            Plaintiff,

6                                    Case No. 19-cv-13382

7        -vs-                        Hon. Gershwin A. Drain

8

9    CHS TX, INC., CORIZON HEALTH, INC.,

10   and DR. KEITH PAPENDICK,

11           Defendants.

12   _____/

13   PAGE 1 TO 77

14

15       The video deposition of JEFFREY BOMBER, D.O.,

16       Taken Via Hanson Remote

17       Commencing at 10:00 a.m.,

18       Thursday, September 4, 2025

19       Before Jennifer Wilke, CSR-8575.

20

21    Court reporter, attorneys & witness appearing remotely

22

23

24

25



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025                                    Page 2

1   APPEARANCES:

2   MR. JONATHAN ROBERT MARKO - P72450

3   Marko Law PLLC

4   220 West Congress Street, 4th Floor

5   Detroit, Michigan 48226-3289

6   (313) 777-7529

7   jon@markolaw.com

8       Appearing on behalf of the Plaintiff.

9

10  MR. ADAM MICHAEL MASIN - #4005708 (NY)

11  Bowman and Brooke LLP

12  750 Lexington Avenue

13  New York, NY 10022

14  (646) 914-6790

15  adam.masin@bowmanandbrooke.com

16      Appearing on behalf of the Defendants CHX TX, Inc.,

17      and Dr. Keith Papendick.

18

19  MR. CONNOR ALEXANDER McLAUGHLIN - P83229

20  Hackney Odlum & Dardas

21  10850 East Traverse Highway, Suite 4440

22  Traverse City, MI 49684-1364

23  (231) 642-5026

24  cmclaughlin@hodlawyers.com

25      Appearing on behalf of Dr. Bomber.



1    APPEARANCES CONTINUED:

2

3    THE VIDEOGRAPHER:   Marc Myers

4

5    ALSO PRESENT:       Ian Cross, Esq.

6                        Nathan Lumbard

7                        Laurence Margolis, Esq.

8                        Brittany Sullivan

9                        Rachel Weil, Esq.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  TABLE OF CONTENTS

 2   Witness

 3   JEFFREY BOMBER, D.O.

 4

 5              E X A M I N A T I O N S

 6                                              Page

 7   DIRECT EXAMINATION BY MR. MARKO:              6

 8   CROSS-EXAMINATION BY MR. MASIN:             32

 9   REDIRECT EXAMINATION BY MR. MARKO:          58

10   RECROSS-EXAMINATION BY MR. MASIN:           74

11

12

13                 E X H I B I T S

14   Exhibit                                    Page

15              (Exhibits not offered.)

16

17

18

19

20

21

22

23

24

25
```

1   Remote deposition

2   Thursday, September 4, 2025

3   About 10:00 a.m.

4           THE VIDEOGRAPHER:  We are now on the record.

5   This is the video-recorded deposition of

6   Dr. Jeffrey Bomber being taken by Zoom videoconference.

7   Today's date is September 4th, 2025.  The time is now

8   10:00 a.m.

9           And at this time, will the attorneys please

10  state their appearances for the record, and the court

11  reporter, please swear in the doctor.

12          MR. MARKO:  Good morning, ladies and gentlemen

13  of the jury, Judge Drain.  This is Jon Marko on behalf

14  of the plaintiff, Kohchise Jackson.  Also with me is

15  Ian Cross.

16          MR. MASIN:  Good morning, everyone.

17  Adam Masin on behalf of CHX Texas, Inc., and

18  Dr. Keith Papendick.

19          MR. McLAUGHLIN:  And Connor McLaughlin for --

20          MR. MASIN:  And that is --

21          MR. McLAUGHLIN:  -- Dr. Bomber.

22          MR. MASIN:  -- my colleague, Rachel Weil.

23          THE COURT REPORTER:  Dr. Bomber, please raise

24  your right hand.  Do you solemnly swear or affirm that

25  the testimony you are about to give will be the truth,



1     the whole truth, and nothing but the truth?

2              DR. BOMBER:  I do.

3                   JEFFREY BOMBER, D.O.,

4     having first been duly sworn, was examined and testified

5     on his oath as follows:

6              MR. MARKO:  Good morning, Dr. Bomber.

7              **THE WITNESS:  Good morning.**

8              MR. MARKO:  My name is Jon Marko.  I'm an

9     attorney, and I represent Kohchise Jackson in this case.

10    DIRECT EXAMINATION BY MR. MARKO:

11    Q.   You were previously deposed in this case; is that right?

12    **A.   Yes, that's correct.**

13    Q.   And you've been deposed several times in the past

14         related to your work for Corizon Healthcare, correct?

15    **A.   Correct.**

16    Q.   And at the time that you were deposed in this case, you

17         had an attorney provided by Corizon Healthcare; is that

18         right?

19    **A.   Yes.  Correct.**

20    Q.   You have a different attorney here today.  Is Corizon

21         paying for your new attorney's representation?

22    **A.   No.**

23    Q.   Okay.  Is that because of -- why is that?

24    **A.   Well, Corizon Health went bankrupt, and they're not**

25    **     providing any further assistance.**



**Jeffrey Bomber, D.O.**
09/04/2025                                          Page 7

 1   Q.   Did -- you were previously the Medical Director for

 2        Corizon?

 3   **A.   I was Medical Director for Corizon Health Michigan under**

 4        **the P.C. that they had operating in Michigan.**

 5   Q.   Right.  I understand that, but that P.C. was just a

 6        pass-through.  So, if we go and look at Exhibit 1,

 7        Plaintiff's Exhibit 1, this is from the contract with

 8        the State of Michigan.

 9             Do you see that Corizon provided an

10        organizational chart here?

11   **A.   Yes, sir.**

12             MR. MASIN:  Object to --

13   **A.   But your question asked me if I was the Chief Medical**

14        **Officer for Corizon Health.  No, not Corizon Health**

15        **National; Corizon Health Michigan.**

16   Q.   Okay.  All right.  Thank you for clarifying.

17             So, here we go.  Here is the Corizon Health,

18        and you see that they're right here.  Can you see that?

19   **A.   Yes.**

20             MR. MASIN:  Objection to this document.

21        There's no foundation.

22             MR. MARKO:  This document's already admitted.

23        It's Plaintiff's Exhibit 1.

24             MR. MASIN:  Nothing's been admitted at this

25        point.



**Jeffrey Bomber, D.O.**
09/04/2025                                    Page 8

1                    MR. MARKO:  That's false.  We submitted a

2          joint final pretrial order which required objections to

3          be made.  This document was admitted by stipulation, I

4          believe.  Let me check.

5                    Yes.  Exhibit 1 Corizon MDOC service contract,

6          which I'm showing to the doctor, was previously admitted

7          by stipulation in the joint final pretrial order that

8          was submitted pursuant to Judge Drain's statement.  So,

9          your objection is false and untrue.

10   BY MR. MARKO:

11   Q.    So, anyways, as I was proceeding before I was

12         interrupted, Doctor, this is Exhibit 1.  It's already

13         been admitted and stipulated to pursuant to

14         Judge Drain's protocol.  This is the contract that

15         Corizon -- between Corizon and the State of Michigan.

16         Do you see this, sir?

17   A.    Yes.

18   Q.    Okay.  And it's just so we figure out where you fall in.

19         You see this is Corizon Health?  You see that logo up

20         there?

21   A.    Yes.

22   Q.    Okay.  And then it has all these individuals that work

23         for Corizon such as Dr. Calvin Johnson.  Do you see that

24         here?

25   A.    Yes.



```
 1   Q.   And then we have the CEO Karey Witty.  You see that
 2        here?
 3   A.   Yes.
 4   Q.   And then we have all these other individuals on this
 5        chart if we go up and down.  And it looks like you're
 6        right here:  Dr. Jeffrey Bomber, State Medical Director.
 7        Is that you, sir?
 8   A.   Yes.
 9   Q.   Okay.  And so you report to, according to this
10        organizational chart, these other individuals and
11        entities, right?
12   A.   Yes.
13   Q.   And under you, over here, if we follow this little line
14        down, is Dr. Keith Papendick who is the UM Outpatient
15        Medical Director; is that true, sir?
16   A.   Yes.
17   Q.   All right.  Now, you mentioned that you had a P.C. or
18        something related to -- I believe it was Quality
19        Correctional Health, but that was just a pass-through
20        entity for Corizon Health; isn't that true, sir?
21   A.   Yes.
22                 MR. MASIN:  Object to -- objection.
23                 MR. MARKO:  What's the objection?
24                 You can't think of one?  Okay.  I'll move on.
25        ///
```



1   BY MR. MARKO:

2   Q.   All right.  And so as the medical director, you have

3        knowledge about how this process called the utilization

4        review process or UM -- utilization management, rather,

5        process work; is that true?

6   **A.   Correct.**

7   Q.   All right.  And you -- before we get to this utilization

8        management -- and, right, just for translating this

9        utilization management into common understanding for

10       people like me who do not work in the corrections,

11       that's when an inmate can be referred outside to a

12       specialist for a condition, right?

13  **A.   Yes.**

14  Q.   All right.  Let's talk, before we get there, just a

15       little bit about you.  You have had -- you no longer

16       work for Corizon, although you did some contract work

17       for them in 2021; is that right?

18  **A.   Yes.**

19  Q.   How long did you work for Corizon?

20  **A.   Well, I started in 2009 as a medical provider at a**

21  **facility, and then I became the Northern Regional**

22  **Medical Director and then the State Medical Director**

23  **after that.**

24  Q.   All right.  I just want to make sure you've never met my

25       client, Kohchise Jackson; is that true?



1   A.   I cannot recall meeting him, no.

2   Q.   You never reviewed the forms that I know are called 407

3        Forms, but the forms -- you never reviewed as part of

4        your job for Corizon at the time, you never reviewed

5        those forms that requested an outside specialist for a

6        colostomy reversal, true?

7   A.   True.

8   Q.   You never provided any patient care for

9        Kohchise Jackson, correct?

10  A.   Correct.

11  Q.   During the time that he was incarcerated, you never

12       reviewed any of his medical records, correct?

13  A.   I reviewed thousands of medical records.  I -- you know,

14       I don't recall reviewing it.

15  Q.   And you don't recall making any decisions of his care as

16       it relates to this case; is that true?

17  A.   Correct.

18  Q.   All right.  And you've testified previously that you are

19       not an expert.  Your words were, "I am not an expert in

20       colostomies."  Is that true?

21  A.   True.

22  Q.   Okay.  Have you ever performed a colostomy reversal

23       surgery?

24  A.   No.

25  Q.   Okay.  Let's talk about this utilization review process



Jeffrey Bomber, D.O.
09/04/2025                                    Page 12

1      now.  All right.  So if we go to this, this is in the

2      same exhibit from the -- Corizon's own document here.

3                   So, if a patient -- you said you're familiar

4      with this process, sir, right?  You had to be as the

5      state medical director?

6  A.  Yes.

7  Q.  All right.  So, the site -- the first step is right

8      here.  Do you see this?  Site medical director sends an

9      outpatient referral to the utilization management,

10     right?

11 A.  Yes.

12 Q.  Now, this site medical director was a Corizon employee,

13     right?

14 A.  Yes.

15 Q.  So, Corizon's employee, a doctor or some other medical

16     director, sends a request through -- for an outpatient

17     referral to the utilization management, right?

18 A.  Right.

19 Q.  And that request is -- basically, that allows the

20     inmate, the patient, to go and see a specialist outside

21     of the prison, correct?

22 A.  Correct.

23 Q.  And that's because the prison doesn't have specialists

24     and Corizon doesn't have specialists who can perform

25     surgeries such as the colostomy reversal surgery,



**Jeffrey Bomber, D.O.**
09/04/2025                                    Page 13

1        correct?

**2   A.   Yes.  Correct.**

3    Q.   And so because there's no doctors on staff there, if a

4         patient needs that surgery, they have to be sent out to

5         an outside doctor who's not part of Corizon, true?

**6   A.   True.**

7    Q.   All right.  Then there's a UM coordinator who's

8         assigned.  Do you see that right there?

**9   A.   Yes.**

10   Q.   And then a nurse reviewer applies relevant criteria as

11        defined by Corizon Health.  Do you see that there?

**12  A.   Yes.**

13   Q.   Okay.  And so the criteria is defined by Corizon, right?

14        You have a Corizon doctor, the Corizon criteria, and

15        then Dr. Papendick is also an employee of Corizon, true?

**16  A.   Criteria as defined includes several databases including**

**17       InterQual and UpToDate.**

18   Q.   Yeah.  Sir, that wasn't my question.  My question is --

**19  A.   But that's the answer.**

20             MR. MARKO:  Well, I move to strike as

21        nonresponsive.

22   Q.   According to this document that was provided to the

23        State of Michigan, the nurse reviewer applies relevant

24        criteria as defined by Corizon Health?  Yes or no, sir?

**25  A.   It's not a yes-or-no question.**



1    Q.   Sir, it is.  I --

**2    A.   No, it's not.**

3    Q.   -- respectively disagree.  Does this --

**4    A.   Okay.**

5    Q.   -- document that was written -- and, look, I'm not

6         trying to be cute here, but I'd ask that you answer my

7         questions.

8              Does this document that was written by Corizon

9         and that was in the contract with the State of Michigan

10        say that the relevant criteria is defined --

**11   A.   All right.**

12   Q.   -- by Corizon Health?  Yes or no, sir.

**13   A.   I understand.  I understand your question.  The answer**

**14        is "yes".  Okay.**

15   Q.   Okay.  And then we get to the decision-maker here where

16        it says, "UM Outpatient Medical Director reviews for

17        appropriateness and medical necessity," correct?

**18   A.   Correct.**

19   Q.   And that's Dr. Papendick, correct, in this case?

**20   A.   I believe it was Dr. Papendick at that time.  Yes.**

21   Q.   All right.  So, then Dr. Papendick gets this request for

22        a specialist outside of Corizon, and he then reviews

23        that request for, quote, appropriateness and medical

24        necessity; is that true?

**25   A.   Yes.**



Jeffrey Bomber, D.O.
09/04/2025                                          Page 15

1    Q.   And then Dr. Papendick has two options:  Option one is

2         "yes" according to this document, and option two is "no"

3         according to this document; is that correct?

4    A.   **Yes.**

5    Q.   Okay.  And so if Dr. Papendick gives it the thumbs-up,

6         the "yes", then it goes -- it's updated in the system

7         and approved, correct?

8    A.   **Correct.**

9    Q.   And then the decision is sent back to the site so the

10        inmate patient can go and get the service, correct?

11   A.   **Right.**

12   Q.   So in this particular case, I understand you didn't have

13        particular involvement in this, but applying this chart

14        and criteria, if Dr. Papendick had given the "yes" to

15        the request for a colostomy reversal for Mr. Jackson, it

16        would have then went through to approval, correct?

17   A.   **Yes.**

18   Q.   And then it would have been sent back to the site,

19        correct?

20   A.   **Correct.**

21   Q.   And then Mr. Kohchise Jackson would have been able to

22        get a colostomy reversal, correct?

23                  MR. MASIN:  Object to --

24   A.   **Correct.**

25                  MR. MASIN:  -- speculation.



1   Q.   Go ahead.

2            MR. MARKO:  He said, "Correct."  Did you get

3        the answer?

4            THE COURT REPORTER:  Yes.

5   BY MR. MARKO:

6   Q.   So, and then -- but there's a whole nother path over

7        here.  Do you see this path that says "no"?

8   **A.   I do.**

9   Q.   So if Dr. Papendick goes down the "no" path and does not

10       give the thumbs-up as we saw over here and instead gives

11       the thumbs-down, then it goes to this tree, correct?

12  **A.   Correct.**

13  Q.   And that's the alternative treatment plan that I know is

14       termed by Corizon and then the person does not get the

15       immediate medical care, true?

16  **A.   False.**

17  Q.   Okay.  And in fact, when -- I know that Corizon doesn't

18       like to use the words "deny", but you've previously

19       testified that those words had been used in the past,

20       isn't that true?

21           MR. MASIN:  Objection to the question, that --

22       the commentary in the question.

23  Q.   True or false?

24  **A.   I'm sorry.  I lost the question.**

25  Q.   That these forms for utilization management, this



1    request for an outside specialist, has -- sometimes

2    they've been -- used the words "denied"?

3    A.   No.

4    Q.   Oh, really?  Let me show you --

5    A.   No.

6    Q.   -- this, your testimony in -- do you remember the case

7    of Franklin?

8    A.   **We generally use the term alternative treatment program.**

9    Q.   That's -- my question was not generally, Doctor.  My

10   question was that you -- although Corizon's loves to use

11   the word alternative treatment program, they've also --

12   you've had the word used "deny" before or "defer"; isn't

13   that true?

14   A.   **Maybe deferred.  I don't recall ever denying anything.**

15   Q.   And let's talk about this process and the purpose of it,

16   right?

17            The -- a component of this process that the

18   patient has to go through through Corizon, this request

19   from the doctor, going up to Dr. Papendick in this case,

20   a component of the review process takes into

21   consideration cost; isn't that true?

22   A.   **No.  Not on the medical side.**

23   Q.   Let me show you your previous deposition testimony where

24   you were asked (as read), "And the utilization

25   management component of the review process takes into



1     account -- consideration cost," correct?

2             MR. MASIN:  Objection to the use of this

3     deposition testimony in this matter.

4             MR. MARKO:  Excuse me, Mr. --

5             MR. MASIN:  This is an improper way to impeach

6     a witness.

7             MR. MARKO:  Mr. Masin, I have not finished my

8     question.  You interrupted me in the middle of my

9     question.  And I'm directly impeaching the witness with

10    a deposition transcript where he literally says the

11    opposite answer.

12            MR. MASIN:  It's an improper way to do it,

13    sir.

14            MR. MARKO:  Your objection is noted.

15            MR. McLAUGHLIN:  I'm gonna object.  I don't --

16    is this from the Franklin case or this case?

17            MR. MARKO:  This is from the Franklin case.

18    I'm allowed to impeach with any -- any document.  This

19    was under oath so I'm not sure I understand the

20    objections.

21    BY MR. MARKO:

22    Q.  Sir, do you see that you previously testified that the

23    utilization management component of the review process

24    takes into consideration cost; do you see that?

25            MR. MASIN:  Objection.  It's not an



Jeffrey Bomber, D.O.
09/04/2025                                              Page 19

1        inconsistent statement.

2    Q.  Sir, do you see that?

3    A.  It's -- the MDOC and Corizon did review cost, yes.  That

4        was part of their process and procedure.  When it came

5        to approving things on a day-to-day basis versus

6        alternative treatment plan, cost was not considered.

7    Q.  Sir, that wasn't my question.  My question was:  Does

8        the utilization management component of the review

9        process take into consideration the cost of the medical

10       care?  And you --

11   A.  On the operation side, yes.

12   Q.  It does.  And when you use words like --

13   A.  On the operation side, sir.

14   Q.  Sir, I'm not finished.  Please don't interrupt me.

15           And when I asked you specifically about it,

16       they do take into consider -- when you say operations

17       cost, you mean the operations of Corizon Healthcare

18       takes into considerations cost, true?

19   A.  As part of the contract with the DOC, they had to report

20       cost and consider cost, but --

21   Q.  And --

22   A.  -- not while approving tests.

23   Q.  So, the fair answer is:  Corizon considers costs, true?

24   A.  Of course they do.  Any health care company does.

25   Q.  And so because Corizon considers costs as part of the



1       utilization management process, they keep track of

2       costs, don't they?

**3   A.   Yes.**

4   Q.   And let me show you Exhibit 89 which is Corizon's own

5       documents in this case which is their own presentation

6       about this.  Do you see this, sir?

7                MR. MASIN:  Objection to this document.

8                MR. MARKO:  What's the objection?

9                MR. MASIN:  To relevance.  We stated our

10      objection to this document.

11               MR. MARKO:  Relevance?

12               MR. MASIN:  It's dated 2013.

13               MR. MARKO:  Again, this is all -- this is --

14      Plaintiff's 88 which is InGauge screenshots admitted at

15      his deposition and have been admitted by stipulation.

16      Sir, please familiarize yourself with the file and stop

17      making objections to exhibits that have already been

18      stipulated to and admitted.

19  BY MR. MARKO:

20  Q.   Sir, I'm showing you this which is marked Plaintiff's

21      Exhibit 88 on the final pretrial.  Do you see that

22      Corizon, as part of its marketing here, says it manages

23      offsite costs by applying industry and standard

24      utilization management criteria?  Do you see that?

**25  A.   I see it.**



1   Q.   Okay.  And that, if we go down here, Corizon uses

2        trended data to evaluate performance and project future

3        costs.  Do you see that?

4   **A.   Yes.**

5   Q.   Now, let me show you another document which is

6        Exhibit -- which is the 2017 Corizon Utilization

7        Management Review Manual, right?  And do you see this,

8        sir?

9   **A.   Yes.**

10  Q.   And --

11  **A.   It says on the page.**

12  Q.   And the utilization review process has an exception for

13       what's called a pass-through list; isn't that true?

14  **A.   Yes.**

15  Q.   And the pass-through list means if you get that -- like,

16       have you ever played Monopoly, you get to go straight

17       around the board to "Go"?  You don't have to go through

18       the entire board?

19  **A.   I'm sorry.  What's the question?**

20  Q.   You ever play the Monopoly game?  You get the card, you

21       get to go straight to "Go"?

22  **A.   Okay.  Yes.**

23  Q.   Corizon has a list that allows -- that process that we

24       just went through that Mr. Jackson would have to go

25       through, they have a pass-through list where if you are



1      on that list, Corizon does not do a utilization

2      management review of the particular service; it's

3      automatically approved, true?

4  A.  Yes.

5  Q.  And have you -- are you aware of -- I'll show you the

6      pass-through list here from the utilization management

7      review.  And if we scroll down here, we see on the

8      pass-through list:  Workers' compensation.  Do you see

9      that?

10  A.  Yes, I see it.

11  Q.  And then you see it's this abbreviated review or this

12      pass-through review.  Do you see that?

13  A.  Yes.

14  Q.  And Corizon is not responsible to pay for those workers'

15      compensation covered benefits, true?

16  A.  **According to that document, but I have no other**

17      **knowledge other than what you're showing me right now.**

18  Q.  And because Corizon doesn't have to pay, if workers'

19      compensation insurance has to pay, it is on the

20      automatic pass-through list, true?

21  A.  **As you say.  I don't have any detailed knowledge of**

22      **that.**

23  Q.  So if somebody needs a colostomy reversal because they

24      were injured at work and they have workers' compensation

25      insurance, and workers' compensation insurance approves



 1      the procedure, then Corizon doesn't do a medical

 2      necessary review because it's on the pass-through list,

 3      true?

 4                  MR. MASIN:  Objection.  Lack of personal

 5      knowledge.  He's just testified he does not have

 6      personal knowledge of that.

 7   Q.  Go ahead, sir.

 8   **A.  I do not.  I do not have personal knowledge of that.  I**

 9   **can't answer that.**

10   Q.  As the state medical director who is responsible for

11      overseeing the utilization review and management

12      process, you don't have knowledge about what's on the

13      pass-through list in your own documents?

14   **A.  I don't remember those details.**

15   Q.  Okay.  Do you have any reason to dispute that document

16      that was written and provided in evidence and is part of

17      Corizon's own produced documents?

18   **A.  No reason to dispute or affirm.**

19   Q.  So, can you explain why in the world if Corizon doesn't

20      have to pay for the procedure, it can be automatically

21      approved, but if Corizon has to pay for the colostomy

22      reversal, then it has to go through this review process

23      with Dr. Papendick?

24   **A.  As you say.  I don't have any recall of the details of**

25   **how that worked.**



Jeffrey Bomber, D.O.
09/04/2025                                    Page 24

1    Q.   Do you think it might be because Corizon was trying to

2         save money and make money?

3    A.   **That's a very broad question.  Every health care company**

4         **tries to make a profit.  I don't see that as unusual.**

5    Q.   All right.  And in fact, you helped author a UM,

6         utilization management, stats report, didn't you?

7    A.   **Every month, I provided to the MDOC the number of ER**

8         **runs, patients in the hospital, and referrals in terms**

9         **of the number.  It had nothing to do with cost on my**

10        **end.**

11   Q.   All right.  Nothing to do with cost.  All right.  Let's

12        take a look.  Here's the report.  Do you see it in front

13        of you?  This has been entered as an exhibit.  It's

14        Exhibit 8.  Do you see this?

15   A.   **Right.  Yeah.  We were required to report that every**

16        **month --**

17   Q.   Right?  And now --

18   A.   **-- in our...**

19   Q.   -- my understanding -- I'm sorry to interrupt you.  Go

20        ahead.

21   A.   **In our contract, this was a required report.**

22   Q.   Right.  Now, Corizon provided -- you helped draft this

23        report with other people is my understanding, true?

24   A.   **True.**

25   Q.   And so let's look at what you would put in this report.



**Jeffrey Bomber, D.O.**
09/04/2025                                              Page 25

1      So, savings guide.  You actually made a very nice chart

2      here showing the millions of dollars of expenditures

3      saved through the outpatient utilization management

4      process.  Do you see that?

5   A.  **I don't remember who generated that, but --**

6   Q.  Well, sir, it's --

7   A.  **-- I see it, yes.**

8   Q.  -- in the report that you were bookmarked --

9   A.  **I see -- yeah.  I think that was one of the required**

10     **reports as well.**

11  Q.  Okay.  But you just said that it has absolutely nothing

12     to do with costs, yet, Corizon, in this report, made a

13     nice chart showing the costs going down from $20 million

14     all the way down to, 2016, less than half.  They were

15     cut less than half.  Do you see that?

16  A.  **Of course they tried to save money and make a profit.**

17     **All health care companies do, but that did not impact**

18     **our day-to-day decisions in the 407 review process.**

19  Q.  And one of the ways to make a profit and save money is

20     deny outside medical care that Corizon would have to pay

21     for, isn't it?

22  A.  **We were never told to deny anything.  We were told to**

23     **base it on medical necessity.**

24  Q.  That wasn't my question.  Corizon saves money if they

25     don't have to pay for additional outside services, true?



 1   A.   They don't deny outside services based on money.  It's

 2        whether or not the patient needs it or not.

 3   Q.   That wasn't my question.

 4   A.   Well, that's the answer.

 5   Q.   My question was -- well, you previously testified in

 6        another case, in the Kensu matter, that you agree that

 7        the less money that Corizon spends on treatment, the

 8        more money Corizon makes, correct?

 9             MR. MASIN:  Objection.  Improper -- improper

10        impeachment, not inconsistent statement.

11   Q.   Let me ask you the question.  Do you agree that the less

12        money that Corizon spends on treatments, the more money

13        Corizon makes?  Do you agree with that statement?

14             MR. MASIN:  I object to this document being

15        shown in respect to that question.

16   Q.   Let me ask you the question, and then if you give an

17        inconsistent answer, I will show the document.  Sir, do

18        you agree that the less money that Corizon spends on

19        treating these patients in the prison system, the more

20        money Corizon makes?  Yes or no.

21   A.   It's not really that gray.  So, okay.  The less money

22        anybody spends on health care costs, the more money the

23        company would make.  Yes.  Okay.

24   Q.   Yes.  Right?  So the more utilization management reviews

25        that are denied, the more requests for outside services



1     that are denied by Corizon, the more money Corizon

2     makes, correct?

3                MR. MASIN:  Objection.  Calls for speculation.

4  A.  **That would --**

5  Q.  Go ahead.

6  A.  **But you're implying that there is an intent to save**

7       **money by denying treatment, and that does not happen.**

8  Q.  Sir --

9  A.  **So, the --**

10 Q.  -- that wasn't my question.

11                MR. MARKO:  I move to strike.

12 A.  **The answer to your very cryptic question which is not**

13      **broad enough to encompass all the decision-making, the**

14      **answer is yes.**

15 Q.  Okay.  And in fact, that was part of this report that

16      you wrote -- I'm now showing you Exhibit 8 again --

17      where Corizon discusses how it saved hundreds -- the

18      cost savings in the area above is in the hundreds of

19      millions of dollars.  Do you see that there, sir?

20 A.  **Yes.  I think that was taken from the Tableau report.**

21 Q.  And this is shown graphically on page 11 where we looked

22      at that graph where it talks about this process that

23      Mr. Jackson had to go through, the outpatient

24      utilization management process, and it talks about how

25      Corizon saved -- it had a cost savings of 60 percent.



1       Do you see that?

**2    A.    I see that.**

3    Q.    And so you -- I know that you said Corizon doesn't take

4          costs into account at all; yet, the report -- you would

5          agree that the report that you helped author to the

6          department of corrections contained a chart showing

7          millions of dollars in savings and a narrative talking

8          about the millions -- hundreds of millions of dollars

9          that were saved, true?

**10   A.    And the answer is, to full disclosure, you have to**

**11         finish reading the rest of the paragraph.  The quality**

**12         of care actually improved during that time.**

13   Q.    Oh, do you think the quality of care improved for

14         Mr. Jackson?

**15   A.    The quality of care improved markedly over that time.**

16   Q.    Is it your testimony that through this process that

17         saved Corizon hundreds of millions of dollars, that the

18         quality of care improved for Mr. Jackson?

19              MR. MASIN:  Objection to the question.

**20   A.    I can't speak to Mr. Jackson.  I can tell you the**

**21         overall quality of health care improved dramatically.**

22   Q.    So, you believe that outside services were cut to the

23         point that they saved hundreds of millions of dollars, a

24         reduction of over 60 percent, and Corizon is so

25         well-qualified and amazing, that they actually got


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

Jeffrey Bomber, D.O.
09/04/2025                                    Page 29

```
 1        better results for people like Mr. Jackson?

 2   A.   We had markedly improved quality of care measures over

 3        that time.  Yes, we did.

 4   Q.   Let me show you another Exhibit which is 62 which is

 5        part of the bid process where, again, Corizon uses the

 6        utilization management process to brag about how much

 7        cost savings they're providing to governments.  Do you

 8        see that?

 9             MR. MASIN:  Objection to the use of this

10        document.  It's an out-of-state document.  It has

11        nothing to do with Michigan.  Relevance and 403.

12   Q.   Okay.  Do you see that, sir?

13   A.   Yes.  And I see that most of the savings is keeping

14        people out of the hospital.

15   Q.   People like Mr. Jackson?

16             MR. MASIN:  Objection --

17   A.   Correct.  To keep people from --

18             MR. MASIN:  Objection to --

19   A.   -- getting sick, meet their needs on-site so that they

20        don't have to go to the hospital.

21   Q.   How are you going to meet somebody who needs a colostomy

22        reversal's needs on-site?  You agree that that could not

23        be done, right?

24   A.   I can't speak to the specifics of that case, but in

25        general, in the whole system, yes, the amount of
```



Jeffrey Bomber, D.O.
09/04/2025                                                    Page 30

1      utilization of outpatient services decreased because we

2      didn't need it.

3   Q.  Can a colostomy reversal be done on-site?  Yes or no.

4   A.  No.

5   Q.  Okay.  And Corizon would have to pay if that was done

6      offsite, true?

7   A.  Yes.  If that were approved, yes.

8   Q.  And because it wasn't in this case, Corizon didn't have

9      to pay; true or false?

10         MR. MASIN:  Objection to speculation.

11  A.  I don't know the specifics.

12  Q.  You don't know --

13  A.  You asked --

14  Q.  -- whether if a service isn't -- as a doctor, would you

15     bill for a service for a patient that you never did or

16     never saw, sir?

17  A.  I think you mentioned Mr. Jackson specifically, and I

18     can't say.

19  Q.  And you don't have knowledge about Mr. Jackson's case so

20     you're not able to offer testimony as it relates to him;

21     is that fair?

22  A.  I don't remember if he had an approval or not, what the

23     specifics were there, but in general, yes, the less we

24     paid for outpatient services and utilization, yes.

25  Q.  All right.  Now, let's look at your contract which is



**Jeffrey Bomber, D.O.**
09/04/2025                                    Page 31

1   Plaintiff's Exhibit 1, the actual contract with the

2   department of corrections.  This is just Michigan by the

3   way.  So if we go up there, do you see it says State of

4   Michigan at the top?

**5   A.   Yes.**

6   Q.   Okay.  Just the State of Michigan, do you see the value

7        of the contract, 715-million-dollars-plus?  Do you see

8        that?

**9   A.   Yes.**

10  Q.   It's a big contract, isn't it?

**11  A.   In correctional medicine, yes.  M-hm.**

12  Q.   All right.  So you would agree, sir, that from a doctor

13       standpoint, that inmates are entitled to the same level

14       of medical care as a patient in the community, correct?

**15  A.   Yes.**

16  Q.   And you would agree that in your private practice, that

17       you would refer individuals who requested and needed a

18       colostomy reversal to a specialist, correct?

**19  A.   If they were medical necessity, yes.**

20  Q.   And if Mr. Jackson required a colostomy reversal, he

21       should have been referred to a specialist, correct?

**22  A.   If it was medically necessary.**

23  Q.   Are you aware that his treating physicians all testified

24       that it was medically necessary?

25                MR. MASIN:  Object to form, misstates



1       testimony.

2   A.   I'm not aware of the specifics, no.

3              MR. MARKO:  Okay.  Thank you, sir.  I don't

4       have any other questions.

5              MR. MASIN:  Dr. Bomber, good morning.  My name

6       is Adam Masin.

7   CROSS-EXAMINATION BY MR. MASIN:

8   Q.   You and I have not spoken before, have we?

9   A.   No.

10  Q.   You haven't spoken with my colleague, Rachel Weil,

11      before, correct?

12  A.   Correct.

13  Q.   Where do you reside, sir?

14  A.   I reside in Naubinway, Michigan, in the Upper Peninsula.

15  Q.   And where did you grow up?

16             MR. MARKO:  Objection --

17  A.   I grew up in --

18             MR. MARKO:  Hold on.  I'm sorry.  Objection.

19      Relevance.

20  Q.   You can answer.

21             MR. MARKO:  And good character testimony which

22      is inappropriate and not admissible.

23             MR. MASIN:  Where he grew up is good character

24      testimony?  Okay.

25      ///



Jeffrey Bomber, D.O.
09/04/2025                                    Page 33

1   BY MR. MASIN:

2   Q.   Where did you grow up, sir?

3   **A.   In Pellston, Michigan.**

4   Q.   Where did you go to high school?

5   **A.   Pellston High.**

6            MR. MARKO:   Same objection.   Can I have a

7        continuing objection?

8   Q.   Did you go to -- did you graduate from high school?

9   **A.   I did.**

10  Q.   Did you attend any postsecondary education?

11  **A.   I did.**

12  Q.   Where did you go to college?

13  **A.   I started at North Central Michigan College, and then I**

14     **graduated from Jacksonville University with my**

15     **bachelor's, and then MS/Ph.D. from the Florida Institute**

16     **of Technology, and then my D.O. degree from Des Moines**

17     **University.**

18  Q.   And what year did you earn your D.O. degree?

19  **A.   That was 1993.**

20  Q.   After you earned your D.O. degree, did you have a

21     residency?

22  **A.   I did.   I completed a family practice residency at the**

23     **Toledo Hospital.**

24  Q.   And how long did you -- how long was that residency?

25  **A.   Three years.**



Jeffrey Bomber, D.O.
09/04/2025                                    Page 34

 1   Q.   What did you do after the residency?

 2   A.   I practiced medicine in Findlay, Ohio, for 12 years,

 3        owned my own practice in conjunction with several other

 4        partners.

 5   Q.   And what did you do after that practice ended?

 6   A.   I moved back to Northern Michigan to the Upper Peninsula

 7        to become a rural health care physician at Helen

 8        Newberry Joy Hospital.

 9   Q.   And how long did you do that for?

10   A.   Well, I did that full-time and part-time off and on for

11        ten years, and then I moved over to the -- to

12        correctional medicine.

13   Q.   When did you first get involved with correctional

14        medicine?

15   A.   That would have been 2009 when I started working at the

16        Newberry Correctional facility.

17   Q.   Do you hold any board certifications?

18   A.   I do.  The American Board of Family Medicine.

19   Q.   And how long have you held a board certification in

20        family medicine?

21   A.   Since I was a resident.  I did let it lapse for a year

22        or two, but overall, yeah, thirty-some years.

23   Q.   What was your first position with Corizon?

24   A.   I was -- it actually wasn't with Corizon.  It was PHS

25        which became Corizon.  I was the site physician at the



Jeffrey Bomber, D.O.
09/04/2025                                          Page 35

```
 1        Newberry Correctional facility, then I became the
 2        Northern Regional Medical Director.  I was in charge of
 3        the correctional facilities in the U.P. and then from
 4        Saginaw across to Muskegon and up.
 5   Q.   And after you were the Northern Regional Medical
 6        Director, what did you do next?
 7   A.   Then I was asked to become the State Medical Director
 8        from when my boss left, and I became the State Medical
 9        Director, and that was from 2015-2018.
10   Q.   And what happened -- what did you do next after 2018?
11   A.   I came back to practice rural health care by becoming
12        the medical director for the little clinic here in
13        Naubinway and also worked for Schoolcraft Memorial
14        Hospital in Manistique.  I also did nursing homework,
15        and at Manistique, I also served on the quality
16        committee.
17   Q.   Are you working as a physician currently?
18   A.   Yes.  I am working two days a week in our rural health
19        care clinic and also consulting for VitalCore which has
20        the contract with the Michigan Department of
21        Corrections.
22   Q.   Are you being compensated for your time spent on this
23        case?
24   A.   Not at all.
25   Q.   There has been some discussion about an alternative --
```



1        well, strike that.  There's been some discussion about a

2        407.  Do you know what that is?

3    A.  I do.

4    Q.  What is a 407?

5    A.  That's a number of a state form.  The state has a lot of

6        forms with numbers, and the 407 Form is the utilization

7        management form for requesting off-site services which

8        may be, especially, consultation, MRIs, imaging, all of

9        those things.

10   Q.  Okay.  And the 407 is a state form, not a Corizon form;

11       is that right?

12   A.  Correct.  Yes.

13   Q.  You were shown some options that a utilization manager

14       would have upon receiving a 407.  One of those options

15       would be to approve the request; one would be an

16       alternative treatment plan.  Are you also familiar with

17       the term NMI?

18   A.  No, not off the top of my head.

19   Q.  Did the utilization manager have the option of seeking

20       more information from the on-site physician at the time?

21   A.  Oh, yes.  Yes.  That was done all the time.  Sometimes

22       the submission wasn't complete or an alternative test,

23       like, for example, sometimes if they required an --

24       requested an MRI and an ultrasound may have been a

25       better test, we would request more information and



1         discuss it with the provider.

2    Q.   What -- can you explain to the jury, what role did cost

3         have in the utilization manager's consideration of a

4         specific 407?

5    A.   We were told repeatedly by operations, from my boss

6         Dr. McQueen and on up, not to practice medicine based on

7         cost.  We had a saying that we must meet all the

8         inmates' needs.  And we were never directed to choose a

9         cheaper test or, you know, decline a test ever.

10             We were required to report the numbers, but

11        never in our decision-making on a day-to-day basis -- I

12        wouldn't participate in anything like that.  I'm a

13        family doctor.  I'm a dad for crying out loud.  You

14        know, we -- you don't go into correctional medicine to

15        make money, okay, as a provider.  You know, the sights

16        are spartan, and you go in because you have a heart for

17        the underserved.

18             And we never denied care based on what

19        corporate said about money or not, and it was based on

20        medicine.

21   Q.   What, if any, information did Corizon provide to the

22        utilization managers who were considering 407s about the

23        cost of the requests that they were considering?

24   A.   I never remember cost being a factor.

25   Q.   What information, if any, was the utilization manager



1      provided relating to the cost of an alternative

2      treatment plan?

3   A.  None.

4   Q.  Would a utilization manager who was reviewing a 407 know

5      whether the cost of an approval was more or less than

6      the cost of an alternative treatment plan?

7   A.  **I mean, they might know the cost of an MRI at the time,**

8      **but, again, it didn't play into our decision-making.  It**

9      **was all based on medical necessity.  If there was a more**

10      **cost effective test that would have met the medical**

11      **necessity, and that might be a factor, but by and large,**

12      **not on a day-to-day basis.**

13   Q.  So, is it -- was it possible that an alternative

14      treatment plan would actually cost more than the

15      approval would cost?

16   A.  **Oh, yes.  Many times I remember saying:  No.  Actually,**

17      **that person at this point needs surgery; not a brace or,**

18      **you know, whatever.**

19   Q.  If a utilization manager approves the request, what, if

20      any, other steps are there that are necessary before the

21      request is considered fully approved?

22   A.  **There are a number of steps.  If, for example an**

23      **alternative treatment plan is suggested and the medical**

24      **provider disagrees, they have a several step appeal**

25      **process that goes all the way up to the state medical**



**Jeffrey Bomber, D.O.**
09/04/2025                                      Page 39

1      director on the Michigan Department of Corrections'

2      side.  An inmate can also file a grievance if they don't

3      feel their needs have been met.

4   Q.  So, let's talk about --

5             MR. MARKO:  Hold on.  Let me object.  Move to

6      strike.  We filed a motion with regards to both of

7      these, referencing appeal process or grievances

8      processes.  No fault can be a portion on the

9      Michigan Department of Corrections, ECF 160, and we're

10     awaiting a ruling from Judge Drain.  So, I want a

11     continuing objection as it relates to anything, your

12     attempts to cast blame or fault on some other party

13     other than Corizon Healthcare.

14  BY MR. MASIN:

15  Q.  I want to talk about Corizon's process for a moment.  If

16     a utilization manager approved an alternative treatment

17     plan and the on-site medical provider disagreed with

18     that decision, did the on-site medical provider have any

19     authority to seek an appeal?

20  A.  Absolutely.

21  Q.  How would they go about --

22            MR. MARKO:  Same objection.

23  Q.  And we're talking only about Corizon's practice right

24     now.

25  A.  Yes.  The site medical provider or whoever the



1       submitting provider was could file an appeal.  That

2       would usually start with the regional medical director,

3       and then there was a committee, a regional medical

4       director, state medical director, and also the assistant

5       chief medical officer for the state, and then, of

6       course, the chief medical officer above that was in the

7       Corizon algorithm.

8   Q.  So if an on-site provider disagreed with the utilization

9       manager's decision and they went to the regional

10      director, what options did the regional director have at

11      that point?

12  A.  **Well, we would discuss the case with the provider and**

13      **then refer it on up to the committee.  If I disagreed**

14      **with the medical provider, they still had the option to**

15      **go beyond me.**

16  Q.  So if the on-site medical provider disagreed with the

17      regional director, the on-site provider had the ability

18      to go above you --

19  A.  **Yes.**

20  Q.  -- to Corizon's state medical director; is that right?

21  A.  **Yeah.  To the committee which included the assistant**

22      **chief medical officer for the state, chief medical**

23      **officer for Corizon, and usually a utilization**

24      **management physician and another medical director,**

25      **regional medical director.**



```
 1   Q.   So, the state medical director was part of that

 2        committee; is that right?

 3   A.   At that level, it would be the assistant chief medical

 4        officer.

 5   Q.   And did that committee have the ability to overturn the

 6        utilization manager's decision, essentially?

 7   A.   Yes.

 8   Q.   And if that committee overturned the utilization

 9        manager's decision, what would happen?

10   A.   Then an authorization number would be issued and the

11        consultation would be approved.

12   Q.   In your role as a regional medical director for Corizon,

13        when you were involved, were you ever involved in a

14        situation where an on-site provider essentially appealed

15        the utilization manager's decision?

16   A.   Yes.

17   Q.   And in your consideration of that appeal, did you ever

18        consider cost?

19   A.   No.

20   Q.   Were you ever involved in a situation where an on-site

21        provider went above your head to the committee that you

22        spoke about?

23   A.   I don't recall.  I was pretty accessible.

24   Q.   As the State Medical Director for Corizon, were you ever

25        part of a committee that was considering a utilization
```



1        manager's request?

2    A.  Yes.

3    Q.  At the committee level, did the committee consider cost?

4    A.  No.  Medical necessity.

5    Q.  What is -- can you explain to the jury, what is the

6        difference between the State Medical Director for

7        Corizon and the Chief Medical Officer for the State of

8        Michigan?

9    A.  **So, the Chief Medical Officer for the State of Michigan**

10       **is employed by the State of Michigan, and their job is**

11       **to oversee the contract.  And the Chief Medical Officer**

12       **for the private side, for Corizon Health, is responsible**

13       **for all of the employees, et cetera, on the private**

14       **side, through the stipulations in the contract.**

15   Q.  You testified earlier that you had a contract with the

16       State of Michigan that provided you with the -- you had

17       to report certain information pursuant to that contract,

18       right?

19   A.  **Yes.  I think there were 30 reports in that contract**

20       **that we had to supply.**

21   Q.  As the contractor for the State of Michigan, what, if

22       any, authority did you have to overturn the State of

23       Michigan's desires?

24            MR. MARKO:  Again, objection as it relates to

25       casting blame on the State of Michigan pursuant to



 1       ECF 160.

 2  A.   I had no authority.

 3  Q.   One of the other avenues of appeal that you had talked

 4       about was the option for the prisoner to go directly to

 5       the Michigan Department of Corrections; is that right?

 6            MR. MARKO:  Object.  That --

 7  A.   Yes.

 8            MR. MARKO:  Hold on.  That mischaracterizes

 9       his testimony, and, again, I object based on ECF 160 and

10       the issues we raised therein.

11  Q.   If a prisoner did not agree, if the prisoner himself or

12       herself did not agree with the decision of the

13       utilization manager, do they have an option to bypass

14       Corizon?

15  A.   Yes.  We had nothing to do -- that was an algorithm on

16       their side.  It goes up the chain.

17  Q.   And are you familiar with the MDOC's grievance process?

18  A.   Yes.

19  Q.   Did Corizon have any role in the MDOC's --

20            MR. MARKO:  Objection, and move to strike to

21       any reference to the grievance process which we filed a

22       motion on and is completely inadmissible.

23  Q.   You can answer.

24  A.   We had no authority there.

25  Q.   Did Corizon have any role at all in the grievance



Jeffrey Bomber, D.O.
09/04/2025                                              Page 44

```
 1        process?

 2   A.   Other than we would be informed if an inmate had a

 3        grievance.

 4   Q.   If, as a result of the grievance process, the prisoner's

 5        request is ultimately approved by the MDOC, did Corizon

 6        have the ability to disagree with that?

 7              MR. MARKO:  Same objection.

 8   A.   No.

 9   Q.   So, is it fair to say that the result of the MDOC

10        grievance process was the final say regarding the

11        prisoner's appeal of a utilization manager's decision?

12              MR. MARKO:  Same objection.

13   A.   Yes.

14   Q.   Did the State of Michigan, as part of your contract,

15        require Corizon to follow certain policies and

16        procedures that the State of Michigan imposed?

17   A.   Oh, yes.

18   Q.   And as part of your job as the State Medical Director

19        for Corizon, were you familiar with the MDOC's policies?

20   A.   Yes.

21   Q.   I want to show you what has been pre-marked as

22        Exhibit N3.  You'll see this on your screen.

23              And do you recognize this document?

24   A.   Yes.

25              MR. MASIN:  And for the record, this is the
```



1       Michigan Department of Corrections Policy Directive

2       03.04.100.

3   Q.  Are you familiar with that document?

4   A.  **Well, I've seen this before.  Yes.**

5   Q.  Okay.  I'd like to scroll down to the section entitled

6       "Corrective and Reconstructive Surgery Services".  Do

7       you see that?

8   A.  **Yes.**

9   Q.  And AA -- can you read AA, please?

10  A.  **"Corrective surgery is a surgical procedure to alter or**

11      **adjust body parts or the body structure.  Reconstructive**

12      **surgery is a surgical procedure to reform body structure**

13      **or correct defects.  For purposes of this policy,**

14      **corrective and reconstructive surgery does not include**

15      **procedures which can be done under local anesthesia."**

16  Q.  And did you understand what you just read in AA to be

17      part of Michigan Department of Corrections' policy

18      during the time that Mr. Jackson was incarcerated?

19  A.  **Yes.**

20  Q.  Can you read BB?

21  A.  **"Corrective and reconstructive surgery shall be**

22      **authorized for a prisoner only if determined medically**

23      **necessary and only if approved by the CMO.  It shall not**

24      **be approved if the sole purpose is to improve**

25      **appearance."**



**Jeffrey Bomber, D.O.**
09/04/2025                                    Page 46

1    Q.   The CMO here, do you know what that refers to?

2    A.   **Yes.  The chief medical officer.**

3    Q.   Is that the chief medical officer for the State of

4         Michigan or someone else?

5    A.   **I believe that's the State of Michigan, yeah, because...**

6    Q.   And did you understand that BB was the

7         Michigan Department of Corrections policy during the

8         time that Mr. Jackson was incarcerated?

9    A.   **Yes.**

10   Q.   Can you read CC, please?

11   A.   **"Before referring a prisoner for corrective or**

12        **reconstructive surgery, the medical provider shall**

13        **monitor the prisoner's condition" -- okay -- "for an**

14        **appropriate period of time to establish the actual**

15        **degree of disability or dysfunction.  The feasibility of**

16        **corrective or reconstructive surgery shall be evaluated**

17        **to determine whether to make a referral.  This shall**

18        **include evaluating the expected improvement in the**

19        **prisoner's level of functioning, any risks and their**

20        **probabilities, and available non-surgical treatments."**

21   Q.   Did you understand what you just read as part of CC to

22        be part of the Michigan Department of Corrections

23        policies during the time that Mr. Jackson was

24        incarcerated?

25   A.   **Yes.**



Jeffrey Bomber, D.O.
09/04/2025                                    Page 47

```
 1   Q.   And what, if any, ability did Corizon have to not follow

 2        these policies?

 3   A.   Oh, there would be a long and extensive process to make

 4        any changes in the policy.

 5   Q.   Did Corizon have any role in writing these policies?

 6   A.   We were -- we were part of the medical services advisory

 7        committee which could make recommendations, but the DOC

 8        had to actually finalize any, you know, policies and

 9        procedures.

10   Q.   Do you know whether -- do you, sir, have any personal

11        knowledge as to whether the State of Michigan's Chief

12        Medical Officer ever considered a request for a

13        colostomy reversal surgery for Mr. Jackson?

14   A.   I do not.  I cannot answer that.

15   Q.   Regarding the grievance process that the prisoner had

16        the option of going through through the MDOC, did

17        Corizon employ any of the individuals who were involved

18        in that grievance process?

19              MR. MARKO:  Objection to any reference to the

20        grievance process pursuant to our motion in limine.

21   A.   No.

22   Q.   I'm gonna show you what has been pre-marked as

23        Exhibit Q3.

24              MR. MARKO:  Yeah.  I object to any -- you're

25        now showing a grievance appeal which we object to.
```



1        Anything related to the grievance process is

2        inadmissible.

3   Q.   Sir, have -- this is a little small.  I'm trying to blow

4        it up for you.  There we go.

5             Sir, do you recall ever reviewing this

6        document relating to Mr. Jackson?

7   **A.   Not to Mr. Jackson.  I've seen grievance appeal**

8   **responses before, but I don't recall seeing this one.**

9   Q.   Okay.  At the bottom of the document, you'll see there's

10       a respondent's name, Subrina Aiken, RN, and at the

11       title:  Clinical Administrative Assistant Jackson Health

12       Care Office Administration.  Do you see that?

13  **A.   I do.**

14            MR. MARKO:  Same objection.

15  Q.   Was Subrina Aiken employed by Corizon?

16  **A.   No.**

17  Q.   I want to turn your attention to a section of this

18       document.  Here we go.

19            You'll see in Summary of Step II

20       Investigation, it states, "The Michigan Department of

21       Corrections (MDOC) doesn't reverse colostomies unless it

22       is medically necessary, the surgery you are requesting

23       is non-essential."  Do you see that?

24  **A.   I do.**

25            MR. MARKO:  Same objection.



 1   Q.   During your time as Chief Medical Officer for Corizon,

 2        was it your understanding that the Michigan Department

 3        of Corrections does not reverse colostomies unless it

 4        was medically necessary?

 5             MR. MARKO:  Same objection.

 6   **A.   Yes, I -- I do.**

 7   Q.   Did you consider this statement, "the

 8        Michigan Department of Corrections doesn't reverse

 9        colostomies unless it is medically necessary", to be

10        consistent with Policy 03.04.100 that we just looked at?

11   **A.   Yes.**

12             MR. MARKO:  Same objection.  Move to strike.

13   Q.   In the bottom of the section, it says, "Grievance

14        Denied: Review of the evidence supports that Grievant's

15        medical needs are being addressed.  Mr. Jackson, per

16        documentation, you are doing fine with current

17        condition, the reversal is a major surgery with

18        potential complications up to death and the Department

19        will not ok a dangerous unnecessary elective procedure,

20        a reversal for a functional colostomy is considered

21        non-essential.  POLICY IS NO REVERSALS UNLESS there is a

22        MEDICAL REASON."

23             Do you see that?

24   **A.   I do.**

25             MR. MARKO:  Same objection, and foundation.



```
 1        He has no knowledge regarding Mr. Jackson's care.
 2   Q.   Did you understand policy is no reversals unless there
 3        is a medical reason to be consistent with the
 4        Michigan Department of Corrections' policy during the
 5        time that you were Chief Medical Officer for Corizon?
 6                   MR. MARKO:  Same --
 7   A.   Yes.
 8                   MR. MARKO:  -- objection.
 9   Q.   It also states here, "Grievant can seek outside Services
10        at his Own Expense, by following policy/procedures."  Do
11        you see that?
12   A.   Yes.
13   Q.   Were you --
14                   MR. MARKO:  Same objection.
15   Q.   Were you familiar with the ability of a prisoner to seek
16        medical services at their own expense by following MDOC
17        prisoners?
18                   MR. MARKO:  Same --
19   A.   Yes.
20   Q.   By following --
21                   MR. MARKO:  -- objection.
22   Q.   -- MDOC procedures.  Excuse me.
23   A.   Yes.  I recall that policy.
24   Q.   And if a prisoner wanted to seek outside services at
25        their own expense by following the MDOC procedures,
```



1      would Corizon have any role in objecting to that?

2              MR. MARKO:  Same objection, and also assumes

3      facts not in evidence, and also is an inappropriate

4      question given that Mr. Jackson's -- given our pending

5      motion in limine that was filed.

6   Q.  You can answer the question.

7   A.  Yes.

8   Q.  So, Corizon would have no role in objecting to that?

9   A.  No.  No role.

10  Q.  During your time working at Corizon, did Corizon have a

11      policy to deny medically necessary care to save money?

12  A.  No.

13  Q.  During your time working at Corizon, did Corizon have a

14      policy to deny medically necessary colostomy reversals

15      to save money?

16  A.  No.

17  Q.  In determining medical necessity, did Corizon have a

18      policy to limit the information that providers could

19      consider in making a decision about medical necessity?

20  A.  No.

21  Q.  What information could the utilization manager consider

22      in making a determination about medical necessity?

23  A.  Virtually, you know, any legitimate medical reference.

24      We used UpToDate.  We used InterQual.  Sometimes

25      providers would cite the medical literature if they



Jeffrey Bomber, D.O.
09/04/2025                                    Page 52

1    found something, you know, that was pertinent to that

2    particular case.  We had -- we considered whatever was,

3    you know, efficacious.

4  Q.  You mentioned UpToDate several times during your

5    testimony so far.  What is UpToDate?

6  A.  UpToDate is literally an up-to-date medical database,

7    up-to-date to the day that helps you to determine the

8    diagnoses and treatment plan for virtually any medical

9    condition.

10  Q.  What, if any, role did Corizon have in preparing the

11    information that was available on UpToDate?

12  A.  Corizon provided for that for all providers.  They paid

13    for that, for subscriptions for everyone to be able to

14    access that.

15  Q.  The information that was provided on UpToDate, was that

16    information that was created by Corizon?

17  A.  No.

18  Q.  Who created that information?

19  A.  The contract physicians that work for UpToDate.

20  Q.  And you mentioned a service called InterQual.  What is

21    InterQual?

22  A.  InterQual is another database that's used mostly on, I

23    believe, the hospital side.  It's the same thing, you

24    know, a database, a compendium of all literature, and

25    helps you make, you know, treatment plans and decisions.



**Jeffrey Bomber, D.O.**
09/04/2025                                    Page 53

1    Q.   Did Corizon pay for utilization managers to get access

2         to InterQual?

3    A.   **Yes.**

4    Q.   Did Corizon create any of the information that was

5         available on InterQual?

6    A.   **No.**

7    Q.   So, is it fair to say that the utilization managers had

8         access to whatever independent medical information they

9         thought was appropriate to look at?

10   A.   **Yes.**

11   Q.   Did Corizon train anyone to apply any sort of

12        one-size-fits-all type of definition to fit any sort of

13        medical necessity?

14   A.   **No.**

15   Q.   Did Corizon have a computer program or algorithm that

16        helped providers make medical decisions based on cost?

17   A.   **No.**

18   Q.   What, if any, role did a patient's presentation have

19        during an examination in making medical necessity

20        decisions?

21   A.   **Oh, it's extremely important.  Physical exams are an**

22        **extremely important part of the presentation.**

23   Q.   And did Corizon conduct routine medical examinations of

24        incoming prisoners?

25   A.   **Yes.**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025                                    Page 54

1    Q.   Can you tell the jury, what examinations was Corizon

2         doing of prisoners when they first entered the MDOC?

3    A.   **They required both a review of the patient's medical**

4         **history, their medications they were on, tried to obtain**

5         **all the old records that we could.  They had a full**

6         **physical assessment and also a full mental health**

7         **assessment while they were at the intake center.**

8    Q.   Did the intake physicians or medical providers who did

9         that examination, did they have the ability to call the

10        patient's outside providers if they wanted to?

11   A.   **Yes.  And do so.**

12   Q.   And if they did call the outside provider and the

13        outside provider gave them information, is that

14        information that the utilization manager could have

15        considered?

16   A.   **Yes.  It would go into the patient's record into their**

17        **document section and that could be available for review.**

18   Q.   Did Corizon perform medical evaluations on prisoners

19        when they were transferred between prisons or

20        facilities?

21   A.   **Yes.**

22   Q.   And what was done during those examinations?

23   A.   **For -- if they're transferred to another site, first,**

24        **there's an RN nursing assessment, and then if there's**

25        **any urgent need, the provider would, you know, see that**



1     patient right away; otherwise, they would put them on

2     the schedule for a new assessment.

3  Q.  And would a utilization manager have access to all of

4     the preexisting medical records that were available

5     based upon the care that was provided in the prison?

6  A.  Yes.

7  Q.  Can you explain to the jury, then, how did a Corizon

8     utilization manager determine what was medically

9     necessary during your time at Corizon?

10 A.  Yeah.  They would base it on the recommendations in

11    UpToDate and other databases, if needed, based on the

12    current literature and recommendations.

13 Q.  During your time at Corizon, did you consider UpToDate

14    to be an authoritative source of medical information?

15 A.  Yes.

16 Q.  Did you consider InterQual to be an authoritative source

17    of medical information?

18 A.  Yes.

19 Q.  Have you ever used UpToDate yourself outside of the MDOC

20    when you've practiced medicine?

21 A.  I do.  In fact, I use it every day in my practice as

22    well as all the physicians that work for the hospital

23    system I'm with.  Yes.

24 Q.  And when you were working at Corizon, did you yourself

25    ever consult UpToDate?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

 1    A.    I did.

 2    Q.    Did UpToDate ever provide information about the cost of

 3          a procedure or the cost of a potential alternative

 4          treatment?

 5    A.    **I don't recall cost being -- mostly, it's what is the**

 6          **best test.**

 7    Q.    Did Corizon take any steps during your time there to

 8          ensure that on-site providers who requested medically

 9          necessary care would have that care approved?

10    A.    **Yes.**

11    Q.    What steps were taken?

12    A.    **Well, the -- can you repeat the question?**

13    Q.    Sure.  What -- I think the question was:  Did Corizon

14          take any steps during your time there to ensure that

15          on-site providers who requested medically necessary care

16          would actually have that care approved?

17    A.    **Oh, yes.  We were required to see the patient if they**

18          **had concerns.  They could file a kite and ask to be**

19          **seen, and we had to see them in a certain amount of time**

20          **and make sure their medical needs were being met.**

21    Q.    Did Corizon ever train the medical providers on what to

22          say in a 407 to ensure that a request that was medically

23          necessary would be approved by the utilization manager?

24    A.    **There was training in the process and procedure; not**

25          **necessarily what to say exactly.  We -- I would give**



 1      guidance as a regional director.

 2              They might call and say, "Hey, Doc, I got this

 3      patient.  I'm not sure.  What should I do next?  Should

 4      I have a, you know, MRI, ultrasound, orthopedic

 5      referral?  What do you think I should do next?"

 6              And we'd give them guidance, but it wasn't

 7      any, you know, black-and-white directive.

 8  Q.  And just so the jury is clear:  During your time as

 9      regional manager, would you have had any review of the

10      facilities that Mr. Jackson was in?

11  A.  I've been to all the facilities.  I, you know, worked in

12      13 of them and met every provider that worked for me at

13      the time.  So, yes.

14  Q.  During your time as regional or state medical director,

15      were you ever asked to make a medical decision relating

16      to Mr. Jackson?

17  A.  I don't recall.

18  Q.  To your knowledge, was anyone at Corizon asked to

19      approve a request related to a colostomy reversal

20      surgery for Mr. Jackson after April 19th, 2017?

21  A.  I don't recall.

22  Q.  You were asked some questions in your examination by

23      Mr. Marko about the term "as defined by Corizon Health".

24      Do you recall that?

25  A.  Yes.



1    Q.   Can you explain what that means, as defined by Corizon

2         Health?

3    A.   **We didn't have an up-to-date database that was created**

4         **by Corizon Health.  We did define, you know, resources**

5         **that were available for our providers such as UpToDate,**

6         **InterQual.  We didn't have any requirement.**

7    Q.   You were asked some questions about -- generally

8         questions about attempts to be cost effective.  Did you

9         have an understanding as to why the State of Michigan

10        wanted you to be cost effective?

11   A.   **Well, yes.  We're compelled to answer to the people of**

12        **the State of Michigan and provide cost effective health**

13        **care so that's why they monitored -- monitored the**

14        **costs.  But, I -- you know, from a day-to-day basis in**

15        **terms of medical decision-making, that was not part of**

16        **our algorithm.**

17             MR. MASIN:  Thank you very much for your time,

18        Dr. Bomber.  I don't have any additional questions for

19        you right now.

20   REDIRECT EXAMINATION BY MR. MARKO:

21   Q.   Dr. Bomber, you talked about this Corizon appeal process

22        on examination by the attorney.  Do you remember that?

23   A.   **It's a joint process, Corizon and MDOC.**

24   Q.   You agree that Mr. Kohchise Jackson does not initiate

25        the Corizon appeal process that you described, correct?



Jeffrey Bomber, D.O.
09/04/2025                                    Page 59

1    A.   No.  The provider would initiate it.

2    Q.   Yeah.  And when you use the words "the provider," you're

3         talking about a Corizon provider, true?

4    A.   True.

5    Q.   So when we use these words about this appeal process,

6         Corizon would have to start that appeal process that you

7         described through their own employee to begin the

8         process, true?

9    A.   Yes.

10   Q.   And if we look at the 407 in this case which is the

11        request that was sent to Dr. Papendick, you see, it

12        looks like the site medical provider was Corizon

13        doctor Mahir H. Alsalman, M.D.  Do you see that?

14   A.   Yes.

15   Q.   And so he's a Corizon employee, correct?

16   A.   Correct.

17   Q.   So, why didn't he start the appeal process?

18             MR. MASIN:  Objection.  Lack of personal

19        knowledge.

20   Q.   Go ahead.

21             MR. MASIN:  He can't --

22   A.   My personal knowledge --

23             MR. MASIN:  -- testify as to what another

24        person --

25   A.   I have no idea.



```
 1                    (Simultaneous discussion interrupted by the
 2                    reporter.)
 3                    MR. MARKO:  Yeah.  I need a --
 4                    MR. MASIN:  He cannot testify as to what
 5          another person was thinking.
 6     Q.   Go ahead.
 7     A.   I have no knowledge.  I can't answer that.
 8     Q.   Well, certainly, you're not going to fault Mr. Jackson
 9          for not having one of Corizon's own doctors initiate an
10          appeal process, correct?
11     A.   I'm not gonna fault Mr. Jackson, no.
12     Q.   And we had down here, Dr. Papendick, who's the reviewer.
13          Do you see that?
14     A.   Yes.
15     Q.   Okay.  Now, did Dr. Papendick, do you know what he did
16          or didn't do when he reviewed this particular request to
17          get Mr. Jackson surgery?
18     A.   I do not know specifically what he did, no.
19     Q.   Are -- would it -- you talked about how it's important
20          to have a physical exam.  Your words were the physical
21          exam are very important.  Would it surprise you that
22          Dr. Papendick never met Mr. Jackson and never examined
23          him?
24     A.   No, it wouldn't surprise me at all.  That wasn't his
25          role.
```



Jeffrey Bomber, D.O.
09/04/2025                                    Page 61

1    Q.   Okay.  And so it doesn't surprise you that there was no

2         physical exam done by the utilization management

3         coordinator in this case?

4    A.   Correct.

5    Q.   And you understand -- we talked about cost of surgery.

6         In this particular case, it was a request for surgery,

7         you understand that, a colostomy reversal surgery?

8    A.   Yes.

9    Q.   Which you understand would cost money to Corizon, true?

10                  MR. MASIN:  Objection.  Lack of foundation.

11                  MR. MARKO:  He has absolute -- he's -- you

12        went over his tenure as a doctor.  I think we all know

13        that it costs money.

14   BY MR. MARKO:

15   Q.   But go ahead, Doctor.

16   A.   A shared expense, MDOC and Corizon.

17   Q.   Yep.  And so Corizon, you understand that by doing

18        nothing, that costs nothing, right?

19   A.   As you say.

20   Q.   And do you know what was done in this case?

21   A.   It looks like what you showed me there was a -- it was a

22        deferred alternative treatment plan.

23   Q.   Of nothing?  Do you understand that there was no

24        recommendations made by Dr. Papendick for any

25        procedures?  Do you understand that?



 1   A.   Yes.

 2              MR. MARKO:  And you also were asked about --

 3        and I'm gonna ask this question pending the ruling on my

 4        motions in limine, but I feel compelled to address some

 5        of the areas that I believe were improperly gone into.

 6        So, we'll cut this question and answer depending on the

 7        judge's rulings on the other ones.

 8   Q.   But you understand that -- if we look at this, that

 9        Mr. Jackson did not have third-party insurance at the

10        time that this request was done to get him surgery?

11              MR. MASIN:  Objection.  Lack of personal

12        knowledge.

13   Q.   This document right here.  Do you see that?

14   A.   Okay.  I -- yeah.  I had no personal knowledge, but...

15   Q.   Well, can you read the document?  Do you see where it

16        says...

17   A.   It looks like third-party insurance, VA, workmen's comp,

18        federal, interstate compact, et cetera.

19   Q.   Right.  There was no private insurance, at least

20        according to this document, available to Mr. Jackson to

21        get the surgery that he needed while he was in prison?

22              MR. MASIN:  Objection.  Misstates the

23        document.

24   Q.   Correct?  Are you aware of any?

25   A.   No.



**Jeffrey Bomber, D.O.**
09/04/2025                                    Page 63

1   Q.   That's not unusual, is it, for a prisoner who's

2        incarcerated and locked away from their friends and

3        family and the outside to not have access to private

4        insurance?

5   **A.   I can't give you percentages, but a lot of them do not.**

6   Q.   And you understand that Mr. Jackson was not free to --

7        once his utilization management review for this surgery

8        was not approved by Dr. Papendick, he wasn't free to go

9        out and get his own doctor on the outside world without

10       assistance from the Michigan Department of Corrections

11       and Corizon, correct?

12                  MR. MASIN:  Objection --

13  **A.   I have no personal knowledge --**

14                  MR. MASIN:  Objection.  Misstates his

15       testimony.

16  Q.   Go ahead.

17                  MR. MASIN:  Foundation.

18  **A.   I have no personal knowledge of his resources.**

19  Q.   Well, you understand that a prisoner can't just leave

20       their cell and go see a doctor on the outside, right?

21  **A.   Right.**

22  Q.   And Mr. Kohchise Jackson, do you have any reason to

23       believe he would be any different than any of the other

24       prisoners who are incarcerated and would need permission

25       to go and get outside medical care?



1    A.    They can request to go outside and have medical care.

2          Yes.

3    Q.    Oh, really?  And that was done in this case by the

4          Corizon doctor, Dr. -- that I mentioned earlier,

5          Dr. Mahir Alsalman who worked for Corizon, true?

6    A.    Yeah.  A policy was shown earlier that they do have the

7          right to seek outside independent consultation.

8    Q.    Are you aware that within a month of being released from

9          the Department of Corrections, that Mr. Jackson was --

10         had already gone to a treating doctor and then scheduled

11         and underwent a surgery for the colostomy reversal?

12   A.    I am not aware.

13   Q.    Based on your medical experience, that's a pretty quick

14         turnaround, getting a -- going to see a doctor for a

15         consultation, getting a surgery scheduled, and then

16         getting it done all within about a month?

17               MR. MASIN:  Objection to foundation,

18         relevance.

19   A.    It just varies so much month-to-month and

20         location-to-location.  Sometimes people wait months;

21         sometimes people just wait a few weeks.  It depends on

22         their backlog.

23   Q.    And you understand that these decisions that are shown

24         here on this chart that were made by Dr. Papendick, this

25         "yes or no" on the Corizon doctor's request to get



 1      Mr. Jackson's surgery, that they can have real world

 2      ramifications for the prisoner, true?

 3  A.  I don't understand the question.

 4  Q.  Well, they can either give a pass to get medical care or

 5      not, true?

 6  A.  They can either approve or give an alternative treatment

 7      plan.  Yes.

 8  Q.  Which -- and that you understand that those have real

 9      world consequences for these individuals who are asking

10      for and need the surgery?

11          MR. MASIN:  Objection.  Lack of foundation.

12  A.  I would say they have medical consequence.  I'm not sure

13      what real world consequences mean.

14  Q.  Are you aware of Corizon doing anything after

15      Dr. Papendick did not improve Mr. Jackson's colostomy

16      reversal to look into this matter further or further

17      investigate it?

18  A.  I'm not aware of any other investigation.  An inmate

19      certainly would have had his regular appointments, his

20      wellness visits and so forth.

21  Q.  Are you aware of Corizon doing any check-in or

22      Dr. Papendick doing any check-in months or even a year

23      later following his refusal to approve the colostomy

24      reversal surgery?

25  A.  His provider would be following the patient.  Yes.



Jeffrey Bomber, D.O.
09/04/2025                                    Page 66

1   Q.   The Corizon provider?

2   A.   Yeah.

3   Q.   And this Corizon provider gets the document from

4        Dr. Papendick.  So just so we understand, the Corizon

5        provider wrote this request to Dr. Papendick for the

6        surgery, correct?

7   A.   Yes.

8   Q.   And then it came back to him, and he was told that that

9        surgery was not being approved at that time, correct?

10  A.   I think it said medical necessity was not demonstrated,

11       something like that.

12  Q.   Right.  Which was not an approval; you agree with that?

13  A.   Yes.

14  Q.   Right?  So the doctor who requested, he's being told by

15       a superior at his own company, Corizon, that it was not

16       medically necessary at that time, true?

17  A.   Not necessarily a superior.  He's not supervising that

18       provider.  He's making a decision of medical necessity

19       or not.  But, no.  Obviously, it wasn't approved.

20  Q.   Well, what was -- the title of Dr. Keith Papendick was

21       UM Outpatient Medical Director, correct?

22  A.   Right.  So, he's in charge of decision-making.

23  Q.   And decision-making, right?  And what was the title of

24       the Corizon doctor who asked Dr. Papendick to approve

25       this surgery for Mr. Jackson?



Jeffrey Bomber, D.O.
09/04/2025                                    Page 67

1              MR. MASIN:  Objection.  It misstates the

2       document.

3   Q.   Go ahead.

4   A.   **I don't remember.  I don't remember.**

5   Q.   Site medical provider, right?

6   A.   **Okay.  M-hm.**

7   Q.   Yes?

8   A.   **Yeah.**

9   Q.   You agree that the medical director is higher up, if we

10       go back to that organizational chart, than a site

11       medical provider?

12  A.   **Only in terms of making decisions based on consultation**

13       **requests.**

14  Q.   And making decisions based on a request, in this case,

15       for surgery, right?

16  A.   **Right.**

17  Q.   Because this -- because the guy who wrote --

18       Mahir Alsalman, Dr. Alsalman didn't have the authority

19       on his own to send Mr. Jackson out to get the surgery

20       that he was requesting, correct?

21  A.   **Yes.  Correct.  M-hm.**

22  Q.   So he had to ask for permission, ask for the key to go

23       out through Dr. Papendick, correct?

24  A.   **Ask for approval.  Yes.**

25  Q.   And that approval was not given, correct?



Jeffrey Bomber, D.O.
09/04/2025                                    Page 68

1   A.   It looked like there was an alternative treatment plan.

2   Q.   And are you aware of any follow-up by Dr. Papendick or

3        anyone else at Corizon to ascertain the continuing need

4        for this surgery?

5   A.   Yes.  Again, the on-site provider is compelled to follow

6        that patient over time.  That could be the alternative

7        treatment plan, to follow the patient, close

8        observation.

9   Q.   And what did Dr. Papendick do to follow-up and

10       reevaluate his request for surgery?

11  A.   He's not --

12            MR. MASIN:  Objection.  Misstates his

13       testimony.

14  A.   I don't -- I don't know...

15  Q.   Go ahead.

16  A.   I don't know if he did anything.  He's not required to.

17  Q.   He's not required to.  Right.

18            So, let me ask you about medical necessity

19       because you were -- you used this word, medical

20       necessity.  You were shown a policy from the department

21       of corrections.  You agree with me, sir, that medical

22       necessity is not defined by the Michigan Department of

23       Corrections, true?

24  A.   Well, we're compelled to follow their policies.

25  Q.   Let me show you a -- your deposition.  Do you remember


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1       when you were deposed in this case?

2   A.  Which case?

3   Q.  This case.  Kohchise Jackson versus Corizon Health, Dr.

4       Papendick, and now it's new form, this new CHS that it

5       morphed into.

6   A.  Yes.  Yes, I remember.

7   Q.  Okay.  Let's see what you said when I asked you that

8       question there.

9                MR. MASIN:  Objection.  This is an improper

10      attempt to impeach the witness.

11               MR. MARKO:  It's not an improper attempt to

12      impeach the witness.  And, additionally, he was a

13      corporate representative at the time of his

14      deposition --

15               MR. MASIN:  The way in which you're -- the way

16      in which you're going about --

17               MR. MARKO:  Excuse me --

18               MR. MASIN:  -- it is not proper.

19               MR. MARKO:  You're interrupting me, and it's

20      inappropriate.  As I was saying, the -- I'm impeaching

21      the witness, and he is a party opponent at the time of

22      his deposition at the time he gave testimony and at the

23      time that decisions were made in this case so I'm

24      allowed to designate his testimony.  I don't need to use

25      it to impeach him.



Jeffrey Bomber, D.O.
09/04/2025                                          Page 70

1              (Video playing and transcribed as follows:)

2              "QUESTION:  Does the MDOC have a definition of

3       medical necessity?

4              "ANSWER:  I don't think so, per se.

5              "QUESTION:  Does the MDOC  --

6              MR. MASIN:  It's not inconsistent.

7              -- "have a definition of medical necessity?"

8              "ANSWER:  I don't think so, per se."

9              (Video stopped.)

10             MR. MASIN:  Objection.  It's not inconsistent.

11             MR. MARKO:  Again -- well, we'll let the judge

12      decide that.

13  BY MR. MARKO:

14  Q.  So, again, the MDOC has no definition of medically

15      necessary, correct?

16             MR. MASIN:  Objection.  Asked and answered.

17  **A.  I answered that from the general perspective of us using**

18  **current literature for medical necessity.  Obviously,**

19  **they have their own policies and procedures as well.**

20  Q.  Sir, that wasn't my question.

21             MR. MARKO:  I move to strike your answer.

22  Q.  My question is very simple.  Can you tell me a document,

23      a procedure, a definition contained anywhere that you're

24      aware of that defines medical necessity that is given to

25      Corizon by the Michigan Department of Corrections?



Jeffrey Bomber, D.O.
09/04/2025                                          Page 71

1   A.   Yeah.   You were showing policies earlier that they have.

2   Q.   Okay.   Sir, show me where it says where the department

3        of corrections tells Corizon the definition of medical

4        necessity?

5   A.   I believe they showed a document earlier that talked

6        about cosmetic procedures.

7   Q.   Cosmetic procedures?   What -- this isn't a cosmetic

8        procedure.   Do you know the definition of cosmetic

9        procedure?

10             MR. MASIN:   Objection.   Relevance.

11  A.   My answer is that we use -- again, for determining

12       medical necessity, utilization management uses UpToDate,

13       InterQual, and other resources as available.

14  Q.   Well, that wasn't my question.   Let's start --

15  A.   That was my answer.

16  Q.   Well, you're not answering my question so let me ask it

17       again.   And I'll continue to ask it as long as I have

18       to, and I apologize to the jury.

19             First of all, you use the words cosmetic

20       procedure.   This was not a cosmetic procedure that

21       Mr. Jackson was requesting.   This wasn't like a breast

22       augmentation or a nose job or anything like that.   You

23       understand that?

24  A.   I don't know.   I'd have to go back -- what is the

25       question?



Jeffrey Bomber, D.O.
09/04/2025                                    Page 72

1    Q.   Getting a colostomy bag reversed where somebody is

2         excreting feces out of a hole in their abdomen is not a

3         cosmetic procedure; you'd agree with that?

4    A.   **Yes.**

5    Q.   Okay.  So, why did you use the word cosmetic procedure

6         when referring to Mr. Jackson's request to get this

7         colostomy bag taken off?

8    A.   **Because you asked me if there was any document stating**

9         **medical necessity, and I thought that that one contained**

10        **it.  But I don't know if they have other policies and**

11        **procedures that show it.**

12                 **On a day-to-day basis, we used UpToDate.**

13   Q.   Okay.  Again, going back to this medical necessity, you

14        understand that Corizon's saying and they -- and

15        Dr. Papendick wrote in that request that Mr. Jackson's

16        colostomy reversal was not medically necessary?  You

17        understand that?

18   A.   **Yes.**

19   Q.   So it's important for us to look at what the meaning of

20        medical necessity is; you understand that?

21   A.   **Yes.**

22   Q.   Back to my original question:  The MDOC did not define

23        for Corizon what is medically necessary, correct?

24                 MR. MASIN:  Objection.  Asked and answered.

25   A.   **So, no.  Not on a day-to-day basis, no.**



```
 1   Q.   So Corizon came up with its definition of what's

 2        medically necessary through the ways that you described

 3        through examination by brother counsel, correct?

 4             MR. MASIN:  Objection.  Misstates his

 5        testimony.  He did not say that Corizon --

 6             MR. MARKO:  No speaking objections, please.

 7   A.   In the initial procedure process, yes, it goes to

 8        Corizon first.  Yes.

 9   Q.   And Corizon applies its definition of medical necessity,

10        correct?

11   A.   Yes.  In the first part of the process, yes.

12   Q.   Okay.  That's not the department of corrections that

13        tells Corizon what's medically necessary or not,

14        correct?

15   A.   Yes.  They do have policies and procedures that direct

16        us in certain ways, but, again, that would usually not

17        come to the first pass-through on the utilization

18        management side.  It starts with our side and our

19        providers.  Yes.

20   Q.   And you had talked about, you know, other health care

21        providers, you were asked that question.  You understand

22        that at the time of this care of the time that

23        Mr. Jackson was at the department of corrections, that

24        Corizon was the sole -- for this particular type of

25        care, Corizon was the sole health care provider pursuant
```



```
 1        to contract with the Michigan Department of Corrections,

 2        correct?

 3   A.   Yes.

 4   Q.   And they provided the doctors on-site, correct?

 5   A.   Correct.

 6   Q.   And they provided this utilization management review

 7        process for requests to go seek outside surgeries,

 8        correct?

 9   A.   Correct.

10             MR. MARKO:  Thank you, sir.  I don't have any

11        other questions.

12             MR. MASIN:  Just a few, quick follow-ups for

13        you, Dr. Bomber.

14   RECROSS-EXAMINATION BY MR. MASIN:

15   Q.   I wanted to show you Exhibit N3 which we looked at

16        earlier.  That's the policy that I believe you were

17        referring to, and you'll see that the policy is

18        entitled, "Corrective and Reconstructive Surgery

19        Services".  Do you see the word cosmetic anywhere in

20        here?

21   A.   No.

22   Q.   You had testified that Dr. Papendick did not have the

23        responsibility to conduct follow-up.  Why was that?

24   A.   He would be part of, you know, following up, I guess, in

25        terms of the overall report to the DOC in terms of
```



Jeffrey Bomber, D.O.
09/04/2025                                    Page 75

1      utilization management numbers and such, but he was not

2      required to go back and look at individual cases.  The

3      responsibility at that point would go back to the

4      medical provider to follow.

5   Q.  So if Dr. Papendick did not have a 407 in front of him,

6      it just wasn't his job to actually keep monitoring all

7      of the patients that he was making decisions for; that

8      was the -- was that the on-site provider's job, right?

9           MR. MARKO:  Objection.

10  A.  Yes.  Correct.

11          MR. MARKO:  Leading -- hold on.  Objection.

12      Form, leading.

13  Q.  Did Dr. Alsalman have the ability to go around

14      Dr. Papendick if he felt that Dr. Papendick had made an

15      incorrect decision?

16  A.  He had the right to appeal.  Yes.

17  Q.  Are you aware of whether Dr. Alsalman ever did that in

18      this case?

19  A.  I am not.

20  Q.  Counsel asked you some questions about the fact that

21      Dr. Papendick did not find medical necessity, and as a

22      result, did not approve the colostomy surgery request.

23      Are you aware of what the alternative treatment plan was

24      in this case?

25  A.  I'd have to look and see exactly what Dr. Papendick



Jeffrey Bomber, D.O.
09/04/2025                                    Page 76

1    wrote but generally it would be to follow on-site, make

2    sure the patient had his regular visits and follow-up.

3    Q.   Are you familiar with what is required for continued

4         colostomy care?

5    A.   Yeah.  In general terms, yeah.  In providing supplies

6         and so forth and monitoring for any breakdown, recurrent

7         infections, dysfunction.

8    Q.   So to the extent that Mr. Jackson needed continuing care

9         related to his colostomy including future health care

10        visits and colostomy supplies, who paid for that?

11   A.   It would be jointly through the DOC and Corizon.

12   Q.   So, Corizon had costs associated with the alternative

13        treatment plan; is that fair?

14   A.   Yes.

15             MR. MASIN:  I don't have any further questions

16        at this time.  Thank you very much.

17             MR. MARKO:  Okay.  We're done.  Thank you,

18        everybody.

19             MR. MASIN:  Thank you, Dr. Bomber.

20             MR. McLAUGHLIN:  All right.  Thank you,

21        Doctor.  You can sign off.

22             THE WITNESS:  Take care.

23             THE VIDEOGRAPHER:  This concludes the

24        deposition, and we're going off the record at 11:31 a.m.

25             (Deposition concluded at 11:31 a.m.)


HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025                                        Page 77

1    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN     )

4                          ) SS

5    COUNTY OF OAKLAND     )

6         I, Jennifer Wilke, Certified Shorthand Reporter, a

7    Notary Public in and for the above county and state, do

8    hereby certify that the above deposition was taken

9    before me at the time and place hereinbefore set forth;

10   that the witness, JEFFREY BOMBER, D.O., was by me first

11   duly sworn to testify to the truth, and nothing but the

12   truth; that the foregoing questions asked and answers

13   made by the witness were duly recorded by me

14   stenographically and reduced to computer transcription;

15   that this is a true, full and correct transcript of my

16   stenographic notes so taken; and that I am not related

17   to, nor of counsel to either party nor interested in the

18   event of this cause.

19

20

21   _____

22   Jennifer Wilke, CSR-8575

23   Notary Public,

24   Oakland County, Michigan

25   My Commission expires:  October 4, 2030



**$**

**$20** 25:13

**0**

**03.04.100** 45:2 49:10

**1**

**1** 7:6,7,23 8:5,12 31:1
**10:00** 5:3,8
**11** 27:21
**11:31** 76:24,25
**12** 34:2
**13** 57:12
**160** 39:9 43:1,9
**1993** 33:19
**19th** 57:20

**2**

**2009** 10:20 34:15
**2013** 20:12
**2015-2018** 35:9
**2016** 25:14
**2017** 21:6 57:20
**2018** 35:10
**2021** 10:17
**2025** 5:2,7

**3**

**30** 42:19

**4**

**4** 5:2
**403** 29:11

**407** 11:2 25:18 36:2,4,6,10,14
  37:4 38:4 56:22 59:10 75:5
**407s** 37:22
**4th** 5:7

**6**

**60** 27:25 28:24
**62** 29:4

**7**

**715-million-dollars-plus** 31:7

**8**

**8** 24:14 27:16
**88** 20:14,21
**89** 20:4

**A**

**a.m.** 5:3,8 76:24,25
**AA** 45:9,16
**abbreviated** 22:11
**abdomen** 72:2
**ability** 40:17 41:5 44:6 47:1
  50:15 54:9 75:13
**absolute** 61:11
**absolutely** 25:11 39:20
**access** 52:14 53:1,8 55:3 63:3
**accessible** 41:23
**account** 18:1 28:4
**actual** 31:1 46:14
**Adam** 5:17 32:6
**additional** 25:25 58:18
**additionally** 69:12
**address** 62:4
**addressed** 49:15

**adjust** 45:11
**Administration** 48:12
**Administrative** 48:11
**admissible** 32:22
**admitted** 7:22,24 8:3,6,13
  20:14,15,18
**advisory** 47:6
**affirm** 5:24 23:18
**agree** 26:6,11,13,18 28:5
  29:22 31:12,16 43:11,12
  58:24 66:12 67:9 68:21 72:3
**ahead** 16:1 23:7 24:20 27:5
  59:20 60:6 61:15 63:16 67:3
  68:15
**Aiken** 48:10,15
**algorithm** 40:7 43:15 53:15
  58:16
**allowed** 18:18 69:24
**Alsalman** 59:13 64:5 67:18
  75:13,17
**alter** 45:10
**alternative** 16:13 17:8,11 19:6
  35:25 36:16,22 38:1,6,13,23
  39:16 56:3 61:22 65:6 68:1,6
  75:23 76:12
**amazing** 28:25
**American** 34:18
**amount** 29:25 56:19
**anesthesia** 45:15
**answering** 71:16
**apologize** 71:18
**appeal** 38:24 39:7,19 40:1
  41:17 43:3 44:11 47:25 48:7
  58:21,25 59:5,6,17 60:10
  75:16
**appealed** 41:14
**appearance** 45:25
**appearances** 5:10

**applies** 13:10,23 73:9

**apply** 53:11

**applying** 15:13 20:23

**appointments** 65:19

**appropriateness** 14:17,23

**approval** 15:16 30:22 38:5,15
66:12 67:24,25

**approve** 36:15 57:19 65:6,23
66:24 75:22

**approved** 15:7 22:3 23:21
30:7 38:21 39:16 41:11 44:5
45:23,24 56:9,16,23 63:8
66:9,19

**approves** 22:25 38:19

**approving** 19:5,22

**April** 57:20

**area** 27:18

**areas** 62:5

**ascertain** 68:3

**assessment** 54:6,7,24 55:2

**assigned** 13:8

**assistance** 6:25 63:10

**assistant** 40:4,21 41:3 48:11

**assumes** 51:2

**attempt** 69:10,11

**attempts** 39:12 58:8

**attend** 33:10

**attention** 48:17

**attorney** 6:9,17,20 58:22

**attorney's** 6:21

**attorneys** 5:9

**augmentation** 71:22

**author** 24:5 28:5

**authoritative** 55:14,16

**authority** 39:19 42:22 43:2,24
67:18

**authorization** 41:10

**authorized** 45:22

**automatic** 22:20

**automatically** 22:3 23:20

**avenues** 43:3

**awaiting** 39:10

**aware** 22:5 31:23 32:2 62:24
64:8,12 65:14,18,21 68:2
70:24 75:17,23

---

**B**

**bachelor's** 33:15

**back** 15:9,18 34:6 35:11 66:8
67:10 71:24 72:13,22 75:2,3

**backlog** 64:22

**bag** 72:1,7

**bankrupt** 6:24

**base** 25:23 55:10

**based** 26:1 37:6,18,19 38:9
43:9 53:16 55:5,11 64:13
67:12,14

**basically** 12:19

**basis** 19:5 37:11 38:12 58:14
72:12,25

**BB** 45:20 46:6

**begin** 59:7

**behalf** 5:13,17

**benefits** 22:15

**bid** 29:5

**big** 31:10

**bill** 30:15

**bit** 10:15

**black-and-white** 57:7

**blame** 39:12 42:25

**blow** 48:3

**board** 21:17,18 34:17,18,19

**body** 45:11,12

**Bomber** 5:6,21,23 6:2,3,6 9:6
32:5 58:18,21 74:13 76:19

**bookmarked** 25:8

**boss** 35:8 37:5

**bottom** 48:9 49:13

**brace** 38:17

**brag** 29:6

**breakdown** 76:6

**breast** 71:21

**broad** 24:3 27:13

**brother** 73:3

**bypass** 43:13

---

**C**

**call** 54:9,12 57:2

**called** 10:3 11:2 21:13 52:20

**Calls** 27:3

**Calvin** 8:23

**card** 21:20

**care** 11:8,15 16:15 19:10,24
24:3 25:17,20 26:22 28:12,13,
15,18,21 29:2 31:14 34:7
35:11,19 37:18 48:12 50:1
51:11 55:5 56:9,15,16 58:13
63:25 64:1 65:4 73:20,22,25
76:4,8,9,22

**case** 6:9,11,16 11:16 14:19
15:12 17:6,19 18:16,17 20:5
26:6 29:24 30:8,19 35:23
40:12 52:2 59:10 61:3,6,20
64:3 67:14 69:1,2,3,23 75:18,
24

**cases** 75:2

**cast** 39:12

**casting** 42:25

**cell** 63:20

**center** 54:7

**Central** 33:13

**CEO** 9:1

**certification** 34:19

**certifications** 34:17

**cetera** 42:13 62:18

**chain** 43:16

**character** 32:21,23

**charge** 35:2 66:22

**chart** 7:10 9:5,10 15:13 25:1, 13 28:6 64:24 67:10

**cheaper** 37:9

**check** 8:4

**check-in** 65:21,22

**chief** 7:13 40:5,6,22 41:3 42:7, 9,11 46:2,3 47:11 49:1 50:5

**choose** 37:8

**CHS** 69:4

**CHX** 5:17

**cite** 51:25

**clarifying** 7:16

**clear** 57:8

**client** 10:25

**clinic** 35:12,19

**Clinical** 48:11

**close** 68:7

**CMO** 45:23 46:1

**colleague** 5:22 32:10

**college** 33:12,13

**colostomies** 11:20 48:21 49:3,9

**colostomy** 11:6,22 12:25 15:15,22 22:23 23:21 29:21 30:3 31:18,20 47:13 49:20 51:14 57:19 61:7 64:11 65:15, 23 72:1,7,16 75:22 76:4,9,10

**commentary** 16:22

**committee** 35:16 40:3,13,21 41:2,5,8,21,25 42:3 47:7

**common** 10:9

**community** 31:14

**comp** 62:17

**compact** 62:18

**companies** 25:17

**company** 19:24 24:3 26:23 66:15

**compelled** 58:11 62:4 68:5,24

**compendium** 52:24

**compensated** 35:22

**compensation** 22:8,15,19,24, 25

**complete** 36:22

**completed** 33:22

**completely** 43:22

**complications** 49:18

**component** 17:17,20,25 18:23 19:8

**computer** 53:15

**concerns** 56:18

**concluded** 76:25

**concludes** 76:23

**condition** 10:12 46:13 49:17 52:9

**conduct** 53:23 74:23

**conjunction** 34:3

**Connor** 5:19

**consequence** 65:12

**consequences** 65:9,13

**consideration** 17:21 18:1,24 19:9 37:3 41:17

**considerations** 19:18

**considered** 19:6 38:21 47:12 49:20 52:2 54:15

**considers** 19:23,25

**consistent** 49:10 50:3

**consult** 55:25

**consultation** 36:8 41:11 64:7, 15 67:12

**consulting** 35:19

**contained** 28:6 70:23 72:9

**continue** 71:17

**continued** 76:3

**continuing** 33:7 39:11 68:3 76:8

**contract** 7:7 8:5,14 10:16 14:9 19:19 24:21 30:25 31:1,7,10 35:20 42:11,14,15,17,19 44:14 52:19 74:1

**contractor** 42:21

**coordinator** 13:7 61:3

**Corizon** 6:14,17,20,24 7:2,3,9, 14,15,17 8:5,15,19,23 9:20 10:16,19 11:4 12:12,24 13:5, 11,13,14,15,24 14:8,12,22 16:14,17 17:18 19:3,17,23,25 20:22 21:1,6,23 22:1,14,18 23:1,19,21 24:1,22 25:12,20, 24 26:7,8,12,13,18,20 27:1, 17,25 28:3,17,24 29:5 30:5,8 34:23,24,25 36:10 37:21 39:13 40:7,23 41:12,24 42:7, 12 43:14,19,25 44:5,15,19 47:1,5,17 48:15 49:1 50:5 51:1,8,10,13,17 52:10,12,16 53:1,4,11,15,23 54:1,18 55:7, 9,13,24 56:7,13,21 57:18,23 58:1,4,21,23,25 59:3,6,12,15 61:9,16,17 63:11 64:4,5,25 65:14,21 66:1,3,4,15,24 68:3 69:3 70:25 71:3 72:23 73:1,5, 8,9,13,24,25 76:11,12

**Corizon's** 12:2,15 17:10 20:4 23:17 39:15,23 40:20 60:9 72:14

**corporate** 37:19 69:13

**correct** 6:12,14,15,19 10:6



**Jeffrey Bomber, D.O.**
**09/04/2025**

4

11:9,10,12,17 12:21,22 13:1,2
14:17,18,19 15:3,7,8,10,16,
19,20,22,24 16:2,11,12 18:1
26:8 27:2 29:17 31:14,18,21
32:11,12 36:12 45:13 58:25
59:15,16 60:10 61:4 62:24
63:11 66:6,9,21 67:20,21,23,
25 70:15 72:23 73:3,10,14
74:2,4,5,8,9 75:10

**correctional** 9:19 31:11 34:12,
13,16 35:1,3 37:14

**corrections** 10:10 28:6 31:2
35:21 39:9 43:5 45:1 46:7,22
48:21 49:3,8 63:10 64:9
68:21,23 70:25 71:3 73:12,23
74:1

**Corrections'** 39:1 45:17 50:4

**corrective** 45:6,10,14,21
46:11,16 74:18

**cosmetic** 71:6,7,8,19,20 72:3,
5 74:19

**cost** 17:21 18:1,24 19:3,6,9,
17,18,20 24:9,11 27:18,25
29:7 37:2,7,23,24 38:1,5,6,7,
10,14,15 41:18 42:3 53:16
56:2,3,5 58:8,10,12 61:5,9

**costs** 19:23,25 20:2,23 21:3
25:12,13 26:22 28:4 58:14
61:13,18 76:12

**counsel** 73:3 75:20

**court** 5:10,23 16:4

**covered** 22:15

**create** 53:4

**created** 52:16,18 58:3

**criteria** 13:10,13,14,16,24
14:10 15:14 20:24

**Cross** 5:15

**CROSS-EXAMINATION** 32:7

**crying** 37:13

**cryptic** 27:12

**current** 49:16 55:12 70:18

**cut** 25:15 28:22 62:6

**cute** 14:6

**D**

**D.O.** 6:3 33:16,18,20

**dad** 37:13

**dangerous** 49:19

**data** 21:2

**database** 52:6,22,24 58:3

**databases** 13:16 55:11

**date** 5:7

**dated** 20:12

**day** 52:7 55:21

**day-to-day** 19:5 25:18 37:11
38:12 58:14 72:12,25

**days** 35:18

**death** 49:18

**decide** 70:12

**decision** 15:9 39:18 40:9 41:6,
9,15 43:12 44:11 51:19 57:15
66:18 75:15

**decision-maker** 14:15

**decision-making** 27:13 37:11
38:8 58:15 66:22,23

**decisions** 11:15 25:18 52:25
53:16,20 64:23 67:12,14
69:23 75:7

**decline** 37:9

**decreased** 30:1

**defects** 45:13

**defer** 17:12

**deferred** 17:14 61:22

**define** 58:4 72:22

**defined** 13:11,13,16,24 14:10
57:23 58:1 68:22

**defines** 70:24

**definition** 53:12 70:2,7,14,23
71:3,8 73:1,9

**degree** 33:16,18,20 46:15

**demonstrated** 66:10

**denied** 17:2 26:25 27:1 37:18
49:14

**deny** 16:18 17:12 25:20,22
26:1 51:11,14

**denying** 17:14 27:7

**department** 28:6 31:2 35:20
39:1,9 43:5 45:1,17 46:7,22
48:20 49:2,8,18 50:4 63:10
64:9 68:20,22 70:25 71:2
73:12,23 74:1

**depending** 62:6

**depends** 64:21

**deposed** 6:11,13,16 69:1

**deposition** 5:1,5 17:23 18:3,
10 20:15 68:25 69:14,22
76:24,25

**Des** 33:16

**designate** 69:24

**desires** 42:23

**detailed** 22:21

**details** 23:14,24

**determination** 51:22

**determine** 46:17 52:7 55:8

**determined** 45:22

**determining** 51:17 71:11

**diagnoses** 52:8

**difference** 42:6

**direct** 6:10 73:15

**directed** 37:8

**directive** 45:1 57:7

**directly** 18:9 43:4

**director** 7:1,3 9:6,15 10:2,22
12:5,8,12,16 14:16 23:10
35:2,6,7,9,12 39:1 40:2,4,10,

17,20,24,25 41:1,12,24 42:6
44:18 57:1,14 66:21 67:9

**disability** 46:15

**disagree** 14:3 44:6

**disagreed** 39:17 40:8,13,16

**disagrees** 38:24

**disclosure** 28:10

**discuss** 37:1 40:12

**discusses** 27:17

**discussion** 35:25 36:1 60:1

**dispute** 23:15,18

**Doc** 19:19 47:7 57:2 74:25
76:11

**doctor** 5:11 8:6,12 12:15 13:5,
14 17:9,19 30:14 31:12 37:13
59:13 61:12,15 63:9,20 64:4,
10,14 66:14,24 76:21

**doctor's** 64:25

**doctors** 13:3 60:9 74:4

**document** 7:20 8:3 12:2 13:22
14:5,8 15:2,3 18:18 20:7,10
21:5 22:16 23:15 26:14,17
29:10 44:23 45:3 48:6,9,18
54:17 62:13,15,20,23 66:3
67:2 70:22 71:5 72:8

**document's** 7:22

**documentation** 49:16

**documents** 20:5 23:13,17

**dollars** 25:2 27:19 28:7,8,17,
23

**draft** 24:22

**Drain** 5:13 39:10

**Drain's** 8:8,14

**dramatically** 28:21

**duly** 6:4

**dysfunction** 46:15 76:7

**E**

**earlier** 42:15 64:4,6 71:1,5
74:16

**earn** 33:18

**earned** 33:20

**ECF** 39:9 43:1,9

**education** 33:10

**effective** 38:10 58:8,10,12

**efficacious** 52:3

**elective** 49:19

**employ** 47:17

**employed** 42:10 48:15

**employee** 12:12,15 13:15
59:7,15

**employees** 42:13

**encompass** 27:13

**end** 24:10

**ended** 34:5

**ensure** 56:8,14,22

**entered** 24:13 54:2

**entire** 21:18

**entities** 9:11

**entitled** 31:13 45:5 74:18

**entity** 9:20

**ER** 24:7

**essentially** 41:6,14

**establish** 46:14

**evaluate** 21:2

**evaluated** 46:16

**evaluating** 46:18

**evaluations** 54:18

**evidence** 23:16 49:14 51:3

**exam** 60:20,21 61:2

**examination** 6:10 53:19 54:9

57:22 58:20,22 73:3

**examinations** 53:23 54:1,22

**examined** 6:4 60:22

**exams** 53:21

**exception** 21:12

**excreting** 72:2

**Excuse** 18:4 50:22 69:17

**exhibit** 7:6,7,23 8:5,12 12:2
20:4,21 21:6 24:13,14 27:16
29:4 31:1 44:22 47:23 74:15

**exhibits** 20:17

**expected** 46:18

**expenditures** 25:2

**expense** 50:10,16,25 61:16

**experience** 64:13

**expert** 11:19

**explain** 23:19 37:2 42:5 55:7
58:1

**extensive** 47:3

**extent** 76:8

**extremely** 53:21,22

**F**

**facilities** 35:3 54:20 57:10,11

**facility** 10:21 34:16 35:1

**fact** 16:17 24:5 27:15 55:21
75:20

**factor** 37:24 38:11

**facts** 51:3

**fair** 19:23 30:21 44:9 53:7
76:13

**fall** 8:18

**false** 8:1,9 16:16,23 30:9

**familiar** 12:3 36:16 43:17
44:19 45:3 50:15 76:3

**familiarize** 20:16



Jeffrey Bomber, D.O.
09/04/2025

6

**family** 33:22 34:18,20 37:13
63:3

**fault** 39:8,12 60:8,11

**feasibility** 46:15

**feces** 72:2

**federal** 62:18

**feel** 39:3 62:4

**felt** 75:14

**figure** 8:18

**file** 20:16 39:2 40:1 56:18

**filed** 39:6 43:21 51:5

**final** 8:2,7 20:21 44:10

**finalize** 47:8

**find** 75:21

**Findlay** 34:2

**fine** 49:16

**finish** 28:11

**finished** 18:7 19:14

**fit** 53:12

**Florida** 33:15

**follow** 9:13 44:15 47:1 68:5,7,
24 75:4 76:1

**follow-up** 68:2,9 74:23 76:2

**follow-ups** 74:12

**form** 31:25 36:5,6,7,10 69:4
75:12

**forms** 11:2,3,5 16:25 36:6

**found** 52:1

**foundation** 7:21 49:25 61:10
63:17 64:17 65:11

**Franklin** 17:7 18:16,17

**free** 63:6,8

**friends** 63:2

**front** 24:12 75:5

**full** 28:10 54:5,6

**full-time** 34:10

**fully** 38:21

**functional** 49:20

**functioning** 46:19

**future** 21:2 76:9


**G**

**game** 21:20

**gave** 54:13 69:22

**general** 29:25 30:23 70:17
76:5

**generally** 17:8,9 58:7 76:1

**generated** 25:5

**gentlemen** 5:12

**give** 5:25 16:10 26:16 56:25
57:6 63:5 65:4,6

**good** 5:12,16 6:6,7 32:5,21,23

**governments** 29:7

**graduate** 33:8

**graduated** 33:14

**graph** 27:22

**graphically** 27:21

**gray** 26:21

**grew** 32:17,23

**grievance** 39:2 43:17,21,25
44:3,4,10 47:15,18,20,25
48:1,7 49:13

**grievances** 39:7

**Grievant** 50:9

**Grievant's** 49:14

**grow** 32:15 33:2

**guess** 74:24

**guidance** 57:1,6

**guide** 25:1

**guy** 67:17


**H**

**half** 25:14,15

**hand** 5:24

**happen** 27:7 41:9

**happened** 35:10

**head** 36:18 41:21

**health** 6:24 7:3,14,15,17 8:19
9:19,20 13:11,24 14:12 19:24
24:3 25:17 26:22 28:21 34:7
35:11,18 42:12 48:11 54:6
57:23 58:2,4,12 69:3 73:20,25
76:9

**Healthcare** 6:14,17 19:17
39:13

**heart** 37:16

**held** 34:19

**Helen** 34:7

**helped** 24:5,22 28:5 53:16

**helps** 52:7,25

**Hey** 57:2

**high** 33:4,5,8

**higher** 67:9

**history** 54:4

**hold** 32:18 34:17 39:5 43:8
75:11

**hole** 72:2

**homework** 35:14

**hospital** 24:8 29:14,20 33:23
34:8 35:14 52:23 55:22

**hundreds** 27:17,18 28:8,17,23


**I**

**Ian** 5:15

**idea** 59:25

**II** 48:19

**imaging** 36:8

**impact** 25:17

**impeach** 18:5,18 69:10,12,25

**impeaching** 18:9 69:20

**impeachment** 26:10

**implying** 27:6

**important** 53:21,22 60:19,21 72:19

**imposed** 44:16

**improper** 18:5,12 26:9 69:9,11

**improperly** 62:5

**improve** 45:24 65:15

**improved** 28:12,13,15,18,21 29:2

**improvement** 46:18

**inadmissible** 43:22 48:2

**inappropriate** 32:22 51:3 69:20

**incarcerated** 11:11 45:18 46:8,24 63:2,24

**include** 45:14 46:18

**included** 40:21

**includes** 13:16

**including** 13:16 76:9

**incoming** 53:24

**inconsistent** 19:1 26:10,17 70:6,10

**incorrect** 75:15

**independent** 53:8 64:7

**individual** 75:2

**individuals** 8:22 9:4,10 31:17 47:17 65:9

**industry** 20:23

**infections** 76:7

**information** 36:20,25 37:21,25 42:17 51:18,21 52:11,15,16, 18 53:4,8 54:13,14 55:14,17

56:2

**informed** 44:2

**Ingauge** 20:14

**initial** 73:7

**initiate** 58:24 59:1 60:9

**injured** 22:24

**inmate** 10:11 12:20 15:10 39:2 44:2 65:18

**inmates** 31:13

**inmates'** 37:8

**Institute** 33:15

**insurance** 22:19,25 62:9,17, 19 63:4

**intake** 54:7,8

**intent** 27:6

**Interqual** 13:17 51:24 52:20, 21,22 53:2,5 55:16 58:6 71:13

**interrupt** 19:14 24:19

**interrupted** 8:12 18:8 60:1

**interrupting** 69:19

**interstate** 62:18

**investigate** 65:17

**investigation** 48:20 65:18

**involved** 34:13 41:13,20 47:17

**involvement** 15:13

**issued** 41:10

**issues** 43:10

---

**J**

**Jackson** 5:14 6:9 10:25 11:9 15:15,21 21:24 27:23 28:14, 18,20 29:1,15 30:17 31:20 45:18 46:8,23 47:13 48:6,7,11 49:15 57:10,16,20 58:24 60:8, 11,17,22 62:9,20 63:6,22 64:9 66:25 67:19 69:3 71:21 73:23 76:8

**Jackson's** 30:19 50:1 51:4 65:1,15 72:6,15

**Jacksonville** 33:14

**Jeffrey** 5:6 6:3 9:6

**job** 11:4 42:10 44:18 71:22 75:6,8

**Johnson** 8:23

**joint** 8:2,7 58:23

**jointly** 76:11

**Jon** 5:13 6:8

**Joy** 34:8

**judge** 5:13 8:8,14 39:10 70:11

**judge's** 62:7

**jury** 5:13 37:2 42:5 54:1 55:7 57:8 71:18

---

**K**

**Karey** 9:1

**keeping** 29:13

**Keith** 5:18 9:14 66:20

**Kensu** 26:6

**key** 67:22

**kite** 56:18

**knowledge** 10:3 22:17,21 23:5,6,8,12 30:19 47:11 50:1 57:18 59:19,22 60:7 62:12,14 63:13,18

**Kohchise** 5:14 6:9 10:25 11:9 15:21 58:24 63:22 69:3

---

**L**

**Lack** 23:4 59:18 61:10 62:11 65:11

**ladies** 5:12

**lapse** 34:21

**large** 38:11

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jeffrey Bomber, D.O.
09/04/2025

8

**leading** 75:11,12

**leave** 63:19

**left** 35:8

**legitimate** 51:23

**level** 31:13 41:3 42:3 46:19

**limine** 47:20 51:5 62:4

**limit** 51:18

**list** 21:13,15,23,25 22:1,6,8,20 23:2,13

**literally** 18:10 52:6

**literature** 51:25 52:24 55:12 70:18

**local** 45:15

**location-to-location** 64:20

**locked** 63:2

**logo** 8:19

**long** 10:19 33:24 34:9,19 47:3 71:17

**longer** 10:15

**looked** 27:21 49:10 68:1 74:15

**lost** 16:24

**lot** 36:5 63:5

**loud** 37:13

**loves** 17:10

---

**M**

**M-HM** 31:11 67:6,21

**M.D.** 59:13

**made** 8:3 25:1,12 61:24 64:24 69:23 75:14

**Mahir** 59:13 64:5 67:18

**major** 49:17

**make** 10:24 24:2,4 25:16,19 26:23 37:15 46:17 47:3,7 52:25 53:16 56:20 57:15 76:1

**makes** 26:8,13,20 27:2

**making** 11:15 20:17 51:19,22 53:19 66:18 67:12,14 75:7

**management** 10:4,8,9 12:9,17 16:25 17:25 18:23 19:8 20:1, 24 21:7 22:2,6 23:11 24:6 25:3 26:24 27:24 29:6 36:7 40:24 61:2 63:7 71:12 73:18 74:6 75:1

**manager** 36:13,19 37:25 38:4, 19 39:16 43:13 51:21 54:14 55:3,8 56:23 57:9

**manager's** 37:3 40:9 41:6,9, 15 42:1 44:11

**managers** 37:22 53:1,7

**manages** 20:22

**Manistique** 35:14,15

**Manual** 21:7

**marked** 20:20

**markedly** 28:15 29:2

**marketing** 20:22

**Marko** 5:12,13 6:6,8,10 7:22 8:1,10 9:23 10:1 13:20 16:2,5 18:4,7,14,17,21 20:8,11,13,19 27:11 32:3,16,18,21 33:6 39:5,22 42:24 43:6,8,20 44:7, 12 47:19,24 48:14,25 49:5,12, 25 50:6,8,14,18,21 51:2 57:23 58:20 60:3 61:11,14 62:2 69:11,17,19 70:11,13,21 73:6 74:10 75:9,11 76:17

**Masin** 5:16,17,20,22 7:12,20, 24 9:22 15:23,25 16:21 18:2, 5,7,12,25 20:7,9,12 23:4 26:9, 14 27:3 28:19 29:9,16,18 30:10 31:25 32:5,6,7,23 33:1 39:14 44:25 58:17 59:18,21, 23 60:4 61:10 62:11,22 63:12, 14,17 64:17 65:11 67:1 68:12 69:9,15,18 70:6,10,16 71:10 72:24 73:4 74:12,14 76:15,19

**matter** 18:3 26:6 65:16

**Mclaughlin** 5:19,21 18:15 76:20

**Mcqueen** 37:6

**MDOC** 8:5 19:3 24:7 44:5,9 47:16 48:21 50:16,22,25 54:2 55:19 58:23 61:16 70:2,5,14 72:22

**MDOC's** 43:17,19 44:19

**meaning** 72:19

**means** 21:15 58:1

**measures** 29:2

**medical** 7:1,3,13 9:6,15 10:2, 20,22 11:12,13 12:5,8,12,15 14:16,17,23 16:15 17:22 19:9 23:1,10 25:20,23 31:14,19 35:2,5,7,8,12 38:9,10,23,25 39:17,18,25 40:2,3,4,5,6,14, 16,20,22,24,25 41:1,3,12,24 42:4,6,7,9,11 44:18 46:2,3,12 47:6,12 49:1,15,22 50:3,5,16 51:17,19,22,23,25 52:6,8 53:8,13,16,19,23 54:3,8,18 55:4,14,17 56:20,21 57:14,15 58:15 59:12 63:25 64:1,13 65:4,12 66:10,18,21 67:5,9,11 68:18,19,21 70:3,7,18,24 71:3,12 72:9,13,20 73:9 75:4, 21

**medically** 31:22,24 45:22 48:22 49:4,9 51:11,14 55:8 56:8,15,22 66:16 70:14 72:16, 23 73:2,13

**medications** 54:4

**medicine** 31:11 34:2,12,14,18, 20 37:6,14,20 55:20

**meet** 29:19,21

**meet all** 37:7

**meeting** 11:1

**Memorial** 35:13

**mental** 54:6

**mentioned** 9:17 30:17 52:4,20 64:4

**met** 10:24 38:10 39:3 56:20 57:12 60:22



**Michigan**  7:3,4,8,15 8:15
13:23 14:9 29:11 31:2,4,6
32:14 33:3,13 34:6 35:20
39:1,9 42:8,9,10,16,21,25
43:5 44:14,16 45:1,17 46:4,5,
7,22 48:20 49:2,8 50:4 58:9,
12 63:10 68:22 70:25 74:1

**Michigan's**  42:23 47:11

**middle**  18:8

**million**  25:13

**millions**  25:2 27:19 28:7,8,17,
23

**mischaracterizes**  43:8

**misstates**  31:25 62:22 63:14
67:1 68:12 73:4

**Moines**  33:16

**moment**  39:15

**money**  24:2 25:16,19,24 26:1,
7,8,12,18,20,21,22 27:1,7
37:15,19 51:11,15 61:9,13

**monitor**  46:13

**monitored**  58:13

**monitoring**  75:6 76:6

**Monopoly**  21:16,20

**month**  24:7,16 64:8,16

**month-to-month**  64:19

**months**  64:20 65:22

**morning**  5:12,16 6:6,7 32:5

**morphed**  69:5

**motion**  39:6 43:22 47:20 51:5

**motions**  62:4

**move**  9:24 13:20 27:11 39:5
43:20 49:12 70:21

**moved**  34:6,11

**MRI**  36:24 38:7 57:4

**MRIS**  36:8

**Ms/ph.d.**  33:15

**Muskegon**  35:4

### N

**N3**  44:22 74:15

**narrative**  28:7

**National**  7:15

**Naubinway**  32:14 35:13

**necessarily**  56:25 66:17

**necessity**  14:17,24 25:23
31:19 38:9,11 42:4 51:17,19,
22 53:13,19 66:10,18 68:18,
20,22 70:3,7,18,24 71:4,12
72:9,13,20 73:9 75:21

**needed**  31:17 55:11 62:21
76:8

**Newberry**  34:8,16 35:1

**nice**  25:1,13

**NMI**  36:17

**non-essential**  48:23 49:21

**non-surgical**  46:20

**nonresponsive**  13:21

**North**  33:13

**Northern**  10:21 34:6 35:2,5

**nose**  71:22

**noted**  18:14

**nother**  16:6

**Nothing's**  7:24

**number**  24:7,9 36:5 38:22
41:10

**numbers**  36:6 37:10 75:1

**nurse**  13:10,23

**nursing**  35:14 54:24

### O

**oath**  6:5 18:19

**object**  7:12 9:22 15:23 18:15

26:14 31:25 39:5 43:6,9
47:24,25

**objecting**  51:1,8

**objection**  7:20 8:9 9:22,23
16:21 18:2,14,25 20:7,8,10
23:4 26:9 27:3 28:19 29:9,16,
18 30:10 32:16,18 33:6,7
39:11,22 42:24 43:20 44:7,12
47:19 48:14,25 49:5,12,25
50:8,14,21 51:2 59:18 61:10
62:11,22 63:12,14 64:17
65:11 67:1 68:12 69:9 70:10,
16 71:10 72:24 73:4 75:9,11

**objections**  8:2 18:20 20:17
73:6

**observation**  68:8

**obtain**  54:4

**off-site**  36:7

**offer**  30:20

**Office**  48:12

**officer**  7:14 40:5,6,22,23 41:4
42:7,9,11 46:2,3 47:12 49:1
50:5

**offsite**  20:23 30:6

**Ohio**  34:2

**on-site**  29:19,22 30:3 36:20
39:17,18 40:8,16,17 41:14,20
56:8,15 68:5 74:4 75:8 76:1

**one-size-fits-all**  53:12

**operating**  7:4

**operation**  19:11,13

**operations**  19:16,17 37:5

**opponent**  69:21

**opposite**  18:11

**option**  15:1,2 36:19 40:14
43:4,13 47:16

**options**  15:1 36:13,14 40:10

**order**  8:2,7

**organizational**  7:10 9:10
67:10

**original** 72:22

**orthopedic** 57:4

**out-of-state** 29:10

**outpatient** 9:14 12:9,16 14:16
25:3 27:23 30:1,24 66:21

**oversee** 42:11

**overseeing** 23:11

**overturn** 41:5 42:22

**overturned** 41:8

**owned** 34:3

---

**P**

**P.C.** 7:4,5 9:17

**paid** 30:24 52:12 76:10

**Papendick** 5:18 9:14 13:15
14:19,20,21 15:1,5,14 16:9
17:19 23:23 59:11 60:12,15,
22 61:24 63:8 64:24 65:15,22
66:4,5,20,24 67:23 68:2,9
69:4 72:15 74:22 75:5,14,21,
25

**paragraph** 28:11

**part** 11:3 13:5 19:4,19,25
20:22 23:16 27:15 29:5 41:1,
25 44:14,18 45:17 46:21,22
47:6 53:22 58:15 73:11 74:24

**part-time** 34:10

**participate** 37:12

**partners** 34:4

**parts** 45:11

**party** 39:12 69:21

**pass** 65:4

**pass-through** 7:6 9:19 21:13,
15,25 22:6,8,12,20 23:2,13
73:17

**past** 6:13 16:19

**path** 16:6,7,9

**patient** 11:8 12:3,20 13:4

15:10 17:18 26:2 30:15 31:14
55:1 56:17 57:3 65:25 68:6,7
76:2

**patient's** 53:18 54:3,10,16

**patients** 24:8 26:19 75:7

**pay** 22:14,18,19 23:20,21
25:20,25 30:5,9 53:1

**paying** 6:21

**Pellston** 33:3,5

**pending** 51:4 62:3

**Peninsula** 32:14 34:6

**people** 10:10 24:23 29:1,14,
15,17 58:11 64:20,21

**percent** 27:25 28:24

**percentages** 63:5

**perform** 12:24 54:18

**performance** 21:2

**performed** 11:22

**period** 46:14

**permission** 63:24 67:22

**person** 16:14 38:17 59:24
60:5

**personal** 23:4,6,8 47:10
59:18,22 62:11,14 63:13,18

**perspective** 70:17

**pertinent** 52:1

**PHS** 34:24

**physical** 53:21 54:6 60:20
61:2

**physician** 34:7,25 35:17 36:20
40:24

**physicians** 31:23 52:19 54:8
55:22

**plaintiff** 5:14

**Plaintiff's** 7:7,23 20:14,20
31:1

**plan** 16:13 19:6 36:16 38:2,6,
14,23 39:17 52:8 61:22 65:7

68:1,7 75:23 76:13

**plans** 52:25

**play** 21:20 38:8

**played** 21:16

**playing** 70:1

**point** 7:25 28:23 38:17 40:11
75:3

**policies** 44:15,19 46:23 47:2,
5,8 68:24 70:19 71:1 72:10
73:15

**policy** 45:1,13,17 46:7 47:4
49:10,21 50:2,4,23 51:11,14,
18 64:6 68:20 74:16,17

**policy/procedures** 50:10

**portion** 39:8

**position** 34:23

**postsecondary** 33:10

**potential** 49:18 56:3

**practice** 31:16 33:22 34:3,5
35:11 37:6 39:23 55:21

**practiced** 34:2 55:20

**pre-marked** 44:21 47:22

**preexisting** 55:4

**preparing** 52:10

**presentation** 20:5 53:18,22

**pretrial** 8:2,7 20:21

**pretty** 41:23 64:13

**previous** 17:23

**previously** 6:11 7:1 8:6 11:18
16:18 18:22 26:5

**prison** 12:21,23 26:19 55:5
62:21

**prisoner** 43:4,11 45:22 46:11
47:15 50:15,24 63:1,19 65:2

**prisoner's** 44:4,11 46:13,19

**prisoners** 50:17 53:24 54:2,18
63:24



**prisons** 54:19

**private** 31:16 42:12,13 62:19 63:3

**probabilities** 46:20

**procedure** 19:4 23:1,20 45:10, 12 49:19 56:3,24 70:23 71:8, 9,20 72:3,5 73:7

**procedures** 44:16 45:15 47:9 50:22,25 61:25 70:19 71:6,7 72:11 73:15

**proceeding** 8:11

**process** 10:3,4,5 11:25 12:4 17:15,17,20,25 18:23 19:4,9 20:1 21:12,23 23:12,22 25:4, 18 27:22,24 28:16 29:5,6 38:25 39:7,15 43:17,21 44:1, 4,10 47:3,15,18,20 48:1 56:24 58:21,23,25 59:5,6,8,17 60:10 73:7,11 74:7

**processes** 39:8

**produced** 23:17

**profit** 24:4 25:16,19

**program** 17:8,11 53:15

**project** 21:2

**proper** 69:18

**protocol** 8:14

**provide** 37:21 56:2 58:12

**provided** 6:17 7:9 11:8 13:22 23:16 24:7,22 38:1 42:16 52:12,15 55:5 74:4,6

**provider** 10:20 37:1,15 38:24 39:17,18,25 40:1,8,12,14,16, 17 41:14,21 46:12 54:12,13, 25 57:12 59:1,2,3,12 65:25 66:1,3,5,18 67:5,11 68:5 73:25 75:4

**provider's** 75:8

**providers** 51:18,25 52:12 53:16 54:8,10 56:8,15,21 58:5 73:19,21

**providing** 6:25 29:7 76:5

**purpose** 17:15 45:24

**purposes** 45:13

**pursuant** 8:8,13 42:17,25 47:20 73:25

**put** 24:25 55:1

---

## Q

**Q3** 47:23

**quality** 9:18 28:11,13,15,18,21 29:2 35:15

**question** 7:13 13:18,25 14:13 16:21,22,24 17:9,10 18:8,9 19:7 21:19 24:3 25:24 26:3,5, 11,15,16 27:10,12 28:19 51:4, 6 56:12,13 62:3,6 65:3 69:8 70:2,5,20,22 71:14,16,25 72:22 73:21

**questions** 14:7 32:4 57:22 58:7,8,18 74:11 75:20 76:15

**quick** 64:13 74:12

**quote** 14:23

---

## R

**Rachel** 5:22 32:10

**raise** 5:23

**raised** 43:10

**ramifications** 65:2

**read** 17:24 45:9,16,20 46:10, 21 62:15

**reading** 28:11

**real** 65:1,8,13

**reason** 23:15,18 49:22 50:3 63:22

**recall** 11:1,14,15 17:14 23:24 41:23 48:5,8 50:23 56:5 57:17,21,24

**receiving** 36:14

**recognize** 44:23

**recommendations** 47:7 55:10,12 61:24

**reconstructive** 45:6,11,14,21 46:12,16 74:18

**record** 5:4,10 44:25 54:16 76:24

**records** 11:12,13 54:5 55:4

**RECROSS-EXAMINATION** 74:14

**recurrent** 76:6

**REDIRECT** 58:20

**reduction** 28:24

**reevaluate** 68:10

**refer** 31:17 40:13

**reference** 43:21 47:19 51:23

**referencing** 39:7

**referral** 12:9,17 46:17 57:5

**referrals** 24:8

**referred** 10:11 31:21

**referring** 46:11 72:6 74:17

**refers** 46:1

**reform** 45:12

**refusal** 65:23

**regional** 10:21 35:2,5 40:2,3, 9,10,17,25 41:12 57:1,9,14

**regular** 65:19 76:2

**related** 6:14 9:18 48:1 57:19 76:9

**relates** 11:16 30:20 39:11 42:24

**relating** 38:1 48:6 57:15

**released** 64:8

**relevance** 20:9,11 29:11 32:19 64:18 71:10

**relevant** 13:10,23 14:10

**remember** 17:6 23:14 25:5 30:22 37:24 38:16 58:22 67:4

68:25 69:6

**Remote** 5:1

**repeat** 56:12

**repeatedly** 37:5

**report** 9:9 19:19 24:6,12,15, 21,23,25 25:8,12 27:15,20 28:4,5 37:10 42:17 74:25

**reporter** 5:11,23 16:4 60:2

**reports** 25:10 42:19

**represent** 6:9

**representation** 6:21

**representative** 69:13

**request** 12:16,19 14:21,23 15:15 17:1,18 36:15,25 38:19, 21 42:1 44:5 47:12 56:22 57:19 59:11 60:16 61:6 62:10 64:1,25 66:5 67:14 68:10 72:6,15 75:22

**requested** 11:5 31:17 36:24 56:8,15 66:14

**requesting** 36:7 48:22 67:20 71:21

**requests** 26:25 37:23 67:13 74:7

**require** 44:15

**required** 8:2 24:15,21 25:9 31:20 36:23 37:10 54:3 56:17 68:16,17 75:2 76:3

**requirement** 58:6

**reside** 32:13,14

**residency** 33:21,22,24 34:1

**resident** 34:21

**resources** 58:4 63:18 71:13

**respect** 26:15

**respondent's** 48:10

**responses** 48:8

**responsibility** 74:23 75:3

**responsible** 22:14 23:10

42:12

**rest** 28:11

**result** 44:4,9 75:22

**results** 29:1

**reversal** 11:6,22 12:25 15:15, 22 22:23 23:22 30:3 31:18,20 47:13 49:17,20 57:19 61:7 64:11 65:16,24 72:16

**reversal's** 29:22

**reversals** 49:21 50:2 51:14

**reverse** 48:21 49:3,8

**reversed** 72:1

**review** 10:4 11:25 17:20,25 18:23 19:3,8 21:7,12 22:2,7, 11,12 23:2,11,22 25:18 49:14 54:3,17 57:9 63:7 74:6

**reviewed** 11:2,3,4,12,13 60:16

**reviewer** 13:10,23 60:12

**reviewing** 11:14 38:4 48:5

**reviews** 14:16,22 26:24

**risks** 46:19

**RN** 48:10 54:24

**role** 37:2 41:12 43:19,25 47:5 51:1,8,9 52:10 53:18 60:25

**routine** 53:23

**ruling** 39:10 62:3

**rulings** 62:7

**runs** 24:8

**rural** 34:7 35:11,18

---

**S**

**Saginaw** 35:4

**save** 24:2 25:16,19 27:6 51:11,15

**saved** 25:3 27:17,25 28:9,17, 23

**saves** 25:24

**savings** 25:1 27:18,25 28:7 29:7,13

**schedule** 55:2

**scheduled** 64:10,15

**school** 33:4,8

**Schoolcraft** 35:13

**screen** 44:22

**screenshots** 20:14

**scroll** 22:7 45:5

**section** 45:5 48:17 49:13 54:17

**seek** 39:19 50:9,15,24 64:7 74:7

**seeking** 36:19

**send** 67:19

**sends** 12:8,16

**September** 5:2,7

**served** 35:15

**service** 8:5 15:10 22:2 30:14, 15 52:20

**services** 25:25 26:1,25 28:22 30:1,24 36:7 45:6 47:6 50:9, 16,24 74:19

**shared** 61:16

**show** 17:4,23 20:4 21:5 22:5 26:17 29:4 44:21 47:22 68:25 71:2 72:11 74:15

**showed** 61:21 71:5

**showing** 8:6 20:20 22:17 25:2, 13 27:16 28:6 47:25 71:1

**shown** 26:15 27:21 36:13 64:6,23 68:20

**sick** 29:19

**side** 17:22 19:11,13 39:2 42:12,14 43:16 52:23 73:18

**sights** 37:15

**sign** 76:21


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

simple 70:22

simultaneous 60:1

sir 7:11 8:16 9:7,15,20 12:4
13:18,24 14:1,12 18:13,22
19:2,7,13,14 20:6,16,20 21:8
23:7 25:6 26:17 27:8,19 29:12
30:16 31:12 32:3,13 33:2
47:10 48:3,5 68:21 70:20 71:2
74:10

site 12:7,8,12 15:9,18 34:25
39:25 54:23 59:12 67:5,10

situation 41:14,20

small 48:3

sole 45:24 73:24,25

solemnly 5:24

sort 53:11,12

source 55:14,16

spartan 37:16

speak 28:20 29:24

speaking 73:6

specialist 10:12 11:5 12:20
14:22 17:1 31:18,21

specialists 12:23,24

specific 37:4

specifically 19:15 30:17 60:18

specifics 29:24 30:11,23 32:2

speculation 15:25 27:3 30:10

spends 26:7,12,18,22

spent 35:22

spoke 41:22

spoken 32:8,10

staff 13:3

standard 20:23

standpoint 31:13

start 40:2 59:6,17 71:14

started 10:20 33:13 34:15

starts 73:18

state 5:10 7:8 8:15 9:6 10:22
12:5 13:23 14:9 23:10 31:3,6
35:7,8 36:5,10 38:25 40:4,5,
20,22 41:1,24 42:6,7,9,10,16,
21,22,25 44:14,16,18 46:3,5
47:11 57:14 58:9,12

stated 20:9

statement 8:8 19:1 26:10,13
49:7

states 48:20 50:9

stating 72:8

stats 24:6

step 12:7 38:24 48:19

steps 38:20,22 56:7,11,14

stipulated 8:13 20:18

stipulation 8:3,7 20:15

stipulations 42:14

stop 20:16

stopped 70:9

straight 21:16,21

strike 13:20 27:11 36:1 39:6
43:20 49:12 70:21

structure 45:11,12

submission 36:22

submitted 8:1,8

submitting 40:1

Subrina 48:10,15

subscriptions 52:13

suggested 38:23

Summary 48:19

superior 66:15,17

supervising 66:17

supplies 76:5,10

supply 42:20

supports 49:14

surgeries 12:25 74:7

surgery 11:23 12:25 13:4
38:17 45:6,10,12,14,21 46:12,
16 47:13 48:22 49:17 57:20
60:17 61:5,6,7 62:10,21 63:7
64:11,15 65:1,10,24 66:6,9,25
67:15,19 68:4,10 74:18 75:22

surgical 45:10,12

surprise 60:21,24 61:1

swear 5:11,24

sworn 6:4

system 15:6 26:19 29:25
55:23

---

## T

Tableau 27:20

takes 17:20,25 18:24 19:18

talk 10:14 11:25 17:15 39:4,15

talked 43:3 58:21 60:19 61:5
71:5 73:20

talking 28:7 39:23 59:3

talks 27:22,24

Technology 33:16

tells 71:3 73:13

ten 34:11

tenure 61:12

term 17:8 36:17 57:23

termed 16:14

terms 24:8 58:15 67:12 74:25
76:5

test 36:22,25 37:9 38:10 56:6

testified 6:4 11:18 16:19 18:22
23:5 26:5 31:23 42:15 74:22

testify 59:23 60:4

testimony 5:25 17:6,23 18:3
28:16 30:20 32:1,21,24 43:9
52:5 63:15 68:13 69:22,24
73:5

**tests** 19:22

**Texas** 5:17

**thing** 52:23

**things** 19:5 36:9

**thinking** 60:5

**third-party** 62:9,17

**thirty-some** 34:22

**thought** 53:9 72:9

**thousands** 11:13

**thumbs-down** 16:11

**thumbs-up** 15:5 16:10

**Thursday** 5:2

**time** 5:7,9 6:16 11:4,11 14:20
  28:12,15 29:3 35:22 36:20,21
  38:7 45:18 46:8,14,23 49:1
  50:5 51:10,13 55:9,13 56:7,
  14,19 57:8,13,14 58:17 62:10
  66:9,16 68:6 69:13,21,22,23
  73:22 76:16

**times** 6:13 38:16 52:4

**title** 48:11 66:20,23

**today** 6:20

**Today's** 5:7

**told** 25:22 37:5 66:8,14

**Toledo** 33:23

**top** 31:4 36:18

**track** 20:1

**train** 53:11 56:21

**training** 56:24

**transcribed** 70:1

**transcript** 18:10

**transferred** 54:19,23

**translating** 10:8

**treating** 26:19 31:23 64:10

**treatment** 16:13 17:8,11 19:6
  26:7 27:7 36:16 38:2,6,14,23
  39:16 52:8,25 56:4 61:22 65:6

68:1,7 75:23 76:13

**treatments** 26:12 46:20

**tree** 16:11

**trended** 21:2

**true** 9:15,20 10:5,25 11:6,7,16,
  20,21 13:5,6,15 14:24 16:15,
  20,23 17:13,21 19:18,23
  21:13 22:3,15,20 23:3 24:23,
  24 25:25 28:9 30:6,9 59:3,4,8
  61:9 64:5 65:2,5 66:16 68:23

**truth** 5:25 6:1

**turn** 48:17

**turnaround** 64:14

**type** 53:12 73:24

---

**U**

**U.P.** 35:3

**ultimately** 44:5

**ultrasound** 36:24 57:4

**underserved** 37:17

**understand** 7:5 14:13 15:12
  18:19 45:16 46:6,21 50:2
  61:5,7,9,17,23,25 62:8 63:6,
  19 64:23 65:3,8 66:4 71:23
  72:14,17,20 73:21

**understanding** 10:9 24:19,23
  49:2 58:9

**underwent** 64:11

**University** 33:14,17

**unnecessary** 49:19

**untrue** 8:9

**unusual** 24:4 63:1

**up-to-date** 52:6,7 58:3

**updated** 15:6

**Upper** 32:14 34:6

**Uptodate** 13:17 51:24 52:4,5,
  6,11,15,19 55:11,13,19,25
  56:2 58:5 71:12 72:12

**urgent** 54:25

**utilization** 10:3,4,7,9 11:25
  12:9,17 16:25 17:24 18:23
  19:8 20:1,24 21:6,12 22:1,6
  23:11 24:6 25:3 26:24 27:24
  29:6 30:1,24 36:6,13,19 37:3,
  22,25 38:4,19 39:16 40:8,23
  41:6,8,15,25 43:13 44:11
  51:21 53:1,7 54:14 55:3,8
  56:23 61:2 63:7 71:12 73:17
  74:6 75:1

---

**V**

**VA** 62:17

**varies** 64:19

**versus** 19:5 69:3

**video** 70:1,9

**video-recorded** 5:5

**videoconference** 5:6

**virtually** 51:23 52:8

**visits** 65:20 76:2,10

**Vitalcore** 35:19

---

**W**

**wait** 64:20,21

**wanted** 50:24 54:10 58:10
  74:15

**ways** 25:19 73:2,16

**week** 35:18

**weeks** 64:21

**Weil** 5:22 32:10

**well-qualified** 28:25

**wellness** 65:20

**Witty** 9:1

**word** 17:11,12 68:19 72:5
  74:19

**words** 11:19 16:18,19 17:2
  19:12 59:2,5 60:20 71:19



**work** 6:14 8:22 10:5,10,16,19
22:24 52:19 55:22

**worked** 23:25 35:13 57:11,12
64:5

**workers'** 22:8,14,18,24,25

**working** 34:15 35:17,18 51:10,
13 55:24

**workmen's** 62:17

**world** 23:19 63:9 65:1,9,13

**writing** 47:5

**written** 14:5,8 23:16

**wrote** 27:16 66:5 67:17 72:15
76:1

---

### Y

**year** 33:18 34:21 65:22

**years** 33:25 34:2,11,22

**yes-or-no** 13:25

---

### Z

**Zoom** 5:6